# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

                 Plaintiff,

       v.

CHI MEI OPTOELECTRONICS
CORPORATION, et al.

                 Defendants.

Civil Action No.  06-726 (JJF)

---

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO CHI MEI OPTOELECTRONICS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FOR INSUFFICIENCY OF SERVICE OF PROCESS

THE BAYARD FIRM

Richard D. Kirk
Ashley B. Stitzer
222 Delaware Avenue, 9th Floor
P.O. Box 25130
Wilmington, DE 19899-5130
(302) 655-5000
rkirk@bayardfirm.com

Attorneys for Plaintiff LG.Philips LCD Co., Ltd.

OF COUNSEL:
Gaspare J. Bono
Song K. Jung
R. Tyler Goodwyn, IV
Lora A. Brzezynski
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C.  20006
(202) 496-7500

May 22, 2007

# TABLE OF CONTENTS

**Page**

I.   STATEMENT OF FACTS ..................................................................... 3

   A.   Background .............................................................................. 3

   B.   CMO's Direct Contacts With Delaware And The United States.............. 4

   C.   CMO's Sales In Delaware Through The Use Of An Established
      Distribution Channel................................................................. 9

   D.   CMO's Substantial Sales And Revenues Derived From Products
      Sold In The United States And Delaware ................................... 12

   E.   Earlier Decisions Regarding Exercise of Personal Jurisdiction over
      CMO in Delaware ................................................................... 14

   F.   Facts Regarding Service of Process......................................... 20

II.  THIS COURT MAY PROPERLY EXERCISE PERSONAL
    JURISDICTION OVER CMO ...................................................... 21

   A.   The Delaware Long-Arm Statute Does Reach CMO .............................. 22

      1.   CMO Regularly Does Business In Delaware Or Engages In
         A Persistent Course Of Conduct In The State .............................. 22

      2.   CMO Derives Substantial Revenues From Goods Sold In
         Delaware ..................................................................... 24

   B.   The Exercise of Personal Jurisdiction Over CMO Is In Accordance
      With Due Process Requirements ............................................. 27

III. LPL'S ALTERNATIVE REQUEST FOR JURISDICTIONAL
    DISCOVERY........................................................................... 35

IV.  LPL'S SERVICE OF PROCESS ON CMO WAS EFFECTIVE UNDER
    BOTH UNITED STATES LAW AND THE LAW OF TAIWAN ..................... 37

   A.   Service on CMO Was Proper Because CMO Is Subject to Personal
      Jurisdiction in Delaware ......................................................... 37

   B.   In the Alternative, This Court Should Exercise Its Discretion To
      Find Service Proper Under Rule 4(f)(3) ................................... 38

660839-1

## TABLE OF AUTHORITIES

### CASES

Aircraft Guar. Corp. v. Strato-Lift, Inc.,
  974 F. Supp. 468 (E.D. Pa. 1997) .............................................................................. 21

Andover, Inc. v. American Bar Ass'n,
  107 F.3d 1026 (3d Cir. 1997) ................................................................................... 36

Asahi Metal Indus. Co. v. Superior Court,
  480 U.S. 102 (1987).................................................................................... 28, 29, 34

Beverly Hills Fan Co. v. Royal Sovereign Corp.,
  21 F.3d 1558 (Fed. Cir. 1994) .......................................................................... passim

Burger King Corp. v. Rudzewicz,
  471 U.S. 462 (1985)................................................................................................ 27, 28

Commissariat À L'Energie Atomique v. Chi Mei Optoelectronics Corp. et al.,
  293 F. Supp.2d 427 (D. Del. 2003), vacated and remanded ........................................ 15

Commissariat À L'Energie Atomique v. Chi Mei Optoelectronics Corp.,
  395 F.3d 1315 (Fed. Cir. 2005) .......................................................................... passim

Compagnie Des Bauxites De Guinee v. L'Union Atlantique S.A. d' Assurances,
  723 F.2d 357 (3d Cir. 1983) ..................................................................................... 36

Forum Fin. Group, LLC v. President and Fellows of Harvard College,
  199 F.R.D. 22 (D. Maine 2001).................................................................................. 39

Hanson v. Denckla,
  357 U.S. 235 (1958)................................................................................................... 27

Hill v. Equitable Trust Co.,
  562 F. Supp. 1324 (D. Del. 1983)............................................................................... 25

In Re: Elonex Phase II Power Management Litigation,
  C.A. Nos. 01-082 GMS through 01-104 GMS, 2003 WL 21026758
  (D. Del. May 6, 2003)................................................................................. 3, 24, 25, 31

In re Int'l Telemedia Assoc.,
  245 B.R. 713 (Bankr. N.D. Ga. 2000) ........................................................................ 39

Intel Corp. v. Broadcom Corporation,
  167 F. Supp. 2d 692 (D. Del. 2001)....................................................................... 21, 22

Int'l Shoe Co. v. Washington,
   326 U.S. 310 (1945)......................................................................................... 27

Jeffreys v. Exten,
   784 F. Supp. 146 (D. Del. 1992)................................................................... 22

Levin v. Ruby Trading Corp.,
   248 F. Supp. 537 (S.D.N.Y. 1965) ............................................................... 39

Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n,
   107 F.3d 1026 (3d Cir. 1997) ....................................................................... 36

Milliken v. Meyer,
   311 U.S. 457 (1940)...................................................................................... 27

Mobil Oil Corp. v. Advanced Environ. Recycling Tech., Inc.,
   833 F. Supp. 437 (D. Del. 1993)................................................................... 22

Motorola Inc. v. PC-Tel, Inc.,
   58 F. Supp. 2d 349 (D. Del. 1999)....................................................... 3, 26, 32

Nehemiah v. The Athletics Congress,
   765 F.2d 42 (3d Cir. 1985) ........................................................................... 36

Philips Electronics North America Corp. v. Contec Corp.,
   Civ. A. No. 02-123-KAJ, 2004 WL 503602 (D. Del. March 11, 2004)................ 15, 24

Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.,
   148 F.3d 1355 (Fed. Cir. 1998) ......................................................... 21, 32, 33

Rio Props., Inc. v. Rio Int'l Interlink,
   284 F.3d 1007 (9th Cir. 2002) ...................................................................... 38

United States v. One Urban Lot,
   885 F.2d 994 (1st. Cir. 1989)........................................................................ 39

Viam Corp. v. Iowa Export-Import Trading Co.,
   84 F.3d 424 (Fed. Cir. 1996) ........................................................................ 31

Worldtronics Int'l., Inc. v. Ever Splendor Enterprise Co.,
   969 F. Supp. 1136 (N.D. Ill. 1997) ............................................................... 31

World-Wide Volkswagen v. Woodson,
   444 U.S. 286 (1980)................................................................................. 30, 31

Wright v. American Home Products,
   768 A.2d 518 (Del. Super. 2000) .................................................................. 21

## STATUTES AND OTHER AUTHORITIES

Del. Code Ann., tit. 10, § 3104 .................................................................................. passim

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff LG.Philips LCD Co., Ltd. ("LPL") obtained valid patents for its LCD technology from the United States Patent and Trademark Office ("USPTO"), including United States Patent Nos. 5,019,002, 5,825,449, and 4,624,737 (the "Patents-in-Suit"). (True and correct copies of the Patents-in-Suit were attached as Exhibits A, B, and C to the Complaint for Patent Infringement.) On December 1, 2006, LPL brought this action against Defendant Chi Mei Optoelectronics Corporation ("CMO") and others for the unlawful infringement of LPL's valid patents on this LCD technology. In response to the Complaint, CMO filed the instant motion.

## SUMMARY OF THE ARGUMENT

1.     CMO is a huge, international corporation with over 15,000 employees and over $6 billion in annual revenues worldwide. CMO is the fourth largest manufacturer of liquid crystal display ("LCD") modules in the world.[1] The North American market accounts for over 31% of LCD monitor purchases worldwide and over 26% of LCD televisions worldwide.

2.     The overwhelming evidence of personal jurisdiction over CMO conclusively establishes that the Delaware long arm statute reaches CMO and the exercise of jurisdiction comports with due process. CMO regularly does business in Delaware and engages in a persistent course of conduct in the State, CMO is part of an established distribution channel designed to serve and benefit from the U.S. markets, including the Delaware market, and CMO derives substantial revenues from goods sold in Delaware.

---

[1] An LCD module, as that term is used in the field, is the main component part of a display device and may be incorporated into a housing for use as a computer monitor or as a television.

660839-1

3.    CMO sells numerous products in the District of Delaware each year, as evidenced by actual purchases of CMO's products in Delaware and sales summaries by Office Depot and CDW.  Significantly, CMO also has owned Delaware companies for many years, through which CMO markets and sells products in the U.S., including IDTech USA, Chi Mei Optoelectronics Corporation USA, and iZ3D.  CMO has also previously consented to jurisdiction in Delaware, thus conceding that it regularly does business in Delaware and engages in a persistent course of conduct in the state such that the Delaware long arm statute reaches CMO.

4.    CMO markets and sells its LCD modules in an established distribution network designed to exploit the U.S. market.  This distribution network is comprised of the largest original equipment manufacturers ("OEMs") of computer monitors such as Samsung, Dell, IBM, Hewlett Packard, NEC-Mitsubishi, and ViewSonic, and the largest chain retail outlets in the United States, including Best Buy, CompUSA, Circuit City, Office Depot, and the like.  Moreover, CMO markets and sells its LCD modules in the U.S., including in Delaware, through its wholly owned Delaware subsidiary, CMO USA.  Having acknowledged in public pleadings that its products are incorporated into brand name products sold by Dell, ViewSonic, and HP in the U.S., CMO indisputably derives substantial revenues from its LCD modules being sold throughout the United States, including in Delaware.  Under these circumstances, traditional notions of equity and fair play require that CMO be held to account for its patent infringement in this United States Court.  CMO's motion to dismiss for lack of personal jurisdiction is meritless.

5.    The Federal Circuit firmly recognized the "established distribution channel" theory of jurisdiction in Beverly Hills Fan Co. v. Royal Sovereign Corp., 21

F.3d 1558 (Fed. Cir. 1994). The Beverly Hills Fan case has been repeatedly followed in

this Circuit in Commissariat à l'Energie Atomique v. Chi Mei Optoelectronics Corp., 395

F.3d 1315, 1317 (Fed. Cir. 2005), Motorola Inc. v. PC-Tel, Inc., 58 F. Supp. 2d 349 (D.

Del. 1999), and In Re: Elonex Phase II Power Management Litigation, C.A. Nos. 01-082

GMS through 01-104 GMS, 2003 WL 21026758 (D. Del. May 6, 2003) (Exhibit A).

CMO ignores that the Federal Circuit already found that CMO derived substantial

revenues in Delaware from the sales of products in Delaware incorporating CMO LCDs.

Commissariat, 395 F.3d at 1320. CMO also fails to cite or discuss the Motorola and

Elonex cases, despite the fact that they are governing precedent directly on point. Based

on these and the other authorities set forth in this answering brief and the extensive

supporting exhibits attached to the Declaration of Lora A. Brzezynski, Esq., this Court

should deny CMO's motion to dismiss and hold that it has personal jurisdiction over

CMO to adjudicate LPL's patent infringement claims against CMO.

      6.     Finally, CMO argues that it was not properly served. Because exercise of

personal jurisdiction over CMO is proper, service on the Secretary of State was valid.

Moreover, CMO responded timely to the Complaint.

**I.**      **STATEMENT OF FACTS**

      **A.**     **Background**

      CMO's Brief and the supporting declaration from Mr. Li-Yi-Chen ("Chen Decl.)

fail to address the true extent of CMO's role in the worldwide supply of LCD products.

CMO is an extremely large international corporation that manufactures a variety of LCD

products, including LCD modules that utilize LPL's technology and infringe LPL's

patents. According to its own website, CMO "is one of the leading TFT-LCD

manufacturers in the world" and "[i]n the last few years, CMO has even established itself

as the world's leading supplier of large-size LCD TV panel." (Exhibit 1 to Declaration of Lora A. Brzezynski, Esq. ("Brzezynski Decl.") at 0001.)[2] CMO states that it has "already become a leading player in the global TFT-LCD industry" and that CMO plays a "**key role . . . in the global optoelectronics supply chain**". (Id. at 0002 (emphasis added).) At present, CMO has "15,878 employees." (Id. at 0021 (emphasis added).)

CMO's website provides its total monthly sales and shipments of products for 2006. (Id. at 0011.) Its total sales for 2006 were NT $190,480,325,000 based on shipments of 33,249,000 modules. (Id.) In November 2006 alone (the month prior to the filing of this action), CMO shipped 3,458,000 modules and had sales of NT $20,108,071,000. (Id.)

