**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LG.PHILIPS LCD CO., LTD.,<br><br>    Plaintiff,<br><br>  v.<br><br>CHI MEI OPTOELECTRONICS<br>CORPORATION, et al.<br><br>    Defendants. | Civil Action No.  06-726 (JJF) |

**EXHIBITS 11-20 TO DECLARATION OF LORA A. BRZEZYNSKI, ESQ.**
**IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS FOR LACK OF**
**PERSONAL JURISDICTION AND FOR INSUFFICIENCY OF SERVICE**
**OF PROCESS**

THE BAYARD FIRM

Richard D. Kirk
Ashley B. Stitzer
222 Delaware Avenue, 9th Floor
P.O. Box 25130
Wilmington, DE 19899-5130
(302) 655-5000
rkirk@bayardfirm.com

Attorneys for Plaintiff LG.Philips LCD Co., Ltd.

OF COUNSEL:
Gaspare J. Bono
Song K. Jung
R. Tyler Goodwyn, IV
Lora A. Brzezynski
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C.  20006
(202) 496-7500

May 22, 2007

# EXHIBIT 11

# Chi Mei Optoelectronics Corporation

**Financial Statements for the
Years Ended December 31, 2006 and 2005 and
Independent Auditors' Report**

**INDEPENDENT AUDITORS' REPORT**

The Board of Directors and the Shareholders
Chi Mei Optoelectronics Corporation

We have audited the accompanying balance sheets of Chi Mei Optoelectronics Corporation ("the Corporation") as of December 31, 2006 and 2005, and the related statements of income, changes in shareholders' equity and cash flows for the years then ended.    These financial statements are the responsibility of the Corporation's management.    Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the Rules Governing the Audit of Financial Statements by Certified Public Accountants and auditing standards generally accepted in the Republic of China.    Those rules and standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.    An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.    An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.    We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Chi Mei Optoelectronics Corporation as of December 31, 2006 and 2005, and the results of its operations and its cash flows for the years then ended in conformity with the Guidelines Governing the Preparation of Financial Reports by Securities Issuers, requirements of the Business Accounting Law and Guidelines Governing Business Accounting relevant to financial accounting standards, and accounting principles generally accepted in the Republic of China.

As disclosed in Note 3 to the financial statements, the Corporation adopted the newly released Statements of Financial Accounting Standards (SFAS) No. 35 "Accounting for Assets Impairment" on January 1, 2005.    The Corporation also adopted the newly released SFAS No. 34 "Accounting for Financial Instruments" and No. 36 "Disclosure and Presentation for Financial Instruments" and the related revisions of previously released SFASs on January 1, 2006.

We have also audited the consolidated financial statements of Chi Mei Optoelectronics Corporation as of and for the years ended December 31, 2006 and 2005, and have expressed an unqualified audited report with an explanatory paragraph on such consolidated financial statements.

February 28, 2007

<u>*Notice to Readers*</u>

*The accompanying financial statements are intended only to present the financial position, results of operations and cash flows in accordance with accounting principles and practices generally accepted in the Republic of China and not those of any other jurisdiction.  The standards, procedures and practices to audit such financial statements are those generally accepted and applied in the Republic of China.*

*For the convenience of readers, the auditors' report and the accompanying financial statements have been translated into English from the original Chinese version prepared and used in the Republic of China.  If there is any conflict between the English version and the original Chinese version or any difference in the interpretation of the two versions, the Chinese-language auditors' report and financial statements shall prevail.*

# CHI MEI OPTOELECTRONICS CORPORATION

**BALANCE SHEETS**
**DECEMBER 31, 2006 AND 2005**
(In Thousands of New Taiwan Dollars, Except Par Value)

| ASSETS | 2006 Amount | % | 2005 Amount | % |
|---|---|---|---|---|
| **CURRENT ASSETS** | | | | |
| Cash and cash equivalents (Notes 2 and 4) | $ 26,728,780 | 6 | $ 20,091,020 | 8 |
| Financial assets at fair value through profit or loss - current (Notes 2, 3, 5 and 30) | 22,708,442 | 6 | | |
| Available-for-sale financial assets - current (Notes 2 and 6) | 860,365 | | | |
| Derivative financial assets for hedging - current (Notes 2, 3 and 30) | | | 880,496 | |
| Notes and accounts receivable (Notes 2, 7 and 26) | | | | |
| Related parties | 1,697,182 | | 3,969,970 | 1 |
| Others, net | 24,981,957 | 6 | 31,993,287 | 12 |
| Other receivables | 745,126 | | 516,843 | |
| Other receivables from related parties (Note 26) | 597,997 | | 494,554 | |
| Other financial assets - current (Note 30) | 8,735 | | 4,619 | |
| Inventories (Notes 2 and 8) | 23,774,039 | 6 | 14,846,750 | 5 |
| Deferred income tax assets - current (Notes 2 and 23) | | | 1,370,109 | 1 |
| Prepaid expenses and other current assets (Notes 26 and 29) | 4,534,322 | | 4,581,777 | 2 |
| Total current assets | 107,985,545 | 26 | 77,232,235 | 28 |
| **LONG-TERM INVESTMENTS** | | | | |
| Investments accounted for using equity method (Notes 2 and 9) | 12,808,801 | 3 | 4,139,142 | 1 |
| Prepayment for long-term investment (Note 9) | | | 5,682,065 | 2 |
| Financial assets at fair value through profit or loss - noncurrent (Notes 2, 5 and 30) | 33,498 | | | |
| Available-for-sale financial assets - noncurrent (Notes 2, 5 and 6) | 4,174,238 | 1 | | |
| Derivative financial assets for hedging - noncurrent (Notes 2, 10 and 30) | 238,327 | | | |
| Financial assets carried at cost (Notes 2 and 11) | 211,175 | | | |
| Bond portfolio with no active market (Notes 2, 3 and 12) | 80,000 | | 229,735 | |
| Total long-term investments | 17,546,039 | 4 | 15,530,320 | 6 |
| **PROPERTY, PLANT, AND EQUIPMENT (Notes 2, 13, 26, 27 and 29)** | | | | |
| Cost | | | | |
| Buildings | 31,292,616 | 8 | 21,383,724 | 8 |
| Machinery and equipment | 179,432,714 | 43 | 124,599,169 | 45 |
| Transportation | 85,220 | | 73,171 | |
| Office equipment | 1,023,969 | | 737,986 | |
| Facility equipment | 26,454,252 | 6 | 1,850,191 | 1 |
| Miscellaneous equipment | 2,564,169 | | 1,820,692 | |
| Total | 240,940,940 | 58 | 166,607,840 | 60 |
| Less: Accumulated depreciation | 80,698,373 | 19 | 52,587,868 | 19 |
| Advanced payments and construction in progress | 106,880,491 | 26 | 59,176,752 | 22 |
| Net property, plant and equipment | 267,310,058 | 65 | 173,038,706 | 63 |
| **INTANGIBLE ASSETS, NET (Notes 2 and 14)** | 1,553,462 | | 1,754,668 | 1 |
| **OTHER ASSETS** | | | | |
| Prepayment for purchases - noncurrent (Note 29) | 8,246,837 | 2 | 8,717,778 | 3 |
| Deferred income tax assets - noncurrent; net (Notes 2 and 23) | 4,257,876 | 1 | 1,533,308 | 1 |
| Deferred charges, net (Notes 2 and 15) | 4,966,226 | 1 | 3,042,194 | 1 |
| Assets leased to others, net (Notes 2 and 16) | 1,411,126 | | 627,270 | |
| Refundable deposits | 401,192 | | 108,545 | |
| Pledged time deposits (Note 27) | 750 | | | |
| Total other assets | 18,932,201 | 4 | 13,988,884 | 5 |
| **TOTAL** | $ 412,410,065 | 100 | $ 276,564,742 | 100 |

| LIABILITIES AND SHAREHOLDERS' EQUITY | 2006 Amount | % | 2005 Amount | % |
|---|---|---|---|---|
| **CURRENT LIABILITIES** | | | | |
| Short-term bank loans (Note 17) | $ 500,000 | | $ 4,080,004 | 1 |
| Commercial paper (Note 18) | | | 2,991,368 | 1 |
| Notes and accounts payable | | | | |
| Related parties (Note 26) | | | | |
| Others | 11,164,617 | 3 | 4,585,656 | 2 |
| Financial liabilities at fair value through profit or loss - current (Notes 2, 5 and 30) | 26,065,664 | 6 | 22,529,431 | 8 |
| Related parties | 3,629,476 | 1 | | |
| Payables to related parties (Note 26) | 114,565 | | 149,891 | |
| Other payables (Notes 2 and 7) | 3,398,062 | 1 | | |
| Payables to contractors and equipment suppliers (Notes 26 and 29) | 17,156,880 | 4 | 10,701,859 | 4 |
| Current portion of long-term liabilities (Notes 19, 26 and 21) | 19,812,619 | 5 | 11,528,742 | 4 |
| Accrued provision for product warranty (Note 2) | 141,420 | | 146,985 | |
| Deferred income tax liabilities - current (Notes 2 and 23) | | | 710,334 | |
| Accrued expenses and other current liabilities (Notes 26 and 26) | 5,406,272 | 1 | 4,143,258 | 1 |
| Total current liabilities | 88,339,838 | 21 | 61,859,441 | 21 |
| **LONG-TERM LIABILITIES BEARING INTERESTS** | | | | |
| Long-term loans - net of current portion (Notes 19, 26 and 27) | 134,073,410 | 33 | 63,900,929 | 23 |
| Derivative financial liabilities for hedging - noncurrent (Notes 2, 10 and 30) | 1,426,080 | | | |
| Financial liabilities at fair value through profit or loss - noncurrent (Notes 2, 5 and 30) | 49,225 | | | |
| Total long-term liabilities bearing interests | 135,548,715 | 33 | 63,900,929 | 23 |
| **OTHER LIABILITIES** | | | | |
| Accrued pension liability (Notes 2 and 20) | 194,143 | | 273,799 | |
| Guarantee deposits | 16,797 | | 44,315 | |
| Others (Notes 2 and 26) | 137,507 | | 4,861,774 | 2 |
| Total other liabilities | 348,447 | | 5,179,888 | 2 |
| Total liabilities | 224,137,058 | 54 | 130,940,192 | 47 |
| **CAPITAL STOCK - $10 PAR VALUE (Notes 2 and 21)** | | | | |
| Authorized - 8,600,000 thousand shares in 2006 and 7,590,000 thousand shares in 2005 | | | | |
| Issued | | | | |
| Common - 6,486,196 thousand shares in 2006 and 5,121,710 thousand shares in 2005 | 64,861,961 | 16 | 51,217,101 | 19 |
| Preferred - 1,578,187 thousand shares | 15,781,870 | 4 | 15,381,870 | 6 |
| Total capital | 80,643,831 | 20 | 66,598,971 | 24 |
| **CAPITAL SURPLUS (Notes 2 and 21)** | | | | |
| From stock issued in excess of par value - common shares | 86,635,394 | 21 | 58,232,394 | 21 |
| From stock issued in excess of par value - preferred shares | 2,501,984 | | 2,901,984 | 1 |
| From long-term investment | 34,944 | | 34,944 | |
| Total capital surplus | 89,172,322 | 22 | 61,169,322 | 22 |
| **RETAINED EARNINGS (Note 21)** | | | | |
| Legal reserve | 3,662,427 | | 2,801,104 | 1 |
| Special reserve | 663,811 | | | |
| Unappropriated earnings | 12,163,218 | | 15,166,045 | 5 |
| Total retained earnings | 16,289,456 | | 17,967,209 | 6 |
| **OTHERS (Notes 2 and 3)** | | | | |
| Cumulative translation adjustments | (587,905) | | (663,347) | |
| Unrealized gain or loss on financial instruments | 2,695,172 | | 468 | |
| Total others | 2,108,102 | | (662,861) | |
| Total shareholders' equity | 188,262,362 | 46 | 145,624,550 | 53 |
| **TOTAL** | $ 412,410,065 | 100 | $ 276,564,742 | 100 |

- 2 -

The accompanying notes are an integral part of the financial statements.

(With Deloitte & Touche audit report dated February 28, 2007.)

# CHI MEI OPTOELECTRONICS CORPORATION

**STATEMENTS OF INCOME**
**YEARS ENDED DECEMBER 31, 2006 AND 2005**
**(In Thousands of New Taiwan Dollars, Except Earnings Per Share)**

| | 2006 | | 2005 | |
|---|---|---|---|---|
| | Amount | % | Amount | % |
| GROSS SALES | $ 192,431,844 | | $ 154,256,773 | |
| SALES RETURNS AND ALLOWANCES (Note 2) | 5,379,740 | | 1,412,158 | |
| NET SALES (Notes 2 and 26) | 187,052,104 | 100 | 152,844,615 | 100 |
| COST OF SALES (Notes 24 and 26) | 165,416,353 | 89 | 133,007,139 | 87 |
| GROSS PROFIT BEFORE REALIZED (UNREALIZED) GROSS PROFIT FROM AFFILIATES | 21,635,751 | 11 | 19,837,476 | 13 |
| REALIZED (UNREALIZED) GROSS PROFIT FROM AFFILIATES (Note 2) | 7,598 | - | (7,598) | - |
| GROSS PROFIT | 21,643,349 | 11 | 19,829,878 | 13 |
| OPERATING EXPENSES (Notes 24 and 26) | | | | |
| Marketing | 4,777,732 | 2 | 3,278,973 | 2 |
| General and administrative | 3,520,770 | 2 | 2,217,228 | 1 |
| Research and development | 5,231,665 | 3 | 4,058,214 | 3 |
| Total operating expenses | 13,530,167 | 7 | 9,554,415 | 6 |
| OPERATING INCOME | 8,113,182 | 4 | 10,275,463 | 7 |
| NONOPERATING INCOME AND GAINS | | | | |
| Valuation gain on financial liabilities, net (Notes 2, 5 and 30) | 3,683,384 | 2 | - | - |
| Interest income | 411,288 | - | 130,198 | - |
| Rental income (Note 26) | 179,365 | - | 69,368 | - |
| Indemnification income | 95,500 | - | 111,723 | - |
| Royalty income (Note 26) | 87,750 | - | 211,700 | - |
| Administrative service income (Note 26) | 44,045 | - | 203,014 | - |
| Foreign exchange gain, net (Notes 2 and 3) | - | - | 1,772,312 | 1 |
| Investment income recognized by equity method, net (Notes 2 and 9) | - | - | 923,498 | 1 |
| Others (Notes 2 and 26) | 422,708 | 1 | 495,961 | - |
| Total nonoperating income and gains | 4,924,040 | 3 | 3,917,774 | 2 |

(Continued)

# CHI MEI OPTOELECTRONICS CORPORATION

**STATEMENTS OF INCOME**
**YEARS ENDED DECEMBER 31, 2006 AND 2005**
**(In Thousands of New Taiwan Dollars, Except Earnings Per Share)**

| | 2006 | | 2005 | |
|---|---|---|---|---|
| | Amount | % | Amount | % |
| NONOPERATING EXPENSES AND LOSSES | | | | |
| Interest expense (Notes 2, 13 and 26) | $ 3,398,145 | 2 | $ 2,391,293 | 2 |
| Foreign exchange loss, net (Notes 2 and 3) | 3,140,558 | 2 | - | - |
| Investment loss recognized by equity method, net (Notes 2 and 9) | 813,531 | 1 | - | - |
| Provision for loss on inventories (Note 2) | 418,643 | - | 574,530 | - |
| Valuation loss on financial assets, net (Notes 2, 3 and 30) | 212,205 | - | 2,566,001 | 2 |
| Financial expenses (Note 3) | 60,432 | - | 17,180 | - |
| Loss on impairment of assets (Notes 2, 3 and 9) | - | - | 234,914 | - |
| Loss on impairment of long-term investments (Notes 2 and 11) | - | - | 106,689 | - |
| Others (Notes 2 and 7) | 454,827 | - | 341,204 | - |
| Total nonoperating expenses and losses | 8,498,341 | 5 | 6,231,811 | 4 |
| INCOME BEFORE INCOME TAX | 4,538,881 | 2 | 7,961,426 | 5 |
| INCOME TAX EXPENSE (BENEFIT) (Notes 2 and 23) | 3,177 | - | (85,356 ) | - |
| NET INCOME BEFORE CUMULATIVE EFFECT OF CHANGES IN ACCOUNTING PRINCIPLES | 4,535,704 | 2 | 8,046,782 | 5 |
| CUMULATIVE EFFECT OF CHANGES IN ACCOUNTING PRINCIPLES, NET OF TAX BENEFIT OF NT$330,874 THOUSAND (Note 3) | (992,623 ) | - | - | - |
| NET INCOME | $ 3,543,081 | 2 | $ 8,046,782 | 5 |

| | 2006 | | 2005 | |
|---|---|---|---|---|
| | Before Income Tax | After Income Tax | Before Income Tax | After Income Tax |
| EARNINGS PER SHARE (Note 25) | | | | |
| Basic | $ 0.54 | $ 0.54 | $ 1.50 | $ 1.52 |
| Diluted | $ 0.54 | $ 0.54 | $ 1.48 | $ 1.50 |

The accompanying notes are an integral part of the financial statements.

(With Deloitte & Touche audit report dated February 28, 2007)          (Concluded)

# CHI MEI OPTOELECTRONICS CORPORATION

**STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY**
**YEARS ENDED DECEMBER 31, 2006 AND 2005**
(In Thousands of New Taiwan Dollars, Except Per Share Amounts)

| | Capital Stock | | | | Capital Surplus | | | Retained Earnings | | | | | Cumulative Translation Adjustments | Others Unrealized Gain or Loss on Financial Instruments | | Total Shareholders' Equity |
| | Common Stock | | Preferred Stock | | | | | | | | | | | Available-for-sale Financial Assets | Derivative for Cash Flow Hedge | |
| | Shares (Thousands) | Amount | Shares (Thousands) | Amount | Stock Issued in Excess of Par Value | Long-term Investment and Merger | Total | Legal Reserve | Special Reserve | Unappropriated Retained Earnings | Total | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BALANCE, JANUARY 1, 2005 | 3,818,414 | $ 38,184,139 | 78,187 | $ 781,870 | $ 59,306,921 | $ 54,405 | $ 59,361,326 | $ 1,081,989 | $ - | $ 17,545,738 | $ 18,627,727 | $ 125,175 | $ - | $ - | $ - | $ (70,070) |
| Appropriation of prior year's earnings | | | | | | | | | | | | | | | | |
| Legal reserve | | | | | | | | 1,719,115 | | (1,719,115) | - | | | | | |
| Cash dividends to preferred shareholders | | | | | | | | | | (47,616) | (47,616) | | | | | (47,616) |
| Stock dividends to common shareholders—NT$1.05 per share | 620,872 | 6,208,722 | | | | | | | | (6,208,722) | (6,208,722) | | | | | - |
| Cash dividends to common shareholders—NT$0.35 per share | | | | | | | | | | (1,553,181) | (1,553,181) | | | | | (1,553,181) |
| Bonus to employees—stock | 68,985 | 689,850 | | | | | | | | (689,850) | (689,850) | | | | | - |
| Remuneration to directors and supervisors | | | | | | | | | | (172,470) | (172,470) | | | | | (172,470) |
| | | | | | | | | | | (3,960) | (3,960) | | | | | (3,960) |
| Conversion of convertible bonds | 113,439 | 1,134,389 | | | 3,124,571 | | 3,124,571 | | | | | | | | | 4,258,960 |
| Issuance of preferred shares on June 6, 2005 | | | 1,500,000 | 15,000,000 | | | | | | | | | | | | 15,000,000 |
| Issuance of GDRs representing common shares on June 15, 2005 | 500,000 | 5,000,000 | | | 18,212,886 | | 18,212,886 | | | | | | | | | 23,212,886 |
| Net income in 2005 | | | | | | | | | | 8,046,782 | 8,046,782 | | | | | 8,046,782 |
| Adjustment arising from changes in ownership interests in investee | | | | | | 32,947 | 32,947 | | | | | | | | | 32,947 |
| Valuation gain on available-for-sale financial assets | | | | | | | | | | | | | | (664) | | (664) |
| Adjustment for remittance from capital return in investee | | | | | | | | | | (33,561) | (33,561) | | | | | (33,561) |
| Translation adjustments | | | | | | | | | | | | (113,101) | | | | (113,101) |
| BALANCE, DECEMBER 31, 2005 | 5,121,710 | 51,217,100 | 1,578,187 | 15,781,870 | 60,734,378 | 87,352 | 60,821,730 | 2,801,104 | - | 17,967,109 | 17,967,109 | (672,421) | - | (664) | - | 152,225,628 |
| Effect of applying the newly released SFASs and related revaluation of previously released SFASs | | | | | | | | | | | | | | 4,893,212 | (97,214) | 4,795,998 |
| Appropriation of prior year's earnings | | | | | | | | | | | | | | | | |
| Legal reserve | | | | | | | | 801,323 | | (801,323) | - | | | | | - |
| Special reserve | | | | | | | | | 663,811 | (663,811) | - | | | | | - |
| Cash dividends to preferred shareholders | | | | | | | | | | (394,054) | (394,054) | | | | | (394,054) |
| Stock dividends to common shareholders—NT$0.48 per share | 262,642 | 2,626,421 | | | | | | | | (2,626,421) | (2,626,421) | | | | | - |
| Cash dividends to common shareholders—NT$0.32 per share | | | | | | | | | | (1,739,947) | (1,739,947) | | | | | (1,739,947) |
| Bonus to employees—stock | 46,844 | 468,440 | | | | | | | | (468,440) | (468,440) | | | | | - |
| | | | | | | | | | | (82,050) | (82,050) | | | | | (82,050) |
| Remuneration to directors and supervisors | | | | | | | | | | (3,000) | (3,000) | | | | | (3,000) |
| Issuance of common shares through private placement on May 5, 2006 | 350,000 | 3,500,000 | | | 13,195,000 | | 13,195,000 | | | | | | | | | 16,695,000 |
| Issuance of common shares through private placement on December 21, 2006 | 705,000 | 7,050,000 | | | 15,228,000 | | 15,228,000 | | | | | | | | | 22,278,000 |
| Adjustment arising from changes in percentage of ownership in investees | | | | | | 106,443 | 106,443 | | | | | | | | | 106,443 |
| Net income in 2006 | | | | | | | | | | 3,541,081 | 3,541,081 | | | | | 3,541,081 |
| Adjustment for changes in shareholders' equities of equity-accounted investee | | | | | | | | | | | | | | (1,176,643) | | (1,176,643) |
| Valuation gain or loss on available-for-sale financial assets | | | | | | | | | | | | | | 114,325 | | 114,325 |
| Valuation gain or loss on derivatives for cash flow hedge | | | | | | | | | | | | | | | (254,944) | (254,944) |
| Translation adjustments | | | | | | | | | | | | 79,252 | | | | 79,252 |
| BALANCE, DECEMBER 31, 2006 | 6,486,126 | $ 64,861,261 | 1,578,187 | $ 15,781,870 | $ 89,157,378 | $ 193,795 | $ 89,351,173 | $ 3,602,427 | $ 663,811 | $ 12,003,318 | $ 12,003,318 | $ (593,169) | $ - | $ 3,830,230 | $ (352,158) | $ 201,202,456 |

The accompanying notes are an integral part of the financial statements.

(With Deloitte & Touche audit report dated February 26, 2007)

- 6 -

# CHI MEI OPTOELECTRONICS CORPORATION

**STATEMENTS OF CASH FLOWS**
**YEARS ENDED DECEMBER 31, 2006 AND 2005**
(In Thousands of New Taiwan Dollars)

|  | 2006 | 2005 |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES |  |  |
| Net income | $ 3,543,081 | $ 8,046,782 |
| Adjustments to reconcile net income to net cash provided by operating activities: |  |  |
| Depreciation and amortization | 33,113,042 | 22,178,928 |
| Loss (gain) on disposal of available-for-sale financial assets, net | 146,920 | (2,515 ) |
| Foreign exchange loss (gain) on disposal of available-for-sale financial assets | 77,513 | (7,990 ) |
| Gain on disposal of bond portfolios with no active market | - | (51 ) |
| Gain on disposal of financial assets designated as at fair value through profit and loss | (954 ) | - |
| Valuation gain on financial assets designated as at fair value through profit and loss | (27,840 ) | - |
| Amortization recorded as nonoperating income and expense | 166,216 | 88,086 |
| Investment loss (income) recognized by equity method, net | 813,531 | (923,498 ) |
| Gain of disposal of investments | (67,766 ) |  |
| Cash dividend from received  investment accounted for using equity method | 23,041 |  |
| Realized exchange gain on long-term investments | - | (113,101 ) |
| Loss on impairment of long-term investments |  | 106,689 |
| Unrealized (realized) gross profit from affiliates | (7,598 ) | 7,598 |
| Loss on disposal of financial assets carried at cost | 54 | - |
| Loss (gain) on disposal of property, plant and equipment and other assets, net | 14,193 | (6,324 ) |
| Loss on impairment of assets | - | 234,914 |
| Deferred income taxes | (683,265 ) | (84,759 ) |
| Accrued redemption premium on convertible bonds | - | (116 ) |
| Accrued pension liabilities | (79,647 ) | 3,618 |
| Net changes in operating assets and liabilities: |  |  |
| Decrease (increase) in: |  |  |
| Financial assets and liabilities for trading | (19,411,048 ) | 243,703 |
| Notes and accounts receivable from related parties | (27,212 ) | (145,298 ) |
| Notes and accounts receivable from others | 3,420,668 | (18,056,524 ) |
| Other receivables | (228,283 ) | (143,155 ) |
| Other receivables from related parties | (192,543 ) | (282,616 ) |
| Other financial assets - current | (4,116 ) | 31,168 |
| Inventories | (8,927,279 ) | 936,952 |
| Prepaid expenses and other current assets | (297,929 ) | (524,049 ) |
| Prepayment for purchases | 584,489 | (5,190,556 ) |
| Increase (decrease) in: |  |  |
| Notes and accounts payable to related parties | 6,580,981 | 1,729,001 |
| Notes and accounts payable to others | 3,736,233 | 9,149,529 |
| Other payables to related parties | (35,386 ) | (4,709 ) |
| Other payables | 3,314,022 | (13,965 ) |

(Continued)

# CHI MEI OPTOELECTRONICS CORPORATION

**STATEMENTS OF CASH FLOWS**
**YEARS ENDED DECEMBER 31, 2006 AND 2005**
**(In Thousands of New Taiwan Dollars)**

|  | 2006 | 2005 |
|---|---|---|
| Accrued provision of product warranty | $        (5,465) | $        (21,405) |
| Accrued expenses and other current liabilities | (252,537) | 1,594,249 |
| Net cash provided by operating activities | 25,285,116 | 18,830,586 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** |  |  |
| Remittance from capital reduction in investee | - | 3,409,600 |
| Acquisition of: |  |  |
| Financial assets designated as at fair value through profit or loss | (43,500) | - |
| Available-for-sale financial assets | (10,799,490) | (5,023,470) |
| Investments accounted for using equity method | (5,463,338) | (1,870,722) |
| Financial assets carried at cost | - | (200,000) |
| Bond portfolios with no active market | - | (24,000) |
| Property, plant, and equipment | (117,069,709) | (62,017,701) |
| Proceeds from disposal of: |  |  |
| Available-for-sale financial assets | 9,360,037 | 6,003,975 |
| Investments accounted for using equity method | 82,679 | - |
| Financial assets carried at cost | 17,946 | - |
| Bond portfolios with no active market | - | 24,051 |
| Property, plant, and equipment and other assets | 824,681 | 168,254 |
| Decrease (increase) in: |  |  |
| Derivative financial instruments for hedging | 690,798 | (454,501) |
| Intangible assets | (1,015,591) | (538,280) |
| Deferred charges | (3,201,008) | (2,230,858) |
| Assets leased to others | (711,539) | (59,133) |
| Refundable deposits | 41,349 | (96,019) |
| Pledged time deposits | (750) | - |
| Net cash used in investing activities | (127,287,435) | (62,908,804) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** |  |  |
| Increase (decrease) in: |  |  |
| Short-term bank loans | (4,180,000) | 2,899,540 |
| Commercial paper | (2,991,508) | (556,799) |
| Guarantee deposits | (27,518) | (8,102) |
| Proceeds from: |  |  |
| Long-term loans | 108,152,148 | 29,799,750 |
| Issuance of common shares through private placement | 38,973,000 | - |
| Issuance of preferred shares | - | 15,000,000 |
| Issuance of GDSs representing common shares | - | 23,212,886 |
| Repayments of : |  |  |
| Long-term loans | (29,835,171) | (14,889,569) |
| Cash dividends to preferred shareholders | (304,054) | (47,616) |
| Cash dividends to common shareholders | (1,750,947) | (1,552,181) |

(Continued)

# CHI MEI OPTOELECTRONICS CORPORATION

**STATEMENTS OF CASH FLOWS**
**YEARS ENDED DECEMBER 31, 2006 AND 2005**
**(In Thousands of New Taiwan Dollars)**

|  | 2006 | 2005 |
|---|---|---|
| Bonus to employees | $       (52,050) | $      (172,470) |
| Remuneration to directors and supervisors | (3,000) | (3,000) |
| Net cash provided by financing activities | 107,980,900 | 53,682,439 |
| EFFECT OF EXCHANGE RATE FOR CHANGES ON CASH | 109,179 | 500,874 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 6,087,760 | 10,105,095 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF YEAR | 20,691,020 | 10,585,925 |
| CASH AND CASH EQUIVALENTS, END OF YEAR | $    26,778,780 | $    20,691,020 |
| SUPPLEMENTAL INFORMATION |  |  |
| Income taxes paid | $        68,710 | $        64,560 |
| Interest paid, net of capitalized interest | $     3,493,784 | $     2,137,472 |
| Capitalized interest | $       113,161 | $       259,260 |
| CASH PAID FOR ACQUISITION S OF PROPERTY, PLANT AND EQUIPMENT: |  |  |
| Total acquisition costs | $ (123,520,728) | $  (62,892,866) |
| Increase in payable to contractors and equipment suppliers | 6,451,019 | 875,165 |
|  | $ (117,069,709) | $  (62,017,701) |
| NONCASH FINANCING ACTIVITIES: |  |  |
| Current portion of long-term loans | $    19,812,619 | $    11,528,742 |
| Shares issued upon conversion of convertible bonds | $             - | $     4,258,960 |
| Reclassification of property, plant, and equipment to assets leased to others | $       127,409 | $             - |

The accompanying notes are an integral part of the financial statements.

(With Deloitte & Touche audit report dated February 28, 2007)                    (Concluded)

# CHI MEI OPTOELECTRONICS CORPORATION

**NOTES TO FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2006 AND 2005**
**(In Thousands of New Taiwan Dollars, Unless Stated Otherwise)**

## 1. ORGANIZATION AND OPERATIONS

Chi Mei Optoelectronics Corporation (the "Corporation" or "CMO") was incorporated on August 6, 1998 in Southern Taiwan Science Park and started its operations on February 1, 2000. In April of the same year, the Corporation merged with Chi Mei Electronics Corp., with Chi Mei Optoelectronics Corp. as the surviving company. The Corporation performs research and development, manufactures and sells thin film transistor liquid crystal display ("TFT-LCD") modules and color filters.

The Corporation's common shares (except for the private placement amounting to $3,500,000 thousand to certain investors in May 2006 and the entitled stock dividends and the private placement amounting to $7,050,000 thousand to certain investors in December 2006) (see Note 21) have been listed on the Taiwan Stock Exchange Corporation (TSEC) since August 26, 2002. The Corporation listed some of its shares on the Luxembourg Stock Exchange in the form of global depositary shares, or GDSs in October 2003 and June 2005, respectively (see Note 21).

In December 31, 2006, The Corporations parent company, CMC, sold a portion of its shares in the corporation in the form of GDSs, which were listed on the Luxembourg Stock Exchange (see Note 21).

As of December 31, 2006 and 2005, the Corporation had 17,060 and 15,421 employees, respectively.

CMC directly or indirectly owns 32% of the Corporation's outstanding common shares as of December 31, 2006 and 2005.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The accompanying financial statements are prepared in conformity with the Guidelines Governing the Preparation of Financial Reports by Securities Issuers, requirements of the Business Accounting Law and Guidelines Governing Business Accounting and accounting principles generally accepted in the Republic of China (ROC). Under these guidelines and principles, the Corporation should reasonably estimate the amounts of allowance for doubtful receivables, allowance for sales returns and discounts; loss on inventories; depreciation of property, plant, and equipment and assets leased to others; loss on assets impairment; amortization of intangible assets and deferred charges; pension expenses; product warranty expenses and contingent liabilities. Actual results could differ from those estimates.

For the convenience of readers, the accompanying financial statements have been translated into English from the original Chinese version prepared and used in the Republic of China. If there is any conflict between the English version and the original Chinese version or any difference in the interpretation of the two versions, the Chinese-language financial statements shall prevail.

Significant accounting policies are summarized as follows:

**Current/Noncurrent Assets and Liabilities**

Current assets are cash, cash equivalents, those for trading purpose, and those expected to be cashed or consumed within 12 months from the balance sheet date. Current liabilities are those for trading purpose and those to be paid off or settled within 12 months from the balance sheet date. Assets and liabilities that are not classified as current are noncurrent assets and liabilities, respectively.

**Cash Equivalents**

Commercial papers with maturities less than three months from the date of purchase are classified as cash equivalents.

**Financial Instruments at Fair Value through Profit or Loss**

Financial instruments at fair value through profit or loss have two categories: (1) financial assets or financial liabilities held for trading and (2) designated on initial recognition as at fair value through profit or loss. These financial instruments are initially recognized at fair value. The transaction costs with the financial instruments are expensed currently. When subsequently remeasured at fair value, the changes in fair value are recognized in current income (expense). A regular way purchase or sale of financial assets is recognized and derecognized using trade date accounting.

Derivatives that do not meet the criteria for hedge accounting are treated as financial assets or liabilities held for trading. When the fair value is a positive number, the financial instrument is listed as a financial asset; when the fair value is a negative number, the financial instrument is listed as a financial liability. Fair value of derivatives with no active market fair value is estimated using valuation techniques.

Hybrid instruments are designated at fair value through profit or loss.

**Available-for-sale Financial Assets**

Investments designated as available-for-sale financial assets include equity securities. Available-for-sale financial assets are initially recognized at fair value plus transaction costs that are directly attributable to the acquisition. When subsequently measured at fair value, the changes in fair value are excluded from earnings and reported as a separate component of shareholders' equity. The accumulated gains or losses are recognized in earnings when the financial asset is derecognized from the balance sheet. A regular way purchase or sale of financial assets is recognized and derecognized using trade date accounting.

Fair values for beneficiary certificates of open-end funds and publicly traded stocks are determined using the net assets value and the closing-price at the balance sheet date, respectively. For financial assets with no active market, fair value is determined using valuation techniques.

Cash dividends are recognized as investment income upon resolution of the shareholders of an investee but are accounted for as reductions to the original cost of investment if such dividends are declared on the earnings of the investees attributable to periods prior to the purchase of the investments. Stock dividends are recorded as an increase in the number of shares held and do not affect investment income. The cost per share is recalculated based on the new number of shares. Any difference between the initial carrying amount of a debt security and its amount at maturity is amortized and recognized in earnings using the effective interest method.

If there is objective evidence that a financial asset is impaired, a loss is recognized. If, in a subsequent period, the amount of the impairment loss decreases, for equity securities, the previously recognized impairment loss is reversed and recorded as an adjustment to shareholders' equity.

**Accounts Receivable Securitization**

Accounts receivable securitization is the transfer of a designated pool of accounts receivable to a special purpose entity, such as a bank, in the form of issuing beneficial securities or asses-backed securities based on the accounts receivable. Under ROC Statement of Financial Accounting Standards (SFAS) No. 33 "Accounting for Transfers of Financial Assets and Extinguishments of Liabilities", such transfer of financial assets in which the transferor surrenders control over those assets is accounted for as a sale to the extent that consideration other than beneficial interests in the transferred assets is received in exchange. The difference between the book value of accounts receivable and total proceeds received is recorded as a gain or loss on the disposal of financial assets.

**Inventories**

Inventories are stated at the lower of cost or market value. Inventories are recorded at standard costs and adjusted to approximate weighted-average cost at the end of the period. Market value is based on replacement cost for raw materials and supplies and spare parts, and net realizable value for finished goods and work in process. Estimated losses on scrap and slow-moving items are recognized and included in the allowance for losses.

**Investments Accounted for Using Equity Method**

Investments in companies wherein the Corporation exercises significant influence on the operating and financial policy decisions are accounted for using the equity method. When equity investments were made, the difference, if any, between the cost of investment and the Corporation's share of the investee's net equity was previously amortized using the straight-line method over five years and was also recorded in the "investment income/losses of equity method investees, net" account. Effective January 1, 2006, pursuant to the revised SFAS No. 5 "Long-term Investments in Equity Securities", investment premiums, representing goodwill, are no longer being amortized; while discounts on acquisition continue to be amortized over the remaining periods. When an indication of impairment is identified in an investment, the carrying amount of the investment is reduced, with the related impairment loss charged to current income.

When the Corporation subscribes for additional investee's shares at a percentage different from its existing ownership percentage of equity interest, the resulting carrying amount of the investment in the investee differs from the amount of the Corporation's share in the investee's net equity. The Corporation records such difference as an adjustment to long-term investments with the corresponding amount charged or credited to capital surplus.

Gains or losses on sales from the Corporation to equity method investees are deferred in proportion to the Corporation's ownership percentage in the investees until such gains or losses are realized through transactions with third parties. The entire amount of the gains or losses on sales to investees over which the Corporation has a controlling interest is deferred until such gains or losses are realized through the subsequent sales of the related products to third parties.

Gains or losses on sales from investees to the Corporation are deferred in proportion to the Corporation's ownership percentages in the investees until they are realized through transactions with third parties.

On the balance sheet date, the Corporation evaluates investments for any impairment. An impairment loss is recognized and charged to current income if the investment carrying amount as of the balance sheet date exceeds the expected recoverable amount. Investments in which the Corporation has significant influence over investees are tested for impairment separately at their carrying amounts.

**Financial Assets Carried at Cost**

Investments that do not have a quoted market price in an active market and whose fair value cannot be reliably measured are carried at original cost, such as non-publicly traded stocks. The costs of funds and non-publicly traded stocks are determined using the weighted-average method. If there is objective evidence that a financial asset is impaired, a loss is recognized. No recording of a subsequent recovery in the fair value is allowed.

The accounting treatment for cash dividends and stock dividends arising from financial assets carried at cost is the same as that for cash and stock dividends arising from available-for-sale financial assets.

**Bond Portfolios with No Active Market**

Bond portfolios with fixed or determinable payments that are not quoted in an active market are carried at amortized cost using the effective interest method.   These bond portfolios are initially recognized at fair value plus transaction costs that are directly attributable to the acquisition or the issuance of the financial asset.   Profit or loss is recognized at the time of derecognizing, impairment or amortization.   A regular way purchase or sale of financial assets is recognized and derecognition using trade date accounting.

If there is objective evidence that an impairment loss has been incurred on the balance sheet date, impairment loss should be recognized.   If the impairment loss decreases and the decrease can be related objectively to an event occurring after the impairment was recognized, the impairment loss should be reversed.   This reversal should not result in the carrying amount of the financial asset exceeding the amortized cost that would have been determined had no impairment loss been recognized.

**Property, Plant, and Equipment and Assets Leased to Others**

Property, plant and equipment and assets leased to others are stated at cost less accumulated depreciation. Major additions, renewals and betterments are capitalized, while maintenance and repairs are expensed currently.   Interest expense related to the acquisition of property, plant, and equipment is capitalized as part of the cost.

On the balance sheet dates, the Corporation evaluates whether the carrying value of property, plant, and equipments and assets leased to others has been impaired.   If impairment is identified, the Corporation will determine the recoverable amount of the assets.   The carrying amount in excess of the expected recoverable amount is recognized as impairment loss and charged to current income.   If the recoverable amount increases in the future, the subsequent reversal of impairment loss will be recognized as gain. However, the adjusted amount of an asset due to a reversal of impairment loss should not exceed the carrying amount that would have been determined (net of depreciation), had no impairment loss been recognized for the assets in prior period.

Depreciation is computed using the straight-line method over the estimated service lives as follows: buildings - 25 to 50 years; machinery equipment - 2 to 5 years; transportation - 5 years; office equipment - 5 to 6 years, facility equipment - 5 to 8 years, and miscellaneous equipment - 3 to 5 years.   Property, plant, and equipment still in use beyond their initially estimated service lives are depreciated over their newly estimated service lives.

Upon sale or other disposal of property, plant, and equipment and assets leased to others, the related cost and accumulated depreciation are removed from the accounts, and any gain or loss is credited or charged to current income.

**Intangible Assets**

Intangible assets are booked at acquisition cost and amortized using the straight line method over the estimated service lives as follows:   technical license fees - 5 to 10 years; patents - 5 years; and technological know-how - 5 years or the term of the contract.

On the balance sheet dates, the Corporation evaluates whether the carrying value of intangible assets have been impaired.   If impairment is identified, the Corporation will evaluate the recoverable amount of such assets.   The carrying amount in excess of the expected recoverable amount is recognized as impairment loss and charged to current income.   If the recoverable amount increases in the future, the subsequent reversal of impairment loss will be recognized as a gain.   However, the adjusted amount of an asset due to a reversal of impairment loss should not exceed the carrying amount that would have been determined (net of amortization), had no impairment loss been recognized for the asset in prior period.

**Deferred Charges**

Deferred charges primarily include masks, software and system design costs, electricity installment costs, and arrangement fee from syndicated bank loans and others.    The amounts are amortized over 2 to 7 years.

On the balance sheet dates, the Corporation evaluates whether the carrying value of deferred charges have been impaired.    If impairment is identified, the Corporation will evaluate the recoverable amount of such assets.    The carrying amount in excess of the expected recoverable amount is recognized as impairment loss and charged to current income.    If the recoverable amount increases in the future, the subsequent reversal of impairment loss will be recognized as a gain.    However, the adjusted amount of an asset due to a reversal of impairment loss should not exceed the carrying amount that would have been determined (net of amortization), had no impairment loss been recognized for the asset in prior period.

**Product Warranty**

Costs associated with product warranty are accrued as a percentage of sales based on the Corporation's historical warranty costs.

**Pension Costs**

For employees under defined benefit pension plans, the related net periodic pension costs are recorded on the basis of actuarial calculations.    For employees under defined contribution pension plans, the related net periodic pension costs are recorded on the basis of the Corporation's actual contributions to employees' personal pension accounts over the employees' service period.

**Convertible Bonds**

Effective January 1, 2006, pursuant to the bond issued prior to December 31, 2005, the total issuing price is recorded as financial liability.    The stated redemption price in excess of the face value of the bond is recognized as interest expense over a period starting from the issuance date to the last day of the redemption period, using the effective interest rate method.    The book value approach is used to account for bond conversion by the bondholders.    Under this method, convertible bonds and related accounts are transferred to capital and capital surplus, and no gain or loss is recorded.

**Employee Stock Options**

Compensatory employee stock option plans that are granted or amended on or after January 1, 2004 must be accounted for in accordance with the interpretations issued by the Accounting Research and Development Foundation of the Republic of China.    The Corporation uses the intrinsic value method to evaluate the compensation cost of employee stock options and expenses the compensation cost over the option vesting period specified in the stock option plans.

**Income Tax**

The Corporation applies intra-period and inter-period tax allocation method.    Deferred income tax assets and liabilities are recognized for the tax effects of temporary differences, unused tax credits, and operating loss carryforwards.    Valuation allowances are provided to the extent, if any, that it is more likely than not that deferred income tax assets will not be realized.    A deferred tax asset or liability is classified as current or noncurrent according to the classification of its related asset or liability.    However, if a deferred tax asset or liability does not relate to an asset or liability in the financial statements, then it is classified as either current or noncurrent based on the expected length of time before it is realized or settled.

Any tax credits arising from purchases of machinery, equipment and technology, research and development expenditures, personnel training, and investments in important technology-based enterprises are recognized using the flow-through method.

Adjustments of prior years' tax liabilities are added to or deducted from the current year's tax expense.

Income taxes on unappropriated earnings of 10% are expensed in the year of shareholders' approval, which is usually the year subsequent to the year the earnings are generated.

## Revenue Recognition, Allowance for Doubtful Receivables and Provision of Sales Returns and Discounts

Sales are recognized when titles to products and evident risks of ownerships are transferred to customers, primarily upon shipment, since the major part of the earning process is completed and revenue is realized or realizable.   The Corporation does not recognize sales on transactions involving the delivery of materials to subcontractors since the ownership over the materials is not transferred.   An allowance is provided for any sales returns and discounts, which are estimated on the basis of historical experience and any known factors that would affect the allowance.   Such provisions are deducted from sales and the related costs are deducted from cost of sales in the year the products are sold.

Sales are determined at fair value taking into account related sales discounts agreed to by the Corporation and customer.   Since the receivables from sales are collectible within one year and such transactions are frequent, the fair value of receivables is equivalent to the nominal amount of cash received.

An allowance for doubtful receivables is provided based on a review of the collectibility of accounts receivable.   The Corporation determines the amount of allowance for doubtful receivables by examining the aging analysis of outstanding accounts receivable and current trends in the credit quality of its customers as well as its internal credit policies.

## Subsidy Income from the Government

The Corporation receives subsidies from the Government related to the research and development of certain products pursuant to agreements.   The subsidy income is recorded as deferred income upon receipt of the fund and subsequently recorded in income statement based on the schedule agreed to by the Corporation and the Government.

## Foreign-currency Translations and Foreign-currency Transactions

Foreign-currency transactions, except derivative transactions, are recorded in New Taiwan dollars at the rates of exchange in effect when the transactions occur.   Exchange gains or losses derived from foreign-currency transactions or monetary assets and liabilities denominated in foreign currencies are recognized in current income.   At the balance sheet date, monetary assets and liabilities denominated in foreign currencies are revalued at the prevailing exchange rates and the resulting gains or losses are recorded as follows:

a.   Investments accounted for using equity method - as cumulative translation adjustment under shareholders' equity.

b.   Other assets and liabilities - credited or charged to current income.

## Derivative Financial Instruments for Hedging

Derivative financial instruments for hedging are stated at fair value.   At period-end, the balances of derivative financial instruments are restated at fair value and the resulting differences are recorded as follows:

a.   To offset changes in the fair value of a designated hedged item - credited or charged to current income.

b.   To offset changes in the cash flows of a designated hedged item - as unrealized gain from financial instruments under shareholders' equity.

**Hedge Accounting**

Hedge accounting recognizes the offsetting effects on profit or loss of changes in the fair values of the hedging instrument and the hedged item.   It shall be accounted for as follows:

a.   Fair value hedges:

The gain or loss from remeasuring the hedging instrument at fair value for a derivative hedging instrument or, non-derivative hedging instrument shall be recognized in profit or loss.   Gain or loss on the hedged item attributable to the hedged risk shall adjust the carrying amount of the hedged item.

b.   Cash flow hedges:

1)   The portion of the gain or loss on the hedging instrument that is determined to be an effective hedge shall be recognized directly in shareholders equity through the statement of changes in equity and the ineffective portion of the gain or loss on the hedging instrument shall be recognized in profit or loss.

2)   If a hedge of a forecast transaction subsequently results in the recognition of a financial asset or a financial liability, the associated gains or losses that were recognized directly in equity shall be reclassified into profit or loss in the same period or periods during which the asset acquired or liability assumed affects profit or loss.

3)   If a hedge of a forecast transaction subsequently results in the recognition of a non-financial asset or a non-financial liability becomes a firm commitment for which fair value hedge accounting is applied, then the entity shall reclassify the associated gains and losses that were recognized directly in equity into profit or loss in the same period or periods during which the asset acquired or liability assumed affects profit or loss.

However, if an entity expects that all or a portion of a loss recognized directly in equity will not be recovered in one or more future periods, it shall reclassify into profit or loss the amount that is not expected to be recovered.

**Reclassifications**

Certain accounts in the financial statements as of and for the year ended December 31, 2005 have been reclassified to conform to the financial statements as of and for the year ended December 31, 2006.

## 3. ACCOUNTING CHANGES

The Corporation adopted the newly released SFAS No. 34 "Accounting for Financial Instruments" and SFAS No. 36 "Disclosure and Presentation for Financial Instruments" and the related revisions of previously released SFASs.

a.   Effect of adopting the newly released SFASs and related revisions of previously released SFASs

The Corporation properly categorized the financial assets and liabilities (included derivative financial instruments) when initially adoption of the newly released and amended SFASs.   The adjustments in original carrying amount for financial instruments categorized as financial assets or financial liabilities at fair value through profit or loss are included in the cumulative effect of change in accounting principles; on the other hand, the adjustments in original carrying amount for those categorized as available-for-sale financial assets are recognized as unrealized gains or losses to shareholders' equity.

The effect of the aforementioned changes in accounting principles is summarized as follows:

|  | Recognized as Cumulative Effect of Changes in Accounting Principles (Net of Tax) | Recognized as a Separate Component of Shareholders' Equity (Net of Tax) |
|---|---|---|
| Financial assets and liabilities at fair value through profit or loss | $ (992,623) | $ - |
| Derivative financial assets and liabilities for hedging | - | (971,214) |
|  | $ (992,623) | $ (971,214) |

The adoption of the newly released SFASs resulted in a decrease net income of $992,623 thousand, and a decrease in basic and diluted earnings per share after income tax of $0.17, for the year ended December 31, 2006.

b.  Reclassifications

Upon the adoption of SFAS No. 34, certain accounts in the financial statements for the year ended December 31, 2005 should be reclassified and presented to conform to the financial statements for the year ended December 31, 2006.   The financial statements shall not be restated.

Significant accounting policies prior to adoption of newly released and amended SFAS are summarized as follows:

1)  Long-term investments

Investments in companies wherein the Corporation owns less than 20% of the outstanding voting shares or does not exercise significant influence over the investees' financial and operating decisions are accounted for by the cost method.   Cash dividends received in the year of acquisition made are accounted for as a reduction in the carrying value of the investment, while cash dividends received in subsequent years are recognized as investment income on the declaration date.   An allowance for decline in value is recognized as follows:

a)  For listed stocks or stocks traded over the counter:   An allowance is recognized for any decline in the market value of investments in publicly traded stocks with readily ascertainable fair market value, with the corresponding amount recorded as an unrealized loss, a component of shareholders' equity.   A reversal of the allowance is recorded for a subsequent recovery of the market value of such investments.

b)  For emerging stock and other stocks with no quoted market prices:   When an indication of significant impairment is identified in an investee company, the carrying amount of this investment is reduced to reflect an other-than-temporary decline, with the related impairment loss charged to current income.   The carrying amount of such investments after recognizing losses will become the new cost of the investment.

Long-term bond investment is stated at cost and the unamortized discount (premium) is amortized using the straight-line method.   This amortization is recorded as an adjustment of interest income.

2) Derivative financial instruments

The Corporation enters into forward exchange contracts to manage currency exposures in cash flows and foreign currency assets and liabilities. Premiums or discounts, which are the differences in the spot rates at the start of the contracts and the contracted forward rates, are recognized in the current year and amortized over the terms of the forward contracts. On balance sheet dates, the receivables or payables arising from forward exchange contracts are restated at the prevailing spot rates, and the resulting differences between these balance sheet date rates and spot rates on the contract starting date are recognized and charged to income. Also, the receivables and payables on open forward exchange contracts are netted out, and the resulting amount is presented as an asset or a liability.

The Corporation enters into cross currency swaps to manage currency exposures in cash flows and foreign-currency assets and liabilities. The differences in the spot rates at the start of the contracts and the contracted rates are amortized over the terms of cross-currency contract using the straight-line method. On the balance sheet dates or the settlement dates, the receivables or payables arising from the cross currency swaps are restated at the prevailing spot rates, and the resulting differences between these rates and spot rates on the contract starting date are recognized and charged to income. Also, the receivables and payables related to the contract are netted out, with the resulting amount presented as either an asset or a liability. Interest payments or receipts and interest income or expense accrual on the balance sheet dates or the contract settlement dates from the interest component of the swaps are recorded in the current year as an adjustment to the interest income or expense of the hedged assets or liabilities.

For the foreign currency option contracts entered into for non-trading purposes, the premiums paid would be amortized over the contract period, and recorded as gain or loss on the balance sheet dates. The difference in foreign currency on contract dates and on the settlement would also be recognized as an adjustment to income. For the foreign currency option contracts entered into for non-trading purposes, the premiums received or paid are recorded as liability or assets and amortized over the contract term. The carrying value of such liabilities or assets shall be adjusted to its fair value on the balance sheet dates with the resulting gains or losses recognized as current income.

Interest rate swap contracts are recorded on the contract dates since there is no exchange of notional principles. For Interest rate swap contracts used for nontrading purposes, interest received or paid upon each settlement is recorded as adjustment to interest expense of the hedged item.

Certain accounts in the financial statements as of and for the year ended December 31, 2005 have been reclassified to conform to the financial statements as of and for the year ended December 31, 2006 in the adoption of newly released and related revisions of previously released SFASs. The reclassifications are summarized as follows:

| Before Reclassification | | After Reclassification | |
|---|---|---|---|
| **Account** | **Amount** | **Account** | **Amount** |
| Balance sheet | | | |
| 1) Forward receivable (recorded as other financial assets) | $ 380,496 | Derivative financial assets for hedging - current | $ 380,496 |
| 2) Long-term investments accounted for using cost method | 229,175 | Financial assets carried at cost - noncurrent | 229,175 |
| 3) Long-term bond investments | 80,000 | Bond portfolios with no active market - noncurrent | 80,000 |

(Continued)

| Before Reclassification | | After Reclassification | |
|---|---|---|---|
| Account | Amount | Account | Amount |

Statement of income

| | | | |
|---|---|---|---|
| 1) Foreign exchange loss, net | $ 2,073,668 | Valuation loss on financial assets, net | $ 2,073,668 |
| 2) Financial expenses | 492,333 | Valuation loss on financial assets, net | 492,333 |

(Concluded)

Effective January 1, 2006, the Corporation adopted the newly revised SFAS No. 1 - "Conceptual Framework for Financial Accounting and Preparation of Financial Statements," SFAS No. 5 - "Long-term Investment under Equity Method" and SFAS No. 25 - "Business Combinations." The amendments of these Statements include the following: (1) goodwill is no longer amortized but it should be assessed for impairment, and (2) investment premiums, representing goodwill based on analysis of the acquisition costs, should be assessed for impairment instead of being amortized. The adoption of these revised Statements had no impact on net income for the year ended December 31, 2006.

The Corporation adopted SFAS No. 35, "Accounting for Assets Impairment," on January 1, 2005 and recognized an asset impairment loss of $234,914 thousand for the year ended December 31, 2005.

## 4. CASH AND CASH EQUIVALENTS

| | December 31 | |
|---|---|---|
| | 2006 | 2005 |
| Bank deposits | $ 25,914,614 | $ 20,690,702 |
| Petty cash and cash on hand | 367 | 318 |
| Commercial paper acquired under repurchase agreements | 863,799 | - |
| | $ 26,778,780 | $ 20,691,020 |

Overseas bank deposits consisted of the following:

| | December 31 | |
|---|---|---|
| | 2006 | 2005 |
| In Hong Kong - US$200,030 thousand and US$2 thousand in 2006 and 2005, respectively | $ 6,519,971 | $ 50 |
| In Japan - JPY31,403 thousand and JPY63,122 thousand in 2006 and 2005, respectively | 8,608 | 17,649 |
| | $ 6,528,579 | $ 17,699 |

## 5. FINANCIAL INSTRUMENTS AT FAIR VALUE THROUGH PROFIT OR LOSS

Financial instruments for trading consisted of the following:

| | December 31 | |
| --- | --- | --- |
| | 2006 | 2005 |
| **Financial assets for trading** | | |
| Current | | |
| Forward exchange contracts | $ 11,933,028 | $ - |
| Foreign currency option contracts | 10,775,414 | - |
| | $ 22,708,442 | $ - |
| Noncurrent | | |
| Interest rate swap contracts | $ 33,498 | $ - |
| **Financial liabilities for trading** | | |
| Current | | |
| Forward exchange contracts | $ 2,756,329 | $ - |
| Foreign currency option contracts | 873,147 | - |
| | $ 3,629,476 | $ - |
| Noncurrent | | |
| Interest rate swap contracts | $ 49,223 | $ - |

Please refer to Note 30 for further information.

## 6. AVAILABLE-FOR-SALE FINANCIAL ASSETS

| | December 31, 2006 |
| --- | --- |
| Subordinated beneficiary certificates | $ 3,046,497 |
| Seller's beneficiary certificates | 994,276 |
| Beneficiary certificates of open - end funds | 860,265 |
| Publicly-listed stock - Formosa Epitaxy Incorporation (FOREPI) | 133,465 |
| | 5,034,503 |
| Less - current portion | 860,265 |
| | $ 4,174,238 |

Please refer to Note 7 for subordinated beneficiary certificates and seller's beneficiary certificates.

## 7. NOTES AND ACCOUNTS RECEIVABLE

|  | December 31 | |
|---|---|---|
|  | 2006 | 2005 |
| Related parties | $   3,097,182 | $   3,069,970 |
| Others | 25,081,402 | 32,136,749 |
| Less - allowance for sales returns and discounts | 199,445 | 231,462 |
|  | 24,881,957 | 31,905,287 |
|  | $  27,979,139 | $  34,975,257 |

a.  In September, 2006, the Corporation entered into a $10 billions, 5-year revolving accounts receivable securitization agreement with Chinatrust Commercial Bank, the trustee.   Under the agreement the Corporation transferred a pool of accounts receivable to the trustee.   The Corporation transferred its receivables to the banks three times a month, and the bank issued securities backed by these accounts receivables monthly.   After the transfer of the accounts receivable, the Corporation continues to service, administer, and collect these accounts receivables on behalf of the bank.   The corporation does not bear the risk of its collectibility, nor provides any collateral.

b.  As of December 31, 2006, the Corporation had a one-time sale of NT$13,901,995 thousand of accounts receivables and relates rights to the trustee for issuing beneficing certificates.   Under the agreement, control over contractual rights of such financial assets was transferred to the buyers, except for subordinated beneficing and seller's beneficing certificates was of NT$2,652,638 thousand and NT$1,263,715 thousand, respectively.   (Recorded as available for sales financial assets.)   In 2006, the Corporation recognized the difference between the book value of the financial assets and the proceed received of NT$149,209 thousand as a loss in the current period.   Collected receivables not yet replaced by new accounts receivable due to timing difference are recorded as other current liability on the balance sheet, which amounted to NT$3,338,062 thousand at December 31, 2006.

c.  Assumptions used to evaluate retained interests.

1)  Subordinated beneficiary certificates

|  | December 31, 2006 |
|---|---|
| Estimated dilution reserve rate | 1.87% |
| Estimated loss rate of credit | 0.01% |
| Estimated funding cost rate | 6.27% |
| Estimated expense rate | 0.04% |
| Projected principal repayment rate | - |

2)  Seller's beneficiary certificates

|  | December 31, 2006 |
|---|---|
| Excess Issue Level | $                 - |
| Ineligible accounts receivable | 655 |
| Aggregate excess concentrations | 933,058 |
| Account payable reserve | 3,541 |

d.  Sensitivity analysis

As of December 31, 2006, the assumptions and sensitivity of the current fair value of residual cash flows with immediate 10% and 20% adverse changes in those assumptions were as follows:

1)  Subordinated beneficiary certificates

|  | December 31, 2006 |
|---|---|
| Book value of Subordinated beneficiary certificates | $ 3,046,497 |
| a) Estimated dilution reserve rate | 1.87% |
| Influence of 10% unfavorable change in fair value | 4,323 |
| Influence of 20% unfavorable change in fair value | 7,795 |
| b) Estimated loss rate of credit | 0.01% |
| Influence of 10% unfavorable change in fair value | - |
| Influence of 20% unfavorable change in fair value | - |
| c) Estimated funding cost rate | 6.27% |
| Influence of 10% unfavorable change in fair value | 59,387 |
| Influence of 20% unfavorable change in fair value | 117,240 |
| d) Estimated expense rate | 0.04% |
| Influence of 10% unfavorable change in fair value | 450 |
| Influence of 20% unfavorable change in fair value | 899 |

2)  Seller's beneficiary certificates

|  | December 31, 2006 |
|---|---|
| Book value of Seller's beneficiary certificates | $ 994,276 |
| a) Ineligible accounts receivable | 655 |
| Influence of 10% unfavorable change in fair value | 1 |
| Influence of 20% unfavorable change in fair value | 3 |
| b) Aggregate excess concentrations | 933,058 |
| Influence of 10% unfavorable change in fair value | 79,549 |
| Influence of 20% unfavorable change in fair value | 162,323 |
| c) Account payable reserve | 3,541 |
| Influence of 10% unfavorable change in fair value | 5 |
| Influence of 20% unfavorable change in fair value | 10 |

3)  Cash flow

Cash inflows from and cash outflows to securitization trustees are as follows:

|  | Year Ended December 31, 2006 |
|---|---|
| Cash from securitization | $ 26,601,573 |
| Income from securitization | 100 |
| Other cash inflows from retained interest | 1,725 |
| Other Charge | 2,501 |

## 8. INVENTORIES

| | December 31 | |
| | 2006 | 2005 |
| --- | --- | --- |
| Finished goods | $ 8,655,859 | $ 5,132,704 |
| Work in process | 14,514,987 | 7,400,189 |
| Raw materials, supplies and spare parts | 2,150,057 | 3,442,088 |
| | 25,320,903 | 15,974,981 |
| Less - allowance for losses | 1,546,864 | 1,128,221 |
| | $ 23,774,039 | $ 14,846,760 |

## 9. INVESTMENTS ACCOUNTED FOR USING EQUITY METHOD

| | December 31 | | | |
| | 2006 | | 2005 | |
| | Carrying Value | % of Owner-ship | Carrying Value | % of Owner-ship |
| --- | --- | --- | --- | --- |
| Listed stocks | | | | |
| Contrel Technology Co., Ltd. (CTC) | $ 203,593 | 14 | $ - | - |
| Unlisted stocks | | | | |
| Landmark International Ltd. (Landmark) | 4,030,691 | 100 | 963,793 | 50 |
| Leadtek Global Group Limited (LGG) | 3,983,285 | 100 | 186 | 100 |
| Chi Mei optoelectronics Japan Co., Ltd. (CMO Japan) | 2,090,717 | 100 | 2,108,794 | 100 |
| Yuan Chi Investment Limited Company (Yuan Chi) | 943,073 | 100 | 98,221 | 100 |
| Chi Mei Materials Technology Corp. (CMMT) | 384,912 | 18 | 97,465 | 10 |
| Chi Mei Electroluminescence Corp. (CMEL) | 293,263 | 100 | 474,290 | 91 |
| GIO Optoelectronics Corp. (GIO) | 277,964 | 29 | 274,620 | 36 |
| Chi Mei Lighting Technology, Inc. (CMLT) | 223,749 | 100 | - | - |
| Exploit Technology Co., Ltd. (Exploit) | 165,365 | 15 | - | - |
| Chi Mei Optoelectronics Europe B.V. (CMO Europe) | 91,299 | 100 | 364 | 100 |
| Power King Optoelectronics Co., Ltd. (Power King) | 43,518 | 15 | - | - |
| TopSun Optronics, Inc. (TSO) | 43,362 | 10 | - | - |
| Keyway Investment Management Limited (Keyway) | 32,630 | 38 | 32,886 | 100 |
| Chi Mei Optoelectronics (Singapore) Pte., Ltd. (CMO Singapore) | 1,380 | 100 | 407 | 100 |
| CTC | - | - | 88,116 | 18 |
| | $12,808,801 | | $ 4,139,142 | |
| Prepayment long-term investment | | | | |
| LGG | $ - | | $ 5,082,003 | |

In March 2005, the Corporation transferred most of CMO Japan's ("CMO Japan", formerly named "International Display Technology Ltd.") operations, primarily production facilities and fabrication equipment at Yasu, Japan and virtually all related fabrication employees to a newly formed subsidiary which was established by CMO Japan solely for the purpose of holding those transferred operations. CMO Japan then sold the entire outstanding share of the subsidiary to Sony Corporation, Japan ("Sony") for JPY18,500,000 thousand. The Corporation evaluated the recoverability of this unamortized balance, representing the investment cost in excess of the Corporation's equity in CMO Japan's net assets, on the basis of an estimate of undiscounted cash flows expected to generate from CMO Japan's operations. As a result of this evaluation, the Corporation recognized an impairment loss of $234,914 thousand under

nonoperating losses and expenses.   The Corporation's investment in CMO Japan decreased by $3,409,600 thousand because the investee returned part of its capital in July and November, 2005, respectively; mean while, the Corporation recognized a realized exchange gain of $113,101 thousand.

With the approval of the authorities, Ningbo CMO Electronics Ltd. ("Ningbo CMO Electronics Ltd.", formerly named    "Ningbo Chi Mei Warehouse Ltd.") and Ningbo Chi Mei Logistics Ltd. (CMLC Ningbo), a company established in the Ningbo Free Trade Zone (NFTZ) in southern Zhe Jiang in China, became the Corporation's 100% indirect subsidiary through Keyway.   Ningbo CMO Electronics engages in developing, manufacturing, customer service and warehousing on TFT-LCD.   CMLC Ningbo engages in warehousing and logistics services.

Ningbo Chi Mei Optoelectronics (CMO Ningbo), a company established in Ningbo Free Trade one (NFTZ) in southern Zhe Jiang in China.   Nanhai Chi Mei Optoelectronics Ltd. (CMO Nanhai), a company established in Nanhai Science & Technology Industry Garden in Guangdong in China.   They both became the Corporation's 100% indirect subsidiary through Landmark as of September 30, 2006.   CMO Ningbo and CMO Nanhai engage in logistics services, manufacturing, and selling of TFT-LCD modules.

In October 2005, the Corporation sold all its shares in HiMax Technologies Limited (HiMax Taiwan) to LGG with an amended price amounting US$157,096 thousand.   The unrealized gains on sales of investment to LGG amounting $4,893,212 thousand are deferred (shown in the balance sheets as "unrealized gain or loss on financial instruments") until subsequent sales of the shares to third parties. With all proceeds of the foregoing transactions, the Corporation acquired additional shares in LGG.

In May 2005, a representative of the Corporation was elected as chairman of CTC's board of directors; thus, the Corporation changed accounting treatment for the related investment from the cost method to the equity method of accounting.   In July 2005, the Corporation subscribed for additional shares issued by GIO, which resulted in an increase in the Corporation's interest of GIO and the Corporation exercises significant influence over GIO.   Therefore, the Corporation changed the accounting for its investments in GIO from the cost method to the equity method of accounting.   The Corporation and its parent company, CMC (see Note 27), both directly and indirectly invested in CMMT, TSO, Exploit and Power King.   The corporation and CMC jointly own more than 20% of CMMT's, TSO's, Exploit's and Power King's voting shares. Therefore, investments in CMMT, TSO, Exploit and Power King are accounted for using equity method.

The investment income (loss) of the investees was as follows:

|  | Years Ended December 31 | |
|  | 2006 | 2005 |
| --- | --- | --- |
| CTC | $      48,196 | $      (10,307 ) |
| Landmark | 67,308 | (7,336 ) |
| LGG | (39,617 ) | 22 |
| CMO Japan | 20,329 | 1,277,621 |
| Yuan Chi | (54,837 ) | (1,315 ) |
| CMMT | (55,356 ) | (2,535 ) |
| CMEL | (764,197 ) | (326,278 ) |
| GIO | (3,521 ) | (6,150 ) |
| CMLT | (26,684 ) | - |
| Exploit | (433 ) | - |
| CMO Europe | 3,734 | (347 ) |
| Power King | (162 ) | - |
| TSO | (8,101 ) | - |
| Keyway | (1,097 ) | (82 ) |
| CMO Singapore | 907 | 205 |
|  | $     (813,531 ) | $      923,498 |

Except for CMO Singapore and CMO Europe in 2005, the carrying value of the investments accounted for under the equity method and the related investment income (loss) were determined based on the audited financial statements of the investees as of and for the same period ended as the Corporation. The Corporation's management believed that unaudited financial statements of foregoing companies and the resulting investment income (losses) will not have material effect on the Corporation's financial statements.

Accounts of all directly and indirectly majority owned subsidiaries of the Corporation, and the accounts of investees in which the Corporation own less than 50% but has a controlling interest have been included in the consolidated financial statements as of and for the years ended December 31, 2006 and 2005.

## 10  DERIVATIVE FINANCIAL INSTRUMENTS FOR HEDGING

Derivative financial instruments for hedging (see Note 30) consisted of the following:

|  | December 31 | |
| --- | --- | --- |
| Derivative financial assets for hedging | 2006 | 2005 |
| Current | | |
| Cross currency swap contracts | $            - | $      380,496 |
| Noncurrent | | |
| Cross currency swap contracts | $      238,327 | $            - |
| Derivative financial liabilities for hedging | | |
| Noncurrent | | |
| Interest rate swap contracts | $   1,426,080 | $            - |

## 11.  FINANCIAL ASSETS CARRIED AT COST

|  | December 31 | | | |
| --- | --- | --- | --- | --- |
|  | 2006 | | 2005 | |
|  | Carrying Value | % of Owner-ship | Carrying Value | % of Owner-ship |
| Unlisted stocks | | | | |
| Top Taiwan VI Venture Capital Co., Ltd. (Top Taiwan) | $      200,000 | 9 | $      200,000 | 9 |
| International Nitto Technology Co., Ltd. (INT) | 11,175 | 15 | 11,175 | 15 |
| Jemiteck Co., Ltd. (Jemiteck) | - | - | 18,000 | 8 |
| ViewSonic Corporation (ViewSonic) | - | - | - | - |
| VP Dynamics Labs (LCD-TV) Ltd. (VP Dynamics) | - | 3 | - | 3 |
| Media Reality Technologies, Inc. (MRT) | - | 2 | - | 2 |
|  | $      211,175 | | $      229,175 | |

The above investments did not have quoted prices in an active market and fair value could not use valuation techniques.   Therefore, these equity securities are carried at cost.   The investees of CMO, ViewSonic and VP Dynamics, recently incurred significant losses.   The Corporation determined the value of its investment in ViewSonic, VP Dynamics were permanently impaired, and accordingly, for the year ended December 31, 2005, the Corporation recognized losses on impairment of investments in ViewSonic and VP Dynamics for $96,585 thousand and $10,104 thousand, respectively.

## 12. BOND PORTFOLIOS WITH NO ACTIVE MARKET

|  | December 31 | |
| --- | --- | --- |
|  | 2006 | 2005 |
| Bank of Overseas Chinese Subordinated Debenture | $ 80,000 | $ 80,000 |

## 13. PROPERTY, PLANT, AND EQUIPMENT

Accumulated depreciation consisted of:

|  | December 31 | |
| --- | --- | --- |
|  | 2006 | 2005 |
| Building | $ 2,921,143 | $ 1,896,634 |
| Machinery equipment | 68,759,528 | 44,870,244 |
| Transportation | 38,821 | 27,226 |
| Office equipment | 488,052 | 355,613 |
| Factory equipment | 7,195,909 | 4,698,817 |
| Miscellaneous equipment | 1,094,920 | 739,354 |
|  | $ 80,498,373 | $ 52,587,888 |

Interest expense (before deducting capitalized amounts of $113,161 thousand in 2006 and $259,260 thousand in 2005) for the years ended December 31, 2006 and 2005 was $3,511,306 thousand and $2,650,553 thousand, respectively. The capitalized interest rates were 2.46% to 3.01% and 1.98% to 2.59% in 2006 and 2005, respectively.

The Company contributed the building to National Cheng Kung University of $242,070 thousand in 2006.

## 14. INTANGIBLE ASSETS, NET

|  | December 31 | |
| --- | --- | --- |
|  | 2006 | 2005 |
| Technical license fees | $ 944,763 | $ 902,512 |
| Patents | 506,949 | 639,072 |
| Technological know-how | 101,750 | 213,020 |
|  | $ 1,553,462 | $ 1,754,604 |

These intangible assets were resulted from the payment on the TFT-LCD related technology and technical license fees.

**15. DEFERRED CHARGES, NET**

|  | December 31 | |
|  | 2006 | 2005 |
| --- | --- | --- |
| Masks | $ 2,606,476 | $ 1,883,888 |
| Software and system design costs | 433,133 | 295,214 |
| Electricity installment cost | 333,723 | 351,382 |
| Arrangement fee From syndicated bank loans and others | 692,888 | 471,710 |
|  | $ 4,066,220 | $ 3,002,194 |

**16. ASSETS LEASED TO OTHERS, NET**

Assets leased to others are those assets leased to Chi Mei Culture Foundation (CMF, see Note 26) and third parties under operating lease agreements.

**17. SHORT-TERM BANK LOANS**

|  | December 31 | |
|  | 2006 | 2005 |
| --- | --- | --- |
| Unsecured loans - 2006:   Annual interest rate at 1.73%; 2005:   Annual interest at 1.54% to 1.60% | $ 500,000 | $ 4,680,000 |

**18. COMMERCIAL PAPER**

|  | December 31, 2005 |
| --- | --- |
| Current guaranteed by various financial institutions, Due by March 2006, annual interest at 1.16%-1.45% | $ 3,000,000 |
| Less - unamortized discount | 8,492 |
|  | $ 2,991,508 |

**19. LONG-TERM LOANS**

|  | Syndicated Banks | December 31 | |
|  |  | 2006 | 2005 |
| --- | --- | --- | --- |
| Syndicated bank loans: |  |  |  |
| a. US$15,000 thousand; repayable semi-annually from September 2002 to March 2006; with annual floating interest at 4.71% | ABN-AMRO Bank and 12 other banks | $         - | $ 492,750 |
| b. Repayable semi-annually from September 2002 to March 2006; with annual floating interest at 2.62% | Bank of Taiwan and 8 other banks | - | 500,000 |

(Continued)

| | Syndicated Banks | December 31 | |
| --- | --- | --- | --- |
| | | 2006 | 2005 |
| c. Repayable semi-annually from November 2003 to May 2008; with annual floating interest at 2.72% and 2.51% in 2006 and 2005, respectively | Mega International Commercial Bank and 26 other banks | $    4,500,000 | $    7,500,000 |
| d. US$18,000 thousand and US$30,000 thousand in 2006 and 2005, respectively; repayable semi-annually from November 2003 to May 2008 with annual floating interest at 6.17% and 5.15% in 2006 and 2005, respectively | Mega International Commercial Bank and 26 other banks | 586,710 | 985,500 |
| e. Repayable semi-annually from December 2005 to June 2010; with annual floating interest at 2.65% and 2.53% in 2006 and 2005, respectively | Mega International Commercial Bank and 22 other banks | 11,900,000 | 15,300,000 |
| f. US$61,600 thousand and US$79,200 thousand in 2006 and 2005, respectively; repayable semi-annually from December 2005 to June 2010; with annual floating interest at 6.39% and 4.99% in 2006 and 2005, respectively | Mega International Commercial Bank and 22 other banks | 2,007,852 | 2,601,720 |
| g. Repayable semi-annually from December 2006 to December 2011; with annual floating interest at 2.64% and 2.41% in 2006 and 2005, respectively | Bank of Taiwan and 42 other banks | 31,109,090 | 22,500,000 |
| h. US$188,181 thousand and US$207,000 thousand in 2006 and 2005, respectively; repayable semi-annually from December 2006 to December 2011; with annual floating interest at 6.14% to 6.33% and 4.86% in 2006 and 2005, respectively | Bank of Taiwan and 42 other banks | 6,133,769 | 6,799,950 |
| i. Repayable semi-annually from July 2007 to July 2012; with annual floating interest at 2.59% | Chinatrust Commercial Bank and 40 other banks and financial institutions | 38,450,000 | - |
| j. US$170,000 thousand, repayable semi-annually from July 2007 to July 2012; with annual floating interest at 6.31% | Chinatrust Commercial Bank and 40 other banks and financial institutions | 5,541,150 | - |
| k. Commercial paper guaranteed by banks and issued by financial institutions; resolving credit from April 2006 to July 2012; with annual floating interest at 1.85% | Chinatrust Commercial Bank and 40 other banks and financial institutions | 5,599,151 | - |

(Continued)

| | Syndicated Banks | December 31 | |
| --- | --- | --- | --- |
| | | 2006 | 2005 |
| l. Repayable semi-annually from May 2010 to November 2013; with annual floating interest at 2.61%-2.63% | Bank of Taiwan and 30 other banks and financial institution | $  20,400,000 | $          - |
| Medium to long-term secured loan: | | | |
| Repayment annual $500,000 thousand from November 2003 to November 2007; with annual floating interest at 2.34% and 2.14% in 2006 and 2005, respectively | | 1,000,000 | 1,500,000 |
| Commercial paper: | | | |
| Issued by various financial institutes, resolving credit from November 2006 to July 2011; with annual floating interest at 1.27%-2.02% | | 8,587,864 | - |
| Unsecured loans: | | | |
| Revolving credit from September 2004 to March 2009; with annual floating interest at 1.00%-1.82% and 1.53%-1.86% in 2006 and 2005, respectively | | 15,741,922 | 16,950,000 |
| Loan of the letter of credit: | | | |
| JPY8,495,150 thousand, revolving credit from March 2006 to January 2009; with annual floating interest 0.76%-1.05% | | 2,328,521 | - |
| Commercial paper guaranteed by bank: | | | |
| Issue by financial institution revolving credit from April 2005 to April 2007; with annual floating interesting at 1.21% | | - | 299,751 |
| | | 153,886,029 | 75,429,671 |
| Less - current portion | | 19,812,619 | 11,528,742 |
| | | $  134,073,410 | $   63,900,929 |
| | | | (Concluded) |

As of December 31, 2006, future principal payments for the Corporation's long-term loans are as follows:

| Year of Repayment | Amount |
| --- | --- |
| 2007 | $    19,812,619 |
| 2008 | 37,925,441 |
| 2009 | 24,761,841 |
| 2010 | 21,513,799 |
| 2011 | 28,114,826 |
| 2012 and thereafter | 21,757,503 |
| | 153,886,029 |
| Less - current portion | 19,812,619 |
| | $   134,073,410 |

The current ratio, debt ratio, tangible net asset ratio and interest coverage ratio of CMC and the Corporation on June 30 and December 31 are subject to certain restrictions in accordance with the loan agreements of (a) to (d) and loan agreements of (e) to (l) contain financial covenants which require the Corporation and CMC to maintain certain financial ratio, including current ratio, debt ratio, tangible net asset ratio and interest coverage ratio on June 30 and December 31, respectively.   In November, 2006, the Corporation amended the syndicated bank loans agreements (c) and (d) with Mega International Commercial Bank.   Both parities consent that CMC is not obligated to provide guaranty for the foregoing syndicated loan and maintain certain financial ratios.   As of December 31, 2006, the Corporation was in compliance with financial covenant of long agreements (e) to (l).

In order to generate for the construction of the Fab for TFT-LCD manufacturing, the Corporation entered into syndicated bank loans agreement with Bank of Taiwan and 20 other banks with the term of seven years aggregating to 52.7 billion.   As of February 28, 2007, the Corporation has not drawn on these syndicated bank loans.

Unused credit lines for long-term loans as of December 31, 2006 are about $50,205,000 thousand and US$306,000 thousand.

## 20. PENSION PLANS

The Labor Pension Act (the "Act") became effective on July 1, 2005 and the pension mechanism under the Act is deemed a defined contribution plan.   The employees who were subject to the Labor Standards Law prior to July 1, 2005 were allowed to choose to be subject to the pension mechanism under the Act or continue to be subject to the pension mechanism under the Labor Standards Law.   For those employees who were subject to the Labor Standards Law prior to July 1, 2005 and still work for the same company after July 1, 2005 and have chosen to be subject to the pension mechanism under the Act, their seniority as of July 1, 2005 shall be maintained.   Employees who joined the Company after July 1, 2005 can only be subject to the pension mechanism under the Act.

The pension mechanism under the Act is deemed a defined contribution plan.   Pursuant to the Act, the Corporation has made monthly contributions to employees' pension accounts per month at 6% of each employee's monthly salary starting from July 1, 2005.   Under the Act, total pension costs were $449,510 thousand and $195,542 thousand for the years ended December 31, 2006 and 2005, respectively.

The Corporation has a defined benefit plan under the Labor Standards Law that provides benefits based on an employee's length of service and average monthly salary for the six-month period prior to retirement. The Corporation contributes an amount equal to 2% of salaries paid each month to a pension fund (the "Fund").   The Fund is administered by a pension fund monitoring committee (the "Committee") and deposited in the Committee's name in the Central Trust of China.

Pension information on the defined benefit plan is summarized as follows:

a.   Components of net periodic pension cost

|  | Years Ended December 31 | |
|  | 2006 | 2005 |
| --- | ---: | ---: |
| Service cost | $    19,225 | $    131,481 |
| Interest cost | 27,941 | 22,001 |
| Projected return on plan assets | (14,442 ) | (11,218 ) |
| Unrecognized net transitional obligation | 1,010 | - |
| Amortization | 5,222 | 1,748 |
| Net periodic pension cost | $    38,956 | $    144,012 |

b.  Reconciliation of the funded status of the plan and accrued pension cost

|  | December 31 | |
|---|---|---|
|  | 2006 | 2005 |
| Benefit obligation | | |
|    Vested benefit obligation | $    (356) | $    - |
|    Nonvested benefit obligation | (520,819) | (451,334) |
|    Accumulated benefit obligation | (521,175) | (451,334) |
|    Additional benefits based on future salaries | (532,473) | (480,022) |
|    Projected benefit obligation | (1,053,648) | (931,356) |
| Fair value of plan assets | 538,495 | 409,108 |
| Funded status | (515,153) | (522,248) |
| Unrecognized net transitional obligation | 8,086 | 9,096 |
| Unrecognized net loss | 312,924 | 239,362 |
| Accrued pension cost | $ (194,143) | $ (273,790) |
| Vested benefits | $   356 | $   - |

c.  Actuarial assumptions

|  | 2006 | 2005 |
|---|---|---|
| Discount rate used in determining present values | 2.75% | 3.00% |
| Future salary increase rate | 2.75% | 3.00% |
| Expected rate of return on plan assets | 3.00% | 3.00% |

|  | Years Ended December 31 | |
|---|---|---|
|  | 2006 | 2005 |
| d.  Contributions to pension fund | $   125,750 | $   134,144 |
|     Payments from pension fund | $   - | $   - |

## 21. SHAREHOLDERS' EQUITY

a.  Capital stock, capital surplus, appropriation of earnings and dividend policy

Under the ROC Company Law, capital surplus can only be used to offset a deficit.   However, capital surplus from donations (donated capital), and capital surplus from stock issued for new capital and mergers, and the reissuance of treasury stock may be transferred to capital as stock dividends based on shareholders' ownership, except the capital surplus from long-term investments accounted for using the equity method is restricted for any purpose.

The ROC Company Law provides that legal reserve should be appropriated until the reserve equals the Corporation's paid-in capital.   This reserve may be used to offset a deficit.   In addition, when the reserve exceeds 50% of the Corporation's paid-in capital, up to the portion in excess of 25% of the paid-in capital thereof can be distributed as stock dividend.

Under the Corporation's Articles of Incorporation, the following should be appropriated from annual net income after paying outstanding taxes, offsetting any cumulative deficit, setting aside 10% as legal reserve, and adjusting for special reverse in accordance with relevant laws or regulations.   The order of the appropriation of the remaining earnings together with the accumulated retained earnings from previous years should be resolved at the shareholders' meeting after taking the following items into account:

1)  Preferred dividends;

2)  Shareholders' dividends, remuneration to directors and supervisors, and bonus to employees at between 5% and 10% of the aggregate amount appropriated;

3)  Determination if dividends will be distributed in cash and/or in the form of stock; nevertheless, cash dividends shall be no less than 10% of the aggregate amount distributed;

4)  Determination if bonus to employees will be distributed in the form of new shares.    As defined in the Company Law, employees of affiliated companies are also entitled to the employee bonus. The entitlement should be approved by the Board of Directors.

The Corporation is conducting business in a rapidly growing and newly emerging industry and needs funds for future expansion; therefore, the dividend policy adopted by the Corporation is the so-called remaining dividend policy.    The board of directors should take into account the long-term financial plan of the Corporation, future investment and capital expenditure plans in making dividend distribution proposal to the shareholders' meeting for approval.

All appropriations should be resolved by the shareholders in their meeting in the following year and given effect to in the financial statements of that year.

A special reserve equivalent to the debit balance of any account shown in the shareholder's equity section of the balance sheet (including the unrealized loss on financial assets and cumulative translation adjustments), shall be made from unappropriated retained earnings pursuant to existing regulations. The special reserve is allowed to be appropriated to the extent that the debit balance of such accounts is reversed.

Under the Integrated Income Tax System, ROC resident shareholders are allowed a tax credit for the income tax paid by the Corporation on earnings.    An imputation credit account (ICA) is maintained by the Corporation for such income tax and the tax credit allocated to each shareholder.

The appropriation of the 2005 and 2004 earning was approved in the shareholders' meetings on June 23, 2006 and May 13, 2005, respectively.    The appropriations and dividend per share were as follows:

|  | Appropriation of Earnings | | Dividend Per Share | |
|  | For Fiscal Year 2005 | For Fiscal Year 2004 | For Fiscal Year 2005 | For Fiscal Year 2004 |
|---|---|---|---|---|
| Legal reserve | $    801,323 | $    1,719,115 | | |
| Special reserve | 663,811 | - | | |
| Cash dividends to preferred shareholders | 304,054 | 47,616 | $0.19 | $0.61 |
| Stock dividends to common shareholders | 2,626,421 | 6,208,722 | 0.48 | 1.41 |
| Cash dividends to common shareholders | 1,750,947 | 1,552,181 | 0.32 | 0.35 |
| Bonus to employees - stock | 468,440 | 689,850 | | |
| Bonus to employees - cash | 52,050 | 172,470 | | |
| Remuneration to directors and supervisors | 3,000 | 3,000 | | |
|  | $    6,670,046 | $    10,392,954 | | |

The appropriations of the 2005 and 2004 earnings were consistent with the resolution approved at the meetings of the board of directors on May 5, 2006 and March 25, 2005, respectively.

If the above bonus to employees, directors and supervisors were to be paid entirely in cash and charged against earning for 2005 and 2004, the basic earnings per share for the years ended December 31, 2005 and 2004 would have decreased from NT$1.61 to NT$1.50 and NT$4.54 to NT$4.31, respectively.

The shares distributed as a bonus to employees represented 0.91% (46,844 thousand shares) and 1.81% (68,985 thousand shares) of the Corporation's total outstanding common shares as of December 31, 2005 and 2004, respectively.

The shareholders' meeting also approved the appropriation of stock bonuses to employees and stock dividends of $3,094,861 thousand to be distributed in the form of new shares.   This took effective on August 7, 2006.

In December 2002, the Corporation issued common shares amounting to $1,800,000 thousand through private placement.   On April 17, 2006, the Corporation submitted the application to the authority to offer the foregoing common shares and its entitled stock dividends on the TSEC.

Accounting to Securities and Exchange Act Article 43, the Corporation issued 350,000 thousand common shares and 705,000 thousand common shares at par value of $10.00 per share through private placement to certain investors in May and December in 2006, respectively (See Note 1)   The issuance price were $47.7 and $31.6 per share, respectively.   The foregoing shares through private placement can not be resell where three years have elapsed since the delivery date (July 13, 2006).

On August 5, 2003, the Corporation issued zero coupon convertible bonds (the "2nd CBs") with a total face value of US$250,000 thousand.   Unless redeemed, repurchased or converted earlier, these bonds are redeemable by the Corporation at 100% of their principal amount on August 5, 2008.   Each bond will, at the conversion price of $43.52 per common share and subject to adjustment based on a formula described in the contract (adjusted to $32.969 subsequent to August 14, 2005) and at the holder's option, be converted into the Corporation's common shares from September 5, 2003 up to 15 days before the maturity day, or be called for redemption on the dates of eighteen months and three years after the issuance date, with interest premium.   As stipulated in the contract, each holder of the convertible bonds has the right to sell the bonds back to the Corporation and the Corporation reserves the right to redeem the convertible bonds from the holders.   As of December 31, 2005, the bondholders had converted US$250,000 thousand of bonds into approximately 214,180 thousand common shares.

As of February 28, 2007, Corporation's Board of Directors has not resolved the appropriation for earnings of 2006.   Information on appropriations can be accessed online through the Market Observation Post System of the Taiwan Stock Exchange Corporation.

b.   Preferred shares

In January 2002, the Corporation issued 78,187 thousand shares of unlisted preferred shares - series A to certain investors with a par value of $10.00 and issuance price at $42.00 per share.   Following are the preferred shareholders' rights and other terms and conditions:

1)   Preferred shareholders are entitled to receive cumulative cash dividend at an annual rate of 1.45%, calculated at the actual issuance price and to be distributed once a year in cash.   After the financial statements are resolved at the shareholders' meeting, the board of directors will determine the grant date for the distribution of preferred dividends declared in the previous year.   Preferred cash dividends must be weighted by the fraction of the period they are outstanding.   Preferred shareholders are not entitled to receive any stock dividends for common shareholders (whether declared out of unappropriated earnings or capital surplus);

2)   At the end of the year, if the Corporation has no earnings or the earnings are not sufficient for the declaration of preferred dividends, the undistributed dividends should be accumulated until the Corporation declares an earnings distribution in the subsequent year.   The preferred shareholders have priority over the common shareholders in receiving the dividend.   Before redeeming the preferred shares, the Corporation should make up all the cumulative earning and dividends;

3) If the Corporation will be liquidated or dissolved, preferred shareholders have priority over the common shareholders with respect to the Corporation's assets available for distribution to shareholders. However, the pre-emptive rights to the assets should not exceed the issuance value of the shares;

4) Preferred shareholders have no voting rights;

5) Preferred shareholders have the same right as common shareholders to subscribe to new shares;

6) Preferred shareholders have no right to convert their shares into common shares. The preferred shares should be redeemed on the maturity date, which is five years from the issuance date, at $48.00 per share plus any accumulated dividend. These amounts should be obtained through issuing new shares or by making appropriations from retained earnings. The Corporation should redeem all the outstanding preferred shares at the same time. Otherwise, the remaining outstanding preferred shareholders retain all the aforementioned rights, and the Corporation's related obligations remain the same until the preferred shares are redeemed by the Corporation;

7) Any paid-in capital arising from the excess of par value from issuance of preferred shares may not be transferred to capital.

On January 2007, the foregoing preferred shares was redeemed at $48.00 per share.

In June 2005, the Corporation raised capital by private placement of 1,500,000 thousand shares of unlisted preferred shares - series B to certain investors with a par value of $10.00 as issuance price. Following are the preferred shareholders' rights and other terms and conditions:

1) Preferred shareholders are entitled to receive cumulative cash dividends once a year at the following annual rates, calculated at the actual issuance price:

| Period | Annual Rate |
|---|---|
| From 1st to 3rd years | 3.00% |
| From 4th to 6th years | 3.75% |
| From 7th to 9th years | 4.75% |
| 10th year and thereafter | 6.00% |

After the financial statements are approved at the shareholders' meeting, the board of directors will determine the grant date for the distribution of preferred dividends declared in the previous year. Preferred cash dividends must be weighted by the fraction of the period they are outstanding in the issuance year. Preferred shareholders are not entitled to receive any stock dividends for common shareholders (whether declared out of unappropriated earnings or capital surplus);

2) By the end of the year, if the Corporation has no earnings or the earnings are not sufficient for the declaration of preferred dividends, the undistributed dividends should be accumulated until the Corporation declares an earnings distribution in the subsequent year;

3) If the Corporation will be liquidated or dissolved, preferred shareholders have priority over the common shareholders on the Corporation's assets available for distribution to shareholders. However, the pre-emptive rights to the assets should not exceed the issuance value of the shares;

4) Preferred shareholders have no voting rights;

5) Preferred shareholders have the same right as common shareholders to subscribe to new shares;

6) Preferred shareholders have no right to convert their shares into common shares;

7) Any paid-in capital arising from the excess of par value from issuance of preferred shares may not be transferred to capital.

c.   Issuance of Global Depositary Shares (GDSs)

On October 24, 2003, the Corporation offered 450,000 thousand common shares with $10.00 par value in the form of 45,000 thousand GDSs.   Each GDS represents the right to receive 10 common shares at the issuance price of US$12.74.   The Corporation's major shareholders also sold up to 50,000 thousand common shares, representing 5,000 thousand GDSs, as part of the initial Purchasers' option to sell additional GDSs.   A total of 50,000 thousand GDSs were listed on the Luxembourg Stock Exchange.

On June 15, 2005, the Corporation offered 500,000 thousand common shares with $10.00 par value for a total of 50,000 thousand GDSs, which were listed on the Luxembourg Stock Exchange.   Each GDS represents the right to receive 10 common shares at the issuance price of US$15.02.

As of December 31, 2006, there were 16,653 thousand units of outstanding GDSs.

In December 2006, The Corporation's parent company, CMC, sold a portion of its shares in the Corporation in the form of 40,130 thousand GDSs, which were listed on the Luxembourg Stock Exchange, representing all of the outstanding GDSs at December, 31, 2006.

## 22. STOCK-BASED COMPENSATION PLANS

On July 18, 2006, the Securities and Futures Commission approved the Corporation's employee stock option plans, hereinafter referred to as "CMO 2006 Plan".   The CMO 2006 Plan has reserved 30 thousand option units with each unit representing 1,000 shares of common stock.   The options may be granted to qualified employees of the Corporation or its subsidiaries worldwide.   The options of all the plans are valid for six years and exercisable at certain percentages subsequent to the second anniversary of the grant date.   Under the terms of the plan, the exercise price is equal to the closing price of the Corporation's common shares on the grant date.

Information about outstanding stock options for the year ended December 31, 2006 was as follows:

|  | Number of Outstanding Options (in Thousands) | Weighted-average Exercise Price (NT$) |
|---|---|---|
| Year ended December 31, 2006 |  |  |
| Balance, beginning of period | - | $        - |
| Options granted | 28 | 32.13 |
| Balance, end of period | 28 |  |

The numbers of outstanding options and exercise prices have been adjusted to reflect the appropriations of dividends under the plans.

As of December 31, 2006, information about outstanding and exercisable options was as follows:

| Range of Exercise Price (NT$) | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| | Number of Options (in Thousands) | Weighted-average Remaining Contractual Life (Years) | Weighted-average Exercise Price | Number of Options (in Thousands) | Weighted-average Exercise Price (NT$) |
| $32.13 | 28 | 5.55 | $  32.13 | - | $  - |

No compensation cost was recognized under the intrinsic value method for the year ended December 31, 2006. Had the Company applied the fair value based method (based on the Black-Scholes model) to evaluate the compensation cost, the assumptions and pro forma results of the Company for the year ended December 31, 2006 would have been as follows:

| | Year Ended December 31, 2006 |
|---|---|
| **Assumptions:** | |
| Expected dividend yield | 3.97% |
| Expected stock price volatility | 40.03% |
| Risk free interest rate | 2.00% |
| Expected life | 4 |
| | |
| **Net income:** | |
| Net income as reported | $  3,543,081 |
| Pro forma net income | 3,504,722 |
| | |
| **Earnings per share (EPS) - after income tax (NT$):** | |
| Basic EPS as reported | $0.54 |
| Pro forma basic EPS | 0.53 |
| Diluted EPS as reported | $0.54 |
| Pro forma diluted EPS | 0.53 |

## 23. INCOME TAX EXPENSE (BENEFIT)

a.  A reconciliation of income tax expense on income before income tax at the statutory rate (25%) and current income tax expense before tax credits is shown below:

| | Years Ended December 31 | |
|---|---|---|
| | 2006 | 2005 |
| Income tax expense based on income before income tax at statutory rate of 25% | $  803,847 | $  1,990,357 |
| Permanent differences | 47,395 | 16,597 |
| Temporary differences | (613,299 ) | (985,709 ) |
| Cumulative effect of changes in accounting principles | (330,874 ) | - |
| Tax-exempt income | - | (653,565 ) |
| Others | - | (10 ) |
| Current income tax expense before tax credits | $  (92,931 ) | $  367,670 |

b.  Income tax expense (benefit) consisted of:

|  | Years Ended December 31 | |
|---|---|---|
|  | 2006 | 2005 |
| Current income tax expense before tax credits | $            - | $      367,670 |
| Additional 10% tax on the unappropriated earnings | 137,674 | 177,103 |
| Income tax credits | (137,674 ) | (544,772 ) |
| Changes in fair value recognized as an adjustment to equity | 323,738 | - |
| Cumulative effect of changes in accounting principles | 330,874 | - |
| Net change in deferred income tax assets (liabilities) | | |
|     Investment tax credits | (834,596 ) | (4,881,575 ) |
|     Loss carryforwards | (3,637,838 ) | (36,671 ) |
|     Temporary differences | 575,242 | 985,501 |
|     Valuation allowance | 3,213,927 | 3,847,986 |
| Taxes withheld on commercial paper | 3,177 | 902 |
| Prior years' adjustment and others | 28,653 | (1,500 ) |
| Income tax expense (benefit) | $          3,177 | $      (85,356 ) |

c.  Deferred income tax assets (liabilities) consisted of the following:

|  | December 31 | |
|---|---|---|
|  | 2006 | 2005 |
| Current | | |
|     Investment tax credits | $    3,267,338 | $      974,243 |
|     Temporary differences | (3,977,672 ) | 356,666 |
|  | $      (710,334 ) | $    1,330,909 |
| Noncurrent | | |
|     Investment tax credits | $   11,827,951 | $  13,286,450 |
|     Loss carryforwards | 4,614,819 | 976,981 |
|     Temporary differences | (5,177,197 ) | (4,083,531 ) |
|  | 11,265,573 | 10,179,900 |
|     Less - valuation allowance | 7,007,697 | 8,646,532 |
|  | $    4,257,876 | $    1,533,368 |

The statutory tax rates used for the deferred income taxes are both 25% as of December 31, 2006 and 2005.

d.  Integrated income tax information was as follows:

|  | December 31 | |
|---|---|---|
|  | 2006 | 2005 |
| Imputation credit account balance (ICA) | $       11,784 | $        7,280 |

The expected and actual creditable tax ratio for 2006 and 2005 earnings were 0.10% and 0.09%, respectively.

The imputation credits allocated to the shareholders are based on the balance as of the date of dividend distribution.   The expected creditable ratio for distribution of earnings of 2006 may be adjusted when the allocation of the imputation credits is made.

e.  As of December 31, 2006, loss carryforwards and investment tax credits consisted of the following:

| Regulation | Items | Total Creditable Amounts | Remaining Creditable Amounts | Expiry Year |
|---|---|---|---|---|
| Income Tax Law | Loss carryforwards | $ 976,981 | $ - | 2006 |
| | | 4,614,819 | 4,614,819 | 2011 |
| | | $ 5,591,800 | $ 4,614,819 | |
| Statute for Upgrading Industries | Investments in machinery and equipment | $ 1,819,336 | $ - | 2006 |
| | | 3,063,794 | 3,063,794 | 2007 |
| | | 3,062,760 | 3,062,760 | 2008 |
| | | 4,871,138 | 4,871,138 | 2009 |
| | | 1,976,500 | 1,976,500 | 2010 |
| | | $ 14,793,528 | $ 12,974,192 | |
| Statute for Upgrading Industries | Research and development expenditures | $ 122,380 | $ - | 2006 |
| | | 192,890 | 192,890 | 2007 |
| | | 411,951 | 411,951 | 2008 |
| | | 824,355 | 824,355 | 2009 |
| | | 654,269 | 654,269 | 2010 |
| | | $ 2,205,845 | $ 2,083,465 | |
| Statute for Upgrading Industries | Personnel training | $ 6,438 | $ - | 2006 |
| | | 10,654 | 10,654 | 2007 |
| | | 14,679 | 14,679 | 2008 |
| | | 5,106 | 5,106 | 2009 |
| | | 7,193 | 7,193 | 2010 |
| | | $ 44,070 | $ 37,632 | |

f.  The ROC government enacted the Alternative Minimum Tax Act (AMT Act), which became effective on January 1, 2006.  The alternative minimum tax (AMT) imposed under the AMT Act is a supplemental tax levied at a rate of 10% which is payable if the income tax payable determined pursuant to the Income Tax Law is below the minimum amount prescribed under the AMT Act.  The taxable income for calculating the AMT includes most of the income that is exempted from income tax under various laws and statutes.  The Corporation has considered the impact of the AMT Act in the determination of its tax liabilities.

g.  The Corporation's sales generated through expansion and construction projects in line with the design, research, development, manufacture, and sale of TFT-LCD and color filter, are exempt from income tax.

| Item | Tax Exemption Period |
|---|---|
| Original application | January 1, 2004 to December 31, 2008 |
| First expansion plan | May 18, 2004 to November 17, 2007 |

h.  The income tax returns through 2003 have been examined and cleared by the tax authorities.

## 24. LABOR COST, DEPRECIATION AND AMORTIZATION EXPENSES

| | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | **2006** | | | **2005** | | |
| | Classified as Cost of Sales | Classified as Operating Expense | Total | Classified as Cost of Sales | Classified as Operating Expense | Total |
| Labor cost | | | | | | |
| Salary | $ 4,611,662 | $ 1,289,414 | $ 5,901,076 | $ 4,015,320 | $ 1,013,560 | $ 5,028,880 |
| Labor and health insurance | 515,342 | 129,468 | 644,810 | 403,199 | 95,269 | 498,468 |
| Pension | 361,123 | 98,596 | 459,719 | 268,585 | 63,478 | 332,063 |
| Others | 1,989,116 | 725,578 | 2,714,694 | 2,187,379 | 668,984 | 2,856,363 |
| | $ 7,477,243 | $ 2,243,056 | $ 9,720,299 | $ 6,874,483 | $ 1,841,291 | $ 8,715,774 |
| Depreciation | $ 26,554,828 | $ 1,730,810 | $ 28,285,638 | $ 18,158,188 | $ 1,387,158 | $ 19,545,346 |
| Amortization | $ 3,159,962 | $ 1,414,863 | $ 4,574,825 | $ 1,605,175 | $ 954,527 | $ 2,559,702 |

## 25. EARNINGS PER SHARE

| | Years Ended December 31 | | | |
|---|---|---|---|---|
| | **2006** | | **2005** | |
| | Before Income Tax | After Income Tax | Before Income Tax | After Income Tax |
| Basic earnings per share (NT$) | | | | |
| Income before cumulative effect of changes in accounting principles attributable to shareholders | $ 0.71 | $ 0.71 | $ 1.50 | $ 1.52 |
| Cumulative effect of changes in accounting principles attributable to shareholders | (0.17) | (0.17) | - | - |
| Income attributable to common shareholders | $ 0.54 | $ 0.54 | $ 1.50 | $ 1.52 |

The numerators and denominators used in computing earnings per share (EPS) were as follows:

| | Amounts (Numerator) | | Shares (Denominator) (Thousands) | Earnings Per Share (NT$) | |
|---|---|---|---|---|---|
| | Before Income Tax | After Income Tax | | Before Income Tax | After Income Tax |
| Year ended December 31, 2006 | | | | | |
| Net income | $ 3,546,258 | $ 3,543,081 | | | |
| Less - preferred shares dividends | 497,616 | 497,616 | | | |
| Basic EPS | | | | | |
| Income available to shareholders | 3,048,642 | 3,045,465 | 5,677,831 | $ 0.54 | $ 0.54 |
| Effect of diluted securities | | | | | |
| Employee stock options | - | - | 1,436 | | |
| Diluted EPS | | | | | |
| Income available to shareholders | $ 3,048,642 | $ 3,045,465 | 5,679,267 | $ 0.54 | $ 0.54 |

(Continued)

| | Amounts (Numerator) | | | Earnings Per Share (NT$) | |
| | Before Income Tax | After Income Tax | Shares (Denominator) (Thousands) | Before Income Tax | After Income Tax |
| --- | --- | --- | --- | --- | --- |
| **Year ended December 31, 2005** | | | | | |
| Net income | $ 7,961,426 | $ 8,046,782 | | | |
| Less - preferred shares dividends | 305,287 | 305,287 | | | |
| Basic EPS | | | | | |
| Income available to shareholders | 7,656,139 | 7,741,495 | 5,109,202 | $ 1.50 | $ 1.52 |
| Effect of diluted securities convertible bonds | - | - | 52,613 | | |
| Diluted EPS | | | | | |
| Income available to shareholders | $ 7,656,139 | $ 7,741,495 | 5,161,815 | $ 1.48 | $ 1.50 |

(Concluded)

The potential common shares from the convertible bonds (see Note 21) and the employee stock option plan (see Note 22) are not included in the denominator of the diluted earning-per-share computation as such shares are not dilutive using the if-converted method and the treasury stock method under the SFAS No. 24, "Earning Per Share" for the years ended December 31, 2006 and 2005, respectively. The average number of shares outstanding for earnings per share calculation was adjusted retroactively for issuance of stock dividends (see Note 21). The retroactive adjustment caused the basic and diluted after income fax for the year ended December 31, 2005 to decrease from $1.61 and $1.59 to $1.52 and $1.50, respectively.

## 27. RELATED PARTY TRANSACTIONS

The Corporation's related parties were as follows:

1) CMC - the parent company.

2) CMO Japan - the Corporation's 100% owned subsidiary.

3) CMEL - the Corporation's 100% owned subsidiary.

4) CMO Europe - the Corporation's 100% owned subsidiary.

5) CMO Singapore - the Corporation's 100% owned subsidiary.

6) LGG - the Corporations' 100% owned subsidiary.

7) CMLT - the Corporation's 100% owned subsidiary.

8) CTC - an equity-method investee of the Corporation.

9) GIO - an equity-method investee of the Corporation.

10) CMMT - an equity-method investee of the Corporation.

11) TSO - an equity-method investee of the Corporation (see Note I below).

12) Exploit - an equity-method investee of the Corporation (see Note I below).

13) Chi Mei Optoelectronics USA, Inc. ("CMO U.S.A." formerly named "IDT U.S.A.") - the Corporation's indirectly 100% owned subsidiaries.

14) Chi Mei Optoelectronics Germany GmbH (CMO Germany) - the Corporation's indirectly 100% owned subsidiaries.

15) CMO Ningbo -the Corporation's indirectly 100% owned subsidiaries.

16) CMLC - the Corporation's indirectly 100% owned subsidiaries.

17) Fulintec Science Engineering Co., Ltd. (FSEC) - the Corporation's indirectly 44% owned subsidiaries.

18) NuLight Technology Corporation (NTC) - the Corporation's indirectly 46% owned investee.

19) Nexgen Mediatech Inc. (NMI) - the general manager of the Corporation is HDI's chairman.

20) HiMax Taiwan - affiliate.

21) Chi Lin Technology Co., Ltd. (CLTC) - affiliate.

22) Chi Lin Optoelectronics Co., Ltd. (CLOC) - affiliate.

23) HiMax Display Inc. (HDI) - affiliate.

24) Poly Chemical Engineering Co., Ltd. (PCE) - affiliate

25) FOREPI - the Corporation is FOREPI's director (see Note I below).

26) CMF - affiliate.

27) Chi Mei Fine Art Ltd. (CMFA) - affiliate.

28) Transmint Precisions Co., Ltd. (TPC) - affiliate.

29) Linklinear development Co., Ltd. (LDC) - affiliate.

30) CTC Ningbo - affiliate.

31) W. L. Shi - the Corporation's director.

32) Others - related parties with whom the Corporation has substantial influence but had no material transactions with (see Note 31).

Note I:     Became the Corporation's related party from 2006; the transactions made as of and for the year ended December 31, 2005 were disclosed only for reference.

The significant transactions with the above related parties, in addition to those disclosed in other notes, are summarized as follows:

| | 2006 | | 2005 | |
|---|---|---|---|---|
| For the years | Amount | % | Amount | % |
| **Net sales** | | | | |
| NMI | $ 5,803,812 | 3 | $ 4,030,077 | 2 |
| CLTC | 3,644,590 | 2 | 2,697,314 | 2 |
| CMO Japan | 1,920,416 | 1 | 1,151,184 | 1 |
| CMC | 609,044 | 1 | 5,374,669 | 4 |
| CMO Ningbo | 261,989 | - | 15,694 | - |
| CMO U.S.A. | 58,597 | - | 15,932 | - |
| CMEL | 9,308 | - | - | - |
| HDI | 3,993 | - | 3,058 | - |
| CMMT | 830 | - | - | - |
| HiMax | 626 | - | 21,155 | - |
| TSO | 531 | - | 13,060 | - |
| CMO Singapore | - | - | 23 | - |
| | $ 12,313,736 | 7 | $ 13,322,166 | 9 |
| **Purchases** | | | | |
| HiMax Taiwan | $ 10,866,472 | 9 | $ 10,184,002 | 10 |
| CLTC | 7,053,677 | 6 | 5,924,701 | 6 |
| CMC | 1,706,443 | 1 | 1,249,439 | 1 |
| CTC | 131,611 | - | 100,315 | - |
| Exploit | 28,497 | - | - | - |
| CMO Ningbo | 3,906 | - | - | - |
| GIO | 967 | - | 30,405 | - |
| CMMT | 515 | - | - | - |
| NMI | 454 | - | - | - |
| FSEC | 101 | - | 102 | - |
| CMO Japan | - | - | 606,681 | 1 |
| HDI | - | - | 1,162 | - |
| | $ 19,792,643 | 16 | $ 18,096,807 | 18 |
| **Subcontract costs** | | | | |
| LGG | $ 10,425,536 | 99 | $ 442,278 | 74 |
| **Operating and manufacturing** | | | | |
| CLTC | $ 259,597 | 1 | $ 234,814 | 1 |
| CMO Europe | 188,437 | - | 35,196 | - |
| CTC | 81,377 | - | 79,165 | - |
| CMF | 60,000 | - | 9,714 | - |
| CMC | 28,869 | - | 19,589 | - |
| CMO Singapore | 17,124 | - | 4,021 | - |
| PCE | 15,078 | - | 19,001 | - |
| CMO Japan | 13,445 | - | 19,671 | - |
| HiMax Taiwan | 9,181 | - | 12,506 | - |
| LDC | 6,491 | - | - | - |
| Others | 2,614 | - | 29,417 | - |
| | $ 682,213 | 1 | $ 463,094 | 1 |

| | 2006 | | 2005 | |
|---|---|---|---|---|
| | **Amount** | **%** | **Amount** | **%** |
| **Rental income** | | | | |
| NTC | $ 19,279 | 11 | $ - | - |
| HDI | 13,369 | 7 | 13,368 | 19 |
| CMEL | 9,687 | 6 | 1,819 | 3 |
| CMLT | 7,131 | 4 | - | - |
| HiMax Taiwan | 3,463 | 2 | - | - |
| CMF | 1,143 | 1 | 1,714 | 2 |
| CMC | 770 | - | - | - |
| CTC | - | - | 533 | 1 |
| | $ 54,842 | 31 | $ 17,434 | 25 |
| | | | | |
| **Royalty income** | | | | |
| CMO Japan | $ 87,750 | 100 | $ 211,700 | 100 |
| | | | | |
| **Administrative Service income** | | | | |
| CMC | $ 41,064 | 93 | $ 139,017 | 68 |
| CLTC | 1,550 | 4 | - | - |
| NMI | 763 | 2 | - | - |
| CTC | 596 | 1 | - | - |
| GIO | 72 | - | - | - |
| CMO Japan | - | - | 63,997 | 32 |
| | $ 44,045 | 100 | $ 203,014 | 100 |
| | | | | |
| **Other nonoperating income** | | | | |
| CMEL | $ 91,667 | 22 | $ 101,884 | 22 |
| CMO Ningbo | 76,688 | 18 | 11,244 | 3 |
| CMO Japan | 30,862 | 7 | 90,713 | 20 |
| GIO | 3,394 | 1 | - | - |
| CTC | 389 | - | 1,261 | - |
| CLTC | 323 | - | 17,123 | 4 |
| CMO U.S.A. | 97 | - | - | - |
| CMO Germany | 74 | - | - | - |
| NTC | 12 | - | - | - |
| HDI | 10 | - | - | - |
| NMI | 5 | - | 80 | - |
| CMF | - | - | 767 | - |
| | $ 203,521 | 48 | $ 223,072 | 49 |
| | | | | |
| **Purchase of equipment** | | | | |
| CTC | $ 2,733,147 | 2 | $ 1,439,974 | 3 |
| PCE | 307,784 | - | 39,188 | - |
| CLTC | 301,509 | - | 175,992 | - |
| HiMax Taiwan | 40,864 | - | 39,036 | - |
| FSEC | 28,217 | - | - | - |
| TPC | 3,700 | - | - | - |
| CMC | 2,400 | - | 8,400 | - |
| CMO Japan | 455 | - | 15,890 | - |
| | $ 3,418,076 | 2 | $ 1,718,480 | 3 |

|  | 2006 | | 2005 | |
|---|---|---|---|---|
|  | Amount | % | Amount | % |
| Proceeds from disposal of equipment | | | | |
| CMO Ningbo | $ 806,854 | 98 | $ 167,502 | 100 |
| CMMT | 1,174 | - | - | - |
| CMC | - | - | 440 | - |
| CMEL | - | - | 39 | - |
|  | $ 808,028 | 98 | $ 167,981 | 100 |
| | | | | |
| Proceeds from disposal of long-term investment | | | | |
| LGG | $ - | - | $ 5,066,660 | 100 |
| | | | | |
| As of December 31 | | | | |
| | | | | |
| Notes and accounts receivable | | | | |
| CLTC | $ 1,372,021 | 5 | $ 517,317 | 2 |
| NMI | 1,298,428 | 5 | 1,270,458 | 4 |
| CMO Japan | 238,027 | 1 | 469,823 | 1 |
| CMO Ningbo | 137,021 | - | 12,072 | - |
| CMO U.S.A. | 49,055 | - | 15,001 | - |
| HDI | 1,588 | - | 64 | - |
| CMMT | 742 | - | - | - |
| TSO | 187 | - | - | - |
| CMC | 113 | - | 785,235 | 2 |
|  | $ 3,097,182 | 11 | $ 3,069,970 | 9 |
| | | | | |
| Receivables form related parties | | | | |
| CMO Ningbo | $ 326,764 | 55 | $ 165,855 | 41 |
| CMLT | 157,633 | 26 | - | - |
| CMLC | 28,929 | 5 | - | - |
| CMO Europe | 24,890 | 4 | 5,457 | 1 |
| NTC | 16,067 | 3 | - | - |
| CMEL | 12,199 | 2 | 17,444 | 4 |
| CMO Japan | 9,255 | 2 | 204,374 | 51 |
| HDI | 6,311 | 1 | 1,114 | - |
| NMI | 4,929 | 1 | 152 | - |
| CTC Ningbo | 4,842 | 1 | - | - |
| CMO Singapore | 2,407 | - | 2,506 | 1 |
| CLTC | 1,628 | - | - | - |
| CMC | 743 | - | 7,595 | 2 |
| CMMT | 328 | - | - | - |
| CMO U.S.A. | 98 | - | - | - |
| CMO Germany | 74 | - | - | - |
| CLOC | - | - | 57 | - |
|  | $ 597,097 | 100 | $ 404,554 | 100 |

|  | 2006 | | 2005 | |
|---|---|---|---|---|
|  | Amount | % | Amount | % |
| **Notes and accounts payable** | | | | |
| LGG | $ 5,035,123 | 13 | $ 230,466 | 1 |
| CLTC | 3,088,782 | 8 | 1,932,347 | 7 |
| HiMax Taiwan | 2,647,340 | 8 | 2,204,460 | 8 |
| CMC | 349,947 | 1 | 171,535 | 1 |
| CTC | 39,687 | - | 22,535 | - |
| Exploit | 2,000 | - | - | - |
| GIO | 784 | - | 2,325 | - |
| CMMT | 515 | - | - | - |
| NMI | 458 | - | - | - |
| FSEC | 1 | - | 52 | - |
| CMO Japan | - | - | 19,936 | - |
|  | $ 11,164,637 | 30 | $ 4,583,656 | 17 |
| | | | | |
| **Payables to related parties** | | | | |
| CMO Europe | $ 76,740 | 67 | $ 5,329 | 4 |
| CLTC | 10,468 | 10 | 112,991 | 75 |
| CTC | 7,604 | 7 | 14,138 | 9 |
| CMO Japan | 4,876 | 4 | 3,289 | 2 |
| CMC | 4,330 | 4 | 6,001 | 4 |
| CMO Singapore | 3,422 | 3 | 1,082 | 1 |
| CMEL | 2,356 | 2 | - | - |
| HiMax Taiwan | 1,522 | 1 | 3,355 | 2 |
| PCE | 1,368 | 1 | 2,249 | 2 |
| NMI | 766 | 1 | - | - |
| FOREPI | 382 | - | - | - |
| CMFA | 361 | - | 326 | - |
| TPC | 294 | - | - | - |
| GIO | 13 | - | - | - |
| CMO U.S.A. | 3 | - | 1,113 | 1 |
| HDI | - | - | 18 | - |
|  | $ 114,505 | 100 | $ 149,891 | 100 |
| | | | | |
| **Payables to contractors and equipment suppliers** | | | | |
| CTC | $ 915,318 | 5 | $ 130,022 | 1 |
| CLTC | 44,013 | - | 27,193 | - |
| FSEC | 13,867 | - | - | - |
| HiMax Taiwan | 7,479 | - | 5,807 | - |
| PCE | - | - | 38,598 | 1 |
| CMC | - | - | 1,260 | - |
|  | $ 980,677 | 5 | $ 202,880 | 2 |

|  | 2006 | | 2005 | |
|  | Amount | % | Amount | % |
|---|---|---|---|---|
| Accrued expenses and other current liabilities | | | | |
| CMO Ningbo (recorded as deferred income - current) | $ 39,185 | - | $ - | - |
| CMO Japan | 4,409 | - | 568 | - |
| CTC (recorded as deferred income - current) | 667 | - | - | - |
| CLTC | 558 | - | 319 | - |
| CMEL (recorded as deferred income - current) | - | - | 91,667 | 2 |
| HiMax Taiwan | - | - | 42 | - |
|  | $ 44,819 | - | $ 92,596 | 2 |
| | | | | |
| Deferred income - noncurrent (Show in the balance sheets as "other liabilities - other") | | | | |
| CMO Ningbo | $ 136,563 | 99 | $ - | - |
| CTC | 944 | 1 | - | - |
| LGG | - | - | 4,861,774 | 100 |
|  | $ 137,507 | 100 | $ 4,861,774 | 100 |

Sales to and purchases from related parties were based on normal prices and collection and payment terms. However, there were no comparable transactions for comparison with purchases from CMO Japan, and the acquisition costs or selling prices of equipment were determined in accordance with the related agreements. The royalty income from CMO Japan is based on a percentage of the net sales of CMO Japan.

The term of rental payments and collections on lease contracts with related parties were similar to those for third parties.

The Corporation's syndicated bank loans (a) to (d) (see Note 19) were guaranteed by both CMC and Mr. W. L. Shi.   Total outstanding balance on the foregoing loans was $5,086,710 thousand and $9,478,250 thousand as of December 31, 2006 and 2005, respectively.

The financing provided by the Corporation (recorded as "other receivables") was as follows:

| | Year Ended December 31, 2006 | | | | | |
| | Maximum Balance | Date of Maximum Balance | Ending Balance | Interest Rate | Interest Income | Interest Receivable |
|---|---|---|---|---|---|---|
| Name of related parties | | | | | | |
| Yuan Chi | $ 80,000 | 2006.06 | $ - | - | $ - | $ - |
| CMO Europe | EUR 976  thousand | 2006.07 | EUR 450  thousand | - | $ - | $ - |

The financing provided by the related parties (recorded as "short-term-loans-other") was as follower:

| | Year Ended December 31, 2005 | | | | | |
| | Maximum Balance | Date of Maximum Balance | Ending Balance | Interest Rate | Interest Income | Interest Receivable |
|---|---|---|---|---|---|---|
| Name of related parties | | | | | | |
| CMC | $ 12,000,000 | 2005.04 | $ - | 1.53%-1.95% | $ 62,207 | $ - |

The Corporation did not obtain and provide any collateral for the financing.

## 27. PLEDGED OR MORTGAGED ASSETS

The following assets had been pledged or mortgaged as collateral for long-term loans and research and development plans:

|  | December 31 | |
| --- | --- | --- |
|  | 2006 | 2005 |
| Property, plant, and equipment - carrying value | $ 167,749,493 | $ 75,387,340 |
| Pledged time deposits | 750 | - |
|  | $ 167,750,243 | $ 75,387,340 |

## 28. SIGNIFICANT LONG-TERM OPERATING LEASES

The Corporation leases 16 parcels of land from the Tainan Science-Based Industrial Park for its manufacturing facilities. The related operating lease agreements will renewable and with terms from February 1, 1998 to December 31, 2026. Total annual lease payment aggregate $166,556 thousand.

Future minimum lease payments are as follows:

| Year | Amount |
| --- | --- |
| 2007 | $ 166,556 |
| 2008 | 166,556 |
| 2009 | 166,556 |
| 2010 | 166,556 |
| 2011 | 166,556 |
| 2012 and thereafter | 1,664,901 |
|  | $ 2,497,681 |

## 29. SIGNIFICANT COMMITMENTS AND CONTINGENCIES

Significant commitments and contingencies as of December 31, 2006, except those disclosed in other notes, are as follows:

a. The Corporation is the guarantor for bank loans of CMEL and CMO Ningbo for the amount of $1,500,000 thousand and $4,824,060 thousand, respectively.

b. In May 2003, Commissariat A L'Energia Atomique (CEA) filed a patent infringement lawsuit against the Corporation in the United States District Court in the District of Delaware, alleging that CEA is the owner of several patents used in certain products of the Corporation. The foregoing lawsuit was overruled by the District Court of Delaware. In December 2003, CEA filed the foregoing case against the Corporation in the United States District Court in the District of California. Prior to the litigation, 2003, the Corporation obtained a report from U.S. - based attorneys specializing in patent law, stating that there is no patent infringement on the products that the Corporation currently manufactures in May 2003. In January, 2007 the Corporation entered into a settlement agreement with CEA.

c.  On November 3, 2004, Semiconductor Energy Labs (SEL), Japan filed a patent infringement lawsuit against the Corporation in the United States District Court in the Northern District of California and in the District Court of Tokyo, alleging that the Corporation, CMO Japan and its subsidiary, CMO U.S.A., infringe the owner of four patent relating to LCD panels.   The Corporation obtained individual reports from U.S. and Japan patent attorneys, stating that there is no patent infringement on the products that the Corporation currently manufactures.   The Japan Patent Office (JPO) on December 16, 2005 separately ruled that all claims of the electrostatic discharge protection patent utilized for LCD owned by the Japanese research and licensing company, SEL, were invalid.   In March 24, 2006 the foregoing lawsuit was overruled by the District Court of Tokyo; however the SEL continued to appeal to the supreme court of Tokyo.   As of February 15, 2007, the Corporation expects that this lawsuit and its outcome will not have a material impact on its financial conditions and operations; thus, the Corporation did not accrue any damages.

d.  The Corporation, CMO Japan, CMO UK, CMO Europe and CMO USA was investigated by the United states, Europe, Japan and Canada Department of Justice investigation into potential antitrust violations in the production and sale of ("LCD") in December 2006,   As of February 28, 2007, this case was still in searching evidence process.

e.  In 2002, the Corporation, along with five other companies - AU Optronics Corp., Chung Hwa Picture Tubes Ltd., Toppoly Optoelectronics Corp., Quanta Display Inc. and HannStar Display Corp. - entered into a seven-year license contract with the Industrial Technology Research Institute (ITRI).   Under this contract, the parties to the contract are entitled to possess certain common TFT-LCD patents.   The ITRI retains the ownership of the patents upon expiry of the contract.   The total contract price is amortized over the contract term.

f.  In March 2002, the Corporation entered into a license agreement with Dai Nippon Printing Co., Ltd. (DNP) for the transfer of DNP's color-filter technology to the Corporation.   The Corporation paid a portion of the fee stated in the contract and will pay the balance on the completion of the transfer.

g.  In July 2004, the Corporation entered into a long-term purchase and supply agreement with Corning Display Technologies Taiwan Co., Ltd. ("Corning").   The contract was amended again in July 2005. In accordance with the second-revised contract, Corning will guarantee to supply liquid crystal display (LCD) glass to the Corporation for 5.5 generation fabrication starting from the first quarter of 2005 to 2009.   Meanwhile, the Corporation makes prepayment to Corning in several installments, which will be deductible from subsequent purchases.

h.  Under a patent cross-license agreement made with Hitachi Displays, Ltd., in June 2005, the Corporation should pay all royalty by installment in the period of the contract.

i.  In December 2005, under a patent cross-license agreement made with Thomson Licensing Inc., the Corporation should pay all royalty by installment in the period of the contract.

j.  In March 2006, under an agreement on a mutual cross-license covering LCD patents with Sharp Corporation of Japan, the Corporation should pay all royalty by installment in the period of the contract.

k.  The Corporation has entered into several purchase and construction agreements for a TFT-LCD fabrication and its related machinery and equipment amounting to $32,889,439 thousand.   The unpaid balance was $10,757,163 thousand as of December 31, 2006.

l.  As of December 31, 2006, the Corporation had unused letters of credit of US$24,311 thousand, JPY11,802,141 thousand, EUR230 thousand.

## 30. DISCLOSURES FOR FINANCIAL INSTRUMENTS

a.  Fair values of financial instruments were as follows:

|  | December 31 | | | |
| --- | --- | --- | --- | --- |
|  | 2006 | | 2005 | |
|  | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Nonderivative financial instruments |  |  |  |  |
| Assets |  |  |  |  |
| Available-for-sale financial assets - current | $    860,265 | $    860,265 | $            - | $            - |
| Available-for-sale financial assets - noncurrent | 4,174,238 | 4,174,238 | - | - |
| Derivative financial instruments (Note) |  |  |  |  |
| Assets |  |  |  |  |
| Forward exchange contracts | 11,933,028 | 11,933,028 | - | - |
| Foreign currency option contracts | 10,775,414 | 10,775,414 | - | - |
| Interest rate swaps contracts | 61,863 | 61,863 | 191,412 | (2,370,487) |
| Cross currency swaps contracts | 244,290 | 244,290 | 385,565 | 20,370 |
| Liabilities |  |  |  |  |
| Forward exchange contracts | 2,756,329 | 2,756,329 | - | - |
| Foreign currency option contracts | 873,147 | 873,147 | - | (74,180) |
| Interest rate swaps contracts | 1,526,547 | 1,526,547 | - | - |

Note:   Interests receivable (payable) is included in the carrying value of interest rate swap contracts and cross currency swap contracts.

The Corporation adopted the newly released SFAS No. 34 "Accounting for Financial Instruments" from January 1, 2006.   As a result, certain financial instruments were not included in the financial statements for the year ended December 31, 2005.   Please see Note 3 for the cumulative effect of changes in accounting principles and adjustments to shareholders' equity.

b.  Methods and assumptions for the fair values of financial instruments

1)  The above financial instruments do not include cash and cash equivalent, notes and accounts receivable, other receivables from related parties, other receivables from others, other financial assets - current, pledge time deposits, short-term bank loans, commercial paper, notes and accounts payable, payables to related parties, payables to others and payables to contractors and equipment suppliers.   The carrying amounts of aforementioned instruments reported in the balance sheets approximate their fair values.

2)  The above financial instruments also exclude refundable (guarantee) deposits, long-term investment accounted for using equity method - unlisted stocks and long-term loans.   The fair values of refundable deposits and guarantee deposits are based on carrying values.   The long-term investments accounted for using equity method - unlisted stocks do not have quoted market prices; therefore, fair values for those long-term investments are not shown above.   The fair value of long-term loans is based on forecasted cash flows discounted at current interest rates of similar long-term liabilities.   The fair values of the Corporation's long-term loans are also their carrying values because they bear floating interest rates.

3)  Fair value of bond portfolios with no active market is determined using valuation techniques incorporating estimates.

4)  The Corporation establishes fair value by using a valuation technique for derivatives instrument.   The valuation technique incorporates all factors and assumptions that market participants would consider in price setting.

c. Fair values of financial assets and liabilities, based on quoted market prices or valuation techniques, were as follows:

| | Quoted Market Prices December 31 | | Valuation Techniques December 31 | |
| --- | --- | --- | --- | --- |
| | 2006 | 2005 | 2006 | 2005 |
| **Nonderivative instruments** | | | | |
| Assets | | | | |
| Available-for-sale financial assets | | | | |
| - current | $ 860,265 | - | $ - | - |
| Available-for-sale financial assess | | | | |
| -noncurrent | 133,465 | - | 4,040,773 | - |
| **Derivative instruments** | | | | |
| Assets | | | | |
| Forward exchange contracts | - | - | 11,933,028 | - |
| Foreign currency option contracts | - | - | 10,775,414 | - |
| Interest rate swaps contracts | - | - | 61,863 | (2,370,487) |
| Cross currency swap contrasts | - | - | 244,290 | 20,370 |
| Liabilities | | | | |
| Forward exchange contracts | - | - | 2,756,329 | - |
| Foreign currency option | - | - | 873,147 | (74,180) |
| Interest rate swaps contracts | - | - | 1,526,547 | - |

d. For the year ended December 31, 2006, the Corporation recognized a gain of $19,411,048 thousand for the changes in fair value of derivatives using the valuation techniques.

e. As of December 31, 2006 and 2005, interest income (expenses) arising from the financial assets (liabilities), excluding those at fair value through profit and loss, were as follows:

| | Years Ended December 31 | |
| --- | --- | --- |
| | 2006 | 2005 |
| Total interest income | $ 411,288 | $ 129,416 |
| Total interest expenses (including capitalized amount) | (3,191,530) | (1,880,547) |

For the year ended December 31, 2006, the Corporation recognized an unrealized gain of $114,325 thousand in shareholders' equity for the changes in fair value of available-for-sale financial assets. The Corporation also recognized an unrealized loss of $1,176,643 thousand in shareholders' equity for the changes in available-for-sale financial assets resulting from the equity-method investees

f. Financial risks

1) Market price risk.   All derivative financial instruments are entered into for the purpose of hedging fluctuations in currency exchange rates on the Corporation's foreign-currency assets or liabilities and interest rate fluctuations on its floating rate long-term loans.   Exchange gains or losses on these derivative contracts are likely to be offset by gains or losses on the hedged assets and liabilities.   Interest rate risks are also controlled because the expected cost of capital is fixed. Thus, market price risks are believed to be minimal.

2) **Credit risk.** Credit risk represents the positive net settlement amount of those contracts with positive fair value on the balance sheet date. The positive net settlement amount represents the loss incurred by the Corporation if the counter-parties breached the contracts. The banks, which are the counter-parties to the foregoing derivative financial instruments, are reputable financial institutions. Management believes its exposure related to the potential default by those counter-parties is low.

3) **Liquidity, cash flow risk and uncertainty of amount and term of future cash demand.** The Corporation entered into forward exchange contracts, foreign-currency option contracts, and cross-currency interest swaps contracts for hedging exchange rate fluctuation of foreign-currency assets or liabilities. The expected cash inflow (outflow) upon settlement of derivative transactions will be offset against the inflow (outflow) of hedged assets and liabilities. The Corporation has sufficient operating capital to meet the above cash demand. The interest rate of the interest rate swaps contracts and cross currency swaps contracts has taken the Corporation's cost of capital into account. In addition, the exchange rate of forward exchange contracts, foreign-currency option contracts and cross currency swaps contracts have been fixed. Therefore, there is no material fund raising risk and cash flow risk.

As of December 31, 2006, CMO's projected cash flows for the outstanding derivative financial instruments were as follows:

**(In Thousands)**

| Derivative Financial Instrument | Settlement Period | Cash Outflow | | Cash Inflow | |
|---|---|---|---|---|---|
| Forward exchange contracts | 2007.01-2007.07 | US$ | 3,572,000 | JPY | 417,496,728 |
| Cross currency swap contracts (Note) | 2007.05-2012.07 | $ | 602,226 | US$ | 47,365 |
| Interest rate swaps contracts (Note) | 2007.01-2012.07 | $ | 4,226,834 | $ | 5,456,536 |
| | | US$ | 1,900 | US$ | 1,940 |

Note: The interest rate swap contracts are calculated based on the most recent floating interest rate.

4) **Cash flow interest rate risk** short-term and Long-term bank loans mainly bear floating interest rates. Thus the fluctuations of market interest rates will result in changes in the Corporations future cash flows.

g. **Policy for hedging**

The Corporation's operations and business activities expose it primarily to the financial risks of changes in fair value and interest rate.

The Corporation enters into cash flow and fair value hedge transactions to manage the financial risks associated with the changes in fair value and interest rates. Cash flow hedge is used to minimize the Corporation's exposure to the risk of interest rate changes, and fair value hedge is used to reduce the Corporation's exposure to the risk of market price changes.

Fair value hedge is used to hedge the risks of fluctuations in exchange rate on foreign-currency denominated assets or liabilities. The Corporation uses foreign exchange forward contracts to hedge these exposures. The Corporation uses foreign exchange forward contracts to hedge these exposures.

The Corporation enters into transactions at fixed rates to reduce the exposures on transactions vulnerable to both foreign currency and interest rate changes. The Corporation uses interest rate swaps contracts and cross currency swaps contracts to hedge these exposures. The Corporation uses interest rate swaps contracts and cross currency swaps contracts to hedge these exposures.

h.  As of December 31, 2006 and 2005, financial assets exposed to fair value interest rate risk were $22,796,767 thousand and $87,575 thousand, respectively, financial liabilities exposed to fair value interest rate risk were $3,629,477 thousand as of December 31, 2006, financial assets exposed to cash flow interest rate risk were $25,915,024 thousand and $20,687,746 thousand, respectively, and financial liabilities exposed to cash flow interest rate risk were $153,886,028 thousand and $75,429,671 thousand, respectively.

i.  Hedge for fair value and cash flow:

   1) Fair value hedge

   CMO evaluated the risk of fair value changes on interest payments associated with borrowings denominated in foreign currency and entered into cross currency swap contracts to hedge the exposure.

| Hedge Item | Hedging Financial Instrument | Fair Value December 31, 2006 |
|---|---|---|
| Foreign currency long-term loans | Cross currency swap contracts | $347,808 |

   2) Cash flow hedge

   CMO evaluates the risk of future cash flow changes on principal payments associated with CMO's floating interest rate bearing borrowings (both current-portion and long term) due to interest rate changes to be significant, and accordingly, entered into interest rate swap and cross-currency swap contracts to hedge such exposures.

| Hedged Item | Hedging Financial Instrument | December 31, 2006 Fair Value | Expected Timing for Future Cash Demand | Expected Timing for the Recognition of Gains or Losses from Hedge |
|---|---|---|---|---|
| Long-term loans | Interest rate swap contracts | $ (1,449,330) | 2002-2012 | 2002-2012 |
| | Cross currency swap contracts | (103,518) | 2005-2012 | 2005-2012 |

| Item | December 31, 2006 |
|---|---|
| Adjustment to shareholders' equity | $ (254,044) |

j.  Information for derivative financial instruments

   1) Derivative financial instruments for hedging

   CMO entered into interest rate swaps contracts and cross currency swap to hedge exposures from fluctuations in both exchange rate and interest rates on long-term loans.

Outstanding interest rate swap contracts as of December 31, 2006 and 2005 were as follows:

| Contract Date | Period | (In Thousands) Notional Amounts |
|---|---|---|
| **As of December 31, 2006** | | |
| 2002.01 | 2002.01-2007.01 | $ 300,000 |
| 2002.03-2002.05 | 2002.03-2008.05 | 3,990,000 |
| 2005.04-2005.05 | 2005.04-2010.06 | 11,900,000 |
| 2005.06 | 2005.06-2011.12 | 9,855,380 |
| 2005.12 | 2005.12-2011.12 | 10,000,000 |
| 2006.03 | 2006.03-2011.12 | 8,000,000 |
| 2006.04 | 2006.04-2012.07 | 11,000,000 |
| **As of December 31, 2005** | | |
| 2002.01 | 2002.01-2006.03 | $ 500,000 |
| 2002.01 | 2002.01-2007.01 | 500,000 |
| 2002.03-2002.05 | 2002.03-2008.05 | 6,650,000 |
| 2005.04-2005.06 | 2005.04-2010.06 | 22,908,762 |
| 2005.06 | 2005.06-2011.12 | 10,835,380 |
| 2005.12 | 2005.12-2011.12 | 10,000,000 |

Outstanding cross currency swap contracts of December 31, 2006 and 2005 were as follows:

| Maturity Date | Contract Amount (in Thousands) | Range of Interest Rates Paid | Range of Interest Rates Received |
|---|---|---|---|
| **As of December 31, 2006** | | | |
| 2008.05 | US$ 18,000 | 3.20% | 5.39% |
| 2008.12 | US$ 90,000 | 3.20% | 5.37% |
| 2010.06 | US$ 61,600 | 3.20% | 5.29% |
| 2010.12 | US$ 37,620 | 3.18% | 5.37% |
| 2011.12 | US$ 29,454 | 3.23% | 5.37% |
| 2012.07 | US$ 154,000 | 1.18% | 5.37% |
| **As of December 31, 2005** | | | |
| 2008.05 | US$ 30,000 | 3.20% | 4.58% |
| 2010.06 | US$ 79,200 | 3.20% | 4.65% |
| 2008.12 | US$ 90,000 | 3.20% | 4.71% |
| 2010.06 | US$ 20,687 | 3.18% | 4.71% |
| 2010.12 | US$ 20,689 | 3.18% | 4.71% |
| 2011.12 | US$ 32,500 | 3.23% | 4.71% |

Net gain (loss) for derivative financial instruments for hedging was $28,263 thousand and ($581,992 thousand) for the years ended December 31, 2006 and 2005, respectively.

2)  Derivative financial instruments not qualified for hedge accounting

CMO entered into derivative transactions during the years ended December 31, 2006 and 2005 to manage exposures related to foreign exchange rate and interest rate fluctuations.   The strategy for financial hedge is to manage its market price risks or cash flow risks.   However, these financial hedges did not qualify for hedge accounting as defined by SFAS No. 34.   Therefore, from January 1, 2006, the Corporation stopped applying hedge accounting to these transactions.

Outstanding forward exchange contracts as of December 31, 2006 were as follows:

| As of December 31, 2006 | Currency | Maturity | Contract Amount (in Thousands) |
|---|---|---|---|
| Sell | US$/JPY | 2007.01-2007.07 | US$ 3,572,000 |

There is no outstanding foreign currency option contract as of December 31, 2005.

Outstanding foreign currency option contracts as of December 31, 2006 and 2005 were as follows:

| Type | Trade | Option | Contract Amount (in Thousands) | Execute Price | Maturity |
|---|---|---|---|---|---|
| As of December 31, 2006 | | | | | |
| Europe | Sell | Call | US$ 2,540,000 | 117.5-118.3 (US$ to JPY) | 2007.02-2007.06 |
| | Buy | Put | US$ 2,100,000 | 117.5-118.3 (US$ to JPY) | 2007.02-2007.06 |
| As of December 31, 2005 | | | | | |
| Europe | Sell | Call | US$ 600,000 | 114.0 (US$ to JPY) | 2006.01-2006.06 |
| | | Put | US$ 600,000 | 114.0 (US$ to JPY) | 2006.01-2006.06 |

Outstanding interest rate swap contracts as of December 31, 2006 and 2005 were as follows:

| Contract Date | Period | Notional Amounts (in Thousands) |
|---|---|---|
| As of December 31, 2006 | | |
| 2004.07 | 2004.07-2007.07 | US$ 35,000 |
| 2005.05 | 2005.05-2010.06 | $ 672,168 |
| 2005.05 | 2005.05-2007.07 | US$ 35,000 |
| 2005.06 | 2005.06-2010.06 | $ 779,800 |

(Continued)

| Contract Date | Period | Notional Amounts (in Thousands) | |
|---|---|---|---|
| As of December 31, 2005 | | | |
| 2004.07 | 2004.07-2009.11 | US$ | 110,000 |
| 2004.09 | 2004.09-2009.09 | $ | 10,000,000 |
| 2005.05-2005.06 | 2005.05-2010.06 | US$ | 70,000 |
| 2005.04 | 2005.04-2007.06 | $ | 1,339,104 |
| | | | (Concluded) |

Net gain (loss) from the foregoing financial instruments was $3,415,075 thousand and ($2,314 thousand) for the years ended on December 31, 2006 and 2005, respectively.

## 31. ADDITIONAL DISCLOSURES

Following are the additional disclosures required by Securities and Futures Bureau for the Corporation and its investees:

a.   Financing provided:   Table 1 (attached);

b.   Endorsement/guarantee provided:   Table 2 (attached);

c.   Marketable securities held:   Table 3 (attached);

d.   Marketable securities acquired and disposed of at costs or prices at least NT$100 million or 20% of the paid-in capital:   Table 4 (attached);

e.   Acquisition of individual real estates at costs of at least NT$100 million or 20% of the paid-in capital:   Table 5 (attached);

f.   Total purchase from or sale to related parties amounting to at least NT$100 million or 20% of the paid-in capital:   Table 6 (attached);

g.   Receivables from related parties amounting to at least NT$100 million or 20% of the paid-in capital:   Table 7 (attached);

h.   Names, locations, and related information of investees of which the Corporation exercises significant influence:   Table 8 (attached);

i.   Information for derivatives of investees over which the Corporation has a controlling interest:

CMO Japan didn't engage in any derivative transactions for the year ended December 31, 2006.   CMO Japan entered into forward contracts during the year ended December 31, 2005 to manage exposures related to foreign exchange rate fluctuations.   As of December 31, 2005, all forward contracts of CMO Japan are settled.

For the year ended December 31, 2005, gains from forward contracts of CMO Japan were JPY16,077 thousand.

j.  Information on investment in Mainland China:

    1)  The name of the investee company in mainland China, the main businesses and products, its issued capital, method of investment, information on inflow or outflow of capital, ratio of ownership, equity in the net gain or net loss, ending balance, amount received from earnings distributed by the investee, and the limitation on investment:    Table 9 (attached);

    2)  Significant direct or indirect transactions with the investee company, its prices and terms of payment, unrealized gain or loss, and related information is helpful to understanding the impact of investment in mainland China on financial reports:    Please see note 26 and Table 2 (attached).

## 32. SEGMENT FINANCIAL INFORMATION

a.  Industry information:    The Corporation consists of a single reportable operating segment, namely, the research, development, manufacture and sale of TFT-LCD and color filters.

b.  Area information:    None.

c.  Gross export sales:

| Area | Years Ended December 31 | |
| --- | --- | --- |
| | 2006 | 2005 |
| Asia | $  88,549,730 | $  65,555,629 |
| Europe | 21,583,396 | 29,098,689 |
| Americas | 16,780,690 | 8,625,965 |
| Others | 4,063,940 | 4,066,824 |
| | $  130,977,756 | $  107,347,107 |

The export sales information is based on sale areas within the region.

d.  Major customers representing at least 10% of sales:

| Area | Years Ended December 31 | |
| --- | --- | --- |
| | 2006 | 2005 |
| Customer A | $  19,727,026 | $  3,381,655 |

- 56 -

# CHI MEI OPTOELECTRONICS CORPORATION

FINANCING PROVIDED
YEAR ENDED DECEMBER 31, 2006
(In Thousands of New Taiwan Dollars, Unless Stated Otherwise)

| No | Financing Company's Name | Counter-party | Financial Statement Account | Maximum Balance for the Period | Ending Balance | Interest Rate | Type of Financing (Note 1) | Transaction Amounts | Reason for Short-term Financing | Allowance for Bad Debt | Collateral | | Financing Limited for Each Borrowing Company (Note 3) | Financing Company Financing Amount Limited (Note 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Item | Value | | |
| 0 | CMO | Yuan Chi | Other receivables | $ 80,000 | $ - | - | 2 | $ - | Note 2 | $ - | - | $ - | $ 28,242,385 | $ 75,313,02 |
| | | CMO Europe | Other receivables | EUR 976 thousand | EUR 450 thousand | - | 2 | - | Note 2 | - | - | - | 28,242,385 | 75,313,02 |

Note 1   The type No. 2 represents necessary for short-term financing.

Note 2   The Corporation provides financial support for Yuan Chi to invest and CMO Europe to establish CMO Germany.

Note 3   Not exceeds 15% of the Corporation's net equity.

Note 4   Not exceeds 40% of the Corporation's net equity.

# CHI MEI OPTOELECTRONICS CORPORATION

ENDORSEMENT/GUARANTEE PROVIDED
YEAR ENDED DECEMBER 31, 2006
(In Thousands of New Taiwan Dollars, Unless Stated Otherwise)

| Endorsement/Guarantee | Counter-party | | Limits on Each Counter-party's Endorsement/ Guarantee Amounts | Maximum Balance for the Year | Ending Balance | Value of Collateral Properties, Plant and Equipment | Percentage of Accumulated Amount of Collateral on Net Equity of the Latest Financial Statement (%) | Maximum Collateral/ Guarantee Amount Allowable |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Name | Nature of Relationship (Note 3) | | | | | | |
| CMO | CMEI | 2 | Note 1 | $ 1,500,000 | $ 1,500,000 | $    - | 1 | Note 2 |
| | CMO Ningbo | 3 | Note 1 | 4,824,060 | 4,824,060 | - | 3 | Note 2 |

Note 1:  Not exceeding 30% ($56,484,770 thousand) of CMO's net equity of $188,282,567 thousand for each entity.

Note 2:  Not exceeding 50% ($94,141,284 thousand) of CMO's net equity of $188,282,567 thousand.

Note 3:  The 2 Represents a subsidiary in which CMO directly owns 100% of the equity interest.
The 3 Represents an investee in which the Corporation directly and indirectly owns 100% of the equity interest.

**CHI MEI OPTOELECTRONICS CORPORATION**

MARKETABLE SECURITIES HELD
DECEMBER 31, 2006
(In Thousands of New Taiwan Dollars, Unless Stated Otherwise)

| Holding Company Name | Marketable Securities Type and Name | Relationship with the Corporation | Financial Statement Account | Shares/Units (Thousands) | December 31, 2006 | | | Note |
|---|---|---|---|---|---|---|---|---|
| | | | | | Carrying Value | Percentage of Ownership | Market Value or Net Asset Value | |
| CMO | **Fund** | | | | | | | |
| | Truswell Hua-Whin Bond Fund | - | Available-for-sale financial assets - current | 27,512 | $ 290,171 | - | $ 290,171 | Note 3 |
| | NITC Bond Fund | - | " | 1,763 | 290,033 | - | 290,033 | Note 3 |
| | Ta Chong Bond Fund | - | " | 21,505 | 280,061 | - | 280,061 | Note 3 |
| | **Beneficiary certificates of Financial asset securitization** | | | | | | | |
| | Subordinated beneficiary certificates | - | Available-for-sale financial assets - noncurrent | - | 3,046,497 | NA | 3,046,497 | Note 4 |
| | Seller's beneficiary certificates | - | " | - | 994,276 | NA | 994,276 | Note 4 |
| | **Stock** | | | | | | | |
| | LGG | The Corporation's 100% owned subsidiary | Investments accounted for using equity method | 160,005 | 3,983,285 | 100 | 3,983,285 | Note 1 |
| | Landmark | The Corporation's 100% owned subsidiary | " | 120,000 | 4,030,691 | 100 | 3,951,513 | Note 1 |
| | CMO Japan | The Corporation's 100% owned subsidiary | " | - | 2,090,717 | 100 | 2,130,440 | Note 1 |
| | Yuan Chi | The Corporation's 100% owned subsidiary | " | - | 943,073 | 100 | 943,073 | Note 1 |
| | CMMT | An equity-method investee of the Corporation | " | 45,000 | 384,912 | 18 | 384,912 | Note 1 |
| | GIO | An equity-method investee of the Corporation | " | 29,000 | 277,964 | 29 | 269,556 | Note 1 |
| | CMLT | The Corporation's 100% owned subsidiary | " | 25,000 | 223,749 | 100 | 223,749 | Note 1 |
| | CTC | An equity-method investee of the Corporation | " | 15,568 | 203,593 | 14 | 1,253,261 | Note 1 |
| | CMO Europe | The Corporation's 100% owned subsidiary | " | - | 91,299 | 100 | 91,299 | Note 1 |
| | TSO | An equity-method investee of the Corporation | " | 8,200 | 43,362 | 10 | 43,362 | Note 1 |
| | Keyway | The Corporation's 100% owned subsidiary directly and indirectly | " | 1,001 | 32,630 | 38 | 32,630 | Note 1 |
| | CMEL | The Corporation's 100% owned subsidiary | " | 60,000 | 293,263 | 100 | 293,263 | Note 1 |
| | CMO Singapore | The Corporation's 100% owned subsidiary | " | 10 | 1,380 | 100 | 1,380 | Note 2 |
| | Exploit | An equity-method investee of the Corporation | " | 9,211 | 165,365 | 15 | 119,550 | Note 1 |
| | Power King | An equity-method investee of the Corporation | " | 3,120 | 43,518 | 15 | 36,611 | Note 1 |
| | FOREPI | FOREPI's director | Available-for-sale financial assets - noncurrent | 4,767 | 133,465 | 3 | 133,465 | Note 1 |
| | Top Taiwan | - | Financial assets carried at cost - noncurrent | 20,000 | 200,000 | 9 | 227,558 | Note 2 |
| | INT | - | " | 1,118 | 11,175 | 15 | 9,607 | Note 2 |
| | ViewSonic | - | " | 1,500 | - | 3 | - | Note 2 |
| | VP Dynamics | - | " | - | - | 3 | - | Note 2 |
| | MRT | - | " | 18 | - | 2 | - | Note 2 |
| | **Bond** | | | | | | | |
| | Bank of Overseas Chinese Subordinated Debenture | - | Bond portfolios with no active market - noncurrent | - | 80,000 | NA | 80,000 | Note 2 |

(Continu

| Holding Company Name | Marketable Securities Type and Name | Relationship with the Corporation | Financial Statement Account | Shares/Units (Thousands) | December 31, 2006 Carrying Value | Percentage of Ownership | Market Value or Net Asset Value | Note |
|---|---|---|---|---|---|---|---|---|
| CMO Japan | Chi Mei Optoelectronics UK Ltd ("CMO UK", formerly named "IDTech Europe") | 100% owned subsidiary of CMO Japan | Investments accounted for using equity method | 150 | £ 332 thousand | 100 | £ 332 thousand | Note 1 |
| | CMO U.S.A | 100% owned subsidiary of CMO Japan | | 1 | US$ 2,160 thousand | 100 | US$ 2,160 thousand | Note 1 |
| Landmark | CMO Ningbo | Landmark's 100% owned subsidiary | Investments accounted for using equity method | - | US$ 91,591 thousand | 100 | US$ 91,591 thousand | Note 1 |
| | CMO Nanhai | Landmark's 100% owned subsidiary | | - | US$ 29,696 thousand | 100 | US$ 29,696 thousand | Note 1 |
| Yuan Chi | CMLC | Yuan Chi's 100% owned subsidiary | Investments accounted for using equity method | 25,100 | 245,387 | 100 | 245,387 | Note 1 |
| | NTC | Yuan Chi's 46% owned subsidiary | " | 41,250 | 355,262 | 46 | 355,262 | |
| | FSEC | Yuan Chi's 44% owned subsidiary | " | 4,546 | 90,566 | 44 | 66,212 | |
| | Optivision Technology Incorporation (OTI) | Yuan Chi's 20% owned subsidiary | " | 4,000 | 78,642 | 20 | 50,961 | |
| | Power King | Yuan Chi An equity-method investee | " | 1,010 | 14,088 | 5 | 11,852 | |
| | Exploit | Yuan Chi An equity-method investee | " | 2,989 | 53,661 | 5 | 38,794 | |
| FSEC | Applied Vacuum Coating Technologies Co., Ltd | - | Available-for-sale financial assets - noncurrent | 300 | 1,536 | - | 1,536 | Note 3 |
| LGG | HiMax Cayman | Affiliate | Available-for-sale financial assets - noncurrent | 24,823 | US$ 118,652 thousand | 14 | US$ 118,652 thousand | Note 3 |
| CMLC | Keyway | The parent company's 100% owned subsidiary directly and indirectly | Investment accounted for using equity method | - | US$ 52,189 thousand | 62 | US$ 52,189 thousand | Note 1 |
| Keyway | Ningbo CMO Electronics Ltd | Keyway's 100% owned subsidiary | Investments accounted for using equity method | - | US$ 1,002 thousand | 100 | US$ 1,002 thousand | Note 1 |
| | CMLC Ningbo | Keyway's 100% owned subsidiary | Investments accounted for using equity method | - | US$ 1,600 thousand | 100 | US$ 1,600 thousand | Note 1 |
| CMO Europe | CMO Germany | CMO Europe's 100% owned subsidiary | Investments accounted for using equity method | - | EUR (148 thousand) | 100 | EUR (148 thousand) | Note 1 |
| CMLT | Fund | | | | | | | |
| | PCW Bond Fund | - | Available-for-sale financial assets-current | 6,450 | 100,215 | - | 100,215 | |
| | NITC Taiwan Bond Fund | - | " | 7,113 | 100,217 | - | 100,217 | |

Note 1: Recognized based on the audit financial statements in the same period.

Note 2: Recognized based on the unaudit financial statements in the same period or book value of the investee ViewSonic, VP Dynamics and MRT recently incurred significant losses, and the Corporation recognized an impairment loss on of its investment in them

Note 3: The market value was based on closing-price as of December 31, 2006.

Note 4: The market value was determined using valuation techniques incorporating estimates

Note 5: Marketable securities disclosed above are not pledged nor mortgaged as of December 31, 2006.

(Conclu

# CHI MEI OPTOELECTRONICS CORPORATION

**MARKETABLE SECURITIES ACQUIRED AND DISPOSED OF AT COSTS OR PRICES OF AT LEAST NT$100 MILLION OR 20% OF THE PAID-IN CAPITAL**
**YEAR ENDED DECEMBER 31, 2006**
(In Thousands of New Taiwan Dollars, Unless Stated Otherwise)

| Company Name | Marketable Securities Type and Name | Financial Statement Account | Counter-party | Nature of Relationship | Beginning Balance Shares/Units (Thousands) | Beginning Balance Amount | Acquisition Shares/Units (Thousands) | Acquisition Amount | Disposal Shares/Units (Thousands) | Disposal Amount | Disposal Carrying Value | Gain on Disposal | Ending Balance Shares/Units (Thousands) | Ending Balance Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CMO | **Funds** | | | | | | | | | | | | | |
| | NITC Taiwan Bond Fund | Available-for-sale financial assets - current | National Investment Trust Co., Ltd | - | - | $ - | 42,590 | 600,000 | - | $ 600,043 | $ 600,000 | $ 43 | - | $ - |
| | UNI-President James Bond Fund | ″ | UNI-President Assets Management Corp | - | - | - | 18,799 | 290,000 | 18,799 | 290,023 | 290,000 | 23 | - | - |
| | Truswell Hua-Whi Bond Fund | ″ | Truswell Investment Trust Co., Ltd | - | - | - | 27,512 | 290,000 | - | - | - | - | 27,512 | - |
| | Fuh-Hwa Bond Fund | ″ | Fuh Hwa | - | - | - | 59,333 | 790,000 | 59,333 | 790,153 | 790,000 | 153 | - | - |
| | Huw Nan Kirin Fund | ″ | Huw Nan Commercial Bank Ltd Tainan Branch | - | - | - | 25,338 | 280,000 | 25,338 | 280,056 | 280,000 | 56 | - | - |
| | Huw Nan Phoenix Bond Fund | ″ | Huw Nan Commercial Bank Ltd Tainan Branch | - | - | - | 18,671 | 280,000 | 18,671 | 280,054 | 280,000 | 54 | - | - |
| | Fubon Chi-Shiang Fund | ″ | Fubon Asset Management Co., Ltd | - | - | - | 19,962 | 290,000 | 19,962 | 290,068 | 290,000 | 68 | - | - |
| | PCA Short Duration USD Bond Fund | ″ | Chinatrust Commercial Bank Ltd | - | - | - | 2,928 | 29,979 | 2,928 | 29,981 | 29,979 | 2,471 | - | - |
| | Mega Diamond Band Fund | ″ | Mega Investment Trust Corp | - | - | - | 27,430 | 290,000 | 27,430 | 290,043 | 290,000 | 43 | - | - |
| | Fuhwa Apex Band Fund | ″ | Fuhwa Securities Investment Trust Corp | - | - | - | 24,849 | 290,000 | 24,849 | 290,052 | 290,000 | 52 | - | - |
| | Fuhwa Advantage Bond Fund | ″ | Fuhwa Securities Investment Trust Co., Ltd | - | - | - | 75,301 | 780,000 | 75,301 | 780,187 | 780,000 | 187 | - | - |
| | Fuhwa Yuli Bond Fund | ″ | Fuhwa Securities Investment Trust Co., Ltd | - | - | - | 23,656 | 290,000 | 23,656 | 290,206 | 290,000 | 206 | - | - |
| | JF(Taiwan) First Bond Fund | ″ | JF Asset Management (TW) Ltd | - | - | - | 9,945 | 150,000 | 9,945 | 150,108 | 150,000 | 108 | - | - |
| | Ta Chong Bond Fund | ″ | Tachong Investment Trust Corp | - | - | - | 153,100 | 1,980,000 | 131,595 | 1,700,547 | 1,700,000 | 547 | 21,505 | - |
| | Jen-hon family Fund | ″ | First Bank | - | - | - | 8,486 | 1,390,000 | 6,723 | 1,100,436 | 1,100,000 | 436 | 1,763 | - |
| | Cathy family Fund | ″ | Cathy Investment Trust Corp. | - | - | - | 25,361 | 290,000 | 25,361 | 290,020 | 290,000 | 20 | - | - |
| | Capital An Shin Fund | ″ | Capital Investment | - | - | - | 34,414 | 400,000 | 34,414 | 400,258 | 400,000 | 258 | - | - |
| | **Stock** | | | | | | | | | | | | | |
| | Landmark | Investments accounted for using equity method | Note 2 | Note 2 | 30,000 | 963,793 | 90,000 | 2,914,545 | - | - | - | - | 120,000 | |
| | Yuan Chi | ″ | - | - | - | 98,221 | - | 900,000 | - | - | - | - | - | |
| | LGG | ″ | LGG | The Corporation's 100% owned subsidiary | 5 | 186 | 160,000 | 5,207,706 | - | - | - | - | 160,005 | |
| | CMMT | ″ | CMMT | An equity-method investee of the Corporation | 10,000 | 97,465 | 35,000 | 350,000 | - | - | - | - | 45,000 | |
| | CMLT | ″ | - | - | - | - | 25,000 | 250,000 | - | - | - | - | 25,000 | |
| | CMEL | ″ | CMEL | The Corporation's 100% owned subsidiary | 81,683 | 474,290 | 58,317 | 583,170 | - | - | - | - | 60,000 | |
| | Exploit | ″ | Exploit | An equity-method investee of the Corporation | - | - | 9,211 | 165,798 | - | - | - | - | 9,211 | |

(Continued)

| Company Name | Marketable Securities Type and Name | Financial Statement Account | Counter-party | Nature of Relationship | Beginning Balance | | Acquisition | | Disposal | | | | Ending Balance | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Shares/Units (Thousands) | Amount | Shares/Units (Thousands) | Amount | Shares/Units (Thousands) | Amount | Carrying Value | Gain on Disposal | Shares/Units (Thousands) | Amount |
| Landmark | **Stock** | | | | | | | | | | | | | |
| | CMO Ningbo | Investments accounted for using equity method | CMO Ningbo | Landmark's 100% owned subsidiary | - | US$ 58,714 thousand | - | US$ 30,000 thousand | - | $ - | $ - | $ - | - | $ - |
| | CMO Nanhai | : | CMO Nanhai | Landmark's 100% owned subsidiary | - | - | - | US$ 30,000 thousand | - | - | - | - | - | - |
| Yuan Chi | **Stock** | | | | | | | | | | | | | |
| | NTC | Investments accounted for using equity method | NTC | An equity-method investee of Yuan Chi | - | - | 41,250 | 412,500 | - | - | - | - | 41,250 | |
| | CMLC | : | CMLC | Yuan Chi's 100% owned subsidiary | 100 | 1,000 | 25,000 | 250,000 | - | - | - | - | 25,100 | |
| CMLT | **Fund** | | | | | | | | | | | | | |
| | PCW Bond Fund | Available-for-sale financial assets - current | First Commercial Bank, Ltd | - | - | - | 100,000 | 6,450 | - | - | - | - | 6,450 | |
| | NTIC Taiwan Bond Fund | : | First Commercial Bank, Ltd | - | - | - | 100,000 | 7,113 | - | - | - | - | 7,113 | |

Note 1    The ending balance included the recognition of the investment income (loss) by the equity method, unrealized gain or loss on financial instruments and the cumulative translation adjustments

Note 2    Landmark (100% owned by the corporation), WDE Cayman-Fimatronne ART Holding International, Fine Art and Clariview Global Limited

# CHI MEI OPTOELECTRONICS CORPORATION

ACQUISITION OF INDIVIDUAL REAL ESTATES AT COSTS AT LEAST NT$100 MILLION OR 20% OF THE PAID-IN CAPITAL
YEAR ENDED DECEMBER 31, 2006
(In Thousands of New Taiwan Dollars)

| Company Name | Types of Property | Transaction Date | Transaction Amount | Payment Term | Counter-party | Nature of Relationship | Prior Transaction of Related Counter-party | | | | Price Reference | Purpose of Acquisition | Other Term |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Owner | Relationship | Transfer Date | Amount | | | |
| CMO | Building | January 1, 2006 | $3,224,552 | Already paid | Yung-Ching Construction Co., Ltd., and Jaie Haour Industrial Co., Ltd | - | - | - | - | $ - | Public bidding | Manufacturing | - |
| | Building | February 28, 2006 | 255,334 | Already paid | Takisha (Taiwan) Ltd | - | - | - | - | - | Public bidding | Manufacturing | - |
| | Building | February 28, 2006 | 706,299 | Already paid | Chiu Ho Engineer Co., Ltd and Jaie Haour Industrial Co., Ltd | - | - | - | - | - | Public bidding | Manufacturing | - |
| | Building | February 28, 2006 | 110,179 | Already paid | Kailay Enginner Co., Ltd | - | - | - | - | - | Public bidding | Manufacturing | - |
| | Building | March 31, 2006 | 403,580 | Already paid | Yung-Ching Construction Co., Ltd., and Da Cin Construction Co., Ltd | - | - | - | - | - | Public bidding | Lease | - |
| | Building | June 30, 2006 | 401,019 | Unpaid | Yung-Ching Construction Co., Ltd | - | - | - | - | - | Public bidding | Manufacturing | - |
| | Building | September 30, 2006 | 3,870,472 | Unpaid | Yung-Ching Construction Co., Ltd., Da Cin Construction Co., Ltd., Tsen Lung Cumenp Products Ltd and Jaie Haour Industrial Co., Ltd | - | - | - | - | - | Public bidding | Manufacturing | - |
| | Building | September 30, 2006 | 382,928 | Unpaid | Chiu Ho Engineer Co., Ltd | - | - | - | - | - | Public bidding | Manufacturing | - |
| | Building | September 30, 2006 | 285,713 | Unpaid | Tung-Kai Technology Engineering Co., Ltd | - | - | - | - | - | Public bidding | Manufacturing | - |
| | Building | September 30, 2006 | 162,931 | Unpaid | United Integrated Service Co., Ltd | - | - | - | - | - | Public bidding | Manufacturing | - |
| | Building | November 30, 2006 | 168,465 | Already paid | Yung - Chng Construction Co., Ltd | - | - | - | - | - | Public bidding | Manufacturing | - |
| CMO Ningbo | Building | May 31, 2006 | 844,235 | Already paid | Jiangsu Jiany Construction and installation Engineering Group Co., Ltd | - | - | - | - | - | Public bidding | Manufacturing | - |
| | Building | October 31, 2006 | 222,566 | Already paid | Jiangsu Jiany Construction and installation Engineering Group Co., Ltd | - | - | - | - | - | Public bidding | Manufacturing | - |
| CMLC | Building | December 31, 2006 | 101,742 | Already paid | Chien Kuo Construction Co., Ltd | - | - | - | - | - | Public bidding | Warehouse | - |

- 63 -

## CHI MEI OPTOELECTRONICS CORPORATION

**TOTAL PURCHASE FROM OR SALE TO RELATED PARTIES AMOUNTING TO AT LEAST NT$100 MILLION OR 20% OF THE PAID-IN CAPITAL**
YEAR ENDED DECEMBER 31, 2006
(In Thousands of New Taiwan Dollars)

| Company Name | Related Party | Nature of Relationship | Purchase/ Sale | Transaction Details | | | Abnormal Transaction | | Notes/Accounts Payable or Receivable | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Amount | % to Total | Payment Terms | Unit Price | Payment Terms | Ending Balance | % to Total |
| CMO | HiMax Taiwan | Affiliate | Purchases | $ 10,866,472 | 9 | T/T 60-90 days | - | - | $ (2,647,340) | 8 |
| | CLTC | Affiliate | Purchases | 7,053,677 | 6 | T/T 30-150 days | - | - | (3,088,782) | 8 |
| | CLTC | Affiliate | Sales | (3,644,590) | 2 | OA 30-60 days | - | - | 1,372,021 | 5 |
| | CMC | The parent company of the Corporation | Purchases | 1,706,443 | 1 | T/T 60-120 days | - | - | (349,947) | 1 |
| | CMC | The parent company of the Corporation | Sales | (609,044) | 1 | OA 30-45 days | - | - | 113 | 1 |
| | CMO Japan | The Corporation's 100% owned subsidiary | Sales | (1,920,416) | 1 | OA 45-60 days | - | - | 238,027 | 1 |
| | NMI | The general manager of the Corporation is NMI's chairman | Sales | (5,803,812) | 3 | OA 60 days | - | - | 1,298,428 | 5 |
| | CMO Ningbo | The Corporation's indirectly 100% owned subsidiary | Sales | (261,989) | - | OA 60 days | - | - | 137,021 | - |
| | CTC | An equity – method investee of the Corporation | Purchases | 131,611 | - | T/T 60-120 days | - | - | (39,687) | - |
| | LGG | The Corporation's 100% owned subsidiary | Note2 | 10,425,536 | Note2 | OA 60 days | - | - | (5,035,123) | 13 |
| CMO Japan | CMO | Parent company of CMO Japan | Purchases | 1,920,416 | 44 | OA 45-60 days | - | - | (238,027) | 57 |
| CMO Ningbo | CMO | Indirect parent company of CMO Ningbo | Purchases | 261,989 | 1 | OA 60 days | - | - | (137,021) | 3 |
| | HiMax Taiwan | Affiliate | Purchases | 2,391,571 | 11 | OA 120 days | - | - | (1,106,179) | 21 |
| | CLTC | Affiliate | Purchases | 502,751 | 2 | OA 120 days | - | - | (184,833) | 3 |
| | Ningbo Lingnoa Optronics Co., Ltd | Affiliate | Purchases | 583,110 | 3 | OA 120 days | - | - | (552,642) | 10 |
| | Lin Shine Optronics (Su-Zhou) Co., Ltd | Affiliate | Purchases | 232,953 | 1 | OA 120 days | - | - | (18,986) | - |
| LGG | LGG | Affiliate | Note 1 | (9,422,954) | Note 1 | OA 60 days | - | - | 3,620,635 | 77 |
| | CMO | Parent company of LGG | Note 1 | (10,425,536) | Note 1 | OA 60 days | - | - | 5,035,123 | 100 |
| | CMO Ningbo | Affiliate | Note 2 | 9,422,954 | Note 2 | OA 60 days | - | - | (3,620,635) | 72 |

Note 1:  Processing revenues

Note 2:  Processing expenses

TAB I

# CHI MEI OPTOELECTRONICS CORPORATION

RECEIVABLES FROM RELATED PARTIES AMOUNTING TO AT LEAST NT$100 MILLION OR 20% OF THE PAID-IN CAPITAL
DECEMBER 31, 2006
(In Thousands of New Taiwan Dollars)

| Company Name | Related Party | Nature of Relationship | Ending Balance | Turnover Rate | Overdue | | Amounts Received in Subsequent Period | Allowance for Bad Debts |
|---|---|---|---|---|---|---|---|---|
| | | | | | Amount | Action Taken | | |
| CMO | CLTC | Affiliate | $1,373,649 | 3.86 | $ 50,398 | Accelerate collection of accounts receivable | $ 407,022 | $ |
| | NMI | General manager of the Corporation is NMI's chairman | 1,303,357 | 4.52 | 102,890 | Accelerate collection of accounts receivable | 580,754 | |
| | CMO Ningbo | The Corporation's indirectly 100% owned subsidiary | 463,785 | 3.52 | 101,211 | Accelerate collection of accounts receivable | 75,965 | |
| | CMO Japan | The Corporation's indirectly 100% owned subsidiary | 247,282 | 5.43 | 11,603 | Accelerate collection of accounts receivable | 185,003 | |
| | CMLT | The Corporation's 100% owned subsidiary | 157,633 | - | - | Accelerate collection of accounts receivable | - | |
| LGG | CMO | Parent corporation of LGG | 5,035,123 | 4.14 | - | Accelerate collection of accounts receivable | 2,538,383 | |
| CMO Ningbo | LGG | Affiliate | 3,620,635 | 3.31 | - | Accelerate collection of accounts receivable | 2,562,152 | |

# CHI MEI OPTOELECTRONICS CORPORATION

## NAMES, LOCATIONS, AND RELATED INFORMATION OF INVESTEES ON WHICH THE CORPORATION EXERCISES SIGNIFICANT INFLUENCE
### YEAR ENDED DECEMBER 31, 2006
(In Thousands of New Taiwan Dollars and Foreign Currency)

| Investor Company | Investee Company | Location | Main Businesses and Products | Original Investment Amount | | Balance as of December 31, 2006 | | | Net Income (Loss) of the Investee | Investment Gain (Loss) | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | December 31, 2006 | December 31, 2005 | Shares (Thousands) | Percentage of Ownership (%) | Carrying Value | | | |
| CMO | LGG | British Virgin Islands | Investment and export trading business | $ 5,207,863 | $ 157 | 160,005 | 100 | $ 3,983,285 | $ (39,617) | $ (39,617) | |
| | Landmark | Samoa Islands | Investment business | 3,920,085 | 1,005,540 | 120,000 | 100 | 4,030,691 | (15,426) | 67,308 | |
| | CMO Japan | Japan | Researching, manufacturing and selling of the film transistor liquid crystal display | 2,207,037 | 2,307,037 | - | 100 | 2,090,717 | (17,530) | 20,329 | |
| | Yuan Chi | Tainan, Taiwan | Investment business | 1,000,000 | 100,000 | - | 100 | 943,073 | (54,837) | (54,837) | |
| | CMMT | Tainan, Taiwan | Selling electronic materials | 450,000 | 100,000 | 45,000 | 18 | 384,912 | (340,749) | (55,356) | |
| | GIO | Tainan, Taiwan | Developing, designing, manufacturing and selling of components of back light module on TFT-LCD | 290,000 | 290,000 | 29,000 | 29 | 277,964 | (5,283) | (3,521) | |
| | CMLT | Tainan, Taiwan | Manufacturing of electronic equipment and lighting equipment | 250,000 | - | 25,000 | 100 | 223,749 | (26,684) | (26,684) | |
| | CTC | Tainan, Taiwan | Manufacturing and selling of related equipment for film transistor liquid crystal display | 147,069 | 157,860 | 15,568 | 14 | 203,593 | 867,404 | 48,196 | |
| | CMO Europe | Jupiterstraat 106 2132 HE Hoofddrop, The Netherlands | Importing, exporting, buying, selling and logistics services of electronic equipment and TFT-LCD monitor | 85,289 | 767 | - | 100 | 91,299 | 3,734 | 3,734 | |
| | TSO | Hsin Chu, Taiwan | Export Trading business, manufacturing, and selling of electronic component | 45,920 | - | 8,200 | 10 | 43,362 | (231,096) | (8,101) | |
| | Keyway | Samoa Islands | Investment business | 32,661 | 32,661 | 1,001 | 38 | 32,630 | (1,118) | (1,097) | |
| | CMEL | Tainan, Taiwan | Developing, designing, manufacturing, and selling of organic light emitting diodes | 1,460,000 | 816,830 | 60,000 | 100 | 293,263 | (729,319) | (764,197) | |
| | CMO Singapore | 25 International Business Park #04-20/21 German Centre Singapore 609916 | Provision of quality control, customer services, design and office support in the computer related business | [90] | 190 | 10 | 100 | 1,380 | 907 | 907 | |
| | Exploit | Taoyuan, Taiwan | Selling electronic materials and material of telecommunications | 165,798 | - | 9,211 | 15 | 165,365 | (58,182) | (433) | |
| | Power King | Hsin Chu, Taiwan | Manufacturing of electronic components and lighting equipment | 43,680 | - | 3,120 | 15 | 43,518 | (12,880) | (162) | |
| CMO Japan | CMO U K | Fareham Hampshire, UK | Customer service on electronic equipment and computer monitors | £ 150 | £ 150 | 150 | 100 | £ 332 | £ 42 | £ 42 | |
| | CMO U S A | Delaware, U S A | Selling of electronic equipment and computer monitors | US$ 2,400 | US$ 600 | 1 | 100 | US$ 2,106 | US$ 89 | US$ 89 | |
| Landmark | CMO Ningbo | China | Manufacturing and selling of TFT-LCD modules | US$ 90,000 | US$ 60,000 | - | 100 | 91,591 | RMB 805 | US$ 101 | |
| | CMO Nanhan | China | Manufacturing and logistics services of TFT-LCD | US$ 30,000 | - | - | 100 | 29,696 | RMB (4,392) | US$ (555) | |
| Yuan Chi | CMLC | Tainan, Taiwan | Warehousing and logistics services | 251,000 | 1,000 | 25,100 | 100 | 245,387 | (5,594) | (5,594) | |
| | NTC | Tainan, Taiwan | Designing, manufacturing, and selling of the related products about back light module on TFT-LCD | 412,500 | - | 41,250 | 46 | 355,262 | (123,773) | (57,238) | |
| | FSEC | Taipei, Taiwan | Researching, producing, outsourcing, importing, and exporting services of semiconductor equipments | 78,000 | 42,000 | 4,546 | 44 | 90,526 | 38,439 | 14,216 | |
| | OTI | HsinChu, Taiwan | Designing, manufacturing, researching and selling of optical elements | 80,000 | - | 4,000 | 20 | 78,642 | (20,351) | (1,358) | |
| | Power King | HsinChu, Taiwan | Selling electronic materials and material of telecommunications | 14,140 | - | 1,010 | 5 | 14,088 | (12,880) | (53) | |
| | Exploit | Taoyuan, Taiwan | Manufacturing of electronic components and lighting equipment | 53,802 | - | 2,989 | 5 | 53,661 | (58,182) | (141) | |
| Keyway | Ningbo CMO Electronics Ltd | China | Developing, manufacturing, customer service and warehousing on TFT-LCD | US$ 1,000 | US$ 1,000 | - | 100 | 1,002 | RMB 251 | US$ (32) | |
| | CMLC Ningbo | China | Warehousing | US$ 1,600 | - | - | 100 | 1,600 | RMB (16) | US$ (2) | |
| CMO Europe | CMO Germany | Willich-Muchheide, Germany | Importing, exporting, buying, and selling electronic equipment and TFT-LCD monitor and providing customer service | EUR 25 | - | - | 100 | EUR (148) | EUR (173) | EUR (173) | |

Note:  Recognized investment income (loss) included unrealized gains/losses on sale and amortized balances representing the investment cost in excess of the Corporation's equity in investee's net assets

- 66 -

# CHI MEI OPTOELECTRONICS CORPORATION

INFORMATION OF INVESTMENT IN MAINLAND CHINA
YEAR ENDED DECEMBER 31, 2006
(In Thousands of New Taiwan Dollars, Unless Stated Otherwise)

| Investee Company | Main Businesses and Products | Total Amount of Paid-in Capital | Investment Type | Accumulated Outflow of Investment from Taiwan as of January 1, 2006 | Investment Flows | | Accumulated Outflow of Investment from Taiwan as of December 31, 2006 | Percentage of Ownership in Investment | Investment Gain (Loss) (Note 3) | Carrying Value as of December 31, 2006 | Accumulated Inward Remittance of Earnings as of December 31, 2006 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Outflow | Inflow | | | | | |
| Ningbo CMO Electronics Ltd | Developing, manufacturing, customer service and warehousing on TFT-LCD | RMB 8,095 thousand | Note 1 | $ 32,645 (US$ 1,000 thousand) | $ - | - | $ 32,645 (US$ 1,000 thousand) | 100% | $ (1,058) (US$ -32 thousand) | $ 32,672 (US$ 1,002 thousand) | $ |
| CMO Ningbo | Manufacturing and selling of TFT-LCD modules | RMB 729,892 thousand | Note 2 | 1,005,540 (US$ 30,000 thousand) | 1,940,195 (US$ 60,000 thousand) | - | 2,945,735 (US$ 90,000 thousand) | 100% | 3,286 (US$ 101 thousand) | 2,985,399 (US$ 91,591 Thousand) | |
| CMO Nanhai | Logistics service of TFT-LCD modules | RMB 236,232 thousand | Note 2 | - | 974,350 (US$ 30,000 thousand) | - | 974,350 (US$ 30,000 thousand) | 100% | (18,058) (US$ -555 thousand) | 967,927 (US$ 29,696 thousand) | |
| CMLC Ningbo | Warehousing | RMB 12,510 thousand | Note 1 | - | 52,229 (US$ 1,600 thousand) | - | 52,229 (US$ 1,600 thousand) | 100% | (67) (US$ -2 thousand) | 52,163 (US$ 1,600 thousand) | |

| Accumulated Investment in Mainland China as of December 31, 2006 | Investment Amounts Authorized by Investment Commission, MOEA | Upper Limit on Investment |
| --- | --- | --- |
| $4,004,959 (US$22,600 thousand) | $7,961,992 (US$244,000 thousand) | $75,313,027 |

Note 1    Indirect investments in Ningbo CMO Electronics Ltd of US$1,000 thousand and in CMLC Ningbo of US$1,600 thousand were through Keyway, the Corporation's 100% subsidiary.

Note 2    Indirect investments in CMO Ningbo of US$90,000 thousand and in CMO Nanhai of US$30,000 thousand were through Landmark, the Corporation's 100% subsidiary.

Note 3    Recognized on the basis of the audited financial statements in the same period

# EXHIBIT 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Anvik Corporation, | |
| Plaintiff, | |
| | 07 Civ. 0821-SCR |
| v. | |
| Chi Mei Optoelectronics and Chi Mei Optoelectronics USA, Inc., | Filed Electronically |
| Defendants. | |

## RULE 7.1 STATEMENT OF CHI MEI OPTOELECTRONICS USA, INC.

Pursuant to Rule 7.1, Fed. R. Civ. P., Defendant, Chi Mei Optoelectronics USA, Inc. ("CMO USA"), by and through its counsel, hereby discloses that it is a nongovernmental corporate party in the above-captioned action. Chi Mei Optoelectronics Japan Co., Ltd. ("CMO Japan"), which is not a publicly held corporation, owns 100% of CMO USA. No publicly held corporation owns 10% or more of CMO USA. However, Chi Mei Optoelectronics ("CMO") is a publicly held corporation that owns 100% of CMO Japan.

Dated: May 15, 2007

Respectfully submitted,

FISH & RICHARDSON P.C.

s/ Michael F. Autuoro
Michael F. Autuoro (MA 2932)
Citigroup Center - 52nd Floor
153 East 53rd Street
New York, NY 10022-4611
Tel.: (212) 765-5070
Fax.: (212) 258-2291

William J. Marsden, Jr.
Raymond N. Scott, Jr.
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899
Tel.: (302) 652-5070
Fax.: (302) 652-0607

Richard A. Sterba
1425 K Street, N.W.
Suite 1100
Washington, D.C. 20005
Tel.: (202) 783-5070
Fax.: (202) 783-2331

*Attorneys for Defendants
Chi Mei Optoelectronics, and Chi Mei
Optoelectronics USA, Inc.*

# EXHIBIT 13



Yahoo! My Yahoo! Mail    Make Y! your home page    Search: [                    ]    **Web Search**



**YAHOO!** FINANCE    **Sign In**    Finance Home - Help
New User? Sign Up

[ Enter Symbol(s) ]    ( GET QUOTES )    Symbol Lookup    Finance Search

Switch to **Scottrade**    The page ca... More than a trade. More for the trader. SCHWAB



REPLAY

Watch the latest
*Spider-Man 3*
trailer & clips.

**YAHOO!** MOVIES

Watch Now

**Press Release**    Source: iZ3D, LLC

# Neurok Optics(TM) and Chi Mei Optoelectronics Form Joint Venture Company

Tuesday February 13, 12:00 pm ET

## iZ3D, LLC Will Develop Products for Electronic Entertainment Market as Well as Commercial and Professional Visualization Applications

SAN DIEGO, Feb. 13 /PRNewswire/ -- Neurok Optics, LLC, a US-based 3D technology developer and marketing company and Chi Mei Optoelectronics (CMO), a Taiwan-based leading worldwide TFT-LCD manufacturing company, announced they have formed a new joint venture company. The new company, iZ3D, LLC, will be based in San Diego. It will develop and market iZ3D products for the electronic entertainment market as well as for commercial and professional visualization applications.

### Top Stories

- Stocks Slide Ahead of Inflation Report - AP (2:28 pm)
- Chrysler Fetches $7.4 Billion in Sale - AP (2:38 pm)
- Video: A Long and Winding Road for Chrysler - CNN News (9:02 am)
- Video: Postal Rates Increase Today - FOX Business Now (12:25 pm)

More...

- Most-viewed articles

ADVERTISEMENT



**Scottrade** ELITE
Member SIPC    ▸ CLICK HERE TO APPLY NOW

Provides the
flexibility & functionality
to fit your trading style.

CLICK HERE FOR MORE INFORMATION

"To enhance its leadership in the 3D display market, the newly formed iZ3D, LLC combines superior iZ3D technology and marketing capabilities with CMO's leading manufacturing techniques and worldwide distribution presence," stated David Chechelashvili, vice president of marketing for Neurok Optics, LLC.

The first iZ3D, LLC product to reach the market will be a 22" W iZ3D, an advanced video monitor capable of displaying impressive into-screen and out-of-screen 3D images with passive polarized glasses. It is designed to replace standard 2D monitors, while maintaining commercial image quality and display brightness.

Its advanced technology takes three-dimensional applications -- such as PC games, 3D entertainment, and professional stereo applications -- and allows users to experience it in a way they never could with a standard 2D monitor. It creates a shock-and-awe-inspiring 3D depth while minimizing eyestrain, spatial disorientation, headache, or nausea.

The unit is powered by any personal computer with a dual output video card. Smart capabilities allow it to be used for regular 2D office tasks as well as 3D viewing. Specifications include: 1680 x 1050 resolution; up to 120-degree viewing angle; 5 ms response time; and 300 NIT brightness with 800:1 contrast ratio. It has dual interface capability with DVI and DVI/VGA inputs.

A CMO official commented, "This is a very exciting, growth-oriented time in the display industry because the rapid pace of innovation in production technology is matched by equally rapid progress in display technology -- this joint venture is ideal because it capitalizes on the strengths of both companies."

The initial iZ3D, LLC product will begin shipping in May. Planned MSRP is $999.

About Neurok Optics, LLC

Founded in 2001, privately held Neurok Optics, LLC is in the visualization and advanced information display business. Currently three-dimensional imaging is gaining appreciable attention in the display market, and interest in Neurok Optics' various 3D visualization technologies is rapidly increasing. It is headquartered in San Diego, CA., from where it directs its marketing, management, and public relations efforts.

The Company specializes in the design and engineering of advanced 3D visualization products that feature the integration of advanced technologies into complex products and processes. It specifically targets Game and Entertainment as initial markets. For more information, visit www.iz3d.com.

About Chi Mei Optoelectronics

Chi Mei Optoelectronics (CMO), headquartered at the Southern Taiwan Science Park, Taiwan, is a leading worldwide manufacturer of TFT-LCD display products. CMO was founded in 1998 and seeks to combine superior TFT-LCD technology with cost-effective expansion to serve a global, diversified customer base. Its key products include large-size TFT-LCD panels for notebooks, desktop monitors, and TV applications.

CMO's manufacturing is done at five fabrication facilities. It is also building additional fabrication facilities to enable the manufacture of a wider range of different sized panels, more efficiently. CMO's in-house color-filter production design has also given it competitive advantages in product quality and development.

The company has 25000 employees worldwide and is listed on the Taiwan Stock Exchange (TSE). In 2006, CMO shipped 33.2-million TFT-LCD's and has revenues of U.S. $5.8 billion. For more information, visit www.cmo.com.tw.

©2007 iZ3D, LLC.  All rights reserved.  Specifications are subject to change without notice.  All other trademarks are the property of their respective companies.

Source: iZ3D, LLC

✉ Email Story          📣 Set News Alert          🖨 Print Story

|  | Search News |
|---|---|

Sponsor Results

Get a $200K Mortgage for Just $580/Month
The quick and easy way to lower your mortgage payment.
www.QuickenLoans.com

Online Currency Trading - Free Demo
24-Hour trading, award-winning software, charts and more from GFT.

Case 1:06-cv-00726-JJF    Document 61-4    Filed 05/22/2007    Page 4 of 4

www.gftforex.com

Earn From 4.91% to 5.43%
With AAA rated, GE Capital Corp. Not an offer of securities for sale.
www.geinterestplus.com
(What's This?)

Copyright © 2007 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright Policy - Ad Feedback
Copyright © 2007 PR Newswire. All rights reserved. Republication or redistribution of PRNewswire content is expressly prohibited without the prior written consent of
PRNewswire. PRNewswire shall not be liable for any errors or delays in the content, or for any actions taken in reliance thereon.

# EXHIBIT 14



# State of Delaware
## The Official Website for the First State



Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal State &

State Directory | Help | Search Delaware                                    Citizen Services | Business Services

**Department of State: Division of Corporations**

| HOME |
|------|
| About Agency |
| Secretary's Letter |
| Newsroom |
| Frequent Questions |
| Related Links |
| Contact Us |
| Office Location |

| SERVICES |
|----------|
| Pay Taxes |
| File UCC's |
| Delaware Laws Online |
| Name Reservation |
| General Information |
| Status |
| Validate Certificate |

| INFORMATION |
|-------------|
| Corporate Forms |
| Corporate Fees |
| UCC Forms and Fees |
| UCC Searches |
| Taxes |
| Expedited Services |
| Service of Process |
| Registered Agents |
| Get Corporate Status |
| Submitting a Request |

Frequently Asked Questions  View Search Results

## Entity Details

### THIS IS NOT A STATEMENT OF GOOD STANDING

| | | | |
|---|---|---|---|
| File Number: | **4292624** | Incorporation Date / Formation Date: | **01/29/2007** (mm/dd/yyyy) |
| Entity Name: | **IZ3D LLC** | | |
| Entity Kind: | **LIMITED LIABILITY COMPANY (LLC)** | Entity Type: | **GENERAL** |
| Residency: | **DOMESTIC** | State: | **DE** |

### REGISTERED AGENT INFORMATION

| | |
|---|---|
| Name: | **THE CORPORATION TRUST COMPANY** |
| Address: | **CORPORATION TRUST CENTER 1209 ORANGE STREET** |
| City: | **WILMINGTON** |
| State: | **DE** |
| Phone: | **(302)658-7581** |

| | |
|---|---|
| County: | **NEW CASTLE** |
| Postal Code: | **19801** |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ⊙ Status ⊙ Status,Tax & History Information  Submit

Back to Entity Search

To contact a Delaware Online Agent click here.

site map | about this site | contact us | translate | delaware gov

https://sos-res.state.de.us/tin/controller1

# EXHIBIT 15

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COMMISSARIAT À L'ENERGIE
ATOMIQUE,
                              Plaintiff,

            v.                                    Civil Action No.  03-484 (KAJ)

CHI MEI OPTOELECTRONICS
CORPORATION, et al.,

                              Defendants.

## STIPULATION AND ORDER

IT IS HEREBY STIPULATED by the parties below, subject to the approval of the Court, that

    1.    Chi Mei Optoelectronics Corporation ("CMO") hereby withdraws its Motion to Dismiss and to Quash Service of Process (D.I. 10) and its Renewed Motion to Dismiss and to Quash Service of Process (D.I. 386) and agrees that it will not contest personal jurisdiction, sufficiency of process, or sufficiency of service of process in this case.  CMO reserves the right to challenge personal jurisdiction and service in any other litigation filed against CMO in this forum;

    2.    Commissariat à l'Energie Atomique ("CEA") will dismiss without prejudice the complaint it filed against CMO in the United States District Court for the Northern District of California captioned, <u>Commissariat à l'Energie Atomique v. Chi Mei Optoelectronics Corporation</u>, Case No. C 03-05812 SBA;

584929v1

3.     CEA agrees that it will not seek a preliminary injunction against CMO in this action;

4.     The deadline for the Joinder of Other Parties and Amendment of Pleadings under the Court's September 23, 2004 Scheduling Order (D.I. 240) is hereby extended as between CEA and CMO only, to July 15, 2005;

5.     CMO consents to consolidation of this case with the Consolidated Cases under this same Civil Action Number against Defendants Samsung Electronics Co., Ltd., Fujitsu Display Technologies Corp., Sharp Corporation, and AU Optronics Corporation;

6.     Pursuant to paragraph 9 of the Court's Scheduling Order [D.I. 240], and subject to the Court's approval and schedule, CEA and CMO hereby request that an in person technology tutorial be held in this matter on  July 25, 2005 in conjunction with the status conference already set for that date (in place of the May 18, 2005 date); and

7.     CMO consents to the filing of a Second Amended Complaint by CEA.  CMO shall file its answer to the Second Amended Complaint within ten (10) business days of its filing.

THE BAYARD FIRM

/s/ Richard D. Kirk (rk0922)
Richard D. Kirk (rkirk@bayardfirm.com)
222 Delaware Avenue, Suite 900
Wilmington, DE  19899-5130
(302) 655-5000

Attorneys for Plaintiff
Commissariat à l'Energie Atomique

FISH & RICHARDSON P.C.

/s/ William J. Marsden, Jr. (wm2247)
William J. Marsden, Jr. (marsden@fr.com)
919 Market Street, #1100
Wilmington, DE  19899
(302) 778-8401

Attorneys for Defendant
Chi Mei Optoelectronics Corporation

SO ORDERED this ____ day of April, 2005.

_____
United States District Judge

584929v1

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on April 20, 2005, he electronically filed

the foregoing document with the Clerk of the Court using CM/ECF, which will send

automatic notification of the filing to the following:

Richard L. Horwitz, Esq.
David E. Moore, Esq.
Potter Anderson & Corroon LLP
1313 N. Market St., 6th Fl.
Wilmington, DE 19801

Josy W. Ingersoll, Esquire
John W. Shaw, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801

Gerard M. O'Rourke, Esq.
Larry J. Hume, Esq.
Connolly, Bove, Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE  19801

William J. Marsden, Jr., Esq.
Fish & Richardson, P.C.
919 North Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114

Robert H. Richards, III, Esq.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19801

The undersigned counsel further certifies that, on April 20, 2005, copies of the

foregoing document were sent by hand to the above local counsel and by email and first

class mail to the following non-registered participants:

Robert W. Adams, Esq.
Nixon & Vanderhye, PC
1100 North Glebe Road, 8th Floor
Arlington, VA  22201-4714

Karen L. Hagberg, Esq.
Sherman Kahn, Esq.
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY  10104

Neil Sirota, Esq.
Baker Botts L.L.P.
30 Rockefeller Plaza
New York, NY  10112

/s/ Richard D. Kirk (rk0922)
Richard D. Kirk

574867v1

# EXHIBIT 16 – PART A

Offering Circular

*45,000,000 Global Depositary Shares*
*Representing 450,000,000 Common Shares*
*US$12.74 per GDS*

 **CHI MEI OPTOELECTRONICS CORP.**
(incorporated as a company limited by shares in Taiwan, the Republic of China)

Chi Mei Optoelectronics Corp, or CMO, is offering 450,000,000 common shares, par value NT$10 per share of Chi Mei Optoelectronics Corp., each in the form of global depositary shares, or GDSs, for a total of 45,000,000 GDSs. As part of the Initial Purchasers' option to purchase additional GDSs, Linklinear Investment Co., Ltd., or the selling shareholder, will sell up to 50,000,000 common shares, each in the form of GDSs for a total of 5,000,000 GDSs. Each GDS represents the right to receive 10 of our common shares.

Neither the GDSs nor the common shares represented by the GDSs have been or will be registered under the U.S. Securities Act of 1933, as amended, or any state securities laws. The GDSs are being offered and sold within the United States only to qualified institutional buyers, as defined under Rule 144A under the U.S. Securities Act, and outside the United States and the Republic of China to non-U.S. persons in accordance with Regulation S under the U.S. Securities Act. The GDSs are not being offered in the Republic of China. For a description of restrictions on transfers of the GDSs, see "Description of the Global Depositary Shares — Deposit, Withdrawal and Cancellation" and "Form of GDSs and Transfer Restrictions."

Our common shares are listed on the Taiwan Stock Exchange. On October 20, 2003, the last reported sale price of our common shares on the Taiwan Stock Exchange was NT$45.10, equivalent to US$1.33 per share at an exchange rate of NT$33.90 to US$1.00 based on the U.S. Federal Reserve Bank of New York noon buying rate on that date. We have applied to list the GDSs offered in reliance on Regulation S on the Société de la Bourse de Luxembourg S.A., or the Luxembourg Stock Exchange. We expect the GDSs offered in reliance on Rule 144A to be eligible for trading in the Private Offerings, Resales and Trading through Automated Linkages Market of NASD Inc., also known as the PORTAL℠ Market. We also expect the GDSs offered in reliance on Regulation S to be eligible for trading on the International Order Book system of the London Stock Exchange, or the IOB. We cannot assure you that the GDSs will be listed on any exchange at the time they are delivered to the initial purchasers named in the section headed "Plan of Distribution," or the Initial Purchasers, or at any other time. Prior to this offering, there has been no market anywhere for the GDSs.

**Investing in the GDSs involves risks. See "Risk Factors" beginning on page 14.**

The Initial Purchasers are offering the GDSs subject to various conditions. The Initial Purchasers expect to deliver the GDSs in book-entry form through The Depository Trust Company, or DTC, Euroclear Bank S.A./N.V., as operator of the Euroclear System, or Euroclear, and Clearstream Banking, société anonyme, or Clearstream on or about October 24, 2003. See "Form of GDSs and Transfer Restrictions — Settlement and Clearance." The selling shareholder has granted the Initial Purchasers an option, exercisable in full or in part from time to time by the Global Coordinator, on behalf of the Initial Purchasers, within 30 days from the date of this offering circular, to purchase up to 5,000,000 additional GDSs, representing 50,000,000 common shares.

*Global Coordinator and Sole Bookrunner*

 **JPMorgan**

*Senior Co-Lead Manager*
**Daiwa Securities SMBC Hong Kong**

*Co-Lead Manager*
**BNP Paribas Peregrine**

*Co-Managers*
**Bank of America Securities LLC.**          **KGI Securities Co. Ltd.**

October 21, 2003

The GDSs and the common shares represented by the GDSs of Chi Mei Optoelectronics Corp. have not been and will not be registered under the U.S. Securities Act of 1933, as amended, or the U.S. Securities Act, for offer or sale as part of their distribution and, subject to certain exceptions, may not be offered or sold in the United States or to U.S. persons. The GDSs and the common shares represented by the GDSs are not transferable except in accordance with the restrictions described herein. See "Description of the Global Depositary Shares," "Form of GDSs and Transfer Restrictions" and "Plan of Distribution."

---

This offering is being made in reliance upon exemptions from registration under the U.S. Securities Act. Prospective purchasers are hereby notified that sellers of the Rule 144A GDSs may be relying on the exemption from the provisions of Section 5 of the U.S. Securities Act provided by Rule 144A. Each purchaser of GDSs offered hereby in making its purchase will be deemed to have made certain acknowledgements, representations and agreements as set forth under "Form of GDSs and Transfer Restrictions."

---

The GDSs and the common shares represented by the GDSs have not been approved or disapproved by the U.S. Securities and Exchange Commission, any state securities commission in the United States or any other U.S. regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of the offering of the GDSs or the common shares represented by the GDSs or the accuracy or adequacy of this document. Any representation to the contrary is a criminal offense in the United States.

---

No person has been authorized to give any information or to make any representations other than those contained in this offering circular, and, if given or made, such information or representations must not be relied upon as having been authorized. This offering circular does not constitute an offer to sell or the solicitation of an offer to buy any securities other than the securities to which it relates or an offer to sell or the solicitation of an offer to buy such securities by any person in any circumstances in which such offer or solicitation is unlawful. Neither the delivery of this offering circular nor any sale hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of Chi Mei Optoelectronics Corp. since the date hereof or that the information contained herein is correct as of any time subsequent to its date.

---

The distribution of this offering circular and the offering and sale of the GDSs in certain jurisdictions may be restricted by law. Persons into whose possession this offering circular comes are required by Chi Mei Optoelectronics Corp., the selling shareholder and the Global Coordinator (as shown on the cover of this offering circular) to inform themselves about and to observe any such restrictions. This offering circular does not constitute an offer of, or an invitation to purchase, any of the GDSs in any jurisdiction in which such offer or invitation would be unlawful.

---

In connection with this offering, the Initial Purchasers or any of their affiliates or agents may over-allot or effect transactions with a view to supporting the market price of the GDSs and, subject to the applicable laws of the Republic of China, the common shares represented by the GDSs at a level higher than that which might otherwise prevail for a limited period of time after the issue date. However, the Initial Purchasers or any of their affiliates or agents are not obligated to do this. Such stabilization, if commenced, may be discontinued at any time, and must be brought to an end after a limited period. See "Plan of Distribution."

---

i

## Notice to New Hampshire Residents

Neither the fact that a registration statement or an application for a license has been filed under chapter 421-b of the New Hampshire revised statutes with the State of New Hampshire nor the fact that a security is effectively registered or a person is licensed in the State of New Hampshire constitutes a finding by the Secretary of State of the State of New Hampshire that any document filed under RSA 421-b is true, complete and not misleading. Neither any such fact nor the fact that an exemption or exception is available for a security or a transaction means that the Secretary of State has passed in any way upon the merits or qualifications of, or recommended or given approval to, any person, security or transaction. It is unlawful to make, or cause to be made, to any prospective purchaser, customer or client any representation inconsistent with the provisions of this paragraph.

_____

Notwithstanding anything to the contrary in this offering circular, each prospective purchaser of the GDSs or common shares represented by the GDSs (and each employee, representative, or other agent of such prospective purchaser) may disclose to any and all persons, without any limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to the prospective purchaser relating to such tax treatment and tax structure. The preceding sentence shall not apply to the extent disclosure of the tax treatment or tax structure of the transaction is subject to restrictions reasonably necessary to comply with the relevant securities laws.

_____

## Available Information

If at any time we are not subject to or not in compliance with the reporting requirements of Section 13 or 15(d) of the U.S. Securities Exchange Act of 1934, as amended, or the information furnishing requirements of Rule 12g3-2(b) thereunder, we will provide to any holder or to any prospective purchaser of GDSs or the common shares represented by the GDSs that are outstanding and that are "restricted securities" within the meaning of Rule 144(a)(3) under the U.S. Securities Act, or to any prospective purchaser of such restricted securities designated by a holder, upon the request of such holder or prospective purchaser, any information required to be provided by Rule 144A(d)(4) under the U.S. Securities Act.

_____

ii

The purpose of this offering circular is to give information about us, the GDSs and our common shares. We accept responsibility for the information contained in this document, which comprises listing particulars for the purpose of listing the GDSs on the Luxembourg Stock Exchange. Having made all reasonable inquiries, we confirm that this offering circular is true and accurate in all material respects and is not misleading and that the opinions and intentions expressed herein are honestly held. Notwithstanding the foregoing, certain market and industry data used in this offering circular were obtained from publicly available information, such as newspapers, statistical data from the Taiwan Stock Exchange, the Federal Reserve Bank of New York and industry publications, and we take responsibility for correctly reproducing such information only. Nothing has come to our attention that would cause us to believe either that such information is not correct and complete in all material respects or that there have been any developments of a material nature affecting us that are not described in this offering circular.

The Luxembourg Stock Exchange takes no responsibility for the contents of this offering circular, makes no representation as to its accuracy or completeness and expressly disclaims any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this offering circular.

The Initial Purchasers whose names appear in "Plan of Distribution" make no representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this offering circular. Nothing contained in this offering circular is, or may be relied upon as, a promise or representation by the Initial Purchasers as to the past or future.

We make no representation to any purchaser of the GDSs regarding the legality of an investment in the GDSs by the purchaser under any legal investment or similar laws or regulations. You should not consider any information in this offering circular to be legal, business or tax advice. You should consult your own attorney, business adviser and tax adviser for legal, business and tax advice regarding an investment in the GDSs.

In making an investment decision, investors must rely on their own examination of our company and the terms of this offering, including the merits and risks involved. See "Risk Factors" for a discussion of certain factors to be considered in connection with an investment in the GDSs.

Each person receiving this offering circular acknowledges that (i) this offering circular does not contain all the information that would be included in an offering circular for this offering were this offering registered under the U S Securities Act; (ii) the financial statements included herein have been prepared in accordance with generally accepted accounting principles in the ROC, or ROC GAAP, which differ in many significant respects from accounting principles generally accepted in the United States, and thus are not comparable to the financial statements of a United States company (see "Appendix A — Summary of Certain Differences Between ROC GAAP and US GAAP"); and (iii) no person has been authorized to give any information or to make any representation concerning us, the GDSs or our common shares, other than as contained herein and, if given or made, any such information or representation should not be relied upon as having been authorized by us.

Statements contained in this offering circular as to the contents of any contract or other document referred to in this offering circular may not set forth all of the terms and conditions of such contracts or other documents

## Table of Contents

| | Page |
|---|---|
| Presentation of Information | v |
| Forward-looking Statements | vii |
| Enforceability of Foreign Judgments in the ROC | viii |
| Summary | 1 |
| Risk Factors | 14 |
| Use of Proceeds | 32 |
| Market Price Information | 33 |
| Exchange Rate Information | 34 |
| Dividend Policy | 35 |
| Capitalization | 36 |
| Selected Consolidated and Unconsolidated Financial and Operating Data | 38 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 41 |
| Industry Overview | 76 |
| Corporate Structure | 83 |
| Business | 84 |
| Our Acquisition of IDTech and Relationship with IBM | 105 |
| Our Relationship with Fujitsu | 110 |
| Management | 112 |
| Related Party Transactions | 118 |
| Major Shareholders and Selling Shareholder | 122 |
| Certain ROC Legal Requirements | 124 |
| Description of Common Shares | 125 |
| Description of the Global Depositary Shares | 132 |
| Form of GDSs and Transfer Restrictions | 144 |
| Taxation | 149 |
| Plan of Distribution | 156 |
| Legal Matters | 161 |
| Independent Auditors | 161 |
| General Information | 162 |
| Index to Consolidated and Unconsolidated Financial Statements | F-1 |
| Appendix A — Summary of Certain Differences Between ROC GAAP and US GAAP | A-1 |
| Appendix B — Glossary | B-1 |
| Appendix C — The Securities Market of the ROC | C-1 |
| Appendix D — Foreign Investment and Exchange Controls in the ROC | D-1 |

## Presentation of Information

Unless otherwise specified, the references to "we," "us," "our," "CMO" and "our company" in this offering circular refer to Chi Mei Optoelectronics Corp and our consolidated subsidiary International Display Technology Co., Ltd., or IDTech. The references to "Taiwan" and "ROC" refer to Taiwan, the Republic of China. The references to "PRC" and "mainland China" refer to the People's Republic of China. The references to "the ROC Company Law" refer to the Company Law of the ROC.

Unless expressly stated otherwise, all financial data as of and for the years ended December 31, 2000, 2001 and 2002 included in this offering circular are presented on an audited consolidated basis in accordance with ROC GAAP, and all financial data as of and for the six months ended June 30, 2002 and 2003 included in this offering circular are presented on an audited unconsolidated basis in accordance with ROC GAAP.

Our consolidated and unconsolidated financial statements are published in New Taiwan dollars, the lawful currency of the ROC. All references to "United States dollars," "U.S. dollars" and "US$" are to United States dollars, and all references to "New Taiwan dollars," "NT dollars" and "NT$" are to New Taiwan dollars. For your convenience, NT dollar amounts and Japanese yen amounts used in this offering circular for, and as of, the year ended December 31, 2002 have been translated into U.S. dollar amounts using NT$34.70 = US$1.00 and ¥118.75 = US$1.00, respectively, the noon buying rates for these currencies as certified for customs purposes by the Federal Reserve Bank of New York on December 31, 2002. NT dollar amounts and Japanese yen amounts used in this offering circular for, and as of, the six months ended June 30, 2003, and all other NT dollar and Japanese yen amounts, other than December 31, 2002 NT dollar and Japanese yen amounts, have been translated using NT$34.61 = US$1.00 and ¥119.87 = US$1.00, respectively, the noon buying rates for these currencies as certified for customs purposes by the Federal Reserve Bank of New York on June 30, 2003. The U.S. dollar translations appear in parentheses next to the relevant NT dollar and Japanese yen amounts. The noon buying rate for NT dollars and Japanese yen as certified for customs purposes by the Federal Reserve Bank of New York on October 20, 2003 was NT$33.90 = US$1.00 and ¥110.22 = US$1.00, respectively.

Under ROC GAAP, we are required to consolidate the financial statements of any subsidiary into our annual financial statements if (i) our ownership in the subsidiary is greater than 50% and (ii) the total assets or net operating revenues of such subsidiary exceed 10% of our unconsolidated total assets or net operating revenues, as the case may be. In addition, the ROC Securities and Futures Commission requires us to consolidate the financial statements of each non-consolidated subsidiary whose total assets or net operating revenues exceed 3% of our unconsolidated total assets or net operating revenues, as the case may be, into our annual financial statements if the assets or net operating revenues of all unconsolidated subsidiaries exceed 30% of our unconsolidated total assets or net operating revenues, as the case may be. We have one subsidiary that has been accounted for as a consolidated subsidiary as of September 18, 2001.

Except as otherwise noted and except for certain financial and operating data as of and for the six months ended June 30, 2002 and 2003, financial and operating data presented in this offering circular include data for IDTech from September 18, 2001 as if IDTech were our wholly owned subsidiary. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Acquisition of IDTech and the Yasu Business," and "Our Acquisition of IDTech and Relationship with IBM."

Except as otherwise indicated in this offering circular, all non-company specific average selling prices, production volumes, sales volumes, shipping volumes, growth projections and other statistics relating to the thin film transistor liquid crystal display ("TFT-LCD") panel industry or our position within such industry have been extracted or derived from publicly available industry reports published by DisplaySearch, an Austin, Texas, U.S.-based industry reporting service which obtains market data from, and sells market reports to, flat panel display producers, their suppliers and customers and other industry observers. Historical results in these reports are based on data provided by market participants and may not have been independently verified. We have not independently verified the contents of these reports and take responsibility only for their accurate extraction.

v

In this offering circular, (i) the GDSs offered and sold outside the United States are referred to as the "International GDSs" and the GDSs offered and sold in the United States to qualified institutional buyers as defined in Rule 144A under the U.S. Securities Act ("Rule 144A") are referred to as the "Rule 144A GDSs" and, together with the International GDSs, the "GDSs," (ii) the common shares, par value of NT$10.00 per share, of CMO are referred to as the "common shares" or "our common shares," (iii) the deposit agreement relating to the GDSs entered into among CMO, JPMorgan Chase Bank, as the depositary (the "Depositary"), and holders from time to time of depositary receipts issued thereunder is referred to as the "Deposit Agreement," (iv) the global depositary receipt evidencing the International GDSs is referred to as the "Master International GDR," (v) the global depositary receipt evidencing the Rule 144A GDSs is referred to as the "Master Rule 144A GDR," and (vi) Linklinear Investment Co., Ltd., who has granted the Initial Purchasers an option, exercisable in full or in part from time to time by the Global Coordinator, on behalf of the Initial Purchasers, within 30 days from the date of this offering circular, to purchase up to 5,000,000 additional GDSs, is referred to as the "selling shareholder."

In this offering circular, where information has been presented in thousands or millions of units, amounts may have been rounded up or down. Accordingly, the total of columns or rows of numbers in tables may not be equal to the apparent total of the individual items, and actual numbers may differ from those contained herein due to rounding

Unless otherwise specified, the information and financial data contained in this offering circular assume that the Initial Purchasers' option to purchase additional GDSs is not exercised.

## Forward-looking Statements

We have made forward-looking statements in this offering circular, including statements regarding our business and operating strategy, our future expansion plans, our business, operations and prospects and our financial condition and results of operations

These forward-looking statements are generally indicated by the use of forward-looking terminology such as "anticipate," "believe," "estimate." "expect." "intend," "plan," "project," "may," "will" or other similar words and expressions or negatives thereof or comparable terminology that express an indication of actions or results of actions that may, or are expected to, occur in the future These statements are subject to risks, uncertainties and assumptions, many of which are beyond our control. You should not place undue reliance on these statements. These forward-looking statements are based on our own information and on information from other sources we believe to be reliable. Actual results may differ materially from those expressed or implied by these forward-looking statements. Factors that could cause differences include, but are not limited to:

- the intensely competitive TFT-LCD industry and market;
- our need to frequently introduce new products and technologies in order to remain competitive;
- our ability to successfully integrate the Yasu fab's operations with our Taiwan operations;
- risks associated with international global business activities;
- our business strategy;
- general economic and political conditions;
- possible disruptions in commercial activities caused by natural and man-made disasters;
- our future expansion plans and capital expenditures;
- our expected production capacity increases;
- fluctuations in foreign currency exchange rates;
- the ownership of the intellectual property we use in our operations; and
- those other risks identified in the "Risk Factors" section of this offering circular.

These forward-looking statements speak only as of the date of this offering circular. We expressly disclaim any obligation or undertaking to update or revise publicly any forward-looking statements in this offering circular, whether as a result of new information, future events or otherwise. Because of these risks, uncertainties and assumptions, the forward-looking events and circumstances discussed in this offering circular might not occur in the way we expect, or at all.

## Enforceability of Foreign Judgments in the ROC

We are a company limited by shares and were incorporated under the ROC Company Law. Substantially all of our directors, executive officers and supervisors and certain other parties named herein are residents of the ROC and a substantial portion of our assets and such persons are located in the ROC. In addition, the selling shareholder is also located in the ROC. As a result, it may not be possible for investors to effect service of process upon us, the selling shareholder or such persons outside the ROC, or to enforce against any of them judgments obtained in courts outside the ROC, including those predicated upon the civil liability provisions of the securities laws of the United States or any State or territory within the United States.

We have been advised by Baker & McKenzie, our legal adviser in the ROC, that any final judgment obtained against us, the selling shareholder or such persons in any court other than the courts of the ROC in respect of any legal suit or proceeding arising out of or relating to the GDSs or our common shares will be enforced by the courts of the ROC without further review of the merits only if the court of the ROC in which enforcement is sought is satisfied that: (i) the court rendering the judgment has jurisdiction over this subject matter according to the laws of the ROC; (ii) the judgment and the court procedures are not contrary to the public order or good morals of the ROC; (iii) if the judgment was rendered by default by the court rendering the judgment, we, the selling shareholder or such persons were served within the jurisdiction of such court, or process was served on us, the selling shareholder or such persons with judicial assistance of the ROC; and (iv) judgments of the courts of the ROC are recognized and enforceable in the jurisdiction of the court rendering the judgment on a reciprocal basis. For instance, under ROC law, claims in respect of the (i) payment of principal would become unenforceable after 15 years and (ii) payment of interest and premium would become unenforceable after five years, each measured from the relevant date for payment in respect thereof. The statute of limitation under ROC law may be regarded as a public order by an ROC court and any foreign judgment rendered differently may not be enforced by the ROC court. Moreover, a person seeking to enforce a foreign judgment in the ROC would, except under limited circumstances, be required to obtain foreign exchange approval from the Central Bank of China, Taiwan's central bank, for the remittance out of the ROC of any amounts exceeding NT$500,000 or its equivalent recovered in respect of such judgment denominated in a currency other than the NT dollar.

## Summary

*You should read the following summary together with the more detailed information regarding our company, the GDSs, our common shares, our audited consolidated and unconsolidated financial statements and notes to those statements included elsewhere in this offering circular.*

### Our Business

We are one of the world's leading manufacturers of thin film transistor liquid crystal display, or TFT-LCD, panels based on production capacity. As of June 30, 2003, our total production capacity was approximately 305,888 square meters of glass substrates per quarter, or 12.2 million 15-inch panel equivalents per year. Substantially all of our products are categorized as "large-sized" TFT-LCD panels, meaning panels ten inches and above in diagonal measurement. Based on data on the number of large-sized panels shipped in the first half of 2003 published by DisplaySearch, we had a market share of approximately 10.6%. Our vision is to combine superior TFT-LCD technology with cost-effective capacity expansion and a global, diversified customer base.

The large-sized TFT-LCD panel industry has experienced rapid growth in the past several years. This was principally a result of product improvements and a general decline in prices that have made products using large-sized TFT-LCD panels more attractive to consumers. Notebook computers and desktop computer display monitors are currently the two primary applications for large-sized TFT-LCD panels. In 2002, these applications accounted for 43.3% and 51.7% of the total shipped volume of large-sized TFT-LCD panels according to DisplaySearch. Substantially all notebook computers use TFT-LCD panels due to their relative light weight, thinness, mobility and low power consumption. Desktop computer display monitors have historically used conventional cathode ray tube technology. However, as TFT-LCD panels have become less expensive, there has been growing demand for TFT-LCD monitors instead of conventional cathode ray tube monitors. Most notebook computers use TFT-LCD panels in the 10 to 15-inch range, while monitors primarily use 15 to 19-inch panels. Demand from both applications has continued to shift to larger panels, however, with more notebook computers utilizing 14 and 15-inch panels and more monitors using 17-inch and larger displays. In addition, new applications, such as liquid crystal display televisions, avionics and medical equipment, are expected to drive demand for large-sized TFT-LCD panels of up to 40 inches, particularly if the long-term downward trend in prices continues and the quality of these panels continues to improve.

In pursuit of our vision of cost-effective capacity expansion, we established two fabs in the Tainan Science-based Industrial Park in Taiwan and acquired from IBM Japan and Display Technologies, during the most recent industry downturn, an 85% interest in their TFT-LCD fabrication equipment located at a fab in Yasu, Japan and a ten-year facility lease for such fab. We began commercial production at Fab 1, a 3.5 generation fab utilizing 620mm by 750mm glass substrates, in December 1999 and at Fab 2, a fourth generation fab utilizing 680mm by 880mm glass substrates, in October 2001. Fab 1 completed its ramp-up phase and reached full design capacity in the second quarter of 2001. Fab 2 completed its ramp-up phase and reached full design capacity in the fourth quarter of 2002. The Yasu fab began commercial production in November 1995 and is a third generation fab utilizing 550mm by 650mm glass substrates. The integration of the Yasu fab with our Taiwan operations is expected to yield cost efficiencies.

The next phase of our capacity expansion, which we began in March 2002, is to construct a new fifth generation fab that will utilize 1,100mm by 1,300mm glass substrates that are approximately twice as large as those used in fourth generation fabs. We have completed the Fab 3 equipment move-in and are currently conducting pilot testing. We expect Fab 3 to begin commercial production in the fourth quarter of 2003 and reach a monthly design capacity of 30,000 glass substrates by the end of 2003. This initial phase of Fab 3 construction will require approximately NT$30,000.0 million (US$866.8 million) in capital expenditures. The second phase of Fab 3 is expected to add an additional 30,000 glass substrates in

monthly capacity in the second quarter of 2004 and would require us to make additional capital expenditures of approximately NT$10,000.0 million (US$288.9 million) on equipment. The third and fourth phases of Fab 3 are each expected to add an additional 30,000 glass substrates in monthly capacity by the third quarter of 2004 and the end of 2004, respectively, and would require us to make further capital expenditures of approximately NT$8,000.0 million (US$231.1 million) and NT$7,000.0 million (US$202.3 million), respectively, on equipment. We believe Fab 3 will allow us to achieve greater cost efficiencies and enable us to produce larger panel sizes more efficiently.

We believe we are among the technology leaders in the global TFT-LCD market. In particular, our technologies have enabled us to make significant advances, such as offering wider viewing angles and higher resolutions, lowering materials costs and producing larger panels at higher yields. In connection with our acquisition of the TFT-LCD fabrication business in Yasu, we gained a license to IBM's TFT-LCD technology, and the experienced research and development team from the Yasu fab. This acquisition has further strengthened our own internally developed design and process technology and production know-how.

Our major customers include both branded industry leaders, such as Dell Corporation, Fujitsu, IBM, Samsung Electronics and Toshiba Corporation, as well as companies in Taiwan that manufacture products on a contract basis for global branded companies. We believe this broad customer base allows us to diversify our revenue sources and improves our pricing flexibility. In addition, our presence in Yasu has allowed us to both expand our customer base and reinforce our relationships with existing customers.

Our consolidated net sales increased from NT$9,381.4 million in 2000 to NT$20,919.8 million in 2001 to NT$59,677.1 million (US$1,719.8 million) in 2002, and our unconsolidated net sales increased from NT$21,183.2 million in the six months ended June 30, 2002 to NT$24,014.6 million (US$693.9 million) in the six months ended June 30, 2003. We had consolidated net income available to common shares of NT$1,946.8 million in 2000 and a consolidated net loss available to common shares of NT$4,099.8 million in 2001. Our net loss in 2001 was due primarily to the downturn in the TFT-LCD industry cycle and the resulting significant decrease in the average selling prices of our panels during this period. In 2002, we had consolidated net income available to common shares of NT$4,487.2 million (US$129.3 million). We had unconsolidated net income available to common shares of NT$4,005.5 million in the six months ended June 30, 2002 and NT$77.1 million (US$2.2 million) in the six months ended June 30, 2003.

## Our Strategy

Our objective is to strengthen our position as a leading manufacturer of TFT-LCD panels. We plan to achieve this goal by implementing the following strategies:

### Taking advantage of our advanced technology to increase the competitiveness of our existing products and produce higher margin new products

We believe that the technology and know-how we utilize is the most advanced in Taiwan, and among the best worldwide. We maintain our technological edge by continual investment in our research and development activities and by leveraging and further improving the significant amount of product and process technology and know-how we obtained with the acquisition of the Yasu fab. Furthermore, we believe that some of our technologies not only allow us to differentiate our products from those of our competitors, but also enable us to increase our market share for these products. In particular, we are able to develop higher margin products with, among other attributes, superior resolution, wider viewing angles, thinner and lighter glass and larger panel sizes. For example, we have developed large-sized panels for use in TFT-LCD televisions and, during the first half of 2003, commenced commercial shipment of 20-inch and 30-inch panels for use in televisions. According to DisplaySearch, we are the only Taiwanese manufacturer that is currently providing 25-inch or larger panels for use in TFT-LCD televisions.

2

***Optimizing product mix and targeting high margin TFT-LCD markets***
We intend to optimize our product mix by focusing more of our efforts on higher margin products. Specifically, we intend to:

- *Expand penetration of the TFT-LCD television business.* We believe that the larger panel size and more stringent requirements of television panels will provide higher margins to producers. We plan to increase our revenues derived from television end-use applications as a percentage of our total revenues.

- *Expand our small and medium panel business through a foundry model.* Small and medium-size panels for consumer electronics devices such as digital cameras and PDAs can have attractive margins, but the wide range of applications and development time required to meet the customer's needs can make providing panels for such devices excessively costly. We plan to focus on this segment through a foundry model, which allows us to participate in the growth of the market while minimizing the heavy resources required for the sales and marketing.

- *Increase our exposure in high-end PC notebook and large-size monitor markets.* We believe high-end PC notebooks and large-size monitors command better profit margins than commodity products. We plan to leverage our technology capabilities such as slim glass and high-resolution technology to offer differentiated products.

***Enhancing margins through cost reduction***
We are committed to improving our margins through aggressive cost reduction initiatives, such as:

- *Reducing raw materials and components costs.* We believe that the ability of TFT-LCD manufacturers to source raw materials and components locally and establish reliable supply chains will be a crucial factor in the reduction of overall production costs. We are addressing these requirements through:

    — *Internal production of components.* Color filters represent a major cost item in the production of TFT-LCD panels. Our Taiwan operations save significant packaging, transportation and other costs relating to color filters by producing these components internally. We are currently in the pilot run stage of our color filters production line for Fab 3.

    — *Near or on-premises production of components.* Through close relationships with our suppliers, we are able to source components both within our fab boundaries and near our fabs in order to lower transportation costs and ensure adequate and timely supplies. For example, Coretronics Inc. produces backlights for our Taiwan operations within our module assembly facility. We are currently bringing online similar on-premises production arrangements with manufacturers of two other key components, polarizers and CCFL.

- *Continually upgrading our process technology.* In addition to the establishment of our fifth generation fab, which will allow us to significantly lower production costs per panel, there are other process technologies that we are already utilizing for cost savings. For example, we were the first TFT-LCD panel manufacturer to adopt one-drop filling technology for commercial production. This technology allows for a substantial reduction in production cycle time and improvement in production yield, especially for larger panels. We plan to continue focusing on improving our process technology and know-how to lower our costs.

- *Continuing to achieve greater efficiencies through integration of the Yasu fab with our Taiwan operations.* We have already achieved greater efficiencies through the integration of research and development, sales and marketing and administrative functions and we expect to continue improving efficiencies through the integration of the procurement and production planning functions of the Yasu fab with our Taiwan operations.

3

*Achieving higher-margin sales through strong customer relationships and high quality service*

We focus on maintaining strong customer relationships and providing high quality customer service. We develop customer relationships by locating our service teams near our customers. These teams address the needs of our customers in various areas, including design, qualification, logistics and quality assurance. From time to time, we also co-develop products with customers. These co-development activities usually relate to advanced or highly integrated panel products. We believe that our focus on customer service has allowed us to support a more diversified product mix with better average selling prices and margins, and to sell higher volumes of panels to the main customers we target.

*Increasing capacity through ramp-up of advanced production facilities*

We continue to review and assess current TFT-LCD market supply and demand conditions and will align our technology maturity and customer readiness for new products with our capacity expansion plan to allow for timely expansions to capture high growth product segments. The ramp-up of our fifth generation Fab 3 in 2003 will greatly enhance our capacity. In particular, we will be able to produce much larger TFT-LCD panels at a lower cost with our fifth generation fab than with earlier generation fabs. In addition, we have started constructing the foundation for our next fab, Fab 4, to further increase our capacity. Furthermore, by building optimal capacity for each single fab at each technology generation, we believe that we achieve higher manufacturing efficiencies

## Corporate and Other Information

We were incorporated (Corporate Registration Number: 16130303) on August 6, 1998 under the ROC Company Law to conduct all lawful business activities as provided in article 2 of our articles of incorporation. Our common shares have been listed on the Taiwan Stock Exchange under the number "3009" since August 26, 2002. Prior to our listing on the Taiwan Stock Exchange, our common shares were traded over the counter through the Emerging Stock Board of the GreTai Securities Market from May 7, 2002 until August 23, 2002

Our principal executive offices are located at No. 1, Chi-Yeh Road, Tainan County, Tainan Science-based Industrial Park, Taiwan, ROC. and our telephone number at the above address is (886) 6505-1888. Our website is www.cmo.com.tw. The information on our website is not a part of this offering circular.

Our largest shareholder is Chi Mei Corporation, the leading worldwide producer of acrylonitrile butadiene styrene resins

4

# The Offering

| | |
|---|---|
| Our company . . . . . . . . . . . . . . . . . . | Chi Mei Optoelectronics Corp. |
| GDSs offered by our company and the selling shareholder. . . . . . . . . | Our company is offering 45,000,000 GDSs, representing 450,000,000 common shares. To the extent the Initial Purchasers' option to purchase additional GDSs is exercised, the selling shareholder will offer up to 5,000,000 GDSs, representing 50,000,000 common shares. |
| Offering. . . . . . . . . . . . . . . . . . | 45,000,000 GDSs at an offering price of US$12.74 per GDS. The International GDSs are being offered by the Initial Purchasers outside the United States in reliance on Regulation S. The Rule 144A GDSs are being offered concurrently in the United States by the Initial Purchasers or their selling agents only to institutions that are qualified institutional buyers as defined under Rule 144A under the U.S. Securities Act. |
| Lock-ups . . . . . . . . . . . . . . . . . . | Each of our company, Chi Mei Corporation and the selling shareholder has agreed that, without the prior written consent of the Global Coordinator on behalf of the Initial Purchasers, subject to certain exceptions, it will not sell or otherwise dispose of any GDSs or common shares or options to acquire GDSs or common shares for a period of 120 days following the date of this offering circular. See "Plan of Distribution." |
| Option to purchase additional GDSs . . . . . . . . . . . . . . . . . . | The selling shareholder has granted the Initial Purchasers an option, exercisable in full or in part from time to time by the Global Coordinators, on behalf of the Initial Purchasers, within 30 days from the date of this offering circular, to purchase up to 5,000,000 additional GDSs, representing 50,000,000 common shares. See "Plan of Distribution." |
| The GDSs . . . . . . . . . . . . . . . . . . | Each GDS represents 10 common shares, or evidence of the right to receive 10 common shares. The GDSs will be issued pursuant to the Deposit Agreement. Our company and the selling shareholder, as the case may be, will deposit the common shares represented by the GDSs with the custodian of JPMorgan Chase Bank, as the depositary under the Deposit Agreement, which in turn will deliver the GDSs. The Rule 144A GDSs will be evidenced by the Master Rule 144A GDR, and the International GDSs will be evidenced by the Master International GDR, as discussed below. |

| Deposit and withdrawal of commons shares............................. | On and after the fourth ROC business day from the closing date of this offering, subject to the approval from the Taiwan Stock Exchange and the provisions under the Deposit Agreement, you are entitled to withdraw and sell the underlying common shares. As a result, on and after the fourth ROC business day from the closing date of this offering, you may request the Depositary to withdraw common shares represented by GDSs and |
|---|---|

- transfer the common shares to you; or

- sell the common shares on your behalf on the TSE.

See "Description of the Global Depositary Shares — Deposit, Withdrawal and Cancellation," "Form of GDSs and Transfer Restrictions" and "Appendix D — Foreign Investment and Exchange Controls in the ROC — Depositary Receipts."

Under current ROC law, no deposits of common shares may be made in our GDR facility, and no GDSs may be issued against these deposits, without specific approval of the ROC Securities and Futures Commission, except in connection with this offering (including the Initial Purchasers' option to purchase additional GDSs) and the issuance of additional GDSs in connection with: (i) dividends on or free distributions of common shares; (ii) the exercise by holders of existing GDSs of their preemptive rights in the event of a capital increase for cash; or (iii) as permitted under the Deposit Agreement, the purchase directly by any person or by depositing in our GDR facility, provided that the total number of GDSs outstanding after the issuance described in clause (iii) does not exceed the number of issued GDSs previously approved by the ROC Securities and Futures Commission in connection with this offering (plus any GDSs created as a result of clauses (i) and (ii) above). Under current ROC law, issuance under clause (iii) above will be permitted only to the extent that previously issued GDSs have been cancelled.

On the closing date of this offering, we will deliver to the custodian a global certificate of payment in respect of the newly issued shares we are offering. The global certificate of payment carries the same rights represented by the common share certificates. However, the selling shareholder will deliver to the custodian the share certificates offered by the selling shareholders in book entry form. Under current ROC laws and regulations, we are required to deliver physical share certificates representing these newly issued shares to Taiwan Securities Central Depositary Co., Ltd. to be credited to the account of the custodian in exchange for the global certificate of payment within 30 days after receiving approval from the Ministry of Economic Affairs of the ROC (the "ROC MOEA") of the amendment of our corporate registration with the ROC MOEA

6

On the forty-sixth calendar day from the closing date of this offering, subject to separate approval from Taiwan Stock Exchange and deliver the physical share certificates evidencing the newly issued common shares to Taiwan Securities Central Depository Co., Ltd. to be credited to the account of the custodian in exchange for the global certificate of payment deposited on the closing date of this offering.

See "Description of the Global Depositary Shares — Deposit, Withdrawal and Cancellation."

**Markets for common shares and GDSs** ............................................

The only trading market for the common shares is the Taiwan Stock Exchange. Our common shares have been listed on the Taiwan Stock Exchange since August 26, 2002. See "Market Price Information." We have applied to list the International GDSs sold in this offering on the Luxembourg Stock Exchange. We also expect the International GDSs to be eligible for trading on the IOB. We expect the Rule 144A GDSs to be eligible for trading in the PORTAL[SM] Market.

**Dividend** ............................................

The common shares represented by GDSs will rank *pari passu* with other outstanding common shares in respect of dividends. Cash dividends will be paid to the Depositary in NT dollars. The Deposit Agreement provides that, except in certain circumstances, cash dividends received by the Depositary will be converted by the Depositary into U.S. dollars and distributed to the holders of the GDSs, less ROC withholding tax, other governmental charges and the Depositary's fees and expenses. See "Dividend Policy" and "Description of the Global Depositary Shares — Share Dividends and Other Distributions."

**ROC taxation** ............................................

Dividends, whether in cash or shares, that we declare out of retained earnings and distribute to a Non-ROC Holder (as defined in "Taxation — ROC Taxation") are subject to ROC withholding tax, which we will collect prior to distribution. The rate of this withholding tax is 20% on the amount of the distribution, in the case of cash dividends, or on the par value of the shares, in the case of stock dividends. It is not clear whether distributions of shares declared by us out of capital reserves will be subject to ROC tax. Under current ROC law, capital gains on the sale of GDSs and shares represented by GDSs are exempt from ROC income tax. See "Taxation — ROC Taxation."

**Voting rights** ............................................

Subject to the provisions of the Deposit Agreement, when we ask the Depositary to ask for your instructions, you will be entitled to instruct the Depositary how to vote the common shares underlying your GDSs. However, the Depositary is not allowed to carry out those instructions unless holders of at least 51% of the aggregate outstanding GDSs at the relevant record date give the Depositary identical voting instructions. See "Description of the Global Depositary Shares — Voting Rights."

7

| | |
|---|---|
| Settlement . . . . . . . . . . . . . . . . . . . . . . | DTC will accept the Rule 144A GDSs into its book-entry settlement system. So long as the Rule 144A GDSs are eligible for such system, all Rule 144A GDSs will be evidenced by a single master global depositary receipt, or the Master Rule 144A GDR, registered in the name of Cede & Co., as nominee of DTC. Your interests in the book-entry Rule 144A GDSs will be represented through financial institutions acting on your behalf as direct and indirect participants in DTC. DTC settlement practices are applicable to the Rule 144A GDSs. |
| | The International GDSs have been accepted for settlement and clearance through DTC, Euroclear and Clearstream, in each case on a book-entry basis. So long as the International GDSs are eligible for the DTC system, all International GDSs will be evidenced by a single master global depositary receipt, or the Master International GDR, registered in the name of Cede & Co, as nominee of DTC. Your interests in the book-entry International GDSs will be represented by records maintained by DTC and its participants and by Euroclear and Clearstream and their respective account holders. DTC settlement practices and, if applicable, Euroclear and Clearstream settlement practices will apply to the International GDSs. Transfers within DTC, Euroclear and Clearstream will be in accordance with the usual rules and operation procedures of the relevant system. |
| | See "Form of GDSs and Transfer Restrictions — Settlement and Clearance." |
| Use of proceeds . . . . . . . . . . . . . . . . . . . | The net proceeds to our company, after deducting commissions and other estimated expenses of this offering payable by our company, are estimated to be approximately US$561,834,000. Our company will use its net proceeds from this offering for the purchase of equipment for and ramp-up of production at Fab 3 and the purchase of raw materials. |
| | To the extent the Initial Purchasers' option to purchase additional GDSs is exercised in full, the net proceeds to the selling shareholder, after deducting commissions and other estimated expenses of this offering payable by the selling shareholder, are estimated to be approximately US$52,426,000. Our company will not receive any of the proceeds to the selling shareholder. |
| Delivery of the GDSs . . . . . . . . . . . . . . . | Delivery of the GDSs, against payment in same-day funds, is expected on or about October 24, 2003. |

8

CUSIPs, ISINs, Common Codes ... ... ...

**Rule 144A GDSs:**
CUSIP No : 167064 10 4
ISIN No.: US1670641042
PORTAL Trading Symbol: CHIMFPC

**International GDSs:**
CUSIP No.: 167064 20 3
ISIN No.: US1670642032
Common Code: 017744542
SEDOL: 7693618

## Summary Consolidated and Unconsolidated Financial and Operating Data

The following table presents summary consolidated and unconsolidated financial and operating data for our company. Although our company was formed in 1998, we did not begin our commercial operations until 1999. The summary consolidated statement of operations data for the years ended December 31, 2000, 2001 and 2002 and the summary consolidated balance sheet data as of December 31, 2000, 2001 and 2002 are derived from our audited consolidated financial statements included elsewhere in this offering circular. The summary consolidated statement of operations data for the year ended December 31, 1999 and the summary consolidated balance sheet data as of December 31, 1999 are derived from our audited consolidated financial statements which are not included in this offering circular. The summary unconsolidated statement of operations data for the six months ended June 30, 2002 and 2003 and the summary unconsolidated balance sheet data as of June 30. 2002 and 2003, are derived from our audited unconsolidated financial statements included elsewhere in this offering circular. Results for the six months ended June 30, 2003 are not necessarily indicative of the results that may be expected for the year ending December 31, 2003.

Our consolidated and unconsolidated financial statements have been prepared and presented in accordance with accounting principles generally accepted in the Republic of China, or ROC GAAP, which differ in certain significant respects from accounting principles generally accepted in the United States, or US GAAP. For a discussion of these differences as they relate to us, see "Appendix A — Summary of Certain Differences Between ROC GAAP and US GAAP."

On September 18, 2001, we and Chi Mei Corporation, our parent company, acquired 26% and 59%, respectively, of the voting equity interest in International Display Technology, or IDTech, a Japanese company. On September 26, 2001, IDTech acquired a TFT-LCD business in Yasu, Japan and certain other related assets. On February 4, 2002, we purchased Chi Mei Corporation's interest in IDTech, thereby increasing our ownership interest in IDTech to 85%. For financial reporting purposes, since our acquisition of Chi Mei Corporation's interest in IDTech is considered a transaction among entities under common control, we elected to account for the transaction in a manner similar to the pooling-of-interest method. As a result, we prepared the consolidated financial statements as of and for the year ended December 31, 2001 as if we had acquired all 85% of IDTech's ownership interests in September 2001. Therefore, IDTech has been accounted for as an 85% owned consolidated subsidiary of our company since September 18, 2001. Accordingly, our consolidated financial results and operating data reflect IDTech's results only from September 18, 2001. Consequently, under ROC GAAP, our consolidated financial results and operating data in 2002 and 2003 will reflect IDTech's results for the full year, while our consolidated financial results and operating data in 2001 reflect IDTech's results for only approximately three months. As a result, our financial results and operating data for 2002 and 2003 are not comparable to our financial results and operating data for prior periods.

10

The summary financial data set forth below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated and unconsolidated financial statements and the notes to those statements included elsewhere in this offering circular.

| | Consolidated financials As of or for the year ended December 31, | | | | | Unconsolidated financials As of or for the six months ended June 30, | | |
|---|---|---|---|---|---|---|---|---|
| | 1999 | 2000 | 2001[7] | 2002 | 2002[7] | 2002 | 2003 | 2003[7] |
| | NT$ | NT$ | NT$ | NT$ | US$ | NT$ | NT$ | US$ |
| | (in millions, except percentages, common shares, per common share data and number of panels shipped) | | | | | | | |
| **Statement of Operations Data:** | | | | | | | | |
| **ROC GAAP** | | | | | | | | |
| Net sales | — | 9,381.4 | 20,919.8 | 59,677.1 | 1,719.8 | 21,183.2 | 24,014.6 | 693.9 |
| Cost of goods sold: | | | | | | | | |
| Raw materials and components | — | 4,554.8 | 14,682.5 | 33,392.8 | 962.3 | 9,615.1 | 14,014.7 | 404.9 |
| Depreciation and amortization | — | 929.2 | 3,330.0 | 5,892.1 | 169.8 | 2,885.7 | 4,442.8 | 128.4 |
| Other costs of goods sold | — | 1,287.3 | 5,021.0 | 10,094.2 | 290.9 | 3,171.5 | 2,991.7 | 86.5 |
| Total cost of goods sold | — | 6,771.3 | 23,033.5 | 49,379.1 | 1,423.0 | 15,672.3 | 21,449.2 | 619.8 |
| Gross profit (loss) | — | 2,610.1 | (2,113.7) | 10,298.0 | 296.8 | 5,510.9 | 2,565.4 | 74.1 |
| Operating expenses: | | | | | | | | |
| Research and development expenses | 357.9 | 447.5 | 1,700.4 | 1,507.3 | 43.5 | 584.8 | 849.1 | 24.5 |
| Selling expenses | 39.2 | 243.5 | 500.8 | 1,767.2 | 50.9 | 288.1 | 643.7 | 18.6 |
| General and administrative expenses | 316.3 | 371.9 | 809.3 | 1,013.1 | 29.2 | 320.3 | 463.1 | 13.4 |
| Total operating expenses | 713.4 | 1,062.9 | 3,010.5 | 4,287.6 | 123.6 | 1,193.2 | 1,955.9 | 56.5 |
| Operating income (loss) | (713.4) | 1,547.2 | (5,124.2) | 6,010.4 | 173.2 | 4,317.7 | 609.5 | 17.6 |
| Net non-operating income (expense) | 41.0 | (378.3) | (241.9) | (1,485.4) | (42.8) | (67.5) | (538.8) | (15.6) |
| Income (loss) before income tax and minority interest | (672.4) | 1,168.9 | (5,366.1) | 4,525.0 | 130.4 | 4,250.2 | 70.7 | 2.0 |
| Income tax benefit (expense) | 478.8 | 777.9 | 1,068.5 | (15.5) | (0.4) | (225.0) | 30.0 | 0.9 |
| Minority interest in loss (income) of subsidiary | — | — | 197.8 | 21.3 | 0.6 | — | — | — |
| Net income (loss) | (193.6) | 1,946.8 | (4,099.8) | 4,530.8 | 130.6 | 4,025.2 | 100.7 | 2.9 |
| Preferred share dividend | — | — | — | (43.6) | (1.3) | (19.7) | (23.6) | (0.7) |
| Net income (loss) available to common shares | (193.6) | 1,946.8 | (4,099.8) | 4,487.2 | 129.3 | 4,005.5 | 77.1 | 2.2 |
| Weighted-average number of common shares outstanding (in millions)[4] | 287.5 | 1,047.5 | 1,620.0 | 1,626.8 | 1,626.8 | 1,827.6 | 2,191.1 | 2,191.1 |
| Net income (loss) per common share | (0.67) | 1.86 | (2.53) | 2.76 | 0.08 | 2.19 | 0.04 | — |

| | Consolidated financials As of or for the year ended December 31, | | | | | Unconsolidated financials As of or for the six months ended June 30, | | |
|---|---|---|---|---|---|---|---|---|
| | 1999 | 2000 | 2001[1] | 2002 | 2002[2] | 2002 | 2003 | 2003[3] |
| | NT$ | NT$ | NT$ | NT$ | US$ | NT$ | NT$ | US$ |
| | *(in millions, except percentages, common shares, per common share data and number of panels shipped)* | | | | | | | |
| **Balance Sheet Data:** | | | | | | | | |
| **ROC GAAP** | | | | | | | | |
| Current assets | 2,409.7 | 11,717.8 | 14,198.4 | 27,752.1 | 799.8 | 14,080.8 | 30,356.0 | 877.1 |
| Long-term investments | 165.0 | 478.2 | 300.0 | 330.8 | 9.5 | 3,910.0 | 3,234.1 | 93.4 |
| Property, plant and equipment | 5,309.5 | 24,314.3 | 48,639.4 | 57,309.3 | 1,651.6 | 48,055.7 | 62,671.9 | 1,810.8 |
| Intangible assets | 226.0 | 247.4 | 4,274.2 | 4,108.9 | 118.4 | 3,876.4 | 3,824.0 | 110.5 |
| Other assets | 512.9 | 2,009.9 | 2,942.8 | 2,973.4 | 85.7 | 2,532.3 | 3,231.4 | 93.4 |
| Total assets | 8,623.1 | 38,767.6 | 70,354.8 | 92,474.5 | 2,665.0 | 72,455.2 | 103,317.4 | 2,985.2 |
| Current liabilities | 354.2 | 7,325.2 | 18,486.2 | 25,243.3 | 727.5 | 16,966.7 | 25,927.1 | 749.1 |
| Long-term liabilities | 2,500.0 | 7,985.8 | 28,889.6 | 33,332.6 | 960.6 | 28,918.7 | 27,822.9 | 803.9 |
| Other liabilities | 10.4 | 38.9 | 81.4 | 213.6 | 6.1 | 87.9 | 83.9 | 2.4 |
| Minority interest | — | — | 577.9 | 595.6 | 17.2 | — | — | — |
| Total liabilities | 2,864.6 | 15,349.9 | 48,035.1 | 59,385.1 | 1,711.4 | 45,973.3 | 53,833.9 | 1,555.4 |
| Total shareholders' equity | 5,758.5 | 23,417.7 | 22,319.7 | 33,089.4 | 953.6 | 26,481.9 | 49,483.5 | 1,429.8 |
| **Statement of Cash Flow Data:** | | | | | | | | |
| **ROC GAAP** | | | | | | | | |
| Capital expenditures | 5,150.5 | 12,346.7 | 27,768.2 | 13,839.3 | 398.8 | 5,701.5 | 14,978.5 | 432.8 |
| Depreciation and amortization | 41.3 | 1,084.1 | 3,813.8 | 8,327.6 | 240.0 | 3,189.3 | 4,936.2 | 142.6 |
| Cash flows from operating activities | (659.3) | (1,892.7) | (3,075.8) | 5,353.8 | 154.3 | 4,706.3 | 4,861.7 | 140.5 |
| Cash flows from investing activities | (5,491.4) | (14,780.6) | (30,661.7) | (15,320.6) | (441.5) | (9,249.4) | (15,586.1) | (450.3) |
| Cash flows from financing activities | 7,647.2 | 18,220.9 | 31,012.6 | 13,750.9 | 396.3 | 4,556.4 | 18,717.3 | 540.8 |
| **Operating Data:** | | | | | | | | |
| **ROC GAAP** | | | | | | | | |
| Gross margin | — | 27.8% | (10.1%) | 17.3% | 17.3% | 26.0% | 10.7% | 10.7% |
| Operating margin | — | 16.5% | (24.5%) | 10.1% | 10.1% | 20.4% | 2.5% | 2.5% |
| Net margin | — | 20.8% | (19.6%) | 7.6% | 7.6% | 19.0% | 0.4% | 0.4% |
| Adjusted EBITDA[5] | (627.1) | 2,631.3 | (1,310.4) | 14,338.0 | 413.2 | 7,507.0 | 5,545.7 | 160.2 |
| Adjusted EBITDA margin[6] | — | 28.1% | (6.3%) | 24.0% | 24.0% | 35.4% | 23.1% | 23.1% |
| Panels shipped | — | 805,137 | 2,937,415 | 7,239,551 | — | 2,327,740 | 3,508,839 | — |

(1) Under ROC GAAP, reflects the consolidated results of IDTech from September 18, 2001, the date of the acquisition.

(2) Translated solely for the convenience of the reader into U.S. dollars at the rate prevailing on December 31, 2002 of NT$34.70 = US$1.00.

(3) Translated solely for the convenience of the reader into U.S. dollars at the rate prevailing on June 30, 2003 of NT$34.61 = US$1.00.

(4) Based on the average number of common shares outstanding during the relevant periods

12

(5)   Adjusted EBITDA is defined as operating income (loss) plus depreciation and amortization. You should not consider adjusted EBITDA as:

- an alternative to net income (loss) or operating income (loss);
- an indicator of our combined operations or cash flow data prepared in accordance with ROC GAAP; or
- an alternative to cash flow as a measure of liquidity.

The items of net income (loss) excluded from adjusted EBITDA are significant components in understanding and assessing our financial performance, and our computation of adjusted EBITDA may not be comparable to other similarly titled measures of other companies.

(6)   Adjusted EBITDA margin is calculated by dividing adjusted EBITDA by net sales.

# Risk Factors

*Before making an investment decision, investors should carefully consider, among other things, the risks described below, as well as other considerations with respect to investments in ROC companies not normally associated with investments in the securities of issuers in the United States and other jurisdictions. In particular, you should note that we are governed by a legal and regulatory environment that in some material respects may be different from that prevailing in other countries. If any of the risks described below actually occurs, our business, financial condition and results of operations could be seriously harmed, the trading price of our GDSs and common shares could decline and you may lose all or part of your investment. Capitalized terms used but not defined herein have the meanings given to them elsewhere in this offering circular.*

## Risks Related to the Large-sized TFT-LCD Industry

*Since we are dependent on the highly cyclical large-sized TFT-LCD industry, which has experienced significant and sometimes prolonged periods of overcapacity, declining demand and declining average selling prices, our revenue and net income may become depressed for long periods, thereby adversely impacting our overall profitability and prospects.*

Market conditions in the large-sized thin film transistor liquid crystal display, or TFT-LCD, industry have historically been highly cyclical. Large-sized panels are panels that are ten inches and above in diagonal measurement. In particular, the industry has experienced significant downturns characterized by production overcapacity and rapid erosion of average selling prices.

Historically, companies in the large-sized TFT-LCD industry have expanded aggressively during periods of increased demand. If actual demand does not increase in accordance with industry expectations, or there is overexpansion in capacity, there will generally be a period in which industry-wide capacity exceeds demand. In periods of overcapacity, we may be required to lower the price we charge our customers for our products. This has in the past resulted in significant losses that weakened our financial condition. For example, the TFT-LCD industry experienced a downturn commencing at the end of 2000 and continuing through 2001. As a result of this cyclical downturn, there was significant overcapacity during this period. This decrease in relative demand led to a 42.4% decline in average selling prices of our panels from the third quarter of 2000 through the third quarter of 2001, and caused us to delay the ramp-up of our second fabrication plant, or Fab 2, until the fourth quarter of 2001. Furthermore, the TFT-LCD industry has experienced periods of declining absolute demand, often as a result of declining demand for monitors and notebook computers, which occur, as in 2002, with sudden and substantial market downturns and inventory corrections. A substantial portion of our revenue is derived from customers who use our products in the manufacture of monitors and notebook computers and a significant decline in the demand for these end-use applications of our products may result in a decrease in the demand for our products, and in our revenue and net income. In 2002, monitors and notebook computers accounted for 56.3% and 34.0%, respectively, of our net revenue on a consolidated basis and, in the first six months of 2003, they accounted for 80.0% and 9.7%, respectively, of our net revenue on an unconsolidated basis. In addition, if the average selling prices of monitors and notebook computers decline significantly, as in the third and fourth quarters of 2002, we may have to further decrease our selling prices, which may further reduce our revenue and significantly reduce our margins. Future downturns in the TFT-LCD industry may be similarly severe and could seriously harm our business or delay the ramp-up of our fifth generation Fab 3. We cannot assure you that we will be able to anticipate or predict future market downturns in the personal computer market or that any downturn would not have a material adverse effect on our financial condition and results of operations

14

*If we cannot compete successfully in our industry, particularly in relation to the implementation of new technology, we may lose customers, our revenue may decrease and our future profitability and growth prospects may be adversely affected.*

The TFT-LCD industry is a highly competitive one where the associated technology is constantly evolving. As a result, we expect that we will need to constantly offer more sophisticated products in order to respond to competitive industry conditions and customer requirements. If we do not anticipate the technology evolution and rapidly develop and adopt new and innovative technology, either self-developed or licensed from third parties on commercially acceptable terms, we may not be able to produce sufficiently advanced products at competitive prices.

We compete with TFT-LCD panel manufacturers in Taiwan, such as AU Optronics, HannStar Display, Chunghwa Picture Tubes and Quanta Display Inc., as well as other TFT-LCD panel manufacturers from South Korea and Japan, such as Samsung Electronics, LG Philips LCD, NEC, Hitachi Ltd. and Sharp Corporation. In addition, Innolux, a newly established company, recently announced its intention to build a fifth generation fab. Many of our competitors have either already commenced production at new fifth generation fabs, or are in the process of constructing fifth generation fabs. In March 2002, LG Philips LCD's fifth generation fab was the first to commence commercial production. LG Philips LCD is currently constructing its first sixth generation fab. Samsung Electronics began ramping up capacity in its first fifth generation fab in the fourth quarter of 2002, and its second fifth generation fab will begin commercial production in the fourth quarter of 2003. Samsung announced plans to skip the sixth generation fab and build the world's first seventh generation fab which is expected to ramp up in 2005. Some of our competitors also have greater access to capital and technology and substantially greater production, research and development, sales and marketing and other resources than we do. As a result, these companies may be able to compete more aggressively over a longer period of time than we can.

The principal elements of competition in the TFT-LCD market include:

- technological expertise and technical competence;
- time-to-market;
- ability to obtain raw materials and components on a timely and cost-effective basis;
- research and development capabilities;
- available capacity;
- manufacturing capabilities and yields;
- customer relationships and customer service; and
- price

We face increasing competition from other TFT-LCD panel manufacturers in Asia. In particular, most of our customers purchase panels from more than one source. Many of our competitors have shown a willingness to quickly and sharply reduce prices, as they did in 2001 and the second half of 2002, in order to maintain high capacity utilization in their facilities during periods of reduced demand. If demand for TFT-LCDs does not keep pace with the growth of supply, our business will be subject to more intense competition, and our results of operations may suffer from the resulting downward pricing pressure. We may also be forced to delay, or even cancel, our expansion plans, which would adversely affect our future profitability and growth prospects. In addition, if we do not continue to produce the most advanced products at competitive prices, our customers may purchase a greater proportion of products from our competitors, which may cause our operating revenue to decline. Advances in technology also typically lead to declining average prices for our products manufactured using older technologies or processes. If we cannot reduce the costs associated with our products, the profit margin for a given product or service, and our overall profitability, may decrease over time.

## Risks Related to Our Business

### *Our future net revenue and gross profit may vary significantly.*

We experienced a significant net loss in 2001, due principally to a decline in the average selling prices of our products caused by the oversupply of TFT-LCD panels in the market. The decline in average selling prices during this period also led to a decrease in our gross margins. A similar decline in the third and fourth quarters of 2002 also resulted in lower profit margins on a per panel basis. We cannot assure you that our current average selling prices can be sustained. Our future net revenue and gross profit may vary significantly due to a combination of factors, including:

- *our ability to develop and introduce products that meet customers' needs* – our inability to develop or introduce new products may damage our competitive position because our customers may choose to source more advanced products from our competitors;

- *our ability to develop or acquire and implement new manufacturing process and product technologies* – if we are unable to successfully implement more efficient manufacturing process and product technologies in a timely manner, our operating results could suffer because we would be unable to lower our costs;

- *our ability to control our fixed and variable costs* – increased fixed or variable costs may reduce our profitability and adversely affect our results of operations;

- *changes in our product mix* – when we change our product mix, our operating results may fluctuate; and

- *lower than expected demand growth for TFT-LCD panels may lead to oversupply in the market* – when oversupply occurs, we may reduce the volume of our production or the price of our panels.

### *We have a limited operating history, and our operating results fluctuate from quarter to quarter, which makes it difficult to evaluate our business and to predict our future performance.*

We were incorporated in August 1998 and commenced commercial production at Fab 1 in December 1999. Accordingly, we have a limited operating history for you to refer to in evaluating our business, and our prospects must be considered in light of the risks, expenses and difficulties frequently encountered by companies in an early stage of development, particularly those in the rapidly developing TFT-LCD industry. These risks include our ability to expand our production capacities, expand and improve our product offerings, respond effectively to competitive pressure, develop and upgrade our technology, maintain our current, and develop new, strategic relationships, and attract, retain and motivate qualified personnel.

Furthermore, our operating results have varied significantly in the past and may fluctuate significantly from quarter to quarter in the future due to a number of factors, many of which are outside our control. Factors that have affected, and that continue to affect, our business and operations include the following:

- changes in general economic and business conditions;

- the cyclical nature of both the TFT-LCD industry and the markets served by our customers;

- changes in the average selling prices of our products;

- the loss of a key customer or the postponement, rescheduling or cancellation of large orders;

- our ability to obtain adequate components, labor, equipment, raw materials, electricity, water and other required production inputs on a timely and cost-efficient basis;

- capital expenditures and production uncertainties relating to the roll-out of new facilities;

- our ability to achieve target production yields, especially for new products;

16

- our ability to accurately predict customer demand, as we must commit to significant capital expenditures well in advance of future orders;

- technological changes;

- exchange rate fluctuations between the NT dollar, U.S. dollar and Japanese yen; and

- natural disasters, such as fires, droughts, floods and earthquakes, or industrial accidents.

Due to the factors noted above and other risks discussed in this section, many of which are beyond our control, you should not rely on quarter-to-quarter comparisons to predict our future performance. Unfavorable changes in any of the above factors may seriously harm our business, financial condition and results of operations.

### As a result of our acquisition of IDTech and the Yasu business, our historical financial results are not comparable to our 2002 and 2003 results.

Our acquisition of International Display Technology, or IDTech, and the TFT-LCD business in Yasu has resulted in a material change in our business and operations. Under accounting principles generally accepted in the Republic of China, or ROC GAAP, our consolidated financial statements reflect IDTech's results only from September 18, 2001. Consequently, under ROC GAAP, our consolidated financial results and operating data in 2002 and 2003 will reflect IDTech's results for the full year, while our consolidated financial results and operating data in 2001 reflect IDTech's results for only approximately three months. As a result, our financial results and operating data for 2002 and 2003 are not comparable to our financial results and operating data for prior periods. Therefore, you should not rely on year-to-year comparisons to evaluate our historical performance or predict our future financial performance.

### If we are unable to continuously improve our capacity utilization and manufacturing yields and optimize our product mix, our profit margins may decline substantially and our prospects may be adversely affected.

Our ability to achieve and maintain our profitability depends, in part, on our ability to:

- maintain or improve our capacity utilization, that is, the actual number of glass substrates we are processing at a fab in relation to the total number of substrates we have the capacity to process;

- maintain or improve the number of saleable panels of a given type that we are able to manufacture from a given number of glass substrates, which is known as our manufacturing yield; and

- optimize the mix of different sized panels manufactured utilizing different process technologies based on pricing and cost considerations.

Achieving these goals while ramping up production at Fab 3 will be particularly challenging for us. If we fail to conduct our business in accordance with these objectives, our profit margins may decline substantially, our losses may increase and our prospects may be adversely affected.

### If we cannot manage the risks related to our expansion plans, our growth prospects may be limited, our competitive position could suffer and our future profitability may be affected.

There are significant risks involved in our expansion plans, including anticipating the timing and the magnitude of the expansion plans correctly and being able to achieve expansion targets on a timely and efficient basis.

Our success depends largely on our ability to anticipate and react to expected changes in future demand for TFT-LCDs. In the event the timing of our expansion does not match market demand, our business strategy may need to be revised, and there could be delays in our roll-out of new fabs, which may adversely affect our growth and future prospects. If we overexpand, or demand does not grow as expected, our financial results will be impaired. However, if we do not expand, and demand increases

17

sharply, our business could be seriously harmed because we may not be as cost-effective as our competitors due to our lack of increased economies of scale, and may not be able to satisfy the needs of our current customers or attract new customers. In addition, if we do not properly allocate our resources in line with future demand for particular TFT-LCD products, our business and financial results could be severely harmed. Therefore, the failure to effectively manage the timing and magnitude of our expansion plans to meet actual demand could seriously harm our competitive position.

There are also risks related to achieving expansion targets on a timely basis. For example, we experienced difficulties in ramping up production at Fab 1 in 1999 and 2000. These difficulties primarily related to:

- inefficient application of new technology and know-how, particularly those obtained from external sources, such as wide viewing angle multi-domain vertical alignment technology that we licensed from Fujitsu;

- incompatibility of raw materials and components; and

- the introduction of untested in-house color filter manufacturing techniques.

As a result, we suffered significant delays in product deliveries and reduced manufacturing yields. We began commercial production at Fab 2 in October 2001 and reached the design capacity of 75,000 glass substrates per month at this fab at the end of 2002. We did not experience similar difficulties at Fab 2.

We are currently in the pre-production phase of our planned Fab 3, which utilizes fifth generation technology. Fab 3 is scheduled to commence commercial production in the fourth quarter of 2003 and is expected to reach a monthly capacity of 30,000 glass substrates by the end of 2003. Our ability to maintain our scheduled construction and ramp-up of Fab 3 is affected by a number of factors, including:

- our ability to fund our capital expenditure requirements;

- our ability to obtain the necessary fifth generation equipment and supplies from a limited number of suppliers;

- our ability to withstand the strain on our resources, particularly with respect to our personnel, resulting from the production ramp-up of a new fab;

- whether we have the necessary know-how to construct and operate a fifth generation fab; and

- our ability to retain key personnel from IDTech, and to increase the number of our qualified engineers.

Our overall production capacity is contingent on the timely commencement of production at Fab 3 in the fourth quarter of 2003.

Should we encounter any difficulties relating to any of these factors, the commencement of operations at Fab 3 could be delayed, and our growth prospects and future profitability could be adversely affected.

**If we are unable to obtain the financing necessary to fund the substantial capital expenditures we expect to incur and to refinance our existing debt, we may not be able to implement our growth plan or meet our debt obligations.**

Our business and the nature of our industry require us to make substantial capital expenditures, resulting in a high level of fixed costs. We expect to incur significant capital expenditures in connection with our growth plans, in particular the planned establishment of our fifth generation Fab 3. These capital expenditures will be made in advance of any additional sales to be generated by new or upgraded fabs as a result of these expenditures. Given the fixed cost nature of our business, we have in the past experienced, and may in the future experience, delays in the implementation of our plans if our operating and financing cash flows do not adequately meet our planned capital expenditures. In addition, our actual expenditures may exceed our planned expenditures for a variety of reasons, including changes in our growth plan, our process technology, prices of equipment, market conditions, interest rates and exchange rates.

We also may be required to draw down our existing credit facilities, as well as undertake additional financing in the future, to supplement our internally generated cash flow from operations in order to meet our future debt obligations.

We cannot assure you that additional financing will be available on satisfactory terms, if at all. In particular, as of June 30, 2003, on an unconsolidated basis, NT$17,737.9 million (US$512.5 million), or 63.8%, of our long-term borrowings and NT$5,453.6 million (US$157.6 million), or 91.6%, of our current portion of long-term borrowings are guaranteed by Chi Mei Corporation and our chairman. NT$5,885.0 million (US$170.0 million), or 21.2%, of our long-term borrowings are guaranteed by our chairman. If for any reason either of these parties ceases to guarantee our existing borrowings, it may be difficult for us to obtain necessary financing. If adequate funds are not available on satisfactory terms, we may be forced to curtail our expansion plans or delay the start-up of Fab 3 or future fabs, which could result in a loss of customers and limit the growth of our business. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources."

### Restrictive covenants and broad default provisions in the agreements governing IDTech's and our existing debt may materially restrict our operations as well as adversely affect our liquidity, financial condition and results of operations.

We, IDTech and Chi Mei Corporation, as our guarantor, are party to numerous loan and other agreements relating to the incurrence of debt, many of which include financial and restrictive covenants and broad default provisions. Chi Mei Corporation failed to comply with various financial covenants at December 31, 2001. IDTech failed to comply with two of its financial covenants at December 31, 2002 and we failed to comply with one of these financial covenants at June 30, 2002 and September 30, 2002.

IDTech and we each have either obtained waivers from, or notified, the relevant lenders relating to such non-compliance. In the case of the IDTech breach, the loan was refinanced in June 2003. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources" for a more detailed discussion of these defaults and waivers. In general, covenants in the loan agreements governing our existing debt, and debt we may incur in the future, may materially restrict our operations, including our ability to incur debt, pay dividends, make certain investments and payments and encumber or dispose of assets. In the event of a prolonged downturn in the demand for or the pricing of our products as a result of a downturn in the worldwide TFT-LCD industry or otherwise, or in the event that we fail to obtain sufficient additional equity financing in the future, we cannot assure you that we will be able to remain in compliance with our financial covenants which, as a result, may lead to a default. Moreover, a default under one agreement may also trigger cross-defaults under our other agreements. In the event of a default, we may not be able to cure the default or obtain a waiver on a timely basis, and our operations could be significantly disrupted. An event of default under any agreement governing our existing or future debt, if not cured or waived, could cause all of our existing borrowings to become immediately due and payable, which will have a material adverse effect on our liquidity, financial condition and results of operations.

### Our customers generally do not place purchase orders far in advance, which makes it difficult for us to predict our future revenues and to adjust production costs and allocate capacity efficiently and on a timely basis.

Our customers generally place purchase orders between two to four months before the desired shipment date, and our contracts with customers generally do not require minimum purchases of our products. In addition, due to the cyclical nature of the TFT-LCD industry, our customers' purchase orders have varied significantly from period to period. As a result, we do not typically operate with any significant backlog. The lack of significant backlog makes it difficult for us to forecast our revenues and allocate resources for future periods. Moreover, our expense levels are based in part on our expectations of future revenues and we may be unable to adjust costs in a timely manner to compensate for revenue shortfalls. We expect that our future revenue in any quarter will continue to be substantially dependent upon purchase orders

received in that quarter. We cannot assure you that any of our customers will continue to place orders with us in the future at the same level as in prior periods. We also cannot assure you that the volume of our customers' orders will be consistent with our expectations when we plan our expenditures for raw materials, components, labor and equipment.

*We depend on a small number of customers for a significant portion of our revenues and a loss of some of these customers, or changes in our business arrangements with these customers, would materially and adversely affect our financial condition and results of operations.*

We depend on a small number of customers for a significant portion of our revenues. In the first six months of 2003, our top two customers, Samsung Electronics Display Division and other Samsung affiliates, collectively, and Fujitsu Limited, or Fujitsu, accounted for approximately 23.8% and 18 2%, respectively, of our unconsolidated net sales. In addition, as of June 30, 2003, 73 6% of our total trade accounts receivable consisted of receivables from ten customers. Historically, the Yasu fab's sales were also highly concentrated, with Dell Corporation and IBM accounting for the substantial majority of purchases. While we expect that our acquisition in Yasu will result in a diversification of our overall customer base, we expect to continue to depend on a relatively limited number of customers for a significant portion of our revenue. Except for our foundry agreement with Fujitsu, as described in this offering circular under "Our Relationship with Fujitsu," we do not currently have any binding purchase contracts with any of our main customers. We cannot assure you that revenue generated from these customers, individually or in the aggregate, will reach or exceed historical levels in any future period. Our failure to meet the demands of these customers, such as a failure to manufacture a sufficient quantity of TFT-LCD panels to satisfy their orders, could result in a cancellation or reduction of business from these customers. Loss, cancellation or reduction of business from, significant changes in scheduled deliveries to, or decreases in the prices of products sold to, any of these customers could significantly reduce our revenues and adversely affect our financial condition and results of operations. See "Our Relationship with Fujitsu — Purchase by AU Optronics Corp."

*Our business could suffer if we are unable to retain and recruit skilled employees.*

The success of our business depends upon attracting and retaining experienced executives, engineers and other employees to implement our strategy. We will be required to substantially increase the number of skilled employees in connection with our expansion plans for Fab 3. The competition for skilled employees in Taiwan is intense. We expect demand for personnel in Taiwan to increase significantly in the future as new flat panel display fabs and other technology-related businesses are established in Taiwan. In addition, we may need to increase employee compensation levels in order to attract and retain our existing officers and staff and the additional personnel we expect to require. We do not have long-term employment contracts with any of our employees, and none of our employees are bound by non-competition agreements. If we were unable to retain our existing personnel or attract, assimilate and retain new experienced personnel in the future, our business, growth prospects and future profitability could suffer.

*We are controlled by Chi Mei Corporation, which may not always act in the best interests of our public shareholders.*

Immediately following this offering, Chi Mei Corporation will directly or indirectly own 43 97% of our issued and outstanding common shares and will continue to be our controlling shareholder. In addition, several of our directors, supervisors and executive officers also serve in official capacities at Chi Mei Corporation, including our chairman, Wen-Long Shi, who also serves as chairman of Chi Mei Corporation, our president, Jau-Yang Ho, who also serves as a director of Chi Mei Corporation, and our vice president, chief financial officer and chief accounting officer, Jung-Chun Lin, who also serves as a director of Chi Mei Corporation. As a result, Chi Mei Corporation will have a controlling influence on our management and policies and the outcome of most corporate actions. Chi Mei Corporation may take actions that you may not agree with or that are not in our or our public shareholders' best interests

20

*We and many of our customers and suppliers are vulnerable to natural or man-made disasters and other events outside of our control that may seriously disrupt our operations and result in financial losses.*

Most of our assets and some of our customers and suppliers are located in the Tainan Science-based Industrial Park. As a result, we are dependent on the infrastructure supporting the park and our ability to avoid damages from earthquakes, floods, power losses and similar events that affect the park. However, since relatively few companies have commenced operations in the Tainan Science-based Industrial Park, we are not certain whether the general infrastructure in the park is sufficient or adequate to avoid these disruptive events. As a result, the occurrence of any of these events could disrupt our business and adversely affect our results of operations.

In addition, Taiwan and Japan are susceptible to earthquakes. In recent years, Taiwan experienced severe earthquakes that caused significant property damage and loss of life, particularly in the central part of Taiwan. Japan also experienced a severe earthquake in Kobe in 1995. These earthquakes caused damage to production facilities and adversely affected the operations of many companies. Although we have not experienced any major structural damage to our facilities or gas or chemical piping from earthquakes, there can be no assurance that future earthquakes will not occur and result in major damage to our facilities, which would have a material adverse effect on our results of operations.

While we maintain several insurance policies relating to our business, we do not currently carry any insurance coverage for interruptions in public utility services or any other business interruption insurance covering our Taiwan operations. Should these interruptions occur, we will be exposed to substantial risks and may be liable for the full amount of any losses. In addition, we do not carry earthquake insurance covering our Taiwan operations. Should an earthquake occur in Taiwan in the future, we may be liable for the full amount of losses and damage.

Taiwan was subject to severe droughts and water rationing measures in the first half of 2002. Although the TFT-LCD manufacturing process requires substantial amounts of fresh water, the Tainan Science-based Industrial Park is located in a region that is less susceptible to droughts than other areas of Taiwan and we have not been directly affected by droughts. Nevertheless, we cannot assure you that future droughts will not occur or that any temporary or sustained adverse impact a drought may have on Taiwan's economic, social or political conditions will not adversely affect our business and operations.

### Risks Related to Our Manufacturing Process

*Our manufacturing processes are highly complex, costly and potentially vulnerable to impurities and other disruptions that can significantly increase our costs and delay product shipments to our customers.*

Our manufacturing processes are highly complex, require advanced and costly equipment and are continuously being modified to improve manufacturing yields and product performance. Impurities or other difficulties in the manufacturing process or defects with respect to equipment or supporting facilities can lower manufacturing yields, interrupt production or result in losses of products in process. As system complexity has increased and process technology has become more sophisticated, requirements for precision have become even more stringent. From time to time, we have experienced production difficulties that have caused delivery delays and quality control problems. We have in the past encountered the following problems, particularly with respect to the establishment of Fab 1:

- capacity constraints due to the delayed delivery of equipment critical to our production;

- difficulties in changing or upgrading our process technologies;

- difficulties in increasing production;

- technical problems or operator errors; and

- raw materials and components shortages and impurities.

21

We cannot assure you that these and other related problems will not reoccur in the future. If they do, our production costs may increase significantly and we may be forced to delay our product shipments to our customers.

***We depend on a limited number of suppliers, and if we are unable to obtain raw materials and components and equipment in a timely manner, our production schedules could be delayed and we may lose customers and become less profitable.***

We depend on our suppliers for our production raw materials and components, including backlights; driver integrated circuits polarizers, glass substrates and, to a limited extent, color filters. To maintain competitive manufacturing operations, we must obtain from these suppliers sufficient quantities of quality materials at acceptable prices and on a timely basis. Although we source our raw materials and components from several suppliers, a small number of these suppliers account for a substantial amount of our raw materials and component requirements because of the consistent quality of their products. These suppliers include Texas Instruments and Himax Optoelectronics for driver integrated circuits, Corning Display for glass substrates, Coretronics Inc. for backlights and Dai Nippon Printing for color filters. A supply shortage of any of these raw materials or components could severely harm our production schedule. In fact, there has been a recent shortage in the industry of color filters, backlights and glass substrates for fifth generation fabs that could adversely affect our production at Fab 3 once that fab enters into commercial production in the fourth quarter of 2003. In addition, we sometimes reject raw materials and components that do not meet our specifications, resulting in declines in output or manufacturing yields. We cannot assure you that we will be able to obtain sufficient quantities of raw materials and components in a timely manner or at all. If the supply of raw materials and components is substantially diminished or if there are significant increases in the costs of these raw materials and components, we may incur additional costs to acquire sufficient quantities of raw materials and components to sustain our operations, which may increase our marginal costs and reduce our profitability. In addition, while the prices of our raw materials and components are generally not volatile relative to panel prices, these prices have exhibited volatility during periods of excess supply and demand.

We also depend on a limited number of manufacturers and vendors of the complex equipment we use in our manufacturing processes. The market for this equipment is characterized, from time to time, by intense demand, limited supply and long delivery cycles. Our operations and expansion plans depend on our ability to obtain a significant amount of this equipment on a timely basis from these manufacturers and vendors. There is currently significant global demand for equipment used by fifth generation fabs, and the lead time for delivery for equipment may be six months or more following the time the orders are placed. In addition, the expansion and modification of fabs planned or announced by us and other companies may further increase the demand for equipment. We have no binding supply agreements with any of these manufacturers or vendors, which exposes us to changing market conditions and other substantial risks. For example, shortages in the supply of equipment could result in an increase in the price of equipment and longer delivery times. If we are unable to obtain equipment in a timely manner, we may be unable to fulfill our customers' orders, which could negatively impact our growth prospects as well as our financial condition and results of operations.

***If we violate environmental regulations, we may be required to pay significant fines, our operations may be delayed or interrupted and our business could suffer.***

We are subject to environmental regulations relating to our manufacturing processes, including the use, storage, discharge and disposal of chemical by-products of, and water used in, our production process. A failure, or a claim that we have failed, to comply with these environmental regulations could result in the assessment of damages or imposition of significant fines, delays in our production and capacity expansion and negative publicity, all of which could harm our business. New regulations could also require us to acquire costly equipment or to incur other significant expenses. In addition, any failure by us to control the use of, or adequately restrict the discharge of, hazardous substances could subject us to future liabilities that may have a material adverse effect on our financial condition and results of operations.

22

### Risks Related to Our Technology and Intellectual Property

*If we are unable to implement new technology as soon as it becomes available, or if we lose the support of our technology partners, we may not be able to compete, which may cause us to lose customers and market share, as well as reduce our future profitability.*

The TFT-LCD industry is developing rapidly and the related technology is constantly evolving. As a result, we expect that we will need to constantly offer more sophisticated products in order to respond to competitive industry conditions and customer requirements. If we do not anticipate the technology evolution and rapidly develop and adopt new and innovative technology, either self-developed or licensed from third parties on commercially acceptable terms, we may not be able to produce sufficiently advanced products at competitive prices. While we develop much of the technology we use internally, we also derive significant benefits from technology and know-how licensed from our technology partners, particularly IBM and Fujitsu. We have also entered into a technology joint development agreement with Honeywell International Inc. We cannot assure you, however, that our existing technology partners will continue to support us, or that we will be able to enter into new arrangements with other potential technology partners on commercially acceptable terms, or at all. If we are unable to obtain the necessary technology support, we may be unable to offer products utilizing the leading technologies to our customers. If we do not continue to produce the most advanced products at competitive prices, our customers may purchase our competitors' products, which may cause our operating revenues to decline. In addition, advances in technology typically lead to declining average prices for our products manufactured using older technologies or processes. If we cannot reduce the costs associated with our products, the profit margin for a given product or service, and our overall profitability, may decrease over time.

*Our and our licensors' inability to obtain, preserve and defend intellectual property rights may limit our product offerings, harm our competitive position and result in a decrease in our revenues.*

Our ability to compete successfully and achieve future growth will depend, in part, on our ability to protect our proprietary technology and to secure critical processing technology that we do not own on commercially acceptable terms. We cannot assure you that we will be able to independently develop, or secure from any third party, the technology required for upgrading our fabs and processes. Our failure to successfully obtain this technology may seriously harm our competitive position.

Our ability to compete successfully also depends on our ability to operate without infringing upon the proprietary rights of others. The TFT-LCD industry is characterized by occasional litigation regarding patents, trade secrets and other intellectual property rights. This is due to the complexity of the technology used and the multitude of patent, copyright and other overlapping intellectual property rights relating to this technology. In particular, it is common for patent owners to assert their patents against TFT-LCD manufacturers. We have received from time to time communications from third parties concerning patents that cover some of our technologies and alleging infringement of the intellectual property rights of others, and we expect to continue receiving these types of communications in the future. IBM and Fujitsu, from whom we license a significant amount of technology and know-how, may be subject to occasional assertions of infringement upon the intellectual property rights of third parties. In addition, although IDTech did not assume any of IBM Japan's potential patent infringement liabilities in connection with the acquisition of IBM Japan's TFT-LCD operations, IDTech may nevertheless be found to be liable for similar patent infringements, with no right of recourse to IBM Japan.

As the TFT-LCD industry becomes increasingly competitive, there may be an increase in infringement claims against TFT-LCD manufacturers in Taiwan, particularly by Japanese and Korean patent holders. In the event any third party were to make a valid claim against us, our customers or our licensors, we could be required to:

● seek to acquire licenses for the infringed technology, which may not be available on commercially acceptable terms, if at all;

23

- discontinue using certain process technologies, which could prevent us from manufacturing certain types of TFT-LCDs;
- pay substantial monetary damages; or
- develop similar non-infringing technologies, which may not be feasible.

Any one of these developments could place substantial financial and administrative burdens on us and hinder our business. Litigation, which could result in substantial costs to us and diversion of our resources, may also be necessary to enforce our patents or other intellectual property rights or to defend us or our customers against claimed infringement of the rights of others. If we fail to obtain necessary licenses or if litigation relating to patent infringement or other intellectual property matters occurs, it could prevent us from manufacturing particular products or using particular technologies, which could reduce our opportunities to generate revenues. As of June 30, 2003, we had not made any provisions in our consolidated financial statements for potential claims.

*Limitations relating to IDTech's technology cross-licensing arrangements may subject us to potential technology infringement claims.*

Our existing cross-licensing arrangements for IDTech relating to flat panel display technology with Hitachi Ltd., Matsushita Electric Industrial Co. Ltd., Seiko Epson Corporation, Sharp Corporation and Toshiba Corporation are subject to production volume limitations based upon IDTech's total revenues. See "Our Acquisition of IDTech and Relationship with IBM — License Agreements — License arrangements between IDTech and third party licensors." Should IDTech exceed these revenue limitations, the excess amounts of production will not be covered under these arrangements. In addition, our Taiwan operations are not covered by these cross-licensing arrangements. As a result, we may be subject to infringement claims by one or more of these licensors to the extent that we exceed these limitations or are perceived to be using this technology at our Taiwan operations.

### Risks Related to Integration

*We may not be able to successfully integrate and manage our acquisition of IDTech with our operations in Taiwan.*

To fully realize the potential of our acquisition of IDTech, we must successfully complete the integration and assimilation of IDTech's business into our operations in Taiwan in a number of important areas, including management, production, research and development, sales and marketing, intellectual property, suppliers, customers and compensation structure. The success and timeliness of this integration may be limited by many factors, including:

- retention of key management personnel;
- coordination of sales and marketing efforts;
- the larger size and greater geographical dispersion of the combined business;
- unforeseen contingent risks or latent liabilities relating to the IDTech business that may only become apparent after the integration is finalized;
- diversion of management's attention by other concerns;
- our inability to directly enjoy the benefits of certain cross-licensing arrangements entered into by IDTech. which may adversely affect our ability to fully integrate our research and development and production activities;
- unforeseen or unexpected expenses, difficulties, complications or delays relating to this integration;
- maintenance of existing relationships with employees, customers and suppliers;

24

- the relocation from Himeji, Japan and integration into our existing operations of the cell assembly assets and equipment to be acquired from Display Technologies Inc ; or

- unexpected business interruptions.

Failure to successfully implement this integration could adversely affect our business, financial condition and results of operations.

### *A substantial portion of IDTech employees are seconded from IBM Japan and Display Technologies Inc., and we have limited control over these employees.*

In connection with the transfer to IDTech of assets relating to the flat panel display business of IBM Japan, IDTech entered into personnel service arrangements with both IBM Japan and Display Technologies Inc., or Display Technologies, for the secondment of employees to IDTech. Of the 687 personnel who worked at IDTech as of June 30, 2003, 151 are seconded from IBM Japan and 339 are seconded from Display Technologies, which is a subsidiary of IBM Japan. Under the relevant agreements, IDTech has limited control over, and in many cases can only make recommendations regarding, the compensation and other aspects of these secondees' employment arrangements. This may limit IDTech's authority over and ability to incentivize these employees. Furthermore, in the event a substantial portion of the seconded employees decide to leave IDTech during the secondment period, a disruption in the operations of IDTech could occur. We cannot assure you that we will be able to retain these seconded employees, or that any failure to retain them or attract replacements would not have an adverse effect on the business and prospects of IDTech.

### Political, Regulatory and Economic Risks

Our business may be harmed, and the price of the GDSs and our common shares may be adversely affected, by changes in economic, political and business conditions resulting from events outside Taiwan, such as terrorist activities, political unrest and military action.

Market conditions in Taiwan, our business and results of operations and the market price and liquidity of the GDSs and our common shares may be adversely affected by developments outside Taiwan, including, among others, those relating to the September 11, 2001 terrorist attacks in the United States and subsequent or any future terrorist activities, the recent war in Iraq and tensions involving North Korea.

### *We face substantial political risks associated with doing business in Taiwan, particularly due to the tense relationship between Taiwan and China.*

Our principal executive offices and a substantial amount of our assets are located in Taiwan and a substantial portion of our revenue is derived from our operations in Taiwan. Accordingly, our business and results of operations and the market price of our GDSs and common shares may be affected by changes in Taiwan governmental policies, taxation, inflation or interest rates and by social instability and diplomatic and social developments in or affecting Taiwan that are outside of our control. Taiwan, which is also known as the Republic of China, or ROC, has a unique international political status. Since 1949, Taiwan and the Chinese mainland China have been separately governed. The government of the People's Republic of China, or PRC, claims that it is the sole government in China and that Taiwan is part of China. Although significant economic and cultural relations have been established during recent years between Taiwan and the PRC, the PRC government has refused to renounce the possibility that it may at some point use force to gain control over Taiwan. Relations between the ROC and the PRC governments have been strained in recent years for a variety of reasons, including the PRC government's position on the "One China" policy and tensions concerning arms sales to Taiwan by the United States government. Any tension between Taiwan and the PRC, or between the United States and the PRC, could adversely affect the market prices of the GDSs and our common shares.

25

*If economic conditions in Taiwan deteriorate, our current business and future growth would be materially and adversely affected.*

Our business and results of operations and the market prices of the GDSs and our common shares may be affected by changes in ROC government policies, taxation, inflation or interest rates in Taiwan.

In recent years, the currencies of many East Asian countries, including Taiwan, have experienced considerable volatility and depreciation. The Central Bank of China, Taiwan's central bank, has from time to time intervened in Taiwan's foreign exchange market to minimize the fluctuation of the U.S. dollar/NT dollar exchange rate and to prevent significant decline in the value of the NT dollar. In October 1997, the Central Bank of China halted its intervention, and in January 1998, the U.S. dollar/NT dollar exchange rate exceeded US$1.00 = NT$34.00 for the first time since April 1987. The NT dollar has depreciated against the U.S. dollar from US$1.00 = NT$27.52 on January 2, 1997 to US$1.00 = NT$33.90 on October 20, 2003.

The banking industry in Taiwan has been seriously harmed by the general economic downturn in Taiwan and other parts of Asia, which has caused a depressed property market and an increase in the number of companies filing for corporate reorganization and bankruptcy protection. As a result, financial institutions are more cautious in providing credit to businesses in Taiwan. We cannot assure you that we will continue to have access to credit at commercially reasonable rates of interest or at all.

*Our business depends on the support of the ROC government, and a decrease in this support may increase our tax expenditures and decrease our net income.*

The ROC government has been very supportive of technology companies such as us. In particular, we, like many Taiwan technology companies, have benefited from substantial tax incentives provided by the ROC government. For example, prior to 2002, the importation of equipment was entitled to a tax credit of 10% and 20% with respect to purchases from foreign and domestic vendors, respectively. Starting from January 2002, if the costs for certain qualifying equipment or technology in any taxable year exceeds NT$0.6 million, the purchase of this equipment is entitled to a 13% tax credit while the purchase of technology is entitled to a 10% tax credit. We also have the right to claim a five-year exemption from income tax for some of our operations within the Tainan Science-based Industrial Park, although we have not yet made this claim. Under the Statute for Upgrading Industries, we are also entitled to other tax incentives. We are granted tax credits currently at rates ranging between 5% to 20% of the acquisition costs of qualifying machinery and equipment, 30% (25% prior to February 2002) of qualifying research and development costs and employee training expenses and 50% of the portion of qualifying research development costs or employee training expenses that exceed the average costs or expenses of the preceding two years. If the investment tax credit cannot be fully utilized in the current year, the unused tax credit may be carried forward for four years. The amount of tax credit utilized in each year is limited to 50% of the corporate income tax payable for that year, except for the final year. In 2002, these exemptions, credits and incentives in the amount of NT$1,790.3 million (US$51.6 million) contributed to the tax benefit recognized by us under ROC GAAP. These exemptions, credits and incentives totaled NT$1,206.4 million (US$34.9 million) in the first six months of 2003. If any of these incentives are curtailed or eliminated, or not renewed upon expiration, our net income may decrease substantially.

*Currency fluctuations could increase our costs relative to our revenues, which could adversely affect our profitability.*

In the first six months of 2003, approximately 85.8% and 8.5% of our unconsolidated net sales were denominated in U.S. dollars and Japanese yen, respectively. In addition, approximately 22.9% of our raw materials and component purchases and 49.0% of our equipment purchases were made with Japanese yen in the first six months of 2003. Although we hedge a portion of the resulting net foreign exchange position through the use of forward exchange contracts, we are still affected by fluctuations in exchange rates among the U.S. dollar, the Japanese yen, the NT dollar and other currencies. Any significant fluctuation in exchange rates may increase our operating costs, decrease our net operating revenue and

26

adversely impact our profitability. In addition, fluctuations in the exchange rate between the U.S. dollar and the NT dollar will affect the U.S. dollar value of any cash dividends we pay, which could have a corresponding effect on the market price of our GDSs and common shares.

### Holders of the GDSs may have difficulty enforcing any judgment obtained outside Taiwan against us, the selling shareholder or our directors, supervisors or executive officers.

We are a company limited by shares and were incorporated under the ROC Company Law. All of our directors, supervisors and executive officers are residents of the ROC or Japan and most of our assets, and such persons' assets, are located in the ROC or Japan. In addition, the selling shareholder is also located in the ROC. As a result, it may not be possible for investors to effect service of process upon us, the selling shareholder or such persons outside the ROC and Japan. We have, however, irrevocably appointed an agent in New York to receive service of process in any proceedings in the State of New York based on any of the GDSs. Notwithstanding the foregoing, it may be difficult to enforce in the ROC courts judgments obtained against us, the selling shareholder or our directors, supervisors and executive officers in non-ROC courts, including those obtained against us in a New York court based upon the civil liability provisions of U.S. securities laws. See "Enforceability of Foreign Judgments in the ROC."

### Risks relating to the GDSs, common shares and our trading markets

#### An active trading market for the GDSs does not yet exist and may never develop.

A trading market for our GDSs does not exist. We have applied to list the International GDSs on the Luxembourg Stock Exchange, and we also expect the International GDSs to be eligible for trading on the IOB. We expect the Rule 144A GDSs to be eligible for trading in the United States on the PORTAL^SM Market. There can be no assurance that such listing or eligibilities for the currently offered GDSs will provide liquidity for those GDSs. Although the Initial Purchasers have advised CMO that they currently intend to make a market in the GDSs, they are not obligated to do so and any market-making activity with respect to the GDSs, if commenced, may be discontinued at any time.

In addition, although holders of GDSs are entitled to withdraw the common shares underlying the GDSs from the Depositary on and after the fourth ROC business day from the closing date of this offering, such withdrawn GDSs will be cancelled. Unless additional GDSs are issued, the effect of withdrawals will be to reduce the number of our outstanding GDSs. If a significant number of GDSs are withdrawn, the liquidity of our GDSs will be substantially reduced. As a result, the market price of our GDSs may differ from the prevailing market price of our common shares on the Taiwan Stock Exchange.

#### The GDSs and the underlying common shares are subject to restrictions on transfer.

Both the GDSs and the underlying common shares are subject to restrictions on transfer as described under "Form of GDSs and Transfer Restrictions" and "Appendix D — Foreign Investment and Exchange Controls in the ROC." These transfer restrictions may adversely affect the liquidity of the GDSs and common shares.

#### Upon your withdrawal of our common shares when you surrender the GDSs, you will be required to appoint a tax guarantor and a local agent in Taiwan.

Any non-ROC person (other than PRC persons who, under current ROC law, regulations and policy, are not permitted to register as our shareholders) electing to withdraw our common shares represented by our GDSs from our depositary facilities and to hold those common shares will be required to appoint an agent in Taiwan for filing tax returns and making tax payments. Such agent, or tax guarantor, will be required to meet the qualifications set by the MOF and to act as the guarantor of the shareholder's tax payment obligations. You may not be able to appoint and obtain approval for a tax guarantor in a timely manner.

In addition, under current ROC law, in electing to withdraw your common shares from our depositary facilities and to hold those common shares, you will be required to register with the Taiwan Stock Exchange and obtain the approval of the Central Bank of China if you are an Off-Shore Foreign Institutional Investor as defined in the relevant foreign investors regulations of the ROC Securities and Futures Commission. See "Appendix D — Foreign Investment and Exchange Controls in the ROC —

27

Foreign Investors Regulations." Moreover, you must appoint a local agent in Taiwan to, among other things, open a general securities trading account with a local securities brokerage firm, remit funds and exercise shareholders' rights. Furthermore, you must appoint a local bank to act as custodian for confirmation and settlement of trades, safekeeping of securities and cash proceeds and reporting and declaration of information. Without satisfying these requirements, you would not be able to sell or otherwise transfer your common shares on the Taiwan Stock Exchange.

In addition, in the event you do not register with the Taiwan Stock Exchange, and, if applicable, obtain the approval of Central Bank of China, you may not elect to withdraw and hold your common shares. You may however, elect to withdraw and sell your common shares by instructing the Depositary to effect such sale. However, we cannot assure you that the Depositary will be able to arrange for a sale of deposited common shares upon their withdrawal in a timely manner or at a specified price, particularly during periods of illiquidity and volatility.

### *Once GDSs are surrendered and common shares are withdrawn from our depositary facilities, you may not be able to re-deposit such common shares to obtain GDSs.*

Under the Deposit Agreement, holders of common shares may deposit those common shares with the Depositary's custodian in Taiwan and obtain GDSs, and holders of GDSs may surrender GDSs to the Depositary and receive common shares. However, under current ROC law, no deposits of common shares may be made in our GDR facility, and no GDSs may be issued against these deposits, without specific approval of the ROC Securities and Futures Commission, except in connection with this offering (including the Initial Purchasers' option to purchase additional GDSs) and the issuance of additional GDSs in connection with: (i) dividends on or free distributions of common shares; (ii) the exercise by holders of existing GDSs of their preemptive rights in the event of a capital increase for cash; (iii) as permitted under the Deposit Agreement. the purchase directly by any person or by depositing in our GDR facility, provided that the total number of GDSs outstanding after the issuance described in clause (iii) does not exceed the number of issued GDSs previously approved by the ROC Securities and Futures Commission in connection with this offering (plus any GDSs created as a result of clauses (i) and (ii) above). Under current ROC law, issuance under clause (iii) above will be permitted only to the extent that previously issued GDSs have been cancelled.

As a result, if a holder of GDSs surrenders GDSs to the Depositary and receives common shares, it may not be possible to deposit the common shares at a later date and receive GDSs. In the case of a deposit of common shares requested as described above. the Depositary may refuse to accept our common shares for deposit if such deposit is not permitted under any restriction notified by us to the Depositary from time to time. These restrictions may include blackout periods during which deposits may not be made as well as limitations on the size and frequencies of the deposits.

### *Holders of GDSs will have limited voting rights.*

Holders of GDSs may not exercise their rights on an individual basis. They may exercise voting rights with respect to the underlying common shares only in the manner described in "Description of the Global Depositary Shares — Voting Rights." Subject to applicable laws and certain conditions, holders of at least 51% of the aggregate outstanding GDSs may direct the Depositary's exercise of voting rights with respect to resolutions proposed at shareholders' meetings. If holders of at least 51% of the aggregate outstanding GDSs do not give clear instructions, they will be considered to have instructed the Depositary to authorize and appoint our chairman, or his nominee, as the voting representative to vote all the underlying common shares represented by the GDSs in any manner as the voting representative deems appropriate. which may not be in the interests of the holders of GDSs.

### *Holders of common shares and GDSs may not be able to participate in rights offerings and may experience dilution in their holdings.*

We may, from time to time, distribute rights to our shareholders, including rights to acquire common shares. If registration is required in any jurisdiction with respect to the offer to holders of common shares of rights, or the common shares or other relevant property to which such rights relate, we will not effect

28

such offer or sale to holders in that jurisdiction, unless we have obtained an exemption from, or effected a registration in accordance with, the requirements of such jurisdiction. Under the Deposit Agreement, the Depositary will not distribute rights to holders of GDSs unless the rights and the common shares to which the rights relate are registered under the U.S. Securities Act or the distribution to all holders of GDSs and the offer and sale of common shares upon exercise of the rights would be exempt from the registration requirements of the U.S. Securities Act. However, under the Deposit Agreement, we are not obligated to register such rights, common shares or other property. Accordingly, holders of common shares and GDSs may be unable to participate in our rights offerings and may experience dilution of their holdings as a result.

If the Depositary is unable to sell rights that are not exercised or distributed or if the sale is not lawful or reasonably practicable, it will allow the rights to lapse, in which case the holders of GDSs will receive no value for these rights.

### Changes in foreign exchange controls which restrict your ability to convert proceeds received from your ownership of GDSs may have an adverse effect on the value of your investment.

Under current ROC law, the Depositary, without obtaining further approvals from the Central Bank of China or any other governmental authority or agency of the ROC, may convert NT dollars into other currencies, including U.S. dollars, for:

- the proceeds of the sale of common shares withdrawn from the depositary receipt facilities or received as stock dividends; and

- any cash dividends or distributions received.

In addition, the Depositary may also convert incoming payments into NT dollars for purchases of common shares for deposit in the GDR facilities against the creation of additional GDSs. The Depositary may be required to obtain foreign exchange approval from the Central Bank on a payment-by-payment basis for conversion from NT dollars into foreign currencies of the proceeds from the sale of subscription rights for new common shares. Although it is expected that the Central Bank will grant this approval as a routine matter, we cannot assure you that in the future any approval will be obtained in a timely manner, or at all.

Under the ROC Foreign Exchange Control Law, the Executive Yuan of the ROC government may, without prior notice but subject to subsequent legislative approval, impose foreign exchange controls in the event of, among other things, a material change in international economic conditions. We cannot assure you that foreign exchange controls or other restrictions will not be introduced in the future.

### We may be subject to restrictions imposed by the Central Bank of China on the conversion of the proceeds from this offering into NT Dollars.

We will receive the proceeds from this offering in U.S. dollars, and will need to convert a portion of the proceeds from this offering into NT dollars to meet our NT dollar-denominated payment obligations in connection with our planned ramp-up of production at Fab 3 and planned purchases of equipment and raw materials. It is reported that, as a result of the recent appreciation of NT dollars, the Central Bank of China may be reluctant to permit the ROC issuers of depositary receipts or convertible or exchangeable notes to convert the proceeds from those offerings into NT dollars during the period of the appreciation of NT dollars, which, the Central Bank of China believes, will expedite the appreciation of NT dollars, thereby adversely impacting its current monetary policy. It has been reported that at least one ROC issuer of depositary receipts was not permitted to convert the proceeds it received from the offering of its depositary receipts into NT dollars, and has suffered exchange losses as a result. If we could not convert a portion of the proceeds from this offering into NT dollars, it may have an adverse effect on our planned ramp-up of production at Fab 3 and planned purchases of equipment and raw materials, and we could also suffer exchange losses.

29

*There are limits on our obligations and the obligations of the Depositary and limits on liability to GDR holders and holders of GDSs under the Deposit Agreement.*

The Deposit Agreement expressly limits the obligations and liability of the Depositary, ourselves and our respective agents. Neither we nor the Depositary nor any such agent will be liable under certain circumstances described under "Description of the Global Depositary Shares — Limitations on Obligations and Liability to GDR Holders — Limits on our obligations and the obligations of the Depositary; limits on liability to GDR holders and holders of GDSs." In addition, neither the Depositary nor its agents have any obligation to appear in, prosecute or defend any action, suit or other proceeding in respect of any deposited securities or the GDRs. We and our agents will only be obligated to appear in, prosecute or defend any action, suit or other proceeding in respect of any deposited securities or the GDRs, which in our opinion may involve us in expense or liability, if indemnity satisfactory to us against all expense (including fees and disbursements of counsel) and liability is furnished as often as we require. Furthermore, the Depositary will not be responsible for failing to carry out instructions to vote the deposited common shares or for the manner in which the deposited common shares are voted or the effect of the vote. See "Description of the Global Depositary Shares — Limitations on Obligations and Liability to GDR Holders — Limits on our obligations and the obligations of the Depositary; limits on liability to GDR holders and holders of GDSs."

*No assurance can be given that the market for our common shares will be active and liquid.*

The average daily trading volume for our common shares on the Taiwan Stock Exchange in 2003 (through October 20) was approximately 40,716.6 thousand shares. No assurance can be given that the liquidity of our common shares will be maintained or enhanced after the offering of the GDSs. Market prices of our common shares have been and continue to be extremely volatile. From January 2, 2003 to October 20, 2003, the daily closing price of our common shares ranged from NT$18.07 per share to NT$48.30 per share. As a result, volatility in the price of our common shares may be caused by factors outside of our control and may be unrelated or disproportionate to our operating results.

*Our public shareholders may have more difficulty protecting their interests than they would as shareholders of a United States corporation.*

While the GDSs will be issued under the Deposit Agreement governed by New York law, we were incorporated under ROC law. Our corporate affairs are governed by our articles of incorporation and by laws governing ROC corporations. The rights of our shareholders to bring shareholders' suits against us or our board of directors under ROC law are much more limited than those of the shareholders of United States corporations. In particular, such suits may only be commenced by shareholders holding at least 3% of our issued share capital for at least one year prior to the commencement of the suit. Therefore, our public shareholders may have more difficulty in protecting their interests in connection with actions taken by our management, members of our board of directors or controlling shareholders than they would as shareholders of a U.S. corporation. Please refer to "Description of Common Shares — Rights to Bring Shareholders' Suits" elsewhere in this offering circular for a detailed discussion of the rights of our shareholders to bring legal actions against us or our directors under ROC law.

*Purchasers of GDSs may incur dilution as a result of the practice among ROC technology companies of issuing stock bonuses to employees.*

Pursuant to our articles of incorporation, after paying outstanding taxes, providing for losses incurred in prior years, setting aside a statutory reserve and any required special reserves, and after considering our financial structure, debt repayment ability, capital expenditures and earnings to be retained for such capital expenditures, we may set forth a shareholder proposal, which would be subject to shareholder approval, proposing to distribute any remaining accumulated retained earnings as dividends to holders of preferred shares, dividends to holders of common shares, remuneration to directors and supervisors, additional shareholder bonuses and employee bonuses. Pursuant to our articles of incorporation, we may allocate between 5% and 10% of the remaining accumulated retained earnings, after deducting the dividends to holders of preferred shares, as employee bonuses. Employee bonuses may be paid in the form of cash,

30

common shares or a combination of both. As a result, we may issue from time to time bonuses in the form of common shares pursuant to our articles of incorporation that are valued at par. Since these common shares are issued at par value, the issuance of these common shares may have a dilutive effect on your GDSs.

### Future sales of securities by us or our existing shareholders may decrease the value of your GDSs.

The market prices of our common shares and GDSs could decline as a result of future sales of a large number of the common shares or GDSs or securities that are convertible into or exchangeable for, or that represent the right to receive, the common shares or GDSs or the perception that such sales could occur. Upon completion of this offering, we will have an aggregate of 78.2 million preferred shares and 3,293.8 million common shares issued and outstanding. If we or the holders of our common shares or GDSs sell a large number of our common shares or GDSs or securities that are convertible into or exchangeable for, or that represent the right to receive, the common shares or GDSs, the market prices for our common shares and GDSs could be depressed. Although we, Chi Mei Corporation and the selling shareholder have agreed, subject to certain exceptions, not to offer, sell or agree to sell, directly or indirectly, or otherwise dispose of, any GDSs or common shares or securities that are convertible into or exchangeable for, or that represent the right to receive, the GDSs or common shares without the prior written consent of the Global Coordinator on behalf of the Initial Purchasers for a period of 120 days from the date of this offering circular. If the Initial Purchasers consent, in their sole discretion, to an earlier sale, or when the 120 day period expires, we, Chi Mei Corporation and the selling shareholder, subject to legal restrictions, will be able to sell common shares or securities that are convertible into or exchangeable for, or that represent the right to receive, the GDSs or common shares in the public market. See "Plan of Distribution."

### Corporate and accounting disclosure standards in the ROC may be different from those in certain other countries.

There may be less publicly available information about ROC-listed companies, such as our company, than is regularly made available by public or listed companies in certain other countries. In addition, except as set forth below, our financial statements are prepared and presented in accordance with ROC GAAP, which differs in certain significant respects from generally accepted accounting principles of certain other countries, including the United States. See "Appendix A — Summary of Certain Differences Between ROC GAAP and US GAAP."

31

## Use of Proceeds

We estimate that our aggregate net proceeds from this offering, after deducting the Initial Purchasers' commissions and other estimated expenses of this offering payable by us, will be approximately US$561,834,000. We will use the net proceeds of this offering for the purchase of equipment for and ramp-up of production at Fab 3 and the purchase of raw materials. We expect that the aggregate amount required for the second, third and fourth phases of planned capacity at Fab 3 will be approximately NT$10,000.0 million (US$288.9 million), NT$8,000.0 million (US$231.1 million) and NT$7,000.0 million (US$202.3 million), respectively.

We may also use the net proceeds for general corporate purposes, subject to necessary approvals, including from our board of directors and relevant regulatory authorities. To the extent the net proceeds from this offering are not immediately used for the above purposes, we will invest the net proceeds in short-term bank deposits or investment-grade debt securities.

To the extent the Initial Purchasers' option to purchase additional GDSs is exercised in full, the selling shareholder estimates that its aggregate net proceeds from this offering, after deducting the Initial Purchasers' commissions and other estimated expenses of this offering payable by the selling shareholder, will be approximately US$62,426,000. We will not receive any of the proceeds from the sale of GDSs by the selling shareholder.

32

## Market Price Information

Our common shares have been listed on the Taiwan Stock Exchange since August 26, 2002 under the number "3009." Prior to our listing on the Taiwan Stock Exchange, our common shares were traded over the counter through the Emerging Stock Board of the GreTai Securities Market from May 7, 2002 until August 23, 2002. The table below sets forth, for the periods indicated, the high and low closing prices and the average daily volume of trading activity on the Emerging Stock Board of the GreTai Securities Market and the Taiwan Stock Exchange of our common shares and the highest and lowest of the daily closing values of the Taiwan Stock Exchange Index. The closing price per common share on the Taiwan Stock Exchange on October 20, 2003 was NT$45.10 (US$1.33).

| Period | Closing price per Common Share | | Average daily trading volume | Taiwan Stock Exchange Index | |
|---|---|---|---|---|---|
| | High | Low | | High | Low |
| | NT$ | NT$ | (in thousands of shares) | | |
| **2002:** | | | | | |
| | Emerging Stock Board of the GreTai Securities Market | | | | |
| May (beginning May 7) | 72.59 | 61.10 | 193.5 | n/a | n/a |
| June | 64.93 | 46.90 | 266.4 | n/a | n/a |
| July | 50.88 | 44.80 | 262.7 | n/a | n/a |
| August (through August 23) | 49.71 | 39.63 | 603.9 | n/a | n/a |
| | Taiwan Stock Exchange | | | | |
| August (beginning August 26) | 50.8 | 38.4 | 3,848.9 | 4,968.85 | 4,572.35 |
| September | 35.8 | 26.3 | 12,109.0 | 4,668.01 | 4,185.95 |
| October | 28.6 | 24.8 | 10,912.6 | 4,601.37 | 3,850.04 |
| November | 30.2 | 26.4 | 15,591.5 | 4,813.53 | 4,500.55 |
| December | 27.8 | 24.6 | 4,840.9 | 4,823.67 | 4,452.45 |
| **2003:** | | | | | |
| January | 28.1 | 25.6 | 6,014.1 | 5,078.80 | 4,524.87 |
| February | 26.4 | 25.0 | 2,962.4 | 4,833.58 | 4,432.46 |
| March | 26.9 | 24.8 | 4,809.4 | 4,599.25 | 4,260.45 |
| April | 25.9 | 20.5 | 5,423.0 | 4,658.30 | 4,139.50 |
| May | 21.2 | 18.1 | 5,131.1 | 4,555.90 | 4,187.82 |
| June | 26.8 | 21.4 | 21,471.9 | 5,048.91 | 4,678.08 |
| July | 37.2 | 27.0 | 110,094.8 | 5,451.80 | 5,017.78 |
| August | 42.4 | 35.3 | 97,886.6 | 5,686.85 | 5,214.60 |
| September | 48.3 | 37.9 | 77,119.5 | 5,757.91 | 5,611.41 |
| October (through October 20) | 46.1 | 42.8 | 68,824.2 | 6,077.89 | 5,581.66 |

*Source:* GreTai Securities Market; Bloomberg.

There is no public market outside Taiwan for our common shares. As of June 30, 2003, there were 51,026 holders of record of our common shares

The Taiwan Stock Exchange has experienced significant fluctuations in the prices of listed securities and there are currently limits on the range of daily price movements. See "Appendix C — The Securities Market of the ROC — Price Limits, Commissions, Transaction Tax and Other Matters."

33

## Exchange Rate Information

We publish our financial statements in New Taiwan dollars, the lawful currency of the Republic of China, or ROC. In this offering circular, references to "US$" and "U.S. dollars" are to United States dollars, references to "NT$" and "NT dollars" are to New Taiwan dollars and references to "¥" are to Japanese yen.

For your convenience, NT dollar amounts and Japanese yen amounts used in this offering circular for, and as of, the year ended December 31, 2002 have been translated into U.S. dollar amounts using NT$34.70 = US$1.00 and ¥118.75 = US$1.00, respectively, the noon buying rates for these currencies as certified for customs purposes by the Federal Reserve Bank of New York on December 31, 2002. NT dollar amounts and Japanese yen amounts used in this offering circular for, and as of, the six months ended June 30, 2003, and all other NT dollar and Japanese yen amounts other than December 31, 2002 NT dollar and Japanese yen amounts, have been translated using NT$34.61 = US$1.00 and ¥119.87 = US$1.00, respectively, the noon buying rates for these currencies as certified for customs purposes by the Federal Reserve Bank of New York on June 30, 2003. The U.S. dollar translations appear in parentheses next to the relevant NT dollar and Japanese yen amounts. The noon buying rate for NT dollars and Japanese yen as certified for customs purposes by the Federal Reserve Bank of New York on October 20, 2003 was NT$33.90 = US$1.00 and ¥110.22 = US$1.00, respectively.

The following tables set forth, for the periods indicated, information concerning the number of NT dollars and Japanese yen for which one U.S. dollar could be exchanged based on the noon buying rate for cable transfers in NT dollars and Japanese yen as certified for customs purposes by the Federal Reserve Bank of New York.

### Noon buying rates for NT dollars and Japanese yen

| | Noon buying rate for NT$ | | | | Noon buying rate for Japanese yen | | | |
|---|---|---|---|---|---|---|---|---|
| | Period-end | Average[1] | High | Low | Period-end | Average[1] | High | Low |
| | (NT$ per US$1.00) | | | | (¥ per US$1.00) | | | |
| 1997 | 32.80 | 29.06 | 33.25 | 27.34 | 130.45 | 121.85 | 131.08 | 111.42 |
| 1998 | 32.27 | 33.50 | 35.00 | 32.05 | 113.08 | 130.99 | 147.14 | 113.08 |
| 1999 | 31.39 | 32.23 | 33.40 | 31.39 | 102.16 | 112.05 | 124.45 | 101.53 |
| 2000 | 33.17 | 31.37 | 33.25 | 30.35 | 114.35 | 108.37 | 114.62 | 101.70 |
| 2001 | 35.00 | 33.91 | 35.13 | 32.23 | 131.04 | 122.18 | 131.47 | 114.26 |
| 2002 | 34.64 | 34.54 | 35.16 | 32.85 | 118.79 | 125.25 | 134.77 | 115.71 |
| January 2003 | 34.61 | 34.57 | 34.76 | 34.40 | 119.96 | 118.81 | 120.18 | 117.80 |
| February 2003 | 34.78 | 34.73 | 34.82 | 34.61 | 118.22 | 118.68 | 121.30 | 117.14 |
| March 2003 | 34.75 | 34.72 | 34.80 | 34.58 | 118.07 | 119.34 | 121.42 | 116.47 |
| April 2003 | 34.85 | 34.82 | 34.98 | 34.79 | 119.07 | 119.89 | 120.55 | 118.25 |
| May 2003 | 34.71 | 34.70 | 34.85 | 34.60 | 119.50 | 117.37 | 119.50 | 115.94 |
| June 2003 | 34.61 | 34.63 | 34.70 | 34.52 | 119.87 | 118.33 | 119.87 | 117.46 |
| July 2003 | 34.40 | 34.41 | 34.58 | 34.25 | 120.42 | 118.70 | 120.55 | 117.24 |
| August 2003 | 34.12 | 34.31 | 34.47 | 34.12 | 116.71 | 118.66 | 120.47 | 116.71 |
| September 2003 | 33.78 | 33.99 | 34.15 | 33.72 | 111.43 | 114.80 | 117.41 | 111.07 |
| October 2003 (through October 20) | 33.90 | 33.81 | 33.92 | 33.72 | 110.22 | 109.88 | 111.10 | 109.29 |

---

Source:  The Federal Reserve Bank of New York.

(1)  Annual averages are calculated from month-end rates.

Fluctuations in the exchange rate between NT dollars and U.S. dollars will affect the U.S. dollar equivalent of the NT dollar price of our common shares on the Taiwan Stock Exchange and, as a result, will likely affect the market price of our GDSs.

34

## Dividend Policy

To date, the only dividend we have paid on our common shares was the share dividend we paid on July 4, 2003, as described below. The form, frequency and amount of future dividends, if any, will depend on our earnings, cash flow, financial condition, reinvestment opportunities, capital expenditures and other factors. Accordingly, we cannot assure you that we will pay any dividends on our common shares in the future. We are required to pay a fixed cumulative annual dividend of 1.45% of the issue price on 78.2 million preferred shares we issued in January 2002. We are required to redeem all of these preferred shares on January 31, 2007. On July 4, 2003, we issued (i) 16,517,000 common shares as an employee bonus and (ii) share dividends on our common shares of 242,381,778 shares at a ratio of 120 common shares for every 1,000 common shares owned.

In the event we do declare dividends, holders of our outstanding common shares on a dividend record date will be entitled to the full dividend declared without regard to any subsequent transfer of the common shares. Payment of dividends in respect of the prior year is made following approval by our shareholders at the annual general meeting of shareholders.

We are generally not permitted under the ROC Company Law to distribute dividends or to make any other distributions to shareholders unless we have retained earnings (including accumulated earnings, if any) at the end of the relevant fiscal year. In addition, before distributing a dividend or making any other distribution to shareholders, we must use the prior year's retained earnings to pay all outstanding taxes, recover any past losses and set aside a statutory reserve equal to 10% of our net income until the reserve reaches an amount equal to at least 100% of our paid-in capital and use accumulated retained earnings, including the prior year's retained earnings, to set aside special reserves if required by law, our articles of incorporation or shareholders' resolution. See "Description of Common Shares — Dividends and Distributions."

In addition, pursuant to our articles of incorporation, after considering our financial structure, debt repayment ability, capital expenditures and earnings to be retained for such capital expenditures, we may set forth a shareholder proposal, which would be subject to shareholder approval, proposing to distribute any remaining accumulated retained earnings as dividends to holders of preferred shares, dividends and bonuses to holders of common shares, remuneration to directors and supervisors, and employee bonuses. Pursuant to our articles of incorporation, we may allocate between 5% and 10% of the remaining accumulated retained earnings, after deducting the dividends of holders of preferred shares, as employee bonuses.

Any dividends distributed to us by IDTech are subject to Japanese withholding tax, currently at a rate of 20%, on the amount of the distribution. To date IDTech has not paid any dividends to us.

For information relating to ROC withholding taxes payable on dividends, see "Taxation — ROC Taxation — Dividends on our common shares."

## Capitalization

The following table sets forth our cash and cash equivalents, short-term debt and capitalization under ROC GAAP as of June 30, 2003. Our capitalization is presented:

- on an actual basis; and

- on an as adjusted basis to reflect this offering (see "Use of Proceeds") and the sale of US$250 million in aggregate principal amount of Zero coupon convertible notes due 2008.

This table should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated and unconsolidated financial statements and their notes included elsewhere in this offering circular.

There has been no material change in our capitalization since June 30, 2003, except on August 5, 2003, we sold US$250 million in aggregate principal amount of zero coupon convertible notes due 2008, with each note convertible into our common shares.

| | As of June 30, 2003 | | | |
|---|---|---|---|---|
| | Actual | Actual | As adjusted[1] | As adjusted[1] |
| | NT$ | US$ | NT$ | US$ |
| | | (in millions) | | |
| **ROC GAAP** | | | | |
| Cash and cash equivalents | 11,794.9 | 340.8 | 39,892.5 | 1,152.6 |
| Short-term borrowings (including current installments of long-term borrowings and commercial paper)[2] | 14,349.8 | 414.6 | 14,349.8 | 414.6 |
| Existing convertible notes | 1,730.5 | 50.0 | 1,730.5 | 50.0 |
| Total short-term borrowings | 16,080.3 | 464.6 | 16,080.3 | 464.6 |
| Long-term borrowings[3] | 27,822.9 | 803.9 | 27,822.9 | 803.9 |
| Convertible notes | — | — | 8,652.5 | 250.0 |
| Total long-term borrowings | 27,822.9 | 803.9 | 36,475.4 | 1,053.9 |

|  | As of June 30, 2003 | | | |
|---|---|---|---|---|
|  | Actual | Actual | As adjusted[1] | As adjusted[1] |
|  | NT$ | US$ | NT$ | US$ |
|  |  | (in millions) | | |
| Shareholders' equity: | | | | |
| Authorized: | | | | |
| 3,000,000 thousand shares | | | | |
| Preferred shares, cumulative, NT$10 par value, 78,187 thousand shares authorized and issued. Aggregate liquidation preference NT$3,284 million | 781.9 | 22.6 | 781.9 | 22.6 |
| Common shares, NT$10 par value, 2,778,747 thousand shares issued (3,228,747 thousand shares issued as adjusted)[4] | 27,787.5 | 802.9 | 32,287.5 | 932.9 |
| Capital surplus | 20,431.1 | 590.3 | 35,376.2 | 1,022.1 |
| Retained earnings: | | | | |
| Legal reserve | 366.9 | 10.6 | 366.9 | 10.6 |
| Special reserve | 16.1 | 0.5 | 16.1 | 0.5 |
| Unappropriated retained earnings | 108.1 | 3.1 | 108.1 | 3.1 |
| Cumulative translation adjustments | (8.1) | (0.2) | (8.1) | (0.2) |
| Total shareholders' equity | 49,483.5 | 1,429.8 | 68,928.6 | 1,991.6 |
| Total capitalization | 93,386.7 | 2,698.3 | 121,484.3 | 3,510.1 |

---

(1)  As adjusted to give effect to this offering and the sale of US$250 million in aggregate principal amount of zero-coupon convertible notes completed on August 5, 2003.

(2)  Of our total short-term borrowings as of June 30, 2003, NT$5,953.6 million (US$172.0 million) was secured by assets and NT$5,453.6 million (US$157.6 million) was guaranteed

(3)  Of our total long-term borrowings as of June 30, 2003, NT$26,122.9 million (US$754.8 million) was secured by assets and NT$23,622.9 million (US$682.5 million) was guaranteed.

(4)  The number of shares issued as adjusted does not include 65,039,765 common shares issued after June 30, 2003, upon conversion of the March convertible notes and the August convertible notes.

37

## Selected Consolidated and Unconsolidated
## Financial and Operating Data

The following table presents selected consolidated and unconsolidated financial and operating data for our company. Although our company was formed in 1998, we did not begin our commercial operations until 1999. The selected consolidated statement of operations data for the years ended December 31, 2000, 2001 and 2002 and the selected consolidated balance sheet data as of December 31, 2000, 2001 and 2002 are derived from our audited consolidated financial statements included elsewhere in this offering circular. The selected consolidated statement of operations data for the year ended December 31, 1999 and the selected consolidated balance sheet data as of December 31, 1999 are derived from our audited consolidated financial statements which are not included in this offering circular. The selected unconsolidated statement of operations data for the six months ended June 30, 2002 and 2003 and the selected unconsolidated balance sheet data as of June 30, 2002 and 2003, are derived from our audited unconsolidated financial statements included elsewhere in this offering circular. Results for the six months ended June 30, 2003 are not necessarily indicative of the results that may be expected for the year ending December 31, 2003.

Our consolidated and unconsolidated financial statements have been prepared and presented in accordance with accounting principles generally accepted in the Republic of China, or ROC GAAP, which differ in certain significant respects from accounting principles generally accepted in the United States, or US GAAP. For a discussion of these differences as they relate to us, see "Appendix A — Summary of Certain Differences Between ROC GAAP and US GAAP."

On September 18, 2001, we and Chi Mei Corporation, our parent company, acquired 26% and 59%, respectively, of the voting equity interest in International Display Technology, or IDTech, a Japanese company. On September 26, 2001, IDTech acquired a TFT-LCD business in Yasu, Japan and certain other related assets. On February 4, 2002, we purchased Chi Mei Corporation's interest in IDTech, thereby increasing our ownership interest in IDTech to 85%. For financial reporting purposes, since our acquisition of Chi Mei Corporation's interest in IDTech is considered a transaction among entities under common control, we elected to account for the transaction in a manner similar to the pooling-of-interest method. As a result, we prepared the consolidated financial statements as of and for the year ended December 31, 2001 as if we had acquired all 85% of IDTech's ownership interests in September 2001. Therefore, IDTech has been accounted for as an 85% owned consolidated subsidiary of our company since September 18, 2001. Accordingly, our consolidated financial results and operating data reflect IDTech's results only from September 18, 2001. Consequently, under ROC GAAP, our consolidated financial results and operating data in 2002 and 2003 will reflect IDTech's results for the full year, while our consolidated financial results and operating data in 2001 reflect IDTech's results for only approximately three months. As a result, our financial results and operating data for 2002 and 2003 are not comparable to our financial results and operating data for prior periods.

The selected financial data set forth below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated and unconsolidated financial statements and the notes to those statements included elsewhere in this offering circular.

| | Consolidated financials As of or for the year ended December 31, | | | | | | Unconsolidated financials As of or for the six months ended June 30, | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1998[1] | 1999 | 2000 | 2001[2] | 2002 | 2002[3] | 2002 | 2003 | 2003[4] |
| | NT$ | NT$ | NT$ | NT$ | NT$ | US$ | NT$ | NT$ | US$ |
| | *(in millions, except percentages, common shares, per common share data and number of panels shipped)* | | | | | | | | |
| **Statement of Operations Data:** | | | | | | | | | |
| **ROC GAAP** | | | | | | | | | |
| Net sales | — | — | 9,381.4 | 20,919.8 | 59,677.1 | 1,719.8 | 21,183.2 | 24,014.6 | 693.9 |
| Cost of goods sold: | | | | | | | | | |
| Raw materials and components | — | — | 4,554.8 | 14,682.5 | 33,392.8 | 962.3 | 9,615.1 | 14,014.7 | 404.9 |
| Depreciation and amortization | — | — | 929.2 | 3,330.0 | 5,892.1 | 169.8 | 2,885.7 | 4,442.8 | 128.4 |
| Other costs of goods sold | — | — | 1,287.3 | 5,021.0 | 10,094.2 | 290.9 | 3,171.5 | 2,991.7 | 86.5 |
| Total cost of goods sold | — | — | 6,771.3 | 23,033.5 | 49,379.1 | 1,423.0 | 15,672.3 | 21,449.2 | 619.8 |
| Gross profit (loss) | — | — | 2,610.1 | (2,113.7) | 10,298.0 | 296.8 | 5,510.9 | 2,565.4 | 74.1 |
| Operating expenses: | | | | | | | | | |
| Research and development expenses | 7.5 | 357.9 | 447.5 | 1,700.4 | 1,507.3 | 43.5 | 584.8 | 849.1 | 24.5 |
| Selling expenses | — | 39.2 | 243.5 | 500.8 | 1,767.2 | 50.9 | 288.1 | 643.7 | 18.6 |
| General and administrative expenses | 68.5 | 316.3 | 371.9 | 809.3 | 1,013.1 | 29.2 | 320.3 | 463.1 | 13.4 |
| Total operating expenses | 76.0 | 713.4 | 1,062.9 | 3,010.5 | 4,287.6 | 123.6 | 1,193.2 | 1,955.9 | 56.5 |
| Operating income (loss) | (76.0) | (713.4) | 1,547.2 | (5,124.2) | 6,010.4 | 173.2 | 4,317.7 | 609.5 | 17.6 |
| Net non-operating income (expense) | 11.9 | 41.0 | (378.3) | (241.9) | (1,485.4) | (42.8) | (67.5) | (538.8) | (15.6) |
| Income (loss) before income tax and minority interest | (64.1) | (672.4) | 1,169.9 | (5,366.1) | 4,525.0 | 130.4 | 4,250.2 | 70.7 | 2.0 |
| Income tax benefit (expense) | 16.2 | 478.8 | 777.9 | 1,068.5 | (15.5) | (0.4) | (225.0) | 30.0 | 0.9 |
| Minority interest in loss (income) of subsidiary | — | — | — | 197.8 | 21.3 | 0.6 | — | — | — |
| Net income (loss) | (47.9) | (193.6) | 1,946.8 | (4,099.8) | 4,530.8 | 130.6 | 4,025.2 | 100.7 | 2.9 |
| Preferred share dividend | — | — | — | — | (43.6) | (1.3) | (19.7) | (23.6) | (0.7) |
| Net income (loss) available to common shares | (47.9) | (193.6) | 1,946.8 | (4,099.8) | 4,487.2 | 129.3 | 4,005.5 | 77.1 | 2.2 |
| Weighted-average number of common shares outstanding (millions)[5] | 75.0 | 287.5 | 1,047.5 | 1,620.0 | 1,626.8 | 1,626.8 | 1,827.6 | 2,191.1 | 2,191.1 |
| Net income (loss) per common share | (0.64) | (0.67) | 1.86 | (2.53) | 2.76 | 0.08 | 2.19 | 0.04 | — |
| **Balance Sheet Data:** | | | | | | | | | |
| **ROC GAAP** | | | | | | | | | |
| Current assets | 502.1 | 2,409.7 | 11,717.8 | 14,198.4 | 27,752.1 | 799.8 | 14,080.8 | 30,356.0 | 877.1 |
| Long-term investments | — | 165.0 | 478.2 | 300.0 | 330.8 | 9.5 | 3,910.0 | 3,234.1 | 93.4 |
| Property, plant and equipment | 159.0 | 5,309.5 | 24,314.3 | 48,639.4 | 57,309.3 | 1,651.6 | 48,055.7 | 62,671.9 | 1,810.8 |
| Intangible assets | 13.5 | 226.0 | 247.4 | 4,274.2 | 4,108.9 | 118.4 | 3,876.4 | 3,824.0 | 110.5 |
| Other assets | 38.4 | 512.9 | 2,009.9 | 2,942.8 | 2,973.4 | 85.7 | 2,532.3 | 3,231.4 | 93.4 |
| Total assets | 713.0 | 8,623.1 | 38,767.6 | 70,354.8 | 92,474.5 | 2,665.0 | 72,455.2 | 103,317.4 | 2,985.2 |

|  | Consolidated financials As of or for the year ended December 31, | | | | | | Unconsolidated financials As of or for the six months ended June 30, | | |
|---|---|---|---|---|---|---|---|---|---|
|  | 1998[1] | 1999 | 2000 | 2001[2] | 2002 | 2002[3] | 2002 | 2003 | 2003[4] |
|  | NT$ | NT$ | NT$ | NT$ | NT$ | US$ | NT$ | NT$ | US$ |
|  | (in millions; except percentages, common shares, per common share data and number of panels shipped) | | | | | | | | |
| Current liabilities | 10.9 | 354.2 | 7,325.2 | 18,486.2 | 25,243.3 | 727.5 | 16,966.7 | 25,927.1 | 749.1 |
| Long-term liabilities | — | 2,500.0 | 7,985.8 | 28,889.6 | 33,332.6 | 960.6 | 28,918.7 | 27,822.9 | 803.9 |
| Other liabilities | — | 10.4 | 38.9 | 81.4 | 213.6 | 6.1 | 87.9 | 83.9 | 2.4 |
| Minority interest | — | — | — | 577.9 | 595.6 | 17.2 | — | — | — |
| Total liabilities | 10.9 | 2,864.6 | 15,349.9 | 48,035.1 | 59,385.1 | 1,711.4 | 45,973.3 | 53,833.9 | 1,555.4 |
| Total shareholders' equity | 702.1 | 5,758.5 | 23,417.7 | 22,319.7 | 33,089.4 | 953.6 | 26,481.9 | 49,483.5 | 1,429.8 |
| **Statement of Cash Flow Data:** | | | | | | | | | |
| **ROC GAAP** | | | | | | | | | |
| Capital expenditures | 159.3 | 5,150.5 | 12,346.7 | 27,768.2 | 13,839.3 | 398.8 | 5,701.5 | 14,978.5 | 432.8 |
| Depreciation and amortization | 1.5 | 41.3 | 1,084.1 | 3,813.8 | 8,327.6 | 240.0 | 3,189.3 | 4,936.2 | 142.6 |
| Cash flows from operating activities | (55.4) | (659.3) | (1,892.7) | (3,075.8) | 5,353.8 | 154.3 | 4,706.3 | 4,861.7 | 140.5 |
| Cash flows from investing activities | (181.0) | (5,491.4) | (14,780.6) | (30,661.7) | (15,320.6) | (441.5) | (9,249.4) | (15,586.1) | (450.3) |
| Cash flows from financing activities | 735.3 | 7,647.2 | 18,220.9 | 31,012.6 | 13,750.9 | 396.3 | 4,556.4 | 18,717.3 | 540.8 |
| **Operating Data:** | | | | | | | | | |
| **ROC GAAP** | | | | | | | | | |
| Gross margin | — | — | 27.8% | (10.1%) | 17.3% | 17.3% | 26.0% | 10.7% | 10.7% |
| Operating margin | — | — | 16.5% | (24.5%) | 10.1% | 10.1% | 20.4% | 2.5% | 2.5% |
| Net margin | — | — | 20.8% | (19.6%) | 7.6% | 7.6% | 19.0% | 0.4% | 0.4% |
| Adjusted EBITDA[6] | (74.5) | (627.1) | 2,631.3 | (1,310.4) | 14,338.0 | 413.2 | 7,507.0 | 5,545.7 | 160.2 |
| Adjusted EBITDA margin[7] | — | — | 28.1% | (6.3%) | 24.0% | 24.0% | 35.4% | 23.1% | 23.1% |
| Panels shipped | — | — | 805,137 | 2,937,415 | 7,239,551 | — | 2,327,740 | 3,508,839 | — |

(1) Reflects the period from August 6, 1998 (inception) to December 31, 1998.

(2) Under ROC GAAP, reflects the consolidated results of IDTech from September 18, 2001, the date of the acquisition

(3) Translated solely for the convenience of the reader into U.S. dollars at the rate prevailing on December 31, 2002 of NT$34.70 = US$1.00.

(4) Translated solely for the convenience of the reader into U.S. dollars at the rate prevailing on June 30, 2003 of NT$34.61 = US$1.00.

(5) Based on the average number of common shares outstanding during the relevant periods.

(6) Adjusted EBITDA is defined as operating income (loss) plus depreciation and amortization. You should not consider adjusted EBITDA as:

- an alternative to net income (loss) or operating income (loss);

- an indicator of our combined operations or cash flow data prepared in accordance with ROC GAAP; or

- an alternative to cash flow as a measure of liquidity.

The items of net income (loss) excluded from adjusted EBITDA are significant components in understanding and assessing our financial performance, and our computation of adjusted EBITDA may not be comparable to other similarly titled measures of other companies.

(7) Adjusted EBITDA margin is calculated by dividing adjusted EBITDA by net sales

40

## Management's Discussion and Analysis
## of Financial Condition and Results of Operations

*Unless otherwise stated, the following discussion and analysis of our financial condition and results of operations in this section apply to our consolidated and unconsolidated financial statements as prepared in accordance with ROC GAAP. You should read this discussion together with the audited consolidated financial statements and the notes to those financial statements for the years ended December 31, 2000, 2001 and 2002 and the audited unconsolidated financial statements and the notes to those financial statements for the six-month period ended June 30, 2002 and 2003 included elsewhere in this offering circular. ROC GAAP differs in many significant respects from US GAAP. For a discussion of these differences as they relate to us, see "Appendix A — Summary of Certain Differences Between ROC GAAP and US GAAP."*

*For the convenience of readers only, NT dollar amounts and Japanese yen amounts of NT$34.70 = US$1.00 and ¥118.75 = US$1.00, the noon buying rates for these currencies as certified for customs purposes by The Federal Reserve Bank of New York on December 31, 2002, have been utilized for December 31, 2002 NT dollar and Japanese yen amounts. NT dollar amounts and Japanese yen amounts of NT$34.61 = US$1.00 and ¥119.87 = US$1.00, the noon buying rates for these currencies as certified for customs purposes by the Federal Reserve Bank of New York on June 30, 2003, have been utilized for June 30, 2003 NT dollar and Japanese yen amounts and all other NT dollar and Japanese yen amounts. The U.S. dollar translations appear in parentheses next to the relevant NT dollar and Japanese yen amounts.*

### Overview

We are one of the world's leading manufacturers of large-sized TFT-LCD panels, which are used primarily in monitors and notebook computers, with increasing use in televisions. We began operations in December 1999 with the commencement of commercial production at our Fab 1 and have subsequently increased capacity significantly. Our Fab 2 began commercial production in October 2001 and we further added to this capacity by acquiring, together with Chi Mei Corporation, an 85% interest in a TFT-LCD business located in Yasu, Japan that was formerly operated through a joint venture between IBM Japan and Toshiba Corporation. Our monthly capacity has grown from 7.9 million 15-inch panel equivalents per year as of December 31, 2001 to 11.9 million 15-inch panel equivalents per year as of December 31, 2002 and to 12.2 million 15-inch panel equivalents per year as of June 30, 2003. Our measurement of capacity by 15-inch panel equivalents represents the number of 15-inch panels we could produce if all of the substrates at the fab or fabs were cut to produce 15-inch panels. As producing 15-inch panels at some of our fabs does not maximize usage of the input substrates at these fabs, our capacity measured in 15-inch panel equivalents, when converted into the total area of such 15-inch panel equivalents, may be less than the total area of the panels we could actually produce. As we have increased our production capacity, we have benefited from increasingly larger economies of scale that have better enabled us to reduce our per unit production costs. We manage our business and measure our results of operations based on a single industry segment.

Our Fab 1 currently has an installed capacity of 65,000 glass substrates per month, which is in excess of its original design capacity of 60,000 glass substrates per month. Design capacity is based on the rated capacity of the equipment used in a fab, as determined by the equipment manufacturers, while installed capacity represents actual capacity that has been achieved through realignment of equipment and process-related debottlenecking. The Yasu fab has an installed capacity of 75,000 glass substrates per month, which is the same as its design capacity. Our Fab 2 has an installed capacity of 88,000 glass substrates per month, which is in excess of its design capacity of 75,000. Utilized capacity of a fab varies from time to time. Our average utilization rates in 2000, 2001, 2002 and the first six months of 2003 were 96%, 93%, 100% and 101%, respectively.

41

The current phase of our capacity expansion, which we began in March 2002, involves construction of a new fifth generation fab that will utilize 1,100 mm by 1,300 mm glass substrates that are approximately twice as large as those used in fourth generation fabs. The initial planned capacity for Fab 3 is 30,000 glass substrates per month. The second, third and fourth phases of Fab 3 are each expected to increase the capacity by an additional 30,000 substrates per month. We have recently completed the process of moving equipment into Fab 3. We expect the first phase of Fab 3 to begin commercial production in the fourth quarter of 2003 and reach a monthly design capacity of 30,000 glass substrates by the end of 2003. Fab 3 will allow us to achieve greater cost efficiencies and enable us to produce larger panel sizes more efficiently. We plan to invest an amount totaling NT$30,266.0 million (US$874.5 million) in capital expenditures relating to Fab 3 in 2003. Of this amount, we had already spent NT$11,386.8 million (US$329.0 million) as of the end of June 2003. The second, third and fourth phases of Fab 3 would require us to make additional capital expenditures of approximately NT$10,000.0 million (US$288.9 million), NT$8,000.0 million (US$231.1 million) and NT$7,000.0 million (US$202.3 million), respectively, on equipment.

### Acquisition of IDTech and the Yasu Business

On September 18, 2001, we and Chi Mei Corporation, our parent company, acquired 26% and 59%, respectively, of the voting equity interest in IDTech, a Japanese company. On September 26, 2001, IDTech acquired a TFT-LCD business and certain other related assets in Yasu, Japan. On February 4, 2002, we purchased Chi Mei Corporation's interest in IDTech with the proceeds we received from the issuance of preferred shares to Chi Mei Corporation, and increased our ownership in IDTech to 85%. For financial reporting purposes, since our acquisition of Chi Mei Corporation's interest in IDTech is considered a transaction among entities under common control, we elected to account for the transaction in a manner similar to pooling-of-interest method. As a result, we prepared the consolidated financial statements as of and for the year ended December 31, 2001 as if we had acquired all 85% of IDTech's ownership interests in September 2001. Therefore, IDTech has been accounted for as an 85% owned consolidated subsidiary of our company since September 18, 2001. As a result, our consolidated financial results and operating data reflect IDTech's results only from September 18, 2001. Consequently, our consolidated financial results and operating data in 2002 reflect IDTech's results for the full year, while our consolidated financial results and operating data in 2001 reflect IDTech's results for only approximately three months. As a result, our financial results and operating data for 2002 is not comparable to our financial results and operating data for prior periods.

This fab was formerly part of a joint venture between IBM Japan and Toshiba Corporation. IBM Japan owns the remaining 15% equity interest in IDTech, but does not have any right to utilize any of the production capacity at the Yasu fab. This acquisition allowed us to increase our aggregate manufacturing capacity and provided us with access to additional TFT-LCD technology and know-how. The Yasu fab began commercial operations in 1995. We did not recognize any goodwill from this acquisition.

In March 2002, we initiated a company-wide project with the goal of fully integrating the operations of the Yasu fab into our own operations. We have not incurred, and do not expect to incur, any costs with respect to the integration process that would have a material adverse effect on our financial condition, liquidity or results of operations.

### Industry Cycles

The TFT-LCD industry is highly cyclical, and most of 2001 represented a downturn in the industry caused by an oversupply of TFT-LCD panels in the market, resulting in a significant decrease in average selling prices for our products. However, due to the industry recovery that began in the fourth quarter of 2001, together with a recovery in average selling prices, we recorded net income available to common shares of NT$4,487.2 million (US$129.3 million) for the year ended December 31, 2002, compared to a net loss available to common shares of NT$4,099.8 million in the same period in 2001. A decline in average selling prices beginning in the third quarter of 2002, however, adversely affected our profitability on a per panel basis in that period. Average selling prices on an unconsolidated basis declined by 24.4% from US$272.3 in the six months ended June 30, 2002 to US$205.9 in the six months ended June 30, 2003.

We believe the industry cycle for TFT-LCDs is driven by, among other factors:

- changes in the supply of TFT-LCD panels;
- the speed by which TFT-LCD monitors replace conventional cathode ray tube desktop monitors; and
- the rate of substitution of notebook computers for desktop computers.

### Pricing

We price our products on a per unit basis, taking into account:

- the prevailing market conditions;
- the panel size and complexity of the technology;
- the cost of raw materials and components, labor and overhead;
- our capacity utilization;
- the order size; and
- the strength and history of our relationship with the customer.

As prices of TFT-LCD panels tend to fluctuate frequently, we generally review our pricing on a monthly basis. Fluctuations in our products' average selling prices historically have had a substantial impact on our margins, as evidenced in the downturn in the market for our panels in 2001. The average selling price for our panels declined by 42.4% from US$346.6 in the third quarter of 2000 to US$199.5 in the third quarter of 2001, mainly due to the downward trend in the LCD cycle, the entrance into the market of new competitors and the general worldwide economic downturn. Prices recovered by 33.4% from the third quarter of 2001 to US$266.1 in the second quarter of 2002 before declining by 6.9% to US$247.6 in the third quarter of 2002. The average selling prices for our panels continued to decline by 17.8% to US$203.5 in the fourth quarter of 2002. From the second quarter of 2002 to the second quarter of 2003, the average selling prices for our panels on an unconsolidated basis declined by 24.4% from US$272.3 to US$205.9.

We charge for our foundry services for Fujitsu based on contractually agreed terms. These terms are based on a cost-plus formula that takes into account, among other factors, market prices for TFT-LCD panels. See "Our Relationship with Fujitsu."

During the fourth quarter of 2001 and the full year 2002, the average selling prices of the Yasu fab's products were adversely impacted by distribution and outsourcing agreements that IDTech entered into with IBM Japan and Display Technologies, respectively. Under the distribution agreements, IBM Japan assisted the Yasu fab with the distribution of its panels to third parties during the period prior to the integration of the Yasu fab's sales and marketing operations with those of our Taiwan operations. Approximately 83.5% of the Yasu fab's net sales in the fourth quarter of 2001 and 20.9% of the Yasu fab's net sales in 2002 were made to IBM Japan under these agreements, with only 3.3% of such net sales made to IBM Japan in the fourth quarter of 2002 under these agreements. For the fourth quarter of 2001, the first quarter of 2002, the second quarter of 2002 and the third quarter of 2002, IDTech paid to IBM Japan the fixed minimum amounts set forth in these agreements of US$7.8 million, US$6.4 million, US$5.5 million and US$4.3 million, respectively. A portion of these payments is reflected in the determination of net sales as set forth in our consolidated financial statements, while the remainder is included under general and administrative expenses in our consolidated financial statements. The distribution agreements terminated at the end of 2002. The outsourcing agreement provides for the Yasu fab to outsource the cell assembly process to Display Technologies on a cost plus 2.5% basis. The pricing discounts and increased costs incurred by the Yasu fab under these agreements had a material adverse effect on the profit margin of our products sold to or through IBM Japan over this period. We plan to terminate the outsourcing agreement upon our acquisition of the cell assembly equipment from Display Technologies and relocation of this equipment from Himeji to either Tainan or Yasu. See "Our Acquisition of IDTech and Relationship with IBM — Outsourcing Arrangements with Display Technologies."

43

We believe that our current level of pricing is comparable to that of other leading TFT-LCD manufacturers. In addition, we believe that our large manufacturing capacity and our ability to produce an optimal mix of panel sizes will enable us to compete effectively with other leading TFT-LCD manufacturers at comparable price levels.

## Capacity Utilization Rates

An important factor influencing our profit margins is our capacity utilization. Our operations are capital intensive and are characterized by high fixed costs. Our primary fixed costs relate to depreciation of our fabs and the equipment used in our manufacturing operations. As a result, conducting our operations at or near full capacity has a significant positive effect on output and profitability, as our fixed charges can be allocated over a larger number of units. Our average utilization rates in 2000, 2001, 2002 and the first six months of 2003 were 96%, 93%, 100% and 101%, respectively. The capacity utilization rate decline in 2001 was due to an oversupply of TFT-LCD panels in the market. The Yasu fab's utilization rate has been at substantially the same level as that of our Taiwan operations.

Production facility efficiency and product flow management affect our capacity utilization rates. Other factors affecting capacity utilization rates are:

- overall industry conditions;
- the level of customer orders;
- the complexity and mix of the TFT-LCD panels produced;
- mechanical failures;
- disruption of operations due to expansion of operations;
- relocation of equipment or disruption of power supply; and
- fires or natural disasters.

Our manufacturing capacity is determined by us based on the capacity ratings given by manufacturers of the equipment used in our fabs, adjusted for, among other things, actual output during uninterrupted trial runs, expected downtime due to set up for production runs and maintenance and expected product mix. As these factors include subjective elements, our measurement of capacity utilization rates may not be comparable to those of our competitors. Operation at utilization rates exceeding 100% has been possible from time to time due to, among other factors, our ability to manage our production facilities and product flows efficiently.

## Manufacturing Yields

Manufacturing yield per glass substrate is measured by the actual number of TFT-LCD panels produced from a glass substrate of a particular size over the maximum number of TFT-LCD panels that can be produced from a glass substrate of the same size. We believe we achieve high manufacturing yields relative to our competitors, and that these high yields have assisted us in achieving higher margins. In order to maintain our margins, we continuously upgrade our process technologies. At the beginning of each technological upgrade, the manufacturing yield utilizing the new technology is generally lower than the yield utilizing the existing technology. The manufacturing yield generally increases with the passage of time, as our research and development personnel and process engineers, as well as our equipment and raw materials and component suppliers, become more familiar with the requirements of the new technology.

## Change in Product Mix and Technology Migration

Since the price of TFT-LCD panels varies significantly based on the size of the panels, the mix of panel sizes that we manufacture affects our revenue and net income. In particular, the manufacturing of large-sized panels, which generally command higher prices and higher margins, is most cost-effective when more advanced facilities and complex processing technologies are used. The increase in price generally has more than offset associated increases in manufacturing costs for large-sized panels.

44

Prices and margins for TFT-LCD panels of a given size generally decline over time. As a result, we continually migrate to increasingly larger-sized and more technologically advanced panels and implement more sophisticated process technology in order to maintain our profitability. Our fifth generation fab is intended to complement our strategy of migrating to higher margin products, as it will allow us to make larger panels at a lower cost per panel than our existing facilities. This product migration requires significant investments in research and development. As the cost of developing and acquiring the technology to produce increasingly larger-sized panels has been rising, we expect our spending relating to the upgrading of our technology and know-how to continue to increase. See "Business — Our Principal Products" for a period-by-period breakdown of our production by panel size.

The following table sets forth the number of panels sold and our net sales in 2000, 2001, 2002 on a consolidated basis and as of the first six months of 2003 on an unconsolidated basis by size of TFT-LCD panel and by type of end use application:

| Type of end-use application | Size of TFT-LCD panel | Consolidated year ended December 31, | | | | | | | |
| | | 2000 | | | | 2001 | | | |
| | | Net sales | % of total | Number of panels | % of total | Net sales | % of total | Number of panels | % of total |
| | (inches) | (NT$ millions) | | | | (NT$ millions) | | | |
| Notebook computers | Below 14.1[1] | 0.5 | 0.0% | 78 | 0.0% | 360.8 | 1.7% | 70,417 | 2.4% |
| | 14.1 | 5,886.5 | 62.8 | 519,424 | 64.5 | 6,975.1 | 33.4 | 1,213,383 | 41.3 |
| | 15 | 0.0 | 0.0 | 0 | 0.0 | 1,658.7 | 7.9 | 198,802 | 6.8 |
| | Sub-total | 5,887.0 | 62.8 | 519,502 | 64.5 | 8,994.6 | 43.0 | 1,482,602 | 50.5 |
| Monitors | 14.1 | 1,534.9 | 16.4 | 126,064 | 15.7 | 392.1 | 1.9 | 86,270 | 3.0 |
| | 15 | 1,575.7 | 16.8 | 135,308 | 16.8 | 4,826.9 | 23.1 | 649,728 | 22.1 |
| | 17[2] | 454.2 | 4.8 | 24,263 | 3.0 | 4,859.6 | 23.2 | 412,193 | 14.0 |
| | 18 and above[3] | 0.0 | 0.0 | 0 | 0.0 | 1,104.9 | 5.3 | 64,405 | 2.2 |
| | Sub-total | 3,564.8 | 38.0 | 285,635 | 35.5 | 11,183.5 | 53.5 | 1,212,596 | 41.3 |
| Others[4] | Sub-total | (70.4) | (0.8) | 0 | 0.0 | 741.7 | 3.5 | 242,217 | 8.2 |
| | Total | 9,381.4 | 100.0% | 805,137 | 100.0% | 20,919.8 | 100.0% | 2,937,415 | 100.0% |

(1)  Includes data for 10.4-inch and 12.1-inch panels.
(2)  Includes data for 17.4-inch panels
(3)  Includes data for 18.0-inch, 18.1-inch, 20.8-inch, 21.3-inch and 22.2-inch panels.
(4)  Includes (i) arrays and cells sold by the Yasu fab after October 2001 and our Taiwan operations, (ii) other products and services sold by our Taiwan operations, including small-sized panels manufactured at Fab 1, and (iii) provision for sales returns.

45

|  |  | Consolidated year ended December 31, 2002 |  |  |  |  |
|---|---|---|---|---|---|---|
| Type of end-use application | Size of TFF-LCD panel | Net sales | Net sales | % of total | Number of panels | % of total |
|  | (inches) | (NT$ millions) | (US$ millions) |  |  |  |
| Notebook computers | Below 14.1[1] | 2,511.5 | 72.4 | 4.2% | 427,942 | 5.9% |
|  | 14.1 | 10,824.7 | 312.0 | 18.1 | 1,513,168 | 20.9 |
|  | 15 | 6,976.3 | 201.0 | 11.7 | 716,443 | 9.9 |
|  | Sub-total | 20,312.5 | 585.4 | 34.0 | 2,657,553 | 36.7 |
| Monitors | 14.1 | 147.6 | 4.2 | 0.3 | 20,041 | 0.3 |
|  | 15 | 16,006.8 | 461.3 | 26.8 | 2,214,059 | 30.6 |
|  | 17[2] | 10,655.5 | 307.1 | 17.9 | 1,052,747 | 14.5 |
|  | 18 and above[3] | 6,750.2 | 194.5 | 11.3 | 407,190 | 5.6 |
|  | Sub-total | 33,560.1 | 967.1 | 56.3 | 3,694,037 | 51.0 |
| Others[4] | Sub-total | 5,804.5 | 167.3 | 9.7 | 887,961 | 12.3 |
|  | Total | 59,677.1 | 1,719.8 | 100% | 7,239,551 | 100% |

(1)  Includes data for 10.4-inch and 12.1-inch panels.
(2)  Includes data for 17 4-inch panels.
(3)  Includes data for 18.0-inch, 18.1-inch, 20.8-inch, 21.3-inch and 22.2-inch panels.
(4)  Includes (i) arrays and cells sold by the Yasu fab and our Taiwan operations, (ii) other products and services sold by our Taiwan operations, including small-sized panels manufactured at Fab 1, and (iii) provision for sales returns.

|  |  | Unconsolidated six months ended June 30, 2003 |  |  |  |  |
|---|---|---|---|---|---|---|
| Type of end-use application | Size of TFF-LCD panel | Net sales | Net sales | % of total | Number of panels | % of total |
|  | (inches) | (NT$ millions) | (US$ millions) |  |  |  |
| Notebook computers | Below 14.1[1] | 0.0 | 0.0 | 0.0 | — | 0.0 |
|  | 14.1 | 1,682.8 | 48.6 | 7.0 | 330,595 | 9.4 |
|  | 15 | 654.7 | 18.9 | 2.7 | 102,647 | 2.9 |
|  | Sub-total | 2,337.5 | 67.5 | 9.7 | 433,242 | 12.3 |
| Monitors | 14.1 | 131.0 | 3.8 | 0.6 | 30,557 | 0.9 |
|  | 15 | 10,095.9 | 291.7 | 42.0 | 1,665,496 | 47.5 |
|  | 17 & 17.4 | 6,980.9 | 201.7 | 29.1 | 849,490 | 24.2 |
|  | 18 and above[2] | 1,995.9 | 57.7 | 8.3 | 220,721 | 6.3 |
|  | Sub-total | 19,203.7 | 554.9 | 80.0 | 2,766,264 | 78.9 |
| Others[3] | Sub-total | 2,473.4 | 71.5 | 10.3 | 309,333 | 8.8 |
|  | Total | 24,014.6 | 693.9 | 100.0% | 3,508,839 | 100.0% |

(1)  Includes data for 10.4-inch and 12.1-inch panels
(2)  Includes data for 18.0-inch and 19.0-inch panels.
(3)  Includes (i) 20.0-inch, 27.0-inch and 30.0-inch panels for use in televisions, (ii) arrays and cells sold by our Taiwan operations, (iii) other products and services sold by our Taiwan operations, including small-sized panels manufactured at Fab 1, and (iii) provision for sales returns.

46

Our main products are 14.1-inch, 15-inch and 17-inch (including 17 4-inch) TFT-LCD panels. We also sell a small amount of cells, array, small-sized panels and panels for use in LCD television applications. The shift in product mix as shown in the table above is indicative of our strategy to migrate to increasingly larger and more profitable panel sizes.

### Description of Revenue and Cost Items

*Net sales*

We generate our net sales primarily from the manufacturing and sale of large-sized TFT-LCD panels. See "Business — Our Principal Products" for data regarding our historical unit sales of these products. Our net sales consist of three components:

- sales to third parties, either directly or through distributors, based on market prices;

- sales made to Fujitsu on a foundry basis according to agreements with Fujitsu; and

- for the fourth quarter of 2001 and the full year 2002 only, sales made by the Yasu fab to and through IBM Japan according to distribution arrangements entered into between IBM Japan and IDTech following our acquisition in Yasu. See "— Pricing" above.

Our sales through each of these three channels for 2000, 2001, 2002 and the first six months of 2003 are set forth in the table below:

|  | Year ended December 31, | | | Six months ended |
|---|---|---|---|---|
|  | 2000 | 2001 | 2002 | June 30, 2003 |
|  | *(percentage of net sales)* | | | |
| Market sales .............................................. | 81 5% | 64.3% | 83.6% | 87 7% |
| Foundry sales ............................................. | 18 5 | 18.0 | 9.6 | 12.3 |
| Sales from the Yasu fab to IBM Japan based on |  |  |  |  |
| distribution arrangement................................ | — | 17.7 | 6.8 | — |
| Total ....................................................... | 100% | 100% | 100% | 100% |

Our direct sales and sales through distributors generally provide us with the highest profit margins. Our foundry sales constitute an important part of our overall relationship with Fujitsu, which also encompasses the technology licensing arrangements that allow us to incorporate Fujitsu's high contrast and wide viewing angle multi-domain vertical alignment technology into our products. In addition, these foundry arrangements provide us with a reliable sales channel, as Fujitsu is committed to purchase at least 10% of our aggregate production capacity at Fabs 1 and 2. IDTech also entered into several transitional agreements with IBM Japan under which IBM Japan assisted the Yasu fab with the distribution of the Yasu fab's panels to third parties during the period prior to the integration of the Yasu fab's sales and marketing operations with those of our Taiwan operations. Some of these agreements between IDTech and IBM Japan were terminated in June 2002 and the remainder were terminated at the end of 2002. Substantially all of the Yasu fab's net sales in the fourth quarter of 2001 and 20.9% of the Yasu fab's net sales in the full year 2002 were made to IBM Japan under these agreements. See "— Pricing" above.

Net sales are recognized when title to the panel and risk of ownership are transferred to the customer, which occurs at the time of shipment, or when the shipment arrives at the customer designated location, depending on the associated shipping terms. In addition, we ship panels to designated inventory hubs at the request of certain customers. We recognize net sales on these arrangements only at the time the customer collects inventory from the inventory hub, which is the point that title to the panel and risk of ownership are transferred to those customers. We usually bill our customers at the time of shipment, with varying terms of credit that generally do not exceed 60 days from the time of billing. We do not accept non-monetary consideration for our products.

47

*Cost of goods sold*

Our cost of goods sold consist principally of:

- raw materials and component costs, such as for color filters, driver integrated circuits, backlights, glass substrates, polarizers, printed circuit board assemblies and liquid crystals;

- overhead, including depreciation and maintenance of production equipment, amortization of license fees, such as those relating to the one-time license fee we paid to IBM and our license of Fujitsu technology, and pre-production costs, indirect labor costs, indirect material costs, supplies and utilities; and

- direct labor costs.

Our total cost of goods sold increased from NT$6,771.3 million in 2000 to NT$23,033.5 million in 2001 and further increased to NT$49,379.1 million (US$1,423.0 million) in 2002. This increase was primarily due to a substantial increase in our production. Our unconsolidated cost of goods sold also increased from NT$15,672.2 million in the first six months of 2002 to NT$21,449.2 million (US$619.7 million) in the same period in 2003, due to significant increases in cost of raw materials in the same period 2003. However, our cost of goods sold per panel decreased from NT$8,410 in 2000 to NT$7,841 in 2001 and further decreased to NT$6,821 (US$197) in 2002. This decrease was due principally to decreases in the costs of our raw materials and components and depreciation and amortization per panel as a result of the increased scale of our production.

We have continued to undertake efforts to reduce raw materials and component costs in an effort to maximize profitability. These cost reduction efforts include:

- finding alternative, less expensive sources of raw materials and components, especially by sourcing domestically in Taiwan;

- deploying more advanced product and manufacturing process technologies;

- negotiating better pricing terms with our suppliers, including quantity discounts; and

- improving our production processes.

We have substantially reduced our raw materials and component costs on a per panel basis. This decrease was partially offset by the higher raw materials and component costs incurred by the Yasu fab. The increase in raw materials and component costs between 2001 and 2002 was due to the consolidation into our Taiwan operations' results of the Yasu fab's higher raw materials and component costs. The Yasu fab's raw materials and component costs are higher primarily because that fab purchases color filters from third parties, while our Taiwan fabs produce their own. Color filter costs are the single largest component of our cost of goods sold. We expect that raw materials and component costs will continue to decline on a per panel basis, but will constitute a larger percentage of our cost of goods sold, as we increase our production.

Due to our substantial investments in capacity over the past three years, depreciation and amortization expenses have increased significantly. However, our depreciation and amortization expenses on a per panel basis have decreased significantly over the same period as a result of our increased capacity and high utilization rates. In addition, the Yasu fab has relatively lower depreciation and amortization expenses, thereby further contributing to a reduction in our per panel depreciation and amortization expenses. We begin depreciating our equipment when it is placed into service. However, there may be a time lag between when our equipment is placed into service and when it achieves high levels of utilization. In absolute terms, depreciation expense increased in 2002 and the first six months of 2003 as a result of our ramp-up of Fab 2 and further investments to expand our capacity. We expect depreciation expenses to increase in the fourth quarter of 2003 as a result of our ramp-up of Fab 3.

Another component of our cost of goods sold are pre-production costs, including overhead and direct labor, relating to the start-up phase of each of our fabs. Prior to the commencement of commercial production, these costs are capitalized and amortized as part of our cost of goods sold.

### Operating expenses

Our operating expenses increased by 183.2% from NT$1,062.9 million in 2000 to NT$3,010.5 million in 2001, and further increased by 42.4% to NT$4,287.5 million (US$123.6 million) in 2002, as we have increased our production. However, on a per panel basis, operating expenses have decreased from NT$1,320 in 2000 to NT$1,025 in 2001 and further decreased to NT$592 (US$17) in 2002. Our unconsolidated operating expenses for the first six months of 2003 were NT$1,955.9 million (US$56.5 million), or NT$557.4 (US$16.1) per panel, compared to NT$1,193.2 million, or NT$512.6 per panel, for the first six months of 2002.

Our operating expenses consist of the following:

*Selling expenses.* Selling expenses consist primarily of salaries and related expenses of personnel engaged in sales, shipping expenses and other marketing expenses. In addition, our selling expenses include an estimate based on our historical experience of our obligations under warranty policies to provide, among other things, replacement parts and after-sale services for our products. We expect that our selling expenses will increase as we seek to further expand our unit sales and customer base.

*General and administrative expenses.* General and administrative expenses consist primarily of salaries for our executive, administrative, finance and human resource personnel, overhead for non-production related activities and a portion of the distribution support fees paid by the Yasu fab to IBM Japan.

*Research and development expenses.* Research and development expenses consist primarily of salaries, bonuses and related costs for product and technology development, amortization of technology used in research and development and depreciation and maintenance on the equipment and various materials used in our research and development activities. These expenses also include payments made to IBM for research and development activities conducted by IBM on behalf of our company under contractual arrangements.

We believe that our operating expenses will increase as our operations continue to grow. However, we expect our operating expenses to continue to decrease on a per panel basis as a result of our increased production capacity and high capacity utilization.

### Non-operating income and expenses

Our non-operating income principally consists of:

- interest income, which has been primarily derived from bank deposits;
- income on investments accounted for under the equity method;
- gains on sales of short-term and long-term investments;
- foreign exchange gains; and
- reversals of provisions for inventory devaluation based on reassessments of inventory status. These reversals of provisions are based on reevaluations of our inventory position at the end of the relevant period in light of then-current business conditions.

Our non-operating expenses principally consist of:

- interest expenses on short-term and long-term borrowings;
- loss on investments accounted for under the equity method;

49

- foreign currency exchange losses; and
- provisions for inventory devaluation

## Critical Accounting Policies and Practices

Our discussion and analysis of our financial condition and results of operations are based on our consolidated financial statements. Our significant accounting policies are set forth in note 2 to our consolidated financial statements and note 2 to our unconsolidated financial statements, included elsewhere in this offering circular. Our reported financial condition and results of operations are sensitive to accounting methods, assumptions and estimates that underlie the preparation of our consolidated financial statements. We base our estimates on historical experience, the experience of other companies in our industry and on various other assumptions that we believe to be reasonable, the results of which form the basis for making judgments about the carrying amounts of assets and liabilities and our financial results. Our management evaluates its estimates on an ongoing basis. Actual results may differ from these estimates under different assumptions and conditions.

The selection of critical accounting policies, the judgments and other uncertainties affecting application of those policies and the sensitivity of reported results to changes in conditions and assumptions are factors to be considered when reviewing our consolidated financial statements. We believe the following critical accounting policies involve the most significant judgments and estimates used in the preparation of our consolidated financial statements.

### Provision for warranty

Our selling expenses include an estimate, based on our historical experience, of our obligations under warranty policies to provide, among other things, replacement parts and after-sale services for our products.

The warranty period averages 12 to 18 months for our Taiwan operations and 12 to 39 months for the Yasu fab from the date of shipment to the customer. These warranties cover the repair of defective panels or the replacement of defective panels if they are unable to be repaired during the warranty period. Our warranty also includes after-sales services such as customer service and other assistance.

Our analysis of our historical costs of warranty claims includes the costs of personnel assigned to review the customers' claims, which includes on-site inspections, the costs of the defective replacement parts and the labor necessary to repair the panels. If the panels cannot be repaired, then the costs of providing replacement panels, including shipping expenses, are incurred. Costs associated with our after-sales service for customer service and other assistance is also included. An increase in the provision for warranty costs will result in a charge to earnings.

### Provision for accounts receivable

We evaluate the collectibility of our outstanding accounts receivable balance on a monthly basis. Our evaluation includes an analysis of the number of days outstanding for each outstanding accounts receivable account. Our sales department performs a monthly evaluation of each individual customer who has an unpaid invoice balance of more than 60 days, which includes such customer's purchase history, repayment history and financial repayment ability, when assessing the need for recognizing a provision on outstanding accounts receivable balances. When appropriate, we recognize a provision for uncollectible accounts receivable.

Historically, we have not experienced any losses from uncollectible accounts receivable. An increase in the allowance for accounts receivable balance will result in a charge to earnings.

### Provision for inventory obsolescence

Provisions for inventory obsolescence and devaluation are recorded when we determine that the fair value of our inventories is less than their cost basis, which may be affected by the number of months the inventory items remain unsold. Furthermore, our analysis of our provision for obsolete and devalued inventory is partially based upon forecasts of demand for our products and any change to these forecasts. Our analysis of our provision for obsolete and devalued inventory consists of three parts: raw materials and components, work-in-process and finished goods.

For raw materials and components, we compare the ending balance of each type of raw material and component in our inventory balance with the replacement costs of each of those items at the end of the following month. An adjustment is then recorded if the replacement costs for the various raw materials and components are less than their carrying amounts.

For work-in-process, we add the estimated labor and overhead allocations to complete the work-in-process to the costs incurred to date. This total per component of work-in-process is then compared to the average selling price of completed panels. An adjustment is made to work-in-process if the average selling price is less than the computed costs to complete of the work-in-process inventory.

For finished goods, the carrying amounts of our finished goods inventory are compared to the average selling price for the respective panels, less selling costs to be incurred. An adjustment is made if the average selling price, less selling costs, for the respective panels is less than the carrying amount of the finished goods inventories.

A decline in the value of our inventory is caused in general by an oversupply of TFT-LCD panels in the market and decreases in average selling prices of our TFT-LCD panels. Changes in inventory value estimates will result in increases or reversals of inventory provisions, which will result in charges or credits to earnings, respectively.

### Recognition of deferred tax assets

We have a significant amount of deferred tax assets as a result of the various tax credits available to us under ROC governmental tax incentive programs and net operating loss carryforwards. The net deferred income tax assets we were able to recognize as of June 30, 2003 amounted to NT$2,552.7 million. This recognition of net deferred tax assets resulted primarily from the projection of income before tax for the year ended December 31, 2003. If we do not achieve this projection of income before tax for 2003, the amount of the deferred tax assets recognized may be significantly reduced, which would increase our tax expense or reduce the amount of our recorded tax benefit.

### Purchase price allocation

Our acquisition of IDTech and the Yasu business was accounted for using the purchase method of accounting. Under the purchase method of accounting, the aggregate purchase price of NT$11,025.9 million was allocated to the assets acquired based on their respective fair values. We are responsible for determining the fair values of the assets acquired, including identifiable intangible assets. In determining such fair values, we considered a number of factors, including valuation reports by third parties.

### Analysis of long-lived assets

We review our long-lived assets and our identifiable intangible assets, including purchased intangible assets, for impairment whenever we believe that events or changes in circumstances indicate that the carrying amounts of these assets may not be recoverable. We measure recoverability of our assets to be held and used by comparing the carrying amount of an asset to future net cash flows expected to be generated by the asset. If we consider our assets to be impaired, the impairment we would recognize is measured by the

51

amount by which the carrying amount of the assets exceeds the fair value of the assets. Furthermore, assets to be disposed of are reported at the lower of the carrying amount or fair value, less cost to sell. None of our assets have incurred any impairment losses to date.

## Results of Operations

### Six months ended June 30, 2003 versus six months ended June 30, 2002

The following table sets forth, for the six months ended June 30, 2002 and 2003, selected statement of operations items derived from our audited unconsolidated financial statements. Since the unconsolidated financial results presented below account for IDTech using the equity accounting method rather than the consolidation method as in the consolidated annual results presented elsewhere in this offering circular, and the operating information does not include the operating results of IDTech, the following information is not comparable to our consolidated financial and operating information presented elsewhere in this offering circular.

| | Unconsolidated financials Six months ended June 30, | | |
|---|---|---|---|
| | 2002 | 2003 | |
| | NT$ | NT$ | US$ |
| | | *(in millions)* | |
| **ROC GAAP** | | | |
| Net sales | 21,183.2 | 24,014.6 | 693.9 |
| Cost of goods sold: | | | |
| Raw materials and components | 9,615.1 | 14,014.7 | 404.9 |
| Depreciation and amortization | 2,885.7 | 4,442.8 | 128.4 |
| Other costs of goods sold | 3,171.5 | 2,991.7 | 86.5 |
| Total costs of goods sold | 15,672.3 | 21,449.2 | 619.8 |
| Gross profit | 5,510.9 | 2,565.4 | 74.1 |
| Operating expenses: | | | |
| Research and development expenses | 584.8 | 849.1 | 24.5 |
| Selling expenses | 288.1 | 643.7 | 18.6 |
| General and administrative expenses | 320.3 | 463.1 | 13.4 |
| Total operating expenses | 1,193.2 | 1,955.9 | 56.5 |
| Operating income | 4,317.7 | 609.5 | 17.6 |
| Net non-operating income (expense) | (67.5) | (538.8) | (15.6) |
| Income before income tax | 4,250.2 | 70.7 | 2.0 |
| Income tax benefit (expense) | (225.0) | 30.0 | 0.9 |
| Net income | 4,025.2 | 100.7 | 2.9 |
| Preferred share dividend | (19.7) | (23.6) | (0.7) |
| Net income available to common shares | 4,005.5 | 77.1 | 2.2 |

52

The following table shows certain of our unconsolidated results of operations data as a percentage of our net sales for the six months ended June 30, 2002 and 2003.

| | Unconsolidated financials Six months ended June 30, | |
|---|---|---|
| | 2002 | 2003 |
| | (percentage of net sales) | |
| **ROC GAAP** | | |
| Net sales | 100.0% | 100.0% |
| Cost of goods sold: | | |
| Raw materials and components | 45.4 | 58.4 |
| Depreciation and amortization | 13.6 | 18.5 |
| Other costs of goods sold | 15.0 | 12.4 |
| Total costs of goods sold | 74.0 | 89.3 |
| Gross profit | 26.0 | 10.7 |
| Operating expenses: | | |
| Research and development expenses | 2.7 | 3.5 |
| Selling expenses | 1.4 | 2.7 |
| General and administrative expenses | 1.5 | 1.9 |
| Total operating expenses | 5.6 | 8.1 |
| Operating income | 20.4 | 2.6 |
| Net non-operating income (expense) | (0.3) | (2.2) |
| Income before income tax and minority interest | 20.1 | 0.4 |
| Income tax benefit (expense) | (1.1) | 0.1 |
| Minority interest in loss (income) of subsidiary | — | — |
| Net income | 19.0 | 0.5 |
| Preferred share dividend | (0.1) | (0.1) |
| Net income (loss) available to common shares | 18.9 | 0.4 |

*Net sales*

Our net sales increased by 13.4% from NT$21,183.2 million in the six months ended June 30, 2002 to NT$24,014.6 million (US$693.9 million) in the six months ended June 30, 2003. This increase resulted primarily from the increased sales of 15-inch and 17-inch panels as well as other products, partially offset by a reduction in sales of 14-inch and 18-inch panels as a result of declines in both volume and average selling prices between the two periods. Net sales of 15-inch panels, our largest product in terms of both volume and revenue contribution, increased from NT$8,222.8 million in the six months ended June 30, 2002 to NT$10,750.6 million (US$310.6 million) in the six months ended June 30, 2003. In the six months ended June 30, 2003, our 15-inch panels contributed to 44.8% of net sales, compared to 38.8% in the six months ended June 30, 2002.

*Cost of goods sold*

Our cost of goods sold increased by 36.9% from NT$15,672.2 million in the six months ended June 30, 2002 to NT$21,449.2 million (US$619.7 million) in the six months ended June 30, 2003. This increase was

53

due to an increase in volume production and overall increase in sales of our products in the six months ended June 30, 2003. However, the cost of goods per panel decreased by 9.2% from US$194.5 per panel in the six months ended June 30, 2002 to US$176.6 per panel in the six months ended June 30, 2003. This was due primarily to decreases in our average purchase prices of the raw materials used for production, and the increased economies of scale of our production due to the expansion of production capacity, which was partially offset by increased depreciation and amortization costs, as we ramped up the capacity at our Taiwan fabs, from NT$2,885.7 million for the six months ended June 30, 2002 to NT$4,442.8 million (US$128.4 million) for the six months ended June 30, 2003.

As a percentage of net sales, cost of goods sold increased from 74.0% in the six months ended June 30, 2002 to 89.3% in the six months ended June 30, 2003. The increase was due primarily to a greater decline of 24.4% in the average selling prices from US$272.3 in the six months ended June 30, 2002 to US$205.9 in the six months ended June 30, 2003, compared to the decline of 9.2% in the cost of goods sold per panel between these same periods.

*Gross profit and gross profit margin*

Primarily as a result of the 24.4% decline in the average selling price of our panels from the six months ended June 30, 2002 to the six months ended June 30, 2003, which exceeded the 9.2% decline in the cost of goods sold per panel during these same periods, our gross profit decreased 53.4% from NT$5,510.9 million in the first six months ended June 30, 2002 to NT$2,565.4 million (US$74.1 million) in the six months ended June 30, 2003. This resulted in a decrease in our gross profit margin from 26.0% for the first six months of 2002 to 10.7% for the first six months of 2003.

*Operating expenses*

Operating expenses increased by 63.9% from NT$1,193.2 million in the six months ended June 30, 2002 to NT$1,955.9 million (US$56.5 million) in the six months ended June 30, 2003. This increase was due primarily to an increase in our production and sales activities. As a percentage of net sales, our operating expenses increased from 5.6% in the six months ended June 30, 2002 to 8.1% in the six months ended June 30, 2003.

*Research and development expenses.* Research and development expenses increased by 45.2% from NT$584.6 million in the six months ended June 30, 2002 to NT$849.1 million (US$24.5 million) in the six months ended June 30, 2003. This was due mainly to an increase in research expenses and costs incurred for pilot testing of production of panels for use in LCD televisions, the commercial production of which began in the second quarter of 2003. As a percentage of net sales, research and development expenses increased from 2.8% in the six months ended June 30, 2002 to 3.5% in the six months ended June 30, 2003.

*Selling expenses.* Selling expenses increased significantly from NT$288.1 million in the six months ended June 30, 2002 to NT$643.7 million (US$18.6 million) in the six months ended June 30, 2003. This was due primarily to an increase in our commission expenses and transportation costs as the volume of our shipments increased. As a percentage of net sales, selling expenses increased from 1.4% in the six months ended June 30, 2002 to 2.7% in the six months ended June 30, 2003.

*General and administrative expenses.* General and administrative expenses increased by 44.6% from NT$320.3 million in the six months ended June 30, 2002 to NT$463.1 million (US$13.4 million) in the six months ended June 30, 2003. This was due principally to an increase in the number of our employees and related personnel costs in connection with the ramp-up of Fab 3, as well as an increase in depreciation and amortization expenses associated with office equipment. As a percentage of net sales, our general and administrative expenses increased from 1.5% in the six months ended June 30, 2002 to 1.9% in the six months ended June 30, 2003.

54

*Operating income and operating margin*

As a result of the factors discussed above, operating income decreased 85.9% from NT$4,317.7 million in the six months ended June 30, 2002 to NT$609.5 million (US$17.6 million) in the six months ended June 30, 2003. This resulted in a decrease in our operating margin from 20.4% for the first six months of 2002 to 2.5% for the corresponding period in 2003.

*Net non-operating loss*

We recorded a net non-operating loss of NT$538.8 million (US$15.6 million) in the six months ended June 30, 2003, compared to a net non-operating loss of NT$67.5 million in the six months ended June 30, 2002. This was due primarily to:

- an increase in net interest expenses between the two periods of NT$145.9 million (US$4.2 million);

- an investment loss of NT$569.7 million (US$16.5 million) we recorded for six months ended June 30, 2003, which consisted entirely of the net losses of IDTech we recognized by the equity method, compared to net investment income of NT$211.4 million we recorded for the six months ended June 30, 2002, which was due primarily to investment income we recognized by the equity method with respect to IDTech for the period;

- a reversal of provision for loss on inventories of NT$161.5 million (US$4.7 million) we recorded for the six months ended June 30, 2003, compared to provision for loss on inventories of NT$38.9 million we made for the six months ended June 30, 2002; and

- a net foreign exchange loss of NT$170.4 million we recorded for the six months ended June 30, 2002, compared to a net foreign exchange gain of NT$88.7 million (US$2.6 million) we recorded for the six months ended June 30, 2003

*Income tax expense (benefit)*

We recorded an income tax expense of NT$225.0 million in the six months ended June 30, 2002, compared to an income tax benefit of NT$30.0 million (US$0.9 million) in the six months ended June 30, 2003.

*Net income available to common shares*

Principally as a result of the factors discussed above, net income decreased 98.1% from NT$4,005.5 million in the six months ended June 30, 2002 to NT$77.1 million (US$2.2 million) in the six months ended June 30, 2003.

*Selected unaudited consolidated financial information for the six months ended June 30, 2002 and 2003*

The following table sets forth certain of our unaudited consolidated financial information for the periods indicated, which is derived from our unaudited consolidated financial statements for the six months ended June 30, 2002 and 2003, not included in this offering circular. This unaudited consolidated financial information is prepared in accordance with ROC GAAP.

| | Unaudited consolidated financials For the six months ended June 30, | | |
| | 2002 | 2003 | |
| | NT$ | NT$ | US$ |
| | (in millions, except percentages) | | |
| **Income Statement Data:** | | | |
| Net sales | 31,932.4 | 33,264.1 | 961.1 |
| Cost of goods sold | 24,874.3 | 30,516.6 | 881.7 |
| Gross profit | 7,058.1 | 2,747.5 | 79.4 |
| Gross profit margin | 22.1% | 8.3% | 8.3% |

*Net sales*

Our consolidated net sales increased by 4.2% from NT$31,932.4 million in the six months ended June 30, 2002 to NT$33,264.1 million (US$961.1 million) in the six months ended June 30, 2003.

This increase resulted primarily from the increased sales of 15-inch and 17-inch panels as well as other products, partially offset by a reduction in average selling prices for these panels, as well as a reduction in sales of 14-inch and 18-inch panels as a result of declines in both volume and average selling prices between the two periods. However, net sales of IDTech, our consolidated subsidiary, decreased by 8.4% from NT$10,777.6 million to NT$9,872.4 million (US$285.2 million).

*Cost of goods sold*

Our consolidated cost of goods sold increased by 22.7% from NT$24,874.3 million in the six months ended June 30, 2002 to NT$30,516.6 million (US$881.7 million) in the six months ended June 30, 2003. This increase was due to an increase in volume production and overall increase in sales of our products in the six months ended June 30, 2003. However, the cost of goods per panel on a consolidated basis decreased by 4.0% from US$197.2 per panel in the six months ended June 30, 2002 to US$189.4 per panel in the six months ended June 30, 2003. This was due primarily to increased depreciation and amortization costs, as we ramped up the capacity at our Taiwan fabs, from NT$2,885.7 million for the six months ended June 30, 2002 to NT$4,442.8 million (US$128.4 million) for the six months ended June 30, 2003, which was partially offset by decreases in our average purchase prices of the raw materials used for production, and the increased economies of scale of our production due to the expansion of production capacity. However, cost of goods sold of IDTech decreased in the first half of 2003 primarily as a result of the decrease in its net sales.

As a percentage of consolidated net sales, consolidated cost of goods sold increased from 77.9% in the six months ended June 30, 2002 to 91.7% in the six months ended June 30, 2003. The increase was due primarily to a greater decline of 18.5% in the average selling prices on a consolidated basis from US$253.1 in the six months ended June 30, 2002 to US$206.4 in the six months ended June 30, 2003, compared to the decline of 4.0% in the cost of goods sold per panel between these same periods, as well as higher cost of goods sold with respect to IDTech's operations as a percentage of its net sales.

56

*Gross profit and gross profit margin*

Primarily as a result of the 18.5% decline in the average selling price of our panels on a consolidated basis from the six months ended June 30, 2002 to the six months ended June 30, 2003, which exceeded the 4.0% decrease in the cost of goods sold per panel on a consolidated basis during these same periods, as well as higher cost of goods sold with respect to IDTech's operations, our consolidated gross profit decreased by 61.1% from NT$7,058.1 million in the first six months ended June 30, 2002 to NT$2,747.5 million (US$79 4 million) in the six months ended June 30, 2003. This resulted in a decrease in our gross profit margin from 22.1% for the first six months of 2002 to 8.3% for the first six months of 2003. We plan to reduce the high costs of IDTech's operations by cutting personnel costs and improving its product mix.

### Year ended December 31, 2002 versus year ended December 31, 2001

The following table sets forth, for the periods indicated, selected statement of operations items from our consolidated financial statements.

| | Consolidated financials Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 | 2002 |
| | NT$ | NT$ | NT$ | NT$ | US$ |
| | | | (in millions) | | |
| **ROC GAAP** | | | | | |
| Net sales | — | 9,381.4 | 20,919.8 | 59,677.1 | 1,719.8 |
| Cost of goods sold: | | | | | |
| Components and raw materials | — | 4,554 8 | 14,682.5 | 33,392.8 | 962 3 |
| Depreciation and amortization | — | 929.2 | 3,330.0 | 5,892.1 | 169 8 |
| Other costs of goods sold | — | 1,287.3 | 5,021.0 | 10,094.2 | 290.9 |
| Total costs of goods sold | — | 6,771.3 | 23,033.5 | 49,379.1 | 1,423.0 |
| Gross profit (loss) | — | 2,610.1 | (2,113.7) | 10,298 0 | 296 8 |
| Operating expenses: | | | | | |
| Selling expenses | 39 2 | 243 5 | 500.8 | 1,767.2 | 50 9 |
| General and administrative expenses | 316.3 | 371.9 | 809.3 | 1,013.1 | 29 2 |
| Research and development expenses | 357.9 | 447.5 | 1,700.4 | 1,507.3 | 43.5 |
| Total operating expenses | 713.4 | 1,062.9 | 3,010.5 | 4,287.6 | 123.6 |
| Operating income (loss) | (713 4) | 1,547 2 | (5,124 2) | 6,010.4 | 173 2 |
| Net non-operating income (expense) | 41.0 | (378.3) | (241.9) | (1,485.4) | (42.8) |
| Income (loss) before income tax and minority interest | (672 4) | 1,168 9 | (5,366.1) | 4,525.0 | 130 4 |
| Income tax benefit (expense) | 478 8 | 777 9 | 1.068 5 | (15 5) | (0.4) |
| Minority interest in loss of subsidiary | — | — | 197.8 | 21.3 | 0.6 |
| Net income (loss) | (193.6) | 1,946.8 | (4,099.8) | 4,530.8 | 130 6 |
| Preferred share dividend | — | — | — | 43.6 | 1.3 |
| Net income (loss) available to common shares | (193.6) | 1,946.8 | (4,099.8) | 4,487.2 | 129.3 |

57

The following table shows some of our results of operations data as a percentage of our net sales for 2000, 2001 and 2002. We did not have any net sales in 1999.

| | Consolidated financials Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2000 | 2001 | 2002 |
| | (percentage of net sales) | | |
| **ROC GAAP** | | | |
| Net sales | 100.0% | 100.0% | 100.0% |
| Cost of goods sold: | | | |
| Components and raw materials | 48.6 | 70.2 | 56.0 |
| Depreciation an amortization | 9.9 | 15.9 | 9.8 |
| Other costs of goods sold | 13.7 | 24.0 | 16.9 |
| Total cost of goods sold | 72.2 | 110.1 | 82.7 |
| Gross profit (loss) | 27.8 | (10.1) | 17.3 |
| Operating expenses: | | | |
| Selling expenses | 2.6 | 2.4 | 3.0 |
| General and administrative expenses | 3.9 | 3.9 | 1.7 |
| Research and development expenses | 4.8 | 8.1 | 2.5 |
| Total operation expenses | 11.3 | 14.4 | 7.2 |
| Operating income (loss) | 16.5 | (24.5) | 10.1 |
| Net non-operating income (loss) | (4.0) | (1.2) | (2.5) |
| Income (loss) before income tax and minority interest | 12.5 | (25.7) | 7.6 |
| Income tax benefit | 8.3 | 5.1 | — |
| Minority interest in loss of subsidiary | — | 1.0 | — |
| Net income (loss) | 20.8 | (19.6) | 7.6 |
| Preferred share dividend | — | — | 0.1 |
| Net income (loss) available to common shares | 20.8% | (19.6%) | 7.5% |

### Net sales

Our net sales increased by 185.3% from NT$20,919.8 million in the year ended December 31, 2001 to NT$59,677.1 million (US$1,719.8 million) in 2002. This increase resulted primarily from significant increases in unit sales of our products as a result of our increased capacity from the ramp-up of Fab 2 and the acquisition of IDTech. In particular:

- We consolidated all of the net sales of the Yasu fab into our results of operations for the year ended December 31, 2002, while net sales for the Yasu fab were included for 2001 only from September 18, 2001.

- Net sales of our 14.1-inch panels increased by 48.9% from NT$7,367.2 million in the year ended December 31, 2001 to NT$10,972.3 million (US$316.2 million) in 2002.

- Net sales of our 15-inch panels increased by 254.4% from NT$6,485.6 million in the year ended December 31, 2001 to NT$22,983.1 million (US$662.3 million) in 2002.

EXHIBIT 16 – PART B

- Net sales of our 17-inch (including 17.4-inch) panels increased by 119.3% from NT$4,859.6 million in the year ended December 31, 2001 to NT$10,655.5 million (US$307.1 million) in 2002. As the Yasu fab does not produce 17-inch or 17.4-inch panels, all of this increase was due to the increase in production at our Taiwan operations.

- Net sales of our 18-inch panels increased by 403.4% from NT$1,104.9 million in the year ended December 31, 2001 to NT$5,562.1 million (US$160.3 million) in 2002.

These increases in net sales were also due to a substantial increase in average selling prices of our products. Our average selling price per panel increased by 15.7% from NT$7,122 in the year ended December 31, 2001 to NT$8,243 (US$238) in 2002. The Yasu fab also produced a small number of 18.1-inch, 20.8-inch, 21.3-inch and 22.2-inch panels in the year ended December 31, 2002. In the year ended December 31, 2002, approximately 9.6% of our sales were made to Fujitsu under foundry arrangements, compared to approximately 18% in 2001.

### Cost of goods sold

Our cost of goods sold increased by 114.4% from NT$23,033.5 million in the year ended December 31, 2001 to NT$49,379.1 million (US$1,423.0 million) in 2002. This increase was due primarily to the inclusion of the Yasu fab's results in the year ended December 31, 2002 and the increase in unit sales of our panels. This difference is mainly due to the higher raw materials and component costs of the Yasu fab, and the proportionally higher labor costs incurred by the Yasu fab under the secondment arrangements entered into between IDTech and IBM Japan and Display Technologies, which were partially offset by the lower depreciation expenses of the Yasu fab.

As a percentage of net sales, cost of goods sold decreased from 110.1% in the year ended December 31, 2001 to 82.7% in 2002. This was due primarily to a 13.0% decrease in the cost of goods sold per panel, from NT$7,841 in the year ended December 31, 2001 to NT$6,821 (US$197) in 2002, and a 15.7% increase in our average selling price per panel between these two periods.

The decrease in the cost of goods sold per panel was mainly due to decreases in the average market prices of raw materials and components, and increased economies of scale due to the expansion of production capacity at Fab 2. This was due primarily to higher manufacturing yields for in-house color filter production, as well as a decrease in the market prices for raw materials and components, partially offset by higher costs per panel incurred at the Yasu fab. Our depreciation expenses increased between 2001 and 2002 due to the purchase of additional equipment and machinery used at Fab 2. Our depreciation expenses, however, decreased as a percentage of our cost of goods sold between 2001 and 2002. This was due mainly to the inclusion of the Yasu fab in our results for the year ended December 31, 2002, since the Yasu fab has lower depreciation costs than our Taiwan operations. In addition, as our unit sales increased, raw materials and components, rather than the overhead of buildings and equipment, constituted an increasingly higher portion of total costs of goods sold.

### Gross profit (loss) and gross margin

We recorded a gross loss of NT$2,113.7 million in the year ended December 31, 2001, but recorded gross profit of NT$10,298.0 million (US$296.8 million) in 2002. The gross profit in the year ended December 31, 2002 was due to an increase in the average selling prices of panels and the decrease in cost of goods sold per panel. We had a negative gross margin of 10.1% for the year ended December 31, 2001 and a gross margin of 17.3% in 2002. The Yasu fab's margins were negatively affected during the year ended December 31, 2002 by the pricing arrangements under the distribution and outsourcing agreements IDTech entered into with IBM Japan and Display Technologies. See "— Pricing" above.

*Operating expenses*

Operating expenses increased by 42.4% from NT$3,010.5 million in the year ended December 31, 2001 to NT$4,287.6 million (US$123.6 million) in 2002. This increase was due primarily to the consolidation of the Yasu fab's results for the year ended December 31, 2002, and the proportionately higher general and administrative expenses relating to that fab. As a percentage of net sales, our operating expenses decreased from 14.4% in the year ended December 31, 2001 to 7.2% in 2002. This was due primarily to the greater economies of scale of our increased production capacity.

*Selling expenses.* Selling expenses increased by 252.9% from NT$500.8 million in the year ended       ,  December 31, 2001 to NT$1,767.2 million (US$50.9 million) in 2002. This was mainly due to increases in aggregate salaries of sales personnel and other selling expenses at both our Taiwan operations and the Yasu fab as a result of increased sales between these two periods, and the inclusion of the Yasu fab's selling expenses for the year ended December 31, 2002. As a percentage of net sales, selling expenses increased from 2.4% in the year ended December 31, 2001 to 3.0% in 2002.

*General and administrative expenses.* General and administrative expenses increased by 25.2% from NT$809.3 million in the year ended December 31, 2001 to NT$1,013.1 million (US$29.2 million) in 2002. This was due primarily to the inclusion of the results of the Yasu fab, which generally incurred higher general and administrative expenses than our Taiwan operations, partly as a result of the portion of the fees paid by IDTech to IBM Japan for distribution support services that were accounted for under general and administrative expenses. In addition, an increase in administrative staff and depreciation expenses also contributed to the increase in general and administrative expenses. As a percentage of net sales, general and administrative expenses decreased from 3.9% in the year ended December 31, 2001 to 1.7% in 2002.

*Research and development expenses.* Research and development expenses decreased by 11.4% from NT$1,700.4 million in the year ended December 31, 2001 to NT$1,507.3 million (US$43.5 million) in 2002. This was due principally to a reduction in costs relating to the purchase of materials for research and development at our Taiwan operations, partially offset by higher salary and depreciation costs. As a percentage of net sales, our research and development expenses decreased from 8.1% in the year ended December 31, 2001 to 2.5% in 2002.

*Operating income (loss) and operating margin*

As a result of the foregoing, we recorded an operating loss of NT$5,124.2 million in the year ended December 31, 2001, compared to operating income of NT$6,010.4 million (US$173.2 million) in 2002. We had a negative operating margin of 24.5% in the year ended December 31, 2001 and an operating margin of 10.1% in 2002. This was due primarily to the Yasu fab's higher per panel cost of goods sold, as well as pricing discounts and other payments under IDTech's distribution agreements with IBM Japan.

*Net non-operating loss*

We recorded a net non-operating loss of NT$241.9 million in the year ended December 31, 2001, compared to a net non-operating loss of NT$1,485.4 million (US$42.8 million) in 2002. This was due primarily to:

- an increase in interest expenses between the two periods of NT$809.5 million (US$23.3 million);

- a decrease in provision for inventory devaluation from our Taiwan operations of NT$20.6 million (US$0.6 million); and

- an increase in foreign exchange loss between the two periods of NT$515.9 million (US$14.9 million),

which were partially offset by an increase in other non-operating income from NT$167.8 million in the year ended December 31, 2001 to NT$415.9 million (US$12.0 million) in 2002.

*Income tax expense (benefit)*

We recorded an income tax benefit of NT$1,068.5 million in the year ended December 31, 2001, compared to an income tax expense of NT$15.5 million (US$0.4 million) in 2002.

*Net income (loss) available to common shares*

As a result of the foregoing, we recorded a net loss of NT$4,099.8 million in the year ended December 31, 2001, compared to net income of NT$4,530.8 million (US$130.6 million) in 2002. In the year ended December 31, 2002, we recognized a preferred share dividend in the amount of NT$43.6 million (US$1.3 million). As a result, we recorded net income available to common shares of NT$4,487.2 million (US$129.3 million) in the year ended December 31, 2002.

### Year ended December 31, 2001 versus year ended December 31, 2000

*Net sales*

Our net sales increased by 123.0% from NT$9,381.4 million in 2000 to NT$20,919.8 million in 2001. This increase was primarily due to the significant increases in unit sales of our panels as a result of our increased capacity from the ramp-up of Fab 2 and our acquisition of IDTech. In particular:

- We consolidated fourth quarter net sales of the Yasu fab into our results of operations for 2001, while no net sales for the Yasu fab were included for 2000. Substantially all of the Yasu fab's sales in the fourth quarter of 2001 were made to or through IBM Japan. See "— Pricing" above.

- Net sales of our 15-inch panels increased by 311.6% from NT$1,575.7 million in 2000 to NT$6,485.6 million in 2001.

- Net sales of our 17-inch (including 17.4-inch) panels increased by 970.0% from NT$454.2 million in 2000 to NT$4,859.6 million in 2001. As the Yasu fab does not produce 17-inch or 17.4-inch panels, all of this increase was due to the increase in production at our Taiwan operations.

However, the increases in net sales for 15 and 17-inch panels were partially offset by a slight decline in net sales of 14.1-inch panels. In particular, net sales of our 14.1-inch panels decreased by 0.7% from NT$7,421.4 million in 2000 to NT$7,367.2 million in 2001. This slight decrease was due to a decrease in the average selling price of 14.1-inch panels. The Yasu fab also produced a small number of 18.1-inch, 20.8-inch, 21.3-inch and 22.2-inch panels in 2001.

These increases in our net sales attributable to increases in our unit sales were partially offset by declines in average selling prices of our panels. Our average selling prices declined by 38.9% from NT$11,652 in 2000 to NT$7,122 in 2001.

In each of 2000 and 2001, approximately 18% of our sales were made to Fujitsu under foundry arrangements.

*Cost of goods sold*

Our cost of goods sold increased by 240.2% from NT$6,771.3 million in 2000 to NT$23,033.5 million in 2001. The increase was primarily due to the increase in unit sales of our panels, which required us to purchase additional raw materials and components in 2001. Another factor was the inclusion of fourth quarter results of the Yasu fab into our results for 2001.

As a percentage of net sales, cost of goods sold increased from 72.2% in 2000 to 110.1% in 2001 due to the decrease in our average selling prices between these periods. However, we significantly reduced our cost of goods sold per panel from NT$8,410 in 2000 to NT$7,841 in 2001. This was principally due to

lower fixed costs per panel as a result of our increased production capacity from the ramp-up of Fab 2 and lower raw materials and components costs per panel. Our depreciation expenses increased between 2000 and 2001, due primarily to the purchase of additional equipment for Fab 2.

*Gross profit (loss) and gross margin*

We recorded a gross profit of NT$2,610.1 million in 2000 and a gross loss of NT$2,113.7 million in 2001. The gross loss in 2001 was principally due to the substantial declines in the average-selling prices of our panels, which was partially offset by a decrease in the cost of goods sold per panel. We had a gross margin of 27.8% in 2000, compared to a negative gross margin of 10.1% in 2001.

*Operating expenses*

Operating expenses increased by 183.2% from NT$1,062.9 million in 2000 to NT$3,010.5 million in 2001. This increase was mainly a result of the significant increases in unit sales of our panels in 2001. As a percentage of net sales, our operating expenses increased from 11.3% in 2000 to 14.4% in 2001. This was due primarily to the increase in our research and development expenses at our Taiwan operations.

*Selling expenses.* Selling expenses increased by 105.7% from NT$243.5 million in 2000 to NT$500.8 million in 2001. This was primarily due to increases in provisions for warranty costs, shipping costs and salaries and bonuses as a result of our increased sales in 2001 compared to 2000. As a percentage of net sales, our selling expenses decreased from 2.6% in 2000 to 2.4% in 2001.

*General and administrative expenses.* General and administrative expenses increased by 117.6% from NT$371.9 million in 2000 to NT$809.3 million in 2001. This was primarily due to the portion of the fees paid by IDTech to IBM Japan for distribution support services accounted for under general and administrative expenses and an increase in salary expenses in connection with the design and planning for Fab 2. As a percentage of our net sales, our general and administrative expenses remained stable at 3.9% for both 2000 and 2001.

*Research and development expenses.* Research and development expenses increased by 280.0% from NT$447.5 million in 2000 to NT$1,700.4 million in 2001. This was primarily due to an increase in purchases of materials for research and development purposes and depreciation of equipment used for research and development activities at our Taiwan operations. Research and development expenses as a percentage of our net sales increased from 4.8% in 2000 to 8.1% in 2001.

*Operating income (loss) and operating margin*

As a result of the foregoing, we recorded operating income of NT$1,547.2 million in 2000, compared to an operating loss of NT$5,124.2 million in 2001. We had an operating margin of 16.5% in 2000 and a negative operating margin of 24.5% in 2001.

*Net non-operating loss*

Our net non-operating loss decreased by 36.1% from NT$378.3 million in 2000 to NT$241.9 million in 2001. This decrease was primarily due to:

- a net increase in foreign exchange income of NT$234.9 million from a loss of NT$196.4 million in 2000 to a gain of NT$38.5 million in 2001;

- an increase in gains on sale of short-term investments of NT$81.4 million; and

- an increase in provision for inventory devaluation, net of any reversals, of NT$31.2 million from NT$185.9 million in 2000 to NT$217.1 million in 2001,

which was partially offset by the inclusion of IDTech's fourth quarter non-operating expenses of NT$99.0 million into our results for 2001 and an increase in interest expense of NT$106.7 million due to an increase in long-term borrowings.

*Income tax benefit*

Our income tax benefit in 2000 was NT$777.9 million, compared to an income tax benefit in 2001 of NT$1,068.5 million. The higher income tax benefit in 2001 was primarily due to increased investment credits.

*Net income (loss) available to common shares*

As a result of the foregoing, we recorded net income available to common shares of NT$1,946.8 million for 2000, compared to a net loss available to common shares of NT$4,099.8 million in 2001.

**Consolidated Quarterly Financial and Operating Data**

The unaudited consolidated financial data of our company shown below for the eight fiscal quarters ended December 31, 2002 was prepared under ROC GAAP. Our results of operations have varied and will continue to vary from quarter to quarter and are therefore not necessarily indicative of our results for the full fiscal year or for any future period. Our future sales and results of operations may vary significantly due to a combination of factors, including the factors described in "Risk Factors — Risks Related to Our Business — We have a limited operating history and our operating results fluctuate from quarter to quarter, which makes it difficult to evaluate our business and to predict our future performance." You should not rely on period-to-period comparisons as an indication of our future performance.

We believe that we have included in the amounts set forth below all necessary adjustments, consisting only of normal recurring adjustments, to fairly present our selected unaudited consolidated quarterly data. You should read our unaudited consolidated quarterly data set forth below in conjunction with our audited consolidated financial statements and the related notes included elsewhere in this offering circular.

|  | Three-month period ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | March 31, 2001 | June 30, 2001 | September 30, 2001 | December 31, 2001 | March 31, 2002 | June 30, 2002 | September 30, 2002 | December 31, 2002 |
|  | (in millions, except for percentages; depreciation and amortization per panel; cost per panel, number of panels shipped and average realized sales price for panels) | | | | | | | |
| **Statement of Operations Data (in NT$):** | | | | | | | | |
| Net sales | 3,096.9 | 3,573.8 | 4,041.4 | 10,207.7 | 13,747.6 | 18,184.8 | 13,632.3 | 14,112.4 |
| Cost of goods sold | 3,401.4 | 4,184.7 | 4,389.1 | 11,058.3 | 12,109.8 | 12,764.5 | 10,958.5 | 13,546.3 |
| Gross profit (loss) | (304.5) | (610.9) | (347.7) | (850.6) | 1,637.8 | 5,420.3 | 2,673.8 | 566.1 |
| Operating expenses | 520.5 | 594.5 | 706.7 | 1,188.8 | 819.6 | 1,156.9 | 1,067.8 | 1,243.3 |
| Operating income (loss) | (825.0) | (1,205.4) | (1,054.4) | (2,039.4) | 818.2 | 4,263.4 | 1,606.0 | (677.2) |
| Depreciation and amortization | 753.8 | 784.2 | 833.4 | 1,442.4 | 1,743.8 | 1,763.9 | 2,259.5 | 2,560.4 |
| **Other Financial Data:** | | | | | | | | |
| Depreciation and amortization as a percentage of cost of goods sold | 22.2% | 18.7% | 19.0% | 13.0% | 14.4% | 13.8% | 20.6% | 18.9% |
| Depreciation and amortization per panel (in NT$) | 1,916.4 | 1,548.8 | 1,424.1 | 993.0 | 1,043.9 | 893.3 | 1,420.4 | 1,277.8 |
| **Statement of Operations Data:** | | | | | | | | |
| Cost per panel (in US$) | 249.9 | 238.8 | 216.7 | 220.0 | 209.5 | 186.8 | 199.0 | 195.3 |
| Adjusted EBITDA[(1)] | (71.2) | (421.2) | (221.0) | (597.0) | 2,562.0 | 6,027.3 | 3,865.5 | 1,883.2 |
| Adjusted EBITDA margin | (2.3%) | (11.8%) | (5.5%) | (5.8%) | 18.6% | 33.1% | 28.4% | 13.3% |
| **Operating Data:** | | | | | | | | |
| Number of panels shipped (in thousands) | 393.3 | 506.3 | 585.2 | 1,452.5 | 1,670.5 | 1,974.6 | 1,590.8 | 2,003.7 |
| Average realized sales price for panels (in US$) | 227.5 | 203.9 | 199.5 | 203.0 | 237.8 | 266.1 | 247.6 | 203.5 |

(1) Adjusted EBITDA is defined as operating income (loss) plus depreciation and amortization. You should not consider adjusted EBITDA as:

* an alternative to net income (loss) or operating income (loss);
* an indicator of combined operations or cash flow data prepared in accordance with ROC GAAP; or
* an alternative to cash flow as a measure of liquidity.

The items of net income (loss) excluded from adjusted EBITDA are significant components in understanding and assessing our financial performance, and our computation of adjusted EBITDA may not be comparable to other similarly titled measures of other companies.

We experienced a significant increase in net sales and number of panels shipped from the second quarter of 2001 to the second quarter of 2002. In particular, our net sales increased from NT$3,573.8 million in the second quarter of 2001 to NT$18,184.8 million in the second quarter of 2002, and our number of panels shipped increased from approximately 506,334 panels to approximately 1,974,600 panels between the same periods. This reflects our increase in production capacity and our acquisition of IDTech, as well as increased market demand relative to the capacity of the industry. However, our net sales and number of

panels shipped decreased by 25.0% and 19.4%, respectively, in the third quarter of 2002. This decrease was primarily due to a downturn in the TFT-LCD panel market during this period. Our net sales and number of panels shipped increased by 3.5% and 26.0%, respectively, in the fourth quarter of 2002.

From the fourth quarter of 2000 to the third quarter of 2001, the average selling prices of our panels declined by 35.5% from US$309.2 before stabilizing at US$199.5. The average selling prices for our panels subsequently increased by 33.4% to US$266.1 in the second quarter of 2002, before declining by 6.9% to US$247.6 in the third quarter of 2002. The average selling prices for our panels continued to decline by 17.8% to US$203.5 in the fourth quarter of 2002. The volatility of our average selling prices was a result of the TFT-LCD demand cycle during that same period.

Our depreciation and amortization expenses on an absolute and per panel basis, and as a percentage of cost of goods sold, increased significantly between the second and third quarters of 2002. This was primarily due to the increase in the expenditures relating to our ramp-up of production capacity at Fab 2. Our depreciation and amortization expenses decreased between the third quarter of 2002 and the fourth quarter of 2002.

Depreciation and amortization as a percentage of cost of goods sold increased to 20.6% in the third quarter of 2002 primarily due to the decrease in the volume of sales during the third quarter of 2002 when compared with previous quarters. Depreciation and amortization expense as a percentage of cost of goods sold decreased to 18.9% in the fourth quarter of 2002.

### Liquidity and Capital Resources

We need cash primarily for capital expenditures relating to capacity expansion and for working capital. Our ability to meet our capital expenditure and working capital needs from cash generated from operations will be affected by the demand for our panels, which in turn may be affected by several factors, including industry cycles and changes in the average selling prices of our panels, which may be subject to downward pressure in the future. Other events that could have a material adverse effect on our liquidity include an increase in our costs for raw materials and components, a reduction in support of our borrowings by our parent company, Chi Mei Corporation, or our chairman or both, and an increase in our equipment or fab construction costs. To the extent that we do not generate sufficient cash flow from our operations to meet our cash requirements, we may rely on external borrowings or other financing. If adequate funds are not available, whether on satisfactory terms or at all, we may be forced to curtail or delay our expansion plans. We have not historically relied, and we do not plan to rely in the foreseeable future, on off-balance sheet financing arrangements to finance our operations or expansion.

We had working capital (defined as our current assets minus our current liabilities) of NT$4,392.6 million as of December 31, 2000, NT$(4,287.7) million as of December 31, 2001, NT$2,508.8 million (US$72.3 million) as of December 31, 2002 and NT$4,428.9 million (US$128.0 million) as of June 30, 2003. The primary reason for the working capital deficit in 2001 was the increase in short-term borrowings and the current installments of long-term borrowings that were used to fund capital expenditures, the increase in notes and accounts payable in connection with our increased production and the increase in accrued expenses and other current liabilities, which were partially offset by the increases in our accounts receivable and inventories during that year.

The following table summarizes our cash flows in 2000, 2001 and 2002 and the six months ended June 30, 2002 and 2003:

| | Consolidated year ended December 31, | | | Unconsolidated six months ended June 30, | |
|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2002 | 2003 |
| | (in millions of NT$) | | | | |
| Net cash provided by (used in) operating activities .......................... | (1,892.7) | (3,075.8) | 5,353.8 | 4,706.3 | 4,861.7 |
| Net cash provided by (used in) investing activities ......................... | (14,780.6) | (30,661.7) | (15,320.6) | (9,249.4) | (15,586.1) |
| Net cash provided by (used in) financing activities ......................... | 18,220.9 | 31,012.6 | 13,751.0 | 4,556.4 | 18,717.3 |
| Net increase (decrease) in cash and cash equivalents ..................... | 1,547.6 | (2,724.9) | 3,784.2 | 13.3 | 7,992.9 |

As of June 30, 2003, we had cash and cash equivalents of NT$11,794.9 million (US$340.8 million). As of the same date, we had total outstanding short-term borrowings of NT$4,802.6 million (US$138.8 million) in the form of bank loans and letters of credit, and unused lines of credit totaling NT$3,508 million (US$101.4 million). On August 5, 2003, we completed a sale of an aggregate principal amount of US$250 million of zero coupon convertible notes, with each note convertible into our common shares. As of December 31, 2002, we had cash and cash equivalents of NT$4,495.5 million (US$129.6 million). As of the same date, we had total outstanding short-term borrowings of NT$4,870.3 million (US$140.4 million) in the form of bank loans and letters of credit, and unused lines of credit totaling NT$18,235.7 million (US$525.5 million). The weighted average interest rate for these borrowings was 1.4% for the six months ended June 30, 2003 and 2.1% for the year ended December 31, 2002. All of our short-term loans are revolving facilities with a term of one year, which may be extended for additional terms of one year each with lender consent. These short-term borrowings are used to fund the purchase of components and other routine business operations.

As of June 30, 2003, we had NT$3,593.5 million (US$103.8 million) outstanding under our short-term commercial paper facilities. As of December 31, 2002, we had NT$3,090.3 million (US$89.1 million) outstanding under these facilities. The weighted average interest rate under these facilities was 1.6% for the six months ended June 30, 2003 and 2.2% for the year ended December 31, 2002. As of the date of this offering circular, these facilities had maturity dates ranging through November 2003. All of our short-term commercial paper facilities are revolving facilities with a term of one year, which may be extended for additional terms of one year each with lender consent. None of our current short-term commercial paper facilities has been rated by a credit rating agency. Our obligations under our short-term loan and commercial paper facilities are unsecured. We believe that our existing credit lines under our short-term loan and commercial paper facilities, together with cash generated from operations and the proceeds from this offering and other financing activities, are sufficient to finance our current working capital needs through 2003.

As of June 30, 2003, we had total outstanding long-term borrowings of NT$27,822.9 million (US$803.9 million). On August 5, 2003, we completed a sale of an aggregate principal amount of US$250 million of zero coupon convertible notes, with each note convertible into our common shares. As of December 31, 2002, we had total outstanding long-term borrowings of NT$33,332.6 million (US$960.6 million). We obtained these loans from financial institutions under five credit facilities. These facilities are used by us to

finance our construction projects, purchase machinery and equipment relating to our business and refinance our short-term borrowings. Weighted-average interest rates on long-term borrowings outstanding were 2.4% and 3.1% as of June 30, 2003 and December 31, 2002, respectively. We have pledged a substantial portion of our buildings, machinery and equipment, with a total carrying amount of NT$21,839.7 million (US$631.0 million) as of June 30, 2003, to secure our obligations under these five credit facilities, and we are subject to restrictions on the sale, lease, transfer or other disposal of these assets. Of these total outstanding long-term borrowings of NT$27,822.9 million (US$803.9 million), 86.6% are denominated in New Taiwan dollars and 13.4% are denominated in U.S. dollars.

On August 5, 2003, we completed a sale of an aggregate principal amount of US$250 million of zero coupon convertible notes, with each note convertible into our common shares. This sale resulted in aggregate net proceeds to us of US$250.0 million, equivalent to NT$8,652.5 million. None of the convertible notes have since been converted into common shares.

On June 30, 2003, we completed a domestic rights offering in which we issued 500,000,000 common shares at a subscription price of NT$19 per share, thereby yielding gross proceeds of NT$9,500.0 million (US$274.5 million).

On March 7, 2003, we completed a sale of an aggregate principal amount of US$250 million of zero coupon convertible notes, with each note convertible into our common shares. This sale resulted in aggregate net proceeds to us of US$246.0 million, equivalent to NT$8,514.1 million. Approximately US$200 million of the convertible notes have since been converted into common shares.

On December 19, 2002, we entered into a syndicated loan agreement with nine lead lenders located in the ROC relating to an NT$17,000 million and US$88 million credit facility primarily to be used to finance our construction, equipment procurement and ramp-up of Fab 3. The loan facility has a term of seven years and is secured by the building, equipment and machinery of Fab 3. The loan facility is not guaranteed by any third party. As of June 30, 2003, we have drawn down NT$1,000 million of this facility.

On December 18, 2002, we completed a private placement of 180,000,000 of our common shares to Chi Mei Corporation, Linklinear Investment Co., Ltd. and Tai Chi Investment Co., Ltd. at an issue price of NT$33.50 per share. This issuance resulted in aggregate net proceeds to us of NT$6,030.0 million (US$173.8 million).

NT$23,622.9 million (US$682.5 million) of our long-term borrowings and NT$5,453.6 million (US$157.6 million) of the current portion of our long-term borrowings are guaranteed by Chi Mei Corporation or our chairman or both. Our long-term loan and commercial paper facilities include provisions for early payment in the event of certain triggering events. Under the terms of these loans and credit facilities, we are required to maintain certain current ratios and liability ratios and comply with other similar financial covenants and approval obligations. Chi Mei Corporation is also required to comply with similar financial covenants under the loan agreements for which it is a guarantor. Our debt under these facilities may be accelerated if there is a default, including defaults and any cross-defaults triggered by failure to comply with financial covenants and other obligations. We and Chi Mei Corporation have from time to time breached certain financial ratios. In particular, Chi Mei Corporation failed to meet the financial covenant relating to the ratio of its current assets to current liabilities as of December 31, 2001 (76% compared to the required ratio of 100%), and we failed to meet the same covenant as of June 30, 2002 (83% compared to the required ratio of 100%) and September 30, 2002 (79% compared to the required ratio of 100%). We have also failed to comply with certain restrictive covenants as well as several representations in our loan agreements. Such non-compliance may also have, through broadly worded cross-default provisions, resulted in default under some of the agreements governing our other existing debt. We have obtained waivers from the relevant lenders relating to such non-compliance and any cross-defaults resulting from such non-compliance.

In addition, IDTech was in violation of two financial covenants relating to minimum net worth and ratio of total liabilities to net worth measured as of December 31, 2002 based on the audited financial statements of IDTech that were finalized in March 2003. These financial covenants are contained in a 12.0 billion Japanese yen long-term syndicated loan agreement between IDTech and Mizuho Bank, Ltd., as lead lender. Failure to meet these financial covenants could have resulted in an event of default under this loan agreement and an acceleration of repayment of this loan. However, IDTech obtained a waiver from Mizuho Bank, Ltd. on March 14, 2003 pursuant to which the date of confirmation of compliance by IDTech with the financial covenants in its syndicated loan agreement was delayed from December 31, 2002 to June 30, 2003. On June 4, 2003, IDTech entered into a new syndicated loan agreement with a syndicate of banks for 14,400.0 million Japanese yen. This loan was used to repay the syndicated loan with Mizuho Bank, Ltd. Under this new loan, we are obligated to guarantee IDTech's payments, but Chi Mei Corporation no longer has such obligation. In addition, the financial covenants in this new loan will be applied to our company rather than to IDTech on a stand-alone basis. See "Risk Factors — Risks Related to Our Business — Restrictive covenants and broad default provisions in the agreements governing our and IDTech's existing debt may materially restrict our operations as well as adversely affect our liquidity, financial condition and results of operations."

Set forth below are the aggregate amounts, as of June 30, 2003, of our future cash payment obligations under our existing debt and lease arrangements:

|  | Payments due by period | | | | |
|---|---|---|---|---|---|
|  | Total | Less than 1 year | 1-3 years | 4-5 years | After 5 years |
|  | (in millions of NT$) | | | | |
| **Contractual Obligations:** | | | | | |
| Long-term debt ......................... | 33,776.5 | 5,953.6 | 18,692.2 | 8,730.6 | 400.0 |
| Operating leases for land and buildings ... | 1,658.9 | 101.8 | 187.2 | 187.2 | 1,182.6 |
| Total contractual cash obligations ......... | 35,435.4 | 6,055.4 | 18,879.4 | 8,917.8 | 1,582.6 |

In addition to the contractual obligations set forth above, we also have continuing obligations to make cash payments for license fees under our technology license agreement with Fujitsu, the amounts of which are determined based on net sales of our panels that incorporate the licensed technology. See "Our Relationship with Fujitsu."

With the exception of our option to purchase cell assembly facilities from Display Technologies, as discussed under "Our Acquisition of IDTech and Relationship with IBM — Outsourcing Arrangements with Display Technologies," we do not have any options on non-financial assets.

In the first six months of 2003, our net cash provided by operating activities was NT$4,861.7 million (US$140.5 million). During the same period, non-cash depreciation and amortization was NT$4,936.3 million (US$142.6 million), notes and accounts receivable (including related parties) increased by NT$3,046.5 million (US$88.0 million), inventories decreased by NT$280.7 million (US$8.1 million) and notes and accounts payable (including related parties) increased by NT$1,856.4 million (US$53.6 million). In the first six months of 2002, our net cash provided by operating activities was NT$4,706.3 million. During the same period, non-cash depreciation and amortization was NT$3,189.4 million, notes and accounts receivable (including related parties) increased by NT$3,925.4 million, inventories increased by NT$663.3 million, while notes and accounts payable (including related parties) increased by NT$1,482.4 million. Depreciation and amortization, inventories and accounts payable were significantly higher in the first six

months of 2003 than the first six months of 2002, principally as a result of the completion of the structure of Fab 3. Accounts receivable were higher in the first six months of 2003 than in the first six months of 2002, principally as a result of our larger scale of operation.

In 2002, our net cash provided by operating activities was NT$5,353.8 million (US$154.3 million). During the same period, non-cash depreciation was NT$8,327.6 million (US$240.0 million), accounts receivable (including related parties) increased by NT$4,455.2 million (US$128.4 million), inventories increased by NT$5,059.1 million (US$145.8 million) and accounts payable (including related parties) decreased by NT$1,674.3 million (US$48.3 million). In 2001, our net cash used in operating activities was NT$3,075.8 million. During the same period, non-cash depreciation was NT$3,813.8 million, accounts receivable (including related parties) increased by NT$2,902.3 million, inventories increased by NT$2,442.7 million, while accounts payable (including related parties) increased by NT$3,894.6 million. Depreciation, accounts receivable, accounts payable and inventories were significantly higher in 2002 compared to 2001, principally as a result of our acquisition of the Yasu business and an increase in our production.

In 2000, our net cash used in operating activities was NT$1,892.7 million. During the same period, non-cash depreciation was NT$1,084.1 million, accounts receivable (including related parties) increased by NT$2,915.9 million, inventories increased by NT$2,531.7 million and accounts payable (including related parties) increased by NT$1,156.6 million. Depreciation was significantly higher in 2001 than in 2000 principally as a result of an increase in our production capacity as well as our acquisition of the Yasu business. Our increased production capacity and net sales also resulted in the increase in accounts receivable, accounts payable and inventories.

Net cash used in investing activities was NT$14,780.6 million in 2000, NT$30,661.7 million in 2001, NT$15,320.6 million (US$441.5 million) in 2002 and NT$15,586.1 million (US$450.3 million) in the first six months of 2003. The significant increase in cash used in investing activities in 2001 was due in part to our acquisition of IDTech. Net cash used in investing activities primarily reflected capital expenditures for property, plant and equipment of NT$12,346.7 million in 2000, NT$27,768.2 million in 2001, NT$13,839.3 million (US$398.8 million) in 2002 and NT$14,978.5 million (US$432.8 million) in the first six months of 2003. These capital expenditures were funded mostly with net cash provided by financing activities, primarily from long-term bank borrowings.

Net cash provided by financing activities totaled NT$18,220.9 million in 2000, NT$31,012.6 million in 2001, NT$13,751.0 million (US$396.3 million) in 2002 and NT$18,717.3 million (US$540.8 million) for the first six months of 2003. These increases in cash provided by financing activities are mainly the result of our increasing levels of long-term debt and, to a lesser degree, by common share issuances in 1999 and 2000, by a convertible note issuance in March 2003 and by a rights offer in June 2003.

## Capital Expenditures

The following table sets forth our historical and planned capital expenditure requirements for our existing fabs for the periods indicated. Actual future capital expenditures may differ from the amounts indicated below.

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 |
| | | | (NT$ millions) | | |
| Taiwan operations: | | | | | |
| Fabs 1 and 2 ........................ | 12,346.7 | 21,998.5 | 10,019.3 | 2,111.5 | — |
| Fab 3 ................................ | — | — | 2,734.2 | 30,266.0 | 21,999.8 |
| Yasu fab ............................ | — | 5,769.7[1] | 1,085.8 | 810.4 | — |
| Total ............................... | 12,346.7 | 27,768.2 | 13,839.3 | 33,187.9 | 21,999.8 |

---

(1) From September 26, 2001

Our capital expenditures in 2002 relating to the ramp-up of Fab 2 and the construction of Fab 3 were approximately NT$12,753.5 million (US$367.5 million). The remainder of our capital expenditures for 2002 related to capital improvements at the Yasu fab. We currently expect our capital expenditures in 2003 relating to our expansion plans to be approximately NT$30,266.0 million (US$874.5 million). During the fourth quarter of 2002, our capital expenditures related primarily to ramping up production at Fab 2 and construction of Fab 3. During the first six months of 2003, our capital expenditures in the amount of approximately NT$11,386.8 million (US$329.0 million) related primarily to constructing and equipping the first phase of Fab 3. During the second half of 2003, our capital expenditures will relate primarily to ramping up production for the first phase of Fab 3 and equipment move-in for the second phase. The second, third and fourth phases of Fab 3 will require approximately NT$10,000.0 million (US$288.9 million), NT$8,000.0 million (US$231.1 million) and NT$7,000.0 million (US$202.3 million), respectively, and will each yield additional capacity of 30,000 glass substrates per month. Such additional phases will require less investment than the first phase, since we could utilize the previously installed fixed assets. In addition, we have started constructing the foundation for our next fab, Fab 4. We estimate the total investment for Fab 4 will be between NT$55,000 million (US$1,589.1 million) and NT$70,000 million (US$2,022.5 million). As of the date of this offering circular, we have not made a decision relating to the technology generation, capacity or ramp-up schedule for Fab 4.

Due to rapid changes in technology in the TFT-LCD industry, we frequently need to invest in new manufacturing technologies. We require significant amounts of capital to build, expand, upgrade and maintain our production facilities and equipment. As of June 30, 2003, we had outstanding purchase agreements in the amount of NT$13,016.7 million (US$376.1 million) for the procurement of machinery and equipment, primarily relating to the construction of Fab 3. The unpaid balance under these agreements at the same date was NT$3,845.3 million (US$111.1 million).

We expect to fund these expansion projects primarily with internally generated funds, bank loans and additional external financings, including the proceeds from this offering. In the future, we may consider additional debt or equity financings, depending on market conditions, our financial performance and other relevant factors. In particular, an extended industry downturn could adversely affect our profitability and cash flow position and increase our reliance on external funding. Taking into account the proceeds of this offering, our August 2003 convertible notes offering, our June 2003 rights offering, our February 2003 convertible notes offering and cash flow from our operations, we believe we will have sufficient resources available to meet our planned capital requirements through 2003. However, we cannot assure you that we will be able to raise additional capital for these planned expenditures, should it become necessary, on terms acceptable to us or at all. If we are unable to generate or otherwise procure sufficient capital for these planned expenditures on acceptable terms, we may be required to curtail or delay our expansion plans.

70

## Inflation

We do not believe that inflation in Taiwan or Japan has had a material impact on our results of operations. Inflation in Taiwan was approximately 1.3%, 0.0% and 0.4% in 2000, 2001 and 2002, respectively, and in Japan was approximately (0.7%), (0.7%) and (1.1%) for the same periods.

## Taxation

The corporate income tax rate in Taiwan that applies to us is 25%. The corporate tax rate that applies to our operations in Japan is 42%. Until January 20, 2001, the corporate income tax rate in Taiwan that applied to us was 20% with respect to our facilities located in the Tainan Science-based Industrial Park and 25% with respect to our facilities located elsewhere in Taiwan. However, we did not record any income in any fiscal year except 2000 and 2002. Although we recorded income before tax in 2000 and 2002, we applied investment tax credits that we accumulated from previous years to offset the tax liability to which we would otherwise have been subject. As a result, we have to date incurred only minimal current income tax expenses

### Tax exemptions

Based on our status as a company engaged in the high technology business in Taiwan, we may be able to benefit from certain ROC corporate income tax exemptions. The income attributable to the use of equipment that we purchase, in part or in whole, with proceeds we raise through share offerings, may be exempted from corporate income tax in Taiwan if our shareholders do not use these tax exemptions themselves. In addition, income attributable to the use of equipment that we purchase, in whole or in part, with retained earnings that we capitalize, may be exempted from corporate income tax in Taiwan. These exemptions typically apply for five consecutive years, commencing in a year to be designated by us within two years following the commencement of commercial production using such equipment. We conducted a share offering in 1998 for the purchase of equipment used at Fab 1 and a share offering in 2000 for the purchase of equipment used at Fab 2. We have not yet designated the year from which we will begin to use any of these tax exemptions.

If we make a qualified rights offering, our shareholders will be entitled to elect to receive a tax credit of up to 10% (in the case of an individual shareholder) or 20% (in the case of a corporate shareholder) of their subscription amount. The tax credit may be used against taxes payable within the five-year period following the first three years of investment, provided that shareholders elect to receive the tax credit pursuant to a majority vote at a shareholders' meeting held within two years of the rights offering.

### Loss carryforwards

We may use the loss carryforwards that we generated in 2001 to offset any taxable income generated by the end of 2006. As of June 30, 2003, our estimated loss carryforwards amounted to NT$1,351.5 million (US$39.0 million), of which NT$937.2 million (US$27.1 million) is expected to expire in 2006 and NT$414.2 million (US$11.9 million) is expected to expire in 2008.

### Tax credits

We benefit from tax credits that we may apply to reduce our tax liabilities. Prior to 2002, we received tax credits at a rate of 10% of the purchase price in connection with our purchase of imported equipment and at a rate of 20% of the purchase price in connection with our purchase of locally manufactured equipment. As of June 30, 2003, we had accumulated NT$4,434.9 million (US$128.2 million) of these tax credits. These tax credits are expected to expire four years from the end of the year in which we received the equipment. As of June 30, 2003, NT$768.3 million (US$22.2 million), NT$878.8 million (US$25.4 million), NT$1,580.7 million (US$45.7 million), NT$1,173.6 million (US$33.9 million) and NT$33.5 million (US$1.0 million) of these tax credits are expected to expire in 2003, 2004, 2005, 2006 and 2007, respectively. As a result of the ROC becoming a member of the World Trade Organization, the ROC

71

Ministry of Economic Affairs has amended the tax credit rules to adopt a tax credit to be applied to the purchase of equipment, regardless of the place of manufacture of the equipment. Starting from January 2002, if the costs for certain qualifying equipment in any taxable year exceed NT$0.6 million, the purchase of this equipment is entitled to a 13% tax credit.

We also benefit from other tax credits of up to 30% (25% prior to February 2002) of research and development and employee training expenses. If the amount of these expenses that we incur in any year exceeds the average of such expenses for the preceding two years, 50% of the excess amount may be included in the applicable tax credit for such year. As of June 30, 2003, we had accumulated NT$1,124.3 million (US$32.4 million) of these tax credits. These tax credits are expected to be fully utilized within five years from the year in which such expenses were incurred. The available tax credit in each year is limited to 50% of the corporate tax payable in that year, except for the last of the five years, for which there is no limit. As of June 30, 2003, NT$11.0 million (US$0.3 million), NT$180.9 million (US$5.2 million), NT$647.0 million (US$18.7 million), NT$153.8 million (US$4.4 million) and NT$131.6 million (US$3.8 million) of these tax credits were expected to expire in 2003, 2004, 2005, 2006 and 2007, respectively.

### Tax on retained earnings

In 1997, the ROC Income Tax Law was amended to integrate the corporate income tax and shareholder dividend tax. Under the amendment, after-tax earnings generated from January 1, 1998 and not distributed to shareholders as dividends in the following fiscal year will be assessed a 10% retained earnings tax. See "Taxation — ROC Taxation — Dividends on our common shares." As a result, if we do not distribute as dividends in any fiscal year all of our annual retained earnings generated in the preceding fiscal year, our applicable corporate income tax rate may exceed 25% for such fiscal year.

## Recent Accounting Pronouncements

We believe that there are no recent accounting pronouncements under ROC GAAP that would have a significant impact on our results of operations.

## Quantitative and Qualitative Disclosures about Market Risk

Market risk is the risk of loss related to adverse changes in market prices, including interest rates and foreign exchange rates, of financial instruments. We are exposed to various types of market risks, including changes in interest rates and foreign currency exchange rates, in the ordinary course of our business.

The following table is based on implied forward rates in the yield curve as of the reporting date. The information is presented in the currencies in which the instruments are denominated. We do not have any capital lease obligations.

| | Expected maturity dates | | | | | | Fair value as of June 30, 2003 |
| | 2003 | 2004 | 2005 | 2006 | 2007 and thereafter | Total | |
|---|---|---|---|---|---|---|---|
| | | | | (in thousands) | | | |
| **Assets** | | | | | | | |
| Certificates of deposit: | | | | | | | |
| Fixed rate (NT$) | — | — | — | — | — | — | — |
| Average interest rate | — | — | — | — | — | — | — |
| **Liabilities** | | | | | | | |
| Short-term loans: | | | | | | | |
| Fixed rate (NT$) | 8,396,145 | — | — | — | — | 8,396,145 | 8,396,145 |
| Average interest rate | — | — | — | — | — | 1.4853% | — |
| Secured long-term loans: | | | | | | | |
| Variable rate (NT$) | 3,226,810 | 6,653,620 | 11,938,620 | 5,134,470 | 6,822,980 | 33,776,500 | 33,776,500 |
| Average interest rate | — | — | — | — | — | — | — |

| | Expected maturity dates | | | | | | Fair value as of June 30, 2003 |
|---|---|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 and thereafter | Total | |
| | | | | (in thousands) | | | |
| **Cross-currency interest rate swaps:** | | | | | | | |
| Variable to fixed (US$) | 519,150 | — | — | — | — | 519.150 | 38,829 |
| Receive rate[1] | 1.31% | — | — | — | — | — | — |
| Pay rate | 5.51% | — | — | — | — | — | — |
| Variable to fixed (US$) | — | 519,150 | — | — | — | 519.150 | 28,612 |
| Receive rate[1] | — | 1.31% | — | — | — | — | — |
| Pay rate | — | 5.70% | — | — | — | — | — |
| Variable to fixed (NT$) | — | — | — | 3,000,000 | — | 3,000,000 | (82,718) |
| Receive rate | — | — | — | 1.114% | — | — | — |
| Pay rate | — | — | — | 3.09% | — | — | — |
| Variable to fixed (NT$) | — | — | 700,000 | — | — | 700.000 | (28,092) |
| Receive rate | — | — | 1.124% | — | — | — | — |
| Pay rate | — | — | 3.285% | — | — | — | — |
| Variable to fixed (NT$) | — | — | — | — | 1,000,000 | 1,000,000 | (47,561) |
| Receive rate | — | — | — | — | 1.155% | — | — |
| Pay rate | — | — | — | — | 3.35% | — | — |
| Variable to fixed (NT$) | — | — | — | — | 1,500,000 | 1,500,000 | (104,120) |
| Receive rate | — | — | — | — | 1.155% | — | — |
| Pay rate | — | — | — | — | 4.05% | — | — |
| Variable to fixed (NT$) | — | — | — | — | 2,000,000 | 2.000.000 | (135,397) |
| Receive rate | — | — | — | — | 1.155% | — | — |
| Pay rate | — | — | — | — | 4.00% | — | — |
| Variable to fixed (NT$) | — | — | — | — | 1,000,000 | 1,000,000 | (69,414) |
| Receive rate | — | — | — | — | 1.155% | — | — |
| Pay rate | — | — | — | — | 4.05% | — | — |
| Variable to fixed (NT$) | — | — | — | — | 1,000,000 | 1,000,000 | (69,414) |
| Receive rate | — | — | — | — | 1.155% | — | — |
| Pay rate | — | — | — | — | 4.05% | — | — |
| Variable to fixed (NT$) | — | — | — | — | 500,000 | 500,000 | (35,108) |
| Receive rate | — | — | — | — | 1.124% | — | — |
| Pay rate | — | — | — | — | 4.05% | — | — |
| Variable to fixed (NT$) | — | — | — | — | 1,000,000 | 1,000,000 | (69,414) |
| Receive rate | — | — | — | — | 1.155% | — | — |
| Pay rate | — | — | — | — | 4.05% | — | — |
| Variable to fixed (NT$) | — | — | — | — | 1,000,000 | 1,000,000 | (69,414) |
| Receive rate | — | — | — | — | 1.155% | — | — |
| Pay rate | — | — | — | — | 4.05% | — | — |
| Variable to fixed (NT$) | — | — | — | — | 1,000,000 | 1,000,000 | (68,607) |
| Receive rate | — | — | — | — | 1.155% | — | — |
| Pay rate | — | — | — | — | 4.02% | — | — |
| Variable to fixed (NT$) | — | — | — | — | 2,000,000 | 2,000,000 | (137,715) |
| Receive rate | — | — | — | — | 1.124% | — | — |
| Pay rate | — | — | — | — | 4.00% | — | — |
| Variable to fixed (NT$) | — | — | — | — | 1,000,000 | 1,000,000 | (66,189) |
| Receive rate | — | — | — | — | 1.155% | — | — |
| Pay rate | — | — | — | — | 3.93% | — | — |
| Variable to fixed (NT$) | — | — | — | — | 1,300,000 | 1,300,000 | (82,092) |

| | | | Expected maturity dates | | | | Fair value as |
|---|---|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 and thereafter | Total | of June 30, 2003 |
| | | | | (in thousands) | | | |
| Receive rate ............. | — | — | — | — | 1.124% | — | — |
| Pay rate ................... | — | — | — | — | 3.79% | — | — |
| Variable to fixed (NT$) | — | — | 2,000,000 | — | — | 2,000,000 | (68,791) |
| Receive rate .. ........... | — | — | 1.023% | — | — | — | — |
| Pay rate ................... | — | — | 2.775% | — | — | — | — |

(1)    Floating rate receivable.

Our exposure to market risk for changes in interest rates relates primarily to our long-term debt obligations. We incur debt obligations primarily for general corporate purposes, including capital expenditures and working capital needs. We use interest rate swaps to modify our exposure to interest rate movements and reduce borrowing costs. Interest rate swaps limit the risks of fluctuating interest rates on our borrowings by allowing us to convert variable interest rates to fixed interest rates.

*Foreign currency risk*

The primary foreign currency risks to which we are exposed are those related to the U.S. dollar and the Japanese yen. 85.8% and 8.5% of our net sales were denominated in U.S. dollars and Japanese yen, respectively, for the six months ended June 30, 2003, on an unconsolidated basis. In addition, 22.9% of our raw materials and component purchases and 49.0% of our equipment purchases were made with Japanese yen for the six months ended June 30, 2003, on an unconsolidated basis. We enter into short-term, forward exchange contracts and contracts to hedge the impact of foreign currency fluctuations on certain underlying assets, liabilities, firm commitments for purchasing raw materials and components and capital expenditures denominated in foreign currencies. The purpose of entering into these hedges is to minimize the impact of foreign currency fluctuations on our results of operations. Gains and losses on foreign currency contracts and foreign currency-denominated liabilities are recorded in the period the exchange rate changes, while gains and losses on foreign currency contracts that hedge foreign currency commitments are deferred until the commitments are realized. These contracts generally have maturity dates that do not exceed three months.

The table below sets forth our outstanding foreign currency forward contracts as of June 30, 2003, on an unconsolidated basis:

| | As of June 30, 2003 |
|---|---|
| **Contracts to sell US$/buy Japanese yen:** | |
| Aggregate contract amount (thousands of Japanese yen) ............ ......................... | JPY11,864,850.0 |
| Average contractual exchange rate ............ ........................... .. ............... | 118.649 yen per US$ |
| Difference in fair value (thousands of NT$) ............ ........................................ | NT$(6,220) |
| **Contracts to sell NT$/buy US$:** | |
| Aggregate contract amount (thousands of US$).. ........................... ...................... | US$10,000.0 |
| Average contractual exchange rate.... ............ ....................... ... ...................... | NT$34.6 per US$ |
| Difference in fair value (thousands of NT$)... .... ......................... .......................... | NT$(120) |

74

## Information Relating to Our Convertible Notes

On March 7, 2003, we completed a sale of an aggregate principal amount of US$250 million zero coupon convertible notes due 2008, each convertible into our common shares. To date, an aggregate principal amount of US$249.8 million of these notes has been converted into our common shares. We have notified the holders of our March 2003 convertible notes that we will redeem the balance of our March 2003 convertible notes on October 31, 2003.

On August 5, 2003, we completed a sale of an aggregate principal amount of US$250 million zero coupon convertible notes due 2008, each convertible into our common shares. As of October 20, 2003, an aggregate principal amount of US$200,000 of our August 2003 convertible notes was converted into our common shares. Under the Indenture governing the terms and conditions of our August 2003 convertible notes, holders of these notes may convert their convertible notes into our common shares on any business day during the conversion period, which commenced on September 5, 2003 and ends at the close of business in the location of the applicable paying agent on July 21, 2008. The conversion price for our August 2003 convertible notes is initially NT$43.52 per common share. The conversion price may be adjusted.

Under the Indenture governing the terms and conditions of our August 2003 convertible notes, in order to effect a conversion, a holder must complete, execute and deliver at such holder's expense during business hours on or before the business day prior to the end of the conversion period at the office of any paying agent, a conversion notice, in the form then obtainable from the office of any paying agent, together with, in the case of certificated convertible notes, the certificate representing the convertible notes to be converted, and any certificates and other documents as may be required under applicable law and any expenses or other payments required to be paid by the holder pursuant to the terms of the Indenture. A conversion notice once so delivered will be irrevocable and may not be withdrawn without our consent in writing. We may reject any incomplete or incorrect conversion notice. All costs and expenses incurred by an incomplete or incorrect conversion notice will be for the account of the relevant holder. A converting holder must satisfy all such conditions on or before the business day prior to the end of the conversion period. As a condition precedent to conversion, the holder must pay to the applicable paying agent all stamp, issue, registration and similar taxes and duties (if any) arising on conversion in the country in which the convertible note is deposited for conversion or arising in any jurisdiction consequent upon the issue and delivery of common shares or any other property or cash upon conversion to or to the order of a person other than the converting holder.

For a detailed description of the conditions governing, and the procedures for, conversion of our August 2003 convertible notes, you may inspect a copy of the Indenture governing the terms and conditions of our August 2003 convertible notes at the office of J.P. Morgan Bank Luxembourg S.A., our Luxembourg paying, conversion and transfer agent, which is located at 5, rue Plaetis, L-2338, Luxembourg Grund.

## Industry Overview

*The information and statistics in this section have been derived, in part, from various private publications. Such information and statistics may not be consistent with other information and statistics compiled by parties other than those that we have identified herein.*

### Background and History of TFT-LCDs

The LCD industry has experienced significant advances in technology and growth both in the number of applications and market share since the 1970s, when LCDs were first used in watches and calculators in the form of small monochromatic twisted nematic displays. With the development in the mid-1980s of super twisted nematic displays, which have improved viewing properties, the application of LCDs widened to include notebook computers with monochrome displays and smaller-sized consumer electronics, such as small LCD televisions

Thin film transistor, or TFT, technology, with active matrix circuitry (as compared to the passive matrix system of super twisted nematic LCDs) that allows for improved color qualities and faster refresh rates, was first commercialized for large-sized displays in the early 1990s. TFT-LCD panels are currently used in nearly all notebook computers, an increasing percentage of computer monitors and, to a lesser extent, LCD televisions

### The Market for Large-Sized Displays

The TFT-LCD market is segmented by panel size into small-, medium- and large-sized TFT-LCD panels. The large-sized segment, defined by DisplaySearch as panels that are ten inches and above in diagonal measurement, represents the largest part of the market by value. Large-sized TFT-LCD panels are used primarily for notebook computer screens, computer monitors and televisions. Small and medium-sized panels are defined by DisplaySearch as panels under ten inches in diagonal measurement. They are generally used in customer-specific products for smaller, more diverse and fragmented markets, including mobile handsets, automobile displays, personal digital assistants, digital cameras, camcorders and handheld electronic games, among other electronics applications. The market for large-sized TFT-LCD panels is currently both larger and growing at a faster rate than that for small- and medium-sized TFT-LCD panels. According to DisplaySearch, the large-sized panel market is expected to grow from US$17.0 billion in 2002 to US$44.6 billion in 2007, while the small- and medium-sized panel market is expected to grow from US$5 4 billion in 2002 to US$11 2 billion in 2007. Large-sized TFT-LCD panels may be manufactured more economically in newer, larger fabrication facilities that have the ability to process larger glass substrates, and have been the recent investment focus of ROC and Korean TFT-LCD panel manufacturers. The production of small- and medium-sized panels is dominated by Japanese manufacturers. They operate older fabs processing smaller glass substrates that are less economical for producing large-sized panels. Since the technologies, fabs, products and end-users for the two markets are different, the industry cycles for large-sized panels and for small- and medium-sized panels are not necessarily synchronized.

The large-sized TFT-LCD panel market is divided into notebook computer, desktop computer monitor and LCD television segments. The largest of these is notebook computers, almost all of which use large-sized TFT-LCD panels. DisplaySearch expects the notebook computer market to grow from 29.4 million units in 2002 to 54.5 million units in 2007, representing a compound annual growth rate of 13%. TFT-LCD panels for use in desktop computer monitors have shown the largest unit growth in the medium term, spurred by replacement of lower-resolution cathode ray tube displays. According to DisplaySearch, the desktop computer monitor LCD panel market is expected to grow from 32.2 million units in 2002 to 138.7 million units in 2007, representing a compound annual growth rate of 34%. LCD televisions, using panels that are 13 inches to over 40 inches in diagonal measurement, comprise a small segment of the market, but are expected to continue to show the largest percentage growth among the major end-user applications. DisplaySearch expects the LCD television market to grow from 1.4 million units in 2002 to 30 8 million units in 2007, representing a compound annual growth rate of 86%.

76

### Desktop Monitor Segment

Desktop computer monitors have traditionally used cathode ray tube technology, which is based on the conventional technology used in most televisions. LCD monitors have several advantages over conventional cathode ray tube monitors, including significantly thinner size and lighter weight, lower radiation, lower power consumption, sharper and more stable images and significantly higher resolution. The disadvantages of LCD monitors compared to cathode ray tube monitors include relatively higher prices and slower response times.

Replacement of cathode ray tube displays with TFT-LCD panels has been limited historically due to the higher cost of TFT-LCD panels. However, after the rapid price erosion of TFT-LCD panels in 2000 and 2001, the pricing disparity between 15-inch TFT-LCD monitors and comparable 17-inch cathode ray tube monitors has narrowed to 2.0 times in August 2003 from 3.3 times in December 2000 according to DisplaySearch. The same source notes that the annualized total cost of ownership, including factors such as electricity, space requirements and freight charges, was US$44 lower for 15-inch TFT-LCDs than for comparable 17-inch cathode ray tube monitors in August 2003. As a result of this price decline, TFT-LCD monitors are gradually replacing cathode ray tube monitors, and demand for LCD monitors is projected to surpass that of cathode ray tube monitors in 2004 on a full-year basis. According to DisplaySearch, the relative market share of LCD monitors (including integrated "LCD PCs") to all desktop monitors is expected to grow from 29% in 2002 to 83% in 2007.

Another potential factor that could increase TFT-LCD monitor demand is the bundling by major computer makers of TFT-LCD monitors, instead of cathode ray tube monitors, with their desktop computers. DisplaySearch has reported that Dell Corporation intends to increase bundled TFT-LCD monitor shipments significantly in 2003, as it eliminates some cathode ray tube offerings.

### Notebook Computer Segment

Although recent incremental demand has been driven primarily by TFT-LCD monitors, notebook computers remain an important and growing end market for TFT-LCD panels. Nearly all notebook computers use TFT-LCD panels. In 2002, 29.4 million notebook computers were shipped and sales of notebook computers are expected to grow at a compound annual rate of 13% from 2002 to 2007 according to DisplaySearch, reaching 54.5 million units in 2007. While some smaller-sized panels are used for "ultra-portable" notebook computers, 14-inch panels are currently the dominant notebook computer panel size. However, 15-inch panels are gaining market share as consumers increasingly purchase notebook computers to replace desktop computers, particularly since a 15-inch panel is equivalent in terms of display size to the 17-inch cathode ray tube display, which is commonly used with desktop computers.

### New Applications for TFT-LCDs

LCD televisions are anticipated to contribute to the growth of the TFT-LCD industry in the long term. The advantages of LCD televisions over cathode ray tube televisions are similar to the advantages of LCD desktop monitors over cathode ray tube desktop monitors. Historically, TFT-LCD panels have been used for specialty television products, such as portable televisions and airplane televisions, but have not been used as household televisions, which represent the largest segment of the television market. This is because standard household televisions are larger than 20 inches in diagonal measurement, which is larger than the panels used for most monitors and notebook computers. However, new fifth generation fabs, which utilize advanced process technologies to process larger glass substrates, are able to produce large-sized panels for household televisions at a lower cost than older fabs. According to DisplaySearch, the large-sized LCD television market is expected to increase from 1.4 million units in 2002 to 30.8 million units in 2007.

Other specific segments that may have increasing TFT-LCD content in the future include:

- medical devices, which require reliability and higher resolution;
- avionics, which requires light weight, durability and viewability under all conditions;

- publishing, which requires higher resolution and larger panels; and
- industrial applications, which require reliability and durability.

**Market Share of Key Players**

The worldwide TFT-LCD industry is currently concentrated in three Asian countries: South Korea, Taiwan and Japan. Although Japanese TFT-LCD manufacturers were the first to enter the market, their market share declined after Korean and ROC TFT-LCD manufacturers entered the market. ROC TFT-LCD manufacturers were the last of these three to penetrate the industry when they began commercial production in 1999. The following chart shows the breakdown in historical and projected TFT-LCD array formation and cell assembly capacity (including small-, medium- and large-sized panels) by region for the first quarter of 2002, 2003 and 2004:

**TFT-LCD Capacity by Region in Realistic Capacity[1]**



Source: DisplaySearch

(1) "Realistic" capacity makes minor adjustments to design capacity based on demand and panel optimization. Based on region of company ownership.

Many Japanese TFT-LCD manufacturers have not invested in newer generation fabs. Instead, they have focused on the production of low volume, customized, small- and medium-sized panels, which require more advanced technology but are less capital intensive.

Since their entry into the market, Korean TFT-LCD panel manufacturers have invested in technology and newer generation fabs generally in advance of other competitors. As a result, they currently enjoy competitive advantages in producing large-sized TFT-LCD panels.

ROC TFT-LCD panel manufacturers have also invested in new capacity and increased their market share. Their ability to source components locally, proximity to the world's leading notebook computer and monitor manufacturers, support from strong technology infrastructure and increased outsourcing from Japanese technology partners have helped fabs in the ROC compete with their counterparts in Japan and Korea. The major TFT-LCD panel manufacturers in the ROC currently include, in addition to our company,

78

AU Optronics, Chunghwa Picture Tubes, HannStar Display and Quanta Display. The following table sets forth the unit market share and realistic capacity of the top eight producers in the TFT-LCD panel industry for the period stated:

| | First half of 2003 | |
| --- | --- | --- |
| Supplier | Unit market share[1] | Realistic capacity[2] |
| | | ('000) |
| LG.Philips LCD ..................................................................... | 20.3% | 4,843 |
| Samsung Electronics ............................................................. | 17.9 | 4,475 |
| AU Optronics ......................................................................... | 11.7 | 2,690 |
| Chi Mei Optoelectronics (including IDTech) ........................ | 10.6 | 2,416 |
| Sharp Corporation ................................................................ | 7.1 | 2,261 |
| Chunghwa Picture Tubes ...................................................... | 6.6 | 1,280 |
| HannStar Display ................................................................... | 5.6 | 1,020 |
| Hitachi Ltd. ............................................................................ | 4.2 | 1,303 |
| Others .................................................................................... | 16.0 | 5,417 |
| Total ...................................................................................... | 100.0% | 25,705 |

Source: DisplaySearch

(1) Unit market share represents large-area TFT-LCD panels that are shipped by the TFT-LCD manufacturer to OEM customers.

(2) Capacity includes all TFT-LCD capacity in panels per quarter.

**Future Generation Fabs**

The TFT-LCD industry has experienced several generations of technology, with most current large-sized panel makers operating third or fourth generation fabs. The primary difference between the successive generations of TFT-LCD technology is the size of glass substrate used and the volume of panels produced. Newer generation fabs are capable of handling larger substrate sizes, which results in greater efficiency by increasing the size and number of panels that can be cut from a single substrate. Due to these economies of scale, new TFT-LCD fabs are expected to have larger substrate sizes, which should result in lower production costs.

Many TFT-LCD panel makers are currently in the process of adopting fifth generation technology. Fifth generation fabs will use glass substrates that are 1,000 mm to 1,150 mm by 1,200 mm to 1,300 mm in dimension. The glass substrates used in the fifth generation fabs are approximately 80% to 120% larger than the glass substrates used in fourth generation fabs. A fifth generation fab is capable of producing up to fifteen 15-inch panels per glass substrate, compared with six 15-inch panels per substrate for a fourth generation fab. A fifth generation fab processing 50,000 glass substrates per month is capable of producing 750,000 15-inch panels per month, which is two and a half times the output from a fourth generation fab and almost four times the output from a third generation fab processing the same number of glass substrates per month.

LG.Philips LCD and Samsung Electronics, two leading Korean TFT-LCD manufacturers, were the first to establish fifth generation fabs. LG.Philips LCD's fifth generation fab was the first to commence commercial production in March 2002, and LG.Philips LCD is currently constructing its first sixth generation fab. Samsung Electronics began ramping up capacity in its first fifth generation fab in the fourth quarter of 2002, and its second fifth generation fab will begin commercial production in the fourth quarter of 2003. Samsung has announced plans to skip the sixth generation fab and build the world's first seventh generation fab which is expected to ramp up in 2005. Our company, as well as AU Optronics, Quanta Display and others, are also in the process of implementing a fifth generation growth strategy. See "Business — Our Strategy."

79

The TFT-LCD industry's migration to fifth generation fabs is expected to widen the competitive gap between top-tier and second-tier producers, and make it more difficult for new competitors to enter the TFT-LCD panel market. The need to access large amounts of capital will likely limit the number of TFT-LCD manufacturers that will be able to construct fifth generation fabs. Challenges in undertaking fifth generation fab production include the limited availability of experienced technicians, the difficulty of handling larger substrates and the equipment and components required, particularly color filters. These factors may further restrict the number of TFT-LCD manufacturers that are able to operate a fifth generation fab efficiently and achieve a high, stable yield and utilization rate in a timely manner.

## Industry Pricing Trends

The LCD industry is highly cyclical due to periodic significant increases in incremental capacity. This cycle results primarily from the large investment demands posed by each new fab, the fact that large amounts of incremental capacity can become available over a short period of time and the long lead times of each investment. Price declines caused by overcapacity make TFT-LCD panels more affordable, open up new markets and expand the demand for products that use TFT-LCD panels. However, these price declines may also adversely affect the financial condition and results of operations of TFT-LCD panel manufacturers. The current increased demand for TFT-LCD monitors is a result of the last downturn in the cycle, when TFT-LCD panel prices fell dramatically. Compared with monitors, notebook computer demand has not been as sensitive to either increases or decreases in TFT-LCD panel prices. In addition, TFT-LCD panels represent a significantly lower percentage of total costs in a notebook computer than in a desktop monitor module.

Down cycles occurred twice in the 1990s: from 1994 to 1995, when Japanese manufacturers expanded capacity too rapidly in response to the increase in demand for notebook computers; and from 1997 to 1998. when Korean manufacturers entered the market during the Asian financial crisis, resulting in excess production capacity. Another cycle began in 2000 as a result of the entrance of new ROC manufacturers into the industry and capacity expansions by Korean manufacturers, causing prices for TFT-LCD panels to drop by 47.8% in 2001, according to DisplaySearch. The down cycle in 2001, while severe, significantly opened the desktop monitor segment to TFT-LCD makers, and TFT-LCD monitor volumes rose 73% in 2001, according to DisplaySearch. DisplaySearch has indicated that prices rose from October 2001 to June 2002 due to strong TFT-LCD monitor demand, limited supply and high fab utilization rates. However, prices declined in the second half of 2002 since several TFT-LCD panel manufacturers increased their manufacturing capacities and growth in demand, particularly for personal computer-based products, did not meet market expectations. Based on DisplaySearch data, average prices are estimated to have risen for the eight consecutive months commencing January 2003, due to the growth in average selling prices of individual sizes for notebooks, the continued shift towards larger and more expensive panels in most large area applications and significant gains projected for the TFT-LCD television market, which is marked by larger and more expensive panels.

## The TFT-LCD Panel Manufacturing Process

A TFT-LCD panel consists of a layer of liquid crystal between two glass substrates. After light passes through the liquid crystal and a color filter composed of the three primary colors of red, green and blue, it is perceived by the human eye as colored light. LCDs utilize the properties of liquid crystals and polarizing filters to generate images. The molecular structure of liquid crystals changes when an electrical current is conducted through them, thus changing the way light passes through the crystals.

The functions of the main elements that constitute a TFT-LCD are as follows:

- *Polarizing film* - controls the light entering and exiting;

- *Glass substrates* - stop the filtering of electricity from electrodes;

- *Liquid crystals* - control the direction of the light;

- *Color filters* - define color through the use of red, green and blue filters;

- *Backlight units* - provide the light source in the form of an even background of light; and

- *Driver integrated circuits* - provide the electrical signal that turns each pixel on and off.

The TFT-LCD panel manufacturing process can be categorized into four general steps, which are as follows:

*Color Filter Process* - Color filters are formed by depositing chemicals onto the color filter substrate. The formation consists of the following main steps: polishing of the substrate, formation of the black matrix, application of the color resist, photolithography, stripping of the unexposed photo resist and cleaning of the color filter. A separate pattern must be applied for each of the primary colors of red, green and blue.

*Array Process* - TFT arrays are formed by depositing chemicals onto the glass substrate in patterns to form the TFTs. The formation process consists of the following main steps: chemical deposition, photo resist application, photolithography and etching and stripping away the unexposed photo resist. All of these steps are fully automated. These several steps result in the TFT circuitry being printed layer by layer onto the glass substrate.

*Cell Process* - This intermediate stage of the TFT-LCD manufacturing process consists of the following main steps: applying edge sealant, placing substrates together, cutting the substrates into panels, injecting liquid crystals and final baking. As a result, the arrayed bottom substrate and the top substrate, which contains the color filters, are assembled and the cell space between the two substrates is filled with liquid crystals. This stage, like the first stage described above, is relatively technology-intensive.

*Module Assembly Process* - This last stage is a more mechanical finishing stage consisting of the following main steps: metal framing, affixing of polarizers, attachment of driver integrated circuits, affixing of backlight and final testing. This results in the attachment of external integrated circuits and printed circuit boards, which carry the integrated circuits and other electric components, to the panel. This stage is the most labor-intensive.

The diagram below sets forth the steps in the TFT-LCD panel manufacturing process:



## Principal Alternative Flat Panel Display Technologies

There are several alternative flat panel display technologies to TFT-LCD technology. Low temperature polysilicon technology uses polysilicon instead of amorphous silicon, as is used in standard TFT-LCD panels, and integrates driver integrated circuits directly onto the glass substrate. Low temperature polysilicon technology allows for the production of more durable and less complex screens and is considered to be the next generation of TFT-LCD technology. Currently, low temperature polysilicon displays are beginning to be used on a limited basis in small- and medium-sized TFT-LCD applications, such as personal digital assistants and digital cameras, but at the moment remain too costly for large-sized display applications. Organic light-emitting diode, or OLED, technology is another alternative to flat panel display technology. Organic light-emitting diode products use electro-luminescent materials and generally a low temperature polysilicon

81

backpanel under active matrix schemes. Both passive and active matrix organic light-emitting diode products are beginning to be commercialized for small- and medium-sized panel applications, such as wireless handsets and car audio systems. Organic light-emitting diode revenue was US$116 million in 2002, but is expected to exceed US$2,458 million in 2007, according to DisplaySearch. A third alternative display technology, plasma, is based on the luminescence of an array of small gas cells and is currently limited for use in displays of 30 inches and above in diagonal measurement, such as televisions and industrial displays. DisplaySearch forecasts that plasma display panel revenue will grow from US$1,163 million in 2002 to over US$6,809 million in 2007.

## Corporate Structure

The following chart shows our corporate structure immediately after this offering:



---

(1)   Includes 420.3 million common shares (12.76%) beneficially owned through Linklinear Investment Co., Ltd., 44.9 million common shares (1.36%) beneficially owned through Tai Chi Investment Co., Ltd., 15.1 million common shares (0.46%) beneficially owned through Chi Mei Foundation and 12.7 million common shares (0.38%) beneficially owned through Chi Lin Technology Co., Ltd. Chi Mei Corporation owns 48.98% of Linklinear Investment Co., Ltd., 6.67% of Tai Chi Investment Co., Ltd. and 49.16% of Chi Lin Technology Co., Ltd. and nominated the majority of the current directors of these companies. If the Initial Purchasers' option to purchase additional GDSs is exercised in full, Linklinear Investment Co., Ltd. will hold 370.3 million common shares, which will result in Chi Mei Corporation's beneficial interest in our company being reduced to 42.46% immediately after this offering.

(2)   57.54% if the Initial Purchasers' option to purchase additional GDSs is exercised in full.

# Business

## Overview

We are one of the world's leading manufacturers of TFT-LCD panels based on production capacity. As of June 30, 2003, our total production capacity was approximately 305,888 square meters of glass substrates per quarter, or 12.2 million 15-inch panel equivalents per year. Substantially all of our products are categorized as "large-sized" TFT-LCD panels, meaning panels ten inches and above in diagonal measurement. Based on data on the number of large-sized panels shipped in the first half of 2003 published by DisplaySearch, we had a market share of approximately 10.6%. Our vision is to combine superior TFT-LCD technology with cost-effective capacity expansion and a global, diversified customer base.

In pursuit of our vision of cost-effective capacity expansion, we established two fabs in the Tainan Science-based Industrial Park in Taiwan and acquired from IBM Japan and Display Technologies, during the most recent industry downturn, an 85% interest in their TFT-LCD fabrication equipment located at a fab in Yasu, Japan and a ten-year facility lease for such fab. We began commercial production at Fab 1, a 3.5 generation fab utilizing 620mm by 750mm glass substrates, in December 1999 and at Fab 2, a fourth generation fab utilizing 680mm by 880mm glass substrates, in October 2001. Fab 1 completed its ramp-up phase and reached full design capacity in the second quarter of 2001. Fab 2 completed its ramp-up phase and reached full design capacity in the fourth quarter of 2002. The Yasu fab began commercial production in November 1995 and is a third generation fab utilizing 550mm by 650mm glass substrates. The integration of the Yasu fab with our Taiwan operations is expected to yield cost efficiencies.

The next phase of our capacity expansion, which we began in March 2002, is to construct a new fifth generation fab that will utilize 1,100mm by 1,300mm glass substrates that are approximately twice as large as those used in fourth generation fabs. We have completed the Fab 3 equipment move-in and are currently conducting pilot testing. We expect Fab 3 to begin commercial production in the fourth quarter of 2003 and reach a monthly design capacity of 30,000 glass substrates by the end of 2003. This initial phase of Fab 3 construction will require approximately NT$30,000.0 million (US$866.8 million) in capital expenditures. The second phase of Fab 3 is expected to add an additional 30,000 glass substrates in monthly capacity in the second quarter of 2004 and would require us to make additional capital expenditures of approximately NT$10,000.0 million (US$288.9 million) on equipment. The third and fourth phases of Fab 3 are each expected to add an additional 30,000 glass substrates in monthly capacity by the third quarter of 2004 and the end of 2004, respectively, and would require us to make further capital expenditures of approximately NT$8,000.0 million (US$231.1 million) and NT$7,000.0 million (US$202.3 million), respectively, on equipment. We believe Fab 3 will allow us to achieve greater cost efficiencies and enable us to produce larger panel sizes more efficiently.

We believe we are among the technology leaders in the global TFT-LCD market. In particular, our technologies have enabled us to make significant advances, such as offering wider viewing angles and higher resolutions, lowering materials costs and producing larger panels at higher yields. In connection with our acquisition of the TFT-LCD fabrication business in Yasu, we gained a license to IBM's TFT-LCD technology, and the experienced research and development team from the Yasu fab. This acquisition has further strengthened our own internally developed design and process technology and production know-how.

Our major customers include both branded industry leaders, such as Dell Corporation, Fujitsu, IBM, Samsung Electronics and Toshiba Corporation, as well as companies in Taiwan that manufacture products on a contract basis for global branded companies. We believe this broad customer base allows us to diversify our revenue sources and improves our pricing flexibility. In addition, our presence in Yasu has allowed us to both expand our customer base and reinforce our relationships with existing customers.

Our consolidated net sales increased from NT$9,381.4 million in 2000 to NT$20,919.8 million in 2001 and to NT$59,677.1 million (US$1,719.8 million) in 2002 and our unconsolidated net sales increased from NT$21,183.2 million in the six months ended June 30, 2002 to NT$24,014.6 million (US$693.9 million) in

84

the six months ended June 30, 2003. We had consolidated net income available to common shares of NT$1,946.8 million in 2000 and a consolidated net loss available to common shares of NT$4,099.8 million in 2001. Our net loss in 2001 was due primarily to the downturn in the TFT-LCD industry cycle and the resulting significant decrease in the average selling prices of our panels during this period. In 2002, we had consolidated net income available to common shares of NT$4,487.2 million (US$129.3 million). We had unconsolidated net income available to common shares of NT$4,005.5 million in the six months ended June 30, 2002 and NT$77.1 million (US$2.2 million) in the six months ended June 30, 2003. These period-to-period changes in our net income available to common shares are indicative of the cyclical nature of our industry, and it is likely that we will experience net losses again during the next industry down cycle.

We were incorporated (Corporate Registration Number: 16130303) on August 6, 1998 under the ROC Company Law to conduct all lawful business activities as provided in article 2 of our articles of incorporation.

## Our Strategy

Our objective is to strengthen our position as a leading manufacturer of TFT-LCD panels. We plan to achieve this goal by implementing the following strategies:

### *Taking advantage of our advanced technology to increase the competitiveness of our existing products and produce higher margin new products*

We believe that the technology and know-how we utilize is the most advanced in Taiwan, and among the best worldwide. We maintain our technological edge by continual investment in our research and development activities and by leveraging and further improving the significant amount of product and process technology and know-how we obtained with the acquisition of the Yasu fab. Furthermore, we believe that some of our technologies not only allow us to differentiate our products from those of our competitors, but also enable us to increase our market share for these products. In particular, we are able to develop higher margin products with, among other attributes, superior resolution, wider viewing angles, thinner and lighter glass and larger panel sizes. For example, we have developed large-sized panels for use in TFT-LCD televisions and, during the first half of 2003, commenced commercial shipment of 20-inch and 30-inch panels for use in televisions. According to DisplaySearch, we are the only Taiwanese manufacturer that is currently providing 25-inch or larger panels for use in TFT-LCD televisions.

### *Optimizing product mix and targeting high margin TFT-LCD markets*

We intend to optimize our product mix by focusing more of our efforts on higher margin products. Specifically, we intend to:

- *Expand penetration of the TFT-LCD television business.* We believe that the larger panel size and more stringent requirements of television panels will provide higher margins to producers. We plan to increase our revenues derived from television end-use applications as a percentage of our total revenues.

- *Expand our small and medium panel business through a foundry model.* Small and medium-size panels for consumer electronics devices such as digital cameras and PDAs can have attractive margins, but the wide range of applications and development time required to meet the customer's needs can make providing panels for such devices excessively costly. We plan to focus on this segment through a foundry model, which allows us to participate in the growth of the market while minimizing the heavy resources required for the sales and marketing.

- *Increase our exposure in high-end PC notebook and large-size monitor markets.* We believe high-end PC notebooks and large-size monitors command better profit margins than commodity products. We plan to leverage our technology capabilities such as slim glass and high-resolution technology to offer differentiated products.

### *Enhancing margins through cost reduction*

We are committed to improving our margins through aggressive cost reduction initiatives, such as:

- *Reducing raw materials and components costs.* We believe that the ability of TFT-LCD manufacturers to source raw materials and components locally and establish reliable supply chains will be a crucial factor in the reduction of overall production costs. We are addressing these requirements through:

    - *Internal production of components.* Color filters represent a major cost item in the production of TFT-LCD panels. Our Taiwan operations save significant packaging, transportation and other costs relating to color filters by producing these components internally. We are currently in the pilot run stage of our color filters production line for Fab 3.

    - *Near or on-premises production of components.* Through close relationships with our suppliers, we are able to source components both within our fab boundaries and near our fabs in order to lower transportation costs and ensure adequate and timely supplies. For example, Coretronics Inc. produces backlights for our Taiwan operations within our module assembly facility. We are currently bringing online similar on-premises production arrangements with manufacturers of two other key components, polarizers and CCFL.

- *Continually upgrading our process technology.* In addition to the establishment of our fifth generation fab, which will allow us to significantly lower production costs per panel, there are other process technologies that we are already utilizing for cost savings. For example, we were the first TFT-LCD panel manufacturer to adopt one-drop filling technology for commercial production. This technology allows for a substantial reduction in production cycle time and improvement in production yield, especially for larger panels. We plan to continue focusing on improving our process technology and know-how to lower our costs.

- *Continuing to achieve greater efficiencies through integration of the Yasu fab with our Taiwan operations.* We have already achieved greater efficiencies through the integration of research and development, sales and marketing and administrative functions and we expect to continue improving efficiencies through the integration of the procurement and production planning functions of the Yasu fab with our Taiwan operations.

### *Achieving higher-margin sales through strong customer relationships and high quality service*

We focus on maintaining strong customer relationships and providing high quality customer service. We develop customer relationships by locating our service teams near our customers. These teams address the needs of our customers in various areas, including design, qualification, logistics and quality assurance. From time to time, we also co-develop products with customers. These co-development activities usually relate to advanced or highly integrated panel products. We believe that our focus on customer service has allowed us to support a more diversified product mix with better average selling prices and margins, and to sell higher volumes of panels to the main customers we target.

### *Increasing capacity through ramp-up of advanced production facilities*

We continue to review and assess current TFT-LCD market supply and demand conditions and will align our technology maturity and customer readiness for new products with our capacity expansion plan to allow for timely expansions to capture high growth product segments. The ramp-up of our fifth generation Fab 3 in 2003 will greatly enhance our capacity. In particular, we will be able to produce much larger TFT-LCD panels at a lower cost with our fifth generation fab than with earlier generation fabs. In addition, we have started constructing the foundation for our next fab, Fab 4, to further increase our capacity. Furthermore, by building optimal capacity for each single fab at each technology generation, we believe that we achieve higher manufacturing efficiencies.

## Our Principal Products

We manufacture and sell a wide range of large-sized TFT-LCD panels mainly for use in monitors and notebook computers. These large-sized TFT-LCD panels manufactured by us range in diagonal size from 10.4 inches to 30 inches. Monitors and notebook computers accounted for 56.3% and 34.0%, respectively, of our net sales in 2002. We also began producing a small number of small-sized panels in the fourth quarter of 2002 and 20-inch and 30-inch panels for LCD television applications in the second quarter of 2003. We expect that these larger panels for use in LCD televisions will account for increasingly large portion of our overall product sales and revenues in the future.

The following table sets forth the number of panels sold and our net sales in 2000, 2001, 2002 on a consolidated basis and as of the first three months of 2003 on an unconsolidated basis by size of TFT-LCD panel and by type of end use application. The relative shift in our sales from notebook computers to monitors was principally the result of a decrease in the price of TFT-LCD panels relative to cathode ray tube displays in 2001 and 2002 and growing consumer preference for TFT-LCD panels. Due to this change in relative price many of our customers began using TFT-LCD panels instead of cathode ray tube displays in their desktop monitors.

| Type of end-use application | Size of TFT-LCD panel | Consolidated year ended December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2000 | | | | 2001 | | | |
| | | Net sales | % of total | Number of panels | % of total | Net sales | % of total | Number of panels | % of total |
| | (inches) | (NT$ millions) | | | | (NT$ millions) | | | |
| Notebook computers | Below 14.1[1] | 0.5 | 0.0% | 78 | 0.0% | 360.8 | 1.7% | 70,417 | 2.4% |
| | 14.1 | 5,886.5 | 62.8 | 519,424 | 64.5 | 6,975.1 | 33.4 | 1,213,383 | 41.3 |
| | 15 | 0.0 | 0.0 | 0 | 0.0 | 1,658.7 | 7.9 | 198,802 | 6.8 |
| | Sub-total | 5,887.0 | 62.8 | 519,502 | 64.5 | 8,994.6 | 43.0 | 1,482,602 | 50.5 |
| Monitors | 14.1 | 1,534.9 | 16.4 | 126,064 | 15.7 | 392.1 | 1.9 | 86,270 | 3.0 |
| | 15 | 1,575.7 | 16.8 | 135,308 | 16.8 | 4,826.9 | 23.1 | 649,728 | 22.1 |
| | 17[3] | 454.2 | 4.8 | 24,263 | 3.0 | 4,859.6 | 23.2 | 412,193 | 14.0 |
| | 18 and above[3] | 0.0 | 0.0 | 0 | 0.0 | 1,104.9 | 5.3 | 64,405 | 2.2 |
| | Sub-total | 3,564.8 | 38.0 | 285,635 | 35.5 | 11,183.5 | 53.5 | 1,212,596 | 41.3 |
| Others[4] | Sub-total | (70.4) | (0.8) | 0 | 0.0 | 741.7 | 3.5 | 242,217 | 8.2 |
| | Total | 9,381.4 | 100.0% | 805,137 | 100.0% | 20,919.8 | 100.0% | 2,937,415 | 100.0% |

(1) Includes data for 10.4-inch and 12.1-inch panels.
(2) Includes data for 17.4-inch panels.
(3) Includes data for 18.0-inch, 18.1-inch, 20.8-inch, 21.3-inch and 22.2-inch panels.
(4) Includes (i) arrays and cells sold by the Yasu fab after October 2001 and our Taiwan operations, (ii) other products and services sold by our Taiwan operations, including small-sized panels manufactured at Fab 1, and (iii) provision for sales returns.

| Type of end-use application | Size of TFT- LCD panel | Consolidated year ended December 31, 2002 | | | | |
|---|---|---|---|---|---|---|
| | | Net sales | Net sales | % of total | Number of panels | % of total |
| | (inches) | (NT$ millions) | (US$ millions) | | | |
| Notebook computers | Below 14.1[1] | 2,511.5 | 72.4 | 4.2% | 427,942 | 5.9% |
| | 14.1 | 10,824.7 | 312.0 | 18.1 | 1,513,168 | 20.9 |
| | 15 | 6,976.3 | 201.0 | 11.7 | 716,443 | 9.9 |
| | Sub-total | 20,312.5 | 585.4 | 34.0 | 2,657,553 | 36.7 |
| Monitors | 14.1 | 147.6 | 4.2 | 0.3 | 20,041 | 0.3 |
| | 15 | 16,006.8 | 461.3 | 26.8 | 2,214,059 | 30.6 |
| | 17[2] | 10,655.5 | 307.1 | 17.9 | 1,052,747 | 14.5 |
| | 18 and above[3] | 6,750.2 | 194.5 | 11.3 | 407,190 | 5.6 |
| | Sub-total | 33,560.1 | 967.1 | 56.3 | 3,694,037 | 51.0 |
| Others[4] | Sub-total | 5,804.5 | 167.3 | 9.7 | 887,961 | 12.3 |
| | Total | 59,677.1 | 1,719.8 | 100.0% | 7,239,551 | 100.0% |

(1) Includes data for 10.4-inch and 12.1-inch panels.
(2) Includes data for 17.4-inch panels.
(3) Includes data for 18.0-inch, 18.1-inch, 20.8-inch, 21.3-inch and 22.2-inch panels.
(4) Includes (i) arrays and cells sold by the Yasu fab and our Taiwan operations, (ii) other products and services sold by our Taiwan operations, including small-sized panels manufactured at Fab 1, and (iii) provision for sales returns.

| Type of end-use application | Size of TFT- LCD panel | Unconsolidated six months ended June 30, 2003 | | | | |
|---|---|---|---|---|---|---|
| | | Net sales | Net sales | % of total | Number of panels | % of total |
| | (inches) | (NT$ millions) | (US$ millions) | | | |
| Notebook computers | Below 14.1[1] | 0.0 | 0.0 | 0.0 | — | 0.0 |
| | 14.1 | 1,682.8 | 48.6 | 7.0 | 330,595 | 9.4 |
| | 15 | 654.7 | 18.9 | 2.7 | 102,647 | 2.9 |
| | Sub-total | 2,337.5 | 67.5 | 9.7 | 433,242 | 12.3 |
| Monitors | 14.1 | 131.0 | 3.8 | 0.6 | 30,557 | 0.9 |
| | 15 | 10,095.9 | 291.7 | 42.0 | 1,665,496 | 47.5 |
| | 17 & 17.4 | 6,980.9 | 201.7 | 29.1 | 849,490 | 24.2 |
| | 18 and above[2] | 1,995.9 | 57.7 | 8.3 | 220,721 | 6.3 |
| | Sub-total | 19,203.7 | 554.9 | 80.0 | 2,766,264 | 78.9 |
| Others[3] | Sub-total | 2,473.4 | 71.5 | 10.3 | 309,333 | 8.8 |
| | Total | 24,014.6 | 693.9 | 100.0% | 3,508,839 | 100.0% |

(1) Includes data for 10.4-inch and 12.1-inch panels.
(2) Includes data for 18.0-inch and 19.0-inch panels.
(3) Includes (i) 20.0-inch, 27.0-inch and 30.0-inch panels for use in televisions, (ii) arrays and cells sold by the Yasu fab after October 2001 and our Taiwan operations, (ii) other products and services sold by our Taiwan operations, including small-sized panels manufactured at Fab 1, and (iii) provision for sales returns.

The key characteristics by which the quality and performance of a TFT-LCD panel are measured include the following:

- panel size;
- resolution;
- viewing angle;
- thickness and weight;
- power consumption;
- brightness;
- response time; and
- color saturation.

These key characteristics vary from product to product, and depend on the requirements of our customers and the end use applications for these panels. We believe that the variety and quality of our TFT-LCD panels in terms of, among other characteristics, panel sizes, resolution and viewing angles, are among the best in Taiwan. We also believe that the Yasu fab's products incorporate the highest resolution technology available, have the highest level of brightness and represent the thinnest and lightest panels in the TFT-LCD industry. This know-how is currently being shared by the Yasu fab with technicians in our Taiwan fabs in order to assist these fabs in achieving the same level of technological competence as the Yasu fab. For example, know-how that our Taiwan operations have obtained from the Yasu fab include a new glass polishing technique, a new photo process technique and improvements to our one-drop filling technology, which is critical in producing larger-sized panels for television applications.

### Our Current Facilities, Production Capacity and Technological Capabilities

#### Facilities and production capacity

We currently operate three fabs. The capacity of fabs is usually measured either in total number of or total square meters of glass substrates input per quarter or in terms of 15-inch panel equivalents per year. As of June 30, 2003, our total production capacity was approximately 305,888 square meters of glass substrates per quarter, or 12.2 million 15-inch panel equivalents per year. The following table lists our existing fabs, together with the year of commencement of commercial production, technology level and capacity during the last three years and the first six months of this year:

| Fab | Month and year of commencement of commercial production | Technology level (substrate size) | Primary size(s) of panels produced | Monthly capacity as of | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | December 31, | | | | | | June 30, |
| | | | | 2000[1] | 2001[1] | 2002[1] | 2000[2] | 2001[2] | 2002[2] | 2003[2] |
| Fab 1 ........ | December 1999 | 3.5G (620mm x 750mm) | 14-inch and 17-inch panels | 40,000 | 56,000 | 60,000 | 160,000 | 224,000 | 240,000 | 228,560 |
| Fab 2[3] ..... | October 2001 | 4G (680mm x 880mm) | 15-inch and 20-inch panels | 0 | 22,000 | 75,000 | 0 | 132,000 | 450,000 | 495,360 |
| Yasu fab ..... | November 1995 | 3G (550mm x 650mm) | 15-inch panels | N/A | 75,000 | 75,000 | N/A | 300,000 | 300,000 | 290,784 |
| Total ........ | | | | 40,000 | 153,000 | 210,000 | 160,000 | 656,000 | 990,000 | 1,014,704 |

89

(1)   In number of glass substrates per month
(2)   In 15-inch panel equivalents per month.
(3)   Fab 2 reached its design capacity of 75,000 glass substrates per month in the fourth quarter of 2002.

Module assembly is the last and most labor-intensive phase of the TFT-LCD panel production process. Fab 1 performs module assembly for the panels it produces. We also have a separate module assembly facility in the Tainan Science-based Industrial Park. This facility has a monthly assembly capacity of 500,000 panels per month and serves as a module assembly facility for panels manufactured at Fab 2 and will also process panels manufactured at Fab 3 when commercial production commences. By having in-house module assembly capacity for our Taiwan operations, we save packaging and transportation costs. The Yasu fab subcontracts the module assembly process for its products to third parties in the Philippines, mainland China and Japan.

The capacity of a fab is determined based on the capacity ratings given by manufacturers of the equipment used in the fab, adjusted for, among other factors, actual output during uninterrupted trial runs, expected down time due to setup for production runs and maintenance, and expected product mix. All of our fabs operate 24 hours per day, seven days a week, except for annual scheduled maintenance stoppages. Each employee in our Taiwan fabs works twelve-hour shifts in two-day rotations, with two days off in between. Employees in the Yasu fab work eight-hour shifts in a staggered rotation of five days a week.

Each of our three fabs is optimized to most efficiently produce a different mixture of panel sizes depending on its specific glass substrate inputs. A single glass substrate of a given size will yield only up to a fixed number of panels of a given size. For example, a glass substrate of 550mm by 650mm can yield six 10.4-inch or 12.1-inch panels, four 13.3-inch, 14.1-inch or 15-inch panels, two 17-inch, 18-inch or 20-inch panels or one 25-inch, 28-inch or 30-inch panel. A fab's production is considered optimized if it produces the maximum possible number of panels from a single glass substrate. Our Fab 1 is optimized for 14-inch and 17-inch panels, our Fab 2 is optimized for 15-inch and 20-inch panels and the Yasu fab is optimized for 15-inch panels. We believe this diversity in substrate sizes not only provides us with flexibility to efficiently produce a wide range of panel sizes, but also enables us to take advantage of what we believe will continue to be the shift in market demand towards larger panels. We currently manufacture TFT-LCD panels of up to 30 inches in diagonal measurement. Large panels of over 20 inches in diagonal measurement are currently manufactured at Fab 2 and will also be manufactured at Fab 3 once that fab enters into commercial production in the fourth quarter of 2003.

### Technological capabilities

A substantial portion of the technology and know-how utilized in our production processes is self-developed. In addition, in connection with our acquisition of IDTech, we purchased a substantial amount of flat panel display-related manufacturing technology from IBM. See "Our Acquisition of IDTech and Relationship with IBM." We have also entered into a technology licensing agreement with Fujitsu. Under this arrangement, Fujitsu licenses to us its proprietary multi-domain vertical alignment wide viewing angle technology for a royalty fee based on the revenue from products we sell using this technology, excluding those products manufactured for Fujitsu. See "Our Relationship with Fujitsu."

### Design technology

One of our primary objectives is to apply our technological expertise to develop higher value-added products. For example, we developed "super multi-domain vertical alignment" technology in 2001, which is based on the multi-domain vertical alignment wide viewing angle technology we license from Fujitsu. Super multi-domain vertical alignment technology requires the application of an additional layer of film on the surface of the polarizer. Super multi-domain vertical alignment panels have a higher contrast ratio than regular multi-domain vertical alignment panels, which results in a wider viewing angle, particularly from diagonal perspectives. We believe the viewing angles offered by our super multi-domain vertical alignment panels are among the best in the world. In addition, we jointly developed with Honeywell International Inc. in 2001 a 14.1-inch super multi-domain vertical alignment TFT-LCD panel technology for use in Honeywell

90

International Inc.'s integrated avionics systems on board business jets. We believe super multi-domain vertical alignment technology provides us with a competitive advantage in applications that require wide viewing angles, such as LCD televisions, avionics and medical diagnostics. By continually working to develop these types of high value-added products, we have also been able to improve and refine the production processes used for more standard applications, thereby resulting in more sustainable average selling prices and higher margins for these products.

Another technological advantage of our products is their fast response time. Response time measures the speed at which each pixel in the screen can change color and determines the clarity and sharpness of moving images. The higher the response time, the clearer moving images will appear, making this technology particularly important for LCD television applications. While speeds of 20 to 30 milliseconds are the current standard, with the "overdrive" technology we license from IBM, we have been able to produce panels with a response time of 16 milliseconds. This is more than twice as fast as necessary to properly view most motion pictures.

We have already recorded a number of significant achievements in product development and production. In addition to being the first Taiwan TFT-LCD manufacturer to produce an internally designed large-sized TFT-LCD panel, and the first TFT-LCD manufacturer in the world to produce a wide viewing angle twisted nematic TFT-LCD panel, we were also the first Taiwan TFT-LCD manufacturer to produce TFT-LCD panels with color saturation exceeding the standards as set forth by the National Television Standards Committee, the organization responsible for setting television and video standards in the United States.

Moreover, the Yasu fab has been a pioneer in the introduction of new products and product technologies in the TFT-LCD industry. In the past decade, the Yasu fab has recorded numerous global first-to-market achievements, including:

- the first 10.4-inch TFT-LCD panel;
- the first monochromatic TFT-LCD panel for medical applications; and
- the first panel for notebook computers utilizing in-plane switching technology, that can provide viewing angles of up to 170 degrees.

### Process technology

We also place strong emphasis on the development of process technologies, which often result in significant cost reductions. For example, as glass constitutes 50% of the total weight of TFT-LCD modules, the Yasu fab has developed know-how that allows it to significantly reduce the thickness of the glass substrates it uses through a special polishing process developed together with Nitto International. These thinner and lighter glass substrates, which are used in the manufacture of 14.1-inch panels used in notebook computers, have a combined thickness of between 0.8mm and 0.9mm, compared to the current TFT-LCD industry standard of 1.2mm. This results in a decrease of approximately 20% in panel weight. We have also installed similar polishing equipment in Fab 2.

Our Taiwan operations also employ "one-drop filling" technology to fill the space between the glass substrate and the color filter with liquid crystals. This process involves the application of the liquid crystals directly on top of the glass substrate instead of injecting them from the side after the color filter has been mounted. The application of this technology results in more efficient use of liquid crystals, higher yield rates and a substantial reduction in production cycle time, especially for larger panels. We licensed this technology from Fujitsu, and we have gradually improved our one-drop filling know-how since we began commercial production using this technology in the second quarter of 2002. We use this technology in the manufacture of 18-inch and larger panels for use in monitors, and plan to use this technology in Fab 3.

In May 2002, all six manufacturers of TFT-LCDs in Taiwan, including our company, jointly entered into an agreement with the ROC's Industrial Technology Research Institute for the purchase of a limited duration joint ownership interest in 232 patents for technology relating to the manufacture of TFT-LCD panels. Each of the six manufacturers agreed to pay approximately NT$20.0 million (US$0.6 million) for its share of the

ownership interest in the patents, which allows each of these manufacturers to use the patents without the consent of the other joint owners. Sole ownership of these patents will revert to the Industrial Technology Research Institute after seven years. We expect the purchase of these patents will provide us with protection against patent infringement claims by non-ROC TFT-LCD manufacturers. However, these patents only protect our Taiwan operations and cannot be licensed or cross-licensed by us individually to any third party, including IDTech.

## Our Capacity Expansion and Technology Upgrade Plans

Once the design of a new fab is completed, it typically takes four to six quarters before the fab commences commercial production, during which time we construct the building, install the machinery and equipment and conduct test production at the fab. It then takes an additional four to six months for the fab to reach its design capacity and achieve high manufacturing yields. At the beginning of this ramp-up process, fixed costs, such as depreciation and amortization, labor, general and administrative and other expenses, are relatively high on a per panel basis, primarily as a result of the low output. Variable costs, particularly raw material and component costs, are also relatively high on a per panel basis since manufacturing yield is typically low in the early stages of a fab's ramp-up, leading to greater wastage of raw materials and components. Generally, as a fab completes the ramp-up process, its production levels gradually approach its installed capacity, leading to lower fixed costs per panel as a result of higher output, as well as lower raw materials and components costs per panel as a result of higher manufacturing yields. We typically construct our new fabs in phases in order to allocate our aggregate capital expenditures across a greater period of time. As a result, the installed capacity in the early phases of production at a new fab is typically lower than its design capacity, which is the maximum capacity that can be installed at a fab.

Giving effect to the ramp-up of Fab 2, our production capacity reached approximately 305,888 square meters of glass substrates per quarter, or 12.2 million 15-inch panel equivalents per year, as of June 30, 2003. In March 2002, we began construction of Fab 3 in the Tainan Science-based Industrial Park. We plan to spend approximately NT$30,000.0 million (US$866.8 million) on the initial planned capacity of Fab 3 of 30,000 glass substrates per month by the end of 2003. We completed the equipment move-in for Fab 3 in the second quarter of 2003, and plan to commence commercial production in the fourth quarter of 2003. We plan to make additional capital expenditures of: approximately NT$10,000.0 million (US$288.9 million) in 2003 and 2004 on the second phase of Fab 3, which would yield 30,000 glass substrates of additional capacity per month by second quarter of 2004; approximately NT$8,000.0 million (US$231.1 million) in 2004 on the third phase of Fab 3, which would yield 30,000 glass substrates of additional capacity per month by third quarter of 2004; and approximately NT$7,000 million (US$202.3 million) in 2004 on the fourth phase of Fab 3, which would yield 30,000 glass substrates of additional capacity per month by the end of 2004. In addition, we have started constructing the foundation for our next fab, Fab 4. We estimate the total investment for Fab 4 will be between NT$55,000 million (US$1,589.1 million) and NT$70,000 million (US$2,022.5 million). As of the date of this offering circular, we have not made a decision relating to the technology generation, capacity or ramp-up schedule for Fab 4.

In connection with our purchase of IDTech, we were also granted an option to purchase equipment and other assets relating to TFT-LCD cell assembly located in Himeji, Japan from Display Technologies, the former joint venture between IBM Japan and Toshiba Corporation. We provided notice to Display Technologies of our intention to exercise this option on March 28, 2002. We do not believe this equipment and other assets are material to our overall business. We plan to relocate this equipment and other assets from Himeji to either Tainan or Yasu.

We have no intention to reduce, change or abandon our existing fabs, including all of their associated equipment and fixed assets, in connection with the implementation of our fifth generation growth strategy. Accordingly, no events or changes in circumstances have occurred to indicate to us that these assets may be impaired.

## Our Fifth Generation Fab 3

In March 2003, we began production on our fifth generation Fab 3. This fab will utilize 1,100 mm by 1,300 mm glass substrates that are approximately twice as large as those used in fourth generation fabs. We have completed the Fab 3 equipment move-in and are currently conducting pilot testing. We expect Fab 3 to begin commercial production in the fourth quarter of 2003 and reach a monthly design capacity of 30,000 glass substrates by the end of 2003. We plan to complete the second, third and fourth phases of Fab 3 by mid-year 2004, the third quarter of 2004 and the end of 2004, respectively. The second, third and fourth phases will each add an additional 30,000 glass substrates of monthly capacity.

We believe Fab 3 will allow us to achieve greater cost efficiencies and enable us to produce larger panel sizes more efficiently. We plan to utilize our Fab 3 primarily for the production of larger-sized panels for use in LCD television applications. Production at this fab will use advanced process technologies, including one-drop filling and wire on array, which will help to improve our yield and utilization rates. This fab will also be supported by its own color filter production facilities, thereby ensuring a reliable supply of this key TFT-LCD component.

## The Acquisition of IDTech and the Yasu Business and Its Integration Into Our Operations

On September 18, 2001, under ROC GAAP, we and Chi Mei Corporation, our parent company, acquired 26% and 59%, respectively, of the voting equity interest in IDTech, a wholly owned subsidiary of IBM Japan. On September 26, 2001, IDTech acquired TFT-LCD fabrication equipment located in Yasu, Japan, a ten-year facility lease, related inventories and design and process technologies relating to the production of TFT-LCD panels. On February 4, 2002, we purchased Chi Mei Corporation's interest in IDTech, thereby increasing our ownership interest in IDTech to 85%. In connection with the acquisition of IDTech, we also obtained a license from IBM of flat panel display-related technology.

This technology license from IBM covered, among others, the following core technology and know-how:

- glass-thinning technology that will allow us to reduce the weight of, for example, 14.1-inch panels from 480 grams to 380 grams as of the end of 2002. This know-how is already being used at the Yasu fab for the production of panels for use in notebook computers. This lighter weight results in higher average selling prices for these products;

- fab management technology that has allowed us to shorten the time interval between the input of each substrate. This technology alone has allowed us to increase the actual input of glass substrates at Fab 1 to the current level of 65,000 glass substrates per month, which exceeds the design capacity of 60,000 glass substrates per month of this fab;

- yield improvement technology, including one-drop filling technology, which allows the yield rate for our 30-inch panels to be as high as for our 20-inch panels; and

- overdrive technology that allows us to reduce response time.

IBM Japan owns the remaining 15% of IDTech and also has additional rights under a shareholders agreement with us and Chi Mei Corporation relating to IDTech. See "Our Acquisition of IDTech and Relationship with IBM" for more details regarding these rights. IBM Japan does not, however, have any right to utilize any of the production capacity at the Yasu fab. As a result of our acquisition of IDTech, we have an experienced engineering team to implement our Fab 3 plan.

In March 2002, we initiated a company-wide project with the goal of fully integrating the operations of the Yasu fab into our own operations. These integration measures relate to a variety of areas, including management, human resources, business planning, finance, sales and marketing, information systems and research and development.

93

Part of the first phase of the integration project was completed at the end of 2002. The main goal of this first phase was the identification and establishment of the optimal business structure for the integrated entity. Our sales and marketing, supply networks, procurement and production planning departments were substantially integrated as of the end of 2002, and we substantially completed our research and development and IT systems integration at the end of the first half of 2003.

With respect to our sales and marketing efforts, we established a single contact point for each of our shared customers in Asia in the first quarter of 2002, and for our U.S. and European customers in the second quarter of 2002. We also established sales offices in the United States and the United Kingdom, as well as several representative offices in mainland China and Japan, to provide more efficient services to our clients. In addition, most of the Yasu fab's customers have already inspected our operations in Taiwan and certified these fabs to be qualified suppliers of TFT-LCD panels. Since the integration of production planning at our Taiwan and Yasu operations, we have, subject to necessary customer certifications and approvals, if any, been able to utilize any of our three fabs to meet a given order, regardless of the identity of the customer and its manufacturing requirements.

We have also been reviewing the IT infrastructure of both companies in an effort to facilitate more efficient information exchange. With respect to our procurement policy, we regularly seek alternative suppliers offering lower prices and conduct joint procurement, where possible and appropriate. In addition, at the end of the first half of 2003, we completed a design center that combines the product design and process improvement resources of both our Taiwan operations and the Yasu fab.

Prior to the full integration of the Yasu fab into our operations, we have been coordinating, and will continue to coordinate, our efforts with the Yasu fab on various matters, including financial planning, information sharing, strategic planning, market intelligence and the establishment of our Fab 3.

## Sales and Marketing

We focus our sales and marketing efforts on a core group of large customers with whom we seek to build close relationships. We serve these customers by appointing sales managers as the primary contact persons for these major accounts.

While the point of sale for the substantial majority of our products is in Asia, many of our ultimate customers are based in the United States. Our sales and marketing division is divided into the following four sales regions: the United States, Japan, non-Japan Asia and Europe. A manager heads each of our sales regions, and this manager has primary responsibility for our relationship with customers in that region. Our sales and marketing division pursues the parallel goals of both maintaining and strengthening relationships with our current customers, and attempting to expand our business by attracting new customers. In addition, the sales manager responsible for a specific region will coordinate both with customers in that region and with employees in our other divisions, such as research and development and manufacturing, to meet the customers' specific needs.

Our Taiwan operations have sales offices in Taipei, Taiwan and Tokyo, Japan, and the Yasu fab has sales offices in Yamato, Japan and San Jose, the United States. As a result of the integration of the Yasu fab's sales activities with our Taiwan operations, we have a unified sales and marketing network based in Taipei, Taiwan, Tokyo, Japan, San Jose and Austin, the United States and Southampton, the United Kingdom. We also have established sales hubs in Taiwan, the United States, Ireland, mainland China and Malaysia for receiving and holding our products prior to final shipment to our customers, and are in the process of establishing sales hubs in South Korea and Mexico.

The following table sets forth our net sales in 2000, 2001, 2002 and the first six months of 2003 by geographic region. Sales are attributed to countries based upon the location of the customer placing the order.

| | Consolidated Year ended December 31, | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2000 | | | | 2001 | | | | 2002 | | | |
| Region | Net revenue | % of total | No. of panels sold | % of total | Net revenue | % of total | No. of panels sold | % of total | Net revenue | % of total | No. of panels sold | % of total |
| | (NT$ million) | | | | (NT$ million) | | | | (NT$ million) | | | |
| Taiwan ___ ___ | 4,272.2 | 45.6% | 381,763 | 47.4% | 8,110.3 | 38.8% | 1,182,673 | 40.3% | 20,573.8 | 34.5% | 2,467,707 | 34.1% |
| Rest of Asia ___ | 4,514.8 | 48.1 | 375,977 | 46.7 | 12,346.9 | 59.0 | 1,673,885 | 57.0 | 32,340.0 | 54.2 | 3,991,555 | 55.1 |
| The Americas ___ | 594.4 | 6.3 | 47,396 | 5.9 | 46.4 | 0.2 | 7,652 | 0.2 | 4,986.5 | 8.3 | 557,888 | 7.7 |
| Other ___ ___ | 0.0 | 0.0 | 1 | 0.0 | 416.2 | 2.0 | 73,205 | 2.5 | 1,776.8 | 3.0 | 222,401 | 3.1 |
| Total: ___ ___ ___ | 9,381.4 | 100.0% | 805,137 | 100.0% | 20,919.8 | 100.0% | 2,937,415 | 100.0% | 59,677.1 | 100.0% | 7,239,551 | 100.0% |

| | Unconsolidated Six months ended June 30, 2003 | | | |
|---|---|---|---|---|
| Region | Net revenue | % of total | No. of panels sold | % of total |
| | (NT$ million) | | | |
| Taiwan ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ | 8,284.0 | 34.5% | 1,222,703 | 34.8% |
| Rest of Asia ___ ___ ___ ___ ___ ___ ___ ___ ___ | 11,346.0 | 47.3% | 1,659,765 | 47.3% |
| The Americas ___ ___ ___ ___ ___ ___ ___ ___ | 1,927.6 | 8.0% | 233,438 | 6.7% |
| Other ___ ___ ___ ___ ___ ___ ___ ___ ___ | 2,457.0 | 10.2% | 392,933 | 11.2% |
| Total: ___ ___ ___ ___ ___ ___ ___ ___ | 24,014.6 | 100.0% | 3,508,839 | 100.0% |

### Customers and Customer Service

Our major customers include both branded industry leaders, such as Dell Corporation, Fujitsu, IBM, Samsung Electronics and Toshiba Corporation, as well as companies in Taiwan that manufacture products on a contract basis for global branded companies, which are known as original design manufacturers. We also have a third category of customers that purchase panels for use in the manufacture of LCD televisions. This category of customers currently accounts for only a small portion of our overall sales, but is rapidly growing in significance. We currently rely on a small number of customers for the majority of our total revenues. Fujitsu and IBM Japan were our top two customers in 2001 and accounted for 30.6% and 16.9%, respectively, of our net sales. Fujitsu and Samsung Electronics Display Division and other Samsung affiliates collectively accounted for 16.0% and 12.6%, respectively, of our net sales in 2002. In the first six months of 2003, Samsung Electronics and affiliates collectively and Fujitsu accounted for approximately 23.8% and 18.2%, respectively, of our net sales. Our presence in Yasu has allowed us to both expand our customer base and reinforce our relationships with certain existing customers. As a result of our acquisition of the Yasu business, our main customers in 2002 also included the Yasu fab's customers.

We believe our broad customer base has provided us with additional pricing flexibility, and that continued diversification of our customers is important to our future success. We plan to continue building on our current customer portfolio of leading manufacturers of notebook computers and monitors both by expanding our number of customers and diversifying into other types of customers, including original

equipment manufacturers. In this manner, we hope to both reduce our reliance on key customers and find new sources of product orders, particularly for less customized monitor panels. We believe our broad range of panel offerings allows us to meet all of our customers' needs relating to both notebook computers and monitors.

A significant portion of our net sales to Fujitsu relate to our foundry manufacturing of TFT-LCD panels. We entered into a foundry agreement with Fujitsu in September 1999, which was amended in January 2002. Under this agreement, Fujitsu supplies us with the designs and required technology that we use to produce TFT-LCD panels, TFT arrays, cells and color filters for Fujitsu. The pricing terms for this arrangement are based on a cost-plus formula that takes into account, among other factors, market prices for TFT-LCD panels. In connection with this foundry manufacturing of TFT-LCD panels, we are required to reserve at least 15% of our total monthly production capacity in Fab 1 and Fab 2, up to a ceiling for each fab of no more than 10,000 glass substrates per month, for the production of Fujitsu-designed TFT-LCDs. Fujitsu is required to utilize at least 10% of the total current production capacity at these two fabs. This foundry arrangement provides us with a reliable flow of product orders and strengthens our relationship with Fujitsu for non-foundry sales and products. For more information relating to our relationship with Fujitsu and its affiliates. see "Our Relationship with Fujitsu."

Other than our foundry business with Fujitsu, we generally do not enter into any long-term sales agreements with any of our customers. Our production is planned based on three- to six-month forecasts from our customers, which provides us with enough lead time to source the necessary raw materials and components. We generally ship the final products to our customers within approximately two months from the date we receive their orders.

We generally require our customers to pay for our products within 30 to 60 days from delivery. This may vary depending on the credit history of, and our relationship with, individual customers. Most customers pay in full within this period. We have not experienced any collection problems relating to customer payment or accounts receivable.

We believe that our focus on customer service has been an important factor in our success. The key elements of our customer service are our responsiveness, flexibility, on-time shipments and efficiency. We have established a customer engineering department to promptly address technical inquiries from our customers. We have also established four repair centers in key locations in Taiwan, Japan, Scotland and the United States to provide after-market service near the point of sale. We believe we are the supplier of choice for most of our customers as a result of this dedication to customer service. We have received customer service awards from, among others, Dell Corporation, Fujitsu and Honeywell International Inc.

We generally provide to our customers a limited product warranty, which includes the provision of free replacement parts and after-sales service. The warranty period averages 12 to 18 months for our Taiwan operations and 12 to 39 months for the Yasu fab from the date of shipment to the customer. We set aside a portion of our revenue as a reserve to cover these warranty obligations. As of December 31, 2002, we had set aside NT$197.7 million (US$5.7 million) in reserves for these purposes, compared to NT$33.4 million as of December 31, 2001.

### Manufacturing Quality and Reliability

We believe that our management experience and our advanced manufacturing process technology and know-how have allowed us to maintain a high standard of manufacturing quality and reliability. Our policy is to implement quality assurance measures during all stages of the manufacturing process. Quality is maintained through in-line testing and inspection of the glass substrates and TFT-LCD panels at various stages in the manufacturing process. Final visual and electronic inspection is performed before shipment to ensure quality. Our quality assurance measures also include on-going process and product reliability testing and failure tracking for early identification of production problems.

Our fabs generally are "qualified" by customers after satisfying stringent quality standards. In particular, our customers will perform on-site fab audits as part of the qualification process. These audits normally address quality management, documentation control, procurement and material incoming inspection, process and material control, product final inspection, calibration and certification training systems. These audits

comprise both record reviews and fab tours for verification of conformity to specifications and procedures If audit findings are satisfactory, then the fab is termed "qualified" for proceeding with further product qualification and mass production. This qualification process generally takes less than six months. We have received quality-related awards from Dell Corporation, Fujitsu and Hewlett-Packard Company, among others.

The quality control programs of our Taiwan operations and the Yasu fab have received accredited International Standards Organization ISO 9001 certifications. The International Standards Organization is an organization formed by delegates from member countries to establish international quality assurance standards for products and manufacturing processes. International Standards Organization certification is required in connection with sales of industrial products in some European countries.

### Research and Development

The TFT-LCD industry is characterized by frequent and rapid changes in technology. We believe that, in order to maintain and enhance our position within the TFT-LCD industry, we need to focus on the continuous development of new and improved manufacturing process technology and know-how. In July 1999, we were the first, and are still the only, company in Taiwan to produce a TFT-LCD panel entirely with self-owned technology and know-how. We believe this achievement is representative of the importance we place upon, among other things, in-house research and development of new technology. Other examples of our research and development achievements include our development of super MVA technology based on our multi-domain vertical alignment license from Fujitsu, our success in achieving commercial production with one-drop filling technology, and our production of very large-sized panels, such as 20-inch and 30-inch panels for television applications.

Our Taiwan operations spent NT$447.5 million, NT$1,525.9 million, NT$1,442.8 million (US$41.6 million) and NT$849.1 million (US$24.5 million) in 2000, 2001, 2002 and the first six months of 2003, respectively, on research and development. Our research and development spending represented 4.8%, 9.3%, 3.5% and 3.5%, respectively, of our net sales in 2000, 2001, 2002 and the first six months of 2003. We did not have any net sales in 1999. Excluding research and development performed by IBM under contractual arrangements with us, the Yasu fab's research and development team also spent NT$174.5 million in the last six months of 2001 on research and development, which represented 0.8% of net sales from that fab for that period. We have budgeted NT$1,764.1 million (US$51.0 million) on an unconsolidated basis on research and development in 2003. As of June 30, 2003, a total of 343 of our employees were involved in research and development activities, representing an increase from 321 employees as of December 31, 2002.

Our Taiwan operations and the Yasu fab each have their own separate research and development teams. These teams are focused on continuously developing next generation manufacturing technologies and know-how. The efforts of our research and development team in the near term will be concentrated on rolling out fifth generation commercial production at Fab 3. In addition, we are in the process of integrating our Taiwan and Yasu research and development teams into a single coordinated unit. In addition, at the end of the first half of 2003, we completed a design center that combines the product design and process improvement resources of both our Taiwan operations and the Yasu fab. See "— The Acquisition of IDTech and the Yasu Business and Its Integration Into Our Operations" for a description of this overall integration plan.

We are also engaged in research and development regarding alternative flat panel display technologies. IBM previously assisted us in the research and development of color active matrix organic light emitting diode displays, or AMOLEDs, and color active matrix liquid crystal displays, or AMLCDs. In 2002, we also produced a sample 20-inch OLED display, the largest OLED display of its kind in the world.

We are currently engaged in research and development regarding wire on array technology, which is more advanced than chip on glass technology and more cost-efficient, simple and reliable than conventional technologies that are used to attach driver integrated circuits to TFT-LCD panels. We began using such wire on array technology in our commercial production in the first quarter of 2003.

97

## Intellectual Property

Our intellectual property is derived from both our own research and development efforts and from licenses we have entered into with third parties. We have developed internally a significant amount of technology and know-how, and as of October 20, 2003, obtained 158 patents in Taiwan, the United States, Japan and other jurisdictions. In addition, as of October 20, 2003, we had 531 patent applications pending in Taiwan and other jurisdictions. We also have access to a significant number of third party patents and other know-how as a result of our licensing and cross-licensing arrangements with Fujitsu, IBM and other third parties.



_IBM technology_

In September 2001, we entered into a license agreement with IBM under which we received a license to certain of IBM's intellectual property rights and patents relating to the production of flat panel displays. Under this same licensing agreement, we also granted to IBM the right to use the technology and know-how covered by our existing patents. In addition, we agreed to grant to IBM the right to use all technology and know-how covered by any patents obtained by IDTech or us in the five years following the effective date of this licensing agreement. IDTech also entered into cross-licenses with each of Hitachi Ltd., Matsushita Electric Industrial Co. Ltd., Seiko Epson Corporation, Sharp Corporation and Toshiba Corporation relating to flat panel display technology that had previously been cross-licensed by IBM. These five-year cross-licensing agreements all became effective as of October 1, 2001. See "Our Acquisition of IDTech and Relationship with IBM — License Agreements — License arrangements between IDTech and third party licensors" for a detailed discussion of these agreements.

_Fujitsu technology_

In February 2001, we entered into a technology license agreement with Fujitsu relating to its patented wide viewing angle multi-domain vertical alignment technology. This license has since been extended to 2006. Under this agreement, Fujitsu granted to us a non-exclusive, non-transferable worldwide license to use Fujitsu's multi-domain vertical alignment technology. In return, we pay to Fujitsu a license fee based on the net revenues of multi-domain vertical alignment TFT-LCD products we sell, excluding those products sold to Fujitsu. To date, the majority of our multi-domain vertical alignment panels have been sold to

Fujitsu. In January 2002, we also entered into an agreement with Fujitsu to license its "one-drop filling" technology and know-how, which facilitates the process of filling the gap between the glass substrates of TFT-LCDs with liquid crystals. Fujitsu has also agreed to grant to us a license with respect to any process technology patents that may be granted with respect to this technology and know-how. We paid a one-time fee for this non-exclusive license. The term of both of these agreements is three years, subject to unlimited automatic one-year renewals. See "Our Relationship with Fujitsu" for a more detailed discussion of these agreements, and "— Our Current Facilities, Production Capacity and Technological Capabilities — Technological capabilities" above for a discussion of the benefits we have received from these technologies.

### Vendor indemnification

Our equipment and component vendors generally indemnify us for losses resulting from any suit or proceedings brought against us involving allegations of infringement of intellectual property rights owing to our use of the equipment or components supplied by them up to the amount paid for the equipment or components.

### Equipment

The technology of the equipment used in TFT-LCD manufacturing effectively defines the limits of our process technology. Advances in process technology, such as advancements from one generation to the next, cannot be achieved without corresponding changes to, and advances in, equipment technology. The principal equipment used by us to manufacture TFT-LCDs are chemical vapor deposition equipment, coaters and developers, dry etchers, cleaners, exposure machines and automatic material handling systems. We source nearly all of this equipment from suppliers located in Japan and we generally deal with at least two suppliers for each type of equipment that we use. We own all of the equipment used at our fabs, as well as the module assembly-related equipment located at facilities in the Philippines, mainland China and Japan to which the Yasu fab outsources its module assembly activities.

In implementing our capacity expansion and technology advancement plans, we expect to make significant purchases of equipment. Some of the equipment is available from a limited number of vendors and/or is manufactured in relatively limited quantities, and certain equipment has only recently been developed. The lead time for delivery of equipment may be six months or more following the time the orders are placed. We believe that our relationships with our equipment suppliers are good, and we work closely with these suppliers so that they are able to provide us with equipment that is customized to our technological and other requirements. Access to these equipment suppliers is vital to the successful establishment of Fab 3. See "Risk Factors — Risks Related to Our Manufacturing Process — We depend on a limited number of suppliers, and if we are unable to obtain raw materials and components and equipment in a timely manner, our production schedules could be delayed and we may lose customers and become less profitable."

### Raw Materials and Components

Our manufacturing processes utilize many raw materials and components, primarily color filters, backlights, polarizers, driver integrated circuits, glass substrates and various chemicals. Our cost of raw materials and components constituted approximately 48.6% of our net sales in 2000, 70.2% of our net sales in 2001 and 56.0% of our net sales in 2002. The lead time required by our components manufacturers is generally less than one month from the date the order is received.

The most important components used in our operations are color filters. While we source some color filters for our Taiwan operations from third parties, we produced more than 90% of the color filter requirements for Fab 1 and Fab 2 in 2002. This allows us to save costs related to the packaging and transport of these fragile components. We believe our ability to produce these color filters gives us an advantage over our competitors, as most of them to our knowledge source these components from third parties. We expect that substantially all of our color filter requirements for Fab 3 will be satisfied through in-house production. We source all of the color filters required for the Yasu fab from third parties.

Most of our raw materials and components are available from several sources, both within Taiwan and abroad. Our procurement policy is to select only those vendors that have demonstrated superior quality control and reliability regarding delivery time and to maintain several sources for each raw material or component so that a quality or delivery problem with any one vendor will not adversely affect our operations. The quality and delivery performance of each vendor is evaluated monthly or quarterly and quantity allocations are adjusted for subsequent periods based upon these evaluations. Although we believe our supplies of raw materials and components are adequate, shortages could occur for various critical components due to interruption of supply or increased demand from the TFT-LCD industry and other industries. There has been a recent shortage of color filters, backlights and glass substrates for fifth generation fabs. This shortage, however, is expected to be alleviated once the component suppliers increase their production to meet the demands of fifth generation fabs in the market. See "Risk Factors — Risks Related to Our Manufacturing Process — We depend on a limited number of suppliers, and if we are unable to obtain raw materials and components and equipment in a timely manner, our production schedules could be delayed and we may lose customers and become less profitable."

Part of our procurement strategy is to source components from nearby suppliers. For example, in the case of glass substrates, our Taiwan operations source the majority of these substrates from the Corning Display factory located near our Fab 2 in the Tainan Science-based Industrial Park. For backlights, we have invited Coretronics Inc. to produce its backlights within the boundaries of our module assembly facility in Tainan, thereby ensuring us of a reliable supply of these components. For driver integrated circuits, we currently own a 15.41% equity interest in Himax, which produces approximately 50% of the driver integrated circuits for our Taiwan operations. We are currently discussing possible in-house production of polarizers with one of our suppliers. We are also in discussions with another supplier for on-premises production of glass substrates. Our close cooperation with each part of our supply chain also facilitates the integration of these components, technology improvements and the development of new products. In addition, we regularly seek alternative suppliers offering lower prices and conduct joint procurement. where possible and appropriate.

The following chart sets forth a list of our key components and our main suppliers for each component:

| Color filters | Backlights | Driver integrated circuits | Polarizers | Glass substrates |
|---|---|---|---|---|
| In-house | Coretronics Inc. | Himax | Sumitomo Corporation | Corning Display Technologies |
| Toppan Printing Co., Ltd. | Radiant Optoelectronics Corporation | Optoelectronics Co., Ltd | Nitto Denko (Taiwan) Corp. | Taiwan Asahi |
| Dai Nippon Printing Co., Ltd. | Fujitsu Kasei Limited | Texas Instruments Taiwan Ltd | | Fine Techno Taiwan Co., Ltd. |
| Advanced Color Tech, Inc. | Stanley Denki Corp | NEC | | N H Techno Glass Corp. |
| Sumitomo Corporation | | Ryotai Corporation | | Nippon Denki Glass Corp |
| | | Toshiba Electronics Taiwan Corporation | | |
| | | Hitachi Ltd. | | |

We generally carry less than one month of inventory of these components, since sufficient quantities can be obtained from our suppliers within this period.

## Competition

We compete internationally and domestically with other TFT-LCD panel manufacturers. We also compete with manufacturers of cathode ray tube displays and have gradually been acquiring market share from these companies as the price differential between cathode ray tube displays and TFT-LCD panels has

narrowed. Makers of plasma display panels and organic light-emitting diode and low temperature polysilicon displays are also our competitors. Our main competitors are Samsung Electronics and LG.Philips LCD in Korea, AU Optronics, Quanta Display and Chunghwa Picture Tubes in Taiwan and Sharp Corporation in Japan.

Competitive factors in the TFT-LCD industry include:

- product features such as panel size and resolution;
- quality of products;
- price of products;
- research and development; and
- customer service.

We also plan to increase capacity and adopt fifth generation technology. However, many of our competitors have either already commenced production at their fifth generation fabs or are ahead of us in terms of construction of their fifth generation fabs. See "Industry Overview" for a more detailed discussion of the trends and characteristics of the TFT-LCD industry, including the competitive landscape.

### Employees

Substantially all of our employees are located in Taiwan and Japan. The following table sets forth, as of the dates indicated, the number of our full-time employees serving in the capacities indicated:

| Function | As of | | | |
|---|---|---|---|---|
| | December 31, | | | June 30, |
| | 2000 | 2001[1] | 2002[1] | 2003[1] |
| Production | 1,472 | 2,079 | 2,735 | 3,396 |
| Sales and administrative | 1,024 | 1,440 | 2,258 | 2,609 |
| Technology and research | 166 | 474 | 611 | 652 |
| Management | 68 | 82 | 119 | 154 |
| Total | 2,730 | 4,075 | 5,723 | 6,811 |

(1) Including employees seconded to IDTech by Display Technologies and IBM Japan.

The following table sets forth, as of the dates indicated, a breakdown of the numbers of our full-time employees by geographic location:

| Location | As of | | | |
|---|---|---|---|---|
| | December 31, | | | June 30, |
| | 2000 | 2001[1] | 2002[1] | 2003[1] |
| Tainan Science-based Industrial Park, Taiwan | 2,730 | 3,446 | 4,997 | 6,119 |
| Japan[1] | 0 | 629 | 726 | 692 |
| Total | 2,730 | 4,075 | 5,723 | 6,811 |

(1) Including employees seconded to IDTech by Display Technologies and IBM Japan.

101

As of June 30, 2003, approximately 19.9% of our workforce possessed a university degree and approximately 13.6% of the workforce held a master's or doctorate degree. We believe that, in order to maintain and improve quality control, efficiency in the manufacturing process and workplace safety, it is important that our employees receive continuing training in these areas.

Our success depends to a significant extent upon, among other factors, our ability to attract, retain and motivate qualified personnel. Taiwan is currently experiencing a labor shortage for qualified technical personnel. As a result, we may face extensive competition in recruiting and retaining these personnel. See "Risk Factors — Risks Related to Our Business — Our business could suffer if we are unable to retain and recruit skilled employees." However, even in this competitive environment, our personnel turnover at our Taiwan operations was approximately 4.6% and 7.7% in 2001 and 2002, respectively. We believe this low turnover rate is due in part to the benefits we provide our employees, including a pension plan into which we contribute 2% of each employee's base salary on an annual basis, quarterly bonuses and opportunities for profit sharing.

We have not adopted a share option scheme for our employees at our Taiwan fabs. Instead, our employees participate in our profits in four ways. Some of our employees are given a one-time opportunity to purchase shares in our company from our shareholder affiliates at the time he or she joins our company. Employees may also receive incentives in the form of quarterly cash bonuses. The aggregate amount of these bonuses is determined based on the performance of our company, and is divided among the employees of each department based upon their individual performance. We are also required under ROC law to establish an employee welfare fund, into which we deposit, on a monthly basis, 0.1% of our net revenue. Before distributing a dividend or making any other distribution to shareholders and employees, we must use the prior year's retained earnings to pay all outstanding taxes, recover any past losses and set aside a statutory reserve equal to 10% of our net income until the reserve reaches an amount equal to at least 100% of our paid-in capital and use accumulated retained earnings, including the prior year's retained earnings, to set aside special reserves if required by law, our articles of incorporation or shareholders' resolution. In addition, pursuant to our articles of incorporation, after considering our financial structure, debt repayment ability, capital expenditures and earnings to be retained for such capital expenditures, we may set forth a shareholder proposal, which would be subject to shareholder approval, proposing to distribute any remaining accumulated retained earnings as dividends to holders of preferred shares, dividends to holders of common shares, remuneration to directors and supervisors, additional shareholder bonuses and employee bonuses. Pursuant to our articles of incorporation, we may allocate between 5% and 10% of the remaining accumulated retained earnings, after deducting the dividends to holders of preferred shares, as employee bonuses.

On October ·, 2001, IDTech entered into personnel support agreements with IBM Japan and Display Technologies, under which IBM Japan and Display Technologies provide personnel support in the form of seconded employees for the operation of the assets they transferred to IDTech. IBM Japan and Display Technologies retain responsibility for the payment of salaries, bonuses and other employment-related benefits and compensation to their respective seconded employees. IDTech is also required to reimburse IBM Japan and Display Technologies for all reasonable costs relating to the seconded employees based on a predetermined amount. IDTech may grant awards to seconded employees at its discretion, but the payment of these awards must follow IBM Japan's procedures with respect to the amount payable and the method of payment of the awards. The seconded employees are required to comply with IDTech employment rules, and IDTech is entitled to take disciplinary action against seconded employees in accordance with these IDTech rules. We may terminate the secondment arrangement with a seconded employee upon 60 days' notice. However, any proposal to terminate, or to reduce or withhold the salary of, a seconded employee must be approved by IBM Japan or Display Technologies, as the case may be. Upon termination of the secondment arrangement, the employee will return to IBM Japan or Display Technologies, unless that employee enters into a direct employment agreement with IDTech. IDTech has the right to solicit these employees at any time during the secondment period. As of June 30, 2003, 114 of these seconded

employees had chosen to become direct employees of IDTech. There are currently 151 IBM Japan secondees and 339 Display Technologies secondees working at IDTech. Secondees at IDTech generally have higher salary and benefit packages than direct employees of IDTech.

Our employees are not covered by any collective bargaining agreements. We have not experienced any strikes or work stoppages. We consider our relationship with our employees to be good.

### Properties

Our significant real properties consist of Fab 1, Fab 2, Fab 3, our module assembly facility, related offices in the Tainan Science-based Industrial Park and the Yasu fab.

Our properties within the Tainan Science-based Industrial Park are all subject to 19-year leases with the Science-based Industrial Park Administration. Fab 1 has a total area of 100,394 square meters, Fab 2 has a total area of 133,176 square meters and Fab 3 has a total area of 204,179 square meters. Our module assembly facility in Tainan has a total area of 108,656.5 square meters. We believe the Tainan Science-based Industrial Park has adequate land available for our future expansion.

The Yasu fab has a total area of 32,210 square meters, and the land and buildings are leased from IBM Japan under several 10-year leases. We also lease a small research and development facility in Yamato, Japan from an affiliate of IBM Japan.

### Environmental, Health and Safety Regulation

The TFT-LCD production process generates gaseous chemical waste, liquid waste, waste water and other industrial wastes in various stages of the manufacturing process. We have installed pollution control equipment for the treatment of gaseous chemical waste and liquid waste and equipment for recycling treated water in our fabs. Our Taiwan operations are subject to regulation and periodic monitoring by the ROC Environmental Protection Administration and local environmental protection authorities, including the Science-based Industrial Park Administration. The Yasu fab is subject to regulation by the environmental offices of both the local and prefecture-level governments.

We believe that we have adopted pollution control measures for the effective maintenance of environmental protection standards consistent with the practice of the TFT-LCD industry in Taiwan and, with respect to the Yasu fab, in Japan. We also believe that we are in compliance in all material respects with all environmental laws and regulations applicable to our operations.

The Yasu fab and Fab 1 have each been certified as meeting the ISO 14001 environmental management system standards. Our Fab 2 and module assembly facility were both ISO 14001 and OHSAS 18001-certified in the first quarter of 2003. The ISO 14001 environmental management system standards are part of a comprehensive series of quality standards for environmental management published by the International Standards Organization. The ISO 14001 standards cover environmental management principles, systems and supporting techniques. OHSAS 18001 is an international occupational health and safety management system specification.

### Electricity and Water

Our Taiwan operations use substantial amounts of electricity supplied by Taiwan Power Company in our manufacturing process. Businesses in the Tainan Science-based Industrial Park, such as us, enjoy preferential electricity supply. In addition, the Yasu fab obtains a reliable supply of electricity from the Kansai Power Company. As a result, we have not experienced any power failures in any of our fabs that have had a significant effect on our operations and do not expect to experience any such power failures in the future. We also have emergency back-up systems that would automatically start in the event of a power failure and can provide sufficient electricity to meet our short-term safety-related requirements for each of our fabs.

103

The TFT-LCD manufacturing process also requires extensive amounts of fresh water. We have made adequate arrangements with both the Tainan Science-based Industrial Park and the town of Yasu to ensure a reliable supply of fresh water to our fabs. The Yasu fab also sources water from a well located on its property. We have also taken steps to reduce fresh water consumption for our fabs in Tainan by installing water recycling systems that allow us to recycle approximately 70% to 80% of the water used during the fabrication process. Although there are water shortages in other parts of Taiwan, we do not anticipate that our operations in Tainan or Yasu will experience any problems relating to water shortages.

### Risk Management

We have a safety, health and environmental department that develops plans for properly handling emergencies and disasters, such as earthquakes, floods, fires, kidnappings, power outages, typhoons and chemical leaks, that could affect our operations. The focus of this department is loss prevention, emergency response, crisis management, evacuation procedures and business recovery. In addition, we have also retained a third party contractor to assist us in our risk management efforts. We also maintain insurance for damage to or loss of our facilities, equipment and inventories due to fires, floods or other similar circumstances. Our contractors are also required to carry insurance covering losses in respect of the construction of Fab 3. While we believe that our overall insurance coverage is adequate, we carry neither business interruption nor earthquake insurance. See "Risk Factors — Risks Related to Our Business — We and many of our customers and suppliers are vulnerable to natural or man-made disasters and other events outside of our control that may seriously disrupt our operations and result in financial losses."

### Legal Proceedings

As is the case with many companies involved in the production of products requiring a high level of specialized technology and know-how, we have received from time to time communications from third parties asserting that our technologies or manufacturing processes infringe on patents or intellectual property rights of others. We are not currently engaged in litigation relating to any of these communications, and these claims are often settled through technical meetings between the parties. In some cases, proof of the use of the relevant technology or know-how prior to the date of the relevant patent is useful in resolving these claims. However, irrespective of the validity of these claims, we could be required to incur significant costs to defend these types of claims in the future and our operations could be adversely effected if any of these claims are successful. We are currently not involved in any material litigation, nor are we aware of any potentially valid claims that are threatened against us.

IDTech did not assume any of IBM Japan's potential patent infringement liabilities in connection with the acquisition of IBM Japan's TFT-LCD operations. However, in the event IDTech is accused of any patent infringement by a third party, IDTech will not have any right of recourse to IBM Japan.

## Our Acquisition of IDTech and Relationship with IBM

### Overview

In September 2001, our company, our parent company, Chi Mei Corporation, IBM Japan, IBM and IDTech entered into a series of transactions, the result of which was the following:

- our company and Chi Mei Corporation acquired for nominal consideration 26% and 59% interests, respectively, in IDTech, a wholly owned subsidiary of IBM Japan with no substantive assets or operations;

- our company, Chi Mei Corporation and IBM Japan made an aggregate capital contribution to IDTech of 18,835.5 million Japanese yen (US$157.1 million) on a pro rata basis based on our respective shareholdings in IDTech of 26%, 59% and 15%;

- IDTech acquired assets relating to the manufacture of TFT-LCD panels from IBM Japan and IBM Japan's wholly owned subsidiary, Display Technologies, for a total purchase price of 22,988.5 million Japanese yen (US$119.8 million); a portion of this investment was financed by a loan to IDTech from an affiliate of Chi Mei Corporation and syndicated loans;

- IBM Japan acquired a 1.79% interest in our company from Chi Mei Corporation for US$16.8 million; and

- we acquired a perpetual, fully paid-up, non-exclusive and non-transferable license to certain of IBM's technology and know-how relating to the production of flat panel displays for a one-time fee of US$125.0 million.

We subsequently acquired Chi Mei Corporation's 59% interest in IDTech with the proceeds we received from the issuance of preferred shares to Chi Mei Corporation. See "Description of Common Shares."

In addition to the transactions set forth above, IDTech entered into other arrangements relating to:

- the distribution of TFT-LCD panels manufactured at the Yasu fab through IBM Japan;

- the outsourcing of cell assembly operations from IDTech to Display Technologies;

- the secondment of personnel from IBM Japan and Display Technologies to IDTech; and

- the leasing of buildings in Yasu and Yamoto from IBM Japan and its subsidiary to IDTech.

These transactions and arrangements, as well as other ongoing arrangements we have entered into with IBM and IBM Japan, have had, and are expected to continue to have, a significant impact on our financial condition and results of operations. As a result, we view our relationship with IBM as an important element in our ongoing business and operations.

IBM Japan sold its 1.79% interest in our company to the public in Taiwan through open market transactions on the Taiwan Stock Exchange during the third and fourth quarters of 2002.

### Information Relating to IDTech

IDTech is engaged in the manufacturing of TFT-LCD panels. The registered office of IDTech is 800, Ichimiyake, Yasu-cho, Yasu-gun, Shigaken 520-2392, Japan. The issued share capital of IDTech was ¥9,428 million as of June 30, 2003.

We currently own an 85% interest in IDTech. We have paid up all amounts relating to the shares of IDTech that we hold. As of June 30, 2003, the carrying value of our interest in IDTech was NT$2,883.6 million (US$83.3 million). We did not receive any dividend payments from IDTech for the year ended December 31, 2002.

We from time to time engage in transactions with IDTech. For the six months ended June 30, 2003, we recorded sales to IDTech of NT$11.6 million (US$0.3 million). During the same period, we also received royalties from IDTech in the amount of NT$265.6 million (US$7.7 million) relating to the technology we licensed from IBM. See "— License Agreements — License agreement with IDTech" below. For the six months ended June 30, 2003, we recorded operating and manufacturing expenses from IDTech of NT$224.8 million (US$6.5 million). As at June 30, 2003, our notes and accounts receivable from IDTech totaled NT$556.7 million (US$16.1 million), our receivables from IDTech totaled NT$524.3 million (US$15.1 million), while our payables to IDTech totaled NT$43.4 million (US$1.3 million). Please see Note 20 to our audited non-consolidated financial statements for more details relating to our transactions with IDTech.

Set forth below is a more detailed summary of our ongoing transactions and arrangements involving IBM and IBM Japan.

### Shareholders Agreement between Chi Mei Corporation, Our Company and IBM Japan Relating to IDTech

The following is a description of the main provisions of the shareholders agreement between Chi Mei Corporation, our company and IBM Japan relating to IDTech:

*Prior consent of IBM Japan.* So long as IBM, IBM Japan, or one of their subsidiaries owns all of IBM Japan's 15% interest in IDTech, IDTech must obtain the prior consent of IBM Japan before undertaking any of the following:

- decrease in its issued or authorized capital;
- amendment of its articles of incorporation;
- change in its form of organization;
- transactions with any of its directors, auditors or any other officers in their personal capacity;
- change in remuneration of its directors, auditors or officers; and
- any split, combination or reclassification of any of its capital stock.

*IBM Japan's put option.* IBM Japan has an option, exercisable at its sole discretion no more than twice between September 28, 2004 and September 28, 2006, to require either our company or Chi Mei Corporation to purchase all or part of IBM Japan's 15% in IDTech for no less than US$23.3 million (or a pro rata portion thereof depending on the number of shares sold), plus compounded interest at the annual rate of 5% on this amount commencing from September 28, 2001, up to and including the option exercise date. IBM Japan's put option will be accelerated in the following circumstances:

- if our company or Chi Mei Corporation transfers shares in IDTech with the result that our company or Chi Mei Corporation, or our respective subsidiaries, own 50% or less of IDTech;
- if our company or Chi Mei Corporation sells shares in IDTech, or IDTech issues shares, to third parties on terms more favorable than those under which IBM Japan purchased its shares in IDTech;
- if IBM, IBM Japan or one of their subsidiaries is the holder of all IDTech shares initially held by IBM on the date of this shareholders agreement and our company or Chi Mei Corporation fails to cause IDTech to notify IBM Japan in advance of board meetings or board resolutions relating to certain significant corporate matters;
- if this shareholders agreement is terminated as a result of failure of either party to cure a breach of its obligations;
- if we fail to pay for IBM Japan's shares in IDTech under our call option;
- if the total liabilities of IDTech exceeds its total assets on its balance sheet for a period of three months;

105

- in the event of a merger or consolidation where IDTech is not the surviving entity, or share exchange, reorganization or other proceeding that has a material adverse effect on IDTech's financial condition and the holders of IBM Japan's shares in IDTech;

- in the event of a transfer of all or a substantial part of IDTech's business; and

- in the event of a voluntary filing by IDTech for bankruptcy, reorganization or other similar proceeding, or in the case of an involuntary filing, failure by IDTech to cause the filing to be dismissed within 60 days.

*Our call option.* We also have an option, exercisable no more than twice commencing on September 28, 2003, to purchase all or part of IBM Japan's shares in IDTech. If exercised, the price of this purchase would be no less than US$29 1 million (or a pro rata portion thereof depending on the number of shares purchased), plus compounded interest based on the aggregate long-term prime rate in Japan, commencing on September 28, 2001, up to and including the option exercise date.

*Guarantee by Chi Mei Corporation.* Our performance obligations under this shareholders agreement are guaranteed by Chi Mei Corporation, including our payment for any of IBM Japan's shares in IDTech purchased under IBM Japan's put option or our call option.

### License Agreements

#### *License agreement with IBM*

In connection with our license of technology and know-how from IBM, as described above, we also granted to IBM the right to use the technology and know-how covered by our existing patents, as well as all technology and know-how covered by any patents obtained by IDTech or us in the five years following the effective date of this license agreement.

#### *License agreement with IDTech*

We also entered into a license agreement with IDTech under which we granted to IDTech a non-exclusive and non-transferable right to use the technology and know-how we licensed from IBM. Under this license agreement, IDTech pays us a license fee of 3% of its net sales for five years, after which time IDTech will retain a fully paid-up license for this technology and know-how. This license fee has been eliminated to the extent of our 85% equity ownership of IDTech in our consolidated financial statements that appear elsewhere in this offering circular.

#### *License arrangements between IDTech and third party licensors*

IBM previously entered into cross-license agreements with five companies in Japan for the use by IBM of flat panel display technology and related information handling systems owned by these companies. IDTech entered into similar five-year cross-licensing agreements with each of these companies that all became effective as of October 1, 2001.

These prior and current cross-licenses subject the Yasu fab to certain volume restrictions relating to production of products utilizing this technology and know-how. These volume restrictions include:

- for the first twelve months after the date of the transfer of assets relating to the Yasu fab, the net sales from the Yasu fab shall be equal to or less than the sales revenue generated by IBM Japan's display business unit for the twelve months immediately preceding the transfer plus ten percent; and

- for the second to fifth twelve-month periods after the asset transfer, the net sales from the Yasu fab shall be equal to no more than the limit for the preceding twelve months plus an additional ten percent per year.

The Yasu fab was in compliance with these volume limitations with respect to the first twelve-month period ended September 30, 2002. In the event the net sales from the Yasu fab exceed these volume limitations in any of these twelve-month periods, the products sold from the Yasu fab in excess of these

limitations may not be protected under this licensing arrangement from technology infringement claims. See "Risk Factors — Risks Related to Our Technology and Intellectual Property — Limitations relating to IDTech's technology cross-licensing arrangements may subject us to potential technology infringement claims."

### Distribution Agreements with IBM Japan

IDTech entered into several transitional agreements with IBM Japan under which IBM Japan has assisted the Yasu fab with the distribution of its panels to third parties during the period prior to the integration of this fab's sales and marketing activities with those of our Taiwan operations. In the fourth quarter of 2001, the first quarter of 2002, the second quarter of 2002 and the third quarter of 2002, IDTech paid to IBM Japan the fixed minimum amounts set forth in these agreements of US$7.8 million, US$6.4 million, US$5.5 million and US$4.3 million, respectively. Under ROC GAAP, a portion of these payments was reflected in the determination of net sales as set forth in our consolidated financial statements, while the remainder was included under general and administrative expenses in our consolidated financial statements. These distribution agreements terminated at the end of 2002.

In February 2002, IDTech also entered into an agreement with IBM Japan for sale by IDTech of its LCD products directly to IBM's personal computer division. This agreement is based on standard commercial terms.

### Outsourcing Arrangements with Display Technologies

IDTech currently outsources its cell assembly process to Display Technologies' facilities in Himeji, Japan on a cost plus 2.5% basis. However, in connection with IDTech's purchase of assets from Display Technologies, Display Technologies granted to IDTech an option to purchase this cell assembly equipment and other assets. On March 28, 2002, IDTech provided notice to Display Technologies of its intention to exercise this option. We do not believe this equipment and other assets are material to our overall business. We plan to relocate this equipment and other assets from Himeji to either Tainan or Yasu.

### Personnel Support Agreements between IDTech and each of IBM Japan and Display Technologies

IDTech entered into personnel support agreements with each of IBM Japan and Display Technologies under which IBM Japan and Display Technologies second employees to IDTech. As of June 30, 2003, four of IDTech's 687 employees, 490 were seconded from IBM Japan and Display Technologies under these agreements. These agreements have a term of two years and may be extended for one year upon agreement of both parties.

IBM Japan retains responsibility for the payment of salaries, bonuses and other employment-related benefits and compensation to the seconded employees. IDTech is also required to reimburse IBM Japan and Display Technologies for all reasonable costs relating to the seconded employees. IDTech may grant awards to seconded employees at its discretion, but the payment of these awards must follow IBM Japan's procedures with respect to the amount payable and the method of payment.

The seconded employees are required to comply with IDTech employment rules, and IDTech is entitled to take disciplinary action against seconded employees in accordance with these IDTech rules. However, any proposal to terminate, or to reduce or withhold the salary of, a seconded employee must be approved by IBM Japan or Display Technologies, as applicable.

IDTech has the right to terminate the secondment arrangements, either entirely or with respect to individual employees, at any time and for any reason upon 60 days' notice to IBM Japan or Display Technologies. IBM Japan or Display Technologies has the right to terminate the relevant secondment arrangement on 60 days' notice to IDTech if there is a change in control of IDTech. The secondment of an employee will also be automatically terminated if the employee resigns or is subject to disciplinary measures for actions that IDTech believes warrant termination.

Upon termination of secondment, the employee will return to IBM Japan or Display Technologies, unless that employee enters into a direct employment agreement with IDTech. IDTech has the right to solicit these employees at any time during and after the secondment period.

We have also entered into a technical support agreement with IDTech that requires IDTech to provide engineers for our fabs in Taiwan to assist in the improvement of our current products and manufacturing lines, as well as to assist in the development, construction and ramping up of our fifth generation Fab 3 There are currently approximately 50 engineers working at our fabs in Taiwan under this agreement. We are required to pay to IDTech the fees and expenses incurred by IDTech in connection with its provision of these services, including the salary and living expenses of IDTech engineers working on-site in Tainan. This agreement is effective through December 31, 2003, with a possible one-year extension at our option

### Letter of Support

As part of our acquisition of IDTech, we obtained from IBM a letter regarding potential patent infringement claims relating to the assets IDTech purchased from IBM Japan and Display Technologies. Under this letter, IBM agreed to provide us with reasonable assistance until October 1, 2003, should any patent infringement claims arise in connection with the purchased assets

### Site Lease Agreements

IDTech has entered into four fixed-term commercial lease agreements with IBM Japan and its subsidiary for various buildings located in Yasu and Yamato, Japan that contain or are related to IDTech's TFT-LCD panel manufacturing operations  The aggregate rent under all four leases is 92.3 million Japanese yen (US$0.8 million) per month, which we believe reflects the fair market rental value of these buildings. Three of the four leases have non-renewable ten-year terms and the fourth, relating to a research and development facility in Yamato, has a term of two and a half years.

### Other Related Agreements and Transactions

IDTech entered into various agreements with IBM Japan and International Test & Engineering Services Co., Ltd , a subsidiary of IBM Japan, relating to the properties leased from IBM Japan in Yasu and Yamato, Japan. These agreements include, among others, agreements for the provision of administrative, utility and waste management services. These agreements all became effective beginning October 1, 2001, have terms of between one and five years and are subject to automatic one-year renewals, unless either party gives notice of its decision not to renew. The amounts and methods of calculating the fees paid by IDTech under these agreements vary depending on the type of services provided. We believe these agreements include standard commercial terms and reflect market rates for these services.

We also arranged for a sale of common shares in our company to certain key management of IDTech. For more information on these transactions, see "Management — Compensation of Directors, Supervisors and Executive Officers."

109

# Our Relationship with Fujitsu

## Overview

We have had a strong business and contractual relationship with Fujitsu since the establishment of our company in 1998. This relationship has been based primarily upon various agreements we have entered into with Fujitsu relating to our manufacture on a foundry basis of multi-domain vertical alignment wide viewing angle TFT-LCDs for Fujitsu and our licensing of patents and production know-how from Fujitsu. Through these foundry arrangements and other standard sales-agreements with Fujitsu, we currently produce a significant portion of Fujitsu's total TFT-LCD requirements. We believe the continued effectiveness of these agreements and the continuation of our relationship with Fujitsu are key elements for our business strategy and future success.

## Foundry Agreement

We entered into a foundry agreement with Fujitsu LCD Group on September 10, 1999 for the manufacture of Fujitsu-designed multi-domain vertical alignment TFT-LCDs. This agreement was subsequently amended on March 13, 2002, with retroactive effect to January 23, 2002.

Under the terms of the amended foundry agreement, we are required to reserve for production of Fujitsu-designed TFT-LCDs at least 15% of our total monthly production capacity in Fab 1 and Fab 2, up to a ceiling for each fab of no more than 10,000 glass substrates per month. Fujitsu is required to utilize at least 10% of this total production capacity. We are also obligated to use our best efforts to provide Fujitsu with additional production capacity from Fab 1 or Fab 2 in the event Fujitsu requires it. Within these capacity parameters, Fujitsu is required to provide us each month with a six-month rolling forecast of its product requirements. After we discuss and agree upon this forecast with Fujitsu, Fujitsu is then committed to purchase 90% of each of the first two months' forecast, 70% of the forecast for the third month and 50% of the forecast for the fourth month. The forecasts for the fifth and six months are for reference and planning purposes only. As this rolling forecast changes each month, Fujitsu's commitments are adjusted accordingly. All of this production planning is based upon firm purchase orders from Fujitsu's customers. However, if Fujitsu's customers cancel one or more purchase orders and Fujitsu does not locate alternate buyers, then Fujitsu has the right to cancel that portion of its monthly order with us, regardless of the commitments described above. To date, Fujitsu has not canceled any orders at the fabs.

The pricing arrangement for these foundry products is determined jointly by Fujitsu and us and is based upon pricing formulas for TFT substrates, color filters and cells. Each of these components is priced based on a cost-plus formula. However, the price of color filters will be determined based on the market prices of other suppliers if those market prices are lower than the price determined using the relevant cost-plus formula for color filters manufactured by us. This pricing arrangement assumes a minimum yield rate for each of these components, which is 90% for TFT substrates and color filters and is subject to negotiation in the case of cells. Measurement of these yield rates will exclude any defects that are attributable to Fujitsu's product design. In accordance with the standard practice in the TFT-LCD industry, in the event we do not meet agreed delivery dates for these products, Fujitsu has the right to demand corresponding pricing discounts.

The term of this agreement was initially for one year and is subject to unlimited automatic renewals for an additional year unless either party gives three months' notice of its intent not to renew. Either party can also terminate this agreement upon:

- insolvency of other party;
- filing of a voluntary petition in bankruptcy or corporate reorganization or similar relief;
- filing of an involuntary petition in bankruptcy unless set aside within 60 days of the filing date;
- appointment of a receiver, trustee or liquidator regarding the other party's assets;

- an assignment by the other party for the benefit of creditors;
- a transfer or acquisition by a third party of an important part of the other party's business or assets; or
- any substantial or important change in ownership, control or management of the other party, including merger, consolidation or takeover, that the non-defaulting party judges to be detrimental to it.

Upon termination of this agreement, each party is required to return the proprietary information received from the other party If the agreement is terminated by Fujitsu, Fujitsu will be obligated to purchase any partially manufactured goods committed by purchase order. If we terminate the agreement, we are obligated to provide to Fujitsu, at no cost, any partially manufactured goods committed by purchase order. We currently have no intention, and are not aware of any intention of Fujitsu, to terminate this agreement.

## Licensing Agreements

On February 22, 2001, we entered into a technology license agreement with Fujitsu relating to its patented wide viewing angle multi-domain vertical alignment technology. Under this agreement, Fujitsu has granted to us a non-exclusive, non-transferable worldwide license to use Fujitsu's multi-domain vertical alignment technology. In return, we pay a license fee based on the revenue generated from products utilizing the licensed technology, excluding products sold to Fujitsu under the amended foundry agreement. The term of this agreement is three years and is subject to unlimited automatic one-year renewals unless either party provides at least three months' notice of its intent not to renew. We recently extended this license to 2006, and we have no intention, and are not aware of any intention of Fujitsu, to terminate this agreement. This license may not be transferred or assigned to IDTech or any other of our subsidiaries or affiliates. In addition, Fujitsu may not transfer this technology to third parties without our consent.

We entered into an agreement with Fujitsu that became effective January 7, 2002 to license its "one-drop filling" technology and know-how, which facilitates the process of injecting liquid crystal into the gap between the glass substrates of TFT-LCDs. This agreement has a term of three years and is subject to unlimited automatic one-year renewals unless either party provides at least three months' notice of its intent not to renew. We currently have no intention, and are not aware of any intention of Fujitsu, to terminate this agreement. We paid a one-time fee of 170.0 million Japanese yen (US$1.4 million) for this non-exclusive license. Fujitsu has also agreed to grant to us a license with respect to any process technology patents that may be granted with respect to this technology and know-how.

## Purchase by AU Optronics Corp.

AU Optronics Corp., one of our competitors, purchased a 20% equity interest in Fujitsu Display Technologies Corporation on January 28, 2003. We do not expect our relationship with Fujitsu to be affected as a result of this investment by AU Optronics Corp. See "Risk Factors — Risks Related to Our Business — We depend on a small number of customers for a significant portion of our revenues and a loss of some of these customers, or changes in our business arrangements with these customers, would materially and adversely affect our financial condition and results of operations" and "— Risks Related to Our Technology and Intellectual Property — If we are unable to implement new technology as soon as it becomes available, or if we lose the support of our technology partners, we may not be able to compete, which may cause us to lose customers and market share, as well as reduce our future profitability."

# Management

### Directors, Supervisors and Executive Officers

The ROC Company Law and our articles of incorporation provide that our board of directors is to be elected by our shareholders in a shareholders' meeting at which a quorum, consisting of a majority of all the issued and outstanding shares having voting rights, is present. Our directors and supervisors are elected for concurrent three-year terms unless one-third or more of the directorships or all of the supervisorships are vacant, at which time a special shareholders' meeting is convened to elect directors or supervisors to fill the vacancies. The current term of our directors and supervisors expires in March 2004. Our articles of incorporation provide for the appointment of seven to nine directors. Directors may serve any number of consecutive terms and may be removed from office at any time by a resolution adopted at a meeting of shareholders. The chairman is a director elected by the board of directors. The chairman of our board of directors presides at meetings of our shareholders, meetings of our board of directors and also represents us in connection with external matters. The board of directors is responsible for the management of our business and other important matters, and the members of the board of directors have fiduciary duties to our company and our shareholders. We do not have an audit committee or a compensation committee.

Our articles of incorporation and the ROC Company Law and related regulations set forth the following requirements and restrictions for directors and supervisors:

* Under the ROC Company Law, a director can neither vote nor act as a proxy to vote on contracts in which the director is materially interested.

* Under the ROC Company Law and our articles of incorporation, a proposal to allocate the retained earnings shall be submitted by the board of directors and be approved by our shareholders every year. Such proposal includes the remuneration of directors and supervisors for that year. As a result, directors have certain power to decide their own remuneration, subject to the approval of our shareholders and the provisions of our articles of incorporation.

* Under the ROC Company Law, we shall not lend money to any individual. As a result, individual directors cannot generally borrow money from us.

* Neither the ROC Company Law nor our articles of incorporation provide age limit requirements or mandatory retirement for directors.

* Under the ROC Company Law and related regulations, a director elected in his or her capacity as an individual is not required to be our shareholder. A director may also be elected as an individual representative of a corporate or government shareholder. In addition, as a public company, the registered common shares held by all of our directors, including those held in representative capacities, shall not be less than 5% of the outstanding common shares, and the registered common shares held by all of our supervisors, including those held in representative capacities, shall not be less than 0.5% of the outstanding common shares.

Our articles of incorporation provide for the appointment of three to four supervisors. In accordance with the ROC Company Law, our supervisors are elected by our shareholders and cannot concurrently serve as one of our directors, officers or have any staff position with us. Their duty is to oversee our activities and the activities of the board of directors, and they have the power to, among other things:

* supervise the operation of our business;

* investigate our business and financial condition;

* attend the meetings of our board of directors to express their opinions;

* inspect corporate records;

* verify financial statements and reports prepared by the board of directors prior to general meetings of shareholders;

112

- call shareholders' meetings if the board of directors does not or cannot call a shareholders' meeting, or the supervisors deem the holding of such a meeting to be in the interest of our company; and

- represent us in negotiations with directors and notify, when appropriate, the board of directors to cease acting in contravention of applicable laws or regulations or in contravention of our articles of incorporation or any resolution adopted by our shareholders

When conducting investigations or verifying statements, supervisors may engage independent experts at our cost.

Our board of directors is currently comprised of nine directors and three supervisors. Of the nine board seats, two are occupied by independent directors. One of our three supervisors is an independent supervisor. Under our articles of incorporation, we must have at least two independent directors and one independent supervisor. One of the independent directors must be an accounting or financial professional. Directors and supervisors will be deemed "independent" only if, for at least one year prior to their election, they:

- do not serve as independent directors or supervisors of five or more other companies;

- are not employed by our company or its affiliates and are not directors or supervisors of its affiliates;

- do not directly or indirectly hold over 1% of our issued and outstanding shares and are not ranked among our top ten individual shareholders;

- are not married or related (father, mother, grandfather, grandmother, son, daughter, grandson or granddaughter) to employees of our company or its affiliates, directors and supervisors, holders (directly or indirectly) of over 1% of our shares or shareholders who are ranked among our top ten individual shareholders;

- are not directors, supervisors or employees of corporate shareholders that directly hold more than 5% of our shares or ranked among our top five corporate shareholders;

- are not directors, supervisors, managers or holders of more than 5% of the shares of a company or institution with which we have a financial or business relationship; and

- are not a, or a spouse of a, partner, director, supervisor or manager of providers of financial, commercial or legal services to our company or its affiliates

In addition, to be deemed "independent," directors and supervisors must be elected in their individual capacities and have five years of experience in business, legal or financial matters or in the company's business and provide proof of attending at least three hours of legal, financial or accounting training each year.

The following table sets forth information with respect to all of our directors, supervisors and executive officers as of June 30, 2003. All directors serve a term of three years or until the election of their respective successors. The business address of each of our directors and executive officers is No. 1, Chi-Yeh Road, Tainan County Tainan Science-based Industrial Park, Taiwan 74147, ROC

| Name | Age | Position |
| --- | --- | --- |
| **Directors** | | |
| Wen-Long Shi | 74 | Chairman of the Board of Directors (Representative of Chi Mei Corporation); Chairman of the board of directors of IDTech |
| Jau-Yang Ho | 53 | Director (Representative of Chi Mei Corporation), President and Chief Executive Officer; Director of IDTech; Vice President of IDTech |
| Ting-Chen Hsu | 39 | Director and Vice President |
| Biing-Seng Wu | 45 | Director and Senior Vice President; Director of IDTech |
| Chuh-Yung Chen | 49 | Independent Director |
| Shue-Sheng Wang | 67 | Independent Director |

113

| Name | Age | Position |
|------|-----|----------|
| Ching-Siang Liao | 64 | Director (Representative of Chi Mei Corporation) |
| Takashi Furusawa | 56 | Director (Representative of T.F. Techno) |
| Hiroyuki Furuhasi | 58 | Director (Representative of T.F. Techno) |
| **Supervisors** | | |
| Ueng-Chun Wu | 45 | Supervisor |
| Shih-Chang Wang | 67 | Supervisor (Representative of Linklinear Investment Co., Ltd.) |
| Wan-Lin Hsu | 61 | Independent Supervisor |
| **Other executive officers** | | |
| Jung-Chun Lin | 54 | Vice President, Chief Financial Officer and Chief Accounting Officer |
| Robert H. Chen | 54 | Vice President and General Counsel |
| Chung Tsun Yen | 51 | Vice President |
| **Other directors and executive officers of IDTech** | | |
| Takahisa Hashimoto | 60 | Vice Chairman of the board of directors of IDTech |
| Noritatsu Haji | 62 | Director of IDTech; President of IDTech |
| Toshihiro Ueki | 47 | Director of IDTech; Managing Director of IDTech |
| Toshihiko Yamashita | 58 | Director of IDTech; Managing Director of IDTech |
| Yao-Hua Hsu | 70 | Director of IDTech |
| Chin-Lung Ting | 39 | Director of IDTech |
| Kiyoto Okabe | 56 | Director of IDTech |

### Directors

*Wen-Long Shi*, 74, is our chairman. Mr. Shi is also the chairman of Chi Mei Corporation and the chairman of the board of directors of IDTech. Mr. Shi currently serves as senior adviser to the President of the ROC. He has been the chairman of our board of directors since our establishment. Mr. Shi is also currently the chairman of Chimei-Asahi Corporation and the chairman of Chi Mei Communication Systems, Inc. Mr. Shi graduated from Tainan Vocational High School.

*Jau-Yang Ho*, 53, is our president, chief executive officer and a member on our board of directors. Mr. Ho is also a director and the vice president of IDTech. He has been employed by our company since its establishment. Mr. Ho graduated from National Cheng Kung University with a bachelor's degree in Petrochemical Engineering. From 1973 to 1982, Mr. Ho was an engineer at Chi Mei Corporation, and then served as a manager of Chi Mei Corporation from 1982 to 1992. From 1992 to 1994, he served as vice president of Chi Mei Corporation. Since 1994, Mr. Ho has served as Chi Mei Corporation's president.

*Ting-Chen Hsu*, 39, has been our director and vice president since our establishment. Dr. Hsu graduated from the University of Texas at Austin with a doctorate degree in Electrical and Computer Engineering. From 1992 to 1996, Dr. Hsu was a staff engineer of the semiconductor division of Motorola. Dr. Hsu also served as product director at Taiwan Applied Materials from 1996 to 1997.

*Biing-Seng Wu*, 45, has been our director and senior vice president since our establishment. Dr. Wu is also a director of IDTech. Dr. Wu graduated from National Cheng-Kung University with a doctorate degree in Electrical Engineering. From 1987 to 1993, Dr. Wu was manager of the Electronics Research and Service Organization. From 1993 to 1997, Dr. Wu served as senior director of Prime View International.

114

*Chuh-Yung Chen*, 49, has been an independent director of our company since May 2002. Dr. Chen graduated from National Cheng Kung University with a doctorate degree in Petrochemical Engineering. Dr. Chen served as a committee member of the Examination Authority from 1995 to 1998, and served as a managing director of the Chemical Industry Association from 1998 to 2002. Dr. Chen currently serves as a committee member of the National Science Association, a professor of the Department of Chemical Engineering at National Cheng Kung University, a vice-director of the head research center of National Cheng Kung University, a chairman of the Business Incubation Center of National Cheng Kung University, a director of the Transfer Licensing Office of National Cheng Kung University, a director of CTCI Foundation, and a director of the Plastic Industry Development Center.

*Shue-Sheng Wang*, 67, has been our independent director since 2003. Mr. Wang graduated from National Taiwan University with a bachelor's degree in Accounting. From September 1998 to September 2001, he was the executive director and the general manager of International Commercial Bank of China. He is currently the chairman of Taipei Forex Inc.

*Ching-Siang Liao*, 64, has been a director of our company since its establishment. Mr. Liao graduated from Chia-Yi Vocational High School. Mr. Liao joined Chi Mei Corporation in 1962. From 1972 to 1976. he served as a manager of Chi Mei Corporation, and as general manager from 1976 to 1983. Mr. Liao served as vice president of Chi Mei Corporation from 1983 to 1998 and has been its vice chairman since 1998.

*Takashi Furusawa*, 56, is a representative director of T.F. Techno. Mr. Furusawa graduated from Keio University in Japan with a bachelor's degree in Business and Commerce. In 1969, Mr. Furusawa joined Mitsubishi Chemical Corporation. He currently serves as associate director and general manager of the battery material department and the strategic management planning department at Mitsubishi Chemical.

*Hiroyuki Furuhasi*, 58, is a representative director of T.F. Techno. Mr. Furuhasi graduated from Kantou College in Japan with a master's degree in Business Management. From 1958 to 1993, Mr. Furuhasi served as a staff member of Sanyo Electric Company. In 1993, Mr. Furuhasi established T.F. Techno and has served as its chairman since then.

### Supervisors

*Ueng-Chun Wu*, 45, is our supervisor. Mr. Wu graduated from Chang Jung Senior High School. In 1990, Mr. Wu founded the Royal Artist Construction Company. He also established Top Interior Decoration Engineering Company in 1991. Mr. Wu is currently serving as the chairman of both companies.

*Shih-Chang Wang*, 67, is a representative supervisor of Linklinear Investment Co., Ltd. Mr. Wang graduated from National Taiwan University with a bachelor's degree in Chemical Engineering. Mr. Wang served as a staff member of Chi Mei Corporation from 1972 and became vice president of Chi Mei Corporation from 1987 to 1995. From 1996 to 2000, Mr. Wang served as vice chairman of Chi Mei Corporation. He retired in 2000 and now serves as a consultant to Chi Mei Corporation.

*Wan-Lin Hsu*, 61, is our independent supervisor. Mr. Hsu graduated from National Taiwan University with a bachelor's degree in accounting. Mr. Hsu served as an accountant at KPMG from 1975 to 2000, and served as an auditor at the finance division tax information center from 1969 to 1971. Mr. Hsu also served as a standing director of the Kaohsiung Accountants Association from 1982 to 1985, and as a standing supervisor of the Kaohsiung Accountants Association from 1986 to 1988. Mr. Hsu currently serves as a director of Dai Rong Private High School, as well as a director of the Tzu-en Memorial Library Foundation.

### Other executive officers

*Jung-Chun Lin*, 54, has been our vice president, chief financial officer and chief accounting officer since 2001. Mr. Lin graduated from National Cheng Chi University with a bachelor's degree in Accounting. Mr. Lin joined Chi Mei Corporation in 1971. Mr. Lin became a manager of Chi Mei Corporation in 1982, and was its vice president from 1998 to 2000.

*Robert H. Chen*, 54, has been our vice president and general counsel since 2002. Dr. Chen graduated from the University of Michigan with a doctorate degree in Physics and from Stanford University with a post-doctorate degree in Electrical Engineering. Dr. Chen also has a J.D. degree from the University of California, Berkeley Boalt Hall School of Law. He is a member of the California Bar and a registered U.S. patent attorney. Dr. Chen was of counsel at the law firm Baker & McKenzie from 2000 to 2002, director of contracts and intellectual property at Taiwan Semiconductor Manufacturing Company Limited in 1999, general counsel for intellectual property at Acer Incorporated from 1991 to 1999, and an associate at several law firms in San Francisco from 1986 to 1991. Dr. Chen is also currently an adjunct professor of Intellectual Property Law at Jiaotong University in Hsinchu, Taiwan.

*Chung Tsun Yen*, 51, has been a vice president of our company since 2000. Mr. Yen graduated from National Cheng Kung University with a bachelor's degree in Machinery. Mr. Yen was an assistant engineer at Formosa Plastics Corporation from 1976 to 1978. Mr. Yen then joined Chi Mei Corporation in 1978 and became its manager in 1992. Mr. Yen was an assistant vice president of Chi Mei Corporation from 1994 to 2000.

### Other directors and executive officers of IDTech

*Takahisa Hashimoto*, 60, is the vice chairman of the board of directors of IDTech. Mr. Hashimoto was the president of IDTech until October 1, 2003 when he was elected as the vice chairman. Mr. Hashimoto graduated from the Tokyo Institute of Technology with a bachelor's degree in Electronics. He joined IBM Japan in 1967 and held various positions at IBM Japan, including serving as the director and general manager of IBM Japan's display business from April 2000 until its spin-off to IDTech.

*Noritatsu Haji*, 62, is a director and the president of IDTech. Mr. Haji was the vice president of IDTech until October 1, 2003 when he was elected as a director. Mr. Haji graduated from Waseda University with a bachelor's degree in commercial science. Mr. Haji joined Chi Mei Corporation in 1970 and served in various directorial positions at Chi Mei Corporation's Tokyo office

*Toshihiro Ueki*, 47, is a director and managing director of IDTech. Mr. Ueki has held a number of executive positions at IDTech since its establishment. Mr. Ueki was the executive senior managing director of engineering of IDTech until October 1, 2003 when he was elected as a director and managing director. He graduated from the Graduate School of Chiba University with a master's degree in Printing Engineering. Mr. Ueki joined IBM Japan in 1981, and served in various managerial and directorial positions from 1991, including serving as the director of LCD development from April 2001.

*Toshihiko Yamashita*, 58, is a director and managing director of IDTech. Mr. Yamashita has held a number of executive positions at IDTech since its establishment and was elected as a director on October 1, 2003. Mr. Yamashita graduated from Azusa Pacific University in business administration. He is also the managing director of Shinko Trading Corporation

*Yao-Hwa Hsu*, 70, is a director of IDTech. Mr. Hsu is also the representative of the Tokyo office of our company, a position he has held since 1998. Mr. Hsu graduated from Chun Hsing University with a bachelor's degree in law and commercial science. Mr. Hsu joined Chi Mei Corporation in 1965, and has been the representative of the Tokyo office of Chi Mei Corporation since 1993

*Chin-Lung Ting*, 39, is a director of IDTech. Mr. Ting is also an associate vice president of our company. Mr. Ting joined our company in 1998. Mr. Ting graduated from the Graduate School of Taiwan University with a master's degree

116

# EXHIBIT 17

**Thank you for your request. Here are the latest results from the TARR web server.**

**This page was generated by the TARR system on** 2007-05-17 17:34:19 ET

**Serial Number:** 76466498 Assignment Information

**Registration Number:** 2775166

**Mark**



**(words only):** CMO

**Standard Character claim:** No

**Current Status:** Registered.

**Date of Status:** 2003-10-21

**Filing Date:** 2002-11-07

**Transformed into a National Application:** No

**Registration Date:** 2003-10-21

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 110

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at TrademarkAssistanceCenter@uspto.gov**

**Current Location:** 900 -File Repository (Franconia)

**Date In Location:** 2003-10-27

---

### LAST APPLICANT(S)/OWNER(S) OF RECORD

1. CHI MEI OPTOELECTRONICS CORP.

**Address:**
CHI MEI OPTOELECTRONICS CORP.
No. 1, Chi-Yeh Road, Tainan County, Tainan Science-Based

Industrial Park
Taiwan
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** Taiwan

## GOODS AND/OR SERVICES

**International Class:** 009
**Class Status:** Active
COLOR FILTERS FOR LIQUID CRYSTAL DISPLAYS; THIN FILM TRANSISTOR LIQUID
CRYSTAL DISPLAYS; LIQUID CRYSTAL DISPLAYS
**Basis:** 1(a)
**First Use Date:** 2002-07-31
**First Use in Commerce Date:** 2002-07-31

## ADDITIONAL INFORMATION

**Design Search Code(s):**
**26.09.02** - Plain single line squares; Squares, plain single line
**26.09.03** - Incomplete squares; Squares, incomplete
**26.09.20** - Squares inside one another
**26.17.25** - Other lines, bands or bars

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

## PROSECUTION HISTORY

2003-10-21 - Registered - Principal Register

2003-07-29 - Published for opposition

2003-07-09 - Notice of publication

2003-05-29 - Approved for Pub - Principal Register (Initial exam)

2003-05-23 - Assigned To Examiner

## ATTORNEY/CORRESPONDENT INFORMATION

**Attorney of Record**
Morton J. Rosenberg, Esq.

**Correspondent**
MORTON J. ROSENBERG, ESQ.
ROSENBERG, KLEIN & LEE

3458 ELLICOTT CENTER DRIVE, SUITE 101
ELLICOTT CITY, MARYLAND 21043
Phone Number: (410) 465-6678
Fax Number: (410) 461-3067

**Domestic Representative**
Rosenberg, Klein & Lee
Phone Number: (410) 465-6678
Fax Number: (410) 461-3067

**Thank you for your request. Here are the latest results from the TARR web server.**

**This page was generated by the TARR system on** 2007-05-17 17:34:49 ET

**Serial Number:** 76385864 Assignment Information

**Registration Number:** 2686095

**Mark**

# CHI MEI

**(words only):** CHI MEI

**Standard Character claim:** No

**Current Status:** Registered.

**Date of Status:** 2003-02-11

**Filing Date:** 2002-03-21

**Transformed into a National Application:** No

**Registration Date:** 2003-02-11

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 108

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at TrademarkAssistanceCenter@uspto.gov**

**Current Location:** 41P -Office Of Public Records - Special Handling Section

**Date In Location:** 2005-03-15

---

## LAST APPLICANT(S)/OWNER(S) OF RECORD

1. CHI MEI OPTOELECTRONICS CORP.

**Address:**
CHI MEI OPTOELECTRONICS CORP.
NO. 1, CHI-YEH ROAD TAINAN SCIENCE-BASED INDUSTRIAL PARK

TAINAN COUNTY
Taiwan
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** Taiwan

## GOODS AND/OR SERVICES

**International Class:** 009
**Class Status:** Active
computers, computer peripherals, notebook computers, telephones, mobile telephones, televisions, facsimile machines, photocopying machines, photographic projectors, thin film transistor liquid crystal displays (TFTLCD), color filters, integrated circuit cards for TFTLCD, liquid crystal displays on silicon, monitors, wireless communication product modules, electric wires, electric cables, batteries, plasma display panels (PDP), personal digital assistants (PDA)
**Basis:** 1(a)
**First Use Date:** 1999-11-18
**First Use in Commerce Date:** 1999-11-18

## ADDITIONAL INFORMATION

**Translation:** "CHI MEI" is the English transliteration of the Chinese company name.

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

## PROSECUTION HISTORY

2003-02-11 - Registered - Principal Register

2002-11-19 - Published for opposition

2002-10-30 - Notice of publication

2002-09-11 - Approved for Pub - Principal Register (Initial exam)

2002-09-09 - Examiner's amendment mailed

2002-08-05 - Non-final action mailed

2002-07-23 - Assigned To Examiner

2002-07-22 - Assigned To Examiner

## ATTORNEY/CORRESPONDENT INFORMATION

**Attorney of Record**

Irene Segal Ayers

**Correspondent**
IRENE SEGAL AYERS
AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
ONE COMMERCE SQUARE
2005 MARKET STREET, 22ND FLOOR
PHILADELPHIA, PA 19103-7086

**Domestic Representative**
AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P

**Thank you for your request. Here are the latest results from the TARR web server.**

**This page was generated by the TARR system on** 2007-05-17 17:35:04 ET

**Serial Number:** 76322784 Assignment Information

**Registration Number:** 2744055

**Mark**

# CHI MEI

**(words only):** CHI MEI

**Standard Character claim:** No

**Current Status:** Registered.

**Date of Status:** 2003-07-29

**Filing Date:** 2001-10-09

**Transformed into a National Application:** No

**Registration Date:** 2003-07-29

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 108

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at TrademarkAssistanceCenter@uspto.gov**

**Current Location:** 41P -Office Of Public Records - Special Handling Section

**Date In Location:** 2005-03-15

---

## LAST APPLICANT(S)/OWNER(S) OF RECORD

1. CHI MEI OPTOELECTRONICS CORP.

**Address:**
CHI MEI OPTOELECTRONICS CORP.
No. 1, Chi-Yeh Road Tainan Science-Based Industrial Park

Tainan County, Taiwan
China
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** Taiwan

---

## GOODS AND/OR SERVICES

**International Class:** 009
**Class Status:** Active
Color filters for liquid crystal displays; thin film transistor liquid crystal displays
**Basis:** 1(a)
**First Use Date:** 2001-10-11
**First Use in Commerce Date:** 2002-06-10

---

## ADDITIONAL INFORMATION

**Translation:** "CHI MEI" is the English transliteration of the Chinese company name.

---

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

---

## PROSECUTION HISTORY

2003-07-29 - Registered - Principal Register

2003-05-22 - Allowed for Registration - Principal Register (SOU accepted)

2003-05-09 - Statement of use processing complete

2003-02-26 - Amendment to Use filed

2003-02-28 - PAPER RECEIVED

2003-02-04 - Notice of allowance - mailed

2002-11-12 - Published for opposition

2002-10-23 - Notice of publication

2002-09-11 - Approved for Pub - Principal Register (Initial exam)

2002-09-09 - Examiner's amendment mailed

2002-06-06 - Non-final action mailed

2002-05-16 - Previous allowance count withdrawn

2002-02-08 - Approved for Pub - Principal Register (Initial exam)

2001-12-14 - Non-final action mailed

2001-12-04 - Assigned To Examiner

---

## ATTORNEY/CORRESPONDENT INFORMATION

**Attorney of Record**
IRENE SEGAL AYERS

**Correspondent**
IRENE SEGAL AYERS
AKIN GUMP STRAUSS HAUER & FELD LLP
ONE COMMERCE SQ
2005 MARKET ST FL 22
PHILADELPHIA PA 19103-7013
Phone Number: (215) 965-1200
Fax Number: (215) 965-1210

**Domestic Representative**
AKIN GUMP STRAUSS HAUER & FELD LLP
Phone Number: (215) 965-1200
Fax Number: (215) 965-1210

---

# EXHIBIT 18

UNITED STATES DISTRICT COURT
FILED-CLERK
U.S. DISTRICT COURT

EASTERN DISTRICT OF TEXAS
2007 MAY -4 AM 10: 39

TX EASTERN-MARSHALL

CHI MEI OPTOELECTRONICS
CORPORATION, a Taiwan Corporation,

    Plaintiff,

    vs

1. LG PHILIPS LCD CO., LTD., a Korean
Corporation, and
2. LG PHILIPS LCD AMERICA, INC., a
California Corporation,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. **2 - 0 7 C V - 1 7 6 TJW**

BY _____

**DEMAND FOR JURY TRIAL**

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Chi Mei Optoelectronics Corporation ("CMO") hereby pleads the following

claims for patent infringement against Defendants LG Philips LCD Co., Ltd., ("LPL") and LG

Philips LCD America, Inc., ("LPLA"), and alleges as follows:

### JURISDICTION AND VENUE

1    This is an action for patent infringement arising under the patent laws of the United

States of America, 35 U.S.C. § 1, et seq., including § 271. This Court has subject matter

jurisdiction over the matters pleaded herein under 28 U.S.C. §§ 1338(a) and 1331.

2    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1400(b) and

1391(b)-(d) because, among other reasons, LPL is subject to personal jurisdiction in this judicial

district, has committed acts of infringement in this judicial district, and is an alien subject to suit in

this judicial district; and LPLA is subject to personal jurisdiction in this judicial district and has

committed acts of infringement in this judicial district.

3    CMO is informed and believes, and thereon alleges, that LPL and LPLA have

placed infringing devices into the stream of commerce by shipping those products into this judicial

district or knowing that the devices would be shipped into this judicial district.

1684361 3 05

1

**PARTIES**

2     4     Plaintiff CMO is a corporation organized and existing under the laws of Taiwan,

3 having a principal place of business at No. 3, Sec. 1, Huanshi Rd., Southern Taiwan Science Park,

4 Sinshih Township, Tainan Country, 74147 Taiwan R.O.C. CMO is the world's leading producer

5 of Thin Film Transistor-Liquid Crystal Display ("TFT-LCD") panels used in notebook and

6 desktop computers and televisions.

7     5     Defendant LPL is a corporation organized and existing under the laws of Korea

8 with a principal place of business at 17/F LG Twin Tower, 20 Yeouido-Dong, Yeongdeungpo-gu,

9 Seoul, Korea, 150875. LPL designs, manufactures, and distributes TFT-LCD panels and Liquid

10 Crystal Display ("LCD") modules worldwide. In addition, LPL has placed TFT-LCD panels and

11 LCD modules into the stream of commerce by shipping those panels and modules into this judicial

12 district or knowing that they would be shipped into this judicial district.

13     6     CMO is informed and believes, and thereon alleges, that LPL has ongoing and

14 systematic contacts throughout the United States. LPL has sales offices in California, Texas,

15 North Carolina, and Illinois, and it has continuous and systematic contacts with this judicial

16 district and elsewhere in the United States for the purpose of, among other things, meetings with

17 employees of its subsidiary and promoting the sale of its products.

18     7     Defendant LPLA is a wholly-owned subsidiary of LPL. LPLA is a corporation

19 organized and existing under the laws of California, having a principal place of business at 150 E.

20 Brokaw Rd., San Jose, CA 95112. LPLA is a wholesale seller of TFT-LCD panels and LCD

21 modules in the United States, such panels and modules being designed and manufactured by LPL.

22     8     CMO is informed and believes, and thereon alleges, that LPLA has ongoing and

23 systematic contacts throughout the United States. LPLA has placed TFT-LCD panels and LCD

24 modules into the stream of commerce by shipping those panels and modules into this judicial

25 district or knowing that they would be shipped into this judicial district.

26

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

1684361.3.05

<u>**FIRST CLAIM FOR RELIEF AGAINST LPL AND LPLA**</u>

<u>**FOR PATENT INFRINGEMENT**</u>

**('786 PATENT)**

9      CMO incorporates by reference paragraphs 1 through 8 as if set forth here in full.

10      CMO is the owner of the entire right, title and interest in and to U.S. Patent No 6,008,786 (the "'786 patent"), entitled "Method for Driving Halftone Display for a Liquid Crystal Display," which was duly issued on December 28, 1999 in the name of inventors Yasuhiro Kimura and Haruhiro Matino, and is now assigned to CMO   A copy of the '786 patent is attached as Exhibit A hereto

11      CMO is informed and believes, and thereon alleges, that LPL and LPLA have infringed, and are currently infringing, the '786 patent, in violation of 35 U.S.C § 271, by making, using, offering for sale, selling and/or importing, within this judicial district and elsewhere in the United States, without license or authority from CMO, TFT-LCD panels, LCD modules, and/or components thereof falling within the scope of one or more claims of the '786 patent.

12      CMO is informed and believes, and thereon alleges, that LPL and LPLA actively induced and are actively inducing the infringement of the '786 patent, in violation of 35 U.S C § 271(b), by actively and knowingly aiding and abetting others to directly make, use, offer for sale, sell and/or import within this judicial district and elsewhere in the United States, without license or authority from CMO, TFT-LCD panels, LCD modules, and/or components thereof falling within the scope of one or more claims of the '786 patent.

13.      CMO is informed and believes, and thereon alleges, that LPL and LPLA have contributorily infringed and are currently contributorily infringing the '786 patent, in violation of 35 U.S.C § 271(c), by selling, offering for sale and/or importing within this judicial district and elsewhere in the United States, without license or authority from CMO, TFT-LCD panels, LCD modules, and/or components thereof, which constitute a material part of the '786 patent, knowing that such panels, modules, and/or components are especially made or especially adapted for use in the infringement of the '786 patent, and not staple articles or commodities of commerce suitable for substantial noninfringing use

1        14.    CMO is informed and believes, and thereon alleges, that LPL and LPLA's

2  infringement of the '786 patent has been and continues to be willful and deliberate

3        15.    Unless enjoined, LPL and LPLA will continue to infringe the '786 patent, and

4  CMO will suffer irreparable injury as a direct and proximate result of LPL's and LPLA's conduct

5        16.    CMO has been damaged by LPL's and LPLA's conduct and until an injunction

6  issues will continue to be damaged in an amount yet to be determined.

7                **SECOND CLAIM FOR RELIEF AGAINST LPL AND LPLA**

8                        **FOR PATENT INFRINGEMENT**

9                              **('923 PATENT)**

10        17.    CMO incorporates by reference paragraphs 1 through 16 as if set forth here in full.

11        18.    CMO is the owner of the entire right, title and interest in and to U S  Patent No

12  6,013,923 (the "'923 patent"), entitled "Semiconductor Switch Array with Electrostatic Discharge

13  Protection and Method of Fabricating," which was duly issued on January 11, 2000 in the name of

14  inventor Zhong Shou Huang, and is now assigned to CMO   A copy of the '923 patent is attached

15  as Exhibit B hereto.

16        19.    CMO is informed and believes, and thereon alleges, that LPL and LPLA have

17  infringed, and are currently infringing, the '786 patent, in violation of 35 U S C. § 271(g), by

18  importing into the United States and/or selling, offering to sell, or using within the United States,

19  within this judicial district and elsewhere in the United States, without license or authority from

20  CMO, TFT-LCD panels, LCD modules, and/or material components thereof, that are made by a

21  process falling within the scope of one or more claims of the '923 patent

22        20.    CMO is informed and believes, and thereon alleges, that LPL and LPLA actively

23  induced and are actively inducing the infringement of the '923 patent, in violation of 35 U S C  §

24  271(b), by actively and knowingly aiding and abetting others to directly make, use, offer for sale,

25  sell and/or import within this judicial district and elsewhere in the United States, without license

26  or authority from CMO, TFT-LCD panels, LCD modules, and/or components thereof that are

27  made by a process falling within the scope of one or more claims of the '923 patent

28

1    21.    CMO is informed and believes, and thereon alleges, that LPL and LPLA have

2    contributorily infringed and are currently contributorily infringing the '923 patent, in violation of

3    35 U S C  § 271(c), by selling, offering for sale and/or importing within this judicial district and

4    elsewhere in the United States, without license or authority from CMO, TFT-LCD panels, LCD

5    modules, and/or components thereof, which constitute a material part of the '923 patent, knowing

6    that such panels, modules, and/or components are especially made or especially adapted for use in

7    the infringement of the '923 patent, and not staple articles or commodities of commerce suitable

8    for substantial noninfringing use.

9    22.    CMO is informed and believes, and thereon alleges, that LPL and LPLA's

10    infringement of the '923 patent is and has been willful and deliberate

11    23.    Unless enjoined, LPL and LPLA will continue to infringe the '923 patent, and

12    CMO will suffer irreparable injury as a direct and proximate result of LPL's and LPLA's conduct

13    24.    CMO has been damaged by LPL's and LPLA's conduct and until an injunction

14    issues will continue to be damaged in an amount yet to be determined.

### THIRD CLAIM FOR RELIEF AGAINST LPL AND LPLA

### FOR PATENT INFRINGEMENT

### ('352 PATENT)

18    25.    CMO incorporates by reference paragraphs 1 through 24 as if set forth here in full

19    26.    CMO is the owner of the right, title and interest in and to U S. Patent No  5,619,352

20    (the "'352 patent"), including the right to recover for past, present and future infringements and

21    violations thereof  The '352 patent is entitled "LCD Splay/Twist Compensator having Varying

22    Tilt and/or Azimuthal Angles for Improved Gray Scale Performance" and was duly issued on

23    April 8, 1997 in the name of inventors Gene C  Koch, Bruce K  Winker, and William J  Gunning,

24    III  A copy of the '352 patent is attached as Exhibit C hereto

25    27.    CMO is informed and believes, and thereon alleges, that LPL and LPLA have

26    infringed, and are currently infringing, the '352 patent, in violation of 35 U S C  § 271, by making,

27    using, offering for sale, selling and/or importing, within this judicial district and elsewhere in the

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

1684361 3 05

1   United States, without license or authority from CMO, TFT-LCD panels, LCD modules, and/or

2   components thereof falling within the scope of one or more claims of the '352 patent.

3       28.    CMO is informed and believes, and thereon alleges, that LPL and LPLA actively

4   induced and are actively inducing the infringement of the '352 patent, in violation of 35 U.S.C. §

5   271(b), by actively and knowingly aiding and abetting others to directly make, use, offer for sale,

6   sell and/or import within this judicial district and elsewhere in the United States, without license

7   or authority from CMO, TFT-LCD panels, LCD modules, and/or components thereof falling

8   within the scope of one or more claims of the '352 patent.

9       29.    CMO is informed and believes, and thereon alleges, that LPL and LPLA have

10  contributorily infringed and are currently contributorily infringing the '352 patent, in violation of

11  35 U.S.C. § 271(c), by selling, offering for sale and/or importing within this judicial district and

12  elsewhere in the United States, without license or authority from CMO, TFT-LCD panels, LCD

13  modules, and/or components thereof, which constitute a material part of the '352 patent, knowing

14  that such panels, modules, and/or components are especially made or especially adapted for use in

15  the infringement of the '352 patent, and not staple articles or commodities of commerce suitable

16  for substantial noninfringing use.

17      30.    CMO is informed and believes, and thereon alleges, that LPL and LPLA's

18  infringement of the '352 patent is and has been willful and deliberate.

19      31.    Unless enjoined, LPL and LPLA will continue to infringe the '352 patent, and

20  CMO will suffer irreparable injury as a direct and proximate result of LPL's and LPLA's conduct.

21      32.    CMO has been damaged by LPL's and LPLA's conduct and until an injunction

22  issues will continue to be damaged in an amount yet to be determined.

23          **FOURTH CLAIM FOR RELIEF AGAINST LPL AND LPLA**

24                **FOR PATENT INFRINGEMENT**

25                      **('926 PATENT)**

26      33.    CMO incorporates by reference paragraphs 1 through 32 as if set forth here in full.

27      34.    CMO is the owner of the entire right, title and interest in and to U.S. Patent No.

28  6,734,926 B2 (the "'926 patent"), entitled "Display Apparatus with a Reduced Thickness," which

1   was duly issued on May 11, 2004 in the name of inventors Kuo-Shu Fan and Chin-Lung Ting, and

2   is now assigned to CMO. A copy of the '926 patent is attached as Exhibit D hereto.

3       35.    CMO is informed and believes, and thereon alleges, that LPL and LPLA have

4   infringed, and are currently infringing, the '926 patent, in violation of 35 U.S.C. § 271, by making,

5   using, offering for sale, selling and/or importing, within this judicial district and elsewhere in the

6   United States, without license or authority from CMO, TFT-LCD panels, LCD modules, and/or

7   components thereof falling within the scope of one or more claims of the '926 patent.

8       36.    CMO is informed and believes, and thereon alleges, that LPL and LPLA actively

9   induced and are actively inducing the infringement of the '926 patent, in violation of 35 U.S.C. §

10  271(b), by actively and knowingly aiding and abetting others to directly make, use, offer for sale,

11  sell and/or import within this judicial district and elsewhere in the United States, without license

12  or authority from CMO, TFT-LCD panels, LCD modules, and/or components thereof falling

13  within the scope of one or more claims of the '926 patent.

14      37.    CMO is informed and believes, and thereon alleges, that LPL and LPLA have

15  contributorily infringed and are currently contributorily infringing the '926 patent, in violation of

16  35 U.S.C. § 271(c), by selling, offering for sale and/or importing within this judicial district and

17  elsewhere in the United States, without license or authority from CMO, TFT-LCD panels, LCD

18  modules, and/or components thereof, which constitute a material part of the '926 patent, knowing

19  that such panels, modules, and/or components are especially made or especially adapted for use in

20  the infringement of the '926 patent, and not staple articles or commodities of commerce suitable

21  for substantial noninfringing use.

22      38.    CMO is informed and believes, and thereon alleges, that LPL and LPLA's

23  infringement of the '926 patent is and has been willful and deliberate.

24      39.    Unless enjoined, LPL and LPLA will continue to infringe the '926 patent, and

25  CMO will suffer irreparable injury as a direct and proximate result of LPL's and LPLA's conduct.

26      40.    CMO has been damaged by LPL's and LPLA's conduct and until an injunction

27  issues will continue to be damaged in an amount yet to be determined.

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership including
Professional Corporations

1684361 3 05                                    - 7 -

## PRAYER FOR RELIEF

WHEREFORE, CMO prays for judgment as follows:

1       That U.S. Patent Nos. 6,008,786; 6,013,923; 5,619,352; and 6,734,926 (collectively, the "Patents-In-Suit") are valid and enforceable;

2.      That LPL and LPLA have directly infringed the Patents-In-Suit;

3       That LPL and LPLA have induced the infringement of the Patents-In-Suit;

4.      That LPL and LPLA have contributorily infringed the Patents-In-Suit;

5.      That LPL and LPLA and their affiliates, subsidiaries, officers, directors, employees, agents, representatives, licensees, successors, assigns, and all those acting for them and on their behalf, or acting in concert with them directly or indirectly, be enjoined from infringing, inducing others to infringe or contributing to the infringement of the Patents-In-Suit;

6       That LPL and LPLA be ordered to pay compensatory damages to CMO, together with interest;

7       That LPL and LPLA be ordered to provide an accounting;

8       That LPL and LPLA be ordered to pay supplemental damages to CMO, together with interest;

9.      That the infringement by LPL and LPLA be adjudged willful and that the damages to CMO be increased under 35 U.S.C. § 284 to three times the amount found or measured;

10      That this be adjudged an exceptional case and that CMO be awarded its attorneys' fees in this action pursuant to 35 U.S.C. § 285; and

11      That CMO be awarded such other and further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff Chi Mei Optoelectronics hereby demands trial by jury on all issues.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership including
Professional Corporations

1684361 3 05

1  Dated:  May 4, 2007                    Respectfully submitted,

2                                         GILLAM & SMITH

3

4

5                                         By: _____
                                          Melissa Smith
6                                         Texas State Bar No  24001351
                                          303 South Washington Avenue
7                                         Marshall, Texas  75670
                                          Phone:  903-934-8450
8                                         Facsimile:  903-934-9257
                                          Email:  Melissa@gillamsmithlaw.com
9
                                          Attorneys for Plaintiff
10                                        **CHI MEI OPTOELECTRONICS**

11  Of counsel:
    IRELL & MANELLA LLP
12  Morgan Chu
    Jonathan S. Kagan
13  Ben J. Yorks
    Alexander C D. Giza
14  1800 Avenue of the Stars
    Suite 900
15  Los Angeles, CA  90067

16

17

18

19

20

21

22

23

24

25

26

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

1684361 3  05                             - 9 -

# EXHIBIT 19

ADRMOP, AO279, CLOSED, E-Filing

# U.S. District Court
## California Northern District (Oakland)
### CIVIL DOCKET FOR CASE #: 4:03-cv-05812-SBA

Commissariat AL'Energie Atomique v. Chi Mei
Optoelectronics Corporation
Assigned to: Hon. Saundra Brown Armstrong
Demand: $0
Cause: 35:271 Patent Infringement

Date Filed: 12/24/2003
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Commissariat AL'Energie Atomique**          represented by   **Frederick Arthur Clark**
McKenna Long & Aldridge LLP
444 South Flower Street
8th Floor
Los Angeles, CA 90071
(213) 243-6126
Fax: 213-243-6330
Email: fclark@mckennalong.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gaspare J. Bono**
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
202-496-7500
Fax: 202-496-7756
*ATTORNEY TO BE NOTICED*

**Matthew T. Bailey**
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
202-496-7500
Fax: 202-496-7756
*ATTORNEY TO BE NOTICED*

**Song K. Jung**
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
202-496-7500
Fax: 202-496-7756
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Chi Mei Optoelectronics Corporation**          represented by   **Brian T. Racilla**
Fish & Richardson P.C.
1425 K Street, N.W., 11th Floor
Washington, DC 20005-3500
202-783-5070
Fax: 202-783-2331
*ATTORNEY TO BE NOTICED*

**Michael J. McKeon**
Fish & Richardson P.C.
1425 K Street N.W., 11th Floor
Washington, DC 20005-3500
202-783-5070
Fax: 202-783-2331
Email: mckeon@fr.com
*ATTORNEY TO BE NOTICED*

**Sean P. Hayes**
Fish & Richardson P.C.
919 N. Market Street
Suite 1100
Wilmington, DE 19899-1114
302-652-5070
Fax: 312-652-0607
*ATTORNEY TO BE NOTICED*

**William J. Marsden, Jr.**
Fish & Richardson P.C.
919 N. Market Street
Suite 1100
Wilmington, DE 19899-1114
302-652-5070
Fax: 302-652-0607
Email: marsden@fr.com
*ATTORNEY TO BE NOTICED*

**Katherine Kelly Lutton**
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063-1526
U.S.A
(650) 839-5084
Fax: (650) 839-5071
Email: lutton@fr.com
*ATTORNEY TO BE NOTICED*

**Katherine D. Prescott**

Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
650-839-5070
Email: prescott@fr.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/24/2003 | 1 | COMPLAINT FOR PATENT INFRINGEMENT; DEMAND FOR JURY TRIAL against Chi Mei Optoelectronics Corporation (Filing fee $ 150.00. #5509154). Filed by Commissariat AL'Energie Atomique. (gba, COURT STAFF) (Filed on 12/24/2003) Additional attachment(s) added on 2/6/2004 (jlm, COURT STAFF). (Entered: 12/30/2003) |
| 12/24/2003 | 2 | ADR SCHEDULING ORDER: Case Management Statement due by 4/16/2004. Case Management Conference set for 4/23/2004 01:30 PM. (Attachments: # 1 Standing Order)(gba, COURT STAFF) (Filed on 12/24/2003) (Entered: 12/30/2003) |
| 12/24/2003 |  | Summons Issued as to Chi Mei Optoelectronics Corporation. (gba, COURT STAFF) (Filed on 12/24/2003) (Entered: 12/30/2003) |
| 12/24/2003 |  | CASE DESIGNATED for Electronic Filing. (gba, COURT STAFF) (Filed on 12/24/2003) (Entered: 12/30/2003) |
| 12/24/2003 | 3 | REPORT on the filing or determination of an action regarding Patent Infingement(cc: form mailed to register). (gba, COURT STAFF) (Filed on 12/24/2003) (Entered: 12/30/2003) |
| 01/07/2004 | 4 | Declination to Proceed Before a U.S. Magistrate Judge by Commissariat AL'Energie Atomique. (gba, COURT STAFF) (Filed on 1/7/2004) Additional attachment(s) added on 2/6/2004 (jlm, COURT STAFF). (Entered: 01/07/2004) |
| 01/07/2004 | 5 | CLERK'S NOTICE re: Failure to E-File and/or Failure to Register as an E-Filer re: 4 (gba, COURT STAFF) (Filed on 1/7/2004) (Entered: 01/07/2004) |
| 01/08/2004 | 6 | CLERK'S NOTICE of Impending Reassignment to U.S. District Judge (klh, COURT STAFF) (Filed on 1/8/2004) (Entered: 01/08/2004) |
| 01/09/2004 | 7 | ORDER REASSIGNING CASE. Case reassigned to Judge Saundra Brown Armstrong for all further proceedings. Judge Joseph C. Spero no longer assigned to case. Signed by Executive Committee on 1/9/04. (as, ) (Filed on 1/9/2004) (Entered: 01/09/2004) |
| 01/26/2004 | 8 | CASE MANAGEMENT SCHEDULING ORDER FOR REASSIGNED CASES: Case Management Conference set for 4/28/2004 03:00 PM. via telephone. Signed by Judge Armstrong on 1/26/04. (lrc, ) (Filed on 1/26/2004) (Entered: 01/26/2004) |
| 03/24/2004 | 9 | MOTION for Issuance of Letters Rogatory filed by Commissariat |

| | | AL'Energie Atomique. (Clark, Frederick) (Filed on 3/24/2004) (Entered: 03/24/2004) |
|---|---|---|
| 03/24/2004 | 10 | MOTION Request for International Judicial Assistance With Proposed Order filed by Commissariat AL'Energie Atomique. (Attachments: # 1 Summons in Chinese# 2 Civil Cover Sheet in Chinese# 3 Complaint in Chinese# 4 Exhibits 1 & 2 in Chinese# 5 Exhibits 3 & 4 - Pictures# 6 Summons, Civil Cv Sht & Complaint in English# 7 Exhibits 1 & 2 to Complaint in English# 8 Exhibits 3&4 (Same for both Chinese & Eng Complaint))(Clark, Frederick) (Filed on 3/24/2004) Modified on 3/25/2004 (jlm, COURT STAFF). (Entered: 03/24/2004) |
| 04/16/2004 | 11 | Joint Case Management Statement and Proposed Order filed by Commissariat AL'Energie Atomique. (Attachments: # 1 Proof of Service) (Clark, Frederick) (Filed on 4/16/2004) Modified on 4/19/2004 (jlm, COURT STAFF) (Entered: 04/16/2004) |
| 04/21/2004 | 12 | CLERK'S NOTICE Case Management Conference set for 5/26/2004 03:45 PM. via telephone. (lrc, ) (Filed on 4/21/2004) ***note: conference date on document says 05/26/2003*** Modified on 4/23/2004 (jlm, COURT STAFF). (Entered: 04/21/2004) |
| 04/22/2004 | 13 | CERTIFICATE OF SERVICE by Commissariat AL'Energie Atomique (Attachments: # 1 Clerk's Notice)(Clark, Frederick) (Filed on 4/22/2004) (Entered: 04/22/2004) |
| 05/07/2004 | 14 | ORDER, signed by Judge Saundra Brown Armstrong on 4/30/2004 re 9 and 10. The Court presents its compliments to the appropriate Judicial Authority in Taiwan and requests international judicial assistance to effect Service of Process as described herein regarding the above-captioned Civil proceeding. (sbasec, COURT STAFF) (Filed on 5/7/2004) (Entered: 05/07/2004) |
| 05/07/2004 | 15 | Letter re Status of Letter Ragatory Application from Frederick A. Clark, dated 05/04/04. (jlm, COURT STAFF) (Filed on 5/7/2004) (Entered: 05/10/2004) |
| 05/21/2004 | 16 | MOTION for Direction of Service filed by Commissariat AL'Energie Atomique. (Attachments: # 1 # 2 # 3 # 4 # 5 # 6 # 7 # 8 # 9 # 10 # 11 # 12)(Clark, Frederick) (Filed on 5/21/2004) Modified on 5/24/2004 (jlm, COURT STAFF). (Entered: 05/21/2004) |
| 05/25/2004 | 17 | ORDER, signed by Judge Saundra Brown Armstrong on 5/25/04. Among other things, the Court ORDERED that the Case Management Conference currently set for 5/25/2004 is moved to 9/8/2004 at 2:30 p.m. via telephonic conference call. (sbasec, COURT STAFF) (Filed on 5/25/2004) (Entered: 05/25/2004) |
| 05/25/2004 | | Set Deadlines/Hearings: re 17 Telephonic Case Management Conference set for 9/8/2004 at 02:30 PM. (jlm, COURT STAFF) (Filed on 5/25/2004) (Entered: 05/26/2004) |
| 05/26/2004 | 18 | MOTION filed by Commissariat AL'Energie Atomique. (Attachments: # |

| | | |
|---|---|---|
| | | 1)(Clark, Frederick) (Filed on 5/26/2004) (Entered: 05/26/2004) |
| 05/27/2004 | 19 | ORDER by Judge Saundra Brown Armstrong, granting 18 Motion for direction regarding manner of service on Defendant Chi Mei Optoelectronics Corporation Pursuant to Federal Rule 4. Defendant shall answer or respond to the complaint in this Action by or before twenty (20) days from the date of this Order. (sbasec, COURT STAFF) (Filed on 5/27/2004) (Entered: 05/27/2004) |
| 05/27/2004 | 20 | CERTIFICATE OF SERVICE by Commissariat AL'Energie Atomique *PROOF OF SERVICE* (Clark, Frederick) (Filed on 5/27/2004) (Entered: 05/27/2004) |
| 06/16/2004 | 21 | MOTION to Stay filed by Chi Mei Optoelectronics Corporation. Motion Hearing set for 10/5/2004 01:00 PM. (Attachments: # 1 Proposed Order)(Prescott, Katherine) (Filed on 6/16/2004) (Entered: 06/16/2004) |
| 06/16/2004 | 22 | Declaration of Katherine Prescott in Support of 21 *Motion to Stay* filed by Chi Mei Optoelectronics Corporation. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G# 8 Exhibit H# 9 Exhibit I)(Related document(s)21) (Prescott, Katherine) (Filed on 6/16/2004) (Entered: 06/16/2004) |
| 06/16/2004 | 23 | ANSWER to Complaint with Jury Demand by Chi Mei Optoelectronics Corporation. (Prescott, Katherine) (Filed on 6/16/2004) (Entered: 06/16/2004) |
| 06/16/2004 | 24 | MOTION for Leave to File *Motion for Reconsideration* filed by Chi Mei Optoelectronics Corporation. Motion Hearing set for 10/5/2004 01:00 PM. (Attachments: # 1 Proposed Order)(Prescott, Katherine) (Filed on 6/16/2004) (Entered: 06/16/2004) |
| 06/16/2004 | 25 | Declaration of Katherine Prescott *in Support of Motion for Leave* filed by Chi Mei Optoelectronics Corporation. (Attachments: # 1 Exhibit A-Motion for Reconsideration# 2 Exhibit B-Decl. ISO Motion for Reconsideration# 3 Exhibit B1 (Ex. 1 to Decl ISO Mtn. for Reconsideration)# 4 Exhibit B2 (Ex. 2 to Decl ISO Mtn for Reconsideration)# 5 Exhibit B3 (Ex. 3 to Decl ISO Mtn for Reconsideration)# 6 Exhibit B4 (Ex. 4 to Decl ISO Mtn for Reconsideration)# 7 Exhibit B5 (Ex. 5 to Decl ISO Mtn for Reconsideration)# 8 Exhibit C-Proposed Order Granting Mtn for Reconsideration)(Prescott, Katherine) (Filed on 6/16/2004) (Entered: 06/16/2004) |
| 07/06/2004 | 26 | MOTION to Change Venue filed by Commissariat AL'Energie Atomique. Motion Hearing set for 10/5/2004 01:00 PM. (Attachments: # 1 Supplement # 2 Supplement # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Exhibit # 9 Proposed Order)(Clark, Frederick) (Filed on 7/6/2004) (Entered: 07/06/2004) |
| 07/08/2004 | 27 | Renotice of Motion re 21 *Motion to Stay* by Chi Mei Optoelectronics Corporation (Prescott, Katherine) (Filed on 7/8/2004) Hearing set for 10/19/04 at 1:00 PM. Modified on 7/9/2004 (jlm, COURT STAFF). |

| | | |
|---|---|---|
| | | (Entered: 07/08/2004) |
| 07/08/2004 | 28 | Renotice of Motion re 24 *Motion for Leave to File Motion for Reconsideration* by Chi Mei Optoelectronics Corporation (Prescott, Katherine) (Filed on 7/8/2004) Hearing set for 10/19/04 at 1:00 PM. Modified on 7/9/2004 (jlm, COURT STAFF). (Entered: 07/08/2004) |
| 07/08/2004 | 29 | Renotice of Motion re 26 *Motion to Change Venue* filed by Commissariat AL'Energie Atomique. Motion Hearing set for 10/19/2004 at 01:00 PM. (Clark, Frederick) (Filed on 7/8/2004) Modified on 7/9/2004 (jlm, COURT STAFF). Modified on 7/9/2004 (jlm, COURT STAFF). (Entered: 07/08/2004) |
| 07/08/2004 | | Set/Reset Deadlines as to 21 Motion to Stay. Motion Hearing set for 10/19/2004 01:00 PM. (jlm, COURT STAFF) (Filed on 7/8/2004) (Entered: 07/09/2004) |
| 07/08/2004 | | Set/Reset Deadlines as to 24 Motion for Leave to File Motion for Reconsideration Motion Hearing set for 10/19/2004 01:00 PM. (jlm, COURT STAFF) (Filed on 7/8/2004) (Entered: 07/09/2004) |
| 07/08/2004 | | Set/Reset Deadlines as to 26 MOTION to Change Venue. Motion Hearing set for 10/19/2004 01:00 PM. (jlm, COURT STAFF) (Filed on 7/8/2004) (Entered: 07/09/2004) |
| 07/14/2004 | 30 | MOTION for leave to appear in Pro Hac Vice for Michael J. McKeon filed by Chi Mei Optoelectronics Corporation. Fee paid, receipt no. 4409839. (jlm, COURT STAFF) (Filed on 7/14/2004) (Entered: 07/15/2004) |
| 07/14/2004 | | Received Order re [30] by Chi Mei Optoelectronics Corporation. (jlm, COURT STAFF) (Filed on 7/14/2004) (Entered: 07/15/2004) |
| 07/14/2004 | 31 | MOTION for leave to appear in Pro Hac Vice for Brian T. Racilla filed by Chi Mei Optoelectronics Corporation. Fee paid, receipt no. 4409842. (jlm, COURT STAFF) (Filed on 7/14/2004) (Entered: 07/15/2004) |
| 07/14/2004 | | Received Order re [31] by Chi Mei Optoelectronics Corporation. (jlm, COURT STAFF) (Filed on 7/14/2004) (Entered: 07/15/2004) |
| 07/14/2004 | 32 | MOTION for leave to appear in Pro Hac Vice for William J. Marsden filed by Chi Mei Optoelectronics Corporation. Fee paid, receipt no. 4409841. (jlm, COURT STAFF) (Filed on 7/14/2004) (Entered: 07/15/2004) |
| 07/14/2004 | | Received Order re [32] by Chi Mei Optoelectronics Corporation. (jlm, COURT STAFF) (Filed on 7/14/2004) (Entered: 07/15/2004) |
| 07/19/2004 | 33 | MOTION for leave to appear in Pro Hac Vice for Sean P. Hayes filed by Chi Mei Optoelectronics Corporation. Fee paid, receipt no. 4409859 (jlm, COURT STAFF) (Filed on 7/19/2004) (Entered: 07/20/2004) |
| 07/19/2004 | | Received Order re [33] by Chi Mei Optoelectronics Corporation. (jlm, COURT STAFF) (Filed on 7/19/2004) (Entered: 07/20/2004) |

| 07/21/2004 | 34 | ORDER by Judge Saundra Brown Armstrong GRANTING [33] Motion for Pro Hac Vice for Sean P. Hayes (jlm, COURT STAFF) (Filed on 7/21/2004) (Entered: 07/23/2004) |
|---|---|---|
| 07/21/2004 | 35 | ORDER by Judge Saundra Brown Armstrong GRANTING [30] Motion for Pro Hac Vice for Michael J. McKeon (jlm, COURT STAFF) (Filed on 7/21/2004) (Entered: 07/23/2004) |
| 07/21/2004 | 36 | ORDER by Judge Saundra Brown Armstrong GRANTING [31] Motion for Pro Hac Vice for Brian T. Racilla (jlm, COURT STAFF) (Filed on 7/21/2004) (Entered: 07/23/2004) |
| 07/21/2004 | 37 | ORDER by Judge Saundra Brown Armstrong GRANTING [32] Motion for Pro Hac Vice for William J. Marsden (jlm, COURT STAFF) (Filed on 7/21/2004) (Entered: 07/23/2004) |
| 08/18/2004 | 38 | Memorandum in Opposition re 24 MOTION for Leave to File *Motion for Reconsideration* filed by Commissariat AL'Energie Atomique. (Clark, Frederick) (Filed on 8/18/2004) (Entered: 08/18/2004) |
| 08/19/2004 | 39 | MOTION to Compel *Participation in Mediation* filed by Commissariat AL'Energie Atomique. Motion Hearing set for 10/19/2004 01:00 PM. (Attachments: # 1 Proposed Order Points and Authorities# 2 Declaration# 3 Proposed Order Compelling Participation in Mediation# 4 Proof of Service)(Clark, Frederick) (Filed on 8/19/2004) (Entered: 08/19/2004) |
| 08/19/2004 | 40 | MOTION to Shorten Time *and Declaration of Frederick A. Clark* filed by Commissariat AL'Energie Atomique. (Attachments: # 1 Points and Authorities in Support# 2 Proposed Order)(Clark, Frederick) (Filed on 8/19/2004) (Entered: 08/19/2004) |
| 08/24/2004 | 41 | Memorandum in Opposition re 40 MOTION to Shorten Time *and Declaration of Frederick A. Clark* filed by Chi Mei Optoelectronics Corporation. (Lutton, Katherine) (Filed on 8/24/2004) (Entered: 08/24/2004) |
| 08/24/2004 | 42 | Declaration of William J. Marsden, Jr. in Support of 41 *Opposition to Motion to Shorten Time* filed by Chi Mei Optoelectronics Corporation. (Attachments: # 1 Exhibit 1# 2 Exhibit -Decl of K.K. Lutton ISO Filing of W.J. Marsden Decl)(Related document(s)41) (Lutton, Katherine) (Filed on 8/24/2004) (Entered: 08/24/2004) |
| 08/27/2004 | 43 | JOINT CASE MANAGEMENT STATEMENT *and Proposed Order* filed by Commissariat AL'Energie Atomique. (Clark, Frederick) (Filed on 8/27/2004) (Entered: 08/27/2004) |
| 09/01/2004 | 44 | CLERK'S NOTICE Case Management Conference set for 10/19/2004 01:00 PM. to follow the hearing on the motions. (lrc, ) (Filed on 9/1/2004) (Entered: 09/01/2004) |
| 09/01/2004 | 45 | ORDER by Judge Saundra Brown Armstrong, denying 40 Motion to Shorten Time. The hearing on CEA's Motion to Compel Defendant's Participation in Consolidated Mediation Or, in the Alternative, to |

| | | |
|---|---|---|
| | | Expedite Consideration of Motion to Transfer Venue will be heard at its regularly noticed time on 10/19/2004 at 1:00 p.m. (sbasec, COURT STAFF) (Filed on 9/1/2004) (Entered: 09/01/2004) |
| 09/01/2004 | 46 | NOTICE by Commissariat AL'Energie Atomique re 44 Clerks Notice *PROOF OF SERVICE* (Clark, Frederick) (Filed on 9/1/2004) (Entered: 09/01/2004) |
| 09/01/2004 | 47 | NOTICE by Commissariat AL'Energie Atomique *PROOF OF SERVICE OF COURT ORDER DATED SEPTEMBER 1, 2004* (Clark, Frederick) (Filed on 9/1/2004) (Entered: 09/01/2004) |
| 09/09/2004 | 48 | ORDER by Judge Saundra Brown Armstrong, denying 24 Motion for Leave to File Motion for Reconsideration filed by Chi Mei Optoelectronics Corporation. (sbasec, COURT STAFF) (Filed on 9/9/2004) (Entered: 09/09/2004) |
| 09/20/2004 | 49 | MOTION for leave to appear in Pro Hac Vice for Gaspare J. Bono filed by Commissariat AL'Energie Atomique. Fee paid, receipt no. 4410112 (jlm, COURT STAFF) (Filed on 9/20/2004) (Entered: 09/21/2004) |
| 09/20/2004 | | Received Order re [49] by Commissariat AL'Energie Atomique. (jlm, COURT STAFF) (Filed on 9/20/2004) (Entered: 09/21/2004) |
| 09/27/2004 | 51 | ORDER by Judge Saundra Brown Armstrong GRANTING [49] Motion for Pro Hac Vice for Gaspare J. Bono (jlm, COURT STAFF) (Filed on 9/27/2004) (Entered: 09/28/2004) |
| 09/28/2004 | 50 | Memorandum in Opposition re 21 MOTION to Stay filed by Commissariat AL'Energie Atomique. (Attachments: # 1 Exhibit Declaration of Gaspare J. Bono)(Clark, Frederick) (Filed on 9/28/2004) Modified on 9/29/2004 (jlm, COURT STAFF). (Entered: 09/28/2004) |
| 09/28/2004 | 52 | Memorandum in Opposition re 39 MOTION to Compel *Participation in Mediation* filed by Chi Mei Optoelectronics Corporation. (Prescott, Katherine) (Filed on 9/28/2004) (Entered: 09/28/2004) |
| 09/28/2004 | 53 | Memorandum in Opposition *to Plaintiff's Motion to Transfer Venue* filed by Chi Mei Optoelectronics Corporation. (Prescott, Katherine) (Filed on 9/28/2004) (Entered: 09/28/2004) |
| 09/28/2004 | 54 | Declaration of William J. Marsden, Jr. in Support of 39 *Defendant's Opposition to Plaintiff's Motion to Transfer Venue* filed by Chi Mei Optoelectronics Corporation. (Attachments: # 1 Exhibit 1)(Related document(s)39) (Prescott, Katherine) (Filed on 9/28/2004) (Entered: 09/28/2004) |
| 10/05/2004 | 55 | Reply Memorandum re 39 MOTION to Compel *Participation in Mediation* filed by Commissariat AL'Energie Atomique. (Attachments: # 1 Exhibit Supplemental Declaration of Gaspare J. Bono)(Clark, Frederick) (Filed on 10/5/2004) (Entered: 10/05/2004) |
| 10/05/2004 | 56 | Reply Memorandum re 26 MOTION to Change Venue filed by Commissariat AL'Energie Atomique. (Attachments: # 1 Exhibit |

| | | Supplemental Declaration of Gaspare J. Bono)(Clark, Frederick) (Filed on 10/5/2004) (Entered: 10/05/2004) |
|---|---|---|
| 10/05/2004 | 57 | RESPONSE in Support re 21 MOTION to Stay filed by Chi Mei Optoelectronics Corporation. (Prescott, Katherine) (Filed on 10/5/2004) (Entered: 10/05/2004) |
| 10/05/2004 | 58 | Certificate of Interested Entities *and F.R.C.P. Rule 7.1 Disclosure Statement* (Prescott, Katherine) (Filed on 10/5/2004) (Entered: 10/05/2004) |
| 10/15/2004 | 60 | LETTERS ROGATORY Returned Executed by Commissariat AL'Energie Atomique. Chi Mei Optoelectronics Corporation served on 7/15/2004, answer due 8/4/2004. (jlm, COURT STAFF) (Filed on 10/15/2004) Modified on 10/19/2004 (jlm, COURT STAFF). (Entered: 10/19/2004) |
| 10/19/2004 | 59 | ORDER by Judge SAUNDRA BROWN ARMSTRONG on 10/19/04, denying 39 Motion to Compel, granting 21 Motion to Stay and denying 26 Motion to Transfer venue as moot. (sbasec, COURT STAFF) (Filed on 10/19/2004) (Entered: 10/19/2004) |
| 01/24/2005 | 61 | STATEMENT OF RECENT DECISION pursuant to Civil Local Rule 7-3.d filed byChi Mei Optoelectronics Corporation. (Attachments: # 1 Exhibit)(Prescott, Katherine) (Filed on 1/24/2005) (Entered: 01/24/2005) |
| 01/27/2005 | 62 | ORDER, signed by Judge SAUNDRA BROWN ARMSTRONG on 01/27/2005. IT IS ORDERED THAT a Case Management Conference is set for 02/17/2005 at 3:00 p.m. by telephone. The Court also ORDERED THAT the parties shall meet and confer prior to the conference, shall prepare a joint Case Management Conference Statement and shall file the same no later than 10 days prior to the Case Management Conference. (sbasec, COURT STAFF) (Filed on 1/27/2005) (Entered: 01/27/2005) |
| 01/27/2005 | | Set Deadlines/Hearings: re 62 Case Management Conference set for 2/17/2005 at 03:00 PM. (jlm, COURT STAFF) (Filed on 1/27/2005) (Entered: 01/31/2005) |
| 02/07/2005 | 63 | Joint Case Management Statement and Proposed Order *Revised* filed by Commissariat AL'Energie Atomique. (Clark, Frederick) (Filed on 2/7/2005) Modified on 2/8/2005 (jlm, COURT STAFF). (Entered: 02/07/2005) |
| 02/16/2005 | 64 | MOTION to Stay *(Renewed)* filed by Chi Mei Optoelectronics Corporation. Motion Hearing set for 2/17/2005 03:00 PM. (Attachments: # 1 Proposed Order)(Prescott, Katherine) (Filed on 2/16/2005) (Entered: 02/16/2005) |
| 02/16/2005 | 65 | Declaration of Katherine Prescott in Support of 64 MOTION to Stay *(Renewed)* filed byChi Mei Optoelectronics Corporation. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D)(Related document (s)64) (Prescott, Katherine) (Filed on 2/16/2005) (Entered: 02/16/2005) |
| 02/16/2005 | 66 | MOTION to Change Venue *and Supporting Memorandum of Points and* |

| | | |
|---|---|---|
| | | *Authorities* filed by Commissariat AL'Energie Atomique. Motion Hearing set for 4/5/2005 01:00 PM. (Attachments: # 1 Proposed Order Transferring Action to U.S. District Court for District of Delaware) (Clark, Frederick) (Filed on 2/16/2005) (Entered: 02/16/2005) |
| 02/16/2005 | 67 | Declaration of Gaspare J. Bono in Support of 66 MOTION to Change Venue *and Supporting Memorandum of Points and Authorities (Part I) with Exhibits A-E* filed byCommissariat AL'Energie Atomique. (Related document(s)66) (Clark, Frederick) (Filed on 2/16/2005) (Entered: 02/16/2005) |
| 02/16/2005 | 68 | EXHIBITS *F-O to Declaration of Gaspare J. Bono* filed byCommissariat AL'Energie Atomique. (Clark, Frederick) (Filed on 2/16/2005) (Entered: 02/16/2005) |
| 02/16/2005 | 69 | Renotice motion hearing re 64 MOTION to Stay *(Renewed)* filed byChi Mei Optoelectronics Corporation. Motion Hearing set for 4/5/2005 03:00 PM. (Prescott, Katherine) (Filed on 2/16/2005) (Entered: 02/16/2005) |
| 02/17/2005 | 70 | Renotice motion hearing re 64 MOTION to Stay *(Renewed)* filed byChi Mei Optoelectronics Corporation. Motion Hearing set for 4/5/2005 01:00 PM. (Prescott, Katherine) (Filed on 2/17/2005) (Entered: 02/17/2005) |
| 02/22/2005 | 71 | Minute Entry: Further Case Management Conference held on 2/17/2005 before JUDGE ARMSTRONG (Date Filed: 2/22/2005). (Court Reporter NOT REPORTED.) (lrc, ) (Date Filed: 2/22/2005) (Entered: 02/22/2005) |
| 02/22/2005 | | Set Deadlines/Hearings: Case Management Conference set for 4/5/2005 01:00 PM. to follow the hearing on the motion. (lrc, ) (Filed on 2/22/2005) (Entered: 02/22/2005) |
| 03/15/2005 | 72 | Memorandum in Opposition *to CMO's Renewed Motion to Stay* filed byCommissariat AL'Energie Atomique. (Clark, Frederick) (Filed on 3/15/2005) (Entered: 03/15/2005) |
| 03/15/2005 | 73 | Memorandum in Opposition re 66 MOTION to Change Venue *and Supporting Memorandum of Points and Authorities* filed byChi Mei Optoelectronics Corporation. (Prescott, Katherine) (Filed on 3/15/2005) (Entered: 03/15/2005) |
| 03/22/2005 | 74 | Reply Memorandum re 66 MOTION to Change Venue *and Supporting Memorandum of Points and Authorities Plaintiff's Reply Brief In Support Of Motion to Transfer Venue* filed byCommissariat AL'Energie Atomique. (Clark, Frederick) (Filed on 3/22/2005) (Entered: 03/22/2005) |
| 03/22/2005 | 75 | Reply to Opposition re 64 MOTION to Stay *(Renewed)* filed byChi Mei Optoelectronics Corporation. (Prescott, Katherine) (Filed on 3/22/2005) (Entered: 03/22/2005) |
| 03/22/2005 | 76 | Declaration of Katherine D. Prescott in Support of 75 Reply to Opposition *to Renewed Motion to Stay* filed byChi Mei Optoelectronics Corporation. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C) (Related document(s)75) (Prescott, Katherine) (Filed on 3/22/2005) (Entered: 03/22/2005) |

| 03/24/2005 | 77 | CLERK'S NOTICE Case Management Conference set for 5/3/2005 01:00 PM. Motion Hearing set for 5/3/2005 01:00 PM in Courtroom 3, 3rd Floor, Oakland. (lrc, ) (Filed on 3/24/2005) (Entered: 03/24/2005) |
| 03/25/2005 | 78 | CERTIFICATE OF SERVICE by Commissariat AL'Energie Atomique re 77 Clerks Notice *dated 3/24/05* (Clark, Frederick) (Filed on 3/25/2005) (Entered: 03/25/2005) |
| 04/27/2005 | 79 | STIPULATION and Proposed Order of Dismissal *Voluntary - Without Prejudice* by Commissariat AL'Energie Atomique. (Clark, Frederick) (Filed on 4/27/2005) Modified on 4/28/2005 (jlm, COURT STAFF). (Entered: 04/27/2005) |
| 04/29/2005 | 80 | MEMORANDUM AND OPINION. Signed by Judge SAUNDRA BROWN ARMSTRONG on 05/29/2005 on 79 Joint Stipulation Of Voluntary Dismissal Without Prejudice. Based on the parties' Joint Stipulation 79 and pursuant to FRCiv.P 41(a)(1)(ii), the Court ORDERED, among other things, THAT the above-captioned action is DISMISSED WITHOUT PREJUDICE. (sbasec, COURT STAFF) (Filed on 4/29/2005) (Entered: 04/29/2005) |
| 04/29/2005 | | REPORT on the determination of an action regarding re Patent Infringement (cc: form mailed to register). (jlm, COURT STAFF) (Filed on 4/29/2005) (Entered: 05/03/2005) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 05/17/2007 16:04:09 | | |
| **PACER Login:** | mc0033 | **Client Code:** | 07773-0071-2867 |
| **Description:** | Docket Report | **Search Criteria:** | 4:03-cv-05812-SBA |
| **Billable Pages:** | 7 | **Cost:** | 0.56 |

# EXHIBIT 20

ECF, RELATED

# U.S. District Court
## United States District Court for the Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:07-cv-00821-SCR

Anvik Corporation v. Chi Mei Optoelectronics et al
Assigned to: Stephen C. Robinson
Related Case: 7:05-cv-07891-SCR-LMS
Cause: 35:271 Patent Infringement

Date Filed: 02/02/2007
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Anvik Corporation**

represented by **Christopher Chad Johnson**
Bernstein Litowitz Berger &
Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
212-554-1396
Fax: 212-554-1444
Email: Chad@blbglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Henry Wierzbowski**
Bernstein Litowitz Berger &
Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212)-594-5300
Fax: (212)-273-4443
Email: adam@blbglaw.com
*ATTORNEY TO BE NOTICED*

**Darnley Dickinson Stewart**
Bernstein Litowitz Berger &
Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
212-554-1476
Fax: 212-554-1444
Email: darnley@blbglaw.com
*ATTORNEY TO BE NOTICED*

**Jai Kamal Chandrasekhar**
Bernstein Litowitz Berger &
Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019

(212)-554-1484
Fax: (212)-554-1444
Email: jai@blbglaw.com
*ATTORNEY TO BE NOTICED*

**Joshua Lee Raskin**
Wolf Block Schorr and Solis-Cohen,
LLP(NYC)
250 Park Avenue
New York, NY 10177
212-768-3800
Fax: 212-382-2124
Email: jraskin@wolfblock.com
*ATTORNEY TO BE NOTICED*

**Martin G. Raskin**
Wolf Block Schorr and Solis-Cohen,
LLP(NYC)
250 Park Avenue
New York, NY 10177
(212)-883-4908
Fax: (212)-672-1108
Email: mraskin@wolfblock.com
*ATTORNEY TO BE NOTICED*

**Steven S. Rubin**
Wolf, Block, Schorr & Solis-Cohen
(NYC)
250 Park Avenue
New York, NY 10177
(212)-883-4967
Fax: (212)-672-1169
Email: srubin@wolfblock.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Chi Mei Optoelectronics**                 represented by   **Michael Frank Autuoro**
Fish & Richardson P.C. (NYC)
Citigroup Center - 153 E. 53rd Street
New York, NY 10022
(212)-641-2237
Fax: (212)- 258-2291
Email: autuoro@fr.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Chi Mei Optoelectronics USA, Inc.**       represented by   **Michael Frank Autuoro**
(See above for address)

*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/02/2007 | 1 | COMPLAINT against Chi Mei Optoelectronics, Chi Mei Optoelectronics USA, Inc.. (Filing Fee $ 350.00, Receipt Number 599518)Document filed by Anvik Corporation.(jma) Additional attachment(s) added on 2/5/2007 (Martinez, Johnny). (Entered: 02/05/2007) |
| 02/02/2007 | | SUMMONS ISSUED as to Chi Mei Optoelectronics, Chi Mei Optoelectronics USA, Inc.. (jma) (Entered: 02/05/2007) |
| 02/02/2007 | | Case Designated ECF. (jma) (Entered: 02/05/2007) |
| 02/02/2007 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Anvik Corporation.(jma) (Entered: 02/05/2007) |
| 02/02/2007 | 3 | Mailed notice to Commissioner of Patents and Trademarks to report the filing of this action. (jma) (Entered: 02/05/2007) |
| 02/02/2007 | | CASE REFERRED TO Judge Stephen C. Robinson as possibly related to 7:05-cv-07891. (jma) (Entered: 02/05/2007) |
| 02/05/2007 | | CASE ACCEPTED AS RELATED. Create association to 7:05-cv-07891-SCR-LMS. Notice of Assignment to follow. (jma) (Entered: 02/07/2007) |
| 02/05/2007 | 9 | NOTICE OF CASE ASSIGNMENT to Judge Stephen C. Robinson. Judge Unassigned is no longer assigned to the case. (jma) (Entered: 02/07/2007) |
| 02/05/2007 | | Magistrate Judge Lisa M. Smith is so designated. (jma) (Entered: 02/07/2007) |
| 02/06/2007 | 4 | NOTICE OF APPEARANCE by Darnley Dickinson Stewart on behalf of Anvik Corporation (Stewart, Darnley) (Entered: 02/06/2007) |
| 02/06/2007 | 5 | NOTICE OF APPEARANCE by Adam Henry Wierzbowski on behalf of Anvik Corporation (Wierzbowski, Adam) (Entered: 02/06/2007) |
| 02/06/2007 | 6 | NOTICE OF APPEARANCE by Jai Kamal Chandrasekhar on behalf of Anvik Corporation (Attachments: # 1 Certificate of Service) (Chandrasekhar, Jai) (Entered: 02/06/2007) |
| 02/07/2007 | 7 | NOTICE OF APPEARANCE by Joshua Lee Raskin on behalf of Anvik Corporation (Raskin, Joshua) (Entered: 02/07/2007) |
| 02/07/2007 | 8 | NOTICE OF APPEARANCE by Martin G. Raskin on behalf of Anvik Corporation (Raskin, Martin) (Entered: 02/07/2007) |
| 02/08/2007 | 10 | NOTICE OF APPEARANCE by Steven S. Rubin on behalf of Anvik Corporation (Rubin, Steven) (Entered: 02/08/2007) |
| | | |

| 02/22/2007 | 11 | SUMMONS RETURNED EXECUTED Summons and Complaint served. Chi Mei Optoelectronics USA, Inc. served on 2/9/2007, answer due 3/1/2007. Service was accepted by Rodney Noriel, Authorized Agent. Document filed by Anvik Corporation. (Raskin, Joshua) (Entered: 02/22/2007) |
| --- | --- | --- |
| 03/05/2007 | 12 | ENDORSED LETTER addressed to The Hon. Stephen C. Robinson from Michael F. Autuoro dated 03/01/2007 re: CMO USA respectfully requests an extension up to and including April 2, 2007 of CMO USA's time to answer, move, or otherwise respond to the complaint filed by plaintiff Anvik Corp.....ENDORSED, APPLICATION GRANTED. (Signed by Judge Stephen C. Robinson on 03/1/2007) (jma) (Entered: 03/05/2007) |
| 03/23/2007 | 13 | CLERK CERTIFICATE OF MAILING of Summons & Complaint mailed to Chi Mei Optoelectronics No. 1 Chi-Yeh Road, Tainan Science-Based Industrial Park, Taiwan 74147 on 3/23/2007 by Federal Express # 7907 0001 9016. (aba) (Entered: 03/23/2007) |
| 03/28/2007 | 14 | CLERK CERTIFICATE OF MAILING of Summons & Complaint mailed to Robert H. Chen at the following address: Chi Mei Optoelectronics No. 1 Chi-Yeh Road, Tainan Science-Based Industrial Park, Tainan County, Taiwan, 74147 on 3/28/2007 by Federal Express # 7929 5796 9310. (aba) (Entered: 03/28/2007) |
| 04/04/2007 | 15 | STIPULATION AND ORDER Extending Time for defendants to answer to 5/15/07. So Ordered. (Signed by Judge Stephen C. Robinson on 4/4/07) (fk) (Entered: 04/06/2007) |
| 04/17/2007 | | CLERK CERTIFICATE OF MAILING NOT RECEIVED Summons & Complaint FedEx # 7929 5796 9310. REASON: Incorrect address. (aba) (Entered: 04/17/2007). (aba) (Entered: 04/17/2007) |
| 04/17/2007 | | CLERK CERTIFICATE OF MAILING NOT RECEIVED Summons & Complaint FedEx # 7907 0001 9016. REASON: Incorrect address; Package returned to shipper. (aba) (Entered: 04/17/2007) |
| 05/15/2007 | 16 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Chi Mei Optoelectronics.(Autuoro, Michael) (Entered: 05/15/2007) |
| 05/15/2007 | 17 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Chi Mei Optoelectronics Japan Co., Ltd. as Corporate Parent. Document filed by Chi Mei Optoelectronics USA, Inc..(Autuoro, Michael) (Entered: 05/15/2007) |
| 05/15/2007 | 18 | ANSWER to Complaint. Document filed by Chi Mei Optoelectronics. (Autuoro, Michael) (Entered: 05/15/2007) |
| 05/15/2007 | 19 | ANSWER to Complaint. Document filed by Chi Mei Optoelectronics USA, Inc..(Autuoro, Michael) (Entered: 05/15/2007) |
| 05/15/2007 | 20 | CERTIFICATE OF SERVICE of CMO's Answer to Complaint and Rule 7.1 Statement; CMO USA's Answer to Complaint and Rule 7.1 Statement |

| | | served on Anvik Corporation on May 15, 2007. Document filed by Chi Mei Optoelectronics, Chi Mei Optoelectronics USA, Inc.. (Autuoro, Michael) (Entered: 05/15/2007) |
|---|---|---|

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/17/2007 12:26:20 | | |
| **PACER Login:** | mc0033 | **Client Code:** | 07773-0071-2140 |
| **Description:** | Docket Report | **Search Criteria:** | 7:07-cv-00821-SCR |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |