# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| LG.PHILIPS LCD CO., LTD., | |
| Plaintiff, | |
| v. | Civil Action No. 06-726 (JJF) |
| CHI MEI OPTOELECTRONICS CORPORATION, et al. | |
| Defendants. | |

## PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS ALTERNATIVE MOTION FOR LEAVE TO USE DISCOVERY OR, IN THE FURTHER ALTERNATIVE, TO CONDUCT JURISDICTIONAL DISCOVERY

THE BAYARD FIRM

Richard D. Kirk
Ashley B. Stitzer
222 Delaware Avenue, 9th Floor
P.O. Box 25130
Wilmington, DE 19899-5130
(302) 655-5000
astitzer@bayardfirm.com

Attorneys for Plaintiff LG.Philips LCD Co., Ltd.

OF COUNSEL:
Gaspare J. Bono
Song K. Jung
R. Tyler Goodwyn, IV
Lora A. Brzezynski
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 496-7500

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDINGS ................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 4

I.    THE CEA LITIGATION ......................................................................................... 4

      A.    The Court of Appeals for the Federal Circuit Adopted Key
            Evidence of CMO's Jurisdictional Contacts ................................................. 4

      B.    Jurisdictional Discovery Obtained in the CEA Litigation Clearly
            Establishes This Court's Jurisdiction .......................................................... 6

      C.    CMO Refuses to Permit LPL to Use the Documents Obtained
            Through Jurisdictional Discovery in the CEA Litigation ........................... 7

ARGUMENT ................................................................................................................ 8

I.    THIS COURT SHOULD PERMIT LPL TO USE THE DOCUMENTS
      PRODUCED IN THE CEA LITIGATION, AND CMO SHOULD BE
      REQUIRED TO SUPPLEMENT ITS OWN PRODUCTION ........................................ 8

      A.    The Documents Produced in the CEA Litigation are Relevant to
            Further Establish This Court's Jurisdiction ................................................. 8

      B.    Judicial Economy Dictates that LPL Should be Allowed to Obtain
            the Documents Produced in the CEA Litigation ....................................... 10

      C.    LPL Will Agree to be Bound by the Protective Order in the CEA
            Litigation .................................................................................................... 11

      D.    LPL's Counsel Did Not Breach the CEA Protective Order ....................... 11

      E.    CMO's Refusal to Permit LPL to Use the Jurisdictional
            Documents Produced in the CEA Litigation Demonstrates that its
            Motion to Dismiss is Frivolous ................................................................. 12

II.   JURISDICTIONAL DISCOVERY IS PROPER BECAUSE LPL'S CLAIM OF
      JURISDICTION IS MERITORIOUS AND NOT "CLEARLY FRIVOLOUS" ............ 13

      A.    Jurisdictional Discovery is Routinely Granted in Cases Like This
            Where LPL's Claim of Jurisdiction Against CMO is Not Clearly
            Frivolous .................................................................................................... 13

      B.    CMO's Basis for Challenging Personal Jurisdiction in Delaware
            for a Second Time is Misplaced ................................................................. 15

      C.    Jurisdictional Discovery Will Supplement the Factual Basis for
            Jurisdiction Over CMO ............................................................................. 19

      D.    CMO Has Conceded it is Subject to Jurisdictional Discovery ................. 20

# TABLE OF CONTENTS

**Page**

CONCLUSION ............................................................................................................................. 20

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Aircraft Guar. Corp. v. Strato-Lift*, Inc.,
    974 F. Supp. 468 (E.D. Pa. 1997) ........................................................................ 16

*Ameriserve Food Distrib., Inc. v. Lamb-Weston, Inc.,*
    267 B.R. 668 (D. Del. 2001) ................................................................................. 17

*Beverly Hills Fan Co. v. Royal Sovereign Corp.,*
    21 F.3d 1558 (Fed. Cir. 1994) ...................................................................... *passim*

*Cipollone v. Liggett Group, Inc.,*
    113 F.R.D. 86 (D. N.J. 1986) ............................................................................... 10

*Commissariat à l'Energie Atomique v. Samsung Electronics Co., et al.,*
    Case No. 03-484-MPT ............................................................................................ 1

*Commissariat à l'Energie Atomique v. Chi Mei Optoelectronics Corp. et al.,*
    293 F. Supp. 2d 423 (D. Del. 2003) ....................................................................... 4

*Commissariat à l'Energie Atomique v. Chi Mei Optoelectronics Corp. et al.,*
    395 F.3d 1315 (Fed. Cir. 2005) .................................................................... *passim*

*Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances,*
    723 F.2d 357 (3d Cir. 1983) ................................................................................. 13

*Intel Corp. v. Broadcom Corp.,*
    167 F. Supp. 2d 692 (D. Del. 2001) ..................................................................... 16

*Jepson, Inc. v. Makita Elec. Works, Ltd.,*
    30 F.3d 854 (7th Cir. 1994) ................................................................................. 10

*Motorola Inc. v. PC-Tel, Inc.,*
    58 F. Supp. 2d 349 (D. Del. 1999)................................................................. 15, 19

*Nehemiah v. Athletics Congress of the U.S.A.,*
    765 F.2d 42 (3d Cir. 1985) ................................................................................... 13

*Philips Elecs. N. Am. Corp. v. Contec Corp.,*
    No. Civ. A. 02-123-KAJ, 2004 WL 503602 (D. Del. Mar. 11, 2004)...................... 15

*Sandvik AB v. Advent Int'l Corp.,*
    83 F. Supp. 2d 442 (D. Del. 1999)........................................................................ 13

*Siemens Aktiengesellschaft v. LG Semicon Co.,*
    69 F. Supp. 2d 622 (D. Del. 1999)................................................................... 17, 18

*Surpitski v. Hughes-Keenan Corp.,*
    362 F.2d 254 (1st Cir. 1966)................................................................................. 14

## TABLE OF AUTHORITIES

**Page**

*Tracinda Corp. v. DaimlerChrysler AG,*
    197 F. Supp. 2d 86 (D. Del. 2002)................................................................................ 14

*Videon Chevrolet, Inc. v. General Motors Corp.,*
    No. 91-4202, 1995 WL 395925 (E.D. Pa. June 28, 1995)......................................... 12

*Wilk v. Am. Med. Ass'n.,*
    635 F.2d 1295 (7th Cir. 1981) .................................................................................. 10

**Federal Rules**

Fed. R. Civ. P. 30(b)(6)................................................................................................. 19

## NATURE AND STAGE OF THE PROCEEDINGS

On December 1, 2006, Plaintiff LG.Philips LCD Co., Ltd. ("LPL") filed a Complaint for Patent Infringement against Defendants Chi Mei Optoelectronics Corporation ("CMO"), AU Optronics Corporation, AU Optronics Corporation America, Tatung Company, Tatung Company of America, Inc., and ViewSonic Corporation alleging infringement of three of LPL's United States patents.  (D.I. 1.)  On April 6, 2007 CMO filed a Motion to Dismiss for Lack of Personal Jurisdiction and Insufficiency of Service of Process.  (D.I. 19.)  By stipulation (D.I. 27), LPL filed its answering brief in response to CMO's motion to dismiss on May 22, 2007 (D.I. 57)[1] and, on that date, LPL also filed a First Amended Complaint against CMO (D.I. 54), which added Chi Mei Optoelectronics USA, Inc. ("CMO USA") as a defendant.  CMO then filed its reply in support of its motion to dismiss (the "Reply Brief") on June 15, 2007.  (D.I. 78.) Although CMO's motion to dismiss should be denied, LPL requests, in the alternative, an order directing CMO to permit LPL to use the discovery produced in the matter of *Commissariat à l'Energie Atomique v. Samsung Electronics Co., et al.,* Case No. 03-484-MPT (the "CEA Litigation") to further establish this Court's jurisdiction, or in the further alternative, to conduct jurisdictional discovery.

## SUMMARY OF ARGUMENT

1.      There is overwhelming evidence of CMO's jurisdictional contacts with the State of Delaware.  For instance, prior to the filing of LPL's complaint, CMO sold hundreds of its

---

[1]  LPL incorporates by reference herein the factual evidence and legal arguments set forth in its opposition to CMO's motion to dismiss (D.I. 57), including the supporting Declaration of Lora A. Brzezynski.  (D.I. 60.)  In LPL's opposition, LPL requested, as alternative relief, leave to take jurisdictional discovery to further establish CMO's substantial, purposeful, and ongoing contacts with this jurisdiction.

1

products in Office Depot and CDW retail stores located in Delaware.  (D.I. 60, Ex. 2 and 3.)

CMO also has purposefully placed its Liquid Crystal Display modules ("LCDs"), which are a

type of flat panel display that are incorporated into, *inter alia*, LCD portable computers, LCD

computer monitors, and LCD televisions, into the established distribution channel for

incorporation into name brand monitors such as Dell, Gateway, Hewlett-Packard, and Apple that

are distributed to retailers such as Best Buy, Circuit City, CompUSA, Office Depot, Staples, and

RadioShack for sale all throughout the United States.  (D.I. 60, Ex. 25; Ex. 30 at 95, 270-71, 278;

Ex. 31-45.)  CMO's contacts with this jurisdiction are not isolated.  Indeed, CMO has repeatedly

and purposefully marketed its products to Delaware consumers, thereby subjecting itself to this

Court's jurisdiction.

