UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

Plaintiff,

v.

CHI MEI OPTOELECTRONICS
CORPORATION, et al.

Defendants.

Civil Action No. 06-726 (GMS)

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS ALTERNATIVE MOTION FOR
LEAVE TO USE DISCOVERY OR, IN THE FURTHER ALTERNATIVE,
TO CONDUCT JURISDICTIONAL DISCOVERY**

July 10, 2007

THE BAYARD FIRM

Richard D. Kirk (rk0922)
Ashley B. Stitzer (as3891)
222 Delaware Avenue, 9th Floor
P.O. Box 25130
Wilmington, DE 19899-5130
(302) 655-5000
dkirk@bayardfirm.com
astitzer@bayardfirm.com

Attorneys for Plaintiff LG.Philips LCD Co., Ltd.

OF COUNSEL:
Gaspare J. Bono
Song K. Jung
R. Tyler Goodwyn, IV
Lora A. Brzezynski
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 496-7500

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.    LPL'S MOTION IS FULLY JUSTIFIED AND APPROPRIATE UNDER THE LAW AND PRECEDENT IN THIS JURISDICTION ...................................... 2

        A.    LPL's Motion is Not a Surreply........................................................... 2

        B.    LPL's Motion is Not a Request to Modify the Protective Order in the CEA Case........................................................................................ 3

II.    LPL HAS MET THE STANDARD FOR JURISDICTIONAL DISCOVERY ............... 5

        A.    The Federal Circuit's Opinion in the CEA Case is Controlling Precedent in Favor of Granting Jurisdictional Discovery......................... 5

        B.    Jurisdictional Discovery Would Not be Ineffectual................................... 7

        C.    LPL Has Submitted Competent Evidence, Including Sworn Affidavits, of CMO's Jurisdictional Contacts ........................................... 8

        D.    CMO Did, in Fact, Concede it Would Have to Produce Jurisdictional Discovery........................................................................ 12

CONCLUSION............................................................................................................ 13

# TABLE OF AUTHORITIES

Page

## CASES

*Agilent Technologies, Inc. v. Elan Microelectronics Corp.*,
No. C 04-05385, 2005 WL 3260162 (N.D. Cal. Nov. 29, 2005) ............................................ 10

*Akro Corp. v. Luker*,
45 F.3d 1541 (Fed. Cir. 1995) ................................................................................................... 10

*Ames v. Whitman's Chocolates*,
No. 91-3271, 1991 WL 281798 (E.D. Pa. Dec. 30, 1991)........................................................ 11

*Asahi Metal Indus. Co v. Superior Court*,
480 U.S. 102 (1987).................................................................................................................... 4

*AU Optronics Corp. v. LG.Philips LCD Co. et al.*,
Case No. 07-357-JJF (D. Del.) ................................................................................................... 8

*Bauman v. DaimlerChrysler AG*,
No. C-04-00194 RMW, 2005 WL 3157472 (N.D. Cal. Nov. 22, 2005) .................................. 10

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*,
21 F.3d 1558 (Fed. Cir. 1994) ................................................................................................... 10

*Commissariat à l'Energie Atomique v. Chi Mei Optoelectronics Corp. et al.*,
395 F.3d 1315 (Fed. Cir. 2005) ........................................................................................... *passim*

*Freeman v. Keycorp*,
1990 U.S. Dist. LEXIS 1525 (M.D. Pa. Jan. 31, 1990)........................................................... 11

*Greenly v. Davis*,
486 A.2d 669 (Del. 1984) ............................................................................................................ 9

*GTE New Media Servs., Inc. v. BellSouth Corp.*,
199 F. 3d 1343 (D.C. Cir. 2000)................................................................................................. 9

*Intel Corp. v. Broadcom Corp.*,
167 F. Supp. 2d 692 (D. Del. 2001)............................................................................................ 9

*Massachusetts Sch. of Law at Andover, Inc., v. American Bar Ass'n*,
107 F.3d 1026 (3d. Cir. 1997) ................................................................................................... 11

*McMullen v. European Adoption Consultants, Inc.*,
109 F. Supp. 2d 417 (W.D. Pa. 2000)........................................................................................ 9

*Molnlycke Health Care AB v. Dumex Med. Surgical Products Ltd.*,
64 F. Supp. 2d 448 (E.D. Pa. 1999) .......................................................................................... 11

*Poe v. Babcock Int'l, PLC*,
662 F. Supp. 4 (M.D. Pa. 1985)................................................................................................. 11

*Rich v. KIS California, Inc.*,
121 F.R.D. 254 (M.D.N.C. 1988)............................................................................................... 11

# TABLE OF AUTHORITIES

**Page**

*Siemens Aktiengesellschaft v. LG Semicon Co.*,
  69 F. Supp. 2d 622 (D. Del. 1999) ............................................................................................. 7

*Southern Ocean Seafood Co. v. Holt Cargo Systems, Inc.*,
  No. CIV.A. 96-5217, 1997 WL 539763 (E.D. Pa. Aug. 11, 1997) .......................................... 11

*Time Share Vacation Club v. Atlantic Resorts, Ltd.*,
  735 F.2d 61 (3d. Cir. 1984) ...................................................................................................... 9

*Toys "R" Us, Inc. v. Step Two, S.A.*,
  318 F.3d 446 (3d Cir. 2003) ...................................................................................................... 9

## PRELIMINARY STATEMENT

The Federal Circuit ruled just two years ago that the District of Delaware should have permitted jurisdictional discovery over Chi Mei Optoelectronics Corporation ("CMO") in another case involving LCD products, *Commissariat à l'Energie Atomique v. Chi Mei Optoelectronics Corp. et al.*, 395 F.3d 1315 (Fed. Cir. 2005). The Federal Circuit found, based on the facts presented by plaintiff CEA in that case, that there was a "sufficient threshold showing to merit jurisdictional discovery." *Id.* at 1323. The evidence presented by CEA in that case was less substantial than the facts and evidence offered by LPL here. CMO's opposition to jurisdictional discovery is all the more puzzling in light of the Federal Circuit's ruling. CMO is attempting to further delay this case and impede LPL from using discoverable information that will further establish that CMO has no basis whatsoever for challenging jurisdiction.

Indeed, after accusing LPL of not providing any competent evidence to support its allegations of CMO's jurisdictional contacts, CMO's opposition brief contains nothing more than conclusory statements without any factual or legal support. For example, CMO states that the discovery LPL seeks from the CEA case "is no better than the 'evidence' already provided by LPL, and that [sic] will not overcome LPL's substantive deficiencies in proof." (D.I. 98 at 11.) CMO does not bother to provide any additional evidence to support this bald statement. In fact, CMO's arguments are designed to divert the Court's attention away from the actual evidence submitted by LPL in support of its opposition to CMO's motion to dismiss and its motion for leave to use the discovery obtained in the CEA case or, in the alternative, for jurisdictional discovery.

CMO's attempts to hold LPL to an imaginary standard to obtain jurisdictional discovery in this case are in vain as LPL has sufficiently demonstrated that its claims are not "clearly frivolous" and have therefore met the standard for jurisdictional discovery.

## ARGUMENT

I.    **LPL'S MOTION IS FULLY JUSTIFIED AND APPROPRIATE UNDER THE LAW AND PRECEDENT IN THIS JURISDICTION**

A.    **LPL's Motion is Not a Surreply**

CMO's opposition begins with a procedural objection to LPL's alternative motion.  CMO wrongly implies that LPL's motion was filed simply to further rebut CMO's motion to dismiss. In its opposition to CMO's motion to dismiss, LPL expressly stated that it alternatively would be seeking leave to use the jurisdictional discovery in the CEA case or, in the further alternative, for leave to take jurisdictional discovery.  (D.I. 57 at 35-36.)  Indeed, in LPL's opposition brief, LPL specifically stated that, "pursuant to the Court's Standing Order, LPL intends to file an alternative motion directing CMO to permit LPL to use the CEA discovery in responding to CMO's motion to dismiss in this case and for leave to conduct additional jurisdictional discovery, which will be filed by the appropriate deadline so that the motion can be heard on this Court's July 13, 2007 hearing date." (*Id.* at 35.)  Thus, LPL's motion should not have come as a surprise to CMO.

As CMO is well aware, in the earlier case, CEA was forced to appeal the district court's dismissal and refusal to permit jurisdictional discovery to the Federal Circuit because the lower court determined that CEA's request was not timely made "because CEA did not fully brief or argue the issue prior to [the Court's] ruling on the motion to dismiss." *Commissariat*, 395 F.3d at 1322.  Even though the Federal Circuit reversed the district court's dismissal, LPL chose to ensure its request for jurisdictional discovery would not be rejected or overlooked by filing a separate motion requesting such alternative relief so there would be no question as to whether the issue had been fully briefed.  LPL's approach is fully justified given that CMO delayed CEA's case against it for two years with its motion to dismiss and the subsequent appeal.

2

**B.    LPL's Motion is Not a Request to Modify the Protective Order in the CEA Case**

CMO wrongly characterizes LPL's request to use the jurisdictional discovery obtained in the CEA case as a request "essentially to modify a protective order." (D.I. 98 at 11.) LPL, however, is not renewing its request filed in the CEA case to modify the protective order there. In the CEA case, Judge Thynge expressly ordered the parties to "[g]o back to Judge Farnan and tell him that this discovery is out there, [sic] enter into a protective order with CMO so that the information can be exchanged appropriately in the L.G.Philips case." (D.I. 82, Ex. 5 at 6.) As the hearing transcript demonstrates, Judge Thynge did not determine that modification of the CEA protective order was not justified under the circumstances, as CMO infers. LPL is simply complying with Judge Thynge's ruling in requesting that this Court order CMO to exchange the documents in this case. Accordingly, LPL is not seeking modification of the protective order in the CEA case. Thus, the cases CMO cites regarding the standard for modifying a protective order are not relevant. Rather, LPL seeks an order from this Court compelling CMO to allow LPL to use the discovery produced in the CEA case and in the alternative, permit further jurisdictional discovery under a protective order to be entered in this case.

Further, CMO ignores LPL's representations that the information from the CEA case is neither sought nor intended to be disclosed to anyone other than appropriate counsel. Thus, there is no prejudice to CMO in permitting LPL's counsel to review the jurisdictional discovery submitted by CMO and third parties in the CEA case. Consequently, no "extraordinary circumstances or compelling needs" must be demonstrated. (D.I. 98 at 12.) Moreover, simply entering into a protective order in one case does not prohibit the exchange of the protected documents in other cases. Indeed, the protective order in the CEA case expressly provides that

3

the protected information "may be relevant and subject to disclosure in another case," a fact that CMO does not refute. (D.I. 82, Ex. 3 at ¶ 18, Ex. 4 at ¶ 18.)

CMO also claims that judicial economy would not be served by permitting LPL to use the jurisdictional discovery from the CEA case. CMO's arguments are not supported by anything other than its own self-serving statements that the discovery sought "is no better than the 'evidence' already provided by LPL, and that [sic] will not overcome LPL's substantive deficiencies in proof." (D.I. 98 at 11.) For all of CMO's objections to LPL's alleged lack of support for its arguments, CMO fails to provide anything other than mere speculation regarding the purported futility of using the jurisdictional documents from the CEA case in the instant case. If CMO really could prove that the discovery would not help LPL, it would have offered such evidence here or allowed LPL to use the discovery from the CEA case.

Finally, CMO's contention that the jurisdictional discovery obtained in the CEA case would not satisfy Justice O'Connor's stream of commerce test in *Asahi Metal Indus. Co v. Superior Court*, 480 U.S. 102 (1987) lacks both legal and factual support. First, it is not established that Justice O'Connor's test must be satisfied before personal jurisdiction attaches, as "*Delaware law is unclear* as to whether the proper interpretation of the long arm statute accords with Justice O'Connor's or Justice Brennan's view as expressed in *Asahi*." *Commissariat*, 395 F.3d at 1322 (emphasis added). No Delaware court has since decided this issue of law. Second, CMO offers only conclusory statements that the CEA discovery would not reveal relevant information. Significantly, CMO provides no competent evidence or sworn affidavits of any kind describing the general contents of the documents produced in the CEA case, or explaining why they would not be relevant to CMO's jurisdictional contacts.

4

CMO has failed to present a compelling argument as to why LPL's request to use the jurisdictional discovery from the CEA case should be denied and its continuous opposition to LPL's request further evidences CMO's attempts to delay this proceeding.

## II.   LPL HAS MET THE STANDARD FOR JURISDICTIONAL DISCOVERY

CMO's arguments opposing LPL's request for jurisdictional discovery have no legal basis and are, in fact, expressly refuted by the Federal Circuit's opinion in the CEA case. LPL's discussion of the *Commissariat* decision is neither misleading nor inaccurate and LPL never implied that the Federal Circuit determined that jurisdiction existed over CMO. Rather, the Federal Circuit made clear that CMO's arguments disclaiming all contacts with Delaware were not "undisputed" as CMO repeatedly asserts in various filings made with this Court. (*See* D.I. 78 at 5-6; D.I. 98 at 10-11.) CMO's opposition to LPL's request again demonstrates CMO's misguided efforts to avoid this Court's jurisdiction.

### A.   The Federal Circuit's Opinion in the CEA Case is Controlling Precedent in Favor of Granting Jurisdictional Discovery

The Federal Circuit's 2005 opinion in *Commissariat* is established precedent in the instant case. Over two years ago, with considerably less evidence than has been presented to this Court with respect to CMO's jurisdictional contacts, the Federal Circuit vacated the district court's order dismissing the case and ordered that jurisdictional discovery be conducted. This Court is bound by *Commissariat* and should likewise permit LPL to conduct jurisdictional discovery from CMO and other third parties.

CMO's analysis of the Federal Circuit's opinion is directly contradicted by the text of the opinion itself. Contrary to CMO's contention, the Federal Circuit *did* adopt many of the facts presented during the adjudication of CMO's motion to dismiss in the CEA case. Indeed, the Federal Circuit's own statements make that clear:

5

> "Contrary to the district court's holding, the evidence already presented by plaintiff is sufficient to demonstrate that CMO sells a very large volume of LCDs to companies which incorporate these displays into their final product and that these products are likely sold in Delaware in substantial quantities." *Commissariat*, 395 F.3d at 1320.

> "Indeed, CEA has gone beyond factual allegations, and *has already made a prima facie case* for CMO's use of an established distribution network that likely results in substantial sales of its products in Delaware." *Id.* at 1323 (emphasis added).

Clearly, the Federal Circuit adopted much of the evidence presented. Further, such statements contradict CMO's allegation that the "court did not opine as to the sufficiency of the evidence." (D.I. 98 at 7.)

Moreover, CMO's assertion that the Federal Circuit did not reject its argument that CMO did not transact business in Delaware is belied by the Federal Circuit's conclusion upon review of the evidence presented:

> CMO did not submit any evidence to contradict CEA's allegation that CMO derived substantial revenue from sales of its products to Delaware. Nor did CMO submit evidence to contradict CEA's assertion that its products, as incorporated by OEMs into computer monitors, were likely to reach Delaware.

*Id.* at 1317-18. Given the unrefuted evidence presented in the CEA case, it is fair to conclude that the Federal Circuit rejected CMO's overly broad assertions that it did not conduct any business in Delaware.

Finally, CMO repeatedly argues that LPL has failed to satisfy Justice O'Connor's more restrictive reading of the stream of commerce theory of jurisdiction. As LPL pointed out in its opening brief (D.I. 81 at 18), the Federal Circuit held that jurisdictional discovery was warranted in the CEA case to determine whether CEA could satisfy Justice O'Connor's test, if it were found to apply, as the court refused to render an opinion on jurisdiction based solely on the

6

record before it. *Commissariat*, 395 F.3d. at 1323. The Federal Circuit also held that the district court abused its discretion in denying CEA's request for jurisdictional discovery. *Id.* at 1324. CMO should not be allowed simultaneously to promote Justice O'Connor's standard, argue that LPL has not met that standard, and then oppose jurisdictional discovery in this case knowing the Federal Circuit ordered it in the CEA case. CMO's position is untenable.

**B.    Jurisdictional Discovery Would Not be Ineffectual**

CMO contends that the "undisputed evidence" shows that CMO has never purposefully conducted or directed business activities to Delaware. CMO's argument, however, is inaccurately predicated upon the premise that, in order to be subject to this Court's jurisdiction, CMO expressly would have had to direct or instruct third parties to transact business *in Delaware*. CMO fails to acknowledge that it has purposefully directed its business activities to the United States, including Delaware, without having to expressly instruct any third parties to do the same. CMO's intentional sale of its LCD modules to original equipment manufacturers ("OEMs") constitutes the purposeful placement of its products into established distribution channels that then sell those products throughout the United States, including Delaware. CMO, therefore, need not have expressly directed such OEMs to sell its modules in the United States, as those sales channels were pre-established. Thus, despite CMO's contentions, the evidence is not undisputed and, in fact, is refuted by information LPL has presented to this Court regarding CMO's jurisdictional contacts.

Moreover, CMO's reliance on *Siemens Aktiengesellschaft v. LG Semicon Co.*, 69 F. Supp. 2d 622 (D. Del. 1999) is misplaced. Although the court did discuss the established distribution channels used by the defendant, as LPL acknowledged in its opening brief (D.I. 81 at 17), it did not engage in a *detailed* analysis of those channels and whether the defendant was aware of *where* its products would be incorporated and then sold. Unlike the defendant in

7

*Siemens*, CMO is acutely aware of the likely destination of its LCD modules that are incorporated by OEMs into brand name LCD monitors that are sold throughout the United States, including Delaware, at stores like Best Buy, CompUSA, Circuit City, Staples, and Office Depot.

Finally, CMO's refusal to permit LPL to use the jurisdictional discovery produced in the CEA case further accentuates the value of conducting jurisdictional discovery. Despite LPL's offer to maintain the confidentiality of the information produced, CMO has prevented LPL from submitting the evidence obtained to refute CMO's motion to dismiss. Conducting jurisdictional discovery would permit LPL the opportunity to obtain that information and additional, more recent information from CMO and third parties. Again, CMO's contention that jurisdictional discovery would reveal only "cumulative" evidence is self-serving and should not be relied upon. (D.I. 98 at 2.) CMO has failed to present a valid reason for denying jurisdictional discovery and its adamant opposition to providing this Court with additional relevant information is telling.[1]

### C. LPL Has Submitted Competent Evidence, Including Sworn Affidavits, of CMO's Jurisdictional Contacts

As explained in its opening brief, CMO's contention that the evidence LPL submitted of CMO's jurisdictional contacts is not competent is without merit. CMO spends three pages and cites a litany of cases to support its argument that LPL has not provided evidence sufficient to warrant jurisdictional discovery. (D.I. 98 at 7-10.)

---

[1] CMO fails to mention that, on the same day CMO filed its opposition to LPL's instant motion, CMO USA filed its answer, affirmative defenses, and counterclaims in this Court, thereby consenting to jurisdiction. (D.I. 87 in *AU Optronics Corp. v. LG.Philips LCD Co., et al.*, Case No. 07-357-JJF.)

The cases CMO cites are either inapposite or demonstrate that LPL's discovery request is fully justified.[2]

First, CMO cites *Intel Corp. v. Broadcom Corp.*, 167 F. Supp. 2d 692 (D. Del. 2001) to support its erroneous assertion that LPL must make a prima facie showing with sworn affidavits or other competent evidence that personal jurisdiction might exist over a defendant *before* being permitted to obtain jurisdiction discovery. CMO mischaracterizes the rule from that case. In full context, *Intel* concludes: "When a non-resident defendant's motion to dismiss challenges personal jurisdiction, the plaintiff has the burden to show the basis for the court's jurisdiction over that defendant. To satisfy this burden, [the plaintiff] must make a prima facie showing that this court may exercise personal jurisdiction over [the defendant]. *After discovery has begun*, the plaintiff must sustain this burden by 'establishing jurisdictional facts through sworn affidavits or other competent evidence.'" *Id.* at 699 (emphasis added) (citations omitted). Of course, in *Intel*, the parties had engaged in 11 months of discovery before the motion to dismiss was denied. *Id.* at 694. The other two cases CMO cites in support of this argument, *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61 (3d. Cir. 1984) and *Greenly v. Davis*, 486 A.2d 669 (Del. 1984) did not discuss jurisdictional discovery at all.

CMO then erroneously asserts that LPL is barred from jurisdictional discovery because it did not provide "sworn evidence" to rebut CMO's declaration. (D.I. 98 at 9.) Indeed, there is no

---

[2] In fact, a number of the cases CMO cites permitted discovery. *See, e.g., GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1352 (D.C. Cir. 2000) (explaining that "We cannot tell whether jurisdictional discovery will assist GTE on this score, but it is entitled to pursue precisely focused discovery aimed at addressing matters relating to personal jurisdiction."); *McMullen v. European Adoption Consultants, Inc.*, 109 F. Supp. 2d 417, 420 (W.D. Pa. 2000) (allowing jurisdictional discovery over the only defendant who contested personal jurisdiction); *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 458 (3d Cir. 2003) (reversing the District Court's denial of plaintiff's request for jurisdictional discovery, vacating the District Court's dismissal of the plaintiff's complaint, and remanding the case for jurisdictional discovery).

such limitation on the evidence that can be used to demonstrate a basis for jurisdictional discovery and none of the cases CMO cites even suggest such a limitation. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1562 (Fed. Cir. 1994) (explaining that there is no authority in the "Federal Rules of Civil Procedure or elsewhere" that supports a rule barring the use of hearsay evidence on a 12(b)(2) motion.) More importantly, CMO completely disregards the three sworn declarations submitted by Lora A. Brzezynski (D.I. 60), attaching 52 exhibits, Michael R. Tierney, Jr. (D.I. 58), and Lewis W. Hyden, II (D.I. 59) in support of LPL's opposition to CMO's motion to dismiss.

While it is LPL's burden to demonstrate that there is prima facie evidence of CMO's jurisdictional contacts, CMO attempts to hold LPL to a non-existent, but incredibly high, standard. Even if any of LPL's evidence is considered hearsay, such evidence is still appropriately considered to determine whether personal jurisdiction exists. *See Akro Corp. v. Luker*, 45 F.3d 1541, 1547 (Fed. Cir. 1995) ("hearsay 'bear[ing] circumstantial indicia of reliability' may be admitted for purposes of determining whether personal jurisdiction obtains.") (quoting *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1562 (Fed. Cir. 1994)); *see also Bauman v. DaimlerChrysler AG*, No. C-04-00194 RMW, 2005 WL 3157472, *5 (N.D. Cal. Nov. 22, 2005) (Exhibit A) (citing *Akro Corp.* in finding that printouts from a website were admissible for purposes of determining personal jurisdiction); *Agilent Technologies, Inc. v. Elan Microelectronics Corp.*, No. C 04-05385, 2005 WL 3260162 (N.D. Cal. Nov. 29, 2005) (Exhibit B) (citing *Beverly Hills Fan* in rejecting defendant's claims that marketing materials and documents printed from a website could not be admitted for purposes of determining whether personal jurisdiction exists).

Unlike in the cases CMO cites where jurisdictional discovery was denied, LPL's claims are not "clearly frivolous" and are not supported by "mere speculation" or attenuated, bare or conclusory allegations. (D.I. 98 at 8-10.) *See, e.g., Molnlycke Health Care AB v. Dumex Med. Surgical Products Ltd.*, 64 F. Supp. 2d 448, 454 (E.D. Pa. 1999) (denying discovery because the sole basis for plaintiff's assertion of personal jurisdiction, defendant's operation of a website, is not a sufficient basis to assert personal jurisdiction); *Southern Ocean Seafood Co. v. Holt Cargo Systems, Inc.*, No. CIV.A. 96-5217, 1997 WL 539763, *8 (E.D. Pa. Aug. 11, 1997) (Exhibit C) (denying discovery because plaintiffs countered defendants' affidavits with only "mere speculation" as a basis for personal jurisdiction); *Ames v. Whitman's Chocolates*, No. 91-3271, 1991 WL 281798, *3 (E.D. Pa. Dec. 30, 1991) (Exhibit D) (denying discovery because plaintiff fails to submit or even describe the evidence that he claims rebuts defendant's affidavit); *Freeman v. Keycorp*, 1990 U.S. Dist. LEXIS 1525, *7 (M.D. Pa. Jan. 31, 1990) (Exhibit E) (denying discovery because plaintiffs offered only "mere conjecture" in response to defendants' affidavits regarding personal jurisdiction); *Poe v. Babcock Int'l, PLC*, 662 F. Supp. 4, 7 (M.D. Pa. 1985) (denying discovery because plaintiff met defendants' affidavit evidence regarding jurisdiction with "mere speculation"). Given the substantial evidence LPL presented regarding CMO's jurisdictional contacts, it is obvious that LPL's claims are not "clearly frivolous." [3] CMO argues, however, that LPL's evidence is not competent. Notably, it does not deny the underlying truth of the facts alleged. For example, CMO contends that the documents submitted

---

[3] CMO's reliance on two cases where jurisdictional discovery over individual defendants was denied is misplaced. As both of those courts recognized, the low standard for jurisdictional discovery with respect to corporate defendants such as CMO does not apply to individual defendants. *See Massachusetts Sch. of Law at Andover, Inc., v. American Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997) (explaining that "[w]here the defendant is an individual, the presumption in favor of discovery is reduced.); *Rich v. KIS California, Inc.*, 121 F.R.D. 254, 259-60 (M.D.N.C. 1988) (permitting jurisdictional discovery as to a foreign corporate defendant, but denying it with respect to an individual defendant.)

in support of LPL's assertion that CMO has, or at least had, a long term agreement with Dell are

not competent. Importantly, CMO does not deny its contractual relationship with Dell, or even

that Dell sold its LCD monitors incorporating CMO's LCD modules to the United States,

including Delaware. CMO cannot deny the facts asserted, thus its only recourse is to challenge

the documentation LPL submitted.

