# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

               Plaintiff,

      v.

CHI MEI OPTOELECTRONICS
CORPORATION, et al.

               Defendants.

Civil Action No.  06-726 (GMS)

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR RULE 11 SANCTIONS AND SANCTIONS PURSUANT TO 28 U.S.C. § 1927

THE BAYARD FIRM

Richard D. Kirk
Ashley B. Stitzer
222 Delaware Avenue, 9th Floor
P.O. Box 25130
Wilmington, DE 19899-5130
(302) 655-5000
rkirk@bayardfirm.com

Attorneys for Plaintiff LG.Philips LCD Co., Ltd.

OF COUNSEL:
Gaspare J. Bono
Song K. Jung
R. Tyler Goodwyn, IV
Lora A. Brzezynski
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C.  20006
(202) 496-7500

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.    LPL HAS NOT MISSTATED THE LAW, NOR HAVE ITS ATTORNEYS
      MADE THE SAME ARGUMENTS CMO MAKES TO AVOID PERSONAL
      JURISDICTION .................................................................................................... 2

      A.    Through the Use of Nationwide Established Distribution Channels, CMO
            Has Purposefully Directed its Business Activities Towards the United
            States Market, Including Delaware ....................................................................... 2

      B.    For the Same Reasons that CMO Cannot Reasonably Contest Jurisdiction
            in This Case, LPL Did Not Contest Jurisdiction in Wisconsin............................. 5

II.   LPL DID NOT MISREPRESENT THE FEDERAL CIRCUIT'S DECISION IN
      THE CEA CASE.................................................................................................... 8

III.  CMO'S ATTEMPT TO MINIMIZE THE JURISDICTIONAL EVIDENCE LPL
      PRESENTED IS UNAVAILING ......................................................................... 10

      A.    CMO's Response to the Evidence Presented is Yet Another Attempt to
            Divert This Court's Attention Away from its Jurisdictional Contacts ................ 10

      B.    CMO Does Not Deny the Truth of the Facts Presented in LPL's
            Opposition to CMO's Motion to Dismiss............................................................ 14

      C.    CMO's Attempt to Exclude LPL's Supporting Documentation Fails................. 15

IV.   SANCTIONS ARE APPROPRIATE AGAINST CMO AND ITS COUNSEL ............ 16

      A.    It was Not Reasonable for CMO to File its Motion to Dismiss for Lack of
            Personal Jurisdiction ............................................................................................ 16

      B.    CMO's Motion to Dismiss was Filed in Bad Faith and for an Improper
            Purpose.................................................................................................................. 17

            1.    CMO's Actions in the CEA Case are Indicative of its Bad Faith............ 17

            2.    CMO Refused to Reconsider the Basis for its Motion ............................ 19

CONCLUSION.......................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

## <u>CASES</u>

*Agilent Technologies, Inc. v. Elan Microelectronics Corp.*,
  No. C 04-05385 JW, 2005 WL 3260162 (N.D.Cal. Nov. 29, 2005) ........................................ 13

*Aircraft Guar. Corp. v. Strato-Lift, Inc.*,
  974 F. Supp. 468 (E.D. Pa. 1997) ........................................................ 15

*Akro Corp. v. Luker*,
  45 F.3d 1541 (Fed. Cir. 1995) ........................................................ 16

*American Bio Medica Corp. v. Peninsula Drug Analysis Co.*,
  No. Civ. A. 99-218-SLR, 1999 WL 615175 (D. Del. August 3, 1999) ...................................... 7

*Ameriserve Food Distrib., Inc. v. Lamb-Weston, Inc.*,
  267 B.R. 668 (D. Del. 2001) ........................................................ 15

*Asahi Metal Indus. Co. v. Superior Court*,
  480 U.S. 102 (1987) ........................................................ 5, 9, 19

*AU Optronics Corp. v. LG.Philips LCD Co. et al.*,
  Case No. 07-357-JJF (D. Del.) ........................................................ 5

*Baden Sports, Inc. v. Molten*,
  No. C06-0210P, 2007 WL 171897 (W.D.Wash Jan. 18, 2007) ................................................ 12

*Beverly Hills Fan Co. v. Royal Sovereign Corp*,
  21 F.3d 1558 (Fed. Cir. 1994) ........................................................ *passim*

*Commissariat a l'Energie Atomique v. Chi Mei Optoelectronics Corp.*,
  395 F.3d 1315 (Fed. Cir. 2005) ........................................................ *passim*

*Comuso v. Nat'l R.R. Passenger Corp.*,
  267 F.3d 331 (3d Cir. 2001) ........................................................ 16

*Eavenson, Auchmuty & Greenwald v. Holtzman*,
  775 F.2d 535 (3d Cir. 1985) ........................................................ 16

*GSK Technologies, Inc. v. Schneider Elec., S.A.*,
  No. 6:06CV361, 2007 WL 788343 (E.D.Tex. Mar. 14, 2007) ................................................ 12

*In Re: Elonex Phase II Power Mgmt. Litig.*,
  2003 WL 21026758 (D. Del. May 6, 2003) ........................................................ 3

*Intel Corp. v. Broadcom Corp.*,
  167 F. Supp. 2d 692 (D. Del. 2001) ........................................................ 15

*Marshall Packaging Co., LLC v. Nestle Waters N. Am., Inc.*,
  No. 6:05CV295, 2006 WL 871015 (E.D.Tex. Mar. 24, 2006) ................................................ 12

*Semiconductor Energy Lab. Co. v. Chi Mei Optoelectronics Corp., et al.*,
  Case No. C 04-04675-MHP (N.D. Cal.) ........................................................ 11

# TABLE OF AUTHORITIES

**Page**

## RULES AND OTHER AUTHORITIES

Fed. R. Civ. P. 11 ............................................................................................................... 1, 16, 17

## PRELIMINARY STATEMENT

CMO seeks to avoid the inescapable fact that this Court clearly has jurisdiction over CMO and CMO has no basis to challenge this Court's jurisdiction again.[1] CMO places undue emphasis on the jurisdictional arguments made by LPL's California subsidiary in a case brought in Wisconsin federal court. Significantly, CMO ignores the fact that LPL itself, which is a foreign corporation and LCD manufacturer just like CMO, did not challenge personal jurisdiction in Wisconsin.

CMO and its counsel should be sanctioned for pursuing a frivolous motion to dismiss for lack of personal jurisdiction. Any reasonable inquiry would have revealed CMO's substantial contacts with this jurisdiction. However, CMO remarkably contends it has no duty to conduct such an inquiry. CMO's attempt to disclaim any and all purposeful jurisdictional contacts flies in the face of the overwhelming evidence that CMO purposefully directed its business activities to the United States, including Delaware. Further, LPL has not misstated or misrepresented the controlling law. Rather, CMO's interpretation of the legal standard for compelling jurisdiction is unjustifiably restrictive.

Overall, CMO's arguments are made in bad faith and appear intended to delay the case and force LPL to incur additional expenses. LPL submits that sanctions are warranted against

---

[1] CMO's first attempt to distract this Court's attention away from the evidence of its jurisdictional contacts is its complaint that LPL did not address the arguments made in its reply brief in support of its motion to dismiss. As CMO is undoubtedly aware, Rule 11 (c)(1)(A) of the Federal Rules of Civil Procedure requires that a party be served with a sanctions motion 21 days prior to the actual filing of the motion with the court. Thus, once LPL had served its motion for sanctions, it could not then file a different version that incorporated new arguments.

both CMO and its counsel for their refusal to withdraw their baseless motion that is directly

contradicted by the evidence, as well as legal precedent.[2]

## ARGUMENT

**I.    LPL HAS NOT MISSTATED THE LAW, NOR HAVE ITS ATTORNEYS MADE THE SAME ARGUMENTS CMO MAKES TO AVOID PERSONAL JURISDICTION**

CMO's response dramatically accuses LPL of misstating the applicable law and arguing

contrary positions in different courts.  CMO is wrong on both counts.  In fact, CMO's

interpretation and application of the law is not supported by precedent.

**A.    Through the Use of Nationwide Established Distribution Channels, CMO Has Purposefully Directed its Business Activities Towards the United States Market, Including Delaware**

According to *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1565 (Fed.

Cir. 1994), CMO is subject to jurisdiction if it is purposefully part of an established distribution

channel that serves the United States, which includes Delaware.   Rather than having random,

attenuated, or unexpected contacts with Delaware, CMO has purposefully availed itself of the

United States, and therefore Delaware markets, through its ongoing relationships with large

original equipment manufacturers ("OEMs") such as Samsung, Dell, IBM, Hewlett-Packard,

NEC-Mitsubishi, and ViewSonic, thereby making it subject to personal jurisdiction in this Court.

(D.I. 60, Ex. 25, 31-35.)  As in this case, the defendants in *Beverly Hills Fan* "purposefully

shipped the accused fan into Virginia through an established distribution channel." *Beverly Hills*

*Fan*, 21 F.3d at 1565; *see also In Re: Elonex Phase II Power Mgmt. Litig.*, No. 01-082-GMS,

---

[2]  Quite apart from being wrong on the facts and law, CMO should be estopped from continuing to object to this Court's jurisdiction.  On May 22, 2007, LPL served its First Amended Complaint For Patent Infringement Against CMO Corporation and CMO USA, Inc.  CMO has not filed any pleading or motion in response to the Amended Complaint.  Therefore, LPL submits, CMO has waived its right to contest this Court's jurisdiction.

2003 WL 21026758 (D. Del. May 6, 2003) (Exhibit A) ("Jean has intentionally sold monitors using nationwide distribution channels. This knowing and purposeful shipment of monitors satisfies the act requirement of Section 3104(c)(4). Because Jean undeniably derives substantial revenue from these activities, it is subject to jurisdiction under Delaware's long-arm statute.") (citing *Beverly Hills Fan*, 21 F.3d at 1571). Because CMO places its LCD modules "in the stream of commerce" knowing "the likely destination of the products," its "conduct and connections with [Delaware are] such that [CMO] should reasonably have anticipated being brought into court [here]." *Beverly Hills Fan*, 21 F.3d at 1566.

CMO has mischaracterized LPL's arguments regarding the conduct necessary to subject CMO to this Court's jurisdiction. LPL has not argued that *no* purposeful conduct is required. Rather, LPL has consistently maintained that the purposeful conduct required to subject a party to personal jurisdiction does not require the specific direction of products to a single forum, as CMO contends.

CMO's interpretation of "purposeful" is not supported by controlling law. For example, CMO makes the following very narrowly tailored and ultimately misleading statements:

1. "It is undisputed that CMO never purposefully directed business activities to Delaware." (D.I. 78 at 5; D.I. 21, ¶ 4.)

2. "It is undisputed that CMO does not manufacture, design, advertise, package, sell or distribute any products or raw materials in Delaware." (D.I. 78 at 5; D.I. 21, ¶ 4.)

3. "It is undisputed that CMO has never maintained, or caused, instructed, or directed any third parties to maintain, any agents, distributors, brokers, wholesalers, or other representatives in Delaware for the transaction of business of any nature." (D.I. 78 at 5; D.I. 21 ¶ 8.)

4. "It is undisputed that CMO has never maintained, or caused, instructed, or directed any third parties to maintain, any agents, distributors, brokers, wholesalers, or other representatives for the purpose of transacting business in Delaware." (D.I. 78 at 5; D.I. 21 ¶ 8.)

-3-

5. "It is undisputed that CMO has never executed any contract in Delaware, or contracted with any party to manufacture, buy, sell or distribute products or services in Delaware." (D.I. 78 at 5; D.I. 21 ¶ 8.)

CMO's argument is inaccurately predicated upon the premise that, in order to be subject to this Court's jurisdiction, CMO would have had to direct or instruct third parties to transact business specifically *in Delaware*. No such requirement exists. Indeed, the following statement in CMO's opposition brief further illustrates its fundamental misunderstanding of the controlling law: "none of the CMO products found in Delaware were sold *by CMO* in Delaware, nor shipped into Delaware *by CMO*." (D.I. 99 at 2) (emphasis in original.) CMO incorrectly argues that the purposeful conduct necessary to subject it to this Court's jurisdiction entails a **direct** sales link between CMO and Delaware. CMO's sales demonstrate that it has successfully targeted the United States market, including Delaware, through its ongoing relationships with large OEMs that market and sell LCD monitors nationwide. CMO therefore knows that its products are likely to be purchased in Delaware.

Indeed, CMO's ongoing, intentional sale of its products to OEMs constitutes the purposeful placement of its LCD modules into established distribution channels that sell CMO's products throughout the United States, including Delaware. Contrary to CMO's arguments, it has not "merely" placed its modules into the global stream of commerce with only the slightest chance such products will end up being sold in the United States and Delaware. Instead, it has affirmatively directed its products to such OEMs that target sales throughout the United States, including Delaware. Indeed, since before 2005, there has been "a prima facie case for CMO's use of an established distribution network that likely results in substantial sales of its products in Delaware." *Commissariat à l'Energie Atomique v. Chi Mei Optoelectronics Corp. et al.*, 395 F.3d 1315, 1323 (Fed. Cir. 2005).

Finally, CMO attempts to infer that the incorporation of its modules into a name brand LCD monitor does not constitute the sale of its "products."  CMO's LCD modules cannot be compared to the valve stems in *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102 (1987), however.  CMO's modules comprise the vital components of the end product that are sold by name brands such as Dell, Gateway, Hewlett-Packard, and Apple.

LPL has not misrepresented the controlling law on personal jurisdiction.  Rather, CMO's interpretation of the law is implausible given the modern day business practices of billion dollar international companies with worldwide sales like CMO.  Although CMO is a Taiwanese company, it has purposefully and intentionally directed its sales activities to the United States market, including Delaware.  CMO knows that such activities are sufficient to compel personal jurisdiction under *Beverly Hills Fan*, yet it filed its motion to dismiss in the face of this controlling law.

### B.    For the Same Reasons that CMO Cannot Reasonably Contest Jurisdiction in This Case, LPL Did Not Contest Jurisdiction in Wisconsin

CMO's allegation that contrary arguments have been made by LPL's counsel in this case and in the case filed by AU Optronics Corporation ("AUO"), which has recently been transferred to this Court from the United States District Court for the Western District of Wisconsin, are without merit.  (*See AU Optronics Corp. v. LG.Philips LCD Co. et al.*, Case No. 07-357-JJF (D. Del.)  CMO attempts to justify its objections to personal jurisdiction by erroneously identifying itself with LG.Philips LCD America, Inc. ("LPLA"), which recently lost its motion to dismiss on the basis of personal jurisdiction in Wisconsin.  Significantly, LPL did *not* contest personal jurisdiction in Wisconsin for the very reasons CMO is subject to this Court's jurisdiction in the instant case.  Thus, CMO's attempt to compare its objection to personal jurisdiction in this Court with LPLA's legitimate objection in Wisconsin is not compelling.

First, it is important to distinguish that LPLA, and not LPL, filed the motion to dismiss. LPL, which is based in South Korea and is the company most similarly situated with CMO, did not object to jurisdiction in Wisconsin. For the same reasons that LPL could not object to jurisdiction in Wisconsin, CMO cannot legitimately object to jurisdiction in Delaware. Because of the different circumstances surrounding LPLA's conduct, the arguments counsel made in Wisconsin on behalf of LPLA are not, as CMO contends, "identical" to those made here regarding CMO's jurisdictional contacts. LPLA, unlike LPL and CMO, is a local California company that does business in California and in just a few other states. LPLA does not utilize sophisticated established distribution channels that specifically target United States companies to sell their products. CMO, on the other hand, has a formal and established means by which its products are directed towards and distributed throughout the United States market, which includes Delaware.

CMO's distribution channels, for example, incorporate CMO's LCD modules into name brand monitors that are then distributed to retailers for sale all throughout the United States. The OEMs with which CMO deals, such as Samsung, Dell, IBM, Hewlett-Packard, NEC-Mitsubishi, and ViewSonic, market and sell the finished products in retail stores all throughout the United States including, but not limited to, Best Buy, Circuit City, CompUSA, Office Depot, Staples, RadioShack, OfficeMax, Wal-Mart and Sears, all of which have locations in Delaware. (D.I. 60, Ex. 25, 31-35, 37-45.) Moreover, in addition to its own established distribution channels, CMO established a *direct* supplier relationship with Dell, which sells "more systems globally than any computer company . . . selling computer systems directly to customers." (D.I. 60, Ex. 1 at 0036, Ex. 25.) Like the defendant in *Beverly Hills Fan* who knew or reasonably should have known its products would end up in Virginia via its ongoing, purposeful shipments through its established

distribution channel, CMO knows or should know that its products are sold in Delaware, as it intentionally and repeatedly ships its modules through an established distribution channel that targets sales to nationwide United States retailers with locations in Delaware.

