## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| LG DISPLAY CO., LTD., | |
| Plaintiff, | Civil Action No. 06-726 (JJF) |
| v. | Civil Action No. 07-357 (JJF) |
| CHI MEI OPTOELECTRONICS CORPORATION, et al. | **CONSOLIDATED CASES** |
| Defendants. | |

### PLAINTIFF LG DISPLAY'S REPLY BRIEF IN SUPPORT OF
### ITS MOTION FOR ENTRY OF PROTECTIVE ORDER

July 3, 2008

OF COUNSEL:
Gaspare J. Bono
R. Tyler Goodwyn, IV
Lora A. Brzezynski
Cass W. Christenson
John W. Lomas, Jr.
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 496-7500

BAYARD P.A.

Richard D. Kirk
Ashley B. Stitzer
222 Delaware Avenue, 9th Floor
P.O. Box 25130
Wilmington, DE 19899-5130
(302) 655-5000

*Attorneys for Plaintiffs LG Display Co., Ltd. and
LG Display America, Inc.*

{BAY:01052449v1}

## TABLE OF CONTENTS

**Page**

ARGUMENT .................................................................................................................. 2

I.     CMO BEARS THE BURDEN TO DEMONSTRATE WHY "INSIDER
       ACCESS" TO THE LG DISPLAY'S MOST SENSITIVE AND PROPRIETARY
       CONFIDENTIAL INFORMATION IS NECESSARY ................................................. 2

II.    CMO FAILS TO SATISFY ITS BURDEN OF DEMONSTRATING A
       SPECIFIC AND COMPELLING NEED FOR "INSIDER ACCESS" TO LG
       DISPLAY'S HIGHLY SENSITIVE TECHNICAL DATA THAT OUTWEIGHS
       THE IRREPARABLE HARM TO LG DISPLAY ........................................................ 4

       A.     CMO's Proposed "Insider Access" Scheme Poses a Severe Risk of
              Irreparable Harm To LG Display ...................................................................... 4

              1.     CMO should not have "insider access" to LG Display's most
                     sensitive and competitive product information ....................................... 4

              2.     CMO's identified "insiders" are employees who are directly
                     involved in competitive activities ............................................................ 5

                     a.     There is a substantial risk of inadvertent disclosure by
                            CMO's insiders because of their relationships with other
                            competitive decision-makers. ....................................................... 6

                     b.     The CMO insiders are involved in a range of activities
                            related to competition. ................................................................. 7

              3.     LG Display would have no adequate legal remedy or recourse for
                     inadvertent disclosure of its most sensitive and proprietary
                     technical trade secrets ........................................................................ 10

              4.     CMO's cases are distinguishable and do not support "insider
                     access" ................................................................................................. 12

       B.     CMO Fails to Show Any Specific Hardship, Much Less a Hardship as
              Serious as the Competitive Threat to LG Display .......................................... 13

III.   CMO IMPLICITLY CONCEDES IT HAS NO JUSTIFICATION FOR
       "INSIDER ACCESS" TO LG DISPLAY'S HIGHLY SENSITIVE BUSINESS
       INFORMATION SUCH AS CUSTOMER LISTS, SALES AND MARKETING
       DOCUMENTS, PRICING INFORMATION, AND LICENSE AGREEMENTS ........ 17

CONCLUSION ............................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Affymetrix, Inc. v. Illumina, Inc.,*
  C.A. No. 04-901-JJF, 2005 WL 1801683 (D. Del. July 28, 2005) ...................................10,15

*Akzo N.V. v. U.S. Int'l. Trade Comm'n*, 808 F.2d 1471, 1483 (Fed. Cir. 1986)
  808 F.2d 1471, 1483 (Fed. Cir. 1986) ................................................................................. 10

*Am. Standard, Inc. v. Pfizer, Inc.,*
  MISC. 87-1-73-IP, 1988 WL 156152 (S.D. Ind. July 08, 1988)........................................... 17

*Autotech Tech. Ltd. P'ship v. Automationdirect.com, Inc.,*
  237 F.R.D. 405 (N.D. Ill. 2006) ....................................................................................... 5, 6

*Brown Bag Software v. Symantec Corp.,*
  960 F.2d 1465 (9th Cir. 1992)........................................................................................ 10,5

*Cmedia, LLC v. LifeKey Healthcare, LLC,*
  216 F.R.D. 387 (N.D. Tex. 2003)........................................................................................ 17

*Commissariat A L'Energique Atomique v. Dell Computer Corp.,*
  No. 03-484-KAJ, 2004 WL 1196965 (D. Del. May 25, 2004) (Jordan, D.J.) ....................... 10

*E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.,*
  219 U.S.P.Q. 37 (D. Del. 1982) ......................................................................................... 12

*Intel Corp. v. VIA Tech., Inc.,*
  198 F.R.D. 525 (N.D. Cal. 2000) ...............................................................................passim

*LG.Philips LCD Co. v. Tatung Co. of Am.,*
  No. 2:02-cv-06775-CBM-JTL (Civil Minutes, D.I. 1493) (C.D. Cal. Dec. 4, 2006) .......... 3, 4

*Liveware Publ'g, Inc. v. Best Software, Inc.,*
  252 F. Supp. 2d 74 (D. Del. 2003) ..................................................................................... 17

*Minnesota Mining and Manufacturing Co. v. Smith & Nephew*,
  No. 3-91 CIV 274, 1992 WL 464352 (D. Minn. July 27, 1992)....................................12, 13

*Minnesota Mining and Manufacturing Co. v. Smith & Nephew*,
  No. 3-91 CIV 274, 1992 WL 464351 (D. Minn. June 23, 1992).......................................... 13

*Netquote, Inc. v. Byrd*,
   No. 07-cv-00630-DME-MEH, 2007 WL 2438947 (D. Colo Aug. 23, 2007)....................... 17

*Nutratech, Inc. v. Syntech Int'l, Inc. et al.*,
   242 F.R.D. 552 (C.D. Cal. 2007)...................................................................................... 17

*R.R. Donnelly & Sons Co. v. Quark, Inc.*,
   C.A. No. 06-032 (JJF), 2007 WL 61885 (D. Del. Jan. 4, 2007) ...................................6, 8, 13

*U. S. Steel Corp. v. United States*,
   730 F.2d 1465 (Fed. Cir. 1984) ...........................................................................6, 9, 10, 12

There is no dispute that the parties' technical product data that Chi Mei Optoelectronics Corporation ("CMO") seeks "insider access" to, such as mask files and product design specifications, are the parties' most highly sensitive, confidential, and proprietary information. CMO thus bears the burden of demonstrating why "insider access" to LG Display Co., Ltd.'s ("LG Display") highly sensitive technical information is necessary. It fails to do so.

CMO's proposal for "insider access" to LG Display's highly sensitive technical data poses a significant risk of irreparable harm that could wipe away LG Display's technical advantage in the highly competitive LCD industry and render worthless years of product development investments. CMO seeks to ship LG Display's highly sensitive confidential information off to its own offices in Taiwan for review by two engineers who advise CMO's business units and "interface" with CMO's inventors and decision-makers, and an in-house attorney, who also advises business units and is involved in, *inter alia*, patent prosecution, settling patent litigation, and structuring contracts. These individuals are unquestionably involved in competitive activities and in a position to commercially exploit LG Display's highly sensitive information in a way that would cause LG Display irreparable harm.

CMO fails to provide any specific explanation as to why these insiders need access to LG Display's highly sensitive confidential information. CMO also makes no attempt to show what specific role in this litigation its employees would perform that is distinct from the roles performed by the twelve Irell & Manella attorneys representing CMO in this case, nor does it demonstrate that its outside counsel is incapable of litigating this matter. CMO also fails to acknowledge that it will be retaining independent experts to advise and testify as to the technical issues involved in this case. CMO's vague and conclusory statements about hardship fail to justify the risk of irreparable harm to LG Display's business.

The sensible approach offered by LG Display, and agreed to by both AUO and CMO in other LCD related litigations, is a two-tiered confidentiality system that limits access to certain highly sensitive confidential documents to the parties' outside attorneys only. Indeed, AUO has already agreed to this approach in this case. This system would protect the parties' sensitive technical data without inhibiting the parties' ability to litigate this case. Accordingly, LG Display respectfully requests that its proposed protective order be entered in this case.

## ARGUMENT

### I.    CMO BEARS THE BURDEN TO DEMONSTRATE WHY "INSIDER ACCESS" TO LG DISPLAY'S MOST SENSITIVE AND PROPRIETARY CONFIDENTIAL INFORMATION IS NECESSARY

There is no dispute that the technical information at issue is the parties' most highly sensitive, proprietary information. CMO recognizes that the technical information to which it seeks "insider access" to is highly sensitive, confidential, and must be safeguarded. (*See* Def.'s Br. at 1, 6-8.) CMO has previously entered into protective orders, like the one LG Display has proposed, where access to such files is limited to outside attorneys only. (Pl.'s Br., Exs. 5, 6.) AU Optronics Corporation refers to its similar technical product information as the "'blue prints'" for manufacturing TFT-LCD displays and the "'crown jewels'" of its technology. (*See* Ex. 1, Letter from Mr. Platt to Ms. Brzezynski, June 24, 2008.)

AUO refuses to allow outside trial counsel for LG Display to have access to AUO's technical data even at LG Display's outside counsel's own office in Washington DC, almost 7,000 miles away from LG Display's headquarters. (*See* Ex. 1.) AUO also refuses to let LG Display's outside counsel print such information without having AUO counsel present and involved. LG Display thus finds itself in the middle of two extreme positions on the issue of disclosure of technical files. AUO refuses to trust LG Display's outside counsel with AUO's

technical files, yet CMO wishes to ship LG Display's highly sensitive technical files off to its own offices in Taiwan so it can have "insider access" to that information.

Courts have also recognized that LCD manufacturer mask files, product design specifications, and manufacturing process flows are trade secrets that must be "shielded from public disclosure." *LG.Philips LCD Co. v. Tatung Co. of Am.*, No. 2:02-cv-06775-CBM-JTL (Civil Minutes, D.I. 1493) (C.D. Cal. Dec. 4, 2006) (attached hereto as Exhibit 2). For example, in a case involving some of the same patents at issue here, the Central District of California granted Taiwanese LCD manufacturer Chungwha Picture Tubes' ("CPT") motion to seal portions of the trial transcript and trial exhibits that reference mask files, product design specifications, and manufacturing process flows, including witness testimony regarding manufacturing and design processes. *Id*. Similarly, CPT moved to close portions of the trial in another related patent infringement case in this Court involving mask files and design specifications because of the competitive threat posed by disclosure of those materials. This Court granted that request. The mask files in that case were produced under an outside counsel attorneys' eyes only protective order. (*See* Ex. 3.)

The highly sensitive and confidential nature of the documents that LG Display will produce in this case, which is undisputed, shifts the burden to CMO to demonstrate that its need for "insider access" to LG Display's highly sensitive confidential information outweighs the risk of injury to LG Display. *See Intel Corp. v. VIA Tech., Inc.*, 198 F.R.D. 525, 528 (N.D. Cal. 2000) ("because it seeks disclosure of information that would otherwise be confidential, Intel bears the burden of establishing a sufficient need for the information which outweighs the risk of injury to VIA." (citing *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1471 (9th Cir. 1992))). CMO cannot meet this burden.

II.     **CMO FAILS TO SATISFY ITS BURDEN OF DEMONSTRATING A SPECIFIC AND COMPELLING NEED FOR "INSIDER ACCESS" TO LG DISPLAY'S HIGHLY SENSITIVE TECHNICAL DATA THAT OUTWEIGHS THE IRREPARABLE HARM TO LG DISPLAY**

CMO's argument for "insider access" to LG Display's most sensitive and competitive information must fail because CMO can identify no specific hardship without "insider access," much less a hardship so compelling that it could justify the significantly high risk of irreparable harm that its "insider access" scheme poses to LG Display. CMO seeks "insider access" for employees who are directly involved in competitive activities through their regular contact with CMO inventors, business decision-makers, and patent prosecution counsel, all of whom make competitive business decisions. Such access carries an unacceptable risk of inadvertent disclosure. CMO fails to show any specific, much less a compelling, need to have "insider access" to LG Display's most sensitive and proprietary technical information that would outweigh the risk of irreparable harm to LG Display.

A.      **CMO's Proposed "Insider Access" Scheme Poses a Severe Risk of Irreparable Harm To LG Display**

1.      **CMO should not have "insider access" to LG Display's most sensitive and competitive product information.**

As AUO has said, mask files and product design specifications are the "'blue prints'" for manufacturing TFT-LCD displays and the "'crown jewels'" of LCD technology. (Ex. 1.) The Honorable Consuelo B. Marshall found that disclosure of an LCD manufacturer's mask files and product design specifications would allow "competitors, or even a third-party, *to duplicate [that manufacturer's] products without investing its own time and resources in developing those products* for itself." *LG.Philips LCD Co.*, No. 2:02-cv-06775-CBM-JTL (Civil Minutes, D.I. 1493) (emphasis added). This result would eliminate LG Display's advantage in the marketplace

and render worthless its years of substantial investments in developing its flat-panel display technology.

LG Display takes great efforts to protect this data, substantially limiting access among employees, and enforcing security checks on computer equipment at the point of entry and exit to and from LG Display's research and development center in Korea.  Presumably, CMO likewise implements security measures to protect its own product design information, given the fact that the LCD industry is among the most competitive industries in the world.  (*See* Ex. 4, Matthew Torres, *2006 Consumer Electronics Show (CES) News and Review*, Jan. 9, 2006, http://tv.about.com/od/manufacturers/a/2006CES.htm.)  In particular, competition among Taiwanese companies, such as AUO and CMO, and Korean companies, such as LG Display is particularly fierce and direct.  (Ex. 5, Moon Ihlwan, *Taiwan Dogs Korea for LCD Share*, BusinessWeek, June 14, 2006.)

> **2.    CMO's identified "insiders" are employees who are directly involved in competitive activities.**

CMO's repeated and conclusory claims that the insiders to whom CMO seeks to provide LG Display's highly confidential information to are not involved in "competitive decision-making," is belied by the declarations provided by those insiders.  As the declarations make clear, those insiders' activities, association, and relationship with [CMO] pose a competitive threat to LG Display.  CMO thus seeks "insider access" to LG Display's highly sensitive mask files and product design specifications for CMO's employees in Taiwan who are directly involved in competitive activities.

a.    There is a substantial risk of inadvertent disclosure by CMO's insiders because of their relationships with other competitive decision-makers.

CMO's repeated, conclusory references to "competitive decisions" and "competitive decision-making" in its opposition brief and accompanying declarations misinterpret the case law and miss the point.  In *U.S. Steel*, the Federal Circuit "employed the phrase 'competitive decision-making,' not as a self-defining test, but 'as a serviceable *shorthand*.'"  *Autotech Tech. Ltd. P'ship v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 407 (N.D. Ill. 2006) (quoting *U. S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984).).  The "competitive decision-making" shorthand is but one "example of a situation where a party ought to be forced to rely on outside counsel."  *Id*. at 408 (citing *U.S. Steel*, 730 F.2d at 1468 & n.3).  CMO takes an improperly narrow view of involvement with decision-making, suggesting that unless employees actually make competitive decisions, they should be permitted to have access to highly sensitive confidential information.  This simply is not the law.

Contrary to CMO's assertions, the proper analysis focuses not on "the uncritical and indiscriminate use of catch phrases" like "competitive-decision making," but instead on the in-house counsel's relationship with competitive decision-makers and "any other factor that enhances the risk of inadvertent disclosure."  *Id*; *see also R.R. Donnelly & Sons Co. v. Quark, Inc.*, C.A. No. 06-032 (JJF), 2007 WL 61885, *1 (D. Del. Jan. 4, 2007) (Farnan, D.J.) ("the relevant inquiry remains whether the employee in question 'is in a position that creates a high risk of inadvertent disclosure.'" (quoting *Commissariat A L'Energique Atomique v. Dell Computer Corp.*, No. 03-484-KAJ, 2004 WL 1196965, at *2 (D. Del. May 25, 2004) (Jordan, D.J.) (LCD patent case))).  Whether CMO's insiders make competitive decisions is not the issue. It is clear that the CMO insiders' admitted job responsibilities create the inappropriately high risk

of inadvertent disclosure that justifies an outside attorneys eyes' only limitation on access to highly confidential documents.

                b.      The CMO insiders are involved in a range of activities related to competition.

CMO's "litigation unit" insiders have a regular working relationship with and provide advice to both inventors and patent prosecution counsel, and are "intermediaries" between the two. (Def.'s Br. Ex. A ¶ 5.) These insiders are also the "interface" between CMO's inventors and CMO's competitive decision makers and provide advice to CMO's business units. (Def.'s Br. Ex. A ¶ 4-6.) They "transfer invention disclosures from the inventors to CMO's retained counsel," "ensure the specification is consistent with the invention disclosure," and "work with the inventors to provide information to the prosecution counsel when necessary to respond to an Office Action." (*Id.*) Indeed, the insiders explicitly note that they "give advice during the prosecution of patents." (Def.'s Br. Ex. C ¶ 6, Ex. D ¶ 6.) Accordingly, contrary to CMO's claim, these employees are substantively involved in patent prosecution. "Insider access" by CMO employees who regularly interface with CMO's in-house inventors and business decision makers clearly constitutes competitive activity. These insiders could inadvertently use or consider the highly sensitive product design information gleaned from LG Display when developing and defining new inventions, and otherwise working closely with CMO's in-house inventors.

The insiders' participation in patent litigation also constitutes competitive activity. The insiders all admittedly advise CMO business unit decision makers on patent law relating to patent litigation. (Def.'s Br., Ex. A ¶ 4, Ex. B ¶ 4, Ex. C ¶ 4, Ex. D ¶ 4.) The insider engineers conduct non-infringement analyses of CMO products, invalidity analyses of other companies' patents, infringement analyses for CMO's patents, and analyses of the content of prior art in

coordination with CMO's business units.  (Def.'s Br., Ex. A ¶ 5, Ex. C ¶ 5, Ex. D ¶ 5.)  Each of

the insiders makes recommendations on filing and settling patent litigation suits, some of which

will involve licensing agreements.  (Def.'s Br., Ex. A at ¶ 4, Ex. B ¶ 4, Ex. C ¶ 4, Ex. D ¶ 4.)

Mr. Lin explains that he provides legal advice on the structure of, and legal risks associated with,

contracts.  (Def.'s Br., Ex. B ¶ 4.)  Given Mr. Lin's involvement in patent litigation, at least

some of those contracts undoubtedly relate to licensing.

 These are all competitive activities.  *See Intel Corp.*, 198 F.R.D. at 532 (finding that

activities related to patent litigation are competitive).  Patent litigation often leads to licensing

agreements.  Insiders who evaluate the strength of a patent, their company's products implicated

by the patent and the competitors' products implicated by the patent are involved in competitive

activity because potential licensing agreements that might result from litigation directly affect the

company's ability to sell products.  *Id.*  Having knowledge of the technical aspects of the

opposing party's products, as well as licensing agreements and marketing information, would

give a company a strategic advantage with respect to licensing and other potential litigation.  *See

id.*  For example, knowledge of LG Display's technical product information may give CMO a

competitive advantage as to license negotiations concerning its own related products and other

LG Display patents, or LG Display's products and other CMO patents.

 This situation is "exacerbated" where, as here, the insiders who engage in such activities

also regularly advise business units and engage others on technical matters.  *Id.*  Two of the

CMO insiders are engineers who advise CMO's business units "and serve an important role as an

*interface* between CMO's *inventors* and the *business and legal decision makers.*"  (Def.'s Br.,

Ex. A ¶¶ 4, 5 (emphasis added).)  This contrasts sharply with the in-house attorney in *R.R.

Donnelly*, who did not report to any business person with responsibility for decision-making.

2007 WL 61885, at *1. The engineers are also "intermediaries between CMO's inventors and CMO's retained patent prosecution counsel." (Def.'s Br., Ex. A ¶ 5.)

Moreover, by their supervisor's own admission, these insider engineers in Taiwan have regular working relationships with and advise: *CMO's inventors*, whose responsibility it is to devise technology that distinguishes CMO's products from those of its competitors, including LG Display; *CMO's patent prosecution counsel*, whose responsibility it is to assist in drafting and obtaining patents that provide CMO with important legal rights and competitive advantages; and *CMO's business unit decision makers*, whose responsibility it is to make CMO more successful in the highly competitive LCD industry. (*Id.* ¶¶ 4-6 (emphasis added).)

It is thus patently unreasonable and unacceptable to expect these engineers to compartmentalize protected information so as to not inadvertently disclose that information during their regular advisory communications with CMO's inventors, patent prosecution counsel, and business unit personnel, each of whom make competitive decisions for CMO. *See, e.g., Intel Corp.*, 198 F.R.D. at 530 ("Though [the insider] may not purposely or knowingly evaluate an agreement in light of protected information, the difficulty in 'lock[ing] up trade secrets in [her] mind' makes protections against inadvertent disclosure necessary." (quoting *Brown Bag*, 960 F.2d at 1471)); *U.S. Steel*, 730 F.2d at 1467 ("It is *humanly impossible* to control the inadvertent disclosure of some of this information in any prolonged working relationship." (emphasis added)).

Like the insider engineers, the third proposed insider - in-house counsel - regularly interacts with and advises CMO's business units. (Def.'s Br. Ex. B ¶ 4.) He also provides advice concerning contracts, is involved with patent prosecution, and makes recommendations on filing and settling litigation. (*Id.*) These responsibilities each create an inappropriately high

risk of inadvertent disclosure that justifies an outside attorneys eyes' only limitation on access to highly confidential documents.[1] *See, e.g., Brown Bag Software*, 960 F.2d at 1465 (affirming denial of access to in-house counsel where in house counsel's responsibilities included advising the corporation on contracts); *Affymetrix, Inc. v. Illumina, Inc.*, C.A. No. 04-901-JJF, 2005 WL 1801683, *2 (D. Del. July 28, 2005) (Farnan, D.J.) (denying access to confidential information to in-house counsel who is involved with settling patent litigation); *Commissariat A L'Energique Atomique*, 2004 WL 1196965, *2 (explaining that patent prosecution implicates competitive decision making); *Intel Corp.*, 198 F.R.D. 525 at 532 (denying access to Intel's in-house counsel, in part, because of her regular interaction with business units).

### 3. LG Display would have no adequate legal remedy or recourse for inadvertent disclosure of its most sensitive and proprietary technical trade secrets.

Granting CMO "insider access" would provide the CMO insiders with information that is extremely valuable to both CMO and other LCD manufacturing companies. CMO's insiders cannot be expected to compartmentalize knowledge of LG Display's competitive information while regularly interfacing with and advising CMO inventors and business decision makers. Further, based on deposition testimony in other LCD patent infringement cases, it is LG Display's understanding that engineers at Taiwanese companies rotate throughout different departments and may move from the legal department to other departments where they would

---

[1] This is particularly true here, where CMO competes with and trails LG Display in the marketplace. LG Display thus has much more to lose. Although the Federal Circuit has stated it is improper to preclude counsel's access to confidential information "*solely*" on the basis of counsel's status as in-house, *U. S. Steel*, 730 F.2d at 1469 (emphasis added), it has recognized that "where confidential material is disclosed to an employee of a competitor, the risk of the competitor's obtaining an unfair business advantage may be substantially increased," *Akzo N.V. v. U.S. Int'l. Trade Comm'n*, 808 F.2d 1471, 1483 (Fed. Cir. 1986). Accordingly, denying access is appropriate when in-house counsel advises the corporation on contracts, interacts with business units, and participates in the settling of litigation.

have an even greater competitive role.  This alone is sufficient to deny "insider access" to CMO.

Further, the insiders may also be lured to other LCD manufacturing companies. Taiwanese companies actively recruit foreign engineers, including from Japan, with specialized technical knowledge.  (Ex. 6, Martin Fackler, *A Japanese Export: Talent*, N.Y. Times, May 24, 2007.)  The Taiwanese government, moreover, has spent $20 million a year since 2003 to recruit foreign engineers in key industries like the *flat-panel display industry at issue here*.  (*Id.*) Indeed, a former Corning Inc. employee was recently found guilty of selling stolen blueprints about Corning's LCD glassmaking process and selling them to a Taiwanese company.  (Ex. 7, Ben Dobbin, "Ex-Corning employee pleads guilty to selling LCD glass secrets to Taiwanese rival," Associated Press Financial Wire (Jan. 17, 2006).)  Taiwanese piracy has cost just United States manufacturers alone hundreds of millions of dollars in recent years.  (Ex. 8, *Taiwan risk: Legal & regulatory risk*, The Economist Intelligence Unit Ltd. (April 30, 2008).)  The threat of working for other competitors poses a very real and significant additional competitive threat to LG Display from any "insider access" by CMO.

