# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| LG DISPLAY CO., LTD.,<br><br>　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>CHI MEI OPTOELECTRONICS<br>CORPORATION, et al.<br><br>　　　　　　　　　Defendants. | Civil Action No. 06-726 (JJF)<br>Civil Action No. 07-357 (JJF)<br><br>**CONSOLIDATED CASES** |

## PLAINTIFF LG DISPLAY'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO COMPEL CHI MEI OPTOELECTRONICS CORPORATION TO PROVIDE DISCOVERY

BAYARD P.A.

Richard D. Kirk
Ashley B. Stitzer
Stephen B. Brauerman
222 Delaware Avenue, 9th Floor
P.O. Box 25130
Wilmington, DE  19899-5130
(302) 655-5000

OF COUNSEL:
Gaspare J. Bono
R. Tyler Goodwyn, IV
Lora A. Brzezynski
Cass W. Christenson
John W. Lomas, Jr.
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C.  20006
(202) 496-7500

*Attorneys for Plaintiffs LG Display Co., Ltd. and LG Display America, Inc.*

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDINGS ................................................................ 1

SUMMARY OF ARGUMENT .............................................................................................. 2

STATEMENT OF FACTS ..................................................................................................... 3

ARGUMENT ......................................................................................................................... 5

I.    LG DISPLAY NEEDS TECHNICAL DISCOVERY FOR ALL POTENTIALLY
      INFRINGING CMO PRODUCTS ................................................................................ 6

      A.    CMO Should Be Compelled To Produce Technical Discovery Concerning
            All Of Its Products ............................................................................................ 6

            1.    CMO Has Sought And Received Information Concerning All Of
                  LG Display's Products And Similarly Situated Defendant AUO
                  Has Agreed To Produce Information Concerning All Of Its
                  Products.................................................................................................. 6

            2.    Courts Routinely Compel Discovery On All Potentially Infringing
                  Products In Patent Cases ....................................................................... 8

      B.    CMO Should Be Compelled To Produce Critical Technical Product
            Design Information Relevant To LG Display's Infringement Claims................. 10

            1.    CMO Must Produce Specifications Disclosing Critical and
                  Relevant TFT Substrate Design Information ......................................... 10

            2.    CMO Must Provide Discovery Concerning Its Gate Deposition
                  And Etching Processes........................................................................... 11

            3.    CMO Must Provide Complete Discovery Concerning Its
                  Fabrication Equipment And Plants ......................................................... 11

II.   LG DISPLAY NEEDS SALES AND DAMAGES DISCOVERY AND COST
      AND PROFIT INFORMATION FOR ALL POTENTIALLY INFRINGING
      CMO PRODUCTS........................................................................................................ 12

      A.    CMO's Worldwide Sales Are Relevant And Discoverable................................. 12

      B.    CMO's Worldwide Product Sales Information Should Be Provided In
            Summary Form ................................................................................................... 14

      C.    CMO Should Provide Discovery Concerning Manufacturing Costs And
            Yields That Are Relevant To LG Display's Damages......................................... 15

III.  CMO HAS FAILED TO PRODUCE INFORMATION THAT IS CRITICAL TO
      LG DISPLAY'S ABILITY TO LITIGATE ITS CLAIMS OF INDUCEMENT............ 15

IV.   CMO SHOULD BE COMPELLED TO PROVIDE SHAREHOLDER
      REPORTS, DOCUMENTS REGARDING LG DISPLAY, AND RELATED
      DISCOVERY............................................................................................................... 18

### TABLE OF CONTENTS
(continued)

**Page**

V.   CMO PRODUCED INFORMATION IN FILES THAT CANNOT BE READILY
     OPENED, VIEWED OR PROCESSED.......................................................................... 19

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*02 Micro Int'l Ltd. v. Sumida Corp.,*
  2006 WL 981987 (E.D. Tex. April 12, 2006)....................................................13, 18

*3COM Corp. v. D-Link Systems, Inc.,*
  No. C-03-2177 VRW, 2007 WL 949596 (N.D. Cal. Mar. 27, 2007) ................................12, 13

*Commissariat A L'Energique Atomique v. Samsung Electronics Co., Ltd. et al.,*
  No. 03-486 (KAJ) .......................................................................................8, 12, 13

*Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.,*
  395 F.3d 1315 (Fed Cir. 2005).......................................................................4

*Corning Inc. v. SRU Biosystems LLC,*
  223 F.R.D. 191 (D. Del. 2004) ......................................................................2, 5

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.,*
  246 F.3d 1336 (Fed. Cir. 2001)......................................................................18

*E.I. DuPont De Nemours and Co. v. Monsanto Co.,*
  903 F. Supp. 680 (D. Del. 1995).....................................................................17

*Fellowes, Inc. v. Michilin Prosperity Co.,*
  491 F. Supp. 2d 571 (E.D. Va. 2007) ..............................................................12

*Kellogg v. Nike, Inc.,*
  No. 8:07cv70, 2007 WL 4570871 (D. Neb. Dec. 26, 2007).......................................8

*LG.Philips LCD Co. v. Chi Mei Optoelectornics Corp.,*
  551 F. Supp. 2d 333 (D. Del. 2008).................................................................16, 17

*LG.Philips LCD Co., Ltd. v. Tatung Company,* Nos. Misc. F-07-0009 EFB, S-07-0018
  FCD EFB, 2007 WL 869700 (E.D. Cal. Mar. 21, 2007) .........................................8

*Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.,*
  730 F.2d 1452 (Fed. Cir. 1984).......................................................................13

*MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp.,*
  420 F.3d 1369 (Fed. Cir. 2005).......................................................................18

*Minnesota Min. and Mfg. Co. v. Smith and Nephew, PLC,*
  No. 3-91 CIV 274, 1992 WL 464352 (D. Minn. July 27, 1992) ...............................13, 14

## TABLE OF AUTHORITIES
(continued)

**Page**

*Murata Mfg. Co. v. Bel Fuse, Inc.*,
   422 F. Supp. 2d 934 (N.D. Ill. Mar. 14, 2006) ..................................................5, 13

*Oklahoma v. Tyson Foods, Inc.*,
   2007 WL 3128422 (N.D. Okla. Oct. 24, 2007) ........................................19

*Semiconductor Energy Laboratory Co. v. Chi Mei Optoelectronics Corp., Ltd.*, 531 F.
   Supp. 2d 1084 (N.D. Cal. 2007) ...................................................17, 18

*Sharp Corp. v. AU Optronics Corp.*,
   2005 WL 1457747 (N.D. Cal. June 20, 2005) ......................................16

*Wing Shing Prods. (BVI), Ltd. v. Simatelex Manufactory Co.*,
   479 F. Supp. 2d 388 (S.D.N.Y. 2007)..............................................15, 18


**STATUTES**

35 U.S.C. § 271.........................................................................17


**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 34(a)(1)(A).................................................3, 19, 20

## NATURE AND STAGE OF THE PROCEEDINGS

This is a patent infringement case involving 23 patents concerning liquid crystal display ("LCD") products and methods of manufacturing. LG Display Co., Ltd. ("LG Display") brought the first filed case (C.A. 06-726) in this District. AU Optronics Corporation ("AUO") and Chi Mei Optoelectronics Corporation ("CMO") responded by filing related suits in Wisconsin ("AUO Action") and Texas ("CMO Action"). Both cases have since been transferred here for consolidation with the first-filed case. This Court has already consolidated the AUO Action, and the parties agree that the CMO Action should also be consolidated with this case.[1]

LG Display is alleging that Defendants AUO and CMO infringe nine patents ("LG Display Patents") covering a wide array of LCD technology.[2] Eight AUO patents and six CMO patents are also at issue in this case. The parties have served hundreds of discovery requests and the July 18, 2008 deadline for the production of documents has passed. The parties have also served a number of third-party subpoenas and those third-parties are just now beginning to produce documents. No third-party or party depositions have taken place. The fact discovery deadline is December 17, 2008.

LG Display, Chi Mei Optoelectronics USA[3] ("CMO USA"), and AUO each has requested information concerning all of the opposing party's products and worldwide sales. CMO is the only party that has not produced such discovery. CMO's continuing refusal to

---

[1] LG Display and CMO have filed cross motions to consolidate the CMO Action, which was assigned Civil Action No. 08-355 (JJF). (D.I. 295, 296, 298, 299.)

[2] The LG Display Patents include United States Patent Nos. 5,019,002 (the "'002 Patent"); 4,624,737 (the "'737 Patent"); 5,825,449 (the "'449 Patent"); 5,905,274 (the "'274 Patent"); 6,815,321 (the "'321 Patent"); 7,176,489 (the "'489 Patent"); 6,803,984 (the "'984 Patent"); 7,218,374 (the "'374 Patent"); and 6,664,569 (the "'569 Patent").

[3] Chi Mei Optoelectronics USA is a United States based subsidiary of CMO.

produce this and other information directly relevant to LG Display's infringement and declaratory judgment claims, has forced LG Display to bring this motion to compel.

## SUMMARY OF ARGUMENT

1.      "In the Third Circuit, 'it is well recognized that the federal rules allow broad and liberal discovery.'" *Corning Inc. v. SRU Biosystems LLC*, 223 F.R.D. 191, 192 (D. Del. 2004). This Motion seeks to compel disclosure of relevant discovery essential to LG Display's claims and defenses. Indeed, CMO USA has requested similar information, and LG Display has already produced such information. CMO should be compelled to provide this discovery without further delay.

2.      CMO has improperly limited its entire production of technical information, including its product design (mask and GDS) files to products directly shipped by CMO to the United States and specifically identified by LG Display. These limitations are improper because CMO has sought and received technical discovery concerning all of LG Display's products and LG Display, having identified a wide range of CMO products that infringe the LG Display Patents, likewise needs discovery to ascertain the full extent of CMO's infringement.

3.      In addition to not providing discovery on all relevant products, CMO has failed to produce critical technical information that LG Display needs. CMO has not produced, for example, product design documents, certain manufacturing process documents, and information concerning its fabrication plants and equipment that are directly relevant and critical to LG Display's infringement claims. CMO has no basis for withholding this discovery that directly concerns technology covered by the LG Display Patents.

4.      CMO should be compelled to produce worldwide sales summaries, as LG Display already has in response to CMO's discovery requests, because such summaries are directly

relevant to LG Display's direct and indirect infringement claims, reasonable royalty damages, and commercial success arguments.

5.      CMO should further be compelled to provide discovery concerning CMO's conduct relevant to inducement, such as documents relating to trips to the U.S. by CMO employees or representatives; documents exchanged with any U.S. government agency or authority or regarding compliance with any U.S. regulatory requirements; documents concerning the service or repair of CMO products in the U.S.; CMO's marketing documents, communications with customers, presentations to customers, and offers to sell; the identities of CMO customers and their products that contain CMO modules; distribution chain information; and other relevant inducement discovery.

6.      LG Display also requests that CMO be compelled to provide discovery responsive to LG Display's requests for discovery concerning reports to shareholders, shareholder agreements, offering circulars, and other stock related documents.

7.      CMO has reproduced unworkable files that can not be opened, viewed, or processed.  Consistent with its obligations under Federal Rule of Civil Procedure 34(a)(1)(A), CMO should reproduce these files in a reasonably usable format.

## STATEMENT OF FACTS

LG Display filed this infringement action on December 1, 2006 ("LG Display Action") against CMO, CMO USA, AUO, and AU Optronics Corporation America ("AUOA") (collectively, the "Defendants").[4]  (D.I. 1.)  LG Display asserts that the Defendants infringe nine patents.  Both AUO and CMO subsequently filed related patent infringement claims concerning

---

[4] LG Display also asserted claims against Viewsonic Corporation, Tatung Company, and Tatung Company of America, who each settled with LG Display and each of whom has since been dismissed from this case.

LCD technology against LG Display in Wisconsin (AUO) and Texas (CMO), asserting eight patents and six patents, respectively. CMO also challenged personal jurisdiction in Delaware and refused to participate in this case while that motion was pending, despite a previous Federal Circuit decision confirming that CMO used established distribution channels that likely resulted in substantial sales of CMO's products in Delaware. *See Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315 (Fed Cir. 2005).

On March 25, 2008, LG Display served CMO with 83 requests for production. (*See* Ex. A.) Three days later AUO served LG Display with two sets of requests for production that included over 200 document requests. (D.I. 174.) On April 8, 2008, CMO USA served LG Display with 109 requests for production, most of which were identical to the requests served by LG Display. (*See* Ex. B.) After denying CMO's motions to dismiss, (D.I. 193), the Court issued a revised Scheduling Order on April 29, 2008 that had a document production deadline of June 27, 2008. (D.I. 194.) At CMO's request, the parties later agreed to extend the deadline to produce documents to July 18, 2008. (D.I. 293.)

LG Display has expended substantial resources and effort to respond to the more than 373 overlapping and broad discovery requests from AUO and CMO USA. LG Display has produced thousands of native product design files covering all of its products, over twenty thousand pages of worldwide sales summaries, and over two million pages of other information responsive to CMO USA's and AUO's discovery requests.

Although CMO requested and received discovery concerning all of LG Display's products, including worldwide sales information, broad technical information including specifications and design files, and voluminous discovery regarding business activities and

customer relationships, CMO has failed to provide such discovery in response to LG Display's requests for similar discovery.

LG Display has repeatedly raised these issues with CMO in an attempt to obtain this discovery or an agreement to provide this discovery. CMO, however, has not agreed to produce this discovery. (*See* Del. L.R. 7.1.1 Certification, filed contemporaneously with this Motion.) LG Display therefore seeks an order compelling CMO to complete its document production and provide all of the information essential to LG Display's case.[5]

## ARGUMENT

"In the Third Circuit, 'it is well recognized that the federal rules allow broad and liberal discovery.'" *Corning Inc.*, 223 F.R.D. at 192. "Patent infringement cases are not exceptions to the rule that discovery is liberal and relevancy is broadly construed." *Murata Mfg. Co. v. Bel Fuse, Inc.*, 422 F. Supp. 2d 934, 945 (N.D. Ill. Mar. 14, 2006) (citing *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993)). CMO has failed to provide the following categories of discovery that is critical to LG Display's claims and defenses: 1) technical discovery for all potentially infringing LCD products, including mask and GDS files, TFT substrate design information, and fabrication equipment and plans; 2) worldwide sales summaries for all potentially infringing LCD products; 3) information concerning CMO's activities inside and outside the United States related to indirect infringement and inducement; and 4) CMO shareholder reports, offering circulars, and other stock and shareholder information.

---

[5] LG Display has collected email responsive to Defendants' discovery requests. The parties have differing views, however, on the proper format of email discovery. All of the parties are currently discussing the production of email discovery. LG Display hopes to resolve those issues promptly so that email discovery is completed without the need for judicial intervention.

I.      **LG DISPLAY NEEDS TECHNICAL DISCOVERY FOR ALL POTENTIALLY INFRINGING CMO PRODUCTS**

   A.      **CMO Should Be Compelled To Produce Technical Discovery Concerning All Of Its Products**

CMO has improperly limited its entire production of technical information, including its mask and GDS files. LG Display has produced technical information concerning LG Display's entire spectrum of products that could be sold in the United States. In contrast, CMO has drastically limited the scope of its production. Specifically, CMO is providing technical information only for products that (1) are shipped by CMO directly to the United States and (2) are currently identified as products accused of infringing LG Display's Patents. (*See* Ex. C, General Objection 9.) CMO's refusal to produce this information is improper. Notably, CMO USA has sought and received technical discovery concerning all of LG Display's products. LG Display is entitled to the same scope of discovery from CMO that LG Display has produced to CMO in this case.

   1.      **CMO Has Sought And Received Information Concerning All Of LG Display's Products And Similarly Situated Defendant AUO Has Agreed To Produce Information Concerning All Of Its Products**

Inexplicably, CMO refuses to provide this relevant discovery, forcing LG Display to seek the Court's intervention, even though CMO has requested and received the same discovery from LG Display. In addition, AUO, a similarly situated defendant as CMO, has either produced or agreed to produce this discovery. Thus, CMO stands alone and without any basis in its refusal to produce this relevant discovery.

CMO USA propounded broad discovery requests seeking information concerning all of LG Display's products in its own document requests, and LG Display has produced that information. For example, CMO USA's document requests define "LGD Products" as "*all* LCD

Modules and LCD Panels made, shipped, imported, or sold by or for LGD and/or LGDA since December 1, 2000." (*See* Ex. B, Defn. 7.) CMO USA has served, and LG Display has responded to, more than twenty document requests seeking broad discovery regarding this entire range of LG Display products. (*See* Ex. B, Doc. Reqs. 25, 27, 28, 29, 30, 31, 33, 34, 36, 67, 69, 70, 73, 74, 75, 76, 77, 83, 84, 86, 87, 88, 99.) CMO has also requested and received comprehensive technical information concerning "[LG Display's] products," "each LG Display LCD Panel," and "any LGD TFT Array or TFT Substrate," in its other discovery requests. (*See* Ex. B, Doc. Reqs. 35, 36, 37, 40). LG Display has gone to great efforts to collect and produce discovery concerning all of its products in response to CMO's requests. LG Display has produced thousands of native product design files and more than two million pages of technical and business information. After receiving LG Display's discovery concerning all of LG Display's products, CMO supplemented its interrogatory responses to include additional accused products. After reaping the benefit of LG Display's discovery to identify accused products, CMO must likewise produce its own information to LG Display.

Significantly, AUO, the other defendant in this case, has agreed to produce technical information concerning all of AUO's products and has also requested discovery of all of LG Display's products. Thus LG Display, AUO, and CMO USA have requested information concerning all of the opposing party's products, but only CMO has refused to provide such information. CMO's position is unreasonable and is prejudicing LG Display's ability to complete discovery, commence depositions, and prepare for trial.

### 2. Courts Routinely Compel Discovery On All Potentially Infringing Products In Patent Cases

Through costly and time consuming efforts, LG Display has already identified dozens of CMO products that each infringe one or more of the nine LG Display patents-in-suit. LG

Display is entitled to discovery to assess the full extent of CMO's infringing conduct. LG Display has already established that CMO has products that infringe or are manufactured using a method that infringes each of the LG Display patents-in-suit. LG Display is thus entitled to necessary information to identify all of the additional CMO LCD products that incorporate infringing technology. *See Kellogg v. Nike, Inc.*, No. 8:07cv70, 2007 WL 4570871, *8 (D. Neb. Dec. 26, 2007) (granting discovery on all potentially infringing products because patentee had already identified at least some infringing products).

Numerous courts, therefore, have specifically held that it is proper to seek information concerning "*all* potentially infringing [LCD] products, not just those that have so far been identified." *See, e.g., LG.Philips LCD Co., Ltd. v. Tatung Company*, Nos. Misc. F-07-0009 EFB, S-07-0018 FCD EFB, 2007 WL 869700, * 2 (E.D. Cal. Mar. 21, 2007). This Court has also previously recognized the importance of providing complete technical information for all of a defendant LCD manufacturer's products. *Commissariat A L'Energique Atomique ("CEA") v. Samsung Electronics Co., Ltd. et al.*, No. 03-486 (KAJ), Telephone Conference Transcript at 11, 17 (D. Del. Nov. 7, 2005) (attached as Exhibit D). In that case, counsel for plaintiff CEA explained that "what we want to know is what are the actual specifications and optical properties for *each* of the modules that they have manufactured over the years that are VA modules." *Id*. at 17 (emphasis added). The Honorable Kent A. Jordan agreed and stated that the plaintiff was "entitled to know what the technical specs are in the [products] that are being manufactured by [the defendant], period." *Id*. CMO was one of a number of defendants in that case, and was the

only defendant that initially attempted to claim Judge Jordan's ruling did not require it to provide technical information concerning all of its products.[6]

CMO's refusal to produce technical information concerning all of its LCD products forces LG Display into a "catch-22" situation, because, without this discovery, LG Display will be unable able to identify which of CMO's many LCD products infringe the Patents-in-Suit. CMO is attempting to force LG Display to make critical decisions about infringement and damages based only on the segment of technical documents that CMO has agreed to produce. CMO's position is improper and violates the well established broad and liberal discovery framework established by the Federal Rules of Civil Procedure.

Indeed, the circumstances of this case particularly warrant broad discovery regarding all of CMO's products. LG Display is asserting nine patents that cover fundamental technologies inherent in LCD module design and manufacturing. The LG Display Patents, for example, are directed to 1) the manufacturing of thin-film transistors (TFTs) on the glass substrates that form TFT-LCD panels; 2) the performance characteristics of the TFTs; 3) the use of guard rings to disperse electrostatic charge to protect critical components; 4) the application of sealant when attaching lower and upper substrates; and 5) a single, serial line LCD manufacturing process.

The vast majority of CMO's products potentially infringe the LG Display Patents. CMO's LCD products include TFTs and are made using manufacturing technologies that could practice the inventions in the LG Display Patents. LG Display has already identified dozens of CMO Products that infringe the LG Display Patents, including products in a wide range of sizes and in each of the six product applications CMO that markets (LCD TV Panels, Notebook

---

[6] CMO eventually provided discovery on all of its products, but only after CEA's counsel pressed this issue further and threatened to raise it with the Court. McKenna Long & Aldridge LLP was counsel for CEA in that case.

Panels, Monitor Panels, AV & Mobile Panels, Medical Display Panels, and Special-application

Panels). Further, LG Display believes that the majority of CMO's manufacturing plants (or

"Fabs") use one-drop fill technology and could therefore potentially infringe the LG Display

patent concerning sealant. The products LG Display has already identified as asserting that

patent also cover a wide range of sizes and applications. Given the broad reach of the nine LG

Display Patents covering products in all sizes and applications, discovery concerning all CMO

products is necessary and appropriate.

### B.    CMO Should Be Compelled To Produce Critical Technical Product Design Information Relevant To LG Display's Infringement Claims

#### 1.    CMO Must Produce Specifications Disclosing Critical and Relevant TFT Substrate Design Information

CMO has failed to produce product specific design documents that are essential to LG

Display's infringement claims. Specifically, CMO has not yet produced array or product

specifications for the TFT substrate that disclose, for example, the composition and thickness of

the various layers of the TFT array for each CMO product. (*See* Ex. A, Doc. Reqs. 32-34, 37.)

This information is directly related to LG Display's infringement claims concerning its six

patents related to the manufacturing of TFT arrays and substrates. LG Display first raised this

issue with CMO by letters dated January 3, 2008 and March 6, 2008 in the Texas case. (*See* Del.

L.R. 7.1.1 Certification) Over seven months later, CMO has not remedied this deficiency.

CMO, however, has also asked for and received critical technical product design information

from LG Display. (*See* Ex. B Doc. Reqs. 35-37, 40.) Because this discovery is indisputably

relevant and necessary, CMO should be compelled to produce this discovery.

2.     **CMO Must Provide Discovery Concerning Its Gate Deposition And Etching Processes**

CMO has similarly failed to produce documents responsive to LG Display's discovery requests concerning TFT array substrate manufacturing processes. (*See* Ex. A, Doc. Reqs. 32, 37(b).) Specifically CMO has not yet produced documents that include the manufacturing recipes for CMO's gate deposition process and gate etching process (i.e. documents that describe the manufacturing conditions for those processes). This information is directly related to LG Display's infringement concerning its patents related to the manufacturing of TFT arrays and substrates. CMO has asked for and received similar information from LG Display. (*See* Ex. B Doc. Req. 40(b).)

3.     **CMO Must Provide Complete Discovery Concerning Its Fabrication Equipment And Plants**

CMO has also failed to produce documents responsive to LG Display's discovery requests concerning its fabrication equipment and plants. (*See* Ex. A, Doc. Reqs. 35.) Specifically CMO has not yet produced documents related to Fab IDT. In addition, CMO's production concerning the floor layouts of its Fabs remains incomplete. CMO has produced only one floor layout for each Fab, although the documents indicate that each Fab may have multiple floors.[7] This information is directly related to LG Display's infringement claims as to U.S. Patent Nos. 6,803,984 and 7,218,374 concerning serial production processes, cell assembly, and sealant dispensing. CMO has asked for and received fabrication equipment and plant information from LG Display. (*See* Ex. B Doc. Req. 28.)

---

[7] For example, CMD 572,072 purports to be the floor layout of Fab 4 6F (sixth floor).

## II.    LG DISPLAY NEEDS SALES AND DAMAGES DISCOVERY AND COST AND PROFIT INFORMATION FOR ALL POTENTIALLY INFRINGING CMO PRODUCTS

CMO has also improperly failed to produce relevant information and sales summaries concerning worldwide sales of its LCD products. As with technical information concerning all products, CMO has brazenly refused to produce information and sales summaries concerning worldwide sales despite requesting and receiving the same information from LG Display. (*See* Ex. B, Doc. Reqs. 77; Ex. E, Rog. 19.) AUO has also requested similar worldwide sales summary information from LG Display. Significantly, moreover, as a similarly situated defendant to CMO, AUO has produced extensive worldwide sales information and summaries covering AUO's products in response to LG Display's requests. CMO should be compelled to produce this information.

### A.    CMO's Worldwide Sales Are Relevant And Discoverable

Worldwide sales of a defendant's products are relevant and discoverable in U.S. patent infringement cases. *See, e.g., 3COM Corp. v. D-Link Systems, Inc.*, No. C-03-2177 VRW, 2007 WL 949596 (N.D. Cal. Mar. 27, 2007); *CEA*, No. 03-486 (KAJ), Telephone Conference Transcript at 34-35 (D. Del. Aug. 23, 2005) (attached as Exhibit F). Worldwide sales of CMO's products are particularly relevant in this case for a number of reasons.

First, CMO's worldwide sales are reasonably calculated to lead to the discovery of admissible evidence relating to LG Display's claims of direct infringement against CMO. *See 3COM Corp.*, 2007 WL 949596 at *3. Regardless of the fact that CMO delivers or ships accused products outside the U.S., such sales and shipments could be directly or indirectly intended for the U.S. market and could constitute infringing sales or reflect infringing offers to sell. *See, e.g., Fellowes, Inc. v. Michilin Prosperity Co.*, 491 F. Supp. 2d 571, 577-83 (E.D. Va. 2007)

(rejecting argument that no liability existed because defendant shipped products "Free on Board" outside the U.S.). Such sales may also reveal the extent to which CMO's customers sold accused products into the United States. *See 3COM Corp.*, 2007 WL 949596 at *3.

Second, CMO's worldwide sales are directly relevant and reasonably calculated to lead to the discovery of admissible evidence relating to LG Display's claims of indirect infringement. *Id.*; *Murata Mfg.*, 422 F. Supp. 2d at 944-46. As one court has expressly observed, "the inducement statute, section 271(b), does *not* include the same territorial limitations of the contributory infringement statute." *02 Micro Int'l Ltd. v. Sumida Corp.,* 2006 WL 981987, at *2 (E.D. Tex. April 12, 2006) (emphasis added). Accordingly, even foreign defendants such as CMO may induce infringement, making conduct outside of the United States relevant and discoverable. *Murata Mfg.*, 422 F. Supp. 2d at 944-46.

Third, CMO's worldwide profits and sales are directly relevant and reasonably calculated to lead to the discovery of admissible evidence relating to a reasonable royalty calculation. *See 3COM Corp.*, 2007 WL 949596 at *4.

Fourth, worldwide profits and sales are directly relevant and reasonably calculated to lead to the discovery of admissible evidence relating to commercial success arguments and non-obviousness. *See, e.g., CEA*, No. 03-486 (KAJ), Telephone Conference Transcript at 29-35 (D. Del. Aug. 23, 2005) (attached as Exhibit F) (ordering defendants to produce worldwide sales because such sales are relevant to the issue of commercial success); *3COM Corp.*, 2007 WL 949596 at *3; *Minnesota Min. and Mfg. Co. v. Smith and Nephew, PLC*, No. 3-91 CIV 274, 1992 WL 464352, *2 (D. Minn. July 27, 1992) (reversing magistrate's ruling and finding that foreign sales are directly relevant to the issue of commercial success and thus discoverable"); *see also Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1461

(Fed. Cir. 1984) (finding that the lower court improperly failed to consider worldwide sales before reaching a conclusion as to obviousness).

### B.    CMO's Worldwide Product Sales Information Should Be Provided In Summary Form

LG Display, CMO USA, and AUO have all requested worldwide sales information in summary form, with detailed information (e.g., date, product, quantity, customer, brand, destination, etc.). (See Ex. A, Doc. Req. 4, 6, 7, 8, 11.) Only CMO has refused to provide such summaries in this case. CMO is able to produce sales summaries, but will not agree to do so.

Courts in patent infringement cases have found the production of worldwide sales summaries in lieu of all sales related documents to be a reasonable and appropriate discovery request. *Minnesota Min. and Mfg. Co.*, 1992 WL 464352, *2. Indeed, CMO has produced extensive sales summaries in other litigations. For example, in the *CEA* case, CMO produced sales summaries that included model numbers, customers, bill to country, month and year, quantity, currency, USD amount, ship to country, bill to address, and tracking number. In that case, CMO also produced cost and profit information organized by product and time period.

CMO cannot reasonably dispute the relevance of detailed worldwide sales summaries. CMO USA requested such detailed sales summaries from LG Display, and LG Display has produced thousands pages of sales summaries for both U.S. and worldwide sales transactions. Similarly, AUO has also produced extensive worldwide sales summaries by both products and customer. LG Display requests that the Court compel CMO to provide its own detailed sales summaries showing all sales and including customer name, sales date, ship to, bill to, item, quantity, currency, USD amount, OEM maker, brand, and final destination for all CMO products sold worldwide and to the United States since December 1, 2000, as LG Display has provided to CMO. (*See* Ex. G.)

**C.    CMO Should Provide Discovery Concerning Manufacturing Costs And Yields That Are Relevant To LG Display's Damages**

CMO has also failed to produce documents concerning LG Display's request for manufacturing costs and yields for CMO products and fabrication plants. (*See* Ex. A Doc. Req. 71.) LG Display's '002 Patent enables LCD manufacturers to increase product yield dramatically, resulting in huge cost savings. CMO's production yields and manufacturing costs are directly related to the reasonable royalty calculation for any infringement of the '002 Patent by CMO. CMO also has asked for and received manufacturing cost and yield information for LG Display products and fabrication plants from LG Display. (*See* Ex. B Doc. Req. 77.) Therefore, CMO should be compelled to produce complete manufacturing costs and yield information for all products and manufacturing facilities.

**III.    CMO HAS FAILED TO PRODUCE INFORMATION THAT IS CRITICAL TO LG DISPLAY'S ABILITY TO LITIGATE ITS CLAIMS OF INDUCEMENT**

LG Display alleges that CMO is liable for both its own infringement, as well as for inducing others to infringe. LG Display has requested documents from CMO that are directly relevant to LG Display's indirect infringement claims. (*See, e.g.* Ex. A at Doc. Reqs. 11-31, 74.) CMO, however, has failed to produce such discovery and also improperly objects to any discovery that relates to conduct outside of the United States. For example, CMO has improperly limited LG Display's definition of the term "CMO Customer" in document requests to only those customers who received products shipped directly to the United States. (*See* Ex. C, Gen. Obj. 10.) Inducement liability, however, can arise even from acts *outside the United States*, including making and selling infringing products in a foreign country. *See Wing Shing Prods. (BVI), Ltd. v. Simatelex Manufactory Co.*, 479 F. Supp. 2d 388, 410-11 (S.D.N.Y. 2007).

Indeed, a triable issue of fact on inducement existed when Sharp offered evidence that AUO intended to induce their customers located outside the U.S. to sell infringing products within the U.S. *See Sharp Corp. v. AU Optronics Corp.*, 2005 WL 1457747, *1 (N.D. Cal. June 20, 2005). "Specifically, plaintiff has offered evidence that defendants, with knowledge of plaintiff's patents, marketed their allegedly infringing component products to U.S. companies interested in purchasing finished products incorporating such components, and that defendants sold such allegedly infringing component products to non-U.S. companies, knowing those non-U.S. customers intended to incorporate defendants' component products into the finished products those non-U.S. companies sell directly to the above-referenced U.S. companies." *Id.*

Thus, CMO's self-imposed limitation of discovery related to activity outside the United States blocks relevant discovery concerning LG Display's indirect infringement claims and ignores CMO's well-established distribution channels that CMO uses to exploit the enormous U.S. market for LCD products. Indeed, CMO engaged in a similar ploy when contesting personal jurisdiction in this case, despite evidence that "CMO's modules are sold to original equipment manufacturers ("OEMs") such as Samsung, Dell, IBM, Hewlett-Packard, NEC-Mitsubishi, and Viewsonic, and incorporated into computer monitors which are then sold to consumers by numerous retailers, including Best Buy, CompUSA, Circuit City, Wal-Mart, Sears, Staples, and OfficeMax both on-line over the internet, and at chain retail stores throughout the United States, including Delaware." *LG.Philips LCD Co. v. Chi Mei Optoelectronics Corp.*, 551 F. Supp. 2d 333, 336 (D. Del. 2008). (D.I. 192 at 4 (citations omitted).) As this Court concluded in denying CMO's motion to dismiss, "CMO clearly acted in consort with Dell Corporation and OEMs to consistently place products containing its allegedly infringing LCD modules into a national distribution network[.]" *Id.* at 339. CMO has targeted and exploited the U.S. market for

infringing products, and CMO should be compelled to provide full discovery concerning the conduct and communications related to that exploitation.

Under 35 U.S.C. § 271, CMO is liable as an infringer if it induces, or, in other words aids, abets or encourages, direct infringement by a third party. *See E.I. DuPont De Nemours and Co. v. Monsanto Co.*, 903 F. Supp. 680, 736 (D. Del. 1995). CMO is therefore liable for any infringing products that CMO encouraged or otherwise induced to be imported, offered for sale, sold or used in or into the United States. CMO regularly induces customers and distributors in the United States to purchase and resell infringing products throughout the United States. Additionally, through its offshore activities, CMO induces foreign and domestic entities, including CMO USA, to introduce CMO's infringing products into the United States.

Indeed, another district court recently found circumstantial evidence that CMO induces the importation of LCD products into the United States. *Semiconductor Energy Laboratory Co. v. Chi Mei Optoelectronics Corp.*, Ltd., 531 F. Supp. 2d 1084, 1112 (N.D. Cal. 2007). That court found such evidence sufficient to create a material issue of fact for trial concerning CMO's liability for indirect infringement under § 271(b). *Id.* In this case, this Court has likewise concluded that CMO "clearly acted in consort with Dell Corporation and OEMs to consistently place products containing allegedly infringing LCD modules into a national distribution network" and that "CMO has successfully targeted the United States market for distribution of its LCD products." *LG.Philips LCD Co.*, 551 F. Supp. 2d at 339-40.

LG Display is entitled to discovery concerning all of CMO's activities and communications relevant to inducement. Conduct that is relevant to inducement includes, for example, selling or supplying infringing products for resale, communications and presentations to promote the infringing products and knowledge that customers will import and sell products in

the U.S., having authorized return and repair centers in the U.S. for CMO panels, providing

technical support in the U.S., shipping products to U.S. customers to fix technical problems, on-

site technical presentations in the U.S., adjustments in manufacturing process based on customer

concerns, coordinating shipping to and for the U.S. market, and making products in accordance

with U.S. laws and regulations. *See generally Semiconductor Energy Laboratory Co.*, 531 F.

Supp. 2d at 1113-14; *Wing Shing Prods.*, 479 F. Supp. 2d at 409-11; *MEMC Electronic*

*Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378-80 (Fed. Cir. 2005);

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1351 (Fed.

Cir. 2001); *02 Micro,* 2006 WL 981987, at *2.

  LG Display has requested and needs discovery concerning such conduct on the part of

CMO that is relevant to LG Display's inducement claims.[8]  (*See* Ex. A at Doc. Reqs. 11-31, 74.)

As discussed above, this discovery will enable LG Display to assess the damages caused by

CMO's infringing activities and the nature of CMO's indirect infringement.  CMO should be

compelled to produce this discovery promptly, so that LG Display can assess the full extent to

which CMO encourages, assists, or otherwise induces others to import, sell, and offer infringing

products.

## IV. CMO SHOULD BE COMPELLED TO PROVIDE SHAREHOLDER REPORTS, DOCUMENTS REGARDING LG DISPLAY, AND RELATED DISCOVERY

  LG Display has requested other relevant discovery that CMO has also failed to produce,

while LG Display has produced the same types of discovery in response to CMO USA's

---

[8] LG Display seeks, for example, documents relating to trips by CMO employees or representatives to the U.S.; documents submitted or received by CMO to any U.S. government agency or authority; documents concerning the service or repair of CMO products in the U.S.; CMO's marketing documents, communications with customers, presentations to customers, and offers to sell; the identities of CMO customers; distribution chain information; steps taken to comply with U.S. regulations; and other relevant discovery.

identical discovery requests.  For example, LG Display served CMO with requests seeking

reports to shareholders, shareholder agreements, offering circulars, and other stock related

documents, but CMO has failed to produce documents responsive to those requests.  (Ex. A,

Doc. Reqs. 81-82.)  CMO has provided no explanation for why it has failed to produce such

documents.  Once again, CMO has served identical requests on LG Display, and LG Display has

provided responsive documents, yet CMO refuses to provide the same information requested by

LG Display.  (Ex. B, Doc. Reqs. 102-03.)

## V.      CMO PRODUCED INFORMATION IN FILES THAT CANNOT BE READILY OPENED, VIEWED OR PROCESSED

CMO has produced a number of files that are corrupt or cannot be opened, viewed or

processed.[9]  These issues have rendered much of CMO's production unworkable and unusable in

contravention of Federal Rule of Civil Procedure 34(a)(1)(A).

In addition to the substantive deficiencies in CMO's production, the form of a significant

portion of CMO's production has rendered that production useless.  Some of the files are

corrupted, others cannot be opened, and still others cannot be processed without non-standard

software or hardware.  LG Display has requested that CMO re-produce these files in a

reasonably usable form or provide instructions on how to run those files, but CMO has either

refused or delayed responding despite its responsibilities under Federal Rule of Civil Procedure

34(a)(1)(A).  *See, e.g., Oklahoma v. Tyson Foods, Inc.*, 2007 WL 3128422, at *4 (N.D. Okla.

Oct. 24, 2007) (ordering plaintiff to produce electronically stored information in a reasonably

---

[9] Despite two letters to CMO detailing this issue dated July 28 and August 4, 2008 CMO has thus far refused to provide useable files and suggests that it is still investigating the issue.  If CMO ultimately agrees to produce replacement files, LG Display will withdraw this portion of the motion.

usable format and provide technical support that would allow the defendants to ascertain the specific information produced).

For example, CMO altered JavaScript files that it produced, changing the original filenames to filenames that include a bates number and confidentiality designation. This destroyed the ability for those documents to be opened in an appropriate program, however, because the program is searching for files with the original filenames, not the revised filenames. CMO further failed to provide any instruction files on how to properly run the appropriate program.

CMO also produced files that require a Macintosh operating system or Apple computer to open. Additional files produced by CMO require other non-standard software that CMO has not provided. CMO's production also included several excel files that are corrupted, cannot be opened properly, or crash the computer when opened.

LG Display requests that the Court compel CMO, consistent with the Fed. R. Civ. P. 34(a)(1)(A), to provide these unusable files in a usable form.[10]

## CONCLUSION

For the foregoing reasons, LG Display requests that the Court grant LG Display's motion to compel CMO to produce the aforementioned discovery, which is all directly relevant to LG Display's claims in this case.

---

[10] LG Display also has an ongoing dispute with CMO regarding CMO producing a large amount of its production in native format in violation of an agreement reached by the parties concerning production format. Production in native format results in the individual documents not having any bates numbering or confidentiality designation when printed, which is of serious concern to LG Display. The parties are still conferring regarding this issue and LG Display hopes to reach an agreement on this issue with CMO.

August 12, 2008

BAYARD P.A.

/s/ Stephen B. Brauerman (sb4952)
Richard D. Kirk (rk0922)
Ashley B. Stitzer (as3891)
Stephen B. Brauerman (sb4952)
222 Delaware Avenue, 9th Floor
P.O. Box 25130
Wilmington, DE 19899-5130
(302) 655-5000
rkirk@bayardfirm.com
*Attorneys for Plaintiffs LG Display Co., Ltd. and
LG Display America, Inc.*

OF COUNSEL:

Gaspare J. Bono
R. Tyler Goodwyn, IV
Lora A. Brzezynski
Cass W. Christenson
John W. Lomas, Jr.
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 496-7500

EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LG DISPLAY CO., LTD., | |
| Plaintiff, | |
| v. | Civil Action No. 06-726 (JJF) |
| | Civil Action No. 07-357 (JJF) |
| CHI MEI OPTOELECTRONICS CORPORATION, et al. | **CONSOLIDATED CASES** |
| Defendants. | |

**PLAINTIFF LG DISPLAY CO., LTD.'S FIRST SET OF REQUESTS**
**FOR THE PRODUCTION OF DOCUMENTS AND THINGS TO**
**DEFENDANT CHI MEI OPTOELECTRONICS CORPORATION**

Plaintiff LG Display Co., Ltd. ("LG Display"), by and through its counsel and pursuant to

Federal Rule of Civil Procedure 34, hereby requests Defendant Chi Mei Optoelectronics

Corporation ("CMO") copy and produce at LG Display's counsel's office at 1900 K Street,

N.W., Washington, D.C. 20006, all the documents and tangible things within its possession,

custody and control that are responsive to the following Document Requests within thirty (30)

days.

**DEFINITIONS**

For purposes of these Document Requests, CMO should use the following definitions for

the terms used herein. All Document Requests and corresponding definitions of terms are for

purposes of discovery only, and not to be construed as limiting or reflecting LG Display's

position in this case regarding claim construction or any other issue. LG Display specifically

reserves the right to use different terms, or to assert different meanings, for all purposes in this

case (including, for example, with respect to claim construction, infringement analysis, and

validity analysis).

A.    "LG Display" means LG Display Co., Ltd., formerly known as LG.Philips LCD Co., Ltd., and all persons or entities acting on its behalf.

B.    "LGDA" means LG Display America, Inc., formerly known as LG.Philips LCD America, Inc., and all persons or entities acting or purporting to act on its behalf.

C.    "CMO," "you," and "your" means Chi Mei Optoelectronics Corporation, and all persons or entities acting or purporting to act on Chi Mei Optoelectronics Corporation's behalf, and any Affiliates (as that term is defined herein) of Chi Mei Optoelectronics Corporation (including, for example, Chi Mei Optoelectronics USA, Inc.).

D.    "CMO USA" means Chi Mei Optoelectronics USA, Inc., and all persons or entities acting or purporting to act on Chi Mei Optoelectronics USA, Inc.'s behalf, and any Affiliates (as that term is defined herein) of Chi Mei Optoelectronics USA, Inc.

E.    "Affiliate(s)" means any partnerships, parents, subsidiaries, and divisions, and any corporation or other entity that controls, is controlled by, or is under common control with the identified corporation or entity.

F.    "CMO Products" means all LCD modules and LCD panels made, shipped, imported, or sold by or for CMO and/or CMO USA since December 1, 2000.

G.    "LCD display product" means any device that contains an LCD module. An LCD computer monitor, LCD television, laptop computer, and any telephone or other portable or handheld product incorporating an LCD module are examples of LCD display products. This includes all such devices, regardless of brand name.

H.    "LCD module" means an LCD display component that includes, inter alia, an LCD panel, a backlight unit, and driver ICs.

I.      "LCD panel" means an LCD display component that includes a TFT array and color filter with liquid crystal material between them.

J.      "TFT substrate" means the substrate that contains one or more TFT arrays.

K.      "TFT array" means a thin-film-transistor array, electrodes, wiring, and pads used to drive and control the liquid crystal material in an LCD display.

L.      "Color Filter substrate" means the substrate that contains one or more color filters used in an LCD panel.

M.      "Brand" means any brand name or company whose name, mark, or logo appears on LCD display products, including, for example, Dell, Hewlett-Packard, Apple, and ViewSonic.

N.      "CMO Customer" means any person (including any brand that sells LCD display products) that has, directly or through an intermediary, ordered, received, purchased, approved, imported, and/or used any CMO Products, including LCD display products that contain CMO Products.

O.      "Communication" means, without limitation, every manner or means of statement, utterance, notation, disclaimer, transfer, or exchange of information between two or more persons of any nature whatsoever, by or to whomever, whether oral or written or whether face-to-face, by telephone, email, mail, personal delivery, or otherwise, including but not limited to, letters, correspondence, conversations, memoranda, dialogue, discussions, meetings, interviews, consultations, agreements, and other understandings.

P.      The connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these document requests all information that might otherwise be construed to be outside of their scope.

3

Q.    "Concern" and "concerning" are used in their broadest sense and embrace all matter relating to, referring to, describing, discussing, evidencing, or constituting the referenced subject.

R.    "Document" means all types of documents, electronically stored information, and things embraced within Federal Rules of Civil Procedure 34 and includes, without limitation, any writing and each original, or a copy in the absence of the original, and every copy bearing notes or markings not present on the original or copy, of the following items, however produced or reproduced, namely: books, accounting records of any nature whatsoever, agreements, communications, correspondence, facsimiles, telegrams, cable, telexes, memoranda, recordings, studies, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, diaries, letters, forecasts, statistical statements, graphs, laboratory or engineering reports and records, notebooks, charts, plans, sketches, drawings, video tapes, films, slides, photographs, information bearing photographic products of any nature whatsoever, photo-records, microfilms, tape recordings, minutes or records of meetings or conferences, expressions or statements of policy, lists of persons attending meetings or conferences, reports or summaries of interviews, reports or summaries of investigations, opinions or reports of consultants, patent studies, opinions of counsel, records, reports, summaries of negotiations, sales literature of any nature whatsoever, brochures, catalogues, catalogue sheets, pamphlets, periodicals, advertisements, circulars or trade letters, press releases, trade releases, publicity releases, new product releases, reprints, drafts of any documents, working papers, indices, original or preliminary notes, sound recordings, computer printouts, floppy disks, hard drives, CD-ROM's, magnetic tapes and any other data, database, server, or data compilations from which information can be obtained either directly, or, if necessary translated by you through detection devices into a

4

reasonably usable form. The term document also refers to any tangible object other than a document as described above, and includes objects of every kind and nature such as, but not limited to, products, prototypes, models, and specimens.

S.    "Any" means each and every.

T.    "Used" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

U.    "Make" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

V.    "Offer to sell" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

W.    "Sell" or "sale" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

X.    "Person" means any natural person, firm, association, partnership, corporation, joint venture, or other form of legal entity.

Y.    The "'002 Patent" refers to United States Patent No. 5,019,002.

Z.    The "'449 Patent" refers to United States Patent No. 5,825,449.

AA.    The "'737 Patent" refers to United States Patent No. 4,624,737.

BB.    The "'274 Patent" refers to United States Patent No. 5,905,274.

CC.    The "'321 Patent" refers to United States Patent No. 6,815,321.

DD.    The "'489 Patent" refers to United States Patent No. 7,176,489.

EE.    The "'569 Patent" refers to United States Patent No. 6,664,569.

FF.    The "'984 Patent" refers to United States Patent No. 6,803,984.

GG.    The "'374 Patent" refers to United States Patent No. 7,218,374.

HH.    The "'781 Patent" refers to United States Patent No. 6,976,781.

II.    The "'266 Patent" refers to United States Patent No. 5,748,266.

JJ.  The "'160 Patent" refers to United States Patent No. 6,778,160.

KK.  The "'629 Patent" refers to United States Patent No. 6,689,629.

LL.  The "'944 Patent" refers to United States Patent No. 6,734,944.

MM.  The "'157 Patent" refers to United States Patent No. 7,125,157.

NN.  The "'506 Patent" refers to United States Patent No. 7,090,506.

OO.  The "'069 Patent" refers to United States Patent No. 7,101,069.

PP.  The "'923 Patent" refers to United States Patent No. 6,013,923.

QQ.  The "'352 Patent" refers to United States Patent No. 5,619,352.

RR.  The "'926 Patent" refers to United States Patent No. 6,734,926.

SS.  The "'786 Patent" refers to United States Patent No. 6,008,786.

TT.  The "'179 Patent" refers to United States Patent No. 7,280,179.

UU.  The "'092 Patent" refers to United States Patent No. 6,134,092.

VV.  The "Patents-in-Suit" refers to the '002 Patent, the '449 Patent, the '737 Patent, the '274 Patent, the '321 Patent, the '489 Patent, the '569 Patent, the '984 Patent, the '374 Patent, the '781 Patent, the '266 Patent, the '160 Patent, the '629 Patent, the '944 Patent, the '157 Patent, the '506 Patent, the '069 Patent, the '923 Patent, the '352 Patent, the '926 Patent, the '786 Patent, the '179 Patent, and the '092 Patent.

WW.  The "CMO Patents" means the '926 Patent, the '923 Patent, the '786 Patent, the '352 Patent, the '179 Patent, and the '092 Patent.

XX.  "Foreign Counterparts of the CMO Patents" means any patent applications filed anywhere in the world that claim priority in whole or in part to the CMO Patents.

6

YY.  "LG Display Patents" means the '002 Patent, the '449 Patent, the '737 Patent, the '274 Patent, the '321 Patent, the '489 Patent, the '569 Patent, the '984 Patent, and the '374 Patent.

ZZ.  "Part Number" means the name(s) and alpha-numeric identifier(s) by which a part or product, for example an LCD display, LCD module, LCD panel, or components thereof, in general, are bought, sold, or identified (including, for example, internally by CMO or for sales and marketing purposes), and/or by CMO Customers).

AAA.  "Specification" means all documents or things that discuss, illustrate, define, or reflect, in whole or in part, any aspect of how something is, can, or should be made, inspected, or tested.  Specifications include, for example, textual documents, drawings, mask files, product specifications, TFT array specifications, TFT substrate specifications, manufacturing process specifications, color filter substrate specifications, panel or cell specifications, material specifications, assembly specifications, blueprints, and/or illustrations.

BBB.  "Manufacturing process specifications" means documents that describe the steps and/or process conditions for forming each layer on a color filter or TFT substrate.

CCC.  "TFT array specifications" means documents that describe a TFT array design such as layout, material composition of layers, and/or properties of array components.

DDD.  The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

For the purposes of the document requests, the following instructions will apply:

1.  CMO shall produce all attachments to e-mails immediately behind the e-mail to which such documents were attached so that the complete contents of each e-mail are together in CMO's production.

2.    If CMO believes that any Document Request contained in this set of discovery requests is unclear, unintelligible or because of its wording otherwise prohibits or prevents CMO from responding to that discovery request, LG Display requests that CMO request immediate clarification of that discovery request from LG Display.

3.    CMO is advised that these discovery requests are continuing and require further and supplemental responses by CMO, in accordance with Rule 26(e) of the Federal Rules of Civil Procedure.

4.    In producing the documents described below, CMO should furnish all documents within your possession, custody or control, including information that you have the ability and right to obtain or access through or from Affiliates, suppliers, or others.

5.    In response to the following set of Document Requests, as to each document withheld in whole or in part from production on the basis of a claim of privilege or immunity, CMO shall state the following outlined information.  CMO is requested to submit this information on the date and at the time of production of documents and things responsive to these Document Requests.

a.    identification of the document being withheld, including separately each copy or draft;

b.    the nature of and basis for the privilege or immunity asserted;

c.    the kind of document (e.g., letter, memorandum, facsimile, etc.);

d.    the date it bears, if any, as well as the date it was prepared, if different;

e.    whether the document was sent, and if so, the date it was sent;

f.      the name, address, and title of its author, its addressee, each person to whom a copy has been sent or who received a copy, and each person known to have read the document; and

g.      a description of the subject matter and contents of the document.

6.      Whenever available, documents shall be produced in native format on a CD, DVD or removable hard drive with the original file names kept in tact, regardless of their language. CMO shall include in the file name a production number by which the file may be later referenced.

## DOCUMENTS REQUESTS

Document Request No. 1

All documents that you relied upon and/or identified in responding to LG Display's First Set of Interrogatories.

Document Request No. 2

All organizational charts and other documents that reflect CMO's entire organizational structure, including the structure of your Intellectual Property department or division, including lines of reporting and all positions, offices, divisions, units, departments, teams, and employees within CMO, and their corresponding titles, functions, and responsibilities.

Document Request No. 3

All documents reflecting the relationship between CMO and CMO USA, currently and historically, including, but not limited to, concerning the extent to which CMO and CMO USA jointly or separately make decisions; appoint or control employees, officers, and directors; own or control shares of stock in each other; and/or report or control sales and revenue.

Document Request No. 4

All documents concerning and summarizing transactions between CMO and CMO USA, including all information concerning sales, shipments, and imports of CMO Products by or to CMO USA.

Document Request No. 5

All documents concerning employees, officers, agents, subsidiaries, or representatives acting on behalf of CMO and/or CMO USA in the U.S.

Document Request No. 6

All documents, including, but not limited to, summaries, reports, communications, price quotations, and negotiations, concerning or reflecting offers to sell and/or supply CMO Products, and all date, customer, Brand, product, model, quantity, price, order, payment, and/or shipment information regarding such offers to sell.

Document Request No. 7

All documents, including, but not limited to, summaries, reports, communications, price quotations, negotiations, purchase orders, bills of sale, bills of lading and invoices concerning or reflecting sales, shipments forecasts and/or projections related to CMO Products, both worldwide and in the U.S. since December 1, 2000, and all date, customer, Brand, product, model, quantity, price, order, payment, and/or delivery information regarding such sales and shipments on an annual and monthly basis.

Document Request No. 8

All documents, in native format, summarizing and reflecting sales, shipments, price per unit, gross profit per unit, net profit per unit, fixed cost per unit, and variable cost per unit of CMO Products, for each LCD panel and LCD module made and sold by or for you since

December 1, 2000, including identifying from whom each product was shipped and to whom each product was shipped.

Document Request No. 9

All documents concerning the actual or potential sale, marketing, advertising, distribution, shipment, or delivery of CMO Products and/or LCD display products in, to, or for the United States, including all documents concerning any meetings or presentations in the U.S. attended by CMO and/or CMO USA.

Document Request No. 10

All documents and communications concerning the use, making, importation, sale, and offer to sell, in or to the U.S. since December 1, 2000 of LCD modules or LCD panels made or sold by or for you, or LCD display products that include LCD modules or LCD panels made by you, including any documents that identify each person that imported, received, purchased, distributed, sold or offered for sale in or to the U.S. each LCD display product, LCD module, and LCD panel, and the quantity, price, Brand, and Part Number of each LCD display product, LCD module, and LCD panel imported, received, purchased, distributed, and sold each month since December 1, 2000.

Document Request No. 11

All documents, in native format if available, summarizing transactions since December 1, 2000 with any CMO Customer, distributor, reseller, and retailer that either does business in part or has an Affiliate that does business in part in the U.S. concerning CMO Products and/or LCD display products that may contain CMO Products, including, but not limited to, all offers to sell, sales, orders, shipments, and imports.

Document Request No. 12

All documents, in native format if available, that identify each LCD display product that has used or incorporated any CMO Products, including which CMO Product Brands, models and Part Numbers have been used or incorporated in which LCD display product Brands, models and Part Numbers since December 1, 2000 and in what quantities.

Document Request No. 13

Documents sufficient to show for each CMO Customer each product, identified by model and Part Number, that you have made, sold, offered for sale, shipped, or supplied to or for that customer since December 1, 2000.

Document Request No. 14

All contracts and agreements between CMO and CMO Customers (including Brands and any original equipment manufacturers or systems integrators that use CMO Products such as AOC, Foxconn, TPV, Jean, Lite-On, and BenQ) concerning CMO products and/or LCD display products (such as, but not limited to Letters of Agreement, Long Term Agreements, Master Purchase Agreements, Product Purchase Agreements, Memoranda of Understanding, Base Agreements, Evaluation and Testing Schedules, Statements of Work, Supplier Agreements, Supplier Quality Agreements, Product Return Schedules, Adoption Agreements, Plan of Record Risks Agreements, Indemnification Agreements, Joint Marketing Agreements, and Goods Agreements).

Document Request No. 15

All documents concerning communications, and other documents exchanged, between or among CMO and CMO Customers (including any Brands and any original equipment manufacturers or systems integrators that use CMO Products) or potential CMO customers

regarding the design, manufacture, testing, use, sale, marketing, supply, distribution, shipping,

and/or importation of CMO Products, or products containing CMO Products, including, but not

limited to proposals, quotes, instructions, specifications, and reports (such as Road Maps,

Business/Biz Alignment presentations, Materials Restricted for Use documents, Product

Codenames, Overviews, Quarterly Updates, Market Updates, Forecasts, Feasibility Studies,

Product Strategies, Quarterly Business Reviews, LCD Market Reports, Performance Updates,

Meeting Agendas, Service Proposals, Product Proposals, Pricing Mechanism Proposals, Sales

Kits, Product or Business Meeting Agendas, Company Profiles, and Action Plans).

Document Request No. 16

All documents concerning strategic alliances and joint ventures including, but not limited

to agreements and related communications between CMO and NEC, TPV, IBM and/or Fujitsu.

Document Request No. 17

All reports, forecasts, projections, plans, estimates, revenues, and data compilations, in

native format if available, created, generated, received or maintained, including the computer

databases or document management systems in which such documents are located, concerning

the revenues, profitability, manufacturing, marketing, advertising, importation, distribution,

purchase and sales of LCD display products, LCD modules or LCD panels made, sold, or offered

for sale, by or for you, on a monthly basis since December 1, 2000.

Document Request No. 18

All documents exchanged between CMO and any of the following concerning CMO

Products, including all accused products and products that could be considered similar to accused

products:

    a.     Apple Computer, Inc., including its affiliates and subsidiaries;

    b.     TPV Technologies Limited Ltd., including its affiliates and subsidiaries;

    c.     Proview International, including its affiliates and subsidiaries;

    d.     Hewlett-Packard, including its affiliates and subsidiaries;

    e.     Westinghouse, including its affiliates and subsidiaries;

    f.     Dell, including its affiliates and subsidiaries;

    g.     Funai Electric Co., Ltd., including its affiliates and subsidiaries (such as Funai Corporation);

    h.     NEC, including its affiliates and subsidiaries;

    i.     Samsung, including its affiliates and subsidiaries.

Document Request No. 19

All documents exchanged between CMO and any of the following concerning the United States, including, for example, with respect to U.S. market trends or consumer preferences, CMO Products that could be used or sold in the U.S., and/or CMO employees, meetings, offices, or presentations in or regarding the U.S:

    a.     Apple Computer, Inc., including its affiliates and subsidiaries;

    b.     TPV Technologies Limited Ltd., including its affiliates and subsidiaries;

    c.     Proview International, including its affiliates and subsidiaries;

    d.     Hewlett-Packard, including its affiliates and subsidiaries;

    e.     Westinghouse, including its affiliates and subsidiaries;

    f.     Dell, including its affiliates and subsidiaries;

    g.     NEC, including its affiliates and subsidiaries;

    h.     Funai Electric Co., Ltd., including its affiliates and subsidiaries (such as Funai Corporation);

i.    Samsung, including its affiliates and subsidiaries.

Document Request No. 20

All documents concerning any meeting, strategy, presentation, communication, plan, or efforts by or involving CMO to sell, supply, import, advertise, market, promote, or distribute LCD modules and LCD panels to CMO Customers, potential customers, and/or any Brand or company that sells LCD display products.

Document Request No. 21

All documents regarding any marketing and advertising of CMO Products, including but not limited to, budgets, advertisements, meeting agendas, presentations (such as the "CMO Competence" presentation), meeting notes, marketing plans and reports, Sales Kits, Joint Marketing Agreements, Product and/or Technology Road Maps, attendance at trade shows worldwide, trademarks applied for or registered for, travel approval forms for travel worldwide, and communications.

Document Request No. 22

All documents exchanged between CMO and DisplaySearch or any other market research publisher concerning LCD modules, LCD panels, CMO Products, or CMO Customers, including, but not limited to, financial information.

Document Request No. 23

All documents generated or relied upon by CMO since December 1, 2000 that reference information or data from DisplaySearch or any other market research publisher.

Document Request No. 24

All documents concerning the U.S. and/or North American market for CMO products and LCD display products.

Document Request No. 25

All documents concerning the marketing and/or sale of LCD display products in or for the U.S. and/or North American market, including, for example, communications with Brands, CMO Customers, or potential customers that sell in the U.S. any LCD display products that contain CMO Products.

Document Request No. 26

All documents concerning any trips to the United States by any CMO employee regarding CMO products.

Document Request No. 27

All documents concerning any trips by any CMO or CMO USA employee to any CMO customer, potential CMO customer, or Brand that does business in part in the U.S. or is an Affiliate of an entity that does business in the U.S., including but not limited to any Dell or Hewlett Packard locations outside the U.S.

Document Request No. 28

Documents sufficient to identify each person who imported and/or sold in the U.S. any CMO Products since December 1, 2000.

Document Request No. 29

All documents concerning any laws, regulations, or requirements in the U.S. that apply to CMO Products or LCD display products, including, but not limited to, documents evidencing compliance with any such U.S. laws, regulations, and requirements (for example, UL and EPA requirements).

Document Request No. 30

All documents that you submitted, filed with, and received since December 1, 2000, from any U.S. (federal, state or local) government agency or authority concerning the importation and/or sale of CMO Products, and any requirements or approvals for such sales and imports.

Document Request No. 31

All documents concerning the service, and/or repair in the U.S. of CMO Products and/or LCD display products that contain CMO Products, including, for example, documents identifying or concerning companies that have provided, or are authorized to provide, warranty or other repair service to CMO Products in the U.S. (such as, but not limited to Teleplan, Peripheral Computer Support and Jabil Circuit) and all contracts, agreements and communications with such companies (such as, but not limited to, Statements of Work, Repair Service Programs, Prospective Global Service Questionnaires, Spare Parts Purchase Orders, and Repair Memos for Repair Centers).

Document Request No. 32

All documents concerning the manufacture of any CMO TFT array or TFT substrate including, but not limited to, TFT array Specifications that describe or disclose the material composition of each layer of each substrate; process Specifications that describe or disclose the steps for forming (e.g., cleaning, depositing, coating, etching, and/or stripping) each layer of each substrate, and mask files (i.e., electronic files such as GDS-II) that describe or disclose the layer patterns of each substrate.

Document Request No. 33

All documents concerning the design and/or analysis of the structure of any thin-film transistor on any CMO TFT substrate including, but not limited to, documents that describe or

disclose the cross section structure of a TFT, and documents that describe or disclose  testing, analysis, or evaluation, including performance, produceability, operation, yield, reliability, fault, or quality control, of CMO Products including components or structures of TFT arrays and LCD panels.

Document Request No. 34

All documents concerning any CMO cell assembly process including, but not limited to, product Specifications and CAD files that describe or disclose patterns (e.g., seal printing or seal dispensing, liquid crystal filling, Au or Ag dispensing, UV light masking, and/or glass cutting) on the CMO TFT substrate and/or the CMO Color Filter Substrate; process Specifications that describe or disclose the steps for assembling (e.g., cleaning, printing, filling, dispensing, attaching, exposing to UV light, baking, cutting, beveling, and/or bubble removal) an CMO LCD panel; and material Specifications that describe or disclose the sealant material (e.g., by designated product name, supplier, and/or composition) for each CMO LCD panel.

Document Request No. 35

All documents concerning any CMO cell assembly material flow and fabrication equipment, including, but not limited to, fabrication equipment floor layouts for all cell assembly production lines; Specifications that describe or disclose a cell production line as serial, single or other similar designation; and documents that describe or disclose the process flow, control, relative timing, and/or operation of the seal dispensing, liquid crystal dispensing, cleaning, and/or assembly equipment in each cell assembly production line.

Document Request No. 36

Representative samples of each distinct type of CMO's LCD modules and LCD panels.

Document Request No. 37

All documents concerning the designs, structures, procedures, process conditions, equipment used, materials, functions, analysis, operation, absence, use, and/or purpose of the following with respect to your products and manufacturing:

a.  Electrostatic Discharge Protection, including:

    i.   structures or components on a TFT substrate or LCD Panel;

    ii.  manufacturing process steps that relate to electrostatic charge or discharge; and

    iii. equipment, environmental conditions or procedures that relate to reducing electrostatic charge, discharge, or dispersal of discharge; and

    iv.  testing, analysis, or evaluation (including performance, produceability, yield, reliability, fault, or quality control) of structures, equipment, conditions or procedures related to electrostatic charge, discharger or dispersal of discharge;

b.  TFT substrate and Color Filter design and manufacture, including:

    i.   procedures, process conditions and materials used for the deposition and patterning of each layer;

    ii.  design and measurement of component performance (e.g., threshold voltage, capacitance values), material characteristics (e.g., resistivity) and pattern parameters (e.g., thickness, width, length, shape); and

    iii. design and operation of components and layers depicted in mask files; and

    iv.  testing, analysis, or evaluation (including performance, produceability, yield, reliability, fault, or quality control) of individual layers, physical interrelationships between layers, and electrical characteristics of interrelationships between layers;

c.  Cell assembly, including:

    i.   applying or dispensing sealant, including patterns as depicted in CAD files;

    ii.  procedures and equipment used for applying or curing the sealant;

    iii. applying, dispensing, or injecting liquid crystal material;

19

      iv.    aligning, joining and cutting TFT and Color Filter substrates;

      v.    optical compensation structures, including films;

      vi.    testing, analysis, or evaluation (including performance, produceability, yield, reliability, fault, or quality control) of sealant application or dispensing patterns; and

      vii.    evaluation of production line capacity, throughput or costs associated with each production line;

  d.    Module assembly, including:

      i.    backlight unit structures and components;

      ii.    design, operation and interrelationship of components depicted in CAD files; and

      iii.    driver circuit attachment and operation.

Document Request No. 38

All documents regarding any product, publication, patent, or other document or thing that you contend qualifies as prior art to the LG Display Patents.

Document Request No. 39

All documents concerning the monetary value of the LG Display Patents (whether individually, together, or as part of a larger portfolio), including but not limited to any appraisals, reports, or opinions.

Document Request No. 40

All documents concerning the monetary value of the CMO Patents (whether individually, together, or as part of a larger portfolio), including but not limited to any licenses, accounting records, settlement agreements, appraisals, reports, or opinions.

Document Request No. 41

All documents reflecting any indemnification provisions or agreements, transfer or conveyance of assets or liabilities, contracts, rights, and interests concerning CMO products since December 1, 2000.

Document Request No. 42

All documents concerning the existence or absence of acceptable, non-infringing alternatives to any products upon which CMO bases its claim for damages, and the features of such alternatives.

Document Request No. 43

All documents concerning any contention by you regarding whether or not any CMO product or process infringes one or more claims of an LG Display Patent, whether literally or under the doctrine of equivalents.

Document Request No. 44

All documents concerning any contention by you regarding whether or not any LG Display product or process infringes one or more claims of an CMO Patent, whether literally or under the doctrine of equivalents.

Document Request No. 45

All documents concerning any opinion of counsel regarding the LG Display Patents, including, for example, all opinions, draft opinions, notes, analyses, and communications regarding each opinion, and all documents received and/or considered for the purposes of each opinion.

Document Request No. 46

All communications concerning the LG Display Patents or any counterpart thereof, including but not limited to, internal memoranda, e-mail, and correspondence between you and your officers, agents, consultants, subcontractors, and employees.

Document Request No. 47

All documents concerning the conception, design, reduction to practice (actual and constructive), diligence or lack of diligence in reduction to practice, research, and development of each invention, product, device, service, method, or activity, that relates to or is covered by one or more of the claims of the CMO Patents or the Foreign Counterparts of the CMO Patents, including but not limited to, all product proposals, design notes, engineering notebooks, laboratory notebooks, memoranda, drawings, specifications, prototypes, computer software, change orders, publications, and printed matter concerning such products, devices, services, methods, or activities, and any written description, printed publication or disclosure prior to the respective application dates for each of the CMO Patents, whether in the U.S. or elsewhere.

Document Request No. 48

All documents concerning any use, whether public or otherwise and whether experimental or otherwise, of each alleged invention corresponding to any claims of the CMO Patents or the Foreign Counterparts of the CMO Patents prior to the respective application dates for each of the CMO Patents, whether in the U.S. or elsewhere.

Document Request No. 49

With respect to each of the CMO Patents and Foreign Counterparts of the CMO Patents, and including any interference or reexamination thereof or related thereto, the following categories of documents:

a.    the complete patent prosecution files and all documents relating to prosecution of each of the CMO Patents;

b.    all documents concerning the decision to file each application, the scope of the claims during prosecution, the naming of inventors or any amendment thereof, and the preparation of the patent application(s);

c.    all documents reviewed, consulted, considered, or prepared in connection with the preparation or prosecution of each application, including, without limitation, any prior art or potential prior art identified or known during prosecution;

d.    all drafts of the application(s), any amendments thereof, any responses to Patent Office actions and any other papers filed during prosecution;

e.    all documents concerning communication with or from any third person or any of the inventors or possible inventors or any person at any time named as an inventor;

f.    all documents concerning communications with or from any patent attorney, patent agent, or prior art searcher relating to the prior art, the invention, applications, or the prosecution of the application(s);

g.    all documents relating to references cited by or to the United States Patent and Trademark Office or any foreign patent office during the prosecution of the application(s); and

h.    all documents concerning ownership and/or assignments or transfers of interest with respect to the CMO Patents.

Document Request No. 50

All documents concerning all links in the chain of title or ownership of the CMO Patents, the Foreign Counterparts of the CMO Patents, or related family patent rights, beginning with the inventors, including but not limited to all assignment documents and all documents referring or

23

relating to the acquisition of the CMO Patents, the Foreign Counterparts of the CMO Patents, or related family patent rights.

Document Request No. 51

All documents concerning the actual or potential purchase, sale, or transfer of any rights or interest in or to the CMO Patents, including but not limited to communications, negotiations, offers, discussions, presentations, meeting notes, meeting minutes, analyses, agreements, contracts, assignments, and licenses, including all drafts, modifications or amendments (if any) thereof, and documents exchanged with third parties.

Document Request No. 52

All documents concerning all communications between CMO and any third-party related to the CMO Patents or the subject matter of the CMO Patents.

Document Request No. 53

All documents concerning any prior art relevant to the LG Display Patents and/or the CMO Patents, including all prior art or potential prior art references to those Patents-in-Suit or their respective Foreign Counterparts.

Document Request No. 54

All documents concerning any contention that secondary considerations show the CMO Patents and the Foreign Counterparts of the CMO Patents to be non-obvious, including, without limitation, documents relevant to:

a.     any alleged long-felt need, or absence thereof, for the subject matter of any of the claims of the CMO Patents;

b.     any alleged commercial success, or lack thereof, of the subject matter of any of the claims of the CMO Patents;

c.      any alleged copying by others, or lack thereof, of the subject matter of any of the

claims of the CMO Patents;

d.      any alleged praise, or absence thereof, for the subject matter of any of the claims

of the CMO Patents;

e.      any alleged unexpected results, or lack thereof, of the subject matter of any of the

claims of the CMO Patents;

f.      any alleged skepticism, or lack thereof, concerning the subject matter of any of

the claims of the CMO Patents; or

g.      any alleged nexus or lack thereof between the use of the subject matter claimed in

the CMO Patents and the alleged commercial success of products or services using or

incorporating that subject matter.

Document Request No. 55

All documents received by CMO from LG Display or any person, referencing any LG

Display Patents.

Document Request No. 56

All documents sent by or on behalf of CMO to LG Display or any person affiliated with

LG Display, referencing any CMO Patents.

Document Request No. 57

All documents relating to any alleged commercial success of CMO's products or third

party products that are comparable to the accused LG Display products, including but not limited

to documents relating to the nexus between the alleged commercial success and the subject

matter of the CMO Patents; licensing revenue attributed to licensing of the patents; the total

market in which the relevant products compete and the percent of the market (based on units or

dollars) which is attributable to such products; commendation or tribute by competitors, customers, or others in the industry to any alleged advance attributed to any of the relevant products; actual savings achieved by use of any of the relevant products and the basis for computing such savings; ratings of allegedly infringing products; and significance of Brand name or trademark in this market.

Document Request No. 58

All documents concerning the utility, advantages, problems, and solutions corresponding to inventions disclosed, described or claimed in any of the CMO Patents and/or LG Display Patents.

Document Request No. 59

All documents that identify employees, officers, agents, subsidiaries, or representatives acting on behalf of CMO and/or CMO USA in the U.S.

Document Request No. 60

All documents concerning indemnification for any infringement or liability with respect to the LG Display Patents, including, but not limited to, any documents constituting or incorporating any indemnification agreements or provisions to which you are a party.

Document Request No. 61

All license agreements, covenants not to sue, and related agreements to which CMO is a party, including all addendums, amendments, and exhibits to such license agreements.

Document Request No. 62

All license agreements and related agreements concerning LCD modules, LCD panels, LCD display products, and/or the manufacture or assembly of any such products, including all addendums, amendments, and exhibits to such license agreements.

Document Request No. 63

All documents concerning your former or current patent licensing policies, practices or strategies, and including documents regarding the identity and significance of all factors that you have considered when negotiating license agreements or valuing technology for licensing purposes from December 1, 2000 to the present.

Document Request No. 64

All documents relating to CMO's first awareness of each allegedly infringing act or product for which CMO seeks any recovery against LG Display, including when CMO first determined that any LG Display Product or process infringes one or more claims of any CMO Patent.

Document Request No. 65

All documents concerning any lost profits sought by CMO in this case.

Document Request No. 66

All documents concerning any reasonable royalties sought by CMO in this case, including with respect to each of the factors referenced in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff 'd*, 446 F.2d 295 (2d Cir. 1971), and royalty damages claimed for each CMO Patent.

Document Request No. 67

All documents reflecting all valuations and the methodology or basis that you have used since December 1, 2000, to negotiate or calculate the rate or amount of royalty regarding any patents concerning technology used in or for LCD modules, LCD panels, LCD display products, or manufacturing as to any such products.

Document Request No. 68

All documents concerning the types of technology involved in any license agreement to which CMO is a party, and documents reflecting the extent to which any existing licenses involve technology that is relevant or comparable to the subject matter of the CMO Patents and/or the LG Display Patents.

Document Request No. 69

All documents reflecting any marking or obligation to mark products with any of the CMO Patent numbers and/or LG Display Patent numbers.

Document Request No. 70

All documents concerning any products that allegedly infringe one or more claims of any CMO Patents.

Document Request No. 71

Documents sufficient to determine the manufacturing cost and yield for all CMO Products and fabrication plants, including, but not limited to, manufacturing cost reports and any other documents reflecting product yield, changes in product yield, and reasons for changes in product yield for each fabrication plant.

Document Request No. 72

All documents concerning the LG Display Patents, including, but not limited to documents reflecting knowledge and awareness of the LG Display Patents, documents used or created by any investigations undertaken by you or on your behalf (including, for example, prior art searches, tests, reverse engineering, or analysis related to patent scope, validity, and infringement), and any documents and communications regarding any lawsuits involving the LG Display Patents.

Document Request No. 73

All documents concerning any analyses or procedures for review of your competitors' patents, including any LG Display patents whether part of this suit or not.

Document Request No. 74

All documents that identify product or project names and codenames for LCD display products, and that link or correlate such names or codenames to CMO Products used and/or approved for those LCD display product projects and/or codenames.

Document Request No. 75

All documents concerning any expert expected to testify for you in this case, including, for example:

a.    each expert's reports for this case and other cases within the past four years;

b.    all documents considered by any expert regarding this case; and

c.    all publications of the expert concerning any issues or subject matter related to the issues or subject matter in this case.

Document Request No. 76

All documents reflecting any communications between CMO and any other person regarding LG Display, LGDA, or the following cases: *AU Optronics Corporation vs. LG.Philips LCD Co., Ltd. and LG.Philips LCD America, Inc.*, Civil Action No. 07-C-0137-S (U.S. District Court for the Western District of Wisconsin); *AU Optronics Corporation vs. LG.Philips LCD Co., Ltd. and LG.Philips LCD America, Inc. et al.*, Civil Action No. 07-357-JJF (U.S. District Court for the District of Delaware); *LG.Philips LCD Co., Ltd. v. Chi Mei Optoelectronics Corporation, et al.*, Civil Action No. 06-726-JJF (U.S. District Court for the District of Delaware); *Chi Mei Optoelectronics Corporation v. LG.Philips LCD Co., Ltd. and LG.Philips*

*LCD America, Inc.*, Civil Action No. 07-176-TJW (U.S. District Court for the Eastern District of Texas); *LG.Philips LCD Co Ltd v. Chunghwa Picture Tubes Ltd*, Civil Action No. 05-07004-CBM (U.S. District Court for the Central District of California); and *LG.Philips LCD Co., Ltd. v. Tatung Co.,* et al., Civil Action No. 05-292-JJF (U.S. District Court for the District of Delaware).

Document Request No. 77

All documents concerning the factual basis for each of the affirmative defenses and any other defenses asserted by you in relation to this lawsuit, and each of your counterclaim allegations, including, for example, all documents supporting each of your affirmative defenses and counterclaim allegations.

Document Request No. 78

All documents concerning CMO's participation in, sponsorship of, and/or communications with any group, organization, or other body concerning establishing, publishing, or developing industry standards potentially relevant to CMO Products or LCD display products.

Document Request No. 79

All policies, procedures, manuals, guidelines, and other documents concerning the retention, destruction, storage, archiving, and management of documents, records, and/or electronically stored information that apply to CMO or its employees.

Document Request No. 80

All documents concerning efforts to identify information (including electronically stored information) relevant to claims and defenses or discovery in this case, including documents identifying all sources of relevant information, all custodians of relevant information.

Document Request No. 81

All reports to shareholders, including all annual reports, in English, since December 1, 2000.

Document Request No. 82

All documents concerning CMO stock or shares, including, but not limited to, stock offerings (such as Offering Circulars), shareholders agreements or any agreements relating to stock purchases, share purchases or asset sales or transfers to which CMO is a party, assignor, assignee, or beneficiary.

Document Request No. 83

Documents sufficient to show or explain the letter and/or numbering system by which CMO assigns model numbers and/or Part Numbers to its LCD modules, including documents sufficient to show or explain what each letter and/or number signifies.

March 25, 2008                              BAYARD, P.A.

                                            /s/ Richard D. Kirk (rk0922)
                                            Richard D. Kirk (rk0922)
                                            Ashley B. Stitzer (as3891)
                                            222 Delaware Avenue, 9th Floor
                                            P.O. Box 25130
OF COUNSEL:                                 Wilmington, DE 19899-5130
                                            (302) 655-5000
Gaspare J. Bono                             rkirk@bayardfirm.com
R. Tyler Goodwyn, IV                        astitzer@bayardfirm.com
Lora A. Brzezynski
McKenna Long & Aldridge LLP                 *Attorneys for Plaintiff LG Display Co., Ltd.*
1900 K Street, N.W.
Washington, D.C. 20006
(202) 496-7500

EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

LG DISPLAY CO., LTD.,                      )
                                           )
      Plaintiff,                         )
                                           )
      v.                                 )    Civil Action No. 06-726 (JJF)
                                           )
CHI MEI OPTOELECTRONICS                    )
CORPORATION; AU OPTRONICS                  )
CORPORATION, AU OPTRONICS                  )
CORPORATION OF AMERICA;                    )
TATUNG COMPANY; TATUNG                     )
COMPANY OF AMERICA, INC.; AND              )
VIEWSONIC CORPORATION,                     )
                                           )
      Defendants.                        )
                                           )

—————————————————

AU OPTRONICS CORPORATION,                  )
                                           )
      Plaintiff,                         )
                                           )
      v.                                 )    Civil Action No. 07-357 (JJF)
                                           )
LG DISPLAY CO., LTD and                    )    CONSOLIDATED CASES
LG DISPLAY AMERICA, INC.,                  )
                                           )
      Defendants.                        )
                                           )

**CHI MEI OPTOELECTRONICS USA, INC.'S
FIRST SET OF REQUESTS FOR THE PRODUCTION OF
DOCUMENTS AND THINGS (Nos. 1 - 109) TO PLAINTIFF**

Defendant, Chi Mei Optoelectronics USA, Inc. ("CMO USA"), by its

undersigned counsel, and pursuant to Rule 34 of the Federal Rules of Civil Procedure,

requests the production for inspection and copying of the following Documents from

Plaintiff, LG Display Co., Ltd. within thirty (30) days after service hereof, said

Documents to be produced at the offices of Jones Day, North Point, 901 Lakeside

Avenue, Cleveland, Ohio 44114, or at such other place and time as may mutually be agreed upon by counsel.

Plaintiff also is requested to serve a written response, separately responding to each request set out herein, specifically identifying for which requests responsive Documents are or are not being produced and/or otherwise identified on appropriate privileged document schedules (which schedules should also be provided with or as part of said written response), on the day said Documents are produced for inspection and copying.

<u>**DEFINITIONS OF TERMS AND INSTRUCTIONS**</u>

The following definitions and instructions are applicable to these requests for production:

For purposes of these requests, you should use the following definitions for the terms used herein. All requests and corresponding definitions of terms are for purposes of discovery only, and not to be construed as limiting or reflecting CMO USA's position in this action regarding claim construction or any other issue. CMO USA specifically reserves the right to use different terms, or to assert different meanings, for all purposes in this action (including, for example, with respect to claim construction, infringement analysis, and validity analysis).

1.    "LG Display," "you," and "your" means LG Display Co., Ltd., formerly known as LG.Philips LCD Co., Ltd., and all Persons or entities acting or purporting to act on its behalf, and any Affiliates (as that term is defined herein) of LG Display Co., Ltd. (including, for example, LG Display America, Inc., formerly known as LG.Philips LCD America, Inc.)

2.    "LGDA" means LG Display America, Inc., formerly known as LG.Philips LCD America, Inc., and all Persons or entities acting or purporting to act on its behalf, and any Affiliates (as that term is defined herein) of LG Display America, Inc.

3.    "CMO" means Chi Mei Optoelectronics Corporation, and all Persons or entities acting on Chi Mei Optoelectronics Corporation's behalf.

4.    "CMO USA" means Chi Mei Optoelectronics USA, Inc., and all Persons or entities acting on Chi Mei Optoelectronics USA, Inc.'s behalf.

5.    "Affiliate(s)" means any partnerships, parents, subsidiaries, and divisions, and any corporation or other entity that controls, is controlled by, or is under common control with the identified corporation or entity.

6.    "Representative" means any Person, attorney, agent, consultant or other individual(s) or business entity(ies) in the employ of, or otherwise acting on behalf of an entity or individual.

7.    "LGD Products" means all LCD Modules and LCD Panels made, shipped, imported, or sold by or for LGD and/or LGDA since December 1, 2000.

8.    "LCD Display Product" means any device that contains an LCD Module. An LCD computer monitor, LCD television, laptop computer, and any telephone or other portable or handheld product incorporating an LCD Module are examples of LCD Display Products.  This includes all such devices, regardless of Brand.

9.    "LCD Module" means an LCD display component that includes, inter alia, an LCD Panel, a backlight unit, and driver ICs.

10.    "LCD Panel" means an LCD display component that includes a TFT Array and color filter with liquid crystal material between them.

11.    "TFT Substrate" means the substrate that contains one or more TFT Arrays.

12.    "TFT Array" means a thin-film-transistor array, electrodes, wiring, and pads used to drive and control the liquid crystal material in an LCD display.

13.    "Color Filter Substrate" means the substrate that contains one or more color filters used in an LCD Panel.

14.    "Brand" means any brand name or company whose name, mark, or logo appears on LCD Display Products, including, for example, Dell, Hewlett-Packard, Apple, and ViewSonic.

15.    "LGD Customer" means any person (including any Brand that sells LCD Display Products) that has, directly or through an intermediary, ordered, received, purchased, approved, imported, and/or used any LGD Products, including LCD Display Products that contain LGD Products.

16.    "Communication" means, without limitation, every manner or means of statement, utterance, notation, disclaimer, transfer, or exchange of information between two or more Persons of any nature whatsoever, by or to whomever, whether oral or written or whether face-to-face, by telephone, email, mail, personal delivery, or otherwise, including but not limited to, letters, correspondence, conversations, memoranda, dialogue, discussions, meetings, interviews, consultations, agreements, and other understandings.

17.    The connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these document requests all information that might otherwise be construed to be outside of their scope.

18.    "Concern," "concerning," and "relative to" are used in their broadest sense and embrace all matter relating to, referring to, describing, discussing, evidencing, or constituting the referenced subject.

19.    "Document" means all types of documents, electronically stored information, and things embraced within Federal Rules of Civil Procedure 34 and includes, without limitation, any writing and each original, or a copy in the absence of the original, and every copy bearing notes or markings not present on the original or copy, of the following items, however produced or reproduced, namely: books, accounting records of any nature whatsoever, agreements, Communications, correspondence, facsimiles, telegrams, cable, telexes, memoranda, recordings, studies, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, diaries, letters, forecasts, statistical statements, graphs, laboratory or engineering reports and records, notebooks, charts, plans, sketches, drawings, video tapes, films, slides, photographs, information bearing photographic products of any nature whatsoever, photo-records, microfilms, tape recordings, minutes or records of meetings or conferences, expressions or statements of policy, lists of persons attending meetings or conferences, reports or summaries of interviews, reports or summaries of investigations, opinions or reports of consultants, patent studies, opinions of counsel, records, reports, summaries of negotiations, sales literature of any nature whatsoever, brochures, catalogues, catalogue sheets, pamphlets, periodicals,

advertisements, circulars or trade letters, press releases, trade releases, publicity releases, new product releases, reprints, drafts of any documents, working papers, indices, original or preliminary notes, sound recordings, computer printouts, floppy disks, hard drives, CD-ROMs, DVDs, portable drives, magnetic tapes and any other data, database, server, or data compilations from which information can be obtained either directly, or, if necessary translated by you through detection devices into a reasonably usable form. The term "Document" also refers to any tangible object other than as described above, and includes objects of every kind and nature such as, but not limited to, products, prototypes, models, and specimens. A draft or nonidentical copy is a separate "Document" within the meaning of this term.

20.    "Thing" is defined to be synonymous in meaning and equal in scope to the usage of the term "tangible things " in Federal Rule of Civil Procedure 34(a), including, without limitation, products, devices, models, mockups, prototypes, systems, and all other tangible things that are in your actual or constructive possession, custody or control, all prior versions or attempts to create the foregoing, and all reproductions of the foregoing that have undergone any alteration, modification, addition, removal, revision, or other change. A non-identical thing is a separate thing.

21.    "Any" means each and every.

22.    "Use" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

23.    "Make" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

24. "Offer to sell" or "Offered for Sale" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

25. "Sell" or "sale" has the same meaning as in 35 U.S.C. § 271 and applicable case law.

26. "Prior Art" has the same meaning as at term is used in 35 U.S.C. § 103 and applicable case law, without regard to pertinence, including, but not limited to, conceptions, reductions to practice, publications, uses, disclosures, offers for sale and sales, and commercial exploitations of an idea, product, device, method, apparatus, or system, that you or any othe party in litigation or licensing negotiations identified as potentially relevant to any claims of the LGD Patents.

27. "Person" means any natural person, firm, association, partnership, corporation, joint venture, or other form of legal entity.

28. The "LGD Patents" means United States Letters Patent Nos. 4,624,737; 5,019,002; 5,825,449; 5,905,274; 6,803,984; 6,815,321; 7,176,489; and 7,218,374, as well as any reissues and/or reexaminations thereof, and any reissue applications therefrom.

29. "Foreign Counterparts of the LGD Patents" means any patent applications filed anywhere in the world that claim priority in whole or in part to the LGD Patents.

30. "Part Number" means the name(s) and alpha-numeric identifier(s) by which a part or product, for example an LCD display, LCD Module, LCD Panel, or components thereof, in general, are bought, sold, or identified (including, for example,

internally by LG Display or for sales and marketing purposes), and/or by LGD
Customers).

31.    "Specification" means all Documents or Things that discuss, illustrate,
define, or reflect, in whole or in part, any aspect of how something is, can, or should be
made, inspected, or tested.  Specifications include, for example, textual Documents,
drawings, mask files, product specifications, TFT Array Specifications, TFT Substrate
specifications, Manufacturing Process Specifications, Color Filter Substrate
specifications, panel or cell specifications, material specifications, assembly
specifications, blueprints, and/or illustrations.

32.    "Manufacturing Process Specifications" means Documents that describe
the steps and/or process conditions for forming each layer on a Color Filter Substrate or
TFT Substrate.

33.    "TFT Array Specifications" means Documents that describe a TFT
Array design such as layout, material composition of layers, and/or properties of array
components.

34.    The use of the singular form of any word includes the plural and vice
versa.

35.    LG Display shall produce all attachments to e-mails immediately behind
the e-mail to which such Documents were attached so that the complete contents of
each e-mail are together in  LG Display's production.

36.    If  LG Display believes that any request contained in this set of
discovery requests is unclear, unintelligible or because of its wording otherwise
prohibits or prevents  LG Display from responding to that discovery request, CMO

USA requests that LG Display request immediate clarification of that discovery request from CMO USA.

37.    LG Display is advised that these discovery requests are continuing and require further and supplemental responses by LG Display, in accordance with Rule 26(e) of the Federal Rules of Civil Procedure.

38.    In producing the Documents described below, LG Display should furnish all Documents within your possession, custody or control, including information that you have the ability and right to obtain or access through or from Affiliates, Representatives, suppliers, or others.

39.    In response to the following set of requests, as to each Document withheld in whole or in part from production on the basis of a claim of privilege or immunity, LG Display shall state the following outlined information. LG Display is requested to submit this information on the date and at the time of production of Documents and Things responsive to these requests.

a.    identification of the Document being withheld, including separately each copy or draft;

b.    the nature of and basis for the privilege or immunity asserted;

c.    the kind of Document (e.g., letter, memorandum, facsimile, etc.);

d.    the date it bears, if any, as well as the date it was prepared, if different;

e.    whether the Document was sent, and if so, the date it was sent;

       f.      the name, address, and title of its author, its addressee, each

Person to whom a copy has been sent or who received a copy, and each

Person known to have read the Document; and

       g.      a description of the subject matter and contents of the Document.

40.      Whenever available, Documents shall be produced in native format on a CD, DVD or removable hard drive with the original file names kept in tact, regardless of their language.  LG Display shall include in the file name a production number by which the file may be later referenced.

41.      No Document or information shall be withheld on the asserted grounds that such Document or information therein is not reasonably calculated to lead to the discovery of admissible evidence unless (i) the burden of responding is fully described, and (ii) persons familiar with the Document or information requested are identified.

## REQUESTS FOR PRODUCTION

**Document Request No. 1**

All Documents concerning LG Display's decision to commence this action, including documents sufficient to identify persons who participated in or contributed to that decision, and all documents concerning the basis or bases upon which that decision was made.

**Document Request No. 2**

All Documents and Things concerning any CMO product obtained by LG Display prior to commencement of this action, including, but not limited to, Documents and Things regarding LG Display's pre-suit investigation of CMO products and its alleged infringement of any LGD Patents.

**Document Request No. 3**

All Documents and Things concerning LG Display's pre-suit investigation of CMO USA and its alleged infringement of any LGD Patents.

**Document Request No. 4**

All Documents concerning the factual basis or bases for each of your allegations in any of LG Display's pleadings relative to CMO, including, but not limited to, LGD's Complaint, Amended Complaints, or Counterclaims.

**Document Request No. 5**

All Documents concerning the factual basis or bases for each of your allegations in any of LG Display's pleadings relative to CMO USA, including, but not limited to, LGD's Complaint, Amended Complaints, or Counterclaims.

**Document Request No. 6**

All Documents that concern, support or refute, or tend to support or refute any of the allegations in any of LG Display's pleadings relative to CMO, including, but not limited to, LGD's Complaint, Amended Complaints, or Counterclaims.

**Document Request No. 7**

All Documents that concern, support or refute, or tend to support or refute any of the allegations in any of LG Display's pleadings relative to CMO USA, including, but not limited to, LGD's Complaint, Amended Complaints, or Counterclaims.

**Document Request No. 8**

All Documents relating to LG Display's first awareness of each allegedly infringing act or product for which LG Display seeks any recovery against CMO, including when LG Display first determined that any CMO act or product allegedly infringed one or more claims of any LGD Patent.

**Document Request No. 9**

All Documents relating to LG Display's first awareness of each allegedly infringing act for which LG Display seeks any recovery against CMO USA.

**Document Request No. 10**

All Documents concerning any contention by you relative to whether or not CMO infringes one or more claims of any LGD Patent, whether literally or under the doctrine of equivalents.

**Document Request No. 11**

All Documents concerning any contention by you relative to whether or not CMO USA infringes one or more claims of any LGD Patent, whether literally or under the doctrine of equivalents.

**Document Request No. 12**

All Documents concerning any contention by you relative to whether or not CMO induces infringement or contributes to the infringement of one or more claims of any LGD Patent.

**Document Request No. 13**

All Documents concerning any contention by you relative to whether or not CMO USA induces infringement or contributes to the infringement of one or more claims of any LGD Patent.

**Document Request No. 14**

All Documents and Things concerning CMO's alleged infringement of one or more claims of any LGD Patent, including, but not limited to, correspondence, electronic mail, memoranda, notes, calculations, presentations, analyses, studies, requests for quotes, invitations to bid, bid packages, bids, quotes, proposals, contracts, purchase orders, invoices, submissions, product samples, reports, or meeting minutes.

**Document Request No. 15**

All Documents and Things concerning CMO USA's alleged infringement of one or more claims of any LGD Patent, including, but not limited to, correspondence, electronic mail, memoranda, notes, calculations, presentations, analyses, studies, requests for quotes, invitations to bid, bid packages, bids, quotes, proposals, contracts, purchase orders, invoices, submissions, product samples, reports, or meeting minutes.

**Document Request No. 16**

All studies, tests, comparisons, analyses, inspections or reports conducted by LG Display or on LG Display's behalf concerning the structure, function or operation of

any of the accused CMO products or any other products LG Display contends practice

any of the inventions purportedly claimed in the LGD Patents.

**Document Request No. 17**

 All Documents concerning any contention by you relative to whether or not

CMO's alleged infringement of one or more claims of any LGD Patent is "willful."

**Document Request No. 18**

 All Documents concerning any contention by you relative to whether or not

CMO USA's alleged infringement of one or more claims of any LGD Patent is

"willful."

**Document Request No. 19**

 All Documents concerning any contention by you relative to whether or not

CMO should be enjoined and restrained from infringing one or more claims of any

LGD Patent.

**Document Request No. 20**

 All Documents concerning any contention by you relative to whether or not

CMO USA should be enjoined and restrained from infringing one or more claims of any

LGD Patent.

**Document Request No. 21**

 All Documents concerning any contention by you relative to whether or not this

action is an "exceptional case."

**Document Request No. 22**

 All Documents concerning any claim by LG Display that any Person other than

CMO or CMO USA infringed one or more claims of an LGD Patent.

**Document Request No. 23**

All Documents concerning the interpretation, scope, or construction of each claim of the LGD Patents.

**Document Request No. 24**

All documents that LG Display intends to use to support its construction of each claim of the LGD Patents.

**Document Request No. 25**

All Documents exchanged between LGD and DisplaySearch or any other market research publisher concerning LGD Products, LCD Display Products, LCD Modules, or LCD Panels, including, but not limited to, financial information.

**Document Request No. 26**

All Documents generated or relied upon by LG Display since December 1, 2000 that reference information or data from DisplaySearch or any other market research publisher.

**Document Request No. 27**

All Documents concerning the United States and/or North American market for LGD Products, LCD Display Products, LCD Modules, or LCD Panels.

**Document Request No. 28**

All Documents concerning the marketing and/or sale of LGD Products, LCD Display Products, LCD Modules, or LCD Panels in or for the United States and/or North American market, including, for example, Communications with Brands, LGD Customers, or potential customers that sell in the United States any LGD Products, LCD Display Products, LCD Modules, or LCD Panels.

**Document Request No. 29**

All Documents concerning any analysis, study, or report prepared by or on behalf of LG Display concerning any LGD Products, LCD Display Products, LCD Modules, or LCD Panels that LG Display contends are covered by any claim of any LGD Patent, including, without limitation, all Documents concerning any estimated, projected or actual market shares; any estimated, projected or actual royalties; and/or any estimated, projected or actual profit for each such product on the market at any time or anticipated to be on the market.

**Document Request No. 30**

All Documents concerning LG Display's market share (actual or estimated) and/or projected market share relative to LGD Products, LCD Display Products, LCD Modules, or LCD Panels in the United States for any period from 2000 to the present.

**Document Request No. 31**

All Documents concerning any trips to the United States by any LG Display employee regarding LGD Products, LCD Display Products, LCD Modules, or LCD Panels.

**Document Request No. 32**

All Documents concerning any trips by any LG Display or LGDA employee to any LGD Customer, potential LGD Customer, or Brand that does business in part in the United States or is an Affiliate of an entity that does business in the United States.

**Document Request No. 33**

All Documents concerning any laws, regulations, or requirements in the United States that apply to LGD Products, LCD Display Products, LCD Modules, or LCD Panels , including, but not limited to, Documents evidencing compliance with any such

United States laws, regulations, and requirements (for example, UL and EPA requirements).

**Document Request No. 34**

All Documents that you submitted, filed with, and received since December 1, 2000, from any United States (federal, state or local) government agency or authority concerning the importation and/or sale of LGD Products, LCD Display Products, LCD Modules, or LCD Panels  and any requirements or approvals for such sales and imports.

**Document Request No. 35**

All Documents concerning the manufacture of any LGD TFT Array or TFT Substrate in accordance with any LGD Patents, including, but not limited to, TFT Array Specifications that describe or disclose the material composition of each layer of each substrate; process Specifications that describe or disclose the steps for forming (e.g., cleaning, depositing, coating, etching, and/or stripping) each layer of each substrate, and mask files (i.e., electronic files such as GDS-II) that describe or disclose the layer patterns of each substrate.

**Document Request No. 36**

All Documents concerning the design and/or analysis of the structure of any thin-film transistor on any LGD TFT Substrate made in accordance with any LGD Patents including, but not limited to, Documents that describe or disclose the cross section structure of a TFT, and Documents that describe or disclose testing, analysis, or evaluation, including performance, produceability, operation, yield, reliability, fault, or quality control, of LGD Products including components or structures of TFT Arrays and LCD Panels.

**Document Request No. 37**

All Documents concerning any LG Display cell assembly process in accordance with any LGD Patents, including, but not limited to, product Specifications and CAD files that describe or disclose patterns (e.g., seal printing or seal dispensing, liquid crystal filling, Au or Ag dispensing, UV light masking, and/or glass cutting) on the LGD TFT Substrate and/or the LGD Color Filter Substrate; process Specifications that describe or disclose the steps for assembling (e.g., cleaning, printing, filling, dispensing, attaching, exposing to UV light, baking, cutting, beveling, and/or bubble removal) a LG Display LCD Panel; and material Specifications that describe or disclose the sealant material (e.g., by designated product name, supplier, and/or composition) for each LG Display LCD Panel.

**Document Request No. 38**

All Documents concerning any LG Display cell assembly material flow and fabrication equipment used in connection with product made in accordance with any LGD Patents, including, but not limited to, fabrication equipment floor layouts for all cell assembly production lines; Specifications that describe or disclose a cell production line as serial, single or other similar designation; and Documents that describe or disclose the process flow, control, relative timing, and/or operation of the seal dispensing, liquid crystal dispensing, cleaning, and/or assembly equipment in each cell assembly production line.

**Document Request No. 39**

Samples of each LCD Display Product, LCD Module, and LCD Panel that LGD contends are covered by or embody, in whole or in part, any claim of any LGD Patent.

**Document Request No. 40**

All Documents concerning the designs, structures, procedures, process conditions, equipment used, materials, functions, analysis, operation, absence, use, and/or purpose of the following with respect to your products that you claim are covered by any LGD Patents or manufactured in accordance with any LGD Patents:

    a.    Electrostatic Discharge Protection, including:

        i.    structures or components on a TFT Substrate or LCD Panel;

        ii.    manufacturing process steps that relate to electrostatic charge or discharge;

        iii.    equipment, environmental conditions or procedures that relate to reducing electrostatic charge, discharge, or dispersal of discharge; and

        iv.    testing, analysis, or evaluation (including performance, produceability, yield, reliability, fault, or quality control) of structures, equipment, conditions or procedures related to electrostatic charge, discharger or dispersal of discharge;

    b.    TFT Substrate and color filter design and manufacture, including:

        i.    procedures, process conditions and materials used for the deposition and patterning of each layer;

        ii.    design and measurement of component performance (e.g., threshold voltage, capacitance values), material characteristics (e.g., resistivity) and pattern parameters (e.g., thickness, width, length, shape);

        iii.    design and operation of components and layers depicted in mask files; and

        iv.    testing, analysis, or evaluation (including performance, produceability, yield, reliability, fault, or quality control) of individual layers, physical interrelationships between layers, and electrical characteristics of interrelationships between layers;

    c.    Cell assembly, including:

        i.    applying or dispensing sealant, including patterns as depicted in CAD files;

    ii.    procedures and equipment used for applying or curing the sealant;

    iii.    applying, dispensing, or injecting liquid crystal material;

    iv.    aligning, joining and cutting TFT and Color Filter Substrates;

    v.    optical compensation structures, including films;

    vi.    testing, analysis, or evaluation (including performance, produceability, yield, reliability, fault, or quality control) of sealant application or dispensing patterns; and

    vii.    evaluation of production line capacity, throughput or costs associated with each production line; and

  d.    Module assembly, including:

    i.    backlight unit structures and components;

    ii.    design, operation and interrelationship of components depicted in CAD files; and

    iii.    driver circuit attachment and operation.

**Document Request No. 41**

All Documents concerning the conception, design, reduction to practice (actual and constructive), diligence or lack of diligence in reduction to practice, research, and development of each invention, product, device, service, method, or activity, that concerns or is purportedly covered by one or more of the claims of any LGD Patents or the Foreign Counterparts of the LGD Patents, including, but not limited to, all product proposals, design notes, engineering notebooks, laboratory notebooks, memoranda, drawings, specifications, prototypes, computer software, change orders, publications, and printed matter concerning such products, devices, services, methods, or activities, and any written description, printed publication or disclosure prior to the respective application dates for each of the LGD Patents, whether in the United States or elsewhere.

**Document Request No. 42**

All Documents concerning the efforts by any Person other than the named inventors to aid in the conception of the subject matter that concerns or is purportedly covered by one or more of the claims of any LGD Patents or any Foreign Counterparts of the LGD Patents.

**Document Request No. 43**

All Documents concerning the efforts by any Person other than the named inventors to aid in the reduction to practice (actual and constructive) of the subject matter that concerns or is purportedly covered by one or more of the claims of any LGD Patents or any Foreign Counterparts of the LGD Patents.

**Document Request No. 44**

All Documents concerning any search, investigation, analysis, review, opinion or study relating to the scope, novelty, nonobviousness, patentability, validity, enforceability and/or infringement of any claim of any LGD Patents or any Foreign Counterparts of the LGD Patents.

**Document Request No. 45**

All Documents concerning any search for Prior Art for the subject matter purportedly defined by each of the claims of the LGD Patents.

**Document Request No. 46**

All Documents concerning any Prior Art, whether or not you contend it is actually Prior Art, relative to the LGD Patents, including all Prior Art or potential Prior Art references to those patents or their respective Foreign Counterparts.

**Document Request No. 47**

All Documents regarding any product, publication, patent, or other Document or Thing that you contend may be relative to Prior Art to the LGD Patents.

**Document Request No. 48**

All English translations of any foreign patent, publication or other Document or Thing that anyone has identified as Prior Art to any of the LGD Patents.

**Document Request No. 49**

All Documents concerning the first Use in public, Offer to Sell, or Sale of the subject matter described and purportedly claimed in any LGD Patent or any Foreign Counterparts of the LGD Patents.

**Document Request No. 50**

All Documents concerning the first description in a printed Document or publication, relative to the first Use in public, Offer to Sell, or Sale of the subject matter described and purportedly claimed in any LGD Patent or any Foreign Counterparts of the LGD Patents.

**Document Request No. 51**

All Documents concerning any Use, whether public or otherwise and whether experimental or otherwise, of each alleged invention corresponding to any claims of any LGD Patent or any Foreign Counterparts of the LGD Patents prior to the respective application dates for each of the LGD Patents, whether in the United States or elsewhere.

**Document Request No. 52**

All Documents concerning the best mode for practicing the purported invention claimed in each of the LGD Patents.

**Document Request No. 53**

All Documents authored by the named inventors of the LGD Patents concerning the subject matter of the LGD Patents including, but not limited to, any lab notebooks, schematics, papers, publications, or notes.

**Document Request No. 54**

With respect to each of the LGD Patents and Foreign Counterparts of the LGD Patents, as well as any reissue application and/or reexamination request and/or interference thereof or related thereto, the following categories of Documents:

     a.    the complete patent prosecution files and all Documents relating to prosecution of each of the LGD Patents and Foreign Counterparts of the LGD Patents;

     b.    all Documents concerning the decision to file each application, the scope of the claims during prosecution, the naming of inventors or any amendment thereof, and the preparation of the patent application(s);

     c.    all Documents reviewed, consulted, considered, or prepared in connection with the preparation or prosecution of each application, including, without limitation, any Prior Art or potential Prior Art identified or known during prosecution;

     d.    all drafts of the application(s), any amendments thereof, any responses to Patent Office actions and any other papers filed or submitted during prosecution;

     e.    all Documents concerning Communications with or from any third Person or any of the inventors or possible inventors or any Person at any time named as an inventor;

     f.    all Documents concerning Communications with or from any patent attorney, patent agent, or Prior Art searcher relating to the Prior Art, the purported invention, applications, or the prosecution of the application(s);

-23-

g.       all Documents relating to references cited by or to the United States Patent and Trademark Office or any foreign patent office during the prosecution of the application(s);

h.       all Documents concerning any conflicts, interferences, oppositions, infringements, nullity, revocation, lawsuits or any other proceedings concerning any of the LGD Patents or any Foreign Counterparts of the LGD Patents; and

i.       all Documents concerning ownership and/or assignments or transfers of interest with respect to any LGD Patents and any Foreign Counterparts of the LGD Patents.

**Document Request No. 55**

All Documents concerning LG Display's policies and/or practices regarding patents or patent applications.

**Document Request No. 56**

All Documents concerning all links in the chain of title or ownership of any LGD Patents, any Foreign Counterparts of the LGD Patents, or related family patent rights, beginning with the inventors, including, but not limited to, all assignment Documents and all Documents concerning the acquisition of any LGD Patent, any Foreign Counterparts of the LGD Patents, or related family patent rights.

**Document Request No. 57**

All Documents concerning the actual or potential purchase, sale, or transfer of any rights or interest in or to any LGD Patent, including, but not limited to, Communications, negotiations, offers, discussions, presentations, meeting notes, meeting minutes, analyses, agreements, contracts, assignments, and licenses, including

all drafts, modifications, or amendments (if any) thereof, and Documents exchanged with third parties.

**Document Request No. 58**

All Documents and Things relating to any test, study, experiment, or investigation conducted by any Person in an effort to design around any LGD Patent or any Foreign Counterparts of the LGD Patents.

**Document Request No. 59**

All Documents concerning any contention that any alleged "secondary considerations" of the type described in *Graham v. John Deere*, 383 U.S. 1 (1966), and its progeny, for the subject matter purportedly described and claimed in any LGD Patent and any Foreign Counterparts of the LGD Patents show them to be non-obvious, including, without limitation, Documents relevant to:

a.    any alleged long-felt need, or absence thereof, for the subject matter of any of the claims of any LGD Patent;

b.    any alleged commercial success, or lack thereof, of the subject matter of any of the claims of any LGD Patent;

c.    any alleged copying by others, or lack thereof, of the subject matter of any of the claims of any LGD Patent;

d.    any alleged praise, or absence thereof, for the subject matter of any of the claims of any LGD Patent;

e.    any alleged unexpected results, or lack thereof, of the subject matter of any of the claims of any LGD Patent;

f.    any alleged skepticism, or lack thereof, concerning the subject matter of any of the claims of any LGD Patent; or

g.      any alleged nexus or lack thereof between the use of the subject matter claimed in any LGD Patents and any alleged commercial success of products or services using or incorporating that subject matter.

**Document Request No. 60**

All Documents concerning the utility, advantages, problems, and solutions corresponding to inventions purportedly disclosed, described or claimed in any of the LGD Patents.

**Document Request No. 61**

All license agreements, covenants not to sue, agreements providing an immunity-from-suit, and related agreements to which LG Display is a party, including all addendums, amendments, and exhibits to such agreements.

**Document Request No. 62**

All Documents concerning any offer of, request for or expression of interest in a license and/or immunity-from-suit under or assignment or purchase of, or concerning any grant or amendment of a license and/or immunity-from-suit under, or concerning any assignment or purchase of the LGD Patents, any patent applications that led to any LGD Patents, or any Foreign Counterparts of the LGD Patents or patent applications corresponding to or claiming the benefit of or priority under any of the foregoing, and for each such offer, request, expression of interest, grant, assignment or purchase, all Documents concerning, but not limited to:

a.      the parties involved;

b.      the negotiation of each license, immunity, assignment or purchase offered or requested;

c.      the duration of each license and/or immunity offered or requested;

d.      the products to be covered by each such proposed license and/or immunity;

e.      the amount of consideration offered, requested or received for such license, immunity, assignment or purchase, if any, including the amounts paid or to be paid for activities which predated each proposed license, immunity, assignment or purchase and the amounts to be paid for activities after the grant of each proposed license, immunity, assignment or purchase;

f.      any royalties, royalty rates, royalty or compensation bases, if any;

g.      any cross-licenses, licenses, or agreements under other patents, patent applications, trade secrets, or know-how;

h.      the actual license(s), immunity(ies) or assignment(s) entered into and any and all proposed license(s), immunity(ies) or assignment(s); and/or

i.      any amendments to any such license(s), immunity(ies) or assignment(s) or any proposed amendments.

**Document Request No. 63**

All Documents concerning your former or current patent licensing policies, practices or strategies.

**Document Request No. 64**

All Documents concerning the identity and significance of all factors that you have considered when negotiating license agreements or valuing technology for licensing purposes from December 1, 2000 to the present.

**Document Request No. 65**

All Documents concerning any lost profits sought by LG Display in this case.

-27-

**Document Request No. 66**

All Documents concerning any reasonable royalties sought by LG Display in this case, including with respect to each of the factors referenced in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff 'd*, 446 F.2d 295 (2d Cir. 1971), and royalty damages claimed for each LGD Patent.

**Document Request No. 67**

All Documents concerning, or providing basis or support for, any of LG Display's contentions, positions, or assertions made or to be made concerning LG Display's damage theories in this litigation, including, without limitation, contentions, positions, or assertions made or to be made concerning the theories of lost profits, reasonable royalty, established royalty, lost sales and/or any other basis for alleged compensation under 35 U.S.C. § 284, including, without limitation:

a.    all Documents concerning the rate at which LG Display pays interest on incurred debts;

b.    all Documents concerning the compensation received or expected to be received by LG Display from its licensing or other exploitation of any of the claims of any LGD Patents;

c.    all Documents concerning how LG Display arrived at the royalty rate or the rate of compensation earned by LG Display for the licensing or other exploitation of any of the claims of any LGD Patents;

d.    any royalties received by LG Display pursuant to any licenses, sublicenses or covenants not to sue of any LGD Patents;

     e.     any royalty rates paid by companies in the United States for the use of patents comparable to any LGD Patents;

     f.     the effect of the LGD Patents in generating sales of LGD Products, LCD Display Products, LCD Modules, or LCD Panels, other products or technology, and/or licensing revenue in the United States;

     g.     all Documents concerning whether there is a demand for products embodying the purported invention disclosed in any LGD Patent;

     h.     all Documents concerning whether there are a lack of acceptable non-infringing alternatives to products embodying the purported inventions disclosed in any LGD Patent;

     i.     all Documents concerning LG Display's marketing and manufacturing capability to exploit the purported demand for the purported inventions disclosed in any LGD Patent; and

     j.     all Documents concerning the amount of profit that LG Display would have allegedly made.

**Document Request No. 68**

All Documents concerning the monetary value of any LGD Patent (whether individually, together, or as part of a larger portfolio), including, but not limited to, any licenses, accounting records, settlement agreements, appraisals, reports, or opinions.

**Document Request No. 69**

All Documents reflecting all valuations and the methodology or basis that you have used since December 1, 2000, to negotiate or calculate the rate or amount of royalty regarding any patents concerning technology used in or for LGD Products, LCD

Display Products, LCD Modules, or LCD Panels, or manufacturing as to any such products.

**Document Request No. 70**

All license agreements and related agreements concerning LGD Products, LCD Display Products, LCD Modules, or LCD Panels, and/or the manufacture or assembly of any such products, including all addendums, amendments, and exhibits to such license agreements.

**Document Request No. 71**

All Documents concerning the types of technology involved in any license agreement to which LG Display is a party, and Documents reflecting the extent to which any existing licenses involve technology that is relevant or comparable to the subject matter of the LGD Patents.

**Document Request No. 72**

All Documents and Things concerning the settlement of any lawsuit or claim concerning any LGD Patent.

**Document Request No. 73**

All Documents, in native format if available, that identify each LCD Module, LCD Panel, or LCD Display Product that incorporates, has been used with, or has been incorporated into any LGD Product, including Documents that identify which Brands, models, and Part Numbers incorporate, have been used with, or have been incorporated into each LGD Product since December 1, 2000 and in what quantities.

**Document Request No. 74**

All reports, forecasts, projections, plans, estimates, revenues, and data compilations, in native format if available, created, generated, received or maintained,

including the computer databases or document management systems in which such Documents are located, concerning the revenues, profitability, costs, margins, manufacturing, marketing, advertising, importation, distribution, purchase and sales of LGD Products, LCD Display Products, LCD Modules, or LCD Panels made, sold, or offered for sale by or for you on a monthly basis since December 1, 2000.

**Document Request No. 75**

All Documents, in native format if available, summarizing transactions since December 1, 2000 with any LGD Customer, distributor, reseller, and retailer that either does business in part or has an Affiliate that does business in part in the United States concerning LGD Products, LCD Display Products, LCD Modules, or LCD Panels, including, but not limited to, all offers to sell, sales, orders, shipments, and imports.

**Document Request No. 76**

All Documents, in native format, summarizing or concerning sales, shipments, price per unit, gross profit per unit, net profit per unit, fixed cost per unit, and variable cost per unit of LGD Products, LCD Display Products, LCD Modules, or LCD Panels made and sold by or for you or on your behalf since December 1, 2000, including identifying from whom each product was shipped and to whom each product was shipped.

**Document Request No. 77**

Documents sufficient to determine the manufacturing cost and yield for all LGD Products, LCD Display Products, LCD Modules, or LCD Panels and fabrication plants, including, but not limited to, manufacturing cost reports and any other Documents reflecting product yield, changes in product yield, and reasons for changes in product yield for each fabrication plant.

**Document Request No. 78**

     All Documents reflecting any marking or obligation to mark products with any of the LGD Patent numbers.

**Document Request No. 79**

     All Communications concerning the LGD Patents or any Foreign Counterparts of the LGD Patents, including but not limited to, internal memoranda, e-mail, and correspondence between you and your officers, agents, consultants, subcontractors, and employees.

**Document Request No. 80**

     All Documents concerning all Communications between LG Display and any third-party related to any LGD Patent or the subject matter of any LGD Patent.

**Document Request No. 81**

     All Documents received by LG Display from CMO or any person, referencing any LGD Patent.

**Document Request No. 82**

     All Documents sent by or on behalf of LG Display to CMO or any person affiliated with CMO, referencing any LGD Patents.

**Document Request No. 83**

     All Documents exchanged between LG Display and any of the following concerning LGD Products, LCD Display Products, LCD Modules, or LCD Panels:

        h.     Apple Computer, Inc., including its affiliates and subsidiaries;

        i.     TPV Technologies Limited Ltd., including its affiliates and subsidiaries;

        j.     Proview International, including its affiliates and subsidiaries;

        k.     Hewlett-Packard, including its affiliates and subsidiaries;

l.      Westinghouse, including its affiliates and subsidiaries;

m.      Dell, including its affiliates and subsidiaries;

n.      Funai Electric Co., Ltd., including its affiliates and subsidiaries (such as Funai Corporation);

o.      NEC, including its affiliates and subsidiaries;

p.      Samsung, including its affiliates and subsidiaries.

**Document Request No. 84**

All Documents exchanged between LG Display and any of the following concerning the United States, including, for example, with respect to United States market trends or consumer preferences, LGD Products, LCD Display Products, LCD Modules, or LCD Panels that could be used, sold, offered for sale in the United States and/or LG Display employees, meetings, offices, or presentations in or regarding the United States:

a.      Apple Computer, Inc., including its affiliates and subsidiaries;

b.      TPV Technologies Limited Ltd., including its affiliates and subsidiaries;

c.      Proview International, including its affiliates and subsidiaries;

d.      Hewlett-Packard, including its affiliates and subsidiaries;

e.      Westinghouse, including its affiliates and subsidiaries;

f.      Dell, including its affiliates and subsidiaries;

g.      NEC, including its affiliates and subsidiaries;

h.      Funai Electric Co., Ltd., including its affiliates and subsidiaries (such as Funai Corporation);

i.      Samsung, including its affiliates and subsidiaries.

**Document Request No. 85**

All Documents concerning any opinion of counsel regarding the LGD Patents, including, for example, all opinions, draft opinions, notes, analyses, and Communications regarding each opinion, and all Documents received and/or considered for the purposes of each opinion.

**Document Request No. 86**

All Documents concerning strategic alliances and joint ventures between LG Display and others regarding LGD Products, LCD Display Products, LCD Modules, or LCD Panels.

**Document Request No. 87**

All Documents that identify product or project names and codenames for LGD Products, LCD Display Products, LCD Modules, or LCD Panels, and that link or correlate such names or codenames between such LGD Products, LCD Display Products, LCD Modules, or LCD Panels, or are used and/or approved for LCD Display Product projects and/or codenames.

**Document Request No. 88**

Documents sufficient to show or explain the letter and/or numbering system by which LG Display assigns model numbers and/or Part Numbers to its LGD Products, LCD Display Products, LCD Modules, or LCD Panels, including Documents sufficient to show or explain what each letter and/or number signifies.

**Document Request No. 89**

All Documents concerning any expert expected to testify for you in this case, including, for example:

      a.     each expert's reports for this case and other cases within the past four years;

      b.     all Documents considered by any expert regarding this case; and

      c.     all publications of the expert concerning any issues or subject matter related to the issues or subject matter in this action.

**Document Request No. 90**

All Documents reviewed by or received by any person LG Display expects to call as a witness at any hearing or at trial in this action to the extent such documents relate to the subject matter of this action.

**Document Request No. 91**

All Documents prepared by any person LG Display expects to call as a witness at any hearing or at trial in this action to the extent such documents relate to the subject matter of this action.

**Document Request No. 92**

All Documents and Things that LG Display may use or introduce at any hearing or trial of this action.

**Document Request No. 93**

All Documents in the possession, custody or control of each of the individuals listed on LG Display's and LGDA's Initial Disclosures that concern the LGD Patents or the subject matter of this action.

**Document Request No. 94**

All Documents identified, described, or referenced in LG Display's and LGDA's Initial Disclosures.

**Document Request No. 95**

All organizational charts and other Documents that reflect LG Display's entire

organizational structure, including the structure of your Intellectual Property department

or division, including lines of reporting and all positions, offices, divisions, units,

departments, teams, and employees within LG Display, and their corresponding titles,

functions, and responsibilities.

**Document Request No. 96**

All Documents that identify employees, officers, agents, subsidiaries, or

Representatives acting on behalf of LG Display and/or LGDA in the United States.

**Document Request No. 97**

All Documents reflecting any Communications between LG Display and any

other Person regarding CMO, CMO USA, or the following cases: *AU Optronics*

*Corporation vs. LG.Philips LCD Co., Ltd. and LG.Philips LCD America, Inc.*, Civil

Action No. 07-C-0137-S (United States District Court for the Western District of

Wisconsin); *AU Optronics Corporation vs. LG.Philips LCD Co., Ltd. and LG.Philips*

*LCD America, Inc. et al.*, Civil Action No. 07-357-JJF (United States District Court for

the District of Delaware); *LG.Philips LCD Co., Ltd. v. Chi Mei Optoelectronics*

*Corporation, et al.*, Civil Action No. 06-726-JJF (United States District Court for the

District of Delaware); *Chi Mei Optoelectronics Corporation v. LG.Philips LCD Co.,*

*Ltd. and LG.Philips LCD America, Inc.*, Civil Action No. 07-176-TJW (United States

District Court for the Eastern District of Texas); *LG.Philips LCD Co Ltd v. Chunghwa*

*Picture Tubes Ltd*, Civil Action No. 05-07004-CBM (United States District Court for

the Central District of California); *LG.Philips LCD Co., Ltd. v. Chunghwa Picture*

*Tubes Ltd., et al.*, Civil Action No. 02-6775-CBM (United States District Court for the

Central District of California); and *LG.Philips LCD Co., Ltd. v. Tatung Co., et al.*, Civil Action No. 05-292-JJF (United States District Court for the District of Delaware).

**Document Request No. 98**

All Documents concerning pleadings, discovery requests, responses to discovery requests, expert reports, claim construction briefing, claim charts, deposition transcripts, court transcripts, trial transcripts, and court orders relative to any action or lawsuit in which LG Display has alleged that any Person has infringed any LGD Patent, including, but not limited to the following cases: *AU Optronics Corporation vs. LG.Philips LCD Co., Ltd. and LG.Philips LCD America, Inc.*, Civil Action No. 07-C-0137-S (United States District Court for the Western District of Wisconsin); *AU Optronics Corporation vs. LG.Philips LCD Co., Ltd. and LG.Philips LCD America, Inc. et al.*, Civil Action No. 07-357-JJF (United States District Court for the District of Delaware); *LG.Philips LCD Co Ltd v. Chunghwa Picture Tubes Ltd*, Civil Action No. 05-07004-CBM (United States District Court for the Central District of California); *LG.Philips LCD Co., Ltd. v. Chunghwa Picture Tubes Ltd., et al.,* Civil Action No. 02-6775-CBM (United States District Court for the Central District of California); and *LG.Philips LCD Co., Ltd. v. Tatung Co.,* et al., Civil Action No. 05-292-JJF (United States District Court for the District of Delaware).

**Document Request No. 99**

All Documents concerning LG Display's participation in, sponsorship of, and/or Communications with any group, organization, or other body concerning establishing, publishing, or developing industry standards potentially relevant to LGD Products, LCD Display Products, LCD Modules, or LCD Panels.

**Document Request No. 100**

All policies, procedures, manuals, guidelines, and other Documents concerning the retention, destruction, storage, archiving, and management of Documents, records, and/or electronically stored information that apply to LG Display, LGDA or their employees.

**Document Request No. 101**

All Documents concerning efforts to identify information (including electronically stored information) relevant to claims and defenses or discovery in this case, including Documents identifying all sources of relevant information, all custodians of relevant information.

**Document Request No. 102**

All reports to your shareholders, including all annual reports, in English, since December 1, 2000.

**Document Request No. 103**

All Documents concerning LG Display stock or shares, including, but not limited to, stock offerings (such as Offering Circulars), shareholders agreements or any agreements relating to stock purchases, share purchases or asset sales or transfers to which LG Display is a party, assignor, assignee, or beneficiary.

**Document Request No. 104**

All annual reports, income statements, and financial statements concerning LG Display since December 1, 2000.

**Document Request No. 105**

All Documents and Things produced to, provided to, examined by or given to AU Optronics Corporation or AU Optronics Corporation of America in connection with this action.

**Document Request No. 106**

All Documents concerning CMO.

**Document Request No. 107**

All Documents concerning CMO USA.

**Document Request No. 108**

All English translations of any non-English documents that are responsive to any of the document request posed by CMO USA.

**Document Request No. 109**

All Documents that you identified, consulted, referred to, or relied upon in responding to any interrogatories posed by CMO USA.


OF COUNSEL:                          POTTER ANDERSON & CORROON LLP

Kenneth R. Adamo
Robert C. Kahrl                      By: _____
Arthur P. Licygiewicz                     Philip A. Rovner (#3215)
Jones Day                                 Hercules Plaza
North Point                               P. O. Box 951
901 Lakeside Avenue                       Wilmington, DE  19899
Cleveland, OH  44114-1190                 (302) 984-6000
(216) 586-3939                            provner@potteranderson.com

Dated:  April 8, 2008
859219                               *Attorneys for Defendant*
                                     *Chi Mei Optoelectronics USA, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on April 8, 2008 true and correct copies of

the within document were served on the following counsel of record, at the addresses and in the

manner indicated:

**BY HAND DELIVERY AND EMAIL**

Richard E. Kirk, Esq.
Ashley Blake Stitzer, Esq.
The Bayard Firm
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, DE  19899
rkirk@bayardfirm.com
astitzer@bayardfirm.com

**BY E-MAIL**

Gaspare J. Bono, Esq.
Matthew T. Bailey, Esq.
Lora A. Brzezynski, Esq.
Cass W. Christenson, Esq.
R. Tyler Goodwyn, IV, Esq.
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
gbono@mckennalong.com
mbailey@mckennalong.com
lbrzezynski@mckennalong.com
cchristenson@mckennalong.com
tgoodwyn@mckennalong.com

**BY HAND DELIVERY AND EMAIL**

John W. Shaw, Esq.
Karen L. Pascale, Esq.
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801
jshaw@ycst.com
kpascale@ycst.com

**BY E-MAIL**

Vincent K. Yip, Esq.
Peter J. Wied, Esq.
Jay C. Chiu, Esq.
Paul Hastings Janofsky & Walker LLP
515 South Flower Street
Los Angeles, CA  90071
vincentyip@paulhastings.com
peterwied@paulhastings.com
jaychiu@paulhastings.com

Ron E. Shulman, Esq.
Julie M. Holloway, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050
rshulman@wsgr.com
jholloway@wsgr.com

M. Craig Tyler, Esq.
Brian D. Range, Esq.
Wilson Sonsini Goodrich & Rosati
8911 Capital of Texas Highway North
Westech 360, Suite 3350
Austin, TX 78759
ctyler@wsgr.com
brange@wsgr.com

Philip A. Rovner  (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

2

EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LG DISPLAY CO., LTD., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-726 (JJF) |
| | ) | |
| CHI MEI OPTOELECTRONICS CORPORATION; AU OPTRONICS CORPORATION, AU OPTRONICS CORPORATION OF AMERICA; TATUNG COMPANY; TATUNG COMPANY OF AMERICA, INC.; AND VIEWSONIC CORPORATION, | ) | |
| Defendants. | ) | |
| AU OPTRONICS CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 07-357 (JJF) |
| | ) | |
| LG DISPLAY CO., LTD and LG DISPLAY AMERICA, INC., | ) | CONSOLIDATED CASES |
| Defendants. | ) | |

## CHI MEI OPTOELECTRONICS CORPORATION'S
## RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF REQUESTS FOR
## THE PRODUCTION OF DOCUMENTS AND THINGS

Defendant, Chi Mei Optoelectronics Corporation ("CMO"), by its counsel, hereby

responds to Plaintiff LG Display Co., Ltd.'s ("LG Display") First Set of Requests for the

Production of Documents and Things to Defendant Chi Mei Optoelectronics Corporation

("Requests").

## GENERAL OBJECTIONS

CMO asserts the following General Objections to LG Display's Requests:

1.    CMO objects to each definition, direction, or Request to the extent that they are inconsistent with or impose a duty beyond that imposed by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Delaware, and/or the Orders or instructions of this Court.

2.    CMO objects to each Request to the extent that it seeks disclosure of information or documents protected by the attorney-client privilege, work product immunity, the privilege afforded non-testifying experts by Fed. R. Civ. P. 26(b), or other applicable privilege or doctrine. Should any response by CMO include such privileged or protected information, such disclosure is inadvertent and shall not constitute a waiver of any applicable privilege or immunity or of any other ground for objecting to discovery with respect to such response, or of CMO's right to object during this litigation or otherwise to the use of such response. Reference herein to "non-privileged" documents includes those documents not protected from disclosure by the attorney-client privilege, the attorney work product doctrine, the non-testifying expert privilege, or any other applicable privilege or doctrine. Insofar as any document is withheld on these grounds, CMO will list them on an appropriate privilege log that will be timely provided to LG Display.

3.    CMO objects to each Request to the extent that it seeks information that is not within the possession, custody, or control of CMO. CMO's responses are limited to a reasonable review of the information within its possession, custody or control that is likely to be responsive to the stated Request, and shall not be construed as an admission that the requested information or documents exist or is within CMO's possession, custody, or control. CMO's statements in the following responses that it will produce "responsive, non-privileged documents" relative to a

given Request shall not be construed as a representation that responsive documents exist. Rather, the phrase means that to the extent that relevant, responsive, non-privileged documents exist that are not otherwise subject to an objection, such documents will be produced.

4.    CMO objects to each Request to the extent that (i) the discovery sought by any such Request is unreasonably cumulative, duplicative, obtainable from other sources that are more convenient, less burdensome or less expensive, the information is as easily ascertainable to LG Display as it is to CMO, or is readily available from public sources, and/or (ii) compliance with any such Request would be unduly burdensome, expensive, harassing and/or oppressive.

5.    CMO objects to the Requests as overly broad and unduly burdensome to the extent that they specify (i) no time frame, or (ii) a time frame beyond that which is relevant to this proceeding.

6.    CMO objects to each Request to the extent that it seeks the disclosure of information or documents that are not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, under Rule 26(b)(1) of the Federal Rules of Civil Procedure.

7.    CMO objects to LG Display's definition of "CMO," "you," and "your" as including any Affiliates (as that term is defined in LG Display's Interrogatories) of Chi Mei Optoelectronics Corporation, such as Chi Mei Optoelectronics USA, Inc. For purposes of its responses, CMO will construe "CMO," "you," and "your" to mean only Chi Mei Optoelectronics Corporation.

8.    CMO objects to LG Display's definition of "CMO USA" as including any Affiliates (as that term is defined in LG Display's Interrogatories) of Chi Mei Optoelectronics

USA, Inc. For purposes of its responses, CMO will construe "CMO USA" to mean only Chi Mei Optoelectronics USA, Inc.

9.      CMO objects to LG Display's definition of "CMO Products" as overly broad to the extent that it includes products other than CMO products made to specifications suitable for sale in the United States. For purposes of its responses, CMO will construe "CMO Products" to mean only those products identified in LG Display's response to CMO's Interrogatory No. 2, made to specifications suitable for sale in the United States and shipped directly to the United States.

10.     CMO objects to LG Display's definition of "CMO Customer" as overly broad to the extent that it relates to products other than CMO products made to specifications suitable for sale in the United States. For purposes of its responses, CMO will construe "CMO Customer" to mean only those customers that purchase CMO Products.

11.     CMO objects to the Requests to the extent that they seek all information or each and every piece of information that refers or relates to a particular subject on the grounds that, to respond completely, CMO would be required to seek information from all of its employees, and this would clearly be inconsistent with the provisions of Rule 26(b)(2)(iii) of the Federal Rules of Civil Procedure. In seeking relevant information, CMO will make inquiry of persons who are reasonably likely to have such documents and of other persons identified by these persons.

12.     CMO objects to LG Display's Instruction Nos. 1, 2, 4, 5, and 6 to the extent that they are inconsistent with or impose an obligation or duty beyond that imposed by the Federal Rules of Civil Procedure.

13.    CMO objects to these Requests to the extent that they seek documents or information subject to a confidentiality obligation owed to a non-party to this case, until such time that the non-party agrees to production.

14.    CMO objects to the Requests to the extent that they seek the production of confidential information in the absence of a suitable protective order.  Any offers made herein (or hereafter) to produce documents are made on the condition that, in advance of their production or provision, an appropriate protective order will be entered limiting the use and disclosure of such information.

15.    CMO reserves all rights to contest and/or object to admissibility at trial of CMO's responses to these Requests and any document or thing produced to LG Display by CMO.

16.    CMO's responses are based on its present knowledge, information and belief.  CMO reserves the right to supplement these responses.  A partial response to any Request that has been objected to in whole or in part is not a waiver of the objection.  By asserting various objections, CMO does not waive other objections that may become applicable.

Subject to and without waiving these General Objections, CMO responds and specifically objects to LG Display's Requests as follows:

## RESPONSES AND SPECIFIC OBJECTIONS

**Document Request No. 1**

All documents that you relied upon and/or identified in responding to LG Display's First Set of Interrogatories.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All

documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 2**

All organizational charts and other documents that reflect CMO's entire organizational structure, including the structure of your Intellectual Property department or division, including lines of reporting and all positions, offices, divisions, units, departments, teams, and employees within CMO, and their corresponding titles, functions, and responsibilities.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All" documents. CMO further specifically objects to this Request as not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce organizational charts that are located after a reasonable search.

**Document Request No. 3**

All documents reflecting the relationship between CMO and CMO USA, currently and historically, including, but not limited to, concerning the extent to which CMO and CMO USA jointly or separately make decisions; appoint or control employees, officers, and directors; own or control shares of stock in each other; and/or report or control sales and revenue.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce annual reports and other responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 4**

All documents concerning and summarizing transactions between CMO and CMO USA, including all information concerning sales, shipments, and imports of CMO Products by or to CMO USA.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents and things relating to transactions between CMO and CMO USA, other than those relating to CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce invoices and shipping records that are located after a reasonable search relative to CMO Products.

**Document Request No. 5**

All documents concerning employees, officers, agents, subsidiaries, or representatives acting on behalf of CMO and/or CMO USA in the U.S.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as overly broad and unduly burdensome and as not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to activities regarding products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning activities relative to CMO Products in the United States.

**Document Request No. 6**

All documents, including, but not limited to, summaries, reports, communications, price quotations, and negotiations, concerning or reflecting offers to sell and/or supply CMO Products, and all date, customer, Brand, product, model, quantity, price, order, payment, and/or shipment information regarding such offers to sell.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents concerning offers to sell and/or supply products other than CMO products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce invoices, shipping records, and purchase orders that are located after a reasonable search relative to CMO Products.

**Document Request No. 7**

All documents, including, but not limited to, summaries, reports, communications, price quotations, negotiations, purchase orders, bills of sale, bills of lading and invoices concerning or reflecting sales, shipments forecasts and/or projections related to CMO Products, both worldwide and in the U.S. since December 1, 2000, and all date, customer, Brand, product, model, quantity, price, order, payment, and/or delivery information regarding such sales and shipments on an annual and monthly basis.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks

documents concerning sales, shipments forecasts and/or projections related to products other than CMO products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce invoices, shipping records, and purchase orders that are located after a reasonable search related to CMO Products.

**Document Request No. 8**

All documents, in native format, summarizing and reflecting sales, shipments, price per unit, gross profit per unit, net profit per unit, fixed cost per unit, and variable cost per unit of CMO Products, for each LCD panel and LCD module made and sold by or for you since December 1, 2000, including identifying from whom each product was shipped and to whom each product was shipped.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents, in native format." CMO also specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents concerning sales, shipments, price per unit, gross profit per unit, net profit per unit, fixed cost per unit, and variable cost per unit relating to products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that to its knowledge, no such summary documents exist, and that it will produce responsive, non-privileged documents, if any, located after a reasonable search reflecting sales,

shipments, price per unit, gross profit per unit, net profit per unit, fixed cost per unit, and variable

cost per unit relating to CMO Products.

**Document Request No. 9**

All documents concerning the actual or potential sale, marketing, advertising, distribution,

shipment, or delivery of CMO Products and/or LCD display products in, to, or for the United

States, including all documents concerning any meetings or presentations in the U.S. attended by

CMO and/or CMO USA.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request

as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All

documents." CMO also specifically objects to this Request as overly broad, unduly burdensome

and as seeking information and documents not relevant to any claim or defense in this action, or

reasonably likely to lead to the discovery of information relevant to any claim or defense.

Subject to and without waiving the foregoing specific and General Objections, CMO

states that it will produce responsive, non-privileged documents, if any, located after a

reasonable search concerning the marketing, supply, distribution, shipping, and/or importation of

CMO Products, or products containing CMO Products purchased by CMO Customers.

**Document Request No. 10**

All documents and communications concerning the use, making, importation, sale, and

offer to sell, in or to the U.S. since December 1, 2000 of LCD modules or LCD panels made or

sold by or for you, or LCD display products that include LCD modules or LCD panels made by

you, including any documents that identify each person that imported, received, purchased,

distributed, sold or offered for sale in or to the U.S. each LCD display product, LCD module, and

LCD panel, and the quantity, price, Brand, and Part Number of each LCD display product, LCD

module, and LCD panel imported, received, purchased, distributed, and sold each month since

December 1, 2000.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request

as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All

documents." CMO also specifically objects to this Request as overly broad, unduly burdensome

and as seeking information and documents not relevant to any claim or defense in this action, or

reasonably likely to lead to the discovery of information relevant to any claim or defense.

Subject to and without waiving the foregoing specific and General Objections, CMO

states that it will produce invoices, shipping records, and purchase orders that are located after a

reasonable search relative to CMO Products.

**Document Request No. 11**

All documents, in native format if available, summarizing transactions since December 1,

2000 with any CMO Customer, distributor, reseller, and retailer that either does business in part

or has an Affiliate that does business in part in the U.S. concerning CMO Products and/or LCD

display products that may contain CMO Products, including, but not limited to, all offers to sell,

sales, orders, shipments, and imports.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request

as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All

documents, in native format if available." CMO also specifically objects to this Request as

overly broad, unduly burdensome and not relevant to any claim or defense in this action, or

reasonably likely to lead to the discovery of information relevant to any claim or defense,

particularly to the extent that it seeks documents concerning transactions with any CMO customer, distributor, reseller, and retailer relative to products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce invoices, shipping records, and purchase orders that are located after a reasonable search relative to CMO Products.

**Document Request No. 12**

All documents, in native format if available, that identify each LCD display product that has used or incorporated any CMO Products, including which CMO Product Brands, models and Part Numbers have been used or incorporated in which LCD display product Brands, models and Part Numbers since December 1, 2000 and in what quantities.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents, in native format if available." CMO also specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning CMO Products.

**Document Request No. 13**

Documents sufficient to show for each CMO Customer each product, identified by model and Part Number, that you have made, sold, offered for sale, shipped, or supplied to or for that customer since December 1, 2000.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents, in native format if available." CMO also specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce invoices, shipping records, and purchase orders that are located after a reasonable search relative to CMO Products.

**Document Request No. 14**

All contracts and agreements between CMO and CMO Customers (including Brands and any original equipment manufacturers or systems integrators that use CMO Products such as AOC, Foxconn, TPV, Jean, Lite-On, and BenQ) concerning CMO products and/or LCD display products (such as, but not limited to Letters of Agreement, Long Term Agreements, Master Purchase Agreements, Product Purchase Agreements, Memoranda of Understanding, Base Agreements, Evaluation and Testing Schedules, Statements of Work, Supplier Agreements, Supplier Quality Agreements, Product Return Schedules, Adoption Agreements, Plan of Record Risks Agreements, Indemnification Agreements, Joint Marketing Agreements, and Goods Agreements).

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All contracts and agreements." CMO also specifically objects to this Request as overly broad,

unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely

to lead to the discovery of information relevant to any claim or defense, particularly to the extent

that it seeks documents relating to products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO

states that it will produce responsive, non-privileged documents, if any, located after a

reasonable search concerning CMO Products purchased by CMO Customers.

**Document Request No. 15**

All documents concerning communications, and other documents exchanged, between or

among CMO and CMO Customers (including any Brands and any original equipment

manufacturers or systems integrators that use CMO Products) or potential CMO customers

regarding the design, manufacture, testing, use, sale, marketing, supply, distribution, shipping,

and/or importation of CMO Products, or products containing CMO Products, including, but not

limited to proposals, quotes, instructions, specifications, and reports (such as Road Maps,

Business/Biz Alignment presentations, Materials Restricted for Use documents, Product

Codenames, Overviews, Quarterly Updates, Market Updates, Forecasts, Feasibility Studies,

Product Strategies, Quarterly Business Reviews, LCD Market Reports, Performance Updates,

Meeting Agendas, Service Proposals, Product Proposals, Pricing Mechanism Proposals, Sales

Kits, Product or Business Meeting Agendas, Company Profiles, and Action Plans).

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request

as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All

documents." CMO also specifically objects to this Request as overly broad, unduly burdensome

and not relevant to any claim or defense in this action, or reasonably likely to lead to the

discovery of information relevant to any claim or defense, particularly to the extent that it seeks

-15-

documents relating to the design, manufacture, testing, use, sale, marketing, supply, distribution, shipping, and/or importation of products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning the design, manufacture, testing, use, sale, marketing, supply, distribution, shipping, and/or importation of CMO Products, or products containing CMO Products purchased by CMO Customers.

**Document Request No. 16**

All documents concerning strategic alliances and joint ventures including, but not limited to agreements and related communications between CMO and NEC, TPV, IBM and/or Fujitsu.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent that it seeks documents relating to strategic alliances or joint ventures concerning products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce agreements located after a reasonable search relating to strategic alliances or joint ventures relative to CMO Products between CMO and TPV, IBM and Fujitsu. CMO is not aware of any documents regarding NEC responsive to this document request.

-16-

**Document Request No. 17**

All reports, forecasts, projections, plans, estimates, revenues, and data compilations, in native format if available, created, generated, received or maintained, including the computer databases or document management systems in which such documents are located, concerning the revenues, profitability, manufacturing, marketing, advertising, importation, distribution, purchase and sales of LCD display products, LCD modules or LCD panels made, sold, or offered for sale, by or for you, on a monthly basis since December 1, 2000.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All" documents "in native format if available." CMO also specifically objects to this request as overly broad and unduly burdensome to the extent that it call for CMO to produce "the computer database or document management systems in which such documents are located." CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning CMO Products.

**Document Request No. 18**

All documents exchanged between CMO and any of the following concerning CMO Products, including all accused products and products that could be considered similar to accused products:

-17-

a.   Apple Computer, Inc., including its affiliates and subsidiaries;

b.   TPV Technologies Limited Ltd., including its affiliates and subsidiaries;

c.   Proview International, including its affiliates and subsidiaries;

d.   Hewlett-Packard, including its affiliates and subsidiaries;

e.   Westinghouse, including its affiliates and subsidiaries;

f.   Dell, including its affiliates and subsidiaries;

g.   Funai Electric Co., Ltd., including its affiliates and subsidiaries (such as Funai Corporation);

h.   NEC, including its affiliates and subsidiaries;

i.   Samsung, including its affiliates and subsidiaries.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this request as vague and ambiguous to the extent that it calls for CMO to produce documents concerning "all accused products and products that could be considered similar to accused products" as LG Display has yet to accuse any CMO products of infringement. CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to products other than CMO products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning CMO Products.

-18-

**Document Request No. 19**

All documents exchanged between CMO and any of the following concerning the United States, including, for example, with respect to U.S. market trends or consumer preferences, CMO Products that could be used or sold in the U.S., and/or CMO employees, meetings, offices, or presentations in or regarding the U.S.:

      a.     Apple Computer, Inc., including its affiliates and subsidiaries;

      b.     TPV Technologies Limited Ltd., including its affiliates and subsidiaries;

      c.     Proview International, including its affiliates and subsidiaries;

      d.     Hewlett-Packard, including its affiliates and subsidiaries;

      e.     Westinghouse, including its affiliates and subsidiaries;

      f.     Dell, including its affiliates and subsidiaries;

      g.     NEC, including its affiliates and subsidiaries;

      h.     Funai Electric Co., Ltd., including its affiliates and subsidiaries (such as Funai Corporation);

      i.     Samsung, including its affiliates and subsidiaries.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to products other than CMO Products.

-19-

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search relative to CMO Products.

**Document Request No. 20**

All documents concerning any meeting, strategy, presentation, communication, plan, or efforts by or involving CMO to sell, supply, import, advertise, market, promote, or distribute LCD modules and LCD panels to CMO Customers, potential customers, and/or any Brand or company that sells LCD display products.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to the sale, marketing, supply, import, advertising, marketing, promotion, or distribution of products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning the sale, marketing, supply, import, advertising, marketing, promotion, or distribution of CMO Products to CMO Customers.

**Document Request No. 21**

All documents regarding any marketing and advertising of CMO Products, including but not limited to, budgets, advertisements, meeting agendas, presentations (such as the "CMO Competence" presentation), meeting notes, marketing plans and reports, Sales Kits, Joint Marketing Agreements, Product and/or Technology Road Maps, attendance at trade shows worldwide, trademarks applied for or registered for, travel approval forms for travel worldwide, and communications.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to the marketing and advertising of products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce U.S. trademark registrations, travel approval forms, marketing materials and other responsive, non-privileged documents, if any, located after a reasonable search concerning the marketing and advertising of CMO Products.

**Document Request No. 22**

All documents exchanged between CMO and DisplaySearch or any other market research publisher concerning LCD modules, LCD panels, CMO Products, or CMO Customers, including, but not limited to, financial information.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent that it seeks documents relating to a country other than the United States or products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning the United States market or CMO Products.

**Document Request No. 23**

All documents generated or relied upon by CMO since December 1, 2000 that reference information or data from DisplaySearch or any other market research publisher.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent that it seeks documents relating to a country other than the United States or products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning the United States market or CMO Products.

**Document Request No. 24**

All documents concerning the U.S. and/or North American market for CMO products and LCD display products.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent that it seeks documents relating to any market other than the United States, or products other than CMO products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce purchase orders and other responsive, non-privileged documents, if any, located after a reasonable search concerning the United States market or CMO Products.

**Document Request No. 25**

All documents concerning the marketing and/or sale of LCD display products in or for the U.S. and/or North American market, including, for example, communications with Brands, CMO Customers, or potential customers that sell in the U.S. any LCD display products that contain CMO Products.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests

documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to any market other than the United States, or the marketing and/or sale of products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce purchase orders and other responsive, non-privileged documents, if any, located after a reasonable search concerning the United States market or the marketing and/or sale of CMO Products.

**Document Request No. 26**

All documents concerning any trips to the United States by any CMO employee regarding CMO products.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents concerning any trips." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce travel approval forms and other responsive, non-privileged documents, if any, located after a reasonable search concerning any trips to the United States related to CMO Products sold to a CMO Customer.

**Document Request No. 27**

All documents concerning any trips by any CMO or CMO USA employee to any CMO

customer, potential CMO customer, or Brand that does business in part in the U.S. or is an

Affiliate of an entity that does business in the U.S., including but not limited to any Dell or

Hewlett Packard locations outside the U.S.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request

as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All

documents." CMO also specifically objects to this Request as overly broad, unduly burdensome

and not relevant to any claim or defense in this action, or reasonably likely to lead to the

discovery of information relevant to any claim or defense, to the extent that it seeks documents

relating to LCD display products, other than those made to specifications suitable for sale in the

United States.

Subject to and without waiving the foregoing specific and General Objections, CMO

states that it will produce travel approval forms and other responsive, non-privileged documents,

if any, located after a reasonable search concerning any trips to the United States relative to

CMO Products sold to a CMO Customer.

**Document Request No. 28**

Documents sufficient to identify each person who imported and/or sold in the U.S. any

CMO Products since December 1, 2000.

**Response:**

In addition to the foregoing General Objections, CMO also specifically objects to this

Request as overly broad, unduly burdensome and as seeking information and documents not

relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce invoices, shipping records, and purchase orders that are located after a reasonable search relative to CMO Products.

**Document Request No. 29**

All documents concerning any laws, regulations, or requirements in the U.S. that apply to CMO Products or LCD display products, including, but not limited to, documents evidencing compliance with any such U.S. laws, regulations, and requirements (for example, UL and EPA requirements).

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this request as overly broad, unduly burdensome, vague and ambiguous to the extent that it calls for CMO to produce documents concerning "any laws, regulations, or requirements in the U.S. that apply to CMO Products or LCD display products." CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search relating to CMO Products.

**Document Request No. 30**

All documents that you submitted, filed with, and received since December 1, 2000, from any U.S. (federal, state or local) government agency or authority concerning the importation and/or sale of CMO Products, and any requirements or approvals for such sales and imports.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this request as overly broad, unduly burdensome, vague and ambiguous to the extent that it calls for CMO to produce documents concerning "U.S. (federal, state or local) government agency or authority concerning the importation and/or sale of CMO Products." CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense.

Subject to and without waiving the foregoing specific and General Objections, CMO states that, to its knowledge, no non-privileged documents exist that are responsive to this Request.

**Document Request No. 31**

All documents concerning the service, and/or repair in the U.S. of CMO Products and/or LCD display products that contain CMO Products, including, for example, documents identifying or concerning companies that have provided, or are authorized to provide, warranty or other repair service to CMO Products in the U.S. (such as, but not limited to Teleplan, Peripheral Computer Support and Jabil Circuit) and all contracts, agreements and communications with such companies (such as, but not limited to, Statements of Work, Repair

-27-

Service Programs, Prospective Global Service Questionnaires, Spare Parts Purchase Orders, and Repair Memos for Repair Centers).

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request as overly broad, unduly burdensome and as seeking information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce warranty / repair service agreements concerning the service and/or repair in the United States of CMO Products that are located after a reasonable search.

**Document Request No. 32**

All documents concerning the manufacture of any CMO TFT array or TFT substrate including, but not limited to, TFT array Specifications that describe or disclose the material composition of each layer of each substrate; process Specifications that describe or disclose the steps for forming (e.g., cleaning, depositing, coating, etching, and/or stripping) each layer of each substrate, and mask files (i.e., electronic files such as GDS-II) that describe or disclose the layer patterns of each substrate.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the

discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning the manufacture of any CMO TFT array or TFT substrate for CMO Products.

**Document Request No. 33**

All documents concerning the design and/or analysis of the structure of any thin-film transistor on any CMO TFT substrate including, but not limited to, documents that describe or disclose the cross section structure of a TFT, and documents that describe or disclose testing, analysis, or evaluation, including performance, produceability, operation, yield, reliability, fault, or quality control, of CMO Products including components or structures of TFT arrays and LCD panels.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning the design and/or analysis of the structure of any thin-film transistor on any CMO TFT substrate for CMO Products.

**Document Request No. 34**

All documents concerning any CMO cell assembly process including, but not limited to, product Specifications and CAD files that describe or disclose patterns (e.g., seal printing or seal dispensing, liquid crystal filling, Au or Ag dispensing, UV light masking, and/or glass cutting) on the CMO TFT substrate and/or the CMO Color Filter Substrate; process Specifications that describe or disclose the steps for assembling (e.g., cleaning, printing, filling, dispensing, attaching, exposing to UV light, baking, cutting, beveling, and/or bubble removal) an CMO LCD panel; and material Specifications that describe or disclose the sealant material (e.g., by designated product name, supplier, and/or composition) for each CMO LCD panel.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning any CMO cell assembly process for CMO Products.

**Document Request No. 35**

All documents concerning any CMO cell assembly material flow and fabrication equipment, including, but not limited to, fabrication equipment floor layouts for all cell assembly production lines; Specifications that describe or disclose a cell production line as serial, single or

-30-

other similar designation; and documents that describe or disclose the process flow, control, relative timing, and/or operation of the seal dispensing, liquid crystal dispensing, cleaning, and/or assembly equipment in each cell assembly production line.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request as vague and ambiguous to the extent that it calls for CMO to produce documents concerning "flow and fabrication equipment." CMO also specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning any CMO cell assembly material fabrication equipment for CMO Products.

**Document Request No. 36**

Representative samples of each distinct type of CMO's LCD modules and LCD panels.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad, unduly burdensome, vague and ambiguous to the extent that it calls for CMO to produce samples of "each distinct type of CMO's LCD modules and LCD panels."

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will meet and confer with LG Display regarding a procedure for the parties to mutually make samples available.

**Document Request No. 37**

All documents concerning the designs, structures, procedures, process conditions, equipment used, materials, functions, analysis, operation, absence, use, and/or purpose of the following with respect to your products and manufacturing:

a.    Electrostatic Discharge Protection, including:

      i.    structures or components on a TFT substrate or LCD Panel;

      ii.    manufacturing process steps that relate to electrostatic charge or discharge; and

      iii.    equipment, environmental conditions or procedures that relate to reducing electrostatic charge, discharge, or dispersal of discharge; and

      iv.    testing, analysis, or evaluation (including performance, produceability, yield, reliability, fault, or quality control) of structures, equipment, conditions or procedures related to electrostatic charge, discharger or dispersal of discharge;

b.    TFT substrate and Color Filter design and manufacture, including:

      i.    procedures, process conditions and materials used for the deposition and patterning of each layer;

      ii.    design and measurement of component performance (e.g., threshold voltage, capacitance values), material characteristics (e.g., resistivity) and pattern parameters (e.g., thickness, width, length, shape); and

      iii.    design and operation of components and layers depicted in mask files; and

      iv.    testing, analysis, or evaluation (including performance, produceability, yield, reliability, fault, or quality control) of individual layers, physical interrelationships between layers, and electrical characteristics of interrelationships between layers;

c.    Cell assembly, including:

      i.      applying or dispensing sealant, including patterns as depicted in CAD files;

      ii.     procedures and equipment used for applying or curing the sealant;

      iii.    applying, dispensing, or injecting liquid crystal material;

      iv.    aligning, joining and cutting TFT and Color Filter substrates;

      v.     optical compensation structures, including films;

      vi.    testing, analysis, or evaluation (including performance, produceability, yield, reliability, fault, or quality control) of sealant application or dispensing patterns; and

      vii.   evaluation of production line capacity, throughput or costs associated with each production line;

   d.    Module assembly, including:

      i.      backlight unit structures and components;

      ii.     design, operation and interrelationship of components depicted in CAD files; and

      iii.    driver circuit attachment and operation.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning the electrostatic discharge protection, TFT substrate and color filter design and manufacture, cell assembly, and module assembly for CMO Products.

-33-

**Document Request No. 38**

All documents regarding any product, publication, patent, or other document or thing that you contend qualifies as prior art to the LG Display Patents.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 39**

All documents concerning the monetary value of the LG Display Patents (whether individually, together, or as part of a larger portfolio), including but not limited to any appraisals, reports, or opinions.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity.

Subject to and without waiving the foregoing specific and General Objections, CMO states that, to its knowledge, no non-privileged documents exist that are responsive to this Request.

**Document Request No. 40**

All documents concerning the monetary value of the CMO Patents (whether individually, together, or as part of a larger portfolio), including but not limited to any licenses, accounting records, settlement agreements, appraisals, reports, or opinions.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about which CMO has not yet made infringement allegations in this case.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 41**

All documents reflecting any indemnification provisions or agreements, transfer or conveyance of assets or liabilities, contracts, rights, and interests concerning CMO products since December 1, 2000.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests

documents subject to the attorney-client privilege and/or work product immunity. CMO also specifically objects to this Request as overly broad, unduly burdensome and as seeking information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, particularly to the extent that it seeks documents relating to products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce indemnification agreements that are located after a reasonable search concerning CMO Products.

**Document Request No. 42**

All documents concerning the existence or absence of acceptable, non-infringing alternatives to any products upon which CMO bases its claim for damages, and the features of such alternatives.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as overly broad, unduly burdensome and as seeking information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, because, to date, CMO has not made any allegation relative to infringement of the CMO Patents or any damages related thereto. CMO further objects that the Request is premature as the relevant patent claims and claim terms that have not yet been construed by the Court.

**Document Request No. 43**

All documents concerning any contention by you regarding whether or not any CMO product or process infringes one or more claims of an LG Display Patent, whether literally or under the doctrine of equivalents.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request to the extent that it seeks to shift the burden regarding infringement of the LG Display Patents to CMO. CMO still further specifically objects to this Request as premature to the extent that it seeks documents that CMO may rely on to support its contentions, and as the relevant patent claims and claim terms that have not yet been construed by the Court.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 44**

All documents concerning any contention by you regarding whether or not any LG Display product or process infringes one or more claims of an CMO Patent, whether literally or under the doctrine of equivalents.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All

-37-

documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about which CMO has not yet made infringement allegations in this case. CMO further objects that the Request is premature as the relevant patent claims and claim terms that have not yet been construed by the Court. CMO still further specifically objects to this Request as premature to the extent that it seeks documents that CMO may rely on to support its contentions.

**Document Request No. 45**

All documents concerning any opinion of counsel regarding the LG Display Patents, including, for example, all opinions, draft opinions, notes, analyses, and communications regarding each opinion, and all documents received and/or considered for the purposes of each opinion.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request on the grounds that it is premature.

**Document Request No. 46**

All communications concerning the LG Display Patents or any counterpart thereof, including but not limited to, internal memoranda, e-mail, and correspondence between you and your officers, agents, consultants, subcontractors, and employees.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All communications." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 47**

All documents concerning the conception, design, reduction to practice (actual and constructive), diligence or lack of diligence in reduction to practice, research, and development of each invention, product, device, service, method, or activity, that relates to or is covered by one or more of the claims of the CMO Patents or the Foreign Counterparts of the CMO Patents, including but not limited to, all product proposals, design notes, engineering notebooks, laboratory notebooks, memoranda, drawings, specifications, prototypes, computer software, change orders, publications, and printed matter concerning such products, devices, services, methods, or activities, and any written description, printed publication or disclosure prior to the respective application dates for each of the CMO Patents, whether in the U.S. or elsewhere.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about which CMO has not yet made infringement allegations in this case.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 48**

All documents concerning any use, whether public or otherwise and whether experimental or otherwise, of each alleged invention corresponding to any claims of the CMO Patents or the Foreign Counterparts of the CMO Patents prior to the respective application dates for each of the CMO Patents, whether in the U.S. or elsewhere.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to

-40-

any claim or defense, to the extent it seeks documents relating to CMO Patents and/or the

Foreign Counterparts about which CMO has not yet made infringement allegations in this case.

Subject to and without waiving the foregoing specific and General Objections, CMO

states that it will produce responsive, non-privileged documents, if any, located after a

reasonable search.

**Document Request No. 49**

With respect to each of the CMO Patents and Foreign Counterparts of the CMO Patents,

and including any interference or reexamination thereof or related thereto, the following

categories of documents:

a.      the complete patent prosecution files and all documents relating to prosecution of

each of the CMO Patents;

b.      all documents concerning the decision to file each application, the scope of the

claims during prosecution, the naming of inventors or any amendment thereof, and the

preparation of the patent application(s);

c.      all documents reviewed, consulted, considered, or prepared in connection with the

preparation or prosecution of each application, including, without limitation, any prior art or

potential prior art identified or known during prosecution;

d.      all drafts of the application(s), any amendments thereof, any responses to Patent

Office actions and any other papers filed during prosecution;

e.      all documents concerning communication with or from any third person or any of

the inventors or possible inventors or any person at any time named as an inventor;

f.      all documents concerning communications with or from any patent attorney,

patent agent, or prior art searcher relating to the prior art, the invention, applications, or the

prosecution of the application(s);

-41-

g.     all documents relating to references cited by or to the United States Patent and

Trademark Office or any foreign patent office during the prosecution of the application(s); and

h.     all documents concerning ownership and/or assignments or transfers of interest

with respect to the CMO Patents.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request

as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All

documents" or "all drafts." CMO also specifically objects to this Request to the extent that it

requests documents subject to the attorney-client privilege and/or work product immunity. CMO

further specifically objects that this Request seeks information and documents not relevant to any

claim or defense in this action, or reasonably likely to lead to the discovery of information

relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about

which CMO has not yet made infringement allegations in this case.

Subject to and without waiving the foregoing specific and General Objections, CMO

states that it will produce responsive, non-privileged documents, if any, located after a

reasonable search.

**Document Request No. 50**

All documents concerning all links in the chain of title or ownership of the CMO Patents,

the Foreign Counterparts of the CMO Patents, or related family patent rights, beginning with the

inventors, including but not limited to all assignment documents and all documents referring or

relating to the acquisition of the CMO Patents, the Foreign Counterparts of the CMO Patents, or

related family patent rights.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents and/or Foreign Counterparts of the CMO Patents about which CMO has not yet made infringement allegations in this case.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce any assignment agreements and related non-privileged communications, if any, located after a reasonable search.

**Document Request No. 51**

All documents concerning the actual or potential purchase, sale, or transfer of any rights or interest in or to the CMO Patents, including but not limited to communications, negotiations, offers, discussions, presentations, meeting notes, meeting minutes, analyses, agreements, contracts, assignments, and licenses, including all drafts, modifications or amendments (if any) thereof, and documents exchanged with third parties.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further

-43-

specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about which CMO has not yet made infringement allegations in this case.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce any assignment agreements and related non-privileged communications, if any, located after a reasonable search.

**Document Request No. 52**

All documents concerning all communications between CMO and any third-party related to the CMO Patents or the subject matter of the CMO Patents.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO also specifically objects to this request as overly broad and unduly burdensome to the extent that it calls for CMO to produce documents concerning "the subject matter of the CMO patents." CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about which CMO has not yet made infringement allegations in this case.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce any assignment agreements and related non-privileged communications, if any, located after a reasonable search.

**Document Request No. 53**

All documents concerning any prior art relevant to the LG Display Patents and/or the CMO Patents, including all prior art or potential prior art references to those Patents-in-Suit or their respective Foreign Counterparts.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about which CMO has not yet made infringement allegations in this case.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 54**

All documents concerning any contention that secondary considerations show the CMO Patents and the Foreign Counterparts of the CMO Patents to be non-obvious, including, without limitation, documents relevant to:

    a.     any alleged long-felt need, or absence thereof, for the subject matter of any of the claims of the CMO Patents;

    b.     any alleged commercial success, or lack thereof, of the subject matter of any of the claims of the CMO Patents;

c.      any alleged copying by others, or lack thereof, of the subject matter of any of the claims of the CMO Patents;

d.      any alleged praise, or absence thereof, for the subject matter of any of the claims of the CMO Patents;

e.      any alleged unexpected results, or lack thereof, of the subject matter of any of the claims of the CMO Patents;

f.      any alleged skepticism, or lack thereof, concerning the subject matter of any of the claims of the CMO Patents; or

g.      any alleged nexus or lack thereof between the use of the subject matter claimed in the CMO Patents and the alleged commercial success of products or services using or incorporating that subject matter.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about which CMO has not yet made infringement allegations in this case. CMO further specifically objects to this Request as premature to the extent that it seeks documents that CMO may rely on to support its contentions.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 55**

All documents received by CMO from LG Display or any person, referencing any LG Display Patents.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 56**

All documents sent by or on behalf of CMO to LG Display or any person affiliated with LG Display, referencing any CMO Patents.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents

-47-

relating to CMO Patents about which CMO has not yet made infringement allegations in this case.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 57**

All documents relating to any alleged commercial success of CMO's products or third party products that are comparable to the accused LG Display products, including but not limited to documents relating to the nexus between the alleged commercial success and the subject matter of the CMO Patents; licensing revenue attributed to licensing of the patents; the total market in which the relevant products compete and the percent of the market (based on units or dollars) which is attributable to such products; commendation or tribute by competitors, customers, or others in the industry to any alleged advance attributed to any of the relevant products; actual savings achieved by use of any of the relevant products and the basis for computing such savings; ratings of allegedly infringing products; and significance of Brand name or trademark in this market.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this request as vague and ambiguous to the extent that it calls for CMO to produce documents concerning "third party products that are comparable to the accused LG Display products." CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it

seeks documents relating to CMO Patents about which CMO has not yet made infringement allegations in this case.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 58**

All documents concerning the utility, advantages, problems, and solutions corresponding to inventions disclosed, described or claimed in any of the CMO Patents and/or LG Display Patents.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about which CMO has not yet made infringement allegations in this case.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 59**

All documents that identify employees, officers, agents, subsidiaries, or representatives acting on behalf of CMO and/or CMO USA in the U.S.

**Response:**

See Response to Document Request No. 5.

**Document Request No. 60**

All documents concerning indemnification for any infringement or liability with respect to the LG Display Patents, including, but not limited to, any documents constituting or incorporating any indemnification agreements or provisions to which you are a party.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent that it seeks documents concerning activities in a country other than the United States.

Subject to and without waiving the foregoing specific and General Objections, CMO states that, to its knowledge, no responsive, non-privileged documents exist.

**Document Request No. 61**

All license agreements, covenants not to sue, and related agreements to which CMO is a party, including all addendums, amendments, and exhibits to such license agreements.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All" documents. CMO also specifically objects to this Request to the extent that it requests

documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent that it seeks documents concerning activities in a country other than the United States.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce license agreements to which CMO is a party that are located after a reasonable search.

**Document Request No. 62**

All license agreements and related agreements concerning LCD modules, LCD panels, LCD display products, and/or the manufacture or assembly of any such products, including all addendums, amendments, and exhibits to such license agreements.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All" documents. CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent that it seeks documents relative to LCD display products, modules, or panels, other than those made to specifications suitable for sale in the United States.

-51-

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce license agreements to which CMO is a party that are located after a reasonable search.

**Document Request No. 63**

All documents concerning your former or current patent licensing policies, practices or strategies, and including documents regarding the identity and significance of all factors that you have considered when negotiating license agreements or valuing technology for licensing purposes from December 1, 2000 to the present.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 64**

All documents relating to CMO's first awareness of each allegedly infringing act or product for which CMO seeks any recovery against LG Display, including when CMO first determined that any LG Display Product or process infringes one or more claims of any CMO Patent.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All

-52-

documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, because, to date, CMO has not sought any recovery from LG Display in this case for any infringing act or product.

**Document Request No. 65**

All documents concerning any lost profits sought by CMO in this case.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO also specifically objects to this Request to the degree it prematurely seeks expert discovery. CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about which CMO has not yet made infringement allegations this case. CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, because, to date, CMO has not sought profits in this case.

**Document Request No. 66**

All documents concerning any reasonable royalty sought by CMO in this case, including with respect to each of the factors referenced *Georgia-Pacific Corp. v. United States*

*Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff 'd*, 446 F.2d 295 (2d

Cir. 1971), and royalty damages claimed for each CMO Patent.

**Response:**

      In addition to the foregoing General Objections, CMO specifically objects to this Request

as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All

documents." CMO also specifically objects to this Request to the extent that it requests

documents subject to the attorney-client privilege and/or work product immunity. CMO also

specifically objects to this Request to the degree it prematurely seeks expert discovery. CMO

further specifically objects that this Request seeks information and documents not relevant to any

claim or defense in this action, or reasonably likely to lead to the discovery of information

relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about

which CMO has not yet made infringement allegations in this case. CMO further specifically

objects to this Request as overly broad, unduly burdensome and not relevant to any claim or

defense in this action, or reasonably likely to lead to the discovery of information relevant to any

claim or defense because, to date, CMO has not sought reasonable royalties in this case.

**Document Request No. 67**

      All documents reflecting all valuations and the methodology or basis that you have used

since December 1, 2000, to negotiate or calculate the rate or amount of royalty regarding any

patents concerning technology used in or for LCD modules, LCD panels, LCD display products,

or manufacturing as to any such products.

**Response:**

      In addition to the foregoing General Objections, CMO specifically objects to this Request

as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All

documents." CMO also specifically objects to this Request to the extent that it requests

documents subject to the attorney-client privilege and/or work product immunity.  CMO further specifically objects to this request as vague and ambiguous to the extent that it calls for CMO to produce documents concerning "technology used in or for LCD modules, LCD panels, LCD display products, or manufacturing as to any such products."

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 68**

All documents concerning the types of technology involved in any license agreement to which CMO is a party, and documents reflecting the extent to which any existing licenses involve technology that is relevant or comparable to the subject matter of the CMO Patents and/or the LG Display Patents.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents."  CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity.  CMO further specifically objects to this request as vague and ambiguous to the extent that it calls for CMO to produce documents concerning "the types of technology involved in any license agreement to which CMO is a party" and "technology that is relevant or comparable to the subject matter of the CMO Patents and/or the LG Display Patents."

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search related to CMO Products that may be covered by any CMO Patent.

**Document Request No. 69**

All documents reflecting any marking or obligation to mark products with any of the CMO Patent numbers and/or LG Display Patent numbers.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about which CMO has not yet made infringement allegations in this case.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 70**

All documents concerning any products that allegedly infringe one or more claims of any CMO Patents.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents" and "any products." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as not relevant to any claim or defense in this

action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, in that it seeks information unrelated to any claim that may be asserted against LG Display.  CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about which CMO has not yet made infringement allegations in this case.

**Document Request No. 71**

Documents sufficient to determine the manufacturing cost and yield for all CMO Products and fabrication plants, including, but not limited to, manufacturing cost reports and any other documents reflecting product yield, changes in product yield, and reasons for changes in product yield for each fabrication plant.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense.

Subject to and without waiving the foregoing specific and General Objections, CMO states that, to its knowledge, no responsive, non-privileged documents exist.

**Document Request No. 72**

All documents concerning the LG Display Patents, including, but not limited to documents reflecting knowledge and awareness of the LG Display Patents, documents used or created by any investigations undertaken by you or on your behalf (including, for example, prior art searches, tests, reverse engineering, or analysis related to patent scope, validity, and infringement), and any documents and communications regarding any lawsuits involving the LG Display Patents.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 73**

All documents concerning any analyses or procedures for review of your competitors' patents, including any LG Display patents whether part of this suit or not.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent that it seeks documents relating to "any analyses or procedures for review of your competitors' patents" other than the LG Display patents at issue in this case.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search related to the LG Display Patents.

-58-

**Document Request No. 74**

All documents that identify product or project names and codenames for LCD display products, and that link or correlate such names or codenames to CMO Products used and/or approved for those LCD display product projects and/or codenames.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent that it seeks documents relating to CMO products, other than those made to specifications suitable for sale in the United States.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce mapping tables concerning CMO Products.

**Document Request No. 75**

All documents concerning any expert expected to testify for you in this case, including, for example:

    a.    each expert's reports for this case and other cases within the past four years;

    b.    all documents considered by any expert regarding this case; and

    c.    all publications of the expert concerning any issues or subject matter related to the issues or subject matter in this case.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity or other

applicable privilege or immunity or agreement among the parties. CMO further specifically objects to this Request as premature.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search in accordance with the Federal Rules of Civil Procedure and the Rule 16 Scheduling Order entered by this Court.

**Document Request No. 76**

All documents reflecting any communications between CMO and any other person regarding LG Display, LGDA, or the following cases: *AU Optronics Corporation vs. LG.Philips LCD Co., Ltd. and LG.Philips LCD America, Inc.*, Civil Action No. 07-C-0137-S (U.S. District Court for the Western District of Wisconsin); *AU Optronics Corporation vs. LG.Philips LCD Co., Ltd. and LG.Philips LCD America, Inc. et al.*, Civil Action No. 07-357-JJF (U.S. District Court for the District of Delaware); *LG.Philips LCD Co., Ltd. v. Chi Mei Optoelectronics Corporation, et al.*, Civil Action No. 06-726-JJF (U.S. District Court for the District of Delaware); *Chi Mei Optoelectronics Corporation v. LG.Philips LCD Co., Ltd. and LG.Philips LCD America, Inc.*, Civil Action No. 07-176-TJW (U.S. District Court for the Eastern District of Texas); *LG.Philips LCD Co Ltd v. Chunghwa Picture Tubes Ltd*, Civil Action No. 05-07004-CBM (U.S. District Court for the Central District of California); and *LG.Philips LCD Co., Ltd. v. Tatung Co.*, et al., Civil Action No. 05-292-JJF (U.S. District Court for the District of Delaware).

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce pleadings from *LG.Philips LCD Co., Ltd. v. Tatung Co.,* et al., Civil Action No. 05-292-JJF (U.S. District Court for the District of Delaware) that are located after a reasonable search.

**Document Request No. 77**

All documents concerning the factual basis for each of the affirmative defenses and any other defenses asserted by you in relation to this lawsuit, and each of your counterclaim allegations, including, for example, all documents supporting each of your affirmative defenses and counterclaim allegations.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about which CMO has not yet made infringement allegations in this case.

**Document Request No. 78**

All documents concerning CMO's participation in, sponsorship of, and/or communications with any group, organization, or other body concerning establishing, publishing, or developing industry standards potentially relevant to CMO Products or LCD display products.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent that it seeks documents relating to products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning CMO Products.

**Document Request No. 79**

All policies, procedures, manuals, guidelines, and other documents concerning the retention, destruction, storage, archiving, and management of documents, records, and/or electronically stored information that apply to CMO or its employees.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All" documents. CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects to this Request as not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense.

-62-

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 80**

All documents concerning efforts to identify information (including electronically stored information) relevant to claims and defenses or discovery in this case, including documents identifying all sources of relevant information, all custodians of relevant information.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All documents." CMO also specifically objects to this Request to the extent that it requests documents subject to the attorney-client privilege and/or work product immunity. CMO further specifically objects that this Request seeks information and documents not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent it seeks documents relating to CMO Patents about which CMO has not yet made infringement allegations in this case.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search.

**Document Request No. 81**

All reports to shareholders, including all annual reports, in English, since December 1, 2000.

-63-

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All" documents. CMO further specifically objects to this Request as not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce annual reports that are located after a reasonable search.

**Document Request No. 82**

All documents concerning CMO stock or shares, including, but not limited to, stock offerings (such as Offering Circulars), shareholders agreements or any agreements relating to stock purchases, share purchases or asset sales or transfers to which CMO is a party, assignor, assignee, or beneficiary.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad and unduly burdensome to the extent that it calls for CMO to produce "All" documents. CMO further specifically objects to this Request as not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce annual reports that are located after a reasonable search.

**Document Request No. 83**

Documents sufficient to show or explain the letter and/or numbering system by which CMO assigns model numbers and/or Part Numbers to its LCD modules, including documents sufficient to show or explain what each letter and/or number signifies.

**Response:**

In addition to the foregoing General Objections, CMO specifically objects to this Request as overly broad, unduly burdensome and not relevant to any claim or defense in this action, or reasonably likely to lead to the discovery of information relevant to any claim or defense, to the extent that it seeks documents relating to products other than CMO Products.

Subject to and without waiving the foregoing specific and General Objections, CMO states that it will produce responsive, non-privileged documents, if any, located after a reasonable search concerning CMO Products.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Jonathan S. Kagan
Alexander C. D. Giza
Irell & Manella LLP
1800 Avenue of the Stars
Los Angeles, CA 90067
(310) 277-1010

Dated: May 15, 2008
864923

By: /s/ Philip A. Rovner
    Philip A. Rovner (#3215)
    Hercules Plaza
    P. O. Box 951
    Wilmington, DE  19899
    (302) 984-6000
    provner@potteranderson.com

*Attorneys for Counterclaim-Defendant*
*Chi Mei Optoelectronics Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on May 15, 2008 true and correct copies of

the within document were served on the following counsel of record, at the addresses and in the

manner indicated:

**BY HAND DELIVERY AND EMAIL**

Richard E. Kirk, Esq.
Ashley Blake Stitzer, Esq.
The Bayard Firm
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, DE  19899
rkirk@bayardfirm.com
astitzer@bayardfirm.com

**BY E-MAIL**

Gaspare J. Bono, Esq.
Matthew T. Bailey, Esq.
Lora A. Brzezynski, Esq.
Cass W. Christenson, Esq.
R. Tyler Goodwyn, IV, Esq.
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
gbono@mckennalong.com
mbailey@mckennalong.com
lbrzezynski@mckennalong.com
cchristenson@mckennalong.com
tgoodwyn@mckennalong.com

**BY HAND DELIVERY AND EMAIL**

John W. Shaw, Esq.
Karen L. Pascale, Esq.
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801
jshaw@ycst.com
kpascale@ycst.com

**BY E-MAIL**

Vincent K. Yip, Esq.
Peter J. Wied, Esq.
Jay C. Chiu, Esq.
Paul Hastings Janofsky & Walker LLP
515 South Flower Street
Los Angeles, CA  90071
vincentyip@paulhastings.com
peterwied@paulhastings.com
jaychiu@paulhastings.com

Ron E. Shulman, Esq.
Julie M. Holloway, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050
rshulman@wsgr.com
jholloway@wsgr.com

M. Craig Tyler, Esq.
Brian D. Range, Esq.
Wilson Sonsini Goodrich & Rosati
8911 Capital of Texas Highway North
Westech 360, Suite 3350
Austin, TX 78759
ctyler@wsgr.com
brange@wsgr.com

/s/ Philip A. Rovner
Philip A. Rovner  (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

2

EXHIBIT D

1

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                           - - -

COMMISSARIAT A L'ENERGIE
4   ATOMIQUE,                        :        CIVIL ACTION
                                     :
5              Plaintiff,            :
                                     :
6         v.                         :
                                     :        (Consolidated)
7   SAMSUNG ELECTRONICS CO., LTD., :
    SHARP CORPORATION, AU OPTRONICS:
8   CORPORATION, and CHI MEI         :
    OPTOELECTRONICS CORPORATION,     :
9                                    :        NO. 03-484 (KAJ)
               Defendants.           - - -
10

11                      Wilmington, Delaware
                 Monday, November 7, 2005 at 8:30 a.m.
12                      TELEPHONE CONFERENCE

13                           - - -

14  BEFORE:      HONORABLE **KENT A. JORDAN**, U.S.D.C.J.

15                           - - -

    APPEARANCES:
16

17              THE BAYARD FIRM
                BY:  RICHARD D. KIRK, ESQ.
18
                     -and-
19
                MCKENNA LONG & ALDRIDGE, LLP
20              BY:  GASPARE J. BONO, ESQ., and
                     LORA A. BRZEZYNSKI, ESQ., and
21                   MATTHEW BAILEY, ESQ.
                     (Washington, District of Columbia)
22
                            Counsel for Plaintiff
23                          Commissariat a L'Energie Atomique

24

25                          Brian P. Gaffigan
                            Registered Merit Reporter

2

1    APPEARANCES:   (Continued)

2

3    POTTER ANDERSON & CORROON, LLP
     BY:   RICHARD L. HORWITZ, ESQ.

4             -and-

5    BAKER BOTTS L.L.P.
     BY:   NEIL P. SIROTA, ESQ., and

6            CHANG SIK KIM, ESQ.
             (New York, New York)

7             -and-

8
     BAKER BOTTS L.L.P.
9    BY:   MICHAEL J. BARTA, ESQ.
             (Washington, District of Columbia)

10

11             Counsel for Defendants Samsung
               Electronics Co., Ltd., Samsung
               Electronics America, Inc., Samsung
12             Electronics Canada, Inc.,
               Samsung Electronics, Inc.

13

14   YOUNG CONAWAY STARGATT & TAYLOR
     BY:   JOSY W. INGERSOLL, ESQ.

15             -and-

16
     NIXON & VANDERHYE, PC
17   BY:   ROBERT W. ADAMS, ESQ.
             (Arlington, Virginia)

18
               Counsel for Sharp Corporation
19

20   CONNOLLY BOVE LODGE & HUTZ, LLP
     BY:   GERALD M. O'ROURKE, ESQ.

21
               Counsel for Defendant AU Optronics
22

23   FISH & RICHARDSON, P.C.
     BY:   KATHERINE A. MOERKE, ESQ., and

24            SEAN P. HAYES, ESQ.

25             Counsel for Chi Mei
               Optoelectronics Corporation

1                        - oOo -

2                   P R O C E E D I N G S

3              (REPORTER'S NOTE:  The following telephone

4     conference was held in chambers, beginning at 8:30 a.m.)

5              THE COURT:  Hi, this is Judge Jordan.  Who do I

6     have on the line?

7              MR. KIRK:  Good morning, Your Honor.  For the

8     plaintiffs, CEA, Richard Kirk from The Bayard Firm in

9     Wilmington; Gap Bono from McKenna Long & Aldridge in New

10    York; and Lora Brzezynski and Matt Bailey from McKenna Long

11    in Korea.

12             THE COURT:  All right.

13             MR. HORWITZ:  Good morning, Your Honor.

14    (Inaudible.)

15             THE COURT:  Go ahead.

16             MR. HORWITZ:  It's -- (inaudible) -- from Baker

17    Botts.

18             THE COURT:  Mr. Horwitz, can you hear me?  You

19    are cutting in and out so if you are on a speakerphone, you

20    may need to pick up.

21             MR. KIRK:  I'm missing most of this, I'm afraid.

22             MS. INGERSOLL:  We cannot hear either.

23             (UNIDENTIFIED SPEAKER):  Neither can I.

24             MR. KIRK:  I think if people were on

25    speakerphones, I think it's best if they picked up.

4

```
 1              THE COURT:  Hello?  I've lost the defendants
 2   entirely.  Mr. Kirk?
 3              MR. HORWITZ:  Your Honor, this is Rich Horwitz
 4   in Wilmington, not on the speakerphone.
 5              THE COURT:  All right.
 6              MR. HORWITZ:  And Neil Sirota and Michael Barta
 7   from Baker Botts are on the line from Korea.
 8              THE COURT:  Mr. Sirota, are you there?  Hello?
 9              MR. SIROTA:  Yes, I am here, Your Honor.
10              THE COURT:  All right.  Is there anybody else on
11   the line?
12              MS. INGERSOLL:  Yes, Josy Ingersoll and Bob
13   Adams for Sharp.
14              MS. MOERKE:  Your Honor, this is Katie Moerke
15   from Fish & Richardson for CMO.
16              MR. HAYES:  This is Sean Hayes from Fish &
17   Richardson for CMO in Wilmington.
18              MR. O'ROURKE:  And this is Jerry O'Rourke for
19   Defendant AU Optronics from Connolly Bove Lodge & Hutz.
20              THE COURT:  Is there anybody else?
21              All right.  This letter, this call is touched
22   off by a couple letters that I got and a phone call before
23   that.  I've read the November 3rd letter from Mr. Kirk as
24   well as the November 4th letter from Mr. Horwitz.
25              Can people hear me?  There is a lot of feedback.
```

5

1          (UNIDENTIFIED SPEAKER):  It is difficult, Your

2   Honor.

3          (UNIDENTIFIED SPEAKER):  I can barely hear.

4          MS. INGERSOLL:  Jerry?

5          MR. O'ROURKE:  Yes.

6          MS. INGERSOLL:  Does it start at the time you

7   joined?  I don't know whether there is something you can do.

8          MR. O'ROURKE:  Maybe, would it be possible to

9   excuse the local counsel?  It might be the number of lines

10  on the call.

11          THE COURT:  That's all right with me if people,

12  except for the two primary players, Samsung and CEA's local

13  counsel I want on the line, but if others want to sign off,

14  that's all right.

15          (Pause.)

16          THE COURT:  All right.  I have read the papers

17  and I have some questions for you, so rather than having you

18  reiterate your issues, the first thing I want to do is begin

19  by asking CEA a couple questions that come out of Samsung's

20  letter and then ask Samsung some questions that come out of

21  CEA's letter.

22          Now, the first thing -- by the way, who is going

23  to speak on this for CEA?  Mr. Bono?  Mr. Bailey?  Mr.

24  Kirk?  Ms. Brzezynski?  Who is up to bat on this?

25          MR. BONO:  Your Honor, this is Gap Bono.  I will

6

1   respond to questions.

2          THE COURT:  All right.

3          MR. BONO:  Your Honor, I hope you can hear.  I

4   must confess I can barely hear you.

5          THE COURT:  All right.  Well, here is what I'm

6   going to do.  This call is not working technologically at

7   this point so I'm going to get off the call.  I'm going to

8   ask you to replace the call and let's see if we can't do a

9   better job with this.  I will say that the local counsel

10  for other defendants besides Samsung don't need to be on

11  the call unless they want to be but I want everybody from

12  Samsung, including local, and everybody from CEA, including

13  local, on the call.

14          MR. KIRK:  We'll replace the call momentarily,

15  Your Honor.

16          THE COURT:  Thanks.  Good-bye.

17          (Brief recess taken.)

18          THE COURT:  Hi, this is Judge Jordan.  Who do I

19  have on now?

20          MR. KIRK:  Your Honor, Dick Kirk, Gap Bono, Lora

21  Brzezynski and Matt Bailey are back on.

22          THE COURT:  Mr. Horwitz.

23          MR. HORWITZ:  Yes, Your Honor.  Neil Sirota and

24  Mike Barta are on as well from Baker Botts with me.

25          MR. KIM:  And Charles Kim as well.

1          THE COURT:  All right.  Is there anybody else

2     on?

3          MS. MOERKE:  Your Honor, this is Katie Moerke

4     and Sean Hayes from Fish & Richardson for CMO.

5          MS. INGERSOLL:  For Sharp, it's Bob Adams from

6     Nixon & Vanderhye in Arlington, Virginia; and Josy Ingersoll

7     from Wilmington, Delaware.

8          MR. O'ROURKE:  And for AUO, Your Honor, it's

9     Jerry O'Rourke from Connolly Bove Lodge & Hutz.

10          THE COURT:  Okay.  It sounds like we've got a

11     better connection.  Hopefully, we can hear each other now.

12          If you were unable to hear me before, I said

13     that I had read the papers that had come in and I have some

14     questions.  I'll start by asking CEA some that arise from

15     Samsung's letter, and then we'll put the shoe on the other

16     foot.

17          Mr. Bono, first I want you to respond to the

18     assertion that you have ginned up a dispute to try to get me

19     to revisit something that we had already discussed.  That

20     is, that on page two of their November 4th letter, they say

21     that in fact you never asked a single question about the

22     technical specification documents to Samsung's 30(b)(6)

23     witness.  That Mr. Bailey walked in the room and announced

24     that the guy was unprepared.  So if you are the one to

25     answer that instead of Mr. Bailey, you go ahead, but I'm

8

1    curious to have a factual response to that factual

2    assertion.

3            MR. BONO:  Yes.  Your Honor, that assertion is

4    completely untrue.  As much as I enjoyed speaking with Your

5    Honor, we have no intention of manufacturing any dispute and

6    wasting the Court's time.  I know how busy you are and we

7    would never do such a thing.

8            THE COURT:  Do you have any idea how they would

9    get that thought in their head?

10            MR. BONO:  Yes, Your Honor.  And I can explain

11   it.  The original dispute for which we set up the conference

12   call when we called was our request for an inspection of the

13   manufacturing research facilities at Samsung.  At the time

14   we set up this call, that was the purpose of the call was

15   our motion for an inspection, but as we took the three days

16   of depositions, it became apparent that not only did we have

17   that problem but that Samsung had failed to produce a whole

18   series of documents from the manufacturing side of the

19   business as opposed to research and development side of the

20   business.  And the witnesses testified that without that

21   information from the mass production management system, they

22   were unable to tell us what the specifications and optical

23   properties were of the VA modules that are actually

24   manufactured by Samsung as distinguished from the design

25   specs which come from the R&D facility and, therefore, we

9

1    added this problem to this hearing today.

2            And so they sort of, in my opinion, fabricated

3    this notion that we just ginned this up.  There is no

4    ginning up here, Your Honor.  They have not given us the

5    documents that the witnesses explained are needed before

6    they can tell us what are the actual specifications in the

7    actual products manufactured by Samsung.  And these are

8    documents that are in the manufacturing facilities, which

9    they've identified what they are.  They, of course, had not

10   produced them to us prior to the depositions.

11           MR. BAILEY:  Your Honor, it's Matt Bailey in

12   Korea.  I'd like to comment a little further on your

13   question.

14           In fact, I did spend about four hours with the

15   witness that required complete Korean to English and English

16   to Korean translation and we provided that translation.  I

17   spent four hours going over about two of their documents

18   trying to find out.  I think we got to about three or four

19   different items on the chart in four hours and it was after

20   that exercise that I realized that they were not prepared

21   and it was going to be impossible for us to get the

22   information we need for all of their different products in

23   this fashion with the documents that we have to date.

24           THE COURT:  All right.

25           MR. BAILEY:  I just wanted to place that comment

10

1    on the record.

2            THE COURT:  Mr. Sirota, are you speaking for

3    Samsung here?

4            MR. SIROTA:  I will be, Your Honor.  Yes.

5            THE COURT:  Well, I want you to respond

6    specifically now to the assertion that this is not for lack

7    of trying by CEA but it's just the fact that they can't get

8    from your people the information they need in light of the

9    documents you have already given them.  What is the answer

10   to that?  And in answering that, I want you specifically --

11   do you have these papers in front of you, sir?

12           MR. SIROTA:  I do, yes.

13           THE COURT:  All right.  Look at your own

14   Exhibit 2 to the letter that you had Mr. Horwitz send over.

15   It's your supplemental response to interrogatories numbered

16   2,3,4,5, the fourth set of interrogatories, and look on the

17   top of page 3:  manufacturing variances and tolerances such

18   as those noted on the documents will frequently cause actual

19   values to differ.  And answer the question about, "hey, we

20   can't get this information in the way they're trying to give

21   it to us through documents and through witnesses who say

22   they can't.  Explain that to us because they don't have

23   manufacturing information."

24           Go ahead.

25           MR. SIROTA:  Okay, Your Honor.  First, as far as

1   the witnesses not being able to testify without these other

2   documents, that is not true.  Any time they were asked

3   questions about the technical documents, they were able to

4   answer them, such as certain values and where they are on

5   the documents and how they can be used.

6              THE COURT:  Okay.  I'm not communicating, Mr.

7   Sirota, so let me cut through there.  I'm not interested

8   whether they can look at the technical documents and give

9   technical responses, I'm trying to get to a practical

10  response point.  CEA says "we're entitled know what are the

11  technical specs in what actually are the products being

12  manufactured by Samsung."  I agree with that premise.  Their

13  assertion to me is when we try to find out what is actually

14  in the products, these people can't tell us.

15             So I don't think anybody is saying that your

16  technical people can't look at technical documents and give

17  a technical response.  I need to you answer the question can

18  they answer the question put to them, "hey, what is in this

19  product?  Tell me about the thing in this product."  That is

20  what you need to speak to.

21             MR. SIROTA:  Sure.  And the answer is yes.

22  Because the documents we gave them are the engineering

23  drawings that are used.

24             THE COURT:  So when Mr. --

25             MR. SIROTA:  The specification --

1              THE COURT:  So when Mr. Bailey --

2              MR. SIROTA:  -- the tolerance --

3              THE COURT:  When Mr. Bailey and Mr. Bono say to

4    me, look, we asked them, "tell us what is in there" and they

5    say to us, "well, we can't do it because we don't know this

6    other piece of information," they're just, what, handing me

7    a complete line of falsehood?

8              MR. SIROTA:  Perhaps they don't understand, but

9    the point is they never asked the questions.  They did not

10   give the witness the polarizing cutter recipes.  They didn't

11   give the witnesses the proper specification sheets.  There

12   were several times in the deposition where they said, "hey,

13   you need to look at those documents.  Can I see it?"  And

14   they didn't give it to them.  And I don't want to repeat

15   what is in our letter but when we asked them, when I asked

16   Mr. Bailey, "why didn't you show them the documents that we

17   referred you to that have these answers," the answer was CEA

18   thinks it's incorrect.

19             Now, we laid all these out, all these

20   documents including the manufacturing tolerances.  There

21   are manufacturing tolerances indicated there.  The witnesses

22   are aware of those and they certainly could have testified

23   to that information.

24             THE COURT:  Okay.  Well, then you help me out.

25   One of the things I try to do is figure out what motivates

13

1    behavior.  Can you shed any insight at all on what would

2    motivate the behavior of the folks on the other side to

3    fly to Korea and not show people documents that have

4    information in it that you think is obviously relevant and

5    would give the answer to the question?

6            MR. SIROTA:  Your Honor, I can't speak to

7    motivation.

8            THE COURT:  No?

9            MR. SIROTA:  I can speak to, prior to the

10   hearing being scheduled, as Mr. Bono alluded to, they came

11   to us with this issue about wanting to inspect manufacturing

12   plants and a whole range of things.  And we said "no, you

13   can't."  We objected.  They told us they were going to the

14   court with this issue.  And, you know, there was a lot of

15   back and forth that I had with Mr. Bono where I just kept

16   asking "what is your basis for this?"  And I never got a

17   satisfactory answer.  And the next thing I know, the motion

18   is not that, it's this other motion that they decided they

19   would bring instead when they didn't have a motion to

20   inspect the manufacturing plants, Your Honor.

21           I can't speak to their motivation.  I suspect

22   it's not a good one.  And I don't like to say that but I do

23   know I sat through two days of depositions with only a

24   handful of questions asked on a couple of documents and,

25   Your Honor, I pointed out in the letter where they gave them

1    a spec sheet that they knew was incomplete.  It's not the

2    one that we directed them to.  And he never showed the

3    witness the complete correct one.

4            MR. BAILEY:  Your Honor, it's Matt Bailey.  I'd

5    like to respond.

6            THE COURT:  Yes, go ahead.

7            MR. BAILEY:  You know, CEA has spent over a half

8    million dollars with teams of translators over the past six

9    weeks reviewing the Samsung documents trying to figure out

10   where the information is.  Samsung's witnesses have quite

11   frankly acknowledged that their documents are missing

12   information.

13           And I think with regard to the manufacturing

14   question, for the first time we learned that Samsung

15   actually possesses third party specification sheets from the

16   component suppliers that, to our review of the 67,000 pages

17   of documents, that have never been produced.  I'm talking

18   about documents that are from the polarizer manufacturers

19   that actually set forth the manufacturers' specifications,

20   that we've never seen and that I have confirmed through the

21   deposition testimony that existed in their manufacturing

22   facilities.  That is the information I want.

23           THE COURT:  Well, here is what is going to

24   happen.  I'm going to lift the restriction on numbers of

25   interrogatories here.  And I'm going to have you folks at

15

1   CEA, you ask the precise targeted questions that you think

2   you need to get at this information because despite my

3   earlier belief based on our discussions, indeed based on

4   CEA's own statement, I mean the folks at Samsung are right,

5   back in August, the indication from CEA was that Samsung had

6   been forthcoming with documents and already produced a large

7   amounts of requested data.  It looked like we were on the

8   right track here, but evidently that derailed some time ago

9   and now I have people halfway around the globe telling me

10  diametrically opposite things about factually what happened.

11           This is what makes it difficult as a judge.

12  I've got one side saying "they don't ask the obvious and

13  pertinent question.  They have the documents.  We point them

14  to the documents they should be asking about.  They won't do

15  it.  It's all a set up."  I have the other side saying

16  "that's baloney.  We asked them the questions.  We spend

17  four hours with them.  We can't get to the information we

18  need because they say, well, without manufacturing

19  information, I can't get it."

20           Now, I could read four hours worth of deposition

21  testimony and try to figure out who has got the better side

22  of that but I'm not going to.  I read the excerpts you have

23  given me, taken a look at them.  This much is clear:  I can

24  tell you right now on a complete side note what I don't want

25  happening.  This is Exhibit 5 to the Samsung letter.  Page

1  11 has a mislabeling.  It has Mr. Bailey arguing with

2  himself but it's got to be Mr. Sirota speaking who says, and

3  has an objection about:  "I think it's improper for you to

4  question this witness on your chart and your document."

5          Look, I don't know where why you think -- I'm

6  prepared to have these folks, having gone over there, to ask

7  them about any documents they want within bounds of reason.

8  If you don't want them talking about your chart, put your

9  objection on the record and then sit back and let it happen

10  because they're entitled to ask questions and I don't think

11  it's helpful to be stepping in and trying to direct the

12  questioning in such a manner.  However, that is just a

13  little side piece.

14          The most important thing is for purposes of this

15  call, it's clear that this process is not working the way

16  it's supposed to.  The notion that we were going to respond

17  to these interrogatories or attempt to answer technical

18  information by producing business records is evidently not

19  being helpful.  So I'm still not at the point where I'm

20  going to say you fill in their chart because I don't have

21  any way of knowing right now whether the assertion of

22  the defendants is accurate when they say "the chart has

23  ambiguities in it.  It would be unfair for us to be

24  compelled to answer given the inherent ambiguities."

25          So instead of having you fill out the chart,

1  this is what you are going to do, Samsung.  I'm lifting the

2  restrictions.  I'm allowing the folks on the CEA side the

3  chance to ask some targeted interrogatories and I'm going

4  to ask in a moment how many you think is appropriate.  Then

5  I'll give the other side a chance to respond.  That's how

6  we'll deal with it and that way we won't be playing "I

7  didn't show them the right document."  Because you guys are

8  going to answer the technical specs.  We're going to stop

9  this game, whatever is going on, because obviously they're

10  entitled to know what the technical specs are in the things

11  that are being manufactured by Samsung, period.  That's the

12  bottom line.  And I want to get there without more fighting,

13  expense, et cetera, et cetera.

14          Okay.  Mr. Bono, to get the information, how

15  many interrogatories do you need?

16          MR. BONO:  Well, Your Honor, that is a difficult

17  question to answer.  And let me just explain what we need.

18  Samsung makes a number of VA modules.  There are maybe 200

19  variations of the actual module they manufacture.  And what

20  we want to know is what are the actual specifications and

21  optical properties for each of the modules that they have

22  manufactured over the years that are VA modules.

23          Now, we laid out in the chart exactly what are

24  the values for each of the items that we need.  And, you

25  know, do you call that one interrogatory or do you call it

1    200 interrogatories?  But it's really not.  It really is,

2    I think, I think Samsung knows what we need and I don't

3    want -- and certainly we have an interest in framing the

4    questions as precisely as possible.  But to say on each and

5    every sub-part how much we need -- that is, in a nutshell,

6    what we need; isn't that right, Matt?

7              MR. BAILEY:  Yes, that's right, Gap.

8              THE COURT:  All right.

9              MR. BAILEY:  Some of the different issues that

10   are going to be variable here are I think, as Gap said, the

11   number of product codes may be around a couple hundred and

12   then there are a couple constituent elements:  the polarizer

13   sheet, the liquid crystals used, the cell gaps used and any

14   other birefringence materials there.  So there are a handful

15   of component parts to each of these modules that we need the

16   optical and physical parts for, and then there is the total

17   number of PVA modules that they have sold since the

18   beginning of their program.

19             THE COURT:  All right.  Now, assume you got this

20   information.  What reason would you have to be going into

21   their manufacturing facilities?

22             MR. BONO:  Your Honor, I agree with what Your

23   Honor is hinting at.  If we got the information they

24   actually gave us for each of the products they've actually

25   manufactured through these manufacturing codes and this

1   information, it says we manufactured these 5,000 VA modules,

2   numbers such-and-such, and we manufactured these between

3   April 2004 and December 2005, and this is what was actually

4   in those products, then we don't need an inspection.

5           THE COURT:  All right.  Mr. Sirota, I've been

6   asking them a series of questions.  What do you want to say,

7   if anything, in response to the ruling I have made and the

8   question I raised about what it would take to get this kind

9   of information from you folks?

10          MR. SIROTA:  Okay.  Well, the things I'm hearing

11  from them, first, it's the first time I'm hearing them about

12  200 variations.  Certainly, they never asked the witnesses

13  about that.  I really can't comment at this point.  I know

14  we gave them all the specs we had and what Your Honor

15  expects.  But I certainly understand the premise.

16          THE COURT:  All right.

17          MR. SIROTA:  As far as the number of

18  interrogatories it would take or how, whether we could

19  answer the interrogatories that are being asked the way

20  they're asked or whether we keep the information the way CEA

21  wants it kept, I just can't comment on it at this point.

22          THE COURT:  Okay.  Well, you don't need to then.

23  Here is what --

24          MR. SIROTA:  And --

25          THE COURT:  Go ahead, sir.

1          MR. SIROTA:  The other thing I wanted to address

2     is this notion of inspecting a manufacturing facility.  I

3     don't know what they could possibly see.

4          THE COURT:  Well, that is off the table.  That

5     is off the table right now.

6          MR. SIROTA:  Okay.

7          THE COURT:  Because what I hear them saying is

8     we really want this technical information.  I hear you

9     saying you don't disagree that they're entitled to have that

10    information.  The only disagreement here is whether they

11    have it or not.  You say they've got it.  It's like the Ragu

12    spaghetti sauce, it's in there.  They're saying we can't

13    figure it out and their own witnesses can't figure it out,

14    and I certainly can't figure it out from here.  So I'm going

15    to let them ask the questions.

16         CEA, you ought to be cautious about how you do

17    it because I'm not going to put a limit on you right now.

18    What I'm telling you is you have expressed to me, Mr. Bono,

19    in less than 30 seconds what you are trying to get at.

20    I take it Mr. Sirota understands it because I think I

21    understand what you are saying.  So you frame the stuff up

22    the way you need to, to get the information.  If it looks

23    like you are being abusive or out of line with it and I've

24    got to get on the phones with you guys again, I guess we'll

25    do that.

1          I will say this:  If we get to a point in this

2    discussion where I'm continuing to have the attorneys say,

3    "wait, we gave them the information, they're not paying

4    attention to it" and the other side is saying "we don't have

5    the information, it's not properly answered," et cetera, et

6    cetera or "it's so vague that we can't make it out," or ...

7    then I'm going to end up selecting an expert, you guys are

8    going to pay the expert and I'll get some technical expert

9    to tell me who has got the right side of the argument about

10   whether the information being provided and the answers in

11   responses being provided are appropriate or not.  And then

12   I'm going to trust my expert.  And if I think one side is

13   jerking the other around, you can expect sanctions of some

14   appropriate level to try to make the other party hold.

15          So I'm really hoping we don't have to go there,

16   okay?  And I'm expecting that if you folks act in good

17   faith, we won't go there.  So you go ahead and propound your

18   interrogatories on the CEA side.  And I'll expect a prompt

19   response.

20          Is there any reason why -- well, let me ask you

21   this, Mr. Bono or Mr. Bailey.  When do you think you can

22   have those interrogatories generated?

23          MR. BONO:  Well, Your Honor, I know we're

24   continuing the deposition in Korea this week.  I'm in an

25   arbitration this week in New York.

1           Matt, what is your schedule next week?

2           MR. BAILEY:  I think certainly by early to the

3    middle of next week we can have it.  Yes, probably by the

4    end of next week would be a safe bet.

5           THE COURT:  All right.  Mr. Sirota, is there any

6    reason why you can't get that stuff done in the typical

7    30-day turnaround or less?

8           MR. SIROTA:  At this point, I don't know.

9    What I would like to ask is they've mentioned these 200

10   variations.  If they could specify what those are, that

11   would be helpful for me, certainly.

12          THE COURT:  Well, absolutely.  You know, it

13   might be a real good idea if, on the basis of this call,

14   when we're all off-line, Mr. Bailey and Mr. Sirota, you

15   may be on the other side of the planet but you are in the

16   same room together, I take it, or you will be soon.  Sit

17   down together and talk about how to do this in a way that

18   is most likely to get to the proper end result, which is

19   just giving them the technical information so that they

20   can make judgments about how to present their case and you

21   know how to present your defense, Mr. Sirota.  All right?

22   And if there is a meet and confer and a good faith effort to

23   work together to transfer this information, I'm sure it can

24   be done and can be done in a way that gets this wrapped up

25   in about a month.  So let's get that cracking immediately,

1    as soon as possible.  All right?

2         All right.  Is there anything else you need or

3    want to talk about, Mr. Bono?

4         MR. BONO:  No, Your Honor.

5         MS. BRZEZYNSKI:  Gap, I wanted to raise one

6    thing with you with the judge.

7         THE COURT:  Hold on just a moment.

8         Is there anything else from the Samsung side,

9    Mr. Sirota?

10        MR. SIROTA:  I don't think so.  No, Your Honor.

11        THE COURT:  All right.  Now, does anybody else

12   on the call have anything something they need to raise?

13   Hello?

14        MS. BRZEZYNSKI:  Yes, Your Honor.  I would just

15   like -- this is Lora Brzezynski in Korea.

16        THE COURT:  Yes.  Okay.

17        MS. BRZEZYNSKI:  I would like to get your

18   clarification of an understanding that we have on a

19   completely different issue.  And it's a clarification

20   regarding our understanding that if one of the defendants'

21   employees actually resides in the U.S. and works in the

22   U.S., that we can take their deposition in the U.S.

23        And the reason why I'm asking this is because we

24   found out just on Friday afternoon that one of the witnesses

25   for this week, this coming Friday, a Mr. Ha actually resides

1    in the U.S. and works at the Samsung Electronics office in

2    DC, one block away from my office.  And despite our

3    understanding from Samsung that all their witnesses reside

4    in Korea, they're flying Mr. Ha here to Korea for the

5    deposition.  And as a result we have to spend an additional

6    day here taking his deposition, at additional cost for a

7    court reporter and videographer.  So we just want to confirm

8    our understanding that per the scheduling order and your

9    prior comments, that if a witness is indeed in the U.S. and

10   working in the U.S., even though for one of the defendants,

11   we can take the deposition in the U.S.

12                THE COURT:  Mr. Sirota.

13                MR. SIROTA:  Your Honor, if I can address that?

14                THE COURT:  Please.

15                MR. SIROTA:  I have never refused to offer this

16   witness in the U.S.  They asked me if they could have this

17   witness during this time period.  He has business here in

18   Korea.  It certainly made sense to me, while the attorneys

19   are here, we were able to prep him here while he is here

20   so we offered him up during this time period when they are

21   questioning other witnesses.

22                It's an issue that Ms. Brzezynski raised with

23   me today.  And he is already here or he is on his way here,

24   I'm not sure.  But now that we're all here, she asked me

25   basically to send him home and say let's take his deposition

1    there.

2              MS. BRZEZYNSKI:  We never knew that he actually

3    worked a block away from our offices until the past Friday

4    afternoon when one of the other witnesses mentioned it.

5              MR. SIROTA:  Well, I did not represent that you

6    couldn't have him there or that --

7              THE COURT:  No, no, no.

8              MR. SIROTA:  -- he be made available.

9              THE COURT:  I can't have you guys talking to

10   each other.  I can't have two lawyers in Korea arguing with

11   each other while the rest of us are on the phone.

12             MR. SIROTA:  Sorry, Your Honor.

13             THE COURT:  So here is the deal.  You know, I'm

14   not getting in the middle of this at this juncture.  It

15   sound like what is done is done, but it also sounds like

16   this is another instance where simple communication could

17   avoid problems.  So if you folks from CEA believed that

18   Samsung or others aren't playing straight with you about

19   where witnesses are located, ask them specifically where the

20   people are and ask the specific question about whether

21   things can be done in the United States, and I'm sure that

22   the other side will be honest and straightforward with you.

23   And if you are an extra day in Korea on this one, that is

24   unfortunate but it's a little late to undo it so that's

25   done.

26

1          All right.  Now, I asked a moment or two ago

2     whether there was anything else from anybody else on the

3     call and I heard nothing.  Am I correct that other parties

4     on the line don't have anything to raise?  Mr. O'Rourke?

5              MR. O'ROURKE:  Nothing at this time, Your Honor.

6              THE COURT:  The folks from Fish?

7              MS. MOERKE:  Nothing right now, Your Honor.

8     Thank you.

9              THE COURT:  All right.  And I think I have

10    covered everybody then.  Okay.  Thanks for your time.  I

11    hope you are able to get things worked out and get some

12    productive depositions taken care of.  Good-bye.

13              (The attorneys respond, "Thank you, Your

14    Honor.")

15              (Telephone conference ends at 9:09 a.m.)

16

17

18

19

20

21

22

23

24

25

EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

LG DISPLAY CO., LTD.,                          )
                                               )
     Plaintiff,                               )
                                               )
     v.                                       )     Civil Action No. 06-726 (JJF)
                                               )
CHI MEI OPTOELECTRONICS                        )
CORPORATION; AU OPTRONICS                      )
CORPORATION, AU OPTRONICS                      )
CORPORATION OF AMERICA;                        )
TATUNG COMPANY; TATUNG                         )
COMPANY OF AMERICA, INC.; AND                  )
VIEWSONIC CORPORATION,                         )
                                               )
     Defendants.                              )
                                               )
_____

AU OPTRONICS CORPORATION,                      )
                                               )
     Plaintiff,                               )
                                               )
     v.                                       )     Civil Action No. 07-357 (JJF)
                                               )
LG DISPLAY CO., LTD and                        )     CONSOLIDATED CASES
LG DISPLAY AMERICA, INC.,                      )
                                               )
     Defendants.                              )
                                               )

**CHI MEI OPTOELECTRONICS USA, INC.'S**
**SECOND SET OF INTERROGATORIES (Nos. 10 – 27) TO PLAINTIFF**

     Defendant, Chi Mei Optoelectronics USA, Inc. ("CMO USA"), by its counsel,

and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, hereby directs

the following interrogatories to Plaintiff, LG Display Co., Ltd. to be answered, under

oath, within thirty (30) days after service hereof in accordance with the applicable

Federal Rules of Civil Procedure

## DEFINITIONS OF TERMS AND INSTRUCTIONS

The following definitions and instructions are applicable to these interrogatories:

For purposes of these interrogatories, you should use the following definitions for the terms used herein. All interrogatories and corresponding definitions of terms are for purposes of discovery only, and not to be construed as limiting or reflecting CMO USA's position in this case regarding claim construction or any other issue. CMO USA specifically reserves the right to use different terms, or to assert different meanings, for all purposes in this case (including, for example, with respect to claim construction, infringement analysis, and validity analysis).

1.    "LG Display," "you," and "your" means LG Display Co., Ltd., formerly known as LG.Philips LCD Co., Ltd., and all Persons or entities acting or purporting to act on its behalf, and any Affiliates (as that term is defined herein) of LG Display Co., Ltd. (including, for example, LG Display America, Inc., formerly known as LG.Philips LCD America, Inc.)

2.    "LGDA" means LG Display America, Inc., formerly known as LG.Philips LCD America, Inc., and all Persons or entities acting or purporting to act on its behalf, and any Affiliates (as that term is defined herein) of LG Display America, Inc.

3.    "CMO" means Chi Mei Optoelectronics Corporation, and all Persons or entities acting on Chi Mei Optoelectronics Corporation's behalf.

4.    "CMO USA" means Chi Mei Optoelectronics USA, Inc., and all Persons or entities acting on Chi Mei Optoelectronics USA, Inc.'s behalf.

5.    "CMO Defendants" means CMO and/or CMO USA.

6.    "Affiliate(s)" means any partnerships, parents, subsidiaries, and divisions, and any corporation or other entity that controls, is controlled by, or is under common control with the identified corporation or entity.

7.    "LGD Products" means all LCD Modules and LCD Panels made, shipped, imported, or sold by or for LG Display and/or LGDA since December 1, 2000.

8.    "LCD Display Product" means any device that contains an LCD Module. An LCD computer monitor, LCD television, laptop computer, and any telephone or other portable or handheld product incorporating an LCD Module are examples of LCD Display Products. This includes all such devices, regardless of Brand.

9.    "LCD Module" means an LCD display component that includes, inter alia, an LCD Panel, a backlight unit, and driver ICs.

10.    "LCD Panel" means an LCD display component that includes a TFT Array and color filter with liquid crystal material between them.

11.    "TFT Array" means a thin-film-transistor array, electrodes, wiring, and pads used to drive and control the liquid crystal material in a LCD display.

12.    "Brand" means any brand name or company whose name, mark, or logo appears on LCD Display Products, including, for example, Dell, Hewlett-Packard, Apple, and ViewSonic.

13.    "Communication" means, without limitation, every manner or means of statement, utterance, notation, disclaimer, transfer, or exchange of information between two or more Persons of any nature whatsoever, by or to whomever, whether oral or written or whether face-to-face, by telephone, email, mail, personal delivery, or otherwise, including but not limited to, letters, correspondence, conversations,

memoranda, dialogue, discussions, meetings, interviews, consultations, agreements, and other understandings.

14.    The connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these document requests all information that might otherwise be construed to be outside of their scope.

15.    "Concerning," and "relative to" are used in their broadest sense and embrace all matter relating to, referring to, describing, discussing, evidencing, or constituting the referenced subject.

16.    "Document" means all types of documents, electronically stored information, and things embraced within Federal Rules of Civil Procedure 34 and includes, without limitation, any writing and each original, or a copy in the absence of the original, and every copy bearing notes or markings not present on the original or copy, of the following items, however produced or reproduced, namely: books, accounting records of any nature whatsoever, agreements, Communications, correspondence, facsimiles, telegrams, cable, telexes, memoranda, recordings, studies, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, diaries, letters, forecasts, statistical statements, graphs, laboratory or engineering reports and records, notebooks, charts, plans, sketches, drawings, video tapes, films, slides, photographs, information bearing photographic products of any nature whatsoever, photo-records, microfilms, tape recordings, minutes or records of meetings or conferences, expressions or statements of policy, lists of Persons attending meetings or conferences, reports or summaries of interviews, reports or summaries of investigations, opinions or reports of consultants, patent studies,

opinions of counsel, records, reports, summaries of negotiations, sales literature of any

nature whatsoever, brochures, catalogues, catalogue sheets, pamphlets, periodicals,

advertisements, circulars or trade letters, press releases, trade releases, publicity

releases, new product releases, reprints, drafts of any documents, working papers,

indices, original or preliminary notes, sound recordings, computer printouts, floppy

disks, hard drives, CD-ROMs, DVDs, portable drives, magnetic tapes and any other

data, database, server, or data compilations from which information can be obtained

either directly, or, if necessary translated by you through detection devices into a

reasonably usable form.  The term "Document" also refers to any tangible object other

than as described above, and includes objects of every kind and nature such as, but not

limited to, products, prototypes, models, and specimens.  A draft or nonidentical copy is

a separate "Document" within the meaning of this term.

17.     "Any" means each and every.

18.     "Use" has the same meaning as in 35 U.S.C. § 271 and applicable case

law.

19.     "Offer for Sale" has the same meaning as in 35 U.S.C. § 271 and

applicable case law.

20.     "Sale" has the same meaning as in 35 U.S.C. § 271 and applicable case

law.

21.     "Prior Art" has the same meaning as at term is used in 35 U.S.C. § 103

and applicable case law, without regard to pertinence, including, but not limited to,

conceptions, reductions to practice, publications, uses, disclosures, offers for sale and

sales, and commercial exploitations of an idea, product, device, method, apparatus, or

system, that you or any other party in litigation or licensing negotiations identified as potentially relevant to any claims of the LGD Patents.

22.    "Person" means any natural person, firm, association, partnership, corporation, joint venture, or other form of legal entity.

23.    The "LGD Patents" means United States Letters Patent Nos. 4,624,737; 5,019,002; 5,825,449; 5,905,274; 6,803,984; 6,815,321; 7,176,489; and 7,218,374, as well as any reissues and/or reexaminations thereof, and any reissue applications therefrom.

24.    "Foreign Counterparts of the LGD Patents" means any patent applications filed anywhere in the world that claim priority in whole or in part to the LGD Patents.

25.    The use of the singular form of any word includes the plural and vice versa.

26.    If LG Display believes that any interrogatory contained herein is unclear, unintelligible or because of its wording otherwise prohibits or prevents LG Display from responding to it, CMO USA requests that LG Display request immediate clarification of that interrogatory from CMO USA.

27.    No information shall be withheld on the asserted grounds that such information therein is not reasonably calculated to lead to the discovery of admissible evidence unless (i) the burden of responding is fully described, and (ii) Persons familiar with the information requested are identified.

28.    In any instance in which any answer to an interrogatory shall require specifying or identifying a "Person," the response shall include, to the extent known:

(a)    the Person's full name;

(b)    the Person's present or last known address;

(c)    the Person's telephone number; and

(d)    if a natural person, the Person's present or last known place and address of employment.

29.    In any instance in which any answer to an interrogatory shall require specifying or identifying a "Document," the response shall include:

(a)    a description of the general type of Document, *i.e.*, letter, memorandum, report, miscellaneous note, etc.;

(b)    the date such Document was created;

(c)    the Document's author;

(d)    the organization, if any, with which the author was then connected;

(e)    all addressees or recipients;

(f)    all other distributees;

(g)    the organization, if any, with which each addressee, recipient, or distributee was then connected;

(h)    a general summary of the subject matter; and

(i)    the Document's present whereabouts, location, and/or custodian.

30.    Whenever an interrogatory refers to or seeks a description of an act, transaction, occurrence, dealing, Communication, or instance (collectively or individually an "occurrence," as the context requires or permits), state to the extent known, the month, day, and year of occurrence; the place of occurrence; the identity of

each Person present; if such Person actively participated, on whose behalf each Person participated or purported to participate; the nature, subject matter, and circumstances surrounding such occurrence; the nature and substance of any conversations or Communications occurring during, in connection with, or relating to such occurrence; and identify all Documents referring thereto or reflecting the occurrence.

      31.    With respect to the following interrogatories, the information sought is that which is current to the date of response hereto, unless otherwise stated in a particular interrogatory. These interrogatories shall be deemed continuing so that with respect to any interrogatory herein, or part thereof, as to which LG Display, after answering, acquires additional knowledge or information, LG Display must serve supplemental answers, pursuant to Rule 26(e) of the Federal Rules of Civil Procedure.

      32.    In any instance in which any answer to an interrogatory shall require specifying or identifying a "Person" or "Document," such specification or identification shall be made even if a claim of privilege or work product is to be raised.

      33.    Where privilege or work product immunity is asserted, Documents or information must be identified with sufficient specificity to allow identification in a motion to compel the discovery or production of such information or Documents.

## INTERROGATORIES

**Interrogatory No: 10**

      For each LGD Product, identify all corresponding product designations, including model and Part Numbers, used to refer to each LCD module, LCD panel and/or TFT substrate that corresponds to that LGD Product as well as every LCD

display product for which that LGD Product was made, used, and approved for use, including the Brand and Part Number information for each LCD display product.

**Interrogatory No: 11**

For each LGD Product identified in response to Interrogatory 10, identify all electronic mask files, manufacturing process specifications, TFT array specifications and fabrication plants that are associated with the design and/or manufacture of the corresponding TFT substrate(s) for that LGD Product.

**Interrogatory No. 12**

For each LGD Product identified in response to Interrogatory 10, identify all CAD files associated with the design and/or manufacture of the corresponding TFT substrate(s), the color filter substrate(s), and/or LCD panel(s)) for that LGD Product.

**Interrogatory No. 13**

For each LGD Product identified in response to Interrogatory 10, describe in sequence the fabrication of each layer on the TFT substrate including the name and purpose of each step, step process conditions and timing, and layer characteristics such as composition, resistivity and thickness.

**Interrogatory No. 14**

For each LGD Product identified in response to Interrogatory 10, describe each step of the cell assembly fabrication process associated with the manufacture of that product including the purpose of each step, the equipment used, the sequencing of the steps within the overall cell assembly process, process conditions, and the fabrication lines within a plant used to manufacture the LGD Product, and identify each type of

document in LGD's possession, custody, or control that is relevant to each of the foregoing.

**Interrogatory No. 15**

For each asserted claim of any LGD Patent that you contend is practiced by your product(s) or process(es), identify by product designation and Part Number each LGD Product that incorporates or reflects that asserted claim, and identify by Bates Number the documents you relied upon that show where each limitation is present for each LGD Product.

**Interrogatory No. 16**

For each claim of any CMO Patents that you allege is invalid in seeking a declaratory judgment of invalidity, identify all bases with underlying facts for your allegation, including, for example, all prior art references with a detailed identification on an element by element basis of all disclosures within each claimed prior art reference that you assert disclose that element, and for each claim that you allege is obvious (pursuant to 35 U.S.C. § 103) each reference or combination of references, including all bases for combining the references, that you assert renders that claim obvious.

**Interrogatory No. 17**

For each claim of any CMO Patents that you allege is not infringed as part of your claim for declaratory judgment of non-infringement specifically state, as to each LGD Product identified in response to Interrogatory 1, all claim elements that are allegedly absent as to that LGD Product, and how and why each element is absent.

**Interrogatory No. 18**

For each claim of any CMO Patents that you allege is unenforceable in seeking a declaratory judgment of unenforceability, identify all bases with underlying facts for your allegation, including the materiality and intent.

**Interrogatory No. 19**

For each LGD Product identified in response to Interrogatory No. 10, in spreadsheet or summary format with subtotals and totals, identify all offers to sell and sales regarding such products, on a monthly or quarterly basis since April 1997, including for each offer to sell and sale, the transaction date, customer, product model, quantity, price, and shipment or delivery destination.

**Interrogatory No. 20**

For each LGD Patent, identify all persons who presently hold, or at any time in the past have held, any right, title, or interest in or to the patent, including, but not limited to, full or partial ownership, equity interest, security interest, other collateral interest, contingency interest, or license rights, including their names and addresses, their relationship with LGD, a detailed explanation of the interest held, when that person(s) obtained each interest, the current status of that interest, and the consideration provided in exchange for that interest.

**Interrogatory No. 21**

Identify each person and product that LGD believes infringes any LGD Patents, including as to each the specific product Brand and Part Number, the infringed patents and claims, when and how you first learned of that infringement or potential

infringement, and the names of LGD employees who learned of or investigated the alleged infringement.

**Interrogatory No. 22**

State the date that LGD first became aware of each of the CMO Patents and describe in detail the circumstances surrounding your first knowledge of each of the CMO Patents, including, but not limited to, identifying the person employed by you who first learned of each of the CMO Patents and from what source, explaining the manner in which that person learned of the patent and identifying all documents concerning when and how you learned of the patents.

**Interrogatory No. 23**

Identify each investigation concerning the CMO Patents undertaken by or for LGD (including, for example, prior art searches, tests, reverse engineering or analysis related to patent scope, validity, and infringement) and describe in detail each such investigation, including the date(s)), the person(s)) involved, the scope of the investigation, information gathered, the results and conclusions of the investigation, and identify all documents used or created concerning the investigation.

**Interrogatory No. 24**

State whether you obtained and intend to rely on any legal opinion or advice as part of your defense concerning the scope, validity, enforceability, or infringement of any of the CMO Patents, and, if so, identify each legal opinion, including whether it is written or oral, the author(s), recipient(s), dates when you requested and received the opinion, and the subject matter regarding each opinion, and identify all facts and documents furnished by you and/or considered for the author(s) of each opinion.

**Interrogatory No. 25**

If you contend that CMO has willfully infringed any LGD Patent, describe in detail all facts that support your contentions, and identify all persons having knowledge of the alleged willful infringement.

**Interrogatory No. 26**

Identify and describe all efforts made and actions taken by you to search for and produce information and documents requested in discovery in this case, including identifying from which departments, offices, locations, and employees documents and information were retrieved; the person(s) responsible for the search, efforts and actions; and if electronic searches for documents were part of your efforts to search for information, identify all search terms used by you.

**Interrogatory No. 27**

Identify and describe all efforts made and actions taken by you to preserve information and documents that are relevant to any claim or defense in this case, including relevant electronically stored information in your possession, custody or control, including when each such measure was taken, the custodians involved in your preservation efforts, all sources of information that were the subject of your preservation efforts, the scope of information that you deemed to be relevant for discovery and preservation, and whether any relevant information was not preserved or was deleted, lost, or compromised (and, if so, the specific information and when).

OF COUNSEL:

POTTER ANDERSON & CORROON LLP

Jonathan S. Kagan
Alexander C. D. Giza
Irell & Manella LLP
1800 Avenue of the Stars
Los Angeles, CA 90067
(310) 277-1010

By: /s/ Philip A. Rovner
      Philip A. Rovner (#3215)
      Hercules Plaza
      P. O. Box 951
      Wilmington, DE  19899
      (302) 984-6000
      provner@potteranderson.com

Dated:  May 28, 2008
866738

*Attorneys for Defendant*
*Chi Mei Optoelectronics USA, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on May 28, 2008 true and correct copies of

the within document were served on the following counsel of record, at the addresses and in the

manner indicated:

### BY HAND DELIVERY AND EMAIL

Richard E. Kirk, Esq.
Ashley Blake Stitzer, Esq.
The Bayard Firm
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, DE 19899
rkirk@bayardfirm.com
astitzer@bayardfirm.com

### BY E-MAIL

Gaspare J. Bono, Esq.
Matthew T. Bailey, Esq.
Lora A. Brzezynski, Esq.
Cass W. Christenson, Esq.
R. Tyler Goodwyn, IV, Esq.
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
gbono@mckennalong.com
mbailey@mckennalong.com
lbrzezynski@mckennalong.com
cchristenson@mckennalong.com
tgoodwyn@mckennalong.com

### BY HAND DELIVERY AND EMAIL

John W. Shaw, Esq.
Karen L. Pascale, Esq.
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
jshaw@ycst.com
kpascale@ycst.com

### BY E-MAIL

Vincent K. Yip, Esq.
Peter J. Wied, Esq.
Jay C. Chiu, Esq.
Paul Hastings Janofsky & Walker LLP
515 South Flower Street
Los Angeles, CA 90071
vincentyip@paulhastings.com
peterwied@paulhastings.com
jaychiu@paulhastings.com

Ron E. Shulman, Esq.
Julie M. Holloway, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050
rshulman@wsgr.com
jholloway@wsgr.com

M. Craig Tyler, Esq.
Brian D. Range, Esq.
Wilson Sonsini Goodrich & Rosati
8911 Capital of Texas Highway North
Westech 360, Suite 3350
Austin, TX 78759
ctyler@wsgr.com
brange@wsgr.com

/s/ Philip A. Rovner
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LG. DISPLAY CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-726 (JJF) |
| | ) | |
| CHI MEI OPTOELECTRONICS | ) | |
| CORPORATION; AU OPTRONICS | ) | |
| CORPORATION, AU OPTRONICS | ) | |
| CORPORATION OF AMERICA; | ) | |
| TATUNG COMPANY; TATUNG | ) | |
| COMPANY OF AMERICA, INC.; AND | ) | |
| VIEWSONIC CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| AU OPTRONICS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-357 (JJF) |
| | ) | |
| LG. DISPLAY CO., LTD and | ) | CONSOLIDATED CASES |
| LG. DISPLAY AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF SERVICE

PLEASE TAKE NOTICE that, on May 28, 2008, true and correct copies of the following

document were served on the following counsel of record at the addresses and in the manner

indicated:

CHI MEI OPTOELECTRONICS USA, INC.'S SECOND SET OF INTERROGATORIES
(NOS. 10-27) TO PLAINTIFF

**BY HAND DELIVERY AND E-MAIL**

Richard E. Kirk, Esq.
Ashley Blake Stitzer, Esq.
The Bayard Firm
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, DE 19899
rkirk@bayardfirm.com
astitzer@bayardfirm.com

**BY E-MAIL**

Gaspare J. Bono, Esq.
Matthew T. Bailey, Esq.
Lora A. Brzezynski, Esq.
Cass W. Christenson, Esq.
R. Tyler Goodwyn, IV, Esq.
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
gbono@mckennalong.com
mbailey@mckennalong.com
lbrzezynski@mckennalong.com
cchristenson@mckennalong.com
tgoodwyn@mckennalong.com

Ron E. Shulman, Esq.
Julie M. Holloway, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050
rshulman@wsgr.com
jholloway@wsgr.com

**BY HAND DELIVERY AND E-MAIL**

John W. Shaw, Esq.
Karen L. Pascale, Esq.
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
jshaw@ycst.com
kpascale@ycst.com

**BY E-MAIL**

Vincent K. Yip, Esq.
Peter J. Wied, Esq.
Jay C. Chiu, Esq.
Paul Hastings Janofsky & Walker LLP
515 South Flower Street
Los Angeles, CA 90071
vincentyip@paulhastings.com
peterwied@paulhastings.com
jaychiu@paulhastings.com

M. Craig Tyler, Esq.
Brian D. Range, Esq.
Wilson Sonsini Goodrich & Rosati
8911 Capital of Texas Highway North
Westech 360, Suite 3350
Austin, TX 78759
ctyler@wsgr.com
brange@wsgr.com

OF COUNSEL:

Jonathan S. Kagan
Alexander C. D. Giza
Irell & Manella LLP
1800 Avenue of the Stars
Los Angeles, CA 90067
(310) 277-1010

Dated:  May 28, 2008
866745

POTTER ANDERSON & CORROON LLP


By: /s/ Philip A. Rovner
     Philip A. Rovner (#3215)
     Hercules Plaza
     P. O. Box 951
     Wilmington, DE  19899
     (302) 984-6000
     provner@potteranderson.com

*Attorneys for Defendant*
*Chi Mei Optoelectronics USA, Inc.*

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on May 28, 2008, the within document

was filed with the Clerk of the Court using CM/ECF which will send notification of such

filing(s) to the following; that the document was served on the following counsel as indicated;

and that the document is available for viewing and downloading from CM/ECF.

**BY CM/ECF, HAND DELIVERY AND E-MAIL**

Richard E. Kirk, Esq.
Ashley Blake Stitzer, Esq.
The Bayard Firm
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, DE  19899
rkirk@bayardfirm.com
astitzer@bayardfirm.com

**BY CM/ECF, HAND DELIVERY AND E-MAIL**

John W. Shaw, Esq.
Karen L. Pascale, Esq.
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801
jshaw@ycst.com
kpascale@ycst.com

I hereby certify that on May 28, 2008 I have sent by E-mail the foregoing

document to the following non-registered participants:

Gaspare J. Bono, Esq.
Matthew T. Bailey, Esq.
Lora A. Brzezynski, Esq.
Cass W. Christenson, Esq.
R. Tyler Goodwyn, IV, Esq.
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006
gbono@mckennalong.com
mbailey@mckennalong.com
lbrzezynski@mckennalong.com
cchristenson@mckennalong.com
tgoodwyn@mckennalong.com

Vincent K. Yip, Esq.
Peter J. Wied, Esq.
Jay C. Chiu, Esq.
Paul Hastings Janofsky & Walker LLP
515 South Flower Street
Los Angeles, CA  90071
vincentyip@paulhastings.com
peterwied@paulhastings.com
jaychiu@paulhastings.com

Ron E. Shulman, Esq.
Julie M. Holloway, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050
rshulman@wsgr.com
jholloway@wsgr.com

M. Craig Tyler, Esq.
Brian D. Range, Esq.
Wilson Sonsini Goodrich & Rosati
8911 Capital of Texas Highway North
Westech 360, Suite 3350
Austin, TX 78759
ctyler@wsgr.com
brange@wsgr.com


/s/ Philip A. Rovner
Philip A. Rovner  (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

2

EXHIBIT F

1

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

COMMISSARIAT A L'ENERGIE
4   ATOMIQUE,                    :      CIVIL ACTION
                                 :
5           Plaintiff,           :
                                 :
6       v.                       :
                                 :      (Consolidated)
7   SAMSUNG ELECTRONICS CO., LTD., :
    TOTTORI SANYO ELECTRICS CO., :
8   LTD., FUJITSU DISPLAY        :
    TECHNOLOGY, SHARP CORPORATION, :
9   and AU OPTRONICS CORPORATION, :
                                 :      NO. 03-484 (KAJ)
10          Defendants.          :
                                 - - -
11

12                    Wilmington, Delaware
              Tuesday, August 23, 2005 at 4:30 p.m.
13                    TELEPHONE CONFERENCE

                         - - -
14

BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.
15
                         - - -
16   APPEARANCES:

17

             THE BAYARD FIRM
18           BY:  RICHARD D. KIRK, ESQ.

19              -and-

20           MCKENNA LONG & ALDRIDGE, LLP
             BY:  GASPARE J. BONO, ESQ.
21              (Washington, District of Columbia)

22                   Counsel for Plaintiff
                     Commissariat a L'Energie Atomique
23

24
                          Brian P. Gaffigan
25                        Registered Merit Reporter

SHEET 2

**2**

1  APPEARANCES:  (Continued)
2
3  POTTER ANDERSON & CORROON, LLP
4  BY:  RICHARD L. HORWITZ, ESQ.
5      -and-
6  BAKER BOTTS L L.P.
7  BY:  NEIL P. SIROTA, ESQ.
8      (New York, New York)
9
10  Counsel for Defendants Samsung
    Electronics Co., Ltd., Samsung
    Electronics America, Inc., Samsung
    Electronics Canada, Inc.,
    Samsung Electronics, Inc.
11  YOUNG CONAWAY STARGATT & TAYLOR
12  BY:  JOSY W. INGERSOLL, ESQ.
13      -and-
14  NIXON & VANDERHYE, PC
    BY:  ROBERT W. ADAMS, ESQ.
15      (Arlington, Virginia)
16  Counsel for Sharp Corporation
17  RICHARDS LAYTON & FINGER
18  BY:  ROBERT H RICHARDS, III, ESQ.
19      -and-
20  MORRISON & FOERSTER LLP
    BY:  SHERMAN KAHN, ESQ
    (New York, New York)
21  Counsel for Defendants Fujitsu
22  Limited, Fujitsu Display Technologies
    Corporation and Fujitsu Microelectronics
23  America, Inc.
24
25

**3**

1  APPEARANCES:  (Continued)
2
3  CONNOLLY BOVE LODGE & HUTZ, LLP
4  BY:  GERALD M. O'ROURKE, ESQ.
5      -and-
6  CONNOLLY BOVE LODGE & HUTZ, LLP
    BY:  LARRY H. HUME, ESQ.
    (Washington, District of Columbia)
7  Counsel for Defendant AU Optronics
8
9  FISH & RICHARDSON, P.C.
10  BY:  WILLIAM J. MARSDEN, JR., ESQ.
11      -and-
12  FISH & RICHARDSON, P.C.
    BY:  KATHLEEN A. MOERKE, ESQ.
    (Minneapolis, Minnesota)
13  Counsel for Chi Mei
14  Optoelectronics Corporation
15
16      - oOo -
17  P R O C E E D I N G S
18  (REPORTER'S NOTE:  The following telephone
19  conference was held in chambers, beginning at 4:30 p.m.)
20  THE COURT:  Hi, this is Judge Jordan.  Who do I
21  have on the line?
22  MR. KIRK:  Good afternoon, Your Honor.  This is
23  Richard Kirk from the Bayard firm for the plaintiffs, CEA.
24  With me on the line is Gap Bono from McKenna Long &
25  Aldridge.

**4**

1  THE COURT:  All right.
2  MR. RICHARDS:  Good afternoon, Your Honor.
3  Robert Richards for the Fujitsu defendants.  With me on the
4  line is Sherman Kahn from Morrison & Foerster.
5  THE COURT:  All right.
6  MS. INGERSOLL:  Josy Ingersoll, Your Honor.  And
7  Bob Adams from Nixon & Vanderhye for Defendant Sharp.
8  MR. O'ROURKE:  Good afternoon, Your Honor, this
9  is Jerry O'Rourke from Connolly Bove Lodge & Hutz on behalf
10  of AU Optronics.  With me on the phone is Larry Hume.
11  MR. HORWITZ:  Your Honor, Rich Horwitz from
12  Potter Anderson & Corroon for Samsung.  With me on the line
13  is Neil Sirota from Baker Botts.
14  MR. MARSDEN:  Good afternoon, Your Honor.
15  William Marsden from Fish & Richardson.  And I have my
16  associate Katie Moerke on the line with me.
17  THE COURT:  All right.  Is there anybody else?
18  Okay.  I have read the several letters that were
19  sent in to me and we've got a few disputes to deal with.  I
20  have to say at the get-go that I'm a bit disappointed that
21  we're here less than a month from our last dispute.  By my
22  count, this is now the fifth time this year that we've had
23  to get together fighting about discovery.  I understand that
24  folks feel there is a lot at stake here but I'm hoping you
25  guys can get your act together and manage to discuss things

**5**

1  without hauling the Court in every couple months or now on a
2  monthly basis.
3  I want to particularly note I'm having a bit of
4  a struggle understanding what is unclear about my scheduling
5  order.  It says pretty plainly in paragraph 3 how we're
6  going to deal with discovery disputes.  3e lays it out for
7  you.  You get a three-page letter to cover your issues.
8  Instead, I get two letters from the folks at CEA.  And I
9  don't know whether that's because you just felt like you
10  needed more space or ... There is a reason why I put the
11  limits on you people.  It's because if I don't put limits on
12  you, I'll get an avalanche of paper.
13  So I'm not even going to ask you to explain it
14  because I want to hurry and get to the meat of what we've
15  got to deal with.  I'm just telling you now, I don't want
16  anybody taking it on themselves to decide, well, I have
17  multiple issues here so I'm giving myself multiple letters.
18  You get a three-page letter.
19  And the folks on the defense side are a bit
20  complicit on this, too, because I got back a six-page letter
21  from you.  Now, you must have thought, hey, they got two
22  letters so I get six pages for me.  But if anybody needs
23  to go back and read it, look at paragraph 3e.  There is a
24  reason why it says what it says.  Follow the order for
25  handling discovery disputes.  And if you think that you

6

1  can't manage to explain to me what is going on in three
2  pages, give a call to chambers and we'll see if you don't
3  get another page or two or three to deal with your issues.
4        All right. With that as introduction, why don't
5  we go ahead and launch into the meat of this.
6        I have, on one side of the table is a demand for
7  foreign sales info that CEA wants and an argument about
8  additional interrogatories. I have, on the other side, some
9  argument about deposition discovery.
10       So, CEA, I'll let you go first. Which of your
11 issues do you want to pick up first?
12       MR. BONO: Your Honor, this is Gap Bono. I
13 think I would like to address the technical issues or
14 the technical discovery that we've requested through the
15 interrogatories.
16       THE COURT: All right. Now, I'll repeat, I've
17 read what you have sent. You don't have to reiterate
18 anything that is already in the papers. What, if any,
19 additional argument do you want to put in front of me?
20       MR. BONO: Your Honor, I would just like to add
21 that this technical information that we are requesting of
22 AUO, which is the party principally at issue here for this
23 purpose, although it's going to equally apply to all the
24 other defendants, this information we're requesting is
25 absolutely the core technical information that is needed

7

1  in this case. And we have boiled it down to a very few
2  interrogatories to get this information in the quickest,
3  easiest, most efficient manner from AUO. And I think
4  the point can be made by simply the Court looks at our
5  interrogatories, you know, 11 through 19 of the first set
6  which are very specific and to the point and then the --
7  (static, audio lost)
8        THE COURT: Hello. You cut out there on me for
9  a minute there Mr. Bono.
10       MR. BONO: I'm sorry. I was saying if you look
11 at 11 through 19 of the first set. Did Your Honor hear
12 that?
13       THE COURT: Yes.
14       MR. BONO: And we put together, because
15 apparently we were getting some feedback that there was some
16 misunderstanding or confusion and so we put together the
17 table for the second set of interrogatories that listed out
18 precisely the technical information that we need in this
19 case. I mean this really sums up virtually all, if not all
20 of the technical information needed in a very concise
21 manner. And AUO has objected to producing or to answering
22 this interrogatory.
23       I think we're entitled to the information and
24 it's certainly highly, highly relevant. It's the core
25 stuff. And I think the points I've made in the letter I

8

1  think I'm not going to repeat. I know Your Honor has
2  studied it. But this is the core information.
3        THE COURT: All right. Let me hear from AUO.
4  Well, before I do that, Mr. Bono, I understand you to be
5  saying if they just help us fill out this chart, we've got
6  what we need?
7        MR. BONO: And the few preceding interrogatories
8  on the first set.
9        THE COURT: Eleven through 19.
10       MR. BONO: Yes, Your Honor.
11       THE COURT: All right. Mr. O'Rourke or
12 Mr. Hume, who is going to be speaking on this point?
13       MR. O'ROURKE: Good afternoon, Your Honor. This
14 is Jerry O'Rourke. The dispute, I will be speaking on this,
15 and I believe that Mr. Adams for Sharp would like to be
16 heard on this issue as well, if you will let him.
17       We do dispute CEA's assertion that they lack
18 technical documents about our panels. We believe we have
19 produced the relevant responsive documents for each of the
20 MVA panels we sell with two exceptions that are outlined in
21 our letter. The reason there are many panels that are blank
22 in the CEA chart is that those panels are either twisted
23 nematic cells, and those are not accused of infringement, or
24 they're panels we do not sell at all. And we have agreed to
25 produce the documents for the two panels: the one panel to

9

1  the chart that is blank and one other MVA panel that we have
2  made CEA aware of by September 23rd.
3        THE COURT: Well, let me stop you long enough to
4  shift back to Mr. Bono here. In an exchange of letters I
5  saw your description of that and I wondered for what purpose
6  we were still fighting about this chart if there is in fact
7  no disagreement that some of what is on the chart, if
8  everybody agrees, isn't in the case. It's the twisted
9  tubes. And if there is already agreement that as to a
10 couple of blanks you are going to get the documents because
11 they're putting them together for you. Is there something
12 else going on here with the chart that I'm not understand-
13 ing, Mr. Bono?
14       MR. BONO: Yes, Your Honor.
15       THE COURT: What?
16       MR. BONO: And let me explain. On the original
17 chart, there were three modules that we agreed were TN mode.
18 That is, the twisted nematic. We can use the phrase TN and
19 that we agreed and we sent AUO a revised chart that removed
20 the three TN modules.
21       We asked them to confirm. There were a few
22 others that were unclear and we asked them to confirm
23 whether these are TN or VA. We don't have that answer yet.
24 But as to the others, and I guess we can focus in on the
25 VA-mode modules, which is what we wanted, there is a big

SHEET 4

10

1 question, has always been, and their documents are unclear
2 as to what they're saying and what we want as to the VA mode
3 modules. And I assume now Mr. O'Rourke, which we didn't
4 know about this until he sent a letter to the Court, is
5 agreeable to giving us this information.
6 We would prefer to receive it in interrogatory
7 narrative form to which we are entitled rather than having
8 to pick, try to pick it out of their documents or not and
9 then we're going to get into a squabble down the road as to
10 what information it really means or not. And I'm trying to
11 avoid all that with a simple practical solution so there is
12 no ambiguities going forward in the case. So I would
13 request that we be given the narrative answers to the
14 interrogatories.
15 THE COURT: All right. But you're not disputing
16 or disagreeing with Mr. O'Rourke's assertion that we're
17 really talking about a couple of models here. The others,
18 everybody conceding or agreeing are not at issue. Am I
19 right?
20 MR. BONO: No, Your Honor. I don't know that.
21 There were three that we took out of the mix and we gave
22 them a revised chart. There are still, we have not received
23 confirmation back on a few other modules.
24 THE COURT: All right.
25 MR. BONO: There is no disagreement if he is

11

1 saying he is going to give us the information on all the VA
2 or MVA modules. That we have no issue on that.
3 MR. O'ROURKE: Your Honor, well, if I may
4 address that point. They recently asked us to confirm that,
5 the ones we say are TN. And I'm happy to talk with them
6 about what would be sufficient to show them that that is a
7 TN module.
8 THE COURT: Yes, I wish you would because --
9 MR. O'ROURKE: That should moot this entire
10 issue.
11 THE COURT: Well, that is what I'm trying to
12 get down to. When you say it will moot the entire issue,
13 I'm not sure it will but it will at least help me to know
14 what we're talking about. When I hear you speaking,
15 Mr. O'Rourke, I hear you saying "these things are
16 irrelevant. Everybody knows they're irrelevant. We've
17 told them they're irrelevant. We're talking about two
18 models here."
19 Now I hear Mr. Bono saying, "well, we want them
20 to confirm that in some fashion." Fine, confirm it. And
21 then I also hear him say, reading only slightly between the
22 lines, "we want them to affirm to us that these additional
23 two models, that there are no other models of this character
24 that are out there," which I assume you would be perfectly
25 prepared to do, so that everybody knows we're talking about

12

1 two specific models of flat screen display; right?
2 MR. O'ROURKE: Your Honor, we have agreed to
3 tell them about any MVA panels that we commercially sell and
4 we will do that.
5 THE COURT: Okay.
6 MR. O'ROURKE: We made them aware of an
7 additional one in our letter.
8 THE COURT: All right. So the universe that
9 we're talking about now of things that they want you to tell
10 them about are two of these flat screens that both sides
11 agree are at issue; is that right?
12 MR. O'ROURKE: Yes, that is right.
13 THE COURT: All right.
14 MR. BONO: Your Honor, I hate to interrupt.
15 There is more than two that are relevant. He was saying
16 there are two additional ones.
17 THE COURT: Yes. If I misspoke, I apologize. I
18 was under the impression, based on what he had earlier said,
19 that you received the technical information previously as
20 to those others but that you have two additional ones that
21 you haven't received and he is going to give you technical
22 information on. Right now, I'm not talking about whether
23 you get it in the form you want it or not. I'm just trying
24 to find out what is on the table. And what is on the table
25 is two additional pieces of info, two additional models that

13

1 you haven't gotten information on that they are willing to
2 give you information on, and that is what we're dealing
3 with; am I correct?
4 I'm hearing nobody correcting me at this
5 juncture, so I will got my hand on at least that much of
6 it. And so that makes the dispute about whether you give
7 them the information in the form of an interrogatory
8 response which will allow them to fill in their chart or you
9 hand them documents.
10 MR. ADAMS: Your Honor, this is Bob Adams for
11 Sharp. Before you go too far and say everyone has been
12 silent, I think there are just minor clarification that
13 really does need to be made.
14 I don't think any of the defendants are saying
15 they shouldn't have to give any documents that are in their
16 possession that are relevant to the request. As you pointed
17 out, the question is the form, whether it's just document
18 production or whether we have to fill out a chart on their
19 behalf, which, of course, the defendants object to.
20 But there are two other points that are being
21 glossed over here, and I want to make sure Your Honor is
22 clear. Some of the information that is being requested is
23 information that the defendants, at least Sharp doesn't
24 have. These are, you know, third-party information and so
25 we don't have it. And the other thing is that I would say

SHEET 5

14

1  at least some of the terms in the chart and elsewhere are
2  vague and those are problems. So I don't want -- you know,
3  I want everything out on the table.
4      THE COURT: All right. Mr. O'Rourke, is there
5  anything else you want to say in this regard about whether
6  you ought to be answering this in some narrative form or
7  just handing over documents?
8      MR. O'ROURKE: Well, we believe that we are,
9  should be entitled to hand over the documents. We agree
10 with Mr. Adams, and we pointed this out in our letter, that
11 that chart is seeking information that we believe AUO does
12 not possess because it's in the possession of polarizer
13 venders who send us our polarizers in the films.
14     In terms of the interrogatories, I think the
15 broad concept here is that everybody agreed they would get
16 25 in this case. They don't really dispute that they're
17 over the limit. Rule 33 provides the presumptive limit by
18 Congress. Congress intends to limit interrogatory practice
19 and that rule is there for a reason. There is every reason
20 in this case to follow it; and they haven't demonstrated
21 any need other than Mr. Bono's argument that they should be
22 relieved from that limit.
23     THE COURT: All right. Now, does anybody from
24 the other defendants have a dog in this fight? I take it no
25 but I'll give you your opportunity to speak, if you want to.

16

1  showing made at some other point or on some other topic.
2  This is a ruling without prejudice to either side coming
3  back with a request for further discovery if it's properly
4  targeted and it's warranted.
5      But I hear the other side saying they're
6  prepared to produce documents. Indeed even if you were
7  allowed to have these interrogatories answered, 33(d)
8  provides parties an option to produce business records in
9  lieu of giving an narrative answer. And there's some reason
10 to believe here that CEA is just as competent to look at
11 technical data and decide how to fill in its chart as it is
12 to say to the other side, "you fill in the chart."
13     So I hear folks saying to you, Mr. Bono, we're
14 going to give you that information. I expect them to follow
15 through on their word and then you fill in your own chart.
16 So that disposes of that.
17     Now we'll turn to the defendants; but don't
18 worry, I'm not forgetting your foreign sales info, Mr. Bono.
19 We'll come back to that.
20     Who is going to be speaking on behalf of the
21 defendants? Is this going to be you, Mr. O'Rourke, again?
22     MR. O'ROURKE: Yes, it will, Your Honor.
23     THE COURT: All right. Let's talk about
24 deposition scheduling.
25     MR. O'ROURKE: Yes, Your Honor. Before we do

15

1      MR. MARSDEN: Your Honor, this is William
2  Marsden for Chi Mei. We also have been served with the
3  chart. We believe that to the extent there are accused
4  products that we can provide the technical documents. There
5  are ambiguities and problems with the way the chart is
6  structured that I think makes it very difficult to answer
7  in a narrative form and so we do have an objection to that.
8      THE COURT: All right.
9      MR. ADAMS: Your Honor, this is Bob Adams again.
10 Sharp was served with this same chart I think in early
11 August. And I won't repeat my comments because Mr. Marsden
12 has hit some of them and you have already heard what I
13 already said.
14     MR. SIROTA: For the record, Your Honor, this
15 is Neil Sirota for Samsung. We have a similar position on
16 answering the chart, that is, filling in the boxes. We are
17 going to answer the interrogatory but it may not be filling
18 in the boxes that they would have us do.
19     THE COURT: All right. Well, here is the ruling
20 on the interrogatories. This one goes in the defendants'
21 column. I've looked at the stuff you guys have submitted;
22 and you're over the limit here, CEA. Nobody has made any
23 persuasive showing to me for why additional interrogatories
24 are needed.
25     That's not to say there couldn't be such a

17

1  that, I just want to put a couple things into perspective.
2  CEA is the patent holder. CEA is the plaintiff. CEA is
3  seeking millions of dollars of damages from AUO. They're
4  seeking an injunction that will put it out of business and
5  their attorney fees and CEA is the aggressor in this case.
6      We need the relief we're seeking because CEA is
7  refusing to give us dates for their 30(b)(6) designees for a
8  notice that we served on them almost two months ago. And
9  they are trying to force AUO and the other defendants to go
10 to France to depose their inventors who may be their trial
11 witnesses, who may be their 30(b)(6) designees, and at least
12 some of whom have the word "director" in their job titles.
13 And AUO had to find out that last fact by combing through a
14 bunch of French language websites and paying to translate
15 them.
16     In terms of their 30(b)(6) witnesses, there is
17 no dispute, after the last call, CEA is going to have to
18 make their 30(b)(6) designees available here in Delaware.
19 The reason we're requesting immediate identification of who
20 the designees will be is because if the inventors are going
21 to be their designees, they should be deposed in their
22 individual capacities here as well.
23     If you read CEA's letter, as you indicated, you
24 saw that we were being told that they still do not know who
25 will testify for them two months after we served the notice.

SHEET 6

18

1  And that is frankly ridiculous.
2       In terms of the named inventors, and they're
3  valid notices, CEA has essentially refused to tell us their
4  job titles in their initial disclosures, never supplemented
5  them after we complained about it. They've refused to
6  produce requested documents showing people's job titles
7  and their responsibilities. CEA undoubtedly has this
8  information in its possession, we could find some of it
9  on the web, and we're requesting that you draw an adverse
10 inference against them in terms of the status of these
11 people as officers, directors or managing agents.
12      In terms of Mr. Clerc and Mr. Vaudaine, both
13 of them have the word "director" in their title, which is
14 something AUO had to find out on the web at its great
15 expense, and they are clearly "managing agents" under the
16 pragmatic standard articulated by the Court.
17      As for Ms. Vey, they still, to this day, refuse
18 to affirmatively state what her title is.
19      THE COURT: Okay. Why don't we just get right
20 to that. Again, I've read your letters. You guys don't
21 need to tell me what is in the letters, which is what I'm
22 hearing right now. I know you want to make your pitch to me
23 so I'm not trying to cut you off but I got your argument.
24      I understand your argument in this regard.
25 Mr. Bono, why don't you speak directly to this assertion

19

1  that they just won't tell us, with these people, they won't
2  tell us what their titles are and that's outside the rules
3  and they're not playing fair ball. Give me the response to
4  that assertion. And why can't you and haven't you told
5  them?
6       MR. BONO: Your Honor, we are happy to tell them
7  the titles of these individuals.
8       THE COURT: Well, evidently not because unless
9  Mr. O'Rourke is just a bald-faced liar, they've been asking
10 you this for quite some time and can't get it out of you.
11      MR. BONO: Well, Your Honor, I disagree that
12 they have been asking this from us for quite some time now.
13 This has all come up during this month and in the last
14 couple of weeks. It hasn't been something that has been
15 pressing for months. And, you know, being in August, I made
16 it clear that a lot of these people at CEA are on vacation.
17 We have had extreme difficulty communicating with CEA for
18 the last three weeks. And I tried to make this clear. It
19 is a cultural thing. They go on vacation and they do not
20 respond to anything work related. But that is not the
21 issue. The issue is -- if the issue is do they want us to
22 tell them the title of these folks, I'm happy to get that
23 information to them promptly.
24      THE COURT: I think they would like to know not
25 just the title but what they do. I mean the question of

20

1  whether an individual is a director, officer or managing
2  agent has ramifications both procedural and evidentiary in
3  terms of the binding character of things they say.
4       So I can understand why they want to know what
5  these folks do, and I guess I'm trying to find out. I mean
6  you've given me a reason for this, if I understand what you
7  are saying, which is they weren't asking for this before
8  August and it's hard to get information out of the French in
9  August, if I have understood you correctly. Is that right?
10      MR. BONO: And the second reason, Your Honor,
11 this goes solely to the question of location of these
12 depositions. That is the issue at hand, the only issue at
13 hand. I asked the defendant in a letter weeks ago, "let's
14 sit down and discuss in a comprehensive fashion the question
15 of location of these depositions" because it's not just the
16 initial notices of AUO of our inventors but it also applies
17 to the deposition notices that we have noticed of their
18 employees. Not once did any of the defendants ever speak
19 to me about trying to work out the issue of location, and I
20 have repeatedly written to them and e-mailed them to try to
21 discuss the issue of location.
22      THE COURT: Okay.
23      MR. BONO: The only thing I get on this issue
24 was the letter from Mr. O'Rourke to Your Honor on Friday
25 which raised this issue for the first time from their point

21

1  of view.
2       THE COURT: This issue being which, sir?
3       MR. BONO: The location of deposition, because
4  the only issue that Mr. O'Rourke is raising with the Court
5  right now is where should the deposition of the inventors
6  take place. That's why he wants the title of these folks,
7  because he is trying to argue, and he argued it for the
8  first time in his letter to the Court on Friday, without
9  ever discussing the issue with me, the issue of location of
10 these witnesses. And so that is the first time I have seen
11 his pitch that these folks he contends are managing agents
12 or officers or directors and he wants them in Delaware.
13      THE COURT: All right. Mr. O'Rourke, do you
14 want to respond to the assertion that we're really here
15 spending time at 5:00 o'clock on Tuesday evening because
16 you failed to meet and confer?
17      MR. O'ROURKE: Well, I believe we have met and
18 conferred. We asked them repeatedly, "what is the status of
19 the inventors? Where are you going to produce them?" The
20 answer is silence and we have this notice. Our notice was
21 served July 1st. The French didn't go on vacation for the
22 entire month of July and August. I mean they sat on these
23 notices for a month and do nothing on them, apparently, and
24 stone walled the entire time.
25      THE COURT: All right.

SHEET 7

22

1  MR. O'ROURKE: In terms of, we believe we have
2  met and conferred, and we believe it's appropriate for Your
3  Honor, given their behavior, to just say, "look, we're going
4  to draw an adverse inference against them." They've got the
5  documents. They know what three people do. You can presume
6  they are officers, directors or managing agents. We put
7  enough out there that we could find on the web to show you
8  that, we believe.
9  MR. ADAMS: Your Honor, this is Bob Adams again.
10  May I make one point?
11  THE COURT: Yes, real quick, Mr. Adams.
12  MR. ADAMS: During two hearings in this case,
13  Your Honor has pointed to the scheduling order where you
14  reminded CEA that because they brought the lawsuit in this
15  forum, they are obligated to bring their officers, directors
16  and managing agents to this forum for deposition. And you
17  also pointed out that because the defendants -- or I should
18  say, you pointed out as long as the defendants did not file
19  counterclaims or the like, they do not have to bring their
20  witnesses to this forum. They're entitled to have them
21  deposed where they reside.
22  THE COURT: All right.
23  MR. ADAMS: So think that is clear and is a
24  context that needs to be remembered in this discussion.
25  THE COURT: All right. Here is the ruling I

23

1  have for you. And it's a little bit of a pox on both
2  your houses. It's clear to me that we've got litigation
3  gamesmanship going on which is not productive. I don't
4  think it's any accident that 40 deposition notices land on
5  somebody's desk instead of an answer to some questions. And
6  I don't think it's any accident that repeated e-mails get
7  ignored either. I think you folks on both sides are not
8  addressing in the manner you should your obligation to meet
9  and confer. You're derelict and that's why we're having to
10  come back to this table repeatedly.
11  So to the extent this is helpful at all -- and I
12  don't know whether it is. I honestly don't know whether the
13  fact that you are wearing my patience thin means anything to
14  you folks in the least, but I'll tell you that you are
15  because I'm getting the strong sense that lawyers aren't
16  talking to each other in good faith. It's, "oh, he landed
17  an elbow; now I'm going to try to a land a thumb in his
18  eye;" and I'm tired of it. You need to be talking to each
19  other, period. That's the bottom line.
20  The two directors as to which CEA has not
21  provided anything except the argument that, "well, director
22  doesn't really mean director," forget about it. They carry
23  the title. They're apparently in positions of authority,
24  directing research, doing important things for the company.
25  They're managing agents. You are going to have those folks

24

1  here. Bring them here. Done. We're done with that.
2  As to the other two, I expect you to give these
3  folks on the other side the information about who they are,
4  what their titles are, what their job responsibilities are.
5  I'm not drawing an adverse inference. Contrary
6  to your comments, Mr. O'Rourke, you not only haven't given
7  me information from which I could draw an adverse inference,
8  all you have given me is that your statement of frustration
9  and assertion that since you don't think they responded at
10  all, I should draw an adverse inference. And I'm not there
11  yet, because I'm prepared to say I don't know the truth of
12  it at this moment.
13  Am I troubled that deposition notices have been
14  hanging out there since the beginning of July and we're
15  talking about this at the end of August and we still haven't
16  gotten things worked out yet? Yes, I am. Am I prepared to
17  say this reflects such bad behavior by CEA that I should
18  just assume these people are managing agents? No, I'm not.
19  So, Mr. Bono, give them the information. You
20  know, are your folks back from vacation? Are they
21  accessible to you at this point, Mr. Bono?
22  MR. BONO: Some are. And the inventors, though,
23  are not, yet.
24  THE COURT: Well, I got to believe somebody else
25  knows what they're doing. I mean it's just stretches

25

1  credulity for me to believe that nobody who knows what these
2  positions are and what they do is answering the phones at
3  CEA.
4  MR. BONO: Your Honor, as to the others -- I
5  understand Your Honor's ruling on the two inventors who
6  have the titles of directors. One of the other two,
7  Mr. Deutsch is no longer employed at CEA, he is retired,
8  and I informed the defendants of that.
9  THE COURT: Yes. Well, you are going to need to
10  put together information and give it to them in a way that
11  satisfies them about what is or is not appropriate to do in
12  light of the information you provide them.
13  Let's assume for the sake of argument he is no
14  longer employed. Accept that as a given. Mr. O'Rourke,
15  what happens to your argument? Do you want me to draw an
16  adverse inference that somebody who everybody acknowledges
17  is not employed is a managing agent?
18  MR. O'ROURKE: Well, at a minimum, Your Honor,
19  we ask that we be given contact information for him. I
20  mean we obviously don't know where he is. We think he is
21  with a CEA-affiliated university. We appended that to our
22  documents. At a minimum, we want the contact information.
23  And we would also want, if he is under their control, that
24  they would make him available at a convenient time and
25  location; possibly outside of France, if he is willing to go

SHEET 8

26

1    there.
2        THE COURT: All right. Mr. Bono?
3        MR. BONO: Your Honor, I have no problem with
4    making the other two inventors, excluding that one who is
5    retired, and working to make them available in France. It's
6    just that I don't have the ability to compel them to come to
7    the United States. He is not employed.
8        THE COURT: Well, as to the first one, the one
9    that you said isn't employed, that may well be true. As to
10   the second, I don't know whether that is true or not. That
11   is why you're going to answer the discovery outstanding
12   about who they are and what they do because, you know, maybe
13   they are subject to compulsion here. And that is something
14   that I'd rather you folks figured out without me having to
15   figure out for you. But you give them the responses and you
16   discuss that in good faith about what the right thing to do
17   is.
18       And as to the other gentleman, if he is not
19   employed, he is not employed.
20       You folks start talking about how to get a
21   reasonable discovery opportunity. Because I can promise you
22   this: If they're not available on some reasonable basis for
23   discovery, you can bet that they're not going to be taking
24   the stand in this case. You can just take that to the bank
25   right now. If there is any proof that is at all persuasive

28

1    sit down and talk to you and you feel you are entitled to
2    that discussion before you have to respond to the 30(b)(6)
3    notice or to bring your officers and agents here otherwise
4    for deposition. This is not a two-way street on this
5    particular front.
6        Should they be responding to you? Yes. I hope
7    I have made that clear in this discussion already. But
8    you are not entitled to say, well, we're just not going to
9    produce your witnesses until you talk to us about an omnibus
10   solution. That is not the way this is going to work. It
11   isn't what the rules provide for. It's not what my
12   scheduling order provides for.
13       So you get the two we've talked about into the
14   United States. You get the 30(b)(6) people here. Let's
15   stop talking about this. We've resolved this. It's done.
16       As to the other witness, not employed one -- I
17   should say retired. It makes him sound like he is thrown
18   out. The retired gentleman, not dealing with him but
19   dealing with the other person who is concededly employed,
20   you respond to the discovery about that.
21       All right. Now I think that clears the decks on
22   the deposition scheduling. Am I correct, Mr. O'Rourke?
23       MR. O'ROURKE: Yes, Your Honor.
24       THE COURT: Mr. Bono?
25       MR. BONO: Yes, Your Honor.

27

1    that they were under your custody or control or subject to
2    your blandishments in any way that would likely to have
3    effect upon them and you chose not to do it in the context
4    of discovery, they will not walk through my courtroom door.
5        So I just want folks on all sides to understand
6    that. And that goes for all defense witnesses as well who
7    are folks who ought to be made available for discovery.
8        Now, that doesn't say anything about where
9    they should be made available for discovery because the
10   assertions in the plaintiff's letters that all the defense
11   witnesses should come to the United States are just wrong.
12   I mean we've been down this path and I don't want to have to
13   keep walking down it. Read the order. If you've come to
14   this Court and you make your pitch for relief here, your
15   corporate officers are going to be deposed here. Defendants
16   who get pulled in here, if they're not making an affirmative
17   claim on their own behalf, they do not stand in the same
18   position, period.
19       So you guys need to be talking about what is a
20   sensible way to approach discovery of foreign witnesses. It
21   is not the case, CEA, that you can stand on your desire for
22   an omnibus solution and refuse to discuss what they have the
23   right to do which is notice depositions of your people and
24   get them done. I mean it's hard for me to understand how
25   you can get yourself worked up, Mr. Bono, because they won't

29

1        THE COURT: Okay. Now let's talk about your
2    last issue, Mr. Bono, which was you wanted information about
3    foreign sales. Is there anything you want to add to the
4    correspondence that you sent to me in that regard?
5        MR. BONO: Your Honor, in addition to what I
6    put in the letter on that point, I'd like to emphasize that
7    the difference of what we're talking about here is the
8    defendants I believe are trying to get the Court to make a
9    ruling that is tantamount to an in limine ruling which says
10   we are only entitled to damages in this, to put in evidence
11   of damages as to only their direct sales to customers in the
12   United States.
13       We know that does not capture or it only
14   captures a fraction of the total sales in the United States
15   of the infringing products. We also know that 30 percent or
16   approximately 30 percent of the worldwide module sales are
17   in the United States or in products that are sold in the
18   United States.
19       And we believe that we will have evidence and
20   be able to put in a damage study which entitles us to a
21   reasonable royalty on not only the direct sales but the
22   total sales of the infringing model that have occurred in
23   this country. And the one sure fire way to calculate that
24   is if we have the worldwide sales and revenues figure from
25   the defendants of their VA mode modules and we can present

30

1  that figure. And that will be a much more representative
2  figure of the actual sales of the infringing product here
3  than what would be just the direct sales which are costing a
4  mere fraction of the infringing sales.
5      THE COURT: Okay. I have your argument on that.
6  Who is taking the cudgels up on the defense for
7  this? Is that you again, Mr. O'Rourke?
8      MR. O'ROURKE: It will be, although I believe
9  Mr. Sirota and some of the other defendants will want to be
10  heard on this as well.
11     THE COURT: Okay.
12     MR. O'ROURKE: Your Honor, we did in our letter
13  emphasize we believe that the worldwide sales revenue is not
14  relevant to any claim or defense under Rule 26(b). As we
15  pointed out, it's not relevant to an inducement claim.
16     We've given CEA the discovery into our U.S.
17  sales. We agreed that we would update that closer to trial.
18  Samsung has, will produce that as well. I think Mr. Sirota
19  will tell you that.
20     There is really no debate that we are allowed to
21  sell free and clear of their patents in Taiwan or Korea or
22  Japan. It can't be, the worldwide sales figures aren't
23  relevant on that basis.
24     In terms of Mr. Bono's unique damages theory,
25  that they're somehow entitled to the gross worldwide sales

31

1  numbers, that alleged approach to damages has no case law
2  support as cited in their brief or any of that we're aware
3  of; and they're trying to use that as the basis for
4  discovery into highly sensitive worldwide sales data which
5  is really, to be reflective of what it is, it's all the
6  sales we make in Taiwan or China where our plants are that
7  don't reflect in any way the U.S. sales. We've given them
8  the U.S. sales.
9      THE COURT: Yes. How about your responding more
10  specifically, if you would, to the assertion that they're
11  entitled to make an argument about commercial success and
12  that commercial success, it's relevant how successful
13  something is in a worldwide market and that your arguments
14  about obviousness are something that they ought to be able
15  to punch back at?
16     MR. O'ROURKE: Well, I would be happy to do
17  that. Your Honor, it's the U.S. patent or U.S. patents that
18  are at issue here. As a result, we believe it's the U.S.
19  sales that are relevant to assessing obviousness of the U.S.
20  patent. There is no Federal Circuit case cited that says
21  that worldwide sales are relevant to commercial success.
22  They've got some court out in Minnesota that supposedly says
23  that. But, you know, just because the gross worldwide sales
24  number is put in issue, that's not the beginning and the end
25  of the inquiry. They also have to have a nexus.

32

1      As you know, a nexus has to exist between the
2  sales or success of the commercial product and the patents
3  in suit. And these patents are directed to a very narrow
4  area of technology. They don't claim LCD computer monitors
5  and LCD televisions. Frankly, we know all those patents
6  were filed in the 1980s by the French Government, and the
7  idea that an LCD monitor or television is commercially
8  successful because of two patents that the French Government
9  filed back then is frankly outlandish. They should not be
10  allowed to use a commercial success argument without even
11  the remotest articulation of nexus to gain access to highly
12  confidential worldwide sales and revenue data from AUO or
13  any other defendant.
14     THE COURT: All right. Who else?
15     MR. ADAMS: Your Honor, this is Bob Adams. Can
16  I make one brief point on your question?
17     THE COURT: You sure can.
18     MR. ADAMS: The object of the hypothetical
19  negotiation is to address the value of the U.S. patent. By
20  giving additional value based upon something in a foreign
21  country, your U.S. damages are, in one sense, if they're
22  good, then it would increase the value of the U.S. patent.
23  And if they're no good, then it would decrease the value.
24  And I would say that in either case, you're not supposed to
25  look outside the U.S. It's a U.S. patent, U.S. damages.

33

1  And what happens abroad stays abroad.
2      MR. SIROTA: Your Honor, Neil Sirota for
3  Samsung. Just a couple quick points.
4      THE COURT: Yes.
5      MR. SIROTA: One, I want to put a finer point
6  on what really is at issue here. CEA is seeking worldwide
7  sales but what they're saying is, what they're really
8  talking about is indirect sales for which the defendants
9  could be liable and those are two very different things.
10     There is a statute, 271(b), that tells you the
11  elements that need to be present for an inducement claim.
12  And CEA's damages theory, the way they've articulated it is
13  they just want to bypass that and say, hey, we were just
14  going to take the number in the U.S. and divide it before by
15  the overall sales and that percentage is what we're entitled
16  to and that is totally improper.
17     And the second point I just want to make is as
18  to commercial success. The sales numbers in the U.S. that
19  they're going to get will likely show commercial success. I
20  don't think there is going to be too much of an issue about
21  that, so adding worldwide sales really doesn't add anything
22  to do that. Now, whether or not it's related to the
23  plaintiff's patent is a whole other issue, as Mr. O'Rourke
24  said, but the raw number is going to be there.
25     THE COURT: Is there anybody else want to speak

34

1  on this?
2        MR. ADAMS: I guess I would have to say for
3  Sharp, I don't agree with the commercial success statement
4  that Mr. Sirota made so I'd like to go on the record.
5        THE COURT: All right.
6        MR. ADAMS: And also I think that in order to
7  be entitled to these worldwide sales or non-U.S. sales
8  information, I do believe that CEA must show some evidence
9  that actual inducement exists, that some of the defendants
10 did something. And so far, they've given this Court and the
11 defendants no proof. Now, obviously they can take discovery
12 and come back and at that point it would be a different
13 issue. But at this point, they don't have any evidence of
14 actual inducement and all the defendants have denied it.
15       THE COURT: Is there anybody else?
16       MR. SIROTA: Just for the record, Neil Sirota.
17 I'm not stipulating to commercial success at this point.
18       THE COURT: I didn't take you as stipulating,
19 Mr. Sirota. That's fine.
20       MR. SIROTA: Okay, Your Honor.
21       THE COURT: All right. Well, this one goes to
22 CEA. And it goes to CEA because of this, and this alone, at
23 this juncture. The Federal Rules of Evidence on relevance
24 are plenty broad and on that broad basis, the question of
25 commercial success as it goes to the argument that the

36

1  needs to be addressed while we're all on the line together,
2  Mr. Bono?
3        MR. BONO: No, Your Honor.
4        THE COURT: Mr. Richards or Mr. Kahn?
5        MR. KAHN: No, Your Honor.
6        THE COURT: Mr. Ingersoll or Mr. Adams?
7        MR. ADAMS: No, Your Honor.
8        THE COURT: Mr. O'Rourke or Mr. Hume?
9        MR. O'ROURKE: No, Your Honor.
10       THE COURT: Mr. Horwitz or Mr. Sirota?
11       MR. SIROTA: No, Your Honor.
12       THE COURT: Mr. Marsden?
13       MR. MARSDEN: No, Your Honor.
14       THE COURT: All right. And for others who are
15 on the call, I apologize if I didn't note you by name. I
16 just jotted down the names real quick. Have I forgotten
17 anybody here that was represented and needs to put their oar
18 in the water?
19       I hear nothing. Okay. Thanks for your time. I
20 hope you get things worked out and we get this case on a
21 track that won't require further Court intervention to help
22 you in the discovery process. See you.
23       (The attorneys respond, "Thank you, Your
24 Honor.")
25       (Telephone conference ends at 5:20 p.m.)

35

1  defendants have raised about obviousness is information that
2  these folks can inquire into.
3        Whether it is ultimately admissible, whether
4  they ultimately make the kind of showing they need to
5  connect up the figures that they've got with an argument
6  that they can put in front of fact-finder who is going to
7  make some judgments with respect to underlying facts before
8  a determination is made perhaps on obviousness is something
9  that I'm not talking about right now. This is not an in
10 limine motion about what does and doesn't get in a trial.
11 What it is is a statement that, you know, how successful
12 something has been selling around the world fits around the
13 broad question of relevance in my mind when you are talking
14 about whether something is obvious or not.
15       So, we've got a protective order in place. It
16 has a very high level of protection available within it. If
17 these sensitive figures are of such a nature that it needs
18 to be provided under the highest level of security, do it.
19 But you haven't made the pitch successfully to me on the
20 defense side that this is relevant to nothing in the case.
21 And CEA has persuaded me there is at least one piece of the
22 case as to which it's sufficiently relevant to warrant
23 discovery under the broad rule.
24       All right. Now, I think that clears everything
25 that we had to discuss. Is there any other matter that

United States District Court for the District of Delaware
Before the Honorable Kent A. Jordan

1

**0**

**03-484** [1] - 1:9

**1**

**11** [2] - 7:5, 7.11
**19** [3] - 7:5, 7.11, 8:9
**1980s** [1] - 32:6
**1st** [1] - 21:21

**2**

**2005** [1] - 1:12
**23** [1] - 1:12
**23rd** [1] - 9:2
**25** [1] - 14:16
**26(b** [1] - 30:14
**271(b** [1] - 33:10

**3**

**3** [1] - 5:5
**30** [2] - 29:15, 29:16
**30(b)(6** [6] - 17.7,
   17:11, 17:16, 17:18,
   28:2, 28:14
**33** [1] - 14:17
**33(d** [1] - 16:7
**3e** [2] - 5:6, 5:23

**4**

**40** [1] - 23:4
**4:30** [2] - 1:12, 3:19

**5**

**5:00** [1] - 21:15
**5:20** [1] - 36:25

**A**

**ability** [1] - 26:6
**able** [2] - 29:20, 31:14
**abroad** [2] - 33:1
**absolutely** [1] - 6:25
**Accept** [1] - 25:14
**access** [1] - 32.11
**accessible** [1] - 24:21
**accident** [2] - 23:4,
   23:6
**accused** [2] - 8:23,
   15:3
**acknowledges** [1] -
   25:16
**act** [1] - 4:25
**Action** [1] - 1:4
**actual** [3] - 30:2, 34:9,

34:14
**Adams** [20] - 2:13, 4:7,
   8:15, 13:10, 14:10,
   15:9, 22:9, 22.11,
   22:12, 22:23, 32:15,
   32.18, 34:2, 34:6,
   36:6, 36:7
**add** [3] - 6:20, 29:3,
   33:21
**adding** [1] - 33:21
**addition** [1] - 29.5
**additional** [10] - 6:8,
   6.19, 11.22, 12:7,
   12:16, 12:20, 12:25,
   15:23, 32.20
**address** [3] - 6:13,
   11.4, 32:19
**addressed** [1] - 36:1
**addressing** [1] - 23:8
**admissible** [1] - 35:3
**adverse** [6] - 18:9,
   22.4, 24:5, 24:7,
   24:10, 25:16
**affiliated** [1] - 25:21
**affirm** [1] - 11:22
**affirmatively** [1] -
   18:18
**afternoon** [5] - 3:22,
   4:2, 4:8, 4:14, 8:13
**agent** [2] - 20.2, 25:17
**agents** [8] - 18.11,
   18.15, 21.11, 22:6,
   22:16, 23.25, 24:18,
   28:3
**aggressor** [1] - 17:5
**ago** [2] - 17.8, 20:13
**agree** [3] - 12.11,
   14:9, 34:3
**agreeable** [1] - 10:5
**agreed** [6] - 8:24,
   9:17, 9:19, 12:2,
   14:15, 30:17
**agreeing** [1] - 10:18
**agreement** [1] - 9:9
**agrees** [1] - 9:8
**ahead** [1] - 6:5
**Aldridge** [2] - 1:20,
   3:25
**alleged** [1] - 31:1
**allow** [1] - 13:8
**allowed** [3] - 16:7,
   30.20, 32:10
**almost** [1] - 17:8
**alone** [1] - 34:22
**ambiguities** [2] -
   10:12, 15.5
**America** [2] - 2:8, 2:22
**Anderson** [2] - 2:2,
   4:12
**answer** [7] - 9:23,

15:6, 15.17, 16:9,
   21:20, 23:5, 26:11
**answered** [1] - 16.7
**answering** [4] - 7:21,
   14.6, 15:16, 25:2
**answers** [1] - 10:13
**apologize** [2] - 12:17,
   36:15
**Appearances** [3] -
   1:16, 2:1, 3:1
**appended** [1] - 25:21
**applies** [1] - 20.16
**apply** [1] - 6.23
**approach** [2] - 27.20,
   31:1
**appropriate** [2] - 22:2,
   25:11
**area** [1] - 32.4
**argue** [1] - 21:7
**argued** [1] - 21:7
**argument** [14] - 6:7,
   6:9, 6:19, 14:21,
   18:23, 18:24, 23:21,
   25:13, 25:15, 30:5,
   31:11, 32:10, 34:25,
   35:5
**arguments** [1] - 31:13
**Arlington** [1] - 2:14
**articulated** [2] - 18:16,
   33:12
**articulation** [1] - 32:11
**assertion** [7] - 8:17,
   10:16, 18:25, 19:4,
   21:14, 24:9, 31:10
**assertions** [1] - 27:10
**assessing** [1] - 31:19
**associate** [1] - 4:16
**assume** [4] - 10:3,
   11:24, 24:18, 25:13
**Atomique** [2] - 1:4,
   1:22
**attorney** [1] - 17:5
**attorneys** [1] - 36:23
**Au** [3] - 1:9, 3:7, 4:10
**audio** [1] - 7:7
**August** [7] - 1:12,
   15:11, 19:15, 20:8,
   20:9, 21:22, 24:15
**Auo** [12] - 6:22, 7:3,
   7:21, 8:3, 9:19,
   14:11, 17:3, 17:9,
   17:13, 18:14, 20:16,
   32:12
**authority** [1] - 23:23
**available** [7] - 17.18,
   25:24, 26:5, 26:22,
   27:7, 27:9, 35:16
**avalanche** [1] - 5:12
**avoid** [1] - 10:11
**aware** [3] - 9:2, 12:6,

31:2

**B**

**bad** [1] - 24:17
**Baker** [2] - 2:5, 4:13
**bald** [1] - 19:9
**bald-faced** [1] - 19:9
**ball** [1] - 19:3
**bank** [1] - 26:24
**based** [2] - 12:18,
   32.20
**basis** [5] - 5:2, 26:22,
   30:23, 31:3, 34:24
**Bayard** [2] - 1:17, 3.23
**beginning** [3] - 3.19,
   24.14, 31:24
**behalf** [4] - 4:9, 13:19,
   16:20, 27:17
**behavior** [2] - 22:3,
   24:17
**bet** [1] - 26:23
**between** [2] - 11:21,
   32:1
**big** [1] - 9:25
**binding** [1] - 20:3
**bit** [4] - 4:20, 5:3, 5:19,
   23:1
**blandishments** [1] -
   27:2
**blank** [2] - 8:21, 9:1
**blanks** [1] - 9:10
**Bob** [5] - 4:7, 13:10,
   15:9, 22:9, 32:15
**boiled** [1] - 7:1
**Bono** [40] - 1:20, 3:24,
   6:12, 6:20, 7:9, 7.10,
   7:14, 8.4, 8:7, 8:10,
   9:4, 9:13, 9:14, 9:16,
   10:20, 10:25, 11.19,
   12:14, 16:13, 16.18,
   18:25, 19:6, 19.11,
   20:10, 20:23, 21.3,
   24:19, 24:21, 24:22,
   25:4, 26:2, 26:3,
   27:25, 28:24, 28:25,
   29:2, 29:5, 36:2,
   36:3
**Bond's** [2] - 14:21,
   30:24
**bottom** [2] - 23:19
**Botts** [2] - 2:5, 4:13
**Bove** [3] - 3:2, 3:5, 4:9
**boxes** [2] - 15:16,
   15.18
**Brian** [1] - 1:24
**brief** [2] - 31:2, 32:16
**bring** [3] - 22:15,
   22:19, 28:3
**Bring** [1] - 24:1

**broad** [5] - 14:15,
   34:24, 35:13, 35:23
**brought** [1] - 22.14
**bunch** [1] - 17:14
**business** [2] - 16.8,
   17.4
**bypass** [1] - 33:13

**C**

**calculate** [1] - 29:23
**Canada** [1] - 2:8
**capacities** [1] - 17:22
**capture** [1] - 29:13
**captures** [1] - 29:14
**carry** [1] - 33:22
**case** [16] - 7:1, 7:19,
   9:8, 10:12, 14:16,
   14:20, 17:5, 22:12,
   26:24, 27:21, 31:1,
   31:20, 32:24, 35:20,
   35:22, 36:20
**Cea** [31] - 3:23, 5:8,
   6:7, 6:10, 8:22, 9:2,
   15:22, 16:10, 17:2,
   17:5, 17:6, 17:17,
   18:3, 18:7, 19:16,
   19:17, 22:14, 23:20,
   24:17, 25.3, 25:7,
   25:21, 27:21, 30:16,
   33:6, 34:8, 34:22,
   35:21
**Ceds** [3] - 8:17, 17:23,
   33:12
**Cea-affiliated** [1] -
   25:21
**cells** [1] - 8:23
**certainly** [1] - 7:24
**chambers** [2] - 3:19,
   6.2
**character** [2] - 11:23,
   20:3
**chart** [20] - 8:5, 8.22,
   9:1, 9.6, 9:7, 9:12,
   9:17, 9:19, 10.22,
   13:8, 13:18, 14:1,
   14.11, 15:3, 15:5,
   15:10, 15:16, 16:11,
   16:12, 16:15
**Chi** [2] - 3:13, 15:2
**China** [1] - 31:6
**chose** [1] - 27:3
**Circuit** [1] - 31:20
**cited** [2] - 31:2, 31:20
**Civil** [1] - 1:4
**claim** [5] - 27:17,
   30:14, 30.15, 32:4,
   33:11
**clarification** [1] -
   13:12

clear [7] - 13:22, 19:16, 19:18, 22:23, 23:2, 28:7, 30:21
clearly [1] - 18:15
clears [2] - 28:21, 35:24
Clerc [1] - 18:12
closer [1] - 30:17
Co [3] - 1:7, 1:7, 2:7
Columbia [2] - 1:21, 3:6
column [1] - 15:21
combing [1] - 17:13
coming [1] - 16:2
comments [2] - 15:11, 24:6
commercial [10] - 31:11, 31:12, 31:21, 32:2, 32:10, 33:18, 33:19, 34:3, 34:17, 34:25
commercially [2] - 12:3, 32:7
Commissariat [2] - 1:3, 1:22
communicating [1] - 19:17
company [1] - 23:24
compel [1] - 26:6
competent [1] - 16:10
complained [1] - 18:5
complicit [1] - 5:20
comprehensive [1] - 20:14
compulsion [1] - 26:13
computer [1] - 32:4
Conaway [1] - 2:10
concededly [1] - 28:19
conceding [1] - 10:18
concept [1] - 14:15
concise [1] - 7:20
confer [2] - 21:16, 23:9
conference [2] - 3:19, 36:25
Conference [1] - 1:12
conferred [2] - 21:18, 22:2
confidential [1] - 32:12
confirm [5] - 9:21, 9:22, 11:4, 11:20
confirmation [1] - 10:23
confusion [1] - 7:16
Congress [2] - 14:18
connect [1] - 35:5
Connolly [3] - 3:2, 3:5,

4:9
Consolidated [1] - 1:6
contact [2] - 25:19, 25:22
contends [1] - 21:11
context [2] - 22:24, 27:3
Continued [2] - 2:1, 3:1
Contrary [1] - 24:5
control [2] - 25:23, 27:1
convenient [1] - 25:24
core [3] - 6:25, 7:24, 8:2
corporate [1] - 27:15
Corporation [5] - 1:8, 1:9, 2:15, 2:22, 3:13
correct [2] - 13:3, 28:22
correcting [1] - 13:4
correctly [1] - 20:9
correspondence [1] - 29:4
Corroon [2] - 2:2, 4:12
costing [1] - 30:3
Counsel [6] - 1:22, 2:7, 2:15, 2:21, 3:7, 3:13
count [1] - 4:22
counterclaims [1] - 22:19
country [2] - 29:23, 32:21
couple [6] - 5:1, 9:10, 10:17, 17:1, 19:14, 33:3
course [1] - 13:19
court [1] - 31:22
Court [69] - 1:1, 3:20, 4:1, 4:5, 4:17, 5:1, 6:16, 7:4, 7:8, 7:13, 8:3, 8:9, 8:11, 9:3, 9:15, 10:4, 10:15, 10:24, 11:8, 11:11, 12:5, 12:8, 12:13, 12:17, 14:4, 14:23, 15:8, 15:19, 16:23, 18:16, 18:19, 19:8, 19:24, 20:22, 21:2, 21:4, 21:8, 21:13, 21:25, 22:11, 22:22, 22:25, 24:24, 25:9, 26:2, 26:8, 27:14, 28:24, 29:1, 29:8, 30:5, 30:11, 31:9, 32:14, 32:17, 33:4, 33:25, 34:5, 34:10, 34:15, 34:18, 34:21, 36:4, 36:6, 36:8,

36:10, 36:12, 36:14, 36:21
courtroom [1] - 27:4
cover [1] - 5:7
credulity [1] - 25:1
cudgels [1] - 30:6
cultural [1] - 19:19
custody [1] - 27:1
customers [1] - 29:11
cut [2] - 7:8, 18:23

## D

damage [1] - 29:20
damages [8] - 17:3, 29:10, 29:11, 30:24, 31:1, 32:21, 32:25, 33:12
data [3] - 16:11, 31:4, 32:12
dates [1] - 17:7
deal [4] - 4:19, 5:6, 5:15, 6:3
dealing [3] - 13:2, 28:18, 28:19
debate [1] - 30:20
decide [2] - 5:16, 16:11
decks [1] - 28:21
decrease [1] - 32:23
defendant [2] - 20:13, 32:13
Defendant [2] - 3:7, 4:7
defendants [21] - 4:3, 6:24, 13:14, 13:19, 13:23, 14:24, 16:17, 16:21, 17:9, 20:18, 22:17, 22:18, 25:8, 29:8, 29:25, 30:9, 33:8, 34:9, 34:11, 34:14, 35:1
Defendants [4] - 1:10, 2:7, 2:21, 27:15
defendants' [1] - 15:20
defense [6] - 5:19, 27:6, 27:10, 30:6, 30:14, 35:20
Delaware [4] - 1:2, 1:11, 17:18, 21:12
demand [1] - 6:6
demonstrated [1] - 14:20
denied [1] - 34:14
depose [1] - 17:10
deposed [3] - 17:21, 22:21, 27:15
deposition [10] - 6:9, 16:24, 20:17, 21:3,

21:5, 22:16, 23:4, 24:13, 28:4, 28:22
depositions [3] - 20:12, 20:15, 27:23
derelict [1] - 23:9
description [1] - 9:5
designees [5] - 17:7, 17:11, 17:18, 17:20, 17:21
desire [1] - 27:21
desk [1] - 23:5
determination [1] - 35:8
Deutsch [1] - 25:7
difference [1] - 29:7
different [2] - 33:9, 34:12
difficult [1] - 15:6
difficulty [1] - 19:17
direct [3] - 29:11, 29:21, 30:3
directed [1] - 32:3
directing [1] - 23:24
directly [1] - 18:25
director [5] - 17:12, 18:13, 20:1, 23:21, 23:22
directors [6] - 18:11, 21:12, 22:6, 22:15, 23:20, 25:6
disagree [1] - 19:11
disagreeing [1] - 10:16
disagreement [2] - 9:7, 10:25
disappointed [1] - 4:20
disclosures [1] - 18:4
discovery [19] - 4:23, 5:6, 5:25, 6:9, 6:14, 16:3, 26:11, 26:21, 26:23, 27:4, 27:7, 27:9, 27:20, 28:20, 30:16, 31:4, 34:11, 35:23, 36:22
discuss [6] - 4:25, 20:14, 20:21, 26:16, 27:22, 35:25
discussing [1] - 21:9
discussion [3] - 22:24, 28:2, 28:7
Display [2] - 1:8, 2:21
display [1] - 12:1
disposes [1] - 16:16
dispute [6] - 4:21, 8:14, 8:17, 13:6, 14:16, 17:17
disputes [3] - 4:19, 5:6, 5:25
disputing [1] - 10:15

District [4] - 1:1, 1:2, 1:21, 3:6
divide [1] - 33:14
document [1] - 13:17
documents [6] - 8:18, 8:19, 8:25, 9:10, 10:1, 10:8, 13:9, 13:15, 14:7, 14:9, 15:4, 16:6, 18:6, 22:5, 25:22
dog [1] - 14:24
dollars [1] - 17:3
Done [1] - 24:1
done [3] - 24:1, 27:24, 28:15
door [1] - 27:4
down [8] - 7:1, 10:9, 11:12, 20:14, 27:12, 27:13, 28:1, 36:16
draw [5] - 18:9, 22:4, 24:7, 24:10, 25:15
drawing [1] - 24:5
during [1] - 19:13
During [1] - 22:12

## E

e-mailed [1] - 20:20
e-mails [1] - 23:6
early [1] - 15:10
easiest [1] - 7:3
effect [1] - 27:3
efficient [1] - 7:3
either [4] - 8:22, 16:2, 23:7, 32:24
elbow [1] - 23:17
Electrics [1] - 1:7
Electronics [5] - 1:7, 2:7, 2:8, 2:8, 2:9
elements [1] - 33:11
Eleven [1] - 8:9
elsewhere [1] - 14:1
emphasize [2] - 29:6, 30:13
employed [9] - 25:7, 25:14, 25:17, 26:7, 26:9, 26:19, 28:16, 28:19
employees [1] - 20:18
end [2] - 24:15, 31:24
ends [1] - 36:25
entire [4] - 11:9, 11:12, 21:22, 21:24
entitled [11] - 7:23, 10:7, 14:9, 22:20, 28:1, 28:8, 29:10, 30:25, 31:11, 33:15, 34:7
entitles [1] - 29:20

equally [1] - 6:23
Esq [12] - 1:18, 1:20,
2:3, 2:5, 2:11, 2:13,
2:17, 2:19, 3:3, 3:5,
3:9, 3:11
essentially [1] - 18:3
evening [1] - 21:15
evidence [4] - 29:10,
29:19, 34:8, 34:13
Evidence [1] - 34:23
evidentiary [1] - 20:2
evidently [1] - 19:8
except [1] - 23:21
exceptions [1] - 8:20
exchange [1] - 9:4
excluding [1] - 26:4
exist [1] - 32:1
exists [1] - 34:9
expect [2] - 16:14,
24:2
expense [1] - 18:15
explain [3] - 5:13, 6:1,
9:16
extent [2] - 15:3,
23:11
extreme [1] - 19:17
eye [1] - 23:18

**F**

faced [1] - 19:9
fact [4] - 9:6, 17:13,
23:13, 35:6
fact-finder [1] - 35:6
facts [1] - 35:7
failed [1] - 21:16
fair [1] - 19:3
faith [2] - 16:13, 26:16
far [2] - 13:11, 34:10
fashion [2] - 11:20,
20:14
Federal [2] - 31:20,
34:23
feedback [1] - 7:15
fees [1] - 17:5
felt [1] - 5:9
few [5] - 4:19, 7:1, 8:7,
9:21, 10:23
fifth [1] - 4:22
fight [1] - 14:24
fighting [2] - 4:23, 9:6
figure [4] - 26:15,
29:24, 30:1, 30:2
figured [1] - 26:14
figures [3] - 30:22,
35:5, 35:17
file [1] - 22:18
filed [2] - 32:6, 32:9
fill [6] - 8:5, 13:8,

13:18, 16:11, 16:12,
16:15
filling [2] - 15:16,
15:17
films [1] - 14:13
finder [1] - 35:6
Fine [1] - 11.20
fine [1] - 34:19
finer [1] - 33.5
Finger [1] - 2:16
fire [1] - 29:23
Firm [1] - 1:17
firm [1] - 3:23
first [9] - 6:10, 6:11,
7:5, 7:11, 8:8, 20:25,
21.8, 21:10, 26:8
Fish [3] - 3:8, 3:11,
4:15
fits [1] - 35:12
flat [2] - 12.1, 12:10
focus [1] - 9:24
Foersten [2] - 2:19, 4:4
folks [18] - 4:24, 5:8,
5:19, 16:13, 19:22,
20:5, 21:6, 21:11,
23:7, 23:14, 23:25,
24:3, 24:20, 26:14,
26:20, 27:5, 27:7,
35:2
follow [2] - 14:20,
16:14
Follow [1] - 5:24
following [1] - 3:18
force [1] - 17:9
foreign [5] - 6:7,
16:18, 27:20, 29:3,
32:20
forget [1] - 23:22
forgetting [1] - 16:18
forgotten [1] - 36:16
form [6] - 10:7, 12:23,
13:7, 13:17, 14:6,
15:7
forum [3] - 22:15,
22:16, 22.20
forward [1] - 10:12
fraction [2] - 29:14,
30:4
France [3] - 17:10,
25:25, 26:5
Frankly [1] - 32:5
frankly [2] - 18:1, 32:9
free [1] - 30:21
French [5] - 17:14,
20:8, 21:21, 32:6,
32:8
Friday [2] - 20:24, 21:8
front [3] - 6:19, 28:5,
35:6
frustration [1] - 24:8

Fujitsu [5] - 1:8, 2:21,
2:21, 2:22, 4:3

**G**

Gaffigan [1] - 1:24
gain [2] - 32:11
gamesmanship [1] -
23:3
Gap [2] - 3:24, 6:12
Gaspare [1] - 1:20
gentleman [2] - 26:18,
28:18
Gerald [1] - 3:3
get-go [1] - 4:20
given [10] - 10:13,
20:6, 22:3, 24:6,
24:8, 25:14, 25:19,
30:16, 31:7, 34:10
glossed [1] - 13.21
Government [2] - 32:6,
32:8
great [1] - 18:14
gross [2] - 30:25,
31:23
guess [3] - 9.24, 20:5,
34:2
guys [4] - 4:25, 15:21,
18:20, 27:19

**H**

hand [5] - 13:5, 13:9,
14:9, 20:12, 20:13
handing [1] - 14:7
handling [1] - 5:25
hanging [1] - 24:14
happy [4] - 11:5, 19:6,
19:22, 31:16
hard [2] - 20:8, 27:24
hate [1] - 12:14
hauling [1] - 5:1
hear [9] - 7:11, 8:3,
11:14, 11:15, 11:19,
11:21, 16:5, 16:13,
36:19
heard [3] - 8:16,
15:12, 30:10
hearing [2] - 13:4,
18:22
hearings [1] - 22:12
held [1] - 3:19
Hello [1] - 7:8
help [3] - 8:5, 11:13,
36:21
helpful [1] - 23:11
HI [1] - 3:20
high [1] - 35:16
highest [1] - 35:18

highly [4] - 7:24, 31:4,
32:11
hit [1] - 15:12
holder [1] - 17:2
honestly [1] - 23:12
Honor [49] - 3:22, 4:2,
4:6, 4:8, 4:11, 4:14,
6:12, 6:20, 7:11, 8:1,
8:10, 8:13, 9:14,
10:20, 11:3, 12:2,
12:14, 13:10, 13:21,
15:1, 15:9, 15:14,
16:22, 16:25, 19:6,
19:11, 20:10, 20:24,
22:3, 22:9, 22:13,
25:4, 25:18, 26:3,
28:23, 28:25, 29:5,
30:12, 31:17, 32:15,
33:2, 34:20, 36:3,
36:5, 36:7, 36:9,
36:11, 36:13, 36:24
Honor's [1] - 25:5
Honorable [1] - 1:14
hope [2] - 28:6, 36:20
hoping [1] - 4:24
Horwitz [4] - 2:3, 4:11,
36:10
houses [1] - 23:2
Hume [4] - 3:5, 4:10,
8:12, 36:8
hurry [1] - 5:14
Hutz [3] - 3:2, 3:5, 4:9
hypothetical [1] -
32:18

**I**

idea [1] - 32:7
identification [1] -
17:19
ignored [1] - 23:7
Iii [1] - 2:17
immediate [1] - 17:19
important [1] - 23:24
impression [1] - 12:18
improper [1] - 33.16
Inc [4] - 2:8, 2:8, 2:9,
2:22
increase [1] - 32:22
Indeed [1] - 16:6
indicated [1] - 17:23
indirect [1] - 33.8
individual [2] - 17:22,
20:1
individuals [1] - 19:7
inducement [4] -
30:15, 33:11, 34:9,
34:14
inference [6] - 18:10,
22:4, 24:5, 24:7,

24:10, 25:16
info [3] - 6:7, 12:25,
16:18
information [34] -
6:21, 6:24, 6:25, 7:2,
7:18, 7:20, 7:23, 8:2,
10:5, 10:10, 11:1,
12:19, 12:22, 13:1,
13:2, 13:7, 13:22,
13:23, 13:24, 14:11,
16:14, 18:8, 19:23,
20:8, 24:3, 24:7,
24:19, 25:10, 25:12,
25:19, 25:22, 29:2,
34:8, 35:1
informed [1] - 25:8
infringement [1] -
8:23
infringing [4] - 29:15,
29:22, 30:2, 30:4
ing [1] - 9:13
Ingersoll [4] - 2:11,
4:6, 36:6
initial [2] - 18:4, 20:16
injunction [1] - 17:4
inquire [1] - 35:2
inquiry [1] - 31:25
instead [1] - 23:5
Instead [1] - 5:8
intends [1] - 14:18
interrogatories [1] -
6:8, 6:15, 7:2, 7:5,
7:17, 8:7, 10:14,
14:14, 15:20, 15:23,
16:7
interrogatory [5] -
7:22, 10:6, 13:7,
14:18, 15:17
interrupt [1] - 12:14
intervention [1] -
36:21
introduction [1] - 6:4
inventors [9] - 17:10,
17:20, 18:2, 20:16,
21:5, 21:19, 24:22,
25:5, 26:4
irrelevant [3] - 11:16,
11:17
Issue [27] - 6:22, 8:16,
10:18, 11:2, 11:10,
11:12, 12:11, 19:21,
20:12, 20:19, 20:21,
20:23, 20:25, 21:2,
21:4, 21:9, 29:2,
31:18, 31:24, 33:6,
33:20, 33:23, 34:13
Issues [5] - 5:7, 5:17,
6:3, 6:11, 6:13

**J**

Japan[1] - 30:22
Jerry[2] - 4:9, 8:14
job[4] - 17:12, 18:4, 18:6, 24:4
Jordan[2] - 1:14, 3:20
Josy[2] - 2:11, 4:6
jotted[1] - 36:16
Jr[1] - 3:9
Judge[1] - 3:20
judgments[1] - 35:7
July[3] - 21:21, 21:22, 24:14
juncture[2] - 13:5, 34:23

**K**

Kahn[4] - 2:19, 4:4, 36:4, 36:5
Kaj[1] - 1:9
Kathleen[1] - 3:11
Katie[1] - 4:16
keep[1] - 27:13
Kent[1] - 1:14
kind[1] - 35:4
Kirk[3] - 1:18, 3:22, 3:23
knows[4] - 11:16, 11:25, 24:25, 25:1
Korea[1] - 30:21

**L**

L'energie[2] - 1:3, 1:22
lack[1] - 8:17
land[2] - 23:4, 23:17
landed[1] - 23:16
language[1] - 17:14
Larry[2] - 3:5, 4:10
last[6] - 4:21, 17:13, 17:17, 19:13, 19:18, 29:2
launch[1] - 6:5
law[1] - 31:1
lawsuit[1] - 22:14
lawyers[1] - 23:15
lays[1] - 5:6
Layton[1] - 2:16
Lcd[3] - 32:4, 32:5, 32:7
least[7] - 11:13, 13:5, 13:23, 14:1, 17:11, 23:14, 35:21
less[1] - 4:21
letter[14] - 5:7, 5:18, 5:20, 7:25, 8:21,

10:4, 12:7, 14:10, 17:23, 20:13, 20:24, 21:8, 29:6, 30:12
letters[8] - 4:18, 5:8, 5:17, 5:22, 9:4, 18:20, 18:21, 27:10
level[2] - 35:16, 35:18
liable[1] - 33:9
liar[1] - 19:9
lieu[1] - 16:9
light[2] - 25:12
likely[2] - 27:2, 33:19
limine[2] - 29:9, 35:10
limit[5] - 14:17, 14:18, 14:22, 15:22
Limited[1] - 2:21
limits[2] - 5:11
line[7] - 3:21, 3:24, 4:4, 4:12, 4:16, 23:19, 36:1
lines[1] - 11:22
listed[1] - 7:17
litigation[1] - 23:2
Ll[6] - 1:20, 2:2, 2:5, 2:19, 3:2, 3:5
location[7] - 20:11, 20:15, 20:19, 20:21, 21:3, 21:9, 25:25
Lodge[3] - 3:2, 3:5, 4:9
look[5] - 5:23, 7:10, 16:10, 22:3, 32:25
looked[1] - 15:21
looks[1] - 7:4
lost[1] - 7:7
Ltd[3] - 1:7, 1:8, 2:7

**M**

mailed[1] - 20:20
mails[1] - 23:6
manage[2] - 4:25, 6:1
managing[9] - 18:11, 18:15, 20:1, 21:11, 22:6, 22:16, 23:25, 24:18, 25:17
manner[3] - 7:3, 7:21, 23:8
market[1] - 31:13
Marsden[8] - 3:9, 4:14, 4:15, 15:1, 15:2, 15:11, 36:12, 36:13
matter[1] - 35:25
Mckenna[2] - 1:20, 3:24
mean[9] - 7:19, 19:25, 20:5, 21:22, 23:22, 24:25, 25:20, 27:12, 27:24

means[2] - 10:10, 23:13
meat[2] - 5:14, 6:5
meet[2] - 21:16, 23:8
Mei[2] - 3:13, 15:2
mere[1] - 30:4
Merit[1] - 1:25
met[2] - 21:17, 22:2
Microelectronics[1] - 2:22
millions[1] - 17:3
mind[1] - 35:13
minimum[2] - 25:18, 25:22
Minneapolis[1] - 3:12
Minnesota[2] - 3:12, 31:22
minor[1] - 13:12
minute[1] - 7:9
misspoke[1] - 12:17
misunderstanding[1] - 7:16
mix[1] - 10:21
mode[4] - 9:17, 9:25, 10:2, 29:25
model[1] - 29:22
models[6] - 10:17, 11:18, 11:23, 12:1, 12:25
module[2] - 11:7, 29:16
modules[7] - 9:17, 9:20, 9:25, 10:3, 10:23, 11:2, 29:25
Moerke[2] - 3:11, 4:16
moment[1] - 24:12
monitor[1] - 32:7
monitors[1] - 32:4
month[4] - 4:21, 19:13, 21:22, 21:23
monthly[1] - 5:2
months[4] - 5:1, 17:8, 17:25, 19:15
moot[2] - 11:9, 11:12
Morrison[2] - 2:19, 4:4
most[1] - 7:3
motion[1] - 35:10
multiple[2] - 5:17
must[2] - 5:21, 34:8
Mva[4] - 8:20, 9:1, 11:2, 12:3

**N**

name[1] - 36:15
named[1] - 18:2
names[1] - 36:16

narrative[5] - 10:7, 10:13, 14:6, 15:7, 16:9
narrow[1] - 32:3
nature[1] - 35:17
need[11] - 7:18, 8:6, 13:13, 14:21, 17:6, 18:21, 23:18, 25:9, 27:19, 33:11, 35:4
needed[4] - 5:10, 6:25, 7:20, 15:24
needs[5] - 5:22, 22:24, 35:17, 36:1, 36:17
negotiation[1] - 32:19
Neil[5] - 2:5, 4:13, 15:15, 33:2, 34:16
nematic[2] - 8:23, 9:18
never[1] - 18:4
New[4] - 2:6, 2:20
nexus[3] - 31:25, 32:1, 32:11
Nixon[2] - 2:13, 4:7
nobody[2] - 13:4, 25:1
Nobody[1] - 15:22
non[1] - 34:7
non-u.s[1] - 34:7
Note[1] - 3:18
note[2] - 5:3, 36:15
nothing[3] - 21:23, 35:20, 36:19
notice[6] - 17:8, 17:25, 21:20, 27:23, 28:3
noticed[1] - 20:17
notices[6] - 18:3, 20:16, 20:17, 21:23, 23:4, 24:13
number[3] - 31:24, 33:14, 33:24
numbers[2] - 31:1, 33:18

**O**

o'clock[1] - 21:15
O'rourke[36] - 3:3, 4:8, 4:9, 8:11, 8:13, 8:14, 10:3, 11:3, 11:9, 11:15, 12:2, 12:6, 12:12, 14:4, 14:8, 16:21, 16:22, 16:25, 19:9, 20:24, 21:4, 21:13, 21:17, 22:1, 24:6, 25:14, 25:18, 28:22, 28:23, 30:7, 30:8, 30:12, 31:16, 33:23, 36:8,

36:9
O'rourke's[1] - 10:16
oar[1] - 36:17
object[2] - 13:19, 32:18
objected[1] - 7:21
objection[1] - 15:7
obligated[1] - 22:15
obligation[1] - 23:8
obvious[1] - 35:14
obviously[2] - 25:20, 34:11
obviousness[4] - 31:14, 31:19, 35:1, 35:8
occurred[1] - 29:22
officer[1] - 20:1
officers[6] - 18:11, 21:12, 22:6, 22:15, 27:15, 28:3
omnibus[2] - 27:22, 28:9
once[1] - 20:18
one[15] - 6:6, 8:25, 9:1, 12:7, 15:20, 22:10, 26:4, 26:8, 28:16, 29:23, 32:16, 32:21, 34:21, 35:21
One[2] - 25:6, 33:5
ones[3] - 11:5, 12:16, 12:20
ooo[1] - 3:16
opportunity[2] - 14:25, 26:21
option[1] - 16:8
Optoelectronics[1] - 3:13
Optronics[3] - 1:9, 3:7, 4:10
order[7] - 5:5, 5:24, 22:13, 27:13, 28:12, 34:6, 35:15
original[1] - 9:16
otherwise[1] - 28:3
ought[3] - 14:6, 27:7, 31:14
outlandish[1] - 32:9
outlined[1] - 8:20
outside[3] - 19:2, 25:25, 32:25
outstanding[1] - 26:11
overall[1] - 33:15
own[2] - 16:15, 27:17

**P**

page[4] - 5:7, 5:18, 5:20, 6:3
pages[2] - 5:22, 6:2

**panel** [2] - 8:25, 9:1
**panels** [7] - 8:18, 8:20, 8:21, 8:22, 8:24, 8:25, 12:3
**paper** [1] - 5:12
**papers** [1] - 6:18
**paragraph** [2] - 5:5, 5:23
**particular** [1] - 28:5
**particularly** [1] - 5:3
**parties** [1] - 16:8
**party** [2] - 6:22, 13:24
**patent** [7] - 17:2, 31:17, 31:20, 32:19, 32:22, 32:25, 33:23
**patents** [6] - 30:21, 31:17, 32:2, 32:3, 32:5, 32:8
**path** [1] - 27:12
**patience** [1] - 23:13
**paying** [1] - 17:14
**Pc** [3] - 2:13, 3:8, 3:11
**people** [8] - 5:11, 18:11, 19:1, 19:16, 22:5, 24:18, 27:23, 28:14
**people's** [1] - 18:6
**percent** [2] - 29:15, 29:16
**percentage** [1] - 33:15
**perfectly** [1] - 11:24
**perhaps** [1] - 35:8
**period** [2] - 23:19, 27:18
**person** [1] - 28:19
**perspective** [1] - 17:1
**persuaded** [1] - 35:21
**persuasive** [2] - 15:23, 26:25
**phone** [1] - 4:10
**phones** [1] - 25:2
**phrase** [1] - 9:18
**pick** [3] - 6:11, 10:8
**piece** [1] - 35:21
**pieces** [1] - 12:25
**pitch** [4] - 18:22, 21:11, 27:14, 35:19
**place** [2] - 21:6, 35:15
**plainly** [1] - 5:5
**Plaintiff** [2] - 1:5, 1:22
**plaintiff** [1] - 17:2
**plaintiff's** [2] - 27:10, 33:23
**plaintiffs** [1] - 3:23
**plants** [1] - 31:6
**playing** [1] - 19:3
**plenty** [1] - 34:24
**Pm** [3] - 1:12, 3:19, 36:25

**point** [15] - 7:4, 7:6, 8:12, 11:4, 16:1, 20:25, 22:10, 24:21, 29:6, 32:16, 33:5, 33:17, 34:12, 34:13, 34:17
**pointed** [6] - 13:16, 14:10, 22:13, 22:17, 22:18, 30:15
**points** [3] - 7:25, 13:20, 33:3
**polarizer** [1] - 14:12
**polarizers** [1] - 14:13
**position** [2] - 15:15, 27:18
**positions** [2] - 23:23, 25:2
**possess** [1] - 14:12
**possession** [3] - 13:16, 14:12, 18:8
**possibly** [1] - 25:25
**Potter** [2] - 2:2, 4:12
**pox** [1] - 23:1
**practical** [1] - 10:11
**practice** [1] - 14:18
**pragmatic** [1] - 18:16
**preceding** [1] - 8:7
**precisely** [1] - 7:18
**prefer** [1] - 10:6
**prejudice** [1] - 16:2
**prepared** [4] - 11:25, 16:6, 24:11, 24:16
**present** [2] - 29:25, 33:11
**pressing** [1] - 19:15
**presume** [1] - 22:5
**presumptive** [1] - 14:17
**pretty** [1] - 5:5
**previously** [1] - 12:19
**principally** [1] - 6:22
**problem** [1] - 26:3
**problems** [2] - 14:2, 15:5
**procedural** [1] - 20:2
**process** [1] - 36:22
**produce** [7] - 8:25, 16:6, 16:8, 18:6, 21:19, 28:9, 30:18
**produced** [1] - 8:19
**producing** [1] - 7:21
**product** [2] - 30:2, 32:2
**production** [1] - 13:18
**productive** [1] - 23:3
**products** [3] - 15:4, 29:15, 29:17
**promise** [1] - 26:21
**promptly** [1] - 19:23

**proof** [2] - 26:25, 34:11
**properly** [1] - 16:3
**protection** [1] - 35:16
**protective** [1] - 35:15
**provide** [3] - 15:4, 25:12, 28:11
**provided** [2] - 23:21, 35:18
**provides** [3] - 14:17, 16:8, 28:12
**pulled** [1] - 27:16
**punch** [1] - 31:15
**purpose** [2] - 6:23, 9:5
**put** [16] - 5:10, 5:11, 6:19, 7:14, 7:16, 17:1, 17:4, 22:6, 25:10, 29:6, 29:10, 29:20, 31:24, 33:5, 35:6, 36:17
**putting** [1] - 9:11

### Q

**questions** [1] - 23:5
**quick** [3] - 22:11, 33:3, 36:16
**quickest** [1] - 7:2
**quite** [2] - 19:10, 19:12

### R

**raised** [2] - 20:25, 35:1
**raising** [1] - 21:4
**ramifications** [1] - 20:2
**rather** [2] - 10:7, 26:14
**raw** [1] - 33:24
**read** [5] - 4:18, 5:23, 6:17, 17:23, 18:20
**Read** [1] - 27:13
**reading** [1] - 11:21
**real** [2] - 22:11, 36:16
**really** [12] - 7:19, 10:10, 10:17, 13:13, 14:16, 21:14, 23:22, 30:20, 31:5, 33:6, 33:7, 33:21
**reason** [9] - 5:10, 5:24, 8:21, 14:19, 16:9, 17:19, 20:6, 20:10
**reasonable** [3] - 26:21, 26:22, 29:21
**receive** [1] - 10:6
**received** [3] - 10:22, 12:19, 12:21

**recently** [1] - 11:4
**record** [3] - 15:14, 34:4, 34:16
**records** [1] - 16:8
**reflect** [1] - 31:7
**reflective** [1] - 31:5
**reflects** [1] - 24:17
**refuse** [2] - 18:17, 27:22
**refused** [2] - 18:3, 18.5
**refusing** [1] - 17:7
**regard** [3] - 14:5, 18:24, 29:4
**Registered** [1] - 1:25
**reiterate** [1] - 6:17
**related** [2] - 19:20, 33:22
**relevance** [2] - 34:23, 35:13
**relevant** [12] - 7:24, 8:19, 12:15, 13:16, 30:14, 30:15, 30:23, 31:12, 31:19, 31:21, 35:20, 35:22
**relief** [2] - 17:6, 27:14
**relieved** [1] - 14:22
**remembered** [1] - 22:24
**reminded** [1] - 22:14
**remotest** [1] - 32:11
**removed** [1] - 9:19
**repeat** [3] - 6:16, 8:1, 15:11
**repeated** [1] - 23:6
**repeatedly** [2] - 20:20, 21:18, 23:10
**Reporter** [1] - 1:25
**Reportefs** [1] - 3:18
**representative** [1] - 30:1
**represented** [1] - 36:17
**request** [3] - 10:13, 13:16, 16:3
**requested** [3] - 6:14, 13:22, 18:6
**requesting** [4] - 6:21, 6:24, 17:19, 18:9
**require** [1] - 36:21
**research** [1] - 23:24
**reside** [1] - 22:21
**resolved** [2] - 28:15
**respect** [1] - 35:7
**respond** [5] - 19:20, 21:14, 28:2, 28:20, 36:23
**responded** [1] - 24:9
**responding** [2] - 28:6, 31:9

**response** [2] - 13:8, 19:3
**responses** [1] - 26:15
**responsibilities** [2] - 18:7, 24:4
**responsive** [1] - 8:19
**result** [1] - 31:18
**retired** [4] - 25:7, 26:5, 28:17, 28:18
**revenue** [1] - 30:13, 32:12
**revenues** [1] - 29:24
**revised** [2] - 9:19, 10:22
**Rich** [1] - 4:11
**Richard** [3] - 1:18, 2:3, 3:23
**Richards** [5] - 2:16, 2:17, 4:2, 4:3, 36:4
**Richardson** [3] - 3:8, 3:11, 4:15
**ridiculous** [1] - 18:1
**road** [1] - 10:9
**Robert** [3] - 2:13, 2:17, 4:3
**royalty** [1] - 29:21
**Rule** [2] - 14:17, 30:14
**rule** [2] - 14:19, 35:23
**Rules** [1] - 34:23
**rules** [2] - 19:2, 28:11
**ruling** [6] - 15:19, 16:2, 22:25, 25:5, 29:9

### S

**sake** [1] - 25:13
**sales** [32] - 6:7, 16:18, 29:3, 29:11, 29:14, 29:16, 29:21, 29:22, 29:24, 30:2, 30:3, 30:4, 30:13, 30:17, 30:22, 30:25, 31:4, 31:6, 31:7, 31:8, 31:19, 31:21, 31:23, 32:2, 32:12, 33:7, 33:8, 33:15, 33:18, 33:21, 34:7
**Samsung** [9] - 1:7, 2:7, 2:7, 2:8, 2:9, 4:12, 15:15, 30:18, 33:3
**Sanyo** [1] - 1:7
**sat** [1] - 21:22
**satisfies** [1] - 25:11
**saw** [2] - 9:5, 17:24
**scheduling** [5] - 5:4, 16:24, 22:13, 28:12, 28:22
**screen** [1] - 12:1

screens [1] - 12:10
second [4] - 7:17, 20:10, 26:10, 33:17
security [1] - 35:18
see [1] - 6:2
See [1] - 36:22
seeking [5] - 14:11, 17:3, 17:4, 17:6, 33:6
sell [4] - 8:20, 8:24, 12:3, 30:21
selling [1] - 35:12
send [1] - 14:13
sense [2] - 23:15, 32:21
sensible [1] - 27:20
sensitive [2] - 31:4, 35:17
sent [5] - 4:19, 6:17, 9:19, 10:4, 29:4
September [1] - 9:2
served [5] - 15:2, 15:10, 17:8, 17:25, 21:21
set [4] - 7:5, 7:11, 7:17, 8:8
several [1] - 4:18
Sharp [8] - 1:8, 2:15, 4:7, 8:15, 13:11, 13:23, 15:10, 34:3
Sherman [2] - 2:19, 4:4
shift [1] - 9:4
show [4] - 11:6, 22:7, 33:19, 34:8
showing [4] - 15:23, 16:1, 18:6, 35:4
side [8] - 5:19, 6:6, 6:8, 16:2, 16:5, 16:12, 24:3, 35:20
sides [3] - 12:10, 23:7, 27:5
silence [1] - 21:20
silent [1] - 13:12
similar [1] - 15:15
simple [1] - 10:11
simply [1] - 7:4
Sirota [16] - 2:5, 4:13, 15:14, 15:15, 30:9, 30:18, 33:2, 33:5, 34:4, 34:16, 34:19, 34:20, 36:10, 36:11
sit [2] - 20:14, 28:1
six [2] - 5:20, 5:22
six-page [1] - 5:20
slightly [1] - 11:21
sold [1] - 29:17
solely [1] - 20:11
solution [3] - 10:11, 27:22, 28:10

sorry [1] - 7:10
sound [1] - 28:17
space [1] - 5:10
speaking [4] - 8:12, 8:14, 11:14, 16:20
specific [2] - 7:6, 12:1
specifically [1] - 31:10
spending [1] - 21:15
squabble [1] - 10:9
stake [1] - 4:24
stand [3] - 26:24, 27:17, 27:21
standard [1] - 18:16
Stargatt [1] - 2:10
start [1] - 26:20
state [1] - 18:18
statement [3] - 24:8, 34:3, 35:11
States [8] - 1:1, 26:7, 27:11, 28:14, 29:12, 29:14, 29:17, 29:18
static [1] - 7:7
status [2] - 18:10, 21:18
statute [1] - 33:10
stays [1] - 33:1
still [5] - 9:6, 10:22, 17:24, 18:17, 24:15
stipulating [2] - 34:17, 34:18
stone [1] - 21:24
stop [2] - 9:3, 28:15
street [1] - 28:4
stretches [1] - 24:25
strong [1] - 23:15
structured [1] - 15:6
struggle [1] - 5:4
studied [1] - 8:2
study [1] - 29:20
stuff [2] - 7:25, 15:21
subject [2] - 26:13, 27:1
submitted [1] - 15:21
success [10] - 31:11, 31:12, 31:21, 32:2, 32:10, 33:18, 33:19, 34:3, 34:17, 34:25
successful [3] - 31:12, 32:8, 35:11
successfully [1] - 35:19
sufficient [1] - 11:6
sufficiently [1] - 35:22
suit [1] - 32:3
sums [1] - 7:19
supplemented [1] - 18:4
support [1] - 31:2
supposed [1] - 32:24

supposedly [1] - 31:22

**T**

table [1] - 6:6, 7:17, 12:24, 14:3, 23:10
Taiwan [2] - 30:21, 31:6
tantamount [1] - 29:9
targeted [1] - 16:4
Taylor [1] - 2:10
technical [11] - 6:13, 6:14, 6:21, 6:25, 7:18, 7:20, 8:18, 12:19, 12:21, 15:4, 16:11
Technologies [1] - 2:21
Technology [1] - 1:8
technology [1] - 32:4
telephone [1] - 3:18
Telephone [2] - 1:12, 36:25
television [1] - 32:7
televisions [1] - 32:5
terms [9] - 14:1, 14:14, 17:16, 18:2, 18:10, 18:12, 20:3, 22:1, 30:24
testify [1] - 17:25
themselves [1] - 5:16
theory [2] - 30:24, 33:12
TheyIve [1] - 18:5, 22:4, 31:22
they've [1] - 19:9, 33:12, 34:10, 35:5
thin [1] - 23:13
third [1] - 13:24
third-party [1] - 13:24
three [9] - 5:7, 5:18, 6:1, 6:3, 9:17, 9:20, 10:21, 19:18, 22:5
three-page [2] - 5:7, 5:18
thrown [1] - 28:17
thumb [1] - 23:17
tired [1] - 23:18
title [6] - 18:13, 18:18, 19:22, 19:25, 21:6, 23:23
titles [7] - 17:12, 18:4, 18:6, 19:2, 19:7, 24:4, 25:6
Tn [6] - 9:17, 9:18, 9:20, 9:23, 11:5, 11:7
together [7] - 4:23, 4:25, 7:14, 7:16,

9:11, 25:10, 36:1
took [1] - 10:21
topic [1] - 16:1
total [2] - 29:14, 29:22
totally [1] - 33:16
Tottori [1] - 1:7
track [1] - 36:21
translate [1] - 17:14
trial [3] - 17:10, 30:17, 35:10
tried [1] - 19:18
troubled [1] - 24:13
true [2] - 26:9, 26:10
truth [1] - 24:11
try [3] - 10:8, 20:20, 23:17
trying [10] - 10:10, 11:11, 12:23, 17:9, 18:23, 20:5, 20:19, 21:7, 29:8, 31:3
tubes [1] - 9:9
Tuesday [2] - 1:12, 21.15
turn [1] - 16:17
twisted [3] - 8:22, 9:8, 9:18
two [27] - 5:8, 5:21, 6:3, 8:20, 8:25, 11:17, 11:23, 12:1, 12:10, 12:15, 12:16, 12:20, 12:25, 13:20, 17:8, 17:25, 22:12, 23:20, 24:2, 25:5, 25:6, 26:4, 28:4, 28:13, 32:8, 33:9
two-way [1] - 28:4

**U**

u.s [1] - 34:7
ultimately [2] - 35:3, 35.4
unclear [3] - 5:4, 9:22, 10:1
under [7] - 12:18, 18:15, 25:23, 27:1, 30:14, 35:18, 35:23
underlying [1] - 35:7
understood [1] - 20.9
undoubtedly [1] - 18:7
unique [1] - 30:24
United [8] - 1:1, 26:7, 27:11, 28:14, 29:12, 29:14, 29:17, 29:18
universe [1] - 12:8
university [1] - 25:21
unless [1] - 19:8
up [6] - 6:11, 7:19, 19:13, 27:25, 30:6,

35:5
update [1] - 30:17
Usdcj [1] - 1:14

**V**

Va [5] - 9:23, 9:25, 10:2, 11:1, 29:25
Va-mode [1] - 9:25
vacation [4] - 19:16, 19:19, 21:21, 24:20
vague [1] - 4:24
valid [1] - 18:3
value [4] - 32:19, 32:20, 32:22, 32:23
Vanderhye [2] - 2:13, 4:7
Vaudaine [1] - 18:12
venders [1] - 14:13
Vey [1] - 18:17
view [1] - 21:1
Virginia [1] - 2:14
virtually [1] - 7:19

**W**

walk [1] - 27:4
walking [1] - 27:13
walled [1] - 21:24
wants [3] - 6:7, 21:6, 21:12
warrant [1] - 35:22
warranted [1] - 16:4
Washington [2] - 1:21, 3:6
water [1] - 36:18
wearing [1] - 23:13
web [3] - 18:9, 18:14, 22:7
websites [1] - 17:14
weeks [3] - 19:14, 19:18, 20:13
whole [1] - 33:23
William [3] - 3:9, 4:15, 15:1
willing [2] - 13:1, 25:25
Wilmington [1] - 1:11
wish [1] - 11:8
witness [1] - 28:16
witnesses [8] - 17:11, 17:16, 21:10, 22:20, 27:6, 27:11, 27:20, 28:9
wondered [1] - 9:5
word [3] - 16:15, 17:12, 18:13
world [1] - 35:12
worldwide [13] -

29:16, 29:24, 30:13,
30:22, 30:25, 31:4,
31:13, 31:21, 31:23,
32:12, 33:6, 33:21,
34:7
**worry** [1] - 16:18
**written**  [1] - 20:20

## Y

**year** [1] - 4:22
**York** [4] - 2:6, 2:20
**Young** [1] - 2:10
**yourself** [1] - 27:25

EXHIBIT G

REDACTED

| Customer name | Sales Date | ship to | bill to | Item | Quantity | currency | usd amt | Biz Maker | Maker | Final Destination |
|---------------|------------|---------|---------|------|----------|----------|---------|-----------|-------|-------------------|
|               |            |         |         |      |          |          |         |           |       |                   |

REDACTED

LGD 2009520
Del. 06-726, et al.

ATTORNEYS' EYES ONLY
Pursuant to Del. L.R 26.2

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on August 12, 2008, he served the

foregoing documents by email and by hand upon the following counsel:

Philip A. Rovner
David E. Moore
POTTER ANDERSON & CORROON LLP
1313 North Market Street
Wilmington, DE  19899-0951

Karen L. Pascale
John W. Shaw
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19899-0391

The undersigned counsel further certifies that, on August 12, 2008, he served the

foregoing documents by email and by U.S. Mail upon the following counsel:

Jonathan S. Kagan
Alexander Giza
IRELL & MANELLA LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA  90067

Vincent K. Yip
Peter J. Wied
PAUL, HASTINGS, JANOFSKY &
WALKER LLP
515 South Flower Street, 25th Floor
Los Angeles, CA   90071

Ron E. Shulman, Esquire
Julie Holloway, Esquire
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, California 94304-1050

M. Craig Tyler, Esquire
Brian D. Range, Esquire
WILSON SONSINI GOODRICH & ROSATI
8911 Capital of Texas Highway North
Westech 360, Suite 3350
Austin, Texas 78759-8497

/s/ Stephen B. Brauerman (sb4952)
Stephen B. Brauerman

656846-1