# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LG DISPLAY CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 06-726 (JJF) |
| | ) | Civil Action No. 07-357 (JJF) |
| v. | ) | |
| | ) | CONSOLIDATED CASES |
| CHI MEI OPTOELECTRONICS | ) | |
| CORPORATION, et al. | ) | PUBLIC VERSION |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DEFENDANTS CHI MEI OPTOELECTRONICS' ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF LG DISPLAY'S MOTION TO COMPEL DEFENDANTS TO PROVIDE DISCOVERY

OF COUNSEL:

Morgan Chu
Jonathan S. Kagan
Alexander C.D. Giza
Adam Hoffman
Thomas C. Werner
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
(310) 277-1010

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 N. Market St.
P.O. Box 951
Wilmington, Delaware 19899-0951
(302) 984-6000
provner@potteranderson.com

*Attorneys for Defendant*
*Chi Mei Optoelectronics Corporation*

Dated: August 29, 2008
Public Version: September 4, 2008

## TABLE OF CONTENTS

Page

I.      NATURE AND STAGE OF PROCEEDINGS ................................................................. 1

II.     SUMMARY OF ARGUMENT ........................................................................................ 2

III.    STATEMENT OF FACTS .............................................................................................. 3

        A.      CMO Has Provided Substantial Responsive Discovery. ...................................... 3

        B.      LGD's Assertions that It Has Provided Extensive Discovery Are
                Inaccurate. ...................................................................................................... 4

        C.      LGD Itself Is Preventing CMO from Producing Documents that LGD
                Has Moved to Compel CMO to Produce. ................................................................ 6

        D.      LGD Abandoned the Meet and Confer Process Despite CMO's
                Cooperation and Compliance with Judge Jordan's Order in CEA. ........................ 6

IV.     ARGUMENT ...................................................................................................................... 7

        A.      CMO Has Provided, Attempted to Provide, or Agreed to Provide
                Relevant Discovery Responsive to LGD's Requests. ............................................ 8

        B.      LGD Is Not Entitled to Unlimited Technical and Financial Discovery
                into Each and Every Sale of a CMO Product Worldwide. ................................... 10

        C.      Summaries of Sales Transactions Having No Nexus to the United
                States Are Not Relevant to LGD's Infringement Claims. .................................... 11

        D.      The Discovery that LGD Seeks Is Extremely Burdensome and Should
                Be Denied or at Least Strictly Limited. ............................................................. 15

        E.      AUO's Responses to LGD's Discovery Requests Are Inapposite. ....................... 18

        F.      LGD's Premature Placeholder Motion Regarding Production Form Is
                Improper and Should Be Stricken or Denied. ..................................................... 18

V.      CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

Page

**Cases**

*02 Micro Int'l Ltd. v. Sumida Corp.*,
    2006 WL 981987 (E.D. Tex. April 12, 2006)............................................................ 16

*3Com Corp. v. D-Link Systems, Inc.*,
    2007 WL 949596 (N.D. Cal. 2007) ......................................................... 10, 11 16, 17

*Commissariat A L'Energique Atomique v. Samsung Elecs. Co.*,
    No. 03-486 KAJ (D. Del.)............................................................................................ 6

*Cyboitronics, Ltd. v. Golden Source Elecs., Ltd.*,
    130 F. Supp. 2d 1152 (C.D. Cal. 2001) .................................................................... 12

*Deepsouth Packing Co. v. Laitram Corp.*,
    406 U.S. 518 (1972)................................................................................................... 14

*DSU Medical Corp. v. JMS Co., Ltd.*,
    471 F.3d 1293 (Fed. Cir. 2006)........................................................................... 13, 14

*Fellowes, Inc. v. Michilin Prosperity Co.*,
    491 F. Supp. 2d 571 (E.D. Va. 2007) ...................................................................... 12

*Hagenbuch v. 3B6 Systemi Elettronici Industriali S.R.I.*,
    2006 WL 665005 (N.D.Ill.) ...................................................................................... 19

*Honeywell Int'l Inc. v. Audiovox Comms. Corp.*,
    2005 WL 3988905 (D. Del. Oct. 7, 2005) .......................................................... 10, 11

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
    420 F.3d 1369 (Fed. Cir. 2005)................................................................................ 12

*Microsoft Corp. v. AT & T Corp.*,
    127 S. Ct. 1746 (2007).................................................................................. 11, 12, 14

*Minnesota Min. & Mfg. Co. v. Smith & Nephew*,
    1992 WL 464352 (D. Minn. July 27 1992) ................................................................ 9

*Oklahoma v. Tyson Foods, Inc.*,
    2007 WL 3128422 (N.D. Okla. Oct. 24, 2007) ........................................................ 19

*Pfizer Inc. v. Aceto Corp.*,
    853 F. Supp. 104 (S.D.N.Y. 1994) .......................................................................... 12

*Samsung SDI Co. v. Matsushita Elec. Indus. Co.*,
    2007 WL 4357552 (C.D. Cal. June 25, 2007) .......................................................... 11

Page

*Semiconductor Energy Lab. Co. v. Chi Mei Optoelecs. Corp.*,
    531 F. Supp. 2d 1084 (N.D. Cal. 2007) .................................................... 12, 14, 15, 16

## **Statutes and Rules**

35 U.S.C. § 271 ................................................................................................................ 12

35 U.S.C. § 271(a) ........................................................................................................... 13

35 U.S.C. § 271(b) ...................................................................................................... 13, 14

