IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LG DISPLAY CO., LTD., | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 06-726-JJF |
| AU OPTRONICS CORPORATION; AU OPTRONICS CORPORATION AMERICA; CHI, MEI OPTOELECTRONICS CORPORATION; and CHI MEI OPTOELECTRONICS USA, INC., | ) ) ) ) ) ) | **CONSOLIDATED CASES** |
| Defendants. | ) ) | |
| AU OPTRONICS CORPORATION, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 07-357-JJF |
| LG DISPLAY CO., LTD. and LG DISPLAY AMERICA, INC., | ) ) ) | |
| Defendants. | ) ) | |

---

**SECOND DECLARATION OF HUA CHEN
IN SUPPORT OF AUO'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
FOR LG DISPLAY'S PATENTS**

OF COUNSEL:

Vincent K. Yip
Peter J. Wied
Terry D. Garnett
PAUL HASTINGS JANOFSKY & WALKER LLP
515 S. Flower Street, 25th Floor
Los Angeles, CA 90071

Ron E. Shulman
Julie M. Holloway
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304

M. Craig Tyler
Brian D. Range
WILSON SONSINI GOODRICH & ROSATI
8911 Capital of Texas Highway North
Westech 360, Suite 3350
Austin, TX 78759

Richard H. Morse (#531)
John W. Shaw (#3362)
Karen L. Pascale (#2903)
Andrew A. Lundgren (#4429)
YOUNG CONAWAY STARGATT & TAYLOR LLP
The Brandywine Bldg., 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6600

*Attorneys for AU Optronics Corporation and
AU Optronics Corporation America*

September 4, 2008

I, Hua Chen, declare as follows:

1.      I am an attorney duly admitted to practice before all the courts of the State of California, and also admitted to practice pro hac vice before this Court. I am an attorney with the law firm of Paul, Hastings, Janofsky & Walker LLP, counsel of record for Defendants Au Optronics Corporation and Au Optronics Corporation America (collectively "AUO"). I have personal knowledge of the facts declared herein, and if called as a witness, could and would competently testify thereto.

2.      I make this Declaration in support of AUO's Responsive Claim Construction Brief for LG Display's Patents.

3.      Attached hereto as Exhibit "1" is a true and correct copy of selected portions from LG. Philips LCD Co., Ltd.'s Opening Claim Construction Brief filed on or about February 6, 2004. The opening brief was filed in connection with a consolidated action in the U.S. District Court for the Central District of California styled *LG. Philips LCD Co., Ltd. v. Tatung of Am., Tatung Co., and Chunghwa Picture Tubes, Ltd.*.

4.      Attached hereto as Exhibit "2" is a true and correct copy of selected pages from the RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY (1991).

5.      Attached hereto as Exhibit "3" is a true and correct copy of U.S. Patent No. 5,410,423, issued to Furushima et al. on April 25, 1995.

6.      Attached hereto as Exhibit "4" is a true and correct copy of selected pages from THE AMERICAN HERITAGE DICTIONARY (3rd Ed. 1994).

I hereby declare under penalty of perjury under the laws of the United States of America that the matters declared herein are true and correct, and that this declaration is executed this 4th day of September, 2008, at Los Angeles, California.

By _____

Hua Chen

SECOND CHEN DECL. ISO AUO'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on September 4, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Richard D. Kirk [rkirk@bayardfirm.com]
> Ashley B. Stitzer [astitzer@bayardfirm.com]
> BAYARD, P.A.
> 222 Delaware Avenue, Suite 900
> P.O. Box. 25130
> Wilmington, DE 19899-5130
> (302) 655-5000
> > *Attorneys for LG Display Co., Ltd. and LG Display America, Inc.*

> Philip A. Rovner [provner@potteranderson.com]
> David E. Moore [dmoore@potteranderson.com]
> POTTER, ANDERSON & CORROON
> 6th Floor, Hercules Plaza
> 1313 N. Market Street
> Wilmington, DE 19801
> > *Attorneys for Chi Mei Optoelectronics Corporation and*
> > *Chi Mei Optoelectronics USA, Inc.*

I further certify that I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

> ### *By E-mail*
>
> Gaspare J. Bono [gbono@mckennalong.com]
> Matthew T. Bailey [mbailey@mckennalong.com]
> R. Tyler Goodwyn, IV [tgoodwyn@mckennalong.com]
> Lora A. Brzezynski [lbrzezynski@mckennalong.com]
> Cass W. Christenson [cchristenson@mckennalong.com]
> MCKENNA LONG & ALDRIDGE LLP
> 1900 K Street, NW
> Washington, DC 20006
> (202) 496-7500
> > *Attorneys for LG Display Co., Ltd. and LG Display America, Inc.*

Jonathan S. Kagan [jkagan@irell.com]
Alexander C.D. Giza [agiza@irell.com]
IRELL & MANELLA LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067
(310) 277-1010
    *Attorneys for Chi Mei Optoelectronics Corporation and*
    *Chi Mei Optoelectronics USA, Inc.*


                YOUNG CONAWAY STARGATT & TAYLOR LLP

                */s/ Karen L. Pascale*

September 4, 2008

                Richard H. Morse (#531) *[rmorse@ycst.com]*
                John W. Shaw (#3362) *[jshaw@ycst.com]*
                Karen L. Pascale (#2903) *[kpascale@ycst.com]*
                Andrew A. Lundgren ( #4429) *[alundgren@ycst.com]*
                The Brandywine Building
                1000 West St., 17th Floor
                P.O. Box 391
                Wilmington, Delaware 19899-0391
                Phone: 302-571-6600

                *Attorneys for AU Optronics Corporation and*
                *AU Optronics Corporation America*

DB02:6785164.1

065944.1001

Exhibit 1

1   JEFFREY N. BROWN (CA SBN 105520)
    TERESA A. MACDONALD (CA SBN 217053)
2   MORGAN, LEWIS & BOCKIUS LLP
    300 South Grand Avenue
3   Twenty-Second Floor
    Los Angeles, CA  90071-3132
4   Tel:  (213) 612-2500
    Fax:  (213) 612-2501
5
6   ANN A. BYUN (CA SBN 161593)
    MORGAN, LEWIS & BOCKIUS LLP
7   1701 Market Street
    Philadelphia, PA  19103
    Tel:  (215) 963-5000
8   Fax:  (215) 963-5001
9   ANTHONY C. ROTH (admitted *pro hac vice*)
    NATHAN W. MCCUTCHEON (admitted *pro hac vice*)
10  1111 Pennsylvania Avenue, NW
    Washington, DC 20004
11  Tel:  (202) 739-3000
    Fax:  (202) 739-3001
12
13  Attorneys for Plaintiff and Counterclaim Defendant
    LG.PHILIPS LCD CO., LTD.

14                  UNITED STATES DISTRICT COURT

15                 CENTRAL DISTRICT OF CALIFORNIA

16  LG.PHILIPS LCD CO., LTD.,            Case No. CV 02-6775 CBM
                                         Case No. CV 03-2866 CBM
17              Plaintiff,               Case No. CV 03-2884 CBM
                                         Case No. CV 03-2885 CBM
18      vs.                              Case No. CV 03-2886 CBM

19  TATUNG CO. OF AMERICA,               **LG.PHILIPS LCD CO., LTD.'S**
    TATUNG COMPANY AND                   **OPENING CLAIM**
20  CHUNGHWA PICTURE TUBES,              **CONSTRUCTION BRIEF**
    LTD.,
21                                       DATE:    April 5, 2004
                Defendants.              TIME:    3:00 PM
22                                       PLACE:   Courtroom of the Honorable
                                         Consuelo B. Marshall
23
    LG.PHILIPS LCD CO., LTD.,
24
                Plaintiff,
25
        vs.
26
    JEAN COMPANY LTD.,
27
                Defendant.
28

1-WA/2132293.2

LG.Philips LCD Co., Ltd.'s Opening Claim Construction Brief

LGD2063038
Del. 06-726 et al.

FILED
CLERK, U.S. DISTRICT COURT

FEB - 6 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

1    LG.PHILIPS LCD CO., LTD.,

2               Plaintiff,

3       vs.

4    LITE-ON TECHNOLOGY CORP. and
      LITE-ON TECHNOLOGY

5    INTERNATIONAL INC.,

6             Defendants.

7    LG.PHILIPS LCD CO., LTD.,

8               Plaintiff,

9       vs.

10    TPV TECHNOLOGY, LTD, and
       ENVISION PERIPHERALS, INC.,

11

12            Defendants.

13    LG.PHILIPS LCD CO., LTD.,

14               Plaintiff,

15       vs.

16    VIEWSONIC CORP.,

17             Defendant.

18

19    ////

20    ////

21    ////

22    ////

23    ////

24    ////

25    ////

26    ////

27    ////

28    ////

1-WA/2132293.2

LG.Philips LCD Co., Ltd.'s Opening Claim Construction
Brief

LGD2063039
Del. 06-726 et al.

1

## TABLE OF CONTENTS

2

**Page**

3   I.    INTRODUCTION .................................................................................. 1

4   II.   LAW OF CLAIM CONSTRUCTION ................................................... 1

    III.  THE SIDE-MOUNTING PATENTS ..................................................... 4

5         A.    Technology Overview ................................................................ 4

6         B.    Side-Mounting Claims ............................................................... 6

7               1.    Liquid Crystal Display Device Claims ........................... 7

                2.    Portable Computer Claims ............................................. 11

8         C.    Claim Construction Disputes ................................................... 12

9               1.    The claims that recite a liquid crystal display device are
                      not limited to a portable computer ................................. 12

10              2.    The phrases "frame," "first frame" and "second frame"
11                    should be given their plain and ordinary meaning ........... 18

12              3.    The phrases "attachable to a housing" and "fixable to a
                      housing" and "fastening part" should not be loaded down
13                    with unrecited details from the specification ................... 19

14              4.    The invention of the side-mounting patents is not limited
                      to the use of screws and holes, thus, the phrases "through"
                      and "passing through" have different meanings ............... 21

15              5.    A typographical error does not render a claim incapable
16                    of construction ............................................................... 25

17              6.    The remaining terms proposed by Defendants for
                      construction do not need a construction, but if the Court
                      decides to construe them, LPL's constructions should be
18                    adopted ........................................................................... 26

19                    a.    Defendants' stretch to find synonyms for or to
                            define common words frequently does not do
20                          justice to the original words .................................. 26

21                    b.    Defendants' stretch to define common words
                            frequently loads the words down with unrecited
22                          details improperly taken from the specification, or
                            worse, improperly taken from extrinsic evidence. ... 27

23  IV.   THE SEMICONDUCTOR PATENTS ................................................... 28

          A.    Overview of Technology ........................................................... 28

24              1.    The Thin Film Transistor ............................................... 28

25              2.    LCD Applications for TFTs ........................................... 30

          B.    '737 Patent Claims ................................................................... 32

26        C.    Construction of Disputed Terms in the '737 Patent .................. 34

27              1.    "thin-film transistor" .................................................... 34

28              2.    "source electrode" ........................................................ 35

LGD2063040
Del. 06-726 et al.