### B.    CMO's Direct Contacts With Delaware And The United States

CMO sells numerous products in the District of Delaware each year. As just a few examples, LPL is aware of at least six CMO products that were purchased in Delaware by individuals at store locations in Delaware or via the Internet before LPL filed suit against CMO that were incorporated into products sold by ViewSonic, Tatung, and Iiyama. (Declaration of Lewis W. Hyden, II ("Hyden Decl."), Declaration of Michael Tierney, Esq. ("Tierney Decl."). In addition, two retailers, Office Depot Corporation ("Office Depot") and CDW Corporation ("CDW") have made numerous sales of CMO LCD products in Delaware.[3] (Exs. 2 and 3.) Indeed, CDW has evidence of at least 30 CMO products sold by CDW in Delaware from July 2002 through March

---

[2] All remaining numbered exhibits referenced herein are attached to the Brzezynski Decl.

[3] These documents were produced in response to discovery served in Commissariat À L'Energie Atomique v. Chi Mei Optoelectronics Corp. et al., Case No., 03-484-KAJ (D. Del.) (filed May 19, 2003). Because the referenced documents were not marked as confidential subject to the Protective Order in that case at the time of their production, no confidential information is disclosed herein.

2005. (Ex. 3.) Office Depot similarly sold 882 CMO products in Delaware from 2003 through 2005.[4] (Ex. 2.)

CMO has a long history of ownership of U.S. companies incorporated in Delaware, the purpose of which is to market and sell CMO products in the U.S. First, in 2001, CMO established a company with IBM Japan Ltd. to own and operate IBM's LCD manufacturing plant in Japan. (Ex. 4.) CMO owned an 85% majority share of this company, known as International Display Technology ("IDTech") until October 2004, when CMO took over 100% ownership of IDTech. (Ex. 1 at 0030.) IDTech's plant produces displays for notebook computers and expanded CMO's production capacity so that CMO could compete in the large area high resolution LCD monitor module market. (Ex. 5 at 385.)

As was reported to the industry, IDTech "positions [CMO] to win more U.S. and Japanese business by leveraging IBM's relationships" and "the IBM sales force has begun selling panels produced by [CMO], resulting in broader distribution for [CMO]." (Id.) IDTech USA is a wholly owned subsidiary of IDTech that was incorporated in the state of Delaware. (Ex. 6.) Although CMO sold IDTech to Sony Corporation in January 2005, CMO kept the IDTech sales location in San Jose, California and changed the name to Chi Mei Optoelectronics USA, Inc. ("CMO USA"). (Exs. 7 and 8.) CMO USA also is incorporated in Delaware. (Ex. 10.)

When CMO owned IDTech, CMO's website listed IDTech US (Sales Office) as a contact in the United States for CMO. (Ex. 1 at 0038 - 0040.) CMO USA has an office in San Jose, California, at IDTech's former offices. CMO's employee Anny Yuan, a

---

[4] The sales summaries only includes sales information through 2005 although it is reasonable to assume that additional products have been sold in subsequent years.

salesperson, works in the offices of CMO USA in San Jose, California and formerly worked in the offices of IDTech USA as a CMO employee.  (Ex. 9.)

CMO acknowledged in its Motion to Dismiss that it "owns stock in a subsidiary, Chi Mei Optoelectronics USA, Inc., which is a Delaware Corporation."  However, CMO's statement that it "owns stock" in Chi Mei Optoelectronics USA, Inc. attempts to downplay the extent to which CMO actually owns CMO USA.  Indeed, CMO owns 100% of the shares of CMO Japan, which is nothing more than a holding company for CMO (Ex. 11 at 60; Ex. 12), and CMO Japan owns 100% of the shares of CMO USA. (Ex. 12.)  Thus, <u>CMO USA is essentially the wholly owned Delaware subsidiary of CMO</u>.  Moreover, CMO USA was incorporated for the sole purpose of marketing, selling, and distributing CMO's products in the United States.  Indeed, on CMO's website, CMO holds CMO USA out as its representative in the United States, and states that CMO USA sells electronic equipment and computer monitors, the very products manufactured and sold by CMO.  (Ex. 1 at 0034; Ex. 11 66.)

CMO transacts regular, continuous business in Delaware, having just entered into a joint venture with Neurok Optics, LLC, a Delaware corporation, which created iZ3D, LLC, ("iZ3D"), a U.S. entity incorporated in the State of Delaware.  (Ex. 13 and 14.) iZ3D develops and markets electronic products, including video monitors.  (Ex. 13.)  In light of CMO's ownership of its Delaware subsidiary CMO USA and Delaware joint venture iZ3D, it is clear that CMO is attempting to target the U.S. market, and in particular, customers within the state of Delaware.[5]

---

[5] CMO argues that it has never been "qualified, authorized, or otherwise chartered, registered, or licensed to conduct or transact business in Delaware."  (D.I. 20 at 5.)  In support of its position, CMO states that neither CMO USA nor iZ3d are named as defendants in this litigation.  However, LPL has filed an Amended Complaint in this action, which among other amendments, names CMO USA as a defendant.

CMO clearly provides support to its customers in the U.S., and likely in Delaware, by providing service, repairs, and warranty support. Specifically, CMO's website states that its Global Service & Support Division ("GSSD") has a "new e-solution platform for customers and suppliers. (Ex. 1 at 0035.) The new e-solution platform will enable customers home and abroad to obtain service & support regarding [] product-related affairs. (Id.) GSSD will use the new platform to provide real time solution to supplier chain and customer chain after goods exit [ ] CMO." (Id.) As CMO's products are sold to customers in Delaware, CMO likely offers and/or provides these support, repair, and warranty services in Delaware.

Importantly, in April 2005, CMO consented to jurisdiction in Delaware in another action in this Court. Commissariat À L'Energie Atomique v. Chi Mei Optoelectronics Corp., et al., Case No., 03-484-KAJ (D. Del.) (filed May 19, 2003) (the "CEA case"). (Ex. 15.) CMO made this concession after first fighting jurisdiction and after months of jurisdictional discovery both of CMO and of numerous third parties in the U.S.[6] Remarkably, CMO refuses to allow LPL to use the jurisdictional discovery produced in the CEA case that was marked confidential or highly sensitive confidential under the Protective Order entered in the CEA case, even though counsel for LPL has agreed to afford the same protections to those documents in this case as was required under the Protective Order in the CEA case.

---

[6] A review of the docket in the CEA case reveals that during the period of jurisdictional discovery, CEA issued 25 subpoenas on the following third parties: ViewSonic Corporation ViewSonic, Inc., JP Morgan Chase & Company, Westinghouse Digital Electronics, LLC, Dell Corporation, Fujitsu Microelectronics America, Inc., Hitachi America, LTD, Samsung Electronics America, Inc., Lite-On Technology USA, Inc., Sony Electronics, Inc., BenQ America Corporation, International Display Tech USA, Best Buy.com LLC, Best Buy Co., Inc., Office Depot, Inc., Avnet Applied Computing, Avnet, Inc. CompUSA, Inc., Amazon.com, Inc., DCW Corporation, Fry's Electronics, Inc., Widgets, Inc., Cyberian Outpost, Inc., Syntax Groups Corporation and Sampo Technology, Inc.

In October 2003, CMO began actively seeking investors in the U.S. and issued a prospectus. (Ex. 16.) This prospectus or stock offering circular states that CMO is offering its global depository shares to qualified investors in the United States, (id.), and CMO has identified JPMorgan Chase Bank as the depositary, with the contact person for JPMorgan located in Delaware. (Ex. 1 at 0015.) In addition, in February 2005, CMO held its 2004 Fourth Quarter Investor Conference, and provided information to allow investors located in the United States to participate in the conference by telephone. (Ex. 1 at 0037.)

CMO also has other contacts with the United States as a whole. CMO has sought the benefit of the laws of the United States by filing trademark applications with the USPTO, one for the mark "Chi Mei" on March 21, 2002 (claiming first use in commerce on November 18, 1999), and another for the mark "CMO" on November 7, 2002 (claiming use in commerce on July 31, 2002). (Ex. 17.) These trademarks were granted registration by the USPTO. (Id.)

In obvious response to LPL's suit against it, CMO has sought the benefit of the laws of the United States by recently filing an action against LPL for patent infringement in the Eastern District of Texas. (Ex. 18.) Further, CMO did not challenge the jurisdiction of the United States District Court for the Northern District of California. (Ex. 19.) Moreover, CMO did not challenge the jurisdiction of the United States District Court for the Southern District of New York in a recently filed case in that District. (Ex. 20.)

Further, CMO has attended meetings in the United States to establish and ensure compliance with U.S. standards for the manufacture and performance of LCD modules.

These meetings are conducted by an industry group known as the Standard Panels

Working Group ("SPWG") and are known in the industry as standards meetings.[7] (Ex.

22.) (Id.) CMO representatives have attended various standards meetings in the United

States as part of this industry working group. In addition to attending these meetings,

CMO has endorsed the standards set by the SPWG and specifically designs its products

to meet American specifications. (Id.)

### C.    CMO's Sales In Delaware Through The Use Of An Established Distribution Channel

CMO's shipments and revenue in 2006 establish that CMO has consistently been

a large presence in the worldwide LCD panel market, through the use of CMO's

established distribution channel. For example, CMO established in approximately 2002 a

direct supplier relationship with Dell Computer Corporation, by successfully passing

Dell's QSA audit, becoming the first Taiwanese company to achieve that status, and

"further improving [CMO's] relationship with Dell." (Ex. 1 at 0036.) Moreover, CMO

acknowledges that it has a long term agreement with Dell to provide monitors into the

United States. (Ex. 24 at 7-8 (emphasis added).) Dell sells "more systems globally than

any computer company . . . selling computer systems directly to customers." (Ex. 25.)

In addition, CMO, as part of its regular course of business, ships substantial

quantities of its LCD products directly into the United States for sale throughout the

United States. CMO's direct shipments into the U.S. include 287,312 pieces that arrived

in the United States in 2006 for Westinghouse Digital Electronics, Inc., 21,966 pieces

that arrived in the United States in 2006 for Acer America, and 1,344 pieces that arrived

---

[7] The standards meetings are attended by manufacturers and suppliers in the industry who intend for their products to be sold in the United States and elsewhere throughout the world.

in the United States on June 17, 2003 for Acer America Corporation. (Ex. 26.) Westinghouse Digital Electronics, Inc.'s products are sold by numerous retailers within Delaware, including Best Buy and Wal-Mart. (Exs. 37 and 44.) Acer America's website (www.acer.com/us) cites to numerous retailers within the United States, including in Delaware, that offer Acer LCD monitors for sale. (Ex. 27.) CMO also shipped LCD monitors to Iiyama North America, Inc. located in Pennsylvania. (Ex. 26.) According to Iiyama North America's website, www.iiyama.com, Iiyama has sales managers located on the east coast of the United States, who likely sell products in Delaware. (Ex. 28.)

CMO makes the infringing LCD modules and sells those infringing modules to companies that have extensive distribution and re-seller networks in the United States. (Ex. 30 at 95, 270-71, 278.) Significantly, CMO acknowledges that its "modules are incorporated into brand-name products, such as Hewlett-Packard ('HP'), Dell Corporation ('Dell'), and Viewsonic Corporation ('Viewsonic')." (Ex. 24 at 3 (emphasis added), Ex. 36 (showing CMO products incorporated in Dell and HP products being sold in the U.S.).) These huge U.S. companies obviously have extensive sales networks throughout the U.S., of which CMO must be aware through its admitted repeated meetings with brand manufacturers in the U.S. Indeed, CMO acknowledges that its employees and other representatives travel to the U.S. to the meet with the brand name companies in the United States. (Ex. 24 at 12.)

According to DisplaySearch data[8], CMO was one of the top three LCD suppliers to five of the top fifteen OEMs for the second quarter of 2006, with CMO being the

---

[8] DisplaySearch is a display-related market research firm that is well-known in the industry for providing accurate and reliable market data. (Ex. 23.) DisplaySearch has extensive industry and market research experience. (Id.) According to its website, located at www.displaysearch.com, DisplaySearch analysts have worked at companies such as Apple Computer, Dell Compaq/Hewlett Packard, Booz Allen and

number two supplier to LG Electronics and the number one supplier to Techview, Proview, and CMV. (Ex. 30 at 95, 270-71, 278.) Through these established OEM relationships, CMO monitor modules are incorporated into Hewlett Packard, Acer, ViewSonic, Proview, Gateway, CMV, and Apple branded LCD monitors. (Id.; see also Ex. 36 (showing CMO products incorporated in Hewlett Packard, Gateway and CMV products being sold in the U.S. over the Internet).) All of these companies have established distribution networks for sales of LCD monitors in the United States. (Id.)

Through negotiations and sales of its products to these OEMs, CMO has placed its LCD modules into established distribution channels designed to sell CMO's LCD modules in products throughout the United States. (Id. at 95, 270-71, 278.) According to published data, Tatung, a company to which CMO likewise supplies LCD modules, ships completed monitors to both Hewlett Packard and Gateway for sale throughout the United States. (Id.) Acer, another company to which CMO supplies LCD modules, is the fourth largest distributor of LCD monitors in the United States, with a 7.1% share of the market. (Id. at 95.) In the second quarter of 2006, Acer purchased 25.3% of its completed LCD monitors from Techview, which had in turn purchased 21.7% of its LCD monitor module supply from CMO. (Id. at 95, 270, 271, 278.) Acer also purchases completed LCD monitors from CMV, for which CMO is the sole LCD monitor module supplier. (Id.)