    2.    Evidence of CMO's contacts with the State of Delaware were previously

presented to this Court in the CEA Litigation filed in 2003 in this Court by plaintiff

Commissariat à l'Energie Atomique ("CEA").  The Court of Appeals for the Federal Circuit

adopted many of the facts presented during the adjudication of CMO's motion to dismiss for lack

of personal jurisdiction in the CEA Litigation.  In its opinion vacating the dismissal of CEA's

complaint and remanding that case to allow jurisdictional discovery, the Federal Circuit

concluded that, "[c]ontrary to the district court's holding, the evidence already presented by

plaintiff is sufficient to demonstrate that CMO sells a very large volume of LCDs to companies

which incorporate these displays into their final product and that these products are likely sold in

Delaware in substantial quantities." *Commissariat à l'Energie Atomique v. Chi Mei*

*Optoelectronics Corp. et al.*, 395 F.3d 1315, 1320 (Fed. Cir. 2005).  "CMO did not submit any

evidence to contradict CEA's allegation that CMO derived substantial revenue from sales of its

products to Delaware.  Nor did CMO submit evidence to contradict CEA's assertion that its

663146-2

products, as incorporated by [original equipment manufacturers] into computer monitors, were likely to reach Delaware." *Id.* 1317-18. The Federal Circuit rejected CMO's argument that it did not transact business in Delaware. Then, after months of extensive discovery revealing the importation, sale, and distribution of CMO's products in the United States, including Delaware, CMO consented to this Court's jurisdiction. (Ex. 1 to Declaration of Ashley B. Stitzer, Esq. ("Stitzer Decl.").)[2]

3.    CMO now raises the same jurisdictional issues it raised in the CEA Litigation. Because the documents produced in the CEA Litigation relate to CMO's jurisdictional contacts, the jurisdictional discovery in the CEA Litigation clearly is relevant to CMO's current motion to dismiss for lack of personal jurisdiction. Providing LPL access to the jurisdictional documents produced in the CEA Litigation will enhance judicial economy and ensure that this Court is provided additional evidence and information regarding CMO's jurisdictional contacts. Moreover, LPL will agree to abide by the protections afforded to confidential documents in the protective order entered in the CEA Litigation.

4.    Alternatively, if the Court does not allow LPL to use the documents produced in the CEA Litigation, LPL should be permitted to obtain discovery from CMO, as well as from third parties that have information relevant to personal jurisdiction, to supplement the factual basis supporting this Court's personal jurisdiction. Jurisdictional discovery is routinely granted when a plaintiff makes a non-frivolous claim of jurisdiction. LPL already has *prima facie* evidence of jurisdiction, which is more fully set forth in LPL's opposition to CMO's motion to dismiss (D.I. 57). LPL believes that jurisdictional discovery from CMO will further establish CMO's substantial and ongoing contacts with the United States and Delaware, including its

---

[2]  All remaining numbered exhibits referenced herein are attached to the Stitzer Decl.

intimate knowledge of the distribution channel through which its products are directly shipped into this state.  Thus, jurisdictional discovery should be ordered in this case, just as it was in the CEA Litigation.

## STATEMENT OF FACTS

**I.    THE CEA LITIGATION**

    **A.    The Court of Appeals for the Federal Circuit Adopted Key Evidence of CMO's Jurisdictional Contacts**

In May 2003, CEA filed a patent infringement action against CMO and other companies in this Court alleging infringement of two of CEA's U.S. patents.  CMO filed a motion to dismiss for lack of jurisdiction, which the district court granted without first affording CEA the opportunity to take jurisdictional discovery.  *Commissariat à l'Energie Atomique v. Chi Mei Optoelectronics Corp. et al.*, 293 F. Supp. 2d 423 (D. Del. 2003), *vacated and remanded*, 395 F.3d 1315, 1320, 1324 (Fed. Cir. 2005).  CEA then appealed the district court's decision and the Court of Appeals for the Federal Circuit vacated the order of dismissal and remanded the case to allow CEA to take jurisdictional discovery.  *Commissariat à l'Energie Atomique v. Chi Mei Optoelectronics Corp. et al.*, 395 F.3d 1315 (Fed. Cir. 2005).

The Federal Circuit adopted key evidence in vacating the District Court's order dismissing the CEA Litigation.  First and foremost, the Federal Circuit found sufficient evidence of CMO's sales of LCD products to companies that incorporate them into their products, which are "likely sold in Delaware in substantial quantities." *Id*. at 1320.  In reaching that conclusion, the Federal Circuit stated:

> Based on the allegations in the complaint, the evidence submitted by CEA, and CMO's failure to rebut the factual inference that devices incorporating its LCDs were sold in Delaware, the district court should have found CEA's showing sufficient to establish that substantial revenues could be derived by CMO from the sales of products in Delaware incorporating CMO's LCDs.

4

*Id*. The Federal Circuit recognized the following key evidence regarding the exercise of jurisdiction over CMO in Delaware as of May 2003:

- CMO sells over $1 billion of its products worldwide, including in the United States; that CMO supplies roughly 12% of the LCD market; that CMO is the number one supplier of 19" LCD monitors; and that North America accounts for approximately 30% of all computer monitor purchases.

- CMO shipped approximately 2,950,000 LCD modules in the first five months of 2003.

- CMO utilized an established distribution network for LCD products, with published industry data on actual and forecasted sales that document the flow of displays from LCD suppliers such as CMO, through to OEMs, and on to name-brand computer manufacturers.

- Orders for devices incorporating CMO products were placed in Delaware prior to the date CEA filed its complaint and the existence of post-filing sales of such devices in Delaware.

- CEA alleged in its complaint that CMO derived "substantial revenue from services or things used or consumed within [Delaware]."

*Id*. at 1317. The Federal Circuit further recognized that, "[c]ontrary to the district court's holding, the evidence already presented by plaintiff is sufficient to demonstrate that CMO sells a very large volume of LCDs to companies which incorporate these displays into their final product and that these products are likely sold in Delaware in substantial quantities." *Id*. at 1320. "Indeed, CEA has gone beyond factual allegations, and has already made a prima facie case for CMO's use of an established distribution network that likely results in substantial sales of its products in Delaware." *Id*. at 1323.

Moreover, the Federal Circuit determined that "CMO did not submit any evidence to contradict CEA's allegation that CMO derived substantial revenue from sales of its products to Delaware. Nor did CMO submit evidence to contradict CEA's assertion that its products, as incorporated by [original equipment manufacturers] into computer monitors, were likely to reach

Delaware" *Id*. at 1317-18. The Federal Circuit also was not convinced by CMO's argument that it "had not transacted business itself, nor performed any type of work in Delaware, and that it had no operations in Delaware, no employees who work or reside in Delaware, held no license to do business in Delaware, and did not own, lease, use or otherwise possess any property in Delaware." *Id*. at 1317. CMO, however, makes these very same arguments in its motion to dismiss, (D.I. 20 at 4-7), even though those arguments were not successful in the CEA Litigation.

**B.    Jurisdictional Discovery Obtained in the CEA Litigation Clearly Establishes This Court's Jurisdiction**

CMO has affirmatively denied the existence of any evidence sufficient to subject it to this Court's jurisdiction. Indeed, CMO has completely disregarded in its motion to dismiss the evidence obtained during its litigation with CEA. CEA and CMO engaged in months of jurisdictional discovery, including written discovery between the parties and from numerous third parties located in the U.S. These third parties included several U.S. retailers to whom CMO sells LCD products, which produced evidence of *actual* sales of CMO products to purchasers in Delaware.[3] Two retailers, Office Depot and CDW sold over 900 CMO products in Delaware, which expressly refutes CMO's allegation in its motion to dismiss that it does not do business in Delaware.[4] (D.I. 60, Ex. 2 and 3.) These sales documents were expressly requested by CEA in a

---

[3] CEA issued 25 subpoenas on the following third parties during jurisdictional discovery: ViewSonic Corporation, JP Morgan Chase & Company, Westinghouse Digital Electronics, LLC, Dell Corporation, Fujitsu Microelectronics America, Inc., Hitachi America, LTD, Samsung Electronics America, Inc., Lite-On Technology USA, Inc., Sony Electronics, Inc., BenQ America Corporation, International Display Tech USA, Best Buy.com LLC, Best Buy Co., Inc., Office Depot, Inc., Avnet Applied Computing, Avnet, Inc., CompUSA, Inc., Amazon.com, Inc., CDW Corporation, Fry's Electronics, Inc., Widgets, Inc., Cyberian Outpost, Inc., Syntax Groups Corporation and Sampo Technology, Inc.

[4] These documents were produced in response to two of the 25 subpoenas issued during jurisdictional discovery in the CEA Litigation. Unlike the majority of the documents produced by CMO and third parties, the referenced documents were not marked as confidential subject to the protective order in that case at the time of their production. Thus, no confidential information is disclosed herein.

subpoena to Office Depot and CDW, of which CMO was well aware.  CMO's failure to

acknowledge in its motion to dismiss or its Reply Brief the tremendous evidence obtained in

jurisdictional discovery in the CEA Litigation, let alone the extensive Delaware sales by Office

Depot and CDW, contradicts directly any argument by CMO that it does not conduct business in

Delaware and that LPL "cannot[] allege any contacts between CMO and Delaware."  (D.I. 20 at

7.)  Despite the substantial evidence of CMO's jurisdictional contacts that was produced in the

CEA Litigation, CMO continues to refuse LPL access to that information.