Finally, additional competent evidence of the validity of LPL's claims comes in the form

of the established precedent for ordering jurisdictional discovery. The Federal Circuit has

already determined that jurisdictional discovery is warranted in similar circumstances. If the

standard for such discovery was met two years ago when less evidence was presented regarding

CMO's jurisdictional contacts, it would be hard to find that the same standard has not been met

in this case. The *Commissariat* decision is arguably the best evidence that LPL's claims are not

"clearly frivolous" and that CMO has sufficient jurisdictional contacts to warrant discovery.

### D.    CMO Did, in Fact, Concede it Would Have to Produce Jurisdictional Discovery

LPL did not carefully parse CMO's words to make it appear as though CMO conceded it

would have to engage in jurisdictional discovery; CMO actually admitted it would have to do so.

CMO now attempts to back-peddle from its prior statements, including the following:

> Because CMO *would have to produce documents relative to jurisdictional discovery in any event*, CMO would not be spared the burden of searching for and producing such information if LPL's Motion were granted. (D.I. 82, Ex. 6 at 2) (emphasis added.)

> Indeed, LPL has already evidenced its intent to seek jurisdictional discovery in that case and presumably can obtain all relevant discovery at that time. (*Id*. at 8.)

> Even if the protective order is modified, LPL has represented that it still intends to move for jurisdictional discovery in the action pending before Judge Farnan. As part of that request, LPL has announced its intent to take jurisdictional discovery in which it may seek the production of at least some of the documents previously produced in

12

this case, as well as similar documents in CMO's possession, custody or control from the last two years. Thus, even if the Protective Order (D.I. 265) was modified, CMO *would have to produce documents relative to jurisdictional discovery*. CMO would not be spared the burden of searching for and producing such information. (*Id.* at 10) (emphasis added.)

CMO does not explain how its statements do not mean it conceded jurisdictional discovery was proper, as it merely states that the "undisputed evidence" shows CMO is not subject to this Court's jurisdiction. (D.I. 98 at 13.) Indeed, none of the quotations above include any objections by CMO to producing documents pursuant to jurisdictional discovery. CMO acknowledged an obligation to provide jurisdictional discovery and its attempt to renege on that statement is transparent.

## CONCLUSION

For the reasons set forth herein and in its Opening Brief, LPL respectfully requests that if the Court does not deny outright CMO's motion to dismiss, it should permit LPL to use the discovery obtained in the CEA case and require CMO to supplement its production or, in the further alternative, to allow LPL to conduct jurisdictional discovery.

July 10, 2007                              THE BAYARD FIRM

                                           /s/ Richard D. Kirk (rk0922)
                                           Richard D. Kirk (#0922)
OF COUNSEL:                                Ashley B. Stitzer (#3891)
                                           222 Delaware Avenue, 9th Floor
Gaspare J. Bono                            P.O. Box 25130
Song K. Jung                               Wilmington, DE 19899-5130
R. Tyler Goodwyn, IV                       (302) 655-5000
Lora A. Brzezynski                         rkirk@bayardfirm.com
McKenna Long & Aldridge LLP                astitzer@bayardfirm.com
1900 K Street, N.W.
Washington, D.C. 20006                     Attorneys for Plaintiff LG.Philips LCD Co., Ltd.
(202) 496-7500

13

664648-1

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on July 10, 2007, he served the foregoing

documents by email and by hand upon the following counsel:

Edmond D. Johnson
Thomas H. Kovach
Pepper Hamilton LLP
1313 Market Street, Suite 5100
PO Box 1709
Wilmington, DE 19899-1709

Karen L. Pascale
John W. Shaw
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

Philip A. Rovner
Dave E. Moore
Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, DE 19899-0951

William E. Manning
Jennifer M. Becnel-Guzzo
Buchanan Ingersoll & Rooney
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801

The undersigned counsel further certifies that, on July 10, 2007, he served the

foregoing documents by email and by U.S. Mail upon the following counsel:

John N. Zarian
Samia McCall
Matthew D. Thayne
J. Walter Sinclair
Stoel Rives LLP
101 S. Capitol Blvd., Suite 1900
Boise, ID 83702

Vincent K. Yip
Peter J. Wied
Jay C. Chiu
Paul, Hastings, Janofsky & Walker LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA 90071

Kenneth R. Adamo
Robert C. Kahrl
Arthur P. Licygiewicz
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190

Bryan J. Sinclair
Karineh Khachatourian
Buchanan Ingersoll & Rooney
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065-1418

/s/ Richard D. Kirk, (rk0922)
Richard D. Kirk

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: 2005 WL 3157472 (N.D.Cal.))**

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Barbara BAUMAN, et al., Plaintiffs,
v.
DAIMLERCHRYSLER AG, and Does 1 thorough
50, inclusive, Defendants.
**No. C-04-00194 RMW.**

Nov. 22, 2005.

Kim E. Card, Daniel M. Kovalik, Kathryn Chris
Palamountain, Derek J. Baxter, Mark Andrew
Chavez, Terry Collingsworth, for Plaintiffs.

Peter J. Messrobian, Matthew J. Kemner, for
Defendant.

ORDER TENTATIVELY GRANTING
DEFENDANT'S MOTION TO DISMISS

WHYTE, J.

[Re Docket No. 36]
*1 Specially-appearing defendant DaimlerChrysler
AG ("DCAG") filed a motion to quash service and
dismiss for lack of personal jurisdiction. Plaintiffs
oppose the motion. The motion to dismiss was heard
on June 17, 2005. The motion to quash was
withdrawn. The court has reviewed the parties' papers
filed before the hearing and considered their
arguments. The court has also reviewed plaintiffs'
post-hearing notice of filing of supplemental
authority but sustains defendant's objection to its
consideration. For the reasons set forth below, the
court tentatively grants DCAG's motion to dismiss
for lack of personal jurisdiction but allows plaintiffs
some limited jurisdictional discovery.

I. BACKGROUND
Plaintiffs are twenty-three people, one of whom is a
citizen of Chile and the rest of whom are citizens of
Argentina. Amend. Compl. ¶¶ 3-21. Plaintiffs allege
that Mercedes-Benz Argentina ("MBA")--now
known as DaimlerChrysler Argentina ("DCA")--
collaborated with the Argentine government to
kidnap, detain, torture, or kill plaintiffs or plaintiffs'
relatives during Argentina's military regime of 1976
to 1983, known as the "Dirty War." *Id.* ¶¶ 1-21.

Claiming that DCA is either a division or wholly-
owned subsidiary of DCAG, plaintiffs bring this
action against DCAG under the Alien Tort Claims
Act ("ATCA"), 28 U.S.C. § 1350, and the Torture
Victims Protection Act ("TVPA"), 28 U.S.C. § 1350.
*Id.*

In 1998, Chrysler Corporation and Daimler-Benz
AG became wholly-owned subsidiaries of DCAG.
Louann Van Der Wiele Decl. Supp. DCAG's Mot.
("Wiele Decl.") ¶ 2. Consequently, Chrysler
Corporation, which had its principal place of business
in Auburn Hills, Michigan, changed its name to
DaimlerChrysler Corporation ("DCC"). *Id.* DCC
maintains the same headquarters as Chrysler
Corporation had maintained before. *Id.;* Miller Decl.,
Ex. 1.

DCAG contends that it is a German stock company
with headquarters located in Stuttgart, Germany. *Id.;*
Amend. Compl. ¶ 22. DCAG is not qualified or
authorized to do business in California and does not
import, manufacture, sell, service, or warranty cars in
California. It manufactures Mercedes-Benz vehicles
in Germany. Peter Waskonig Decl. Supp. DCAG's
Mot. ("Waskonig Decl.") ¶ 3. A separate Delaware
corporation, Mercedes-Benz United States, LLC
("MBUSA") purchases Mercedes-Benz cars in
Germany, imports them into the United States, and
distributes them throughout the United States. *Id.* ¶¶
7, 10. MBUSA also provides all product
advertisement, service and sales support for
Mercedes-Benz vehicles in the United States. *Id.* ¶ 7.
Plaintiffs, however, allege that DCAG is both an
American and German corporation with headquarters
in both countries, respectively, in the cities of Auburn
Hills and Stuttgart. Brian Campbell Decl. Opp.
DCAG's Mot. ("Campbell Decl."), Ex. 1, 2.

Plaintiffs originally named DCC as the defendant.
Compl. ¶ 1. They subsequently amended their
complaint, replacing DCC with DCAG as the
defendant. Amend. Compl. ¶ 1. Plaintiffs originally
believed that DCAG had its sole headquarters in
Stuttgart, Germany. Compl. ¶ 22. In accord with the
procedures set forth by the Hague Convention for
international service of process, plaintiffs initiated
service attempts upon DCAG through the German
courts. Plaintiffs' Ex Parte Appl. Ct. Iss. Amend.
Summons ("Appl.Amend.Summons") ¶ 1. The
German district court authorized service of process

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)
(Cite as: 2005 WL 3157472 (N.D.Cal.))

upon DCAG on July 14, 2004. Req. Jud. Not. ("RJN"), Ex. A. On September 7, 2004, however, the German appellate court halted service to determine whether service would violate Germany's sovereignty rights. If that was the case, the requested service could potentially be refused according to the Hague Convention, Article 13(1). *Id.* Whether plaintiffs' requested service in Germany will be permitted awaits resolution by Germany's highest court of a matter involving Napster and Bertelsmann AG, which poses similar issues. *Id.* On March 7, 2005, after hearing the parties' comments on the temporary suspension of service, the German appellate court reaffirmed its original stay order. RJN, Ex. B.

*2 From a proxy statement to shareholders regarding the 1998 merger of Chrysler Corporation with Daimler-Benz AG, plaintiffs discovered that DCAG purports to maintain operational headquarters at the DCC headquarters in Auburn Hills, Michigan. Appl. Amend. Summons at 3. Plaintiffs then applied for and were issued an amended summons for DCAG at the Auburn Hills location.

On January 28, 2005, plaintiffs' process server first attempted to serve DCAG at DCC headquarters but was unsuccessful. Sunny Miller Decl. Opp. DCAG's Mot. ("Miller Decl.") ¶ 3; Elizabeth Tichvon Decl. Supp. DCAG's Mot. ("Tichvon Decl.") ¶ ¶ 2-5. Elizabeth Tichvon, the service of process paralegal for DCC, explained to the server that she and DCC were not authorized to accept service of process on behalf of DCAG. *Id.;* Wiele Decl., Letter from Van Der Wiele to Plaintiffs' Counsel of 3/2/05, Ex. 1. On February 15, 2005, plaintiffs' process server Sunny Miller attempted to serve on DCAG at the DCC headquarters but was not permitted to proceed any further than the reception area. Miller Decl ¶ 5; Tichvon Decl. ¶ 6. Tichvon explained to Miller that DCC and not DCAG was located at the premises. Miller Decl. ¶ 3. In addition, Tichvon reiterated her statements on January 28 to Miller and told Miller that she did not work for DCAG. Tichvon Decl. ¶ 6. Plaintiffs contend that as Tichvon walked away, Miller told her that he was leaving the papers there for DCAG. Miller Decl. ¶ 5. Miller then left the papers at the security desk in the presence of security guard Eric Uzenski, who works for Wackenhut Corporation. *Id.* The papers were returned to plaintiffs' counsel. Wiele Decl. ¶ 6.

On March 3 and March 10, 2005, plaintiffs mailed copies of the summons and complaint to the DCC headquarters by registered mail. *Id.* ¶ 7. Plaintiffs also mailed a copy of the summons and complaint to

the Michigan Corporation Securities Bureau. Miller Decl. ¶ 4. The documents were addressed to Jurgen Schrempp, Chief Executive Officer ("CEO") of DCAG. Wiele Decl. ¶ 6. DCAG contends that Schrempp was not present at the DCC headquarters on March 3 and 10. *Id.* at 7; Waskonig Decl. ¶ 11. In addition, DCAG contends that Schrempp has no office in Auburn Hills but has an office in Stuttgart, Germany. Plaintiffs, however, allege that Schrempp has offices in both Auburn Hills and Stuttgart. Waskonig Decl. ¶ 11; Campbell Decl., Ex. 2. Plaintiffs further allege that the copy of the summons and complaint sent on March 10, 2005, was signed for by an agent of DCAG. Miller Decl., Ex. 3.

DCAG filed a motion to dismiss for insufficiency of service of process, pursuant to *Federal Rule of Civil Procedure 12(b)(5)*, and to dismiss for lack of personal jurisdiction, pursuant to *Federal Rule of Civil Procedure 12(b)(2)*. Mot. at 1. In response to plaintiffs' opposition, DCAG withdrew its challenge to service of process, but continues to assert that the court must dismiss the complaint for lack of personal jurisdiction. The parties agree that plaintiffs' claim does not arise out of or relate to DCAG's purported activity in California. Mot. at 9; Opp'n at 8. Thus, plaintiffs do not seek to establish specific jurisdiction over DCAG. *Id.*

*3 Plaintiffs submitted a notice of filing of supplemental authority and exhibits on August 8, 2005 pursuant to *Federal Rule of Civil Procedure 15(d)*. Defendant filed an objection to its consideration. The court sustains the defendant's objection to plaintiffs' supplemental materials, which were submitted without prior court approval and in violation of Civil L.R. 7- 3(d) (except for a new judicial opinion, "once a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval."). If the court considered plaintiffs' exhibits for the purpose of determining the existence of personal jurisdiction, the supplemental materials would only add marginally to the calculus in favor of jurisdiction.

## II. ANALYSIS

The court may obtain personal jurisdiction over a defendant if it finds that either specific or general jurisdiction exists. Plaintiffs contend that the court has general jurisdiction over DCAG. General jurisdiction subjects a foreign defendant to suit within the forum state even on matters unrelated to its contacts with the forum. *Doe v. Unocal Corp., 248 F.3d 915, 923 (9th Cir.2001)*. General jurisdiction requires a two-part inquiry: (1) whether defendant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: 2005 WL 3157472 (N.D.Cal.))**

has "systematic and continuous contacts" with California; and (2) whether the assertion of general jurisdiction is reasonable. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416 (1984); *Amoco Egypt Oil Co. v. Leonis Navigation Co., Inc.,* 1 F.3d 848, 851 (9th Cir.1993). Consequently, even if "continuous and systematic, contacts exist, the assertion of general jurisdiction must be reasonable." *Gator.com Corp. v. L.L. Bean,* 341 F.3d 1072, 1079-80 (9th Cir.2003) (citing *Amoco,* 1 F.3d at 852-53). This case presents a difficult question: can a federal court exercise personal jurisdiction over a case arising under federal subject matter jurisdiction in which plaintiffs are all foreign nationals and the defendant is a foreign corporation which has subsidiaries doing business in the United States?

Plaintiff has the burden of establishing that defendant has systematic and continuous contacts with the forum state. *See Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1019 (9th Cir.2002); *Unocal,* 248 F.3d at 923. The standard for establishing general jurisdiction is "fairly high," requiring defendant's contacts in the state to be of a sort that "approximate physical presence" within the forum state. *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000). Conceptually, plaintiff must establish that the defendant has been conducting business in California, not merely with California. *See Bancroft,* 223 F.3d at 1086.

When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, the plaintiff need only make a prima facie showing of the jurisdictional facts to withstand the motion. *Unocal,* 248 F.3d at 922. In order to make a prima facie showing, plaintiff must allege facts which, if true, would be sufficient to establish personal jurisdiction. *Id.* If not directly controverted, plaintiffs' version of the facts is taken as true for the purposes of the motion. *Id.* Conflicts between the facts stated in the parties' affidavits must be resolved in plaintiff's favor during a prima facie jurisdictional analysis. *Dole Food Co. v. Watts,* 303 F.3d 1104, 1108 (9th Cir.2002).

**\*4** Defendant has the burden of establishing that exercise of jurisdiction over it is unreasonable. *Amoco,* 1 F.3d at 851. To determine whether exercise of jurisdiction is reasonable, the following seven factors are balanced: (1) the extent of defendant's purposeful interjection into the forum; (2) the burden on the defendant of litigating in the forum; (3) the extent of conflict with the sovereignty of defendant's

state; (4) the forum state's interest in adjudicating the issue; (5) the most efficient judicial resolution of the dispute; (6) the importance of the forum to plaintiff's interest in convenient and effective relief; and (7) the existence of an alternate forum. *Id.*

A. Systematic and Continuous Contacts

Courts focus on two primary areas when applying the "systematic and continuous contacts" test. First, they seek to determine whether there is "some kind of deliberate 'presence' in the forum state, including physical facilities, bank accounts, agents, registration, or incorporation." *Gator.com,* 341 F.3d at 1077. Second, courts "look at whether the company has engaged in active solicitation toward and participation in the state's markets, i.e., the economic reality of the defendant's activities in the state." *Id.* Plaintiffs seek to establish that DCAG has the requisite systematic and continuous contacts with California by arguing that (1) DCAG itself has such contacts or (2) DCAG has sufficient contacts by virtue of MBUSA, which plaintiffs contend acts as DCAG's agent. Opp'n at 8.

1. DCAG's Objections to Evidence

As a preliminary matter, DCAG objects to much of the evidence plaintiffs have submitted in support of their contention that this court has personal jurisdiction over DCAG, particularly to documents attached to the declaration of Brian Campbell. First, DCAG objects that plaintiffs have not properly authenticated certain materials submitted in support of their opposition and that the materials are thus inadmissible as lacking foundation. The materials to which DCAG objects on the basis of authentication are pages printed from the www.daimlerchrysler.com website and a proxy statement and marketing brochure purportedly distributed by DCAG.

Although some courts have refused to consider unauthenticated internet documents for purposes of any motion, *see, e.g., Wady v. Provident Life and Accident Ins. Co. of Am.,* 216 F.Supp.2d 1060 (C.D.Cal.2002) (excluding internet evidence on a summary judgment motion for these reasons), this court agrees with a recent Central District of California decision holding that the court should consider the stage of litigation when determining the admissibility of unauthenticated evidence. In *Moose Creek, Inc. v. Abercrombie & Fitch Co.,* 331 F.Supp.2d 1214 (C.D.Cal.2004), the court considered unauthenticated internet documents submitted by plaintiffs in support of their motion for preliminary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: 2005 WL 3157472 (N.D.Cal.))**

injunction for trademark infringement. The court
stated:

> **\*5** Rule 901(a) defines a standard of admissibility
> that is rather general or elastic: the evidence must
> merely be 'sufficient to support a finding that the
> matter in question is what proponent claims.'
> Although Plaintiffs are correct that these internet
> documents are not individually authenticated, the
> Court finds that at this stage they satisfy Rule
> 901(a).

*Id.* at 1225 n. 4. Likewise, the court will consider
plaintiffs' unauthenticated documents for purposes of
determining whether DCAG is subject to personal
jurisdiction.

Defendant also objects that the statements contained
in the internet materials are offered for the truth of
their contents and are thus hearsay. District courts
have discretion to consider otherwise inadmissible
evidence in ruling on an application for a temporary
restraining order or preliminary injunction. *Republic
of the Philippines v. Marcos,* 862 F.2d 1355, 1363
(9th Cir.1988) ( "It was within the discretion of the
district court to accept this hearsay for purposes of
deciding whether to issue the preliminary
injunction."). Other courts have held that hearsay
may be considered for purposes of determining
personal jurisdiction, provided it bears circumstantial
indicia of reliability. *Akro Corp. v. Luker,* 45 F.3d
1541, 1546-47 (Fed.Cir.1995) ( "[E]ven if Luker had
objected to the hearsay nature of the statements at
trial, such an objection would have been overruled, as
we have held that hearsay 'bear [ing] circumstantial
indicia of reliability' may be admitted for purposes of
determining whether personal jurisdiction obtains.")
(citing *Beverly Hills Fan v. Royal Sovereign Corp.,*
21 F.3d 1558, 1562 (Fed.Cir.1994)). The court finds
that the documents printed from the
www.daimlerchrysler.com website bear such
circumstantial indicia of reliability, as the printouts
bear the date and site from which they were printed,
along with the DaimlerChrysler banner style. [FN1]
The court will consider plaintiffs' evidence printed
from the DaimlerChrysler and MBUSA websites for
the purpose of determining the existence of personal
jurisdiction. The documents printed from other
websites, however, do not bear these circumstantial
indicia of reliability. The court sustains defendant's
objection to the contents of Exhibits 5, 6, 7, 9, 10, 11,
12, 14, 20, and 21 to the Campbell declaration.

> FN1. These documents could, in the
> alternative, be considered party admissions.

2. DCAG's Contacts

Plaintiffs present evidence of nine of DCAG's
contacts in support of their claim that DCAG has
continuous and systematic contacts with California.
Opp'n at 9. DCAG, however, argues that plaintiffs
have incorrectly attributed five of those nine contacts
to DCAG when, in fact, they are contacts by certain
subsidiaries of DCAG. Reply at 3. With regard to the
remaining four contacts, DCAG argues that one
contact is not supported by plaintiffs' evidence and
that the other three contacts are insufficient to
establish that DCAG has continuous and systematic
contacts with California. *Id.* at 4-5.

a. Contacts Allegedly Attributable to Subsidiaries

**\*6** The parent-subsidiary relationship itself is not
sufficient to attribute the contacts of the subsidiary to
the parent for jurisdictional purposes. [FN2] *Harris
Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements,
Ltd.,* 328 F.3d 1122, 1134 (9th Cir.2003) (citing
*Unocal,* 248 F.3d at 925). Thus, only contacts that
can properly be attributed to DCAG, and not its
subsidiaries, may be used to determine whether
DCAG has systematic and continuous contacts with
California.

> FN2. An exception to this general rule
> occurs when the subsidiary is the alter ego
> or agent of the parent. Plaintiffs address this
> exception in the section of the analysis
> regarding MBUSA's systematic and
> continuous contacts.

DCAG contends that plaintiffs wrongly attribute five
contacts to it. First, plaintiffs point to a brochure
published by DCAG in 2004, entitled
*DaimlerChrysler Commitment to North America.*
Opp'n at 9. In the section of this brochure entitled
"Direct Economic Impact in North America--2003,"
DCAG reported that it pays more than $64 million
annually to 707 California employees, $15 million
annually to 1,562 California retirees, $1 billion total
to California suppliers, and $31 million annually to
California in taxes. Campbell Decl., Ex. 4 at 42.
Defendant, however, argues that the information in
*DaimlerChrysler Commitment to North America*
refers to the North American contacts of DCAG-
affiliated subsidiaries and not those of DCAG. Reply
at 3-4. Defendant claims that the entire brochure,
including the "Direct Economic Impact in North
America--2003 section," makes clear that it is
discussing a group of DaimlerChrysler affiliated
subsidiaries located in North America. *Id.* at 3. In
further support of its argument that the brochure does

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: 2005 WL 3157472 (N.D.Cal.))**

not refer to DCAG's own direct impact in North America, DCAG submits that it has no offices, agents, representatives, employees, property, or bank accounts in California. Waskonig Decl. ¶ ¶ 3-4. Aside from the brochure, plaintiffs have submitted no evidence to oppose DCAG's assertion.