CMO is mistaken in arguing that jurisdiction only attaches when there is a degree of control over the OEMs to direct the sale of the finished products. CMO emphasizes LPLA's reliance on *American Bio Medica Corp. v. Peninsula Drug Analysis Co.*, No. Civ. A. 99-218-SLR, 1999 WL 615175 (D. Del. August 3, 1999), which is distinguishable from the instant case because of CMO's ongoing relationship with various OEMs. In fact, *American Bio* recognized the holding in *Beverly Hills Fan* that jurisdiction can be found against a defendant who acts through an intermediary where, as here, the commercial relationship with the intermediary is ongoing and the products in question are, in fact, shipped into the forum. *American Bio*, 1999 WL 615175 at *5 (Exhibit B). "'From these ongoing relationships, it can be presumed that the distribution channel formed by defendants and [the intermediary] was intentionally established, and that defendants knew, or reasonably could have foreseen, that a termination point of the channel was [the forum].'" *Id.* (quoting *Beverly Hills Fan*, 21 F.3d at 1564).

The facts in *American Bio* are distinguishable, however, from the present case because in *American Bio* there was the absence of an ongoing commercial relationship with the intermediary and no actual sales of infringing product in Delaware or evidence of offers to sell to Delaware residents prior to the filing of the Complaint. *American Bio*, 1999 WL 615175 at *5. Where there is an established distribution channel that a defendant knowingly and purposefully uses, as CMO does, a finding of direct control by the accused party over the downstream parties is not necessary. *See Beverly Hills Fan*, 21 F.3d at 1564-66. CMO has purposefully targeted the United States, including Delaware, for the sales of its LCD modules by intentionally maintaining

ongoing relationships with companies like Dell, IBM, and Hewlett-Packard. Because such

conduct is sufficient to establish jurisdiction under *Beverly Hills Fan*, CMO cannot legitimately

challenge jurisdiction in this case. LPLA does not manufacture any products and primarily

operates in California, thus LPLA believed it had a legitimate basis to object to personal

jurisdiction in Wisconsin. The Wisconsin court rejected LPLA's jurisdictional arguments and

found personal jurisdiction was appropriate over LPLA in both Wisconsin *and Delaware*, yet

CMO, despite identifying itself with LPLA, continues objecting to jurisdiction in Delaware. In

fact, the Wisconsin court concluded that "LPLA 'knowingly and intentionally exploited' the

markets in both Wisconsin and Delaware and that LPLA should reasonably anticipate being sued

for patent infringement *in any United States district court*." (Ex. 1 to Declaration of Richard D.

Kirk ("Kirk Decl.") at 10)[3] (emphasis added.) Because the same holds true for CMO, its motion

to dismiss is frivolous.

## II.     LPL DID NOT MISREPRESENT THE FEDERAL CIRCUIT'S DECISION IN THE CEA CASE

In another diversionary move, CMO argues that LPL has "deliberately misreported" the

Federal Circuit's ruling in the CEA case. Like CMO's other arguments, this lacks merit.

Several times in its motion, LPL quoted full passages from the Federal Circuit's opinion,

including the following:

> CMO did not submit any evidence to contradict CEA's allegation
> that CMO derived substantial revenue from sales of its products to
> Delaware. Nor did CMO submit evidence to contradict CEA's
> assertion that its products, as incorporated by OEMs into computer
> monitors, were likely to reach Delaware. (*See* D.I. 87 at 2)
> (quoting *Commissariat*, 395 F.3d at 1317-18.)

---

[3] All remaining numbered exhibits referenced herein are attached to the Kirk Decl.

> Based on the allegations in the complaint, the evidence submitted
> by CEA, and CMO's failure to rebut the factual inference that
> devices incorporating its LCDs were sold in Delaware, the district
> court should have found CEA's showing sufficient to establish that
> substantial revenues could be derived by CMO from the sales of
> products in Delaware incorporating CMO's LCDs. (*See* D.I. 87 at
> 14) (quoting *Commissariat*, 395 F.3d at 1320.)

> Indeed, CEA has gone beyond factual allegations, and has already
> made a prima facie case for CMO's use of an established
> distribution network that likely results in substantial sales of its
> products in Delaware. (*See* D.I. 87 at 15) (quoting *Commissariat*,
> 395 F.3d at 1323.)

If LPL truly intended to misrepresent the Federal Circuit's holding regarding the evidence of

CMO's sales, it would not have repeatedly quoted the Federal Circuit's opinion. Notably,

CMO's opposition brief fails to mention any of the above quotations.

CMO's allegations of LPL's misrepresentations of the law are ironic considering CMO's

contrasting statements about the law within its own briefs. For example, in its opposition to

LPL's motion for jurisdictional discovery, CMO repeatedly states that LPL has failed to satisfy

Justice O'Connor's stream of commerce test in *Asahi*, inferring that such a standard is required

to demonstrate personal jurisdiction. (*See* D.I. 98 at 1 ("LPL again fails to prove that the Justice

O'Connor test for jurisdiction set forth in [*Asahi*] was met and that CMO is subject to personal

jurisdiction in Delaware."); *see also id*. at 5.) Throughout its motion opposing jurisdictional

discovery CMO infers that Justice O'Connor's test must be met and alleges that LPL failed to do

so. It is not until CMO's opposition to LPL's motion for sanctions that it admits that the Federal

Circuit did *not* find Justice O'Connor's test to be the controlling test for determining personal

jurisdiction. (D.I. 99 at 3.)

Finally, CMO appears to have changed its overall view of the significance of the Federal

Circuit's opinion. One of the focal points of LPL's motion for sanctions is that CMO blatantly

ignored the findings and conclusions made by the Federal Circuit in the CEA case when it filed a

-9-

frivolous motion to dismiss.  In its opposition brief, however, CMO readily admits the "*Federal Circuit's views on jurisdiction over CMO in the CEA case thus remain highly important in this case.*"  (D.I. 99 at 4) (emphasis added.)  CMO now finally concedes the significance of that decision and its relevance to CMO's jurisdictional arguments.  CMO's concession substantiates LPL's motion for sanctions, as the Federal Circuit concluded that "CMO did not submit any evidence to contradict CEA's allegation that CMO derived substantial revenue from sales of its products to Delaware.  Nor did CMO submit evidence to contradict CEA's assertion that its products, as incorporated by OEMs into computer monitors, were likely to reach Delaware." *Commissariat*, 395 F.3d at 1317-18.  CMO remains unable to produce such evidence.  CMO's recognition of the significance of the Federal Circuit's decision further demonstrates the untenable position CMO has taken in objecting to this Court's jurisdiction.

III.   **CMO'S ATTEMPT TO MINIMIZE THE JURISDICTIONAL EVIDENCE LPL PRESENTED IS UNAVAILING**

A.   **CMO's Response to the Evidence Presented is Yet Another Attempt to Divert This Court's Attention Away from its Jurisdictional Contacts**

CMO also attempts to divert the Court's attention from the overwhelming evidence of its jurisdictional contacts with Delaware by arguing that the documentation LPL provided reflecting the sale of 900 CMO products in Delaware is not proof of those sales and, even if it were, they would not be "substantial" enough so as to subject CMO to this Court's jurisdiction.  (D.I. 78 at 8-10.)  The Office Depot and CDW sales documents, however, were only a few of the documents not subject to the protections of the protective order in the CEA case that LPL was permitted to review and present to this Court.  Thousands of additional confidential documents exist within the jurisdictional discovery exchanged in the CEA case that CMO has refused to permit LPL to review to further support its position that this Court may exercise jurisdiction over

CMO. As the Federal Circuit acknowledged, there is already "a prima facie case for CMO's use of an established distribution network that likely results in substantial sales of its products in Delaware." *Commissariat*, 395 F.3d at 1323.

Moreover, CMO implies that those 900 products sold are not *CMO products* and argues that CMO's LCD modules are simply incorporated into another company's finished product, *e.g.*, the LCD monitor. Significantly, CMO never explains what precisely it does consider to be *its* products that would account for it being the fourth largest LCD panel manufacturer in the world with worldwide gross annual revenues of over US $6 billion. (D.I. 60, Ex. 29 at 10, 77.) Indeed, these total revenues derive in large part from sales in North America, which accounts for over 31% of LCD monitor purchases worldwide and over 26% of LCD televisions worldwide.[4]

---

[4]  In its June 19, 2007 Memorandum & Order Re: Motions for Summary Judgment in *Semiconductor Energy Lab. Co. v. Chi Mei Optoelectronics Corp., et al.*, Case No. C 04-04675-MHP, the United States District Court for the Northern District of California, the Honorable Marilyn Hall Patel presiding, acknowledged:

> According to SEL's expert, approximately 29% of all CMO LCD panels ultimately reach the United States. SEL has specifically identified two CMO customers [Apple and Hewlett-Packard] which allegedly import CMO LCD panels into the United States in end products which are ultimately sold in the United States. According to the public filings of these companies, 60% of one company's sales and 40% of the other company's sales are in the United States.

(Ex. 2 at 33) (citations omitted.) The court also noted that:

> CMO also apparently has designated return and repair centers in the United States for defective panels. . . . SEL has identified a number of domestic activities on the part of CMO directed toward the use and sale of its products by third parties. The conduct includes (1) providing technical support, (2) shipping products directly to U.S. customers in order to address technical problems of pre-existing products, (3) on site technical presentations in the United States, (4) adjustments in the manufacturing process to accommodate customer concerns, and (5) coordinating shipping via e-mail.

(*Id*. at 34-35.) It appears obvious that the sale of products incorporating CMO's LCD modules necessarily would constitute the sale of CMO products. It also appears obvious that CMO has purposefully withheld from this Court information about these activities in the U.S., which certainly bear on CMO's knowledge of the U.S. market and personal jurisdiction over it in Delaware.

(D.I. 60, Ex. 30 at 13, 88, Ex. 46 at 258.) If CMO does not include the sale of the final LCD monitor by name brands such as Dell, ViewSonic, and Hewlett-Packard as the sale of *its* LCD modules, it would be interesting to learn what 31% of all LCD monitor sales does include.

In addition to CMO's distribution of its products into the United States market, including Delaware, CMO USA is a Delaware subsidiary of CMO. (D.I. 60, Ex. 10.) Again, CMO attempts to distract this Court's attention from the fact that CMO USA is essentially a wholly owned subsidiary, as CMO owns 100% of the shares of the holding company, CMO Japan, that owns 100% of CMO USA. (D.I. 60, Ex. 11 at 60, Ex. 12.) Remarkably, CMO attempts to deny that CMO USA is not its United States representative. On CMO's own website, however, CMO USA is the sole contact information provided in the United States. (D.I. 60, Ex. 1 at 0034.) The remaining contact information listed on CMO's "Contact Us" link on its website are for its offices in Asia and Europe. Notably, there are several contacts in Asia, most of them in Taiwan, and a few European offices, but only one contact in the United States, CMO USA's office. (D.I. 60, Ex. 1 at 0032-34.) CMO's contention that its Delaware subsidiary is not its representative in this country is belied by the evidence.

Further, contrary to CMO's argument, personal jurisdiction may be asserted over a parent corporation based on its relationship with a subsidiary. In patent infringement cases, a U.S. based subsidiary's contacts may be imputed to its foreign parent corporation when the subsidiary sells the foreign parent's products, provides technical support, or conducts research and development within the United States. *See GSK Technologies, Inc. v. Schneider Elec., S.A.*, No. 6:06CV361, 2007 WL 788343 (E.D. Tex. Mar. 14, 2007) (Exhibit C); *Baden Sports, Inc. v. Molten*, No. C06-0210P, 2007 WL 171897 (W.D. Wash Jan. 18, 2007) (Exhibit D); *Marshall Packaging Co., LLC v. Nestle Waters N. Am., Inc.*, No. 6:05CV295, 2006 WL 871015 (E.D. Tex.

-12-

Mar. 24, 2006) (Exhibit E); *Agilent Technologies, Inc. v. Elan Microelectronics Corp.*, No. C 04-05385 JW, 2005 WL 3260162 (N.D. Cal. Nov. 29, 2005) (Exhibit F). Interestingly, CMO never denies that CMO USA markets, sells, and distributes CMO's products in the United States, including in Delaware. Contrary to CMO's contention, LPL's current argument is distinguishable from LPLA's argument in the Wisconsin case where AUO argued that LPL's website should be attributed to its subsidiary, LPLA, even though LPLA had no ownership, control or any other involvement with the site.

In addition, CMO and a Delaware corporation also entered into a joint venture creating iZ3D, a Delaware corporation. (D.I. 60, Ex. 13-14.) These CMO entities in Delaware all further illustrate CMO's exploitation of the LCD market in the United States and Delaware. LPL has not relied solely upon these Delaware contacts, however, in arguing that this Court may properly exercise its jurisdiction over CMO.

Finally, CMO's attempt to distinguish its consent to jurisdiction in other district courts throughout the United States should be disregarded. Although CMO adamantly argues that accepting jurisdiction in California, New York, Texas, and in the CEA case has no relevance to this case, it tellingly does not explain why jurisdiction was proper in those courts, but not Delaware. Given CMO's ongoing and intentional relationships with OEMs with nationwide distribution channels, Delaware is just as appropriate a forum as New York or Texas, for example. Surely the Wisconsin court would agree. Moreover, CMO's consent to this Court's jurisdiction in the CEA case remains relevant. CMO's current attempt to avoid jurisdiction in this case is undermined by its consent in other district courts, and its previous consent in the CEA case, which was given over two years after CMO initially filed its motion to dismiss. It is more than reasonable to infer that CMO would not have consented to jurisdiction had there been

an adequate legal and factual basis to support its motion.  Despite the sequence of events in the

CEA case culminating in CMO's eventual consent to jurisdiction, CMO continues to deny that

jurisdiction is proper in this case, thereby intentionally delaying the adjudication of LPL's

claims.

CMO's arguments attempt to mislead the Court regarding the concrete evidence of its

jurisdictional contacts and are therefore sanctionable.

**B.      CMO Does Not Deny the Truth of the Facts Presented in LPL's Opposition
          to CMO's Motion to Dismiss**

Significantly, CMO does not deny the underlying truth of the jurisdictional evidence

presented by LPL in its opposition to CMO's motion to dismiss.  Instead, CMO again attempts to

divert this Court's attention away from the facts presented by challenging the sufficiency of the

supporting documentation.  For example, in response to LPL's proof of CMO's long-term

contract with Dell to provide monitors to the United States, CMO's response was merely that

LPL's supporting exhibits "show[] no agreement or sales," do "not show that any such

agreement continues to exist," and that one of the exhibits "mentions only LCD panel and

module components, not finished LCD monitors."  (D.I. 78 at 7.)  CMO does not deny that it has,

or at least had, a long-standing supply agreement with Dell; it merely states that LPL's exhibits

do not reflect that agreement.

Further, in response to LPL's contention that CMO has attended meetings in the United

States to establish and ensure compliance with U.S. standards for the manufacture and

performance of LCD modules, CMO argues that LPL's evidence shows "nothing about meetings

or about CMO's attending them, or about compliance with US standards."  (D.I. 99 at 20.)  CMO

falls far short of denying that CMO ever attended such meetings in the United States.  Indeed,

CMO admits LPL's exhibit shows "nothing more than endorsement by CMO (and many other

-14-

companies) of the rejuvenation in 2004 of a standards working group." (*Id.*) CMO's response is nothing more than a feeble attempt to refute yet another fact demonstrating that it has actively targeted the United States market, including Delaware. Moreover, CMO does not even bother to attempt to deny that it repeatedly travels to the United States to meet with large brand name manufacturers. (*See* D.I. 60, Ex. 24 at 12.) The evidence of CMO's jurisdictional contacts is compelling and CMO's inept attempts to mislead this Court into thinking otherwise are sanctionable.

### C.    CMO's Attempt to Exclude LPL's Supporting Documentation Fails

The supporting documentation presented by LPL regarding CMO's jurisdictional contacts may properly be considered by this Court with respect to the issue of personal jurisdiction. The cases upon which CMO relies in arguing that such evidence is hearsay are inapposite. (*See* D.I. 78 at 15-16.) None of the cases concerned the submission of evidence to make a prima facie showing of jurisdiction. Further, CMO's arguments ignore that a court must accept plaintiff's jurisdictional allegations as true and "view all factual inferences in the light most favorable to the plaintiff." *Intel Corp. v. Broadcom Corp.*, 167 F. Supp. 2d 692, 699-700 (D. Del. 2001) (citations omitted); *see also Aircraft Guar. Corp. v. Strato-Lift, Inc.*, 974 F. Supp. 468, 475 (E.D. Pa. 1997).