Should another Taiwanese or other foreign company convince the CMO insiders to leave CMO and reveal LG Display's confidential information, LG Display would be left with no adequate recourse.  Any disclosure of LG Display's information outside the United States could be extremely difficult to confirm or prove.  Even if LG Display could locate the insiders abroad, and even if LG Display could begin litigation and obtain judgment in the United States, LG Display would lack an adequate remedy.  There is nothing in the record to show that the CMO insiders have sufficient funds to compensate LG Display for any unauthorized use or disclosure. Indeed, any disclosure of LG Display's product information to competitors would result in irreparable harm.  Such an unacceptable risk of disclosure and irreparable harm justifies denying

"insider access" to LG Display's most competitive confidential information. *Intel Corp.*, 198 F.R.D. at 529.

> **4.    CMO's cases are distinguishable and do not support "insider access"**

The cases that CMO cites are distinguishable from this case.  First, as discussed in section II.B. below, CMO is not relying on inside counsel such that counsel cannot litigate without "insider access."  In addition, CMO seeks "insider access" for employees who are not attorneys.  Two of CMO's insiders are engineers in Taiwan who are neither "'bound by the same Code of Professional Responsibility,'" nor "'subject to the same sanctions as' [CMO's] outside counsel."  (Def.'s Br. at 7.)  This is significant because, in cases relied on by CMO; courts have noted that attorneys are members of regulated bars with professional, ethical and obligations that necessarily merit trust.  *See U. S. Steel*, 730 F.2d at 1468.  CMO's non-attorney engineers, however, lack that status, in addition, the one attorney insider apparently works outside the United States.  None of the cases cited by CMO involve disclosure to insiders outside the United States.

CMO's reliance on *E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*, 219 U.S.P.Q. 37 (D. Del. 1982) (Latchum, D.J.), and *Minnesota Mining and Manufacturing Co. v. Smith & Nephew*, No. 3-91 CIV 274, 1992 WL 464352 (D. Minn. July 27, 1992), is unpersuasive.  Issued two years before *U.S. Steel*, the *E.I. DuPont Nemours* case does not adequately recognize or discuss the heightened concerns and potential risks associated with disclosure of highly sensitive, confidential information to in-house personnel, nor does its consider the enhanced risk of inadvertent disclosure that arises when those employees have relationships with competitive decision-makers.  *See E.I. DuPont Nemours*, 219 U.S.P.Q. 37. The case also is distinguishable because the parties had already agreed to disclose confidential information to certain in-house personnel, *see id.* at 38, a factor not in play here.

Likewise, the *Minnesota Mining and Manufacturing* case is readily distinguishable from this case. Looking at the underlying opinion of the magistrate judge, the court was persuaded to allow the plaintiff's in-house expert to have access to the defendant's highly sensitive, confidential information because the expert had been transferred from the division "where [the] defendants' technical information [was] most applicable," thereby addressing concerns that the expert would apply the defendants' technology or otherwise inadvertently disclose it. *Minnesota Mining and Manufacturing Co. v. Smith & Nephew*, No. 3-91 CIV 274, 1992 WL 464351, at *1 (D. Minn. June 23, 1992), *rev'd on other grounds*, *Minnesota Mining and Manufacturing Co.*, 1992 WL 464352. The court also found that the plaintiff had "demonstrated a compelling need" for the expert's assistance, as evidenced by the expert's status as a co-inventor of two of the patents at issue and by the plaintiff's offer to preclude the expert from ever again working in the relevant division. *Id.*, at *2. None of these facts is present in the instant case.

**B.    CMO Fails to Show Any Specific Hardship, Much Less a Hardship as Serious as the Competitive Threat to LG Display**

This Court has explained that "the risk of inadvertent disclosure cannot be overcome by the mere contention that access to confidential information is necessary for case management." *R.R. Donnelly*, 2007 WL 61885, at *1 (citing *Intel Corp.*, 198 F.R.D. at 528). CMO does not even show any specific need for "insider access." CMO merely offers conclusory statements that it needs to rely on the identified insiders to "advise and manage the case for CMO." (Def.'s Br. at 9.) Thus, CMO offers no proof that limiting access to confidential information to CMO's retained counsel will impair its ability to prosecute its claims or defend against those of LG Display.

Indeed, CMO is represented by experienced patent litigation counsel and will have the additional support of expert witnesses. "'Requiring a party to rely on its competent outside

counsel does not create an 'undue and unnecessary burden,'" especially here, where CMO is represented by at least twelve attorneys from a firm with a great deal of experience in patent litigation relating to highly technical subject matter. *See Intel Corp.*, 198 F.R.D. at 529. CMO does not contend - nor could it - that it is inadequately represented by outside counsel. CMO is represented by at least twelve attorneys from Irell & Manella, and at least two attorneys from Potter, Anderson, & Corroon LLP. (*See* D.I. 19, 65, 219, 312.) Irell & Manella has been involved in CMO's LCD patent dispute with LG Display since at least May, 2007, when CMO filed a patent infringement suit against LG Display in the Eastern District of Texas, which was ultimately transferred to Delaware for consolidation with this case.[2]

CMO's lead trial counsel, Irell & Manella, boasts of being one of the "country's foremost practices of its kind" and has successfully represented parties in patent litigation involving very complex technology such as semiconductors and digital video recorder "time-warp" technology. (Ex. 9, Irell & Manell LLP, *IP Litigation*, available at http://www.irell.com/practices-19.html.) Irell also boasts of representing a party in possibly "the largest patent litigation in history" involving over 20 electrical and mechanical patents relating to disk drives. (*Id.*) Among the many Irell & Manella counsel representing CMO in this case are Ben Yorks, Esq., who has prosecuted over 400 patents in the mechanical, electrical and optics arts, and has been involved in litigation matters concerning semiconductor fabrication equipment (Ex. 10), and Christopher Vanderlaan, Esq., who has prosecuted patents in a wide variety of areas of technology, including

---

[2] LG Display and CMO have filed cross motions for consolidation. Essentially, the difference between LG Display's and CMO's motions to consolidate is that LG Display believes the schedule entered in Civil Action No. 06-726 (JJF) should continue to govern the consolidated cases, since transfer and consolidation of the Texas case was discussed with the Court prior to entry of the Scheduling Order and all the patents and issues in the Texas case are also at issue in this case. CMO disagrees, believing the schedule should be extended.

strained silicon technology for use in semiconductor devices, computer software, digital imaging, LED-based lighting systems, and microprocessors (Ex. 11) .

Furthermore, LG Display has already produced substantially all of its mask files and CAD files concerning product design, thus CMO's large team of outside attorneys will have sufficient time and resources to competently review and evaluate the highly confidential materials to which CMO seeks "insider access." *See, e.g., Brown Bag Software,* 960 F.2d at 1471.

CMO's reference to the "Litigation Unit" in *Affymetrix* is inapposite. In *Affymetrix*, a party incurred significant expense in setting up its "Litigation Unit" so that it would not have to engage outside counsel to represent it in patent actions. 2005 WL 1801683, at *1. There, the "Litigation Unit," whose *sole function* was to work on current or future litigation, served as lead trial counsel and was located 50 miles away in a different city. *Id.* Here, in stark contrast, CMO is represented by at least fourteen outside attorneys. CMO has thus failed to demonstrate any hardship, let alone a hardship that would outweigh the significant risk of irreparable harm created by "insider access" to LG Display's highly sensitive confidential information.

CMO's opposition brief also ignores the fact that, in addition to its dozen outside counsel, CMO will be able to retain a technical expert in the field of LCD technology to assist with the technical issues in this case. This expert not only will have access to LG Display's highly sensitive, confidential information, but also will be more than capable of evaluating that information and advising CMO and its counsel accordingly. As such, prohibiting CMO personnel from accessing this information will not impair CMO's ability to prosecute its claims or defend against those of LG Display.

To the extent CMO argues that its in-house personnel have some special "expertise" regarding the CMO patents at issue that warrants access to LG Display's highly sensitive, confidential information, such an argument has already been rejected in another case before this court. In *Commissariat A L'Energique Atomique*, No. 03-484-KAJ, the defense counsel claimed that they should be able to show to their clients highly sensitive, confidential documents concerning certain methodologies used by the plaintiff's expert in his testing of the accused products. (Ex. 12, Hr'g Tr. at 8-11 (hearing before Hon. Kent A. Jordan on May 9, 2005).) The defense counsel asserted that the testing software used was "very technical software that takes years of experience" and one that was "not . . . prevalent among independent consultants who might give opinions in [the] case." (*Id.* at 8-9.) Because the clients had experience with the software, they argued, denying access would prevent the clients from "having the full benefit of [their] technical people [being] able to evaluate the assertions that [had] been made [and] the alleged basis for it." (*Id.* at 8, 10-11.)

Recognizing the plaintiff's concern that the defendant-clients might "do something or [could] do something with [the information] that [would] be detrimental to [the plaintiff's] legitimate business interests," the Honorable Kent A. Jordan rejected the assertion of prejudice. (*Id.* at 12.) In so finding, he cited the likelihood that the defendants were "going to able to find somebody who knows how to run [the software] in a satisfactory way to meet the [defendant's] legitimate litigation interests." (*Id.* at 12.) Significantly, CMO was one of the defendants in that case. The same reasoning warrants rejecting CMO's argument here and similarly prohibiting CMO personnel from accessing LG Display's highly sensitive, confidential information.

## III. CMO IMPLICITLY CONCEDES IT HAS NO JUSTIFICATION FOR "INSIDER ACCESS" TO LG DISPLAY'S HIGHLY SENSITIVE BUSINESS INFORMATION SUCH AS CUSTOMER LISTS, SALES AND MARKETING DOCUMENTS, PRICING INFORMATION, AND LICENSE AGREEMENTS

Although CMO claims it needs "insider access" to "all the documents produced in this case," it fails to make any attempt at explaining why such "insider access" should extend to LG Display's highly sensitive business information, such as customer lists, sales and marketing documents, pricing information, and license agreements. (Def.'s Br. at 9.) CMO's argument for "insider access" is directed solely toward LG Display's highly sensitive "technical data." (*Id.* at 8-9.)

A company's highly sensitive business information, such as customer lists, sales and marketing documents, and pricing information is regularly afforded outside attorneys' eyes only protection. *See*, *e.g.*, *Nutratech, Inc. v. Syntech Int'l, Inc. et al.*, 242 F.R.D. 552, 555 (C.D. Cal. 2007) (recognizing that customer and supplier lists are regularly produced subject to an "'attorneys eye's only order'"); *Netquote, Inc. v. Byrd*, No. 07-cv-00630-DME-MEH, 2007 WL 2438947, at *3-4 (D. Colo Aug. 23, 2007) (finding that customer lists and pricing options and forecasts should be subject to attorney's eyes only protection); *Liveware Publ'g, Inc. v. Best Software, Inc.*, 252 F. Supp. 2d 74, 85 (D. Del. 2003) (Jordan, D.J.) (finding that customer lists are regularly accorded treatment as trade secrets and are appropriately subject to a protective order and available only to trial counsel). Highly sensitive documents such as settlement agreements and license agreements relevant to rate calculations are also appropriately limited to review by outside litigation counsel only. *See*, *e.g.*, *Am. Standard, Inc. v. Pfizer, Inc.*, MISC. 87-1-73-IP, 1988 WL 156152, at *4 (S.D. Ind. July 08, 1988). The same is true for contract terms. *See*, *e.g.*, *Cmedia, LLC v. LifeKey Healthcare, LLC*, 216 F.R.D. 387, 391 (N.D. Tex. 2003).

CMO makes no attempt to justify why it needs "insider access" to any such confidential information other than LG Display's "technical documents."  Accordingly, access to all highly sensitive business information such as customer lists, sales and marketing documents, contracts, settlement and license agreements, pricing information, and forecasts, is appropriately limited to outside attorneys only as provided for in LG Display's proposed protective order.

## **CONCLUSION**

For the foregoing reasons, LG Display requests that the Court grant its motion for entry of protective order and enter LG Display's proposed protective order as soon as possible.


July 3, 2008                                      BAYARD P.A.

                                                 */s/ Richard D. Kirk (rk0922)*
                                                 Richard D. Kirk
                                                 Ashley B. Stitzer
                                                 222 Delaware Avenue, 9th Floor
                                                 P.O. Box 25130
                                                 Wilmington, DE 19899-5130
                                                 (302) 655-5000
                                                 rkirk@bayardfirm.com
                                                 *Attorneys for Plaintiffs,*
                                                 *LG Display Co., Ltd. and LG Display America, Inc.*

OF COUNSEL:

Gaspare J. Bono
R. Tyler Goodwyn, IV
Lora A. Brzezynski
Cass W. Christenson
John W. Lomas, Jr.
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C.  20006
(202) 496-7500

# EXHIBIT 1

**Paul** *Hastings*

Paul, Hastings, Janofsky & Walker LLP
3579 Valley Centre Drive
San Diego, CA 92130
telephone 858-720-2500 · facsimile 858-720-2555 · www.paulhastings.com

Atlanta
Beijing
Brussels
Chicago
Frankfurt
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Tokyo
Washington, DC

(858) 720-2524
christianplatt@paulhastings.com

June 24, 2008                                                                    59322-00008

**VIA EMAIL**

Lora A. Brzezynski, Esq.
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006-1108

Re:    LG Display v. Chi Mei, et al. (AUO)
       USDC DE Consolidated Case Nos. 1:06cv00726 and 1:07cv00357

Dear Ms. Brzezynski:

We write to continue AUO and LGD's discussions regarding the procedures to be used for producing GDS files.

As both LGD and AUO agree, GDS files and related information are extremely confidential. Like source code and semiconductor mask files, GDS files represent the "blue prints" or mask files for manufacturing TFT-LCD displays. These files represent the "crown jewels" of AUO's technology. While we appreciate LGD's need for discovery, AUO must take appropriate safeguards to protect the confidentiality of its GDS files. That is why we began this discussion in advance of the June 27, 2008 agreed upon date for producing mask files in accordance with the June 23, 2008 stipulation.

We were disappointed to learn that LGD has taken the position that "LG Display and AUO are at an impasse" on this issue and "LG Display plans to invoke the Court's emergency e-mail procedure" to resolve the issue of how AUO will provide its GDS files. *See* June 24, 2008 e-mail from R. Kirk. As you will recall, during our telephone conference yesterday, we set forth a couple different options for resolving this dispute, including the possible use of a software escrow company. You agreed to give us a day or two to provide you with additional information relating to the use of a software escrow company to maintain and allow for inspection of AUO's GDS files. If LGD had no intention of considering this information, you should have informed us of that during our call yesterday.

As we discussed yesterday, AUO cannot agree to LGD's current proposal of having the GDS files maintained on a stand alone computer at LGD's counsel's office in a conference room. AUO does not believe that this procedure will provide sufficient security and safeguards for AUO's most highly confidential information.

Lora A. Brzezynski, Esq.
June 24, 2008
Page 2

Listed below, we have provided several alternative proposals for your consideration and comment.

**Option 1:**

AUO will agree to make its GDS files available for LGD's counsel's inspection at Paul Hastings' Washington D.C. office, which is approximately six blocks from McKenna Long, LGD's counsel in this case. We are willing to make reasonable accommodations to McKenna Long and any approved experts for review of the GDS files during and after normal business hours – assuming that LGD's counsel is willing to give us reasonable notice so that we can confirm that we have conference rooms and staff available. For example, if LGD's counsel provides 24 hours of notice, we should be able to make the GDS files available for review during normal business hours. If LGD's counsel seeks to inspect the GDS files after normal business hours, we would request that you provide us with 48 hours of notice of such a request so that we can make arrangements with our staff to stay after hours. LGD would be responsible for any overtime for our staff in allowing such after hours inspections. Finally, we would permit LGD to print out any pages it requires, which we would then produce in Bates stamped format. Please note that the 24 and 48 hour notice periods above are suggestions and we would work with LGD in good faith to arrange for inspection by LGD's counsel. For example, if LGD's counsel needed to inspect the materials on short notice, we would attempt to accommodate LGD's request. We would also expect LGD to work with us in good faith in making arrangements for inspection.

**Option 2:**

AUO will agree to make the GDS files available through a third party escrow company, such as Iron Mountain. The GDS files would be available for LGD's review during normal business at Iron Mountain's facility in the Washington D.C. area. The GDS files would be stored on a standalone laptop that has printing capabilities. Based on our discussions with Iron Mountain, it appears that LGD would be required to pay $500 for each visit to Iron Mountain to inspect the GDS files. Iron Mountain will maintain the laptop in a secure vault when the files are not being inspected. If you would like, we can arrange for a conference call with a representative at Iron Mountain to discuss the details of this escrow arrangement.

Iron Mountain provided us with the following information:

> Iron Mountain's Discovery Escrow Litigation Service facilitates the secure gathering of evidence during IP lawsuits by vaulting intellectual property such as source code and other proprietary information.

> As you know, during the discovery phase of litigation there is an inherent conflict of interest between the parties. Defendants must satisfy the discovery requirements of the court while simultaneously protecting their intellectual

Lora A. Brzezynski, Esq.
June 24, 2008
Page 3

property. For plaintiffs, it is essential that their attorneys and experts gain access
to the information necessary to prepare for trial. With Iron Mountain acting as a
neutral third party, our Service provides a secure and controlled environment that
allows the plaintiff to access the proprietary information in question, while
eliminating the potential exposure and risk associated with the defendant
delivering the material directly to the plaintiff. Leveraging Iron Mountain's
national foot print of secure data protection vaults, we can assure a location that is
convenient and agreeable to both parties.

Iron Mountain's Discovery Escrow Litigation Service provides:

- State-of-the-art electronic media vaults located in every major metropolitan
  area

- Controlled and documented viewing of intellectual property to a select group
  of authorized personnel

- A comfortable working environment with onsite customer service in which to
  review the deposited material

- A flexible security protocol to meet the specific needs of each case

Since its founding in 1951, Iron Mountain has helped organizations reduce the
cost and risk associated with information protection and storage. Iron Mountain's
Intellectual Property Management division is the founder of the technology
escrow industry and has been a trusted partner for safeguarding intellectual
property for over 25 years. We now serve more than 20,000 clients - including
two-thirds of the Fortune 500.

**Click Here** to view a brief 4 minute web presentation that outlines Iron
Mountain's Discovery Escrow Litigation Service in greater detail.

(Please note that The "Click Here" link can be accessed at:
http://www.brainshark.com/brainshark/vu/GuestBook.asp?referer=vu&pi=695300255
&sid=26529554&sky=947DA3D6E9DA4D4EAD65926599E0F836&uid=0)


Please let us know if LGD will agree to any of the above proposals. If LGD cannot agree,
please explain why that is the case for each proposal so we can understand LGD's
position and attempt to reach a compromise.

Finally, if the parties are unable to agree on any of these proposals, we are willing to
discuss additional safeguards that LGD can propose to further protect AUO's confidential
information and help alleviate our client's concerns. Because LGD's current proposal
remains insufficient, we are still waiting for LGD's additional safeguards that will alleviate
AUO's concerns. To date, we have not received any additional proposed safeguards.

Lora A. Brzezynski, Esq.
June 24, 2008
Page 4

We are generally available to meet and confer with you tomorrow between 9AM and 3:45PM PDT. Please let us know what time works with your schedule.

We look forward to hearing from you and hope that the parties can resolve their differences with having to burden the Court with these issues.

Very truly yours,

S. Christian Platt
of PAUL, HASTINGS, JANOFSKY & WALKER LLP

cc:    Gaspare J. Bono, Esq.
       Karen L. Pascale, Esq.
       Brian Range, Esq.
       Jonathan S. Kagan, Esq.

# EXHIBIT 2

DOCKETED ON CM

DEC - 5 2006

BY _____ 053

Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only___

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES--GENERAL

Case No. CV 02-6775 CBM (JTLx)                    Date: December 4, 2006

Title:   LG.Philips LCD Co., Ltd. v. Tatung Co. of America, et al.
===============================================================

DOCKET ENTRY
ORDER GRANTING DEFENDANTS' MOTION TO SEAL PORTIONS OF THE TRIAL
TRANSCRIPT AND TRIAL EXHIBITS; and GRANTING DEFENDANTS' *EX PARTE*
APPLICATION TO FILE UNDER SEAL EXHIBITS A AND B OF MOTION TO SEAL
PORTIONS OF THE TRIAL TRANSCRIPT AND TRIAL EXHIBITS
===============================================================

PRESENT:

Hon. CONSUELO B. MARSHALL, JUDGE

JOSEPH LEVARIO                    none present
Deputy Clerk                     Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:      ATTORNEYS PRESENT FOR DEFENDANTS:

N/A                                    N/A

**PROCEEDINGS:**

On November 16, 2006, Defendants Chunghwa Picture Tubes, Ltd. and Tatung Company
and Tatung Co. of America filed a Motion to Seal Portions of the Trial Transcript and Trial
Exhibits. Defendants request an order from the court sealing portions of the trial transcript and
trial exhibits and extending the applicability of the Confidentiality Stipulation and Protective
Order (the "Confidentiality Order") to the disclosure and use of Confidential or Confidential
Attorneys Only material in post-trial and in subsequent proceedings. In addition, on the same
day, Defendants filed an *ex parte* Application to file under seal two exhibits filed in support of
its Motion. No opposition has been filed.

Defendant CPT argues that it has been compelled to reveal information about how it
makes its products in order to defend itself against LPL's infringement claims. According to
CPT, its detailed array manufacturing procedures, mask files, and process information was both
discussed and described in several trial exhibits, as well as in the testimony of several trial
witnesses. Defendant has identified those portions of the trial transcript which contain
information about how CPT builds its LCD modules, as well as information about CPT's
relationships with its customers, including the terms of licensing agreements between CPT and
its customers.

The Ninth Circuit has affirmed that the right of access to judicial records is not absolute.
Although the presumption of public access is strong, a party seeking to seal a judicial record may
overcome this presumption by meeting the "compelling reasons" standard. *See* Foltz v. State



Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1135 (9th Cir. 2003). "In general, 'compelling reasons ' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such court files might have become a vehicle for improper purposes, such as the use of records to . . . release trade secrets." Kamakana v. City and County of Honolulu, 447 F.3d 1172, 1179 (9th Cir. 2006) (citing *Nixon v. Warner Communications, Inc.,* 435 U.S. 589 (1978); *see also Nixon,* 435 U.S. at 598 ("courts have refused to permit their files to serve as . . . . sources of business information that might harm a litigant's competitive standing.").

In California, "trade secrets" are defined as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code 3426.1(d)(2005). CPT argues that the information it has identified in Exhibits A and B to the Motion are trade secrets under California law because the information derives some value from not being generally known to the public and because of the company's efforts to maintain the secrecy of the information. Regarding the mask files, CPT maintains the secrecy of its mask files in its dealing with other companies, and even within CPT the files are keep on computers connected to an isolated server, separate from the company's main server; moreover, the only design department employees who have access to the files are those who use and revise mask files. Regarding the design specifications, CPT protects its design specifications from disclosure by keeping the specs on a password-protected computer system; moreover, only personnel involved with a particular product have access to the documents related to that product. CPT argues that witness testimony regarding its manufacturing and design processes are valuable for its competitors to the extent that such testimony reveals nonpublic information about particular steps taken and specific materials used to build CPT's LCD products. Regarding its process flows, CPT protects such information from disclosure by not divulging such information to other companies, and by restricting access to such information within the company. Given the competitive nature of the information and CPT's reasonable efforts to maintain the secrecy of the information, the Court finds that this information is "trade secrets," as per California law. *See* Cal. Civ. Code 3426.1(d)(2005).

Regarding its customer data, sales data, and license agreements, CPT argues that such information should be placed under seal in order to protect CPT from its competitors' efforts to interfere with its customer relationships. CPT cites *Morlife v. Perry,* a California Court of Appeals case, for the proposition that customer data is a trade secret since "disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who might only be interested [in such a product]." 56 Cal. App. 4th 1514, 1522 (Cal. App. 1997). CPT has filed supporting declarations which attest that CPT does not disclose its pricing, sales data, or customer data to the public nor to any other third party. CPT also attests that its license agreements are stored under lock, and only one CPT employee has the key for that cabinet; these agreements are also protected by confidentiality agreements between CPT and its customers. The Court finds that such information is also properly qualified as trade secrets according to California law.