Advisory Committee Note to Fed. R. Civ. P. 34, 48 F.R.D. 527 (1970) .............................. 20

Fed. R. Civ. P. 26 ....................................................................................................... 14, 16

Fed. R. Civ. P. 26(b) ........................................................................................................ 16

Fed. R. Civ. P. 26(b)(i) ..................................................................................................... 16

Fed. R. Civ. P. 26(b)(iii) ................................................................................................... 16

Plaintiffs LG Display Co., Ltd. and LG Display America, Inc. ("LGD") claim that despite their extensive, thorough, and complete production of documents, Chi Mei Optoelectronics Corporation and Chi Mei Optoelectronics USA, Inc. ("CMO") are refusing to provide basic discovery on the products LGD has accused of infringement in this case. In fact, however, CMO has not refused to provide any such discovery. Rather, it has been CMO that has been forced to file multiple motions against LGD to force them to provide the most basic factual information—including two motions to compel LGD to simply provide a response to CMO's interrogatories. Regarding the bulk of LGD's demands, LGD filed its motion before the parties completed the meet and confer process. Had the parties been able to complete this process, much of LGD's motion would likely have been mooted because CMO has already produced many of the documents sought by LGD, and it has agreed to investigate whether additional documents exist. For the few areas in which the parties have a disagreement over the scope and breadth of LGD's discovery demands, CMO has indicted unequivocally that it will comply with the legal requirements for such discovery—specifically including an Order by Judge Jordan on the scope of production for worldwide sales data. In short, the only issue genuinely in dispute in this motion is whether CMO should be ordered to produce hundreds of thousands, if not millions, of additional pages of documents where existing precedent indicates that these documents are not the proper subject of discovery. Therefore, LGD's motion should be denied.

## I.    NATURE AND STAGE OF PROCEEDINGS

This action is a patent litigation involving LCD flat panel technology used in products such as computers and televisions. LGD is currently asserting eight patents against CMO in this action, implicating each of CMO's product lines. CMO has also accused LGD products of infringing six patents in an action transferred to this Court from the Eastern District of Texas

- 1 -

("the transferred action"), which both LGD and CMO believe can and should be consolidated with this action once an appropriate schedule can be set for all remaining discovery and pre-trial activities.

LGD has served roughly 100 document requests on CMO. CMO responded to each of these requests before the end of June 2008, and produced roughly 1 million pages of documents by the initial July 18, 2008 production date. Since then, CMO has supplemented its production to address questions and additional requests from LGD.

Despite the size and scope of CMO's document production, LGD argues that this production is insufficient because: (1) LGD cannot find certain documents in CMO's production that LGD asserts "must exist;" and (2) CMO has not provided discovery into products that are not at issue in this case and, in fact, could not be accused because they have no connection to the United States. Despite CMO's clear agreement to look for—and produce—any "missing" documents, and LGD's persistent inability to provide any legal authority supporting its request for exceedingly burdensome and extensive discovery on the multitude of unaccused products, LGD elected to file this Motion.

## II.    SUMMARY OF ARGUMENT

1.    CMO has provided LGD with hundreds of thousands of pages of information relating to the products at issue in this case. In addition, where LGD has raised a question about relevant, non-privileged, documents, CMO has consistently worked to ensure that all such documents were produced, and has agreed to investigate whether any additional documents exist—and to produce any it finds. Moreover, for each of the categories for which LGD claims it has not been able to locate any documents in CMO's production, CMO has been able to locate— and verify—that responsive documents were, in fact, produced to LGD. LGD might have

discovered its error had it thoroughly reviewed CMO's production—or even waited to confer with CMO—before rushing to file this Motion.

2.      LGD's claims that it has provided the same scope of discovery it seeks from CMO in this Motion are inaccurate. Rather, LGD has taken the position that it is **not** required to produce the very discovery it seeks from CMO. Indeed, LGD has failed to provide even the basic discovery that CMO needs to analyze the specific LGD products CMO has accused of infringement, much less discovery relating to all of LGD's worldwide products.

3.      LGD's contention that it is entitled to broad financial and technical discovery into each and every sale of all CMO products worldwide (including products with no connection to the United States) is wrong. None of the cases on which LGD relies support its position.

## III.    STATEMENT OF FACTS

### A.      CMO Has Provided Substantial Responsive Discovery.

On May 9, 2008, CMO started producing documents to LGD. Werner Decl. ¶ 3.[1] By May 14, 2008, the size of CMO's production had surpassed a quarter of a million pages.[2] *Id.*. By the July 18, 2008 stipulated date for document production, CMO stood ready to produce additional documents—including email—that would bring the size of its total production to the equivalent of nearly 4.5 million pages of documents. *Id.* ¶¶ 5–6. As discussed below, however, LGD unilaterally declared that the parties would not proceed with general email discovery. *See* discussion *infra* Part III.C. As a result, on July 18, 2008, even without producing general email discovery, CMO produced documents that brought its total production to the equivalent of just

---

[1] Exhibit references are to the exhibits attached to the Declaration of Thomas C. Werner, submitted concurrently herewith in support of this Answering Brief ("Werner Decl."). Citations to "LGD Ex." refer to the exhibits attached to LGD's Motion.