**TABLE OF CONTENTS**
(continued)

Page

3. "continuously depositing" ..................................................37

4. "high-resistivity semiconductor film" and "low-resistivity semiconductor film" ............................................................38

5. "conducting film" and "conducting film containing at least a low-resistivity semiconductor film" ..............................40

6. "oxidizing atmosphere" and "without exposing them to an oxidizing atmosphere" ...................................................42

7. "island region"/"island region on said gate electrode"............43

8. "a fourth step for selectively forming a source electrode and drain electrode" .....................................................45

9. "contacting a part of the surface of said island region"............46

10. "at least a part of the mask"/ "said source and drain electrodes serving as at least part of the mask" ......................46

D.  '449 Patent Claims ................................................................48

E.  Construction of Disputed Terms in the '449 Patent.............................50

1. "on"/"formed on"/"disposed on" ......................................50

2. "contact hole is provided through . . . layer"/"provided through" ................................................................52

3. "thin film transistor" ....................................................53

4. "selectively etching" ....................................................54

5. "gate electrode", "source electrode", "drain electrode" ...........54

6. "gate pad" and "source pad" .........................................56

7. "active layer" ............................................................57

8. "common hole" ..........................................................58

9. "aligned" .................................................................59

10. "said second insulating layer having a second contact hole exposing a predetermined portion of said second conductive layer and said first contact hole region"...............59

11. "wiring structure" ......................................................60

V.  CONCLUSION ...........................................................................60

LGD2063041
Del. 06-726 et al.

# I.   INTRODUCTION

LG.Philips LCD Co., Ltd. ("LPL") has sued Chunghwa Picture Tubes, Ltd. ("CPT"), Tatung Co. and Tatung Company of America (collectively, "Tatung"), Jean Co., Ltd. ("Jean"), Lite-On Technology Corp. and Lite-On Technology International Inc. (collectively, "Lite-On"), TPV Technology, Ltd. and Envision Peripherals, Inc. (collectively, "TPV"), and ViewSonic Corporation ("ViewSonic") (all collectively "Defendants") for patent infringement.  Following the parties' Second Revised Joint Claim Construction Statement (hereinafter "JCC"), this is LPL's brief in support of its claim constructions.

The patents at issue relate to liquid crystal display ("LCD") devices, which are ubiquitous today in the form of displays in laptop computers, LCD monitors, LCD TVs, and other consumer and commercial products.  LPL's patents fall into two categories.  Four of the patents relate to a particularly advantageous way of mounting an LCD device in a laptop computer or stand-alone LCD unit (*e.g.*, an LCD monitor) by using the sides of the LCD device so that the front, viewing surface of the LCD device is maximized.  For convenience, this first group of patents, U.S. Patent Nos. 6,373,537 ('537 patent); 6,002,457 ('457 patent); 6,020,942 ('942 patent); and 5,926,237 ('237 patent), will be referred to as the "side-mounting patents."  The other two patents, U.S. Patent Nos. 4,624,737 ('737 patent) and 5,825,449 ('449 patent), relate to the semiconductor structures used in LCD devices and their formation and are referred to as "the semiconductor patents."

Copies of the asserted patents can be found in LG.Philips LCD Co., Ltd.'s Exhibits to the Revised Joint Claim Construction Statement at 2-56 (side mounting patents); 374-83 ('733 patent); and 374-83 ('449 patent).  This collection of exhibits will be cited hereinafter as "LPL Exs. at __."

# II.   LAW OF CLAIM CONSTRUCTION

"It is well-settled that in interpreting an asserted claim, the court should first

LGD2063046
Del. 06-726 et al.

1  figure). *Id.* The gate pads 630 and source or data pads 640 receive electrical

2  signals from external driving circuitry. *Id.* (1:27-30). *See also* Figure 8 of U.S. Pat.

3  No. 4,331,758 ("the '758 patent") (at LPL Exs. 313) (illustrating a portion of such

4  an array).

5       In operation, by electrically addressing any given row and any given column,

6  a single transistor of the array can be turned on, thereby permitting current to flow

7  from its source through the conductive channel of the semiconductive material to

8  the corresponding drain where said current builds a voltage on its associated pixel

9  electrode. LPL Exs. at 317 ('758 patent at 7:58-8:5); *id.* at 380 ('449 patent at 1:67-

10  2:2). As previously noted, the resultant voltage on the pixel electrode will produce

11  an electric field across the liquid crystal that controls how bright or how dark the

12  particular pixel of the LCD appears. *Id.* at 317 ('758 patent at 8:5-9); *id.* at 380

13  ('449 patent at 2:2-4).

14       **B.    '737 Patent Claims**

15       The '737 patent discloses and claims a process for producing a TFT which,

16  among other things, improves electrical contact between the various layers that

17  make up the TFT while reducing the number of steps required to complete the

18  device. LPL Exs. at 309 ('737 patent at 1:47-58). LPL asserts only claim 1 of the

19  '737 patent against Defendants, and therefore, only terms within claim 1 are

20  disputed. To illustrate the process recited in claim 1, LPL presents the following

21  figure which correlates the steps and structures recited in the claim with

22  corresponding elements of Figure 3 of the '737 patent describing one embodiment

23  of the claimed invention.

24  ////

25  ////

26  ////

27  ////

28  ////

1-WA/2132293.2                          32                 LG.Philips LCD Co., Ltd.'s Opening Claim Construction
                                                           Brief

LGD2063077
Del. 06-726 et al.

## Claim 1 and Fig. 3 of '737 Patent

**A process for producing a thin-film transistor comprising**

a first step for forming a ▮▮▮▮▮▮▮▮ on an ▮▮▮▮▮▮▮▮▮▮▮,



FIG. 3a

a second step for continuously depositing on said ▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮ a gate insulating film, a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ containing at least a low resistivity semiconducting film without exposing them to an oxidizing atmosphere, a third step in which said high-resistivity semiconductor film and said ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are established so that they are partly left as an island region on said ▮▮▮ ▮▮▮▮▮▮▮,



FIG. 3b

a fourth step for selectively forming a ▮▮▮▮▮ ▮▮▮▮▮▮▮ and a ▮▮▮▮▮▮▮▮▮▮▮ both contacting a part of the surface of said island region and spaced apart from each other, a fifth step for selectively removing said ▮▮▮▮▮▮▮▮▮ exposed on said island region with said ▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮ serving as at least a part of the mask,



FIG. 3c

a sixth step for depositing a ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮, and a seventh step for selectively removing said ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮ and exposing a part of each of said ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮, ▮▮▮▮▮ ▮▮▮▮▮▮▮ and ▮▮▮▮ ▮▮▮▮▮▮▮▮▮,



FIG. 3d

As can be seen, claim 1 of the '737 patent recites a process for producing a TFT. As previously mentioned, this TFT can be used to control a pixel in an LCD. In fact, the elongated source electrode 16 shown in Figure 3c and 3d above is taught to be used as a "picture cell electrode" (or pixel electrode) for just such an

LGD2063078
Del. 06-726 et al.

1  application.  LPL Exs. at 310 (3:41-44).

2      Note that the second step of the claimed process calls for the continuous

3  deposition of gate insulating film 3, the high-resistivity semiconductor film 4, and

4  conducting film 20 (which, in this embodiment is made up of only a low-resistivity

5  amorphous semiconductor layer), as shown in Figure 3b above, without exposure to

6  an oxidizing atmosphere.  This step is of particular importance in ensuring good

7  electrical contact between the drain and source electrodes 15, 16 of the claimed

8  TFT.  Note that the conducting film 20 acts as a contact between the semiconductor

9  film 4 and the drain and source electrodes 15, 16.  Oxide gives rise to electrical

10  resistance and, therefore, the development of substantial oxidation between the

11  semiconductor film and conducting film can inhibit current flow between the source

12  and drain electrodes through the semiconductor film when the TFT is activated.

13  LPL Exs. at 309-310 (1:32-46; 3:53-4:2).

14      As discussed above, in operation, when gate electrode 2 is energized, high-

15  resistivity semiconductor film 4 becomes conductive and conducts electrical current

16  between the drain and source electrodes 15, 16.

17      **C.      Construction of Disputed Terms in the '737 Patent**

18      The parties have outlined their disputes with regard to the construction of the

19  claims of the '737 patent in Exhibit D to the JCC.  The following addresses various

20  disputes with respect to certain terms contained therein.

21          **1.      "thin-film transistor"**

22      LPL construes the term "thin film transistor" in accordance with the

23  definitions and portions of the specification discussed in Section IV(A)(1), *supra*.

24  *See* JCC at 89.  Defendants' construction differs from LPL's in one important

25  respect -- Defendants fail to acknowledge that TFTs, by definition, are not

26  constructed in a single crystal silicon wafer.  *See id.*  This is an important

27  distinction between thin-film transistors and other types of semiconductor devices.

28  The distinction is noted in technical dictionaries contemporary to the filing date of

LGD2063079
Del. 06-726 et al.

1    the '737 patent. <u>Compare</u> LPL Exs. at 331 (defining "thin film transistor" as
2    "fabricated using thin-film techniques on an insulating substrate rather than on a
3    semiconductor chip.") <u>with</u> <i>id.</i> at 327 (defining "chip" as "[a] small piece of a
4    single crystal of semiconductor material"). This distinction is also noted in the
5    intrinsic evidence. <i>See</i> USPN 4,426,407 1:13-22 ("A thin-film transistor (TFT) is .
6    . . similar to a MOS transistor (metal-oxide semiconductor) with the difference that
7    it is produced on an amorphous substrate <u>and not on a monocrystalline [i.e., single</u>
8    <u>crystal] silicon wafer.</u>") (emphasis added) (LPL Exs. at 320). Accordingly, this
9    distinction is appropriately part of the construction of the term.

10        **2.    "source electrode"**
11        The specification of the '737 patent teaches the source electrode being
12    formed via the deposition and patterning of electrically conductive materials, such
13    as metal films, using etching techniques. LPL Exs. at 309 (1:25-29). Moreover,
14    the specification shows a portion of the source electrode formed over the source
15    region of semiconductor layer (<i>e.g.</i>, the portion of the semiconductor that, when
16    activated, conducts charge to or from the source electrode). <i>Id.</i> at 306, 309 ('737
17    patent, 1:21-24; Fig. 1c). Accordingly, LPL construes this term as "[a] patterned,
18    electrically conductive material formed over the source region." JCC at 136.
19    LPL's construction of this term also notes that, as discussed in Section IV(A),
20    <i>supra</i>, that "[c]urrent flows through the channel between the source electrode and
21    drain electrode under control of the gate electrode." <i>Id.</i>
22        Defendants' proposed construction of this term, while similar to LPL's in
23    some respects, contains several additional limitations that significantly and
24    improperly narrow the meaning of the term. For example, they attempt to limit the
25    term "source electrode" by explicitly stating that it is "distinct from the source/data
26    line and the source/data pad." JCC at 136. There is no such exclusion in the
27    specification or prosecution history of the '737 patent. Moreover, none of the
28    dictionary definitions cited in the JCC for "source electrode" suggest such an

LGD2063080
Del. 06-726 et al.

1   exclusion is appropriate. Also, Defendants' definition states that "charge carriers

2   flow [from the source electrode] into the channel toward the drain." *Id.* While

3   current can be directed in such a fashion in a TFT, it can also travel in the opposite

4   direction. In fact, the embodiment shown in Figure 3 of the '737 patent illustrates

5   such an arrangement. The specification teaches that the source electrode in that

6   embodiment doubles as a picture cell (or pixel electrode) which, as discussed in

7   Section IV(A), collects charge carriers from the channel. LPL's Exs. at 310 ('737

8   patent at 3:36-44). Thus, in this embodiment, charge carriers flow from the drain

9   through the channel toward the source.

10      The terms "drain electrode" (JCC at 139-140) and "gate electrode" (*id.* at 93-

11   94) should be construed using the same reasoning. Defendants' definition of "drain

12   electrode," for example, specifies the drain region is where "charge carriers flow

13   from the source into the channel." JCC at 139 (emphasis added). As noted above,

14   this direction of charge carrier flow can be reversed in TFTs, and is in fact reversed

15   in the embodiment of the invention shown in Figure 3 of the '737 patent.