Similarly, also in the second quarter of 2006, Gateway purchased 55.4% of its completed LCD monitors from Proview, which had in turn purchased 29.6% of its LCD monitor module supply from CMO. (Id.) Acer also purchases completed LCD monitors from Tatung, which in turn purchases LCD monitor modules from CMO. (Id.) In the

---

Hamilton, Panasonic, Zenith, and CMO. (Id.) DisplaySearch analysts are regularly quoted in major media and publications, and its data and analysis is used on a regular basis by investment analysts. (Id.)

same quarter, ViewSonic purchased 53.1% of its completed LCD monitors from Techview, which (as noted above) had purchased 21.7% of its LCD monitor module supply from CMO.  (Id.)

These large OEMs to whom CMO sells its LCD modules, including Samsung, Dell, IBM, Hewlett Packard, NEC-Mitsubishi, and ViewSonic, have well-established distribution and reseller networks in the United States, of which CMO is aware.  (Exs. 25, 31-35).)  They market and sell their computer monitors throughout the United States, including Delaware, through internet websites and online retailers.  (Id.)  They also market and sell their computer monitors in numerous retail stores throughout the United States, including in Delaware.  (Id.).  These retail stores include, but are not limited to, Best Buy, Circuit City, CompUSA, Office Depot, Staples, RadioShack, OfficeMax, Wal-Mart and Sears, all of which have store locations in Delaware.  (Exs. 37-45.)

**D.    CMO's Substantial Sales And Revenues Derived From Products Sold In The United States And Delaware**

Industry data states that CMO is the fourth largest LCD panel manufacturer in the world and has worldwide gross annual revenues of over US $6 billion.  (Ex. 29 at 10, 77.) These revenues derive in large part from sales in North America, which market accounts for over 31% of LCD monitor purchases worldwide and over 26% of LCD televisions worldwide.  (Ex. 30 at 13, 88; Ex. 46 at 258.)  CMO is the largest supplier of the 1440 x 900 type of 19-inch LCD module and is the third largest supplier of all types of 19-inch modules.  (Ex. 29 at 189-90.)  CMO also leads as the largest supplier of LCD televisions in the 25-inch to 29-inch and the 30-inch to 34-inch categories.  (Ex. 46 at 207.)  In the Second Quarter of 2006 (which is the most recent data LPL has available), CMO was the second largest supplier (on a unit basis) of LCD television panels, shipping over

2,205,000 LCD television panels during that quarter.  (Id. at 208.)  It has been reported

that LCD monitor modules account for 47%, and LCD television module shipments

account for another 33.9%, of CMO's total LCD shipments.  (Ex. 29 at 69-69.) CMO

expected to ship 100% of the 17-inch LCD modules with MVA mode it manufactures in

2003.  (Ex. 47 at 636.)

      According to industry reports, for the Fourth Quarter of 2006, CMO generated US

$1.8 billion in revenue.  (Id. at 77.)  Industry data reveals that CMO supplies 12% of the

worldwide market for LCD monitors and supplies over 18% of the worldwide market for

LCD televisions.  (Id. at 15; Ex. 46 at 209, 211.)  In the fourth quarter of 2006 alone,

CMO shipped 3,222,700 LCD modules, which equated to a quarterly share of

approximately 11.4% of the overall LCD market.  (Ex. 29 at 63-64.)  CMO's LCD

revenues from July through September 2006 exceeded US $1.5 billion, which included

US $620,000,000 from sales of LCD monitor modules and US $750,000,000 from sales

of LCD television modules.  (Id. at 10, 15, 17.)  CMO's shipments and revenue establish

that CMO has consistently been a huge presence in the overall worldwide LCD module

market.  (Ex. 47 at 635; Ex. 48 at 28-29; Ex. 49 at 180.)  Industry data (as well as direct

evidence here of sales in Delaware and offers to sell throughout the U.S.) demonstrates

that CMO products are sold into North America, including the United States.  Again,

CMO supplies approximately 12-18% of the LCD market (Ex. 29 at 15; Ex. 46 at 211),

and North America accounts for over 31% of LCD monitors and over 26% of LCD

televisions manufactured worldwide.  (Ex. 30 at 13, 88; Ex. 46 at 258; Ex. 48 at 20.)

660839-1

E.    **Earlier Decisions Regarding Exercise of Personal Jurisdiction over CMO in Delaware**

In May 2003, Commissariat à l'Energie Atomique ("CEA") filed an action against Chi Mei Optoelectronics Corporation ("CMO"), and others, alleging patent infringement. Commissariat À L'Energie Atomique v. Chi Mei Optoelectronics Corp., et al., Case No., 03-484-KAJ (D. Del.) (filed May 19, 2003) ("the CEA case"). In response to the Complaint in the CEA case, CMO filed a Motion to Dismiss for Lack of Personal Jurisdiction (D.I. 10). In September 2003, the Honorable Kent A. Jordan granted CMO's motion and, despite a request by CEA, did not grant jurisdictional discovery (D.I. 52, 75).

Although Judge Jordan initially granted CMO's Motion to Dismiss in the CEA case, the Court confirmed that, at the time of the filing of the CEA complaint in May 2003, CMO supplied "approximately 12% of the LCD market and North America accounts for over 30% of all computer monitor purchases." (D.I. 52 at 3.) The Court further confirmed that CMO sold its LCD products to OEMs, who incorporated them into computer monitors and shipped the monitors to major brand name computer manufacturers. The major brand name computer manufacturers then shipped the monitors to large national retailers, who maintained store locations within Delaware. (Id. at 3-4.)

Within the context of those facts, the Court concluded that, with respect to the stream of commerce theory presented by CEA, that "[i]n order for the Court to exercise specific jurisdiction under §3104(c)(1), CEA must present 'competent evidence that the accused products were in Delaware at the time the suit was filed.'"[9] Commissariat À

---

[9] CEA relied principally on the stream of commerce theory in attempting to establish personal jurisdiction over CMO in Delaware, as CEA had not learned of the many direct contacts that CMO has with Delaware that are outlined herein.

L'Energie Atomique v. Chi Mei Optoelectronics Corp. et al., 293 F.Supp.2d 427 (D. Del.

2003), vacated and remanded.  The Court found, however, that the only evidence

regarding CMO products located in Delaware was a request for "two computer monitors

which were never delivered."  Id.  Because CEA had purchased the computer monitors

after the complaint was filed, the Court suggested that CEA lacked the requisite

"competent evidence of pre-filing sales by CMO in Delaware."  Id. at 428 (emphasis

added).

As further evidence that the Court found the lack of pre-filing sales in the CEA

case to be dispositive, Judge Jordan's subsequent opinion just a few months later in the

Philips Electronics case found jurisdiction based on the same stream of commerce theory

advocated by CEA, yet distinguished the CEA case.  Philips Electronics North America

Corp. v. Contec Corp., Civ. A. No. 02-123-KAJ, 2004 WL 503602 (D. Del. March 11,

2004) (Ex. B).  Specifically, Judge Jordan concluded that in the Philips Electronics case,

there was "evidence of actual sales and the presence of the accused device in Delaware

prior and subsequent to the date the complaint was filed, evidence that was lacking in

Commissariat."  2004 WL 503602, at *5.

CEA appealed this Court's ruling to the Court of Appeals for the Federal Circuit

(D.I. 81) and simultaneously filed an action against CMO in the Northern District of

California alleging the same cause of action for patent infringement to ensure that it could

bring its claim against CMO for CMO's patent infringement in the United States.

Commissariat À L'Energie Atomique v. Chi Mei Optoelectronics, Corp., Case No. 03-

05812 SBA, (N.D. Cal.) (filed December 23, 2003).  CMO did not challenge personal

jurisdiction in California.  (Ex. 19.)  After the California action had commenced, the

Federal Circuit vacated this Court's order dismissing CMO and remanded the case to

allow CEA to conduct jurisdictional discovery.

On appeal, the Federal Circuit summarized the evidence regarding the exercise of

jurisdiction over CMO in Delaware as of May 2003:

- CMO sells over $1 billion of its products worldwide, including in the United States; that CMO supplies roughly 12% of the LCD market; that CMO is the number one supplier of 19" LCD monitors; and that North America accounts for approximately 30% of all computer monitor purchases.

- CMO shipped approximately 2,950,000 LCD modules in the first five months of 2003.

- CMO utilized an established distribution network for LCD products, with published industry data on actual and forecasted sales that document the flow of displays from LCD suppliers such as CMO, through to OEMs, and on to name-brand computer manufacturers.

- Orders for devices incorporating CMO products were placed in Delaware prior to the date CEA filed its complaint and the existence of post-filing sales of such devices in Delaware.

- CEA alleged in its complaint that CMO derived "substantial revenue from services or things used or consumed within [Delaware]."

Commissariat, 395 F.3d at 1317..[10]

In addition, the Federal Circuit stated that "CMO did not submit any evidence to

contradict CEA's allegation that CMO derived substantial revenue from sales of its

products to Delaware. Nor did CMO submit evidence to contradict CEA's assertion that

its products, as incorporated by OEMs into computer monitors, were likely to reach

Delaware." Id. at 1317-18. The Federal Circuit also stated that "[c]ontrary to the district

court's holding, the evidence already presented by plaintiff is sufficient to demonstrate

that CMO sells a very large volume of LCDs to companies which incorporate these

---

[10] CMO's total sales and revenues have increased over the numbers before the Court at the time of the CEA case, as described more fully Section D above.

displays into their final product and that these products are likely sold in Delaware in substantial quantities." Id. at 1320.

In referring to Judge Jordan's requirement that CEA present evidence of pre-filing sales, the Federal Circuit said that "[b]ased on the allegations in the complaint, the evidence submitted by CEA, and CMO's failure to rebut the factual inference that devices incorporating its LCDs were sold in Delaware, the district court should have found CEA's showing sufficient to establish that substantial revenues could be derived by CMO from the sales of products in Delaware incorporating CMO's LCDs." Id. Notwithstanding the above, however, the Federal Circuit held that the record before it "presents a factual scenario which would require us to determine whether or not additional conduct, beyond a showing of use of established distribution channels, is required to meet the demands of due process under the stream of commerce theory of personal jurisdiction." Id. at 1322.  However, the Federal Circuit concluded that it need not resolve that issue in the CEA case because jurisdictional discovery may "provide pertinent evidence to establish the defendant's intent and purpose to serve the Delaware market, including demonstration of CMO's 'ongoing relationships with retailers in Delaware.'"[11]  Id. at 1323.  As a result, the Federal Circuit vacated this Court's order and remanded the case for jurisdictional discovery.

---

[11] With respect to CEA's request for jurisdictional discovery, the Federal Circuit also said that CEA went beyond the mere factual allegations of contacts by CMO, as required for jurisdictional discovery, and "has already made a prima facie case for CMO's use of an established distribution network that likely results in substantial sales of its products in Delaware." Commissariat, 395 F.3d at 1323.  The Federal Circuit then suggested that jurisdictional discovery would allow CEA to determine: (1) CMO's ongoing relationships with retailers in Delaware; (2) CMO's knowledge that its products were being shipped in Delaware; (3) its design and marketing efforts directed to the U.S. market (including Delaware); (4) more information on the defendants' e-solution platform; and (5) the existence of marketing arrangements and demonstration that the website serves as a channel for providing regular advice to customers in the forum state. Id.

After the Federal Circuit's decision remanding the case, CEA and CMO engaged in months of jurisdictional discovery, including written discovery between the parties, and from numerous third parties located in the U.S.  These third parties included several U.S. retailers to whom CMO sells LCD products.  After months of jurisdictional discovery, CMO ultimately consented to the jurisdiction of this Court, on the day before CEA was to take the deposition of a CMO sales person, Anny Yuan, working in the United States (D.I. 375).  The parties then began merits discovery and engaged in additional extensive written and oral discovery, which resulted in further evidence regarding CMO's importation, sale, and distribution of products in the United States, including in this judicial district.

As a result of that discovery and LPL's subsequent investigation, LPL has discovered **additional evidence regarding CMO's contacts with Delaware, which was not before this Court or the Federal Circuit at the time of the CEA case**.  Indeed, in addition to the evidence previously before this Court and the Federal Circuit, LPL now has further overwhelming evidence to establish that CMO's direct contacts with Delaware establish jurisdiction.  Such facts include:

- Evidence of at least six CMO products purchased by consumers in Delaware. While those purchases were made after the Complaint in the CEA case was filed, and thus were not considered "competent evidence" by Judge Jordan in that case, those purchases were clearly made prior to the filing of the Complaint in this action.  Concerning the CMO products purchased in Delaware, LPL believes that at least the ViewSonic N2000 LCD TV purchased in April 2005 is an infringing product in this action.