### C.    CMO Refuses to Permit LPL to Use the Documents Obtained Through Jurisdictional Discovery in the CEA Litigation

CMO refuses to allow LPL to use the jurisdictional discovery produced in the CEA

Litigation that was marked "Confidential" or "Highly Sensitive Confidential" under the

protective order entered in that case, even though counsel for LPL agreed to afford the same

protections to those documents in this case as was required under the protective order in the CEA

Litigation.  LPL repeatedly attempted to obtain CMO's consent to modify the protective order in

the CEA Litigation; CMO refused.[5]

On April 17, 2007, LPL filed a motion to modify the protective order in the CEA

Litigation to permit LPL to use the directly relevant jurisdictional discovery to oppose CMO's

motion to dismiss in the instant case.[6]  (Ex. 2.)  Instead, CMO objected to LPL's motion for

---

[5]  CMO's current counsel, Potter Anderson & Corroon LLP and Jones Day, did not represent CMO in the CEA Litigation, however, these firms represented CMO with respect to LPL's motion to modify the protective order in that case.

[6]  LPL's motion requested modification of a December 13, 2004 Stipulated Protective Order ("December Order") filed in the CEA Litigation. (Ex. 3.)  CMO contends that it did not stipulate to the December Order, but rather stipulated to an earlier protective order dated June 15, 2004.  (Ex. 4.)  The difference between the two orders, however, is not material to LPL's request to use the jurisdictional discovery produced in the CEA Litigation for the purpose of further establishing this Court's jurisdiction.

modification arguing, *inter alia*, that permitting LPL to be subject to the protective order would provide LPL access to CMO's confidential and proprietary business information and that CMO would not be spared the burden of searching for and producing documents relating to jurisdictional discovery. In its response, however, CMO did not deny that the information it produced in the CEA Litigation establishes jurisdiction in this Court.

At a May 7, 2007 telephone conference on LPL's motion in the CEA Litigation, Judge Thynge ruled that it was not necessary to modify the protective order because the parties should "[g]o back to Judge Farnan and tell him that this discovery is out there, enter into a protective order with CMO so that the information can be exchanged appropriately in the L.G.Philips case." (Ex. 5 at 6.)

## ARGUMENT

### I. THIS COURT SHOULD PERMIT LPL TO USE THE DOCUMENTS PRODUCED IN THE CEA LITIGATION, AND CMO SHOULD BE REQUIRED TO SUPPLEMENT ITS OWN PRODUCTION

#### A. The Documents Produced in the CEA Litigation are Relevant to Further Establish This Court's Jurisdiction

Although LPL believes that it has presented substantial facts sufficient to warrant the outright denial of CMO's motion to dismiss, LPL moves in the alternative that it be allowed to use the jurisdictional discovery obtained in the CEA Litigation to supplement the jurisdictional evidence against CMO in this case. If permitted to use the jurisdictional discovery already provided by CMO and other third-parties that have information relevant to CMO's sale of LCD products in the U.S., including Delaware, LPL could further establish that CMO is subject to this Court's jurisdiction.

The jurisdictional discovery requested and obtained in the CEA Litigation is not specific to that case – the information relates to CMO's importation, sale, and distribution of LCD

8

products in the United States, including Delaware. Such general sales information clearly relates to whether CMO has sufficient contacts with the state of Delaware so that this Court may exercise jurisdiction over CMO in this case. Indeed, the jurisdictional discovery produced by CMO in the CEA Litigation is the same information that LPL is entitled to obtain through jurisdictional discovery in this action, which CMO conceded in its opposition to LPL's motion to modify the protective order in the CEA Litigation. *See infra* at 20-21.

Most importantly, the protective order in the CEA Litigation expressly provides that the information exchanged could be disclosed in another case. It provides that: "By entering this order and limiting the disclosure of information in this case, the court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case." (Ex. 3 at ¶ 18.)[7] Thus, this Court is not precluded and, in fact, is expressly permitted to determine that the documents subject to either of the CEA protective orders may be disclosed in the current action for the purpose of further establishing this Court's jurisdiction over CMO.

Moreover, CMO does not object to the relevance of the jurisdictional discovery in the instant matter. Thus, CMO's refusal to permit LPL to use that discovery is without merit.

**B.    Judicial Economy Dictates that LPL Should be Allowed to Obtain the Documents Produced in the CEA Litigation**

As explained above, given that the documents produced in the CEA Litigation regarding this Court's jurisdiction are the very same category of documents now sought by LPL to support this Court's jurisdiction, judicial economy dictates that LPL be allowed to use the jurisdictional discovery previously produced.

---

[7] The June 2004 protective order contains an identical provision. (Ex. 4 at ¶ 18.) Thus, no matter which protective order governs, LPL should be permitted access to the protected materials.

663146-2

Judicial economy supports the prevention of any duplicative efforts and expenses. Indeed, avoiding the cost and expense of engaging in repetitious discovery should be avoided. *Cipollone v. Liggett Group, Inc.*, 113 F.R.D. 86 (D. N.J. 1986) (recognizing the utility in the collaborative use of discovery); *see also Wilk v. Am. Med. Ass'n*, 635 F.2d 1295, 1299 (7th Cir. 1981) ("We therefore agree with the result reached by every other appellate court which has considered the issue, and hold that where an appropriate modification of a protective order can place private litigants in a position they would otherwise reach only after repetition of another's discovery, such modification can be denied only where it would tangibly prejudice substantial rights of the party opposing modification."). CMO cannot hide behind the protective order in the CEA Litigation as a shield to prevent those jurisdictional documents from being used in another litigation. *See Jepson, Inc. v. Makita Elec. Works, Ltd.*, 30 F.3d 854 (7th Cir. 1994) (refusing to assist in efforts to use the protective orders as shields.)

Rather than force LPL to incur the expense of serving duplicative requests for jurisdictional discovery in the instant case, this Court should order CMO to permit LPL to use the discovery produced in the CEA Litigation and order CMO to supplement its discovery to date. CMO has conceded that it "would have to produce documents relative to jurisdictional discovery in any event," thus, requiring CMO to supplement its previous production is neither overly burdensome nor duplicative of its previous efforts. (Ex. 6 at 2.) In fact, merely supplementing CMO's April 2005 production would be cost effective for both parties.

Not only has CMO completely ignored the jurisdictional evidence exchanged in the CEA Litigation, but it has also affirmatively prevented LPL from using it in this action to contradict CMO's denial that any evidence exists sufficient to establish this Court's jurisdiction, thereby unjustifiably increasing the cost of the litigation.

10

C.    **LPL Will Agree to be Bound by the Protective Order in the CEA Litigation**

CMO's concern that providing LPL access to the jurisdictional documents produced in the CEA Litigation would put CMO at a competitive disadvantage is not an issue. First, in accordance with the restrictions contained in the CEA protective order, only LPL's outside counsel, *i.e.*, McKenna Long & Aldridge LLP, and not LPL itself, would be allowed to receive documents or information designated "HIGHLY SENSITIVE CONFIDENTIAL." (Ex. 3 at ¶¶ 2.2, 4.2.)[8] The protective order also prohibits disclosure to counsel involved in the prosecution of LCD-related patents and expressly prohibits disclosure to attorneys providing non-legal advice to clients in the LCD industry where highly sensitive business-related financial information would be relevant to such representation. (Ex. 3 at ¶ 4.1(a)(1)-(2).)[9] Accordingly, only appropriate counsel, and not LPL, would receive the confidential and proprietary business information. Thus, there is no reason to prevent LPL from using this information for the purpose of further confirming this Court's jurisdiction.

D.    **LPL's Counsel Did Not Breach the CEA Protective Order**

In its opposition to LPL's motion to modify the protective order in the CEA Litigation (Ex. 6), CMO argued, without basis, that LPL's counsel, which also continues to represent CEA, violated the protective order by using its knowledge to benefit another client, *i.e.*, LPL. CMO's reliance on *Videon Chevrolet, Inc. v. General Motors Corp.* is misplaced. In *Videon*, counsel retained documents after the conclusion of the litigation that should have been returned to the producing party or destroyed and then sought to obtain those documents in collateral litigation in which he represented parties suing the original defendant, General Motors. *Videon Chevrolet,*

---

[8]  Again, both protective orders contain identical language. (*See* Ex. 4 at ¶¶ 2.2, 4.2.)

[9]  The language is identical in both protective orders. (*See* Ex. 4 at ¶ 4.1(a)(1)-(2).)

*Inc. v. General Motors Corp.*, No. 91-4202, 1995 WL 395925 (E.D. Pa. June 28, 1995) (Exhibit A).[10] First, the CEA Litigation has not concluded, thus undersigned counsel rightfully continues to possess the protected materials. Moreover, none of the documents produced in the CEA Litigation that were marked "Confidential" or "Highly Sensitive Confidential" pursuant to the protective order in that case were shown to LPL or used by LPL in its opposition to CMO's motion to dismiss. Thus, there has been no breach of the CEA protective order and CMO's inference of counsel's improper conduct completely lacks foundation.