Consolidating the activities of a subsidiary into the parent's reports is a common business practice. *Unocal,* 248 F.3d at 929 (quoting *Calvert v. Huckins,* 875 F.Supp. 674, 678 (E.D.Cal.1995)). Such consolidated statements are allowed by both the Internal Revenue Service and the Securities and Exchange Commission and recommended by generally accepted accounting principles. *Calvert,* 875 F.Supp. 679. Thus, although *DaimlerChrysler Commitment to North America* begins with a letter signed by the Chairman of DCAG, which tells the reader that "this brochure highlights many of our North American activities," the numbers published in *DaimlerChrysler Commitment to North America* do not serve to establish that DCAG itself has California contacts. [FN3]

> FN3. These numbers and documents may prove relevant to establishing DCAG's California contacts where plaintiffs seek to demonstrate that a subsidiary is an agent or alter ego of DCAG. *See, e.g., In Akzona Inc. v. E.I. Du PontNemours and Co.,* 607 F.Supp. 227, 238 (D.Del.1984), *cited in Unocal,* 248 F.3d at 928 (finding parent corporation's annual report clearly indicated parent corporation's corporate status as separate from relevant subsidiary).

Second, plaintiffs point to an expenditure reported in DCAG's 2005 SEC 20-F filing of approximately $595,000 for advertising and related marketing activities with Black Enterprise Magazine in 2004. Campbell Decl., Ex. 15. Because Black Enterprise Magazine has offices in California, plaintiffs contend that this reported expenditure evidences a DCAG contact with California. In response, DCAG presents a declaration from its media purchasing affiliate stating that the amount cited by plaintiff was spent, not on behalf of DCAG, but on behalf of three of its subsidiaries: DaimlerChrysler Motors Company LLC, MBUSA, and Mitsubishi Motors North America, Inc. Peter L. Swiecicki Decl. Supp. DCAG's Reply ("Swiecicki Reply Decl.") ¶ 3. Thus, the evidence does not support the conclusion that the reported advertising expenditure may be properly attributed to DCAG.

*7 DCAG's third alleged contact with California is its participation in the Stop Red Light Running Campaign, in which it purportedly made grants worth $200,000 to seven communities in the United States, including the City of Fresno, California. Campbell Decl., Ex. 17. Plaintiffs found the information in a press release from "Auburn Hills/Stuttgart" on the DaimlerChrysler website. *Id.* DCAG contends that it was DCC, not DCAG, that participated in the Stop Red Light Running Campaign. Louann Van Der Wiele Decl. Supp. DCAG's Reply ("Wiele Reply Decl.") ¶ 5.

Fourth, plaintiffs contend that DCAG filed for certification from the California Air Resources Board for its engines. The certification allegedly allows DCAG's products to be marketed in California. Campbell Decl., Ex. 8. DCAG, however, contends that it does not make submissions to the California Air Resources Board but that a distinct subsidiary company in the United States does so. [FN4] Peter Waskonig Decl. Supp. DCAG's Reply ("Waskonig Reply Decl.") ¶ 10. The filing itself does not constitute a contact of DCAG with the forum state. However, the impact of the filing, that DCAG's products may be marketed in California, may be relevant, as set forth below.

> FN4. DCAG does not identify which subsidiary company performs this function.

Fifth, plaintiffs allege that DCAG directly participated in the establishment of the California Fuel Cell Partnership, which involved Ferdinand Panik, Senior Vice President at DCAG, being present in California as chairperson of the organization. DCAG does not refute plaintiffs' allegation but contends first that the evidence is inadmissible and that DaimlerChrysler Research and Technology North America, Inc., is the only company in the DaimlerChrysler Group of companies that currently is a member of the California Fuel Cell Partnership. Waskonig Reply Decl. ¶ 9.

The court concludes that DCAG has presented sufficient evidence that these contacts are attributable, not to DCAG, but to subsidiaries of DCAG. Accordingly, they are not properly considered direct contacts of DCAG to California.

b. California-specific product designs

As a sixth contact with California, plaintiffs claim that DCAG designs vehicles specifically for California, which indicates purposeful availment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)
(Cite as: 2005 WL 3157472 (N.D.Cal.))

Opp'n at 10. In support of this argument, plaintiffs offer evidence that DCAG produces cars to meet California's air quality standards. Campbell Decl., Ex. 11-12. Plaintiffs also offer evidence that DCAG built a prototype fuel cell vehicle specifically for United Parcel Service ("UPS") to use in California and that DCAG built a fuel cell for the California Fuel Cell Partnership, which DCAG tested by driving 25,000 miles on California roads. Campbell Decl., Ex. 13. DCAG does not deny that it produces cars to meet California's air quality standards or that it built a fuel cell for the California Fuel Cell Partnership. However, DCAG uses plaintiffs' evidence to demonstrate that Mercedes-Benz vehicles sold in California have the same design, including emission-system design, as those sold elsewhere in the United States. Reply at 4. DCAG also does not deny its activities with UPS but contends that its Mercedes-Benz hydrogen fuel cell vehicles in California do not differ in design from those elsewhere in the world and that its Mercedes-Benz hydrogen fuel cell vehicles are not sold to the public in California. *Id.* at 4-5.

*8 Designing a product specifically for the forum market has traditionally been helpful for establishing purposeful availment for specific jurisdiction. "Whether dealing with specific or general jurisdiction, the touchstone remains 'purposeful availment' ... [to] ensure[ ] that 'a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts." ' *Gator.com,* 341 F.3d at 1076 (citing *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1123 (9th Cir.2002)). However, purposeful availment alone is not enough to establish general jurisdiction; the purposeful availment itself must be systematic and continuous. *See, e.g., Asahi Metal Indus. Co. v. Superior Ct. of Cal.,* 480 U.S. 102, 112-13 (1986); *Rockwell Int'l v. Costruzioni Aeronautiche Giovanni Agusta,* 553 F.Supp. 328, 331-32 (E.D.Pa.1982); *see also Calvert,* 875 F.Supp. at 677 (concluding that evidence used to establish specific jurisdiction does not establish general jurisdiction unless it is continuous and systematic). Although plaintiffs' unrefuted evidence establishes that DCAG designed products that could be marketed in California, among other locations, and built prototypes for testing and use on California roads by UPS and others, this purposeful availment is not sufficiently systematic and continuous for the exercise of general jurisdiction.

c. Remaining Contacts

Of the nine contacts that DCAG allegedly has with California, the three remaining are not disputed by the parties, but DCAG contends that they do not support the assertion of general jurisdiction.

First, DCAG is listed on the Pacific Stock Exchange located in San Francisco, which plaintiffs allege gives DCAG countless benefits including access to innovative electronic trading technology, increased liquidity of its assets, and higher corporate visibility. Second, plaintiffs contend that DCAG has pursued enough litigation in California to retain permanent counsel in San Francisco. This litigation includes DCAG initiating actions in the federal courts of California challenging California's clean air laws and initiating additional actions in California to protect its patent rights. Opp'n at 10. Furthermore, DCAG answered a complaint in a case unrelated to this one but within this district and cross-complained after waiving service of process. Opp'n at 10. Third, as a corporate partner in the Global Nature Fund, DCAG has been participating in the Living Lakes Project at Mono Lake in California. Campbell Decl., Ex. 16. Part of this project involved DCAG employees or their family members traveling to Mono Lake to participate in a nature camp in 2003. *Id.*

The single trip by DCAG employees or their family members to Mono Lake, California, as part of DCAG's participation in the Living Lakes Project, cannot be regarded as a contact of continuous and systematic nature. *See Helicopteros,* 466 U.S. at 416 (reasoning that "the one trip to Houston by Helicol's chief executive officer for the purpose of negotiating the transportation-service contract with Consorcio/WSH cannot be described or regarded as a contact of 'continuous and systematic' nature"). Neither is a listing on a stock exchange, without more, sufficient to confer general jurisdiction. *See Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 97 (2d Cir.2000).

*9 The lawsuits that DCAG filed in California courts to challenge California's clean air laws and protect its patents are likely central to DCAG's business functions but do not serve to establish contacts of a continuous and systematic nature sufficient to confer personal jurisdiction. For example, in *Calvert,* the district court determined that the defendant demonstrated a kind of purposeful availment similar to that necessary for the exercise of limited or specific jurisdiction by initiating a lawsuit in a California court. *Calvert,* 875 F.Supp. at 677. However, the court determined that a single defendant-initiated lawsuit does not establish general

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)
(Cite as: 2005 WL 3157472 (N.D.Cal.))

Page 7

jurisdiction because it was neither continuous nor systematic. *Id.* Similarly, in *Soma Medical Int'l v. Standard Chartered Bank,* 196 F.3d 1292, 1296 (10th Cir.1999), defendant bank had filed a small number of financing statements, recorded several instruments, and filed five civil cases in the forum state to recover monies and/or foreclose on trust deeds. The court in *Soma* held that those were not the kinds of activities which courts have found necessary to subject a defendant to general jurisdiction. *Soma Medical Int'l,* 196 F.3d at 1296. While DCAG's lawsuits may be systematic in the sense that they are part of a larger corporate business or litigation plan, there is no evidence of either a larger corporate plan or such continuous and substantial litigation as to justify finding general jurisdiction over DCAG. Furthermore, retaining permanent counsel in California is "the type of ongoing contact needed for general jurisdiction," but this contact alone is not sufficient to establish general jurisdiction over DCAG. *Calvert,* 875 F.Supp. at 677.

d. Conclusion

The court finds that plaintiffs' allegations do not establish that DCAG has continuous and systematic contacts with California. Plaintiffs have failed to establish that DCAG has contacts approximating a physical presence in California. *See, e.g., Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437 (1952) (finding general jurisdiction when president of Philippines-based corporation maintained office, kept company files, held director meetings, distributed salaries, and conducted other company business in the forum state). The contacts that plaintiffs allege in support of their contention that DCAG has continuous and systematic contacts with California are not of the pervasive nature required to find general jurisdiction over DCAG. In *Helicopteros,* for example, the defendant had purchased more than $4 million in equipment from a company in the forum state and sent management and maintenance personnel to receive training at that company in the forum state. *Helicopteros,* 466 U.S. at 411-12. During this seven-year period, the defendant had also negotiated a contract in the forum state and received $5 million in payments from a bank located within the forum state. *Id.* However, the Supreme Court held that these contacts were insufficient for establishing general jurisdiction over the defendant. *Id.* at 418-19.

*10 Plaintiffs have not demonstrated that DCAG has directly invested more in California than the defendant in *Helicopteros.* Plaintiffs also have not demonstrated that DCAG's Pacific Stock Exchange listing, California litigation, participation in the Living Lakes Project, building a fuel cell for UPS, and helping to establish the California Fuel Cell Partnership amount to contacts with the forum state that are greater than those of the defendant in *Helicopteros.* In *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 573-74 (2d Cir.1995) the court found that while the defendant's contacts standing alone were not continuous and systematic, together they were sufficient to establish general jurisdiction. However, this is not the case here: even when DCAG's California contacts are considered as a whole, as the court did in *Metropolitan Life Ins. Co.,* they fall short of establishing the systematic and continuous contacts necessary for this court to have general jurisdiction over DCAG.

3. Agency Relationship with MBUSA

Plaintiffs alternatively contend that DCAG has continuous and systematic contacts with California through MBUSA's contacts. Opp'n at 17. MBUSA has its principal place of business in New Jersey and is wholly-owned by DaimlerChrysler North America Holding Company ("DCNAHC"), a Delaware corporation. DCNAHC is a subsidiary of DCAG. Waskonig Decl. ¶ 8. MBUSA serves the United States market as DCAG's exclusive Mercedes-Benz importer and sales agent for the United States. Waskonig Decl. ¶ 7. Plaintiffs point out that MBUSA is the single largest supplier of luxury vehicles to the California car market, and that over 10 percent of all new vehicle sales in the United States take place in California. [FN5] Furthermore, MBUSA has a regional office in Costa Mesa, California, a Vehicle Preparation Center in Carson, California, and a Classic Center in Irving, California. Campbell Decl., Ex. 19. DCAG does not dispute that MBUSA is subject to general jurisdiction in California but argues that MBUSA's contacts cannot be imputed to DCAG.

> FN5. This point is, however, unsupported by admissible evidence because the web pages provided by plaintiffs supply only unauthenticated hearsay. However, as DCAG does not directly refute this evidence, the court will consider it for purposes of determining whether DCAG has sufficient minimum contacts through MBUSA.

A subsidiary's contacts may be imputed to the parent where the subsidiary is the parent's alter ego or where

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)
(Cite as: 2005 WL 3157472 (N.D.Cal.))

the subsidiary acts as the general agent of the parent. *Rutsky,* 328 F.3d at 1134. How the courts determine whether a subsidiary is an alter ego or agent of the parent has undergone a gradual evolution. *See, e.g., Unocal,* 248 F.3d at 925 (delineating two separate tests for alter ego and agency); *Chan v. Soc'y Expeditions, Inc.,* 39 F.3d 1398, 1405-06 (9th Cir.1994); *Kramer Motors, Inc. v. Br. Leyland, Ltd.,* 628 F.2d 1175, 1177-78 (9th Cir.1980) (finding that day-to-day control over the subsidiary by the parent was required to find a subsidiary to be an alter ego or agent of the parent); *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 422-24 (9th Cir.1977) ("The common law requirements of a 'general agency' demand that such substantial activities be carried on for the benefit of the principal that, in some cases, those same activities may indeed be sufficient to render the principal himself 'present' under the 'continuous and systematic' test of *Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 445-46, 72 S.Ct. 413, 96 L.Ed. 485 (1952).").

a. Alter Ego

*11 To establish that the subsidiary is the alter ego of the parent corporation, the plaintiffs "must make out a prima facie case '(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." ' *Rutsky,* 328 F.3d at 1134 (quoting *Unocal,* 248 F.3d at 926). Plaintiffs do not seek to demonstrate that MBUSA is an alter ego of DCAG.

b. Agency

The Ninth Circuit in *Rutsky* described the agency test:

> To satisfy the agency test, plaintiffs must make a prima facie showing that the subsidiary represents the parent corporation by performing services "sufficiently important to the [parent] corporation that if it did not have a representative to perform them, the [parent] corporation ... would undertake to perform similar services." The agency test permits the imputation of contacts where the subsidiary was either "established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself."

*Rutsky,* 328 F.3d at 1135 (citations omitted) (quoting *Chan v.. Soc'y Expeditions, Inc.,* 39 F.3d 1398, 1405 (9th Cir.1994)). In determining whether a subsidiary satisfies the agency test, the following

factors may be relevant: (1) what percentage of the parent corporation's business comes from the subsidiary; (2) whether the parent corporation's only agent in the United States is the subsidiary; and (3) whether the parent corporation conducts marketing activities in the United States. *Chan,* 39 F.3d at 1406. Furthermore, while a parent corporation's day-to-day control over the subsidiary's activities may contribute to an agency finding, it is not the *sine qua non* of the agency test. *Modesto City Sch. v. Riso Kagaku Corp.,* 157 F.Supp.2d 1128, 1134 (E.D.Cal.2001) (analyzing *Unocal* ); *see also* *Synopsys v. Ricoh Co.,* 343 F.Supp.2d 883, 887 (N.D.Cal.2003). As noted by the Ninth Circuit in *Unocal,* " '[t]he question to ask is not whether the American subsidiaries can formally accept orders for their parent, but rather whether, in the truest sense, the subsidiaries' presence substitutes for the presence of the parent." ' *Unocal,* 248 F.3d at 928-29 (quoting *Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.,* 508 F .Supp. 1322, 1342 (E.D.N.Y.1981)).

Plaintiffs' evidence regarding the factors suggested in *Chan* is inconclusive. Based upon DCAG's declaration that MBUSA is the exclusive distributor of Mercedes-Benz vehicles in the United States, the court can infer that MBUSA must provide a significant amount of business to DCAG through the American automobile market. It is clear that MBUSA is not DCAG's only subsidiary in the United States (or even in California), however, it is certainly a subsidiary that engages in substantial activity by selling Mercedes-Benz products in the United States. Furthermore, DCAG argues that it does no advertising in the United States--all such advertising is performed by its subsidiaries. With regard to day-to-day control, plaintiffs have provided no evidence whatsoever that DCAG exercises operational control over MBUSA.

*12 Thus, the court again turns to the question of whether MBUSA's presence in California "substitutes for the presence of" DCAG. To make this determination, a court should look to the main business of the parent and subsidiary. *See, e.g., Unocal,* 248 F.3d at 929. If the business of the parent is carried out entirely at the parent level, the subsidiary's activities are not imputable to the parent. *Id.* DCAG argues its business is manufacturing Mercedes-Benz vehicles and parts. MBUSA is not involved in this manufacturing but purchases Mercedes-Benz vehicles in Germany (where title passes) and imports them into the United States. Waskonig Decl. ¶ 10. DCAG has no control over the ultimate destination of the products in the United

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)
(Cite as: 2005 WL 3157472 (N.D.Cal.))

States and none of the dealerships at which the vehicles are sold is a subsidiary of Mercedes-Benz. *Id.* DCAG also points out that even before MBUSA (and its predecessor entities) came into existence, independent non-subsidiary companies distributed Mercedes-Benz vehicles in the United States. *Id.* Plaintiffs, on the other hand, argue that without MBUSA or another similar entity to import and sell its products into the United States, DCAG would not be able to sell vehicles in the United States market.

On somewhat analogous facts, a Northern District of California court found an agency relationship between Ricoh Company, a Japanese corporation with no sales in or other direct contacts with California, and Ricoh Corporation, a subsidiary of Ricoh Company that functioned as its main marketing and distribution arm for North and South America. *Synopsys, Inc. v. Ricoh Co., Ltd.,* 343 F.Supp.2d 883 (N.D.Cal.2003). The court found Ricoh Company subject to personal jurisdiction in California and concluded that "it is evident that Defendant's multifaceted operations are necessary to its viability in the forum and represent tasks Defendant would have to perform itself but for the existence of its subsidiaries based in this forum or registered to do business here." *Id.* at 887. In the present case, without MBUSA or another distributor, DCAG would not be able to sell Mercedes-Benz vehicles in California. However, it is not clear that it would be required to perform such functions itself to avail itself of the California, luxury-vehicle market. In contrast, Ricoh Company had three subsidiaries in California and another registered to do business here. It appears the tasks performed by these subsidiaries were ones the court felt Ricoh Company would have had to perform itself but for the existence of its subsidiaries. No evidence suggested these operations were ones that could be performed, for example, by a wholly independent company. Although admittedly a close question, the court concludes that the activities of MBUSA should not be imputed to defendant for the purpose of establishing personal jurisdiction over DCAG.

**B. Reasonableness**

Even assuming the existence of sufficient minimum contacts with the forum state to support the exercise of general jurisdiction, exercise of personal jurisdiction must nonetheless be reasonable. "For jurisdiction to be reasonable, it must comport with 'fair play and substantial justice.' " *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1322 (9th Cir.1998) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S.

462, 476 (1985)). As set forth above, the court considers seven factors in determining whether the exercise of personal jurisdiction is reasonable. *Amoco,* 1 F.3d at 851. DCAG claims that all seven factors militate against the exercise of jurisdiction.

1. Purposeful Interjection into California

*13 The first factor of the scope of defendant's purposeful interjection into the forum state favors exercising jurisdiction. "When a corporation 'purposefully avails itself of the privilege of conducting activities within the forum State,' it has clear notice that it is subject to suit there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980). By initiating lawsuits in California courts to challenge the state's clean air laws and to protect DCAG's patents and other business interests, DCAG has purposefully availed itself of the privilege of conducting business within California. *See Calvert,* 675 F.Supp. at 677 (citing *Vorys, Sater, Seymour, & Pease v. Ryan,* 154 Cal.App.3d 91, 94 (1984)). Additionally, the Supreme Court in *World-Wide Volkswagen* indicated that a corporation demonstrates purposeful availment when the sale of its product "is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other states." *World-Wide Volkswagen Corp.,* 444 U.S. at 297. Given that California consumers account for 10 percent of new vehicles purchased in the United States and that one of DCAG's subsidiaries is the single largest supplier of luxury vehicles to California, it is reasonable to infer that the sale of DCAG's vehicles, including Mercedes-Benz vehicles, in California is not an isolated occurrence but arises from the efforts of DCAG to serve the California market. Thus, on the basis of purposeful availment, exercise of personal jurisdiction over DCAG would not be unreasonable.

2. Burden on DCAG of Litigating in California

The second factor tips in DCAG's favor. None of the events in question occurred in California, and there is no contention that any discovery will be conducted in California nor that any potential witnesses are located here. *See Rocke v. Can. Auto. Sport Club,* 660 F.2d 395, 399 (9th Cir.1981) (concluding that the occurrence of the alleged acts in Canada created substantial burden for the defendant to litigate in California because of the location of potential evidence and witnesses). DCAG will be further burdened because this court will be unable to compel the attendance of any Argentine witness who is not a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)
(Cite as: 2005 WL 3157472 (N.D.Cal.))

party in the case and not a current DCAG employee, for either trial or deposition testimony. *See Doe v. Sun Int'l Hotels, Ltd.,* 20 F.Supp.2d 1328, 1330 (S.D.Fla.1998) (noting, in *forum non conveniens* context, that witnesses who are defendant's employees are under defendant's control); *Duha v. Agrium, Inc.,* 340 F.Supp.2d 787, 796 (E.D.Mich.2004) (noting, in *forum non conveniens* context, that the court cannot compel attendance of unwilling witnesses). Lastly, as DCAG is a German corporation, it may incur unique burdens in defending itself in the United States legal system. *Asahi,* 480 U.S. at 113.

DCAG's burden of having to defend itself under the United States' legal system, however, will likely be minimal as it is a sophisticated, global business, has previously litigated in California, retains permanent counsel in California, and has subsidiaries in California. *See Wiwa,* 226 F.3d at 99 (finding that defendant foreign corporations would not be subject to great inconvenience in litigating in the forum state, despite the fact that the disputed events did not occur in the forum state, because defendants controlled a wealthy and far-flung business empire, had a physical presence in the forum state, had access to enormous resources, faced little or no language barrier, had litigated in the country on previous occasions, had a four-decade long relationship with one of the nation's leading law firms, were the parent companies of one of America's largest corporations, and had to defend themselves in New York City, which was "a major world capital"). It is not clear that the burden on DCAG of litigating in California presents an "inconvenience [that] is so great as to constitute a deprivation of due process." *Caruth v. Int'l Psychoanalytical Ass'n,* 59 F.3d 126, 128-29 (9th Cir.1995). Thus, the burden alone will not overcome otherwise clear justifications for the exercise of jurisdiction. *Id.*

3. Conflict with Sovereignty of Argentina or Germany

*14 Potential conflicts with another state's sovereignty, the third factor, also militate against the exercise of jurisdiction over DCAG. This factor is given greater importance where the events giving rise to the suit occurred on the foreign state's territory and when a foreign state has explicitly voiced a sovereign interest in the case. *See Harris Rutsky,* 328 F.3d at 1133 (finding sovereignty considerations cut against jurisdiction where alleged tortious conduct of British defendants occurred in London); *Pac. Atl. Trading Co., Inc. v. M/V Main Exp.,* 758 F.2d 1325, 1330 (9th

Cir.1985) (finding Malaysia's sovereign interest weighed against jurisdiction "since the contract was executed in Malaysia by Malaysian citizens on forms supplied by a Malaysian bank"). On the other hand, sovereignty considerations are given less importance where the defendant has manifested an intent to serve and benefit from the United States market, for example, where a foreign defendant maintains a continuing business relationship with its United States agent. *Sinatra v. Nat'l Enquirer, Inc.,* 854 F.2d 1199, 1200 (9th Cir.1988). Moreover, "the factor of conflict with the sovereignty of the defendant's state 'is not dispositive because, if given controlling weight, it would always prevent suit against a foreign national in a United States court." ' *Id.* at 1199 (citing *Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1333 (9th Cir.1984)).

In this case, DCAG argues that Germany has expressed concern that this suit may violate its sovereignty rights by delaying service under the Hague Convention. Mot. at 13. Additionally, the conduct giving rise to the suit occurred entirely outside of California. These facts increase the importance of "the conflict with sovereignty factor," while DCAG's manifested intent to serve and benefit from the United States market by maintaining continuing business relationships with its multiple United States subsidiaries decreases its importance. Thus, the court concludes that this factor cuts slightly against the exercise of jurisdiction over DCAG.