The majority of the cases cited by CMO dealt with evidence presented in support of *summary judgment* motions. CMO also mischaracterizes Judge Robinson's opinion in *Ameriserve Food Distrib., Inc. v. Lamb-Weston, Inc.*, 267 B.R. 668 (D. Del. 2001). Judge Robinson's comment in *Ameriserve* regarding the "compilation of hearsay" was directed to the overall reliability of an expert's opinion, not solely on information obtained from the internet. *Id.* at 672. Even if any of LPL's evidence is considered hearsay, such evidence is still appropriately considered to determine whether personal jurisdiction exists. *See Akro Corp. v.*

-15-

*Luker*, 45 F.3d 1541, 1547 (Fed. Cir. 1995) ("hearsay 'bear[ing] circumstantial indicia of

reliability' may be admitted for purposes of determining whether personal jurisdiction obtains.")

(quoting *Beverly Hills Fan*, 21 F.3d at 1562).)  Finally, CMO ignores the fact that some of the

information LPL presented from the Internet regarding its jurisdictional contacts are admissions

made by CMO.  For instance, CMO's website lists CMO USA as its representative in the United

States.  (D.I. 60, Ex. 1 at 0034, Ex. 10.)  Again, CMO employs misdirection to attempt to prevent

the Court from noticing the substantial evidence of its jurisdictional contacts.

## IV.    SANCTIONS ARE APPROPRIATE AGAINST CMO AND ITS COUNSEL

### A.    It was Not Reasonable for CMO to File its Motion to Dismiss for Lack of Personal Jurisdiction

Any reasonable inquiry would have revealed substantial evidence of CMO's

jurisdictional contacts.  CMO's motion does not pass the objective reasonableness test that is the

standard for awarding Rule 11 sanctions.  *Eavenson, Auchmuty & Greenwald v. Holtzman*, 775

F.2d 535, 540 (3d Cir. 1985), *overruled on other grounds by Comuso v. Nat'l R.R. Passenger

Corp.*, 267 F.3d 331 (3d Cir. 2001).  CMO has the audacity to argue that it had no duty to

conduct an inquiry.  (D.I. 99 at 13-14.)  Indeed, CMO states it has no obligation to "investigate

sales of finished products sold by others in Delaware containing CMO components."  (D.I. 99 at

14.)  CMO is mistaken, as Rule 11 expressly provides otherwise.

CMO should have reviewed various materials to satisfy the reasonable inquiry

prerequisite to filing a motion.  First, it should have reviewed the jurisdictional discovery

exchanged in the CEA case, which includes sales data from multiple United States retailers.

Second, CMO should have reviewed its own U.S. sales statistics.  Surely the fourth largest LCD

panel manufacturer in the world with total gross annual revenues of over U.S. $6 billion

maintains detailed records about its North American sales, which account for over 31% of LCD

monitor purchases worldwide and over 26% of LCD televisions worldwide. (*See* D.I. 60, Ex. 29 at 10, 77, Ex. 30 at 13, 88, Ex. 46 at 258.) Further, even a cursory review of the established distribution channels would reveal that its products are marketed throughout the entire United States. Despite the clear provisions of Rule 11, CMO did not fulfill its affirmative duty to ensure its motion was well grounded in law and in fact. Thus, sanctions should be imposed.

### B.    CMO's Motion to Dismiss was Filed in Bad Faith and for an Improper Purpose

In addition to CMO's failure to conduct a reasonable inquiry before filing a motion to dismiss generally denying all jurisdictional contacts, CMO's conduct in pursuing its frivolous motion exhibits its bad faith and the improper purpose for which the motion was filed.

### 1.    CMO's Actions in the CEA Case are Indicative of its Bad Faith

As the Court is well aware, this is not the first time CMO has contested to this Court's jurisdiction in a patent case. Two years after the district court granted CMO's motion to dismiss in the CEA case, the Federal Circuit vacated the order dismissing the case and remanded the case to the trial court so that jurisdictional discovery could be taken. *Commissariat*, 395 F.3d at 1324. Then, months later, after many subpoenas had been served and depositions scheduled, on the day before CMO's U.S. sales employee was to be deposed, CMO consented to this Court's jurisdiction. (D.I. 88, Ex. 1.) More than two years after the Complaint was filed, and after significant legal fees and expenses, including an appeal to the Federal Circuit, had been incurred, CMO consented to jurisdiction.

Two years after that, CMO once again attempts to avoid this Court's jurisdiction. Given its prior history in the CEA case, CMO's motion is even more egregious in this case. Indeed, CMO is acutely aware that the Federal Circuit concluded that, "[c]ontrary to the district court's holding, the evidence already presented by plaintiff is sufficient to demonstrate that CMO sells a

very large volume of LCDs to companies which incorporate these displays into their final product and that these products are likely sold in Delaware in substantial quantities." *Commissariat*, 395 F.3d at 1320.  Moreover, the Federal Circuit determined that "CMO did not submit any evidence to contradict CEA's allegation that CMO derived substantial revenue from sales of its products to Delaware.  Nor did CMO submit evidence to contradict CEA's assertion that its products, as incorporated by OEMs into computer monitors, were likely to reach Delaware" *Id*. at 1317-18.  CMO again has failed to submit evidence refuting LPL's assertion that its products are continuously and repeatedly sold throughout the United States, including Delaware.

Finally, CMO's refusal to permit LPL to use the jurisdictional discovery obtained during the CEA case and its opposition to LPL's alternative request for jurisdictional discovery are further instances of CMO's bad faith in pursuing its motion to dismiss.  CMO's objections to permitting LPL access to the protected documents are without merit.  LPL agreed to abide by the protections afforded to confidential documents in the protective order entered in the CEA case; only appropriate counsel, and not LPL itself, would have been permitted to review those documents.  Thus, CMO has no basis to prevent LPL from presenting this Court with additional information regarding CMO's jurisdictional contacts and its continuous refusal to acknowledge that such evidence may exist illustrates its attempt to delay this proceeding.

Despite its recent realization that the Federal Circuit's views on jurisdiction over CMO are "highly important in this case," CMO fails to acknowledge the precedent set forth by the Federal Circuit in the CEA case with respect to jurisdictional discovery.  (D.I. 99 at 4.) Presented with significantly less evidence of CMO's jurisdictional contacts than this Court has been provided, the Federal Circuit determined that the district court abused its discretion in

denying CEA's request for jurisdictional discovery and remanded the case for jurisdictional

discovery to determine whether CEA could meet Justice O'Connor's more restrictive standard as

set forth in *Asahi*. *Id*. at 1323-24. Accordingly, CMO's unjustifiable refusal to permit LPL to

provide this Court with further evidence of CMO's jurisdictional contacts illustrates CMO's bad

faith in filing and pursuing its motion to dismiss.

### 2.    CMO Refused to Reconsider the Basis for its Motion

For over a month, LPL attempted to reason with CMO and convince it to withdraw its

baseless motion. LPL emphasized the Federal Circuit's opinion, the non-confidential sales data

produced during jurisdictional discovery in the CEA case, as well as other additional evidence of

CMO's jurisdictional contacts. CMO, however, has refused to acknowledge such evidence and

continues to delay this proceeding and force LPL to incur additional fees and expenses in

opposing CMO's frivolous motion. Such behavior further demonstrates CMO's bad faith.

## CONCLUSION

For the reasons set forth herein and in its Opening Brief, LPL respectfully requests that the Court impose sanctions against CMO and its counsel pursuant to Rule 11 or against CMO's counsel pursuant to 28 U.S.C. § 1927.

July 11, 2007                                    THE BAYARD FIRM

                                    */s/ Richard D. Kirk (rk0922)*
                                    Richard D. Kirk
                                    Ashley B. Stitzer
                                    222 Delaware Avenue, 9th Floor
                                    P.O. Box 25130
                                    Wilmington, DE 19899-5130
                                    (302) 655-5000
                                    rkirk@bayardfirm.com

                                    Attorneys for Plaintiff LG.Philips LCD Co., Ltd.

OF COUNSEL:

Gaspare J. Bono
Song K. Jung
R. Tyler Goodwyn, IV
Lora A. Brzezynski
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 496-7500

664742-1

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on July 11, 2007, he served the foregoing

documents by email and by hand upon the following counsel:

Edmond D. Johnson
Thomas H. Kovach
Pepper Hamilton LLP
1313 Market Street, Suite 5100
PO Box 1709
Wilmington, DE  19899-1709

Karen L. Pascale
John W. Shaw
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391

Philip A. Rovner
Dave E. Moore
Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, DE  19899-0951

William E. Manning
Jennifer M. Becnel-Guzzo
Buchanan Ingersoll & Rooney
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE  19801

The undersigned counsel further certifies that, on July 11, 2007, he served the

foregoing documents by email and by U.S. Mail upon the following counsel:

John N. Zarian
Samia McCall
Matthew D. Thayne
J. Walter Sinclair
Stoel Rives LLP
101 S. Capitol Blvd., Suite 1900
Boise, ID  83702

Vincent K. Yip
Peter J. Wied
Jay C. Chiu
Paul, Hastings, Janofsky & Walker LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA  90071

Kenneth R. Adamo
Robert C. Kahrl
Arthur P. Licygiewicz
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190

Bryan J. Sinclair
Karineh Khachatourian
Buchanan Ingersoll & Rooney
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA  94065-1418

/s/ Richard D. Kirk, (rk0922)
Richard D. Kirk

656846-1

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d                                                                      Page 1
Not Reported in F.Supp.2d, 2003 WL 21026758 (D.Del.)
(Cite as: 2003 WL 21026758 (D.Del.))

▷
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
In re: ELONEX PHASE II POWER
MANAGEMENT LITIGATION
Nos. 01-082 GMS, 01-083 GMS, 01-084 GMS, 01-
085 GMS, 01-086 GMS, 01-087 GMS,
01-088 GMS, 01-089 GMS, 01-104 GMS.

May 6, 2003.

*MEMORANDUM AND ORDER*

SLEET, J.

## I. INTRODUCTION

*1 On February 13, 2001, the plaintiffs, Elonex I.P.
Holdings, Ltd. and EIP Licensing, B.V. (collectively
"Elonex"), filed this action against certain companies
that manufacture and sell computer systems or
computer monitors.  [FN1] The complaint alleges
infringement of U.S. Patent Numbers 5,389,952 ("the
'952 patent"), 5,648,799 ("the '799 patent"), and
5,649,719 ("the '719 patent"). The lawsuit relates to
technology that concerns power management in
computer monitors.

> FN1. In December 1998, Elonex I.P.
> Holdings Ltd. and Elonex plc filed a related
> lawsuit against another group of defendants
> on substantially the same grounds ("Elonex
> Phase I litigation").

On May 21, 2001, Elonex requested entry of default
against the defendant Jean Co., Ltd. ("Jean"). The
Clerk of the Court entered default against Jean on
June 18, 2001. On January 31, 2003, Elonex then
moved for entry of default judgment against Jean. On
February 20, 2002, counsel entered an appearance on
behalf of Jean.

Presently before the court is Jean's motion to dismiss
for lack of personal jurisdiction. For the following
reasons, the court will deny this motion.

## II. BACKGROUND

Jean is an international monitor and electronics
manufacturer, with its principle place of business in
Taipei, Taiwan. In 2001, Jean had more than $316
million in worldwide sales.

From March 1995 until April 1996, Elonex alleges
that Jean shipped 404,855 monitors to the United
States. Since 1998, ViewSonic Corporation and
eMachines, Inc.--two United States monitor
companies with nationwide re-seller networks-- have
been among Jean's biggest customers. According to
Jean's 1999 Annual Report, ViewSonic alone
accounted for 22.91% of Jean's worldwide monitor
sales in 1998. In 1999, ViewSonic purchased 30.4%
of Jean's total 1999 monitor sales. In 2001,
ViewSonic purchased 39.7% of Jean's total monitor
sales. Likewise, in 1999, eMachines purchased
12.94% of Jean's worldwide monitor sales.

Additionally, both ViewSonic and eMachines have
well-established  retail  distribution  networks.
ViewSonic monitors are available from retailers such
as Best Buy, Office Depot, and CompUSA. Likewise,
eMachines monitors are sold in Delaware at Best
Buy, Office Depot, and Circuit City. Both ViewSonic
and eMachines also sell monitors directly to
consumers via their own internet websites. Thus, the
Jean monitors sold to ViewSonic and eMachines are
resold in Delaware and throughout the United States.

Furthermore, Delaware purchasers of Jean monitors
can download monitor software and obtain customer
service via Jean's website. Visitors to the website can
also download drivers for Jean monitors and obtain
technical support via e-mail. Finally, Jean's website
lists an "East Coast" service facility located in New
Jersey.

## III. DISCUSSION

### A. Due Process

The Due Process Clause requires that, in order to
subject a defendant who is  "not present within the
territory of the forum" to personal jurisdiction, the
court must first make sure that the party "ha[s] certain
minimum contacts with [the forum] state such that
the  maintenance  of  the  suit  does  not  offend
'traditional notions of fair play and substantial
justice." ' *International Shoe* 326 U.S. at 316 (quoting
*Milliken v. Meyer,* 311 U.S. 457, 463 (1940)). In

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21026758 (D.Del.)
(Cite as: 2003 WL 21026758 (D.Del.))

Page 2

order to give non-residents "fair warning" that a particular activity may subject them to litigation within the forum, these "minimum contacts" must be purposeful. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985). In other words, the defendant's contacts must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980). Finally, "even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied." *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1568 (Fed.Cir.1994).

**\*2** In *Beverly Hills Fan,* the Federal Circuit addressed the question of whether Ultec, a People's Republic of China corporation with a manufacturing facility in Taiwan, was subject to personal jurisdiction in Virginia. 21 F.3d at 1560. Ultec claimed that it was not subject to personal jurisdiction in Virginia because it did not have any Virginia assets, employees, or a license to do business in that state. *Id.* Acknowledging that Ultec's sole contact with the forum resulted from indirect shipments through the stream of commerce, the Federal Circuit held that Ultec "purposefully shipped the accused fans into Virginia through an established distribution channel The cause of action for patent infringement is alleged to rise out of these activities. No more is usually required to establish specific jurisdiction." *Id.* at 1560, 1564-65.

The court's decision in *Motorola Inc. v. PC-Tel, Inc.* is likewise instructive in resolving the present issue. 58 F.Supp.2d 349 (D.Del.1999). In that case, the court described the accused infringer's sales activities as follows:

Altocom does not (and, it seems, cannot) contest the fact that its softmodems are integrated into a variety of consumer electronic products which are manufactured by well-known multi-national corporations like Compaq, Phillips, Samsung, Sharp, Song, and the like. These goods are then put into the world-wide distribution networks which place them for sale in equally well-known retail stores such as Caldor, Circuit City, CompUSA, Office-Max, Sears, Service Merchandise, and others--all of which have outlets in Delaware.

58 F.Supp.2d at 352. Relying on *Beverly Hills Fan,* the court rejected AltoCom's arguments and held that

exercising personal jurisdiction comported with due process. *See id.* at 355-56.

In the present case, as in *Beverly Hills Fan,* Jean's president states in his declaration that Jean makes no direct sales to the United States. He further states that Jean has no United States offices or subsidiaries. However, the court concludes that Jean has, for many years, been the first link in precisely the kind of indirect distribution chain that the Federal Circuit found sufficient to establish personal jurisdiction. Specifically, Jean sells it monitors to ViewSonic and eMachines, who in turn distribute Jean's monitors to retailers with Delaware operations. Given ViewSonic's and eMachines' extensive re-reseller networks in Delaware and on the Internet, Jean cannot credibly claim it had no inkling that some of its monitors would make their way into Delaware via well-established distribution channels.

Jean further maintains an interactive website through which customers in Delaware, and elsewhere, can download driver software, as well as obtain customer support. On its website, it also lists "Global Service Centers," including an "East Coast" service facility in New Jersey. These facts further support the court's conclusion that Jean's undeniably substantial and regular monitor sales into ViewSonic's and eMachines' national distribution networks constitute "purposeful minimum contacts" with Delaware.

**\*3** Notwithstanding the existence of Jean's purposeful minimum contacts with this forum, the court must consider whether the "minimum requirements inherent in the concept of 'fair play and substantial justice ...' defeat the reasonableness of [the assertion of] jurisdiction, even [if] the defendant has purposefully engaged in forum activities." *Asahi Metal Indust. Co. v. Superior Court,* 480 U.S. 102, 116 (1987). This question will only be answered affirmatively if the state's and the plaintiff's interest in having the dispute adjudicated in the forum are so minimal as to be outweighed by the burden imposed by subjecting the defendants to litigation within the forum. *See Beverly Hills Fan,* 21 F.3d at 1568.