During these proceedings, CPT has taken steps to protect the confidentiality of its trade

secrets by moving for closure of the courtroom, filing standing objections to trial exhibits, and attempting to redact information from trial exhibits which it thought would compromise its trade secrets. In prior litigation between the parties, CPT also applied for and obtained an order sealing portions of the transcript and limiting access to the courtroom during the presentation of testimony which would compromise its trade secrets. The Court finds that these efforts were reasonable, and that any disclosure of trade secrets during trial does not abrogate Defendant's confidentiality. *See* Gates Rubber Co. v. Bando Chemical Indus., Ltd., 9 F.3d 823, 848-849 (10th Cir. 1993) (finding that information retained its secret status despite being disclosed at hearing, where plaintiff evidenced continuing intent to maintain its secrecy by acting to seal record).

Having determined that the mask files, design specifications, customer data, sales data, and license agreements are trade secrets, and therefore present a compelling reason for being shielded from public disclosure, as per *Kamakana*, the Court turns to a consideration of the competing public and private interests at stake.

The only public use to which this information could be put is commercial. According to Defendants, "[a] competitor could use CPT's mask files, design specifications and/or process flows to modify its materials, processes, or designs to compete with CPT. Once another company obtains possession of [ ] CPT's design and process information, it would not need to perform design work at all, but could immediately begin producing LCD modules." Defs.' Mot. 11. The Court finds that the disclosure of this information would allow one of CPT's competitors, or even a third-party, to duplicate CPT's products without investing its own time and resources in developing these products for itself. Similarly, the disclosure of CPT's sales data would allow a competitor to seek to undercut CPT's prices both with its existing customers, and with the public at large. As such, this information should be placed under seal, so as to protect Defendants' interests in its trade secrets.

This Court has previously accepted the parties' private interest in confidentiality in its approval of the parties' Confidentiality Stipulation and Protective Order ("Confidentiality Order"). The Confidentiality Order, entered on July 15, 2003, provided that the parties would designate as "Confidential or Confidential Attorneys Only" any documents or materials purported to contain, reflect or disclose any trade secret or other confidential information. The Order further prescribes procedures for retrieving and returning inadvertently produced confidential materials. The Order applied, however, exclusively to pretrial proceedings, filings, and information exchanges. Defendant now asks this Court to enter an order extending the applicability of the Confidentiality Order to the disclosure and use of Confidential or Confidential Attorneys Only material in post-trial and in subsequent proceedings. The Court finds that, based on the foregoing, such an extension of the protective order is appropriate, and hereby GRANTS the request to extend the applicability of the Confidentiality Order.

Accordingly, the Court **GRANTS** Defendants' Motion to Seal Portions of the Trial Transcript and Trial Exhibits. CPT has identified the portions of the transcript to which it seeks to have sealed in Exhibits A and B to the Motion. CPT has identified the affected trial exhibits in footnotes 9 and 10 of the Motion; these include Trial Exhibits 421, 422, 448, 462, 529, 1124, 1144, 1159, 1182, 1413, 1435, 1520, 1568, 1668, 1673, 1681, 1687, 1688, 1690, 1692, 1693, 1702-1704, 1706-1709, 1742-1749, 1754-1757, 1886, 2031, 2035, 2039, 2232, 2233, 2234, 2468, 2499, 2626, 2711, 2718, and 2724. Moreover, the Court **GRANTS** Defendants' request to extend the applicability of the parties' Confidentiality Order.

Defendants have also filed an *ex parte* Application to file under seal two exhibits (Exhibits A and B) filed in support of its Motion. Although the Application indicates that Plaintiff LG.Philips opposes the *ex parte* Application, no opposition has been received by this Court. Local Rule 79-5.1 provides that: "[N]o case or document shall be filed under seal without prior approval by the Court" and provides the procedure for seeking court approval, with which CPT has complied. The Court finds that public disclosure of the information contained in the two supporting exhibits would frustrate the purpose of the Court's Order sealing portions of the transcript and trial exhibits.

Accordingly, the Court **GRANTS** Defendants' *Ex Parte* Application to File Under Seal Exhibits A and B of Motion to Seal Portions of the Trial Transcript and Trial Exhibits.

**IT IS SO ORDERED.**

Initials of Deputy Clerk _____

cc:  Judge Marshall

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG PHILIPS LCD CO., LTD.,

Plaintiff/Counterclaim Defendant,

v.

TATUNG COMPANY;
TATUNG COMPANY OF AMERICA, INC.;
CHUNGHWA PICTURE TUBES, LTD.;
AND VIEWSONIC CORPORATION,

Defendants/Counterclaim Plaintiffs.

Civil Action No. 05-292 (JJF)

## CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER

IT IS HEREBY STIPULATED by Plaintiff/Counterclaim Defendant, LG.PHILIPS LCD

CO., LTD. and by Defendants/Counterclaim Plaintiffs CHUNGHWA PICTURE TUBES, LTD.,

TATUNG CO. OF AMERICA, INC., TATUNG COMPANY, and VIEWSONIC

CORPORATION on the other hand, through their respective counsel of record, that the

following Confidentiality Stipulation and Protective Order ("Order") shall govern the handling

of any document, information or other things exchanged by the parties or, pursuant to paragraph

16, received from third parties, in connection with all phases of the above captioned action

leading up to trial, including, but not limited to, the filing of any pleadings, answering any

discovery requests, taking depositions, filing motions, and preparing transcripts and exhibits.

This Order does not govern proceedings during trial. nor does it prohibit any party from seeking

a separate protective order to govern trial proceedings; however, this Order shall govern all

testimony taken at a pretrial hearing or other judicial proceeding.

1.    The parties, and any third party whose confidential information is sought through

discovery by a party to the captioned action, shall make a designation of CONFIDENTIAL with

1

regard to any document or other discovery material it produces or provides, or any testimony it gives in the above captioned action, that purportedly contains, reflects, or otherwise discloses a trade secret or other confidential research, development, commercial, technical, business, financial, personnel, or customer information. Moreover, the parties, and any third party whose confidential information is sought through discovery by a party to the captioned action, shall make a designation of CONFIDENTIAL ATTORNEYS ONLY with regard to any document or other discovery or other discovery material containing confidential information that the disclosing party or disclosing third party in good faith considers to constitute or to contain technical, research, development, cost, pricing or other financial information, or information that could lead to the discovery of such information or other information of any kind, which the disclosing party or disclosing third party believes in good faith to be highly-sensitive or highly confidential. The following information shall not be designated CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY: any information that at the time of its disclosure in this action is part of the public domain or public knowledge by reason of prior publication or otherwise; and any information that after its disclosure in this action has become part of the public domain or public knowledge by reason of prior publication or otherwise through no act, omission or fault of the receiving party

      (a)      Each party and all persons bound by the terms of this Order shall use any information or document governed by this Order only in connection with the prosecution or defense of the above captioned action, except by consent of all of the parties or order of the Court. With respect to information or documents produced by third parties, such information or documents will be used only in connection with the prosecution or defense of the above captioned action, except by consent of all of the parties and the third party that produced such

2

information or documents, or order of the Court. CONFIDENTIAL and/or CONFIDENTIAL ATTORNEYS ONLY information and/or documents may be disclosed or released only to those persons entitled to receive such information and/or documents under this Order.

(b)     Documents will be treated in accordance with their designation under this Order. However, failure of a party to designate material CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY shall not be deemed or construed to constitute an admission that such material is not confidential or proprietary. If a party discovers that it has inadvertently failed to properly designate material as CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY, such party may promptly designate the material as CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY as applicable. Disclosure of such confidential information to persons not authorized to receive that information prior to receipt of the confidentiality designation shall not be deemed a violation of this Order. However, in the event the document has been distributed in a manner inconsistent with the designation, a receiving party will take reasonable steps to retrieve all copies of the CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY documents that are inconsistently designated, or notes or extracts thereof. In the event distribution has occurred to a person not under the control of a receiving party, the receiving party shall make a request in writing for return of the document and for an undertaking of confidentiality. In the event the request is not promptly agreed to in writing, or in the event there is no response, or in the event that the receiving party deems the making of the request to be a useless act, the receiving party shall promptly notify the disclosing party of the distribution and all pertinent facts concerning it, including the identity of the person or entity not under the control of the receiving party.

(c)    If a disclosing party inadvertently discloses information that is privileged or otherwise immune from discovery, the disclosing party shall promptly upon discovery of the disclosure so advise the receiving party in writing, provide the receiving party with satisfactory proof that the disclosure was inadvertent, and request that the item or items of information be returned, and if that request is properly made and supported, no party to the above captioned action shall thereafter assert that the disclosure waived any privilege or immunity.  It is further agreed that the receiving party will return or destroy the inadvertently produced item or items of information, and all copies and derivations, within five (5) days of the earliest of (a) discovery by the receiving party of the inadvertent nature of the production, or (b) the receiving party receiving a written request for the return or destruction of the information.

(d)    Should any documents, testimony, or information designated as CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY be disclosed, through inadvertence by the receiving party, to any person or party not authorized under this Order, then the receiving party shall use commercially reasonable efforts to (i) promptly retrieve the disclosed documents, testimony, or information from such unauthorized person or party; (ii) bind such person or party to the terms of this Order; (iii) promptly inform such person or party of all the provisions of this Order; (iv) request such person or party to sign the "ACKNOWLEDGEMENT" in the form attached hereto; (v) identify such person or party immediately to the disclosing party that designated the documents, testimony, or information as CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY; and (vi) identify the CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY documents, testimony, or information immediately to the disclosing party that designated the documents, testimony, or information as CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY.  The executed

4

"ACKNOWLEDGEMENT" shall promptly be served upon the party that designated the documents, testimony, or information as CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY. Nothing in this paragraph shall limit the right of the party that designated the documents, testimony, or information as CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY to seek any appropriate sanction or remedy against the party that intentionally disclosed the documents, testimony, or information to a person or party not authorized under this Order.

      (e)    It is understood that counsel for a party may give advice and opinions to his or her client based on his or her evaluation of information designated CONFIDENTIAL and CONFIDENTIAL ATTORNEYS ONLY received by the party, provided that such rendering of advice and opinions shall not reveal the content of information to which the recipient is not otherwise entitled, and also shall not reveal or disclose competitively useful information, such as, without limitation, financial information; sales information; pricing data; strategic business plans; research and development projects; circuit implementations; process flows; yield and cost information; marketing plans, forecasts and strategies; testing information; and customer-specific information, except by prior written agreement with counsel for the producing party.

    2.    Information designated as CONFIDENTIAL may be disclosed only to the following persons:

      (a)    outside attorneys representing any party in the above captioned action, and any paralegal, law clerk, or other employees working under the direct supervision of such attorneys, provided, however, that no person who is a party or a director, officer, managing agent or other employee of a party may be retained as a paralegal, stenographic or clerical employee within the meaning of this paragraph;

(b)    (i)    experts, including consultants and investigators, retained by any party or counsel to any party to assist in the above captioned action or to testify at trial in that action, but only to the extent necessary to perform such work, and provided that such experts shall not be past or present employees of a party and that paragraphs 2(b)(ii) and (iii) are complied with;

(ii)    For each expert to whom any party desires to disclose CONFIDENTIAL and/or CONFIDENTIAL ATTORNEYS ONLY information and/or documents, such party must first identify in writing to the attorneys for the producing party the following information:  the expert's full name; professional address; educational background; general areas of expertise; all present employment and consultancies; all prior employment and consultancies within the last four years; all present or prior relationships between the expert and the receiving party, its subsidiaries, its affiliates, or other related entities; and a list of all cases in which the expert or consultant has testified at a deposition or in court within the last four years. An expert's disclosure of confidential employment and consultancies may be designated as CONFIDENTIAL ATTORNEYS ONLY.

(iii)    Counsel for the producing party shall have ten (10) business days from receipt of such Paragraph 2(b)(ii) notice to object to disclosure of such CONFIDENTIAL and/or CONFIDENTIAL ATTORNEYS ONLY information and/or documents to such expert. Any and all such objections must be made in writing with all such grounds stated with specificity.  The parties shall attempt to resolve such objections informally.  In the event of such an objection, no disclosure of CONFIDENTIAL and/or CONFIDENTIAL ATTORNEYS ONLY documents, testimony or information shall be made to such persons for a period of five (5) court days following the date the objection is received to permit the objecting party to move, pursuant

6

to Para. 4 of the Joint Rule 16 Scheduling Order entered by the Court on December 21, 2005, for an order that disclosure not be made to such expert or consultant or that the disclosure be made only upon certain conditions. Provided that the Paragraph 2(b)(ii) notice is fully responsive to all of the requirements set forth in that same paragraph, the moving party shall have the burden of establishing that good cause exists for such an order, and shall seek to have the matter heard at the earliest possible date. If no motion is noticed within five (5) court days following receipt of the objection, CONFIDENTIAL and/or CONFIDENTIAL ATTORNEYS ONLY documents, testimony, and information may be disclosed to such experts or consultants for the purposes of and upon the conditions stated in this Protective Order. If such motion is made, there shall be no disclosure to such expert or consultant until the Court has ruled upon the motion, and then only in accordance with the ruling so made. The filing and pendency of such motion shall not limit, delay, or defer any disclosure of the CONFIDENTIAL and/or CONFIDENTIAL ATTORNEYS ONLY documents, testimony and information to persons as to whom no such objection has been made, nor shall it delay or defer any other pending discovery unless the motion and the inability to disclose such documents, testimony, and information bear directly on the non-objecting party's ability to conduct such discovery. The right of a party to object shall be waived if no objection is received by the party disclosing the expert or consultant within ten (10) business days of receipt of said disclosure except to the extent that the non-designating party later discovers that the original disclosure of a particular expert was in error or otherwise not fully responsive to Paragraph 2(b)(ii) above.

        (c)     personnel of third party vendors, whose regular business is providing litigation support services, engaged by a party or by counsel for a party to assist counsel in (i) the coding, imaging or other management of documents produced in discovery in the above

captioned action or of associated databases; (ii) the preparation of demonstrative exhibits or other visual aids for presentation at a hearing or trial; (iii) jury research and analysis, including mock jurors; (iv) translation; or (v) outside photocopying or scanning services, provided that such personnel of third party vendors shall not be employees of a party or otherwise working for or on behalf of a party in connection with that party's business;

(d)     any party, including directors, officers, managing agents and other employees assisting with the preparation of this case for trial; and

(e)     the Court and its personnel and court reporters and videographers.

3.     Information designated as CONFIDENTIAL ATTORNEYS ONLY may be disclosed only to the following persons:

(a)     outside attorneys representing any party in the above captioned action, and any paralegal, law clerk, or other employees working under the direct supervision of such attorneys, provided, however, that no person who is a party or a director, officer, managing agent or other employee of a party may be retained as a paralegal, stenographic or clerical employee within the meaning of this paragraph;

(b)     experts, including consultants and investigators, retained by any party or counsel to any party to assist in the above captioned action or to testify at trial in that action, but only to the extent necessary to perform such work, and provided that such experts shall not be present or past employees of a party and that paragraphs 2(b)(ii) and (iii) are complied with;

(c)     personnel of third party vendors, whose regular business is providing litigation support services, engaged by a party or by counsel for a party to assist counsel in (i) the coding, imaging or other management of documents produced in discovery in the above captioned action or of associated databases; (ii) in the preparation of demonstrative exhibits or

8

other visual aids for presentation at a hearing or trial; (iii) jury research and analysis; (iv) translation; or (v) outside photocopying or scanning services, provided that such personnel of third party vendors shall not be employees of a party or otherwise working for or on behalf of a party in connection with that party's business; and

        (d)    the Court and its personnel and court reporters and videographers.

    4.    The persons described in paragraphs 2(b), 2(d), 3(a), 3(b), or 3(c), and mock jurors under paragraph 2(c), shall be allowed access to the CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY material, as appropriate, only after they have read this Order and signed a copy of the attached "ACKNOWLEDGEMENT." As limited exceptions to the foregoing, the persons identified in paragraph 3(c) need not sign Acknowledgements if they are employed by a vendor who has signed an Acknowledgement that governs their receipt and use of the CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY information, and paralegals, law clerks, and other employees identified in paragraph 3(a) need not sign Acknowledgements if they are supervised by an attorney who has signed an Acknowledgement. The undersigned counsel shall forward copies of all executed ACKNOWLEDGEMENTS to the all other parties, and shall also maintain a list, available for inspection by the Court, of persons to whom CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY material is disclosed. The persons receiving CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY material are enjoined from disclosing it to any other person, except as permitted by this Order, and are further enjoined from using such material for any purpose other than the prosecution or defense of the above captioned action.

    5.    The persons receiving CONFIDENTIAL ATTORNEYS ONLY material under Paragraphs 3(a), 3(b), and 3(c) shall not be substantively involved in drafting, filing, or

prosecuting any patent applications (including any continuations, continuations-in-part, or divisions thereof and/or any reissue or reexamination applications), selecting or identifying the subject matter of any patent claims, or preparing or drafting of any patent claims, or providing instruction, direction or advice regarding these prosecution activities, where the application or claims are directed to (a) the manufacture and/or structure of thin film transistors and/or associated wiring structures (for liquid crystal display devices) of the type disclosed in the patents-in-suit in *LG Philips LCD Co., Ltd. v. Tatung Co. of America, et al.*, Consolidated Cases CV 02-6775 CBM (JTLx), CV 03-2866 CBM (JTLx), CV 03-2884 CBM (JTLx), CV 03-2885 CBM (JTLx), CV 03-2886 CBM (JTLx) (C.D. Cal.), (b) tape carrier packages in liquid crystal display devices, or (c) products or methods directed to protecting against electrostatic discharge in the thin film transistor substrate of liquid crystal display devices, until one (1) year after the conclusion of their participation in the above captioned action. These restrictions do not apply, however, to providing general legal advice on procedural aspects of patent prosecution.

      6.     The persons under Paragraphs 3(b) and 3(c) receiving CONFIDENTIAL ATTORNEYS ONLY material shall be precluded from consulting or working for any party to the above captioned action as a participant in any competitive decision-making processes, including without limitation, in the areas of sales and marketing, product pricing, strategic planning, research and development, product development, or manufacturing of products related to the subject matter of the patents-in-suit. This competitive decision-making preclusion shall be effective from the time the CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY information is received and shall last for a period of one (1) year after the conclusion of their participation in the above captioned action.

7.      Each individual who receives any CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY material agrees to subject himself or herself to the jurisdiction of this Court for the purpose of any proceedings relating to performance under, compliance with, or violation of this Order.

8.      The recipient of any CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY material shall maintain such information in a secure and safe area accessible only to persons eligible to review such CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY material.

9.      If a party discloses CONFIDENTIAL and/or CONFIDENTIAL ATTORNEYS ONLY information and/or documents in another document, at a deposition, or at a hearing, such party shall designate, and treat, at least such portion of such other document or resulting transcript as CONFIDENTIAL and/or CONFIDENTIAL ATTORNEYS ONLY as applicable. Parties, third parties agreeing to be bound by this Order, and their counsel shall designate CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY material as follows:

        (a)      In the case of documents that are produced as part of discovery or are responsive to any discovery request, which includes, but is not limited to, responses to interrogatories, document production requests, and requests for admission and any attachments or exhibits to any of the foregoing documents referenced in this provision, such documents shall be stamped or otherwise labeled:    CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY.

        (b)      In the case of depositions, counsel may designate portions of the transcript (including exhibits) as CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY during the deposition by making a statement to that effect on the record. Alternatively, within twenty (20)

11

calendar days after receipt of any written deposition transcript, counsel for a party or third party whose CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY material was disclosed during the deposition may so designate the appropriate pages of the transcript (including exhibits) and serve notice of the designation on opposing counsel. For twenty (20) calendar days after receipt of any written deposition transcript, the deposition transcript, including exhibits, shall be deemed CONFIDENTIAL ATTORNEYS ONLY.

      10.    During any deposition taken in the above captioned action at which CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY information and/or documents are disclosed or discussed, any party may exclude from attendance at the deposition during such disclosure or discussion any person other than the deponent, counsel for the deponent (as long as that counsel is otherwise authorized under the terms of this protective order to have access to the CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY information and/or documents), court reporter, videographer, and persons to whom the information and/or documents may be disclosed under Paragraphs 2 and 3.

      11.    A party or third party shall not be obligated to challenge the propriety of a CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY designation at the time made, and failure to do so shall not preclude a subsequent challenge. If at any time any party disagrees with a designation of CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY, that party shall provide written notice of its disagreement to the producing party or third party, including its basis for disagreeing with the designation. The disclosing party shall then have a reasonable period, not exceeding fourteen (14) days, from the date of receipt of such notice to: (a) advise the receiving party whether the disclosing party maintains its designation; and (b) if so, provide its basis for the particular designation. The parties or third parties shall first try to resolve the

dispute on an informal basis. If the dispute cannot be informally resolved, the party or third party challenging the designation may, after advising the disclosing party, request appropriate relief from the Court.

12.    All applications and motions to the Court in which a party submits CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY material shall be filed under seal and shall be made available only to the Court and to persons authorized by the terms of this Protective Order.    The party filing any paper which reflects, contains or includes any CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY information subject to this Protective Order shall file such paper in a sealed envelope, or other appropriately sealed container, which indicates the title of the action, the party filing the materials, the nature of the materials filed, the appropriate legend (see paragraph 1(a) above), and a statement substantially in the following form:

> This envelope contains documents subject to a Protective Order of
> the Court.  It should be opened only by the Court.  Its contents
> should not be disclosed, revealed or made public except by Order
> of the Court or written agreement of the parties.

13.    In the event that any CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY material is used in any pretrial proceeding in connection with the above captioned action, it shall not lose its CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY status through such use, and the parties shall take all steps reasonably required to protect its confidentiality during such use.  Disclosure and use of CONFIDENTIAL and CONFIDENTIAL ATTORNEYS ONLY material at trial and in subsequent proceedings shall be governed by the terms of an order to be entered by the Court.

14.    Nothing in this Order shall preclude a party or its attorneys from:

(a)    showing   a   document   designated   as   CONFIDENTIAL   or CONFIDENTIAL ATTORNEYS ONLY to an individual identified by the document or by sworn testimony as having been previously prepared, received, or reviewed by that individual;

(b)    showing a document produced in discovery by an opposing party to a current or former director, officer, managing agent or employee of the producing party or of any related entities of the producing party during the questioning of such person in a deposition, hearing, or trial in the above captioned action; or

(c)    disclosing or using for any purpose any information or documents from the party's own files which the party itself has designated as CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY.

15    Counsel for a party producing documents may mask ("redact") material deemed exempt from discovery because it is protected from disclosure under the attorney-client privilege or work product doctrine. Any and all documents from which material is redacted shall identify in all redacted areas that a redaction has occurred. In addition, the reason for any and all such redactions shall be stated either on the documents themselves or on a log to be provided within thirty (30) days after the production of the documents. Sufficient information regarding the masked material must be provided to the other party to enable it to evaluate the legitimacy of the asserted privilege or immunity. The parties reserve the right to pursue categories for redaction in addition to those identified above, by either consent of the parties or order of the Court, to be addressed on a case-by case basis. All disputes arising out of a party's objection to another party's redaction of material under this paragraph shall be resolved pursuant to Fed. R. Civ. P. 37, Local Rule 7.1 1, and the Joint Rule 16 Scheduling Order entered by the Court.

16.     Third parties may produce documents and/or other things and may disclose information pursuant to the terms of this Order.  Such third parties shall be entitled to the remedies and relief provided by this Order.

17.     Any court reporter or videographer who records testimony in the above captioned action at a deposition shall be provided with a copy of this Protective Order by the party noticing the deposition.  That party shall advise the court reporter or videographer, before any testimony is taken, that all confidentially designated documents, information, or testimony is and shall remain confidential and shall not be disclosed except as provided in this Protective Order.  The noticing party shall further advise the court reporter and videographer that copies of all transcripts, reporting notes, and all other records of any such testimony must be treated in accordance with this Protective Order, delivered to attorneys of record, or filed under seal with the Court.

18.     In the event any person or receiving party having possession, custody, or control of any document, testimony, or information produced in the above captioned action and designated as CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY by a disclosing party receives a subpoena or other process or order to produce such information, such subpoenaed person or entity shall notify by mail the attorneys of record of the disclosing party claiming such confidential treatment of the document sought by such subpoena or other process or order, shall furnish those attorneys with a copy of said subpoena or other process or order, and shall cooperate with respect to any reasonable procedure sought to be pursued by the party whose interest may be affected.  The disclosing party asserting the confidential treatment shall have the burden of defending against such subpoena, process or order.  The person or party receiving the subpoena or other process, or order shall be entitled to comply with it except to the

extent the disclosing party asserting the confidential treatment is successful in obtaining an order modifying or quashing it.