[2] LGD later asked CMO to voluntarily reduce the size of its production to eliminate less material prior art references, after LGD dramatically narrowed its Document Request No. 38. *See* Ex. A. LGD currently finds itself in the same situation with AUO. *See* Ex. B.

over 1 million pages. Werner Decl. ¶ 5. This massive production includes all relevant and responsive documents that LGD seeks through this Motion. *See* discussion *infra* Part IV.A.

### B.    LGD's Assertions that It Has Provided Extensive Discovery Are Inaccurate.

LGD started its document production approximately one month after CMO first produced documents in this action. Werner Decl. ¶ 7. Prior to the week of the July 18 initial production date, LGD had produced a total of roughly 150,000 pages, along with some native files. *Id*. LGD's production was devoid of many of the most basic documents CMO needed to perform its infringement analysis. For example, key information identifying which components of LGD's products correspond to the individual limitations of CMO's patents is contained in LGD's service manuals. Although CMO has accused 120 LGD products of infringement, LGD's pre-July 15, 2008 document production contained fewer than 20 service manuals, only 12 of which correspond to LGD products that CMO has accused of infringement. *See* Ex. C.

Moreover, while LGD trumpets its document production, the vast majority of LGD's documents are completely unusable because of the manner in which LGD chose to produce those documents. For example, LGD's production includes 615 documents that represent "XML source code," i.e., voluminous text that a computer must process and translate into comprehensible form. *See* Ex. D; Werner Decl. ¶ 8. LGD opted to produce that source code "printed out" to TIF, an electronic "picture" of a document. Werner Decl. ¶ 8. The result is that over 1.2 million of LGD's "two million pages of technical and business information" are really just 615 source code documents. *Id*. In fact, based on CMO's review, it appears that all but roughly 300,000 pages of LGD's production represents source code documents. *See id*. But, because LGD elected to produce its source code in TIF format rather than the native XML form in which LGD stores and uses them, these documents are virtually unusable to CMO. LGD has

- 4 -

further taken the perplexing position that its massive source code dump—the vast majority of its production—is not responsive to any CMO document request, begging the question why LGD produced it in the first place.[3] *See* Ex. E.

LGD's claim that it has produced to CMO the very type of document it seeks from CMO is also inaccurate. For example, LGD claims repeatedly that LGD has produced "comprehensive" technical discovery concerning "all" LGD products, including documents that reflect the "critical technical product design information" that CMO needs to litigate its infringement claims in the transferred case. *See* Motion at 2, 4, 6, 7, 10. However, CMO has thoroughly analyzed LGD's document production, and cannot find technical information for many of the LGD products CMO has accused of infringement. *See* Ex. F. For example, CMO is unable to locate the technical specifications of the timing controller (just one of several components comprising the accused instrumentalities) for most of the accused LGD products. *Id.* As another example, LGD claims that it "has produced technical information concerning LG Display's entire spectrum of products *that could be sold in the United States*." Motion at 6 (emphasis added). LGD has therefore limited its production based on geographical considerations, while insisting that CMO may not do the same.

LGD plays similar games with its demand for all documents regarding all sales of all products worldwide. Despite its demands, LGD nowhere claims in its motion to have produced such documents, and, indeed has now asserted it is not obligated to produce those documents. *See* Motion at 15–18; Ex. G. LGD does not, and cannot, submit any declaration or provide other factual support for its claims of "comprehensive" production.

---

[3] In support of its arguments, LGD thoroughly mischaracterizes the scope of CMO's Document Requests, and ignores severe limitations LGD imposed on discovery through its Objections to those Responses. *See* Werner Decl. ¶ 9. Those limitations are fundamentally inconsistent with LGD's arguments in this Motion. *See id.*

### C.    LGD Itself Is Preventing CMO from Producing Documents that LGD Has Moved to Compel CMO to Produce.

Among the documents that CMO collected in response to LGD's Document Requests are a substantial volume of email documents. CMO prepared these documents for production by the July 18, 2008 stipulated production date. On the eve of the production deadline, however, LGD unilaterally demanded that the parties postpone general email discovery. *See* Ex. H. Although CMO remains willing to produce its emails—and, in fact, has repeatedly tried to get LGD to agree on a date certain for an exchange of emails—LGD continues to delay. *See* Ex. I. LGD identifies in its motion certain regular business activities that, if conducted by CMO under certain circumstances, might bear on LGD's infringement claims. *See* Motion at 17–18. CMO's emails likely contain the information LGD seeks and CMO stands ready to produce these emails. The only reason this production has not yet occurred is because LGD insists on postponing it. If LGD wants these documents, it does not need to file a motion; it just needs to propose a date for an exchange.

### D.    LGD Abandoned the Meet and Confer Process Despite CMO's Cooperation and Compliance with Judge Jordan's Order in CEA.

During the meet and confer process, CMO tried to understand the legal basis for LGD's claim that it was entitled to unlimited discovery into all CMO products sold worldwide, including non-accused products. *See* Exs. J; K; L. In response to CMO's numerous requests, LGD cited CMO to only one authority: Judge Jordan's order, reflected in seven pages of an August 23, 2005 hearing transcript from *Commissariat A L'Energique Atomique v. Samsung Elecs. Co.*, No. 03-486 KAJ (D. Del.) ("the CEA case"). In his ruling, Judge Jordan balanced the interests of the parties, consistent with the Federal Rules of Civil Procedure, and ordered the defendants to provide certain limited information about their overseas products. *See* LGD Ex. F, at 34:23–35:23 (ordering production not of detailed financial or technical information regarding

- 6 -

each sale of every CMO product, but rather only information showing "how successful something has been selling around the world"). Although CMO disagreed with this ruling in the CEA case, it fully complied with it.[4]  Moreover, in an effort to compromise with LGD in this case, CMO repeatedly offered to provide LGD with the same worldwide information Judge Jordan had ordered produced in the CEA case. Exs. K; L. Despite citing Judge Jordan's order as the only "authority" for its extreme position, however, LGD refused to adhere to the terms of that order in this case. *See* Ex. M. CMO has since provided to LGD the information described in Judge Jordan's order. Werner Decl. ¶ 10.