16      Also, Defendants' definition of "gate electrode" excludes "the gate line and

17   the gate pad". JCC at 93-94. As in the case of the term "source electrode" above,

18   there is no support in the intrinsic evidence or cited dictionary definitions for such

19   an exclusion. In fact, the specification indicates that gate lines should be included

20   in the definition of "gate electrode". *See* LPL Exs. at 310 ('737 patent at 3:24-28

21   ("FIG. 3a illustrates a step in which gate electrode 2 extending along one line [is]

22   formed on a transparent insulating substrate 1 such as glass substrate.") (emphasis

23   added)).[4]

24   ////

25

26   _____

    [4]   While Defendants' proposed constructions of "source electrode" and "gate
27   electrode" specifically exclude source/gate line and source/gate pad structures,
    even though such an exclusion is unsupported in either the intrinsic evidence or
28   dictionary definitions, their construction of "drain electrode" does not exclude
    data line and/or pad structures. Id.

LGD2063081
Del. 06-726 et al.

### 3.  "continuously depositing"

LPL construes this term as: "[t]he formation of the gate insulating film, the high-resistivity semiconductor film and conducting film without intervening films." JCC at 95-96. Defendants' construction requires



**FIG.1b** PRIOR ART

"[s]uccessively depositing each constituent film on top of the underlying film or structure without interruption and without performing any processing steps between the deposition of each constituent film." *Id.*

LPL's definition is consistent with the plain meaning of the term "continuously" because it requires the films to be deposited so that they are spatially continuous. *See 1981 Webster's* 243-44 (defining "continuous" is defined as "marked by uninterrupted extension in space, time, or sequence") (emphasis added) (Defendants Exs. 3 at 472-73). LPL's definition is also consistent with the specification, which states that "as shown in FIG. 1b, a gate insulating film 3 (such as silicon nitride film) and an amorphous silicon film 4 are continuously deposited, and said amorphous silicon film 4 is selectively etched." LPL Exs. at 309 (1:17-21) (emphasis added). Figure 1b, shown above right, does not show that films 3 and 4 are deposited without any timewise interruption and without any intervening processing steps, as Defendants propose. Instead, Figure 1b simply depicts amorphous silicon film 4 deposited on the gate insulating film 3 without intervening films, as shown above right. Accordingly, the '737 patent specification does not support Defendants' construction.

LPL's construction of "continuously depositing" is also consistent with the object of the invention of the '737 patent – a simplified process for producing a thin film transistor with an improved contact arrangement. LPL Exs. at 309 (1:56-58). As discussed in the Background of the Invention, prior art processes resulted in the formation of an intervening film, a natural oxide layer, between the high-resistivity

LGD2063082
Del. 06-726 et al.

1    silicon film and the low-resistivity silicon film. LPL Exs. at 309 (1:32-35). LPL's

2    construction of "continuously depositing" excludes such an intervening film.

3        Defendants' proposed construction also contradicts the aforementioned

4    *Webster's* dictionary definition of "continuous," which defines "continuous" as

5    "uninterrupted in space, time <u>or</u> sequence. Defendants Ex. 3 at 472-73 (emphasis

6    added). Defendants construe "continuously depositing" to require 1) successively

7    depositing each constituent film on top of the underlying film, 2) without

8    interruption, <u>and</u> 3) without performing any processing steps between the

9    deposition of each constituent film. Defendants thus construe "continuous" to

10   prevent interruption in space, time, <u>and</u> sequence. Moreover, Defendants'

11   definition has no foundation in the intrinsic evidence, and adds unwarranted

12   ambiguity to the term "continuously depositing." In particular, nowhere does the

13   '737 patent specification or file history prohibit "interruption" or "performing <u>any</u>

14   processing steps between the deposition of each constituent film." (Emphasis

15   added.) Moreover, Defendants' definition invites confusion as to what constitutes

16   an "interruption" and/or a "processing step."

17           **4.**    <u>**"high-resistivity semiconductor film" and "low-resistivity**</u>
18                  <u>**semiconductor film"**</u>

19        The primary distinction between LPL and Defendants' constructions of these

20   terms is the manner in which the parties distinguish the "high-resistivity

21   semiconductor film" from the "low-resistivity semiconductor film" and vice versa.

22   *See* JCC at 102-103, 112-113. LPL distinguishes the two via comparison to the

23   relative resistivity of the two films. For example, LPL construes the term "high-

24   resistivity semiconductor film" as "[a] thickness of semiconductor material . . . that

25   has a higher resistance to current flow relative to the low-resistivity semiconductor

26   film" JCC at 102-103. Such a definition is consistent with the plain and ordinary

27   meaning of each term. The '737 patent discloses adding impurities, such as

28   phosphorous, to the semiconductor material to produce the low-resistivity

LGD2063083
Del. 06-726 et al.

1  semiconductor film. LPL Exs. at 309 (2: 26-29, 43-45). This process of enhancing
2  the conductive properties of semiconductor material (and thereby lowering the
3  resistivity) by the addition of impurities is called "doping." Generally, the more
4  impurities are added, or the higher the "doping level," the more conductive the
5  semiconductor material. Consider, for example, the following definition of the
6  term "doping level" taken from a technical dictionary contemporary to the time of
7  the '737 invention: "[t]he amount of doping necessary to achieve the desired
8  characteristic in a semiconductor. Low doping levels . . . give a high-resistivity
9  material; high doping levels . . . give a low-resistivity material." Id. at 337
10 (emphasis added). One of skill, reading the specification of the '737 patent, would
11 understand the term "high-resistivity semiconductor" to refer to semiconductor
12 material that is undoped or that has a low doping level, and, therefore, has a higher
13 resistance to current flow relative to a highly doped, or low-resistivity
14 semiconductor. Similarly, one of skill, reading the specification of the '737 patent,
15 would understand the term "low-resistivity semiconductor" to refer to
16 semiconductor material with a high doping level, and one that, therefore, has a low
17 resistance to current flow relative to a less doped, or low-resistivity semiconductor.
18      Defendants' constructions of these terms, on the other hand, inject vague and
19 unwarranted limitations drawn from extrinsic evidence to distinguish the two films.
20 For example, they construe the high-resistivity semiconductor material to have an
21 "electrical resistance many orders of magnitude higher than a low-resistivity
22 semiconductor film." JCC at 102-103 (emphasis added). Once again, Defendants
23 attempt to add limitations to the term that have no basis in the intrinsic evidence
24 and add additional ambiguity to the term. See Biovail Corp., 239 F.3d at 1301.
25 Nowhere in the specification is there a requirement regarding "many orders of
26 magnitude" between the electrical resistance of low and high-resistivity
27 semiconductor films. Moreover, Defendants' definitions invite confusion as to
28 what, quantitatively, constitutes "many orders of magnitude."

39

LGD2063084
Del. 06-726 et al.

### 5.  "conducting film" and "conducting film containing at least a low-resistivity semiconductor film"

The primary distinction between LPL and Defendants' constructions of this term and phrase is whether a "low-resistivity semiconductor film" by itself meets the phrase "a conducting film containing a least a low-resistivity semiconductor film." LPL defines the term "conducting film" as "[a] thickness of electrically conductive material" and defines the phrase "conducting film containing at least a low-resistivity semiconductor film" as "[t]he conducting film is composed of a low-resistivity semiconductor film and possibly other conductive films." JCC at 106, 116. Thus, according to LPL's construction, claim 1 requires "a conducting film" that is made up of at least the "low-resistivity semiconductor film." Defendants' constructions, on the other hand, characterize the "low-resistivity semiconductor film" as distinct from the "conducting film." *See id.*

The '737 patent claims clearly use the phrase "conducting film containing at least a low-resistivity semiconductor film" to mean that the low-resistivity semiconductor film is a component (and possibly the sole component) of the "conducting film." LPL Exs. at 310. Applying a plain and ordinary meaning to the term "containing," it is clear this phrase characterizes the makeup of the conducting film, namely that it includes at least the low-resistivity semiconductor film. *See* LPL Exs. at 354-355 (defining "contain" as "to have as component parts; comprise; include"). Moreover, the ordinary meaning conveyed by the phrase "at least" is that the conducting film may be made up solely of the low-resistivity semiconductor film or of the low-resistivity semiconductor film and additional material.

This construction is supported by the remainder of claim 1. For example, claim 1 also recites "a fifth step for selectively removing said conducting film exposed on said island region." LPL Exs. at 310 (4:39-42). The corresponding portion of the specification discussing this step explicitly states that the "exposed

LGD2063085
Del. 06-726 et al.

1    portion of low-resistivity amorphous silicon film 20 is removed." *Id.* at 307-308,

2    310 (3:40-41; Figs. 2d and 3c (showing the claimed TFT after the exposed portion

3    of the low-resistivity amorphous silicon film 20 is selectively removed)). Further,

4    claim 2 of the '737 patent recites "said <u>conducting film</u> is <u>composed of</u> at least two

5    layers consisting of <u>a low-resistivity semiconductor film</u> and thereon a refractory

6    metal film or transparent conducting film." *Id.* at 310 (4:47-54) (Emphasis added.)

7    Claim 2 makes clear the recited "conducting film" is to be composed of, among

8    other films, a low-resistivity semiconductor film.

9        In contrast, Defendants limit the construction of "conducting film" by

10   requiring the film to have "an electrical resistance several orders of magnitude

11   lower than low-resistivity semiconductor film", and thereby excluded a low-

12   resistivity semiconductor film from <u>being</u> a "conducting film." JCC at 106-107.

13   Thus, Defendants' construction of "a conducting film containing at least a low-

14   resistivity semiconductor film" requires two films – a metal conducting film (which

15   cannot be made of a low-resistivity semiconductor) <u>and</u> a low-resistivity

16   semiconductor film. Such a construction directly contradicts the plain language of

17   claims 1 and 2. Claim 1 explicitly recites that the conducting film contains "at least

18   a low-resistivity semiconductor film," while claim 2 recites that the conducting film

19   "is composed of at least two layers [including] a low-resistivity semiconductor

20   film." Defendants' construction also prohibits the conducting film from <u>including</u> a

21   low-resistivity semiconductor film, in contrast to claim 2, which specifically states

22   that the "conducting film" is composed of a low-resistivity film.[5] Further,

23   Defendants' construction fails to read on the embodiment of the invention shown in

24   Figure 3d, which has only a low-resistivity semiconductor without an adjoining

25
26
27

[5]    Several of Defendants' other constructions similarly refuse to recognize that
the "conducting film" includes the "low resistivity semiconductor film". <u>See</u>
"selectively etched" at JCC, p. 129 (referring to a "conducting film" and a distinct
"low-resistivity semiconductor film"); "without exposing them to an oxidizing
atmosphere" at <u>id.</u>, p. 124-125 (same); "island region on said gate electrode" at
<u>id.</u>, p. 133 (same).

28

1-WA/2132293.2                       41          LG.Philips LCD Co., Ltd.'s Opening Claim Construction
                                                 Brief

LGD2063086
Del. 06-726 et al.

1    strip of metal. *See* LPL Exs. at 308. Moreover, nowhere in the '737 patent

2    disclosure is there a requirement regarding the relative "several orders of

3    magnitude" between the electrical resistance of conductive and low-resistivity

4    semiconductor films. Again, Defendants plainly, and improperly, seek to read

5    limitations into the claim which do not even exist in the specification or prosecution

6    history of the '737 patent. *See Biovail Corp.*, 239 F.3d at 1301. Also, Defendants'

7    definition invites confusion as to what, quantitatively, constitutes "several orders of

8    magnitude." For at least these reasons, LPL's definitions should therefore be

9    adopted.