- Evidence of over 900 CMO products sold by Office Depot and CDW in their Delaware stores between July 2002 and March 2005.

- Evidence that numerous CMO products are offered for sale in Delaware via the eBay Internet site, among others.

- Evidence that CMO formerly owned IDTech USA, a Delaware Corporation, that CMO held out as its representative in the United States and sold and distributed CMO products in Delaware.

- Evidence that CMO acknowledges that its modules are incorporated into brand-name products, such as Hewlett-Packard, Dell Corporation, and ViewSonic Corporation. CMO also admits to repeated meetings in the U.S. with these U.S. brand companies, thus establishing that CMO must have intimate knowledge of these U.S. companies' extensive distribution networks.

- Evidence that CMO has a long term agreement with Dell to provide monitors into the United States.

- Evidence that CMO owns Chi Mei Optoelectronics USA, Inc., a Delaware Corporation that CMO holds out as its representative in the United States and which likely sells and distributes CMO products in Delaware.

- Evidence that CMO entered into a joint venture with Neurok Optics, LLC, a Delaware corporation, to create iZ3D, LLC, also a Delaware corporation, to develop and market electronic products, including video monitors.

- Evidence that CMO issued a prospectus or stock offering circular that states that CMO is offering its global depository shares to qualified investors in the United States and identifying JPMorgan Chase Bank as the depositary, with the contact person for JPMorgan located in Delaware. The prospectus was issued one month after this Court's ruling on CMO's motion to dismiss in the CEA case, and thus, was not a part of the Court's decision. Although CEA informed the Federal Circuit of this fact in its appeal brief, the prospectus was not made a part of the record on appeal and is not mentioned in the Federal Circuit's decision.

- Evidence that CMO consented to jurisdiction previously in Delaware after months of jurisdictional discovery.

- Evidence that CMO did not challenge the jurisdiction of the United States District Court for the Northern District of California.

- Evidence that CMO did not challenge the jurisdiction of the United States District Court for the Southern District of New York.

- Evidence that CMO has also sought the benefit of the laws of the United States by filing an action against LPL for patent infringement in the Eastern District of Texas.

- CMO's failure to justify why Texas, New York, and California can exercise jurisdiction over CMO, yet Delaware cannot. Indeed, particularly with respect to New York and Texas, CMO has no office or employees there, is not

-19-

authorized to do business there, and does not own any subsidiaries incorporated in those jurisdictions.

The above facts establish jurisdiction over CMO in Delaware, particularly when combined with CMO's knowing exploitation of the North American market, its OEM relationships with LCD manufacturers and resellers such as Samsung, Dell, ViewSonic, and Jean, its attendance at standards meetings in the United States, and its presence in the United States through Delaware subsidiary CMO USA, and Delaware joint venture iZ3D. These contacts and relationships further establish that the United States, including Delaware, is an intentional destination for ultimate sales of CMO's shipments and that the United States, including Delaware, is a significant source of CMO's worldwide revenues which exceed $6 billion.

**F.**    **Facts Regarding Service of Process**

On February 15, 2007, LPL served a copy of the Summons and Complaint for Patent Infringement and Demand for Jury Trial on the Secretary of State of Delaware pursuant to 10 *Del. C.* §3104, which states that a party can serve a nonresident defendant by serving a copy of the Summons and Complaint on the Secretary of State, if the person is subject to personal jurisdiction in Delaware.

On February 16, 2007, LPL sent to CMO's attention by registered mail, return receipt requested, a notice letter, together with copies of the Summons and Complaint for Patent Infringement and Demand for Jury Trial as served upon the Secretary of State of Delaware and the exhibits to that Complaint. (Ex. 50.) On February 20, 2007, LPL filed a notice with this Court confirming that service of process had been made pursuant to the long arm statute. CMO was served on February 15, 2007, and requested an extension of time to respond to the Complaint. (D.I. 16.) On April 6, 2007, CMO timely filed its

motion to dismiss, which does not assert that CMO failed to receive notice of the

Complaint.  As discussed below, the evidence establishes that this Court has jurisdiction

over CMO and that CMO was properly served with process.

ARGUMENT

## II.    THIS COURT MAY PROPERLY EXERCISE PERSONAL JURISDICTION OVER CMO

Although the plaintiff must establish the basis for the court's jurisdiction over a

defendant who challenges personal jurisdiction, LPL need only make a *prima facie*

showing.  Intel Corp. v. Broadcom Corporation, 167 F. Supp. 2d 692, 699 (D. Del. 2001).

Further, the Court must accept plaintiff's jurisdictional allegations as true and "view all

factual inferences in the light most favorable to the plaintiff."  Id. at 699-700 (citing

Wright v. American Home Products, 768 A.2d 518, 526 (Del. Super. 2000)); see also

Aircraft Guar. Corp. v. Strato-Lift, Inc., 974 F. Supp. 468, 475 (E.D. Pa. 1997).

The law of the Court of Appeals for the Federal Circuit applies to patent

infringement actions.  See Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc., 148

F.3d 1355, 1358-59 (Fed. Cir. 1998).  The Federal Circuit has held that "[i]n order to

establish personal jurisdiction in a patent infringement case over a non-resident defendant

whose products are sold in the forum state, a plaintiff must show both that the state long

arm statute applies and that the requirements of due process are satisfied."  Commissariat,

395 F.3d at 1319.

### A.    The Delaware Long-Arm Statute Does Reach CMO

The Court may properly exercise personal jurisdiction over CMO because: (1)

CMO's conduct falls within the scope of Delaware's long-arm statute, Del. Code Ann.,

tit. 10, § 3104, and (2) the exercise of jurisdiction over CMO comports with due process.

-21-

Section 3104(c)(4) of the Delaware long-arm statute has been interpreted as providing general jurisdiction over the defendant, <u>Intel Corp. v. Broadcom Corp.</u>, 167 F. Supp. 2d at 700, and it reaches the "maximum parameters of the due process clause". <u>Jeffreys v. Exten</u>, 784 F. Supp. 146, 151 (D. Del. 1992).

In general, sub-section (c) of the Delaware long-arm statute should be construed liberally, favoring the exercise of jurisdiction. <u>Mobil Oil Corp. v. Advanced Environ. Recycling Tech., Inc.</u>, 833 F. Supp. 437, 444 (D. Del. 1993). CMO is subject to personal jurisdiction in Delaware, pursuant to 10 *Del. C.* § 3104(c)(4) because CMO: (1) regularly does business in Delaware or engages in a persistent course of conduct in the State; and (2) derives substantial revenues from goods sold in Delaware.

     1.    <u>CMO Regularly Does Business In Delaware Or Engages In A Persistent Course Of Conduct In The State</u>

The Court may exercise jurisdiction over a person who "[c]auses tortious injury in the State or outside of the State by an act or omission outside the State if the person <u>regularly does or solicits business, engages in any other persistent course of conduct in the State</u> or derives substantial revenue from services, or things used or consumed in the State." 10 Del. C. § 3104(c)(4) (emphasis added); <u>see also</u> <u>Commissariat</u>, 395 F.3d at 1317.

CMO regularly does business in Delaware and engages in a persistent course of conduct in the state, such that the Delaware long arm statute reaches CMO. First, CMO sells numerous products in the District of Delaware each year. As just a few examples, LPL is aware of at least six products containing CMO modules that were purchased in Delaware by individuals at Delaware store locations and via the Internet before LPL filed suit against CMO. (Hyden Decl.; Tierney Decl.) At least 900 CMO LCD products were

-22-

sold in Delaware by Office Depot and CDW from 2002 to 2005, and they are merely two of the many entities that sell CMO products in the United States and in Delaware. (Exs. 2 and 3.) CMO has a long history of ownership of U.S. companies, incorporated in Delaware, the purpose of which is to market and sell CMO products in the U.S. (Exs. 5 and 13.) Those entities include CMO's former fully owned Delaware subsidiary IDTech, which helped CMO "to win more U.S. . . . business," helped CMO obtain "broader distribution," gave CMO a U.S. presence, and marketed, sold, and distributed CMO's products in the United States, including in Delaware. (Ex. 5.) That history also includes CMO's current wholly owned subsidiary, CMO USA, which also markets, sells, and distributes CMO's products in the United States, including in Delaware. (Ex. 1 at 0034.) Finally, CMO also owns iZ3D, yet another Delaware subsidiary, which was formed as a result of a joint venture with another Delaware company to develop and market electronic products, including video monitors. (Exs. 13 and 14.)

CMO has also previously consented to jurisdiction in Delaware in April 2005 in the CEA case in this Court after first fighting jurisdiction and after months of jurisdictional discovery, both of CMO and of numerous third parties in the U.S. CMO also seeks investors in the United States using a depositary, with the contact person for JPMorgan located in Delaware. (Ex. 1 at 0015.) CMO also offers or provides support to its customers in the U.S. and in Delaware, in the form of service, repairs, and warranty support. (Ex. 1 at 0035.)

These facts are similar to the facts presented in Philips Electronics North America Corp. v. Contec Corp., Civ. A. No. 02-123-KAJ, 2004 WL 503602 (D. Del. March 11, 2004). There, the Court found that the exercise of jurisdiction over a foreign defendant

-23-

was proper where defendant had a U.S. salesperson who solicited customers in the U.S. as a whole, the defendant had a U.S. subsidiary incorporated in California, the California subsidiary entered into agreements relating to the products, the defendant desired to sell as many products as possible, the defendant's salesperson sold products to customers within Delaware with defendant's knowledge, and third party discovery showed that approximately 2000 infringing products were sold or used in Delaware since 1999. Id. at *2-3. The facts of the Philips Electronics case are remarkably similar to the facts here. As such, the Court should similarly find that CMO regularly does business in Delaware or engages in a persistent course of conduct in the state such that the Delaware long arm statute reaches CMO.

2.    CMO Derives Substantial Revenues From Goods Sold In Delaware

In considering whether a defendant derived "substantial revenues" from goods sold in Delaware, the Court held in Elonex that:

> Jean has intentionally sold monitors using nationwide distribution channels. This knowing and purposeful shipment of monitors satisfies the act requirement of Section 3104(c)(4). See Beverly Hills Fan, 21 F.3d at 1571. **Because Jean undeniably derives substantial revenue from these activities, it is subject to jurisdiction under Delaware's long-arm statute**.

Elonex, 2003 WL 21026758 at *3 (emphasis added); see also Hill v. Equitable Trust Co., 562 F. Supp. 1324, 1330 (D. Del. 1983) (a party is subject to jurisdiction pursuant to the Delaware long arm statute if it "conducts a substantial volume of business in Delaware").

The facts in the present case are very similar to those found in the Elonex case. CMO cannot deny that it has derived substantial revenues from its sales into North America. CMO has also derived substantial revenue from its sales in Delaware, as confirmed by the numerous products sold in Delaware prior to the filing of this

-24-

Complaint.  Having intentionally utilized a nationwide distribution system, and having participated in a structure to both serve and benefit from the U.S. and Delaware market, CMO is subject to personal jurisdiction pursuant to § 3104(c).

Industry data states that CMO is the fourth largest LCD panel manufacturer in the world and has worldwide gross annual revenues of over US $6 billion.  (Ex. 29 at 10, 77.) These revenues derive in large part from sales in North America, which market accounts for over 31% of LCD monitor purchases worldwide and over 26% of LCD televisions worldwide.  (Ex. 30 at 13, 88; Ex. 46 at 258.)  Extrapolating that data shows that CMO derives approximately $1.86 billion from the sale of its LCD monitors in North America and $1.56 billion from the sale of its LCD televisions in North America.  Government data shows that in 2002, Delaware was 8th in the nation in per capita computer and software store sales with the average person spending almost $82 on computers and software (behind Alaska, California, Hawaii, New Hampshire, North Dakota, Oregon, and Utah).[12]  (Exs. 51-52.)  As such, CMO derives substantial revenues from goods sold in Delaware such that the Delaware long arm statute reaches CMO.

In Motorola, the court held that a party is subject to jurisdiction when it places products in an established distribution channel with the intent that they end up in the U.S. Motorola Inc. v. PC-Tel, Inc., 58 F. Supp. 2d 349, 357 (D. Del. 1999) ("AltoCom has acted in consort with its licensees or customers to place products containing its softmodems into a nationwide distribution network.  As a result, many of its products have found their way to Delaware-- their intended destination.  Consequently, AltoCom cannot now complain that it should not be sued here.")

---

[12] Because there was no 2002 census data available showing computer and software store sales for Arizona, the District of Columbia, and South Dakota, these states are excluded from this calculation.

The facts showing that CMO places its product into an established distribution channel are described more fully below with respect to the due process clause. To summarize, however, it is clear that CMO knows and intends for its products to be sold in the U.S. First, CMO acknowledges that it has a long term agreement with Dell to provide monitors into the United States. (Ex. 24 at 7-8.) Dell sells "more systems globally than any computer company . . . selling computer systems directly to customers." (Ex. 25.) In addition, CMO acknowledges that its "modules are incorporated into brand-name products, such as Hewlett-Packard ('HP'), Dell Corporation ('Dell'), and Viewsonic Corporation ('Viewsonic')." (Ex. 24 at 3, see also Ex. 36.)