    **E.**    **CMO's Refusal to Permit LPL to Use the Jurisdictional Documents Produced in the CEA Litigation Demonstrates that its Motion to Dismiss is Without Merit**

Finally, CMO had actual knowledge that its products were being sold in this jurisdiction. For instance, CMO was aware of the existence of documents tracking the sale of CMO products by CDW and Office Depot in Delaware, which were produced in the CEA Litigation pursuant to a third party subpoena. CMO's motion to dismiss also fails to recognize the findings of the Federal Circuit in its opinion in the CEA Litigation remanding the case for jurisdictional discovery. The Federal Circuit concluded that "[b]ased on the allegations in the complaint, the evidence submitted by CEA, and CMO's failure to rebut the factual inference that devices incorporating its LCDs were sold in Delaware, the district court should have found CEA's showing sufficient to establish that substantial revenues could be derived by CMO from the sales of products in Delaware incorporating CMO's LCDs." *Commissariat*, 395 F.3d at 1320. Further, and perhaps most tellingly, the Federal Circuit determined that "CMO did not submit

---

[10]  In addition, the *Videon* court did not find, *inter alia*, sufficient evidence that the protected discovery material was relevant to the collateral litigation for which the materials were sought or that the same materials eventually would have been exchanged in the collateral litigation. *Id*. at *3. In this case, the documents CMO produced in the CEA Litigation are *identical* to those sought by LPL to refute CMO's arguments in the motion to dismiss and would be sought by LPL regardless.

any evidence to contradict CEA's allegation that CMO derived substantial revenue from sales of its products to Delaware. Nor did CMO submit evidence to contradict CEA's assertion that its products, as incorporated by [original equipment manufacturers] into computer monitors, were likely to reach Delaware." *Id*. at 1317-18. Despite the Federal Circuit's adoption of key evidence demonstrating CMO's jurisdictional contacts, and the subsequent jurisdictional discovery further establishing these contacts, CMO continues to deny that it has any contacts in Delaware to support the exercise of this Court's jurisdiction.

To ensure this Court is given all the relevant information regarding CMO's jurisdictional contacts, LPL should be permitted to use the confidential documents from the CEA Litigation.

## II.    JURISDICTIONAL DISCOVERY IS PROPER BECAUSE LPL'S CLAIM OF JURISDICTION IS MERITORIOUS AND NOT "CLEARLY FRIVOLOUS"

### A.    Jurisdictional Discovery is Routinely Granted in Cases Like This Where LPL's Claim of Jurisdiction Against CMO is Not Clearly Frivolous

LPL moves in the further alternative to take jurisdictional discovery in this case if this Court does not order CMO to allow LPL to use the discovery from the CEA Litigation and supplement its own production from that case. Under well-settled precedent, LPL is entitled to jurisdictional discovery. *Commissariat*, 395 F.3d at 1321-23. Jurisdictional discovery should be allowed "unless the plaintiff's claim is clearly frivolous." *Nehemiah v. Athletics Congress of the U.S.A.*, 765 F.2d 42, 48 (3d Cir. 1985) (quotations omitted); *see also Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983) ("Where the plaintiff's claim is not clearly frivolous, the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden."); *Sandvik AB v. Advent Int'l Corp.*, 83 F. Supp. 2d 442 (D. Del. 1999) (determining that, prior to dismissing non-frivolous claims for lack of personal jurisdiction, trial courts should allow limited discovery), *aff'd*, 220 F.3d 99 (3d Cir. 2000).

663146-2

The U.S. Court of Appeals for the Third Circuit also strongly favors jurisdictional discovery. *Compagnie des Bauxites de Guinee*, 723 F.2d at 362 ("The condemnation of plaintiff's proposed further activities as a 'fishing expedition' was unwarranted. When the fish is identified, and the question is whether it is in the pond, we know no reason to deny a plaintiff the customary license.") (citing *Surpitski v. Hughes-Keenan Corp.*, 362 F.2d 254, 255-56 (1st Cir. 1966)). "Indeed, the Third Circuit, as well as other circuit courts[,] have not hesitated to reverse a dismissal for lack of personal jurisdiction where the plaintiff asserts non-frivolous claims and the court has declined to grant limited discovery." *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 86, 96 (D. Del. 2002).

LPL has presented overwhelming evidence of CMO's jurisdictional contacts with Delaware. As the Federal Circuit recognized in the CEA Litigation, there is evidence of pre- and post-filing sales of LCD products in Delaware. *Commissariat*, 395 F.3d at 1317; *see also supra* at 4-6. Additional discovery will provide this Court with further support for LPL's assertion that the motion to dismiss for lack of personal jurisdiction should be denied. (*See* D.I. 21; D.I. 20 at 4-7.) For instance, LPL should be permitted to explore the purported basis for CMO's sworn declaration that "Chi Mei has *never* sold components for liquid crystal displays to consumers or retailers, including consumers or retailers in Delaware." (D.I. 21 at ¶ 6 (emphasis added).) Given that the Federal Circuit in the CEA Litigation concluded that there is evidence of CMO products being sold in Delaware and that "CMO did not submit any evidence to contradict CEA's allegation that CMO derived substantial revenue from sales of its products to Delaware," LPL should be permitted to discover additional facts concerning CMO's general statements denying any contacts with Delaware. *Commissariat*, 395 F.3d at 1317.

663146-2

Furthermore, because CMO is infringing LPL's patents in Delaware, CMO is accountable in Delaware under the "established distribution channel" theory adopted by the Federal Circuit in *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994) and followed by this Court. *See Motorola Inc. v. PC-Tel¸ Inc.*, 58 F. Supp. 2d 349 (D. Del. 1999) (holding that a party is subject to jurisdiction when it places products in an established distribution channel with the intent that they end up in the U.S.); *Philips Elecs. N. Am. Corp. v. Contec Corp.*, No. Civ. A. 02-123-KAJ, 2004 WL 503602 (D. Del. Mar. 11, 2004) (Exhibit B) (concluding that the exercise of jurisdiction over a defendant was proper based on the defendant's purposeful shipping of products into the forum state through an established distribution channel.)  According to *Beverly Hills Fan* and the Delaware decisions following it, CMO is subject to jurisdiction because it purposefully participates in an "established distribution channel" that serves the State of Delaware.  Rather than having random, attenuated, or unexpected contacts with Delaware, CMO has purposefully availed itself of the Delaware and U.S. markets, thereby subjecting CMO to this Court's jurisdiction.  With jurisdictional discovery, LPL will be able to further establish that CMO places its products "in the stream of commerce" knowing "the likely destination of the products."  *Beverly Hills Fan*, 21 F.3d at 1566.

**B.**    **CMO's Basis for Challenging Personal Jurisdiction in Delaware for a Second Time is Misplaced.**

CMO does not deny there is evidence of its jurisdictional contacts with Delaware.  In its Reply Brief, CMO attempts to discredit the overwhelming evidence of CMO's direct contacts with Delaware by summarily concluding that LPL's evidence does "not show that CMO either purposefully availed itself of doing business in Delaware or that CMO targeted consumers in Delaware." (D.I. 78 at 9.)  Interestingly, CMO never denies the truth of the facts set forth in

15

LPL's opposition to its motion to dismiss relating to CMO's purposeful and direct contacts with this jurisdiction.  For example, in response to LPL's proof of CMO's long-term contract with Dell to provide monitors to the United States, CMO's response was merely that LPL's supporting exhibits "show[] no agreement or sales," "do[] not show that any such agreement continues to exist," and that one of the exhibits "mentions only LCD panel and module components, not finished LCD monitors."  (D.I. 78 at 7.)  CMO does not deny that it has, or at least had, a long-standing supply agreement with Dell; it merely states that LPL's exhibits do not reflect that agreement.  Similarly, in response to LPL's evidence that CMO has sold over 900 products in Office Depot and CDW retailers, CMO contends that "LPL's Exhibits 2 and 3 do not prove any sales of CMO products."  (D.I. 78 at 8.)  CMO never denies that its products were, in fact, sold in those Delaware stores; it only denies that those documents reflect those sales.[11]

Moreover, the evidence obtained from the internet that was presented in LPL's opposition to CMO's motion to dismiss should not be disregarded as inadmissible hearsay as CMO contends in its Reply Brief.  The cases upon which CMO relies are inapposite.  None of the cases concerned the submission of evidence to make a prima facie showing of jurisdiction.  Further, CMO's arguments ignore that a court must accept plaintiff's jurisdictional allegations as true and "view all factual inferences in the light most favorable to the plaintiff."  *Intel Corp. v. Broadcom Corp.*, 167 F. Supp. 2d 692, 699-700 (D. Del. 2001) (citations omitted); *see also Aircraft Guar. Corp. v. Strato-Lift*, Inc., 974 F. Supp. 468, 475 (E.D. Pa. 1997).

---

[11]  Indeed, CMO goes on to argue that, even if those sales occurred, they did not meet the substantial revenue test of the Delaware long arm statute.  (D.I. 78 at 9-10.)  As previously explained, however, the Office Depot and CDW sales documents were part of the few documents not subject to the protections of the protective order in the CEA Litigation.  Additional confidential documents exist that CMO has refused to permit counsel for LPL to review to present to this Court.

663146-2

The majority of the cases cited by CMO dealt with evidence presented in support of summary judgment motions. CMO also mischaracterizes Judge Robinson's opinion in *Ameriserve Food Distrib., Inc. v. Lamb-Weston, Inc.*, 267 B.R. 668 (D. Del. 2001). Judge Robinson's comment in *Ameriserve* regarding the "compilation of hearsay" was directed to the overall reliability of an expert's opinion, not solely on information obtained from the internet. *Id.* at 672. Finally, CMO ignores the fact that some of the information LPL presented from the internet regarding its jurisdictional contacts are admissions made by CMO. For instance, CMO's website lists Chi Mei Optoelectronics USA, Inc., a Delaware corporation, as its representative in the United States. (D.I. 60, Ex. 1 at 0034, Ex. 10.)