4. California's Interest in Adjudicating the Dispute

The fourth factor requires consideration of California's interest in adjudicating the issue. California has little direct interest in adjudicating this suit. None of the plaintiffs is a California citizen, DCAG is not a California corporation, and the DCAG subsidiary allegedly involved in the human rights violations at issue has absolutely no demonstrated connection with California. However, Congress has expressed that human rights violations are the business of federal courts. *See Wiwa,* 226 F.3d at 106 (reasoning, in *forum non conveniens* context, from TVPA legislative history that "Congress has expressed a policy of U.S. law favoring the adjudication of such suits in U.S. courts"); *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 339 (S.D.N.Y.2003). Thus, although the court concludes that California has at least an abstract interest in adjudicating plaintiffs' dispute, its interest is only in a general goal of world-wide preservation of human rights. On balance, this factor weighs against the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 11
Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)
**(Cite as: 2005 WL 3157472 (N.D.Cal.))**

exercise of personal jurisdiction.

5. Absence of an Alternative Forum

**\*15** Although typically listed as the seventh factor in the Ninth Circuit reasonableness analysis, the court next evaluates the absence of an alternative forum because plaintiffs contend that this factor influences the remaining two factors, efficient judicial resolution of the dispute and convenience and effectiveness of relief for plaintiffs. The plaintiffs bear the burden of showing the absence of an alternative forum. *Harris Rutsky,* 328 F.3d at 1133 . [FN6]

> FN6. In performing this evaluation, the court may consider "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed.R.Civ.P. 44.1. Accordingly, the court may consider expert testimony in determining the law of a foreign jurisdiction. *See also Lockman Foundation v. Evangelical Alliance Mission,* 930 F.2d 764, 768 (9th Cir.1991) (moving party may demonstrate adequacy of alternative forum's law through affidavits and declarations of experts); *accord Zipfel v. Halliburton Co.,* 832 F.2d 1477 (9th Cir.1987). DCAG objects to the admissibility of the testimony of plaintiffs' foreign law experts, arguing that plaintiffs' experts' opinions are not adequately supported by the law. DCAG submits competing expert declarations on Argentine and German law. Because the court may consider testimony regarding foreign law irrespective of admissibility, the court considers the foreign law declarations submitted by both sides, but notes plaintiffs' experts' lack of citation to statutory or other legal authority.

Plaintiffs claim that United States courts are the only courts that are empowered to hear their claims against DCAG and that will allow them to obtain "necessary" evidence. Opp'n at 19. In support of this argument, plaintiffs contend that both Argentina and Germany are unsuitable fora and will provide no effective relief for plaintiffs' claims. *Id.* They further contend that there exists no other alternative forum in which plaintiffs can proceed against DCAG and obtain effective relief. *Id.* at 19-20. DCAG, however, asserts that Germany and Argentina provide alternative fora, especially since the Argentine claims process is still open for victims of "Dirty War"

crimes, like the plaintiffs in this case. Mot. at 14-15.

a. Argentina as an Alternative Forum

Plaintiffs allege that they cannot bring their claims against DCAG in the Argentine legal system because Argentine courts do not permit lawsuits against "juridical persons" like corporations and require a court entrance fee of three percent of the total claim, which plaintiffs cannot afford. Ricardo Sans Decl. Opp. DCAG's Mot. ("Sans Decl.") ¶ ¶ 5, 14. Specifically in regard to their claims of human rights violations by DCAG, plaintiffs allege that the Argentine claims process, to which defendant refers, provides relief only for illegal conduct by its government during the "Dirty War" but not for illegal conduct by private parties during that period. *Id.* ¶ 6. In addition, plaintiffs allege that Argentina has amnesty laws protecting entities like DCAG that are accused of committing human rights violations during the "Dirty War." *Id.* ¶ 9. Plaintiffs support their contentions with the declaration of Mr. Monner Sans, their expert on Argentine law. Sans' declaration cites no legal basis for his assertions. *Id.* ¶ 6 ("[T]here are no legal provisions in force under Argentine law to sue a corporation for its responsibility in the violation of human rights.").

DCAG, however, submits expert testimony on Argentine law by Jorge Daniel Ortiz that plaintiffs can bring their claims against DCAG in the Argentine legal system because Argentina courts permit corporations to be sued for "quasi-delicts" or "delicts," which may be either a criminal offense or a civil wrong. [FN7] Ortiz Decl. ¶ ¶ 6-7. DCAG also asserts that Argentina may exempt plaintiffs from paying the court entrance fee through a procedure called "benefit to litigate without affording court fees." *Id.* ¶ 9. Specifically with regard to plaintiffs' human rights claims, DCAG provides citations to statutory authority supporting its contention that Argentina provides causes of action similar to those available in the United States for human rights violations by corporations. *Id.* ¶ 8. Furthermore, DCAG contends that the Argentine amnesty laws to which plaintiffs refer were annulled by the Argentine Congress in August of 2003. *Id.* ¶ 16. The court concludes that DCAG has cited sufficient authorities to refute plaintiffs' contention that they may not bring their claims in Argentina.

> FN7. Pursuant to Article 1072 of the Argentine Civil Code, DCAG's Argentine law expert describes delicts as "every illicit act executed knowingly and with intent to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)
(Cite as: 2005 WL 3157472 (N.D.Cal.))

damage another person or his rights." Pursuant to Articles 1107-1123 of the Civil Code, the expert describes quasi-delicts as illicit acts committed with fault or negligence, including vicarious tort liability imposed upon employers. Jorge Ortiz Decl. Supp. DCAG's Reply ("Ortiz Decl.") ¶ 7.

*16 However, plaintiffs allege that even if they were able to bring their claims in Argentina, they would not be able to obtain evidence necessary to pursue their claims because Argentina cannot order discovery or witness testimony from DCAG, and individuals located in Germany are beyond the reach of Argentine courts. Sans Decl. ¶¶ 5, 15. DCAG, however, claims that plaintiffs would be able to collect and present the evidence necessary to pursue their claims, although this procedure is not termed "discovery" in the Argentine legal system. Ortiz Decl. ¶ 11. Discovery procedures that are not identical to those in the United States but that are nonetheless adequate do not render an alternative forum inadequate. *See Lockman Found. v. Evangelical Alliance Mission,* 930 F.2d 764, 768 (9th Cir.1991) (holding, for *forum non conveniens* motion, that Japanese forum was adequate although discovery procedures were not identical to those in the United States); *Zipfel v. Halliburton Co .,* 832 F.2d 1477, 1484 (9th Cir.1987) (finding, for *forum non conveniens* motion, that Singapore was an adequate forum although depositions were allowed only in certain circumstances); *Mercier v. Sheraton Int'l, Inc.,* 981 F.2d 1345, 1352-53 (1st Cir.1992) (reasoning, for *forum non conveniens* motion, that an alternative forum ordinarily is not considered inadequate merely because its courts afford different or less generous discovery procedures than are available under American rules).

Finally, plaintiffs allege that the Argentine judiciary is subject to rampant corruption, that judicial resolution is severely hindered in various ways, and that the plaintiffs, judges and witnesses involved in the case would likely be subject to violent intimidation. Sans Decl. ¶¶ 10-12. Opp'n at 21-22. They also contend that the Argentine subsidiary of DCAG is a major contributor to Argentina's economy and would thus be subject to favorable treatment by the Argentine courts. Sans Decl. ¶ 8. In response, DCAG submits expert testimony refuting Sans' statement that "the most recent Report on Human Rights of the U.S. State Department" is the 2003 version. Ortiz states that the most recent version is the 2004 Report on Human Rights of the U.S. State Department ("2004 Report"), which lacks "any

reference to reports that security forces are attempting to intimidate the judiciary, witnesses, or human rights organizations." Ortiz Decl. ¶¶ 12-13. Ortiz further points out that the 2004 Report recognizes the Argentine government's continued pursuit of anti-corruption measures and accountability for human rights violations that occurred during the "Dirty War," with a Supreme Court ruling that crimes against humanity were not subject to statutes of limitations. *Id.* ¶ 14.

United States courts "have been reluctant to find foreign courts 'corrupt' or 'biased' " for the purpose of deeming the foreign forum inadequate. *See, e.g., Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukr.,* 311 F.3d 488, 499 (2d Cir.2002) (quoting *Blanco v. Banco Indus. de Venez., S.A.,* 997 F.2d 974, 981-82 (2d Cir.1993)). In *Blanco,* plaintiffs alleged that the Venezuelan justice system contained systemic corruption and was biased in favor of defendants. Furthermore, plaintiffs in *Blanco* submitted evidence of political unrest in Venezuela. The court, however, concluded that Venezuela was a suitable alternative forum because "no convincing showing ha[d] been made of those 'rare circumstances' that render the proposed alternative forum 'clearly unsatisfactory.' " *Blanco,* 997 F.2d at 982 (quoting *Piper Aircraft v. Reyno,* 454 U.S. 235, 254 n. 22 (1981)).

*17 Considering the number of cases that have concluded that the foreign forum is adequate may be helpful in determining the adequacy of alternative fora. *See Blanco,* 997 F.2d at 981-82; *Lockman Found.,* 930 F.2d at 769 n. 3 (considering other courts' findings as to whether alternative forum is adequate). DCAG cites a number of courts that have found Argentina to be a suitable forum, [FN8] however, none of these cases evaluated suitability of the forum in a human rights context. *See, e.g., Wiwa,* 226 F.3d at 88 (recognizing that dismissal of ATCA claims on *forum non conveniens* grounds frustrates Congress' intent to address human rights abuses).

> FN8. *See, e.g., Satz v. McDonnell Douglas Corp.,* 244 F.3d 1279, 1284 (11th Cir.2001) (concerning product liability actions against aircraft manufacturer); *Duha,* 340 F.Supp.2d at 801 (concerning various contract and tort actions arising from employment termination).

The suggestion by DCAG's Argentine law expert that the 2004 Report indicates that judiciary and witnesses in Argentina are not subject to intimidation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)
(Cite as: 2005 WL 3157472 (N.D.Cal.))

is not supported by the text of the report. Most notably, the 2004 Report states, "Threats and beatings allegedly aimed to intimidate witnesses were common and, in some cases, occurred in connection with killings believed committed by members of security forces or their criminal allies," and "[t]here were credible allegations of efforts by members of security forces and others to intimidate the judiciary and witnesses ... [with] [a]llegations of corruption in provincial courts ... more frequent than at the federal level, reflecting strong connections between some of the governors and judicial powers in their provinces." Ortiz Decl., Ex. A at 5.

These persisting conditions cause the court concern. The question is whether this concern is sufficient to find the Argentine forum inadequate. For the court to find an alternative forum inadequate, that forum must be characterized by a complete absence of due process or an inability of the forum to offer any satisfactory remedy. *See, e.g., Rasoulzadeh v. Associated Press,* 574 F.Supp. 854, 861 (S.D.N.Y.1983), *aff'd,* 767 F.2d 908 (2d Cir.1985) (mem.); *see also Piper Aircraft,* 454 U.S. at 254. Here, the plaintiffs are asserting human rights violations by a corporation in cooperation with the Argentine military. Although there is a possibility that the Argentine security forces may want to keep certain witnesses from testifying to DCAG's alleged acts, plaintiffs have not alleged a strong rationale for why witnesses in a case against the corporation might be subject to such treatment.

DCAG has convincingly argued that plaintiffs would be able to file similar claims to those asserted here, obtain the equivalent of adequate discovery, and receive appropriate damages. Even in light of the potential intimidation, plaintiffs have not made out a prima facie case that "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft,* 454 U.S. at 254. Thus, Argentina provides plaintiffs an alternative forum, although, as set forth in further detail below, it may not be the most favorable forum for obtaining relief.

b. Germany as an Alternative Forum

**\*18** Plaintiffs also contend that they cannot bring their claims in German courts because German courts fail to recognize either human rights actions against corporations or equitable tolling, without which plaintiffs' claims would be barred by the statute of limitations. Opp'n at 22; Wolfgang Kaleck Decl. Opp. DCAG Mot. ("Kaleck Decl.") ¶ 5. Plaintiffs

additionally contend that Argentine citizens will not have access to German courts for the purpose of filing suit against a German corporation for its illegal actions in Argentina. Kaleck Decl. ¶ 5. Even if plaintiffs were able to file suit in Germany, plaintiffs point out that German courts cannot order document production. *Id.;* Opp'n at 19-20, 22-23. [FN9] DCAG denies plaintiffs' assertion that German courts fail to recognize human rights actions against corporations, contending that German courts recognize causes of action for human rights violations similar to those recognized in the United States. Stefan Rutzel Decl. Supp. DCAG's Reply ("Rutzel Decl.") ¶ ¶ 6-26. DCAG's German law expert, Dr. Stefan Rutzel, further concludes that "none of [plaintiffs'] relevant causes of action causes an exclusive jurisdiction of a court which would bar the jurisdiction of the German court." *Id.* ¶ 6. Of significance, however, DCAG does not refute plaintiffs' contention that their actions would be barred by the statute of limitations in Germany.

> FN9. Plaintiffs contend that DCAG made these arguments before the German courts in their effort to halt service of process under the Hague Convention. Aside from their expert's assertion, there is no other evidence on the record that this is so.

Preclusion of a claim by the alternative forum's statute of limitations renders the alternative forum inadequate. *See Miracle v. N.Y.P. Holdings, Inc.,* 87 F.Supp.2d 1060 (D.Haw.2000); *Crimson Semiconductor, Inc. v. Electronum,* 629 F.Supp. 903, 909 (S.D.N.Y.1986) (ruling, in *forum non conveniens* motion, that foreign forum was unsatisfactory where statute of limitations bar in foreign forum did not simply go to the merits of plaintiffs' claim or to the quantum of damages but to the very existence of the claim). In the present case, undisputed expert testimony suggests that the assertion of plaintiffs' claims in Germany would be barred by the lack of equitable tolling provisions for this type of claim under German law. Thus, Germany does not appear to be an alternative forum available to the plaintiffs.

6. Efficient Judicial Resolution of the Dispute

The court next evaluates the efficiency of alternative fora. Here, as set forth above, that alternative forum is Argentina. In evaluating this factor, courts have looked primarily at where the witnesses and evidence are likely to be located. *Ziegler v. Indian River County,* 64 F.3d 470, 475-76 (9th Cir.1995) (quoting *Core-Vent Corp. v. Nobel Indus. AB,* 11 F.3d 1482,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)
(Cite as: 2005 WL 3157472 (N.D.Cal.))

1489 (9th Cir.1983)). As noted earlier, it is undisputed that plaintiffs' alleged injuries did not occur in California, and plaintiffs do not contend that relevant evidence is located in California. Thus, a consideration of the location of the dispute and evidence does not initially favor California as the proper forum.

*19 Plaintiffs also argue that this court provides the most efficient forum because proceedings here will be conducted in English. Opp'n at 20. According to plaintiffs, DCAG officially conducts business in English, thus making it efficient for the parties to adjudicate this dispute in United States courts versus Argentine courts. *Id.* Were the dispute to be adjudicated in Argentina, DCAG's evidence would have to be translated into Spanish. Even assuming that DCAG conducts business in English, however, this does not account for the fact that plaintiffs are all Spanish speakers and that many of the alleged events occurred in Argentina. Thus, if adjudicating in the United States, all Spanish language evidence would need to be translated into English. This argument does not support plaintiffs' contention that the United States provides the most efficient forum for resolution of this dispute.

However, the court notes that the 2004 Report states "while the judiciary is nominally independent and impartial, some judges and judicial personnel were inefficient and, at times, subject to, and apt to exercise political manipulation. [ ] The system was hampered by inordinate delays, procedural logjams, changes of judges, inadequate administrative support, and incompetence." Ortiz Decl., Ex. A at 4. Thus, DCAG's own evidence supports a conclusion that this court would provide the more efficient and trustworthy judicial system for resolution of the present dispute. On the other hand, the witnesses and evidence are not located here but are located in Argentina. This factor is difficult to balance.

7. Convenient and Effective Relief to Plaintiff

Consideration of convenient and effective relief to plaintiffs favors jurisdiction, although it is generally not given as much weight as the other factors. *See Panavision,* 141 F.3d at 1316; *Core-Vent,* 11 F.3d at 1490. As before, plaintiffs contend that only United States courts will hold DCAG accountable for its alleged participation in the "Dirty War." Thus, plaintiffs conclude that this forum will provide them with the most convenient and effective relief. Although this court does not agree with plaintiffs' contention that the United States is the only adequate

forum for their claims and, in fact, has found that Argentina presents an alternative forum for plaintiffs' claims, the possibility of plaintiffs encountering intimidation in Argentina for bringing a human rights suit involving actions by the Argentine government during its "Dirty War" tips this factor in favor of plaintiffs.

8. Conclusion

Although the question is a close one, the court tentatively concludes that this court does not have personal jurisdiction over DCAG. However, before making a final decision, limited jurisdictional discovery will be allowed on whether an agency relationship exists between DCAG and MBUSA and the ability of plaintiffs to pursue their claims in Germany (e.g., is the claim barred by the statute of limitations?) or Argentina (e.g. does Argentine law allow human rights claims against private parties acting in concert with the government?)

III. ORDER

*20 For the foregoing reasons, the court tentatively grants DCAG's motion to dismiss for lack of personal jurisdiction. However, before making a final decision, limited jurisdictional discovery may be undertaken. The parties may each submit up to twenty-five interrogatories and a narrowly tailored set of requests for production on the jurisdictional issues. A further hearing on the motion is hereby set for March 24, 2006, at 9:00 a.m. Any further briefing by plaintiff must be submitted by March 3, 2006, and any further briefing by defendant by March 10, 2006.

Not Reported in F.Supp.2d, 2005 WL 3157472 (N.D.Cal.)

END OF DOCUMENT

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3260162 (N.D.Cal.)
**(Cite as: 2005 WL 3260162 (N.D.Cal.))**

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
AGILENT TECHNOLOGIES, INC., Plaintiff,
v.
ELAN MICROELECTRONICS CORPORATION, et
al., Defendants.
**No. C 04-05385 JW.**

Nov. 29, 2005.

Morgan Chu, Alan J. Heinrich, Richard Elgar Lyon, III, Samuel Kai Lu, Irell & Manella LLP, Los Angeles, CA, David Craig Mcphie, Newport Beach, CA, for Plaintiff.

Elizabeth H. Rader, Akin Gump Strauss Hauer & Feld LLP, East Palo Alto, CA, for Defendants.

ORDER DENYING DEFENDANT ELAN
MICROELECTRONICS' MOTION TO DISMISS

WARE, J.

## I. INTRODUCTION

**\*1** Agilent Technologies, Inc., ("Agilent" or "Plaintiff") brings this action against Elan Microelectronic Corp., ("Elan") and Elan Information Technology Group ("EITG") for patent infringement. Currently before this Court is Elan's Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2). (*See* Docket Item No. 16, hereafter, "Motion"). On August 22, 2005, the Court conducted a hearing on the motion. Based upon the arguments presented during the hearing and submitted in the briefs, the Court DENIES Elan's Motion to Dismiss.

## II. BACKGROUND

Agilent is a Delaware Corporation with its principal place of business in Palo Alto, California. Agilent is the sole owner by assignment of U.S. Patent No. 6,433,780 (the '780 patent), entitled "Seeing Eye Mouse for a Computer System," and U.S. Patent No. 5,786,804 (the '804 patent), entitled "Method and System for Tracking Attitude." (Complaint ¶ 8, 11.) Agilent alleges that Defendants have infringed and are infringing both patents by making, using, selling or offering to sell within the United States inventions protected by one or more claims of the patents. (Complaint ¶ 9, 12.)

Defendant Elan is a Taiwanese Corporation with its principal place of business in Hsin-Chu, Taiwan. (Complaint ¶ 2.) Elan's primary business is the design and marketing of consumer integrated circuits ("IC"). (Motion at 3.) Elan manufactures these IC products in Taiwan but maintains a worldwide network of sales channels and technical support groups, including one in North America. *Id.* EITG is Elan's wholly-owned subsidiary in North America with its principal place of business in Saratoga, California. (Complaint ¶ 3.)

Plaintiff asserts the following jurisdictional facts. Elan founded EITG in 2001. Elan sells and markets its products in the United States through EITG. Elan advertises on its website that in all its regions, including North America, it provides local technical and commercial support through its subsidiary. (Declaration of David C. McPhie in Support of Agilent Technologies, Inc.'s Opposition to Motion to Dismiss Elan Microelectronics Corporation For Lack of Personal Jurisdiction, hereafter, "McPhie Decl." Ex. 11.) The percentage of Elan's total sales directed to the U.S. has been substantial, reaching as high as about 40%, or tens of millions of U.S. dollars each year. (Opp'n at 11.) Elan has jointly developed the products at issue in this litigation with a California corporation. Significantly, the optical mice containing the alleged infringing products are sold in California. (*Id.*)

In addition, Yueh-O Yu ("Ms.Yu"), Elan's cofounder, chief engineer, and head of research and development (R & D) has traveled to California to serve as President and registered agent of EITG (McPhie Decl. Exs. 2, 12.) In this capacity, Ms. Yu was responsible for overseeing training of Elan's engineers from Taiwan and taking charge of technology transfer of advanced "know-how to Elan" in the United States. (McPhie Decl. Ex. 2.) There is also an allegation of overlapping board membership between the two companies.

## III. STANDARDS

**\*2** Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may seek dismissal of an action brought against him on the basis that personal jurisdiction over him is lacking. Once a defendant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3260162 (N.D.Cal.)
**(Cite as: 2005 WL 3260162 (N.D.Cal.))**

challenges jurisdiction, the plaintiff has the burden of establishing that the court has personal jurisdiction over a defendant. *See Rio Properties, Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1019 (9th Cir.2002); *Doe v. Unocal Corp.,* 248 F.3d 915, 923 (9th Cir.2001).

The court may obtain personal jurisdiction over a defendant if it finds that either general or specific jurisdiction exists. General jurisdiction requires that a defendant engage in "systematic and continuous contacts" with California. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Specific jurisdiction is appropriate when a foreign defendant's less substantial contacts with the forum give rise to the causes of action in the suit. *Hanson v. Denckla,* 357 U.S. 235, 250, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

## IV. DISCUSSION

Agilent contends that Elan is subject to personal jurisdiction under multiple theories. Agilent contends the Court has general jurisdiction over Elan because Elan has had continuous and systematic business dealings in California, including the creation of its North American sales, research, development, and support hub in Silicon Valley. (Opp'n at 2.) Alternatively, Agilent contends the Court has specific jurisdiction over Elan based on the development efforts of the accused products in California and the purposeful release of those products through established distribution channels, resulting in sales within the forum. (*Id.*)

Elan contends that the majority of the facts asserted in Agilent's opposition and accompanying declarations are nothing more than hearsay snippets from a variety of websites. Moreover, while Elan does not dispute that Elan products are sold in the United States, it argues that this merely establishes jurisdiction over its American subsidiary, EITG, which distributes and markets the products, not the Taiwanese parent company. (Rely at 3.)

The Court finds that there is sufficient basis to exercise specific jurisdiction over Elan, and therefore, will not address Agilent's other theories for jurisdiction.

Three criteria are used to determine whether specific jurisdiction exists. First, the defendant must make such contact with the forum state that would constitute purposeful availment. *See McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 816 (9th Cir.1988); *Federal Deposit Ins. Corp. v. British-*

*American Ins. Co., Ltd.,* 828 F.2d 1439, 1442 (9th Cir.1987). This requirement aims to ensure that a defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into its court. *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1397 (9th Cir.1986) (*citing Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). Second, the litigation must arise out of that contact with the forum state. *McGlinchy,* 845 F.2d at 816. Third, the exercise of jurisdiction must be reasonable. *Id.*

### A. *Purposeful Availment.*

**\*3** Under the first prong of the specific jurisdiction test, Agilent must establish that Elan either purposefully availed itself of the privilege of conducting activities in the Northern District of California, or purposefully directed its activities toward the Northern District of California. In this case, Agilent alleges that Elan has joined with Peripheral Imaging Corporation ("PIC"), a San Jose-based company to develop the alleged infringing optical sensor. (McPhie Decl. Ex. 15.) Elan touts that its investment in PIC has enabled it to design a CMOS senor for an optical mouse. (*Id.* Ex. 35.) Further, in a 2004 financial statement, Elan reports that it "executed a joint development contract [with PIC] on optical mouse ... whereby when [Elan] uses this technology to make and sale products, it must pay royalties to PIC based on a certain percentage of the gross profits." (*Id.* Ex. 48, 49, 54.) Royalties paid by Elan to PIC under this contract have exceeded one million U.S. dollars in the first three quarters of 2004. (*Id.*) The Court finds that these allegations support the contention that Elan purposefully sought a partnership with a California company to develop the alleged infringing sensor.