In the present case, Delaware clearly has a substantial interest in discouraging injuries in the state, including patent infringement injury. It has also been the sole forum for the Elonex Power Management Litigation for several years. Finally, and as the *Beverly HIlls Fan* court noted, "progress in communications and transportation" have made "the defense of a lawsuit in a foreign tribunal less burdensome." 21 F.3d at 1569 (internal quotation and

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21026758 (D.Del.)
**(Cite as: 2003 WL 21026758 (D.Del.))**

citation omitted). Thus, the court concludes that any burden on Jean "is not sufficiently compelling to outweigh" Elonex's and Delaware's interests. *Id.*

B. Delaware's Long-Arm Statute

The second step in the court's analysis into the propriety of subjecting Jean to personal jurisdiction in this forum is the determination of whether any of the provisions of Delaware's long-arm statute apply. *See* Del.Code. Ann. tit. 10 § 3104. While Jean contends that it does not fall within the grasp of any of Section 3104's provisions, Elonex contends that at least two of the provisions apply here. For purposes of this order, the court need only discuss one.

Under subsection (c)(4), the court may exercise personal jurisdiction over anyone who causes injury either inside or outside of this State "by an act or omission outside of the State" if that individual "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services or things used or consumed in the State." Del.Code. Ann. tit. 10, § 3104(c) (2001). [FN2] The court will interpret this language broadly, as reaching the "maximum parameters of the due process clause." *See* *Jeffreys v. Exten,* 784 F.Supp. 146, 151 (D.Del.1992).

> FN2. This subsection provides general jurisdiction over the nonresident defendant. *See* *Mendelson v. Delaware River and Bay Auth.,* 56 F.Supp.2d 436, 439 (D.Del.1999). Accordingly, it is immaterial whether the jurisdictional contact is related to the claim. *See id.*

As discussed above in Section III A, Jean has intentionally sold monitors using nationwide distribution channels. This knowing and purposeful shipment of monitors satisfies the act requirement of Section 3104(c)(4). *See* *Beverly Hills Fan,* 21 F.3d at 1571. Because Jean undeniably derives substantial revenue from these activities, it is subject to jurisdiction under Delaware's long-arm statute. *See* Chang Decl. at ¶ ¶ 3-7 (discussing Jean's revenue from sales to ViewSonic and eMachines).

C. Venue

*\*4* Jean finally asserts that, pursuant to 28 U.S.C. § 1391(c), venue is improper in this district. Jean's argument is meritless, however, because "[t]he venue issue is subsumed in the personal jurisdiction issue. Venue lies ipso facto if ... the district court has

personal jurisdiction over [the defendant]." *North American Philips Corp. v. American Vending Sales, Inc.,* 35 F.3d 1576, 1577 n. 1 (Fed.Cir.1994); *see also* 28 U.S.C. § 1391(b)(1) & (c) (stating that venue is proper in a judicial district where the defendant corporation is subject to personal jurisdiction at the time the action is commenced). As the court has already found that the exercise of personal jurisdiction is proper and complies with both due process and the Delaware long-arm statute, venue in this district is also proper.

IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Jean's Motion to Dismiss (D.I.856) is DENIED.

Not Reported in F.Supp.2d, 2003 WL 21026758 (D.Del.)

END OF DOCUMENT

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
**(Cite as: 1999 WL 615175 (D.Del.))**

Page 1

**C**
Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
AMERICAN BIO MEDICA CORPORATION,
Plaintiff,
v.
PENINSULA DRUG ANALYSIS CO., INC.; James
T. Ramsey; Phamatech, Inc .; Dipro
Diagnostic Products, Inc.; Dipro Diagnostic Products
of North America, Inc.,
Defendants.
**No. Civ.A. 99-218-SLR.**

Aug. 3, 1999.

Daniel F. Wolcott, Jr., Gregory A. Inskip, and
Joanne Ceballos, of Potter, Anderson & Corroon
LLP, Wilmington, Delaware, and Charles Michael
Tobin, of Hopkins & Sutter, Washington, D.C., for
plaintiff.

Matthew B. Lehr, and Maryellen Noreika, of Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware,
and Edward W. Moore, of Dallas, Texas, for
defendants Peninsula Drug Analysis Co., Inc.; James
T. Ramsey; DiPro Diagnostic Products, Inc.; and
DiPro Diagnostic Products of North America, Inc.,
Doreen L. Costa, Neil P. Sirota, and Steven R.
Gustavson, of Baker & Botts, L.L.P., New York,
New York, of counsel.

Kevin W. Goldstein, of Ratner & Prestia,
Wilmington, Delaware, for defendant Phamatech,
Inc., Steele N. Gillaspey, of Gillaspey, Harms &
Associates, San Diego, California, of counsel.

MEMORANDUM OPINION

ROBINSON, J.

I. INTRODUCTION

*1 Pending before the court are motions to dismiss
or transfer venue filed by defendants Dipro
Diagnostic Products of North America, Inc.
("Dipro"), Phamatech, Inc. ("Phamatech"), and
Peninsula Drug Analysis Co., Inc. and James T.
Ramsey ("Peninsula" and "Ramsey," respectively).
(D.I. 17, 25 and 49) Plaintiff American Bio Medica
Corporation ("ABMC") opposes said motions.

ABMC owns the rights to U.S. Design Patent No.
D404812, which patent issued on January 26, 1999.
ABMC is a New York corporation engaged in the
manufacture, worldwide distribution and sale of the
Rapid Drug Screen, a product covered by the patent
at issue. According to ABMC, when the Rapid Drug
Screen was developed in 1995, it was the first
vertical, hands free test for the detection of the
presence of drug residue in urine. Until February
1999, ABMC purchased test strips from defendant
Phamatech for incorporation into the Rapid Drug
Screen. ABMC alleges that Phamatech initiated
production of its own vertical test kit (Quick Screen)
in 1998 or earlier, using proprietary information it
acquired by reason of its supply relationship with
ABMC.

Defendant Phamatech is a California corporation.
According to ABMC, Phamatech distributes Quick
Screen through the auspices of defendants Peninsula
and Ramsey, among others. Defendant Dipro is a
Delaware corporation that, according to ABMC,
acquires directly or indirectly from Phamatech an
accused product called Rapid Response and
distributes that product through Peninsula and
Ramsey, among others. Peninsula is a Virginia
corporation and Ramsey is the sole stockholder and
an employee of Peninsula.

Plaintiff ABMC initiated this lawsuit on April 7,
1999 against defendants for design patent
infringement, violation of the Lanham Act, and other
acts of unfair competition. A day later, on April 8,
1999, Phamatech filed suit in the United States
District Court for the Southern District of California
seeking a declaratory judgment that ABMC's design
patent is invalid, and joining other federal and state
claims essentially mirroring the claims and operative
facts at issue. By decision issued June 21, 1999,
Judge Keep of the Southern District of California
found that the California court could exercise specific
personal jurisdiction over ABMC; however, applying
the "first-filed" rule, she stayed the California case
pending disposition of the instant motions.

II. FACTS

The facts are essentially undisputed. Prior to the
filing of the complaint, none of the accused products
had been sold to a Delaware resident. In the fall of
1998, defendant Peninsula did ship an order of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
(Cite as: 1999 WL 615175 (D.Del.))

Page 2

ABMC's Rapid Drug Screen to a Delaware resident, Pace Electric of New Castle, Delaware. Sometime thereafter and prior to January 1999, Peninsula stopped handling ABMC's product. In January 1999, defendant Ramsey and a third party met with a representative of Pace to discuss a possible business relationship for the sale and distribution of the Phamatech/Dipro product, Rapid Response, in Delaware. These discussions took place in Hawaii and Maryland. Although there are averments of record indicating that some agreement was reached (D.I.32), it is the court's understanding that no actual sales or movement of defendants' products occurred in Delaware prior to the filing of the complaint.

*2 Prior to April 1999, Peninsula sent direct mail postcards to Delaware as part of a mass mailing to potential customers in more than 20 states. [FN1] Both Ramsey and Phamatech maintain national Internet websites that can be accessed from Delaware. It is the court's understanding that these websites include promotional material about the allegedly infringing products, including information on ordering and shipping; however, orders cannot be consummated directly through the websites.

> FN1. Approximately 60 out of a total of 6,000 postcards were directed to Delaware residents. No responses are recorded.

III. DISCUSSION

A. Personal Jurisdiction

ABMC, as plaintiff, bears the burden of establishing that this court may exercise personal jurisdiction over defendants. When personal jurisdiction is contested without the benefit of discovery, the plaintiff need only establish a *prima facie* case with the record viewed in the light most favorable to the plaintiff. *See Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1462 (D.Del.1991); *Computer People, Inc. v. Best Int'l Group, Inc.,* No. Civ. A. 16648, 1999 WL 288119, at *4 & n. 5 (Del. Ch. Apr 27, 1999). There is no question but that this court can exercise personal jurisdiction over defendant Dipro, a Delaware corporation. The focus of the following discussion, therefore, is whether the exercise of personal jurisdiction over the remaining defendants comports with the law of the Federal Circuit. [FN2]

> FN2. According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal

Circuit, "rather than that of the regional circuit in which the case arose," is applicable. *Akro Corp. v. Luker,* 45 F.3d 1541, 1543 (Fed.Cir.1995).

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a court may dismiss a suit for "lack of jurisdiction over the person." According to the United States Supreme Court,

> before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 104 (1987). The principle pronounced above is traditionally described in this court as a two-step analysis. The court will determine, first, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendants' rights to due process.

Rule 4(e)(1) of the Federal Rules of Civil Procedure states that service of a summons may be effected "pursuant to the law of the state in which the district court is located." The Delaware long-arm statute, 10 Del. C. § 3104(c), has been construed "broadly ... to confer jurisdiction to the maximum extent possible under the due process clause." *LaNuova D & B S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986). As noted by this court in *Intel Corp. v. Silicon Storage Tech., Inc.,* 20 F.Supp.2d 690, 694 (D.Del.1998), "[t]he Delaware Supreme Court has not determined that § 3104(c) is coextensive with federal due process, nor does it substitute federal due process analysis for state long-arm analysis." *Accord Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* 611 A.2d 476, 480-81 (Del.1992); *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods. Inc.,* Civ. A. No. 12036, 1991 WL 129174, at *3 (Del. Ch. July 10, 1991); *Ramada Inns v. Drinkhall,* No. Civ. A. 83C-AU-56, 1984 WL 247023, at *2 (Del.Super. May 17, 1984). Therefore, the court must determine that the exercise of personal jurisdiction is compatible with both the specific requirements of the Delaware long-arm statute and with defendants' constitutional rights to due process. [FN3]

> FN3. The Federal Circuit has instructed that, "in interpreting the meaning of state long-arm statutes, we ... defer to the interpretations of the relevant state and

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
**(Cite as: 1999 WL 615175 (D.Del.))**

federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." *Graphic Controls Corp. v. Utah Med. Prods., Inc.,* 149 F.3d 1382, 1386 (Fed.Cir.1998). Thus, in *Luker,* the Federal Circuit's analysis followed that of the Sixth Circuit's holding in *R.L. Lipton Distrib. Co. v. Dribeck Importers, Inc.,* 811 F.2d 967 (6th Cir.1987): " 'This Ohio [long-arm] statute has been construed to extend to the outer limits of due process, and thus an Ohio personal jurisdiction analysis becomes an examination of constitutional limitations.' " *Luker,* 45 F.3d at 1544 (quoting *Dribeck,* 811 F.2d at 969). By contrast, as noted above, the Delaware state courts do not collapse the long-arm inquiry into the due process inquiry and neither shall this court.

**\*3** Delaware's long-arm statute provides:
(c) As to a cause of action brought by a person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-resident, or his personal representative, who in person or through an agent:
(1) Transacts any business or performs any character of work or service in the State;
(2) Contracts to supply services or things in this State;
(3) Causes tortious injury in the State by an act or omission in this State;
(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State....
Del.Code Ann. tit. 10, § 3104(c)(1)-(4).

As explained by the Delaware Supreme Court in *LaNuova,*
[t]he conduct embraced in subsections (1) and (2), the transaction of business or performance of work and contracting to supply services or things in the State, may supply the jurisdictional basis for suit only with respect to claims which have a nexus to the designated conduct. Where personal jurisdiction is asserted on a transactional basis, even a single transaction is sufficient if the claim has its origin in the asserted transaction.

\* \* \*

Similarly, where the claim is one for tortious injury

under subsection (c)(3),
a single "act or omission" in the State in which the injury was caused will suffice. Such a claim may also be viewed as transactional.

*LaNuova,* 513 A.2d at 768. Therefore, in order to establish transactional or specific jurisdiction, plaintiff must demonstrate not only that an act or acts occurred in Delaware but also that its causes of action arise from those act or acts. According to relevant caselaw, plaintiff also must demonstrate that the act or acts occurring in Delaware actually constitute "transacting business" in Delaware, i.e., that defendants "purposefully avail[ed themselves] of the privileges and benefits of Delaware law." *Computer People, Inc.,* 1999 WL 288119, at \*8; *see also Thorn EMI N. Am. v. Micron Tech., Inc.,* 821 F.Supp. 272, 274 (D.Del.1993) (stating that the designated conduct "must be directed at residents of the State of Delaware and the protection of its laws"). With this requirement in mind, courts have concluded that "[m]ere solicitation does not arise to transacting business, nor does the isolated shipment of goods into Delaware." *Id.* (citing *Moore v. Little Giant Indus., Inc.,* 513 F.Supp. 1043, 1047 (D.Del.1981); *Waters v. Deutz Corp.,* 460 A.2d 1332, 1335 (Del.Super.1983). The distinction between isolated business activities and those giving rise to personal jurisdiction has been explained on the basis of whether the conduct is "part of a general business plan ... to solicit business in Delaware and deliver products to customers in Delaware." *Thorn EMI,* 821 F.Supp. at 274.

**\*4** Plaintiff alleges in its complaint seven causes of action, including unlawful use of the trademarks and service marks of the Rapid Drug Screen in violation of the Lanham Act and common and state law trademark rights; violation of the design patent "by making, using and/or selling the ABMC design ..."; and engaging in unfair competition and deceptive trade practices. (D.I.1) Although the products at issue have not been made, used, or sold in Delaware, plaintiff asserts that, "[t]hrough offers and extensive planning to sell the infringing product in Delaware, defendants have engaged in a course of conduct that readily meets the nexus requirements of sections 3104(c)(1), (2), and (3)." (D.I. 57 at 7-8)

The record demonstrates that defendants Peninsula and Ramsey have offered to sell [FN4] allegedly infringing products to Delaware residents through what appears to be a concerted marketing effort. The marketing effort includes national advertisements accessible to Delaware residents (the internet website), out-of-state sales negotiations with a Delaware resident, [FN5] and the mailing of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)
**(Cite as: 1999 WL 615175 (D.Del.))**

promotional materials to Delaware residents. Given the history of these defendants' relationship with plaintiff, the record adequately demonstrates that these activities are directed at Delaware residents, constitute "transacting business," and are sufficiently related to plaintiff's causes of action to satisfy the requirements of 10 Del. C. § 3104(c)(1). [FN6] *Cf. Computer People, Inc.,* 1999 WL 288119, at *8. [FN7]

> FN4. Plaintiff did not specifically allege such in its complaint; however, 35 U.S.C. § 271(a) reads "whoever without authority makes, uses, offers to sell, or sells any patented invention ... infringes the patent." (Emphasis added)

> FN5. The out-of-state sales negotiations with Pace Electric are viewed in tandem with defendants' other conduct as evidence of a general business plan directed at Delaware residents and the protection of its laws.

> FN6. As noted, the court is satisfied that the activities described above are "part of a general business plan" and not isolated, unrelated events. In the past, this court has demanded as well proof that the activities have had a "tangible effect" in Delaware. *See,* e.g., *Intel Corp.,* 20 F.Supp. at 696 ("... SST's solicitations in Delaware [have not] been shown to have had any tangible effect on Intel's sales here."). Sales are lost generally because of the sale of competing products. Given the fact that liability under 35 U.S.C § 271(a) can now rest on mere "offers to sell," the court is reluctant to require proof of actual sales and is not sure what other "tangible effect" is contemplated. Therefore, the court will not require evidence of "tangible effects" in this case.

> FN7. Although the court noted that, "as a general matter telephone calls and an e-mail [to a Delaware resident] do not, in and of themselves, automatically constitute 'transacting business' within Delaware sufficient to invoke jurisdiction under § 3104(c)(1)," the court looked at the specific factual context and held that these contacts were insufficient because they could not be a basis for the plaintiff's causes of action.

The court further finds that the exercise of personal jurisdiction over these defendants comports with federal due process considerations. The Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945), held that

> due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintainance of the suit does not offend "traditional notions of fair play and substantial justice."

*Id.* at 316 (citation omitted). The Court in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985), added the further requirement that the minimum contacts be "purposeful" contacts, noting that "even a single act can support jurisdiction" so long as it creates a "substantial connection" with the forum, in contrast to an "attenuated affiliation." *Id.* at 475 n. 18. Therefore, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477. In *Luker,* the Federal Circuit suggested a three-prong jurisdictional analysis: 1) has the defendant purposefully directed its activities at residents of the forum?; 2) do the claims arise out of or relate to those activities?; 3) is the assertion of personal jurisdiction reasonable and fair? *See Luker,* 45 F.3d at 1545-46. The court has already answered the first two inquiries in the affirmative and has not discovered in the record any compelling evidence which suggests that the exercise of personal jurisdiction over these defendants would be unreasonable.