19.     If the discovery process calls for the production of information that a party does not wish to produce because the party believes its disclosure would breach an express or implied agreement with a non-party to maintain such information in confidence, the disclosing party shall give written notice to the non-party that its information is subject to discovery in the above captioned action, and shall provide the non-party with a copy of this Protective Order.  When such written notice is given to the non-party, the disclosing party will advise the potential receiving party that such notice has been given.  The non-party shall have fourteen (14) days from receipt of the written notice in which to seek relief from the Court, if the non-party so desires.  If the fourteen (14) days elapse without relief being sought from the Court, the requested information shall be produced in accordance with the terms of this Protective Order.

20.     Unless otherwise agreed to by the parties or by order of the Court, within sixty (60) days of the final resolution of all of the above captioned action and of any and all appeals of such action, all CONFIDENTIAL and CONFIDENTIAL ATTORNEYS ONLY material, and all copies thereof, shall be (1) upon request, returned to the party that produced it, or (2) destroyed. Notwithstanding the foregoing, counsel of record for the parties shall be permitted to retain a file copy of materials created during the course of the above captioned action, or made part of the record, or which have been filed under seal with the Clerk of the Court, including but not limited to any motion, brief, affidavit, expert report, discovery response, and/or memoranda which contains CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY material within the document or as an exhibit thereto, and a copy of all depositions, including exhibits, and deposition evaluations.    Such file copies must be maintained under the conditions of

16

CONFIDENTIAL or CONFIDENTIAL ATTORNEYS ONLY documents as provided in this Order. Counsel of record for the parties shall certify in writing that they have complied with this paragraph.

21.    This Order is not intended to address discovery objections to produce, answer, or respond on the grounds of attorney-client privilege or work product immunity, or to preclude either party from seeking further relief or protective orders from the Court as may be appropriate under the Federal Rules of Civil Procedure.

22.    Except as specifically provided herein, the terms, conditions, and limitations of this Order shall survive the termination of the above captioned action.

23.    This Order is without prejudice to the right of any party or third party to seek relief from the Court, upon good cause shown, from any of the provisions hereof.

(signature blocks on following page)

17

MCKENNA LONG & ALDRIDGE LLP

_signature_

Gaspare J. Bono
Cass W. Christenson
1900 K Street, NW
Washington, DC 20006
(202) 496-7500

HOWREY LLP

_____

Christine A. Dudzik
Thomas W. Jenkins
321 North Clark Street
Suite 3400
Chicago, IL  60610
(312) 595-1239

Teresa M. Corbin
Glenn W. Rhodes
HOWREY LLP
525 Market Street, Suite 3600
San Francisco, CA  94105
(415) 848-4900

THE BAYARD FIRM

_signature_

Richard D. Kirk (#0922)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899-5130
rkirk@bayardfirm.com
(302) 655-5000

RICHARDS, LAYTON & FINGER, P.A.

_____

Robert W. Whetzel (#2288)
whetzel@rlf.com
Matthew W. King (#4566)
king@rlf.com
One Rodney Sqare
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

*Attorneys for plaintiff*
*LG PHILIPS LCD CO., LTD.*

*Attorneys for defendants*
*CHUNGHWA PICTURE TUBES, LTD.,*
*TATUNG COMPANY OF AMERICA,*
*TATUNG COMPANY, and VIEWSONIC*
*CORPORATION*

IT IS SO ORDERED.

Dated:_____        _____
                                    U.S. District Court Judge

18

MCKENNA LONG & ALDRIDGE LLP

HOWREY LLP

_Christine A. Dudzik_

_____

Christine A. Dudzik
Thomas W. Jenkins
321 North Clark Street
Suite 3400
Chicago, IL 60610
(312) 595-1239

Gaspare J. Bono
Cass W. Christenson
1900 K Street, NW
Washington, DC 20006
(202) 496-7500

Teresa M. Corbin
Glenn W. Rhodes
HOWREY LLP
525 Market Street, Suite 3600
San Francisco, CA 94105
(415) 848-4900

THE BAYARD FIRM

RICHARDS, LAYTON & FINGER, P.A.

_Robert W. Whetzel_

_____

Richard D. Kirk (#0922)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899-5130
rkirk@bayardfirm.com
(302) 655-5000

Robert W. Whetzel (#2288)
whetzel@rlf.com
Matthew W. King (#4566)
king@rlf.com
One Rodney Sqare
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

*Attorneys for plaintiff*
*LG.PHILIPS LCD CO., LTD.*

*Attorneys for defendants*
*CHUNGHWA PICTURE TUBES, LTD ,*
*TATUNG COMPANY OF AMERICA,*
*TATUNG COMPANY, and VIEWSONIC*
*CORPORATION*

IT IS SO ORDERED.

Dated:_____    _____
                         U.S. District Court Judge

18

## ACKNOWLEDGEMENT

I, _____, declare:

      1.    I reside at _____ [Street Address]

_____ [City, State, Zip code].

      2.    I am employed by _____ [Employer] located at

_____ [Street Address]

_____ [City, State, Zip code] as

_____ [Position or Title]

      3.    I have read and understand the provisions of the Confidentiality Stipulation and Protective Order ("Protective Order") entered in the U.S. District Court for the District of Delaware ("the Court") with respect to the non-disclosure of CONFIDENTIAL and CONFIDENTIAL ATTORNEYS ONLY information and/or documents, and I agree to abide by and be bound by its terms. Specifically, and without limitation upon such terms, I agree not to use or disclose any confidential information made available to me other than in accordance with the Protective Order.

      4.    I hereby submit to the jurisdiction of the Court for the limited purpose of enforcing the Protective Order, and this Acknowledgement, by contempt proceedings or other appropriate judicial remedies.

      5.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Acknowledgement was executed this _____ day of _____, 200_.

By:_____

19

# EXHIBIT 4

 **About.com** TV / Video

ⓘ Internet Explorer cannot display the webpage

Most likely causes:

# 2006 Consumer Electronics Show (CES) News and Review

By Matthew Torres, About.com

TV / Video Newsletter - **Sign up**!        Email        Print
**Discuss** in My Forum

*Jan 9 2006*

The 2006 International Consumer Electronics Show (CES) in Las Vegas, Nevada, was filled with many bright moments. New technology was unveiled, existing technology was improved and many companies looked to take the next step forward to find a place in your home.

Companies that participated in the 2006 International CES included makers of televisions, flashlights, vacuum cleaners and virtually anything else imaginable that plugs into the wall or runs on batteries. According to Las Vegas officials, this was the largest convention in the history of Las Vegas conventions. Over 130,000 attended the show, but realistic numbers put the crowds over 200,000 when factoring in support crews for the 2500+ booths on exhibit at the showcase.

Some high notes and points of interest within the television industry include:

- The size of the manufacturer exhibits was extraordinary. It was everything Las Vegas - opulent, extravagant and excessive. Samsung had the largest booth with square footage rivaling that of half a NFL football field. The Las Vegas Convention Center had floor space encompassing more than 65 football fields.
- Manufacturers like Westinghouse, Philips and Panasonic introduced aesthetic ways to incorporate a wall-mounted television into your home decorating motif. Westinghouse and Panasonic used picture framing techniques to create an illusion that the television is nothing more than a large painting on the wall. Philips created a television that doubles as a mirror when not powered on, which is an excellent idea for hanging above a dresser in the bedroom.
- Digitrex, a new LCD manufacturer, debuted at the 2006 CES. They announced a line of 26-46" LCD-TVs that feature Samsung LCD panels. The line is now selling with the exception of the 46" model, which is expected to hit the market during the second quarter of 2006. Digitrex also unveiled wireless technology intended to integrate the PC and TV.
- Wireless technology was a high point for many manufacturers. Systems introduced by companies in the speaker and TV business comprised units designed to create a cable-free home theater audio system or cable-free connectivity between a TV, PC, DVD player and other home theater peripherals.
- Upscaling images to HD-quality was a huge breakthrough for many manufacturers. Some companies like NEC introduced external video processors that would upscale any image to near HD-quality. Others introduced televisions with the video processor upscaling technology built inside the television. NEC boasted that their video processor would even improve the picture of a high definition image.
- Blu-ray and HD-DVD had a presence at CES. Blu-ray manufacturers seemed almost certain it was a matter of time before their technology became the standard high definition DVD destination for consumers. All of that aside, the consumer will soon be able to decide who wins as Toshiba is expected to release its HD-DVD player sometime in March of 2006, while Samsung will be the first Blu-Ray manufacturer to sell its player in stores sometime in April of 2006.
- One of the brightest innovations regarding LCD-TVs was a motion blurring technology included in sets by Pioneer, Philips and Samsung. Their LCD TVs featured a super-clear display of moving images, which means an option now exists for those wanting near complete removal of motion blur on LCD screens. This is just one example at CES of a subtle improvement on existing technology that is essential to the television industry.
- Google and Yahoo! announced plans to begin delivering TV content through their respective Web sites. Will this mark trouble for the traditional providers or a reinvention of the television delivery business?

- Large screen televisions were points of conversation at CES. Several companies displayed prototypes of plasma display panels with screen sizes ranging from 80 to 100 inches. Companies also unveiled LCD televisions with screen sizes over 70 inches. The consumer-level is likely to max out around 80 inches for plasma and LCD. Projectors were also prevalent. Some models of note included LG's wall-mounted projection system and NEC's desktop projector that can display a 100-inch image from only 2.5 feet away.
- Suprisingly, perhaps not, but there wasn't a lot of CRT tube or rear projection televisions on display. This probably signals the direction the industry is headed.

Overall, the 2006 International Consumer Electronics Show demonstrated that there is a product for everyone whether it is a front-loading wall-mountable LCD TV/DVD combo by Westinghouse, under-the-cabinet portable screen TV/DVD combo by Cyberhome or a 2006 Award-winning remote control by Philips.

Consumer electronics is a fiercely competitive industry where every manufacturer tries to stake its claim in the marketplace. This works wonders for the consumer because so many manufacturers produce well-conceived products for all price points that will benefit anyone looking to upgrade their current audio and video system.

## Explore TV / Video

**By Category**
- LCD
- Plasma
- DLP
- Direct View (Tube)
- Cable and Satellite
- Product Reviews
- TV Basics
- DVD - VCR - DVR
- IPTV
- Manufacturers
- Glossary
- Frequently Asked Questions
- Wiring Antennas Accessories

**Must Reads**
- About The Digital Transition
- Watch Free HDTV Programming
- How To Save Money Buying An HDTV
- Digital Converter Box Coupon Program
- Antenna Buying Guide

**Most Popular**
- HDMI, DVI, and HDCP
- Converter Box Coupon Program
- Intro: Mounting Flat Panel TVs
- Watch Free HD Programming
- Hottest HD Antennas

# EXHIBIT 5



► Close Window

**JUNE 14, 2006**

CONSUMER ELECTRONICS
By Moon Ihlwan

# Taiwan Dogs Korea for LCD Share

## The Taiwanese now have greater market share, but Korean companies have been investing in a key growth area: the large-panel TV market

Will Korean liquid crystal display (LCD) makers be outgunned by their Taiwanese rivals? To hear Derek Lidow, of researcher iSuppli, tell it, the Taiwanese have already seized leadership of the industry. In the first quarter of this year, Taiwan accounted for 52.2% of LCD panel shipments, while Korea had a 37.4% share. A year earlier, Korea had a lead of 48.8% against Taiwan's 41.8%. "Taiwan will remain the leader in LCD panel production for the foreseeable future," Lidow predicted in a Seoul forum last month.

More importantly, Lidow points out that the loss of market share in the sophisticated, capital-intensive, business highlights the dangers for Korea of losing high-tech competitiveness. "To remain competitive, the nation must change its approach to the high-tech industry, focusing more on entrepreneurial innovation and less on lower-margin, or commodity, products," he said at the forum.

While some of Lidow's concerns are well founded, they don't take the complete picture into account. Two Korea-based companies, LG.Philips (**LPL**) and Samsung Electronics, remain the world's top manufacturers in the industry, and experts expect them to remain key players.

**GOING FOR BIG.**  One big reason for the fall in their market share is their strategy to reduce sales of small LCD panels, that have become widely available and cheap, in favor of bigger ones, particularly TV screens measuring 40 inches or more diagonally but thin enough to be hung on the wall.

In recent years LG.Philips and Samsung have been spearheading an aggressive campaign to ramp up output and adopt new technologies that will boost productivity and lower costs. In January, both companies started mass production of large TV panels from new seventh-generation plants. That meant slow sales in the first quarter as they tried to enter a market so far dominated by plasma technology. No Taiwanese company has the latest-generation factory.

With the computer market saturated, TVs have become the hope for future growth in LCD panels. Consumers are trading-in fat cathode-ray-tube TVs for sleek, thin models as the broadcasting standard shifts from analog to digital technology (see BusinessWeek.com, 11/7/05, **"Dive Into HDTV"**).

**THREEFOLD JUMP.**  DisplaySearch, another research firm tracking information technology trends, expects demand for large LCD panels used in PCs to rise 50% over the next three years, while demand for LCD panels for TVs is projected to jump more than threefold.

In fact, tapping into the new flat-screen TV market takes on greater importance as LCD panels have become a commodity business. Taiwan's strength as a PC production base has created demand there for LCD panels for monitors and notebooks. But the country's presence in flat-TV manufacturing doesn't come close to matching its standing in the computer industry, and it lacks any established global brand.

April's agreement by AU Optronic (**AUO** ), Taiwan's largest and the world's No. 3 maker of LCD displays, to acquire smaller cross-town rival Quanta Display signals a change in the contour of the industry. The merger will give AU Optronic economy of scale matching the Koreans, who have announced plans to spend billions on next-generation plants that will enable them to cut prices further.

**VALUE SURGE.**  Industry execs say the acquisition will probably trigger a new wave of consolidation among smaller Taiwanese LCD makers, including Chunghwa Picture Tubes, HannStar Display, and Innolux Display, a unit of Hon Hai Precision Industry. "We expect Samsung, LG.Philips, and AU Optronic to become strong players in the industry, with Sharp and another Taiwanese company, probably Chi Mei, serving as niche players in the industry," says Cho Yeong Duk, Samsung's vice-president in charge of strategy for the LCD business.

Analysts note that as demand picks up for big LCD TVs, revenues for the Korean companies are likely to grow faster than they will for the Taiwanese. DisplaySearch forecasts the two Korean leaders will represent 47.6% of total global sales for thin-film transistor liquid-crystal displays in terms of value in the third quarter of this year.

That's up from an estimated 45.8% in the second quarter of 2006 and 41.8% in the first quarter. By contrast, the two largest Taiwanese LCD companies—AU Optronic and Chi Mei Optoelectronics—together are expected to account for 25.4% in the third quarter, down from 27% in the first quarter, according to DisplaySearch.

**DEMAND STALL.** Of course, the projected growth in market share doesn't mean smooth sailing for the Koreans. A race to add new capacity among LCD makers and a fierce battle with plasma-panel makers for a bigger share of the flat-TV prize have led to a dramatic fall in prices, making it hard for all the participants in the market to make a profit (see BusinessWeek.com, 09/12/05, **"War of the Screens"**). DisplaySearch expects the average price for a 32-in. LCD TV panel to drop 21%, to $435 in December from $552 in January.

Demand for LCD panels isn't growing fast enough either. Share prices of all LCD manufacturers—whether they are Taiwanese, Korean, or Japanese—took a bad beating on June 7 after AU Optronic scaled down its second-quarter growth target for LCD TV and PC monitor shipments to 6% to 8%, from an earlier projection of a 20% increase (see BusinessWeek.com, 06/8/05, **"LCDs Display Their Flaws"**).

The slower than expected growth in demand is hurting the Koreans more severely, at least in the short-term. Their multibillion-dollar investments in seventh-generation production facilities mean a write-off of hundreds of millions of dollars annually as depreciation for the next couple of years. This comes at a time of a high won that eats into margins. The Korean currency has gained in value against the dollar by about 22% in the past two years.

**LEADER'S PENALTY.** This may be a penalty for past success. Joo Dae Young, director of the electronics industry division at state-funded think tank Korea Institute for Industrial Economics and Trade, says the Taiwanese will have to invest in new plants as well, to stay competitive.

But as the Koreans used to do against Japanese market leaders, Taiwanese companies can play an easier and cheaper game of catch up. "Now, with the Japanese no longer ahead of them, the Koreans will have to pay for developing new technologies and production equipment," Joo said.

Some analysts believe Korean high-tech players are at the crossroads. "I don't think Samsung and LG.Philips are outshined by their Taiwanese competitors, at least not yet," says Chung Chang Won, electronics analyst at Daewoo Securities in Seoul. "But with the business environment getting tougher, their leadership will be tested." The Koreans have still to prove they can keep pulling away from the pack and differentiating themselves.

---

**Moon** is *BusinessWeek*'s Seoul bureau chief

Advertising | Special Sections |
MarketPlace | Knowledge Centers       Xerox Color. It makes business sense.

Terms of Use | Privacy Notice | Ethics
Code | Contact Us

The McGraw·Hill Companies

Copyright 2000- 2008 by The McGraw-Hill Companies Inc.
All rights reserved.

# EXHIBIT 6



PRINTER-FRIENDLY FORMAT
SPONSORED BY


May 24, 2007

# A Japanese Export: Talent

### By **MARTIN FACKLER**

HSINCHU, Taiwan — One of the hottest exports from Japan these days isn't video games or eco-friendly cars.

It is engineers.

Japan's once vaunted electronics industry has downsized to survive global competition, and is inadvertently setting off a brain drain. Thousands of Japanese engineers and other industry professionals have gone to Taiwan, South Korea and China to seek work at aggressive, fast-growing companies that want to use Japanese technological expertise.

One such explorer is Heiji Kobayashi, a 41-year-old semiconductor engineer, whose career hit a dead end when his employer, Mitsubishi Electric, spun off its memory-chip business a few years ago. With job prospects bleak in Japan, he turned to Taiwan's booming chip industry, where he became a popular commodity.

Last month, he began a new job overseeing the design of factory production lines at Powerchip Semiconductor, a memory-chip maker in this suburban city just south of Taipei. As a deputy director, he gets stock options (rare in Japan) and a secretary, and he is climbing the top rungs of management at the company, which has 6,500 employees.

"My skills are in far higher demand here," said Mr. Kobayashi, who once worked in Taiwan for Mitsubishi Electric. Such employment mobility was once unthinkable in highly insular Japan, where until recently, workers virtually married into their company and kept their jobs for life, and the strength of its electronics industry was a source of national pride.

However, the recent export of job seekers is a sign of just how much Japan has changed during a decade of increased competition, corporate belt-tightening and the end of lifetime job guarantees. This harsher new world has forced Japan's famously conservative salarymen to become more aggressive in their job choices, and to view their careers as something for their own benefit and not simply their companies', employment experts say.

This shift in mindset also underscores how Japan's long-closed economy is finally integrating with that of its neighbors. China has already replaced the United States as Japan's biggest trading partner, and many Japanese now see their nation's and their own personal future as linked to Asia's red-hot economies.

"Salarymen are taking bigger risks," said Mitsuhide Shiraki, a professor of economics at Waseda University in Tokyo. "They're making a logical decision to work in Asia, where they are being better rewarded than in

Japan." The trend has set off some hand-wringing in Japan, where the government fears the loss of technology to Asian rivals. Some Japanese companies are also complaining that they are having trouble finding enough talented engineers at home, especially as fewer young Japanese are now entering the field.

No one knows for sure how many Japanese have left, since the outflow began in earnest less than five years ago. However, employment agencies in Tokyo have reported a surge in inquiries by middle-age Japanese professionals seeking work abroad.

There has also been a growing number of retired engineers wanting to go to less-developed economies where their skills are still highly valued, allowing them to pursue second careers late in life.

"In Asia, we can keep contributing to society," said Kazumitsu Nakamura, 64, a former engineer for Hitachi who quit to go to Taiwan, and was recently hired by a Hitachi subsidiary to train Taiwanese employees. "In Japan, we would just be collecting pensions."

Taiwan was one of the first to start courting Japanese professionals, with at least 2,500 moving here in recent years, the Taiwanese government says.

Taiwanese companies have been keen to gain access to Japan's leading technology in areas like electronics, both to catch up with Japanese front-runners like Sony and to stay ahead of fast-gaining Chinese competitors.

More recently, however, China and Southeast Asian countries like Singapore have also begun hiring Japanese en masse to acquire their know- how, recruiting agencies say.

"This is a new era," said Tomoko Hata, managing director of Pasona Global, a Tokyo-based recruiting agency that specializes in finding jobs overseas for Japanese. "The number of Japanese working abroad is only going to keep growing."

The Japanese migrants are finding themselves welcomed with open arms and generous pay packages. The Taiwan government says it has spent $20 million a year since 2003 to recruit foreign engineers, including Japanese, in key industries like semiconductors and flat-panel displays. It has held annual job fairs in Japanese cities like Tokyo and Osaka, and offers subsidies to Taiwan companies to help pay moving costs and the higher salaries that Japanese expect. To avoid angering Tokyo, Taiwan officials say that they direct their efforts at older Japanese engineers nearing retirement age.

"We need experienced engineers, and we need them quickly," said Lin Ferng-ching, the cabinet minister in charge of technology policy in Taiwan. "Japanese engineers are very well trained, and have good attitudes toward their work."

Larger Taiwanese companies have offered annual pay packages topping $1 million for candidates in prized technological fields, according to some Japanese engineers. Such a large number of Japanese has moved to Taiwan that some cities are building or planning Japanese-language schools for the engineers' children.

In Hsinchu, a subeconomy has sprung up to serve the rising number of Japanese, including izakaya (pub-

style restaurants), karaoke bars and dubious-looking massage parlors with names like Tokyo Town.

Japan's trade ministry is trying to stem the outflow of engineers by persuading Japanese companies to offer better pay and more frequent promotions. It has also reminded companies of other alternatives, like laws that forbid former employees from leaking corporate secrets to competitors. Asian diplomats have also said that Japanese officials have complained to them about their efforts to lure Japanese engineers.

"The national government cannot stop these people from going overseas," said Nobuhiro Komoto, an official in the Japanese trade ministry's manufacturing policy section. "We're helping companies think of their own ways to protect their technological know-how."

While many Japanese engineers say that they have been offered potential jobs by Asian companies, others say that they have looked for work in Asia in hopes of finding something more promising or stimulating.

Pasona Global, the employment agency, said 4,930 Japanese registered last year for job searches in other Asian countries, twice the number five years ago.

Almost every Japanese with technology-related experience attracts job offers, Ms. Hata said. The largest number of offers are from companies in China, she said, but those with the most coveted skills tended to be hired by companies in Taiwan, which is rushing to close the technological gap with Japan.

Hiroshi Itabashi was an engineer with more than 20 years of experience at a midsize Japanese television maker when he got an unexpected phone call in 1999 from Delta Electronics, a fast-growing Taiwanese electronic components company. Delta wanted to start producing TV screens and asked Mr. Itabashi to help set up their operation.

Three interviews later, including one with a Delta executive who flew to Tokyo to have lunch with him on a Saturday, Mr. Itabashi decided to make the jump.

"They gave me this exciting opportunity to build a whole new business from scratch," said Mr. Itabashi, 56, who asked that his former Japanese employer not be named. "This is something you can't do in Japan. These days, Japanese companies always seem to be closing down operations, not starting new ones."

Mr. Itabashi said that his friends were puzzled at first about his moving to a company they had never heard of. But now, they ask him for help finding jobs overseas for themselves. To lure Japanese engineers and their families to Taiwan, a government-run industrial park for technology companies in the southern city of Tainan is building a Japanese-language school. A similar technology park in Hsinchu plans to add a Japanese school and a Japanese restaurant.

"Companies in the park are asking us to do more for the Japanese," said the director of the Hsinchu Science Park, Huang Der-ray. Though the benefits are great, Japanese going abroad say they sometimes struggle to adapt to vastly different corporate cultures. For Tatsuo Okamoto, a 51-year-old semiconductor engineer, the biggest change was the speed in decision-making at the Taiwanese company, Winbond Electronics, which hired him away from the Tokyo-based chip maker Renesas Technology two years ago.

Dr. Okamoto recalled one instance when a 15-minute chat in the hallway with Winbond's president was enough to win immediate approval to purchase millions of dollars worth of factory equipment. The same decision in Japan would have taken days of committee meetings, he said.

Dr. Okamoto said the experience opened his eyes to the problems that were hobbling the competitiveness of Japan's electronics industry.

"Joining a Taiwanese company was a high-risk, high-return decision," Mr. Okamoto said. "But staying in Japan had become a high-risk, low-return proposition."