LGD did not even purport to participate in a meaningful meet and confer process regarding the technical documents that are the subject of its motion. Four hours before a long-scheduled meet and confer to discuss deficiencies in LGD's document production, LGD sent a five-page letter claiming that LGD could not find a single document responsive to 71 of LGD's 97 document requests, and that CMO was wrongfully withholding documents. Ex. N. In response, CMO investigated LGD's claims and confirmed that it had in fact produced relevant documents responsive to each of the 71 requests identified by LGD. *See* Ex. O. CMO further offered to investigate whether additional relevant, responsive, non-privileged documents existed and, if they did, to produce them. *See id.* LGD filed its motion anyway, claiming it would just withdraw its motion when it was able to locate or receive these documents. *See* Ex. M; D.I. 393. In other words, even though the parties were not at an impasse, LGD wanted to file a motion.

## IV.     ARGUMENT

This Court should deny LGD's motion because CMO has already produced, or agreed to produce, responsive, non-privileged documents relevant to the products at issue in this lawsuit. If CMO has knowledge that a particular product was shipped to the United States—regardless of

---

[4] LGD inaccurately describes CMO's production in the CEA case. Werner Decl. ¶ 11.

whether CMO knows where that product was ultimately used or sold—CMO has provided

worldwide sales data for that product, consistent with Judge Jordan's previous rulings on this

issue.

**A.    CMO Has Provided, Attempted to Provide, or Agreed to Provide Relevant Discovery Responsive to LGD's Requests.**

In response to LGD's discovery requests, CMO identified each of the products LGD

accused in its infringement contentions that CMO had any knowledge was shipped to the United

States.  CMO then expended significant resources compiling and producing:

- Detailed transactional sales data for all such products. .

- Invoices, purchase orders, samples requests, and shipping records, for these products..

- High-level worldwide sales and profits data for these products, on a product-by-product basis, regardless of where the products were shipped or sold, anywhere in the world.

- Detailed technical documentation for these products.

Werner Decl. ¶ 10.  As noted above, CMO has also repeatedly attempted to produce the

equivalent of 3.5 million pages of responsive email, but LGD insisted the parties delay that

discovery.  *See* discussion *supra* Part III.C.  CMO believes that this email contains much of the

information LGD seeks in its motion, and it remains ready and willing to exchange its email files

with LGD as soon as LGD is ready to make this exchange.

LGD also claims that CMO has either refused or failed to provide discovery in response

to a number of LGD's document requests.  This is false.  For each of the categories identified by

LGD, CMO expressly offered to investigate and to produce any additional relevant, non-

privileged documents it could locate.  *See* Ex. O.  CMO's investigation uncovered that, contrary

to LGD's claims, CMO had already produced the vast majority of the documents LGD said it

could not find.  *See id.*  Werner Decl. ¶¶ 12–17.  Where CMO determined that documents had

not been produced, it has now produced those documents, or is investigating whether additional relevant, responsive documents exist. *See* Ex. F; Werner Decl. ¶ 12–18. CMO has further worked cooperatively with LGD to remedy problems regarding the legibility of a handful of documents reflecting the layout of CMO's fabrication facilities ("fab floor layouts"). Werner Decl. ¶ 16. CMO therefore believes it has addressed the issues outlined in LGD's motion at Argument, Part I.B, Part II.C., and IV. To the extent CMO locates any additional documents in the future, it has already agreed that it will produce such documents voluntarily. In short, there is, and was, no need for LGD to move to compel production of these documents.

The only potential dispute remaining between the parties is whether CMO must produce detailed financial and technical information for products that—to the best of CMO's knowledge—were never even shipped to the United States and are not accused of infringement in this case. Based on the cases cited by LGD, CMO believes this part of LGD's motion may now be moot.

Before LGD filed its motion, CMO repeatedly asked LGD for any legal authority supporting its request for discovery regarding non-US sales of CMO products. LGD cited only one case at that time (or at any time prior to filing its motion): Judge Jordan's Order in the CEA case. Judge Jordan's Order was strictly limited to information relevant to "commercial success," and he thus did not order the production of detailed sales records. Rather, Judge Jordan's Order permitted the production of high-level, summary documents that would indicate whether a product had a high level of sales worldwide. LGD Ex. F, at 34:23–35:2. CMO has now produced this data to LGD. Werner Decl. ¶ 11.

The other authority cited by LGD—which LGD did not cite before bringing this motion— is in full accord with Judge Jordan's limited discovery Order. *See, e.g., Minn. Mining*

- 9 -

& *Mfg. Co. v. Smith & Nephew*, 1992 WL 464352, *2 (D. Minn. July 27, 1992) (ordering only "a

summary of this information either in the form of consolidated sales documents or . . . sworn

affidavits, rather than every pertinent document in [Defendant]'s possession"); LGD Ex. F, at

34:23–35:23. Similarly, the court rendering the decision on which LGD relies to argue that

discovery into worldwide sales is "directly relevant" to a reasonable royalty analysis ordered the

production only of extremely high-level information. *See 3Com Corp. v. D-Link Systems, Inc.*,

2007 WL 949596, *4 (N.D. Cal. 2007) (identifying information showing "worldwide profit

margin" and a party's "financial condition generally" as relevant).