10          6.    **"oxidizing atmosphere" and "without exposing them to an**

11                **oxidizing atmosphere"**

12          The '737 patent teaches "continuously depositing" the films that make up the

13    channel, source, and drain "without exposing them to an oxidizing atmosphere" in

14    order to prevent the development of electrical resistance between the films. *See*

15    LPL Exs. at 309 (1:41-44) ("[Exposure to an oxidizing atmosphere] would give rise

16    to electrical resistance between the source and drain and between channels in the

17    thin-film transistor thus obtained, making such transistor unable to exhibit its

18    desired characteristics."). Thus, one of ordinary skill reading the specification

19    would understand the language at issue in the claim calls not for an absolute ban on

20    oxidation, but rather for steps to be taken to prevent substantial oxidation that

21    would impair the electrical contact between the films. Practical limitations in

22    fabrication techniques used in "continuously depositing" these layers may very well

23    expose the films to insubstantial amounts of oxidizing atmosphere which could, in

24    turn, develop trace oxide deposits on the surface of one or more films. Such trace

25    oxide deposits would have little or no effect on electrical resistance, and as such

26    would still meet the objective of the claimed invention. Accordingly, LPL defines

27    the term "oxidizing atmosphere" as "an atmosphere that would create substantial

28    oxidation on a film" (*i.e.*, an amount of oxidation that will give rise to electrical

LGD2063087
Del. 06-726 et al.

1  resistance such that the transistor is unable to exhibit its desired characteristics).

2  JCC at 121.

3      Defendants, on the other hand, define the term as "[a]n atmosphere that

4  would create an oxide on a film." *Id.* Under Defendants' construction, the claim

5  requires the exclusion of even insubstantial amounts of oxidation without

6  consideration of whether said oxidation would be sufficient to cause increased

7  electrical resistance. Such a definition is unduly rigid and inconsistent with real

8  world fabrication techniques. Accordingly, LPL's definition should be adopted.[6]

9      **7.    "island region"/"island region on said gate electrode"**

10      LPL defines the term "island region" as "[a] discrete portion of the high-

11  resistivity semiconductor film and conducting film that is formed by selective

12  etching" and the phrase "island region on said gate electrode" as "[a] discrete

13  portion of the high-resistivity semiconductor film and conducting film that is

14  formed by selective etching. The discrete portion is located above and supported

15  by or in contact with the gate electrode." JCC at 131-133. These definitions are

16  consistent with the description of the island region contained in the specification.

17  *See* LPL Exs. at 307-309 (2:54-57; Figs. 2c-2e, 3c-3d).

18      Defendants' definitions of this term and phrase, however, include several

19  unwarranted limitations, such as "etched around its entire perimeter into a separate

20  isolated region located over the gate electrode of a single thin-film transistor." JCC

21  at 133. First, contrary to Defendants' construction, there is nothing in the plain

22  meaning of "island region on said gate electrode" that limits the island region to an

23  isolated region located over the gate electrode of a single TFT. Moreover, there is

24

25  [6]    There are several other terms at issue where, similarly, Defendants adopt
unduly rigid constructions that one of skill would recognize as inconsistent with
26  real world fabrication techniques. They include "selectively removing" (JCC at
142-143) (requiring removal in "selected regions only", presumably excluding the
27  possibility that a slight imperfection in the etching process may result in removal
of a tiny amount of material outside of the "selected region") and "selectively
28  forming" (*id.* at p. 134-135) (same).

LGD2063088
Del. 06-726 et al.

1   nothing in the '737 patent disclosure or prosecution history that limits the island

2   region to a single TFT. Once again, Defendants construction seeks to inject

3   unsupported limitations into claim 1. *See Biovail Corp.*, 239 F.3d at 1301.

4        Furthermore, there is nothing in the specification of the '737 patent requiring

5   the "entire perimeter" of the island region to be etched "into a separate isolated

6   region". The various two dimensional cutaways of the TFT shown in Figures 2c-2e

7   and 3c-3d of the specification do show a portion of the island region located over

8   the gate. *See* LPL Exs. at 307-308. However, there is nothing in the '737 patent

9   specification or figures that in any way limits the extension of the island region in

10  the dimension perpendicular to the figure (*e.g.*, in or out of the page) or in other

11  areas of the substrate not depicted in the cross sectional views. The phrase "on said

12  gate electrode" does not require that the perimeter of the island region be located

13  over the gate electrode, as Defendants suggests. Note, for example, that claim 1

14  also recites that the gate insulating film is "on said gate electrode." *Id.* at 310

15  (4:27-30). Figures 2a-2e and 3b-3d show an example where the gate insulating film

16  3 is on gate electrode 2 and in various additional locations on the substrate 1

17  beyond gate electrode 2. *Id.* at 307-308. Clearly, the phrase "on said gate

18  electrode" in claim 1 does not require that a perimeter of the gate insulating film be

19  located over the gate electrode. Such a construction is contradicted by the '737

20  patent specification, which plainly shows the gate insulating film "on said gate

21  electrode" and elsewhere on the substrate 1. The perimeter of the gate insulating

22  film is not limited to the region located over the gate electrode. Once again,

23  Defendants attempt to improperly limit claim language even to the point of ignoring

24  the intrinsic evidence.

25  ////

26  ////

27  ////

28  ////

LGD2063089
Del. 06-726 et al.

1      **8.    "a fourth step for selectively forming a source electrode and
2           drain electrode"**

3           LPL construes this phrase as "[t]he source electrode and drain electrode are

4    selectively formed together." JCC at 135. LPL's definition recognizes, as stated

5    plainly in the '737 patent, that the source and drain electrodes are formed at the

6    same time in the claimed process for producing a TFT. The phrase at issue recites

7    "a fourth step for selectively forming a source electrode and a drain electrode."

8    (Emphasis added.) Note that the source and drain electrodes are recited as being

9    formed in the same step. Similarly, the specification describes the source and drain

10   electrodes being deposited and etched at the same time. *See* LPL Exs. at 309-10

11   (1:25-29; 3:36-41).

12          Defendants, on the other hand, construe this phrase as "[f]orming a source

13   electrode and drain electrode in selected regions only by depositing a conducting

14   film or other material such as Al." JCC at 135. Defendants' definition is deficient

15   in several respects. First, it fails to acknowledge one feature of the claimed

16   invention – namely that both the source and drain electrodes are formed in the same

17   step. Additionally, Defendants' construction can be read to require "forming" the

18   source and drain electrodes via deposition alone, *i.e.*, without subsequent etching to

19   form the desired pattern for the electrodes. Nothing in the plain meaning of the

20   term "forming" suggests such a narrow construction. Moreover, the specification

21   clearly teaches that source and drain electrodes can be formed via deposition and

22   subsequent etching of conductive material. *See* LPL Exs. at 309 (1:25-29). For at

23   least these reasons, LPL's construction should be adopted.[7]

24   ////

25   ////

26   ___

     [7]   There are several other terms at issue where, similarly, Defendants'
27   construction of the term "forming" can be read to require deposition alone
     (without subsequent etching). They include "selectively forming" (JCC at 134-
28   135) and "forming . . . on" (id. at 148).

LGD2063090
Del. 06-726 et al.

1   9.   "**contacting a part of the surface of said island region**"

2   LPL construes this phrase to mean "[f]orming an electrical connection to a

3   part of the surface of the island region" while Defendants construes it to require

4   "[t]ouching a part of the surface of the island region." JCC at 141. The claim

5   states, in relevant part, "a source electrode and a drain electrode both contacting a

6   part of the surface of said island region." LPL Exs. at 310 (4:36-39). At several

7   places in the specification, the patent discusses the importance of maintaining

8   electrical connectivity between the various layers that make up the island region as

9   well as between the island region and the layers which are patterned to form the

10   source and drain electrodes. *See id.* at 307-310 (3:53-62, 4:1-2; Figs. 2d-2e; 3c-3d).

11   In fact, throughout the specification, the term "contact" is used consistently in the

12   context of forming an electrical connection. *See id.* at 309-310 (1:21-25; 1:55-57;

13   3:59-4:2). Accordingly, LPL's definition should be adopted as a more appropriate

14   reading of the claim term "contact" in light of the specification.

15   10.   "**at least a part of the mask**"/ "**said source and drain**
16   **electrodes serving as at least part of the mask**"

17   A mask is a device used to shield selected areas of a semiconductor chip

18   during the manufacture of semiconductor components and integrated circuits. Of

19   particular relevance to this case, a mask is used to form a pattern in a surface of a

20   film or films during the fabrication of a TFT. *See, e.g.,* '758 patent at 5:37-6:7

21   (discussing the use of mask in forming source bus patterns in a conductive layer)

22   (LPL Exs. at 316). In application, a mask is typically formed in a desired pattern

23   above a surface from which material is to be selectively removed. *See, e.g., id.* at

24   5:37-56 (describing one method of developing a mask). Then, a removal technique,

25   such as the application of an etching solution, is applied that will remove portions

26   of the exposed surface but not the mask. *See, e.g., id.* at 5:57-59 ("A suitable

27   etching solution will then be employed to remove the unprotected conductive layer .

28   . . .") Obviously, for this technique to work the mask must be made of material that

LGD2063091
Del. 06-726 et al.

1   is resistive to the removal technique relative to material to be removed.  The
2   ultimate result of this process is that a pattern matching the mask will be left in the
3   surface following the application of the removal technique.  *See, e.g., id.* at 6:6-7
4   ("The structure now has the configuration shown in FIGS. 6 and 6A").
5   Accordingly, LPL defines the term "mask" as "a pattern above a surface from
6   which material is to be selectively removed" where "the pattern is made of material
7   that is resistive to the removal technique relative to material to be removed."  JCC
8   at 145-147.  The remainder of the phrases at issue ("at least a part of the
9   mask"/"said source and drain electrodes serving as at least part of the mask") are
10  either otherwise construed (*e.g.* source and drain electrode) or have plain meanings
11  (*e.g.*, "serving as at least part of" the mask means there can be other parts to the
12  mask) and the phrases should be construed accordingly.

13      Defendants' constructions of these phrases fail to define the term mask, and
14  add limitations contrary to a plain reading of the phrases.  For example, the claim
15  requires only that the source and drain electrode serve as "at least a part of the
16  mask."  (Emphasis added.)  Defendants, however, read this qualified limitation to
17  mean the source and drain electrode must "make a significant contribution to
18  defining the edges of the selectively removed region."  JCC, Exh. at 146-47
19  (emphasis added).  There is simply no logical reason for requiring a structure
20  identified as only making up "at least a part" of the mask to make a "significant
21  contribution to defining the edges of the selectively removed region."  If, for
22  example, the source and drain electrodes made up only a small portion of the mask,
23  they would still account for "at least a part" of the mask as required by the claim.
24  Defendants construction, however, would further require this small portion of the
25  mask accounted for by the electrodes to make a "significant" contribution to
26  defining the "edges of the removed region."  Such an encumbrance of this
27  limitation is unsupported, unwarranted, and in clear contravention of the plain
28  meaning of the phrase "at least a part of the mask" as recited in the patent.

LGD2063092
Del. 06-726 et al.

1   Moreover, Defendants' definition is fraught with ambiguity.  For example, how

2   much of "contribution" is required to be considered a "significant" contribution?

3   Similarly, what constitutes the "edges of the  selectively removed region"?  There is

4   no reason to import these ambiguous, unsupported, and extraneous limitations into

5   the claim.  Accordingly, LPL's construction should be adopted.

6   **D.     '449 Patent Claims**

7         The '449 patent discloses and claims an LCD device and a method of

8   manufacturing said device, which, among other things, has a novel interconnection

9   structure.  LPL Exs. at 380-81 (2:30-3:14).  The claims of the '449 patent fall into

10  two main categories:  (1) claims directed to a "wiring structure" and (2) claims

11  directed to a "liquid crystal display device."  This same novel interconnection is

12  included in both categories of claims.  To illustrate the nature of the interconnection

13  recited in the claims of the '449 patent, LPL presents the following illustration

14  which correlates the structures recited in claim 1 with the corresponding elements

15  of Figure 5 of the patent describing one embodiment of the claimed invention.