CMO also sells its products directly to OEMs, including but not limited to Techview, Proview, and CMV, which companies in turn sell the products to Viewsonic, Lenovo, and Gateway, among others, for subsequent resale in the United States. (Ex. 30 at 95, 270-271, 278.) These local sales are made through established retailers such as Best Buy, CompUSA, Circuit City, and Staples, all of which have store locations in Delaware. (Exs. 37-45.) As such, CMO uses an established distribution channel to sell its products in the stream of commerce.

**B.**    **The Exercise of Personal Jurisdiction Over CMO Is In Accordance With Due Process Requirements**

The exercise of personal jurisdiction consistent with due process requires "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). Minimum contacts are established by "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State." Burger King Corp. v.

Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

Here, CMO has sufficient minimum contacts with Delaware such that the exercise of personal jurisdiction over CMO by this Court is consistent with due process. CMO acknowledges that it sells products directly to Dell, which sells monitors and televisions directly to customers in Delaware. (Ex. 24 at 7, 8.) CMO also acknowledges that HP, Dell, and ViewSonic's brand monitors and televisions contain CMO products. (Id. at 3.) At least six CMO products have been incorporated into ViewSonic, Tatung, and Iiyama monitors and televisions sold in Delaware. (Exs. C and D.) CMO's products are offered for sale all over the U.S. via the eBay Internet website, among others, and are certainly available for purchase in Delaware. (Ex. 36.) At least 900 CMO LCD products were sold in Delaware by retailers Office Depot and CDW from 2002 to 2005. (Exs. 2 and 3.) For many years, CMO has owned Delaware companies, through which CMO markets and sells products in the U.S., including IDTech USA, CMO USA, and iZ3D. (Exs. 5, 13 and 14.) CMO has also previously consented to jurisdiction in Delaware in complex litigation lasting over three years.

CMO also seeks investors in the United States using a depositary, with the contact person for JPMorgan located in Delaware. (Ex. 1 at 0015.) CMO offers support to its customers in Delaware, by providing service, repairs, and warranty support. (Ex. 1 at 0035.) These numerous contacts with Delaware establish that CMO is "purposefully avail[ing] itself of the privilege of conducting activities within the forum State." Burger King, 471 U.S. at 475.

Even if the Court finds that CMO's extensive contacts with Delaware are somehow not sufficient, however, the exercise of jurisdiction over CMO is proper because CMO has sold countless infringing products in Delaware by placing those products in the stream of commerce using an established distribution channel. Indeed, in Commissariat, 395 F.3d at 1321, the Federal Circuit discussed the due process standard from Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 114-15 (1987), which involved "a foreign defendant in a stream of commerce case involving the use of established distribution networks, where the defendant itself had no direct contacts with the forum state." In such a case, the Federal Circuit confirmed that due process is ultimately decided on the "fairness prong" of the due process inquiry. Commissariat, 395 F.3d at 1321.

In Commissariat, the Federal Circuit further reiterated two competing views from the Asahi case on what constitutes minimum contacts. First is Justice O'Connor's view, writing for four members of the Court, in which Justice O'Connor "urged that more than a 'mere act of placing the product into the stream [of commerce]' is required, and that due process also demands "an act of the defendant purposefully directed toward the forum State." Id. at 112. In the alternative, Justice Brennan's position, adopted by three other members of the Court, was that such "additional conduct" is not needed when the defendant places goods in a stream of commerce defined as "the regular and anticipated flow of products from manufacture to distribution to retail sale." Id. at 117.

In Commissariat, the Federal Circuit concluded that CMO's products are components, like the final product in Asahi. In addition, the Federal Circuit concluded that the "evidence on the established distribution channels presented by CEA suggests

that the flow of CMO products to Delaware is 'regular and anticipated,' and more than 'unpredictable currents or eddies,' thus likely satisfying Justice Brennan's version of the stream of commerce theory." <u>Commissariat</u> 395 F.3d at 1321-1322.  Based on the record presented by CEA regarding CMO's contacts with Delaware, however, the Federal Circuit held that the record would benefit from jurisdictional discovery before determining whether CMO also met Justice O'Connor's more stringent test.  <u>Id.</u>  As such, the Federal Circuit thereby declined to decide whether a plaintiff is required to show something more than the use of established distribution channels, to meet the demands of due process under the stream of commerce theory of personal jurisdiction.

Indeed, consistent with the Federal Circuit's opinion in <u>Commissariat</u>, the record presented by LPL in this matter conclusively establishes that the exercise of jurisdiction over CMO in this action comports with the requirements of due process, even under the more stringent test set forth by Justice O'Connor.  Under the rule established by the Federal Circuit in <u>Beverly Hills Fan</u>, CMO is subject to jurisdiction if it is purposefully part of an established distribution channel that serves the State of Delaware.  21 F.3d at 1565.  Rather than having random, attenuated, or unexpected contacts with Delaware, CMO has purposefully availed itself of the Delaware and U.S. markets, making it subject to personal jurisdiction in this Court.

Indeed, importantly, <u>CMO has acknowledged that it supplies products directly to Dell Corporation, a large multi-national corporation that sells numerous products in the United States (not through an OEM) and further acknowledges that its modules are incorporated into brand-name products, such as Hewlett-Packard, Dell, and Viewsonic.</u>

(Ex. 24 at 3, 7-8.) Because CMO is distributing its products directly to U.S. distributors, CMO has availed itself of the U.S. market through its established distribution channel.

In <u>Beverly Hills Fan</u>, defendant Ultec, a Taiwanese ceiling fan manufacturer, was sued for patent infringement in Virginia. 21 F.3d at 1558. Ultec ceiling fans were purchased in Taiwan by Royal Sovereign, which shipped and sold the ceiling fans in the United States. Although Ultec had no assets or employees in Virginia, had no agent for service of process in Virginia, and had not shipped the product into Virginia, the Federal Circuit upheld the lower court's finding of personal jurisdiction. The Court distinguished the case from preceding "stream of commerce" cases, such as <u>World-Wide Volkswagen v. Woodson</u>, 444 U.S. 286, 297 (1980)) and <u>Asahi</u>, on the grounds that the infringing product arrived in Virginia "through defendants' purposeful shipment of the fans through an <u>established distribution channel</u>." <u>Id.</u> at 1565 (emphasis added).

Quoting <u>World-Wide Volkswagen</u>, the Federal Circuit noted that "if the sale of a product of manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the [defendants] to serve, directly or indirectly, the market for its product . . . it is not unreasonable to subject it to suit." <u>Id.</u> at 1566 (citing <u>World-Wide Volkswagen</u>, (holding that Taiwanese manufacturer of coffee makers, which sells and ships its products f.o.b. Taiwan or Hong Kong, and otherwise did not sell into or have customers in Illinois, had requisite minimum contacts with Illinois given evidence of established distribution channel, with manufacturer positioned upstream and Illinois downstream); <u>Viam Corp. v. Iowa Export-Import Trading Co.</u>, 84 F.3d 424 (Fed. Cir. 1996) (finding jurisdiction over non-resident manufacturer that placed its products into an

established distribution channel, knowingly albeit indirectly exploiting the California market).

In the same manner, this Court's unpublished decision in the Elonex case is directly on point and concerns the same distribution channel involved in this case. In Re: Elonex Phase II Power Management Litigation, 2003 WL 21026758 (D. Del. May 6, 2003). Elonex involved a patent infringement lawsuit against Jean Co., Ltd., a Taiwanese manufacturer of computer monitors, which sold its products to computer companies including ViewSonic and eMachines, which in turn sold their products in retail establishments such as Best Buy, Office Depot, and CompUSA. In the present instance, CMO supplies LCD modules to Jean, and to CMO USA, which uses its established distribution system to sell LCD monitors to U.S. companies including Dell, IBM, and ViewSonic, which offer their products for sale in retail establishments such as Best Buy, Office Depot, Circuit City, and CompUSA. Although Jean argued in Elonex that it makes no direct sales to the United States, that it has no offices or subsidiaries in the United States, and that it has no other contacts with the forum, this Court concluded that "Jean has, for many years, been the first link in precisely the kind of indirect distribution chain that the Federal Circuit found sufficient to establish personal jurisdiction" in Beverly Hills Fan. Id. at *2. Likewise, CMO, one of the three largest manufacturers of LCD products, is the first link in an established distribution channel through which CMO modules worth hundreds of millions of dollars are sold in the United States.

This Court also found personal jurisdiction based on an "established distribution channel" in Motorola, 58 F. Supp.2d 349. In Motorola, AltoCom, a California manufacturer of software modem products, licensed its software products to

-31-

manufacturers such as Samsung, Sharp, Sony, and Compaq, who integrated the product into their merchandise. This merchandise was subsequently shipped for sale in retail establishments such as Circuit City, CompUSA, Office-Max, and Sears, each of which have retail stores in Delaware. <u>Motorola</u> at 352. Much like CMO, AltoCom argued that it did not have any direct contacts with Delaware (Chen Decl., ¶ 5), that it had never shipped products into Delaware (Chen Decl., ¶ 6), and that it had never advertised, conducted business, or maintained any assets in Delaware (Chen Decl., ¶ 6). <u>Id.</u> Relying on <u>Beverly Hills Fan</u>, however, the Court found jurisdiction over the defendant, finding that "by contracting with entities that have a market presence both nationally and world-wide, AltoCom can hardly be heard to complain that it did not know the likely destination of some of its products would include this forum." <u>Id.</u> at 355.

CMO relies on <u>Red Wing Shoe Company, Inc. v. Hockerson-Halberstadt, Inc.</u>, 148 F.3d 1355 (Fed. Cir. 1998), which is readily distinguishable. In <u>Red Wing Shoe</u>, the defendant was solely engaged in the business of licensing and enforcing the rights associated with two patents. Although it owned the patents, the defendant did not manufacture any products and solely licensed the patents for manufacture by others. <u>Id.</u> at 1357. In contrast, CMO holds 12% of the worldwide market share for LCD monitors and over 18% of the worldwide market share for LCD televisions, approximately one-third of which is supplied to the U.S. market. (Ex. 30 at 15; Ex. 46 at 211.)

Additionally, CMO has specifically designed its products to meet American specifications. CMO has participated in and attended standards meetings held in the United States solely to ensure that it complies with U.S. standards for manufacture and performance of TFT-LCD modules. (Ex. 29.) Although the declaration of CMO's Mr.

660839-1

Chen asserts that CMO does not directly sell products into Delaware (Chen Decl., ¶ 4) or design its products in Delaware (Chen Decl., ¶ 6), CMO does not and cannot deny that its products are sold into the United States, including Delaware and that it has designed and manufactured its goods specifically for the U.S. market.

CMO admits that its LCD modules are sold to customers "who subsequently incorporate the components into computer monitors, notebooks and LCD TVs." (Chen Decl., ¶ 3). Significantly, although CMO states that it has "never sold components to OEMs or others with the intent or for the purpose of selling those products in Delaware," (Chen Decl., ¶ 6.) CMO does not deny that it sells its LCD modules to OEMs with the intent and purpose of selling those products in the U.S. Further, CMO never states that its sales are only in Taiwan or outside the United States. (Id.) Indeed, CMO cannot make such a claim as the evidence clearly establishes that CMO both sells to OEMs worldwide, including in the U.S., and purposefully injects its products into a well-publicized and established distribution channel that leads directly to the United States.

Indeed, published reports relied upon by the industry identify the suppliers and customers at various levels in the distribution chain and even provide market share by region of the world, including North America. "The stream of commerce refers not to unpredictable currents or eddies, but to regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." Asahi Metal Indus. Co. Ltd. v. Superior Court, 480 U.S. 102, 117 (1987) (Brennan, J.) (emphasis added).

Moreover, CMO's obvious knowledge of the worldwide LCD market and industry as shown by published industry data, its attendance at standards meetings, including in the United States, and its presence in the United States through its Delaware subsidiary CMO USA, and Delaware joint venture iZ3D, show that CMO cannot deny that the United States, including Delaware, is the destination for the ultimate sales of the shipments of its LCD modules and the substantial source of its worldwide revenues. Because CMO places its monitors "in the stream of commerce" knowing "the likely destination of the products," its "conduct and connections with [Delaware are] such that [CMO] should reasonably have anticipated being brought into court [here]." See Beverly Hills Fan, 21 F.3d at 1566. CMO most certainly concurs with and substantially benefits from its role in this established distribution channel. The exercise of personal jurisdiction over CMO therefore satisfies the requirements of due process.