CMO also mistakenly argues in its Reply Brief that this Court's opinion in *Siemens Aktiengesellschaft v. LG Semicon Co.*, 69 F. Supp. 2d 622 (D. Del. 1999) supports CMO's position that its established distribution channels do not constitute sufficient jurisdictional contacts. Contrary to CMO's allegations in its Reply Brief, *Siemens* is not "factually close" to this case. (D.I. 78 at 12.) In *Siemens*, the defendant, LG Semicon, manufactured DRAM[12] chips which are incorporated into a variety of other electronic products. Unlike LCD modules which are the heart and guts of LCD monitors and televisions, DRAM chips are a minor computer component. Further, unlike CMO in this case, it is clear from the *Siemens* opinion that LG Semicon was not aware how its chips were used or in which products their chips were incorporated for each given market. Significantly, the *Siemens* opinion contains no detailed analysis by the court of an "established distribution channel." Here, however, there can be no

---

[12] "DRAM is a memory chip that is widely used for short term data storage and retrieval. DRAM chips are implanted on printed circuit boards and the resulting memory boards are incorporated in personal computers and other electronic devices." *Siemens*, 69 F. Supp. 2d at 623.

17

dispute but that CMO's LCD modules are the major integral component of LCD monitors and LCD televisions and that CMO knew the likely destination of its products as a result of the published supply and distribution data such that it "should reasonably have anticipated being brought into court" in Delaware. *See Beverly Hills Fan*, 21 F.3d at 1566.

Moreover, the *Siemens* court noted that "any revenue [defendant] has generated through sales of DRAM chips to customers outside Delaware whose electronic devices are sold in Delaware is too remote and insubstantial to meet the requirements of § 3104(c)(4)." *Siemens*, 69 F. Supp. 2d at 627. In contrast, CMO acts in concert with original equipment manufacturers and U.S. retailers, the other two links in the distribution channel.

Finally, and most importantly, the Federal Circuit's opinion in the CEA Litigation is binding precedent on this Court. Indeed, the Federal Circuit has already ordered CMO to respond to jurisdictional discovery once before when it vacated the dismissal order in the CEA Litigation and remanded that case so that jurisdictional discovery could be taken. Indeed, the Federal Circuit ordered jurisdictional discovery before determining whether additional conduct, beyond a showing of use of established distribution channels, is required under due process. *Commissariat*, 395 F.3d at 1322. Although CEA had already "made a prima facie case for CMO's use of an established distribution network that likely results in substantial sales of its products in Delaware," the Federal Circuit determined that CEA was entitled to jurisdictional discovery to determine whether it can satisfy Justice O'Connor's more restrictive version of the stream of commerce theory requiring additional conduct indicating an intent to serve the Delaware market. *Id.* at 1323. Just as the Federal Circuit held in the CEA Litigation, LPL has "clearly made a sufficient threshold showing to merit jurisdictional discovery." *Id.*

663146-2

In addition to the evidence of established distribution channels, however, LPL has presented evidence of *actual* and repeated sales of hundreds of CMO's products in Delaware at CDW and Office Depot retailers.  (D.I. 60, Ex. 2 and 3.)  Accordingly, LPL has sufficiently demonstrated that its claims against CMO are clearly meritorious, thus this Court should permit LPL to take jurisdictional discovery, as ordered in the CEA Litigation, to further establish CMO's purposeful contacts with Delaware.

C.    **Jurisdictional Discovery Will Supplement the Factual Basis for Jurisdiction Over CMO**

LPL has demonstrated that CMO has established a comprehensive distribution network throughout the United States, which includes CMO's U.S. operations.  LPL has confirmed sales to Delaware customers and shown that infringing CMO products are shipped to Delaware.  LPL seeks to supplement its jurisdictional evidence by (1) obtaining jurisdictional discovery from CMO, including interrogatories, requests for production, and deposition testimony under Fed. R. Civ. P. 30(b)(6), and (2) limited third-party discovery directed at distributors and resellers of CMO's products.  This discovery is calculated to confirm this Court's personal jurisdiction over CMO.  *See Beverly Hills Fan*, 21 F.3d 1558; *Motorola*, 58 F. Supp. 2d 349.  With this jurisdictional discovery, LPL will be able to further establish that CMO derives substantial revenue from the United States, including Delaware, and is therefore subject to this Court's jurisdiction.

Contrary to CMO's allegation in its Reply Brief, the discovery sought would not be "ineffectual."  Indeed, LPL seeks additional evidence of CMO's intent to purposefully avail itself of the Delaware market.  LPL's request is not limited, as CMO inaccurately contends, to probing CMO's knowledge of the distribution channels it employs to ship its products to the

663146-2

United States and Delaware.  Rather, LPL seeks, *inter alia*, to obtain additional evidence of

CMO's efforts to directly target Delaware customers.

     **D.**     **CMO Has Conceded it is Subject to Jurisdictional Discovery**

     In its opposition to LPL's motion to modify the protective order in the CEA Litigation,

CMO repeatedly referred to being subject to jurisdictional discovery in the instant case.  For

example, CMO stated it "would have to produce documents relative to jurisdictional discovery in

any event," and that LPL could presumably obtain all relevant information when it seeks

jurisdictional discovery.  (Ex. 6 at 2, 8.)  Finally, CMO conceded that, even if the protective

order was modified, "CMO would have to produce documents relative to jurisdictional

discovery."  (Ex. 6 at 10.).  CMO admittedly had knowledge of LPL's intention to seek

jurisdictional discovery and effectively conceded that it would have to produce the same

documents it produced in the CEA Litigation.

## CONCLUSION

     For the foregoing reasons, LPL respectfully requests that if the Court does not deny

outright CMO's motion to dismiss, it should permit LPL to use the discovery obtained in the

CEA Litigation, but require CMO to supplement its production or, in the further alternative, to

allow LPL to conduct jurisdictional discovery.

June 18, 2007              THE BAYARD FIRM

                  /s/ Richard D. Kirk (rk0922)
                  Richard D. Kirk (#0922)
                  Ashley B. Stitzer (#3891)
                  222 Delaware Avenue, 9th Floor
                  P.O. Box 25130
                  Wilmington, DE 19899-5130
                  (302) 655-5000
                  rkirk@bayardfirm.com

                  Attorneys for Plaintiff LG.Philips LCD Co., Ltd.

OF COUNSEL:

Gaspare J. Bono
R. Tyler Goodwyn
Lora A. Brzezynski
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, D.C.  20006
(202) 496-7500

663146-2

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on June 18, 2007, she served the foregoing

documents by email and by hand upon the following counsel:

Edmond D. Johnson
Thomas H. Kovach
Pepper Hamilton LLP
1313 Market Street, Suite 5100
PO Box 1709
Wilmington, DE  19899-1709

Karen L. Pascale
John W. Shaw
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

Philip A. Rovner
Dave E. Moore
Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, DE  19899-0951

William E. Manning
Jennifer M. Becnel-Guzzo
Buchanan Ingersoll & Rooney
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE  19801

The undersigned counsel further certifies that, on June 18, 2007, she served the

foregoing documents by email and by U.S. Mail upon the following counsel:

John N. Zarian
Samia McCall
Matthew D. Thayne
J. Walter Sinclair
Stoel Rives LLP
101 S. Capitol Blvd., Suite 1900
Boise, ID  83702

Vincent K. Yip
Peter J. Wied
Jay C. Chiu
Paul, Hastings, Janofsky & Walker LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA  90071

Kenneth R. Adamo
Robert C. Kahrl
Arthur P. Licygiewicz
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190

Bryan J. Sinclair
Karineh Khachatourian
Buchanan Ingersoll & Rooney
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA  94065-1418

/s/ Richard D. Kirk (rk922)
Richard D. Kirk

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.                                                          Page 1
Not Reported in F.Supp., 1995 WL 395925 (E.D.Pa.)
**(Cite as: 1995 WL 395925 (E.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
VIDEON CHEVROLET, INC., Plaintiff,
v.
GENERAL MOTORS CORPORATION, Defendant.
**Civ. A. No. 91-4202.**

June 28, 1995.
Paul I. Guest, Jr., Newtown Square, PA, for plaintiff.

Francis P. Burns, III, Joseph E. O'Neil, George J. Lavin, Jr., Associates, Philadelphia, PA, Michael H. Carpenter, Jeffrey A. Lipps, Jones, Day, Reavis & Pogue, Columbus, OH, John J. O'Donnell, Lavin, Coleman, Finarelli & Gray, Philadelphia, PA, for Defendant General Motors Corp.

David T. Videon, Media, PA, for Respondent Frank C. Videon, Sr.

Jeffrey M. Chebot, Whiteman, Bankes and Chebot, Philadelphia, PA, for movant.

Martin J. D'Urso, Kohn, Savett, Klein & Graf, P.C., Philadelphia, PA, for Race Buick-Pointiac-Cadillac-Oldsmobile-GMC, Inc., Larry James Oldsmobile-Pontiac-GMC Truck Co., Inc., Lockwood Motors, Inc., Bob Walls Chevrolet/Oldsmobile.

*MEMORANDUM*

McGLYNN, District Judge.

I. FACTUAL BACKGROUND

*1 The plaintiffs in four separately filed class actions (hereinafter, "Intervenors") request permission to intervene in this action in order to modify the Stipulation and Protective Order Governing Confidential Material (hereinafter, "Protective Order") filed October 29, 1991. [FN1]

The Protective Order provides that certain discovery material exchanged shall remain confidential. It also provides that such discovery material was only to be used for the Videon-GM litigation as well as any Videon-GM appeal proceeding thereafter. Paragraph 13 of the Protective Order, provides that any and all

discovery materials supplied by GM, including copies, were to "be returned to GM or, in the alternative, destroyed and certified to GM to have been destroyed." [FN2]

In December of 1993, GM won a jury verdict in this case which was affirmed by the Court of Appeals. Upon expiration of the time to appeal the Third Circuit's decision (March 1995), Videon and its counsel, Paul Guest, failed to return or destroy the confidential discovery materials as agreed in the stipulation and required by the Protective Order. Instead, Videon's attorney retained the Videon-GM confidential discovery material and requested permission to disclose it to the Intervenors.