Elan contends that it does not sell its products directly into the United States and does not import its products into the United States. However, during oral argument, counsel for Elan admitted to the Court that EITG directly purchases products from Elan and turns around to sale them to California companies. This seems to support Agilent's allegation that Elan has deliberately and willfully directed its products toward California through sales. (Complaint ¶ 9.) At the very least, the Court finds that Elan has caused its products to be imported into the United States, specifically to the Northern District of California.

Elan's contends that the majority of jurisdictional facts asserted by Plaintiff are hearsay and are not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 3
Not Reported in F.Supp.2d, 2005 WL 3260162 (N.D.Cal.)
**(Cite as: 2005 WL 3260162 (N.D.Cal.))**

sufficiently supported by accompanying evidence. However, the Federal Circuit has held that "hearsay bear[ing] circumstantial indicia of reliability" may be admitted for purposes of determining whether personal jurisdiction exists. *Beverly Hills Fan Co. v. Royal Soverign Corp.,* 21 F.3d 1558, 1562 (Fed.Cir.1994). Elan makes no evidentiary claims as to the nature of the alleged hearsay. As the Ninth Circuit has held, when a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, a plaintiff needs only make a prima facie showing of the jurisdictional facts to withstand the motion. *Unocal,* 248 F.3d at 922. In order to make a prima facie showing, a plaintiff must allege facts which, if true, would be sufficient to establish personal jurisdiction. *Id.* If not directly controverted, a plaintiff's version of the facts is taken as true for the purposes of the motion. *Id.* Conflicts between the facts stated in the parties' affidavits must be resolved in plaintiff's favor during a prima facie jurisdictional analysis. *Dole Food Co., Inc. v. Watts,* 303 F.3d 1104, 1108 (9th Cir.2002). In this case, the jurisdictional facts asserted all come from Elan's own marketing materials and as well as other public documents, such as its website. The Court finds that at the pleading stage, the alleged jurisdictional facts present sufficient circumstantial indicia of reliability to determine personal jurisdiction over Elan.

**\*4** In addition, Elan is correct in asserting that Plaintiff must prove facts outside of a subsidiary relationship for this Court to establish personal jurisdiction Elan. The Ninth Circuit has held that "[t]he existence of a parent-subsidiary relationship is insufficient to establish personal jurisdiction over companies." *Transure, Inc. v. Marsh and McLennan, Inc.,* 766 F.2d 1297, 1299 (9th Cir.1985). The jurisdictional analysis depends on the corporate relationship between the parent and its subsidiary. "Jurisdictional contacts of a subsidiary corporation should be imputed to the corporate parent when the subsidiary corporation is engaged in functions that, but for the existence of the subsidiary, the parent would have to undertake." *Gallagher v. Mazda Motor of America, Inc.,* 781 F.Supp. 1079, 1085 (E.D.Pa.1992.)

 As counsel for Elan represented to the Court during oral argument, EITG, Elan's subsidiary, gets its products directly from Elan. If EITG did not exist, Elan would have to undertake direct sales with its clients in the United States, particularly in California. As Elan public marketing documents tout, Elan wholly-owned subsidiary EITG serves as the North American hub for Elan's "worldwide network of sales channels and technical support." (McPhie Decl. Exs. 6, 7, 48, 49.) But for the existence of EITG, Elan would have to provide local technical support, research and development, and sales to its customers in this district. These circumstantial jurisdictional facts support the proposition that EITG's activities may be imputed to Elan.

 The activities and relationship between Elan and EITG as alleged establish a prima facie showing of jurisdiction facts. The Court finds that Elan has both availed itself of the privilege of conducting activities in the Northern District of California and purposefully directed its activities toward this district.

 B. *Plaintiff's Claims and Defendant's Forum Activities.*

 The second prong of the test for specific jurisdiction requires that the claim against the defendant be one which "arises out of" or relates to the defendant's forum-related activities. This factor is measured in terms of "but for" causation. *See Panavision International v. Toeppen,* 141 F.3d 1316, 1322 (9th Cir.1998). The court asks whether the action would exist but for the contacts. Agilent contends that Elan infringes its patents by marketing and selling the alleged infringing products in California. But for the injury that Agilent, a California-based company, suffered in California from Elan's infringing activity, Agilent would not have a cause of action against Elan. Therefore, Agilent's patent infringements action against Elan arises out of Elan's alleged activities directed at California.

 C. *Reasonableness of Jurisdiction.*

 The third prong of the test for specific jurisdiction provides that the exercise of personal jurisdiction must comport with fair play and substantial justice. The Ninth Circuit has held that a lesser showing of contacts with the forum may be sufficient if considerations of reasonableness so require. *Haisten,* 784 F.2d at 1397. Seven factors are considered in assessing reasonableness of jurisdiction: (1) the extent of defendant's purposeful interjection into the forum; (2) the burden on the defendant of litigating in the forum; (3) the extent of conflict with the sovereignty of defendant's state; (4) the forum state's interest in adjudicating the issue; (5) the most efficient judicial resolution of the dispute; (6) the importance of the forum to plaintiff's interest in convenient and fair relief; and (7) the existence of an alternate forum. *Federal Deposit Ins. Corp. v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3260162 (N.D.Cal.)
**(Cite as: 2005 WL 3260162 (N.D.Cal.))**

Page 4

_British-American Ins. Co., Ltd.,_ 828 F.2d 1439, 1442 (9th Cir.1987); _Core-Vent Corp. v. Nobel Industries,_ 11 F.3d 1482, 1487-88 (9th Cir.1993). Of the seven factors to be considered in an assessment of reasonableness of jurisdiction, no single factor is dispositive and a court must balance all seven. _Cor-Vent Corp.,_ 11 F.3d 1482 at 1488.

**\*5** There is a presumption that jurisdiction is reasonable so long as the first two prongs of the specific jurisdiction test have been met. _Haisten v. Grass Valley Medical Reimbursement,_ 784 F.2d 1392, 1397 (9th Cir.1986). For example, once a plaintiff has established purposeful availment and shown that its claims arise out of defendant's purposeful contacts, defendant must present a compelling case of the unreasonableness of jurisdiction in order to defeat jurisdiction. _Schwarzenegger v. Fred Martin Motor Co.,_ 374 F.3d 797, 802 (9th Cir.2004).

In arguing that an exercise of jurisdiction is unreasonable, Elan's primary argument rests with the burden of litigation in California because it is Taiwanese company. (Reply at 11.) The Ninth Circuit has held that unless such inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction. _Caruth v. International Psychoanalytical Ass'n,_ 59 F.3d 126, 128-129 (9th Cir.1995). In this case, Elan's purposeful interjection into the forum state favors jurisdiction because as described above, Elan's alleged wrongful activities were and still are directed at California.

Elan's status as a foreign company slightly weighs in its favor with respect to the burden factor. However, "when minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." _See Asahi Metal Industry Co. V. Superior Court,_ 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Here, Elan maintains a subsidiary in Saratoga, California. Its cofounder, chief-engineer, and head of R & D, Ms. Yu, has traveled to California to serve as President and registered agent of EITG. (McPhie Decl. Exs. 2, 12.) In these capacities, Ms. Yu was responsible for overseeing training of Elan's engineers from Taiwan and taking charge of certain technology transfer in the United States. Ms. Yu's role as President of EITG is not insignificant; it goes to Agilent's contention that Elan and EITG are closely connected. With its subsidiary in the Northern District, and the fact that its cofounder has readily

traveled to California to foster its business, the burden on Elan to defend the litigation lessens.

The third factor, potential conflicts with another state's sovereignty, is given greater importance where the events giving rise to the suit occurred on the foreign state's territory. In this case, Elan has not argued that California's sovereignty conflicts with another state's authority. Elan does not dispute that the events giving rise to the suit occurred in California. Therefore, this case does not give rise to potential conflicts with Taiwanese's sovereignty.

California's interest in adjudicating this case is significant and thus, weighs toward the Plaintiff. The accused product is in fact directed toward the United States and California markets. Elan maintains a continuous business relationship with the United States through its office in Saratoga. Elan directs its customers in North America to contact EITG for products and services. Elan list of customers includes several large American and Californian companies. These facts clearly outweigh the burden of subjecting Elan to litigation in this state. _See Beverly Hills Fan Co. v. Royal Soverign Corp.,_ 21 F.3d 1558, 1568 (Fed.Cir.1994). A forum state has the power to settle issues that arise within its boundaries, and between its companies and the companies that do business with it. _Id._

**\*6** Agilent's interest in a convenient and fair relief for the alleged infringement is important. Agilent, being a California corporation, has rightfully elected its forum state to redress a wrong. If the allegations are true and the case is resolved in Agilent's favor, properly enforcing an award would necessitate an American court and enforcement mechanism. Given that Agilent and one of Elan's subsidiaries are located in the Silicon Valley, the convenience factor weighs in favor of Agilent.

The last factor in the reasonableness prong is to consider whether there is an alternate forum. Again there are multiple factors which weigh in favor of Plaintiff's chosen forum. The Plaintiff and one of the Defendants are located in California. The alleged infringing products are produced and sold in California. It appears that California would be the most obvious and least taxing forum for all parties affected by this litigation. Elan contends that it would have to retain counsel for this forum. Perhaps this would create a minor inconvenience for Elan, however, it pales in comparison to the difficulties Plaintiff would encounter in Taiwan, where it has no contacts whatsoever.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 2005 WL 3260162 (N.D.Cal.)
**(Cite as: 2005 WL 3260162 (N.D.Cal.))**

Weighing all the factors, the Court finds that it is reasonable to subject Elan to personal jurisdiction in the Northern District.

### V. CONCLUSION

Defendant Elan Microelectronics' Motion to Dismiss for Lack of Personal Jurisdiction is DENIED.

The parties shall appear for a case management conference on Monday, January 9, 2006 at 10 a.m. Pursuant to the Civil Local Rules of this Court, the parties shall submit a joint case management statement no later than ten (10) days before the date of the conference.

Not Reported in F.Supp.2d, 2005 WL 3260162 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.                                                                                     Page 1
Not Reported in F.Supp., 1997 WL 539763 (E.D.Pa.)
**(Cite as: 1997 WL 539763 (E.D.Pa.))**

c

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
SOUTHERN OCEAN SEAFOOD COMPANY
v.
HOLT CARGO SYSTEMS, INC.
**No. CIV.A. 96-5217.**

Aug. 11, 1997.

Matthew A. Taylor, Taylor & Taylor, Phila, PA,
Robert W. Ayling, James T. Hannink, Gray, Cary,
Ware and Freidenrich, San Diego, CA, Matthew A.
Taylor, Taylor & Taylor, Phila, PA, for Southern
Ocean Seafood Company, Plaintiff.

Joann Hile, Pepper, Hamilton & Scheetz, Phila, PA,
for Holt Cargo Systems, Inc., Defendant.

MEMORANDUM

O'NEILL, Senior District J.

*1 Plaintiff Southern Ocean Seafood Company
("SOS"), a New Zealand corporation, brought this
action against Holt Cargo Systems ("Holt") to
recover payment under a guarantee agreement which
provided that Holt would be liable to SOS for the
debts of Dockside International Fish Co., Inc.
("Dockside") under a distributorship agreement
between SOS and Dockside. Jurisdiction is based on
diversity of citizenship and the requisite amount in
controversy.

Holt and Dockside filed an answer asserting nine
counterclaims against SOS, its corporate parent
Salmond Smith Biolab ("SSB"), and three other New
Zealand entities, Chatham Processing Limited
("Chatham"), Karamea Holdings Limited
("Karamea"), and Treaty of Waitangi Fisheries
Commission ("TOWFC"). The counterclaims arise
out of a series of transactions in which TOWFC and
Karamea acquired control of SSB and SOS and
negotiated a transfer of SOS's fishing rights to
Chatham, disrupting the distributorship arrangement
between SOS and Dockside.

In Counts I and II Dockside alleges that SOS
breached the distributorship agreement between SOS
and Dockside and the duty of good faith and fair

dealing arising under that agreement.

In Count III and IV Holt alleges that SOS breached
an agreement to arbitrate disputes arising under the
guarantee agreement and breached a duty of good
faith and fair dealing.

In Counts V, VI and VII Dockside alleges that SSB,
Chatham, Karamea and TOWFC intentionally
interfered with the distributorship agreement between
SOS and Dockside and with Dockside's contractual
relations with customers in the United States.

In Counts VIII and IX Dockside alleges that SOS
and SSB are liable for fraud and negligent
misrepresentation for failing to disclose the events in
New Zealand that disrupted the arrangements under
the distributorship agreement.

Counterclaim defendants moved to dismiss or strike
the counterclaims. In considering their challenges to
the Court's jurisdiction I must review the evidence
and resolve questions of jurisdictional fact. _Robinson
v. Dalton,_ 107 F.3d 1018, 1021 (3d Cir.1997). In
considering their motions to dismiss the
counterclaims for failure to state a claim I must
accept as true the well-pleaded factual allegations in
the counterclaims, construe them in the light most
favorable to counterclaim plaintiffs, and dismiss the
counterclaims only if counterclaim plaintiffs could
not prevail under any set of facts that could be proved
consistent with their allegations. _Hishon v. King &
Spalding,_ 467 U.S. 69,73, 104 S.Ct. 2229, 81 L.Ed.2d
59 (1984); _Colburn v. Upper Darby Township,_ 838
F.2d 663, 664-65 (3d Cir.1988).

I. Intervention

Counterclaim defendants contend that Dockside is
not entitled to assert counterclaims because it has not
moved to intervene pursuant to Federal Rule of Civil
Procedure 24(c). Rule 24(c) provides that "a person
desiring to intervene shall serve a motion to intervene
upon the parties.... The motion shall state the grounds
therefor and shall be accompanied by a pleading
setting forth the claim or defense for which
intervention is sought." Dockside's pleadings,
although not styled as a Rule 24(c) motion to
intervene, clearly state the grounds for intervention
and the claims for which intervention is sought.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 2
Not Reported in F.Supp., 1997 WL 539763 (E.D.Pa.)
**(Cite as: 1997 WL 539763 (E.D.Pa.))**

**\*2** Under Rule 24(b)(2), "[u]pon timely application anyone may be permitted to intervene in an action ... when an applicant's claim or defense and the main action have a question of law or fact in common." Dockside's claims, which arise from the distributorship agreement, have questions of law and fact in common with the main action in which Holt's liability as a guarantor of Dockside's debts turns on Dockside's debts and liabilities under the distributorship agreement. Because Dockside's pleadings notify all parties of the facts warranting Dockside's intervention, it would not serve the interests of "the just, speedy and inexpensive determination of this action" to require further motions on the subject. See Fed .R.Civ.P. 1. Dockside may assert its counterclaims.

## II. Joinder

### A. Joinder of Counterclaim Defendants

Counterclaim defendants object to the assertion of claims against SSB, Chatham, Karamea and TOWFC who have not been joined with SOS as parties to this action. Federal Rule of Civil Procedure 13(h) provides that "[p]ersons other than those made parties to the original action may be made parties to a counterclaim ... in accordance with ... [Fed.R.Civ.P.] 20." Rule 20(a) provides that "[a]ll persons ... may be joined in one action ... if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action." The counterclaims alleged against SSB, Chatham, Karamea and TOWFC arise out of the same events as the counterclaims against SOS and involve common questions of law and fact. These counterclaims are appropriately resolved in the same action. I will exercise my discretion under the Federal Rules to permit Holt and Dockside to join SSB, Chatham, Karamea and TOWFC as additional counterclaim defendants in their counterclaims against SOS. See In re Texas Eastern Transmission Corp., 15 F.3d 1230, 1237 n. 5 (3d Cir.1994).

However, under Rule 13(h) a counterclaim "may not be directed solely against persons who are not already parties to the original action, but must involve at least one existing party." FDIC v. Bathgate, 27 F.3d 850, 873 (3d Cir.1994). In Counts V and VI Dockside seeks to assert counterclaims solely against parties other than SOS. I will therefore dismiss Counts V and VI.

### B. Joinder of SSB as an Indispensable Party Plaintiff

Holt moves, under Federal Rule of Civil Procedure 19, to join SSB as an indispensable party or to dismiss SOS's claim against Holt for failure to join an indispensable party. Rule 19(a) provides that a person:

> shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

**\*3** Holt contends that it believes that SSB "owns [the] claim" asserted by SOS under the guarantee agreement, and thus that SSB's absence from the action will subject Holt to the risk of incurring double or inconsistent obligations under the guarantee agreement it entered with SOS. Holt avers that its "only interest is that the proper plaintiff or plaintiffs be made parties to this action."

A "non-party to a commercial contract ordinarily is not a necessary party to an adjudication of rights under the contract." Conntech Dev. Co. v. University of Conn. Educ. Properties, Inc., 102 F.3d 677, 682 (2d Cir.1996); Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1043 (9th Cir.1983). While Holt identifies communications suggesting that SSB has interests under the guarantee agreement, SSB has submitted an affidavit disclaiming any interest under the guarantee agreement and confirming those interests belong to SOS. SSB attests:

> SSB does not claim the right to receive funds from Holt Cargo Systems, Inc. under the Guarantee, or the right to receive funds from Dockside under the Distributorship Agreement entered into between Southern Ocean Seafood Company and Dockside. SSB acknowledges that such rights are held by ... Southern Ocean Seafood Company. [FN1]

> FN1. Plaintiff's Opposition, Ex. C. The affiant identifies SOS as "New Zealand King Salmon Company, which before June 1996 was known as Southern Ocean Seafood Company." Changes in the parties' names, which may affect proper captioning of the case, are not material to the joinder

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                   Page 3
Not Reported in F.Supp., 1997 WL 539763 (E.D.Pa.)
**(Cite as: 1997 WL 539763 (E.D.Pa.))**

issues before the Court.

Moreover, SOS attests that the debt from Dockside which gives rise to Holt's obligations under the guarantee agreement remains a receivable payable to SOS, confirming that the liabilities between Holt and SOS, which did not originally involve SSB, have not subsequently been assigned to or otherwise acquired by SSB. Plaintiff's Opposition, Ex. B.

Joinder is warranted based on a non-party's interests only where "the absent party claim[s] a legally protected interest relating to the subject matter of the action." *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 49 (2d Cir.1996). It is not warranted where, as here, the absent party "has clearly declined to claim an interest in the subject matter of the dispute," *Conntech,* 102 F.3d at 683, or has "expressly disclaimed" such an interest. *Boczon v. Northwestern Elevator Co., Inc.,* 652 F.Supp. 1482, 1486 (E.D.Wis.1987) (citations omitted); *Seiler v. E.F. Hutton Co., Inc.,* 102 F.R.D. 880, 883-84 (D.N.J.1984).

Because Rule 19 requires a "substantial risk" of double liability based on "the practical and not the theoretical," SSB's potential interests do not justify its joinder where it "has filed an affidavit ... disclaiming any interest." *Morgan Guar. Trust Co. of New York v. Martin,* 466 F.2d 593, 597 (7th Cir.1972). In this case where both SOS and SSB attest on the record that SOS owns the claim and SSB does not, their statements, which I regard as judicial admissions, "foreclose any 'substantial risk' " that Holt will incur double liability if SSB is not made a party to the claim by its subsidiary against Holt. *Id.* [FN2] SSB is neither necessary nor indispensable to resolution of the claims between SOS and Holt. [FN3] I will deny Holt's motion to join SSB as a party plaintiff and its alternative motion to dismiss SOS's claim for failure to join an indispensable party. [FN4]

>   FN2. The fact that SSB, before withdrawing its proposed stipulation, considered stipulating that the benefits of the agreement would "inure to" SSB does not undermine the effect of its admission on the record disavowing the claim.

>   FN3. Under Rule 19(b) a person is indispensable if it satisfies the requirements of Rule 19(a) and "in equity and good conscience" the action should not proceed in that party's absence.

>   FN4. Because joinder is not warranted under Rule 19 I need not decide whether SSB would satisfy Rule 19(a)'s mandate that the person to be joined be "subject to service of process." SSB has not challenged the basis for personal jurisdiction.

### III. Subject Matter Jurisdiction Over TOWFC and Chatham

**\*4** TOWFC and Chatham contend that they are immune from this Court's subject matter jurisdiction pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602-05. The FSIA provides that a foreign state, which "includes ... an agency or instrumentality of a foreign state," is "immune from the jurisdiction" of United States courts. 28 U.S.C. § 1603(a), 1604. [FN5]

>   FN5. Under § 1603(a) a "foreign state" also includes "a political subdivision of a foreign state." No political subdivision of New Zealand is involved in this case.

### A. Agency or Instrumentality

An "agency or instrumentality of a foreign state" is defined as any entity which is: (1) a separate legal person; (2) an organ of, or majority-owned by, a foreign state or a political subdivision thereof; and (3) not a citizen of the United States or the creation of a third country. 28 U.S.C. § 1603(b). [FN6] The parties dispute whether TOWFC and Chatham are organs of, or majority-owned by, New Zealand within the meaning of § 1603(b)(2).

>   FN6. Under § 1603(b) "[a]n agency of instrumentality of a foreign state means any entity--
>   (1) which is a separate legal person, corporate or otherwise, and
>   (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose ... ownership interest is owned by a foreign state or political subdivision thereof, and
>   (3) which is neither a citizen of a State of the United States ... nor created under the laws of any third country.

In assessing whether an entity is an organ of a foreign state courts consider whether: (i) the foreign state created the entity for a national purpose; (ii) the foreign state actively supervises the entity; (iii) the foreign state hires public employees and compensates

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

them;  (iv) the entity holds exclusive rights to some right in the country;  and (v) the entity is treated as a part of the government under the laws of the foreign state.    *Corporacion Mexicana de Servicios Maritimos, S.A. v. M/T Respect,* 89 F.3d 650, 654-55 (9th Cir.1996);  *Supra Medical Corp. v. McGonigle,* 955 F.Supp. 374, 379 (E.D.Pa.1997).

According to affidvits of TOWFC officials, the Treaty of Waitangi, entered into in 1840 between the Crown of New Zealand and the Maori, an indigenous people of New Zealand, guaranteed the Maori certain rights to native fisheries.  In 1986, an Act of the New Zealand Parliament imposed a quota system creating private property rights to fish resources that can be transferred on the open market.  Maori parties challenged the legislation as undermining their rights under the Treaty of Waitangi.  After the Maori obtained interim relief precluding the Crown from bringing any further fish resources under the quota system, the New Zealand Parliament passed the Maori Fisheries Act of 1989 and the Treaty of Waitangi Fisheries Claims Settlement Act of 1992 which transferred 10% of the marketable fishing quota to the Maori Fisheries Commission, which later became the Treaty of Waitangi Fisheries Commission, to be administered on behalf of indigenous tribes in compliance with the treaties entered into by the Crown.

TOWFC's Commissioners are appointed by the Governor-General of New Zealand on the advice of the Minister of Maori affairs.  Under the legislation creating TOWFC the Commission reports to the Minister regarding matters within its jurisdiction. The Commission, like other public entities, is subject to an annual Audit the results of which are reported to Parliament.  TOWFC's salaries, fees, and expenses are subject to the approval of the Minister of Finance.

The record establishes that TOWFC was created by the New Zealand government for the national purpose of complying with treaty obligations between New Zealand and indigenous peoples.  Its purpose and functions are defined by an Act of the New Zealand Parliament, its Commissioners are appointed by governmental officials, it holds exclusive control over a significant portion of national fishing resources, and New Zealand courts have declared that TOWFC acts "on behalf of the Crown" as well as the Maori people.  TOWFC bears the indicia of a governmental organ under the FSIA. See *M/T Respect,* 89 F.3d at 654-55;  *Supra Medical,* 955 F.Supp. at 379.

*5 Counterclaim plaintiffs contend that TOWFC is not an organ of New Zealand because its chief constituency is the Maori people.  I disagree. TOWFC's role serves a clear "national purpose" of complying with New Zealand's treaty obligations to the Maori and administering fishing rights among peoples within New Zealand's borders.  This public function is no less governmental because it involves the rights of indigenous populations. [FN7]  TOWFC is an organ of the New Zealand government and thus an agency or instrumentality of New Zealand under § 1603.

> FN7. Pursuant to counterclaim plaintiffs' argument, the Department of the Interior's Bureau of Indian Affairs would not be an organ of the United States government because its role involves interests of Native Americans.