**\*5** The court concludes otherwise with respect to defendant Phamatech. The conduct attributed to Phamatech includes the following: 1) Phamatech manufactures allegedly infringing products; 2) Phamatech arranges for the distribution of its product through defendants Peninsula and Ramsey; and 3) Phamatech advertises its product through an Internet website accessible to Delaware residents. As noted previously, however, there had been no actual sales of infringing product in Delaware prior to the filing of the complaint. Neither is there evidence relating Phamatech to Peninsula and Ramsey's marketing efforts directed at Delaware residents. Although plaintiff asserts that "Phamatech intentionally established a chain of distribution that it knew, or reasonably could have foreseen, had a termination point in Delaware" (D.I. 62 at 11), the record does not demonstrate the existence of ongoing commercial relationships with retailers and customers in Delaware.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)

**(Cite as: 1999 WL 615175 (D.Del.))**

Page 5

The facts of record are distinguishable, therefore, from the facts in _Beverly Hills Fan Co. v. Royal Sovereign Corp.,_ 21 F.3d 1558, 1564 (Fed.Cir.1994), cited by plaintiff. In that case, the court concluded that the alleged infringers were placing accused products into the chain of commerce, which included shipping products into the forum for sale to customers through an intermediary. Because the commercial relationship with the intermediary was ongoing and the accused products in fact had been shipped into the forum, the court found the defendant amenable to the exercise of personal jurisdiction: "From these ongoing relationships, it can be presumed that the distribution channel formed by defendants and [the intermediary] was intentionally established, and that defendants knew, or reasonably could have foreseen, that a termination point of the channel was [the forum]." _Royal Sovereign,_ 21 F.3d at 1564. Instantly, there is no evidence demonstrating that Phamatech directed Peninsula and Ramsey's sales efforts at Delaware residents; there certainly is no evidence of any ongoing commercial relationships between Phamatech, Peninsula/Ramsey, and Delaware residents. The final conduct designated is Phamatech's Internet website. Assuming for purposes of this motion that a website with product information constitutes an "offer to sell," in the absence of evidence that Delaware residents actually accessed this website, the court declines to find that Phamatech transacted business in Delaware, consistent with 10 Del. C. § 3104(c)(1) and (3). [FN8]

FN8. Plaintiff does not assert general jurisdiction under § 3104(c) (4).

B. Venue

Generally, in reviewing a motion for transfer of venue, this court gives great deference to a plaintiff's choice of forum and only transfers venue if the defendants truly are regional (as opposed to national) in character. Motions to transfer venue are granted as well if there is a related case which has been filed first or otherwise is the more appropriate vehicle to litigate the issues between the parties. Given the court's conclusion that it cannot exercise personal jurisdiction over defendant Phamatech, the manufacturer of the accused products, transfer of this case to the Southern District of California is warranted.

IV. CONCLUSION

*6 For the reasons stated, defendants' motions to dismiss are granted in part and denied in part. Defendants' motions to transfer venue are granted.

An appropriate order shall issue.

Not Reported in F.Supp.2d, 1999 WL 615175 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Slip Copy                                                                                                Page 1
Slip Copy, 2007 WL 788343 (E.D.Tex.)
(Cite as: 2007 WL 788343 (E.D.Tex.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Texas,
Tyler Division.
GSK TECHNOLOGIES, INC., Plaintiff,
v.
SCHNEIDER ELECTRIC, S.A.; Schneider Electric
Holdings, Inc., Defendants.
No. 6:06CV361.

March 14, 2007.

Jeffrey Ray Bragalone, Jennifer Laurel Murphy, Martin Pascual, Shore Chan Bragalone, Dallas, TX, for Plaintiff.

Clyde Moody Siebman, Siebman Reynolds Burg & Phillips LLP, Sherman, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

LEONARD DAVIS, United States District Judge.

*1 Before the Court are Schneider Electric, S.A.'s ("SESA") and Schneider Electric Holdings, Inc.'s ("SEHI") separate Motions to Dismiss Plaintiff GSK Technologies, Inc.'s ("GSK") Complaint Pursuant to Rule 12(b)(2) (Docket Nos. 5 and 7). For the reasons discussed below, the Court **DENIES** SESA's and SEHI's Motions to Dismiss.

## FACTUAL BACKGROUND

On August 15, 2006, GSK filed suit against SESA alleging infringement of its United States Patent No. 4,949,214 (the "'214 Patent") entitled "Trip Delay Override For Electrical Circuit Breakers." On October 23, 2006, GSK amended its complaint to accuse SEHI and Square D Company ("Square D") of infringement. SESA is a French corporation and owns Schneider Electric Industries S.A.S. ("SEISAS"), a French company. SEISAS owns SEHI, a Delaware corporation. SEHI owns Square D, a Delaware corporation. SESA and SEHI each filed a Motion to Dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure claiming this Court does not have personal jurisdiction over them because they do not have sufficient minimum contacts with the State of Texas. GSK argues that SESA and SEHI have sufficient minimum contacts with the State of Texas

because they purposefully market and offer for sale the Square D brand products to U.S. residents and knowingly place these products into the stream of commerce in Texas through their subsidiary.

## APPLICABLE LAW

Because personal jurisdiction in a patent case is intimately related to patent law, Federal Circuit law governs the issue. _Silent Drive, Inc. v. Strong Indus., Inc.,_ 326 F.3d 1194, 1201 (Fed.Cir.2003). If the parties have not conducted jurisdictional discovery, a plaintiff only needs to make a prima facie showing that the defendants are subject to personal jurisdiction, and the pleadings and affidavits are to be construed in the light most favorable to the plaintiff. _Id._ A court can exercise personal jurisdiction over an out-of-state defendant if the forum state's long-arm statute permits jurisdiction without violating federal due process as delineated in _International Shoe Co. v. Washington,_ 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). _LSI Indus. Inc. v. Hubbell Lighting, Inc.,_ 232 F.3d 1369, 1371 (Fed.Cir.2000); _3D Sys., Inc. v. Aarotech Labs., Inc.,_ 160 F.3d 1373, 1376-77 (Fed.Cir.1998). Although federal courts hearing patent cases defer to the forum state's interpretation of its long-arm statute, Federal Circuit law controls whether the exercise of personal jurisdiction comports with federal due process. _3D Sys.,_ 160 F.3d at 1377.

"The Texas long-arm statute reaches 'as far as the federal constitutional requirements of due process will allow.' " _Am. Type Culture Collection, Inc. v. Coleman,_ 83 S.W.3d 801, 806 (Tex.2002) (quoting _Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,_ 815 S.W.2d 223, 226 (Tex.1991)). Thus, the analysis of Texas's long-arm statute collapses into the federal due-process inquiry. Due process requires an out-of-state defendant to have minimum contacts with the forum such that maintaining the suit does not offend traditional notions of fair play and substantial justice. _Int'l Shoe,_ 326 U.S. at 316.

## ANALYSIS
_1. Minimum Contacts_

*2 GSK alleges jurisdiction over SESA and SEHI is proper under the stream of commerce theory. "The forum does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980). In *Asahi Metal Industry Co. v. Superior Court*, the Supreme Court reiterated that the stream of commerce theory provides a valid basis for finding minimum contacts. *See* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). However, the Court split as to the exact requirements of applying the theory. *See id .* at 112, 117. Four Justices on the Court adopted the view that a defendant must both place a product in the stream of commerce and take some action to purposefully direct that product toward the forum state. *See id.* at 112. The other four Justices adopted the view that a showing of additional action aside from placing the product in the stream of commerce was not necessary. *See id.* at 117.

The Federal Circuit applied the stream of commerce theory in *Beverly Hills Fan Co. v. Royal Sovereign Corp. See* 21 F.3d 1558, 1566 (Fed.Cir.1994). The Federal Circuit emphasized that " '[I]f the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the [defendants] to serve, directly or indirectly, the market for its product ..., it is not unreasonable to subject it to suit.' " *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297). However, instead of adopting one of the two versions of the stream of commerce theory laid out by the Supreme Court in *Asahi* the Federal Circuit stated, "We need not join in this debate here, since we find that, under either version of the stream of commerce theory, plaintiff made the required jurisdictional showing." *Id.* Similarly, the Court in this case does not need to join in the debate because GSK made the required jurisdictional showing under either version of the stream of commerce theory. *See id.* at 1566.

When a court does not hold an evidentiary hearing, the party seeking jurisdiction must make out a prima facie case supporting jurisdiction. *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir.2000). The Court will "resolve in [the party seeking jurisdiction's] favor, all conflicts between the facts contained in the parties' affidavits and other documentation." *Id.*

SESA and SEHI deny they introduce any of the accused products into any distribution network or into any stream of commerce anywhere in the world. This denial controverts GSK's jurisdictional allegations on point. However, GSK introduced

evidence the allegedly infringing Square D brand products are sold and were bought in a well-known home improvement store in the Eastern District of Texas. It is undisputed that distribution channels have been intentionally set up to sell the Square D brand products in home improvement stores and other retailers in the United States. Within the United States, the State of Texas has the second largest population of any state and three of the ten most populated cities. In light of resolving the controverted factual allegations in favor of GSK, it is only reasonable to assume that SESA and SEHI knew, or reasonably could have foreseen, that the Square D brand of circuit breakers would be sold in the State of Texas. *See Beverly Hills Fan*, 21 F.3d at 1564. Accordingly, under the applicable standard, GSK has sufficiently alleged that SESA and SEHI purposefully placed the accused products into the stream of commerce with the expectation the Square D brand products would be sold in Texas.

**\*3** SESA and SEHI argue the mere fact that a subsidiary exclusively sells or offers for sale the accused products is not sufficient to exercise personal jurisdiction over the subsidiary's parent. *See 3D Sys.*, 160 F.3d at 1380 (finding no personal jurisdiction over parent of a subsidiary that was subject to personal jurisdiction where parent directed no activities toward residents of forum state); *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1468 (Fed.Cir.1998) (upholding district court's dismissal for want of personal jurisdiction of a parent of a subsidiary). The cases SESA and SEHI cite are not on point. In *3D Systems*, the plaintiff did not allege, and the court did not address, whether the defendant had minimum contacts with the State of California under the stream of commerce theory. The plaintiff in *3D Systems* did not allege the defendant corporation was selling or offering to sell the infringing products in California through its subsidiary. *See* 160 F.3d at 1381. In *Phonometrics*, the Federal Circuit's finding that plaintiffs failed to make a prima facie showing of personal jurisdiction over the parent company was based on the facts before it, which are notably different than those here. Further, the jurisdictional issue was prudentially moot since the Federal Circuit upheld summary judgment of non-infringement in favor of the subsidiary.

GSK presented evidence that SESA and SEHI identify and advertise themselves interchangeably as "Schneider Electric" to promote the Square D brand. Throughout their websites and sales literature, including the instruction sheet provided with the

alleged infringing product, SESA and SEHI reference Square D as their "brand name" for the sale of circuit breakers in the United States. SESA and SEHI freely use the Square D mark and make public representations that they are the actual company behind the Square D brand and reference Square D as a North American division of Schneider Electric.

In light of resolving factual conflicts in favor of GSK, SESA and SEHI have sufficient minimum contacts with the State of Texas to justify subjecting them to personal jurisdiction.

*2. Traditional Notions of Fair Play and Substantial Justice*

Even if a defendant has minimum contacts with the forum, personal jurisdiction over the defendant must not offend traditional notions of fair play and substantial justice. *Int'l Shoe,* 326 U.S. at 316. Determining whether personal jurisdiction offends traditional notions of fair play and substantial justice involves balancing (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversies; and (5) the interest of the states in furthering their social policies. *Viam,* 84 F.3d at 429. Cases where personal jurisdiction offends traditional notions of fair play and substantial justice "are limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Beverly Hills Fan,* 21 F.3d at 1568 (citing *Burger King,* 471 U.S. at 477).

*4 Applying the *Viam* factors to the facts in this case does not suggest that exercising jurisdiction over SESA and SEHI would offend traditional notions of fair play and substantial justice. SESA and SEHI do not provide evidence that they would be substantially burdened by having to defend this case in Texas. It is well recognized that modern communication and transportation have made defending a lawsuit in a foreign tribunal less burdensome. *See World-Wide Volkswagen,* 444 U.S. at 294. The State of Texas has a significant interest in preventing patent infringement within its borders and in protecting the patent rights of its citizens. *See Beverly Hills Fan,* 21 F.3d at 1568 ("[The forum state] has an interest in discouraging injuries that occur within the state."). Texas has an interest in furthering commerce and scientific development, especially within its

technology sector, which is promoted by patent laws. GSK has an interest in litigating the case in Texas because it is a Texas corporation. The interstate judicial system's interest is not directly applicable to the present case and is, therefore, not addressed.

This is not one of the rare cases where exercising personal jurisdiction would offend traditional notions of fair play and substantial justice. The State of Texas and GSK's interests are not so attenuated that they are clearly outweighed by any burden SESA and SEHI would suffer by having to defend this case in Texas. Therefore, exercising personal jurisdiction over SESA and SEHI does not offend traditional notions of fair play and substantial justice.

## CONCLUSION

Resolving the controverted factual allegations in favor of GSK, SESA and SEHI have sufficient minimum contacts with the State of Texas to justify subjecting them to personal jurisdiction in the State of Texas. Furthermore, exercising personal jurisdiction over SESA and SEHI in the State of Texas does not offend traditional notions of fair play and substantial justice. Accordingly, the Court **DENIES** SESA's and SEHI's Motions to Dismiss.

**So ORDERED.**

Slip Copy, 2007 WL 788343 (E.D.Tex.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2007 WL 171897 (W.D.Wash.)
**(Cite as: 2007 WL 171897 (W.D.Wash.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, W.D. Washington,
at Seattle.
BADEN SPORTS, INC., Plaintiff,
v.
Kabushiki Kaisha MOLTEN (dba Molten
Corporation) and Molten U.S.A., Inc.,
Defendants.
**No. C06-0210P.**

Jan. 18, 2007.

Bruce A. Kaser, Vantage Law, Issaquah, WA, James
L. Phillips, Miller Nash LLP, Seattle, WA, for
Plaintiff.

James E. Armstrong, Armstrong Kratz Quintos
Hanson & Brooks, Joseph V. Colaianni, Patton
Boggs, Washington, DC, Richard Lewis Goff, Adele
Conover, Miller Nash, Seattle, WA, for Defendants.

ORDER DENYING MOTION TO DISMISS
BASED ON LACK OF PERSONAL
JURISDICTION AND
INAPPROPRIATE VENUE

MARSHA J. PECHMAN, United States District
Judge.

**\*1** This matter comes before the Court on Defendant
Kabushiki Kaisha Molten's Motion to dismiss for
lack of personal jurisdiction and inappropriate venue.
(Dkt. No. 43). Plaintiff, a Washington sports ball
company, brought this suit for patent infringement
and unfair competition against the sporting goods
company Kabushiki Kaisha Molten (DBA Molten
Corporation) ("Molten Japan") and its wholly-owned
subsidiary, Molten U.S.A. Molten Japan brought this
motion on the grounds that Molten Japan has no
contacts with the state of Washington. Baden
contends that this Court has personal jurisdiction over
Molten Japan based on the contacts of its subsidiary,
Molten U.S.A. Having reviewed the papers and
pleadings submitted by the parties, the Court
DENIES the motion to dismiss.

**BACKGROUND**
Defendant Molten Japan is a Japanese sports ball
company with a principal place of business in

Hiroshima, Japan. (Nishihara Decl. ¶ 7). Molten
Japan has no offices, employees, sales agents, or
assets in Washington. (Id.). Molten Japan makes no
direct sales to consumers in Washington. (Id.).
Molten Japan has not shipped any products directly
to Washington residents or directed any marketing or
advertising efforts towards Washington residents. (Id
.)

Molten Japan sells its products throughout the
United States through its wholly owned subsidiary,
Molten U.S.A. (Id. ¶ 8). Specifically, as explained in
the declaration of Molten U.S.A.'s chairman and
CEO:

Molten [Japan] has a license agreement with
Molten U.S.A. that allows Molten U.S.A.(licensee)
to purchase "Molten" brand goods from Molten
Thailand Company, Inc. and other Asian suppliers.
The license also allows Molten U.S.A. to sell such
goods to its customers, at its discretion, within the
scope of the rights written in the agreement.
Molten U.S.A pays a percentage of royalties to
Molten [Japan] (licensor) on its U.S. sales but
Molten Japan plays no role in Molten U.S.A.'s
sales of "Molten" brand products. As per the
above-mentioned agreement, Molten U.S.A.
purchases basketballs from Molten Thailand
Company, Inc. Molten U.S.A. purchases digital
scoreboards and whistles periodically from Molten
Corporation.