Copyright 2007 The New York Times Company

"

# EXHIBIT 7

FOCUS - 57 of 235 DOCUMENTS

Copyright 2006 Associated Press
All Rights Reserved
Associated Press Financial Wire

January 17, 2006 Tuesday 11:26 PM GMT

**SECTION:** BUSINESS NEWS

**LENGTH:** 573 words

**HEADLINE:** Ex-Corning employee pleads guilty to selling LCD glass secrets to **Taiwanese** rival

**BYLINE:** By BEN DOBBIN, AP Business Writer

**DATELINE:** ROCHESTER N.Y.

**BODY:**

A fired Corning Inc. employee pleaded guilty Tuesday to **stealing trade secrets** for making ultrathin glass used in flat-panel televisions and computers and selling them to a rival business in **Taiwan.**

Jonathan Sanders, 37, who worked at a Corning glassmaking plant in Harrodsburg, Ky., could get five years in prison at sentencing on April 18. He pleaded guilty to a felony charge of conspiring to commit **trade secret** theft, which carries a maximum penalty of nine years in prison.

Sanders admitted selling **stolen** blueprints about Corning's liquid-crystal-display glassmaking process and selling them for $34,000 to PicVue Electronics Ltd. He met with officials of the private **Taiwanese** company in California and Kentucky in July and December 2000, Assistant U.S. Attorney Tiffany Lee said.

The materials, which were returned to Corning after it sued PicVue, were valued at more than $100 million, Lee told U.S. District Judge Charles Siragusa. PicVue intended to use the technology to manufacture thin-filter-transistor LCD glass and compete with Corning, she said.

The specialty glass accounts for more than one-third of Corning's annual revenue, which totaled $3.8 billion in 2004. Corning commands more than 50 percent of the worldwide LCD glass market, and its display technologies division hit a record $489 million in third-quarter sales.

Sanders, of Lawrenceburg, Ky., said he found the documents at the Harrodsburg plant in 1999 in a hopper containing confidential material that was to be destroyed. He brought the documents with him to a job interview with PicVue officials, thinking it might help him get hired, he told the court.

Sanders said he didn't initially intend to sell the blueprints but changed his mind. He described the subsequent sale as "a serious lapse of judgment."

On Oct. 20, the day after FBI agents arrested Sanders, Corning and PicVue revealed that they had settled a Corning lawsuit stemming from the sale. PicVue agreed not to use the information and to compensate Corning for any past wrongdoing.

Court records allege that a PicVue consultant, Yeong Lin, told the company that Sanders was offering drawings he had obtained from Corning, and PicVue authorized payments. Yeong Lin is scheduled to appear before Siragusa next month.

Ex-Corning employee pleads guilty to selling LCD glass secrets to Taiwanese rival Associated Press Financial Wire
January 17, 2006 Tuesday 11:26 PM GMT

PicVue engineers took digital photographs of the Corning blueprints, which described a proprietary glassmaking process called "fusion draw," and downloaded the pictures to a disk that was taken to **Taiwan,** the records showed. The original blueprints were then destroyed.

Corning learned about the theft when PicVue representatives visited a Compagnie de Saint-Gobain SA glass facility in Niagara Falls, N.Y., in 2001 to buy a part used in the fusion draw process. During that visit, the representatives showed drawings that the French glass company recognized as containing Corning's **trade secrets.**

Corning was contacted by Saint-Gobain and notified the FBI, which began investigating in October 2001.

Based in western New York, Corning makes LCD glass in Harrodsburg, South **Korea,** Japan and **Taiwan,** where it is spending nearly $1.5 billion to expand its manufacturing plant in Taichung.

Two sheets of chemically stable LCD glass, separated by a thin layer of liquid crystals, make for slender, high-resolution displays found in a growing assortment of products, from TVs, computers, watches, gas pumps and Palm Pilots to video cameras, medical imaging devices and aircraft navigation panels.

**LOAD-DATE:** January 18, 2006

# EXHIBIT 8

FOCUS - 5 of 235 DOCUMENTS

Copyright   2008 The Economist Intelligence Unit Ltd.
All Rights Reserved
Copyright   2008 Economist Intelligence Unit
Risk Briefing Select

April 30, 2008 Wednesday

**LENGTH:** 6288    words

**HEADLINE: Taiwan** risk: Legal & regulatory risk

**SERIES:** Risk Briefing 30 Apr 2008 (T12:01) - Part 8 of 11

**BODY:**

COUNTRY BRIEFING

FROM THE ECONOMIST INTELLIGENCE UNIT

SUMMARY

The judiciary is independent of the executive branch but organised crime is known to influence the outcome of some court cases by means of bribery and physical threats. Decision-making within the judiciary is also slow. While **Taiwan** is not a member of the various international judicial bodies that mediate investment disputes, these are rare in practice and are generally resolved based on domestic law. Foreign direct investment is welcome, while restrictions on portfolio investment are gradually being reduced. Laws on intellectual property rights are improving, but enforcement is a problem. Contract rights are generally well-respected, and there is virtually no risk of the expropriation of foreign assets. Private property is secure and the government imposes few price controls.

SCENARIOS

Enforcement of intellectual property rights remains inadequate (Low risk)

| RISK RATINGS | Current Rating | Current Score | Previous Rating | Previous Score |
|---|---|---|---|---|
| Overall assessment | B | 23 | B | 25 |
| Legal & regulatory risk | A | 18 | A | 18 |

Note: E=most risky; 100=most risky.

Inadequate protection of intellectual property rights are a major concern for foreign companies in **Taiwan.** In May 2003 the US Trade Representative's Special 301 Priority Watch List described **Taiwan** as 'one of the largest sources of pirated optical media products in the world'. The island earned this designation even though **Taiwan's** government had declared 2002 the 'Action Year for IPR protection'. Since then the Copyright Law has been amended twice, with the latest changes occurring in June 2003, prompting the US to change **Taiwan's** status from the priority to the ordinary Special 301 Watch List. Nevertheless, in some areas, such as internet-orientated piracy, pharmaceuticals and text books, copyright violation remains a major concern. Improvements in the area could take years, and will require changes in official attitudes and the severity of criminal punishments for piracy. Companies should encourage their governments to put pressure on the **Taiwan** authorities when there are signs that their products or ideas are being pirated. The growing clout (in terms of fines and punishments) of law enforcement officials in cases of IPR theft means that foreign firms should also make use of the judiciary, particularly where they believe the case is clear cut.

Judges succumb to pressure from local criminal groups (Low risk)

The judiciary is largely independent of political interference. Organised crime and corruption are, however, real problems in **Taiwan.** In addition, complex cases involving technical issues stretch the professional expertise both of the

Taiwan risk: Legal & regulatory risk Risk Briefing Select April 30, 2008 Wednesday

judiciary, and also of the broader legal establishment--there are an insufficient number of lawyers on the island. This is becoming more of an issue as **Taiwan** has moved to higher value-added production, which has increased the number of cases involving issues like IPR in the semiconductor and software industries. This weakness in the knowledge base leaves the system open to yet further manipulation from criminals. Arbitration may be an option for some businesses, although **Taiwan** is not a member of the major international arbitration conventions. Patience is required when using the courts.

BACKGROUND

(Updated: January 31st, 2008)

Enforceability of Contracts

**Taiwan** has an effective system of registration and enforcement for secured interests in private property, and contracts are generally well protected.

**Taiwan** is not a member of either the International Centre for the Settlement of Investment Disputes or the New York Convention of 1958 on the recognition and enforcement of foreign arbitration awards. Nevertheless, investment disputes are rare and are resolved based on domestic law, in the form of the 1931 Civil Code. The government also passed the Arbitration Law of the Republic of China separately in 1961 (updated in 1982, 1986 and 1998) and has comprehensive commercial laws on various specific industries to protect contracts and investment. Among these is a bankruptcy law that allows creditors to share debtor assets on a proportional basis.

Independence of the Judiciary

**Taiwan's** judicial system comprises a lower court, a court of appeals and a supreme court. Like members of the civil service, judges are selected by examination. They are appointed for life but may be removed through disciplinary procedures. The courts are independent and free from the influence of the Executive Branch; they are overseen by the Control Yuan. The judiciary's biggest problems are corruption associated with 'black gold' (that is, organised crime), slow decision-making and lack of training to handle complex commercial or technological cases.

Foreign Investment: Discriminatory Practices

The Ministry of Economic Affairs approved foreign-investment projects (excluding overseas Chinese investments) worth $10US.16bn through the first nine months of 2007, an increase of 8.9% from the $9US.33bn recorded in the same period a year earlier.

Of the invested amount in the first nine months of 2007, non-metal mineral manufacturing took up 63.13%, followed by finance and insurance (21.13%) and wholesale/retail (5.92%), according to the ministry. The top three countries that invested in **Taiwan** during this period were the Netherlands (42.65% of total), the UK (15.88%) and the Cayman Islands (13.52%).

Amendments to the Land Law made in 2001 and 2002 permitted foreigners to buy land for use and for investment. Some restrictions are still in place, however, and the government has not set a timetable for the complete liberalisation of such investments (see Acquisition of real estate for details).

The Bank Merger Law, passed in November 2000, allows foreign banks to take up to 100% ownership of a local bank. By September 2007, two foreign banks had taken advantage of the relaxed rules: Standard Chartered Bank (UK) acquired 95.4% of Hsinchu International Bank for $1US.2bn on November 3rd 2006. Citigroup (US) said on April 9th 2007 that it had received approval from the board of directors of Bank of Overseas Chinese, based in **Taiwan,** to buy 100% in the **Taiwan** lender for $14NT.1bn. Citigroup announced on December 1st 2007 that it had completed the purchase; the new entity will be known as Citibank **Taiwan.**

**Taiwan** eliminated both the previous 50% ceiling for shareholding in a local company by a single foreign investor and the 50% ceiling on all foreign investment in the **Taiwan** Stock Exchange in 2001. Foreign institutional investors face no maximum quota on the amount they can invest, but they need approval from the Central Bank of the Republic of China (**Taiwan**) for investments. Foreign individual investors face a maximum allowed amount of $5USm. The Securities and Futures Commission abolished the Qualified Foreign Institutional Investor (QFII) system as from October 2nd 2003. Instead of obtaining permission from the commission, foreign investors may now invest in the securities

Taiwan risk: Legal & regulatory risk Risk Briefing Select April 30, 2008 Wednesday

market after simply registering with the **Taiwan** Stock Exchange and obtaining an investment ID. (For more details, see the Economist Intelligence Unit report Country Finance **Taiwan.)**

**Taiwan** liberalised its oil market in 2001 with the passage of the Petroleum Management Law. But the law states that a company wishing to maintain a retail presence in **Taiwan** must always keep reserves to last 60 days in times of crisis. ExxonMobil (US) was the only foreign oil company that ever met this requirement. It had a 2% market share and 48 petrol stations on the island in 2002. The company had planned to expand that number to 100 and increase its market share to 10?15% by end-2003, but instead it cut its number of petrol stations to just three because of the poor economic conditions. It abandoned the **Taiwan** market altogether in 2003.

The legislature passed a law (the revised Telecommunications Act) in 1999 that opened the fixed-line telecoms network to as much as 60% foreign investment (direct and indirect shareholdings; the cap for direct foreign shareholdings was set at 49%); the law was formally implemented in February 2000. The main criterion for investing in the sector--investment worth at least $1US.2bn--prevented foreign firms from bidding for any of the three licences available. And the total maximum foreign shareholding in Chunghwa Telecom was set at 40%.

Foreign firms may invest in the mobile-phone market, teleconferencing services and value-added network services. The Directorate-General of Telecommunications under the Ministry of Transportation and Communications (MOTC) announced in October 2004 that it would begin accepting applications for licences for complex fixed-line network services and undersea-cable circuit leasing services in March and September each year. The licence includes local, long-distance and international telecoms licences. But no licences had yet been awarded by November 2007.

In November 2007 the National Communications Commission was preparing a draft of the Communications and Media Act, integrating the Telecommunications Act, the Broadcasting and Television Act, and the Satellite Broadcasting Act. The new act could significantly increase the permitted levels of foreign investments in television and telecommunications, though at least two versions of the law were circulating in late 2007. One version would completely lift the 60% limit on fixed-line telecoms networks. The main difference between the two versions concern terrestrial broadcasters, where at present foreigners are not allowed to hold any stakes. One version would maintain this ban; the other would permit 20% foreign ownership.

In market-opening moves in 1999, the Legislative Yuan amended the Shipping Business Law to allow foreign firms to operate shipping-related businesses on the island, in line with standards of the World Trade Organisation. Foreigners may now take a 100% stake in operating shipping agents, container transporters and cargo terminals. Companies that want to engage in the container-terminal business must have paid-in capital of at least $100NTm and be in possession of a site area of at least 33,000 sq metres. High land prices, however, discourage foreign firms from participating in the sector.

The Negative List for Investment by Overseas Chinese and Foreign Nationals prohibits and restricts investment in several categories. The negative list, amended most recently in May 2004, is available from the Department of Investment Services (formerly the Industrial Development and Investment Centre) of the Ministry of Economic Affairs. It now lists 11 prohibited industries and 23 restricted industries. Except for items on the negative list, foreign investors receive national treatment; they may do business in all areas allowed to **Taiwan** citizens. Moreover, foreign investors no longer have to use foreign exchange as the source of their capital.

For reinvestment, approval of the Ministry of Economic Affairs is now required only when foreign ownership of shares or provision of capital exceeds one-third of the total. A general prohibition still exists on foreign investments that are perceived to imperil public safety, security or morals, or the environment.

In line with **Taiwan's** then-anticipated membership in the World Trade Organisation, the Government Procurement Law took effect in May 1999, putting foreign firms on an equal footing in bidding for government procurement contracts. The Procurement and Public Construction Commission of the Executive Yuan is the authority in charge of procurement contracts. The law mandates open-tender procedures for such contracts and establishes a complete framework for open and transparent government procurement, covering the bidding process, contract-performance management, acceptance inspection, and protests and complaints. Provisions of the law govern all procurement by government agencies, public schools, public enterprises and military agencies, and also by corporations or organisations commissioned to handle procurement for military agencies. Government purchases fall into one of three categories: engineering, finance and services.

Taiwan risk: Legal & regulatory risk Risk Briefing Select April 30, 2008 Wednesday

Of most importance to foreign firms is that even if a foreign supplier submits the lowest bid for a tender, a **Taiwan** supplier might still win the contract if its quotation is not more than 3% higher than that offered by the foreign firm. But this provision does not apply to bidders from countries that have special agreements on the issue with **Taiwan.**

The Statute for Investment by Foreign Nationals (SIFN) gives the following favourable terms to eligible direct investors (foreign direct investments not conducted under the SIFN programme do not enjoy the same privileges):

reduction to 20% (from 35%) in the withholding tax rate levied on dividends paid to non-residents;

waiver of a requirement that the chairman, vice-chairman and half the shareholders be **Taiwan** citizens and residents;

right to up to 100% foreign ownership;

convertibility and remittability of all net profits and interest earnings (avoiding a $5USm annual limit that otherwise applies);

right to repatriate up to 100% of investment capital and profits at any time after incorporation or on dissolving the company;

same access to incentives and privileges enjoyed by domestic investors; and

20-year guarantee--for enterprises with a foreign investment component of at least 45% equity--against government expropriation and exemptions from employee-share-subscription requirements and from certain reporting obligations under the Securities and Exchange Law.

Investments under the SIFN may be implemented by establishing new enterprises, expanding existing ones through capital increases, purchasing shares or bonds at fair market value, extending loans (in cash or in kind) or furnishing technical know-how or patents at a fair market value. Capital may be in the form of cash, imported goods, technical know-how or patents. It may also be in the form of remittable funds acquired from previous investments in **Taiwan** and reinvested.

Suppliers of advanced technology are particularly welcome in **Taiwan** if they can contribute to greater technological independence for local industry, improve product design, manufacture new items or divert exports from the US market to Japan or other countries. There is special emphasis on innovative technology in such areas as data processing, aeronautics, power generation, energy conservation, precision machinery, automation and defence materials.

**Taiwan** eliminated all local-content requirements upon its accession to the World Trade Organisation in January 2002. Before that, local-content requirements were enforced only for cars and motorcycles produced in **Taiwan.** (Vehicles exceeding 10 tonnes had to be 31% locally made; those of 3.51?10 tonnes had to have a local content of 40%. The local content rate for motorcycles had been 90%.)

Unfair competitive Practice

The 1991 Fair Trade Law, along with various provisions of the civil code and other fair-trade measures, provides a basic framework for acceptable business practices in **Taiwan.** The law limits business monopolies and prohibits collusion and unfair competition. It also forbids a wide range of practices intended to damage other businesses, including the use of force, bribery or the like to obtain technology or business secrets, and the dissemination of false reports to damage the commercial reputation of another company. The law also bans multi-tiered sales schemes, making it illegal for participants to obtain commissions, bonuses or other benefits merely for persuading others to participate in a scheme rather than for selling goods or services.

Other provisions cover practices such as the following: counterfeiting products; misrepresenting contents, price, production date, quality or place of manufacture; and using names, trademarks or packaging without authorisation. Liability extends to advertising agencies and media that deliberately design or disseminate false advertisements.

The Fair Trade Law was given more teeth in 1999. The law now covers price adjustments by government-run monopolies (such as Chunghwa Telecom and domestic airlines) and public utilities. If price adjustments by such firms hinder market competition, those firms will face fines as high as $100NTm (up from $1NTm), along with other administrative fines as high as $50NTm. The Fair Trade Law now includes shareholdings by listed firms.

Taiwan risk: Legal & regulatory risk Risk Briefing Select April 30, 2008 Wednesday

The Fair Trade Law of 2002 changed regulations on mergers. Article 11 of the law requires prior approval from the Fair Trade Commission (FTC) for a merger if the following conditions exist:

the merged entity will have a market share of one-third or more;

one of the entities to be merged holds a market share of one-fourth or more; or

one of the entities to be merged had annual sales in the preceding year of an amount higher than the threshold set by the FTC. The FTC announces its thresholds separately for financial and non-financial enterprises every year.

The new Company Merger and Acquisition Law passed in December 2003 liberalised merger regulations to benefit **Taiwan's** 'traditional' industries (such as textiles and machinery). Under the new rules, companies can use a compulsory share exchange during a transaction; they can approach the management of target companies and request a shareholders' meeting, at which a two-thirds majority could force the minority shareholders to sell. The law also gives foreign companies equal footing with local firms and exempts mergers from various taxes.

In general, the Fair Trade Law has been designed to curb the abuse of monopoly power rather than to eliminate monopolies altogether. Bulk-commodity importers, for instance, may still import on a joint basis to maximise trade efficiency. Co-operation is sometimes permissible if it is intended to help promote uniform product specifications, lower costs, improve quality or upgrade efficiency. Much the same holds true in co-operative research and development, marketing, rationalisation of business management and enhancement of export performance. Special provisions apply under conditions of extreme economic adversity or recession.

Under the Fair Trade Law, a monopoly is considered to exist under any of the following conditions: (1) one enterprise has at least a 50% market share; (2) two enterprises have a combined market share of at least two-thirds; or (3) three enterprises have a combined market share of at least three-fourths of the total market.

There is no need to prove the existence of any anti-competitive agreements. But if any one of these enterprises has less than a 10% market share or annual income revenue of less than $1NTbn for the most recent fiscal year, it is in principle not considered a monopoly. Although the law forbids the formation of new monopolies, it gave some long-standing ones a five-year grace period (until end-2007) to adjust to new competition.

Many state-owned monopolies still exist, but the government-sanctioned monopolies in petroleum products, steel products and ocean shipping have been privatised. Telecommunications, energy, alcoholic beverages and tobacco, harbours, fertilisers, farmers' banks, natural gas, the Nantze industrial park, medicines, iron, sugar and plastics are industries that either are now privatising or are slated for privatisation.

A Wine and Tobacco Tax Law, approved on March 28th 2000, ended the decades-old government monopoly on the sale of wine and tobacco in the domestic market. The change has led to big price hikes on local wine and tobacco, which must now compete with foreign competitors without benefit of government subsidies.

The Fair Trade Commission (FTC) ruled in January 2000 that there were no signs of monopoly behaviour in the cable-television industry. This decision came after independent cable-TV operators and consumer-rights groups called on the FTC to investigate an alleged monopoly of the industry by Eastern Multimedia and United Communications, which control more than 80% of the local market. The FTC said it would monitor the two firms for signs of market dominance.

The FTC in January 2007 launched an investigation into whether an acquisition by Yahoo! **Taiwan** of Wretch, which operates a popular blog site, would result in a monopoly, as some competitors had claimed. The FTC announced in March 2007 that it had approved the deal, arguing that it would do little to change Yahoo! **Taiwan's** position in the market as measured by revenues from advertisement. Based on this standard, Yahoo! **Taiwan's** existing market share of 59.54% would not be significantly altered by adding Wretch's 1.75%. Earlier, in November 2006, the FTC had ruled that Yahoo-Kimo, an online auction, was not engaging in monopolistic behaviour by introducing a 3% transaction fee, arguing that the existence of several major competitors was evidence that no monopoly existed.

Intellectual Property Rights

On January 18th 2005 the United States Trade Representative (USTR) announced **Taiwan's** upgrading to its Watch List of intellectual-property-rights (IPR) violators. **Taiwan** had been on the more severe Special 301 Watch List since 2001. Despite the upgrade, which the USTR maintained as at November 2007, some critical problems remain. Although the International Intellectual Property Alliance (IIPA), an IPR-protection watchdog based in the US, approved of the

Taiwan risk: Legal & regulatory risk Risk Briefing Select April 30, 2008 Wednesday

USTR's decision, it highlighted several areas in its 2007 report (released in February 2007) where **Taiwan** still needed to improve. Among these were more-effective fighting of Internet piracy (especially through unauthorised file-sharing services); combating IPR infringements on TANet, a government-owned network; addressing piracy of books; and passing legislation to extend the term of copyright. Nevertheless, the IIPA estimated that US manufacturers lost $124US.2m in 2006 because of **counterfeit** products from **Taiwan** in the US market, down markedly from $355US.4m the previous year.

The Business Software Alliance and IDC estimated the piracy rate for business software was 41% in 2006, down from 43% in 2005. But because of the growth in the software industry, it estimated losses from piracy grew to $180USm, from $110USm in 2005.

**Taiwan** created an Intellectual Property Office (IPO) in 1999 to cover all copyright and patent activities and an in-tellectual-property-rights enforcement regime. The IPO handles the screening, registration and protection of copyrights and is responsible for protecting industry secrets and cracking down on trademark violators.

There have been cases of US companies suing **Taiwan** companies in US courts. In March 2007 Hewlett-Packard sued Acer, a **Taiwan** computer maker, in a federal court in Texas, claiming that Acer had infringed on five patents, in-cluding DVD-editing technology, seeking unspecified damages. The following month, Hewlett-Packard followed up with yet another suit in Texas, alleging five more patent infringements by Acer. Acer counter-sued in July 2007, claim-ing Hewlett-Packard had violated its patents in areas such as DVD ROM head technologies. Acer filed yet another suit in October 2007, claiming that its patents had been violated. As at early December 2007 no decision had been reached on these cases.

In March 1999 the IPO made public a list of criteria for which 'well-known' trademarks or logos will receive 'strict' government protection from infringers. Although such rules ostensibly already existed, the government wanted to show the World Trade Organisation that **Taiwan** was doing its utmost to end copyright infringement. As with many laws in **Taiwan,** however, its enforcement has been inconsistent. The criteria essentially cover trademarks that are generally known by the public, regardless of whether they have been registered with the government. For the most part, the IPO will rely on sales figures to determine which trademarks or logos are widely known.

The Board of Foreign Trade (BOFT) implemented an inspection system for exports of software products in July 1998. Instead of simply receiving certification from the Institute for Information Industry and passing a counter-check by the Bureau of Commodity Inspection and Quarantine, software products are subject to inspection at inspection cen-tres at major harbours and airports around **Taiwan.**

According to **Taiwan's** Trade Law, the BOFT can impose administrative penalties against companies found guilty of infringing the intellectual-property rights (IPR) of other enterprises and fine them $30NT,000?300,000. The BOFT can also suspend violators' rights to import or export products for 1?12 months.

**Taiwan** plans to establish an Intellectual Property Court to hear civil, criminal and administrative disputes. The court was originally to be set up by August 2007, but it has been delayed by the need to obtain necessary certifications. In addition, renovation work had not been completed on the building in the Taipei suburb of Panchiao that will house the court. The Central News Agency reported on September 20th 2007 that the court would probably begin operations in July 2008.

**Taiwan's** improvements in IPR protection include both amendments of laws and regulations and improved en-forcement efforts by local agencies. These include the following legislative and administrative measures:

The Fair Trade Law, enacted in 1992, tightens protection against anti-competitive activities and boosts protection for unregistered marks.