 Under LGD's own cited precedent, therefore, CMO's production of high-level worldwide

sales and profits data has satisfied its discovery obligations regarding information relevant to

commercial success as it relates to obviousness, as well as a reasonable royalty analysis, and it is

therefore moot to that extent.

  **B.**  **LGD Is Not Entitled to Unlimited Technical and Financial Discovery into Each and Every Sale of a CMO Product Worldwide.**

 Underlying every aspect of LGD's motion is the incorrect assertion that LGD's

identification of a specific number of allegedly infringing CMO products entitles it to unlimited

technical and financial discovery regarding all CMO products sold anywhere in the world,

including those not accused of infringement.[5]  LGD fails to cite a single case that supports this

remarkable position. Rather, the case law is clear that the scope of permissible discovery in

patent litigation is defined and limited by the products that LGD has actually accused of

infringement. *See Honeywell Int'l Inc. v. Audiovox Comms. Corp.*, 2005 WL 3988905, *1 n.2

(D. Del. Oct. 7, 2005) (holding on facts nearly identical to this Motion that the party seeking

discovery is "required to specifically identify accused products" to receive discovery into those

---

[5] CMO notes that, while LGD's interrogatory responses purport to identify numerous CMO products, its actual infringement contentions identify only three CMO products.

products).  Ironically, the case on which LGD relies most extensively in support of this Motion is in full accord. *See 3Com*, 2007 WL 949596, *1, *5 (expressly limiting ordered discovery only to accused products).

LGD is not, as it suggests, in a "catch 22" regarding which CMO products it should accuse of infringement.  Before LGD filed its case, it chose which products to investigate and accuse of infringement.  Having chosen not to investigate or accuse certain products of infringement, it cannot now obtain detailed discovery regarding those products. *See Honeywell*, 2005 WL 3988905, *1 n.2 ("[W]hat you are not entitled to do is to say you manufacture 15 different kinds of cell phones. We tore down three. Tell us about your other 12.").  LGD's attempt to use its existing claims against a small number of CMO products to force extensive and highly burdensome discovery into every one of CMO's products is improper. *See Samsung SDI Co. v. Matsushita Elec. Indus. Co.*, 2007 WL 4357552, *5 (C.D. Cal. June 25, 2007) (upholding the magistrate judge's denial of discovery regarding non-accused products and holding that a plaintiff may not engage "in a fishing expedition" so that it does "not have to conduct an investigation into whether or not additional products infringe [its] patents.").  Rather, LGD is simply seeking any discovery that will help it increase the scope of its case or create additional costs and burdens on CMO.  There is no legal basis supporting LGD's efforts to gain this strategic advantage.

### C.   Summaries of Sales Transactions Having No Nexus to the United States Are Not Relevant to LGD's Infringement Claims.

It is well-settled that the patent laws of the United States do not reach foreign products that have no nexus to the United States. *See Microsoft Corp. v. AT & T Corp.*, 127 S. Ct. 1746, 1751 (2007) (holding that U.S. patent law "governs domestically but does not rule the world").  Infringing acts—whether direct or indirect—must bear some connection to the United States.

*See* 35 U.S.C. § 271.  LGD asserts that "summaries" (i.e., transaction-level detail) of sales to

customers outside of the United States of products made by CMO in its Taiwan facility ("foreign

sales summaries") are relevant to its infringement claims.  LGD is incorrect.

      CMO's foreign sales summaries are not reasonably calculated to lead to admissible

evidence regarding LGD's claims of direct infringement.  *See, e.g., Microsoft Corp. v. AT&T*

*Corp.*, 127 S. Ct. 1746, 1750 (2007) ("no [direct] infringement occurs when a patented product is

made and sold in another country"); *Cyboitronics, Ltd. v. Golden Source Elecs., Ltd.*, 130 F.

Supp. 2d 1152, 1163 (C.D. Cal. 2001) ("As the statute makes clear, and as the Federal Circuit

has recently reiterated, the only activities that are relevant to direct infringement are those

activities that take place within the borders of the United States.  Extraterritorial activities are

irrelevant."); *Pfizer Inc. v. Aceto Corp.*, 853 F. Supp. 104, 105 (S.D.N.Y. 1994) (dismissing

infringement claim against Chinese manufacturer because it did not actually import the accused

product into the United States, but sold the accused product to a foreign manufacturer that sold it

to the actual importer).  Even the cases on which LGD relies concur.  *See, e.g., MEMC Elec.*

*Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369 (Fed. Cir. 2005) ("It is well-

established that the reach of *section 271(a)* is limited to infringing activities that occur within the

United States."); *Semiconductor Energy Lab. Co. v. Chi Mei Optoelecs. Corp.*, 531 F. Supp. 2d

1084, 1111 (N.D. Cal. 2007) ("In light of the strong presumption against extraterritorial

application, the court holds that 'the "offer to sell" language was not intended to (and could not)

extend the protection of a U.S. patent to allow the patentee to . . . prevent sales taking place in

other countries.'").[6]  By the terms of LGD's own request, CMO's foreign sales summaries are

---

[6] LGD's reliance on *Fellowes, Inc. v. Michilin Prosperity Co.*, 491 F. Supp. 2d 571 (E.D. Va. 2007) is misplaced.  CMO did not exclude from discovery products that are shipped F.O.B. Taiwan.  Werner Decl. ¶ 10.

nothing more than (albeit voluminous) raw data recording the mundane details of completely foreign transactions. *See* Motion at 14. No information reflected in CMO's foreign sales summaries can therefore bear on LGD's claims under § 271(a), and LGD is thus not entitled to that discovery on that basis.