16  / / / /

17  / / / /

18  / / / /

19  / / / /

20  / / / /

21  / / / /

22  / / / /

23  / / / /

24  / / / /

25  / / / /

26  / / / /

27  / / / /

28  / / / /

LGD2063093
Del. 06-726 et al.

**PROOF OF SERVICE**

    I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 300 South Grand Avenue, Twenty-Second Floor, Los Angeles, CA 90071-3132. On February 6, 2004, I served the within documents:

**LG.PHILIPS LCD CO., LTD.'S OPENING CLAIM CONSTRUCTION BRIEF**

☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☐    by placing the document(s) listed above in a sealed _____ envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a _____ agent for delivery.

☐    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

Teresa M. Corbin
Glenn W. Rhodes
HOWREY SIMON ARNOLD &
WHITE LLP
301 Ravenswood Avenue
Menlo Park, CA 94025

    I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

    Executed on February 6, 2004, at Los Angeles, California.

    I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct.

_____
Jill Jacobs

1-LA/756591.1

LGD2063106
Del. 06-726 et al.

1

## PROOF OF SERVICE

2      I am a resident of the State of California and over the age of eighteen years, and
not a party to the within action; my business address is First Legal Support Services, 1511 West
3  Beverly Boulevard, Los Angeles, California 90026. On February 6, 2004, I served the within
documents:
4

**LG.PHILIPS LCD CO., LTD.'S OPENING CLAIM**
5  **CONSTRUCTION BRIEF**

6      ☐    by transmitting via facsimile the document(s) listed above to the fax number(s)
set forth below on this date before 5:00 p.m.
7

8      ☐    by placing the document(s) listed above in a sealed envelope with postage thereon
fully prepaid, in the United States mail at Los Angeles, California addressed as set
forth below.
9

10     ☐    by placing the document(s) listed above in a sealed _____ envelope
and affixing a pre-paid air bill, and causing the envelope to be delivered to a
_____ agent for delivery.
11

12     ☒    by personally delivering the document(s) listed above to the person(s) at the
address(es) set forth below.

13     Christopher A. Mathews
Brian S. Y. Kim
14     HOWREY SIMON ARNOLD &
WHITE LLP
15     550 South Hope Street, Suite 1400
Los Angeles, CA 90071-2627
16     Fax: (213) 892-2300

17     I am readily familiar with the firm's practice of collection and processing
correspondence for mailing. Under that practice it would be deposited with the U.S. Postal
18  Service on that same day with postage thereon fully prepaid in the ordinary course of business. I
am aware that on motion of the party served, service is presumed invalid if postal cancellation
19  date or postage meter date is more than one day after date of deposit for mailing in affidavit.

20     Executed on February 6, 2004, at Los Angeles, California.

21     I declare under penalty of perjury, under the laws of the State of California and the
United States of America, that the foregoing is true and correct.
22

23

24  _____          _____
        Type/Print Name                                Signature
25

26

27

28

1-LA/756591.1

-2-

LGD2063107
Del. 06-726 et al.

**PROOF OF SERVICE**

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is First Legal Support Services, 1511 West Beverly Boulevard, Los Angeles, California 90026. On February 6, 2004, I served the within documents:

**LG.PHILIPS LCD CO., LTD.'S OPENING CLAIM CONSTRUCTION BRIEF**

☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☐    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☐    by placing the document(s) listed above in a sealed _____ envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a _____ agent for delivery.

☒    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

Mark H. Krietzman
Valerie W. Ho
GREENBERG TRAURIG LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404
Fax: (310) 586-0288

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on February 6, 2004, at Los Angeles, California.

I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct.

_____     _____
Type/Print Name                  Signature

1-LA/756591.1

-3-

LGD2063108
Del. 06-726 et al.

1
## PROOF OF SERVICE

2      I am a resident of the State of California and over the age of eighteen years, and
not a party to the within action; my business address is First Legal Support Services, 1511 West
3    Beverly Boulevard, Los Angeles, California 90026.  On February 6, 2004, I served the within
documents:
4

**LG.PHILIPS LCD CO., LTD.'S OPENING CLAIM**
5    **CONSTRUCTION BRIEF**

6    ☐    by transmitting via facsimile the document(s) listed above to the fax number(s)
set forth below on this date before 5:00 p.m.
7

8    ☐    by placing the document(s) listed above in a sealed envelope with postage thereon
fully prepaid, in the United States mail at Los Angeles, California addressed as set
forth below.
9

10    ☐    by placing the document(s) listed above in a sealed _____ envelope
and affixing a pre-paid air bill, and causing the envelope to be delivered to a
_____ agent for delivery.
11

12    ☒    by personally delivering the document(s) listed above to the person(s) at the
address(es) set forth below.

13    Scott R. Miller
Tracy R. Roman
14    BINGHAM McCUTCHEN LLP
355 South Grand Avenue, Suite 4400
15    Los Angeles, CA 90071-3106
Fax:  (213) 680-6499
16

17      I am readily familiar with the firm's practice of collection and processing
correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal
18    Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I
am aware that on motion of the party served, service is presumed invalid if postal cancellation
date or postage meter date is more than one day after date of deposit for mailing in affidavit.
19

20      Executed on February 6, 2004, at Los Angeles, California.

21      I declare under penalty of perjury, under the laws of the State of California and the
United States of America, that the foregoing is true and correct.

22

23    _____        _____
24    Type/Print Name                                  Signature

25

26

27

28

1-LA/756591.1
-4-

# Exhibit 2



Copyright © 1991 by Random House, Inc.

All rights reserved under International and Pan-American Copyright Conventions.
No part of this publication may be reproduced in any form or by any means,
electronic or mechanical, including photocopying, without permission in writing
from the publisher. All inquiries should be addressed to Reference Department,
Random House, Inc., 201 E. 50th St., New York, NY 10022. Published in the United
States by Random House, Inc., New York, and simultaneously in Canada
by Random House of Canada Limited, Toronto.

*Random House Living Dictionary Project* is a trademark of Random House, Inc.

Library of Congress Cataloging-in-Publication Data

Random House Webster's college dictionary.
    p.    cm.
    ISBN 0-679-40110-5; ISBN 0-679-40100-8
    1. English language—Dictionaries.
    PE1628.W55185  1990    423—dc20    90-21963

A number of entered words which we have reason to believe constitute trademarks
have been designated as such. However, no attempt has been made to designate
as trademarks or service marks all words or terms in which proprietary rights might
exist. The inclusion, exclusion, or definition of a word or term is not intended to
affect, or to express a judgment on, the validity or legal status of the word or term
as a trademark, service mark, or other proprietary term.

International Phonetic Alphabet, courtesy International Phonetic Association

Random House Publications are available at special discounts for corporate use,
in bulk purchases of 100 copies or more for promotions or premiums. Special
editions, including personalized covers and corporate imprints, can be created in
large quantities for special needs. For more information, write to the Director of
Special Markets, Random House, Inc., 201 E. 50th Street, New York, N.Y. 10022.

Manufactured in the United States of America

r.o/sr

Case 1:23-cv-00782-JE    Document 123-2    Filed 09/04/2009    Page 31 of 40

**for-gi-ve** to forgive, Go *fragiban* to bestow; SEE FOR-, GIVE] —**for-giv'a-ble,** *adj.* —**for-giv'er,** *n.* —Syn. SEE EXCUSE.

**for-give-ness** (for giv'nis), *n.* 1. the act of forgiving or the state of being forgiven; pardon. 2. willingness to forgive. [bef. 900]

**for-giv-ing** (far giv'ing), *adj.* 1. disposed to forgive or showing forgiveness. 2. offering the chance to recover from mistakes; tolerant: *This stage is forgiving of inexperienced skiers.* [1680-90] —**for-giv'ing-ly,** *adv.* —**for-giv'ing-ness,** *n.*

**for-go** or **fore-go** (fôr gō'), *v.t.*, **-went, -gone, -go-ing.** 1. to abstain or refrain from; give up; renounce. 2. *Archaic.* to neglect; overlook. 3. *Archaic.* to quit or leave. [bef. 950] —**for-go'er,** *n.*

**for-got** (far got'), *v.* a pt. and pp. of FORGET.

**for-got-ten** (far got'n), *v.* a pp. of FORGET.

**for-int** (fôr'int), *n.* the basic monetary unit of Hungary. See table at CURRENCY. [1945-50; < Hungarian < It *fiorino.* SEE FLORIN]

**for-judge** or **fore-judge** (fôr juj'), *v.t.,* **-judged, -judg-ing.** *Law.* to exclude, expel, or deprive by a judgment. [1250-1300; ME *forjugen* < OF *forjugier* = *for-* out (SEE FORFEIT) + *jugier* to JUDGE] —**for-judg'ment,** *n.*

**fork** (fôrk), *n., v.* forked, fork-ing. —*n.* 1. an instrument having two or more prongs or tines, for holding, lifting, etc., esp. an implement for handling food. 2. something resembling this in form. 3. a division into branches. 4. the point or part at which a thing, as a river or a road, divides into branches. 5. either of the branches into which a thing divides. 6. a principal tributary of a river. —*v.t.* 7. to pierce, raise, pitch, dig, etc., with a fork. 8. to make into the form of a fork. 9. to maneuver so as to place (two opposing chess pieces) under simultaneous attack by the same piece. —*v.i.* 10. to divide into branches, as a road. 11. to turn as indicated at a fork in a road, path, etc. 12. *Informal.* fork over, out, or up, to deliver; pay; hand over. [bef. 1000; ME *forke,* OE *forca* < L *furca* fork, gallows, yoke] —**fork'less,** *adj.* —**fork'like',** *adj.*

**fork-ball** (fôrk'bôl'), *n.* a baseball pitch thrown with the ball inserted between the index and middle fingers, causing it to dip sharply near home plate. [1920-25, Amer.]

**forked** (fôrkt, fôr'kid), *adj.* 1. having a fork or forklike branches. 2. zigzag, as lightning. —*Idiom.* 3. to speak with or have a forked tongue, to speak deceitfully; attempt to deceive. [1250-1300] —**fork'ed-ly** (fôr'kid lē), *adv.* —**fork'ed-ness,** *n.*

**fork-ful** (fôrk'fool'), *n., pl.* **-fuls.** the amount a fork can hold. [1635-45] —Usage. See -FUL.

**fork-lift** (fôrk'lift'), *n., v.* **-lift-ed, -lift-ing.** —*n.* 1. Also called **fork'lift truck', fork' truck'.** a small vehicle with two power-operated prongs at the front that can be slid under heavy loads in order to lift, carry, and stack them, as in warehouses. —*v.t.* 2. to move or stack by forklift. [1940-45]



forklift (def. 1)

**for-ky** (fôr'kē), *adj.,* fork-i-er, fork-i-est. forked. [1500-10 ( < for'k)i-ness, *n.*

**For-lì** (fôr lē'), *n.* a city in N Italy, SE of Bologna. 110,334.

**for-lorn** (fôr lôrn'), *adj.* 1. miserable, as in condition or appearance; dreary; wretched. 2. lonely and sad; forsaken; desolate. 3. expressive of hopelessness; despairing: *forlorn glances.* 4. bereft; destitute: *forlorn of comfort.* [bef. 1150; ME *forloren,* ptp. of *forlesen* to forfeit, desert, OE *forlēosan;* c. OS, OHG *farliosan,* Go *fraliusan.* See FOR-, LOSE] —**for-lorn'ly,** *adv.* —**for-lorn'ness,** *n.*

**for-lorn' hope',** *n.* 1. a perilous or desperate enterprise. 2. a vain hope. 3. *Obs.* a group of soldiers assigned to perform some unusually dangerous service. [1530-40; folk-etymological alter. of D *verloren hoop* lit. lost troop]