Finally, this is not one of those "rare cases" where, despite purposeful contacts, it would be unreasonable to assert jurisdiction because Delaware's and plaintiff's interests are "so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." Beverly Hills Fan at 1568. The Beverly Hills Fan court held that Virginia had substantial interests in (1) discouraging injuries in the state, including patent infringement injury; and (2) cooperating with other states to provide a forum for efficiently litigating plaintiff's cause of action, so as to spare other states and the defendant from the burden of multiple lawsuits. Id. Delaware has the same interests here. Further, as the Beverly Hills Fan court noted, "progress in communications and transportation" have made "the defense of a lawsuit in a foreign

-34-

tribunal less burdensome." Thus, it would not be unduly burdensome to require CMO to defend itself in Delaware. See id. at 1569.

This is particularly true in light of CMO's direct contacts with Delaware. Having purposefully availed itself of the privilege of its LCD modules being sold in Delaware and of the benefits of the United States laws, the exercise of specific or general jurisdiction over CMO will not violate due process.

III.    **LPL'S ALTERNATIVE REQUEST FOR JURISDICTIONAL DISCOVERY**

CMO raised the same jurisdictional issues in the CEA case as those raised here. In addition, the documents produced by CMO in the CEA case related to CMO's importation, sale, and distribution of products in the United States, including in Delaware. Consequently, LPL filed a motion with Magistrate Judge Thynge, seeking to modify the Protective Order to allow LPL to use the discovery from the CEA case in responding to CMO's new motion to dismiss, even though LPL believes that the evidence regarding CMO's contacts with Delaware are more than sufficient to support a denial of CMO's motion. In response to LPL's request, Magistrate Judge Thynge denied the motion without prejudice on the grounds that LPL should have presented it first to the Judge deciding the motion to dismiss. As such, pursuant to the Court's Standing Order, LPL intends to file an alternative motion directing CMO to permit LPL to use the CEA discovery in responding to CMO's motion to dismiss in this case and for leave to conduct additional jurisdictional discovery, which will be filed by the appropriate deadline so that the motion can be heard on this Court's July 13, 2007 hearing date.

LPL has made a sufficient showing to justify the Court's exercise of personal jurisdiction over CMO. However, if the Court is inclined not to deny CMO's motion outright, then LPL requests in the alternative an order directing CMO to permit LPL to

use the discovery produced by CMO in the CEA case or in the alternative to conduct

jurisdictional discovery. LPL believes that jurisdictional discovery from CMO will

further establish CMO's substantial and ongoing contacts with the United States and

Delaware, including its intimate knowledge of the distribution channel through which its

products are directly shipped into this State. See, e.g., Commissariat, 395 F.3d at 1323

(finding that CEA went beyond the mere factual allegations of contacts by CMO, as

required for jurisdictional discovery, and "has already made a prima facie case for

CMO's use of an established distribution network that likely results in substantial sales of

its products in Delaware"); Massachusetts Sch. of Law at Andover, Inc. v. American Bar

Ass'n, 107 F.3d 1026, 1042 (3d Cir. 1997) (holding that "[j]urisdictional discovery

should be allowed unless the plaintiff's claim is 'clearly frivolous'") (citing Nehemiah v.

The Athletics Congress, 765 F.2d 42, 48 (3d Cir. 1985), and Compagnie Des Bauxites De

Guinee v. L'Union Atlantique S.A. d' Assurances, 723 F.2d 357, 362 (3d Cir. 1983)).

## IV.    LPL'S SERVICE OF PROCESS ON CMO WAS EFFECTIVE UNDER BOTH UNITED STATES LAW AND THE LAW OF TAIWAN

### A.    Service on CMO Was Proper Because CMO Is Subject to Personal Jurisdiction in Delaware

LPL's attempted service on CMO under 10 *Del. C.* § 3104 was effective.

Specifically, under 10 Del. C. §3104(d), a party can serve a nonresident defendant by

serving a copy of the Summons and Complaint on the Secretary of State if the defendant

is subject to personal jurisdiction in Delaware, but has no registered agent in the state. 10

Del. C. §3104 ("Any person who commits any of the acts hereinafter enumerated thereby

submits to the jurisdiction of the Delaware courts and is deemed thereby to have

appointed and constituted the Secretary of State of this State the person's agent for the

acceptance of legal process"). Because CMO is subject to personal jurisdiction in

-36-

Delaware, LPL's service on the Secretary of State is valid. While CMO claims that it "never accepted service or signed a receipt for [the Summons and Complaint]," CMO does not state that it never received the Summons and Complaint.[13]

CMO's arguments are also belied by its recent actions in <u>Anvik Corporation v. Chi Mei Optoelectronics Corp., et al.</u>, Case No. 07-0821 SCR (S.D.N.Y.) (filed February 2, 2007). In the <u>Anvik</u> case, the plaintiff attempted to serve CMO with the Summons and Complaint via Federal Express. Although the Federal Express was returned for an "incorrect address," and it is unclear on which section of the service rules plaintiff in that case relied, CMO nonetheless filed its answer to the Complaint without asserting insufficiency of service, apparently conceding to the appropriateness of the service in question. (Ex. 21.)

CMO cannot explain why it failed to challenge either service or jurisdiction in the <u>Anvik</u> case, suggesting that both were either proper or not objectionable, and yet objected to both personal jurisdiction and service in this action where the facts are similar. CMO has no office or employees in New York, is not authorized to do business in New York, and does not own any subsidiaries incorporated in New York. In light of the facts there, it is unclear how CMO can challenge personal jurisdiction and service in this case. The obvious conclusion is that LPL's bringing of this suit in Delaware and its service on CMO in this action are also proper.

---

[13] In addition, CMO's reliance on Section 142 of the Taiwan Code of Civil Procedure is misplaced. Section 142 applies anytime the defendant either refused service or was absent when service was attempted, which CMO has not asserted.

**B.**   **In the Alternative, This Court Should Exercise Its Discretion To Find Service Proper Under Rule 4(f)(3)**

This Court may authorize "other means" of service given CMO's receipt of the Complaint. Fed. R. Civ. P. 4(f)(3) states in relevant part that "service upon an individual . . . may [also] be effected . . . by any other means not prohibited by international agreement as may be directed by the court."

Subsection (f)(3) is an independent basis for service of process and is neither "extraordinary relief" nor a "last resort" to be used only when parties are unable to effectuate service under subsections (f)(1) or (f)(2).[14]  Rio Props., Inc. v. Rio Int'l Interlink, 284 F.3d 1007, 1014 (9th Cir. 2002) (affirming the propriety of allowing service of process by regular mail and e-mail under Rule 4(f)(3)).  Courts have authorized such alternative means of service as service by fax, e-mail, ordinary mail, and publication. See e.g., In re Int'l Telemedia Assoc., 245 B.R. 713, 719-20 (Bankr. N.D. Ga. 2000) (permitting service by fax, email, and mail to the defendant's last known address); Levin v. Ruby Trading Corp., 248 F. Supp. 537, 541 (S.D.N.Y. 1965) (approving service by ordinary mail upon defendant and defendant's attorneys); Forum Fin. Group LLC v. President and Fellows of Harvard College, 199 F.R.D. at 22 (authorizing service upon a defendant located in Russia by sending the summons and complaint by certified mail to defendant's New York counsel).

Here, CMO timely responded to the Complaint with its present motion. See United States v. One Urban Lot, 885 F.2d 994, 998-99 (1st. Cir. 1989); Levin v. Ruby Trading Corp., 248 F. Supp. at 541, n. 10 ("actual receipt of notice is a fact of

---

[14] Application of subsection (f)(3) is particularly appropriate as CMO has a history of attempting to evade service. Commissariat À L'Energie Atomique v. Chi Mei Optoelectronics Corp., et al., Case No., 03-484-KAJ (D. Del.) (filed May 19, 2003).

significance"). In addition, LPL has filed an Amended Complaint in this action (D.I, 54), which among other amendments, names CMO USA as a defendant, and has begun taking steps to serve CMO and CMO USA with the Amended Complaint. As a result, CMO's challenge to the service of the Summons and Complaint is moot. Accordingly, LPL respectfully requests that this Court deny CMO's motion to dismiss the Complaint for insufficient service.

## CONCLUSION

Fair play and substantial justice are the touchstones of the jurisdictional inquiry. CMO has substantial direct contacts with Delaware. CMO also has engaged in purposeful activity involving the United States and this State through an established distribution channel. It would be manifestly unfair and unjust for CMO to profit substantially-- as it undeniably has-- from its use of international distribution channels while pretending that it knows absolutely nothing about what happens beyond its factory doors. CMO (i) continues to manufacture and sell products that infringe LPL's patents, and (ii) now contests personal jurisdiction even though CMO derives substantial revenue from sales of its products in the United States and in Delaware. Further, this Court should find service proper. Accordingly, the Court should deny CMO's motion to dismiss and to quash service.

THE BAYARD FIRM

/s/ *Richard D. Kirk* (rk0922)
Richard D. Kirk
Ashley B. Stitzer
222 Delaware Avenue, 9th Floor
P.O. Box 25130
Wilmington, DE 19899-5130
(302) 655-5000
rkirk@bayardfirm.com

Attorneys for Plaintiff LG.Philips LCD Co., Ltd.

OF COUNSEL:
Gaspare J. Bono
Song K. Jung
R. Tyler Goodwyn, IV
Lora A. Brzezynski
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 496-7500

660839-1

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on May 22, 2007, he electronically filed

the foregoing document with the Clerk of the Court using CM/ECF, which will send

automatic notification of the filing to the following:

Edmond D. Johnson
Thomas H. Kovach
Pepper Hamilton LLP
1313 Market Street, Suite 5100
PO Box 1709
Wilmington, DE  19899-1709

Karen L. Pascale
John W. Shaw
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

Philip A. Rovner
Dave E. Moore
Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, DE  19899-0951

William E. Manning
Jennifer M. Becnel-Guzzo
Buchanan Ingersoll & Rooney
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE  19801

The undersigned counsel further certifies that copies of the foregoing document

were sent by email to the above counsel on May 22, 2007, and will be sent by hand on

May 22, 2007, and were sent by email on May 22, 2007, and will be sent by first class

mail on May 22, 2007, to the following non-registered participants:

John N. Zarian
Samia McCall
Matthew D. Thayne
J. Walter Sinclair
Stoel Rives LLP
101 S. Capitol Blvd., Suite 1900
Boise, ID  83702

Vincent K. Yip
Peter J. Wied
Jay C. Chiu
Paul, Hastings, Janofsky & Walker LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA  90071

656846-1

Kenneth R. Adamo
Robert C. Kahrl
Arthur P. Licygiewicz
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190

Bryan J. Sinclair
Karineh Khachatourian
Buchanan Ingersoll & Rooney
333 Twin Dolphin Drive
Redwood Shores, CA  94065-1418


/s/ Richard D. Kirk (rk922)
Richard D. Kirk

656846-1

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21026758 (D.Del.)
**(Cite as: 2003 WL 21026758 (D.Del.))**

Page 1

▷
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
In re: ELONEX PHASE II POWER
MANAGEMENT LITIGATION
Nos. 01-082 GMS, 01-083 GMS, 01-084 GMS, 01-
085 GMS, 01-086 GMS, 01-087 GMS,
01-088 GMS, 01-089 GMS, 01-104 GMS.

May 6, 2003.

*MEMORANDUM AND ORDER*

SLEET, J.

I. INTRODUCTION

*1 On February 13, 2001, the plaintiffs, Elonex I.P. Holdings, Ltd. and EIP Licensing, B.V. (collectively "Elonex"), filed this action against certain companies that manufacture and sell computer systems or computer monitors. [FN1] The complaint alleges infringement of U.S. Patent Numbers 5,389,952 ("the '952 patent"), 5,648,799 ("the '799 patent"), and 5,649,719 ("the '719 patent"). The lawsuit relates to technology that concerns power management in computer monitors.

> FN1. In December 1998, Elonex I.P. Holdings Ltd. and Elonex plc filed a related lawsuit against another group of defendants on substantially the same grounds ("Elonex Phase I litigation").

On May 21, 2001, Elonex requested entry of default against the defendant Jean Co., Ltd. ("Jean"). The Clerk of the Court entered default against Jean on June 18, 2001. On January 31, 2003, Elonex then moved for entry of default judgment against Jean. On February 20, 2002, counsel entered an appearance on behalf of Jean.

Presently before the court is Jean's motion to dismiss for lack of personal jurisdiction. For the following reasons, the court will deny this motion.

II. BACKGROUND

Jean is an international monitor and electronics manufacturer, with its principle place of business in Taipei, Taiwan. In 2001, Jean had more than $316 million in worldwide sales.

From March 1995 until April 1996, Elonex alleges that Jean shipped 404,855 monitors to the United States. Since 1998, ViewSonic Corporation and eMachines, Inc.--two United States monitor companies with nationwide re-seller networks-- have been among Jean's biggest customers. According to Jean's 1999 Annual Report, ViewSonic alone accounted for 22.91% of Jean's worldwide monitor sales in 1998. In 1999, ViewSonic purchased 30.4% of Jean's total 1999 monitor sales. In 2001, ViewSonic purchased 39.7% of Jean's total monitor sales. Likewise, in 1999, eMachines purchased 12.94% of Jean's worldwide monitor sales.