II. LEGAL STATUS

The proper method for a non-party to seek modification of a protective order is through permissive intervention under Fed.R.Civ.P. 24(b). [FN3]

III. DISCUSSION

This court retains broad discretion over the enforcement of protective orders. [FN4] Protective orders are tailored to reflect the specific intentions of each party to a lawsuit. Accordingly, courts will allow intervention by collateral litigants under limited circumstances. However, in doing so, the courts will make sure that "a collateral litigant [is] not permitted to exploit another's discovery in the sense of instituting the collateral litigation simply as a device to obtain access to sealed information." [FN5]

In analyzing the issue, courts have generally followed one of three alternate paths. Under the first alternative, the court may adopt a strict interpretation which advocates a "presumption in favor of the "continued integrity of the protective order." [FN6] A second alternative espouses balancing the interpretation in favor of efficiency by avoiding duplicative discovery. [FN7] Finally, a third alternative allocates the balancing to the discretion of the trial court. [FN8] However, by no means do any of these alternatives authorize carte blanche access to discovery materials.

Here, both Videon and GM freely consented to the Protective Order illustrating that each party agreed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 2
Not Reported in F.Supp., 1995 WL 395925 (E.D.Pa.)
**(Cite as: 1995 WL 395925 (E.D.Pa.))**

there was good cause present for the entry of the order. [FN9] Hence, there is a higher burden on the movant--here, the Intervenors--to justify its modification. [FN10] GM has demonstrated that they reasonably relied on the content of the protective order and that no extraordinary circumstances are present to warrant modification.

A) EXPRESS TERMS BINDING

*2 Paragraph two(2) of the Protective Order specifies that "all discovery material so designated and all information derived therefrom...shall be handled in *strict accordance* with the terms of this Stipulation and Protective Order." [FN11] Furthermore, the express terms in paragraph 4 of the Order state, "Confidential Discovery Material shall be used *only* for the prosecution and/or defense of *this action* or any appeal therefrom and not for any business or other purpose *whatsoever*." [FN12] An important factor interpreted by the court when initially deciding to later modify a confidentiality order is whether parties have relied on a standing confidentiality order. [FN13] Here, GM entered into this agreement with Videon recognizing the commercially sensitive nature of the documents to be exchanged. Moreover, the Protective Order "applied only to specific types of confidential commercial information, provided a means whereby the opposing parties could contest confidential designations believed to be improper, limited use of the confidential materials to this litigation, and required either return or destruction of the documents upon conclusion of the litigation." [FN14]

Videon and its counsel acted contrary to the clear mandate of the Protective Order when they refused to return or destroy the discovery material. The specific language incorporated into the Protective Order would bar the Intervenors from access to any of the Videon-GM confidential discovery material.

B) REPRESENTATION

Paul Guest participated in the Videon-GM litigation as counsel for Videon and is presently engaged as counsel in each of the Intervenors' separate class action lawsuits. [FN15] As counsel for Videon, Paul Guest specifically agreed to be bound by the Protective Order. [FN16] Upon conclusion of the Videon-GM litigation, Guest agreed to return or destroy all Confidential material supplied by GM. [FN17] Moreover, Guest retained and continues to retain the Videon-GM Confidential Material even though he represents the Intervenors' who would

assuredly be interested in the material. Guest refused to comply with the express terms of the Protective Order and has also engaged in activities related to the commencement and prosecution of four separate class action lawsuits against GM.

C) EFFICIENCY THEME DISCUSSED

While there exists the potential for overlap between the Videon-GM confidential discovery materials and any discovery material produced during the Intervenors' collateral litigation, this overlap does not necessarily indicate discovery inefficiency. The fact that there is a potential for overlap is not determinative.

Enforcing the Protective Order reinforces each party's ability to freely enter and control the content of such protective agreements. Here, both Videon and GM clearly and specifically stipulated to the content of the Protective Order and agreed that there was good cause for the entry of such an order. [FN18] Thus, both parties recognized the need to protect the sensitive nature of the discovery material.

*3 Finally, the Intervenors have not persuaded the court that access to the Videon-GM confidential discovery material will prevent repetitive and inefficient discovery. When modification of a protective order will place private litigants in a position they would otherwise reach *only* after repetition of another's discovery, modification is appropriate. [FN19] However, here, the Intervenors do not present sufficient evidence necessary to persuade this court that: 1) the four separate actions would eventually exchange the same material as the Videon-GM confidential discovery material; 2) the complaints are founded on virtually identical allegations; or, 3) much of the discovery material in Videon-GM litigation will be relevant to the four separate suits.

Similarly, absent from the record are any objections or corrections to the Protective Order advanced by either party during the three and one half years after its inception on October 29, 1991. Likewise, the record is devoid of any evidence revealing coercive or deceptive inducements by GM designed to force Videon into acquiescing in the Order. Reliance by the parties on the permanence of the Protective Order should not be lightly regarded. [FN20] It should also be noted that "allowing modification of protective orders for the benefit of collateral litigants tends to undermine the order's potential for more efficient discovery." [FN21]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                Page 3
Not Reported in F.Supp., 1995 WL 395925 (E.D.Pa.)
**(Cite as: 1995 WL 395925 (E.D.Pa.))**

Finally, Guest and the Intervenors should not be permitted to benefit from Guest's clear violation of the stipulation and Protective Order. Likewise, denial of access to the materials covered by the Protective Order does not prevent the Intervenors from accessing any information pertinent to their respective lawsuits against GM through standard discovery techniques.

IV. CONCLUSION

In consideration of the foregoing, the Intervenors Motion to Intervene for the purpose of modifying the Confidentiality Order will be DENIED.

*ORDER*

And now this 28th day of June, 1995, upon consideration of Intervenors'   [FN1] Motion to Intervene and Modify the Confidentiality Order, and the response thereto, it is hereby

ORDERED

that Intervenors' Motion is DENIED.

FN1.    *Race Buick-Pontiac-Cadillac-Oldsmobile-GMC, Inc. v. General Motors Corp.,* C.A. No. 94-25 (W.D. Pa.) *(Race)* (certified to proceed as a class action by Order dated October 11, 1994); *Larry James Oldsmobile-Pontiac-GMC Truck Co., Inc. v. GM,* C.A. No. 2:94CV090-D-C (N.D. Miss.) *(James)* ; *Lockwood Motors, Inc. v. GM,* C.A. No. 3-94-CV-1141 (D. Minn.) *(Lockwood);* and *Bob Walls Chevrolet/Oldsmobile v. GM,* No. 94-C-1019B (N.D. Okla.) *(Walls).*

FN2.  Protective Order, Oct. 29, 1991 at 8.

FN3.  *Pansy v. Borough of Stroudsberg,* 23 F.3d 772, 778 (3rd Cir. 1994) (newspaper gained access to third party settlement agreement).

FN4.    *In re Alexander Grant & Co. Litigation, (ESM-1),* 820 F.2d 352, 357 (11th Cir. 1987).

FN5.  *Wilk v. American Medical Ass'n,* 635 F.2d 1295, 1300 (7th Cir. 1980).

FN6.    *United Nuclear Corp. v.Cransford Ins. Co.,* 905 F.2d 1424, 1428 (10th Cir.

1990) (citing *In re Agent Orange Product Liability Litigation,* 821 F.2d 139, 147-48 (2d Cir. 1987) (stating protective orders modifiable only under extraordinary circumstances).

FN7.  *Id.* (citing *Wilk,* 635 F.2d at 1299.)

FN8.  *Id.* (citing *Stavro v. Upjohn Co.,* 664 F.2d 114, 120 (6th Cir. 1981)).

FN9.    *Pansy,* 23 F.3d at 786 (Parties establish good cause when "disclosure will work a clearly defined and serious injury to the party seeking disclosure").

FN10.  *American Tel. & Tel. Co. v. Grady,* 594 F.2d 594, 597 (7th Cir. 1978), *cert. denied sub nom. American Tel. & Tel. Co. v. MCI Communications Corp.,* 440 U.S. 971 (1979), See *Federal Deposit Insurance Corp.,* 677 F.2d 230, 232 (2d Cir. 1982) (confidentiality order can only be modified "if extraordinary circumstance or 'compelling need' warrants the requested application").

FN11.  Protective Order, Oct. 29, 1991, at 2 (emphasis added).

FN12.  *Id.* at 3 (emphasis added).

FN13.    *Baby Doe v. Methacton School District,* 878 F. Supp. 40, 41 (E.D. Pa. 1995).

FN14.  GM's Mem. in Opp. to the Motion to Intervene and Modify Confidentiality Order, at 9-10.

FN15.  See Intervenors' Mem. in support of Motion to Intervene and Modify a Confidentiality Order, at 2.

FN16.    Intervenors' Mem. in Support of Motion to Intervene and Mod. a Conf. Ord., at 8. The Videon-GM Protective Order would remain binding "upon all persons to whom Confidential Discovery Material has been disclosed or communicated..." *Id.*

FN17.  *Id.* The Protective Order stating "all Confidential Discovery Material supplied by GM...shall be returned to GM or, in the alternative, destroyed and certified to GM to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 395925 (E.D.Pa.)
**(Cite as: 1995 WL 395925 (E.D.Pa.))**

have been destroyed." *Id.*

FN18. *See* Fed.R.Civ.P. 26(c).