Chatham, however, has not made the requisite prima facie showing that it satisfies § 1603(b)(2). See *Federal Ins. Co. v. Richard I. Rubin & Co., Inc.,* 12 F.3d 1270, 1285 n. 13 (3d Cir.1993);  *Supra Medical,* 955 F.Supp. at 379.  Chatham's only basis for invoking the FSIA is the fact that it "is a wholly owned subsidiary of Chatham Holdings Limited, which in turn is a wholly owned subsidiary of TOWFC."  Under the plain language of § 1603(b)(2) an entity is not an agency or instrumentality of a foreign state unless it is either an organ of the state or is majority-owned by the state. § 1603(b)(2). [FN8]

> FN8. An entity can also satisfy § 1603(b)(2) if it is an organ of, or majority-owned by, a political subdivision of the state.  This case does not involve any political subdivisions of New Zealand.

Chatham bears none of the indicia of an "organ" of a foreign state, *see M/T Respect,* 89 F.3d at 654-55; *Supra Medical,* 955 F.Supp. at 379, and does not assert that it is majority-owned by New Zealand or a subdivision thereof;  it asserts only that it is majority-owned by an agency or intrumentality of New Zealand, TOWFC.  While the definition of an "agency or instrumentality" under § 1603(b)(2) explicitly includes entities that are either organs of or majority-owned by a foreign state or a subdivision thereof, it does not include entities that, like Chatham, are merely majority-owned by an agency or instrumentality thereof.  An "entity wholly owned by an 'agency or instrumentality of a foreign state' is not owned by a 'foreign state or a political

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1997 WL 539763 (E.D.Pa.)
**(Cite as: 1997 WL 539763 (E.D.Pa.))**

subdivision thereof' and therefore does not meet the definition of § 1603(b)(2)." *M/T Respect,* 89 F.3d at 655; *accord Federal Ins. Co. v. Richard I. Rubin & Co., Inc.,* 12 F.3d 1270, 1285 n. 12 (3d Cir.1993) (noting, in dictum, that § 1603(b)(2)'s definition of "agency or instrumentality" explicitly includes entities that are organs of or majority-owned by either a foreign state or a political subdivision, and thus can be construed as implicitly excluding entities that are organs of or majority-owned by another agency or instrumentality); *but see In re Air Crash Disaster Near Roselawn, Ind.,* 96 F.3d 932, 938-39 (7th Cir.1996) (holding that ownership by agency or instrumentality is tantamount to ownership by the foreign state and satisfies § 1603(b)(2)). [FN9] Chatham, unlike TOWFC, is not entitled to invoke the jurisdictional immunity conferred by the FSIA.

> FN9. I find the dictum of the Third Circuit Court of Appeals persuasive although it is set forth as the view of only one Judge. Contrary cases reason that because, under § 1603(a), a "foreign state ... includes ... an agency or instrumentality of a foreign state," an agency or instrumentality can be equated with a "foreign state." By equating the agency or instrumentality with the foreign state, these cases conclude that an entity majority-owned by the agency or instrumentality is in effect majority-owned by the foreign state and thus also constitutes an agency or instrumentality under § 1603(a)(2). *See In re Air Crash Disaster,* 96 F.3d at 938-39. I find this view unpersuasive. An agency or instrumentality is "included" within the definition of a foreign state under § 1603(a); it is thus narrower than, and not equivalent to, the concept of a foreign state.
> A construction that equates an agency or instrumentality with a foreign state for the purposes of § 1603(b)(2) ignores the fact that under § 1603(a) a "foreign state ... includes a political subdivision of a foreign state" as well as an agency or instrumentality, placing agencies and instrumentalities on equal footing with political subdivisions in terms of whether they may be equated with the foreign state. Yet § 1603(b)(2) explicitly includes entities majority-owned by political subdivisions but does not include those majority-owned by agencies and instrumentalities.
> If the entities owned by agencies or instrumentalities were implicitly included

> simply because agencies or instrumentalities can be equated with foreign states, then entities majority-owned by political subdivisions would also be implicitly included by the same logic and the explicit references to entities owned by political subdivisions would be wholly superfluous. While § 1603(b)(2) does not distinguish between direct and indirect ownership, it does distinguish based on the type of state entity that holds the ownership interest, and extends the FSIA to entities owned, whether directly or indirectly, by states and their political subdivisions but not to those owned by agencies or instrumentalities of the state. I thus find *M/T Respect* and *Federal Insurance* persuasive and would not deem Chatham, which is owned by an agency or instrumentality, a foreign state under the FSIA.

**B. The FSIA's Commercial Exception**

Counterclaim plaintiffs contend that their claims fall within the FSIA's commercial exception which permits certain suits against otherwise immune foreign sovereign entities. Under the commercial exception, foreign states are not immune from jurisdiction in actions based upon: (i) a commercial activity carried on in the United States by the foreign state; (ii) an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or (iii) an act outside the United States in connection with a commercial activity of the foreign state elsewhere that causes a direct effect in the United States. 28 U.S.C. § 1605(a)(2).

**\*6** The counterclaims allege that TOWFC and Karamea wrongfully negotiated a transfer of fishing rights from SOS and SSB to Chatham, thus interfering with contractual relations related to the distributorship agreement. These transactions, which occurred exclusively among New Zealand entities in New Zealand, do not implicate the first and second prongs of § 1605(a)(2), which require acts in the United States. I must decide whether TOWFC's actions outside the United States caused a "direct effect" in the United States as required under the third prong of § 1605(a)(2).

Mere financial loss in the United States caused by commercial activity abroad does not constitute a "direct effect." *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n,* 33 F.3d 1232, 1238-39 (10th Cir.1994); *Antares Aircraft v. Federal*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 6
Not Reported in F.Supp., 1997 WL 539763 (E.D.Pa.)
**(Cite as: 1997 WL 539763 (E.D.Pa.))**

*Republic of Nigeria,* 999 F.2d 33, 35-37 (2d Cir.1993); *Gregorian v. Izvestia,* 871 F.2d 1515, 1527 (9th Cir.1989). To establish a "direct effect" in the United States the plaintiff must establish that "something legally significant actually happened in the U.S." *Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511, 1515 (D.C.Cir.1988). A party's breach of duties or obligations that were to be performed in the United States can constitute the legally significant act in the United States causing the requisite direct effect. *See, e.g., Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 619-20, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (holding that where parties designated New York as "the place of performance for [the] ultimate contractual obligations" breach of those obligations had a "direct effect" in the United States).

TOWFC had no duties or obligations to be performed in the U.S. The claims against it arise from transfers of fishing rights among New Zealand entities in New Zealand. This conduct directly affected only the New Zealand entities SOS and SSB. The fact that the effects of these transactions on SOS and SSB in New Zealand in turn caused SOS to breach its obligations to Dockside establishes only an indirect effect in the United States that is too attenuated to satisfy § 1605(a)(2). Because the effect of TOWFC's conduct on other foreign entities fails to satisfy the "direct effect in the United States" requirement of § 1605(a)(2), the FSIA's commercial exception does not deprive TOWFC of the immunity granted in § 1604.

**C. The FSIA's Tort Exception**

Counterclaim plaintiffs also contend that their claims fall within the FSIA's tort exception. That exception, set forth in 28 U.S.C. § 1605(a)(5), applies to claims "not otherwise encompassed in paragraph (2) [the commercial exception] above." [FN10] Under the tort exception the FSIA does not afford immunity for actions in which "money damages are sought against a foreign state for ... damages to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state" or any official thereof acting in an official capacity. § 1605(a)(5).

> FN10. The exceptions to immunity are set forth in paragraphs 1605(a)(1)-(6) and separated by the word "or." Only paragraph (a)(2)'s commercial exception and paragraph (a)(5)'s tort exception potentially apply to this case.

*7 For paragraph (a)(5) to confer jurisdiction "both the tort and the injury must occur in the United States." *Persinger v. Islamic Republic of Iran,* 729 F.2d 835, 842 (D.C.Cir.1984). The counterclaims do not allege tortious conduct in the United States and thus do not implicate paragraph (a)(5). Even where paragraph (5) would otherwise apply, a restriction set forth in subparagraph (a)(5)(B) provides that paragraph (5) "shall not apply to ... any claim arising out of misrepresentation, deceit, or interference with contract rights." § 1605(a)(5)(B). The counterclaims allege that TOWFC interfered with Dockside's contractual relations and thus fall squarely within subparagraph (a)(5)(B). Accordingly paragraph (a)(5)'s tort exception does not apply and does not deprive TOWFC of immunity. [FN11] TOWFC is an agency of the New Zealand government entitled to immunity under the FSIA, 28 U.S.C. § § 1603-04, and is not deprived of that immunity by any of the exceptions set forth in § 1605(a). The claims against TOWFC must be dismissed for lack of subject matter jurisdiction.

> FN11. The parties cite cases analyzing the relationship between paragraphs (a)(2) and (a)(5). *See Export Group v. Reef Indus., Inc.,* 54 F.3d 1466 (9th Cir.1995); *WMW Mach., Inc. v. Werkzeugmaschinenhabdel Gmbh IM Aufbau,* 960 F.Supp. 734 (S.D.N.Y.1997); *Bryks v. Canadian Broadcasting Corp.,* 906 F.Supp. 204 (S.D.N.Y.1995). Those cases analyzed whether subparagraph (a)(5)(B) could override (a)(2)'s exception to immunity. In this case where (a)(2) does not provide an exception to immunity because its "direct effects" requirement is not met, I need not decide whether (a)(5)(B) could override an exception to immunity under paragraph (a)(2). I note, however, that paragraph (a)(5) applies only to conduct "not otherwise encompassed in paragraph [(a)(2)]," and that subparagraph (a)(5)(B) is preceded by the clause "this paragraph shall not apply to--," which I construe as limiting the effect of (a)(5)(B) to denials of immunity under paragraph (a)(5). I would thus follow *Export Group* and *WMW Machinery* and not *Bryks* and would hold that subparagraph (a)(5)(B) does not restrict an exception to immunity under paragraph (a)(2).

**IV. Personal Jurisdiction Over TOWFC, Chatham and Karamea**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 7
Not Reported in F.Supp., 1997 WL 539763 (E.D.Pa.)
**(Cite as: 1997 WL 539763 (E.D.Pa.))**

TOWFC, Chatham and Karamea contend that they are not subject to personal jurisdiction because they lack the requisite "minimum contacts" with Pennsylvania. *International Shoe Co. v. Washington,* 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945). These "contacts" must be such that the defendant "should reasonably anticipate being haled into court" in the forum state. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980). Where, as here, the defendant contests the basis for personal jurisdiction, "the plaintiff bears the burden of proving that the defendant's contacts with the forum are sufficient." *Dutoit v. Strategic Minerals Corp.,* 735 F.Supp. 169, 170 (E.D.Pa.1990).

Jurisdiction over a non-resident defendant may be either general or specific. General jurisdiction exists when the non-resident has "systematic and continuous" contacts with the forum state. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Such "systematic and continuous" contacts can arise from domiciling, maintaining offices, owning property, or conducting commercial activity within the forum state. *See Arch v. American Tobacco Co., Inc.,* 1997 WL 338597 at *2 (E.D.Pa.1997); *Boehringer, Inc. v. Murawski Corp.,* 699 F.Supp. 59, 61 (E.D.Pa.1988).

Counterclaim plaintiffs do not allege any facts based on their knowledge, information or belief that would establish "systematic and continuous" contacts with Pennsylvania. Counterclaim defendants TOWFC, Chatham and Karamea aver, through affidavits, that they neither have offices nor employ workers in Pennsylvania. TOWFC, through an authorized affidavit, contends that it has had no contacts with Pennsylvania apart from one visit by two representatives to meet with Dockside in 1995. Chatham, through the authorized affidavit of its general managers, attests that it has no contacts with Pennsylvania apart from twice shipping products through Philadelphia en route from New Zealand to New Hampshire. The record reveals no contacts between Karamea and Pennsylvania. The isolated contacts identified in the pleadings and the record do not support the exercise of general personal jurisdiction.

**\*8** A non-resident defendant is subject to specific personal jurisdiction for claims arising from its forum-related contacts. *See Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.,* 75 F.3d 147, 151 (3d Cir.1996); *Arch,* 1997 WL 338597

at *2. The counterclaims in this case arise from counterclaim defendants' alleged actions in New Zealand and do not involve any contacts with Pennsylvania. Neither the pleadings nor the record presents a basis for exercising specific personal jurisdiction over counterclaim defendants.

Dockside requests discovery as to counterclaim defendants' contacts with Pennsylvania. Parties are entitled to a "fair opportunity to engage in jurisdictional discovery" to obtain "facts necessary for thorough consideration of the [jurisdictional] issue." *Federal Ins. Co. v. Richard I. Rubin & Co., Inc.,* 12 F.3d 1270, 1285 n. 11 (3d Cir.1993). However, jurisdictional discovery may, in the court's discretion, be denied where the party that bears the burden of establishing jurisdiction fails to establish a "threshold prima facie showing" of personal jurisdiction. *Arch,* 1997 WL 338597 at *11; *Rose v. Granite City Police Dep't,* 813 F.Supp. 319, 321 (E.D.Pa.1993).

A prima facie case requires factual allegations that suggest "with reasonable particularity" the possible existence of the requisite "contacts between [the party] and the forum state." *Mellon Bank PSFS v. Farino,* 960 F.2d 1217, 1223 (3d Cir.1992). [FN12] In this case where counterclaim defendants have submitted affidavits attesting to a lack of jurisdictional contacts and counterclaim plaintiffs, who have the burden of establishing jurisdictional facts, have countered the affidavits with "mere speculation, [their] request for an opportunity to conduct discovery on the matter must be denied." *Poe v. Babcock Int'l,* 662 F.Supp. 4, 7 (M.D.Pa.1985). [FN13]

> FN12. *See Raymark Indus., Inc. v. Baron,* 1997 WL 359333 at *4 (E.D.Pa.1997) (permitting discovery where party seeking discovery alleged specific acts in furtherance of conspiracy believed to have occurred in forum state); *Manhattan Life Ins. Co. v. A.J. Stratton Syndicate,* 731 F.Supp. 587, 593 (S.D.N.Y.1990) (permitting jurisdictional discovery based on affidavits identifying specific business contacts with forum state).

> FN13. *See Massachusetts Sch. of Law v. American Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir.1997) (holding that conclusory allegation that defendant "transacts business" in an area is a "clearly frivolous" basis for jurisdictional discovery); *Narco*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 8
Not Reported in F.Supp., 1997 WL 539763 (E.D.Pa.)
**(Cite as: 1997 WL 539763 (E.D.Pa.))**

*Avionics v. Sportsman's Market, Inc.,* 1992 WL 37106 (E.D.Pa.1992) (holding that where the "assertion of personal jurisdiction is tenuous and based on mere allegations and speculation in the face of specific sworn denials by defendants ... discovery is not appropriate"); *Ames v. Whitman's Chocolates,* 1991 WL 281798 (E.D.Pa.1991) (refusing to permit jurisdictional discovery where plaintiff failed to present affidavits or other evidence to refute affidavits denying jurisdictional contacts).

Counterclaim plaintiffs contend only that they are unable to allege jurisdictional facts because "they were not privy to the transactions in New Zealand that adversely affected [Dockside's] contract with SOS." This contention suggests only that other unknown events occurred in New Zealand; it does not suggest any information or belief that any defendant had contacts with Pennsylvania. Counterclaim plaintiffs have failed to make out a prima facie case of jurisdictional contacts and thus may not pursue discovery "in the hopes that it may uncover some evidence supporting jurisdiction." *Arch,* 1997 WL 338597 at *11. [FN14] Because the record reveals no basis for exercising personal jurisdiction over TOWFC, Chatham or Karamea and does not establish a prima facie case warranting jurisdictional discovery as to these counterclaim defendants, I will dismiss the claims against them, which are alleged in Counts VI and VII of the counterclaim complaint, for lack of jurisdiction. [FN15]

> FN14. As the *Arch* court stated, with no pun intended as to the facts underlying this case, "discovery should not be used as a fishing expedition." *Arch,* 1997 WL 338597 at *11

> FN15. If I had jurisdiction over Chatham I would be inclined to dismiss the claims against it on the pleadings, which allege that TOWFC and Karamea took the affirmative steps to acquire control of SSB/SOS and to negotiate the transfer of fishing rights. Chatham, which had not yet been created when these events occurred, merely received the rights once TOWFC and Karamea transferred them from SSB/SOS. Despite the conclusory assertion that these events constitute torts on the part of TOWFC, Karamea, "and/or Chatham," the factual allegations reveal no acts on the part of

Chatham that give rise to a claim on which relief could be granted.

V. Failure to State a Claim

A. Holt's Breach of Contract Claim Against SOS

*9 In Count III counterclaim plaintiffs allege that Holt breached an agreement with SOS to arbitrate disputes. By Order dated January 15, 1997 this Court held that Holt and SOS did not enter an agreement to arbitrate disputes. Holt's appeal from that Order was dismissed by agreement of the parties by Order dated June 20, 1997. For reasons explained in the January 15, 1997 Order, SOS had no contractual duty to arbitrate disputes with Holt. Count III will be dismissed for failure to state a claim upon which relief can be granted.

B. Dockside's Breach of Contract and Interference With Contract Claims Against SOS and SSB

In Count I Dockside alleges that SOS breached the distributorship agreement between Dockside and SOS by requiring Dockside to maintain above-market prices, by failing to supply salmon, [FN16] and by relinquishing its fishing rights to TOWFC, thus depriving itself of the means to fulfill its obligations under the agreement to supply seafood to Dockside. SOS seeks dismissal because the distributorship agreement may be terminated upon a "change in control" of SOS. ¶ 14(b)(ii). According to SOS, because its parent company SSB underwent a "change in control," SOS also underwent a change in control that terminated the contract.

> FN16. Salmon was identified in ¶ 1 of the agreement as a product within the exclusive distributorship.

The counterclaims, however, allege acts preceding the change in control that could, under certain sets of facts, constitute breaches of the agreement. [FN17] Moreover, the agreement does not terminate automatically upon a change in control but rather provides that it "may be terminated by [SOS]" upon a change in control. ¶ 14(b)(ii). The counterclaims allege that SOS did not immediately terminate the agreement but rather assured Dockside that the arrangements under the agreement would continue despite the change in control. Thus a breach of contract could arise from conduct occurring after the change in control but before termination of the contract. Accepting the factual allegations as true and construing them favorably to counterclaim

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 9
Not Reported in F.Supp., 1997 WL 539763 (E.D.Pa.)
(Cite as: 1997 WL 539763 (E.D.Pa.))

plaintiffs, I find that Count I states a claim for breach of the distributorship agreement. I will deny the motion to dismiss Count I.

> FN17. I reserve judgment on the question whether a change in control of SSB constitutes a change in control of SOS within the meaning of ¶ 14(b)(ii) of the agreement.

In Count VII Dockside alleges that SOS and SSB, by requiring Dockside to maintain unrealistically high prices, failing to supply salmon, and transferring fishing rights so SOS could no longer fulfill obligations to supply seafood to Dockside, "intentionally, improperly and without justification" interfered with current and prospective contractual relations between Dockside and its customers. [FN18] SOS and SSB contend that these allegations fail to state a claim for interference with contract because the contract between SOS and Dockside had terminated upon the "change in control" before the transfer of fishing rights. According to SOS and SSB, because there was no longer a contract obligating SOS to retain its fishing rights, the transfer of those fishing rights fails, as a matter of law, to establish the wrongful intent or impropriety required to state a tortious interference claim. *See Shein v. Myers,* 394 Pa.Super. 549, 576 A.2d 985, 988 (Pa.Super.1990) (holding that tortious interference claim requires intentional action that is improper and that results in interference of the performance of a contract with another).

> FN18. Dockside named TOWFC, Chatham and Karamea as additional counterclaim defendants in Count VII. Because jurisdiction is lacking as to these parties I consider only whether Count VII states a claim against SOS and SSB.

**\*10** However, as discussed in connection with Count I, the agreement did not automatically terminate upon a change in control and may have been in effect at the time the fishing rights were transferred. The allegations, when taken as true and construed favorably to counterclaim plaintiffs, assert that at the time SOS and SSB transferred all of SOS's fishing rights to third parties, SOS was under a contractual duty to Dockside to supply seafood, which it could not do if it relinquished those fishing rights. Thus the change in control provision does not defeat Dockside's tortious interference claim as a matter of law.

Count VII, however, differs from traditional tortious interference claims. The Pennsylvania Supreme Court, adopting § 766 of the Restatement (Second) of Torts, has recognized tortious interference claims against defendants who induce others to breach obligations owed to the plaintiff. *See Adler, Barish, Daniels, Levin & Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175 (Pa.1978). [FN19] The Pennsylvania Supreme Court has not, however, addressed whether it would adopt § 766A of the Restatement, which recognizes tortious interference claims against defendants who prevent the plaintiff from performing its own obligations to others. [FN20] Section 766A is more applicable to Dockside's counterclaim, which does not allege that SOS and SSB induced a third party to breach a duty to Dockside but rather alleges that SOS and SSB prevented Dockside from performing its duties to others. The Court of Appeals noted in dictum that it is "far from clear" whether the Pennsylvania Supreme Court would recognize a cause of action under § 766A. *Windsor Secs., Inc. v. Hartford Life Ins. Co.,* 986 F.2d 655, 663 (3d Cir.1993). [FN21]

> FN19. Section 766 provides that one who "interferes with the performance of a contract ... between another and a third person by ... causing the third person not to perform the contract" is liable for the tort of interference.

> FN20. Section 766A provides that one who "interferes with the performance of a contract between another and a third person, by preventing the other from performing the contract" is liable for the tort of interference.

> FN21. *Windsor Securities* noted divergences between Pennsylvania law and the Restatement regarding interference torts but, because defendant was entitled to summary judgment under the elements of § 766A, declined to predict whether Pennsylvania would adopt § 766A. 986 F.2d at 660-67.

The parties have not addressed the application of § 766A to this case. Having raised the question *sua sponte,* I decline to predict the status of § 766A under Pennsylvania law without affording the parties an opportunity to address the issue. I will reserve judgment to permit any party who wishes to be heard on the issue to file a brief addressing it. Because the present motions raise no grounds defeating Dockside's tortious interference with contract claim I will deny the motion to dismiss Count VII.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 10
Not Reported in F.Supp., 1997 WL 539763 (E.D.Pa.)
**(Cite as: 1997 WL 539763 (E.D.Pa.))**

C. Holt's and Dockside's Breach of Duty of Good Faith and Fair Dealing Claims Against SOS

In Count II Dockside alleges that SOS breached a duty of good faith and fair dealing. Dockside contends that duties of good faith and fair dealing were implied in the exclusive distributorship agreement between the parties and that SOS acted in bad faith and dealt unfairly with Dockside by failing to supply salmon, by requiring Dockside to price products above market rates, and by failing to advise Dockside of changes in ownership of fishing rights the loss of which would "materially and adversely impact on SOS's ability to fulfill its contractual obligations to Dockside."

SOS, in support of its motion to dismiss, argues that Pennsylvania courts have recognized a duty of good faith and fair dealing only where a "special relationship" exists between the parties. *Chrysler Credit Corp. v. B.J.M., Jr., Inc.,* 834 F.Supp. 813, 841 (E.D.Pa.1993). A special relationship may arise when "one party surrenders substantial control over some portion of his affairs to the other." *Id.* at 842. The counterclaims allege that Dockside surrendered control to SOS in important matters related to pricing its products. The agreement established an exclusive distributorship arrangement between SOS and Dockside containing several covenants imposing duties to use "best efforts" to carry out aspects of the arrangement. *See* ¶ ¶ 12(b), 12(c). I find sufficient allegations of a special relationship to give rise to a duty of good faith and fair dealing.

*11 SOS correctly emphasizes that the implied duty of good faith cannot defeat a party's express contractual rights by imposing obligations the party expressly contracted to avoid. *See Creeger Brick & Bldg. Supply, Inc. v. Mid-State Bank & Trust Co.,* 385 Pa.Super. 30, 560 A.2d 151, 153 (Pa.Super.1989). However, " 'in the absence of an express provision, the law will imply an agreement ... to do an perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract." ' *Seal v. Riverside Fed. Sav. Bank,* 825 F.Supp. 686, 699 (E.D.Pa.1993) (quoting *Somers v. Somers,* 418 Pa.Super. 131, 613 A.2d 1211, 1213 (1992)). In *Seal* this Court refused to dismiss a case where the defendants failed to disclose material facts that compromised their ability to perform their contractual obligations. The counterclaims similarly allege that SOS failed to disclose the transfer of fishing rights that compromised SOS's ability to perform its obligations under the distribution agreement and that SOS took other actions that impaired Dockside's right to receive the fruits of the agreement. I will deny the motion to dismiss Count II. [FN22]

> FN22. A party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are "identical to" a claim for "relief under an established cause of action." *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 701-02 (3d Cir.1993). This principle does not warrant dismissal of Dockside's bad faith claim, which invokes duties reasonably implied from, but not expressly set forth in, the distributorship agreement. Dockside's claim is not identical to an otherwise established cause of action.