(Id.). Defendant Molten U.S.A. is a wholly owned
subsidiary of Molten Japan and has its principal place
of business in Reno, Nevada. (Id. ¶ 8; Dawson Decl.
¶ 2).

Baden has sued Molten Japan and Molten U.S.A. for
patent infringement and unfair competition under the
Lanham Act and the Washington Consumer
Protection Act. Baden alleges that Molten [FN1]
recently introduced several basketball models into the
United States that infringe on two of Baden's patents.
(Second Amended Complaint ¶ 15). Baden also
alleges that Molten is misrepresenting certain
qualities of Molten's basketball design in a way that
violates section 43(a) of the Lanham Act, 15 U.S.C. §
1125(a). Molten Japan has moved to dismiss under
Fed.R.Civ.P. 12(b)(2) and (3) for lack of personal
jurisdiction and improper venue.

FN1. When referring simultaneously to both
Molten Japan and Molten U .S.A., the Court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 171897 (W.D.Wash.)
(Cite as: 2007 WL 171897 (W.D.Wash.))

Page 2

will refer to "Molten" or "Defendants".

## ANALYSIS

### A. Standard on Motion to Dismiss for Lack of Personal Jurisdiction

*2 Federal Circuit Law governs personal jurisdiction issues in patent-related actions. *Electronics for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1348 (Fed.Cir.2003). "[W]here the district court's disposition as to the personal jurisdictional question is based on affidavits and other written materials in the absence of an evidentiary hearing, a plaintiff need only to make a prima facie showing that defendants are subject to personal jurisdiction." *Id.* at 1349. "In the procedural posture of a motion to dismiss, a district court must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor." While a plaintiff carries the burden of showing minimum contacts, upon that showing, a defendant must prove that the exercise of jurisdiction is unreasonable. *Id.* at 1350.

### B. Specific Jurisdiction

Baden does not assert general jurisdiction in this case. Thus, the Court only considers whether specific jurisdiction over Molten Japan is proper. "Determining whether specific personal jurisdiction over a nonresident defendant is proper entails two inquiries: whether a forum state's long-arm statute permits service of process, and whether the assertion of jurisdiction would be inconsistent with due process." *Id.* Washington State's long-arm statue extends jurisdiction to the limits of federal due process. *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1405 (9th Cir.1994). Therefore, the analysis turns on whether the exercise of jurisdiction is consistent with due process. *See Amana Refrigeration, Inc. v. Quadlux, Inc.* 172 F.3d 852, 857 (Fed.Cir.1999). "The due process analysis requires the nonresident defendant to have certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Pennington Seed, Inc. v. Produce Exch. No. 229*, 457 F.3d 1334, 1344 (Fed.Cir.2006) (internal quotation marks omitted). "A court's consideration of minimum contacts generally involves three inquiries: whether (1) the defendant purposefully directed its activities at residents of the forum state, (2) the claim arises out of or relates to the defendant's activities with the forum state, and (3) assertion of personal jurisdiction is reasonable and fair. *Id.* (internal quotation marks omitted). Application of these three factors to the facts of this case establishes that this Court's jurisdiction over Molten Japan is proper.

### 1. Activities Purposely Directed to the Forum

This Court's jurisdiction over Molten Japan is based on the contacts of its subsidiary Molten U.S.A. with the forum state. The parent company located in Japan is subject to jurisdiction in Washington by attributing the Nevada subsidiary's contacts with the forum to the parent.

This Court has previously considered whether the contacts of a subsidiary may be imputed to the parent for the purposes of establishing personal jurisdiction. *See IP Innovation, L.L.C. v. RealNetworks, Inc.*, 310 F.Supp.2d 1209, 1212 (W.D.Wash.2004). The Court repeats here its interpretation of the relevant case law governing the applicable agency doctrine:

*3 A subsidiary company's contacts with the forum state may be imputed to the parent company where the subsidiary was established for, or is engaged in, activities that the parent would have to undertake if not for the subsidiary's involvement. *Dainippon Screen Manufacturing Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266, 1271 (Fed.Cir.1998). *Dainippon* involved a suit by an international company seeking a declaratory judgement that its products did not infringe a patent held by CFMT, a wholly owned subsidiary of CFM, the company that sold the patented products in the United States. CFMT, the subsidiary being sued, argued that it was not subject to personal jurisdiction in California because it had no employees, offices, or agents in that state and had never sold products in that state. The court held that "the parent subsidiary relationship between CFM and CFMT [led] to the conclusion that the imposition of personal jurisdiction [was] 'reasonable and fair,' one of the due process factors." *Id.* at 1271. Further, the court chided CFM's position that by establishing CFMT as a holding company for its intellectual property it could take actions without becoming defendant to a declaratory judgement action. *Id.*
Though Federal Circuit case law on this issue is minimal, the Ninth Circuit has reached similar conclusions that jurisdiction over an international company can be established through minimum contacts in the forum by a subsidiary that was "either established for, or is engaged in activities that, but for the existence of the subsidiary, the parent would have to undertake itself." *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1405 n. 9 (9th Cir.1994); *Wells Fargo & Co. v. Wells Fargo*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 171897 (W.D.Wash.)
**(Cite as: 2007 WL 171897 (W.D.Wash.))**

*Express Co.*, 556 F.2d 406, 422-23 (9th Cir.1977). *Id.* at 1212-13; *see also Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir.2001) ("The agency test is satisfied by a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.") (internal quotation marks omitted).

In this case, the Court concludes that the agency test has been satisfied. Particularly revealing is Molten U.S.A.'s statement on its website that Molten U.S.A. was created for the purpose of selling Molten brand products in the United States:

> Founded in 1958 with its worldwide headquarters in Hiroshima, Japan, Molten is the world's largest ball and sports equipment manufacturer. Molten U.S.A., Inc. was established in 1983 to bring these quality sports balls to the United States marketplace.

(Kaser Decl. at 52, Exh. H). On that same webpage, Molten U.S.A. describes Molten's widespread presence in the world basketball market: Molten has been the official basketball for six Olympic Games and has also been the official ball for the International Basketball Federation for the past twenty-five years, including the Men's and Women's World Basketball Championship held in Indianapolis, Indiana in 2002. As the "world's largest ball and sports equipment manufacturer," it is reasonable to believe that if Molten U.S.A. never existed, Molten Japan would have distributed its goods to the United States market itself. The agency test is therefore satisfied and the Court will consider the contacts of Molten U.S.A. in performing its analysis regarding personal jurisdiction over Molten Japan.

*4 Molten U.S.A. has sufficient contacts with Washington to support specific jurisdiction. The Court finds that Molten U.S.A. has the following contacts with the forum state:

(1) Molten U.S.A. has relationships and accounts with "team dealers" in Washington. (Dawson Decl. ¶ 9; Lambert Decl. ¶¶ 2, 5). A "team dealer" is a "middleman" through whom Molten U.S.A. sells Molten products to coaches, schools, recreation departments, teams, and individuals. (Dawson Decl. ¶ 7).

(2) Molten U.S.A. catalogues containing the allegedly infringing balls for sale are sent to team dealers in Washington. [FN2]

FN2. The Court notes that Baden alleges in

its opposition brief that Molten catalogues containing infringing balls for sale are sent to Team Dealers in Washington. In its reply, Molten Japan does not refute this statement except to clarify that the catalogues are Molten *U.S.A.* catalogues, as opposed to Molten *Japan* catalogues. The declaration of Melissa Dawson, president of Molten U.S.A., explains that sporting goods companies, like Molten, typically present their product line to Team Dealer salespeople, hand out catalogs and price lists, and assist the salespeople with calls or e-mails to the end consumers. (Dawson Decl. ¶ 7).

(3) On May 13, 2005, a Molten U.S.A. employee contacted the athletic director for North Kitsap High School in Washington via email and stated that "Molten U.S.A. would like to become the ball provider for *North Kitsap High School."* (Kaser Decl. at 87-88, Exh. Q).

(4) Molten basketballs are available for purchase on internet websites and may be purchased by Washington consumers. (Kaser Decl., Exhs. B (G.I.Joes) & L (Amazon.com)).

(5) In August 2006, Athletic Supply, a Team Dealer in Redmond, Washington, ordered 45 Molten basketballs from Molten U.S.A. (Lambert Decl. ¶ 5). Those basketballs were shipped to Athletic Supply on August 17, 2006. (*Id.* ¶ 6). Athletic Supply has since placed some of those Molten basketballs on the retail floor. (*Id.*). [FN3]

FN3. Molten suggests in its briefing that the Court should not consider this contact because it occurred after Baden filed its First Amended Complaint. (*See* Mot. at 8, n. 1). But the Federal Circuit has held that a court may consider evidence of contacts with the forum occurring subsequent to the events giving rise to the patent infringement litigation. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1563 (Fed.Cir.1994). As the *Beverly Hills* court explained, in contrast to a case involving a single tort, where subsequent contacts would have no relation to the cause of action, "[i]n a case involving a continuous tort, it would be arbitrary to identify a single moment after which defendant's contacts with the forum necessarily become irrelevant to the issue of specific jurisdiction." *Id.*

Through these contacts of Molten U.S.A., Molten

Slip Copy                                                                                          Page 4
Slip Copy, 2007 WL 171897 (W.D.Wash.)
**(Cite as: 2007 WL 171897 (W.D.Wash.))**

Japan has purposefully directed its activities at residents of the state of Washington. [FN4]

> FN4. Because the Court concludes that minimum contacts are established through the contacts of Molten Japan's agent, Molten U.S .A., the Court does not consider whether Molten Japan places its infringing basketballs into the stream of commerce with one ultimate target being consumers in Washington. (*See* Resp. at 14-15; Reply at 10).

The Court also notes that Molten U.S.A. also has other, more generalized contacts with the state of Washington. Molten U.S.A. is the official sponsor of the Puget Sound Region of U.S.A. Volleyball. (Kaser Decl. at 74, Exh. O). The Puget Sound Region office is in Seattle, Washington. (*Id.* at 75) Through that sponsorship, Molten U.S.A. has offered Puget Sound clubs special pricing on game volleyballs. (*Id.* at 82).

**2. A claim arising out of or relating to Molten's activities in the Forum**

Baden's claims arise out of and relate to the activities of Molten Japan (through its agent, Molten U.S.A.) with the forum state. The advertising, offering for sale, and sale of the allegedly infringing basketballs in Washington give rise to Baden's claims for patent infringement and unfair competition. *See* 35 U.S.C. § 271(a) ("[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."); 15 U.S.C. § 1125(a) (creating cause of action against any person who falsely advertises or makes a false association regarding a good or service).

**3. Exercise of Personal Jurisdiction over Molten Japan is Reasonable**

The presence of minimum contacts does not end the analysis. Once minimum contacts are established, the defendant must prove that the exercise of jurisdiction would "render justice unreasonable." *Coyle,* 340 F.3d at 1352. In making its assessment, the Court may consider: "(1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies." *Id*

*5 Molten Japan asserts that exercise of jurisdiction in this case would be unreasonable for the following reasons (1) it would be forced to defend this suit thousands of miles away from its principal place of business; (2) Washington's interest in adjudicating this dispute is not compelling because Molten Japan has not directed any allegedly infringing activities towards Washington residents; and (3) Baden's interest in obtaining relief would not be impacted by the Court's decision because Baden could maintain its suit against Molten U.S.A.

The Court is not persuaded that the inconvenience to Molten Japan is significant enough to render jurisdiction in this Court unreasonable. The Court has already found that Molten Japan purposely directs its activities at the forum state through the acts of its agent, Molten U.S.A. It should come as no surprise to Molten Japan that it may be sued here. Moreover, "[p]rogress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *Beverly Hills,* 21 F.3d at 1569 (internal citations and quotations omitted); *Sinatra v. National Enquirer, Inc.,* 854 F.2d 1191, 1199 (9th Cir.1988) ("[M]odern advances in communications and transportation have significantly reduced the burden on litigating in another country."). Molten Japan may confer with counsel by telephone, fax, and e-mail, and under this Court's Local Rules may even make telephonic court appearances. Any burden on Molten Japan is further minimized by its regular dealings with Molten U.S.A. *See Beverly Hills,* 21 F.3d at 1569.

Molten Japan's burden does not outweigh the state and plaintiff's interests in the litigation. Washington has an interest in the litigation because Baden is located here. And although Baden could maintain its suit just against Molten U.S.A., Molten Japan is the entity that designs and manufactures (through another subsidiary) the allegedly infringing basketball. Defendants have therefore not demonstrated that the burden of litigating the instant case will be so great as to constitute a deprivation of due process.

**C. Venue**

In a patent infringement case against a corporate defendant, venue exists wherever there is personal jurisdiction over the defendant. *Trintec Indus. v. Pedre Promotional Prods.,* 395 F.3d 1275, 1280 (Fed.Cir.2005). Because the Court has personal jurisdiction over Molten Japan, venue in this judicial district is proper.

Slip Copy
Slip Copy, 2007 WL 171897 (W.D.Wash.)
**(Cite as: 2007 WL 171897 (W.D.Wash.))**

## CONCLUSION

 Because Molten Japan uses Molten U.S.A. as its marketing and distribution conduit in the United States, because Baden has made a prima facie showing that Molten U.S.A. has sufficient minimum contacts to support specific jurisdiction, and Because Molten Japan has failed to show that jurisdiction would be unreasonable, the Court DENIES Molten Japan's motion to dismiss for lack of personal jurisdiction and inappropriate venue.

 The Clerk is directed to send copies of this order to all counsel of record.

 Slip Copy, 2007 WL 171897 (W.D.Wash.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 871015 (E.D.Tex.)
**(Cite as: 2006 WL 871015 (E.D.Tex.))**

**C**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Texas, Tyler Division.
MARSHALL PACKAGING COMPANY, LLC
Plaintiff
v.
NESTLE WATERS NORTH AMERICA, INC.;
Groupe Danone SA; the Dannon Co ., Inc.;
Great Brands of Europe, Inc. Defendants
**No. 6:05CV295.**

March 24, 2006.

Mark William Born, Brent Nelson Bumgardner, Gordie Donald Puckett, Leslie Dale Ware of Monts & Ware, Dallas, TX, Thomas John Ward, Jr., Law Office of T. John Ward, Jr., PC, Longview, TX, for Plaintiffs.

Massimo Ciccarelli of Thompson & Knight, Dallas TX, for Defendant. Nestle Waters North America.

Charles Samuel Cotropia and Steven Charles Malin of Sidley Austin Brown & Wood, Dallas, TX, Allen Franklin Gardner and Michael Edwin Jones of Potter Minton, Tyler, TX, for Defendant, Great Brands of Europe and the Dannon Co, Inc.

Charles Samuel Cotropia, Kelly James Kubasta and Steven Charles Malin of Sidley Austin Brown & Wood, Dallas, TX, for Defendant, Groupe Danone SA.

MEMORANDUM OPINION AND ORDER

DAVIS, J.

**\*1** Before the Court are Defendant Groupe Danone, S.A.'s ("Groupe Danone") Motion to Dismiss Plaintiff's Complaint Pursuant to Rule 12(b)(2) (Docket No. 19) and Plaintiff Marshall Packaging Company LLC's ("Marshall Packaging") Objections to and Motion to Strike the Declaration of Alexis Smith (Docket No. 31). For the reasons discussed below, the Court DENIES Groupe Danone's Motion to Dismiss. Similarly, the Court DENIES Marshall Packaging's Motion to Strike.

FACTUAL BACKGROUND

Marshall Packaging filed this suit against Groupe Danone; Nestle Waters North America, Inc. ("Nestle"); The Dannon Co., Inc. ("Dannon"); and Great Brands of Europe, Inc. ("Great Brands") (collectively "Defendants") alleging that Defendants infringe its U.S. Patent No. RE 38,770 (the " '770 Patent"), which discloses a "Collapsible Container." [FN1] Specifically, Marshall Packaging contends that Groupe Danone, Dannon, and Great Brands infringe the '770 Patent by "making, using, offering to sell, selling (directly or through intermediaries), importing, in this district and elsewhere in the United States, Evian Natural Spring Water bottles (and bottles sold under other brand labels) that use or embody the patented invention." Groupe Danone filed this Motion to Dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure claiming that the Court does not have personal jurisdiction over Groupe Danone because Groupe Danone does not have sufficient minimum contacts with the State of Texas. Marshall Packaging argues that Groupe Danone has sufficient minimum contacts with the State of Texas in that Groupe Danone indirectly sells or offers to sell allegedly infringing water bottles through intermediaries and distributors in the State of Texas.

FN1. Dannon and Great Brands are both subsidiaries of Groupe Danone.