A comprehensive copyright law was passed in 1992, revised in 1993 to include restrictions on parallel imports and revised again in 1998. Major provisions include the following: granting of protection upon creation; entitlement to re-ciprocal protection for foreign authors (except US nationals, who receive national treatment); and expansion of police powers to seize infringements and to prosecute violators. The 1998 revision expands protection to foreign works from all member countries of the WTO; this provision came into force with **Taiwan's** membership in the trade body in Janu-ary 2002. Until then, only works from France, Hong Kong, Switzerland, the UK and the United States enjoyed the pro-tection of this law. Amendments to the Copyright Law, which came into force on July 14th 2007, bans products or ser-vices that enable the online transmission of copyright-protected works.

Taiwan risk: Legal & regulatory risk Risk Briefing Select April 30, 2008 Wednesday

The Trademark Law was revised in 1993 and again in 1998. Innovations include adoption of the international classification system; provision for priority based on foreign filings; inclusion of certification and collective marks; reduction of formalities for application; relaxation of licensing restrictions; and provision for pledging trademark rights. The international classification system for goods and services was adopted in July 1994 as a minimum standard. The Civil Code was changed in 1996 to enhance the ability of foreign trademark owners to appeal for protection of their brands. New amendments to the Trademark Law, announced in 1997 and implemented when **Taiwan** entered the WTO, include sections stating that a particular combination of colours in a group of items can constitute a trademark, and protection will be extended to well-known marks; thus, registration applications for trademark designs similar enough to existing trademarks to cause the public to form a mistaken belief will be rejected.

**Taiwan** Intellectual Property Office in May 2007 released new proposed amendments to the Trademark Law meant to bring local legislation better in line with international practices. Among the amendments are rules that will better protect trademark owners in future, such as a regulation that the owner is not obliged to prove intentional or negligent infringement in order to stop infringement. The amendments will probably also adopt a very broad definition of trademark, to include virtually any object that can serve to identify a certain product.

The Cable-Television Law, passed in July 1993 (along with implementing regulations issued later that year), increased protection for copyrighted materials. Cable-television operators must obtain permission from film producers before airing their works.

The Patent Law, revised in 1994, allows a standard patent term of 20 years (only for patents issued after the law was issued, and with special provisions for pharmaceuticals, agrochemicals or processes for preparing these); patentability extends to beverages, food and micro-organisms. The Patent Law also includes a priority provision based on foreign applications and reciprocity. Article 78 limits the circumstances in which the Intellectual Property Office may grant a compulsory licence; one example is when the applicant seeks to use the patent for the public benefit and without profit. Since **Taiwan** has not been permitted to subscribe to the Bern Convention, 'absolute novelty' is a condition for granting a patent.

The Law for Protection of Layout Designs of Integrated Circuits was passed in 1996 to protect designs of integrated circuits.

The **Trade Secret** Law was promulgated in 1996 to safeguard **trade secrets,** preserve industrial ethics and competitive order, and balance public interest. This law defines **trade secrets** as methods, technologies, manufacturing processes, formulae, programmes, designs or other information used in production sales or management.

The Science and Technology Basic Law was enacted in 1998. It mandates that results and IPR stemming from research-and-development projects either wholly or partially subsidised by the government belong to the enterprise undertaking the research and not to the government.

The Legislative Yuan approved a number of revisions to the Patent Law in October 2001 that went into effect when **Taiwan** entered the WTO on January 1st 2002. Major changes include the introduction of an advanced publicising system under which inventors or researchers may provide new revisions of and improvements to their inventions within one year of filing their patent applications. The inventor is allowed priority rights. The revised law also recognises patents based on the locality of the patents granted; hence, foreign inventors and researchers can own their patents retroactive to the date on which the patent was granted in other areas. It further extends the duration of a patent (including those obtained before 1994) from 15 to 20 years.

In order to comply with international trademark standards and to allow sounds and three-dimensional shapes to be registered as trademarks, the Legislative Yuan passed amendments to the Trademark Law on April 29th 2003, with effect from November 28th 2003.

Amendments to the Copyright Law entered into force on July 11th 2003. But observers such as the **Taiwan** Anti-Piracy Coalition criticised the changes, saying that they actually weakened IPRs. The biggest concern arose over the loose definition of copyright violation and lax stipulations for enforcement. Consequently, a special session of parliament in August 2004 adopted amendments correcting many of the perceived deficiencies of the 2003 law. The 2004 changes protect digital content and stipulate fines and jail terms for those found guilty of infringing right-registered digital-content products. The new version of the law overrides the provision of the 2003 law that stated that circulating fewer than five copies of a product or circulating copies valued at less than $30NT,000 was not a violation of the law.

Taiwan risk: Legal & regulatory risk Risk Briefing Select April 30, 2008 Wednesday

An amendment to the Trademark Law, promulgated on November 28th 2003, inserted the condition 'likely to cause confusion' and added 'three-dimensional shape, colour and sound' as trademark-protection targets. At the same time, the IPO also enacted two related examination standards to strengthen the trademark mechanism.

Amendments to the Patent Law promulgated in February 2003 and in force since July 1st 2004 specified the rules for the inspection and examination of patents.

An amendment to the Copyright Law, promulgated on September 1st 2004, sought to improve protection for digital industries and e-business by imposing stiffer penalties for optical-disc piracy. It also includes provisions to strengthen overall enforcement of the act.

An amendment to the Optical Disc Law, promulgated on June 15th 2005, sought to address the problem of optical discs with pornographic content that may subject manufacturers to criminal penalty. The revised law specifies that a business entity that manufactures pre-recorded optical discs under lawful foreign authorisation are exempt from criminal penalties when the following requirements are fulfilled: (1) the entity has received authorisation documentation from the foreign rights holders, and the discs are for export only, and (2) the exporter guarantees that the export of the discs does not violate the laws of the importing country. Confirmed violations of these provisions will result in the cancellation of the firm's manufacturing permit.

**Taiwan** has signed bilateral agreements on IPR protection with Australia, France, Germany, Japan, Paraguay, South **Korea,** Switzerland and the United States; others are being negotiated, despite their lessened importance since **Taiwan's** entry into the World Trade Organisation.

Of the WTO-related revisions to **Taiwan's** Patent Law announced in April 1997, one section, on enforcement of IPRs, lets patent owners and exclusive licensees request the destruction of goods or disposal of **counterfeit** products, raw materials and instruments used to make pirated goods. Moreover, the amended Patent Law eliminated reciprocity requirements for micro-organisms, the extension of patent-protection terms and the granting of exclusive import rights, and it limits compulsory licensing for semiconductor technology to non-commercial use. The revised Patent Law also provides for longer terms of protection for industrial design, in line with the ten-year minimum that is the norm in other developed countries. After **Taiwan** joined the WTO, it became bound by its regulations affecting intellectual property.

Violators of the Trademark Law face a maximum prison sentence of three years and a fine of $200NT,000 for knowingly copying trademarks (three years and/or $1NTm for copying unregistered but 'famous' trademarks). Imitation of a product carries a maximum penalty of one year in prison and a fine of $50NT,000; reproducing a work without authorisation involves a maximum prison sentence of three years and a fine of $200NT,000. The authorities may confiscate all copied works, along with the equipment used to make the counterfeit trademarks (though the authorities would probably not confiscate machinery used to make the products).

Under a revised Copyright Law passed in June 2003, convicted violators of IPRs face a maximum imprisonment of five years plus fines of up to $500NT,000, regardless of whether their intent was to earn profit. The maximum fine for persons engaged in selling or importing pirated products to earn profit was raised by $200NT,000. Repeat offenders who reproduce, sell and import pirated products as a part of regular business operations face imprisonment of 1?7 years and a maximum fine of $1NTm. Despite the changes, public prosecutors and other law-enforcement agents still handle piracy cases only after complaints are filed (as with the previous policy).

Price Controls

Domestic price controls apply primarily to public utilities or to implement specific government policies. The Commodity Price Supervisory Board conducts regular price monitoring. The board comprises representatives of the central bank, the Ministry of Finance, the Ministry of Economic Affairs, the Agriculture Commission and the Ministry of Communications. It lacks the authority to intervene directly in setting merchandise price levels.

**Taiwan** law mandates price controls on electricity (Electricity Law) and salt (Statute for Salt Administration). The state-run Chinese Petroleum Corp (CPC) regulates the price of oil (though Formosa Petrochemical now produces diesel oil for domestic production) as part of **Taiwan's** general policy both to stabilise the price of domestic oil for consumption and to provide a fixed-cost input for manufacturing other basic commodities. CPC received permission in July 2006 to adjust prices on diesel and petroleum on a weekly basis; this was changed to a schedule of monthly revisions in September 2006. To ensure price stability, the CPC may raise or cut prices by no more than 15% a month, and also not exceeding 80% of changes in global crude prices over the two most recent months. The most recent revisions took place in November 2007, when the CPC raised prices on diesel and petroleum by about 3%, despite opposition by lawmakers.

Taiwan risk: Legal & regulatory risk Risk Briefing Select April 30, 2008 Wednesday

Chunghwa Telecom, the government-run telecoms monopoly, controls the price of telecoms services. It set new prices in 2000, cutting service rates by an average of 8%. The cost of international calls saw the biggest reductions, by up to 40%. It cut prices again in April 2001, lowering the cost of international calls by 57%. These prices remained in effect as at early December 2007.

Domestic airlines have been allowed to set ticket prices since 1999, and the maximum discount that can be made as a seasonal adjustment is 50%. A single-pricing system had been in effect for all domestic airlines before the change, with a seasonal discount of 25% allowed.

The Directorate-General of Posts lowered postage in 1999 on international parcels to 64 countries, but it increased the cost of domestic and international registered mail. The postal rate cuts (to countries including Australia, Canada, New Zealand and South Africa) varied. This did not affect postage on parcels sent to France, Germany, the UK and the US. Postage for registered letters increased to $25NT domestically and $45NT internationally. Other postage rates remained unchanged in 2007.

**LOAD-DATE:** April 30, 2008

# EXHIBIT 9

# IRELL & MANELLA LLP

## IP Litigation

For over a quarter century, Irell & Manella LLP's intellectual property litigation practice has stood at the intersection of Irell & Manella's litigation and high-technology/intellectual property practices, creating one of the country's foremost practices of its kind. In a landmark case against Microsoft, Irell & Manella obtained a $120 million jury verdict for infringement of Stac's data compression patents.  In another matter, Irell & Manella represented a patent owner in litigation that resulted in a settlement requiring the defendant to pay more than $1 billion.  Irell & Manella also successfully defended the alleged infringer in the first trial ever involving a computer software patent. Chambers and Partners, publishers of the *Global Directory of the World's Leading Lawyers*, selected Irell & Manella as the U.S. Intellectual Property Law Firm of the Year for 2005 and 2006.  Irell & Manella's intellectual property litigators are nationally known as leaders in the field, and are frequently sought not just by technology clients, but by leading national and international conferences of intellectual property specialists.

Our intellectual property litigation practice covers intellectual property, including patents, trademarks and copyrights, the protection of trade secrets, and the unfair competition and antitrust issues so frequently involved in intellectual property matters.  We are also called upon in significant commercial disputes with intellectual property overtones, such as disputes involving licensing, the transfer of intellectual property rights, or technology-related transactions.  Irell & Manella recently obtained a $500 million jury verdict – including $200 million in punitive damages – on behalf of City of Hope National Medical Center in an action against Genentech arising from Genentech's failure to pay royalties owed on patents relating to fundamental technology that helped to create the biotechnology industry. The depth of our experience with intellectual property issues, our facility with handling technical matters, and our legal innovations have all contributed to our successful representation of our clients in these matters.  The attorneys in our intellectual property litigation practice are adept at handling the most technically and legally challenging matters.  Many have advanced technical degrees; all have extraordinary academic records.

Irell & Manella's patent litigation practice is bounded by neither geography nor technical subject matter. As lead counsel, we have litigated patents from every technology discipline, including software, semiconductors, computer peripherals, visual effects, biotechnology, pharmaceuticals, medical products, telecommunications, industrial machinery, video games and e-commerce.  We are proud to have been selected to litigate patent matters on behalf of well-known, industry-leading companies such as TiVo, eBay, Novellus, Broadcom, St. Jude Medical and Western Digital, as well as many younger, growing corporations.  We also represent a number of leading academic institutions, including Columbia University and the University of Illinois.

Some of our recent engagements illustrate the depth and breadth of our patent litigation practice.  For example, we won a $74 million patent infringement verdict for DVR market leader TiVo; we obtained a settlement of $80 million in up front payments and significant future royalty payments for Tessera, Inc.

## IP Litigation (continued)

in a patent and antitrust litigation involving semiconductor packaging; we obtained an $82 million verdict against Sony Computer Entertainment in a patent infringement matter involving Immersion's "force feedback" technology, which ultimately led to more than $150 million being paid by Sony to Immersion; we represented Hewlett-Packard in a nationwide series of cases against Xerox relating to inkjet and laser printer technology; the firm obtained a dismissal on summary judgment of a patent infringement suit against visual effects leader Lucas Digital Ltd. (Industrial Light & Magic) relating to special effects employed in the film *Forrest Gump*; we successfully represented the Ireland-based pharmaceutical company Elan Corporation in defending claims of patent infringement asserted by Bayer A.G. relating to high blood pressure drugs; and we represented biotech leader Affymetrix in cases relating to genetic sequencing and nucleic acid array technology.

We also represent clients in litigation in the U.S. Patent and Trademark Office Trademark Trial and Appeal Board and the Court of Appeals to bring and defend oppositions and petitions to cancel. We represent plaintiffs and defendants in copyright and trademark litigation, seeking and defending temporary restraining orders, preliminary injunctions, and trials on the merits. We have represented clients in high-profile copyright and trademark litigation. For example, David Nimmer and Jane Shay Wald successfully represented Dastar on the briefs of a case before the U.S. Supreme Court in which Fox claimed a Lanham (Trademark) Act violation for omission of its name on public domain videos of President Eisenhower's memoirs. We represented publisher Matthew Bender in a copyright action successfully challenging West Publishing Company's claim to copyright in "star pagination," in judicial decisions collected in West reporters; we represented video game publisher Activision in a trademark action against MicroProse involving rights to the mark "Civilization"; and we represented Intel against Cyrix and AMD in trademark litigation involving Intel's MMX™ technology.

### Representative Matters:

The following is a selection of patent-related litigation matters that Irell & Manella has handled:

TiVo Inc. v. EchoStar. Irell & Manella represented TiVo, the developer of the first commercially available digital video recorder and leader in developing and licensing the technology that allows television viewers to control their viewing experience. TiVo sued EchoStar for patent infringement, asserting TiVo's patent covering digital video recording systems. After a two-week jury trial – and with only two hours and fifteen minutes of deliberations – the jury concluded that EchoStar had willfully infringed TiVo's patent on its "time-warp" technology for digital video recorders and awarded TiVo $74 million in damages.

AmberWave v. Intel. Irell & Manella represented AmberWave in its patent infringement lawsuits related to AmberWave's strained silicon technology, which is critical to current and future microprocessors. After protracted litigation, the case settled with Intel taking a license to all of AmberWave's patents and patent applications.

2

# IP Litigation (continued)

<u>Tessera v. Micron and Infineon.</u>  Irell & Manella successfully represented Tessera, Inc., a global leader in the development and licensing of semiconductor packaging technology.  Tessera alleged patent infringement by Micron and Infineon, two of the world's largest manufacturers of DRAM, which is used as main memory in computer systems. Tessera further alleged that the defendants anticompetitively colluded to forestall widespread adoption of Tessera's patented technology, as part of their efforts to monopolize and then fix prices in the DRAM market.  Shortly before jury selection, both Micron and Infineon agreed to resolve the case for $30M and $50M, respectively, in up front payments, and royalty-bearing licenses to Tessera's patents on confidential terms.

<u>Ultratech Stepper, Inc. v. Canon, Inc. and ASM Lithography, Inc.</u>  Irell & Manella represented ASM Lithography, a leading manufacturer of photolithographic equipment, which is used to make semiconductor chips.  Ultratech sued ASML as well as Nikon and Canon, the other two top photolithographic equipment manufacturers, for patent infringement of "step and scan" machines.  Nikon and Canon settled with Ultratech early on in the case.  ASML went to trial, arguing that its own "step-and-scan" machine constituted prior art.  After a four-week jury trial, the jury returned a verdict for ASML, finding all asserted claims of the patent at issue invalid.

<u>Microprocessor Enhancement Corporation v. Texas Instruments Incorporated.</u> Irell & Manella represented Texas Instruments in an infringement action filed by patent holding and enforcement company Acacia Research Corporation and its subsidiary Microprocessor Enhancement Corporation.  Acacia is one of the largest and most aggressive serial filers of patent litigation in the country – the company claims to control some 58 separate patent portfolios.  Acacia claimed that sales of TI's high-performance C6000 line of Digital Signal Processing chips infringed a patent relating to architectures for high speed microprocessors.  Acacia also asserted the same patent against Intel's Itanium 2 and XScale processors in a parallel case trailing the case against TI.  Acacia sought over $94 million in damages from TI plus a permanent injunction barring future sales of all C6000 products (which have annual sales well in excess of $200 million).  In 2006, Irell & Manella filed a number of summary judgment motions, seeking a ruling that TI did not infringe and that the patent was invalid.  On February 9, 2007, Judge Alicemarie H. Stotler, Chief Judge of the U.S. District Court for the Central District of California entered rulings representing a complete victory for TI.  Judge Stotler ruled that Texas Instruments did not infringe any claims of Acacia's patent (on two separate grounds) and that all of the claims of the patent are invalid (again for two separate reasons).  Judge Stotler also awarded TI its costs of suit.

<u>Stac Electronics v. Microsoft Corp.</u>  Irell & Manella represented a relatively small, independent, computer software developer, Stac Electronics, in this bet-the-company lawsuit against software giant Microsoft. The suit asserted that Microsoft had infringed Stac's patented data compression technology.  After an intense year of pretrial conflict, in which Microsoft devoted enormous resources to the litigation, the case concluded in a month-long jury trial.  The jury found that Microsoft infringed two Stac patents and awarded Stac $120 million.  After the firm secured a sweeping post-verdict injunction requiring Microsoft to recall infringing products worldwide, the case settled, with more than $80 million to be paid to Stac and with a variety of mutually beneficial cross-licenses.

3

## IP Litigation (continued)

Immersion v. Sony.  Irell & Manella represented Immersion in this patent infringement litigation regarding complex tactile sensation technologies used in the popular Playstation videogame system.  After trial in August and September 2004, the jury awarded $82 million to Immersion, and the trial court subsequently entered a permanent injunction against Sony's sale of the infringing product (which was stayed pending appeal, conditioned on Sony's payment of a royalty for the duration of the appeal). Ultimately, Sony's appeal was dismissed and Immersion received more than $150 million.

Immersion v. Microsoft et al.  In an earlier action in which Immersion asserted the same patents against Microsoft with respect to the Xbox videogame system, Microsoft settled shortly after the claim construction hearing.  Under the settlement, Microsoft agreed to pay Immersion $26 million for certain license rights to Immersion's patent portfolio and an equity stake in the company.  Microsoft also agreed to lend Immersion up to $9 million in convertible debt.

In re Certain Electronic Products, Including Semiconductor Products, Manufactured by Certain Processes. (effectively Texas Instruments Inc. v. Samsung Electronics Co.)  Irell & Manella represented Texas Instruments before the International Trade Commission in a patent infringement action against Samsung that involved several Texas Instruments patents.  This action was one of many patent infringement actions brought by Texas Instruments against Samsung when Samsung refused to renew its patent licensing agreement with Texas Instruments.  After extensive litigation, Samsung settled with Texas Instruments by entering into a new patent licensing agreement worth more than $1 billion.

City of Hope National Medical Center v. Genentech, Inc.  Irell & Manella represented City of Hope, a non-profit bio-medical research institute and hospital against Genentech, one of the largest biotechnology companies in the world.  The suit alleged that, in an effort to deprive City of Hope of hundreds of millions of dollars in royalties, Genentech fraudulently concealed numerous third-party licenses it had granted to patents that City of Hope had assigned to Genentech under a 1976 agreement. The patents at issue arose from early groundbreaking inventions discovered by City of Hope scientists in the field of recombinant DNA technology.  After a six week trial, the jury returned a compensatory damage award of $300.1 million and an *express* finding "of clear and convincing evidence that there was malice or fraud in Genentech's conduct."  In a second phase of the trial, the jury awarded City of Hope an additional $200 million in punitive damages.

Grayzel v. St. Jude Medical, Inc.  Irell & Manella successfully defended St. Jude Medical, Inc. in a patent case relating to vascular closure devices.  These devices are used at the end of angioplasty and other cardiac catheterization procedures.  The number of cardiac catheterization procedures increased by 400 percent from 1979 to 2002; there are now over 1.5 million such procedures each year in the United States alone.  Dr. Joseph Grayzel, a director of one of St. Jude's vascular closure device competitors, sued St. Jude for patent infringement, seeking to enjoin St. Jude's AngioSeal vascular closure device and recover a portion of the more than $1 billion in AngioSeal revenue.  After discovery closed, St. Jude moved for and was granted a summary judgment of patent invalidity, and the lawsuit was dismissed.

## IP Litigation (continued)

Conner Peripherals v. Western Digital Corp.  Irell & Manella represented Western Digital Corporation, a premier maker of hard disk drives, in a case referred to by the Federal District Court for the Northern District of California as possibly "the largest patent litigation in history."  The action involved Conner, Western Digital, and IBM, and more than 20 electrical and mechanical patents relating to disk drive technology.  The case against Western Digital was dismissed with prejudice in 1995.

Novellus Systems v. Applied Materials.  Irell & Manella represented patent owner Novellus in this lawsuit concerning physical vapor deposition tools and methods for depositing metal onto semiconductor wafers.  In 1999, as Novellus was in the process of acquiring the PVD assets of Varian, Applied Materials sued Novellus on four patents related to semiconductor manufacturing equipment and methods. Novellus brought a counter-suit against Applied Materials.  Over the seven year period before negotiating a favorable global settlement between the parties, Irell & Manella, on behalf of Novellus, precluded Applied Materials from relying upon various invalidity contentions, defeated in whole or in part three summary judgment motions brought by Applied Materials, and succeeded in having all four of the patents asserted against Novellus dismissed entirely.

Xerox v. Hewlett-Packard.  Irell & Manella represented Hewlett-Packard in seven different intellectual property cases against Xerox that were brought in Rochester, New York; San Jose, California; Idaho; and Kansas.  After the firm obtained summary judgment in favor of Hewlett-Packard in the initial case filed by Xerox, the parties settled all litigation between them.

Bloomstein v. Lucas Digital, et al.  Irell & Manella represented defendants Lucasfilm and Lucas Digital in a patent infringement litigation concerning techniques used to create visual effects in a number of films, including *Star Wars Episode I:  The Phantom Menace*, *Star Wars Episode II:  Attack of the Clones*, and *Forest Gump*.  The firm obtained a dismissal of all claims on a summary judgment of noninfringement and a ruling that one of two asserted patents was invalid.  The firm also obtained an affirmance in the Federal Circuit.

Amstrad plc v. Western Digital Corporation and Western Digital U.K., Ltd.  Irell & Manella represented Western Digital against the British computer manufacturer's $200 million contract and warranty claims concerning Western Digital's hard disk drives.  The matter was tried to two juries and ended in a complete defense verdict.  *The National Law Journal* named the result, which was affirmed on appeal, one of the Top Fifteen Defense Verdicts of 1999.

Hewlett-Packard Co. v./adv. Repeat-O-Type Stencil Mfg. Corp.  Irell & Manella represented Hewlett-Packard in two separate actions against Repeat-O-Type involving Hewlett-Packard ink-jet cartridges for ink-jet printers.  In the first action, Hewlett-Packard sued Repeat-O-Type for trademark infringement and state law tort claims.  At trial, we obtained compensatory and punitive damages, plus an award of attorneys' fees.  In the second action, Repeat-O-Type sued Hewlett-Packard for antitrust violations relating to its ink-jet cartridges.  We obtained a complete dismissal of Repeat-O-Type's complaint.

## IP Litigation (continued)

Affymetrix v. Incyte Genomics; Hyseq v. Affymetrix.  Irell & Manella represented DNA microarray manufacturer Affymetrix in a series of high-stakes patent litigations in the Northern District of California. First, the firm asserted Affymetrix's microarray patents against Incyte Genomics, Synteni, and Hyseq.  The firm also defended Affymetrix against Hyseq's claims that Affymetrix's DNA microarrays infringe Hyseq's "sequencing by hybridization" patents.  The firm also represented Affymetrix against Incyte Genomics' claims of patent infringement based on Affymetrix's preparation of genetic sample materials for analysis.