CMO's foreign sales summaries also do not bear on LGD's claims of indirect infringement under § 271(b). The Federal Circuit recently narrowed the scope of conduct that may result in liability under § 271(b) for inducement of patent infringement. In *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1307 (Fed. Cir. 2006), an *en banc* panel clarified that the "mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." *Id.* at 1305. The evidence relevant to § 271(b) liability is "evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities" and "not merely that the defendant had knowledge of the acts alleged to constitute inducement." *Id.* at 1306. The *DSU en banc* panel thus affirmed that even though an Australian company knowingly sold to a Japanese importer products manufactured in Malaysia and Singapore that were intended for sale in the United States, which were later found to infringe, the foreign manufacturer was not liable for inducing those Japanese importers to directly infringe. *Id.* at 1302, 1307 n.20 ("ITL did not induce JMS to infringe by purposefully and culpably encouraging JMS's infringement").

CMO's foreign sales summaries consist entirely of raw data showing only that a CMO product was sold and shipped to a customer outside the United States. Such raw data cannot possibly reflect any "culpable state of mind" on CMO's part to allegedly induce CMO's customers to infringe LGD's patents. It is merely evidence that a product was shipped from point

- 13 -

A to point B, both of which were outside the United States. This voluminous, transaction-by-transaction data will not illuminate whether CMO possessed the requisite intent to induce infringement, and the data is therefore not relevant to LGD's claims under § 271(b).

The *DSU en banc* panel reflects a growing trend in affirming the limited reach of the United States patent laws, which past lower court decisions had potentially expanded. The Supreme Court recently confirmed that any doubt whether conduct falls outside the restricted territorial scope of the patent laws should be resolved in favor of the "presumption against extraterritoriality" that is firmly rooted in Supreme Court precedent. *See Microsoft*, 127 S. Ct. at 1752, 1758 (citing *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 531 (1972) ("Our patent system makes no claim to extraterritorial effect; these acts of Congress do not, and were not intended to, operate beyond the limits of the United States."). The Supreme Court made clear this presumption applies even to statutes directed squarely at extraterritorial conduct, with the purpose of limiting the use of such statutes as a "springboard for liability" that is in truth beyond the scope of the United States patent laws. *Microsoft*, 127 S. Ct. at 1758–59 (the presumption "remains instructive in determining the *extent* of the statutory exception").[7]

That LGD might use CMO's foreign sales summaries as a springboard to conduct other discovery into its claims should be weighed in light of this recent precedent. Rule 26 permits discovery into evidence that is not directly relevant only if it is *reasonably* calculated to lead to other relevant evidence. CMO's foreign sales summaries do not show which CMO products are incorporated into which of CMO's customers' products, nor do they reveal any other parties to whom those incorporating products are shipped or sold, or whether or not those incorporating

---

[7] Nearly all of the cases on which LGD relies pre-date the *DSU* or *Microsoft* decisions. The sole more recent case cited by LGD on this issue holds merely that weighing circumstantial evidence is a question for the trier of fact. *See Semiconductor Energy Lab. Co. v. Chi Mei Optoelecs. Corp., Ltd.*, 531 F. Supp. 2d 1084, 1113–14 (N.D. Cal. 2007).

- 14 -

products ever eventually wind up in the United States (the vast majority of which never do). *See*

*Semiconductor Energy Lab. Co.*, 531 F. Supp. 2d at 1112 (less than one-third of CMO products

enter the United States). Any benefit LGD might derive from the raw data in CMO's foreign

sales summaries is therefore too remote to make that discovery *reasonably* targeted. While the

identity of CMO's products and customers may be reflected in CMO's foreign sales summaries,

that information is readily available to LGD elsewhere. Indeed, LGD has already subpoenaed

numerous third parties, though LGD has repeatedly delayed deposing those third parties to obtain

information on which CMO products are shipped to the United States. Werner Decl. ¶ 19.

Further, CMO has provided substantial discovery regarding its products and customers,

including in its document production and interrogatory responses.

Given the extreme burden to CMO of providing the voluminous information regarding

the sale of each and every CMO product around the world, including its foreign sales summaries,

*see* discussion *infra* Part IV.D., and because LGD's demands are not *reasonably* calculated to

lead to the discovery of admissible evidence, LGD's improper request for CMO's foreign sales

summaries should be denied.