**form** (fôrm), *n., v.,* formed, form-ing. —*n.* 1. external appearance of a clearly defined area, as distinguished from color or material; configuration: *a triangular form.* 2. the shape of a thing or person. 3. a body, esp. that of a human being. 4. a dummy having the same measurements as a human body, used for fitting or displaying clothing. 5. something that gives or determines shape; a mold. 6. a particular condition, character, or mode in which something appears: *water in the form of ice.* 7. the manner or style of arranging and coordinating parts for a pleasing or effective result, as in literary or musical composition. 8. the organization, placement, or relationship of basic elements, as lines and colors in a painting or volumes and voids in a sculpture, so as to produce a coherent image; the formal structure of a work of art. 9. a particular kind, type, species, or variety, esp. of a zoological group. 10. the combination of all the forces possible on a crystal of given symmetry. 11. due or proper shape; orderly arrangement of parts; good order. 12. *Philos.* a. the structure, organization, or essential character of something, as opposed to its matter. b. (*cap.*) *Platonism.* IDEA (def. 6c). c. *Aristotelianism.* that which places a thing in its particular species or kind. 13. a set, prescribed, or customary order or method of doing something. 14. a set order of words, as for use in religious ritual or in a legal document; formula. 15. a document with blank spaces to be filled in with particulars before it is executed: *a tax form.* 16. a typical document to be used as a guide in framing others for like cases: *a form for a deed.* 17. a conventional method of procedure or behavior: *society's forms.* 18. a formality or ceremony, often with implication of absence of real meaning. 19. procedure according to a set order or method. 20. conformity to the usages of society; formality; ceremony. 21. procedure or conduct, as judged by social standards: *Good form demands that we go.* 22. manner or method of performing something; technique: *The violinist displayed excellent form.* 23. physical condition or fitness, as for performance: *a tennis player in peak form.* 24. a. LINGUISTIC FORM. b. a particular shape of a word that occurs in more than one shape: *In* tin, *'m is a form of* am. c. a word with a particular inflectional ending or other modification: *Boys is a form of* boy. d. the external shape or pattern of a word or other construction, as distinguished from its meaning, function, etc. 25. temporary boarding or sheeting of plywood or metal for giving a desired shape to poured concrete, rammed earth, etc. 26. a grade or class of pupils in a British secondary school or in certain U.S. private schools. 27. a bench or long seat. 28. an assemblage of printing types, leads,

etc., secured in a chase to print from. —*v.t.* 29. to construct or frame. 30. to make or produce. 31. to serve to make up; compose; constitute: *Three citizens form the reformed board.* 32. to place in order; arrange; organize. 33. to frame (ideas, opinions, etc.) in the mind. 34. to contract or develop (habits, friendships, etc.). 35. to give form or shape to; shape; fashion. 36. to give a particular form or shape to: *Form the dough into squares.* 37. to mold or develop by discipline or instructions. 38. to produce (a word or class of words) by adding an affix, combining elements, or changing the shape of the form: *to form the plural by adding* -s. —*v.i.* 39. to take or assume form. 40. to be formed or produced: *Ice began to form on the window.* 41. to take a particular form or arrangement: *The ice formed in patterns across the window.* [1175-1225; ME *forme* < OF < L *fōrma* form, mold, sort, ML: seat] —**form'a-ble,** *adj.* —**form'a-bly,** *adv.*

**-form,** a combining form meaning "having the form of": *cruciform.* [< L *-(fōrmis)*]

**for-mal** (fôr'mel), *adj.* 1. being in accordance with the usual requirements, customs, etc.; conventional: *to pay one's formal respects.* 2. marked by form or ceremony: *a formal occasion.* 3. designed for wear or use at elaborate ceremonial or social events: *The invitation specified formal attire.* 4. requiring dress suitable for elaborate social events: *a formal dance.* 5. observant of conventional requirements of behavior, procedure, etc., as persons; punctilious. 6. excessively ceremonious; prim; decorous. 7. being a matter of form only; perfunctory: *formal courtesy.* 8. made or done in accordance with procedures that ensure validity: *a formal authorization.* 9. of, pertaining to, or emphasizing the organization or composition of the constituent elements in a work of art perceived separately from its subject matter: *the formal structure of a poem.* 10. acquired in school; academic. 11. symmetrical or highly organized: *a formal garden.* 12. of or pertaining to language use typical of impersonal and official situations, characterized by adherence to traditional standards of correctness, often complex vocabulary and syntax, and the avoidance of contractions and colloquial expressions. 13. pertaining to the form, shape, or mode of a thing, esp. as distinguished from the substance: *formal writing.* 14. being such merely in appearance or name; nominal: *a formal head of state.* 15. *Math.* a. (of a proof) in strict logical form with a justification for every step. b. (of a calculation) correct in form; made with strict justification for every step. —*n.* 16. a dance, ball, or other social occasion that requires formal attire. 17. an evening gown. —*adv.* 18. in formal dress: *We're supposed to go formal.* [1350-1400; ME < L] —**for'mal-ness,** *n.*

**form-al-de-hyde** (fôr mal'də hīd', fer-), *n.* a toxic gas, $CH_2O$, used chiefly in aqueous solution as a disinfectant and preservative. [1870-75; < G *Formaldehyd;* SEE FORMIC ACID, ALDEHYDE]

**for-ma-lin** (fôr'ma lin), *n.* a clear, colorless, aqueous solution of 40 percent formaldehyde. [1893; FORMAL(DEHYDE) + -IN]

**for-mal-ism** (fôr'mə liz'əm), *n.* strict adherence to or observance of prescribed or traditional forms, as in music, poetry, and art. [1830-40] —**for'mal-ist,** *n., adj.* —**for'mal-is'tic,** *adj.* —**for'mal-is'ti-cal-ly,** *adv.*

**for-mal-i-ty** (fôr mal'i tē), *n., pl.* **-ties.** 1. condition or quality of being formal; accordance with required or traditional rules, procedures, etc.; conventionality. 2. rigorously methodical character. 3. strict adherence to established rules and procedures; rigidity. 4. observance of form or ceremony. 5. marked or excessive ceremoniousness. 6. an established order or method of proceeding: *the formalities of judicial process.* 7. a formal act or observance; ritual. 8. something done merely or mainly for form's sake; a requirement of custom or etiquette. [1525-35; < L]

**for-mal-ize** (fôr'mə līz'), *v.t.,* **-ized, -iz-ing.** 1. to make formal, esp. for the sake of official or authorized acceptance: *to formalize an agreement with a legal contract.* 2. to give a definite form or shape to. [1590-1600] —**for'mal-i-za'tion,** *n.* —**for'mal-iz'er,** *n.*

**for'mal log'ic,** *n.* the branch of logic concerned with the principles of deductive reasoning and with the form rather than the content of propositions. [1855-60]

**for-mal-ly** (fôr'mə lē), *adv.* 1. in a formal manner. 2. as regards form; in a *formally correct composition.* [1350-1400]

**for'mal-wear'** (fôr'məl wâr'), *n.* clothing designed for or customarily worn on formal occasions, as tuxedos and evening gowns. [1965-70]

**for-mant** (fôr'mənt), *n.* one of the regions of concentration of energy, prominent on a sound spectrogram, that collectively constitute the frequency spectrum of a speech sound. [1900-05; < G (1894) < L *formans-,* s. of *fōrmāns,* prp. of *fōrmāre* to FORM; see -ANT]

**for-mat** (fôr'mat), *n., v.,* **-mat-ed, -mat-ing.** —*n.* 1. the shape and size of a book as determined by the number of times the original sheet has been folded to form the leaves. Compare DUODECIMO, FOLIO (def. 2), OCTAVO, QUARTO. 2. the general physical appearance of a book, magazine, or newspaper. 3. the organization, plan, style, or type of something. 4. the arrangement of data for computer input or output, as the number of fields in a database record or the margins in a report. 5. the programming featured by a radio or television station: *a talk-show format.* —*v.t.* 6. to plan or provide a format for. 7. a. to set the format of (computer data input or output). b. to prepare (a computer disk) for writing and reading. —*v.t.* 8. to devise a format. [1830-40; < F < G < L (*liber*) *fōrmātus* (a book) formed (in a certain way): F *format,* G *Format*]

**for-mate** (fôr'māt), *n.* a salt or ester of formic acid. [1800-10]

**for-ma-tion** (fôr mā'shən), *n.* 1. the act or process of forming or the state of being formed: *the formation of ice.* 2. the manner in which a thing is formed; disposition of parts; formal structure or arrangement. 3. a. a particular arrangement or disposition of persons, as of troops or players in a game. b. any required assembling of the soldiers of a unit. 4. a. a body of rocks classed as a stratigraphic unit for geologic mapping. Compare MEMBER (def. 8). b. the process of depositing rock or mineral of a particular composition or origin. [1375-1425; late ME < L] —**for-ma'tion-al,** *adj.*

**form-a-tive** (fôr'mə tiv), *adj.* 1. giving form or shape; forming; shaping; fashioning: *a formative process in manufacturing.* 2. pertaining to formation or development: *a child's formative years.* 3. a. capable of or

**PRONUNCIATION KEY:** act, cāpe, dâre, pärt; set, ēven; if, īce; ox, nō, fôr, oil, boŏk, bōōt, out; up, ûrge; child; sing; shoe; thin, that; zh in treasure. ə = a in alone, e in item, i in easily, o in gallop, u in circus; ° in fire (fī°r), hour (ou°r).



# Exhibit 3

US005410423A

# United States Patent [19]

## Furushima et al.

[11] **Patent Number:** 5,410,423

[45] **Date of Patent:** Apr. 25, 1995

[54] **METHOD OF FABRICATING A LIQUID CRYSTAL PANEL USING A DUMMY SEAL WHICH IS CLOSED AFTER HARDENING**

[75] Inventors: **Terahiko Furushima**, Atsugi; **Moriyuki Okamura**, Sagamihara; **Masaru Kamio**, Kawasaki; **Yutaka Genchi**, Atsugi, all of Japan

[73] Assignee: **Canon Kabushiki Kaisha**, Tokyo, Japan

[21] Appl. No.: **19,568**

[22] Filed: **Feb. 18, 1993**

[30] **Foreign Application Priority Data**

Feb. 21, 1992 [JP] Japan ...................... 4-070131

[51] Int. Cl.6 ................................................. G02F 1/13
[52] U.S. Cl. ........................................... 359/80; 359/82; 359/62; 445/24
[58] Field of Search ...................... 359/80, 59, 82, 62; 257/67, 347; 437/62, 90; 445/24, 25

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,255,848 | 3/1981 | Frees et al. | 359/80 |
| 4,806,996 | 2/1989 | Luryi | 257/190 |
| 4,808,983 | 2/1989 | Benjamin et al. | 359/57 |
| 4,875,086 | 10/1989 | Malhi et al. | 257/351 |
| 4,910,165 | 3/1990 | Lee et al. | 257/347 |
| 4,925,805 | 5/1990 | van Ommen et al. | 247/347 |
| 5,206,749 | 4/1993 | Zavrachy et al. | 359/59 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 55-02282 | 1/1980 | Japan . |
| 58-121021 | 7/1983 | Japan . |
| 58-139126 | 8/1983 | Japan . |
| 298219 | 6/1988 | Japan . |
| 63-271226 | 11/1988 | Japan . |
| 03298219 | 12/1988 | Japan . |
| 4338926 | 11/1992 | Japan . |
| 2183073 | 5/1987 | United Kingdom . |

### OTHER PUBLICATIONS

Patent Abstracts of Japan, vol. 6, No. 258 (Dec. 1982) P–163) (1136).
Patent Abstracts of Japan, vol. 9, No. 161 (Jul. 1984) (P370) (1884).
Patent Abstracts of Japan, vol. 13, No. 127 (Dec. 1988) (P–848).