Additionally, both ViewSonic and eMachines have well-established retail distribution networks. ViewSonic monitors are available from retailers such as Best Buy, Office Depot, and CompUSA. Likewise, eMachines monitors are sold in Delaware at Best Buy, Office Depot, and Circuit City. Both ViewSonic and eMachines also sell monitors directly to consumers via their own internet websites. Thus, the Jean monitors sold to ViewSonic and eMachines are resold in Delaware and throughout the United States.

Furthermore, Delaware purchasers of Jean monitors can download monitor software and obtain customer service via Jean's website. Visitors to the website can also download drivers for Jean monitors and obtain technical support via e-mail. Finally, Jean's website lists an "East Coast" service facility located in New Jersey.

III. DISCUSSION

A. Due Process

The Due Process Clause requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "ha[s] certain minimum contacts with [the forum] state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice." ' *International Shoe* 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). In

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 2
Not Reported in F.Supp.2d, 2003 WL 21026758 (D.Del.)
**(Cite as: 2003 WL 21026758 (D.Del.))**

order to give non-residents "fair warning" that a particular activity may subject them to litigation within the forum, these "minimum contacts" must be purposeful. *See* Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985). In other words, the defendant's contacts must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See* World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). Finally, "even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied." Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1568 (Fed.Cir.1994).

**\*2** In *Beverly Hills Fan,* the Federal Circuit addressed the question of whether Ultec, a People's Republic of China corporation with a manufacturing facility in Taiwan, was subject to personal jurisdiction in Virginia. 21 F.3d at 1560. Ultec claimed that it was not subject to personal jurisdiction in Virginia because it did not have any Virginia assets, employees, or a license to do business in that state. *Id.* Acknowledging that Ultec's sole contact with the forum resulted from indirect shipments through the stream of commerce, the Federal Circuit held that Ultec "purposefully shipped the accused fans into Virginia through an established distribution channel The cause of action for patent infringement is alleged to rise out of these activities. No more is usually required to establish specific jurisdiction." *Id* at 1560, 1564-65.

The court's decision in *Motorola Inc. v. PC-Tel, Inc.* is likewise instructive in resolving the present issue. 58 F.Supp.2d 349 (D.Del.1999). In that case, the court described the accused infringer's sales activities as follows:

Altocom does not (and, it seems, cannot) contest the fact that its softmodems are integrated into a variety of consumer electronic products which are manufactured by well-known multi-national corporations like Compaq, Phillips, Samsung, Sharp, Song, and the like. These goods are then put into the world-wide distribution networks which place them for sale in equally well-known retail stores such as Caldor, Circuit City, CompUSA, Office-Max, Sears, Service Merchandise, and others--all of which have outlets in Delaware.

58 F.Supp.2d at 352. Relying on *Beverly Hills Fan,* the court rejected AltoCom's arguments and held that

exercising personal jurisdiction comported with due process. *See* id. at 355-56.

In the present case, as in *Beverly Hills Fan,* Jean's president states in his declaration that Jean makes no direct sales to the United States. He further states that Jean has no United States offices or subsidiaries. However, the court concludes that Jean has, for many years, been the first link in precisely the kind of indirect distribution chain that the Federal Circuit found sufficient to establish personal jurisdiction. Specifically, Jean sells it monitors to ViewSonic and eMachines, who in turn distribute Jean's monitors to retailers with Delaware operations. Given ViewSonic's and eMachines' extensive re-reseller networks in Delaware and on the Internet, Jean cannot credibly claim it had no inkling that some of its monitors would make their way into Delaware via well-established distribution channels.

Jean further maintains an interactive website through which customers in Delaware, and elsewhere, can download driver software, as well as obtain customer support. On its website, it also lists "Global Service Centers," including an "East Coast" service facility in New Jersey. These facts further support the court's conclusion that Jean's undeniably substantial and regular monitor sales into ViewSonic's and eMachines' national distribution networks constitute "purposeful minimum contacts" with Delaware.

**\*3** Notwithstanding the existence of Jean's purposeful minimum contacts with this forum, the court must consider whether the "minimum requirements inherent in the concept of 'fair play and substantial justice ...' defeat the reasonableness of [the assertion of] jurisdiction, even [if] the defendant has purposefully engaged in forum activities." Asahi Metal Indust. Co. v. Superior Court, 480 U.S. 102, 116 (1987). This question will only be answered affirmatively if the state's and the plaintiff's interest in having the dispute adjudicated in the forum are so minimal as to be outweighed by the burden imposed by subjecting the defendants to litigation within the forum. *See* Beverly Hills Fan, 21 F.3d at 1568.

In the present case, Delaware clearly has a substantial interest in discouraging injuries in the state, including patent infringement injury. It has also been the sole forum for the Elonex Power Management Litigation for several years. Finally, and as the *Beverly Hills Fan* court noted, "progress in communications and transportation" have made "the defense of a lawsuit in a foreign tribunal less burdensome." 21 F.3d at 1569 (internal quotation and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

citation omitted). Thus, the court concludes that any burden on Jean "is not sufficiently compelling to outweigh" Elonex's and Delaware's interests. *Id.*

**B. Delaware's Long-Arm Statute**

The second step in the court's analysis into the propriety of subjecting Jean to personal jurisdiction in this forum is the determination of whether any of the provisions of Delaware's long-arm statute apply. *See* Del.Code. Ann. tit. 10 § 3104. While Jean contends that it does not fall within the grasp of any of Section 3104's provisions, Elonex contends that at least two of the provisions apply here. For purposes of this order, the court need only discuss one.

Under subsection (c)(4), the court may exercise personal jurisdiction over anyone who causes injury either inside or outside of this State "by an act or omission outside of the State" if that individual "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services or things used or consumed in the State." Del.Code. Ann. tit. 10, § 3104(c) (2001). [FN2] The court will interpret this language broadly, as reaching the "maximum parameters of the due process clause." *See Jeffreys v. Exten,* 784 F.Supp. 146, 151 (D.Del.1992).

> FN2. This subsection provides general jurisdiction over the nonresident defendant. *See Mendelson v. Delaware River and Bay Auth.,* 56 F.Supp.2d 436, 439 (D.Del.1999). Accordingly, it is immaterial whether the jurisdictional contact is related to the claim. *See id.*

As discussed above in Section III A, Jean has intentionally sold monitors using nationwide distribution channels. This knowing and purposeful shipment of monitors satisfies the act requirement of Section 3104(c)(4). *See Beverly Hills Fan,* 21 F.3d at 1571. Because Jean undeniably derives substantial revenue from these activities, it is subject to jurisdiction under Delaware's long-arm statute. *See* Chang Decl. at ¶¶ 3-7 (discussing Jean's revenue from sales to ViewSonic and eMachines).

**C. Venue**

*4 Jean finally asserts that, pursuant to 28 U.S.C. § 1391(c), venue is improper in this district. Jean's argument is meritless, however, because "[t]he venue issue is subsumed in the personal jurisdiction issue. Venue lies ipso facto if ... the district court has personal jurisdiction over [the defendant]." *North American Philips Corp. v. American Vending Sales, Inc.,* 35 F.3d 1576, 1577 n. 1 (Fed.Cir.1994); *see also* 28 U.S.C. § 1391(b)(1) & (c) (stating that venue is proper in a judicial district where the defendant corporation is subject to personal jurisdiction at the time the action is commenced). As the court has already found that the exercise of personal jurisdiction is proper and complies with both due process and the Delaware long-arm statute, venue in this district is also proper.

**IV. CONCLUSION**

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Jean's Motion to Dismiss (D.I.856) is DENIED.

Not Reported in F.Supp.2d, 2003 WL 21026758 (D.Del.)

END OF DOCUMENT

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                                                              Page 1
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)
**(Cite as: 2004 WL 503602 (D.Del.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.

PHILIPS ELECTRONICS NORTH AMERICA
CORPORATION and U.S. Philips Corporation,
Plaintiffs,
v.
CONTEC CORPORATION, Compo Micro Tech, Inc.,
Seoby Electronics Co., Ltd., Remote
Solution Co., Ltd., F/K/A Hango Electronics Co., Ltd.,
Hango Remote Solution,
Inc., Defendants.
**No. Civ.A. 02-123-KAJ.**

March 11, 2004.

Richard L. Horwitz, Potter Anderson & Corroon,
LLP, Wilmington, DE, for Plaintiffs.

Patricia Smink Rogowski, Connolly, Bove, Lodge &
Hutz, Jack B. Blumenfeld, Morris, Nichols, Arsht &
Tunnell, Kathleen Jennings-Hostetter, Oberly &
Jennings, Andre G. Bouchard, Bouchard, Margules &
Friedlander, David L. Finger, David L. Finger, Esq.,
Wilmington, DE, for Defendants.

*MEMORANDUM ORDER*

JORDAN, J.

I. INTRODUCTION

**\*1** This is a patent infringement case. Jurisdiction is
proper under 28 U.S.C. § 1338. Presently before me is
a Motion to Dismiss for Lack of Personal Jurisdiction
(the "Motion") filed by defendant Remote Solution
Co., Ltd. ("Remote Solution") pursuant to Federal
Rule of Civil Procedure 12(b)(2). (Docket Item
["D.I."] 105.) For the following reasons, Remote
Solution's Motion will be denied.

II. BACKGROUND

Plaintiffs Philips Electronics North America
Corporation and U.S. Philips Corporation
(collectively, "Philips"), both Delaware corporations,
filed an action on February 12, 2002, alleging that
Contec Corporation ("Contec"), also a Delaware

corporation, was infringing U.S. Patent Nos.
4,703,359 [FN1] (the " '359 patent") and 5,872,562
[FN2] (the " '562 patent"), both owned by Philips.
[FN3] The technology disclosed in the '359 and '562
patents is directed to remote control units ("RCUs")
for controlling home appliances from different
manufacturers and categories. *See* '359 patent, col 1,
Ins. 15-17; '562 patent, col 1, Ins. 13-16 (attached to
D.I. 1 as Exs. A and B). On September 17, 2002,
Philips filed an amended complaint joining Remote
Solution and others as additional defendants in this
action. (D.I.41, 42.) Remote Solution is a Korean
corporation with its principal place of business in
Kimcheon City, Kyongbuk, Korea. (D.I. 41, Ex. A at ¶
6.) Philips alleges that Remote Solution
"manufactures and designs RCUs that infringe the
patents in suit under a manufacturing and purchase
agreement with Contec, and is subject to personal
jurisdiction in [the District of Delaware]." (*Id.* at ¶
12.) One of the types of RCUs accused of
infringement in this case is Remote Solution's model
RT U49C. (*Id.*)

> FN1. The '359 patent, entitled "Universal
> Remote Control Unit With Model
> Identification Capability," names as
> inventors Robin B. Rumbolt, William R.
> McIntyre, and Larry E. Goodson. The '359
> patent issued on October 27, 1987 and was
> assigned to Philips on May 25, 1993. (D.I. 42,
> Ex. A at ¶ 16.)

> FN2. The '562 patent, entitled "Universal
> Remote Control Transmitter With Simplified
> Device Identification," names as inventors
> Donald P. McConnell and William R.
> McIntyre. The '562 patent issued on February
> 16, 1999 and was assigned to Philips on the
> same day. (D.I. 42, Ex. A at ¶ 17.)

> FN3. Defendants Contec Corporation and
> Seoby Electronics Co. are no longer involved
> in this case, having submitted to a Consent
> Judgment on August 28, 2003. (D.I.258.)

Remote Solution filed its Motion on January 24, 2003,
arguing that this court cannot properly exercise
personal jurisdiction over it under Delaware's
long-arm statute, 10 Del. C. § 3104, or consistent with
the requirements of the Due Process Clause. (D.I. 106
at 4, 9.) In support of its Motion, Remote Solution

Not Reported in F.Supp.2d                                                                                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)
**(Cite as: 2004 WL 503602 (D.Del.))**

submitted the Declaration of its Director, Suk-Kyu Park. (*Id.,* Ex. A.) In his declaration, Mr. Park stated that Remote Solution does not have any offices, facilities, subsidiaries or employees in Delaware; is not registered to do business in Delaware; has not contracted to supply services or things in Delaware; has no sales force in Delaware; has derived no revenues from sales in Delaware; does not own any property, assets or bank accounts in Delaware or maintain any offices in Delaware. (*Id.* ¶ 4, 7-10.) According to Mr. Park, Contec is Remote Solution's only customer for the accused RT U49C RCU. (*Id.* ¶ 5.) Mr. Park further stated that Remote Solution maintains a website to provide information about its products, but Remote Solution does not accept orders through its website. (*Id.* ¶ 12.)

After Remote Solution filed its Motion, the parties conducted jurisdictional and substantive discovery until September 15, 2003. (D.I. 286 at 2.) The following facts are taken from Philips' opposition to Remote Solution's Motion. (D.I.286.) Since Philips' factual allegations are not directly controverted, they are taken as true for purposes of determining jurisdiction in this court. *See Beverly Hills Fan Co. V. Royal Sovereign Corp.,* 21 F.3d 1558, 1563 (Fed.Cir.1994).