FN19. *Wilk,* 635 F.2d at 1299.

FN20. *In re Agent Orange,* 821 F.2d at 147.

FN21. *Id.* at 1427-28.

FN1. *Race Buick-Pontiac-Cadillac-Oldsmobile-GMC, Inc. v. General Motors Corp., (Race); Larry James Oldsmobile-Pontiac-GMC Truck Co., Inc. v. GM, (James); Lockwood Motors, Inc. v. GM, (Lockwood);* and *Bob Walls Chevrolet/Oldsmobile v. GM, (Walls).*

Not Reported in F.Supp., 1995 WL 395925 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)
**(Cite as: 2004 WL 503602 (D.Del.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
PHILIPS ELECTRONICS NORTH AMERICA
CORPORATION and U.S. Philips Corporation,
Plaintiffs,
v.
CONTEC CORPORATION, Compo Micro Tech,
Inc., Seoby Electronics Co., Ltd., Remote
Solution Co., Ltd., F/K/A Hango Electronics Co.,
Ltd., Hango Remote Solution,
Inc., Defendants.
**No. Civ.A. 02-123-KAJ.**

March 11, 2004.
Richard L. Horwitz, Potter Anderson & Corroon,
LLP, Wilmington, DE, for Plaintiffs.

Patricia Smink Rogowski, Connolly, Bove, Lodge &
Hutz, Jack B. Blumenfeld, Morris, Nichols, Arsht &
Tunnell, Kathleen Jennings-Hostetter, Oberly &
Jennings, Andre G. Bouchard, Bouchard, Margules &
Friedlander, David L. Finger, David L. Finger, Esq.,
Wilmington, DE, for Defendants.

*MEMORANDUM ORDER*

JORDAN, J.

I. INTRODUCTION

**\*1** This is a patent infringement case. Jurisdiction is
proper under 28 U.S.C. § 1338. Presently before me
is a Motion to Dismiss for Lack of Personal
Jurisdiction (the "Motion") filed by defendant
Remote Solution Co., Ltd. ("Remote Solution")
pursuant to Federal Rule of Civil Procedure 12(b)(2).
(Docket Item ["D.I."] 105.) For the following
reasons, Remote Solution's Motion will be denied.

II. BACKGROUND

Plaintiffs Philips Electronics North America
Corporation and U.S. Philips Corporation
(collectively, "Philips"), both Delaware corporations,
filed an action on February 12, 2002, alleging that
Contec Corporation ("Contec"), also a Delaware

corporation, was infringing U.S. Patent Nos.
4,703,359 [FN1] (the " '359 patent") and 5,872,562
[FN2] (the " '562 patent"), both owned by Philips.
[FN3] The technology disclosed in the '359 and '562
patents is directed to remote control units ("RCUs")
for controlling home appliances from different
manufacturers and categories. *See* '359 patent, col 1,
lns. 15-17; '562 patent, col 1, lns. 13-16 (attached to
D.I. 1 as Exs. A and B). On September 17, 2002,
Philips filed an amended complaint joining Remote
Solution and others as additional defendants in this
action. (D.I.41, 42.) Remote Solution is a Korean
corporation with its principal place of business in
Kimcheon City, Kyongbuk, Korea. (D.I. 41, Ex. A at
¶    6.) Philips alleges that Remote Solution
"manufactures and designs RCUs that infringe the
patents in suit under a manufacturing and purchase
agreement with Contec, and is subject to personal
jurisdiction in [the District of Delaware]." (*Id.* at ¶
12.) One of the types of RCUs accused of
infringement in this case is Remote Solution's model
RT U49C. (*Id.*)

> FN1. The '359 patent, entitled "Universal
> Remote    Control    Unit    With    Model
> Identification    Capability,"    names    as
> inventors Robin B. Rumbolt, William R.
> McIntyre, and Larry E. Goodson. The '359
> patent issued on October 27, 1987 and was
> assigned to Philips on May 25, 1993. (D.I.
> 42, Ex. A at ¶ 16.)

> FN2. The '562 patent, entitled "Universal
> Remote    Control    Transmitter    With
> Simplified Device Identification," names as
> inventors Donald P. McConnell and William
> R. McIntyre. The '562 patent issued on
> February 16, 1999 and was assigned to
> Philips on the same day. (D.I. 42, Ex. A at ¶
> 17.)

> FN3. Defendants Contec Corporation and
> Seoby Electronics Co. are no longer
> involved in this case, having submitted to a
> Consent Judgment on August 28, 2003.
> (D.I.258.)

Remote Solution filed its Motion on January 24,
2003, arguing that this court cannot properly exercise
personal jurisdiction over it under Delaware's long-
arm statute, 10 Del. C. § 3104, or consistent with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 2
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)
**(Cite as: 2004 WL 503602 (D.Del.))**

requirements of the Due Process Clause. (D.I. 106 at 4, 9.) In support of its Motion, Remote Solution submitted the Declaration of its Director, Suk-Kyu Park. (*Id.,* Ex. A.) In his declaration, Mr. Park stated that Remote Solution does not have any offices, facilities, subsidiaries or employees in Delaware; is not registered to do business in Delaware; has not contracted to supply services or things in Delaware; has no sales force in Delaware; has derived no revenues from sales in Delaware; does not own any property, assets or bank accounts in Delaware or maintain any offices in Delaware. (*Id.* ¶ 4, 7-10.) According to Mr. Park, Contec is Remote Solution's only customer for the accused RT U49C RCU. (*Id.* ¶ 5.) Mr. Park further stated that Remote Solution maintains a website to provide information about its products, but Remote Solution does not accept orders through its website. (*Id.* ¶ 12.)

After Remote Solution filed its Motion, the parties conducted jurisdictional and substantive discovery until September 15, 2003. (D.I. 286 at 2.) The following facts are taken from Philips' opposition to Remote Solution's Motion. (D.I.286.) Since Philips' factual allegations are not directly controverted, they are taken as true for purposes of determining jurisdiction in this court. *See Beverly Hills Fan Co. V. Royal Sovereign Corp., 21 F.3d 1558, 1563 (Fed.Cir.1994).*

*\*2* In 1997, Remote Solution decided to expand its RCU sales by entering the United States consumer market. (*Id.* at 5 citing deposition testimony of Suk-Kyu Park at D.I. 287, Ex. 14).) To that end, Remote Solution hired David Ahn, a native Korean living in California, as its exclusive sales agent in the United States. (*Id* .) Mr. Ahn established Hango Electronics, Inc., d/b/a Remote Solution ("HEI") in California, for the sole purpose of soliciting customers in the United States on behalf of Remote Solution. (*Id.* (citing deposition testimony of David Ahn at D.I. 287, Ex. 3).) HEI is an independent corporation of which Mr. Ahn is the sole owner and employee. (*Id.*)

In 1999, HEI entered into a Manufacturing and Purchase Agreement with Contec, L.P., a New York limited partnership, wherein Contec L.P. retained HEI to design and manufacture RCUs and sell them to Contec L.P. [FN4] (D.I. 287, Ex. 15 at 1.) HEI also agreed to "defend any suit or proceeding brought against Contec L.P. to the extent that such suit or proceeding is based on a claim that the [RCUs] constitute an infringement of any valid United States ... patent...." (*Id.* at 3.) In 2000, with Mr. Ahn's consent, HEI changed its name to Remote Solution,

the name under which Mr. Ahn conducts business in California. (*Id.* at 6.)

> FN4. The relationship between Contec L.P. and Contec Corporation was fleshed out at oral argument. At some point in time, Contec L.P., a New York entity, merged with Contec LLC, another New York entity, which then merged with Contec Corporation, a Delaware entity. (D.I. 338 at 67:16-25.)

According to Mr. Ahn, Remote Solution's business plan was to sell as many RCUs as possible. (*Id.*) As a result of his extensive efforts to market the RCUs, Mr. Ahn acquired Contec, TiVo, Inc., Harman Kardon, Inc. and Hy-Tek Manufacturing Co., Inc. as customers for Remote Solution. (*Id*) Remote Solution does not design its own remote controls, rather, it manufactures them according to its customers' specifications. (*Id.* at 7.) Contec is a Delaware corporation with its principal place of business in New York, and its primary business is to sell refurbished cable set top boxes and RCUs to major cable companies in the United States. (*Id.* at 10.) Contec's customers include Comcast, which provides cable television services to residents of Delaware. (*Id*) Generally, Remote Solution knows who Contec's customers are because Remote Solution marks the RCUs with those customer's logos. (*Id.;* D.I. 287, Ex. 10.) Remote Solution knew that Comcast was one of Contec's customers, as it sent drawings of the Comcast logo to Contec via email on April 24, 2002. (D.I.287, Ex. 36.)

In 2000, Remote Solution established a subsidiary in the United States, Hango Remote Solution, Inc. ("Hango"). (D.I. 286 at 8.) Remote Solution was a 70% shareholder in Hango and Mr. Ahn owned the remaining 30%. (*Id.*) About half of Hango's revenue came from sales of Remote Solution's RCUs, Hango's primary business was marketing an MP3 player called Personal Jukebox. (*Id.* at 8-9.) Ultimately, however, Hango's business failed, and the company folded in December 2002. (*Id.* at 9.) Thereafter, Remote Solution began litigating this case on Hango's behalf as well as its own, filing an answer to the complaint and a motion to amend the answer to include a crossclaim against Contec for indemnification in the event Hango is found liable for patent infringement. (*Id.* at 9; *see also* D.I. 287, Ex. 2 at 8.)