In Count IV Holt alleges that SOS breached a duty of good faith and fair dealing arising from the guarantee agreement between Holt and SOS. Holt alleges that it agreed to act as Dockside's guarantor only until Dockside attained a certain net worth, and that SOS, by failing to supply salmon, inflating prices, and diverting fishing rights essential to sustaining Dockside's distributorship, prevented Dockside from attaining that net worth. Construed favorably to Holt, the counterclaim alleges that the guarantee agreement provided Holt assurance that its obligations as Dockside's guarantor would end under specified circumstances and that SOS, acting in a manner contrary to "reason and justice," denied Holt the fruits of that contractual assurance by preventing those circumstances from occurring. These allegations state a claim for breach of the duty of good faith and fair dealing. I will deny the motion to dismiss Count IV.

D. Dockside's Fraud and Misrepresentation Claims Against SOS and SSB

SOS and SSB move to dismiss Dockside's claims of fraud and negligent misrepresentation asserted in Counts VIII and IX on the grounds that the allegations lack the specificity and particularity required by Federal Rule of Civil Procedure Rule 9(b). [FN23]

> FN23. While Rule 9(b) does not govern negligent misrepresentation claims, courts require a degree of specificity in allegations

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 11
Not Reported in F.Supp., 1997 WL 539763 (E.D.Pa.)
**(Cite as: 1997 WL 539763 (E.D.Pa.))**

of negligent misrepresentation. *See S. Kane & Son Profit Sharing Trust v. Marine Midland Bank,* 1996 WL 325894 at \*9 (E.D. Pa. 1996).

To satisfy Rule 9(b) a plaintiff must plead: (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) intention that it should be acted upon; and (5) actions taken upon it to the plaintiff's detriment. *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 284 (3d Cir. 1992). These requirements must, however, be applied in light of the "general simplicity and flexibility" of the Federal Rules of Civil Procedure. *Id.* at 284-85. The pleadings, even when subject to the heightened specificity requirements of Rule 9, are governed by Rules 8(a)(2) and 8(e) which require a "short and plain" statement of the claim made through "simple, concise and direct" averments. *In re Westinghouse Secs. Litigation,* 90 F.3d 696, 702 (3d Cir.1996). I assess the adequacy of counterclaim allegations in light of these competing requirements of particularity and simplicity.

Dockside alleges that "[i]n 1995" SOS and SSB "met or communicated with Dockside on several occasions about market price for lobster tail" and made representations about the pricing of lobster tail that SOS and SSB knew were false and knew Dockside, in its lesser experience, would rely on to its detriment. Dockside also alleges that SOS and SSB fraudulently concealed the impending transfer of fishing rights that would materially impair SOS's ability to fulfill its obligations under the distributorship agreement, causing Dockside to invest in developing the distributorship it did not know was in jeopardy.

While the counterclaims do not "describe the precise words used, each allegation of fraud adequately describes the nature and subject of the alleged misrepresentation." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984). The allegations need not specify the "date, place or time" of the fraudulent conduct as long as they use other means of "injecting precision and some measure of substantiation" into the allegations of fraud. *Id.* In this case the averments of fraud are confined to a finite number of communications between the parties during 1995 pertaining to specified subjects. The content of the allegedly fraudulent communications is identified with sufficient specificity to apprise counterclaim defendants of the "precise misconduct with which

they are charged." *General Ins. Co. of America v. Gross,* 1997 WL 239800 (E.D.Pa.1997); *Kirschner v. Castello,* 1992 WL 17212 (E.D.Pa.1992); *Pep Boys v. American Waste Oil Servs. Corp.,* 1997 WL 367048 (E.D.Pa.1997). I find the allegations sufficient to satisfy Rule 9(b) and will deny the motion to dismiss Counts VIII and IX.

E. Punitive Damages

**\*12** Punitive damages are not recoverable in either breach of contract claims or breach of duty of good faith claims, which are contractual in nature. *Adjusters, Inc. v. Computer Sciences Corp.,* 818 F.Supp. 120, 122 (E.D.Pa.1993); *Lott Holding, Inc. v. Pennsylvania Manufacturers' Ass'n Life Ins. Co.,* 1989 WL 32751 (E.D.Pa.1989); *Mazzula v. Monarch Life Ins. Co.,* 487 F.Supp. 1299, 1300 (E.D.Pa.1980); *Iron Mountain Security Storage Corp. v. American Specialty Foods, Inc.,* 457 F.Supp. 1158, 1169 (E.D.Pa.1978). I will therefore dismiss counterclaim plaintiffs' claims for punitive damages as to Counts I, II and IV. Counterclaim plaintiffs' allegations in connection with their tort claims, when taken as true and construed favorably to them, give rise to a potential claim of "malicious, wanton, willful or oppressive" conduct, precluding dismissal of the punitive damage claims as to the tort-based counterclaims. *See Adjusters, Inc.,* 818 F.Supp. at 122.

ORDER
AND NOW this 11 day of August, 1997 upon consideration of defendant Holt's motion for joinder of Salmond Smith Biolab as an indispensable party or for dismissal of the complaint for failure to join an indispensable party, plaintiff's and counterclaim defendants' motions to dismiss or strike the counterclaims, and the parties' filings related thereto it is hereby ORDERED that:

(1) Defendant Holt's motion for joinder of Salmond Smith Biolab as an indispensable party or to dismiss the action for failure to join an indispensable party is DENIED;

(2) Dockside is hereby GRANTED leave to intervene pursuant to Federal Rule of Civil Procedure 24(b) as a counterclaim plaintiff;

(3) SSB, TOWFC, Chatham and Karamea are hereby JOINED as counterclaim defendants pursuant to Federal Rules of Civil Procedure 13(h) and 20(a);

(4) Plaintiff's and counterclaim defendants' motions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 539763 (E.D.Pa.)
**(Cite as: 1997 WL 539763 (E.D.Pa.))**

Page 12

to dismiss or strike the counterclaims are GRANTED IN PART AND DENIED IN PART AS FOLLOWS:

 (a) The motion to dismiss or strike Count I is DENIED;

 (b) The motion to dismiss or strike Count II is DENIED;

 (c) The motion to dismiss or strike Count III GRANTED and Count III is DISMISSED for failure to state a claim upon which relief can be granted;

 (d) The motion to dismiss or strike Count IV is DENIED;

 (e) The motion to dismiss or strike Count V is GRANTED and Count V is DISMISSED as a counterclaim improperly brought solely against persons not originally parties to this action;

 (f) The motion to dismiss or strike Count VI is GRANTED and Count VI is DISMISSED as to TOWFC for lack of subject matter jurisdiction and lack of personal jurisdiction;  and is DISMISSED as to Chatham and Karamea for lack of personal jurisdiction;  and is DISMISSED as to all parties as a counterclaim improperly brought solely against persons not originally parties to this action;

 (g) The motion to dismiss or strike Count VII is GRANTED as to TOWFC, Chatham and Karamea and Count VII is DISMISSED as to TOWFC for lack of subject matter jurisdiction and lack of personal jurisdiction;  and is DISMISSED as to Chatham and Karamea for lack of personal jurisdiction.    The motion to dismiss or strike Count VII is DENIED as to SOS and SSB.

 **\*13** (h) The motion to dismiss or strike Count VIII is DENIED;

 (i) The motion to dismiss or strike Count IX is DENIED;

 (j) The motion to dismiss or strike the punitive damages claims is GRANTED as to Counts I, II, III and IV and the punitive damages claims as to those Counts are DISMISSED.   The motion to dismiss or strike the punitive damages claims is otherwise DENIED;  and

 (k) The requests for attorney's fees are DENIED.

 Not Reported in F.Supp., 1997 WL 539763

(E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

1991 WL 281798                                                                                    Page 1
Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: 1991 WL 281798 (E.D.Pa.))**

C

United States District Court, E.D. Pennsylvania.
Marvin AMES
v.
WHITMAN'S CHOCOLATES, a DIVISION OF
PET INCORPORATED and Jay G. Shoemaker and
Whitman Corporation.
**Civ. A. No. 91-3271.**

Dec. 30, 1991.

Ronald H. Surkin, Media, Pa., Robert G. Haas,
Blank, Rome, Comisky, & McCauley, Philadelphia,
Pa., for plaintiff.

Allan M. Dabrow, Mitchell Feigenbaum, Mesirov,
Gelman, Jaffe, Cramer & Jamieson, Philadelphia,
Pa., for defendants.

*MEMORANDUM AND ORDER*

BARTLE, District Judge.

**\*1** This is an Age Discrimination in Employment
Act ("ADEA") case filed pursuant to 29 U.S.C. §
621 *et seq.* The action was brought by Marvin Ames
("Ames") against (1) Whitman's Chocolates ("the
chocolate company"), a division of Pet, Incorporated,
which conducts a candy and chocolate manufacturing
business in Pennsylvania; (2) Jay G. Shoemaker
("Shoemaker"), the former president of the chocolate
company; and (3) Whitman Corporation ("the parent
corporation"), the parent corporation of Pet with a
principal place of business in Chicago, Illinois.

Plaintiff Ames contends that his employment as Vice
President of Manufacturing and Technical Services
for the chocolate company was terminated by
defendants in violation of the ADEA. (Complaint at
¶ ¶ 5, 9, 12, 13, 14.) The parent corporation has
moved for dismissal under Rule 12(b)(2) of the
Federal Rules of Civil Procedure claiming lack of
jurisdiction over the person. Shoemaker has moved
for dismissal under Rule 12(b)(1) and (6) of the
Federal Rules of Civil Procedure or, alternatively, for
summary judgment under Rule 56 of the Federal
Rules of Civil Procedure, claiming lack of subject
matter jurisdiction and/or failure to state a cause of
action because of Ames' failure to exhaust
administrative remedies. [FN1] For the reasons set
forth below, the motion of the parent corporation will
be granted and the motions of Shoemaker will be

denied. Additionally, the request of Ames for
attorneys' fees and costs incurred in responding to the
motions filed by Shoemaker will be denied.

I. *The Motion of the Parent Corporation to Dismiss
for Lack of Jurisdiction Over the Person.*

A district court may assert jurisdiction over a
nonresident defendant, such as the parent
corporation, to the extent allowable under the due
process clause of the federal constitution and the law
of the state in which the court sits. *See* Fed.R.Civ.P.
4(e); *International Shoe Co. v. Washington,* 326 U.S.
310, 316-317, 66 S.Ct. 154, 158 (1940); *North Penn
Gas v. Corning Natural Gas,* 897 F.2d 687, 689 (3d
Cir.1990); *Provident National Bank v. California
Savings and Loan Association,* 819 F.2d 434 (3d
Cir.1987); *Time Share Vacation Club v. Atlantic
Resorts, Ltd.,* 735 F.2d 61, 63 (3d Cir.1984).

The uncontroverted facts establish that the parent
corporation is not incorporated under the laws of the
Commonwealth of Pennsylvania, does not qualify as
a foreign corporation under the laws of the
Commonwealth, and has not consented to be sued
within the Commonwealth. Jurisdiction, however,
can exist under Pennsylvania's general personal
jurisdiction statute if the corporation carries on "a
continuous and systematic part of its general business
within [the] Commonwealth" and, thus, has
maintained continuous and substantial forum
affiliations. *See* 42 Pa.Cons.Stat.Ann. § 5301;
*Reliance Steel Products v. Watson, Ess, Marshall &
Enggas,* 675 F.2d 587, 588 (3d Cir.1982); *North
Penn Gas v. Corning Natural Gas, supra,* n. 2 at 690.

**\*2** Alternately, specific jurisdiction exists under
Pennsylvania's Long Arm Statute, the reach of which
is coextensive with the due process clause of the
United States Constitution, if the cause of action
arises from activities of defendant within
Pennsylvania. The defendant, however, must have
had sufficient minimum contacts within the forum so
that maintenance of the suit would not offend notions
of fair play and substantial justice, and the defendant
reasonably could have anticipated being haled into
court there. *See* 42 Pa.Cons.Stat.Ann. § 5322(b);
*International Shoe v. Washington, supra* at 158;
*North Penn Gas v. Corning Natural Gas, supra* at
690; *Provident National Bank v. California Federal
Savings and Loan Association, supra* at 436-437;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1991 WL 281798                                                                                                                    Page 2
Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: 1991 WL 281798 (E.D.Pa.))**

*Time Share Vacation Club v. Atlantic Resorts, Limited, supra* at 63.

Ames seeks to invoke specific jurisdiction on the ground that his termination was authorized and approved in advance by the parent corporation. (Complaint at ¶ 14; Memorandum of Law in Opposition to Motion to Dismiss at 2.) He further alleges the existence of general jurisdiction on the ground that facts exist "tending to show substantial involvement by Whitman Corp. in the operations of Pet and Whitman's [Chocolates]." (Memorandum of Law in Opposition at 3.)

Where, as here, a jurisdictional defense has been raised, plaintiff bears the burden of establishing contacts with the forum state sufficient to confer specific or general jurisdiction. Evidence before the court bearing on this question must be considered in the light most favorable to the plaintiff. Plaintiff, however, must come forward with sworn affidavits or other competent evidence to establish a *prima facie* case of jurisdiction. Pleadings alone and mere allegations will not suffice. *See North Penn Gas v. Corning Natural Gas, supra* at 689; *Stranahan Gear Company v. NL Industries,* 800 F.2d 53, 58 (3d Cir.1986); *Time Share Vacation Club v. Atlantic Resorts, Ltd, supra* at 63, 66; *LaRose v. Sponco, Manufacturing, Inc.,* 712 F.Supp. 455, 458 (D.N.J.1989); *Boehringer, Inc. v. Murawski Corporation,* 699 F.Supp. 59, 61 (E.D.Pa.1988).

Plaintiff Ames contends that this Court has jurisdiction over the parent corporation because of its putative advance approval and authorization of his termination. Plaintiff, however, has failed to establish any such approval or authorization. The parent corporation has provided affidavits from William Moore, Vice President, Secretary and General Counsel of the parent corporation; defendant Jay G. Shoemaker, former President of the chocolate company; John C. Elbin, Vice President of Pet; and Miles Marsh, who was both Acting President of Pet and President of the parent corporation at the pertinent time. These affidavits establish that plaintiff's termination was not approved or authorized in advance by anyone in the parent corporation, including Mr. Marsh. (Moore affidavit at ¶ 10; Shoemaker affidavit at ¶ 2; Elbin affidavit at ¶ 4; Marsh affidavit at ¶¶ 1, 2.)

*3 Plaintiff alleges in response that he

is already in possession of evidence tending to contradict the assertions in the affidavit of William B.

Moore, a Whitman Corp. officer, to the effect that Whitman Corp. was not involved in the day-to-day affairs of Pet, including matters relating to personnel.

(Memorandum of Law in Opposition at 2.) Plaintiff never specifies the nature of such evidence. Such an unsupported allegation is legally insufficient to sustain his burden of proof. Nor does he meet his burden by his additional sworn statement that "[o]n information and belief, Marsh was aware of, authorized and ratified Shoemaker's decision to terminate me." (Ames affidavit at ¶ 7). This plainly is inadmissible hearsay evidence under the Federal Rules of Evidence which apply to this civil proceeding. *See* Fed.R.Evid. 1101.

In addition, plaintiff Ames asserts that he

has already propounded interrogatories and document requests directed in part to fleshing out these facts [relating to his termination], to which Whitman Corp. has refused to respond pending disposition of its motion.

(Memorandum of Law in Opposition at 2.) The interrogatories are not of record and plaintiff has not moved, pursuant to Rule 37(a) of the Federal Rules of Civil Procedure, for an order compelling discovery. Further, since Ames has not contradicted the parent corporation's affidavit evidence, this Court is persuaded that "[i]t would be inappropriate ... to allow plaintiff to conduct a fishing expedition to construct a basis for jurisdiction." *Poe v. Babcock International, PLC,* 662 F.Supp. 4 (M.D.Pa.1985).

Ames' alternate assertion of general jurisdiction is predicated upon his putative awareness "of significant facts tending to show substantial involvement by Whitman Corp. in the operations of Pet and Whitman's [chocolates]." (Memorandum of Law in Opposition at 3.) The law applicable to specific factual allegations of such involvement is well settled. A foreign corporation is not subject to a forum state's jurisdiction merely because it owns stock in a subsidiary doing business within the state. General jurisdiction does exist, however, when the parent corporation exercises such a degree of control that (1) the subsidiary is its alter ego or agent, (2) the subsidiary is its mere instrumentality, or (3) the corporations function as one integrated enterprise. *See Lucas v. Gulf and Western Industries, Inc.,* 666 F.2d 800 (3d Cir.1981); *Beckwith v. International Mill Services,* 617 F.Supp. 187 (E.D.Pa.1985); *Kamens v. Summit Stainless, Inc.,* 586 F.Supp. 324 (E.D.Pa.1984).

1991 WL 281798                                                                                           Page 3
Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: 1991 WL 281798 (E.D.Pa.))**

The specifics asserted by Ames to support his claim of the parent corporation's "substantial involvement" in the affairs of the chocolate company are these:

(1) The parent corporation authorized Pet to commission a study into the chocolate company's possible relocation and had officials attend meetings to discuss the relocation plan. Ames "understood" that the "final call" on relocation lay with the parent corporation. (Ames affidavit at ¶ 3.)

*4 (2) Six (6) months before Ames' termination parent corporation officials announced, among other things, that the parent corporation "was 'undergoing a transformation from a loosely-held conglomerate to a more focused operating company' " and that additional reorganization might be considered where the parent corporation could " 'gain greater efficiencies as an operating company.' " (Ames affidavit at ¶ 4; Exhibit 1 at 3, 7.)

(3) Two (2) months before Ames' termination the parent corporation announced a plan to discard " 'its holding company structure for a more cost effective operating company structure' " and said that that program "would continue to move forward with 'cost reductions and reorganizations for greater efficiencies.' " (Ames affidavit at ¶ 5, Exhibit 1 at 11.)

(4) During the spring before Ames' termination the parent corporation commissioned a firm to study restructuring "the entire company." Based on conversations with Pet and chocolate company officials Ames "understood that [the parent corporation] had assumed a more active role in the day-to-day operations of the subsidiary." (Ames affidavit ¶ 6.)

(5) During the summer of 1990 there were shared common directors between Pet and the parent corporation when Miles Marsh, President and Chief Operating Officer ("COO") for the parent corporation, also served as President and Chief Executive Officer ("CEO") for Pet after Pet President and CEO J. Robert Cooper resigned because, it was reported in a trade magazine, of " 'apparently agreeing with [the parent corporation's] management on the need for a change at Pet.' " (Ames affidavit at ¶ 7; Exhibit 3.)

(6) A senior human resources officer from the parent corporation accompanied a search firm representative to the chocolate company to prepare to interview candidates for the presidency of the company--the position ultimately filled by Shoemaker. " 'This suggests that [the parent corporation] was directly involved in hiring Shoemaker.' " (Ames affidavit at ¶ 8.)

(7) When he assumed the presidency of the chocolate company Shoemaker stated that revenue and profit goals and timetables had been set by Miles Marsh, the parent corporation's president. (Ames affidavit at ¶ 9.)

(8) Two (2) months after Ames' termination the corporate chairman and CEO announced that Miles Marsh had been given " 'direct management responsibility for Pet' " and that the parent corporation "had moved to reduce operational costs through the elimination of a thousand jobs in its subsidiaries through 'retirement, attrition and severance.' " (Ames affidavit at ¶ 10; Exhibit 4.)

(9) During Ames' tenure as vice president for the chocolate company every capital expenditure over a certain dollar amount had to be approved by the parent corporation. (Ames affidavit at ¶ 11.)

(10) During Ames' employment he and other employees participated in a parent corporation stock ownership plan which was totally separate from Pet and the chocolate company. (Ames affidavit at ¶ 12.)

*5 (11) During Ames' employment he and other key employees received stock options from the parent corporation. (Ames affidavit at ¶ 13.)

The competent evidence which plaintiff has proffered must be viewed in the light most favorable to him as the non-moving party, _see Time Share Vacation Club v. Atlantic Resorts, supra_ at 63, 66; _LaRose v. Sponco, supra_ at 458. The evidence presented by the parent corporation, however, is relevant to the extent that it supplements--rather than contradicts--the plaintiff's competent evidence. Thus, the Court may properly also consider the parent corporation's evidence (1) that the chocolate company was established before both its acquisition by Pet and Pet's acquisition by the parent corporation (Motion to Dismiss at ¶ ¶ 16-20, Moore affidavit at ¶ ¶ 1-4); (2) that only capital expenditures of a million dollars or more required corporate approval (Capital Appropriation Approval Policy of the parent corporation); and (3) that the senior human resources officer from the parent corporation who visited the chocolate company with the executive recruiter did

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1991 WL 281798                                                              Page 4
Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: 1991 WL 281798 (E.D.Pa.))**

so solely to provide the recruiter the opportunity to familiarize himself with the business and the scope of the company president's responsibilities (Wright affidavit at ¶ 3).

Further, despite the requirement that the evidence be viewed in the light most favorable to plaintiff, the Court need accept only those inferences that reasonably and necessarily follow from the evidence. Accordingly, since other inferences are equally likely, the Court declines to conclude that the parent corporation was " 'directly involved in the hiring of Shoemaker.' "   The Court also need not consider mere "plans" which have never been shown to have come to fruition at all, much less during the relevant time period.   Neither is it bound by Ames' "understandings" based on non-specified conversations with unnamed Pet and chocolate company officials.

Thus narrowed, the competent evidence before the Court to be considered in deciding whether an alter ego, mere instrumentality or integrated enterprise test has been met, or whether the chocolate company served as an agent of the parent corporation, is as follows:

(1) the parent corporation authorized Pet to consider relocating the chocolate company and may have retained the right finally to decide whether relocation would occur;

(2) plans to change the parent corporation's role were announced and a restructuring study was commissioned;

(3) there was some shared common directorship during the summer of 1990 when Miles Marsh served as President and COO for the parent corporation and President and CEO for Pet;

(4) Marsh set goals and timetables for the chocolate company when Shoemaker assumed its presidency;

(5) the parent corporation retained the right to approve all capital expenditures of a million dollars or more; and

(6) various chocolate company employees participated in a parent corporation stock ownership plan and received parent corporation stock options.

**\*6** It is this Court's conclusion that the foregoing evidence does not met either the alter ego, the mere instrumentality or the integrated enterprise test.   See

*Lucas v. Gulf, supra;   Beckwith v. International Mill Services, supra.*

The alter ego test allows a court to disregard a parent company's separate existence when the two companies are alter egos and "such disregard will 'prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability of a crime.' "   *Kamens v. Summit Stainless, Inc., supra* 327 (quoting *Publicker Industries v. Roman Ceramics, 603 F.2d 1065, 1069 (3d Cir.1979)*).

Where a parent company constitutes one hundred percent of the stockholders of the subsidiary, it is to be expected that there will be directors which are common to both boards of both.   It is quite possible that those who occupy such positions might exercise some degree of control over the subsidiary. Nevertheless, as long as the corporations are separate entities, the subsidiary will not be deemed to be the "alter ego" of the parent, no matter how much control the parent exercises.

*Poe v. Babcock International, supra* at 6.   *See also Berkowitz v. Allied Stores of Penn-Ohio, Inc., 541 F.Supp. 1209, 1214 (E.D.Pa.1982)*.   The evidence before this Court does not meet the alter ego test.

In addition, plaintiff Ames has not established that the chocolate company is a mere instrumentality of the parent corporation or that these entities function as an integrated enterprise.   Under the mere instrumentality test

the parent corporation will be held liable if (1) it controls the subsidiary to such a degree that the subsidiary is its instrumentality, (2) it is perpetrating a wrong, *e.g.,* violating a statute, through its subsidiary, and (3) an unjust loss would result if the parent is allowed to be shielded by its separate corporation.