APPLICABLE LAW
Because personal jurisdiction in a patent case is intimately related to patent law, Federal Circuit law governs the issue. _Silent Drive, Inc. v. Strong Indus., Inc.,_ 326 F.3d 1194, 1201 (Fed.Cir.2003). If the parties have not conducted jurisdictional discovery, a plaintiff only needs to make a prima facie showing that the defendants are subject to personal jurisdiction, and the pleadings and affidavits are to be construed in the light most favorable to the plaintiff. _Id._ A court can exercise personal jurisdiction over an out-of-state defendant if the forum state's long-arm statute permits jurisdiction without violating federal due process as delineated in _International Shoe Co. v. Washington,_ 326 U.S. 310 (1945). _LSI Indus. Inc. v. Hubbell Lighting, Inc.,_ 232 F.3d 1369, 1371 (Fed.Cir.2000); _3D Sys., Inc. v. Aarotech Labs., Inc.,_ 160 F.3d 1373, 1376-77 (Fed.Cir.1998). Although federal courts hearing patent cases defer to the forum state's interpretation of its long-arm statute, Federal Circuit law controls whether the exercise of personal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

jurisdiction comports with federal due process. *3D Sys.,* 160 F.3d at 1377.

"The Texas long-arm statute reaches 'as far as the federal constitutional requirements of due process will allow.' " *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002) (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991)). Thus, the analysis of Texas's long-arm statute collapses into the federal due-process inquiry. Due process requires an out-of-state defendant to have minimum contacts with the forum such that maintaining the suit does not offend traditional notions of fair play and substantial justice. *Int'l Shoe,* 326 U.S. at 316.

## ANALYSIS
### *1. Minimum Contacts*

**\*2** Courts employ different methods when describing whether a defendant has established sufficient contacts with a forum to justify asserting jurisdiction over the defendant. *See Viam Corp. v. Iowa Export-Import Trading Co.,* 84 F.3d 424, 427 (Fed Cir.1996). Some courts analyze minimum contacts in terms of either specific or general jurisdiction. *See id.* A court has specific jurisdiction over the defendant when the litigation arises out of the defendant's minimum contacts with the forum. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985). A court has general jurisdiction over the defendant when the cause of action does not arise from or relate to the defendant's contacts with the forum, but the defendant maintains continuous and systematic contacts with the forum state to confer jurisdiction. *LSI Indus. Inc.,* 232 F.3d at 1375. In some cases the distinction between specific and general jurisdiction is not analytically helpful in determining if the defendant has sufficient contacts with the forum. *See Viam,* 84 F .3d at 427. In such cases, like the one before this Court, where Marshall Packaging alleges that Groupe Danone's contacts are the result of Groupe Danone establishing a distribution network for the sale of its products in Texas, courts apply what is generally referred to as the "stream of commerce" theory to analyze minimum contacts. *See id.* In the present case, Marshall Packaging only alleges jurisdiction under the stream of commerce theory. Accordingly, the Court's minimum contacts analysis will focus exclusively on the stream of commerce theory.

In reference to the stream of commerce theory, the Supreme Court stated, "The forum does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297-98 (1980)). In *Asahi Metal Indus. Co. v. Superior Court,* the Supreme Court reiterated that the stream of commerce theory provides a valid basis for finding minimum contacts. *See* 480 U.S. 102, 112 (1987). However, the Court split as to the exact requirements of applying the theory. *See id.* at 112, 117. Four Justices on the Court adopted the view that a defendant must both place a product in the stream of commerce and take some action to purposefully direct that product toward the forum state. *See id.* at 112. The other four Justices adopted the view that a showing of additional action aside from placing the product in the stream of commerce was not necessary. *See id.* at 117.

The Federal Circuit applied the stream of commerce theory in *Beverly Hills Fan Co. v. Royal Sovereign Corp. See* 21 F.3d 1558, 1566 (Fed.Cir.1994). The Federal Circuit emphasized that " '[I]f the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the [defendants] to serve, directly or indirectly, the market for its product ..., it is not unreasonable to subject it to suit." ' *Id.* (quoting *World-Wide Volkswagen,* 444 U.S. at 297). However, instead of adopting one of the two versions of the stream of commerce theory laid out by the Supreme Court in *Asahi* the Federal Circuit stated, "We need not join in this debate here, since we find that, under either version of the stream of commerce theory, plaintiff made the required jurisdictional showing." *Id.* Similarly, the Court in this case does not need to join in the debate because Marshall Packaging made the required jurisdictional showing under either version of the stream of commerce theory. *See id.* at 1566.

**\*3** For purposes of determining jurisdiction, when a plaintiff's factual allegations are not directly controverted by the defendant they are taken as true. *See id.* at 1563. In this case, when a court does not hold an evidentiary hearing, the party seeking jurisdiction must make out a prima facie case supporting jurisdiction. *Alpine View Co. Ltd. v. Atlas Copco AB,* 205 F.3d 208, 215 (5th Cir.2000). [FN2] The Court will accept as true the party seeking jurisdiction's uncontroverted allegations, "and resolve in its favor, all conflicts between the facts contained in the parties' affidavits and other documentation." *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 871015 (E.D.Tex.)
**(Cite as: 2006 WL 871015 (E.D.Tex.))**

Page 3

FN2. The Court is unaware of a Federal Circuit case expressly addressing how a district court should proceed when the factual allegations of the party seeking jurisdiction are controverted. However, the Federal Circuit has held that with regard to procedural matters that are not unique to patent issues, courts shall apply the law of the particular regional circuit court where appeals from the district court would normally lie. *See Lab. Corp. of Am. Holdings v. Chiron Corp.*, 384 F.3d 1326, 1330 (Fed.Cir.2004); *see also Jacobs Chuck Mfg. Co., v. Shandong Weida Mach. Co., Ltd.*, No. 2:05-CV-185, 2005 U.S. Dist. Lexis 36211, at *8 (E.D.Tex. Dec. 5, 2005)(Ward, J.)(applying Fifth Circuit rule for handling controverted allegations in the absence of guidance from the Federal Circuit). Accordingly, the Court will apply the rule of the Fifth Circuit.

Groupe Danone failed to controvert factual allegations that it indirectly sells or offers to sell Evian and Volvic water bottles in the State of Texas through distributors or intermediaries. Marshall Packaging asserts in its Original Complaint that,

6. The Court has personal jurisdiction over each Defendant. Each Defendant has conducted and does conduct business within the State of Texas. Each Defendant, directly and/or through intermediaries (including distributors, retailers, and others), ships, distributes, offers for sale, sells, and/or advertises its products in the United States, the State of Texas, and the Eastern District of Texas. Each Defendant has purposefully and voluntarily placed one or more of its infringing products, as described below in Count 1, into the stream of commerce with the expectation that they will be purchased by consumers in the Eastern District of Texas. These infringing products have been and continue to be purchased by consumers in the Eastern District of Texas. Each Defendant has committed the tort of patent infringement within the State of Texas, and, more particularly, within the Eastern District of Texas.

....

11. Upon information and belief, [Groupe] Danone has infringed and continues to infringe the '770 Patent by making, using, offering to sell, selling (directly and through intermediaries), importing, in this district and elsewhere in the United States, Evian Natural Spring Water bottles (and bottles sold under other brand names) that use or embody the patented invention. Upon information and belief, Danone has also contributed to the infringement of the '770 Patent, and/or actively induced others to infringe the '770 Patent, in this district and elsewhere in the United States.

Plaintiff's Original Complaint ¶ ¶ 6, 11. Groupe Danone submits the Declaration of Butte Christiane ("the Christiane Declaration") in support of its Motion to Dismiss. In response to paragraph six of the Complaint, the Christiane Declaration states that "Group Danone, S.A. denies that it ships, distributes, offers for sale, sells, and/or advertises its products in the United States, the State of Texas, or the Eastern District of Texas." In response to paragraph eleven of the Complaint, the Christiane Declaration states, "Groupe Danone, S.A. denies that it has infringed or continues to infringe the '770 Patent by making, using, offering to sell, selling, importing, in this district or anywhere else in the United States, Evian Natural Spring Water bottles...." Finally, the declaration states,

*4 Products such as Dannon Yogurt, Dannon water, Evian water, and other consumer products are not sold, offered for sale, distributed, advertised, imported, or otherwise made available in the United States by Groupe Danone, S.A. Rather, these and other consumer products are distributed by, in some cases, corporations distantly related to Groupe Danone, S.A., and in other cases, third party companies. However, in no case does Groupe Danone itself sell, offer for sale, distribute, import, or otherwise make available such products in the United States.

Groupe Danone further submits the Declaration of Alexis Smith as a corporate representative of Groupe Danone in support of its motion to dismiss. [FN3] The Smith Declaration states:

FN3. Marshall packaging filed Objections to and Motion to Strike the Declaration of Alexis Smith, which is discussed below.

Groupe Danone, S.A. ("Groupe Danone") does not directly ship, distribute, offer for sale, sell, or advertise products in Texas. Groupe Danone has relationships with other entities--both third party companies and subsidiaries--that import, market, and distribute EVIAN and VOLVIC water products in the United States. Such relationships relate to the United States as a whole and do not specifically target the State of Texas. All U.S. distributors of EVIAN and VOLVIC water products work with sub-distributors.

The Smith Declaration further states, "Groupe Danone, S.A does not directly control U.S. marketing and/or distribution activities such as where and how

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 871015 (E.D.Tex.)
(Cite as: 2006 WL 871015 (E.D.Tex.))

Page 4

EVIAN or VOLVIC water products are marketed and sold."

Neither the Christiane Declaration nor the Smith Declaration states that Groupe Danone does not indirectly sell or offer to sell Evian water bottles in the State of Texas through intermediaries or distributors. Rather, the Smith Declaration seems to admit that Groupe Danone indirectly sells or offers to sell bottled water through distributors and intermediaries, including its subsidiaries. It seems that both the Smith and Christiane Declarations are carefully drafted such that Groupe Danone does not expressly deny Marshall Packaging's allegations that Groupe Danone indirectly sells or offers to sell Evian water bottles in the State of Texas through intermediaries or distributors. Because Groupe Danone fails to directly controvert them, these factual allegations must be taken as true. *See Beverly Hills Fan,* 21 F.3d at 1563-64.

In the Christiane Declaration, Groupe Danone does directly deny that it purposefully placed one or more of its products into the stream of commerce with the expectation that they would be sold to consumers in the Eastern District of Texas. This denial controverts Marshall Packaging's jurisdictional allegations on the point. However, Marshall Packaging presents evidence that both Evian and Volvic brands of bottled water are sold throughout Texas. Marshall Packaging also introduces evidence that Evian and Volvic water bottles were found in numerous grocery store chains and convenience stores throughout the Eastern District of Texas. It is undisputed that distribution channels have been intentionally set up to sell Evian and Volvic water to grocery stores and other retailers of bottled water in the United States. Within the United States, the State of Texas has the second largest population of any state and three of the ten most populated cities. In light of the uncontroverted fact that Groupe Danone indirectly sells or offers to sell Evian and Volvic brand water through distributors and intermediaries in the United States, and resolving the controverted facts in favor of Marshall Packaging, it is only reasonable to assume that Groupe Danone knew, or reasonably could have foreseen, that its Evian and Volvic brands of bottled water would end up in the State of Texas. *See Beverly Hills Fan,* 21 F.3d at 1564. Accordingly, under the applicable standard, Marshall Packaging has sufficiently alleged that Groupe Danone purposefully placed the accused products into the stream of commerce with the expectation the products would be sold in Texas.

*5 Groupe Danone cites *3d Systems* arguing that it controls in this situation and that personal jurisdiction over Groupe Danone is not proper because it is merely a parent corporation. In *3d Systems,* the Federal Circuit held that a district court in California did not have personal jurisdiction over a parent corporation while holding the court could exercise personal jurisdiction over the parent's subsidiary. *See* 160 F.3d at 1381. However, *3d Systems* is distinguishable from the present case in that the plaintiff did not allege, and the court did not address, whether the defendant had minimum contacts with the State of California under the stream of commerce theory. The plaintiff in *3d Systems* did not allege that the defendant corporation was selling or offering to sell the infringing products in California through intermediaries or distributors, or even through its subsidiary. Accordingly, the Federal Circuit's holding in *3d Systems* is not factually on point with the present case and is not controlling as to this motion to dismiss.

In light of the uncontroverted facts and resolving factual conflicts in favor of Marshall Packaging, Groupe Danone has sufficient minimum contacts with the State of Texas to justify subjecting it to personal jurisdiction.

*2. Traditional Notions of Fair Play and Substantial Justice*

Even if a defendant has minimum contacts with the forum, personal jurisdiction over the defendant may not offend traditional notions of fair play and substantial justice. *Int'l Shoe,* 326 U.S. at 316. Determining whether personal jurisdiction offends traditional notions of fair play and substantial justice involves balancing (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversies; and (5) the interest of the states in furthering their social policies. *Viam,* 84 F.3d at 429. Furthermore, in *Beverly Hills Fan,* the Federal Circuit stated that cases where personal jurisdiction offends traditional notions of fair play and substantial justice "are limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Beverly Hills Fan,* 21 F.3d at 1568 (citing *Burger King,* 471 U.S. at 477).

Applying the *Viam* factors to the facts in this case

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 5
Not Reported in F.Supp.2d, 2006 WL 871015 (E.D.Tex.)
**(Cite as: 2006 WL 871015 (E.D.Tex.))**

does not suggest that exercising jurisdiction over Groupe Danone would offend traditional notions of fair play and substantial justice. Groupe Danone does not provide evidence that it would be substantially burdened by having to defend this case in Texas. It is well recognized that modern communication and transportation have made defending a lawsuit in a foreign tribunal less burdensome. *See World-Wide Volkswagen,* 444 U.S. at 294. The State of Texas has an interest in the litigation. In *Beverly Hills Fan,* a patent case where the forum state was Virginia, the Federal Circuit stated, "Virginia's interests in the dispute are significant. Virginia has an interest in discouraging injuries that occur within the state. That interest extends to design patent infringement actions such as the one here." *21 F.3d at 1568.* Similarly, Texas has a significant interest in preventing patent infringement within its borders and in protecting the patent rights of its citizens. Texas also has an interest in furthering commerce and scientific development, especially within its technology sector, which is promoted by patent laws. Marshall Packaging has an interest in litigating the case in Texas because it is a Texas corporation. The interstate judicial system's interest discussed in *Viam* is not directly applicable to the present case and is, therefore, not addressed.

**\*6** This is not one of the rare cases discussed by the Federal Circuit in *Beverly Hills Fan.* The State of Texas and Marshall Packaging's interests are not so attenuated that they are clearly outweighed by any burden Groupe Danone would suffer by having to defend this case in Texas. Therefore, exercising personal jurisdiction over Groupe Danone does not offend traditional notions of fair play and substantial justice.

MOTION TO STRIKE THE DECLARATION OF ALEXIS SMITH

Marshall Packaging filed its Objections to and Motion to Strike the Declaration of Alexis Smith (the "Smith Declaration") in response to Groupe Danone's submission of the Smith Declaration as an exhibit to its Reply Brief. Unaccompanied by any legal support for its arguments, Marshall Packaging claims that the affidavit of Alexis Smith should be stricken because it is not made on personal knowledge and it recites impermissible hearsay. Groupe Danone contends that Alexis Smith's affidavit testimony is closely analogous to the testimony of a designated representative under Federal Rule of Civil Procedure 30(b)(6) and, therefore, does not require her personal knowledge. Furthermore, Groupe Danone argues that facts recited in the Smith Declaration fall under the "Residual Exception" to the hearsay rule. [FN4] It is

not necessary for the Court to resolve Marshall Packaging's objections to the Smith Declaration. Regardless of the Court's determination on Marshall Packaging's Objections and Motion to Strike, the Court's final conclusion on the Motion to Dismiss would remain the same. Accordingly, the Court DENIES Marshall Packaging's Motion to Strike as moot.

FN4. Groupe Danone cites Fed.R.Evid. 807 in support of the "Residual Exception."

CONCLUSION

Considering the uncontroverted facts as true and resolving the controverted facts in favor of Marshall Packaging, Groupe Danone has sufficient minimum contacts with the State of Texas to justify subjecting it to personal jurisdiction in the State of Texas. Furthermore, exercising personal jurisdiction over Groupe Danone in the State of Texas does not offend traditional notions of fair play and substantial justice. Marshall Packaging has made the requisite prima facie showing that Groupe Danone is subject to personal jurisdiction in the State of Texas. Accordingly, the Court DENIES Groupe Danone's motion to dismiss.

So ORDERED.

Not Reported in F.Supp.2d, 2006 WL 871015 (E.D.Tex.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 3260162 (N.D.Cal.)
**(Cite as: 2005 WL 3260162 (N.D.Cal.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
AGILENT TECHNOLOGIES, INC., Plaintiff,
v.
ELAN MICROELECTRONICS CORPORATION, et
al., Defendants.
No. C 04-05385 JW.