Sonus Pharmaceuticals v. Molecular Biosystems, et al.  Irell & Manella represented Sonus, a Bothell, Washington-based pharmaceutical company in patent litigation relating to "ultrasound contract agents," drugs used to enhance the results of ultrasound scans.  The firm represented Sonus in asserting its patents against Molecular Biosystems and Mallinckrodt Medical in the Western District of Washington.  After the client obtained a summary judgment finding literal infringement, rejecting various invalidity challenges to the asserted patents and dismissing all counterclaims, the matter was favorably settled.  The firm also represents Sonus in the Western district of Washington and the District of Massachusetts in litigation against DuPont involving the same patents.

Bayer AG v. Elan Corporation plc.  Irell & Manella represented Elan, the Ireland-based pharmaceutical company, in a series of patent infringement suits brought by Bayer relating to drugs used to treat high blood pressure.  In one of the actions, the firm obtained a summary judgment of noninfringement and an affirmance of that summary judgment in the federal circuit.  We also represented Elan in other suits brought by Bayer under the same patents, which ended in a settlement.

Pfizer, Inc. v. Elan Pharmaceutical Research Corp., et al.  This case involved the interplay of patent law and the law governing FDA approval of new drugs.  Pfizer filed a patent infringement lawsuit against Elan in federal court in Delaware, seeking an injunction to block FDA approval of Elan's once-daily version of the cardiovascular drug nifedipine, which would compete with Pfizer's Procardia XL (a blockbuster drug with more than $1 billion in annual sales).  Irell & Manella, representing Elan, succeeded in persuading the court to dismiss the suit.

Chou v. The University of Chicago, et al.  Irell & Manella successfully represented vaccine company Aviron in a multi-party litigation in the Northern District of Illinois relating to inventorship of several genetic engineering patents.  The firm obtained dismissal of all damage claims against Aviron, and the United States Court of Appeals for the Federal Circuit affirmed that decision.

Oklahoma Medical Research Foundation v. Eli Lilly & Company.  Irell & Manella represented pharmaceutical company Eli Lilly in a high-stakes patent infringement and licensing litigation in Oklahoma relating to Lilly's blockbuster drug for sepsis, Xigris.  After the firm filed summary judgment papers asserting that the plaintiff's patent was not infringed and invalid, the parties reached a settlement.

AIDS Healthcare Foundation v. GlaxoSmithKline, plc.  Irell & Manella represented pharmaceutical company GlaxoSmithKline in a patent and antitrust case relating to its blockbuster AIDS drug AZT and various AIDS combination therapies.  The firm obtained dismissal of all the plaintiff's claims, including

6

## IP Litigation (continued)

claims that GlaxoSmithKline's AZT patents were invalid and procured by fraud, and the plaintiff ultimately agreed to dismiss its claims.

<u>Medical Analysis Systems, Inc. v. Biopool International, Inc, et al.</u>  Irell & Manella successfully represented a Southern California biomedical products company in a complex trade secret litigation.  The case involved allegations that individual defendants and Biopool International misappropriated portions of proprietary chemical formulae and techniques.

<u>Candle Corporation v. Boole & Babbage, Inc.</u>  This was the first trial ever involving any patent on computer software.  Irell & Manella represented Candle Corporation in attacking the validity of a patent issued on software performance monitors for large mainframe installations.  Irell & Manella won the case, which was concluded after a two-month jury trial.

For more information, please contact Morgan Chu.

# EXHIBIT 10

# IRELL & MANELLA LLP

## Partner

Newport Beach
T: 949-760-5271
F: 949-760-5200
byorks@irell.com

## Practice Areas

- IP Litigation
- IP Transactions
- Litigation

## Education

- University of Houston (J.D. 1987)
- California State University, Fullerton (M.S., Electrical Engineering 2000)
- Auburn University (B.S., Mechanical Engineering 1981), Pi Tau Sigma; Tau Beta Pi



## Ben J. Yorks

Mr. Yorks specializes in intellectual property matters, particularly patents.  His practice includes patent prosecution, licensing, IP diligence and litigation.  Mr. Yorks has been involved in litigation matters involving various areas of technology such as digital video recorders, semiconductor fabrication equipment, medical devices and printers.  He has prosecuted over 400 patents in the mechanical, electrical and optics arts.  Several of the patents have been successfully litigated and/or the subject of licensing deals.

### Representative Matters

Tivo Inc. v. Echostar Communications, Inc. (E.D. Tex)
Represented TiVo in a patent infringement suit related to pioneering digital video recorders (DVR).  A jury found the patent claims to be valid and infringed and awarded TiVo damages of $74 million.

Ultratech Stepper, Inc. v. ASM Lithography, Inc. (N.D. Cal.)
Represented ASML in a patent infringement suit related to photolithographic equipment used for semiconductor fabrication.  A jury found the asserted patent claims to be invalid on numerous grounds.

### Bar & Court Admissions

- 1987, Texas
- 1988, California
- Registered to practice before U.S. Patent and Trademark Office

# EXHIBIT 11

# IRELL & MANELLA LLP



## Christopher A. Vanderlaan

**Partner**

Century City
T: 310-203-7906
F: 310-203-7199
cvanderlaan@irell.com

**Practice Areas**

- IP Transactions
- IP Litigation
- Litigation
- Patent, Copyright & Trademark

**Education**

- University of California, Hastings College of the Law (J.D., 1991), magna cum laude
- University of California, Berkeley (B.S., Electrical Engineering/Computer Science, 1987)

Christopher A. Vanderlaan is a partner in the Century City office of Irell & Manella LLP. He specializes in intellectual property, and his practice includes patent litigation, strategic planning, licensing, and patent/trademark prosecution (domestic and international).

Mr. Vanderlaan is registered with the United States Patent and Trademark Office and has experience in all phases of patent prosecution, including specialized proceedings such as re-examinations and reissues. He has obtained issuance of a variety of patents in wide-ranging areas of technology, and his technical experience includes telecommunications, spread spectrum communication, feedback control systems, control networks, signal processing, medical devices, pacemakers, digital imaging, Internet computer systems, business methods, computer software, microprocessors, optical readers, LED-based lighting systems, amplifiers, disk drives, and power generators.

In litigation, Mr. Vanderlaan has represented clients primarily in large, complex patent cases and in challenging technical fields. Representative engagements include:

- Represented plaintiffs Polycom, Inc. and Polycom Israel Ltd., world leaders in the videoconferencing industry, against Codian Ltd. and Tandberg ASA in a case involving six patents covering videoconferencing technology and streaming. The case was filed in the Eastern District of Texas, and later involved satellite litigations in Arkansas and Virginia. The litigations all settled shortly before trial in Texas was to commence. Terms of the settlement remain confidential.

- Represented AmberWave Corporation, a small engineering and research firm founded by MIT professor and his students, against Intel Corporation in Delaware and Texas litigations over six patents involving strained silicon technology for use in semiconductor devices. The suit

## Christopher A. Vanderlaan (continued)

accused Intel's most advanced Pentiums and dual-core microprocessors of infringement, with total estimated revenues in excess of $100 billion. The case concluded when Intel agreed to license AmberWave's patent portfolio and make license payments over a 10-year term. As part of the settlement, the companies also agreed to continuing discussions and evaluation of AmberWave's ongoing technology research and development efforts.

- Represented plaintiff Zone Labs in *Zone Labs, Inc. v. Sygate Technologies, Inc.*, in the Northern District of California. The case involved a seminal software patent relating to network security, covering Zone Labs' highly successful Integrity security product. In a consent decree (filed with the Court as part of a settlement agreement), Sygate agreed to an injunction preventing it from selling network security products without a valid license, and acknowledged the patent's validity and enforceability.

- Successfully defended Zone Labs in subsequent post-trial proceedings in which, among other things, Sygate asserted that it had not breached the settlement agreement.

- Represented defendant Cisco Systems, Inc. in patent litigation involving 8 patents in the Northern District of California related to v.90 modem technology. The case eventually settled on confidential terms.

- Represented defendant Hewlett-Packard Company in a suit involving three patents in the Eastern District of Texas relating to computer architecture. The infringement allegations implicated the vast majority of PCs and servers that had been sold by HP and Compaq at the time, totaling tens of millions of units. The case settled prior to trial.

- Represented Quickturn Design Systems, Inc. ( acquired during suit by Cadence Design Systems, Inc.) in a multi-patent litigation against Mentor Graphics Corp. and Meta Systems Inc. in the District of Oregon. Quickturn prevailed in an initial bench trial in which the enforceability of the patents was challenged based on alleged inequitable conduct. The case eventually settled midway through the subsequent jury trial, with the defendants agreeing to a permanent injunction against the further sale of their products in the United States – thus protecting a market worth hundreds of millions of dollars.

- Represented Intermedics, Inc. against Cardiac Pacemakers, Inc. ("CPI") in a 14-patent case in the District of Minnesota. The case settled on favorable terms with the acquisition of Intermedics by CPI's parent company, Guidant Corporation, for over $775 million.

- Represented Intermedics, Inc. against Medtronic, Inc. in a 17-patent case in the District of Minnesota. After Intermedics prevailed on a key ruling of a license defense, the case rapidly settled on terms that have not been publicized.

- Represented Semtech Corporation in a non-patent matter involving semiconductor technology. The matter centered around a customer dispute over whether a Semtech integrated circuit caused failures in the customer's product.

# Christopher A. Vanderlaan (continued)

In 2005, Mr. Vanderlaan was named by *Los Angeles Magazine* to the Southern California "Ri
sing Stars" list for intellectual property litigation.

Mr. Vanderlaan is co-author of an article on business method patents entitled "Method Madness," *Los
Angeles Lawyer*, Vol. 23, No. 7 (October 2000), also reprinted in *The Computer & Internet Lawyer*, Vol.
18, No. 2 (February 2001).

Mr. Vanderlaan received his J.D. degree, *magna cum laude*, in 1991 from the University of California,
Hastings College of the Law, in San Francisco, California. In 1987, he received the degree of Bachelor of
Science in Electrical Engineering/Computer Science from the University of California, Berkeley. He also
worked in private industry for several years, primarily in the aerospace field.

## Professional Activities

- American Intellectual Property Law Association

## Bar & Court Admissions

- 1991, California
- U.S. Court of Appeals, Federal Circuit; U.S. Patent and Trademark Office

# EXHIBIT 12

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                IN AND FOR THE DISTRICT OF DELAWARE
 2
                            - - -
 3    COMMISSARIAT A L'ENERGIE
      ATOMIQUE,                        :      CIVIL ACTION
 4                                     :
                 Plaintiff,            :
 5                                     :
           v.                          :
 6                                     :
      SAMSUNG ELECTRONICS CO., LTD., :
 7    TOTTORI SANYO ELECTRICS CO.,     :
      LTD., FUJITSU DISPLAY            :
 8    TECHNOLOGY, SHARP CORPORATION, :
      and AU OPTRONICS CORPORATION,    :      (Consolidated)
 9                                     :      NO. 03-484 (KAJ)
                 Defendants.
10                          - - -

11                      Wilmington, Delaware
                    Monday, May 9, 2005 at 10:00 a.m.
12                      TELEPHONE CONFERENCE

13                          - - -

14    BEFORE:       HONORABLE KENT A. JORDAN, U.S.D.C.J.

15                          - - -
      APPEARANCES:
16

17            THE BAYARD FIRM
               BY:  RICHARD D. KIRK, ESQ.
18
                    -and-
19
              MCKENNA LONG & ALDRIDGE, LLP
20             BY:  MATTHEW T. BAILEY, ESQ., and
                    LORA A. BRZEZYNSKI, ESQ.
21                  (Washington, District of Columbia)

22                    Counsel for Plaintiff
                      Commissariat a L'Energie Atomique
23

24
                             Brian P. Gaffigan
25                           Registered Merit Reporter
```

**2**

1  APPEARANCES (Continued)

2

3              FISH & RICHARDSON, P.C.
4              BY:  WILLIAM J. MARSDEN, JR., ESQ., and
                    SEAN P. HAYES, ESQ.

5                   Counsel for Chi Mei
6                   Optoelectronics Corporation

7  POTTER ANDERSON & CORROON, LLP
8  BY:  RICHARD L. HORWITZ, ESQ.

                    -and-

9  BAKER BOTTS L.L.P.
10 BY:  NEIL P. SIROTA, ESQ.
        (New York, New York)

11                  -and-

12 BAKER BOTTS L.L.P.
13 BY:  MICHAEL J. BARTA, ESQ.
        (Washington, District of Columbia)

14                  Counsel for Defendants Samsung
15                  Electronics Co., Ltd., Samsung
                    Electronics America, Inc., Samsung
16                  Electronics Canada, Inc.,
                    Samsung Electronics, Inc.
17

18 YOUNG CONAWAY STARGATT & TAYLOR
   BY:  JOHN W. SHAW, ESQ.
19
                    -and-
20
21 NIXON & VANDERHYE, PC
   BY:  ROBERT W. ADAMS, ESQ.
22      (Arlington, Virginia)

23                  Counsel for Sharp Corporation

24

25

---

**3**

1  APPEARANCES:  (Continued)

2

3  RICHARDS, LAYTON & FINGER
   BY:  ROBERT H. RICHARDS, III, ESQ.
4
                    -and-
5
6  MORRISON & FOERSTER LLP
   BY:  KAREN L. HAGBERG, ESQ.
        (New York, New York)
7
                    Counsel for Defendants Fujitsu
8                   Limited, Fujitsu Display Technologies
                    Corporation and Fujitsu
9                   Microelectronics America, Inc.

10 CONNOLLY BOVE LODGE & HUTZ, LLP
   BY:  GERALD M. O'ROURKE, ESQ.
11
                    -and-
12
13 CONNOLLY BOVE LODGE & HUTZ, LLP
   BY:  LARRY W. HUME, ESQ.
14      (Washington, District of Columbia)

                    Counsel for Defendant AU Optronics
15

16              - oOo -

17          P R O C E E D I N G S

18          (REPORTER'S NOTE:  The following telephone
19 conference was held in chambers, beginning at 11:30 a.m.)
20          THE COURT:  Hi, this is Judge Jordan.  Who do I
21 have on the line?
22          MR. KIRK:  Your Honor, for CEA, this is Dick
23 Kirk from The Bayard Firm.  With me on the line from McKenna
24 Long & Aldridge from Washington are Lora Brzezynski and Matt
25 Bailey.

---

**4**

1          MR. RICHARDS:  Good morning, Your Honor.  Robbie
2  Richards on behalf of Fujitsu; and I have with me on the
3  line Karen Hagberg of the Morrison & Foerster firm.
4          MS. HAGBERG:  Good morning, Your Honor.
5          MR. HORWITZ:  Good morning, Your Honor.  It's
6  Rich Horwitz for Samsung; and with me on the line are Neil
7  Sirota and Michael Barta from Baker Botts.
8          THE COURT:  All right.
9          MR. SHAW:  Good morning, Your Honor.  It's John
10 Shaw on the line for Sharp; and with me is Bob Adams.
11         MR. O'ROURKE:  Good morning, Your Honor.  This
12 is Gerry O'Rourke from Connolly Bove Lodge & Hutz from AU
13 Optronics.  And with me on the line is Larry Hume.
14         MR. MARSDEN:  Good morning, Your Honor.  It's
15 William Marsden from Fish & Richardson joining the
16 conference on behalf of Chi Mei Optoelectronics.
17         THE COURT:  All right.  Does that round out our
18 list here?  I think it does.
19         Okay.  I'm dealing with a discovery dispute.
20 Well, I had two sets of letters come in.  My understanding
21 is that the issues raised on behalf of the folks at AU and
22 Sharp and Fujitsu and Chi Mei have been resolved.  Correct,
23 Mr. O'Rourke?
24         MR. O'ROURKE:  That's correct, Your Honor.
25         THE COURT:  You wrote for everybody and I don't

---

**5**

1  hear anybody disagreeing with that.  So the one thing we're
2  dealing with today is the issue raised by Samsung in it's
3  letter of May 5th and which was responded to by CEA's May
4  6th letter.
5          And again, I've read the correspondence so we
6  don't need to repeat that.  Let me -- since it's your
7  motion, I'll give the ball to Samsung first.  Why do you --
8  well, you know what?  Let me retract that.  Actually when
9  there is a designation in place, it's the burden of the
10 designating party.  So Ms. Brzezynski or Mr. Kirk, whoever
11 is going to be speaking for CEA, I'll let you take the
12 laboring oar here first because as designating party, you
13 have the burden of proof.  Go ahead.
14         MS. BRZEZYNSKI:  Thank you, Your Honor.  This is
15 Lora Brzezynski.  Good morning.
16         THE COURT:  Good morning.
17         MS. BRZEZYNSKI:  Your Honor, I apologize for
18 taking up the Court's time on this matter but CEA feels it
19 can only be pushed so far on this.  We are not challenging
20 that documents reviewed or generated by Dr. Scheffer that
21 are relevant to this case are discoverable.  You ordered for
22 the documents to be produced and we produced them.
23         However, we continue to challenge the right that
24 we have designated the documents as confidential under the
25 protective order.

6

1    We believe here that these documents, the
2  remaining pages at issue are highly sensitive, confidential
3  to Dr. Scheffer and to CEA because they disclosed Dr.
4  Scheffer's confidential methodology that he used to derive
5  the simulations.
6       THE COURT: Okay. Speak to me. Get facts
7  specific with me, Ms. Brzezynski. They say, hey, and his
8  deposition indicates that he used commercially available
9  software, input the parameters and so it really can't be
10 that sensitive. Go ahead and tell any why you think they're
11 wrong on that.
12      MS. BRZEZYNSKI: Sure. These pages that are at
13 issue are simply not just a simple rote inputting values.
14 The exhibit that we attached to our paper shows that, shows
15 a simple inputting of values. The specific methodology used
16 by Dr. Scheffer -- and I'm going to say this out loud to be
17 very specific, Your Honor, but it's this that we maintain is
18 highly sensitive, confidential.
19      THE COURT: Well, stop. Before you do this, are
20 you about to disclose something that should make this
21 transcript be.
22      MS. BRZEZYNSKI: Yes --
23      THE COURT: Designated as highly confidential,
24 sensitive?
25      MS. BRZEZYNSKI: -- I would request that it be

7

1  so designated.
2       THE COURT: All right. Well, let me hear what
3  you have to say. Go ahead.
4       (Sealed, bound separately.)
5       MS. BRZEZYNSKI: You know, Your Honor, there has
6  been absolutely no suggestion by Samsung that it's outside
7  counsel and its expert witnesses are not fully qualified to
8  evaluate and prepare and produce their own simulation.
9  They'll have access to these, to these documents even with
10 the high license tiff confidential designation. Both
11 Samsung's outside counsel and expert witnesses will have
12 access to it.
13      We just don't want Samsung itself, the party, or
14 any other infringing parties to have access to this
15 information --
16      THE COURT: Okay. I got your position.
17      MS. BRZEZYNSKI: -- to make --
18      THE COURT: Is there anything else that you
19 think you need to add?
20      MS. BRZEZYNSKI: (No audible response.)
21      THE COURT: I'll take that as a no.
22      All right. Mr. Sirota or Mr. Horwitz, who is
23 speaking to this?
24      MR. SIROTA: It will be me, Your Honor. Neil
25 Sirota. Thank you very much. We're all learning a little

8

1  bit this morning about what CEA's position is.
2       (Sealed, bound separately.)
3       THE COURT: But what is it other than the fact
4  that you don't like them designating something that you
5  think shouldn't be? What is it that makes this information
6  that ought to go to your in-house people?
7       MR. SIROTA: Okay. The software at issue is
8  very highly complex and it's used throughout the industry.
9  Samsung has it or something similar. It costs 25,000 Euros.
10 This is not a couple hundred dollars off the shelf at
11 Staples.
12      And it's something that, which they have
13 expertise in using. They use it in designing their LCDs and
14 doing simulations and things like that. That is not
15 something that is prevalent among independent consultants
16 who might give opinions in this case. So contrary to what
17 has been said, there is an extreme prejudice that would
18 occur if my client cannot look at and evaluate what are, as
19 far as I know, standard simulations, nothing CEA has said.
20      THE COURT: Well, stop.
21      MR. SIROTA: Yes.
22      THE COURT: You said contrary to what they say,
23 there will be extreme prejudice. Now, maybe I didn't hear
24 you but I still haven't heard it. That you have it, your
25 experts have it. What is it that is prejudicial to you if

9

1  your in-house people don't also get to see it? What is the
2  prejudice?
3       MR. SIROTA: The lack of expertise in the
4  software. In fact, what we would need to do is have Samsung
5  run simulations using what, trying to recreate what Dr.
6  Scheffer did which necessarily involved giving over what
7  this highly sensitive confidential or alleged highly
8  sensitive confidential information is. As I said, this is
9  very technical software that takes years of experience.
10 That Dr. Scheffer I gather has certainly the in-house
11 Samsung people have.
12      (Sealed, bound separately.)
13      MR. SIROTA: Dr. Scheffer was the one testifying
14 and he was asked at page 182, and you were provided with
15 that. He was asked in the context of doing his simulations,
16 he was asked "how did you determine that number?" And his
17 answer was, at the bottom of page 182, "well, exactly as was
18 described what '028 patent." He didn't say, "well, wait a
19 minute. There is something confidential about what I did or
20 something that is not known out there." He said "exactly as
21 described."
22      THE COURT: All right. Well, what I'm hearing
23 from you -- and you correct me if I'm wrong -- (sealed,
24 bound separately) -- is, hey, it's hard to find people who
25 know how to work this stuff and Samsung knows how to work

10

1 it. Now, I don't mean to be giving it less than the full
2 argument you gave it but that is sort of the nub of it as I
3 understood it; am I right?
4     MR. SIROTA: That is part of the prejudice, yes,
5 Your Honor.
6     THE COURT: Well, then give me the rest of it.
7 I'm trying to understand your whole argument about
8 prejudice. What else is there?
9     MR. SIROTA: Well, there is a broader issue here
10 of CEA's expert witness who is going to get on the stand and
11 testify about what he did and it goes to the underlying
12 basis for the assertion of infringement.
13     THE COURT: Well, you're not helping me, Mr.
14 Sirota. Because that assumes that you don't have it at all.
15 You do have it. You will have it. Your experts will have
16 it and you will have it. So it's not a question of do you
17 get it or not, it's who gets to see it on behalf of Samsung.
18 That's the distinction that is in play right now and that is
19 what I'm trying to get you to speak to with respect to the
20 issue of prejudice, and what I've heard so far is it's hard
21 to find people who know how to run this software.
22     MR. SIROTA: Your Honor is correct then.
23     THE COURT: Is there something else?
24     MR. SIROTA: We would be prejudiced in not
25 having the full benefit of our technical people to be able

11

1 to evaluate the assertions that have been made of the
2 alleged basis for it.
3     THE COURT: All right. And that is the argument
4 "I'm prejudiced," right? There is not -- in other words,
5 this is your chance to make that pitch. If there is
6 something else, put it on the table now. Okay? Go ahead.
7     MR. SIROTA: Correct, Your Honor. Correct.
8     THE COURT: All right.
9     MR. SIROTA: Right now, we don't have the
10 outside expertise to do what Samsung can do.
11     THE COURT: All right. Well, here is the
12 upshot. The designation, I'm going to permit that
13 designation to stand because I believe that CEA has
14 articulated a legitimate business reason for designating it
15 highly confidential, sensitive. You guys are litigating in
16 the United States, you are litigating in Europe, you are
17 litigating in Japan. You may be litigating some place else
18 as far as I know. CEA has chosen to sue everybody and there
19 are dozens and dozens of uncles and cousins in this suit and
20 probably a lot of the people being sued in cases overseas.
21 I don't know what the business drivers are but it's clear
22 that this is an intensely competitive industrial niche,
23 and I'm not going to have the generally broad issues of
24 discovery turn into a basis for frustrating legitimate
25 business interests when that can be avoided. When somebody

12

1 comes to court, they forfeit some of their right to keep
2 everything they want to keep secret secret and CEA has to
3 know that.
4     So I don't want anything I'm saying now to make
5 them feel uncomfortable about stamping everything highly
6 sensitive. But they've articulated what sounds to me to be
7 a credible basis for saying this is highly sensitive. The
8 in-house people don't need it and if they have it, they'll
9 do something or can do something with it that will be
10 detrimental to our legitimate business interests. And I'm
11 inclined to accept that. And the only prejudice I'm hearing
12 on the other side of that issue is, boy, it's hard to find
13 somebody who knows what is going on with this but I'm
14 telling you I got to believe, first, you are going to be
15 able to do that, Samsung. And, second, if you can't, you
16 can come back to me and we'll end up talking with CEA about
17 Mr. Scheffer being made available to you with the presence
18 of your experts to run simulations you want.
19     You know, if you are telling me he is the only
20 outside expert there who has got this stuff and knows how to
21 run it and you can't find somebody else, we'll figure out a
22 way to make his expertise available to you, but I got the
23 suspicion you are going to be able to find somebody who
24 knows how to run this in a satisfactory way to meet the
25 legitimate litigation interests you've got.

13

1     So that's the way the ruling comes down. I'll
2 designate this transcript as highly sensitive confidential
3 and you guys keep doing whatever you need to do to move the
4 case forward. All right?
5     Is there any question about my ruling, Mr.
6 Sirota?
7     MR. SIROTA: No, Your Honor.
8     THE COURT: Ms. Brzezynski?
9     MS. BRZEZYNSKI: No, Your Honor. Thank you.
10     THE COURT: All right. Is there anything from
11 any other folks on the call?
12     MR. ADAMS: Yes, Your Honor. My name is Robert
13 Adams. And counsel for CEA has said a number of times
14 during this phone conference that the indefiniteness of two
15 epsilon zero is not at issue in this case and that is not
16 correct. It is at issue and I believe that Samsung's
17 counsel articulated one of the ways in which it is at issue
18 where he said that Dr. Scheffer testified, on the one hand,
19 that he did what was merely said in the '028 patent and it's
20 now for the first time apparently through these letters of
21 counsel advising us that, no, it was a proprietary
22 information that doesn't exist out in commercial world, and
23 that he didn't just input information. So I just wanted to
24 make sure it was clear that that issue does exist in this
25 case, Your Honor.

14

```
1          THE COURT:  Okay.