### D.     The Discovery that LGD Seeks Is Extremely Burdensome and Should Be Denied or at Least Strictly Limited.

As LGD is aware, less than one-third of CMO's LCD products sold worldwide ever enter

the United States. *See Semiconductor Energy Lab. Co.*, 531 F. Supp. 2d at 1112. LGD's motion

to compel the production of information regarding the over 70% of CMO's sales that bear

absolutely no connection to the United States whatsoever therefore seeks discovery that is

substantially more irrelevant than relevant. Even assuming that any of the legal theories

proffered by LGD could be read to support the conclusion that literally every single document

relating to every single transaction involving any CMO product sold anywhere in the world is

relevant and discoverable—which they cannot under recent Federal Circuit and Supreme Court authority—LGD's motion ignores the substantial limitations on discovery that are integral to the Rule 26 definition of relevancy. Even the cases on which LGD relies recognize that relevancy, while broad in concept, "is not without 'ultimate and necessary boundaries'" in practice. *See 3Com*, 2007 WL 949596, *1.[8]

Under Rule 26(b), courts must limit discovery that it finds can be obtained from "less burdensome or less expensive" sources, or if "the burden or expense of the proposed discovery outweighs its likely benefit." *See* Fed. R. Civ. P. 26(b)(i), (iii). Both of these considerations undercut LGD's effort to obtain worldwide sales data from CMO. As LGD itself acknowledges, CMO's products are relevant to this litigation only to the extent they enter into, or are offered for sale in, the United States. If a third party were to purchase a product from CMO and, without CMO's knowledge, sell that product in the United States, the appropriate source for information about that transaction would be the third party. LGD is already seeking such information directly from parties to whom CMO sells its products, as it has issued numerous subpoenas to third parties seeking discovery on this subject. To the extent these third parties shipped or sold product into the United States without CMO's knowledge, these third parties, not CMO, are the only source of that information. LGD's attempts to obtain detailed sales information for all products sold outside the United States is not only more burdensome and expensive than compliance with existing subpoenas, but it will not give LGD the information it claims to need. LGD's end run at discovery explains the utter lack of factual support submitted by LGD with its

---

[8] Discovery in many of the cases on which LGD relies was further limited based on the facts in those cases. *See, e.g., 02 Micro Int'l Ltd. v. Sumida Corp.*, 2006 WL 981987, *1–*3 (E.D. Tex. April 12, 2006) (products at issue sold to only one customer); *Semiconductor Energy Lab. Co. v. Chi Mei Optoelectronics Corp., Ltd.*, 531 F. Supp. 2d at 1112 ("SEL has specifically identified two CMO customers which allegedly import CMO LCD panels into the United States in end products which are ultimately sold in the United States.").

motion, and is inconsistent even with the conduct of the parties in LGD's cited cases. *See, e.g.,* *3Com*, 2007 WL 949596, *1 (party seeking similar discovery supported request with deposition testimony). LGD should be required to take basic discovery and at least establish that a given CMO product is actually subject to the United States patent laws before demanding discovery into that product.

Moreover, the burden and expense of compliance with LGD's demands immensely outweighs any benefit LGD may receive from gaining access to all documents relating to all CMO products. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ The volume of such documentation would be substantial, particularly given the unlimited nature of LGD's requests. The resulting burden would disrupt CMO's business for several weeks at least. *Id.* ¶ 20. Further costs, both in terms of attorney time for collection and review, as well as the costs associated with physically preparing documents for production, could easily measure in the hundreds of thousands of dollars. *Id.*

LGD provides no case holding that an allegation that certain products infringe a patent entitles a plaintiff to detailed records of *all* documents relating to *all* of a defendant's products. LGD's motion should be denied.

### E.    AUO's Responses to LGD's Discovery Requests Are Inapposite.

As discussed above, LGD's assertions that it has provided to CMO the same discovery that LGD seeks to compel by this Motion are inaccurate. LGD further claims that CMO is obligated to produce this discovery because AUO—a party to this action, but not this dispute— has produced this discovery. Again, none of LGD's numerous assertions regarding AUO are supported by any factual evidence. CMO, moreover, attempted repeatedly to obtain from LGD a precise explanation of what AUO has produced. LGD has refused to provide this information save for broad generalities that, in essence, claim AUO has provided LGD with anything and everything LGD has demanded. Regardless, CMO understands that AUO may have conceded to LGD's requests for broad discovery in its discovery responses. *See, e.g.*, Ex. P, at 10 ("*Absent reciprocal agreements with LGD*, AUO will NOT produce documents regarding AUO products sold worldwide." (emphasis added)). CMO made no promises to LGD, and has consistently questioned the legal basis and propriety of LGD's demands for unlimited discovery into all CMO products regardless of their nexus to the United States.

### F.    LGD's Premature Placeholder Motion Regarding Production Form Is Improper and Should Be Stricken or Denied.

As LGD notes, the parties were discussing electronically stored information ("ESI") production form issues when LGD terminated the meet and confer process and filed this Motion. *See* Motion at 19 n.9; 20 n.10. CMO intends to continue to discuss these issues with LGD, both to address LGD's legitimate concerns, and to (hopefully) remedy the substantial problems CMO has identified in LGD's production without Court intervention. *See* Ex. D. CMO has already noted to the Court one such problem with LGD's production—roughly 1.7 million pages of it are

virtually useless because LGD opted to produce tens of thousands of source code documents in TIF form, rather than the format LGD uses to store and access these documents. *See* discussion *supra* Part III.B. LGD refuses to produce any of those source code documents in their native form. As the decision on which LGD relies makes clear, CMO's native production form is indeed reasonably usable. *See Oklahoma v. Tyson Foods, Inc.*, 2007 WL 3128422, *4 (N.D. Okla. Oct. 24, 2007). LGD equates CMO's production of a handful of JavaScript and Macintosh files—two widely and publicly available file formats—to the massive production of raw ORACLE and SQL data without the proprietary queries needed to make any sense of that data. But CMO has not used or withheld any proprietary data or tools necessary to access these files. LGD has no legitimate complaint about these files.