*Primary Examiner*—William L. Sikes
*Assistant Examiner*—Kenneth Parker
*Attorney, Agent, or Firm*—Fitzpatrick, Cella, Harper & Scinto

[57] **ABSTRACT**

In fabricating a liquid crystal panel, preparing a substrate sized larger than the same at a finished state, following to bonding the prepared substrate, an excess peripheral portion of the substrate is cut off. A dummy seal having an opening portion at least in part thereof is formed on the excess portion of the substrate. And, the opening portion of the dummy seal is sealed off to make the dicing after bonding of upper and lower substrates and curing of the seal.

**5 Claims, 2 Drawing Sheets**



# FIG. 1



# FIG. 2

# FIG. 3



# FIG. 4



5,410,423

| 1 | 2 |

# METHOD OF FABRICATING A LIQUID CRYSTAL PANEL USING A DUMMY SEAL WHICH IS CLOSED AFTER HARDENING

## BACKGROUND OF THE INVENTION

### 1. Field of the Industrial Applicability

The present invention relates to a method of fabricating a liquid crystal panel, and more particularly to a method of fabricating a liquid crystal panel which is produced by using a substrate larger in size than a completed panel substrate, and cutting off excess peripheral portions by dicing, after bonding of substrates.

### 2. Related Background Art

Conventional liquid crystal panels of the simple matrix type have been fabricated with a slab chocolate method in which a plurality of panel patterns are formed on a large substrate, and such substrates are then bonded and scribed to divide into individual panels. When using a quartz glass or Si wafer for a TFT substrate of the liquid crystal panel, because the scribe is difficult, a dicing method is adopted in which a disk-like grinding stone is rotated for cutting.

However, the dicing method had a problem that because the liquid crystal inlets of the liquid crystal panels were not yet closed at the time of dicing, the cooling water which was necessary to be flowed therethrough in the dicing process might enter the liquid crystal panels.

Means for resolving such a problem has been disclosed in Japanese Patent Application Laid-open No. 63-298219, in which the invasion of the cooling water into the liquid crystal panels is prevented in such a way that a larger substrate than a completed panel substrate is used to form a dummy seal in the excess peripheral portion of the substrate, and the dicing is performed after curing of the seal.

However, the above-described conventional method had a problem that since in bonding two substrates, the internal air might be enclosed by the dummy seal which was formed in a thickness of two to three times a desired cell gap thickness, the air compressed to half or one-third of its volume by a bonding pressure would expand due to heating for curing the seal, thereby enlarging the cell gap, so that a desired cell gap could not be obtained.

## SUMMARY OF THE INVENTION

To resolve the above-mentioned conventional problems, it is an object of the present invention to provide a method of fabricating a liquid crystal panel in which the invasion of the cooling water into the liquid crystal panel at the time of dicing is prevented, and the enlargement of the cell gap at the time of heat curing the seal is prevented.

It is another object of the present invention to provide a method of fabricating a liquid crystal panel in which a desired cell gap can be stably obtained, whereby an excellent display can be realized.

It is a further object of the present invention to provide a method of fabricating a reliable liquid crystal panel without restrictions on the temperature condition for the heat curing.

It is still another object of the present invention to provide a method of fabricating a liquid crystal panel in which a larger substrate than a finished panel substrate is cut off excess peripheral portions thereof by dicing after bonding of the substrates, characterized in that a dummy seal having an opening portion at least in part thereof is formed on the excess portion of the substrate, and the opening portion of the dummy seal is sealed off to make the dicing after bonding of upper and lower substrates and curing of the seal.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic view showing the state of a substrate before bonding of substrates in the present invention.

FIG. 2 is a schematic view showing one example of a liquid crystal panel after dicing.

FIG. 3 is a schematic view of a substrate before bonding of substrates in the present invention.

FIG. 4 is a schematic view showing the state of a substrate before bonding of substrates in the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The preferred embodiments of the present invention are as follows. That is, a method of fabricating a liquid crystal panel according to the present invention in which a larger substrate than a completed panel substrate is used to cut off excess peripheral portions by dicing after bonding of substrates, is characterized in that a dummy seal having an opening portion at least in part thereof is formed on the excess portion of the substrate, and the opening portion of the dummy seal is sealed off to make the dicing after bonding of upper and lower substrates and curing of the seal.

Since the dummy seal is provided with an opening portion in this invention, a desired cell gap can be obtained without enclosing the air between substrates, whereby a liquid crystal panel which can make excellent display can be fabricated. Further, the variation in the cell gap owing to expansion of the air on heat curing of the sealing material can be prevented. Accordingly, it is possible to fabricate a reliable liquid crystal panel without restrictions on the temperature condition of the heat curing. And since the opening portion of the dummy seal is sealed off before dicing, the invasion of the cooling water into the liquid crystal panel can be prevented.

In the present invention, the material for the dummy seal may be a thermosetting epoxy resin or ultraviolet setting epoxy resin, for example. Specific examples of the thermosetting epoxy resin include XN-21 (trade name) and XN-5A (trade name) made by Mitsui Toatsu Chemical. The thickness of dummy seal is typically in a range from 4 $\mu$m to 20 $\mu$m, and preferably in a range from 4 $\mu$m to 7 $\mu$m to be equivalent to a gap thickness of liquid crystal layer. The width of dummy seal is typically in a range from 0.1 mm to 1.5 mm, and preferably in a range from 0.1 mm to 0.5 mm. The dummy seal is formed as in the following way, for example. That is, a seal is printed in a thickness (e.g., about 10 $\mu$m to 30 $\mu$m) of approximately two to three times the thickness of final seal, and in a print width of about 0.1 mm to 1.5 mm, by seal printing, and then is pressurized and treated with the heat curing to form a dummy seal. In the present invention, the opening portion of the dummy seal is sealed off by an adhesive or epoxy resin.

The present invention will be described below with reference to the drawings.

Embodiment 1

FIG. 1 is an upper view showing a state before bonding of substrates in this embodiment, and FIG. 2 is a

**3**

cross-sectional view of a liquid crystal panel after bicing.

A TFT substrate 1 composed of Si wafer on which the electrodes for driving the liquid crystal are formed and the thin film transistors are fabricated and an opposite substrate 2 composed of a low alkali glass of low thermal expansion (AL made by Asahi Glass) were treated for orientation. On one substrate, seals 3 constituting liquid crystal panels 8 and a dummy seal 4 on peripheral excess portion of the substrate, as shown in FIG. 1, were formed using a sealing material having a spacer mixed for forming a cell gap at good precision.

Two substrates were bonded in a predetermined alignment, pressurized, and heated to cure the seals 3 and the dummy seal 4. Since an opening portion 5 for the outlet of the air was provided on the dummy seal 4, it was possible to prevent the variation in the gap width due to thermal expansion of the air on the heat curing.

Then, the opening portion 5 of outer peripheral seal was sealed off by instantaneous adhesive 6, and diced (half-cut 7) in which the substrate was not completely cut. The provision of the dummy seal 4 can prevent the invasion of the cooling water into the liquid crystal panels 8 at the time of dicing.

After the dicing, the substrate was dried in a drying process to remove water contents therefrom, and divided into individual panels by applying a shearing force. After dividing, liquid crystal was poured into respective panels, and the inlet of the liquid crystal was sealed by sealant. The processes involving this liquid crystal relied on any of the well-known fabrication techniques for liquid crystal display.

The surface opposite to that as formed with TFT of Si substrate is covered with hydrofluoric acid resistant rubber except for immediately below the liquid crystal pixel portion, and Si wafer was partially removed down to insulation layer, using a mixture solution of hydrofluoric acid, acetic acid and nitric acid, whereby light transmission-type liquid crystal image displays could be completed.

Note that Si wafer for use with the TFT substrate 1 was fabricated by the following method.

Anodization was conducted on a P-type (100) monocrystalline Si substrate having a thickness of 300 microns in an HF solution to form a porous Si substrate.

Anodization was performed under the following conditions:

Applied voltage: 2.6 (V)
Current density: 30 (mA·cm⁻²)
Anodizing solution: $HF:H_2O:C_2H_5OH=1:1:1$
Time: 2.4 (hours)
Thickness of porous Si: 300 ($\mu$m)
Porosity: 56 (%)

An Si epitaxial layer with a thickness of 1.0 $\mu$m was grown on the P-type (100) porous Si substrate by low-pressure CVD. Deposition was conducted under the following conditions:

Source gas: $SiH_4$
Carrier gas: $H_2$
Temperature: 850° C.
Pressure: $1 \times 10^{-2}$ Torr
Growth rate: 3.3 nm/sec

Then, a 1,000 Å oxide layer was formed on the surface of this epitaxial layer, and on this oxide surface, another Si substrate having formed a 5,000 Å oxide layer, a 1,000 Å oxide layer and a 1,000 Å nitride layer on its surface was superposed. The whole structure was

**4**

heated at 800° C. in a nitrogen atmosphere for 0.5 hour to firmly join the two substrates to each other.

Thereafter, selective etching was conducted on the bonded substrates in a mixed solution of 49% hydrofluoric acid, alcohol and 30% hydrogen peroxide solution (10:6:50) without stirring. In sixty five minutes, the porous Si substrate was completely removed by selective etching with the monocrystalline Si layer acting as an etch stopper, only the non-porous Si layer being left behind without etching. The etching rate of the non-porous monocrystalline Si in such etching solution was so low that the etching layer reached only a maximum of 50 Å in sixty five minutes, with the selection ratio of the etching rate of the non-porous monocrystalline Si to that of the porous layer being 1:10⁵ or more, so that the amount of non-porous layer which was etched (several tens angstroms) could be ignored in the practical operation. Thus, the 200-micron thick porous Si substrate was removed, with a result that the 1.0 $\mu$m thick monocrystalline Si layer was formed on $SiO_2$. When $SiH_2Cl_2$ was used as the source gas, the growth temperature had to be higher by several tens of degrees. However, high-speed etching characteristic to the porous substrate was maintained.

A field effect transistor was fabricated on the above-mentioned monocrystalline Si thin film and connected to creat complementary elements and its integrated circuit, thereby forming pixel switching elements and a drive circuit necessary for the liquid crystal image display. Note that the method of fabricating each transistor relied on one of the well-known MOS integrated circuit fabrication techniques.

Also, the opposite substrate 2 was fabricated in the following way.

A chromium dioxide film was formed as the black matrix on a low alkali glass substrate of low thermal expansion by sputtering, and shaped into a predetermined pattern by photo-etching. Then, each filter of red, blue and green was formed by pigment dispersing, a top coat layer was provided thereon, and further an ITO layer was formed by sputtering.

Embodiment 2

A liquid crystal panel was fabricated in the same way as in the embodiment 1, except that a bank 9 was provided on the opening portion 5 of the dummy seal 4 as shown in FIG. 3.

Because a sealant for the opening portion 5, even though being low viscous, can be dammed by the bank 9, according to this embodiment, the sealant can be prevented from flowing within the dummy seal 4 owing to surface tension to seal off liquid crystal inlets 10 of individual panels 3. Accordingly, using a dummy seal 4 of this shape, the usable range of viscosity of sealant for the dummy seal 4 can be extended.

Note that the shape of bank is not limited to that as shown in FIG. 3, but a variety of shapes such as " ] " may be used.

Embodiment 3

A polycrystalline silicone was formed on a quartz glass as the TFT substrate, and a field effect transistor was created on the polycrystalline silicone thin film, and connected to creat complementary elements and its integrated circuit, thereby forming pixel switching elements and a drive circuit necessary for the liquid crystal image display.

A chromium dioxide film was first formed as the black matrix on a quartz glass substrate as the opposite substrate by sputtering, and shaped into a predeter-

5,410,423

5

mined pattern by photo-etching. Then, each filter of red, blue and green was formed by a dyeing method, a top coat layer was provided thereon, and further an ITO layer was formed by sputtering. FIG. 4 shows schematically a shape of the dummy seal in this embodiment.