**\*2** In 1997, Remote Solution decided to expand its RCU sales by entering the United States consumer market. (*Id.* at 5 (citing deposition testimony of Suk-Kyu Park at D.I. 287, Ex. 14).) To that end, Remote Solution hired David Ahn, a native Korean living in California, as its exclusive sales agent in the United States. (*Id* .) Mr. Ahn established Hango Electronics, Inc., d/b/a Remote Solution ("HEI") in California, for the sole purpose of soliciting customers in the United States on behalf of Remote Solution. (*Id.* (citing deposition testimony of David Ahn at D.I. 287, Ex. 3).) HEI is an independent corporation of which Mr. Ahn is the sole owner and employee. (*Id.*)

In 1999, HEI entered into a Manufacturing and Purchase Agreement with Contec, L.P., a New York limited partnership, wherein Contec L.P. retained HEI to design and manufacture RCUs and sell them to Contec L.P. [FN4] (D.I. 287, Ex. 15 at 1.) HEI also agreed to "defend any suit or proceeding brought against Contec L.P. to the extent that such suit or proceeding is based on a claim that the [RCUs] constitute an infringement of any valid United States ... patent...." (*Id.* at 3.) In 2000, with Mr. Ahn's consent, HEI changed its name to Remote Solution, the name under which Mr. Ahn conducts business in California. (*Id.* at 6.)

FN4. The relationship between Contec L.P. and Contec Corporation was fleshed out at oral argument. At some point in time, Contec L.P., a New York entity, merged with Contec LLC, another New York entity, which then merged with Contec Corporation, a Delaware entity. (D.I. 338 at 67:16-25.)

According to Mr. Ahn, Remote Solution's business plan was to sell as many RCUs as possible. (*Id.*) As a result of his extensive efforts to market the RCUs, Mr. Ahn acquired Contec, TiVo, Inc., Harman Kardon, Inc. and Hy-Tek Manufacturing Co., Inc. as customers for Remote Solution. (*Id.*) Remote Solution does not design its own remote controls, rather, it manufactures them according to its customers' specifications. (*Id.* at 7.) Contec is a Delaware corporation with its principal place of business in New York, and its primary business is to sell refurbished cable set top boxes and RCUs to major cable companies in the United States. (*Id.* at 10.) Contec's customers include Comcast, which provides cable television services to residents of Delaware. (*Id.*) Generally, Remote Solution knows who Contec's customers are because Remote Solution marks the RCUs with those customer's logos. (*Id.;* D.I. 287, Ex. 10.) Remote Solution knew that Comcast was one of Contec's customers, as it sent drawings of the Comcast logo to Contec via email on April 24, 2002. (D.I.287, Ex. 36.)

In 2000, Remote Solution established a subsidiary in the United States, Hango Remote Solution, Inc. ("Hango"). (D.I. 286 at 8.) Remote Solution was a 70% shareholder in Hango and Mr. Ahn owned the remaining 30%. (*Id.*) About half of Hango's revenue came from sales of Remote Solution's RCUs, Hango's primary business was marketing an MP3 player called Personal Jukebox. (*Id.* at 8-9.) Ultimately, however, Hango's business failed, and the company folded in December 2002. (*Id.* at 9.) Thereafter, Remote Solution began litigating this case on Hango's behalf as well as its own, filing an answer to the complaint and a motion to amend the answer to include a crossclaim against Contec for indemnification in the event Hango is found liable for patent infringement. (*Id.* at 9; *see also* D.I. 287, Ex. 2 at 8.)

**\*3** Remote Solution has sold at least 1,969,849 of the accused RCUs in the United States since November 22, 2000. (D.I. 286 at 2 (citing Expert Report of Kerry Ruoff at D.I. 287, Ex. 1).) Based on the records obtained from TiVo, one of Remote Solution's customers, Philips discovered that at least 2,000 infringing RCUs manufactured by Remote Solution

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)
**(Cite as: 2004 WL 503602 (D.Del.))**

for TiVo have been sold or used in Delaware since March 31, 1999. (D.I. 286 at 3, 13.) According to TiVo's records, 1,738 residents of Delaware subscribed to TiVo's service between March 31, 1999 and May 28, 2003. (*Id.* (citing Declaration of Matthew P. Zinn at D.I. 287, Ex. 39 ¶ 12).) Because TiVo sells its digital video recorders ("DVRs") bundled with the RCUs manufactured by Remote Solution, it is likely that more than 1,500 Remote Solution RCUs are being used for TiVo recorders in Delaware today. (*Id.* (citing D.I. 287, Ex. 39 ¶ ¶ 6, 17).) Furthermore, since January 1, 2000, more than 1,000 DVRs bundled with RCUs manufactured by Remote Solution were sold in Delaware at two retailers, specifically, 694 were sold at BestBuy and 406 were sold at Circuit City. (*Id.* (citing Declaration of Scott Jacobi at D.I. 287, Ex. 40 ¶ 7; Declaration of Mark Smucker at D.I. 287, Ex. 41 ¶ 9).)

**III. DISCUSSION**

When a non-resident defendant's motion to dismiss challenges personal jurisdiction, the plaintiff has the burden to show the basis for the court's jurisdiction over that defendant. *Intel Corp. v. Broadcom Corp., 167 F.Supp.2d 692, 699 (D.Del.2001)* (citing *Wright v. American Home Products, 768 A.2d 518, 526 (Del.Super.2000)*). To satisfy this burden, Philips must make a *prima facie* showing that this court may exercise personal jurisdiction over Remote Solution. *Id.* After discovery has begun, the plaintiff must sustain this burden by "establishing jurisdictional facts through sworn affidavits or other competent evidence." *Id.* (citing *Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n. 9 (3d Cir.1984)*).

Determining whether Remote Solution is subject to personal jurisdiction requires a two-part analysis. *Id. at 700; see also Siemens Aktiengesellschaft v. LG Semicon Co., Ltd., 69 F.Supp.2d 622, 624 (D.Del.1999)*. First, I must determine whether the language of Delaware's long-arm statute, 10 Del. C. § 3104(c), reaches Remote Solution. *Broadcom,* 167 F.Supp. at 700. Second, if I find that Remote Solution's conduct gives rise to personal jurisdiction under the long-arm statute, I must then determine whether subjecting Remote Solution to jurisdiction in Delaware would comport with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.* (citing *Intel Corp. v. Silicon Storage Tech., Inc., 20 F.Supp.2d 690, 694 (D.Del.1998)*).

A. Jurisdiction over Remote Solution is Proper Under § 3104(c)(1) of Delaware's Long-Arm Statute

Philips contends that Remote Solution is subject to jurisdiction under sections 3104(c)(1) and (c)(4) of the Delaware long-arm statute (D.I. 286 at 17, 20), which provide:

**\*4** (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:

* * *

(1) Transacts business or performs any character of work or service in the State;

* * *

(4) Causes tortious injury in the State or outside of the State by an act or omission outside of the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State.... 10 Del. C. § § 3104(c)(1) & (c)(4). Delaware state courts have interpreted the "transacting business" provision of § 3104(c)(1) as a specific jurisdiction provision that requires a nexus between the cause of action and the conduct used as a basis for jurisdiction. *See LaNuova D & B S.p.A. v. Bowe Co., 513 A.2d 764, 768 (Del.1986)*. The Federal Circuit has held that, where a defendant has "purposefully shipped the accused [product] into [the forum state] through an established distribution channel ... [n]o more is usually required to establish specific jurisdiction." *Beverly Hills Fan, 21 F.3d at 1564*. Moreover, in order to meet the requirements of § 3104(c)(1), Remote Solution's actions must be directed at residents of Delaware and the protection of Delaware laws. *See Thorn EMI N. Am., Inc. v. Micron Tech., Inc., 821 F.Supp. 272, 274 (D.Del.1993)* (citing *Sears, Roebuck & Co. v. Sears, 744 F.Supp. 1289, 1292 (D.Del.1990)*).

Philips argues that Remote Solution has shipped the accused RCUs into an established distribution channel as part of a general business plan that results in sales of the accused products in Delaware. (D.I. 286 at 18.) In response, Remote Solution argues that it merely had a general plan to serve the national market and that its activities were not directed specifically toward Delaware. (D.I. 309 at 2, 4.)

I find that Philips has presented competent evidence that an established distribution channel exists through which accused RCUs manufactured by Remote Solution are shipped to, distributed, and sold in Delaware. First, the evidence shows that Remote Solution and Contec have enjoyed a close business relationship since at least as early as 1999, when, in a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 4
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)
**(Cite as: 2004 WL 503602 (D.Del.))**

manufacturing and purchase agreement governed by New York law, Remote Solution agreed to defend one of Contec's predecessors against any claims of patent infringement. Furthermore, Remote Solution is seeking indemnification from Contec for Hango, Remote Solution's defunct subsidiary, in the event Hango is found liable for patent infringement in this case. Philips has also presented competent evidence that Remote Solution knew that Comcast, a major provider of cable television services in the State of Delaware, was one of Contec's customers for the accused RCU. Given all of these facts, and in light of Remote Solution's ongoing business relationship with Contec, it was reasonably foreseeable that the accused RCUs would make their way into the Delaware market through Contec's customers. Documents obtained from Remote Solution show that Contec was selling the accused RCUs to Comcast, such that Remote Solution knew or should have known that the accused RCUs were being sold or distributed in Delaware. *See Thorn EMI, 821 F.Supp. at 275-76.*

**\*5** Finally, Philips has competent evidence that the accused RCUs are present in Delaware in large numbers, and were present in Delaware prior to its filing suit, as a result of Remote Solution manufacturing the accused RCUs for TiVo. Because Philips has presented competent evidence of an established distribution channel that caused the accused RCUs to be sold and distributed in Delaware, and that the accused RCUs are actually present in Delaware, I find that jurisdiction over Remote Solution is proper under § 3104(c)(1), and I need not address the issue of whether jurisdiction over Remote Solution is proper under § 3104(c)(4). [FN5]

> FN5. Remote Solutions relies upon *Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.,* 293 F.Supp.2d 423, *reconsideration denied,* 293 F.Supp.2d 430 (D.Del.2003) (granting defendant's motion to dismiss for lack of personal jurisdiction in patent infringement case) in support of its motion to dismiss. There are key factual distinctions between this case and *Commissariat.* First, unlike the plaintiff in *Commissariat,* Philips requested and conducted jurisdictional discovery which uncovered evidence of actual sales and the presence of the accused device in Delaware prior and subsequent to the date the complaint was filed, evidence that was lacking in *Commissariat.* Second, that Remote Solution (1) agreed to defend a predecessor of Contec from patent

infringement and (2) is seeking indemnification from Contec should Hango be found liable for patent infringement is evidence of Remote Solution's close business relationship with Contec, and its knowledge of the established distribution channel through which its products were being sent into Delaware. Thus, the quantum of evidence upon which to rest personal jurisdiction in this case is significantly greater than in *Commissariat.*

B. Exercising Jurisdiction over Remote Solution in Delaware Comports With the Requirements of the Due Process Clause

Due process requires that sufficient minimum contacts exist between the defendant and the forum state to satisfy "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In considering whether jurisdiction may extend to a defendant, courts should primarily consider whether the defendant has purposely availed itself of the forum state's law, *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), and whether the defendant reasonably could have anticipated being haled into the courts of the forum state, *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291-92, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Courts should also consider the burden imposed on the defendant by having to litigate in a foreign forum, as well as the interests of the plaintiff and the forum state. *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

In this case, the accused RCUs arrived in Delaware through Remote Solution's purposeful shipment of them through an established distribution channel. See *Beverly Hills Fan,* 21 F.3d at 1565. Philips has "stated all of the necessary ingredients for an exercise of jurisdiction consonant with the requirements of due process," namely, that Remote Solution placed the accused products in the stream of commerce, that it knew the likely destination of the products, and that its conduct and connections with Delaware were such that they should reasonably have anticipated being brought into court here. *Id.* at 1566.

Finally, litigating this case in Delaware would not place such a burden on Remote Solution as to offend traditional notions of fair play and substantial justice, especially since Remote Solution has executed an agreement to defend Contec L.P. against all claims of

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)
**(Cite as: 2004 WL 503602 (D.Del.))**

patent infringement, which proves that Remote Solution was well aware of and prepared for the possibility of litigation where Contec did business, including Delaware. Nor has Remote Solution shown that it does not have the resources to fairly litigate this case in Delaware. See *Thorn EMI*, 821 F.Supp. at 276. Moreover, "Delaware has an abiding interest in protecting the property rights of its residents[.]" *id.,* including corporate citizens such as Philips. Thus, exercising jurisdiction over Remote Solution in this case comports with the requirements of the Due Process Clause.

IV. CONCLUSION

**\*6** For these reasons, it is hereby ORDERED that Remote Solution's Motion to Dismiss for Lack of Personal Jurisdiction (D.I.105) is DENIED.

Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.