*\*3* Remote Solution has sold at least 1,969,849 of the accused RCUs in the United States since

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)
**(Cite as: 2004 WL 503602 (D.Del.))**

Page 3

November 22, 2000. (D.I. 286 at 2 (citing Expert Report of Kerry Ruoff at D.I. 287, Ex. 1).) Based on the records obtained from TiVo, one of Remote Solution's customers, Philips discovered that at least 2,000 infringing RCUs manufactured by Remote Solution for TiVo have been sold or used in Delaware since March 31, 1999. (D.I. 286 at 3, 13.) According to TiVo's records, 1,738 residents of Delaware subscribed to TiVo's service between March 31, 1999 and May 28, 2003. (*Id* (citing Declaration of Matthew P. Zinn at D.I. 287, Ex. 39 ¶ 12).) Because TiVo sells its digital video recorders ("DVRs") bundled with the RCUs manufactured by Remote Solution, it is likely that more than 1,500 Remote Solution RCUs are being used for TiVo recorders in Delaware today. (*Id.* (citing D.I. 287, Ex. 39 ¶ ¶ 6, 17).) Furthermore, since January 1, 2000, more than 1,000 DVRs bundled with RCUs manufactured by Remote Solution were sold in Delaware at two retailers, specifically, 654 were sold at BestBuy and 406 were sold at Circuit City. (*Id.* (citing Declaration of Scott Jacobi at D.I. 287, Ex. 40 ¶ 7; Declaration of Mark Smucker at D.I. 287, Ex. 41 ¶ 9).)

III. DISCUSSION

When a non-resident defendant's motion to dismiss challenges personal jurisdiction, the plaintiff has the burden to show the basis for the court's jurisdiction over that defendant. *Intel Corp. v. Broadcom Corp.,* 167 F.Supp.2d 692, 699 (D.Del.2001) (citing *Wright v. American Home Products,* 768 A.2d 518, 526 (Del.Super.2000)). To satisfy this burden, Philips must make a *prima facie* showing that this court may exercise personal jurisdiction over Remote Solution. *Id.* After discovery has begun, the plaintiff must sustain this burden by "establishing jurisdictional facts through sworn affidavits or other competent evidence." *Id.* (citing *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 66 n. 9 (3d Cir.1984)).

Determining whether Remote Solution is subject to personal jurisdiction requires a two-part analysis. *Id.* at 700; *see also Siemens Aktiengesellschaft v. LG Semicon Co., Ltd.,* 69 F.Supp.2d 622, 624 (D.Del.1999). First, I must determine whether the language of Delaware's long-arm statute, 10 Del. C. § 3104(c), reaches Remote Solution. *Broadcom,* 167 F.Supp. at 700. Second, if I find that Remote Solution's conduct gives rise to personal jurisdiction under the long-arm statute, I must then determine whether subjecting Remote Solution to jurisdiction in Delaware would comport with the Due Process

Clause of the Fourteenth Amendment to the United States Constitution. *Id.* (citing *Intel Corp. v. Silicon Storage Tech, Inc.,* 20 F.Supp.2d 690, 694 (D.Del.1998)).

A. Jurisdiction over Remote Solution is Proper Under § 3104(c)(1) of Delaware's Long-Arm Statute

Philips contends that Remote Solution is subject to jurisdiction under sections 3104(c)(1) and (c)(4) of the Delaware long-arm statute (D.I. 286 at 17, 20), which provide:

**\*4** (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
* * *
(1) Transacts business or performs any character of work or service in the State;
* * *
(4) Causes tortious injury in the State or outside of the State by an act or omission outside of the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State....
10 Del. C. § § 3104(c)(1) & (c)(4). Delaware state courts have interpreted the "transacting business" provision of § 3104(c)(1) as a specific jurisdiction provision that requires a nexus between the cause of action and the conduct used as a basis for jurisdiction. *See LaNuova D & B S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986). The Federal Circuit has held that, where a defendant has "purposefully shipped the accused [product] into [the forum state] through an established distribution channel ... [n]o more is usually required to establish specific jurisdiction." *Beverly Hills Fan,* 21 F.3d at 1564. Moreover, in order to meet the requirements of § 3104(c)(1), Remote Solution's actions must be directed at residents of Delaware and the protection of Delaware laws. *See Thorn EMI N. Am., Inc. v. Micron Tech., Inc.,* 821 F.Supp. 272, 274 (D.Del.1993) (citing *Sears, Roebuck & Co. v. Sears,* 744 F.Supp. 1289, 1292 (D.Del.1990)).

Philips argues that Remote Solution has shipped the accused RCUs into an established distribution channel as part of a general business plan that results in sales of the accused products in Delaware. (D.I. 286 at 18.) In response, Remote Solution argues that it merely had a general plan to serve the national market and that its activities were not directed specifically toward Delaware. (D.I. 309 at 2, 4.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)
**(Cite as: 2004 WL 503602 (D.Del.))**

I find that Philips has presented competent evidence that an established distribution channel exists through which accused RCUs manufactured by Remote Solution are shipped to, distributed, and sold in Delaware. First, the evidence shows that Remote Solution and Contec have enjoyed a close business relationship since at least as early as 1999, when, in a manufacturing and purchase agreement governed by New York law, Remote Solution agreed to defend one of Contec's predecessors against any claims of patent infringement. Furthermore, Remote Solution is seeking indemnification from Contec for Hango, Remote Solution's defunct subsidiary, in the event Hango is found liable for patent infringement in this case. Philips has also presented competent evidence that Remote Solution knew that Comcast, a major provider of cable television services in the State of Delaware, was one of Contec's customers for the accused RCU. Given all of these facts, and in light of Remote Solution's ongoing business relationship with Contec, it was reasonably foreseeable that the accused RCUs would make their way into the Delaware market through Contec's customers. Documents obtained from Remote Solution show that Contec was selling the accused RCUs to Comcast, such that Remote Solution knew or should have known that the accused RCUs were being sold or distributed in Delaware. *See Thorn EMI*, 821 F.Supp. at 275-76.

*5 Finally, Philips has competent evidence that the accused RCUs are present in Delaware in large numbers, and were present in Delaware prior to its filing suit, as a result of Remote Solution manufacturing the accused RCUs for TiVo. Because Philips has presented competent evidence of an established distribution channel that caused the accused RCUs to be sold and distributed in Delaware, and that the accused RCUs are actually present in Delaware, I find that jurisdiction over Remote Solution is proper under *§ 3104(c)(1)*, and I need not address the issue of whether jurisdiction over Remote Solution is proper under *§ 3104(c)(4)*. [FN5]

> FN5. Remote Solutions relies upon *Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 293 F.Supp.2d 423, *reconsideration denied*, 293 F.Supp.2d 430 (D.Del.2003) (granting defendant's motion to dismiss for lack of personal jurisdiction in patent infringement case) in support of its motion to dismiss. There are key factual distinctions between this case and *Commissariat*. First, unlike the plaintiff

in *Commissariat*, Philips requested and conducted jurisdictional discovery which uncovered evidence of actual sales and the presence of the accused device in Delaware prior and subsequent to the date the complaint was filed, evidence that was lacking in *Commissariat*. Second, that Remote Solution (1) agreed to defend a predecessor of Contec from patent infringement and (2) is seeking indemnification from Contec should Hango be found liable for patent infringement is evidence of Remote Solution's close business relationship with Contec, and its knowledge of the established distribution channel through which its products were being sent into Delaware. Thus, the quantum of evidence upon which to rest personal jurisdiction in this case is significantly greater than in *Commissariat*.

B. Exercising Jurisdiction over Remote Solution in Delaware Comports With the Requirements of the Due Process Clause

Due process requires that sufficient minimum contacts exist between the defendant and the forum state to satisfy "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In considering whether jurisdiction may extend to a defendant, courts should primarily consider whether the defendant has purposely availed itself of the forum state's law, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), and whether the defendant reasonably could have anticipated being haled into the courts of the forum state, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Courts should also consider the burden imposed on the defendant by having to litigate in a foreign forum, as well as the interests of the plaintiff and the forum state. *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

In this case, the accused RCUs arrived in Delaware through Remote Solution's purposeful shipment of them through an established distribution channel. See *Beverly Hills Fan*, 21 F.3d at 1565. Philips has "stated all of the necessary ingredients for an exercise of jurisdiction consonant with the requirements of due process," namely, that Remote Solution placed the accused products in the stream of commerce, that it knew the likely destination of the products, and that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)
(Cite as: 2004 WL 503602 (D.Del.))

Page 5

its conduct and connections with Delaware were such that they should reasonably have anticipated being brought into court here. *Id.* at 1566.

Finally, litigating this case in Delaware would not place such a burden on Remote Solution as to offend traditional notions of fair play and substantial justice, especially since Remote Solution has executed an agreement to defend Contec L.P. against all claims of patent infringement, which proves that Remote Solution was well aware of and prepared for the possibility of litigation where Contec did business, including Delaware. Nor has Remote Solution shown that it does not have the resources to fairly litigate this case in Delaware. *See Thorn EMI,* 821 F.Supp. at 276. Moreover, "Delaware has an abiding interest in protecting the property rights of its residents[,]" *id.,* including corporate citizens such as Philips. Thus, exercising jurisdiction over Remote Solution in this case comports with the requirements of the Due Process Clause.

IV. CONCLUSION

 **\*6** For these reasons, it is hereby ORDERED that Remote Solution's Motion to Dismiss for Lack of Personal Jurisdiction (D.I.105) is DENIED.

 Not Reported in F.Supp.2d, 2004 WL 503602 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.