*Kamens v. Summit Stainless, Inc., supra* at 327. Whether entities function as an integrated enterprise, on the other hand, requires a court to assess "the interrelations of the operations, the common management, centralized control of labor relations and common ownership or financial control existing between the parent and the subsidiary." *Beckwith v. International Mill Services, supra* at 189.

Applying these tests the *Beckwith* court, *supra* at 189 and 189-190, found that plaintiff had not met its jurisdictional burden where the executive vice

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1991 WL 281798                                                                    Page 5
Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: 1991 WL 281798 (E.D.Pa.))**

president of the parent corporation was also the chairman of the board of the subsidiary, and where the subsidiary had the authority to develop its own budget, although the parent corporation retained the authority to approve or reject it.    The facts in the case before the court are even more compelling in favor of a conclusion of lack of personal jurisdiction over the parent corporation.    Here, there is substantially less control than was exercised in *Beckwith.*    Further, the chocolate company was not created by the parent corporation for "tax or finance purposes to carry on their business." *Poe v. Babcock International, PLC, supra* at 7.    Unlike the situation considered in *Berkowitz v. Allied Stores of Penn-Ohio, Inc., supra* at 1213-1214, the parent corporation here did not directly supervise and control the major decisions concerning the operations of the chocolate company.

*7 Neither does the evidence establish an agency relationship between the parent corporation and the chocolate company so that the parent corporation is an "employer," as that term is defined in § 630(b) of the ADEA. [FN2]

An agency relationship requires the presence and exercise of a master's control.    The requisite inquiry is whether some nexus exists between the parent corporation and the subsidiary (or subsubsidiary) to indicate that the latter is not independent, "but rather *totally* under the control and dominion" of the parent. *Beckwith v. International Mill Services, supra* at 189 (emphasis added).    *See also Odriozola v. Superior Cosmetic Distributors, Inc.,* 531 F.Supp. 1070, 1074 (D.P.R.1982).    Unlike the situation considered in *Bumpers v. International Mill Services, Inc.,* 595 F.Supp. 166, 170 (E.D.Pa.1984), where there existed a factual issue as to whether the parent company ordered the termination of older employees receiving high salaries, the evidence does not establish such a relationship in this case.

The parent corporation's motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure will be granted.

II. *The Motion of Shoemaker for Dismissal or for Summary Judgment Because of the Failure of Ames to Exhaust Administrative Remedies.*

Like claimants under Title VII of the Civil Rights Act, claimants under the ADEA must exhaust all federal and any and all existing state law administrative remedies.    *See* 42 U.C.S. § 2000(e)-5(f)(1);   29 U.S.C. § 626(d);   29 U.S.C. § 633(b);

*Borecki v. Eastern International Management Corporation,* 694 F.Supp. 47, 53 (D.N.J.1988);   *Bumpers v. International Mill Services, Inc., supra* at 7.

In this case, Ames filed charges with the Pennsylvania Human Relations Commission ("PHRC"), in accordance with 29 U.S.C. § 626(d), after his employment was terminated on August 21, 1990 by Shoemaker who was then president of the chocolate company.    *See also* 29 U.S.C. § 633(a) and 42 Pa.Cons.Stat.Ann. § 957.    In that filing Ames named only the chocolate company and the parent corporation.    The failure to name Shoemaker is the basis for the pending motion to dismiss and/or motion for summary judgment.

To support his motions Shoemaker alleges

(1) that plaintiff Ames was represented by experienced labor counsel at all stages of the proceedings, including the filing of the administrative complaint (Motion to Dismiss at ¶ 9);

(2) that Ames and his counsel were aware of Shoemaker's involvement in Ames' termination before the filing of the administrative complaint (Motion to Dismiss at ¶ 14;  Complaint at ¶ 12);

(3) that Shoemaker did not participate in the administrative hearings except in his capacity as president of the chocolate company (Motion to Dismiss at ¶ 12;  Shoemaker affidavit at ¶ 8);

(4) that Shoemaker did not receive any indication that he would be charged individually (Motion to Dismiss at ¶ 12;  Shoemaker affidavit at ¶ 8);

*8 (5) that if Shoemaker had been personally named as a defendant "he may have retained personal counsel at the initiation of this Complaint at the administrative level" (Motion to Dismiss at ¶ 16;  Shoemaker affidavit at ¶ 10);  and

(6) that if Shoemaker had been aware of the potential for personal liability  "he may have pursued an early negotiated settlement of this matter, as it related to him personally, in conjunction with his participation in the fact-finding conference."  (Motion to Dismiss at ¶ 17;  Shoemaker affidavit at ¶ 11.)

Ames does not dispute most of the foregoing facts stated by Shoemaker.    He argues in response, however, that Shoemaker has failed to allege "any actual, as opposed to speculative, prejudice to his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1991 WL 281798                                                                                          Page 6
Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: 1991 WL 281798 (E.D.Pa.))**

interests by not being named as Respondent in the charge." (Memorandum of Law in Opposition at 13.) He further notes that Shoemaker attended the PHRC fact-finding conference with two (2) attorneys--one of whom is presently representing him and one of whom is a member of Pet's in-house legal staff--and that during the conference he consulted with counsel on several occasions when asked questions. (Ames affidavit at ¶ 5.) (*See also* Shoemaker affidavit at ¶ 8 acknowledging participation in the PHRC fact-finding proceeding.)

Plaintiff Ames has presented corroborated and uncontradicted evidence, supported by affidavit and a PHRC memoranda, which establishes that Shoemaker's name was on the complaint originally prepared for filing with the PHRC but that his name was removed upon the advice of a PHRC investigator who said that the filing would otherwise be rejected by the PHRC and by the EEOC. (Ames affidavit at ¶ 4; Exhibit 2.) He also has provided a letter which was transmitted to Shoemaker's counsel before the now pending motions were filed. It explained the reason for Shoemaker's non-inclusion in the PHRC filing and offered to provide supporting documentation (Exhibit 4).

The test which this Court must apply, in determining whether Shoemaker's exclusion from the PHRC complaint warrants his dismissal from this court action, was articulated by the Third Circuit in *Glus v. G.C. Murphy Company,* 562 F.2d 880 (3d Cir.1977). The four factors pertaining to such administrative filings and complaints which were set forth in that Title VII case and have since been applied in ADEA cases, are these:

1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the ... complaint;

2) whether, under the circumstances, the interests of a named are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the ... proceedings;

3) whether its [the unnamed party's] absence from the ... proceedings resulted in actual prejudice to the interests of the unnamed party; and

4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named

party.

**\*9** *Glus v. C.G. Murphy Company, supra* at 888. *See also Borecki v. Eastern International Management Corporation, supra* at 53. This four prong test, however, "is not a mechanical one. Instead, each factor should be evaluated in light of the statutory purposes of Title VII and the interests of both parties." *Glus v. G.C. Murphy Company,* 629 F.2d 248, 251 (3d Cir.1980), *vacated on other grounds Retail, Wholesale & Dept. Store Union v. G.C. Murphy Company,* 451 U.S. 935, 101 S.Ct. 2013 (1981). No one factor is determinative and balancing is required. *See Borecki v. Eastern International Management Corporation, supra* at 55.

Prongs (1) and (4) of the *Glus* test are closely related in that collectively they "are aimed at ferreting out and assessing the reasons for failing to name an entity." *Kouri v. Todd,* 743 F.Supp. 448, 451 (E.D.Va.1990). In this case the corroborated and uncontradicted evidence establishes that Shoemaker was deleted as a defendant in the PHRC complaint upon the advise of a PHRC employee. Shoemaker's involvement in the relevant events, however, was plainly specified (PHRC Complaint at ¶ 3H, I), and those specifications were clearly sufficient to put both Shoemaker and the state administrative agency on notice as to Shoemaker's alleged role. *Compare Borecki v. International Corporation, supra* at 54. Indeed, Shoemaker "received every indication that [his] conduct was being formally reviewed by the PHRC." *Kinnally v. Bell of Pennsylvania,* 748 F.Supp. 1136, 1140 (E.D.Pa.1990). *See also Sandom v. Travelers Mortgage Services, Inc.,* 752 F.Supp. 1240, 1249 (D.N.J.1990); *Acampora v. Boise Cascade Corporation,* 635 F.Supp. 66, 71 (D.N.J.1986).

Prong (3) of the *Glus* test--pertaining to the similarity of interests of named and unnamed parties--also inures in favor of denying Shoemaker's motions. The allegedly discriminatory actions of Shoemaker occurred while he was acting within the scope of his employment with the result that "his interests could be adequately represented by his employer." *Borecki v. Eastern International Management Corporation, supra* at 54. In fact, it is reasonable to expect that Shoemaker, by virtue of his position as president of the chocolate company, could exercise authority over any litigation involving the company. *Compare Kouri v. Todd, supra* at 451. The law in this circuit is settled that the "court recognizes an exception when the unnamed party has received notice and when there is a shared

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1991 WL 281798                                                                                    Page 7
Not Reported in F.Supp., 1991 WL 281798 (E.D.Pa.), 57 Fair Empl.Prac.Cas. (BNA) 1301
**(Cite as: 1991 WL 281798 (E.D.Pa.))**

commonality of interest with the named party." _Schafer v. Board of Public Education,_ 903 F.2d 243, 251 (3d Cir.1990).

The final _Glus_ prong to be considered--pertaining to whether an unnamed party's absence from administrative proceedings resulted in actual prejudice to his interests--also is not supportive of Shoemaker's position. The uncontradicted evidence establishes that Shoemaker was in fact present at the PHRC proceeding. Further, the prejudice which he asks this Court to find-- based on his assertions that he might have retained personal counsel and sought an early settlement individually--is both speculative and unpersuasive. This is not a case in which Shoemaker faced possible exposure for legal fees and was precluded from attending the PHRC fact-finding hearing because he was not apprised in advance of the proceeding. _Compare Duva v. Bridgeport Textron,_ 632 F.Supp. 880, 883 (E.D.Pa.1985). Neither was he deprived of the opportunity to participate in the hearing. _See Kouri v. Todd, supra_ at 452. Under the balancing test of _Glus,_ which this Court must apply, Shoemaker is not entitled to either dismissal or to a summary judgment, and his motions under Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure will be denied.

III. _The motion of Ames for Attorneys' Fees and Costs Incurred in Responding to the Motion Filed by Shoemaker._

**\*10** Ames has moved for sanctions under Rule 11 of the Federal Rules of Civil Procedure, in the form of attorneys' fees and costs, claiming that a reasonable investigation of the facts, and a competent level of legal research, would have led counsel for Shoemaker to conclude that there was no legal basis for his motions filed under Rules 12 and 56 of the Federal Rules of Civil Procedure.

Insofar as counsel for Shoemaker was notified of Shoemaker's deletion as a defendant in the PHRC action based on the advice of a PHRC investigator (_see_ Exhibit 4), this fact certainly could have been noted and discussed in his Rule 12 and Rule 56 motions. Neither the exclusion of a discussion about this deletion nor the applicable law, however, establishes a bad faith filing which would warrant the imposition of attorneys' fees and costs. _See, e.g., Duva v. Bridgeport Textron, supra_ at 883. This Court will not assess fees and costs against defendant Shoemaker.

_ORDER_

AND NOW, this 30th day of December, 1991, for the reasons set forth in the accompanying Memorandum, IT IS HEREBY ORDERED that

(1) the motion to dismiss, for lack of personal jurisdiction, filed by defendant Whitman Corporation under Rule 12(b)(2) of the Federal Rules of Civil Procedure is GRANTED;

(2) the motion to dismiss and/or motion for summary judgment, for lack of subject matter jurisdiction and/or failure to state a cause of action, filed by defendant Jay G. Shoemaker under Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure is DENIED; and

(3) the motion for attorneys' fees and costs filed by plaintiff Marvin Ames under Rule 11 of the Federal Rules of Civil Procedure is DENIED.

> FN1. Rule 12(b)(1) is concerned with "lack of jurisdiction over the subject matter," while Rule 12(b)(6) involves a "Failure to state a claim upon which relief can be granted." A summary judgment shall issue under Rule 56 if it is established "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

> FN2. § 630(b) defines an "employer" for purposes of the ADEA as "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.... The term also means (1) any agent of such a person ..."

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

LEXSEE

**MURRAY F. FREEMAN and AILEEN S. FREEMAN, Plaintiffs v. KEYCORP, KEYCORP d/b/a KEY BANK OF CENTRAL NEW YORK, Defendants**

Civil No. 89-1287

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

1990 U.S. Dist. LEXIS 1525

January 31, 1990, Decided

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, bank and subsidiary, filed a motion to dismiss for the lack of personal jurisdiction the suit by plaintiffs, contracting claimant and his wife, for the breach of an agreement and an amended agreement. The wife filed a motion for a default judgment. Defendants also sought sanctions for the default motion.

**OVERVIEW:** The bank was a citizen of New York. Defendants argued that plaintiffs were attempting to interchange the bank, its subsidiary, and a second subsidiary bank that was not named in the complaint and which did business in Pennsylvania to establish jurisdiction where none existed. The court granted the motion to dismiss but denied the motion for a default judgment and denied sanctions. A parent could have been subjected to a state's jurisdiction even when it did not do business within the state when the parent and a subsidiary were alter egos. Plaintiff raised only vague accusations that the bank, its subsidiary, and the unnamed bank were so interrelated that personal jurisdiction existed. Plaintiffs had the burden of establishing jurisdiction but failed to do so. Even though the wife was personally not served with pleadings, the wife was aware of the course of proceedings through her husband. Defendants also properly served plaintiffs at the address listed on the summons. Defendants took active steps to properly serve defendants and avoid a default judgment. Sanctions were inappropriate.

**OUTCOME:** Defendants' motion to dismiss for the lack of jurisdiction the suit by plaintiffs was granted. The wife's motion for a default judgment was denied. Sanctions against plaintiffs were not granted.

**CORE TERMS:** subsidiary's, default judgment, interrogatories, entities, personal jurisdiction, advertisements, residents, principal place of business, alter ego, newspapers, toll-free, reply brief, conducts business, documents filed, transacts business, responsive pleading, reserved, deposits, national banking, wholly owned subsidiary, business activities, attorney's fees incurred, jurisdictional, prejudiced, defending, summons

**LexisNexis(R) Headnotes**

Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > General Overview
Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview
[HN1]Even though a parent corporation is not located in or personally doing business in a state, the parent may be subject to the jurisdiction of that state if a subsidiary located therein is deemed to be merely an alter ego of the parent. However, where the separation between a parent corporation and a subsidiary is real, albeit formal, the subsidiary's activities are not a sufficient basis for subjecting the non-resident parent to the jurisdiction of the forum state.

Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview
[HN2]It is the burden of the plaintiffs to prove the existence of jurisdiction over the person of the defendants.

**OPINION BY:** [*1] KOSIK

**OPINION**

*MEMORANDUM*

EDWIN M. KOSIK, UNITED STATES DISTRICT JUDGE

Pro se plaintiffs filed a complaint in the instant action on September 6, 1989. The action arises out of the alleged breach of an agreement and amended agreement entered into between the plaintiffs and defendants on August 4, 1977 and June 1, 1978, respectively. On October 4, 1989, the defendants filed a motion to dismiss on the ground that the court lacked jurisdiction over the defendants. A brief in support of the motion was filed on October 4, 1989. A brief in opposition to the motion to dismiss was also filed on October 18, 1989. A reply brief was filed by defendants on October 30, 1989.

On October 27, 1989, plaintiff Aileen S. Freeman filed a motion for default judgment pursuant to Fed.R.Civ.P. 55(b)(2) and a brief in support thereof. A brief and affidavit in opposition to Plaintiff's motion for default judgment was filed on November 7, 1989. A reply brief and joinder in support of the motion for default judgment was filed on November 14, 1989.

In their briefs and affidavit in support of the motion to dismiss, [1] defendants argue that plaintiffs are attempting to interchangeably use the conduct of three distinct [*2] entities, to wit, Key Bank of Central New York, Key Bank USA, and Keycorp, to establish jurisdiction. Specifically, defendants argue that in the documents filed with this court, plaintiffs have identified three entities: Keycorp, a national banking association and bank holding company located in Albany, New York; Key Bank of Central New York, a wholly owned subsidiary of Keycorp with its principal place of business in Syracuse, New York, and the bank which gave the plaintiffs the line of credit from which the instant claims derive; and Key Bank, USA, an independent subsidiary of Keycorp, which advertises in Pennsylvania newspapers for depositors.

1 *See* Docs. 3, 4, and 11.

Plaintiffs' brief in opposition to defendants' motion to dismiss and supporting affidavit [2] argue that this court has personal jurisdiction over the defendants under 42 Pa. C.S.A. § 5301(a)(2)(iii), that is, that the defendant Keycorp has conducted a continual and substantial part of its business within the Commonwealth of Pennsylvania. In particular, plaintiffs assert that Keycorp has placed substantial advertisements in Pennsylvania newspapers under the name "Key Bank;" that Keycorp has received substantial [*3] deposits from residents of

Pennsylvania as a result of the advertisements; that Keycorp transacts business through a toll-free number available to Pennsylvania residents; and that the name "Key Bank" has been reserved for use as a corporation in the Commonwealth of Pennsylvania on behalf of Keycorp.

2 *See* Docs. 6 and 7.

Further, on December 19, 1989, plaintiffs filed a motion to compel answers to interrogatories and a brief in support thereof. Attached to the brief was a copy of an interview conducted with the CEO of Key Corp and the Highlights and Message from the President, Key Corp Annual Shareholders Meeting 1989. The motion referred to fourteen interrogatories which related to the business activities of defendant Key Corp. On January 11, 1990, this court granted plaintiff's motion to compel and directed defendant to provide plaintiff and the court with a copy of the answers to the interrogatories. The court received defendant's answers to the interrogatories on January 31, 1990.

In their opposition brief, plaintiffs cite several Pennsylvania district court cases for the proposition that extensive advertising and maintenance of a toll-free number may be sufficient contacts [*4] with the Commonwealth of Pennsylvania to exercise personal jurisdiction over out-of-state defendants. *Provident National Bank v. Cal. Fed. Sav. & Loan Ass'n,* 624 F.Supp. 858 (E.D.Pa. 1985); *aff'd* 819 F.2d 434 (3d Cir. 1987); *Johnson v. Summa Corp.,* 632 F.Supp. 122 (E.D.Pa. 1985). While we have no dispute with the plaintiffs' reasoning, we believe that the plaintiffs' analysis is misplaced under the instant circumstances. The problem which this court faces in addressing the question of personal jurisdiction is the nature and relationship of the three entities named by the plaintiffs in the documents filed with this court.

The named defendants in the instant action are "Keycorp, Keycorp d/b/a Key Bank of Central New York." Paragraphs 2 and 3 of plaintiffs' complaint identify the defendants as follows:

2. Defendant Keycorp is a corporation organized under the laws of the State of New York with its principal place of business at One Keycorp Plaza, Albany, New York 12201.

3. Defendant Keycorp has at all times material hereto, conducted business under the name "Key Bank of Central New York" and has used said name as a trade name for its business activities.

In support of its [*5] jurisdictional allegations, plaintiffs' brief and affidavit indicate that plaintiff Murray F. Freeman believes that Keycorp has placed substantial advertisements in Pennsylvania newspapers under the name "Key Bank;" that Keycorp has received

substantial deposits from residents of Pennsylvania as a result of the advertisements; that Keycorp transacts business from and with the use of a toll-free number available to Pennsylvania residents; that "Key Bank" has been reserved for use by a corporation within the Commonwealth of Pennsylvania; and that the reservation of "Key Bank" was made by or on behalf of Keycorp. These assertions are contradicted by defendant in its answers to interrogatories.

Defendants opposing documentation indicates that Keycorp is a bank holding company organized under the laws of the State of New York which conducts business through its various subsidiaries. Its principal place of business is One Keycorp Plaza, Albany, New York. Key Bank of Central New York, a wholly owned subsidiary of Keycorp, is a national banking association with its principal place of business at 201 South Warren Street, Syracuse, New York. Key Bank USA is also a subsidiary of Keycorp.

A similar [*6] issue existed in *Poe v. Babcock International, PLC, 662 F.Supp. 4 (M.D. Pa. 1985)*, wherein the court stated that [HN1]even though a parent corporation is not located in or personally doing business in a state, the parent may be subject to the jurisdiction of that state if a subsidiary located therein is deemed to be merely an alter ego of the parent. However, where the separation between a parent corporation and a subsidiary is real, albeit formal, the subsidiary's activities are not a sufficient basis for subjecting the non-resident parent to the jurisdiction of the forum state. *Papercraft Corp. v. Proctor & Gamble Co., 439 F.Supp. 1060, 1062-63 (W.D. Pa. 1977)*.

While neither party has delineated in detail the corporate structures involved in the instant action, plaintiffs have not established that the parent and subsidiaries have so disregarded the formal indicia of corporate separation that the latter are mere departments or alter egos of the former or that an agency relationship exists. *See Bellomo v. Pennsylvania Life Co., 488 F.Supp. 744 (S.D.N.Y. 1980)*. Plaintiffs merely raise vague and unsubstantiated allegations that Keycorp conducts business under the names of Key [*7] Bank of Central New York and Key Bank USA and that all activities conducted by the subsidiaries are on behalf of Keycorp. Defendants argue that all three entities named by Plaintiffs are separate, independent corporate entities related in a parent-subsidiary fashion. Plaintiffs' complaint is based upon their dealings with Key Bank of Central New York. Plaintiffs' grounds for jurisdiction are based on the alleged activities in this Commonwealth by Key Bank USA, who has not been named as a defendant.

[HN2]It is the burden of the plaintiffs to prove the existence of jurisdiction over the person of the defen-

dants. *Poe, supra, at 7*; *Indian Coffee Corp. v. Proctor & Gamble Co., 482 F.Supp. 1098 (W.D.Pa. 1980)*. Plaintiffs in the instant action have not produced any evidence that Keycorp is a mere alter ego of the other defendant, and therefore, plaintiffs have failed to meet their burden. Additionally, because plaintiffs have met defendants' affidavit regarding corporate structure with mere conjecture, [3] we do not believe it is necessary for this court to allow plaintiffs an opportunity to conduct further discovery in order to construct a basis for jurisdiction Accordingly, the defendants' [*8] motion to dismiss for lack of personal jurisdiction will be granted.

    3  As pointed out above, the plaintiffs' interrogatories add nothing in support of their jurisdictional claim.

Also before the court is a motion for default judgment under *Federal Rule of Civil Procedure 55(b)(2)*, filed by plaintiff, Aileen S. Freeman. Plaintiff asserts she has not been served with any responsive pleading by the defendant within the appropriate time. However, plaintiff does acknowledge in her affidavit [4] that her co-plaintiff and husband was timely served with the responsive pleading of the defendants and that receipt and acceptance of the responsive pleading was made by her, on behalf of plaintiff Murray Freeman, at their residence.

    4  *See* Doc. 9.

Defendants filed a brief in opposition to plaintiff's motion for default judgment and an affidavit. [5] In the affidavit, counsel for defendants alleges that the summons in this action directs that responding papers be served upon Murray F. Freeman, P.O. Box 411, Paupack, Pennsylvania 18451, not upon both Murray and Aileen S. Freeman. Counsel further asserts that she relied upon plaintiffs' summons when she arranged service of the motion to [*9] dismiss. Finally, she argues that Aileen S. Freeman signed for delivery of the motion, and therefore, had notice of the motion and was not prejudiced by not receiving her own set of papers. Defendants also request sanctions against plaintiff in the amount of $ 500.00.

    5  *See* Doc. 12.

We will deny the plaintiffs' motion for default. As stated in *Wright and Miller, Federal Practice and Procedure,* § 1141, Rule 5 has two basic objectives: [1] to insure a full exchange of the written communications among the litigants so that each party has a copy of all papers affecting him; and [2] it attempts to establish a system for the filing of papers with the court that will create an orderly court record. We believe that these objectives were reached by the instant service and that plaintiff Aileen Freeman was in no way prejudiced by not receiving an individual copy of the motion to dis-

1990 U.S. Dist. LEXIS 1525, *

miss. However, we will deny the defendants' request for $ 500.00 as sanctions for attorney's fees incurred in defending the motion.

*ORDER*

NOW, THEREFORE, this 31st day of January, 1990, IT IS HEREBY ORDERED THAT:

[1] plaintiff, Aileen S. Freeman's motion for default judgment is denied;

[2] defendants' [*10] motion to dismiss is granted; [3] defendants' request for $ 500.00 as sanctions for attorney's fees incurred in defending the motion for default judgment is denied; and

[4] the Clerk of Court is directed to close this case.