Nov. 29, 2005.

Morgan Chu, Alan J. Heinrich, Richard Elgar Lyon,
III, Samuel Kai Lu, Irell & Manella LLP, Los
Angeles, CA, David Craig Mcphie, Newport Beach,
CA, for Plaintiff.

Elizabeth H. Rader, Akin Gump Strauss Hauer &
Feld LLP, East Palo Alto, CA, for Defendants.

ORDER DENYING DEFENDANT ELAN
MICROELECTRONICS' MOTION TO DISMISS

WARE, J.

*I. INTRODUCTION*
**\*1** Agilent Technologies, Inc., ("Agilent" or
"Plaintiff") brings this action against Elan
Microelectronic Corp., ("Elan") and Elan Information
Technology Group ("EITG") for patent infringement.
Currently before this Court is Elan's Motion to
Dismiss for Lack of Personal Jurisdiction pursuant to
Fed.R.Civ.P. 12(b)(2). (*See* Docket Item No. 16,
hereafter, "Motion"). On August 22, 2005, the Court
conducted a hearing on the motion. Based upon the
arguments presented during the hearing and
submitted in the briefs, the Court DENIES Elan's
Motion to Dismiss

*II. BACKGROUND*
Agilent is a Delaware Corporation with its principal
place of business in Palo Alto, California. Agilent is
the sole owner by assignment of U.S. Patent No.
6,433,780 (the '780 patent), entitled "Seeing Eye
Mouse for a Computer System," and U.S. Patent No.
5,786,804 (the '804 patent), entitled "Method and
System for Tracking Attitude." (Complaint ¶ 8, 11.)
Agilent alleges that Defendants have infringed and
are infringing both patents by making, using, selling
or offering to sell within the United States inventions

protected by one or more claims of the patents.
(Complaint ¶ 9, 12.)

Defendant Elan is a Taiwanese Corporation with its
principal place of business in Hsin-Chu, Taiwan.
(Complaint ¶ 2.) Elan's primary business is the
design and marketing of consumer integrated circuits
("IC"). (Motion at 3.) Elan manufactures these IC
products in Taiwan but maintains a worldwide
network of sales channels and technical support
groups, including one in North America. *Id.* EITG is
Elan's wholly-owned subsidiary in North America
with its principal place of business in Saratoga,
California. (Complaint ¶ 3.)

Plaintiff asserts the following jurisdictional facts.
Elan founded EITG in 2001. Elan sells and markets
its products in the United States through EITG. Elan
advertises on its website that in all its regions,
including North America, it provides local technical
and commercial support through its subsidiary.
(Declaration of David C. McPhie in Support of
Agilent Technologies, Inc.'s Opposition to Motion to
Dismiss Elan Microelectronics Corporation For Lack
of Personal Jurisdiction, hereafter, "McPhie Decl."
Ex. 11.) The percentage of Elan's total sales directed
to the U.S. has been substantial, reaching as high as
about 40%, or tens of millions of U.S. dollars each
year. (Opp'n at 11.) Elan has jointly developed the
products at issue in this litigation with a California
corporation. Significantly, the optical mice
containing the alleged infringing products are sold in
California. (*Id.*)

In addition, Yueh-O Yu ("Ms.Yu"), Elan's
cofounder, chief engineer, and head of research and
development (R & D) has traveled to California to
serve as President and registered agent of EITG
(McPhie Decl. Exs. 2, 12.) In this capacity, Ms. Yu
was responsible for overseeing training of Elan's
engineers from Taiwan and taking charge of
technology transfer of advanced "know-how to Elan"
in the United States. (McPhie Decl. Ex. 2.) There is
also an allegation of overlapping board membership
between the two companies.

*III. STANDARDS*
**\*2** Under Rule 12(b)(2) of the Federal Rules of Civil
Procedure, a defendant may seek dismissal of an
action brought against him on the basis that personal
jurisdiction over him is lacking. Once a defendant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

challenges jurisdiction, the plaintiff has the burden of establishing that the court has personal jurisdiction over a defendant. *See Rio Properties, Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1019 (9th Cir.2002); *Doe v. Unocal Corp.,* 248 F.3d 915, 923 (9th Cir.2001).

The court may obtain personal jurisdiction over a defendant if it finds that either general or specific jurisdiction exists. General jurisdiction requires that a defendant engage in "systematic and continuous contacts" with California. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Specific jurisdiction is appropriate when a foreign defendant's less substantial contacts with the forum give rise to the causes of action in the suit. *Hanson v. Denckla,* 357 U.S. 235, 250, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

### IV. DISCUSSION

Agilent contends that Elan is subject to personal jurisdiction under multiple theories. Agilent contends the Court has general jurisdiction over Elan because Elan has had continuous and systematic business dealings in California, including the creation of its North American sales, research, development, and support hub in Silicon Valley. (Opp'n at 2.) Alternatively, Agilent contends the Court has specific jurisdiction over Elan based on the development efforts of the accused products in California and the purposeful release of those products through established distribution channels, resulting in sales within the forum. (*Id.*)

Elan contends that the majority of the facts asserted in Agilent's opposition and accompanying declarations are nothing more than hearsay snippets from a variety of websites. Moreover, while Elan does not dispute that Elan products are sold in the United States, it argues that this merely establishes jurisdiction over its American subsidiary, EITG, which distributes and markets the products, not the Taiwanese parent company. (Rely at 3.)

The Court finds that there is sufficient basis to exercise specific jurisdiction over Elan, and therefore, will not address Agilent's other theories for jurisdiction.

Three criteria are used to determine whether specific jurisdiction exists. First, the defendant must make such contact with the forum state that would constitute purposeful availment. *See McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 816 (9th Cir.1988); *Federal Deposit Ins. Corp. v. British-*

*American Ins. Co., Ltd.,* 828 F.2d 1439, 1442 (9th Cir.1987). This requirement aims to ensure that a defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into its court. *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1397 (9th Cir.1986) (*citing Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).) Second, the litigation must arise out of that contact with the forum state. *McGlinchy,* 845 F.2d at 816. Third, the exercise of jurisdiction must be reasonable. *Id.*

#### A. Purposeful Availment.

**\*3** Under the first prong of the specific jurisdiction test, Agilent must establish that Elan either purposefully availed itself of the privilege of conducting activities in the Northern District of California, or purposefully directed its activities toward the Northern District of California. In this case, Agilent alleges that Elan has joined with Peripheral Imaging Corporation ("PIC"), a San Jose-based company to develop the alleged infringing optical sensor. (McPhie Decl. Ex. 15.) Elan touts that its investment in PIC has enabled it to design a CMOS senor for an optical mouse. (*Id.* Ex. 35.) Further, in a 2004 financial statement, Elan reports that it "executed a joint development contract [with PIC] on optical mouse ... whereby when [Elan] uses this technology to make and sale products, it must pay royalties to PIC based on a certain percentage of the gross profits." (*Id.* Ex. 48, 49, 54.) Royalties paid by Elan to PIC under this contract have exceeded one million U.S. dollars in the first three quarters of 2004. (*Id.*) The Court finds that these allegations support the contention that Elan purposefully sought a partnership with a California company to develop the alleged infringing sensor.

Elan contends that it does not sell its products directly into the United States and does not import its products into the United States. However, during oral argument, counsel for Elan admitted to the Court that EITG directly purchases products from Elan and turns around to sale them to California companies. This seems to support Agilent's allegation that Elan has deliberately and willfully directed its products toward California through sales. (Complaint ¶ 9.) At the very least, the Court finds that Elan has caused its products to be imported into the United States, specifically to the Northern District of California.

Elan's contends that the majority of jurisdictional facts asserted by Plaintiff are hearsay and are not

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3260162 (N.D.Cal.)
**(Cite as: 2005 WL 3260162 (N.D.Cal.))**

Page 3

sufficiently supported by accompanying evidence. However, the Federal Circuit has held that "hearsay bear[ing] circumstantial indicia of reliability" may be admitted for purposes of determining whether personal jurisdiction exists. *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1562 (Fed.Cir.1994). Elan makes no evidentiary claims as to the nature of the alleged hearsay. As the Ninth Circuit has held, when a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, a plaintiff needs only make a prima facie showing of the jurisdictional facts to withstand the motion. *Unocal,* 248 F.3d at 922. In order to make a prima facie showing, a plaintiff must allege facts which, if true, would be sufficient to establish personal jurisdiction. *Id.* If not directly controverted, a plaintiff's version of the facts is taken as true for the purposes of the motion. *Id.* Conflicts between the facts stated in the parties' affidavits must be resolved in plaintiff's favor during a prima facie jurisdictional analysis. *Dole Food Co., Inc. v. Watts,* 303 F.3d 1104, 1108 (9th Cir.2002). In this case, the jurisdictional facts asserted all come from Elan's own marketing materials and as well as other public documents, such as its website. The Court finds that at the pleading stage, the alleged jurisdictional facts present sufficient circumstantial indicia of reliability to determine personal jurisdiction over Elan.

**\*4** In addition, Elan is correct in asserting that Plaintiff must prove facts outside of a subsidiary relationship for this Court to establish personal jurisdiction Elan. The Ninth Circuit has held that "[t]he existence of a parent-subsidiary relationship is insufficient to establish personal jurisdiction over companies." *Transure, Inc. v. Marsh and McLennan, Inc.,* 766 F.2d 1297, 1299 (9th Cir.1985). The jurisdictional analysis depends on the corporate relationship between the parent and its subsidiary. "Jurisdictional contacts of a subsidiary corporation should be imputed to the corporate parent when the subsidiary corporation is engaged in functions that, but for the existence of the subsidiary, the parent would have to undertake." *Gallagher v. Mazda Motor of America, Inc.,* 781 F.Supp. 1079, 1085 (E.D.Pa.1992.)

As counsel for Elan represented to the Court during oral argument, EITG, Elan's subsidiary, gets its products directly from Elan. If EITG did not exist, Elan would have to undertake direct sales with its clients in the United States, particularly in California. As Elan public marketing documents tout, Elan wholly-owned subsidiary EITG serves as the North American hub for Elan's "worldwide network of sales channels and technical support." (McPhie Decl. Exs. 6, 7, 48, 49.) But for the existence of EITG, Elan would have to provide local technical support, research and development, and sales to its customers in this district. These circumstantial jurisdictional facts support the proposition that EITG's activities may be imputed to Elan.

The activities and relationship between Elan and EITG as alleged establish a prima facie showing of jurisdiction facts. The Court finds that Elan has both availed itself of the privilege of conducting activities in the Northern District of California and purposefully directed its activities toward this district.

B.  *Plaintiff's Claims and Defendant's Forum Activities.*

The second prong of the test for specific jurisdiction requires that the claim against the defendant be one which "arises out of" or relates to the defendant's forum-related activities. This factor is measured in terms of "but for" causation. *See Panavision International v. Toeppen,* 141 F.3d 1316, 1322 (9th Cir.1998). The court asks whether the action would exist but for the contacts. Agilent contends that Elan infringes its patents by marketing and selling the alleged infringing products in California. But for the injury that Agilent, a California-based company, suffered in California from Elan's infringing activity, Agilent would not have a cause of action against Elan. Therefore, Agilent's patent infringements action against Elan arises out of Elan's alleged activities directed at California.

C.  *Reasonableness of Jurisdiction.*

The third prong of the test for specific jurisdiction provides that the exercise of personal jurisdiction must comport with fair play and substantial justice. The Ninth Circuit has held that a lesser showing of contacts with the forum may be sufficient if considerations of reasonableness so require. *Haisten,* 784 F.2d at 1397. Seven factors are considered in assessing reasonableness of jurisdiction: (1) the extent of defendant's purposeful interjection into the forum; (2) the burden on the defendant of litigating in the forum; (3) the extent of conflict with the sovereignty of defendant's state; (4) the forum state's interest in adjudicating the issue; (5) the most efficient judicial resolution of the dispute; (6) the importance of the forum to plaintiff's interest in convenient and fair relief; and (7) the existence of an alternate forum. *Federal Deposit Ins. Corp. v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 3260162 (N.D.Cal.)
(Cite as: 2005 WL 3260162 (N.D.Cal.))

*British-American Ins. Co., Ltd.,* 828 F.2d 1439, 1442 (9th Cir.1987); *Core-Vent Corp. v. Nobel Industries,* 11 F.3d 1482, 1487-88 (9th Cir.1993). Of the seven factors to be considered in an assessment of reasonableness of jurisdiction, no single factor is dispositive and a court must balance all seven. *Cor-Vent Corp.,* 11 F.3d 1482 at 1488.

**\*5** There is a presumption that jurisdiction is reasonable so long as the first two prongs of the specific jurisdiction test have been met. *Haisten v. Grass Valley Medical Reimbursement,* 784 F.2d 1392, 1397 (9th Cir.1986). For example, once a plaintiff has established purposeful availment and shown that its claims arise out of defendant's purposeful contacts, defendant must present a compelling case of the unreasonableness of jurisdiction in order to defeat jurisdiction. *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802 (9th Cir.2004).

In arguing that an exercise of jurisdiction is unreasonable, Elan's primary argument rests with the burden of litigation in California because it is Taiwanese company. (Reply at 11.) The Ninth Circuit has held that unless such inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction. *Caruth v. International Psychoanalytical Ass'n,* 59 F.3d 126, 128-129 (9th Cir.1995). In this case, Elan's purposeful interjection into the forum state favors jurisdiction because as described above, Elan's alleged wrongful activities were and still are directed at California.

Elan's status as a foreign company slightly weighs in its favor with respect to the burden factor. However, "when minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *See Asahi Metal Industry Co. V. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Here, Elan maintains a subsidiary in Saratoga, California. Its cofounder, chief-engineer, and head of R & D, Ms. Yu, has traveled to California to serve as President and registered agent of EITG. (McPhie Decl. Exs. 2, 12.) In these capacities, Ms. Yu was responsible for overseeing training of Elan's engineers from Taiwan and taking charge of certain technology transfer in the United States. Ms. Yu's role as President of EITG is not insignificant; it goes to Agilent's contention that Elan and EITG are closely connected. With its subsidiary in the Northern District, and the fact that its cofounder has readily traveled to California to foster its business, the burden on Elan to defend the litigation lessens.

The third factor, potential conflicts with another state's sovereignty, is given greater importance where the events giving rise to the suit occurred on the foreign state's territory. In this case, Elan has not argued that California's sovereignty conflicts with another state's authority. Elan does not dispute that the events giving rise to the suit occurred in California. Therefore, this case does not give rise to potential conflicts with Taiwanese's sovereignty.

California's interest in adjudicating this case is significant and thus, weighs toward the Plaintiff. The accused product is in fact directed toward the United States and California markets. Elan maintains a continuous business relationship with the United States through its office in Saratoga. Elan directs its customers in North America to contact EITG for products and services. Elan list of customers includes several large American and Californian companies. These facts clearly outweigh the burden of subjecting Elan to litigation in this state. *See Beverly Hills Fan Co. v. Royal Soverign Corp.,* 21 F.3d 1558, 1568 (Fed.Cir.1994). A forum state has the power to settle issues that arise within its boundaries, and between its companies and the companies that do business with it. *Id.*

**\*6** Agilent's interest in a convenient and fair relief for the alleged infringement is important. Agilent, being a California corporation, has rightfully elected its forum state to redress a wrong. If the allegations are true and the case is resolved in Agilent's favor, properly enforcing an award would necessitate an American court and enforcement mechanism. Given that Agilent and one of Elan's subsidiaries are located in the Silicon Valley, the convenience factor weighs in favor of Agilent.

The last factor in the reasonableness prong is to consider whether there is an alternate forum. Again there are multiple factors which weigh in favor of Plaintiff's chosen forum. The Plaintiff and one of the Defendants are located in California. The alleged infringing products are produced and sold in California. It appears that California would be the most obvious and least taxing forum for all parties affected by this litigation. Elan contends that it would have to retain counsel for this forum. Perhaps this would create a minor inconvenience for Elan, however, it pales in comparison to the difficulties Plaintiff would encounter in Taiwan, where it has no contacts whatsoever.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3260162 (N.D.Cal.)
**(Cite as: 2005 WL 3260162 (N.D.Cal.))**

Page 5

Weighing all the factors, the Court finds that it is reasonable to subject Elan to personal jurisdiction in the Northern District.

### V. CONCLUSION

Defendant Elan Microelectronics' Motion to Dismiss for Lack of Personal Jurisdiction is DENIED.

The parties shall appear for a case management conference on Monday, January 9, 2006 at 10 a.m. Pursuant to the Civil Local Rules of this Court, the parties shall submit a joint case management statement no later than ten (10) days before the date of the conference.

Not Reported in F.Supp.2d, 2005 WL 3260162 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.