2          MR. ADAMS:  Thank you very much.

3          THE COURT:  Sure.  Who do you represent Mr.

4    Adams?

5          MR. ADAMS:  I'm sorry.  I represent Sharp

6    Corporation.

7          THE COURT:  All right.  Thanks.

8          MS. BRZEZYNSKI:  If it's necessary, Your Honor,

9    I'll note for the record that Samsung did not raise that as

10   an issue in their preliminary injunction motion.

11         THE COURT:  Well, if it's in the case it's in

12   the case.  If it's not, it's not.  The ruling I made today

13   isn't based on that issue in any event.  So the ruling

14   stands.

15         MS. BRZEZYNSKI:  All right.

16         THE COURT:  Is there anything else that anybody

17   else on the call needs to bring up?  Fujitsu?

18         MS. HAGBERG:  No, Your Honor.

19         THE COURT:  From AU?

20         MR. HUME:  No, Your Honor.

21         THE COURT:  Chi Mei Optoelectronics?

22         MR. MARSDEN:  No, Your Honor.

23         THE COURT:  I think that's it.  Okay.  Thanks

24   your for your time.

25         (Telephone conference ends at 12:00 p.m.)
```

**'**

'028 [2] - 9:18, 13:19

**0**

03-484 [1] - 1:9

**1**

10:00 [1] - 1:11
11:30 [1] - 3:19
12:00 [1] - 14:25
182 [2] - 9:14, 9:17

**2**

2005 [1] - 1:11
25,000 [1] - 8:9

**5**

5th [1] - 5:3

**6**

6th [1] - 5:4

**9**

9 [1] - 1:11

**A**

able [3] - 10:25, 12:15, 12:23
absolutely [1] - 7:6
accept [1] - 12:11
access [3] - 7:9, 7:12, 7:14
Action [1] - 1:3
Adams [7] - 2:21, 4:10, 13:12, 13:13, 14:2, 14:4, 14:5
add [1] - 7:19
advising [1] - 13:21
ahead [4] - 5:13, 6:10, 7:3, 11:6
Aldridge [2] - 1:19, 3:24
alleged [2] - 9:7, 11:2
America [2] - 2:15, 3:8
Anderson [1] - 2:7
answer [1] - 9:17
apologize [1] - 5:17
Appearances [3] - 1:15, 2:1, 3:1
argument [3] - 10:2, 10:7, 11:3
Arlington [1] - 2:21

articulated [3] - 11:14, 12:6, 13:17
assertion [1] - 10:12
assertions [1] - 11:1
assumes [1] - 10:14
Atomique [2] - 1:3, 1:22
attached [1] - 6:14
Au [5] - 1:8, 3:14, 4:12, 4:21, 14:19
audible [1] - 7:20
available [3] - 6:8, 12:17, 12:22
avoided [1] - 11:25

**B**

Bailey [2] - 1:20, 3:25
Baker [3] - 2:9, 2:12, 4:7
ball [1] - 5:7
Barta [2] - 2:13, 4:7
based [1] - 14:13
basis [4] - 10:12, 11:2, 11:24, 12:7
Bayard [2] - 1:17, 3:23
beginning [1] - 3:19
behalf [4] - 4:2, 4:16, 4:21, 10:17
benefit [1] - 10:25
bit [1] - 8:1
Bob [1] - 4:10
bottom [1] - 9:17
Botts [3] - 2:9, 2:12, 4:7
bound [4] - 7:4, 8:2, 9:12, 9:24
Bove [3] - 3:10, 3:12, 4:12
boy [1] - 12:12
Brian [1] - 1:24
bring [1] - 14:17
broad [1] - 11:23
broader [1] - 10:19
Brzezynski [17] - 1:20, 3:24, 5:10, 5:14, 5:15, 5:17, 6:7, 6:12, 6:22, 6:25, 7:5, 7:17, 7:20, 13:8, 13:9, 14:8, 14:15
burden [2] - 5:9, 5:13
business [4] - 11:14, 11:21, 11:25, 12:10

**C**

Canada [1] - 2:16
cannot [1] - 8:18
case [7] - 5:21, 8:16, 13:4, 13:15, 13:25,

14:11, 14:12
cases [1] - 11:20
Cea [10] - 3:22, 5:11, 5:18, 6:3, 8:19, 11:13, 11:18, 12:2, 12:16, 13:13
Cea's [3] - 5:3, 8:1, 10:10
certainly [1] - 9:10
challenge [1] - 5:23
challenging [1] - 5:19
chambers [1] - 3:19
chance [1] - 11:5
Chi [4] - 2:5, 4:16, 4:22, 14:21
chosen [1] - 11:18
Civil [1] - 1:3
clear [2] - 11:21, 13:24
client [1] - 8:18
Co [3] - 1:6, 1:7, 2:15
Columbia [3] - 1:21, 2:13, 3:13
commercial [1] - 13:22
commercially [1] - 6:8
Commissariat [2] - 1:3, 1:22
competitive [1] - 11:22
complex [1] - 8:8
Conaway [1] - 2:18
conference [3] - 4:16, 13:14, 14:25
Conference [1] - 1:12
confidential [11] - 5:24, 6:2, 6:4, 6:18, 6:23, 7:10, 9:7, 9:8, 9:19, 11:15, 13:2
Connolly [3] - 3:10, 3:12, 4:12
Consolidated [1] - 1:8
consultants [1] - 8:15
context [1] - 9:15
continue [1] - 5:23
Continued [2] - 2:1, 3:1
contrary [2] - 8:16, 8:22
Corporation [6] - 1:8, 1:8, 2:5, 2:22, 3:8, 14:6
Correct [3] - 4:22, 11:7
correct [4] - 4:24, 9:23, 10:22, 13:16
correspondence [1] - 5:5
Corroon [1] - 2:7
costs [1] - 8:9
counsel [5] - 7:7, 7:11, 13:13, 13:17,

13:21
Counsel [6] - 1:22, 2:5, 2:14, 2:22, 3:7, 3:14
couple [1] - 8:10
Court [33] - 1:1, 3:20, 4:8, 4:17, 4:25, 5:16, 6:6, 6:19, 6:23, 7:2, 7:16, 7:18, 7:21, 8:3, 8:20, 8:22, 9:22, 10:6, 10:13, 10:23, 11:3, 11:8, 11:11, 13:8, 13:10, 14:1, 14:3, 14:7, 14:11, 14:16, 14:19, 14:21, 14:23
court [1] - 12:1
Courts [1] - 5:18
cousins [1] - 11:19
credible [1] - 12:7

**D**

dealing [2] - 4:19, 5:2
Defendant [1] - 3:14
Defendants [3] - 1:9, 2:14, 3:7
Delaware [2] - 1:1, 1:11
deposition [1] - 6:8
derive [1] - 6:4
described [2] - 9:18, 9:21
designate [1] - 13:2
designated [2] - 5:24, 7:1
Designated [1] - 6:23
designating [4] - 5:10, 5:12, 8:4, 11:14
designation [4] - 5:9, 7:10, 11:12, 11:13
designing [1] - 8:13
determine [1] - 9:16
detrimental [1] - 12:10
Dick [1] - 3:22
disagreeing [1] - 5:1
disclose [1] - 6:20
disclosed [1] - 6:3
discoverable [1] - 5:21
discovery [2] - 4:19, 11:24
Display [2] - 1:7, 3:7
dispute [1] - 4:19
distinction [1] - 10:18
District [5] - 1:1, 1:1, 1:21, 2:13, 3:13
documents [5] - 5:20, 5:22, 5:24, 6:1, 7:9
dollars [1] - 8:10

down [1] - 13:1
dozens [1] - 11:19
Dr [8] - 5:20, 6:3, 6:16, 9:5, 9:10, 9:13, 13:18
drivers [1] - 11:21
during [1] - 13:14

**E**

Electrics [1] - 1:7
Electronics [5] - 1:6, 2:15, 2:15, 2:16, 2:16
end [1] - 12:16
ends [1] - 14:25
epsilon [1] - 13:15
Esq [14] - 1:17, 1:20, 1:20, 2:3, 2:4, 2:7, 2:10, 2:13, 2:18, 2:21, 3:3, 3:5, 3:10, 3:13
Europe [1] - 11:16
Euros [1] - 8:9
evaluate [3] - 7:8, 8:18, 11:1
event [1] - 14:13
exactly [2] - 9:17, 9:20
exhibit [1] - 6:14
exist [2] - 13:22, 13:24
experience [1] - 9:9
expert [4] - 7:7, 7:11, 10:10, 12:20
expertise [4] - 8:13, 9:3, 11:10, 12:22
experts [3] - 8:25, 10:15, 12:18
extreme [2] - 8:17, 8:23

**F**

fact [2] - 8:3, 9:4
facts [1] - 6:6
far [4] - 5:19, 8:19, 10:20, 11:18
figure [1] - 12:21
Finger [1] - 3:2
firm [1] - 4:3
Firm [2] - 1:17, 3:23
first [4] - 5:7, 5:12, 12:14, 13:20
Fish [2] - 2:3, 4:15
Foerster [2] - 3:5, 4:3
folks [2] - 4:21, 13:11
following [1] - 3:18
forfeit [1] - 12:1
forward [1] - 13:4
frustrating [1] - 11:17
Fujitsu [7] - 1:7, 3:7,

3:7, 3:8, 4:2, 4:22,
14:17
full [2] - 10:1, 10:25
fully [1] - 7:7

## G

Gaffigan[1] - 1:24
gather [1] - 9:10
generally [1] - 11:23
generated [1] - 5:20
Gerald [1] - 3:10
Gerry[1] - 4:12
guys [2] - 11:15, 13:3

## H

Hagberg[4] - 3:5, 4:3,
4:4, 14:18
hand [1] - 13:18
hard [3] - 9:24, 10:20,
12:12
Hayes[1] - 2:4
hear [3] - 5:1, 7:2,
8:23
heard [2] - 8:24, 10:20
hearing [2] - 9:22,
12:11
held [1] - 3:19
helping [1] - 10:13
Hi[1] - 3:20
high [1] - 7:10
highly [10] - 6:2, 6:18,
6:23, 8:8, 9:7, 11:15,
12:5, 12:7, 13:2
Honor[24] - 3:22, 4:1,
4:4, 4:5, 4:9, 4:11,
4:14, 4:24, 5:14,
5:17, 6:17, 7:5, 7:24,
10:5, 10:22, 11:7,
13:7, 13:9, 13:12,
13:25, 14:8, 14:18,
14:20, 14:22
Honorable[1] - 1:14
Horwitz[4] - 2:7, 4:5,
4:6, 7:22
house [4] - 8:6, 9:1,
9:10, 12:8
Hume[3] - 3:13, 4:13,
14:20
hundred [1] - 8:10
Hutz[3] - 3:10, 3:12,
4:12

## I

Iii [1] - 3:3
in-house [4] - 8:6, 9:1,
9:10, 12:8
Inc [4] - 2:15, 2:16,

2:16, 3:8
inclined [1] - 12:11
indefiniteness [1] -
13:14
independent [1] - 8:15
indicates [1] - 6:8
industrial [1] - 11:22
industry [1] - 8:8
information [5] - 7:15,
8:5, 9:8, 13:22,
13:23
infringement [1] -
10:12
infringing [1] - 7:14
injunction [1] - 14:10
input [2] - 6:9, 13:23
inputting [2] - 6:13,
6:15
intensely [1] - 11:22
interests [3] - 11:25,
12:10, 12:25
involved [1] - 9:6
issue [13] - 5:2, 6:2,
6:13, 8:7, 10:9,
10:20, 12:12, 13:15,
13:16, 13:17, 13:24,
14:10, 14:13
issues [2] - 4:21,
11:23
itself [1] - 7:13

## J

Japan[1] - 11:17
John[2] - 2:18, 4:9
joining [1] - 4:15
Jordan[2] - 1:14, 3:20
Jr[1] - 2:3
Judge[1] - 3:20

## K

Kaj[1] - 1:9
Karen[2] - 3:5, 4:3
keep [3] - 12:1, 12:2,
13:3
Kent[1] - 1:14
Kirk[4] - 1:17, 3:22,
3:23, 5:10
known [1] - 9:20
knows [4] - 9:25,
12:13, 12:20, 12:24

## L

L'energie [2] - 1:3,
1:22
laboring [1] - 5:12
lack [1] - 9:3
Larry[2] - 3:13, 4:13

Layton[1] - 3:2
Lcds[1] - 8:13
learning [1] - 7:25
legitimate [4] - 11:14,
11:24, 12:10, 12:25
less [1] - 10:1
letter [2] - 5:3, 5:4
letters [2] - 4:20,
13:20
license [1] - 7:10
Limited[1] - 3:7
line [6] - 3:21, 3:23,
4:3, 4:6, 4:10, 4:13
list [1] - 4:18
litigating [4] - 11:15,
11:16, 11:17
litigation [1] - 12:25
Llp[7] - 1:19, 2:7, 2:9,
2:12, 3:5, 3:10, 3:12
Lodge[3] - 3:10, 3:12,
4:12
look [1] - 8:18
Lora[3] - 1:20, 3:24,
5:15
loud [1] - 6:16
Ltd[3] - 1:6, 1:7, 2:15

## M

maintain [1] - 6:17
Marsden [4] - 2:3,
4:14, 4:15, 14:22
Matt [1] - 3:24
matter [1] - 5:18
Matthew [1] - 1:20
Mckenna [2] - 1:19,
3:23
mean [1] - 10:1
meet [1] - 12:24
Mei [4] - 2:5, 4:16,
4:22, 14:21
merely [1] - 13:19
Merit [1] - 1:25
methodology [2] -
6:4, 6:15
Michael [2] - 2:13, 4:7
Microelectronics [1] -
3:8
might [1] - 8:16
minute [1] - 9:19
Monday [1] - 1:11
morning [9] - 4:1, 4:4,
4:5, 4:9, 4:11, 4:14,
5:15, 5:16, 8:1
Morrison [2] - 3:5, 4:3
motion [2] - 5:7, 14:10
move [1] - 13:3

## N

name [1] - 13:12
necessarily [1] - 9:6
necessary [1] - 14:8
need [5] - 5:6, 7:19,
9:4, 12:8, 13:3
needs [1] - 14:17
Neil [3] - 2:10, 4:6,
7:24
New[4] - 2:10, 3:6
niche [1] - 11:22
Nixon[1] - 2:20
note [1] - 14:9
Note [1] - 3:18
nothing [1] - 8:19
nub [1] - 10:2
number [2] - 9:16,
13:13

## O

O'rourke [5] - 3:10,
4:11, 4:12, 4:23,
4:24
oar [1] - 5:12
occur [1] - 8:18
one [4] - 5:1, 9:13,
13:17, 13:18
ooo [1] - 3:16
opinions [1] - 8:16
Optoelectronics[3] -
2:5, 4:16, 14:21
Optronics[3] - 1:8,
3:14, 4:13
order [1] - 5:25
ordered [1] - 5:21
ought [1] - 8:6
outside [4] - 7:6, 7:11,
11:10, 12:20
overseas [1] - 11:20
own [1] - 7:8

## P

page [2] - 9:14, 9:17
pages [2] - 6:2, 6:12
paper [1] - 6:14
parameters [1] - 6:9
part [1] - 10:4
parties [1] - 7:14
party [3] - 5:10, 5:12,
7:13
patent [2] - 9:18,
13:19
Pc [2] - 2:3, 2:20
Pconference [1] - 3:19
people [8] - 8:6, 9:1,
9:11, 9:24, 10:21,
10:25, 11:20, 12:8

permit [1] - 11:12
phone [1] - 13:14
pitch [1] - 11:5
place [2] - 5:9, 11:17
Plaintiff [2] - 1:4, 1:22
play [1] - 10:18
Pm [1] - 14:25
position [2] - 7:16, 8:1
Potter[1] - 2:7
prejudice [7] - 8:17,
8:23, 9:2, 10:4, 10:8,
10:20, 12:11
prejudiced [2] - 10:24,
11:4
prejudicial [1] - 8:25
preliminary [1] - 14:10
prepare [1] - 7:8
presence [1] - 12:17
prevalent [1] - 8:15
produce [1] - 7:8
produced [1] - 5:22
proof [1] - 5:13
proprietary [1] - 13:21
protective [1] - 5:25
provided [1] - 9:14
pushed [1] - 5:19
put [1] - 11:6

## Q

qualified [1] - 7:7

## R

raise [1] - 14:9
raised [2] - 4:21, 5:2
read [1] - 5:5
really [1] - 6:9
reason [1] - 11:14
record [1] - 14:9
recreate [1] - 9:5
Registered [1] - 1:25
relevant [1] - 5:21
remaining [1] - 6:2
repeat [1] - 5:6
Reporter[1] - 1:25
Reporters[1] - 3:18
represent [2] - 14:3,
14:5
request [1] - 6:25
resolved [1] - 4:22
respect [1] - 10:19
responded [1] - 5:3
response [1] - 7:20
rest [1] - 10:6
retract [1] - 5:8
reviewed [1] - 5:20
Rich[1] - 4:6
Richard[2] - 1:17, 2:7

**Richards**[4] - 3:2, 3:3, 4:1, 4:2
**Richardson**[2] - 2:23, 4:15
**Robbie**[1] - 4:1
**Robert**[3] - 2:21, 3:3, 13:12
**rote** [1] - 6:13
**round** [1] - 4:17
**ruling** [4] - 13:1, 13:5, 14:12, 14:13
**run** [5] - 9:5, 10:21, 12:18, 12:21, 12:24

## S

**Samsung**[18] - 1:6, 2:14, 2:15, 2:15, 2:16, 4:6, 5:2, 5:7, 7:6, 7:13, 8:9, 9:4, 9:11, 9:25, 10:17, 11:10, 12:15, 14:9
**Samsung's** [2] - 7:11, 13:16
**Sanyo**[1] - 1:7
**satisfactory** [1] - 12:24
**Scheffer**[8] - 5:20, 6:3, 6:16, 9:6, 9:10, 9:13, 12:17, 13:18
**Scheffer's** [1] - 6:4
**sealed** [1] - 9:23
**Sealed** [3] - 7:4, 8:2, 9:12
**Sean**[1] - 2:4
**second** [1] - 12:15
**secret** [2] - 12:2
**see** [2] - 9:1, 10:17
**sensitive** [10] - 6:2, 6:10, 6:18, 6:24, 9:7, 9:8, 11:15, 12:6, 12:7, 13:2
**separately** [4] - 7:4, 8:2, 9:12, 9:24
**sets** [1] - 4:20
**Sharp**[5] - 1:8, 2:22, 4:10, 4:22, 14:5
**Shaw**[3] - 2:18, 4:9, 4:10
**shelf** [1] - 8:10
**shows** [2] - 6:14
**side** [1] - 12:12
**similar** [1] - 8:9
**simple** [2] - 6:13, 6:15
**simply** [1] - 6:13
**simulation** [1] - 7:8
**simulations** [6] - 6:5, 8:14, 8:19, 9:5, 9:15, 12:18
**Sirota**[18] - 2:10, 4:7,

7:22, 7:24, 7:25, 8:7, 8:21, 9:3, 9:13, 10:4, 10:9, 10:14, 10:22, 10:24, 11:7, 11:9, 13:6, 13:7
**software** [5] - 6:9, 8:7, 9:4, 9:9, 10:21
**sorry** [1] - 14:5
**sort** [1] - 10:2
**sounds** [1] - 12:6
**speaking** [2] - 5:11, 7:23
**specific** [3] - 6:7, 6:15, 6:17
**stamping** [1] - 12:5
**stand** [2] - 10:10, 11:13
**standard** [1] - 8:19
**stands** [1] - 14:14
**Staples** [1] - 8:11
**Stargatt**[1] - 2:18
**States** [2] - 1:1, 11:16
**still** [1] - 8:24
**stop** [2] - 6:19, 8:20
**stuff** [2] - 9:25, 12:20
**sue** [1] - 11:18
**sued** [1] - 11:20
**suggestion** [1] - 7:6
**suit** [1] - 11:19
**suspicion** [1] - 12:23

## T

**table** [1] - 11:6
**Taylor**[1] - 2:18
**technical** [2] - 9:9, 10:25
**Technologies**[1] - 3:7
**Technology**[1] - 1:8
**telephone** [1] - 3:18
**Telephone**[2] - 1:12, 14:25
**testified** [1] - 13:18
**testify** [1] - 10:11
**testifying** [1] - 9:13
**they've** [1] - 12:6
**throughout** [1] - 8:8
**tiff** [1] - 7:10
**today** [2] - 5:2, 14:12
**Tottori**[1] - 1:7
**transcript** [2] - 6:21, 13:2
**trying** [3] - 9:5, 10:7, 10:19
**turn** [1] - 11:24
**two** [2] - 4:20, 13:14

## U

**uncles** [1] - 11:19

**uncomfortable** [1] - 12:5
**under** [1] - 5:24
**underlying** [1] - 10:11
**understood** [1] - 10:3
**United** [2] - 1:1, 11:16
**up** [3] - 5:18, 12:16, 14:17
**upshot** [1] - 11:12
**Usdcj**[1] - 1:14

## V

**values** [2] - 6:13, 6:15
**Vanderhye**[1] - 2:20
**Virginia**[1] - 2:21

## W

**wait** [1] - 9:18
**Washington**[4] - 1:21, 2:13, 3:13, 3:24
**ways** [1] - 13:17
**whole** [1] - 10:7
**William** [2] - 2:3, 4:15
**Wilmington**[1] - 1:11
**witness** [1] - 10:10
**witnesses** [2] - 7:7, 7:11
**words** [1] - 11:4
**world** [1] - 13:22
**wrote** [1] - 4:25

## Y

**years** [1] - 9:9
**York**[4] - 2:10, 3:6
**Young**[1] - 2:18

## Z

**zero** [1] - 13:15

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on July 3, 2008, he served the foregoing

documents by email and by hand upon the following counsel:

Philip A. Rovner                           Karen L. Pascale
David E. Moore                             John W. Shaw
POTTER ANDERSON & CORROON LLP              YOUNG CONAWAY STARGATT &
1313 North Market Street                   TAYLOR, LLP
Wilmington, DE  19899-0951                 The Brandywine Building
                                           1000 West Street, 17th Floor
                                           Wilmington, DE  19899-0391


The undersigned counsel further certifies that, on July 3, 2008, he served the

foregoing documents by email and by U.S. Mail upon the following counsel:

Jonathan S. Kagan                          Vincent K. Yip
Alexander Giza                             Peter J. Wied
IRELL & MANELLA LLP                        PAUL, HASTINGS, JANOFSKY &
1800 Avenue of the Stars                   WALKER LLP
Suite 900                                  515 South Flower Street, 25th Floor
Los Angeles, CA  90067                     Los Angeles, CA   90071

Ron E. Shulman, Esquire                    M. Craig Tyler, Esquire
Julie Holloway, Esquire                    Brian D. Range, Esquire
WILSON SONSINI GOODRICH & ROSATI           WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road                         8911 Capital of Texas Highway North
Palo Alto, California 94304-1050           Westech 360, Suite 3350
                                           Austin, Texas 78759-8497


                                           /s/ Richard D. Kirk, (rk0922)
                                           Richard D. Kirk

656846-1