A growing number of courts have concluded that LGD's production of ESI in TIF form is not production of documents in reasonably usable form. *See, e.g., Hagenbuch v. 3B6 Systemi Elettronici Industriali S.R.I.*, 2006 WL 665005, *2–*3 (N.D. Ill. Mar. 8, 2006) (ordering a party who produced ESI in TIF form to produce underlying ESI in native form, rejecting arguments that TIF form is reasonably usable, and sustaining objections that TIF form deprived recipient of native functionality, including searchability). LGD has further refused to produce the searchable text for any of its millions of pages of ESI, despite that both AUO and CMO have provided searchable text for the ESI they have produced.

Instead, LGD has argued to CMO that its production of documents in TIF form is not only defensible under Rule 34, but that the parties are *required* to produce documents in TIF form under a purported agreement.[9] Under LGD's logic, had CMO produced ESI as TIF images, stripping them of their native functionality (including, for example, the filenames that LGD

---

[9] CMO never signed on to that agreement, the draft of which further expressly permits the parties to produce documents in native form. Werner Decl. ¶ 22.

demands that CMO produce), and rendering them virtually useless, CMO would have satisfied its obligations. LGD claims that by producing these documents in their native form—the form in which CMO maintains these documents—CMO has incurred further obligations, including tutoring LGD on basic web-tools such as JavaScript, and buying a Mac computer for LGD's counsel. JavaScript and Mac files are not proprietary to CMO, and if LGD's counsel legitimately cannot figure out how to use JavaScript or a Macintosh computer, the technology available to "translate" these files into other formats are readily available to LGD as off the shelf products. CMO's production of documents in native form comports with Rule 34, and LGD's motion should be denied. *See* Advisory Committee Note to Fed. R. Civ. P. 34, 48 F.R.D. 527 (1970) (Under Rule 34(a)(1)(A), when "data can as a practical matter be made usable by the discovering party *only through respondent's devices*, respondent may be required to use his devices to translate the data into usable form." (emphasis added)).

## V.    CONCLUSION

For the reasons stated above, CMO respectfully requests that the Court deny LGD's motion, or in the alternative, that it order the parties to further meet and confer.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Morgan Chu
Jonathan S. Kagan
Alexander C.D. Giza
Adam Hoffman
Thomas C. Werner
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
(310) 277-1010

By: /s/ Philip A. Rovner
        Philip A. Rovner (#3215)
        Hercules Plaza
        1313 N. Market St.
        P.O. Box 951
        Wilmington, Delaware 19899-0951
        (302) 984-6000
        provner@potteranderson.com

Dated: August 29, 2008
880620
Public Version: September 4, 2008

*Attorneys for Defendant*
*Chi Mei Optoelectronics Corporation*

- 20 -

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on September 4, 2008, the within

document was filed with the Clerk of the Court using CM/ECF which will send notification of

such filing(s) to the following; that the document was served on the following counsel as

indicated; and that the document is available for viewing and downloading from CM/ECF.

| **BY CM/ECF, HAND DELIVERY AND E-MAIL** | **BY CM/ECF, HAND DELIVERY AND E-MAIL** |
|---|---|
| Richard E. Kirk, Esq. | John W. Shaw, Esq. |
| Ashley Blake Stitzer, Esq. | Karen L. Pascale, Esq. |
| The Bayard Firm | Young Conaway Stargatt & Taylor LLP |
| 222 Delaware Avenue | The Brandywine Building |
| Suite 900 | 1000 West Street, 17th Floor |
| P.O. Box 25130 | Wilmington, DE 19801 |
| Wilmington, DE 19899 | jshaw@ycst.com |
| rkirk@bayardfirm.com | kpascale@ycst.com |
| astitzer@bayardfirm.com | |

I hereby certify that on September 4, 2008 I have sent by E-mail the foregoing

document to the following non-registered participants:

| | |
|---|---|
| Gaspare J. Bono, Esq. | Vincent K. Yip, Esq. |
| Matthew T. Bailey, Esq. | Peter J. Wied, Esq. |
| Lora A. Brzezynski, Esq. | Jay C. Chiu, Esq. |
| Cass W. Christenson, Esq. | Katherine F. Murray, Esq. |
| R. Tyler Goodwyn, IV, Esq. | Ms. Denise Esparza |
| McKenna Long & Aldridge LLP | Paul Hastings Janofsky & Walker LLP |
| 1900 K Street, NW | 515 South Flower Street |
| Washington, DC 20006 | Los Angeles, CA 90071 |
| gbono@mckennalong.com | vincentyip@paulhastings.com |
| mbailey@mckennalong.com | peterwied@paulhastings.com |
| lbrzezynski@mckennalong.com | jaychiu@paulhastings.com |
| cchristenson@mckennalong.com | katherinemurray@paulhastings.com |
| tgoodwyn@mckennalong.com | deniseesparza@paulhastings.com |

Ron E. Shulman, Esq.
Julie M. Holloway, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050
rshulman@wsgr.com
jholloway@wsgr.com

M. Craig Tyler, Esq.
Brian D. Range, Esq.
Wilson Sonsini Goodrich & Rosati
8911 Capital of Texas Highway North
Westech 360, Suite 3350
Austin, TX 78759
ctyler@wsgr.com
brange@wsgr.com

*/s/ Philip A. Rovner*
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

846666