While the quartz glass was of a square shape in this embodiment, it may be formed in the same shape as the wafer.

As above described, since the dummy seal is provided with an opening portion according to the present invention, a desired cell gap can be obtained without enclosing the air between substrates, whereby a liquid crystal panel which can make excellent display can be fabricated. Further, the variation in the cell gap due to expansion of the air on heat curing of the sealant can be prevented. Accordingly, a reliable liquid crystal panel can be fabricated without restrictions on the temperature condition for the heat curing. And since the opening portion of dummy seal is sealed off before dicing, the invasion of the cooling water into the liquid crystal panel can be prevented.

What is claimed is:

**1.** A method of fabricating a liquid crystal panel by bonding TFT substrate, on which plural TFTs are formed with an opposing substrate, and then dividing

6

the substrates into each of display panels, comprising steps of:

forming a dummy seal having an opening at least in part thereof, said dummy seal being located at a peripheral area around at least 2 liquid crystal panels and not being located at the display panel area on at least one of said TFT substrate and the opposing substrate;

bonding said TFT substrate with said opposing substrate;

hardening said dummy seal;

sealing the opening of said hardened dummy seal; and

dividing said substrates into display panels.

**2.** The method of fabricating the liquid crystal panel according to claim **1**, wherein one of the substrates comprises an Si wafer.

**3.** The method of fabricating the liquid crystal panel according to claim **2**, further comprising the step of producing said Si wafer by making porous a monocrystalline Si substrate and thereafter forming an epitaxial layer on said porous substrate layer.

**4.** The method of fabricating the liquid crystal panel according to claim **1**, further comprising the step of selecting an adhesive as a sealant for sealing said opening.

**5.** The method of fabricating a liquid crystal panel according to any of claims **1–4**, wherein said dummy seal is a thermally hardening resin.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  : 5,410,423

DATED       : April 25, 1995

INVENTOR(S) : TERUHIKO FURUSHIMA, ET AL

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

ON TITLE PAGE

In [56] References Cited, under U.S. PATENT DOCUMENTS:
"4,255,848  3/1981  Frees et al." should read
--4,255,848  3/1981  Freer et al.--;
"5,206,749  4/1993  Zavrachy et al." should read
--5,206,749  4/1993  Zavracky et al.--.

In [56] References Cited, under FOREIGN PATENT DOCUMENTS:
"298219  6/1988  Japan" should be deleted;
"03298219  12/1988  Japan" should read
--63-298219  12/1988  Japan--; and
"4338926  11/1992  Japan" should read
--4-338926  11/1992  Japan.--.

Signed and Sealed this

Eighth Day of August, 1995

Attest:

*Bruce Lehman*

**BRUCE LEHMAN**

*Attesting Officer*

*Commissioner of Patents and Trademarks*

# Exhibit 4



*The*

# AMERICAN
# HERITAGE
## *dic•tion•ar•y*

THIRD EDITION

BASED ON THE BESTSELLING
AMERICAN HERITAGE DICTIONARY
OF THE ENGLISH LANGUAGE
THIRD EDITION

• OVER 70,000 ENTRIES •
• THOUSANDS OF NEW WORDS AND MEANINGS •
• OVER 400 PHOTOGRAPHS AND ILLUSTRATIONS •
• EXPERT GUIDANCE ON CORRECT USAGE •

A LAUREL BOOK

Published by
Dell Publishing
a division of
Bantam Doubleday Dell Publishing Group, Inc.
1540 Broadway
New York, New York 10036

If you purchased this book without a cover you should be aware that this book is stolen property. It was reported as "unsold and destroyed" to the publisher and neither the author nor the publisher has received any payment for this "stripped book."

Words are included in this Dictionary on the basis of their usage. Words that are known to have current trademark registrations are shown with an initial capital and are also identified as trademarks. No investigation has been made of common-law trademark rights in any word because such investigation is impracticable. The inclusion of any word in this Dictionary is not, however, an expression of the Publisher's opinion as to whether or not it is subject to proprietary rights. Indeed, no definition in this Dictionary is to be regarded as affecting the validity of any trademark.

American Heritage® and the eagle logo are registered trademarks of Forbes Inc. Their use is pursuant to a license agreement with Forbes Inc.

Copyright © 1994 by Houghton Mifflin Company

All rights reserved. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without the written permission of the Publisher, except where permitted by law. For information address: Houghton Mifflin Company, 222 Berkeley Street, Boston, Massachusetts 02116.

The trademark Laurel® is registered in the U.S. Patent and Trademark Office.

The trademark Dell® is registered in the U.S. Patent and Trademark Office.

ISBN: 0-440-21861-6

Reprinted by arrangement with Houghton Mifflin Company

Printed in the United States of America

Published simultaneously in Canada

10

OPM

**se·quel** (sē′kwəl) *n.* **1.** Something that follows; continuation. **2.** A literary work that continues an earlier narrative. **3.** A consequence. [< Lat. *sequēla.*]

**se·quence** (sē′kwəns, -kwěns′) *n.* **1.** A following of one thing after another; succession. **2.** An order of succession; arrangement. **3.** A related or continuous series. [< Lat. *sequēns,* following.] —**se·quence** *v.* —**se·quen′tial** (sĭ-kwěn′shəl) *adj.* —**se·quen′tial·ly** *adv.*

**se·ques·ter** (sĭ-kwěs′tər) *v.* **1.** To cause to withdraw into seclusion. **2.** To set apart; segregate. See Syns at isolate. **3.** *Law.* To confiscate (property) as security against legal claims. [< Lat., depositary.] —**se′ques·tra′tion** *n.*

**se·quin** (sē′kwĭn) *n.* A small shiny ornamental disk, *esp.* sewn on cloth; spangle. [< Ital. *zecchino,* a Venetian coin.] —**se′quined** *adj.*

**se·quoia** (sĭ-kwoi′ə) *n.* See redwood 1. [After Sequoya.]

**Se·quoy·a** or **Se·quoy·ah** (sĭ-kwoi′ə). 1770?–1843. Cherokee scholar.



Sequoya

**se·ra** (sîr′ə) *n.* A pl. of serum.

**se·ra·glio** (sə-răl′yō, -räl′-) *n., pl.* **-glios. 1.** A harem. **2.** A sultan's palace. [Ital. *serraglio.*]

**se·ra·pe** also **sa·ra·pe** (sə-rä′pē, -rä′pě) *n.* A long blanketlike shawl worn esp. by Mexican men. [Am.Sp. *sarape.*]

**ser·aph** (sĕr′əf) *n., pl.* **-aphim** (-ə-fĭm) or **-aphs.** *Theol.* An angel of the highest order. [< Heb. *śārāp.*] —**se·raph′ic** (sə-răf′ĭk), **se·raph′i·cal** *adj.*

**Serb** (sûrb) *n.* A member of a southern Slavic people that is the principal ethnic group of Serbia.

**Ser·bi·a** (sûr′bē-ə). A region and former kingdom of the Balkan Peninsula. With Montenegro it established a new Yugoslavian nation in Apr. 1992.

**Ser·bi·an** (sûr′bē-ən) *n.* **1.** A native or inhabitant of Serbia. **2.** Serbo-Croatian as used by the Serbs. —**Ser′bi·an** *adj.*

**Ser·bo-Cro·a·tian** (sûr′bō-krō-ā′shən) *n.* **1.** The Slavic language of the Serbs, Croats and other people. **2.** A native speaker of Serbo-Croatian. —**Ser′bo-Cro·a′tian** *adj.*

**sere** also **sear** (sîr) *adj.* Withered; dry. [< OE *sēar.*]

**ser·e·nade** (sĕr′ə-nād′, sĕr′ə-nād′) *n.* A musical performance given to honor or express love for someone. —**v.** -**nad·ed,** -**nad·ing.** To perform a serenade (for). [< Ital. *serenata.*] —**ser′e·nad′er** *n.*

**ser·en·dip·i·ty** (sĕr′ən-dĭp′ĭ-tē) *n.* The faculty of making fortunate discoveries by accident. [After the Persian fairy tale *The Three Princes of Serendip.*] —**ser′en·dip′i·tous** *adj.* —**ser′en·dip′i·tous·ly** *adv.*

**se·rene** (sə-rēn′) *adj.* **1.** Calm and unruffled; tranquil. **2.** Unclouded; fair. [< Lat. *serēnus.*] —**se·rene′ly** *adv.* —**se·rene′ness, se·ren′i·ty** (-rěn′ĭ-tē) *n.*

**serf** (sûrf) *n.* **1.** A member of a feudal class of people in Europe, bound to the land and owned by a lord. **2.** A slave. [< Lat. *servus,* slave.] —**serf′dom** *n.*

**serge** (sûrj) *n.* A twilled cloth of worsted or worsted and wool. [< Lat. *sērica,* silken.]

**ser·geant** (sär′jənt) *n.* **1.** Any of several ranks of noncommissioned officers, as in the U.S. Army. **2.** A police officer ranking next below a captain, lieutenant, or inspector. [< Lat. *serviēns,* public official.]

**sergeant at arms** *n., pl.* **sergeants at arms.** An officer appointed to keep order within an organization, such as a legislature.

**sergeant first class** *n., pl.* **sergeants first class.** A rank in the U.S. Army below master sergeant.

**sergeant major** *n., pl.* **sergeants major** or **sergeant majors. 1.** Any of the highest noncommissioned ranks in the U.S. Army and Marine Corps. **2.** *Chiefly Brit.* A noncommissioned officer of the highest rank.

**se·ri·al** (sîr′ē-əl) *adj.* **1.** Of, forming, or arranged in a series. **2.** Published or produced in installments. —*n.* A work published or produced in installments. —**se′ri·al·i·za′tion** *n.* —**se′ri·al·ize′** *v.* —**se′ri·al·ly** *adv.*

**se·ries** (sîr′ēz) *n., pl.* **series. 1.** A number of objects or events arranged one after the other in succession; set. **2.** A succession of regularly aired radio or television programs. **3.** *Sports.* A number of games played in succession by the same opposing teams. [Lat. *seriēs* < *serere,* join.]

*Usage:* When *series* has the singular sense of "one set," it takes a singular verb, even when followed by *of* and a plural noun: *A series of lectures is scheduled.* When *series* has the plural sense of "one or more sets," it takes a plural verb: *Two series of lectures are scheduled.*

**ser·if** (sĕr′ĭf) *n. Print.* A fine line finishing off the main strokes of a letter. [Perh. < Du. *schreef,* line.]

**se·ri·o·com·ic** (sîr′ē-ō-kŏm′ĭk) *adj.* Both serious and comic.

**se·ri·ous** (sîr′ē-əs) *adj.* **1.** Grave in quality or manner. **2.** Carried out in earnest. **3.** Concerned with important rather than trivial matters. **4.** Causing great concern; critical. [< Llat. *sēriōsus.*] —**se′ri·ous·ly** *adv.* —**se′ri·ous·ness** *n.*

**ser·mon** (sûr′mən) *n.* **1.** A homily delivered as part of a liturgy. **2.** A lengthy and tedious reproof or exhortation. [< Lat. *sermō,* discourse.] —**ser′mon·ize′** *v.* —**ser′mon·iz′er** *n.*

**se·rol·o·gy** (sĭ-rŏl′ə-jē) *n.* The medical study of serum. —**se′ro·log′ic** (sîr′ə-lŏj′ĭk), **se′ro·log′i·cal** *adj.* —**se′ro·log′i·cal·ly** *adv.*

**se·ro·neg·a·tive** (sîr′ō-něg′ə-tĭv) *adj.* Showing a negative reaction to a test on blood serum for a disease, esp. syphilis or AIDS.

**se·ro·pos·i·tive** (sîr′ō-pŏz′ĭ-tĭv) *adj.*