```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE


LG DISPLAY CO., LTD,        )  Volume 3
                           )
        Plaintiff,         )
                           )
v.                         )
                           )
AU OPTRONICS CORPORATION,  )
AU OPTRONICS CORPORATION   )
AMERICA, CHI MEI           )
OPTOELECTRONICS            )
CORPORATION, and CHI MEI   )
OPTOELECTRONICS, USA,      )
INC.,                      )
                           )
        Defendants.        )


                Thursday, June 4, 2009
                9:00 a.m.
                Courtroom 4B


                844 King Street
                Wilmington, Delaware


BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
         United States District Court Judge

APPEARANCES:

         BAYARD
         BY:  RICHARD D. KIRK, ESQ.
         BY:  STEPHEN B. BRAUERMAN, ESQ.

             -and-

         McKENNA, LONG & ALDRIDGE, LLP
         BY:  GASPARE J. BONO, ESQ.
         BY:  CASS W. CHRISTENSON, ESQ.
         BY:  LORA BRZEZYNSKI, ESQ.
         BY:  TYLER GOODWYN, ESQ.

             Counsel for the Plaintiff
```

1    APPEARANCES CONTINUED:

2

3            YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
             BY:  KAREN L. PASCALE, ESQ.
4            BY:  JOHN SHAW, ESQ.

5                    -and-

6            WILSON, SONSINI, GOODRICH & ROSATI
             BY:  RON E. SHULMAN, ESQ. ESQ.
7            BY:  JULIE HOLLOWAY, ESQ.
             BY:  CRAIG TYLER, ESQ.
8            BY:  GREGORY WALLACE, ESQ.

9                Counsel for the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1           THE CLERK:  All rise

2           THE COURT:  Be seated, please.

3     Good morning.

4           Ready to proceed?

5           MR. BONO:  Your Honor, just one

6     housekeeping matter.  With respect to

7     yesterday's testimony, I would also ask that the

8     portion of the deposition designation transcript

9     relating to Mr. Kim's testimony relating to the

10    Seico license be sealed as part of the trial

11    transcript.

12          I think yesterday I only mentioned

13    Hitachi and CPT.  And I would also like that

14    sealed.  Plus, all the exhibits that relate to

15    those agreements in that testimony.

16          THE COURT:  Mr. Tyler, any

17    objection?

18          MR. TYLER:  No objection, Your

19    Honor.

20          THE COURT:  It will be done

21    without objection.

22          MR. TYLER:  May I proceed, Your

23    Honor?

24          THE COURT:  Yes.

1

2      BY MR. TYLER:

3                Q.   Welcome back, Dr. Putnam.

4                A.   Good morning.

5                Q.   So, in your experience, do you

6      believe that this is a complex damages case?

7                A.   Yeah.  I would say that of all the

8      damages case I've worked on, this is probably

9      the most complex.

10               Q.   Why do you say that?

11               A.   Well, in a typical case, you have

12     one or maybe a couple of patents asserted by one

13     party against the other.  But in this case, you

14     have a relatively large number of patents

15     asserted by two competitors against each other.

16               Q.   Is there anything about the type

17     or amount of data that's different in this case?

18               A.   Well, in this case, we have

19     unusually good data on the cross-licensing

20     behavior of the parties, in situations like I

21     described where you have two parties that have

22     claims against each other.

23               Q.   Okay.  The amount of data, does

24     that make -- and type of data does, that make

1    your job harder or easier in this case?

2              A.   Well, it makes your job harder

3    initially because cross licenses are inherently

4    complicated than one-way licenses.  On the other

5    hand, if you use more sophisticated methods, you

6    extract very precise estimates of the damages

7    that we're trying to get to in this case.

8              Q.   Okay.  And we can go to the slides

9    now, and I'd like for you, if you could sort of

10   summarize what our complex problem is here.

11             A.   Yes.  The problem that we're

12   trying to get to at the end of the day is how to

13   value the four patents that AUO has asserted in

14   this case.  But these four patents aren't just

15   sitting in space or in a vacuum.  They're

16   actually located in a particular context of

17   industry and a pair of firms they're negotiating

18   over.

19             Q.   So in solving this problem, what

20   approach did you use?

21             A.   Well, I adopted four principles, I

22   think, that guided my investigation.

23             Q.   What's the first principle?

24             A.   Well, the first principle is you

1      want to - to predict the -- how the parties are

2      going to behave in a hypothetical negotiation

3      with each other.  Then the best indicator of how

4      they will behave is how they behaved in the

5      past.

6                  So the past conduct of the

7      parties, in particular in their cross-licensing

8      negotiations with other competitors in the

9      industry is going to be your best predictor of

10     how they would behave in a cross-license with

11     each other.

12                 So the graphic shows the -- some

13     of the cross-licenses that each of the parties

14     has entered into with other LCD competitors.

15                 Q.   Okay.  What's your other principle

16     here?

17                 A.   The second principle is that you

18     want to analyze all the data.  So what I've done

19     is modified the graph to show that each of the

20     parties brings to the table, not only the past

21     cross-licensing behavior, but also the entire

22     patent portfolio.

23                 So you see each party sort of

24     papered over with hundreds or thousands of

1    patents that are part of the entire portfolio.

2    You want to take those patents into account in

3    determining the portion of the total value that

4    is attributable to the four patents that have

5    been asserted.

6           Q.   And do you have a third principle?

7           A.   Well, in the third principle,

8    again, I've illustrated this in the graphic.

9    The parties have cross claims against one

10   another.

11          So each party is sitting across

12   the table making a claim against the other

13   party.  And so you have a symmetric bargaining

14   situation, which is unusual.

15          And what you want to do is develop

16   a method that takes account of that symmetric

17   bargain situation and treats each party

18   evenhandedly without bias.  So that the method

19   that you apply in determining the value of one

20   party's asserted patents and exactly the same

21   method, you would apply to the other party in

22   determining the value of their asserted patents.

23          Q.   And does this mean you're going to

24   have the same damages number for both sides?

1          A.   No, of course not.  The method is

2     going to be the same, but since the data for

3     each side are going to be different, you're

4     going to end up with different numbers, because

5     they're asserting different patents and accusing

6     different sales.

7          Q.   And what is -- you said the four,

8     what's the fourth principle?

9          A.   The first principle is that each

10    one of the four patents is a part of the whole,

11    so what this means in this case is that the

12    parties typically transact over a whole, meaning

13    an entire patent portfolio and what you want to

14    do is look at the contribution to that whole of

15    the four asserted patents that each side has

16    actually brought to trial.

17              It's sort of like with a pizza,

18    you got a whole pizza and you want to figure out

19    the value of the slices of the pizza, so in this

20    case the price of the whole pizza acts as a

21    ceiling on the price of the individual slices.

22         Q.   Okay.  So in this case, why do you

23    think one should consider all the cross licenses

24    and patent portfolios for solving the damages

1    problem?

2              A.   Well, remember the objective of

3    the exercise of what we're trying to do here is

4    to simulate the outcome of a hypothetical

5    negotiation between the parties.  The way the

6    parties have actually behaved in the past is

7    that they negotiate licenses with other members

8    of the industry over their entire patent

9    portfolios.  So if you want to figure out how

10   they're going to negotiate with each other in a

11   hypothetical negotiation, then based on the

12   first principle you should look at the way

13   they've actually negotiated with each other in

14   their past licensing -- not with each other, but

15   with other similar firms with past licensing

16   conduct.

17             Q.   Could you give us an overview of

18   the method you're going to use to solve the

19   problem given these principles?

20             A.   Sure.

21             The basic approach is going to be

22   what I have called an industry price method of

23   asserting -- of valuing individual patents.  And

24   what this means is that we're going to first of

1    all figure out the average price at which firms

2    transact their entire patent portfolios, and

3    then break that down so that we can figure out

4    the particular price that should be charged for

5    the individual asserted patents.

6            Q.   And can you explain the steps of

7    your method?

8            A.   Yes.  It's basically a three-step

9    process and I think the next slide shows this.

10   The first step is that we want to recognize the

11   data that we observe is a cross license

12   balancing payment.  And so in each of the cross

13   licenses that we find in the industry, one of

14   the parties makes a payment to the other party.

15   Now, it's represented on the screen by a green

16   circle.  But a green circle is -- green is not a

17   primary color, it's really a mixture of two

18   primary colors, yellow and blue.

19            So what I have shown is in a

20   balancing payment that's really the net of

21   claims that each party has made against the

22   other, so firm A makes a claim against firm B,

23   that's the yellow circle, firm B makes a claim

24   against the firm A, that's the blue circle, and

1    when you mix the circles together you get the

2    balancing payment or the net payment that the

3    weaker party pays to the stronger party.

4           Q.   The industry data that you

5    mentioned are -- what data do you have that

6    you're going to look at?

7           A.   So for each of the agreements in

8    the industry we have the green circle, which is

9    the amount that in that transaction one party

10   paid to the other, so we have a total of eight

11   cross license transactions and they involve all

12   of the major competitors in the industry.  LG

13   has a license with NEC, AUO has a license with

14   Sharp and so forth.  And so we're going to take

15   all those -- we're going to use the balancing

16   payments that we observe in these agreements to

17   make a prediction and I think this next slide

18   actually shows that.

19          Q.   How are you going to make this

20   prediction?

21          A.   Well, the prediction -- just to be

22   clear, the prediction we want to make is the

23   balancing payment in the hypothetical

24   negotiation between AUO and LG.  What we're go

1    to do is use a statistical technique called

2    regression analysis which is going to summarize

3    all of the data and determine the rate at which

4    given the particular characteristics of these

5    parties they would exchange their -- the terms

6    on which they would exchange their portfolios

7    and what the size of their balancing payment

8    would be.

9           Q.   Is there another way you could

10    have done this instead of using the regression?

11           A.   I could have taken one of the

12    cross license agreements at random and sort of

13    eyeballed it and said well, I think this

14    particular agreement is the most comparable and

15    so that's why I think it should be imputed to

16    the parties in a hypothetical negotiation, but

17    that -- I was going to say that that's -- you

18    know, as an economist what I'm trying to do is

19    to summarize all the data and determine, you

20    know, sort of the behavior of the parties in all

21    of their agreements and not favor one agreement

22    over the other.

23           Q.   So what are you going to do with

24    this prediction?

1        A.   Well, that's the first step of the

2   process.  So I think the next slide shows that

3   we're going to assume that we have got that

4   prediction for the balancing payment that would

5   exist between the parties so we have the green

6   circle for AUO and LG.

7        Q.   This would be a hypothetical

8   negotiation over hundreds or thousands of

9   patents?

10       A.   Yes, exactly.  That's the exchange

11   of the entire worldwide rights to both parties'

12   patent portfolios.

13       Q.   Okay.

14       A.   And then what we want to do is

15   decompose that, we want to sort of extract from

16   that process.  We know that the green circle is

17   really the combination of a yellow circle and a

18   blue circle, the yellow circle being AUO's claim

19   against LG, the blue being LG's claim against

20   AUO.

21            And for the purposes of this part

22   of the trial we want to focus on the yellow

23   circle, which is AUO's claim against LG.

24       Q.   This is the second step?

1          A.   Yes.  And again, the regression

2     analysis, because of the way I have formulated

3     the model, the regression analysis is actually

4     going to allow you decompress the predicted

5     balancing payment into the two constituent

6     parts.

7          Q.   What's your third step?

8          A.   The third step now that we have

9     AUO's aggregate claim against LG for the

10    hundreds or thousands of patents that it's

11    asserting, what we want to do is narrow that

12    down to the contribution of that, to that claim

13    of the four patents that it's actually asserted

14    in this trial.  And we're going to use a method

15    that I call count, rank and divide to try to

16    figure out how to distribute that pie so that

17    each patent gets its appropriate share.

18          Q.   I'm going to jump right in and see

19    how you use this method to solve the problem

20    here.  Where do you begin, what's the first

21    step?

22          A.   Well, the parties have already

23    agreed that this is not a lost profits case, so

24    we start with using a reasonable royalty.

1          Q.   And how do you calculate a

2     reasonable royalty?

3          A.   A reasonable royalty is what

4     emerges from a negotiation between a willing

5     licensor and a willing licensee.

6          Q.   And what do you mean by that,

7     willing licensor, willing licensee?

8          A.   A willing licensor is somebody who

9     knows that they have to license their patent,

10     and a willing licensee is somebody who knows

11     that the patent is valid and infringed and

12     recognizes that they have to buy the rights to

13     the patent, and so then the only question is

14     what's the price at which the rights to the

15     patent or patents in this case are exchanged.

16          Q.   And should that allow the willing

17     licensor and willing licensee to make a profit

18     in your understanding?

19          A.   Yes, each side should be able to

20     make a profit as a result of that exchange.

21          Q.   Does the law, based on your

22     understanding, provide a framework for how you

23     would construct, find what the willing licensee

24     and willing licensor would pay?

1          A.   Yes.  The standard framework

2    that's used for reasonable royalty is called the

3    Georgia-Pacific factors.

4          Q.   Did you consider those in this

5    case?

6          A.   Yes, I did.

7          Q.   Let's walk through how you did

8    your analysis on the Georgia-Pacific factors.

9    If we go to the next slide.

10         A.   Sure.

11         Q.   Can you explain what this shows?

12         A.   Yes.  Well, there are fifteen

13   Georgia-Pacific factors.  And the way they're

14   listed in this case is actually in kind of a

15   semi-random order, so I find it convenient to

16   regroup the factors so that you consider similar

17   factors all at the same time with related data.

18   So I have listed them here.

19              The first is the actual licensing

20   conduct of the parties.  Secondly, information

21   on the profits.  Third, the commercial

22   advantages of the technology.  And finally, the

23   parties' commercial relationship and their

24   bargaining position.

1          Q.   Do all fifteen of the

2     Georgia-Pacific factors fall within your four

3     groupings?

4          A.   Yes, that's right.

5          Q.   Do you view in this case any one

6     of these groupings as more important than the

7     others?

8          A.   In this case given the data and

9     the conduct of the parties, I would say that the

10    first group is the most important.  Again, what

11    we're trying to do is simulate the outcome of a

12    hypothetical negotiation.  And what we have good

13    information on is how each of these parties has

14    negotiated with other competitors in the past.

15          So in the first factor, for

16    example, which is the rates, or the first two

17    factors, the rates paid and received by the

18    parties, the court, or the law looks in

19    particularly to whether there is an established

20    royalty and when looking at an established

21    royalty it determines something for consistency

22    of behavior.  Here we're looking again for

23    consistency of behavior.

24          Q.   When you said established royalty,

1      do you believe that there is an established

2      royalty in this case?

3              A.   No, because an established royalty

4      typically refers to the rate that is charged for

5      a particular patent.  The parties don't license

6      any of the asserted patents on an individual

7      basis so there is no license you can point to

8      which says here is the price of the individual

9      patent.  But what the law does look for is

10     consistency, as I said.  And so what you're

11     looking for is consistency of behavior.  And in

12     this case, they consistently license their

13     portfolios at a very predictable rate

14              Q.   Why do you care about consistency

15     of behavior from the past licensing?

16              A.   Well, if you go back to our first

17     principle, the best way to figure out what the

18     party will do in a hypothetical situation is to

19     look at what they have done in similar past

20     situations.  And so, if you can -- if you are --

21     if you can understand -- if their past behavior

22     is consistent, then you are more likely to be

23     able to predict what they've done, what they

24     will do in the hypothetical situation.

1          Q.   Okay.  So the consistency of

2     behavior will set the stage for the hypothetical

3     negotiation?

4          A.   Yes, that's exactly right.

5          Q.   What evidence did you consider in

6     this case regarding the parties' past licensing

7     conduct?

8          A.   Well, we looked at -- there's a

9     very large number of licenses that were

10    produced.  I and my team went to look at more

11    than 70 industry licenses, both within the

12    industry between the LCD competitors and also

13    between an LCD competitor, and somebody outside

14    the industry.

15              And we focused, in particular, on

16    the eight cross-licenses that are observed

17    between competitors, because that's the closest

18    analog to the hypothetical negotiation that we

19    have.

20         Q.   Okay.  And did your review of

21    licenses include the AUO licenses that Ms. Chen

22    testified about on the first day of trial?

23         A.   Yes.

24         Q.   Did you prepare summaries in this

1    case for your review of licenses?

2              A.   Yes.

3              Q.   Okay.  Can we go to AUO 267,

4    please.

5                   And what is -- is this one of your

6    summaries?

7              A.   That's right.

8              Q.   What does this summary show?

9              A.   This summary shows -- and again,

10   the first column has been redacted, because

11   that's got the names of the licensor, or I

12   should say the other party to the agreement.

13   These are AUO across licenses.

14                  And so we've redacted the names of

15   the other party.  But as you go down the list,

16   you see who is -- who the parties are to the

17   cross-license, the date of the license, the --

18   perhaps most importantly the payments that were

19   made in the license.

20                  And then on the right-hand side,

21   you have a description of the patents that were

22   transacted.  And there are typically portfolios

23   on each side.

24              Q.   Okay.  And did you rely on the

1    summary in forming your opinions in the case?

2            A.   Yes.

3                 MR. TYLER:  Your Honor, we'd move

4    for admission of AUO 267 at this time.  And,

5    again, as I mentioned yesterday what will be

6    submitted in the record is unredacted.

7                 MR. CHRISTENSON:  We'll preserve

8    our objection, Your Honor.

9    BY MR. TYLER:

10           Q.   And did you do a similar summary

11   for LGD'S licenses?

12           A.   Yes, I did.

13           Q.   Can we turn to AUO 268, please?

14                Will you tell us what this is?

15           A.   Well, this is the analogous

16   summary for LGD.  So it's got exactly the same

17   information, but with LGD's licensing partners

18   instead.

19           Q.   Okay.  And did you rely on this in

20   forming your opinions in the case?

21           A.   Yes, I did.

22                MR. TYLER:  At this time, we'd

23   move for admission of AUO 268, Your Honor.

24                MR. CHRISTENSON:  Your Honor,

 1    we'll preserve our objection.  If I may, I'd

 2    just like to have a standing reservation of

 3    objections regarding each of the exhibits

 4    offered into evidence from Dr. Putnam's report.

 5             THE COURT:  When you say you want

 6    to maintain or continue your objection, towards

 7    the redaction?

 8             MR. CHRISTENSON:  No, Your Honor.

 9    It's an objection.  As I understand, Mr. Tyler

10    is offering it into evidence, each of the

11    exhibits that Dr. Putnam has from his report.

12    There are going to be, I think, several

13    exhibits.

14             And rather than continuing to

15    interrupt and object to each one individually, I

16    would just like to preserve our objections

17    regarding each of the exhibits offered in today.

18             THE COURT:  Because it's -- this

19    ultimately goes toward your initial objection of

20    methodology?

21             MR. CHRISTENSON:  Yes, Your Honor.

22    That's correct.

23             THE COURT:  Just so the record is

24    clear, it's not redaction.  I think you're both

1    kind of in some compromising position.

2                    So I'll -- so I'll admit it

3    subject to that methodology objection.

4                    MR. TYLER:  Okay.  Thank you, Your

5    Honor.

6    BY MR. TYLER:

7              Q.    So let me now turn your attention

8    to AUO 269.  And did you also summarize AUO and

9    LGD's in licenses in this case?

10             A.    Yes.  As I mentioned, it's

11   important to analyze all the data.

12                    So in addition to the

13   cross-licenses, we also looked at each parties

14   one-way licenses.  A one-way license is when the

15   firm is either licensing in technology of

16   another firm or licensing out its own

17   technology.

18                    And so Exhibit 269 shows the same

19   information for AUO for all of its in licenses.

20   And again, the party from whom it's licensing

21   technology has been redacted.

22                    But we have the title and

23   financial terms of the agreement summarized

24   here.

```
 1              Q.   And did you rely on this in

 2        forming your opinions?

 3              A.   Yes.

 4                   MR. TYLER:  I'd move for admission

 5        of AUO 269.

 6                   THE COURT:  It's admitted.

 7        BY MR. TYLER:

 8              Q.   Let's go to AUO 270, please.  And

 9        is this the same thing for LGD?

10              A.   Yes.  It is symmetric for LGD,

11        exactly the same information with the partners

12        redacted.

13              Q.   And this is their in and out

14        licenses?

15              A.   In and out licenses, relative,

16        that's right.

17              Q.   So not cross licenses?

18              A.   No the -- not cross licenses, only

19        one-way licenses.

20              Q.   And did you rely on this summary

21        in forming your opinions as well?

22              A.   Yes, I did.

23                   MR. TYLER:  We'd move for the

24        admission of AUO 270.
```

1           Your Honor, we move for admission

2     of AUO 270.

3           THE COURT:  It's admitted.

4           MR. TYLER:  I am sorry.  I didn't

5     hear you.

6  BY MR. TYLER:

7           Q.  And I'd like to now put up the

8     license summary.  This is a demonstrative.

9           And, Dr. Putnam, did you prepare a

10    summary of LGD's licenses in this case?  And

11    this is the cross licenses and all the licenses

12    we've seen so far, but with their trial exhibit

13    numbers on them.

14           A.  Yes.  There's three categories of

15    agreements here.

16           There's the LG cross-licenses.

17    There are one-way licenses, and also their

18    purchasing agreements of various patents and

19    patent portfolios.

20           MR. TYLER:  Okay.  And, Your

21    Honor, we had premarked this.  It's a summary

22    for his testimony as AUO 1563.

23           And we would move for admission of

24    the summary as well as underlying exhibits based

1    on their trial exhibit numbers.

2                    THE COURT:  All right.  It's

3    admitted.

4    BY MR. TYLER:

5                    Q.  All right.  Dr. Putnam, those were

6    quite a lot of licenses.  And you mentioned

7    earlier you're looking for consistency of

8    behavior.

9                    Did you find it?

10                   A.  Yes, I did.

11                   Q.  What consistency did you find

12   among the licenses?

13                   A.  Well, the basic pattern that you

14   observe in all these licenses is the parties

15   negotiate a worldwide portfolio license with a

16   lump sum balancing payment from the weaker party

17   to the stronger party for a fixed number of

18   years, or sometimes the life of the patents.

19   Typically five years or, as I said, the life of

20   the patents.

21                   Q.  And the cross-licenses you

22   observed that within the competitors -- or there

23   are a lot of one-way licenses up there, too;

24   right?

1              A.   Yes, that's right.

2              Q.   So the cross-licenses, you

3      observed in which category?

4              A.   Well, the cross-licenses are much

5      more commonly found between competitors in the

6      LCD industry.  And we actually tested for that

7      to determine statistically whether it's more

8      likely that a firm cross licenses within the

9      industry.

10                  And the answer is that

11     statistically speaking, it is much more likely

12     that you would cross-license.

13             Q.   And did you prepare a summary

14     where we can see that?

15             A.   Yes.

16             Q.   Let's go to AUO 266, please.

17             A.   Yeah.

18             Q.   Can you tell us what this is?

19             A.   I got ahead of myself.  What we've

20     got here is the -- either -- these are a summary

21     of licenses within the LCD industry.  And,

22     again, we've redacted the names of the other

23     competitors.

24                  What I've shown here is the firms'

1    market share and their current size of their

2    current patent portfolio.  And then the table is

3    divided into LCD manufacturers and then licenses

4    with other firms.

5              And so the bottom line of all this

6    is that of the -- among the LCD manufacturers,

7    19 of the 24 licenses that you observe are

8    cross-licenses.  Whereas when firms are

9    licensing out of the industry, only 16 out of

10   the 49 licenses are cross-licenses.

11             And so a statistical test tells us

12   that it's much more likely that within the

13   industry, a firm is going to cross-license.

14

15

16

17

18

19

20        Q.   Did you rely on this summary in

21   forming your opinions?

22        A.   I did.

23             MR. TYLER:  And at this time, we

24   would ask for move to admit 266 in evidence.

```
1                    THE COURT:  It's admitted.

2    BY MR. TYLER:

3            Q.  So what, if anything, does a

4    consistency that you found in the licensing data

5    tell you about the hypothetical negotiation

6    between AUO and LGD?

7            A.  Well, again, this provides a

8    framework for the hypothetical behavior in

9    negotiation.  Under the first principle, if you

10   know what the parties have done in the past,

11   then you are better able to predict what they

12   would do in a hypothetical negotiation.  In the

13   agreements that we are looking at, seven of the

14   eight agreements are agreements that involve

15   either AUO or LGD.

16           So we can be pretty confident that

17   if those agreements are consistent, then the

18   parties would behave with one another

19   consistently with their past behavior.

20           Q.  And besides licenses, did you have

21   any other evidence or proof that would show us

22   that LGD and AUO would act in this way?

23           A.  Well, of course, I also looked at

24   testimony of the corporate representatives on
```

1    licensing and what they had to say about their

2    licensing policies.

3           Q.   And did you prepare a summary of

4    some of that testimony?

5           A.   Yes, I did.

6           Q.   Can we turn to AUO 273, please.

7                It's a lot of information here,

8    but can you tell us what's in this exhibit?

9           A.   Yeah.  It's a little hard to read,

10   but what I did was examine the testimony of each

11   of the corporate representatives in various

12   dimensions to characterize how they viewed

13   licensing according to whether they would, you

14   know, do a one-way license or a cross-license,

15   the type of payment that they would exchange

16   between themselves and their competitors and so

17   forth.

18                And then I gave sample quotations

19   from their deposition testimony.

20          Q.   The second to -- I guess second

21   from the right column is for Joo Sup Kim.  Who

22   is that?

23          A.   Mr. Kim is LGD's vice president

24   and corporate representative designated to

1        testify about licensing matters.

2                 Q.   And Ms. Chen on the right

3        column, she's the one who testified for AUO?

4                 A.   Yes.  We heard from her on the

5        first day of the trial.

6                 Q.   You prepared this summary?

7                 A.   Yes, I did.

8                 Q.   And did you rely on it in forming

9        your opinions?

10                A.   I did.

11                     MR. TYLER:   I move to admit AUO

12       273, Your Honor.

13                     THE COURT:   It's admitted.

14       BY MR. TYLER:

15                Q.   And what did these representatives

16       say about balancing payments?

17

18

19

20

21

22

23

24

1

2

3

4          Q.   Okay.  Now, did you cross -- I

5     mean, did you chart the cross-licensing

6     balancing payments that you observed in this

7     case?

8          A.   Yes, I did.

9          Q.   Can we go to the next slide?

10          And what does this slide show?

11          A.   Well, here we have -- now we're

12     getting down to the actual data.  These are the

13     eight licenses that I mentioned, these are the

14     balancing payments that are observed in those

15     licenses the parties actually agreed to pay

16     expressed in US dollars, and the present value

17     of US dollars at the time that the license was

18     executed.

19          Q.   Okay.  So does each of these

20     represent a separate cross license in the

21     industry?

22

23

24

1

2

3

4

5

6          Q.   So it looks like there is a fair

7     amount of variation here.  How are you going to

8     use this to predict what might happen between

9     AUO and LGD?

10          A.   Well, remember the first step of

11    the process, it's a three-step process and the

12    first step is to simply predict the balancing

13    payment that would emerge from a cross license

14    between LGD and AUO.  So what you want to do is

15    take the characteristics of each of the parties

16    and then try to predict the balancing payment.

17          Q.   Could you do that through

18    analyzing whether one of these was comparable?

19          A.   Well, again, one method of doing

20    this would be to take an agreement and sort of

21    eyeball it and say this is the agreement that I

22    think is most comparable, so I'm going to assign

23    that agreement to the parties.

24               But as an economist what I am

1    trained to do is to say let's use all the data,

2    let's take as inputs the characteristics of the

3    parties that they brought to these negotiations

4    and let's see if we can use these

5    characteristics to predict how they actually

6    behaved in the negotiation and what would

7    emerge, what would emerge from it as a final

8    balancing payment.

9          Q.   Do you have any tools to help you

10   with that?

11         A.   Yes.  Well, that's where the

12   regression analysis comes in.  A regression is

13   simply a way of taking a mathematical equation

14   and fitting it so that it produces the most

15   precise prediction of the behavior that you

16   actually observe.  What you do is -- what you

17   want to do in this case is take as inputs the

18   characteristics of the parties and then as an

19   output, you want to predict how they behaved or

20   their -- the net of how they behaved, which is

21   their balancing payment.

22         Q.   How in the world would you know

23   what inputs to use, there is a lot of

24   characteristics to these companies?

1          A.   Sure.  But I think Georgia-Pacific

2     organizes the data for us.  So what we're going

3     to be concerned with primarily is what the

4     strengths of the parties bargaining positions as

5     they come to the table and that's reflected, for

6     example, in the fourth group of Georgia-Pacific

7     factors that I identified earlier, the parties

8     commercial relationship, and the size of their

9     patent portfolio.

10          Q.   In your work, did you prepare a

11     summary of the raw data that you used as inputs

12     to construct a regression?

13          A.   Yes, I did.

14          Q.   Can we go to AUO 274.

15          What does this show us?

16          A.   This is actually quite a useful

17     slide.  Again, we have on the left hand --

18          Q.   Take that down please.  There was

19     one column that was not redacted.  It listed the

20     individual paying parties, so if you don't mind,

21     go ahead and tell us what that exhibit showed in

22     the abstract.  We'll just go ahead and put it in

23     the record, go ahead and explain what it showed?

24          A.   Sure.  Okay.  All right.  So as I

1      said, the problem conceptually is to take the

2      parties' characteristics and to predict what

3      they would do in the negotiation.  And so what

4      this table summarized is for each one of the

5      licenses, the parties' patent portfolio, the

6      size of the patent portfolio at the time of the

7      license which reflects their bargaining power

8      and the sales of the exposed sales of the other

9      party that their patent portfolio is being aimed

10     at.

11             So if you think of this as being

12     to use one metaphor as being arrows in a quiver,

13     so two parties are negotiating with each other,

14     what's going to emerge from the negotiation is

15     is determined by the number of arrows in my

16     quiver, which is the size of my patent

17     portfolio, and the size of the target that the

18     other party represents, which is the exposure of

19     its sales.  The more it sells, the bigger the

20     target is.

21             So I guess we resolved our

22     technical difficulties.

23             So, but...

24        Q.   What does this -- so the second to

1       right-hand column, are those the actual payments

2       that were made that we charted?

3               A.   Yes, that's the output.  So the

4       middle two columns are the number of patents and

5       the sales, that's the inputs.  And then the next

6       to the last column is the output, which is what

7       the weaker party actually paid to the stronger

8       party.  That's a real number in this

9       negotiation.

10              Q.   Okay.  And on the far column, what

11      is that, effective royalty?

12              A.   That's the effective royalty rate.

13      So in these agreements, what's actually

14      happening is that one party is writing a check

15      to the other party for a fixed amount of money.

16      If you want to compare that to a running royalty

17      rate, the way that you would do that is to

18      divide that number by the expected sales so you

19      would get a rate for dollar of sales, that's

20      what an effective royalty rate is.

21              Q.   Did you notice anything about the

22      range of rates here?

23

24

1

2

3

4

5

6

7

8

9          Q.   Just to be clear, we're talking

10   about --

11               THE COURT:  Do you have an

12   unredacted hard copy of this?

13               MR. TYLER:  Yes, we do.  And it's

14   in the binder as Exhibit 274, if you have the

15   big binder.  This is actually -- these are

16   actually exhibits.

17               THE COURT:  Right.  But I'm --

18   could you show the clerk where it is and she can

19   pull it out for me.

20               MR. TYLER:  May I approach, Your

21   Honor, and hand these up?

22               THE COURT:  Sure.

23               (Discussion off the record.)

24               MR. TYLER:  May I proceed, Your

1    Honor?

2                    THE COURT:  Yes.

3    BY MR. TYLER:

4        Q.  So this is the real data, right,

5    because we're talking about constructing a model

6    but these are the payments that were actually

7    made?

8        A.  Yes.  Before you constructed the

9    model or done any analysis or anything like

10   that, this is what you're actually looking at in

11   terms of what happened and what you're trying to

12   explain.

13       Q.  And these are for entire patent

14   portfolios of hundreds of patents; is that

15   correct?

16       A.  Yes.

17       Q.  And did this -- did this range of

18   rates have any, any relevance to your problem of

19   determining what a royalty would be on an

20   individual patent?

21       A.  Well, yes it does.  Remember under

22   the fourth principle, the fourth principle is

23   that the asserted patents in this case are parts

24   of a whole, and so in the same way that -- just

1    the way a slice of a pizza is part of an entire

2    pizza.

3                So in effect what you have on the

4    right-hand side is the price of the entire pizza

5    expressed as an effective royalty rate, so the

6    rates that you would charge for individual

7    patents are necessarily capped by those rates,

8    so there is a ceiling for the price you would

9    pay for an individual patent or an individual

10   slice of pizza.

11              Q.   And did you prepare this summary?

12              A.   Yes, I did.

13              Q.   And did you rely on it in forming

14   your opinions?

15              A.   Yes, I did.

16              MR. TYLER:  Your Honor, at this

17   time we move for admission of AUO 274.

18              THE COURT:  It's admitted.

19   BY MR. TYLER:

20              Q.   So you have these inputs of

21   strength and exposed sales, and this is all

22   their sales; correct, exposed sales?

23              A.   Worldwide sales, yes, that's

24   right.

1          Q.   Did you have any other inputs

2     besides these two?

3          A.   Well, what we wanted, our first

4     objective is to explain what happens on average

5     when the parties transact their portfolios.  But

6     we're particularly concerned in this case that

7     we're insuring that we predict the behavior of

8     the two parties, you know, the two claimants in

9     this litigation accurately.

10              So you can imagine that in each

11    one of these negotiations, parties might behave

12    systematically different from each other.  So,

13    for example, one party might have a

14    systematically stronger patent portfolio and

15    that would cause it to pay less in a negotiation

16    or to receive more.  Or another party might be

17    an especially good bargainer so that would cause

18    it to pay less in a negotiation.

19              So we're looking for systematic

20    factors that follow the parties around from

21    negotiation to negotiation.  And an economist

22    calls those fixed effects.

23              So what I have done as part of the

24    model is to estimate a fixed effect, one for LG

1     and one for AUO, so as part of predicting how

2     they actually behave in these negotiation.

3                Also, I assume that there is this

4     constant that follows the party from negotiation

5     to negotiation and you actually estimate the

6     value that you attach to each party in

7     predicting its balancing payment.

24               Q.   So I thought you were here on

1    behalf of AUO?

2              A.   Well, I am, but the data say what

3    they do, and you have to just go with what they

4    say.  And that's the implication of the fixed

5    effects for the two parties.

6              Q.   So we talked about your inputs,

7    and I want to move now to see what happens when

8    you push the button on your regression analysis?

9              A.   Sure.

10             Q.   If we go to the next slide.  What

11   does this new line show?

12             A.   So what I have done here is just

13   overlay on to the actual data the results of the

14   model.  And the green line shows how the model

15   predicts the balancing payment that would emerge

16   in each one of these negotiations based on the

17   characteristics of the party that it brings to

18   the negotiation, including for each of the

19   parties here, the fixed effect that they write

20   to that negotiation.

21             Q.   Do you have a summary of your

22   inputs and outputs that made this chart?

23             A.   Yes.

24             Q.   Can we go to AUO 277, please.  We

1    have redactions there.

2              So what is this summary?

3         A.   Well, this is the actual data that

4    the input data set and at the end of the day in

5    the far right-hand column, the output which is

6    the payment that's predicted.  So you can

7    contrast the predicted payment in the far

8    right-hand column with the actual payment that

9    we observed in the data which is the fourth

10   column from the right.

11        Q.   And so the farthest column is the

12   predicted payment?

13        A.   Yes, that's right.

14        Q.   And does this chart, did you

15   prepare this chart?

16        A.   I did.

17        Q.   And did you rely on it in forming

18   your opinions?

19        A.   I did.

20             MR. TYLER:  I move for admission

21   of AUO 277, Your Honor.

22             THE COURT:  It's admitted.

23   BY MR. TYLER:

24        Q.   So your inputs to your model were

1    the patent portfolio strength, exposed sales,

2    fixed effects.  Do those relate to any

3    Georgia-Pacific factors?

4         A.  Yes.  Well, as I mentioned, in the

5    fourth group of factors you got the commercial

6    relationship between the parties which is --

7         Q.  Can we go to slide 21.

8         A.  They're obviously competitors, and

9    remember under the third principle that we want

10   to treat them symmetrically because they operate

11   relatively similar positions in the industry.

12   And then under Factor 15 you're looking at the

13   outcome of a hypothetical negotiation which is

14   determined in part by the bargaining strength of

15   the party or the bargaining power it has and

16   that is determined by the size of portfolio it

17   brings to the negotiation.

18        Q.  Did you do any tests to verify the

19   accuracy of your model?

20        A.  I did.

21        Q.  What did you do?

22        A.  Well, the standard -- in a

23   regression context, the standard measure of

24   accuracy is something called goodness of fit.

1    And the statistic for that is something called

2    adjusted R squared, what statisticians call

3    this, and an adjusted R squared is a number that

4    represents on a scale of zero to one or from

5    zero percent to a hundred percent the amount of

6    variation in the variable that you're trying to

7    explain that you actually are able to explain

8    using the model, so the most you can explain is

9    a hundred percent, the least you can explain is

10   nothing.

11           In this case the adjusted R

12   squared for my model is .92, or about 92

13   percent, which means that I explain all but

14   about eight percent of the variation that we

15   observe in industry balancing payments.

16           Q.   And did you prepare a summary of

17   this analysis, your regression?

18           A.   Yes.

19           Q.   Can we go to AUO 276, please.

20                And what does this provide us?

21           A.   This is just basically a copy of

22   the computer output.  It gives the coefficients

23   that are estimated under the regression which

24   gives the industry average royalty rate, the

1    fixed effects for the parties and then as you

2    can see the second to the last line it says

3    adjusted R squared of .916, or about 92 percent.

4              Q.   Did you rely on this in forming

5    your opinions?

6              A.   Yes, I did.

7              MR. TYLER:  Move for admission of

8    AUO 276.

9              THE COURT:  It's admitted.

10   BY MR. TYLER:

11             Q.   Dr. Putnam, you got R squared up

12   here and talk about regression.  How can someone

13   without a Ph.D. in economics know that your

14   model is reliable?

15             A.   Well, in addition to the fact that

16   it actually predicts the real world data

17   relatively accurately, I think if you sort of

18   think about the intuition of this, going back to

19   the arrow metaphor, you got a certain number of

20   arrows in your quiver that each side is aiming

21   at the other across the table, and each side

22   represents a target to the other side based on

23   the size of its sales.

24             And so roughly speaking, the

1    bargaining power that each party brings to the

2    table is a function of how many arrows it's got

3    and how big a target the other side is to it.

4    And the more arrows you got and the bigger the

5    other side's target, the better you're going to

6    do in that negotiation and either the less you

7    will pay or the more the other side will pay to

8    you.

9           Q.   So how are we going to use your

10   model in this case?

11          A.   Well, the first thing, the first

12   of our three steps is to actually predict a

13   balancing payment between AUO and LG when they

14   sit down with each other based on their

15   characteristics.

16          Q.   And did you do that in this case?

17          A.   Yes, I think there is a slide.

18

19

20

21

22

23

24

1

2

3

4

5

6

7          Q.   Okay.  So did you do this for

8    multiple time periods?

9          A.   Yes.  Obviously the parties'

10   characteristics are changing in the sense that

11   their patent portfolios are growing over time

12   and the exposed sales of the other party are

13   growing over time.  This is taken from 2004.

14         Q.   Why did you do that in 2004?

15         A.   Because two of AUO's patents, the

16   '629 and the '160 patents, the infringement of

17   those patents began according to AUO in 2004.

18         Q.   And for the other two patents in

19   the case, the '506 and the '157, when did you do

20   the analysis for those patents?

21         A.   2006.

22         Q.   Did you prepare a summary of the

23   different time periods of your analysis?

24         A.   Yes, I did.

1          Q.   Can we go to Exhibit 275, please.

2     And 275 shows what?

3          A.   Well, here we have overzealous

4     redactions because we have actually redacted the

5     parties to this case.

6          Q.   Okay.  Sorry.

7          A.   So the point of this exhibit is

8     that it shows for each of five hypothetical

9     negotiation dates, all between AUO and LGD, the

10    balancing payment that in this case AUO would

11    pay to LGD as of that date as well as the

12    individual claims that each party would make

13    against each other, which results in that

14    balancing payment.

15         Q.   And you have done effective

16    royalty rates for those on the right-hand side?

17         A.   Yes, I have.

18         Q.   And did you rely on this

19    information in forming your opinions?

20         A.   That's right.

21              MR. TYLER:  Move for admission of

22    AUO 275, Your Honor.

23              THE COURT:  It's admitted.

24    BY MR. TYLER:

1          Q.   Let's go back to your example of

2     2004.  If we go back to slide 22.  So looking at

3     this slide, what does this tell you about AUO's

4     claim for the offensive part of this case?

5          A.   So we have accomplished step one,

6     which is predicting the balancing payment.  Now

7     we have to take that green circle, which is the

8     mixture of two primary colors, the yellow and

9     blue, and break that down into AUO's claim

10    against LG and LG's claim against AUO.  And so

11    that's shown in the next slide.

12         Q.   Okay.

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11          Q.   This is the 2004 time frame?

12          A.   That is right.

13          Q.   So you have this at other time

14     frames as well?

15          A.   The previous exhibit shows the

16     calculations for all the time periods.

17          Q.   Now, you darked out the right

18     side.  That's LGD's side of the equation?

19          A.   Yes.

20          Q.   And we will be talking about that

21     in a couple of weeks?

22          A.   That's the next trial.  That's

23     right.

24          Q.   Okay.  So this isn't your measure

1    of damages.

2              So what else do we have to do?

3        A.   Well, now we have finished our

4    second step, which is figuring out the portion

5    of the balancing payment that represents AUO's

6    claim against LGD.

7

8

9

10

11       Q.   Okay.  Well, before I go to that

12   last step, I want to ask you a question to talk

13   about the portfolio strength.

14              You mentioned that a few times.

15   And you said you looked at the patent portfolios

16   of the parties --

17       A.   Yes, I did.

18       Q.   -- as well as other parties in the

19   industry?

20       A.   That's right.

21       Q.   Did you summarize that?

22       A.   I did.

23       Q.   Can we go to AUO 278?

24              This one's free of redaction.

1    It's publicly available information?

2            A.   Yes.

3            Q.   So how did you -- well, what is

4    this first, let me ask you that?

5            A.   This exhibit just shows for the

6    time period 2000 to 2008 for all the major LCD

7    competitors, the sizes of their portfolio as

8    they accumulate patents over time.

9            Q.   And did you compile these lists?

10           A.   Yes, I did.

11           Q.   How did you do that?

12           A.   I used a publicly available

13   commercial database called Delphion.com, which

14   allows you to extract information for each one

15   of these assignees.

16           Q.   Okay.  And were you here in Court

17   the first day when Dr. Luo from AUO testified

18   about AUO's patent portfolio growth?

19           A.   I was, yes.

20           Q.   And did his chart match your

21   chart?

22           A.   No.

23           Q.   Why not?

24           A.   Well, remember as part of his

 1    testimony, he talked about, or that first day of

 2    his testimony, we discussed that AUO had

 3    purchased a number of patents from IBM.  It

 4    turns out AUO has purchased or acquired other

 5    firms and patents other over time.  Dr. Luo's

 6    chart shows, AUO, the size of AUO's patent

 7    portfolio as of the date they acquired the

 8    various patents.

 9              My chart shows AUO's patent

10    portfolio as though it had been receiving the

11    patents that it purchased at the time that they

12    issued.  So for example, the 2001, we have the

13    IBM patents that AUO purchased in 2005, but

14    they're assigned to AUO in 2001.

15              Q.   And you did the same thing for LG,

16    didn't you?

17              A.   Yes, of course.

18              Q.   At this time -- did you rely on

19    this chart in forming your opinions?

20              A.   Yes.

21              MR. TYLER:  Your Honor, we'd move

22    to admit AUO 278.

23              THE COURT:  It's admitted.

24    BY MR. TYLER:

1          Q.   Okay.  So let's go from the

2     results of your model down to your damages

3     conclusion.  And let's go to the next slide.

4               This is the last step of your

5     analysis; is that correct?

6          A.   Yes, that's right.

7          Q.   Would you explain what we're doing

8     here?

9

10

11

12               Now, we have to restrict that

13     claim to the portion of it that's attributable

14     to accused sales in the United States.  And then

15     of the accused sales in the U.S., we have to

16     further restrict it to the portion that is

17     attributable to the four asserted patents.

18          Q.   Okay.  And how do you -- how do

19     you do that here?

20          A.   Well, you basically just have to

21     multiply by two adjustment factors.  The first

22     of them is taking AUO -- taking LG's sales and

23     varying out the fraction of LG's worldwide sales

24     that are actually made in the United States.

1            And then the second step is to --

2     of those, the set of LG sales in the United

3     States, further take out those sales that AUO

4     has not accused under the four patents.

5            Q.   In this case?

6            A.   In this case, that's right.

7            Q.   All right.  So how did you do the

8     -- first, how did you find out the first

9     percentage, the sales in the United States?

10           A.   Well, it's important to remember

11    that AUO typically does not track the place that

12    its LCD modules end up.  An LCD module is an

13    input into another good, like a computer monitor

14    or a television set.

15           So when AUO says its sells an LCD

16    module to Sony, Sony might assemble that module

17    into a television set in, let's say, Mainland

18    China, and then ship it to the U.S.  But AUO

19    doesn't track where that television set ends up.

20           It only knows that it shipped it

21    from China.  So you have to -- so it's a

22    two-part process for the module to end up in the

23    U.S., and AUO doesn't track that.

24           So in order to do that, you've got

1          to go to an industry standard source, which I

2          think we mentioned previously, Display Search.

3          And Display Search tracks the two parts of this

4          transaction, not the individual module, but it

5          tracks the sales that AUO makes to China and/or

6          to a customer actually which may be in China.

7          And then it tracks the customer sales into the

8          United States.

9                    And so by looking at the fraction

10          of sales that go to the customer and the

11          fraction of the customer sales that go to the

12          U.S., you can infer the fraction that -- of AUO

13          modules, or in this case, LGD modules that end

14          up in the United States.

15                    Q.   And did you do that in this case?

16                    A.   I did, yes.

17

18

19

20

21

22

23                    Q.   Will that number be at the same

24          time for all manufacturers?

1        A.   No, it's not.  It's not the same,

2    because it depends on where the customers of

3    each one of the parties in this case sell their

4    products.  And that, obviously, varies depending

5    on how they market their products.

6        Q.   And then the second percentage is

7    the percentage of accused products?

8        A.   Yes.  So then we have to take

9    that, the sales that end up in the U.S. and

10   figure out what fraction of them are actually

11   accused under one of the four patents.

12

13

14

15

16

17

18       Q.   So it looks like the last step in

19   your flow chart is to determine the value share

20   of the asserted patents.  How do you do that?

21       A.   Okay.  So we're getting close.

22

23

24

1          And now we've got to apportion it

2     among the four asserted patents.  And to do

3     that, we use this method that I mentioned called

4     count, rank and divide.

5          Q.   Okay.  Explain that to us.

6          A.   Sure.  It's sort of like you could

7     think of this as being very similar to the

8     problem that you face when you invite people

9     over for Thanksgiving dinner.  You've got a

10    certain number of guests.

11         You've got to figure out how to

12    apportion the food among those guests.  And

13    you've got to divide those portions so that each

14    guest's portion adds up to the entire amount of

15    food that you've got.

16         So the difference here is --

17    there's a couple of differences.  One of them is

18    that instead of having a dinner party for eight,

19    in this case, you've got thousands of patents in

20    the portfolio.  And so you've got to find a way

21    of giving them their correct portion.

22         And you don't necessarily -- you

23    aren't able to look at a single number, which

24    tells you -- I should say you've got to find a

1      way of assigning a single number to each one of

2      these patents, so that it gets its correct

3      portion.

4              Q.   Okay.  I think the counting is

5      easy.  We've already seen that.

6              How do you -- you've got to rank

7      thousands of patents from top to bottom?

8              A.   Yes.  So, in the same way that you

9      had thousands of dinner guests, what you might

10     do is look for an indicator that would predict

11     their appetite.

12             So you might say that the amount

13     that the guest weighs is correlated with how

14     much they eat.  So here you've got to find a

15     ranking for the thousand patents in the

16     portfolio, and the ranking that I use is the

17     number of citations that each patent has

18     received in subsequent -- from subsequent

19     patents at issue in the United States.

20             Q.   Well, in your analogy on

21     Thanksgiving dinner, couldn't you just ask

22     people who knew about the folks coming to

23     Thanksgiving dinner, maybe ask some experts how

24     much they might eat?

1          A.   Well, you could.  But in this

2     case, you face two problems.

3               First of all, it's very difficult

4     to -- we don't have enough time or resources to

5     get experts to rank all of the patents in each

6     party's portfolio based on their importance.

7               And, secondly, there's an element

8     of subjectivity that enters into this.  So even

9     if you did ask experts to rank these patents,

10    you're not going to get any two experts to agree

11    on the exact ranking.  So you need an objective

12    indicator that does this for you, and get it at

13    least approximately right for all of the patents

14    in the portfolio.

15         Q.   And you said the objective

16    indicator was the number of patent citations per

17    patent?

18         A.   Yes.  That's right.

19         Q.   How do you know that's a good

20    measure of importance of patents?

21         A.   Well, economists have been working

22    now for more than 20 years on ways of trying to

23    take large groups of patents and figure out how

24    to value portfolios of patents or weigh them in

1    some fashion to reflect their value without

2    having to go through and obtain expert advice on

3    each of the individual patents.

4           Q.   So you didn't make this up for

5    this case?

6           A.   No.  No.  No.

7                This approach is more than 20

8    years old.  I think it goes back -- I've got an

9    article on the screen.  It goes back originally

10   to the classic article by Manual Tracenberg on

11   Patent Citations & Evaluations.  That is -- that

12   spawned a whole flurry of research that was on

13   eventually researched in a book published by MIT

14   Press called Patent Citations and Innovations.

15               I've also worked on the methods to

16   weight patents appropriately, so that you,

17   rather than simply counting them, you assign

18   them their appropriate share in total value.

19          Q.   Okay.  When you first mentioned

20   this to me, what I thought was, well, how about

21   patent citations -- there's going to be a whole

22   lot more for an older patent than a younger

23   patent.

24               So how did you account for that?

1          A.   Well, you have to, obviously,

2     adjust for the age of the patent.  So in the

3     same way that when you look at your child's

4     height on a height-weight chart and say what

5     percentile does my child fall in, you look at

6     the chart for the -- that corresponds to the age

7     of your child.

8               So my child falls in the 70th

9     percentile for six-year-olds.  If your child is

10    eight, then you use a different one, because all

11    eight-year-olds are taller on average than all

12    six-year-olds.

13              So in the same way, we use a

14    different chart that ranks the patents based on

15    its age and adjusts for that fact in computing

16    its overall ranking.

17         Q.   So you ranked all the AUO patents

18    in this case?

19         A.   All the AUO patents and all the

20    LGD patents.  That's right.

21         Q.   Okay.  So does this ranking of

22    patents, the way you approached it, does that

23    take into account any of the Georgia-Pacific

24    factors?

1          A.   Yes.   The third factor refers to

2     commercial advantages of invention, the nature

3     of the invention and the benefits, the

4     advantages of the invention over old modes and

5     devices, and so forth.   And so the number of

6     citations is correlated with these commercial

7     advantages, because truly pioneering inventions

8     typically spawn other inventions that build upon

9     them and improve upon them.

10          And these later inventions

11     generate citations back to the pioneer.   So the

12     number of citations that a patent receives is

13     correlated, on average, with the commercial

14     significance.

15          Q.   So once you ranked them, how did

16     you divide them up?   Did you just average them?

17          A.   No.   And the last step, once

18     you've got a ranking from Number 1 to Number

19     1000 or whatever, you have to go back to the

20     economic literature and look at the literature

21     on the distribution of patent values.   And that

22     literature says that if you know -- for any size

23     patent portfolio, if you know the number of

24     patents in that portfolio, and you know the

1    ranking of where a particular patent falls in

2    that portfolio, then you can assign a share of

3    the entire portfolio's value, whatever the

4    aggregate value is.  You can figure out the

5    share based on the literature on the

6    distribution of patent values.

7              Q.   Okay.  And so once you have that

8    share, you can determine what?

9              A.   Well, basically we've got the size

10   of the pie.  We've now got the share of the pie

11   that's attributable to each patent.

12              You multiply those things

13   together, and you get the size the actual piece

14   of the pie that each patent gets.  And that's

15   our damages number.

16              Q.   And you did that in this case?

17              A.   That's correct.

18              Q.   For each of the patents?

19              A.   For each of the four patents.

20   That's right.

21              Q.   All right.  So these are the

22   numbers you came up with that value share on

23   that analysis?

24              A.   Yes.

1           Q.   What if you underrepresented the

2     importance of the patents due to the fact that

3     the patent citation method maybe was unreliable

4     after all these patents were actually chosen to

5     be asserted in this case?

6           A.   Yes.

7           Q.   You take that into account?

8           A.   Well, the -- I know each party

9     says that its patent is among its most important

10    patents.  The objective indicator of citations

11    actually doesn't support that claim for any of

12    the patents in this case.  They don't rank even

13    within the top five percent of all patents.

14               But, you know, citations are not a

15    perfect measure of commercial significance.  And

16    so I assumed instead to, as a check on this, so

17    that each patent fell within the top five

18    percent.  And I assigned it a share value that

19    would be appropriate for the average top five

20    percent.

21               So, in other words, I just

22    disregarded citations entirely and said, Let's

23    assume the patent is important, place it in the

24    top five percent and then figure out the value

1    that you would get.

2            Q.   So then in your Thanksgiving meal

3    value, you assume the top five percent eaters?

4            A.   Yeah, exactly, that are the heavy

5    eaters.  Whether they weigh a hundred pounds or

6    400 pounds, we're going to assume they're a

7    heavy eater and assign them the heavy eater

8    sale.

9            Q.   Did that change your results?

10           A.   Yes, of course.

11           Q.   Go to the next slide.  And what

12   does this show?

13

14

15

16

17

18

19

20

21           Q.   So the two value shares together

22   provide you a range under this method; is that

23   right?

24           A.   Yes.  That's right.

1          Q.   This is the range?

2          A.   Yeah.  So this just summarizes the

3     results for the two methods for each of the four

4     patents, or I should say two assumptions under

5     the single method for each of the four patents.

6

7

8

9

10         Q.   Now, this method industry price

11    method, did you do another method to check these

12    values?

13         A.   Yes.

14         Q.   And is the other method going to

15    take us as long to go through?

16         A.   No.  We can actually take

17    advantage of all the work we've done up until

18    now and go -- it goes very quickly.

19         Q.   Okay.  So what's your other

20    method, Slide 33.

21         A.   Well, going back to -- well, I

22    call it the apportionment of LGD's profits.  And

23    for the four asserted patents what you want to

24    do is conceptually take a different pie.

1                    We're going to change pies and

2        instead of looking at AUO's claim against LG,

3        we're going to look at LG's profits on the

4        accused sales and then apportion that among the

5        four patents.

6                    Q.   Okay.   Now, we've discussed, I

7        think, your group one, group two, and group four

8        of your Georgia Pacific factors?

9                    Does this relate to any of the

10       Georgia-Pacific factors?

11                   A.   The group two --

12                   Q.   Group two?

13                   A.   -- is the factor related to

14       profitability.   I think it's on the next slide.

15                   And so, in particular, we have the

16       established profitability of the patented

17       product and portion of the defendant's profit

18       that's credited to the invention.

19                   And this is under Factor 13 as

20       distinguished from the defendant's own

21       contributions.   So what we're particularly

22       concerned with here is separating the portion of

23       LG's profits that are attributable to AUO's

24       patents and the portion of LG profits that are

1    attributable to LG's own patents.

2         Q.   Okay.  You're saying profits a

3    lot.  You already said you are going to conduct

4    a reasonable royalty analysis.

5              Is this a lost profits analysis?

6         A.   No.  These are -- as I said, what

7    I've listed here are the four Georgia-Pacific

8    factors, which are directed to computing a

9    reasonable royalty.  But these are four factors

10   that tell us to look at the profits of the

11   patented products and the share of those profits

12   that should be -- that are used as an input in

13   determining what would emerge from a

14   hypothetical negotiation.

15        Q.   How would this analysis fit into a

16   hypothetical negotiation?

17        A.   Well, you might think of it this

18   way:  The first method that I looked at examines

19   negotiations between parties, and that's -- that

20   reflects what a seller is willing to sell its

21   invention for or its portfolio, or in this case

22   four members of its portfolio.

23              Here we're looking at it from the

24   buyer's side.  And this reflects what a buyer

1    would be willing to pay as a share of the total

2    profits that the buyer earns for the use of

3    these particular patents.

4         Q.   Okay.  So what's the first step in

5    your analysis here?

6         A.   Well, as I said, we're going to

7    start with LG's profits.  And so we're just

8    changing the pie.  It took a lot of work last

9    time to get to the appropriate pie.

10        Now, we can read the LG's income

11   statement and simply add those up and figure out

12   what their profits are.  So --

13        Q.   Did you prepare a summary of the

14   profits --

15        A.   Yes, I did.

16        Q.   -- in this case?

17        Please turn to AUO 283, please.

18        What is this?

19        A.   Well, this is just a standard

20   income statement for the period 2001 through

21   2008 that shows as a top line LG's actual sales

22   worldwide.  It subtracts other costs and the

23   bottom line is the profits earned by LG over

24   this period.

1            Q.   And did you prepare this

2      information?

3            A.   Yes, I did.

4            Q.   From publicly available resources?

5            A.   Yes.

6            Q.   And did you rely on this

7      information in forming your opinions?

8            A.   Yes.

9                 MR. TYLER:  At this time, we'd

10     move to admit AUO 238, Your Honor.

11                THE COURT:  It's admitted.

12     BY MR. TYLER:

13            Q.   So after you have the profits

14     information, what do you do next?

15            A.   Well, the LG's profits are

16     attributable to many factors.  Not only just the

17     patents, but other intellectual property and

18     other things that a company like LG does to make

19     money.

20                It's got, you know, the good sales

21     staff.  It's got a brand name.  It does

22     advertising and that sort of thing.

23                So what I've done is assume

24     conservatively, again, based on economic

1    literature that half of LG's profits are

2    attributable to patents.  And so we're going to

3    take the total profits up into two pieces and

4    say half of the profits are -- half of the

5    profits are caused by the patents that it uses

6    in its LCD modules.

7         Q.   Past work in your career in

8    looking at parties' profits as they related to

9    patents, did that inform your decision here?

10        A.   Yes.  I mean, this is actually a

11   conservative assumption.  There's some other

12   work that I did that shows that, if anything,

13   the number might be less than this.

14             So I'm assuming conservatively

15   that patents accounted for half of the profits.

16        Q.   Okay.  And let's turn to AUO 265.

17   And what is this summary?

18        A.   This just shows the calculation

19   that takes you from worldwide sales.  So on the

20   right-hand side, we have AUO, as the plaintiff,

21   which means we're looking at LGD sales as the

22   defendant.

23             It takes you from worldwide sales

24   subtracts out foreign sales and non-accused

1      sales to get to U.S. sales.

2                  Then computes the profits on those

3      sales.  Takes half that profit.

4

5

6

7

8                  Q.   Okay.  Thank you.

9                  And did you rely on this summary

10     in forming your opinions?

11                 A.   Yes.

12                 MR. TYLER:  At this time, Your

13     Honor, we move for admission of AUO 265.

14                 THE COURT:  Admitted.  It's

15     admitted.

16     BY MR. TYLER:

17                 Q.   Before we leave this, the left

18     side of this is what we're going to see in two

19     weeks; right?

20                 A.   Yeah.  Under the third principle,

21     this is a symmetrical analysis.  So we do

22     exactly the same for LGD.

23                 Q.   So now we have the profits

24     attributable to LGD's patents, and we talked

1    about accused products and we've taken down the

2    size of the pie.  What do you do next?

3            A.   Well, now, we take advantage of

4    all the work we did previously and simply apply

5    the count, rank and divide method to get the

6    share of those methods that's attributable to

7    each one of the four asserted AUO patents.  So

8    it's exactly the same thing.

9            Q.   Is there any difference in the way

10   you did the shares for this particular analysis?

11           A.   Well, there's only one difference

12   and that is that previously when you were

13   looking at AUO's claim against LGD across the

14   bargaining table, you were ranking the four

15   patents within AUO's portfolio to determine

16   their contribution to AUO's total claim.

17                Now, you're looking at the profits

18   that LG has earned.  And so what you want to do

19   is put the AUO patents within the LG portfolio

20   and figure out what contribution to LG's profits

21   AUO's patents made.  So you're ranking AUO's

22   patent within LG's portfolio.

23           Q.   So your Thanksgiving guests now

24   went over to LGD's table?

1              A.   House.   That's right.

2                   There's a different number of

3      guests and our -- the four patents don't change

4      in size, but their ranking within that set of

5      guests would change.

6              Q.   Okay.   Did you summarize how you

7      did the value share analysis for the

8      profitability?

9

10

11

12

13

14             Q.   Actually go to the -- go to the

15     next slide.   That's fine.

16                  And on the right side, is this

17     your conclusions?

18

19

20

21

22

23

24

1

2

3

4

5

6

7          Q.   So on the portion on the

8    profitability side, you have testified before

9    about this method?

10         A.   Yes, on the count, rank and divide

11   method, I have testified before.

12         Q.   And in front of which judge?

13         A.   That was -- I mentioned last year

14   I testified in front of Judge Sleet, and I

15   testified about this method.

16         Q.   Okay.  And so does this have your

17   conclusions in the case?

18         A.   Yes.  This basically summarizes my

19   opinion as to the damages that one would observe

20   for one -- the range of damages that in which

21   the award should fall for each one of the four

22   asserted patents.

23              MR. TYLER:  Your Honor, we

24   premarked this conclusion slide as AUO 1576, and

1    we would offer this into evidence right now.

2                THE COURT:  It's admitted.

3    BY MR. TYLER:

4           Q.   So I want to ask a few questions

5    about your conclusion, sir.

6           A.   Okay.

7           Q.   Are you telling us that these

8    patents that AUO chose to sue in this case are

9    only worth anywhere from a few thousand dollars

10   to a few million dollars?

11          A.   When you say the value of patent,

12   let me be clear what you mean.  The objective in

13   this case is to figure out what LG would pay for

14   the right to use these patents in the United

15   States during the damages period.  So that's

16   actually a small fraction of these patents'

17   total value.

18               If you think about the entire

19   value of the patent, it's the value over the

20   entire lifetime potentially between all the

21   competitors in the industry, LG is only about

22   one-sixth of the industry, and these damages

23   periods are only about one-fourth of these

24   patents' lives on average, so if you were to --

1    so you got one-fourth of one-sixth of the total

2    value being represented here by these claims of

3    AUO against LG, if you were to multiply that by

4    twenty-four, you get a better estimate of what

5    the value of these patents are as an asset to

6    LG.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23           Q.   Did you make any sanity checks to

24    make sure that your numbers were right as

1    compared to the numbers LGD is putting up in

2    this case?

3             A.   Yes.

4             Q.   And what did you do?

5             A.   Well, the -- the second principle

6    that I articulated at the beginning is it's

7    important to analyze all the data.  So one of

8    the things I did was to go back to what people

9    actually did in this real world to see whether

10   these numbers were consistent with the rates

11   that are paid not for entire portfolios of

12   patents, but when you're actually licensing

13   individual patents.

14            Q.   Did you summarize those

15   in-licenses that you now analyzed?

16            A.   Yes, I did.

17            Q.   I think we looked at the exhibit

18   earlier, turn to AUO 270.

19                 We saw this earlier?

20            A.   Yes.

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23             If you --

24        Q.   Does that fall within your range?

1              A.   Yes, exactly within the range

2      that's articulated between the two methods that

3      I proposed.

4              Q.   Are you just cherry picking one

5      that fits your analysis?

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23              Q.   What about when LGD bought

24      patents, not just license them, did you look at

1    that as well?

2            A.   Yes, I did.  Again, I think we

3    have seen -- well, there is an exhibit that

4    summarizes that.

5            Q.   Let's go to AUO 272, please.

6            What is this summary?

7            A.   Well, this is a similar summary

8    which shows transactions that LGD engaged in

9    where they actually purchased the patent.  Of

10   course, when you purchase a patent, you're

11   purchasing all the right, title and interest in

12   the patent, you're not just simply licensing the

13   right to use it, so you would expect to pay more

14   for the entire patent.

15           Q.   On the far right-hand column you

16   summarize the per patent?

17           A.   Yes.  Again, we have the actual

18   payment in present value terms.

19           Q.   Far right column.  Thank you.

20           A.   Yes.

21           So this sort of -- this makes it

22   easier to see.  You got the number of patents

23   being transacted including some of the patents

24   that have been asserted in this case, the

1    payment that LG made for those patents in

2    present value terms, and then the average

3    payment per patent which is just the total

4    payment divided by the number of patents.

5

6

7

8

9

10

11

12

13         Q.  Did you rely on this summary in

14    coming to your conclusions in the case?

15         A.  Yes.

16          MR. TYLER:  At this time, Your

17    Honor, we would move to admit 272.

18          THE COURT:  It's admitted.

19  BY MR. TYLER:

20         Q.  Now, Dr. Putnam, in your expert

21    report, you have made a comment about either in

22    this case, the overall case that if Mr. Cobb's

23    valuation method is going to be correct, it

24    needs to apply equally, or if yours is correct,

1    it needs to apply equally.  What did you mean by

2    that?

3          A.   Well, under the third principle

4    that I mentioned at the beginning this is a

5    symmetrical analysis so each party is sitting

6    across the table pointing patents at the other

7    side.  If you're going to -- regardless of the

8    method that you choose to assign value to these

9    patents, it's got to apply equally to each

10   sides' patents against the other.

11          I happen to disagree with all of

12   Mr. Cobb's analysis, but if you were to adopt

13   that analysis, it has to apply symmetrically to

14   AUO as it would to LG.

15          Q.   Why should it apply symmetrically,

16   LG patents are worth a whole lot more than

17   AUO's?

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8          Q.   Were you at Mr. Cobb's deposition?

9          A.   Yes.

10         Q.   What method is he advocating in

11    this case?

12         A.   He says that you should apply a

13    two percent running royalty to each one of LG's

14    asserted patents.

15

16

17

18         A.   Yes.

19         Q.   You did that for your hypothetical

20    negotiation as well?

21         A.   Yes, I did.

22         Q.   In Mr. Cobb's deposition, what

23    type of license did he think that AUO and LGD

24    would agree to if they sat down in the real

1    world?

2              A.   He said in the real word that the

3    parties would agree to a worldwide portfolio

4    wide cross license agreement.

5              Q.   Did he apply any of the

6    Georgia-Pacific factors to the AUO patents?

7              A.   No, he said he didn't.

8              Q.   Did he determine an appropriate

9    royalty rate for the AUO patents?

10             MR. CHRISTENSON:  Your Honor, I'm

11   going to object to this line of questioning

12   because I think it mischaracterizes Mr. Cobb's

13   testimony.  He hasn't testified yet.  This goes

14   to the later part of the trial regarding our

15   patents after Mr. Cobb has had an opportunity to

16   offer his testimony.

17             THE COURT:  I'll overrule the

18   objection.

19             MR. TYLER:  Pardon?

20             THE COURT:  I'll overrule the

21   objection.

22   BY MR. TYLER:

23             Q.   Did he determine an appropriate

24   royalty rate for AUO's patents?

1          A.   He did not.

2          Q.   Did he have an opinion as to the

3    appropriate negotiation date for AUO's patents?

4          A.   He said he didn't.

5          Q.   Did he identify any alternatives

6    to AUO patents?

7          A.   He said he wasn't aware of any.

8          Q.   Did he have any ideas on how many

9    fundamental patents there were in the LCD

10   industry as a whole?

11         A.   He had no idea as to either the

12   number of fundamental patents or the number of

13   any patents.

14         Q.   Did he indicate in certain

15   situations that his two percent rate could apply

16   as an appropriate royalty to AUO's asserted

17   patents?

18

19

20

21         He first review any of the

22   literature that you identify to us in the Court.

23         A.   He said he hadn't.

24         Q.   Did he believe that the patent

1      citations the way you use it could be an

2      objective indicator of the importance of a

3      patent?

4             A.   He said it could be an indicator,

5      yes.

6             Q.   Is Mr. Cobb here today?

7             A.   I believe that he is.

8             Q.   Back there in the corner?

9             A.   That's right.

10            Q.   Now, I talked about effective

11     royalty rates.  Let's go to AUO 271.  What do we

12     see here?

13            A.   This chart shows a matrix of

14     licenses within the LCD industry.  So we have

15     seen a version of this previously.  Again, the

16     names of all the other competitors have been

17     redacted except for AUO and LGD.

18                 What the matrix shows is the

19     payment between the two competitors as the

20     outcome of a -- their actual cross licensing

21     negotiations.  The difference is that in this

22     case, I have expressed the payment not as the

23     actual lump sum payment that one party paid to

24     the other, but as a percentage of sales in these

1    agreements.  So it's the effective royalty rate

2    or the equivalent to a running royalty rate that

3    you actually observe in the industry.

4            Q.   So this is real data in that

5    little square box we see between AUO and LGD,

6    those are all your hypothetical negotiations?

7            A.   Yes, that's the effective royalty

8    rate that's implied by the model that I predict

9    as an outcome of the negotiation between LGD and

10   AUO.

11           Q.   At various time frames?

12           A.   At various time frames, that's

13   where it varies from  .17 to .46.

14           Q.   And the other royalty rates?

15

16

17           A.   Yes, that's right.  We have seen

18   this previously, it varies between .1 percent on

19   the low end to the .5 percent on the high end.

20

21

22

23           A.   Yes.  As you can see the outcome

24   of the model that I presented falls squarely

1    within the range of rates that we observed in.

2

3

4

5

6

7

8            A.   Yes, this is across the entire

9    portfolio.

10           Q.   What would this tell you about

11   rates for individual patents in the industry?

12           A.   Well, again, going back to the

13   pizza analogy, this is the price of the entire

14   pizza, so that acts as a cap on the price that

15   you would pay for a slice of pizza.  A slice

16   can't be worth -- in the same way that if a

17   pizza cost $10, a slice of piece can't cost more

18   than $10.

19           One of the patents in a portfolio

20   of patents can't be worth more on an effective.

21

22

23

24

1          A.   Yes, we relied on LG's actual

2     behavior.

3          Q.   And those involve LG patents that

4     are asserted in this case; correct?

5          A.   Yes, they have licensed the same

6     patents as part of a portfolio.

7          Q.   Does this tell you anything about

8     Mr. Cobb's two percent slice of pizza?

9          A.   Well, again, Mr. Cobb thinks that.

10

11

12

13

14

15

16

17

18

19

20

21

22          Provide you any sort of upper

23     bound on what could be an appropriate royalty

24     rate.

1          A.   Well, if you were going to assign

2     a running royalty, which again I think is not.

3

4

5

6

7

8

9

10

11

12

13          A.   Yes.

14               MR. TYLER:   Your Honor, we move

15     271 in evidence.

16               THE COURT:   It's admitted.

17     BY MR. TYLER:

18          Q.   And did you calculate the accused

19     LGD sales in the case?

20          A.   I did.

21          Q.   Can we go to AUO 284, please.   And

22     what does the summary in 284 provide for us?

23          A.   Well, this just shows the royalty

24     base starting with AUO's total worldwide sales

1    over the infringement period.

2           Q.   This is for the accused -- the

3    four AUO patents in this case?

4           A.   Well, line A just to be clear,

5    line A is total sales worldwide, and then within

6    the US, and we'll get in a moment to what we

7    mean by in the US.  Line C is the subset of

8    sales that AUO is accused under these four

9    patents, again worldwide, and then restricted to

10   the US.

11          Q.   And the column, the second column

12   there, US sales, what does that show?

13          A.   So using the method that I

14   described previously, which found that 24.7.

15

16

17

18

19

20

21

22

23          A.   Well, here we have other measures

24   of US sales, so what I have called direct US

1      sales are sales made by the LG parent company

2      into the US, either directly or through its

3      subsidiary, which is referred to as LGPLA.

4              Q.   So you calculated the royalty base

5      as not just doing a percentage, but also the

6      evidence shows direct sale into the United

7      States?

8              A.   Yes.  Yes.  These are actual --

9      without going through the two-step leg via China

10     or whatever, these are the transactions that

11     show direct sales into the US.

12             Q.   And did you do this for each of

13     the asserted patents?

14             A.   Yes, I did.

15             Q.   Can you go to the next page of

16     this.  And this is Schedule A of this same

17     exhibit.  And what does this show?

18             A.   Here we have for each of the

19     asserted patents, the corresponding figures,

20     worldwide sales, US sales, estimated by the

21     display search public data source, direct sales

22     measured as the sum of sales into the US plus

23     sales by -- to LG's subsidiary, and then only

24     direct sales into the US.

1          Q.   And dividing up these sales, did

2     you have to study the transaction flow of the

3     products into the United States?

4          A.   Yes.

5          Q.   And did you prepare a summary of

6     the documents or some of the transactions, sales

7     documents that helped you to understand the

8     transaction point?

9          A.   Yes, I did.

10         Q.   Can we go to the summary of sales.

11    And this has been premarked as AUO 1562.  What

12    does it show?

13         A.   Well, this is just a summary of

14    documents that show how LG interacts with its US

15    subsidiary and with its US customers in

16    basically documenting how the product ends up --

17    starts out in Seoul and ends up in the US.

18         Q.   And did you review these documents

19    in forming opinions in this case?

20         A.   Yes.

21         MR. TYLER:  At this time, Your

22    Honor, we would move for admission of AUO 1562,

23    which is a summary as well as the underlying

24    documents.

1              THE COURT:  Admitted.

2              MR. CHRISTENSON:  We reserve our

3      objections.

4  BY MR. TYLER:

5              Q.  Can we go back to the previous

6      slide, exhibit AUO 284.  And go to the schedule

7      A.  So if you're going to -- if you're going to

8      apply Mr. Cobb's analysis, what's the math that

9      you do?

10             A.   Well, here we have the US royalty

11     base for accused products under each one of the

12     four patents.  So if you were going to take --

13     use Mr. Cobb's method, which is to multiply a

14     royalty base times a royalty rate, then this

15     gives you the appropriate royalty bases that you

16     would multiply that rate by, once you resolved

17     the question of what constitutes a US sale.

18             Q.  So direct infringement would be

19     multiplied by the third column?

20             A.  Yes.

21             Q.  And inducement theory on the

22     second column?

23             A.  Yes.

24             Q.  You're not opining on inducement,

```
 1        are you?
 2                   A.   No.   That's a liability question
 3        and I have no opinion about that.
 4                        MR. TYLER:   We at this time move
 5        284 into evidence, this particular slide we have
 6        been looking at, Your Honor.
 7                        TH COURT:   It's admitted.
 8    BY MR. TYLER:
 9                   Q.   So I'm just about through,
10        Dr. Putnam.   We have covered a whole lot today.
11        But I do want to take us back to where we
12        started.   Is your analysis based on
13        Georgia-Pacific factors?
14                   A.   Yes, that's right.
15                   Q.   Have you prepared a brief summary
16        about that?
17                   A.   Yes.   I think if you go back to
18        the four principles that I articulated.
19                   Q.   Did you prepare a summary of all
20        your exhibits in this case?
21                   A.   The exhibits, yes.   I'm sorry, the
22        Georgia-Pacific, yes, I did.
23                   Q.   AUO 294, please.
24                        And what is this summary?
```

1          A.   Well, here I have just grouped the

2     fifteen Georgia-Pacific factors as I have said

3     previously into, you know, licensing conduct and

4     so forth.  I have listed the individual factor

5     and then summarized the evidence in my

6     conclusions with respect to that factor.

7          Q.   And did you rely on this

8     information in forming your opinions?

9          A.   Yes.

10              MR. TYLER:  At this time we move

11    AUO 294 in evidence, Your Honor.

12              THE COURT:  It's admitted.

13    BY MR. TYLER:

14         Q.   So let's go back to your final

15    slide, slide 38.  Now, you provided a range for

16    potential hypothetical licenses, what you would

17    pay for that.  Do you have any guidance for the

18    Court in actually picking a number, an actual

19    number for the damages?

20         A.   Yes.  I think the number should

21    fall obviously within the range I have

22    articulated.  Of course, you have to acknowledge

23    there are limits of your prediction with respect

24    to measuring the value of the patents in this

1    case, so the Court will have also -- has heard

2    and will continue to hear evidence on the

3    commercial advantages and the technical

4    advantages of each of these inventions.

5              So what I would do is weigh that

6    evidence and within the range move toward the

7    lower or the higher end of the range depending

8    on the Court's aggregate determination as to the

9    importance of that invention relative to its

10   alternatives based on the rest of the technical

11   evidence.

12        Q.   And can you summarize for us why

13   it is that you think a range of a few thousand

14   dollars to a few million dollars would be the

15   appropriate hypothetical payment that LGD would

16   make to AUO for the individual patents?

17        A.   Well, I think it's important to go

18   back to the principles I articulated in the

19   beginning in evaluating these conclusions.  The

20   first one is that the best prediction of what

21   people would do in a hypothetical negotiation is

22   what they actually have done.  And so when you

23   look at their cross license agreements as well

24   as their one-way agreements that they have

1    actually entered into, the numbers that I

2    proposed are exactly consistent with the actual

3    agreements.

4              Secondly, you have to analyze all

5    the data, which means that you have to look not

6    only at the four asserted patents in a vacuum,

7    but you have to look at them as part of a

8    portfolio and look at all the agreements

9    pertaining to all the patents and not just

10   cherry pick a few.

11             The third principle is that the

12   analysis has to be symmetric, so it has to apply

13   equally when you're sitting on AUO's side of the

14   table as it does when you're sitting on LGD's

15   side of the table.  And the analysis that I

16   proposed exactly does that and comes up with --

17

18

19

20

21

22             Portfolio, and so the whole acts

23   as a ceiling on the parts, and the parts have to

24   add up to the whole.  And again, if you add up

1      these numbers and did the same thing for all of

2      AUO's patents, what you would get is the whole

3      of AUO's claim or the whole of LG's profits, and

4      that's an important conceptual and practical

5      constraint in evaluating whether these numbers

6      are accurate or not.

7              Q.   Now, you're going to be back here

8      in a few weeks testifying about LGD's case, and

9      how are you going to square then what you're

10     doing now?

11             A.   Well, the method that I'm going to

12     use is going to be exactly the same.  We'll do

13     the same calculations and, but obviously the

14     data will change because in that case we'll be

15     talking about the four LG patents, we'll be

16     talking about AUO's royalty base, we'll be

17     talking about the share of value that LG's

18     patents command as a fraction of LG entire

19     portfolio.  So the method will be identical.

20             For that reason, though, it's

21     important to emphasize that the conclusions that

22

23

24

1

2

3

4

5              THE COURT:  All right.  I think

6     we'll take a little break here and come back in

7     fifteen minutes.

8              (A brief recess was taken.)

9              THE CLERK:  All rise.

10             THE COURT:  All right.  Be seated,

11    please.

12             Ready to proceed?

13             MR. CHRISTENSON:  Thank you, Your

14    Honor.

15    BY MR. CHRISTENSON:

16        Q.   Dr. Putnam, good morning.

17        A.   Good morning, Mr. Christenson.

18        Q.   Now, to value AUO's claim, you

19    first estimated the value of AUO's entire

20    portfolio measured against accused U.S. sales of

21    LG Display; correct?

22        A.   Well, when you say the "entire

23    portfolio", I measured the value of AUO's

24    portfolio as directed against LG.  That's right.

1      Q.   Right.   And can we see your Slide

2  25, please?

3                Your Slide 25 summarizes that

4  conclusion?

5      A.   Yes, that's right.

6      Q.   And based on your analysis and the

7  formula that you used, the fair maximum value in

8

9

10

11     Q.   And as part of your analysis, you

12  also considered the value of each party's R & D

13  stock over time; right?

14     A.   I -- I did that as a check to

15  estimate the value of the entire portfolio as

16  against all competitors worldwide.   Yes.

17     Q.   Let's look at your Exhibit 19 to

18  your expert report.   This is your calculation of

19  AUO's R & D stock value over time; right?

20     A.   Yes.

21     Q.   And if we look at the year 2006,

22  you have the value you calculated for AUO's R &

23  D stock as $443 million?

24     A.   That's correct.

1          Q.   You did a similar analysis for LG

2     Display?

3          A.   That's right.

4          Q.   That's your Exhibit 20?

5          A.   That's right.

6          Q.   In Exhibit 20, we can see that you

7     calculated for the same year 2006, the value of

8     LG Display's research and development stock at

9

10

11

12

13          A.   Yes.

14          Q.   And, again, for that same year,

15     you valued LG Display's R & D stock at in excess

16     of $2 billion; correct?

17          A.   That's right.

18

19

20

21          Q.   But you didn't start to credit LG

22     Display's R & D stock until 2002; correct?

23          A.   I didn't have the data.  That's

24     right.

1        Q.   So you didn't intend -- you didn't

2   intend to give AUO a two-year head start there;

3   that was just based on the data you were able to

4   find.

5        A.   That's right.  And based on level

6   of expenditures, the numbers by 2007 would be

7   essentially the same.  But you're right, I

8   didn't -- I did the best that I could with the

9   data that I had.

10        Q.   And let's look at a slide

11   reflecting your analysis of R & D stock values

12   between 2002 and 2007, you calculated that LG

13   Display's R & D stock had substantially

14   increased in value over time; right?

15        A.   Well, they both have.  But, yes,

16   proportionally it's about the same.

17        Q.   LG Display's R & D stock has

18   substantially increased over time; right?

19        A.   It has substantially increased.

20   Yes, that's right.

21        Q.   And even giving AUO that two-year

22   head start, LG Display's R & D stock value is

23   about four times larger than AUO's R & D stock

24   based on your calculations; correct?

1          A.   As of 2007, that was true.  Yes.

2          Q.   Dr. Putnam, you testified about

3    your predicted outcome of a hypothetical

4    cross-license of all patents on AUO and LG

5    Display's entire portfolios; right?

6          A.   Yes.

7          Q.   And I think Slide 22 that you

8    presented addresses that analysis; is that

9    right?

10         A.   Yes.  That's right.

11              As of 2004.

12         Q.   So this shows your model, your

13   economic model of formula that you used to

14   predict the outcome or what might have happened

15   several years ago; right?

16         A.   At the time of the hypothetical

17   negotiation, yes.

18         Q.   In 2004?

19         A.   That's correct.

20         Q.   And we agree, Dr. Putnam, that in

21   any cross-license deal between AUO and LG

22   Display, AUO would have to pay LG Display;

23   right?

24         A.   Well, when you say "would have

1    to", I think what you're saying -- what you mean

2    to say by that is that the model would predict

3    that.

4                And based on the characteristic of

5    the parties, I would agree with that statement.

6    Yes.

7                Q.   So AUO would have to pay LG

8    Display a lump sum balancing payment, a running

9    royalty, or some combination of those two;

10   correct?

1

2          A.   That sounds right.

3          Q.   And the '506 patent issued in

4    August 2006?

5          A.   Sounds right.

6          Q.   And in a more recent

7    cross-license, say in 2007, AUO would pay more

8    money than that to LG Display; right, based on

9    your model?

10          A.   Yes, that's correct.

11          Q.   Because from 2004 through 2007, LG

12    Display's patent portfolio has substantially

13    increased in size?

14          A.   Well, yes, both sides are

15    increasing the size of their patent portfolios.

16    And so what happens is that each side's claim

17    against the other is increasing, and the net of

18    that is that the balancing payment would

19    increase.

20          Q.   And so you agree with me that from

21    2004 through 2007, LG Display's patent portfolio

22    has substantially increased; right?

23          A.   Yes.  Again, I think that AUO's is

24    actually increasing at a faster rate, but your

1      statement is correct.

2                Q.   Well, we'll get to that, but -- in

3      a moment.  But this chart reflects the growth of

4      LG Display's patent portfolio over time; right?

5                A.   Yes.

6                Q.   And in your analysis, one of the

7      things you considered is the number of patents

8      that each side owned at the time of the

9      hypothetical negotiation on a cross-license?

10               A.   That's right.

11               Q.   And since 2004, Dr. Putnam, LG

12     Display's patent portfolio of U.S. patents

13     reflected in this chart has substantially

14     increased every year; right?

15               A.   Yes.

16               Q.   And as the portfolio size has

17     increased, the value of LG Display's portfolio

18     also has increased over time; right?

19               A.   I would expect that, yes.

20               Q.   In fact, your analysis proves

21     that; right?

22               A.   Well, that's --

23               Q.   Your Exhibit 15.1 confirms that;

24     right?

1        A.   As -- yeah, I think.  I don't

2    remember the exhibit number off the top of my

3    head.

4             But, yes, as the portfolio size

5    increases, the number of arrows in your quiver

6    goes up.  Then the value of your portfolio goes

7    up.  That's true as a general statement.

8        Q.   You mentioned a minute ago, you

9    also looked at the number of patents that AUO

10   acquired over time; right?

11       A.   Yes.

12       Q.   And you acknowledged, in your

13   direct testimony, that some of the patents

14   weren't actually owned by AUO at the time that

15   you listed them; right?

16       A.   Well, at the time that they

17   issued, they were not owned by AUO, but AUO

18   acquired them.  They acquired the right to sue

19   for past damages.

20            So they, in effect, acquired the

21   benefit of the issue date.  But it's true, they

22   weren't in AUO's possession as of that date.

23       Q.   But you still credited them as if

24   they were in AUO's possession as of that date;

1    right?

2              A.   For the purpose of the outcome of

3    the hypothetical negotiation, yes, because they

4    represent a claim against another party in this

5    case, LG.

6              Q.   Well, at the time they were

7    acquired, they weren't asserted against LG, were

8    they?

9              A.   No, but AUO acquired the right to

10   sue LG for damages going back to the issue date.

11             Q.   And all of those acquired patents

12   are not involved in this case, are they?

13             A.   I think there's only two.

14             Q.   Now, since 2004, again, looking at

15   the slide, the size difference between LG

16   Display's portfolio and AUO's portfolio has

17   increased over time; right?

18             A.   Well, it depends on how you

19   measure.  I would look at the ratio.

20             And the ratio when we start out

21   about being three times as big and now it's

22   about two and a half times as big.  So actually,

23   relatively speaking, the difference has shrunk.

24             But absolute terms, you're right.

1          Q.   In terms of actual numbers,

2     Dr. Putnam, the size number has increased?

3          A.   In terms of actual numbers, that's

4     correct.

5          Q.   Because in 2004, the time that you

6     did your hypothetical cross-license model, LG

7     Display had 524 more U.S. patents than AUO;

8     right?

9          A.   That's right.

10         Q.   And in 2009, LG Display has 1,570

11    more U.S. patents than AUO; correct?

12         A.   It looks -- the figures look right

13    to me.

14         Q.   And, again, at the time -- at the

15    time of the hypothetical negotiation that you

16    did for cross-licenses on all patents, 2004, LG

17    Display owned, you say, 789 U.S. patents; right?

18         A.   Yes.

19         Q.   But by 2006, LG Display's U.S.

20    patent count, according to you, had increased to

21    1,620 U.S. patents?

22         A.   I think that's right.

23         Q.   So by 2006, LG Display had more

24    than doubled the number of U.S. patents that LG

1    Display had on the date you used for the

2    hypothetical cross license?

3              A.   As had AUO, that's right.

4              Q.   And, again, your research suggests

5    that as the number of patents in a portfolio

6    increases, the royalty rate for that portfolio

7    increases at an almost linear rate; isn't that

8    right?

9              A.   All things equal, that's the way

10   that people in the industry behave.  That's

11   true.

12             Q.   So we agree, again, that AUO's

13   balancing payment to LG Display today would

14   certainly be more than a balancing payment that

15   you illustrated in 2004; right?

16             A.   Well, if you were predicting based

17   on the characteristics of the model, I think

18   that would be true.  Obviously, that's not a

19   question that I addressed as part of damages,

20   which are retrospective and determined on the

21   date of hypothetical negotiation.

22                  But that would be an implication

23   of the model if you were to apply it today.

24             Q.   And given the fact that two of

1     AUO's patent didn't issue until after 2004, it

2     could be appropriate to do a hypothetical

3     negotiation looking at more recent data when

4     those patents actually existed; right?

5             A.   And that's what I did.  The

6     exhibit -- I also calculated this for 2006, and

7     as you pointed out, the balancing payment as

8     well as each side's claim against the other are

9     larger in 2006 than in 2004.

10            Q.   And the net difference increases

11    in favor of LG Display over time as well;

12    correct?

13            A.   Well, when you say "net

14    difference", I think if you mean -- if you mean

15    the balancing payment increases, then the answer

16    is yes.

17            Q.   Yes.  Now, Dr. Putnam, you did a

18    very interesting study regarding which companies

19    in the LCD industry owned the most significant

20    LCD patents; do you remember that?

21            A.   Yes.

22            Q.   And you briefly alluded to that.

23    I'd like to explore that a little bit more in

24    detail with you.

```
 1                      That was your Exhibit 11.1 to your

 2        report; correct?

 3                A.    Yes.

 4                Q.    Let's look at redacted Exhibit

 5        11.1?

 6                      Let's take the blow up off for

 7        just a second.  So looking at this redacted

 8        version of Exhibit 11.1, can we increase that a

 9        little bit -- again, this is an exhibit that you

10        prepared as part of your analysis; correct?

11                A.    Yes.

12                Q.    And the title of your -- the title

13        of your Exhibit 11.1 at the top is you

14        characterize this as the rate of patent

15        portfolio strength and balancing payments for

16        cross licenses in the industry; right?

17                A.    That's right.

18                Q.    You did this to rank the patent

19        portfolios of AUO and other LCD companies;

20        correct?

21                A.    Well, I ranked -- I computed the

22        number of top five percent patents that each

23        firm had, that's right.

24                Q.    Just to step through your
```

1      analysis.  To do your ranking of which -- you

2      did a ranking of which companies own the top LCD

3      patents; right?

4              A.   As measured by patent citations,

5      that's correct.

6              Q.   And you evaluated approximately

7      9,000 LCD patents based on number of citations

8      adjusted for age; correct?

9              A.   That's right.

10             Q.   And that allowed you, Dr. Putnam,

11     to identify the top five percent or roughly 450

12     top LCD patents?

13             A.   Again, that's correct.

14             Q.   And you then determined how many

15     of each of those top five percent patents is

16     owned by nine LCD companies identified in your

17     Exhibit 11.1; correct?

18             A.   Yes.

19             Q.   And the heading here on the

20     left-hand side of your Exhibit 11.1 is 95th plus

21     percentile patents; right?

22             A.   Yes.

23             Q.   So again, we're talking about the

24     top five percent of all LCD patents?

1          A.   That's correct.

2          Q.   And this shows the -- this Exhibit

3     11.1 shows the negotiating positions of the

4     various LCD companies relative to each other;

5     correct?

6          A.   Well, what it shows is the list of

7     top five percent patents that one might think

8     that the number of -- one hypothesis would be

9     that the more important patents that a company

10    has, the better its bargaining position.

11             I actually used this to estimate

12    my model and I found that it didn't pick the

13    data as well as simply using all the patents in

14    the portfolio.

15             So while the hypothesis is

16    plausible, it doesn't fit the data as well.

17         Q.   Dr. Putnam, as you already

18    testified on direct, the weaker party pays the

19    stronger party in a cross license; right?

20         A.   Yes.

21         Q.   And this is a way to assess which

22    parties are stronger and which parties are

23    weaker; right?

24         A.   By one measure, yes.

1           Q.   And this is the measure you used;

2      correct?

3           A.   Sure.

4           Q.   This is your measure?

5           A.   Yes.

6           Q.   And as part of your measure, you

7      determined that at the top on the left, LG

8      Display owns 80 of the top LCD patents in the

9      world; correct?

10          A.   That's what I estimated, yes.

11          Q.   And if you look down toward the

12     bottom, you can see you estimated that AUO owns

13     only sixteen of the top LCD patents; correct?

14          A.   Yes.

15          Q.   And just to be clear, none of

16     those sixteen patents are in this case; right?

17          A.   I'm not sure that that's true.

18     There may be one AUO patent that made the top

19     five percent, so I'm just not sure.  It's no

20     more than one, and it may be zero.

21          Q.   Did you testify in your deposition

22     that none of the sixteen AUO patents are

23     involved in this case?

24          A.   Yeah, I did say that.  And then I

1     went back and actually looked at the data and

2     see where they rank, but I hadn't looked at any

3     of the individual patents.  Once we selected the

4     patents for trial, I think I did see that.  I

5     think I remember seeing in retrospect one of the

6     patents appearing in the top 96th percentile.

7     It won't make any difference in my conclusion,

8     so I won't fight you on -- that was my

9     impression at the time and my opinions don't

10    change whether it's true or not true.

11                Q.   But in any event, LG Display,

12    according to these calculations that you did,

13    owns five times as many top LCD patents as AUO

14    owns; right?

15                A.   Your arithmetic is correct.

16                Q.   And this is a way that you ranked

17    LG Display and AUO in terms of their patent

18    portfolio strength and value?

19                A.   Well, I wouldn't say that it's a

20    way that I ranked the portfolio value, it's a

21    way of ordering the company to explain the

22    effective royalty rate that they pay in the

23    industry.  And it turns out that the rates that

24    they pay are consistent with this ranking.  But

1    I wouldn't go further than that.

2              Q.   Well, previously you went a little

3    further.  You gave a deposition in this case on

4    April 22nd, 2009, that's when I deposed you;

5    correct?

6              A.   Yes.

7              Q.   And on page 184, line 18, didn't

8    you testify as follows, Dr. Putnam:

9              "QUESTION:  So this is a way to

10   rank" -- we were talking about Exhibit 11.1, you

11   remember testifying on Exhibit 11.1 at your

12   deposition?

13             A.   Yes.

14             Q.   "QUESTION:  So this is a way to

15   rank LCD companies in terms of their patent

16   portfolio strength and value?

17             "ANSWER:  Broadly speaking, I

18   would agree with that statement."

19             Was that your testimony?

20             A.   Yes.  And it's still true.

21   Broadly speaking I still agree with it.

22             Q.   So broadly speaking, this is a way

23   to rank LG Display and AUO in terms of their

24   patent portfolio strength and value; correct?

1          A.   For the purpose of analyzing the

2     rates they actually pay in the industry, yes.

3          Q.   And as shown in your Exhibit 11.1,

4     LG Display holds one of the top portfolios in

5     the industry; right?

6          A.   It ranks near the top of that

7     list, yes.

8          Q.   And AUO, sir, is listed seventh

9     out of nine LCD companies; correct?

10         A.   That's true.

11         Q.   In fact, the only companies lower

12    than AUO in patent portfolio strength and value

13    are CMO and CPT; correct?

14         A.   On that list, that's true.

15         Q.   On your list; correct?

16         A.   Yes.

17         Q.   Now, you looked at actual cross

18    licenses; right, existing cross licenses in the

19    industry?

20         A.   Yes.  That's what's redacted from

21    the table.

22         Q.   And slide 19 that you just

23    presented on direct provides some dollar amounts

24    related to actual licenses; right?

1           A.    That's true.

2           Q.    So your slide 19 list the cross

3    licenses between LCD companies?

4           A.    Well, in particular it shows the

5    balancing payments paid by one of the parties to

6    the other, that's right.

7           Q.    And you identify the parties to

8    those cross licenses in your slide six?  Let's

9    look at your slide six.

10          A.    This is not a complete list, but

11   yes, that's right.

12          Q.    These are six of the eight that

13   you looked at; right?

14          A.    Yes.

15          Q.    And you looked at specifically for

16   AUO, AUO's cross licenses with Sharp, with

17   Samsung, with Hitachi; right?

18          A.    Yes.

19          Q.    Now, Dr. Putnam, in each of those

20

21

22

23          Q.    In all of AUO's licenses, AUO has

24   always paid the other party; isn't that right?

1              A.    Among cross licenses within the

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19              A.    The ultimate objective is to award

20      damages to those four individual patents, that's

21      true.

22              Q.    So you're trying to predict the

23      value of AUO's claim on its four asserted

24      patents; right?

1          A.   I wouldn't say predict, but yes, I

2     am trying to measure the value, that's right.

3          Q.   And you concluded that if all four

4     of AUO's patents are valid and infringed, then

5     AUO should recover somewhere between $100,000

6     and $6 million; right?

7          A.   I said that was the most likely

8     range, that's correct.

9

10

11

12          Q.   And that range is based on the

13     four separate estimates you calculated for each

14     of AUO's patents-in-suit?

15          A.   That's right.

16          Q.   So for each of AUO's asserted

17     patents, you calculated a royalty range based on

18     four separate estimates; right?

19          A.   Yes.

20          Q.   You used two, what you called

21     method one estimates and two method two

22     estimates?

23          A.   There is two estimates and then

24     for each estimate there are upper boundaries.

1          Q.   There are two assumptions for each

2     estimate?

3          A.   That's right.

4          Q.   There is the assumption that you

5     think should apply and then there is the top

6     five percent value assumption?

7          A.   That's right.

8          Q.   And that's summarized in AUO

9     Exhibit 1564; right, your estimates?

10         A.   If that's the slide that describes

11    my damages conclusions, then yes.

12         Q.   So let's look at AUO Exhibit 1564.

13    And you calculated as you stated on direct, you

14    calculated ranges of royalties for each patent,

15    you're not offering a specific dollar amount; is

16    that right?

17         A.   Well, it's a very precise range,

18    but you're right, within that range I have no

19    particular preference.

20         Q.   And it may be precise, but it is

21    fairly broad; right?

22         A.   No, actually I disagree.  It's

23    within, typically within a few hundred thousand

24    dollars from the top end to the bottom end.

1     Maybe as much as a couple of million, but you

2     know, that's given the quantity of sales at

3     stake here, that's actually -- particularly

4     relative to LG's claim, it's incredibly precise.

5             Q.   Well, let's be precise.  Let's

6     look at where your royalty ranges start for each

7     of AUO's four asserted patents.

8             For the '629 patent, your royalty

9     range starts at $22,000; isn't that right?

10            A.   Yes.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12          Q.   And if we look at some totals and

13     some averages, we can get I think another sense

14     of your valuation of AUO's claims.  This is a

15     slide that summarizes your conclusions providing

16     some totals and some averages.  Do you see that?

17     Do you see that slide?

18          A.   I see the slide.  I don't

19     understand it yet, but I'm sure you'll explain

20     it to me.

21          Q.   I'll do my best.

22              If you look at the headings,

23     method one, industry price, and method two,

24     apportionment, those are your method one and

1      method two approaches; right?

2              A.   Yes.

3              Q.   And then for each of the four

4      patents listed in this slide, I have set forth

5      the four damages estimates that you have

6      provided for each patent.  Do you see that?

7              A.   Yes.

8              Q.   So again, we have two method one

9      estimates and two method two estimates; right?

10             A.   Yes, that's right.

11             Q.   And then at the bottom along the

12     total column at the bottom, the total row, I

13     have added the four numbers in each of your four

14     estimates.  Do you see that?

15             A.   Yes.

16             Q.   So at the starting point, your

17     first royalty estimate for all four patents in

18     suit, the total is $45,500; correct?

19             A.   Yes, it looks like you have added

20     that correctly.

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22          A.   Based on the objective data,

23     that's true.

24          Q.   And so and each of these, method

1      one and method two ranges, the first number

2      gives the value share for the four patents that

3      you think actually applies; right?

4              A.    That's correct.

5              Q.    And the second number, the second

6      estimate for method one and method two is the

7      top five percent value assumption that you don't

8      think actually applies; right?

9              A.    Well, if one were to disregard the

10     citation data and simply take the parties at

11     their word that these are among the most

12     important patents, then that would apply.  So

13     I'm trying to offer alternative ways of

14     summarizing the data citation, data -- the

15     objective indicators.  They're limited.

16              Obviously, the parties attach some

17     weight to these patents, because they've

18     taken -- undertaken the expense to bring them

19     into Court.  So I think that's also a factor to

20     consider.

21              And so I wouldn't say it

22     doesn't -- that it doesn't apply.  I would say

23     that it ignores the objective evidence.

24              Q.    And your opinion is that we need

1    to rely on the objective evidence; right?

2                    That's important, isn't it?  Isn't

3    that the reason you used citation rankings?

4                    A.   I would say you rely on it, not

5    solely.  You rely on it, because it's the best

6    way of ranking all the patents in both parties'

7    portfolio.

8                    Well, which now are over 3000.  So

9    it's the best available measure for the exercise

10   at hand.

11                   Given that it may not be perfect,

12   it's important to provide a check on that or,

13   you know, basically ask yourself a question:

14   How wrong can I be?  And so if the answer is

15   that we have to throw out that, then we throw it

16   out.  And we have -- it's improved.

17                   Q.   But using your objective indicator

18   of value, which you think is the most

19   appropriate approach, the real range of value?

20

21

22

23

24

```
 1                    A range there.  But if you impose that

 2       restriction, yes.

 3                    Q.   And if AUO cannot prove

 4       infringement for all four patents, AUO's claim

 5       loses value off of those numbers; right?

 6                    A.   That's true by definition.

 7                    Q.   And by definition, if any of AUO's

 8       asserted claims is invalid, then AUO's claim

 9       loses value; correct?

10                    A.   I think that's also true by

11       definition.

12                    Q.   In fact, your average royalty for

13       the '157 patent, for example, is only $174,250;

14       correct?

15

16

17

18                    Average for that range.  But

19       that's a number you've calculated.

20                    Q.   And --

21                    A.   The more appropriate thing would

22       be to take the average of the low end and the

23       average of the high end, and then pick some

24       number in between.
```

1          So that would be the appropriate

2    thing to do.  But if you treat them as four

3    independent numbers, then it's the 174,000.

4

5

6

7

8

9

10

11          THE COURT:  All right.  Thank you.

12          MR. TYLER:  I have no further

13    questions, Your Honor.

14          THE COURT:  All right.  Thank you,

15    Doctor.

16          MR. SHULMAN:  AUO rests.

17          THE COURT:  All right.  Thank you.

18          MR. BONO:  Your Honor, I assume

19    all motions are reserved until post-trial

20    motions?

21          THE COURT:  We'll assume that you

22    would interpose the appropriate motions at this

23    time, and so your position is reserved.  And

24    they can become part of the post-trial briefing.

```
 1                    There's no objection?

 2                    MR. SHULMAN:  No.  I was wondering

 3      how if you granted the motion, you would take

 4      the case away from yourself.

 5                    THE COURT:  That's what I was

 6      thinking.

 7                    Okay.  Mr. Bono.

 8                    MR. BONO:  Yes, Your Honor.  We're

 9      ready to proceed.

10                    We would call Dr. Rubloff as our

11      next -- first witness.  Mr. Goodwyn will present

12      the witness.

13                    THE CLERK:  Sir, do you want to

14      swear or affirm?

15                    THE COURT:  You know, while we're

16      doing this, if we can get Mr. Tyler and Mr.

17      Christenson.  Is Dr. Putnam still here?

18                    MR. SHULMAN:  Yes, he's here.

19                    THE COURT:  Could he just come up

20      to side-bar for a mini -- lawyers that want to

21      come, at least those two -- to conduct a mini

22      examination.

23                    (Beginning of side-bar

24      conference:)
```

BY THE COURT:

       Q.   I was going to save this, because I know I'm going to see you again, but I thought I'd ask it now.

       A.   Sure.

       Q.   So we have the hypothetical negotiation?

       A.   Yes.

       Q.   And we have your model to apply to that negotiation?

       A.   Yes.

       Q.   And understanding all the data that you've relied on and the premises of that model, --

       A.   Yes.

       Q.   -- in your opinion, why haven't these parties been able to negotiate on the basis of your model?

       Let me just expand a little bit --

       A.   Mm-hmm.

       Q.   -- away from the patents-in-suit here.  But why haven't they been able to negotiate a worldwide license, a cross-license?

       A.   Well, it's an excellent question,

1    Your Honor.  And, of course, I'm not privy to

2    all their actual negotiations, so I am speaking

3    without full knowledge.

4              What I can say is that LG's

5    damages claim, the alleged aggregate value of

6    the claim is about $700 million.  And so whereas

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1      conclusion and having some appreciation for the cost

2      of patents, you having some appreciation for the cost

3      of patent litigation, is that -- does that cost make

4      any sense to you, as an economist, under any theory

5      that you can conjure up?

6                     A.   I understand your question.   I

7          think I understand your question.   And --

8                     Q.   Well, there's a certain cost to

9          engage in this litigation.

10                    A.   Yes.

11                    Q.   And typically, you know, we'll

12         have patent cases where parties will spend 20,

13         $25 million, but they're going after a $12

14         billion a year industry.

15                    A.   Yes.

16                    Q.   Even I understand that.   25

17         million, 12 billion a year.

18                    A.   Right.

19                    Q.   I understand.   With the numbers

20         here and what we've been hearing in this

21         commercial marketplace, and in this competitive

22         arena, does the typical cost of patent

23         litigation make sense to you, as an economist,

24         in the context of the numbers you're proposing?

1          A.   Yes.  I do understand your

2     question.

3               And it's clearly the case that if

4     you were to award AUO the full damages that I

5     have recommended, AUO would not recover its

6     litigation costs.

7               And in two weeks when I testify

8     about LG's claim, I expect that LG would not

9     recover its litigation costs based on the

10    damages that I recommended for LG.

11         Q.   So does that kind of push us back

12    into your thought that this might really be

13    about the deflecting competition early on, or

14    does it give us some other lead to another

15    theory that would make sense to you, again as an

16    economist, or a damages expert?

17         A.   I think there are two answers.

18    First of all, it may very well be worthwhile,

19    because Your Honor obviously has the power to

20    injoin an injunction, an incredibly important

21    weapon in a negotiation.

22               And so often times in litigation,

23    the damages are really a sideshow to the

24    equitable relief that the Court is expected to

1  award and the parties bargain over that.

2                     The other --

3            Q.   Let's assume here it would be just

4  like cross-licensing.  It would be

5  cross-injunctions.  So it would put everybody

6  out of business?

7            A.   Yes, that would -- that --

8            Q.   You and I would work in the LCD

9  business.

10           A.   That's right.  Well, that's

11  obviously an incentive for both parties to

12  negotiate, if you were to award that.

13                     The other thing I think it's fair

14  to say is that damages award -- well, my

15  opinion, as an economist, is that there's very

16  little science that goes into damages award.

17                     I've spent a lot of my

18  professional life trying to more accurately

19  value patent rights, so that you don't have a

20  situation where somebody can go into Court and

21  ask for the moon and then settle outside of

22  Court for pennies on the dollar.

23                     That's often what you see

24  happening.  There's no relationship between what

1    parties actually pay in the marketplace and what

2    they say in the courtroom.

3                    That's a -- that's a frustration

4    in my business, because I'm privy to the

5    settlement negotiations.  I know what parties

6    settle for.

7                    And then I also see what they ask

8    for in the courtroom, which may be a hundred

9    times that.  Insofar as the possibility exists

10   that one party can come into this Court and make

11   a very large claim that can -- it may not vary

12   in a relationship to the truth, but there's a

13   chance of a jury, in particular, never having

14   seen these numbers before, a chance of a jury

15   awarding that large number.  And that the

16   prospect of that large award influences both the

17   conduct of the litigation and the settlement

18   negotiations.

19                   So while I have done the best that

20   I can to actually measure the value in the

21   marketplace from real transactions about the use

22   of these patents, there's no question that in a

23   courtroom juries have awarded amounts that bear

24   no relationship to those actual transactions.

1          And if you thought you could get a

2      jury to do that, you might proceed to trial on

3      the chance that you'll win the lottery and

4      receive something that you wouldn't get at the

5      bargaining table.

6              THE COURT:  Okay.  It's your

7      witness.  Did you have anything you wanted to

8      ask about what I've asked?

9              MR. TYLER:  That's great.  I'm

10     fine.

11             THE COURT:  Mr. Christenson?

12             MR. CHRISTENSON:  No questions.

13     Thank you, Your Honor.

14             (Conclusion of side-bar

15     conference.)

16             THE CLERK:  Please state and spell

17     your full name for the record.

18             THE WITNESS:  Gary Wayne Rubloff.

19     G-A-R-Y, W-A-Y-N-E, R-U-B-L-O-F-F.

20

21       GARY WAYNE RUBLOFF, PH.D.,

22         the deponent herein, having first

23         been duly sworn on oath, was

24         examined and testified as follows:

```
 1                    DIRECT EXAMINATION

 2   BY MR. GOODWYN:

 3          Q.   Good morning, Dr. Rubloff.

 4          A.   Good morning.

 5          Q.   Were you asked to form opinions

 6   regarding AUO's '629 patent?

 7          A.   Yes, sir, I certainly was.

 8          Q.   Before we get into explaining your

 9   opinions, can you briefly describe your

10   education and work experience?

11          A.   Yes.  I took my bachelors, masters

12   and Ph.D. degrees from the University of Chicago

13   in physics.  I then did a post-doctoral

14   researcher appointment at Brown University which

15   led me into the area of surface and interface

16   science.

17               And in the course of the

18   professional experience that I've had, I have

19   published about 200 papers.  I've -- let's see,

20   I missed the -- excuse me.

21          Q.   I apologize.

22          A.   I have had twenty patents issued

23   in the areas of electronic materials,

24   manufacturing processes, and testing in
```

 1      semiconductor technologies.  And I'm a fellow in

 2      two professional societies.

 3              Q.   Can you also explain some of your

 4      work experience?

 5              A.   Yes.  After I finished my

 6      post-doc, I went to IBM Research Center in New

 7      York for twenty years where I started as a

 8      research staff member in the science areas, and

 9      gradually got involved looking at IBM

10      semiconductor technology and trying to elucidate

11      some of the important factors in materials and

12      processors for those technologies.

13              In about 1985, I spent a very

14      special year of my career as technical assistant

15      to the vice-president for logic and memory, who

16      later became IBM's chief scientist.  And I

17      emphasize that because it changed my career.  It

18      led me into technology areas as you see, I went

19      into management, senior management of silicon

20      technology, and I managed thin film process

21      modeling in the manufacturing research

22      department.

23              But the perspective that I gained

24      in that, I always say that was the best year of

1     my career, is that I was able to see many

2     technologies across the spectrum that IBM had at

3     the time.

4                My job was in substantial part to

5     do the homework of the chief -- of the VP in

6     preparing the ten-year technology outlook for

7     the company which he then presented to corporate

8     management board.

9                That gave me a chance to see

10    gallium cyanide silicon, optimal electronics,

11    storage displays and other technologies and to

12    work with the directors of all of those

13    divisions.  As it happened, it was also my first

14    introduction to LCD technology because I

15    remember very well a tasks force that was going

16    on at that time that I had attended on behalf of

17    my boss to see what IBM's position should be in

18    the new era of opportunity in LCD technology.

19                In the course of doing all of

20    these things, I did research through this entire

21    time, in fact, I'm still doing plenty of

22    research.  I think I was -- it's fair to say i

23    was recognized as a leader in integrated

24    semiconductor processing and equipment

1    technology, those things which helped one

2    realize what chemical and physical processes can

3    achieve in a technology, and for that I was

4    awarded a well-known prise by the American

5    Vacuum Society.

6            Q.   Were those experiences in

7    semiconductor processing and equipment

8    technology relevant to the manufacturing of

9    liquid crystal displays?

10           A.   Yes, certainly.  In particular,

11   the wiring and the thin film transistors that

12   are built in liquid crystal displays are exactly

13   the same processes used in many of those other

14   technologies.

15                And furthermore, when you look at

16   the equipment industry that supplies those

17   expensive machines that go into those expensive

18   factories, they're the same companies basically

19   making ULSI claims, making LCD displays and the

20   like.

21           Q.   After working at IBM, what did you

22   do?

23           A.   I went to academia where I still

24   am.  In particular, I went to North Carolina

1     State University.  I had served on their

2     Industrial Advisory Board and knew the work very

3     well.  They were at the time the leading center

4     for research and development in academia of the

5     kinds of technologies needed for semiconductor,

6     particularly silicon devices.

7                    And it was an unusual situation

8     because this is a center sponsored by The

9     National Science Foundation, but in this

10    particular case together with an industry

11    consortium called the Semiconductor Research

12    Corporation.

13                    After that I went to the

14    University of Maryland in 1996 where I have had

15    a number of positions beside my research in

16    teaching.  I was director of another engineering

17    research center.  I have a title.  And five

18    years ago I was asked to start the Nano

19    Technology Center at Maryland, which I did.  And

20    I learned last month that I have another

21    director's job to do.

22             Q.   You're still a professor at the

23    University of Maryland today?

24             A.   Yes.

1        Q.   Well, in addition to work within

2   the universities, did you also have any

3   experience with industry?

4        A.   Yes.  I have enjoyed that from my

5   IBM days for sure.  I have worked as a

6   consultant.  I have had research support from a

7   number of companies.  They are across the

8   spectrum of kinds of companies involved in this

9   area.  And in particular I remember well in 1994

10  when the industry started its pre-competitive

11  technology roadmap working with that it's called

12  the SIA roadmap at the time, working with one of

13  those groups in metrology.  And in particular I

14  remember leading the group on advanced process

15  control which has been a dominant theme in the

16  industry, now it's actually been accepted quite

17  well.

18       Q.   And was much of that research

19  relevant to liquid crystal display manufacturing

20  technologies?

21       A.   Oh, absolutely.  One of the things

22  that's -- well, the LCD industry, the storage

23  industry, they all have these consortia for

24  pre-competitor research with the roadmaps and so

1      on, they use very similar processes in large

2      part, the same companies make the equipment to

3      do that, and so on.

4                    In fact, that was the reason why

5      in 1994, actually, the same time, I started in

6      the professional society, the topical

7      conferences that led to the establishment of a

8      manufacturing and science technology focus

9      group.

10             Q.   You mentioned earlier that you

11     were also involved in research.  What type of

12     research were you involved in?

13             A.   Well, that's changed over the

14     years.  As I said, I started in fundamental

15     surface and solid state physics and interface

16     science.  It migrated increasingly into

17     materials and process science and technology,

18     and that relationship of those processes to each

19     other and to the equipment that's needed to make

20     that happen.  And I have enjoyed 25 or $30

21     million of support from the National Science

22     Foundation, other government agencies in the

23     defense and intelligence industry, private

24     foundations and so on.

1      Q.   Was any of this research relevant

2  to the manufacturing processes for liquid

3  crystal displays?

4      A.   Yes.  Certainly.  For the parts

5  that create the TFT and wiring networks that are

6  found on LCD displays, it's very relevant.

7      Q.   Have you previously been qualified

8  as an expert in a patent infringement

9  litigation?

10     A.   Yes, I was.  A couple of years ago

11  the case between LG and Chunghwa Picture Tubes

12  in California.

13     Q.   What were the patents in that

14  case?

15     A.   I was responsible to opine on the

16  '449 and the '737 patent.

17     Q.   Are those patents directed to

18  manufacturing of liquid crystal displays?

19     A.   Yes.

20          MR. GOODWYN:  Your Honor, I would

21  like to offer Dr. Rubloff as an expert in the

22  field of semiconductor and thin film

23  manufacturing and processes including

24  manufacturing of thin film transistors for

1        liquid crystal displays.

2                    THE COURT:  All right.

3                    MR. SHULMAN:  No objection.

4                    THE COURT:  All right.  He's

5        accepted.

6    BY MR. GOODWYN:

7                    Q.   Now, Dr. Rubloff, you mentioned at

8        the beginning of your testimony that you had

9        formed some opinions regarding the '629 patent.

10       What information did you consider in forming

11       those opinions?

12                   A.   Well, there were lots of

13       documents.  Of course, the patent itself and its

14       file history.  The discussions which accompanied

15       claim construction and the formation of joint

16       claim construction statements.  The expert

17       reports, particularly of Dr. Silzars on

18       infringement and validity.  The exhibits that

19       were included within those reports.  A number of

20       prior art patents and publications.  I also

21       considered as relating to the use of pattern

22       density and how one manages it when it becomes a

23       problem.  I actually knew about that field and

24       already brought some of those articles to the

1    fore of my attention from the work I did in

2    advanced process control already.

3              I looked at many GDS files.  These

4    are the mask files that describe the LG Display

5    products.

6              And I've considered deposition

7    transcripts, including In Duk Songs and Youngwoo

8    Cho.  And of course I have listened to the

9    trial.

10         Q.   What are your opinions with

11   respect to infringement and validity of the '629

12   patent?

13         A.   Well, the first opinion I have is

14   that the accused products of LG Display do not

15   infringe Claim 7 and 16 of the '629 patent.

16             I say this on the basis of

17   understanding the structure which has been

18   discussed, if not debated here in the courtroom

19   called dummy patterns.

20             Dummy patterns are used in

21   manufacturing, in specific manufacturing process

22   as a way to deal with the complexity of the

23   structures that you have on the panel.  And the

24   way chemical and physical processes come out

1    once you have these -- some structures in place

2    and attempt to build other ones.  So I have been

3    able to consider that.  And I have known about

4    that.

5              I know you've heard that the

6    accused wiring in this case, which Dr. Silzars

7    has talked about is what's called line on glass

8    wiring.  And I have found having looked at all

9    of the accused structures in the mask files

10   associated with them, that this LOG wiring is

11   present in all of them, and they are certainly

12   not dummy patterns as described in the '629

13   patent.

14             Furthermore, I have tried to make

15   an analysis of the fractional area, the amount

16   of such dummy patterns if we were to make the

17   erroneous assumption that the line on glass

18   patterns are dummy patterns to see if they would

19   reach the thirty percent figure that's specified

20   in the patent and they do not.

21             Therefore, my conclusion, the

22   accused products do not infringe Claim 7 and 16

23   that have been asserted.

24        Q.   And do you also have an opinion

1    with respect to whether the '629 patent is

2    valid?

3            A.   Yes, I certainly do.  I believe it

4    is invalid.  First of all, the claims are

5    indefinite.  I will hope to talk more about that

6    as we go along.

7            Secondly, the prior art discloses

8    all of the elements of the asserted claims.  And

9    finally, on-sale bar, there were LG Display

10   products which if we assume the constructions

11   that have been offered by Dr. Silzars, those

12   products were sold more than a year before the

13   US filing of the '629 and, therefore, constitute

14   an on-sale bar invalidity.

15           Q.   Let's first look at why you

16   believe Claim 7 and 16 are noninfringed.  What

17   is your opinion regarding Claim 7?

18           A.   So, Claim 7 is a dependent claim.

19   It depends on Claim 1, the independent claim

20   which is shown here, so this is a listing of the

21   elements of Claim 1.  And I have looked at each

22   of these elements and what I find is two things;

23   one, is this first element, a layer of an

24   insulating substrate, having an area, is

1    indefinite.  I would like to speak more about

2    that later.

3              And secondly, when we look at the

4    dummy conductive patterns statements that are in

5    the final element of Claim 1, the LG products

6    that have been -- have been accused, excuse me,

7    do not have dummy conductive patterns.  And

8    structures which are there even if they were

9    dummy conductive patterns do not comprise thirty

10   percent of the area of the insulating substrate.

11   So because Claim 1 is not infringed, I conclude

12   Claim 7 cannot be infringed.

13             Q.   Do you have a similar opinion with

14   respect to Claim 16?

15             A.   Yes, I certainly do.  Claim 16 is

16   again a dependent claim, and it's dependent on

17   Claim 9, the independent method claim that

18   corresponds essentially to Claim 1, the

19   independent claim of structure.

20             So I have marked again the two

21   elements, the forming a layer of insulating

22   substrate, having an area, as indefinite, and

23   then the last element about dummy conductive

24   patterns not being met by the LG products.

1          Q.   When you say the dummy conductive

2     pattern element is not met by the LG products,

3     what are dummy conductive patterns in the

4     context of the '629 patent?

5          A.   Dummy conductive patterns as I

6     said earlier are structures that are put into

7     the design of a product in order to aid a

8     manufacturing step.

9               And they have nothing to do with

10    the operation of the final product.  They are

11    only to help get the manufacturing process to

12    work so that the product can work.

13              Now, both parties agree that dummy

14    conductive patterns do not convey electrical

15    signals during the operation of the display.  So

16    in Trial Exhibit 1074 here, we have the claim

17    term dummy conductive patterns.  LG's

18    construction is that portions of the layer that

19    do not receive or convey voltages or signals is

20    what a dummy conductive pattern is.

21              AUO's is somewhat more restrictive

22    than that, but it's essentially the same, a

23    metal pattern that does not conduct signals or

24    current used in the operation of the display.

1          So this is a little more

2     restrictive, but the important point here is

3     that both parties agree that if you have a dummy

4     conductive pattern, it cannot convey electrical

5     signals when the display is working.

6          And I note that this is also

7     supported by other things.

8          Q.   What is your opinion regarding the

9     structure of LG Display's products that AUO has

10    accused of being dummy patterns?

11         A.   They do not involve dummy

12    patterns.  The structures which Dr. Silzars has

13    pointed to are line on glass structures which

14    you see here.

15         Let me take a minute to explain

16    this in some detail because I want to make sure

17    that we make contact with earlier discussion

18    yesterday and with the essence of what's here.

19         So what you see here is a picture

20    of -- it is an optical micrograph of an LG

21    product denoted as Trial Exhibit 903.

22         On the right side in the upper

23    portion, you see the gate pads which then fan

24    out to the gate lines in the TFT array that

1      makes the actual picture.  As we move down on

2      the right side to the bottom, what we see is

3      wiring that goes from the pads on the product to

4      TCP, that's -- I have forgotten what that is.

5             Q.  Was it tape carrier package?

6             A.  Thank you, tape carrier package.

7      This piece of plastic which has wiring on it and

8      it goes to where there will be a chip.

9                  Now, the wiring from that chip

10     also extends to the portion here which is toward

11     the center of the structure.  And that wiring

12     goes to other pads on the substrate which are

13     shown near the middle of this structure.  And

14     these are the pad connections to the line on

15     glass interchip wiring.

16            Q.  Let me try putting on the

17     overhead, perhaps a little bit bigger picture,

18     that might help.

19                  Are these photographs that were

20     included with your expert report?

21            A.  Yes.

22            Q.  I believe this is a portion that

23     you were just discussing up here in the top

24     left-hand corner.  And it's continuing down.

1    What do you see continuing down?

2           A.   So, these are the wiring to the

3    pads for the gate connections.  They then go on

4    to the TCP, and to the chip that drives the gate

5    connections.

6           There are also a set of wires from

7    the chip which come up to -- in this picture --

8    the left side of the pads at the gate level and

9    then wires extend out from them and these are

10   the line on glass wires.

11          Q.   Let me show one more photograph

12   that was included with your expert report that

13   shows a little bit bigger view.

14          What is shown now on this display?

15          A.   Well, this is the entire chip that

16   is on the tape carrier package here.  So

17   basically the idea is that there are things not

18   shown right in the middle that go to drive the

19   gate lines from the gate driving chip, but there

20   are also wires which come from the chip on to

21   the tape carrier package to additional pads next

22   to the gate pads and then to the line on glass

23   patterns of wiring that allow this chip to

24   communicate with the chip that's down further to

1    the left, not shown on this drawing.

2            Q.   Is it your understanding that the

3    chip that's shown on the display is necessary

4    for the operation of the display?

5            A.   It sure is.  If you pull it off,

6    the display will go dark.

7            Q.   Okay.  There's a demonstrative to

8    your left that shows a printout of a mask file.

9    Can you show us on the demonstrative where these

10   photographs would correspond to?

11           A.   Yes.  They are upside down.

12   Please understand we have to think that way.

13               So what we have here, this is the

14   edge of the TFT display panel.  These are the

15   pads that I alluded to on the left, center and

16   right.

17               The wiring, which I was talking

18   about, the line-on-glass wiring comes from a

19   side software that are in the circuit boards.

20   Wires turning the corner here.  They then go out

21   through some of the pads with the line-on-glass

22   wiring to the TCP to a chip.

23               Here that chip now has the

24   information necessary to give the right signal

1      to the gate pads here that drive all of these

2      rows that are going to be on this display.  And

3      the chip will send other information to the

4      line-on-glass patterns through an additional set

5      of pads here, that then go through the

6      line-on-glass wiring to the next chip.

7               Send the information through the

8      line-on-glass pads here to the next chip.  The

9      next chip drives these lines that fan out here

10     like this, and sends the -- the information back

11     to -- back here onto the -- onto the panel to

12     more line-on-glass wiring that goes to the next

13     chip and so on.

14               This is a blow-up.  In the middle

15     portion here showing the line-on-glass pads

16     here, that would connect, as I said, to the

17     chip.  And then funnel that information down

18     these structures to pads that communicate with

19     the next chip.

20               MR. GOODWYN:  Your Honor, may I

21     approach the witness?

22               THE COURT:  You may.

23     BY MR. GOODWYN:

24          Q.   Dr. Rubloff, I'm going to hand you

1    a panel from a LCD product manufactured by LG

2    Display, and I wonder if you could just very

3    briefly explain, using the panel, the

4    line-on-glass approach you just discussed?

5              A.   Yes.  So to keep it -- may I

6    stand?  Is that okay?

7                   THE COURT:  Yes.

8                   THE WITNESS:  So to keep it in the

9    same orientation as you see here, the display

10   communicates with the outside world here through

11   printed circuit boards to give information to

12   the -- to the source lines here, which are

13   driven by the source driver chips here.

14             The technology advance that

15   happened here, wouldn't it be nice if I didn't

16   have this?  Well, we used to have that up here.

17             Now, what we have is just these

18   little tape.

19             Carrier packages with chips on

20   them here.  And they get the information, not by

21   this rudimentary way of doing it, but by having

22   signals, line-on-glass signals that go through

23   the glass here, go over to the corner, turn the

24   corner here, then go on to take care of your

1    package.  Excuse me if I use some more

2    interesting language.

3                    Talk to the chip.  Tell the chip

4    here what signals to send out to the gate lines

5    in this region.

6                    Then those -- that information,

7    and power and other things are communicated back

8    onto the glass, the line-on-glass wiring.  Then

9    out here to the next chip, back over and so on.

10           Q.  Dr. Rubloff, did you review LG

11   Display's mask files -- I'll take this from you.

12                    Did you review LG Display's mask

13   files to determine whether or not all of the

14   accused products use this line-on-glass

15   technology?

16           A.  Yes.  I looked at every one of the

17   -- at the mask files for every one of the

18   accused products.

19           Q.  And are the -- put up on the board

20   -- I'd ask you to look at your binder that you

21   have with you.  There's a tab with 46 numbered

22   tabs.

23                    If you could look at the first

24   one, and the first page of the first one.

1          A.   Yes.

2          Q.   There's a printout from a mask

3     file.  Is this the printout from the mask file

4     in your notebook?

5          A.   Yes.

6          Q.   Okay.  Now, how do you know that

7     this uses line-on-glass technology?

8          A.   Well, right here what we see are

9     gate pads that go to the fan out for the gate

10    structures.  And next to it we see a number of

11    pads here that would then be communicating

12    through the tape carrier package to a chip.

13               And it shows a number of

14    structures here.  And if I follow on the mask

15    file, these structures, for example, this heavy

16    one here that goes this way or this one here

17    that goes this way, these guys go a long

18    distance to the left, and then come back in a

19    fairly symmetrical pattern to what we see here

20    near the location of the next chip.

21          Q.   Now, if we zoom in on one of those

22    pictures, which I believe is probably the third

23    picture in your binder, you see some text, VOG,

24    VVV, GOE.

1              Did you add those labels?

2         A.    No.   The mask file, the GDS file

3    that gives a complete design of this structure

4    has the different, for example, the red layer,

5    for gate metal, the different layers of material

6    that are patterned on this structure, but it

7    also includes layers that are really there to

8    annotate the design.

9              And so this layer is a separate

10   layer in the mask file that you can turn on and

11   off in various kinds of viewers we have for

12   dealing with GDS software.  And so this is

13   simply there because I turned on that layer, so

14   it would print.

15             Incidentally, these displays are

16   so complicated, the designers need these kinds

17   of annotations to keep track of where they are.

18        Q.   Okay.  Just before those numbered

19   tabs, there's a list that's three pages long

20   that identifies each of the mask files

21   associated with the 46 tabs.

22             Does this document reflect the

23   names of the mask files that you reviewed with

24   respect to your noninfringement analysis of the

1          '629 patent?

2                    A.   Yes.  I didn't memorize all 46,

3          but they look just about right.

4                    MR. GOODWYN:  Your Honor, I'd like

5          to move into evidence the list of mask files

6          that Dr. Rubloff reviewed, and it's from LGD

7          Trial Exhibit 380.

8                    MR. SHULMAN:  No objection.

9                    THE COURT:  It's admitted.

10    BY MR. GOODWYN:

11                   Q.   Now, Dr. Silzars -- first, you

12         said you were present in the courtroom when

13         Dr. Silzars testified; is that right?

14                   A.   Yes, I was.

15                   Q.   Now, Dr. Silzars had testified

16         about line-on-glass being necessary for etching

17         and to protect those outermost lines in the fan

18         out.  Do you agree?

19                   A.   No, I do not agree.

20                   Q.   Why?

21                   A.   Actually, in my deposition

22         testimony, I talked about the pattern dependency

23         that sometimes is an issue for

24         manufacturability.  And one of the things that I

1    said was that these pattern dependencies are

2    known.

3               We try -- when we're developing a

4    product or a technology, we try to first develop

5    the rudiments of that so that we can make some

6    devices working, and so that we know what are

7    the next set of problems to address.

8               Because by the time you get to a

9    product this complex, there may be many such

10   challenges.  So we don't -- we know that pattern

11   dependency can happen.

12              But we only address it when we

13   start to see where there's evidence for it.  And

14   there is no evidence that's been presented nor

15   that I have seen of a pattern dependency in any

16   of these LOG structures.  In fact, there's

17   evidence to the contrary.

18        Q.   What evidence to the contrary are

19   you discussing?

20        A.   Well, one thing is the testimony

21   of In Duk Song from LG who said they had

22   analyzed this.  They had never seen a problem

23   that is that one described in the specification

24   of the '629 patent.

1              The second is that yesterday we

2     saw a mask file where those LOG structures were

3     not present during the time of etching.  So

4     that's a very nice experiment to test whether

5     there is a problem such as that highlighted in

6     the specification of the '629.

7              Q.   Is the mask file you just

8     mentioned on the display now that's been marked

9     as LG Display Trial Exhibit 1080?

10             A.   Yes, it is.

11             Q.   How do you know there aren't any

12    patterns present during the etching of the fan

13    outs of the gate metal?

14             A.   From a number of things.  First of

15    all, I note we saw this zoomed up yesterday.

16             But the gate layer is the red

17    layer here.  I happen to remember what they are

18    and I know these colors by now.

19             The blue is a silicon layer.  The

20    source drain layer is the kind of pink-purple

21    layer and so on.

22             And so when this structure was

23    made, the blue layer was not present.  These are

24    little blue dots actually.

```
 1                And they were not present when the

 2      etching of the gate metal layer, which is in red

 3      was actually done.  So here's the case where

 4      there was no metal in the region where the

 5      line-on-glass wiring of gate metal is present in

 6      the accused LG products.

 7                Q.   Would this figure that's now on

 8      display, which just shows the gate metal layer,

 9      show the structures that would be present during

10      the etching of the gate metal layer?

11                A.   Absolutely.

12                MR. SHULMAN:  Could we just

13      identify what it is we're looking at?

14                MR. GOODWYN:  Sure.

15                MR. SHULMAN:  The record is going

16      to be a mess.

17                MR. GOODWYN:  I identified it as

18      LG Display Trial Exhibit 1080.

19                MR. SHULMAN:  Production numbers.

20                MR. GOODWYN:  They're printouts

21      from a mask file, which I think I read out

22      yesterday, which is NBPC_P2_10.41 -- or excuse

23      me, 10.4_ SVGA_G005.gds.

24                MR. SHULMAN:  Thank you.
```

1

2

3

4          Q.   Now, I apologize, Dr. Rubloff.

5     Did I interrupt your testimony?

6          A.   Well, let's see.  I think your

7     question was you said that this is a printout,

8     which shows only the gate layer.  And so you can

9     see that there is -- there are pads here that

10    could have been used in this product for

11    line-on-glass wiring, but there is no such here.

12              We don't see these structures

13    that -- if I may now refer to this big poster

14    here.  We don't see these structures, those

15    accused by Dr. Silzars in the product.  Yet this

16    product has been sold successfully, I

17    understand.  And I think that's a very good

18    evidence that there was no problem here --

19         Q.   Okay.

20         A.   -- with the etching described in

21    the specification.

22         Q.   Well, in addition to the fact

23    that, in your opinion, LG Display's products

24    don't have dummy conductive patterns, you also

1     mentioned that they don't meet the limitation

2     related to the 30 percent of an area.

3                    What is your understanding of the

4     meaning of that in the claim in the context of

5     the '629 patent?

6                    A.   So I made a slide for that.   Thank

7     you.

8                    So what's important in

9     interpreting the last element of Claim 1, and I

10    guess it was Claim 9 is to understand how would

11    we interpret area to evaluate a 30 percent

12    limitation.   Thirty percent is always enumerator

13    over a denominator.

14                   Now, the claim term that we start

15    with is a layer of insulating substrates having

16    an area.   My belief is that this is indefinite

17    because there are many layers on these

18    substrates.   And there's another part of the

19    claim which says forming a layer, and we know

20    this technology is all -- all about forming a

21    layer.

22                   And once we have these layers,

23    they have different pieces to them.   So there

24    could be many different areas.

```
 1              So that's the basis on which I
 2    think this is indefinite.  I do believe that the
 3    best interpretation and construction for this
 4    claim term, and I want to adopt some term --
 5    some construction in order to make an analysis
 6    of infringement, is that offered by LG Display,
 7    which is material deposited and patterned on
 8    substrate, such as glass, that covers part of
 9    the array substrate surface.
10              We didn't get any help from AUO on
11    what this claim term means.  I guess that means
12    that they don't agree it's indefinite.
13              The word area is certainly
14    indefinite, and so I've interpreted it in this
15    way.  I would have to say that AUO's
16    construction didn't help me either by giving
17    just a synonym.
18         Q.   Okay.  Well, did you prepare a
19    demonstrative that helps you to explain what
20    that construction means?
21         A.   Yes.  I hope it's the next slide.
22              Yes.  Thank you.
23              So Claim 1 talks about a layer of
24    an insulating substrate, having an area.  And
```

1    Claim 9 is about forming it.

2                    So we start with the glass

3    substrate.  That's what all these technologies

4    begin with.

5                    Then we deposit the gate metal

6    layer or the first layer on the substrate which

7    would be patterned.  And then next we pattern

8    that structure to form pads for bringing signals

9    into the gate lines and then fan outs of those

10   signals to the gate lines that stretch across

11   the substrate.

12                   And so this area that we see from

13   the left where you see they're kind of really

14   larger things to the right and all the way

15   across the panel is where the picture would

16   appear on the display that we're looking at.

17                   The dummy patterns in the '629

18   patent are specified to be situated between the

19   connection pads, which are these dark -- two

20   dark things at the left hand of this picture and

21   the pixel electrodes, which is everything in the

22   picture part of the display.

23                   And so I've colored in yellow the

24   region where the dummy patterns would have to

1    exist.  I should note that I've gone a little

2    too much towards the front with the element.  It

3    should go from the foremost gate line to the

4    rearmost gate line.

5         Q.   Okay.  Now, what is your opinion

6    regarding AUO's infringement claims related to

7    the claim limitation dummy conductive patterns

8    comprising about 30 percent of the area?

9         A.   Well, I'm sorry.  If you'll just

10   leave that -- if you'll leave that up then.

11        Q.   Okay.

12        A.   If there were to be dummy

13   conductive patterns, they have to be in the

14   region specified by yellow.  And so in

15   evaluating the percentage, I will take the area

16   of the dummy conductive patterns and divide by

17   the area of the entire layer, because I think

18   that's the appropriate way to look at the

19   definitions that are here, and the final element

20   of Claim 1.

21        Q.   When you say total layer, are you

22   referring to the total layer on the substrate or

23   the total layer occupied by the metal?

24        A.   Just by the metal.  There's an

1    important physical reason for thinking this way.

2           We build the gate line structures

3    by the thousand or so to be able to run this

4    display, and the dummy patterns would be there

5    to improve manufacturability, if needed, of

6    those gate line patterns.

7           So a measure of how much has been

8    needed from dummy patterns is to relate what's

9    been added to the things which need to be there

10   already.

11          Q.   Okay.  Now, with respect to the

12   specific 30-percent limitation, did you form an

13   opinion?

14          A.   Yes.  Under this algorithm for

15   figuring out what the percent would be, the LOG

16   wiring in the products is certainly less than 30

17   percent of the gate metal layer.

18          Q.   And what if you were to interpret

19   it differently?

20          A.   Well, I thought of other kinds of

21   interpretations because of the indefiniteness

22   problems with this pattern.  And another one I

23   thought about is, well, suppose the LOG wiring

24   were to be dummy patterns.

1          I'm sorry.  That's the assumption

2     in both of these cases.  If we were to assume

3     the LOG wiring were a dummy pattern, which it's

4     not, what fraction would it comprise of the

5     portion which was essentially the yellow part?

6          And I did that calculation.  So if

7     the LOG wiring here were a dummy pattern, what

8     fraction of the yellow area, essentially would

9     that be?  And that's under that.

10          Q.  Can you turn and point to the

11     demonstrative of the full mask file of one of

12     the accused LG Display's products of the area

13     you considered?

14          A.  So, yes.  So the gate pads are

15     this region, this region and this region.

16          The fan out of those -- to the

17     lines comprising -- this is kind of -- I hope we

18     can see triangular region, triangular region,

19     triangular region.

20          And the portion that the line on

21     glass wiring going from this end to here and

22     then from here to here and from here to here is

23     shaped like this, the portion of that.  That

24     starts at the -- at -- the end of the pads

```
1     closest to the TFT array would be included in

2     that configuration.

3              Q.   Now, in addition to forming an

4     opinion with respect to noninfringement, did you

5     also form an opinion with respect to the

6     validity of the '629 patent?

7              A.   Yes, I did.

8              Q.   In addition to your invalidity

9     discussions that you've just had, did you also

10    review prior art?

11             A.   Yes, I did.

12             Q.   Did you review a reference that

13    I'll refer to as the Hirabayashi '695 or EP

14    '695?

15             A.   Yes.

16             Q.   Is this that reference?

17             A.   That's the reference.

18             Q.   Did you form an opinion as to

19    whether or not EP '695 anticipates the asserted

20    claims?

21             A.   Yes, I did the evaluation this

22    way.  I looked at each and every claim in the

23    '629 patent, which was asserted.

24                  And I looked at the reference that
```

1    you see here, the '695 and asked if each and

2    every claim element in the asserted claims could

3    be found in this patent.  And the answer was

4    yes.

5              Therefore, this patent, by itself,

6    anticipates the '629 patent.

7              Q.   Can you show us where in the EP

8    '695 patent each of the limitations are

9    disclosed?

10             A.   Sure.  So I'd like to start with

11   the independent Claim 1, which I believe --

12   which I've reproduced here.  And there are some

13   pictures and references that I've put on the

14   right-hand side of this slide.

15             So the preamble is an array

16   substrate for display, of course.  And then the

17   first three elements of that claim, a layer of

18   an insulating substrate, a -- having an area.

19             A thin film transistor array on

20   top of it and plurality of wiring.  I'm sorry.

21   Just the first two of those are found in EP '695

22   Column 31, Lines 16 to 23.

23             Then a plurality of wiring, in the

24   next element, arranged on the insulating

1       substrate, that can be found in Figure 4 of the

2       EP '695 patent as I've shown here, these are the

3       various pads and pixel regions and so on.

4               The next element of the claim,

5       connection pads, can be found in -- along with

6       pixel electrodes in Figure 1, and designated by

7       the yellow highlighted pieces, the numbers of

8       which I'm sorry, I cannot read.  But they are

9       there, and I have looked at them a number of

10      times, including last night.

11              And finally, the dummy conductive

12      patterns element is here.  The last one of Claim

13      1.  And the evidence for that in the EP '695 is

14      found in column 19 lines 49 to 54.

15              Q.   This is Claim 1.  Did you also

16      find sufficient disclosure with respect to

17      asserted Claim 7?

18              A.   Yes, I did.

19              Q.   And can you explain to us how all

20      the limitations of Claim 7 are disclosed in EP

21      '695?

22              A.   Well, I just talked about Claim 1,

23      and now let's talk about what's needed to get to

24      Claim 7.  Claim 7 is dependent on Claim 4 which

1     is dependent on Claim 2 which is dependent on

2     Claim 1.

3             So Claim 2 talks about a dual

4     metal structure, and Claim 4 talks about the

5     selection of the upper layer of wiring from the

6     molybdenum and a number of other refractory

7     metals, and the evidence from that comes from EP

8     '695 column 16, lines 19 to 28.

9             And then the Claim 7 talks about

10    the upper layer wiring material not becoming

11    insoluble in an acid or alkaline etchant, and I

12    tell you that titanium nitrate does not become

13    insoluble in an acid or alkaline etchant.

14            Therefore, all of the elements of

15    Claim 7, 4, 2 and 1 are found in EP '695, and,

16    therefore, this claim is invalid as anticipated.

17            Q.   Did you do a similar review for

18    asserted Claim 16?

19            A.   Yes, I did.

20            Q.   Can you briefly explain that to

21    us?

22            A.   Yes, I'll make it very brief.

23    It's essentially the same argument.  This is the

24    method claim and there is one extra element in

1    the sequence of dependent claims needed to get

2    to 16, and that is Claim 11 which is the group

3    of aluminum and aluminum alloys, and that's also

4    found in exactly the same reference, column 16,

5    lines 19 to 28.

6            Q.   In addition to the EP '695, did

7    you also review a reference, Watanabe 275?

8            A.   Yes.

9            Q.   Is this the reference shown on the

10   display now?

11           A.   Yes.

12           Q.   Did you form an opinion as to

13   whether this reference anticipates or renders

14   obvious the claims of the '629 patent?

15           A.   Yes, I believe that Watanabe 275,

16   this reference, together with other references

17   would render the '629 patent invalid for

18   obviousness reasons.

19           Q.   Can you step us through your

20   analysis, please?

21           A.   Yes.  So let's start with Claim 1

22   again.  We're a little lucky here that the

23   reference in the '275 patent, column three,

24   lines 37 to 49 has essentially all of the

1   components, all of the elements of Claim 1.

2          Q.   What about the dependent claims?

3          A.   Of the dependent claims, including

4   Claim 2, which requires a dual layer metal

5   structure that is missing from Watanabe 275, and

6   if one were to have that, one would likely have

7   also Claims 4 and 7, but let me go through that.

8               '275 does not disclose a double

9   layer gate metal wiring.  But the '275 patent

10  does mention the metals that might be used, as

11  molybdenum, aluminum, chrome and so on, so it

12  gives us a hint where we might go.

13              The '430 patent, which is another

14  prior art patent, discloses a two-layer

15  structure of molybdenum, that's column four, 39

16  through 55 in Exhibit 315.

17              The '629 patent --

18         Q.   Before you go on, the '430 patent,

19  can I have that up there, please.  Is what's

20  shown on the board the '430 patent, the patent

21  that you're referring to?

22         A.   Yes, that's Kubota.

23         Q.   Kubota?

24         A.   Yes, that's it.

1          Q.   And that's identified as LG

2   Display Trial Exhibit 315.

3          A.   Okay.  Continuing on, the '629

4   patent admits that the dual layer structure was

5   known in the art, so there would be other

6   references for that as well.

7               Therefore, it would have been

8   obvious to form a dual layer wiring as described

9   in the '430 and the '629.  And so the dual layer

10  with molybdenum on top will inherently not

11  become insoluble in acid or alkaline solution.

12              So if we take Watanabe 275

13  together with other references, I would judge

14  that Claim 7 is obvious and therefore invalid.

15         Q.   I believe you indicated earlier

16  that all of the elements of Claim 1 are

17  disclosed in Watanabe; is that correct?

18         A.   Yes.

19         Q.   And the one thing that's missing

20  is the double layer gate metal wire layer?

21         A.   Yes.

22         Q.   '629 and Kubota both disclose a

23  double wiring structure?

24         A.   Yes, that's true.

1          Q.   Did you also do a similar analysis

2     with respect to Claim 16?

3          A.   Yes.  So Claim 16 is a dependent

4     claim, depending on the method Claim 9.  And

5     exactly the same reference that was '275 patent

6     column three, lines 37 to 49, has all of the

7     elements of Claim 9 in it.

8          Q.   Okay.  And the dependent claims?

9          A.   And the dependent claims work

10    essentially the same way.  As I mentioned, there

11    is one little difference which is aluminum which

12    is Claim 11, but that's also found in these

13    references.

14         Q.   Now, you also mentioned an on sale

15    bar, and in your expert report, you had

16    identified a couple of products manufactured by

17    LG Display, the LT060V1 and the LT071V1.  Do you

18    have an opinion as to whether or not the

19    products manufactured by LG Display, those

20    products would anticipate or render the claims

21    invalid or an on sale bar?

22         A.   Yes, they would.

23         Q.   Did you look at those mask files?

24         A.   Yes.

1        Q.   For the record I would like to

2   show you a portion of a mask file printout from

3   a mask file C7160VA01.GDS with a cell

4   60LAY_PNL_$49, is what's shown on the display

5

6

7

8

9

10

11              MR. SHULMAN:   Could we have a

12   copy.

13              MR. BONO:   Your Honor, would you

14   like a copy of the binder for these exhibits?

15              THE COURT:   You can pass it to the

16   clerk.

17   BY MR. GOODWYN:

18        Q.   I think my question was,

19   Dr. Rubloff, do you see a difference between

20   this mask file and the one you saw earlier with

21   respect to the dots?

22        A.   Yes.  You'll note that the dots

23   are a different color, they are red in this

24   case.  And what that tells us is that those dots

1    were patterned into the gate metal layer when

2    the gate lines are made as well.

3            Q.   So if we look at just the gate

4    layer, which is another -- it's just only layer

5    six from the same printout; is that right?

6            A.   Yes.  So you see the dots here,

7    you see the gate fan out region here to go to

8    the gate lines and so on.

9            Q.   And in accordance with the

10   testimony that Dr. Silzars had, would those be

11   dummy conductive patterns?

12           A.   Yes, under his interpretation and

13   construction, these would be dummy patterns.

14   Notice that they exist between the inner edge of

15   the gate pads and the TFT display.  They are not

16   connected to any wiring.  And so they would

17   function as dummy pads.

18           He also made comments about

19   regular structures which is exactly what you see

20   here that could be divided in any number of

21   ways.  So there could be -- he would potentially

22   give many different ways of drawing the dummy

23   structures here.

24           Q.   Well, do you know what material

1    was used in forming the gate lines for this

2    product?

3             A.   Yes.  That's the dual layer,

4    aluminum neodynium on the bottom, molybdenum on

5    the top.

6             Q.   What is the basis for that

7    understanding?

8             A.   That's been testified by an LG

9    engineer, Youngwoo --

10            Q.   In Duk Song?

11            A.   He may have said it, but there was

12   another one.

13            Q.   Youngwoo Cho?

14            A.   Thank you.

15            Q.   And do you have an understanding

16   of when this product was made and sold in the

17   US?

18            A.   Yes, I do.

19            Q.   What's the basis -- first of all,

20   what is that understanding?

21            A.   The understanding is that this

22   product was sold in the 1999-2000 time frame

23   into the United States.

24            Q.   At what point in time?  I'm sorry,

1   you said '99.  What was the basis for your time

2   frame?

3            A.  Oh, yes.  I had a discussion with

4   In Duk Song in Korea to make sure I understood

5   the time frame for the sales of these, and I had

6   another discussion with an LG representative who

7   was here, who I think you will hear from later.

8   He showed me the sales data and the invoice data

9   for these products, and they were in the time

10  frame well before the sale bar.

11           Q.  Is there any information in the

12  mask file itself that would give you an

13  indication of the date of the mask file?

14           A.  Yes.  These mask files as I said

15  have a number of different kind of annotations

16  and, of course, one of them is a time stamp or a

17  date stamp.  So in the program which I used to

18  analyze the GDS file, there is tools, and then

19  you pick time stamp and you see what the date of

20  that is.  And it says 1998.

21           Q.  1998.

22           Well, I would like to show you a

23  mask file for the other product that you

24  mentioned in your expert report.  And it comes

1    from the same mask file, C7160VAO1.GDS, but has

2

3

4

5

6

7

8         A.   I actually don't remember if

9    that's the difference, but maybe.

10        Q.   Okay.

11             MR. GOODWYN:  Your Honor, I would

12   like to move in evidence the printouts from the

13   mask files for the products LT060V1 and LT071V1

14   that come from the file C7160VA01.GDS, and are a

15   part of LG Display Trial Exhibit 380.

16

17

18

19

20

21             Shown in the mask files that we

22   just went through if you apply Dr. Silzars'

23   definition.

24        A.   Absolutely.

```
 1            Q.   Would the same be the case for

 2   Claim 16?

 3            A.   Yes.

 4            Q.   Dr. Rubloff, if I could just ask

 5   you to very briefly summarize your opinions with

 6   respect to the '629 patent?

 7            A.   My opinion is that the accused

 8   products do not infringe any claim of the '629

 9   patent.  And that the '629 patent is invalid for

10   three reasons; it's indefinite, it's invalid

11   over prior art, and because of on-sale bar.

12                MR. GOODWYN:  Thank you,

13   Dr. Rubloff.  No more questions, Your Honor.

14                THE COURT:  All right.  We'll

15   recess for lunch for forty-five minutes.  We'll

16   come back at about 1:35.

17                (A luncheon recess was taken.)

18                THE COURT:  All right.  Be seated,

19   please.

20                MR. CHRISTENSON:  Your Honor,

21   before we proceed with Dr. Rubloff's testimony,

22   I just wanted to respectfully request that some

23   of the exhibits that were offered in during

24   Dr. Putnam's testimony be submitted under seal
```

1    because they contain confidential information of

2    third parties and pursuant to your rulings

3    yesterday, my understanding is to protect the

4    interest of those parties, you would allow us

5    those materials to be submitted under seal,

6    specifically this would be the license

7    agreements and patent agreements that are

8    summarized in AUO Exhibit 1563, and there was

9    also I think it was Exhibit 273 which was Putnam

10   Exhibit 13 to his report.  All of those

11   documents contain highly sensitive confidential

12   third-party information and we respectfully ask

13   that they be admitted under seal.

14              MR. TYLER:  No objection, Your

15   Honor.

16              THE COURT:  They'll be submitted

17   under seal without objection.

18              MR. GOODWYN:  Your Honor, one more

19   quick housekeeping matter.  With respect to the

20   documents that Dr. Rubloff referred to during

21   his direct examination, there is an LGD Trial

22   Exhibit 1082, and I would like to move or offer

23   into evidence the exhibit and all the documents

24   identified there.

1                    MR. SHULMAN:  We'll have to look

2      at it, but --

3                    THE COURT:  We'll admit it subject

4      to any objection you may have.

5                    MR. SHULMAN:  Very well.

6                    THE COURT:  Ready to proceed?

7                    MR. SHULMAN:  Yes.

8                      CROSS-EXAMINATION.

9      BY MR. SHULMAN:

10                   Q.  Dr. Rubloff, you and I have not

11     met before; correct?

12                   A.  I think that's right.

13                   Q.  Okay.  My name is Ron Shulman and

14     I have some questions for you regarding the '629

15     patent.

16                   Now, you understand, sir, that at

17     this trial, AUO is asserting Claims 7 and 16 of

18     that patent against LG; correct?

19                   A.  Yes.

20                   Q.  Okay.  And Claim 7 and 16 are

21     dependent claims; correct?

22                   A.  Yes.

23                   Q.  Okay.  And Claim 7 depends

24     indirectly from independent Claim 1 and 16 does

1    likewise from Claim 9; correct?

2            A.   Yes.

3            Q.   Now, let's look at independent

4    Claim 1 on the screen.  You agree that Claim 1

5    is directed to "an array substrate for display"?

6            A.   Yes, that's what it says.

7            Q.   And the first element of Claim 1,

8    that first subparagraph calls for a layer of an

9    insulating substrate having an area, do you see

10   that?

11           A.   Yes, I see that.

12           Q.   And the insulating substrate

13   refers to a piece of suitable insulating

14   material such as glass, for example; correct?

15           A.   Okay.

16           Q.   Is that right?

17           A.   The insulating substrate, yes.

18           Q.   Okay.  And that insulating

19   material such as a piece of glass is said to

20   have, "an area," according to the claim;

21   correct?

22           A.   That's what it says.

23           Q.   And Claim 9 says the same thing;

24   right?

1          A.   Yeah, forming that.

2          Q.   And in your personal opinion, the

3     meaning of the term, "an area," as recited in

4     Claims 1 and 9, is, "insolubly ambiguous";

5     correct?

6          A.   That's right.

7          Q.   Okay.  Now, let's look at the

8     third element of Claim 1.  And this element

9     calls for a plurality of wiring arranged on the

10    insulating substrate with each wiring having a

11    first end, et cetera, et cetera.  Correct?

12         A.   Yes, that's what it says.

13         Q.   Okay.  And once again, in your

14    personal opinion, the meaning of the term "each

15    wiring", as recited in Claim 1, also is,

16    "insolubly ambiguous"; correct?

17         A.   I think that's what I said in the

18    report.

19         Q.   Well, let me remind you.  Could we

20    have his invalidity report, Section G on page

21    77, please.

22              And you stated here on page 77 of

23    your invalidity report that specifically, "It is

24    my opinion that the terms 'area', 'each wiring',

1    and 'the dummy patterns' comprising at least

2    about 30 percent of the area of the insulating

3    substrate, as recited in Claims 1 and 9 are

4    insolubly ambiguous."

5              That was your opinion; right?

6         A.   Yes.  What I meant by that was

7    that there was no clear distinction on the

8    proper interpretation of those terms.  And

9    that's the reason why I spent significant effort

10   trying to imagine what is the most reasonable

11   definition of those terms --

12        Q.   Okay.  But you --

13        A.   -- in order to understand the

14   patent.

15        Q.   Your personal opinion was that

16   they're insolubly ambiguous; right?

17        A.   Correct.  What I meant --

18        Q.   I'm going to get to what you meant

19   in a moment.  What you said in your report is

20   these terms are quite insolubly ambiguous;

21   right?

22        A.   That's what I said.

23        Q.   Okay.  Now, the adverb insolubly

24   means incapable of being explained; correct?

1           A.    Where does that come from?

2           Q.    Well, let's pull up a dictionary.

3      Can we have the dictionary definition of

4      insoluble?

5                 It has two definitions.  One of

6      which has to do with dissolving salt in water

7      and that's not applicable here; right?

8           A.    Right.

9           Q.    Okay.  And the second definition

10     is incapable of being solved or explained.

11     That's what insolubly means in this context;

12     correct?

13          A.    Well, that's what the dictionary

14     says.

15          Q.    Well, you speak English; right?

16          A.    Certainly do.

17          Q.    And you were using insolubly as

18     people who speak English use the word insolubly?

19          A.    I used insolubly to mean that

20     is -- cannot be done ambiguously.  And I did not

21     look in the dictionary to look up that term.

22                I used it in the sense that I

23     normally would have in dealing with an issue

24     where there is ambiguity.

1          Q.   Okay.  And what you said is

2     insoluble.  Insoluble, the amplifier is such

3     that it can't be such?

4          A.   You're reading it with my use of

5     the word what you think I meant by the word.

6          Q.   Well --

7          A.   I'm telling you what I mean.

8          Q.   Okay.  So you use the word in a

9     way that the dictionary doesn't define; is that

10    your testimony?

11         A.   I'm sorry.  The dictionary doesn't

12    have all the nuances of context or use of words,

13    and I certainly don't look up every word in the

14    dictionary before I use it.

15         Q.   Okay.  But you do use it?

16         A.   I'm sure other people don't

17    either.

18         Q.   Could you explain to the Court

19    exactly what you meant by insoluble?

20         A.   What I meant by insoluble was that

21    there is ambiguity in the terms that I use this

22    expression for.  And despite my efforts and

23    discussions with whoever I might choose to

24    discuss this with and whatever references I

1    might take, I will never have a strong degree of

2    confidence.  No.  That is uniquely the right

3    explanation for those terms that I labeled as

4    indefinite.

5            Q.   Okay.  So, in your opinion, there

6    is no definite meaning of these terms; correct?

7            A.   The terms are indefinite.

8            Q.   Okay.

9            A.   Yes.

10           Q.   And if you don't definitely know

11   what these terms mean, then would you agree that

12   you're also incapable of telling this Court

13   whether these terms that have no meaning to you

14   exist in the accused products and in the prior

15   art?

16           A.   Absolutely not.

17           Q.   Okay.  Let's move on.

18                Is it correct, sir, that as

19   explained in the '629 patent, the problem the

20   patent addresses is known as undercutting that

21   can occur during the wet etching process?

22           A.   Well, that's part of the

23   description.  It's really talking about the use

24   of wet etching as you etch through a layer,

1  reach another layer at which two different

2  mounts or different work functions create what's

3  sometimes called a battery effect that can cause

4  a change in the etching characteristics.

5          Q.   So what I said is not correct?

6              MR. GOODWYN:  Objection.  Your

7  Honor, if counsel would allow the witness to

8  complete his answer.

9              MR. SHULMAN:  I'm sorry.  I

10 thought he was done.

11             THE WITNESS:  I'm sorry.  The last

12 -- where was I?

13 BY MR. SHULMAN:

14         Q.   I'll just ask the question again.

15 Is it correct that your opinion, sir, as

16 explained in the '629 patent, the problem that

17 the patent addresses is known as undercutting

18 that can occur during the wet etching process?

19         A.   Undercutting is a part of the

20 phenomenon described in the specification.  It

21 is not described in the claims.

22         Q.   Okay.

23         A.   The claims are very broad in this

24 patent.  The motivation is to look at issues of

1    etching in dual layer structures and

2    undercutting and the relationship to specific

3    structures in the vicinity.  That is the focus

4    of much of the discussions in the specification.

5             Q.  Very good.  Let's look at your

6    opening report at Page 16, please.

7             You did write that, "As explained

8    in the '629 patent, Column 2, Lines 56 to 63,

9    the problem addressed is the development of an

10   undercut."  You did say that; right?

11            A.  As I see it, that's not the end of

12   the sentence.

13            Q.  We're getting to the next part.

14   But you did say that; right?

15            Yes?

16            A.  Yes.

17            Q.  Okay.  And the undercutting refers

18   to the fact that during the wet etching process

19   of double layer wiring structures, the lower

20   layer of metal is etched underneath the top

21   layer of metal; correct?

22            A.  Well, are you quoting the next

23   sentence?

24            Q.  Just tell me whether it's correct

1    and then we'll look at the rest of the sentence?

2            A.   That's a part of it.

3            Q.   Okay.  Let's look at the rest of

4    the sentence.

5                 As explained in the '629 patent,

6    the problem addressed is development of an

7    undercut or where the aluminum surface is etched

8    underneath the top metal.  That's true; right?

9            A.   Yes.

10           Q.   Okay.  And undercutting of double

11   layer wires during wet etching is a problem,

12   because it can reduce manufacturing yield by

13   causing electrical shorts; true?

14           A.   Electrical shorts.  May be other

15   things as well.

16           Q.   Okay.  Now, according to the '629

17   patent, this undercutting problem can occur due

18   to a phenomenon known as passivity of the top

19   layer of the metal wire; correct?

20           A.   I think that's what it says.

21           Q.   And passivity means that the top

22   layer of metal becomes insoluble in the acid or

23   alkaline solution used as the etchant; correct?

24           A.   Reduced etching.

1          Q.   Pardon?

2          A.   Reduced etching, right.

3          Q.   Okay.  So, well let's look at what

4     the patent says.  '629, Column 5, 13 to 17.

5               In the present invention, the term

6     passivity is referred to as a phenomenon that

7     metal such as molybdenum or a metal allow such

8     as a -- the M word alloy becomes insoluble in an

9     acid or alkaline etchant.  That's what the

10    patent says; right?

11         A.   Mm-hmm.

12         Q.   And when the top layer of metal

13    becomes insoluble in the etchant, but the bottom

14    layer does not, you can get this etching

15    underneath that is referred to as the

16    undercutting problem; correct?

17         A.   Yes, that's -- that's the

18    mechanism by which you would worry about the

19    shape, the mouse hole, the overhang and so on.

20         Q.   Right.  Now, is it true, sir, that

21    there are many different metals that can be used

22    to form the top layer of a wire to be etched?

23         A.   I think there are a number.  Sure.

24         Q.   Yeah.  And some examples are given

 1      in the patent, for example; right?

 2              A.   Okay.

 3              Q.   And let's look at Column 4 and 5

 4      of the patent.   In there, they -- the inventors

 5      identify molybdenum, chromium, tantalum,

 6      titanium, and other alloys are some of the

 7      suitable metals that can be used for the top

 8      layer of the wire; right?

 9              A.   Yes.

10              Q.   And is it true, sir, that there

11      are many different or several different wet

12      etchants that can be used to etch both the top

13      and bottom metal layers of the wire?

14              A.   Yes, with different results

15      possibly.

16              Q.   Right.  And according to the '629

17      patent, these different wet etchants would

18      include both acidic solutions as well as

19      alkaline solutions; right?

20              A.   You know where that reference is?

21              Q.   Yeah.  Let's look at the -- on the

22      screen '629, Column 5, Lines 13 to 17.  You see

23      that it says you can use either acid or an

24      alkaline etchant; right?

1      A.   Well, this is talking about what

2  causes passivity, not what acid or alkaline you

3  can use to do the etching.

4      Q.   Well, it's talking about the

5  insolubility of a metal in the etchant and it

6  says the etchant can either be acidic or

7  alkaline; right?

8      A.   Right.  I thought your question

9  had to do with whether you can use acids or

10  alkalines to do etching at various points in the

11  patent.

12      Q.   Right.  It says the etchant that

13  leads to the solubility problem, sometimes is an

14  acid or sometimes is an alkaline; right?

15      A.   Well, this is not really

16  prescribing what the etchant is.

17      Q.   Okay.  Well, let's move on.  It's

18  not important.

19      A.   This is making the assumption that

20  there's an acid or an alkaline that's used to do

21  etching.  And in some cases, there may be a

22  passivation that develops during that process.

23      Q.   Okay.  And the inventors provided

24  you some examples of different kinds of acidic

1      etchants that can be used in the patent; right?

2                  A.   I think that's right, but you

3      probably can put it on the screen for me.

4                  Q.   Sure.   Columns 6, Lines 34 to 37.

5                  A.   Yes.

6                  Q.   And it says --

7                  A.   That is an example.

8                  Q.   Phosphoric acid, nitric acid,

9      other kinds of acid mixtures, whatever; right?

10                 A.   Yes, you can use those.

11                 Q.   Now, let's return to this

12     passivity problem that we spoke about earlier.

13     One way of solving the problem, according to the

14     patent, is to select an appropriate metal for

15     the top layer and an appropriate etchant such

16     that the metal of the top layer doesn't become

17     insoluble in the etchant; right?

18                 A.   Would you be more specific about

19     the configuration that you're talking about?

20                 Q.   Talking about a double layer piece

21     of metal where the problem could arise.   I'm

22     saying that passivity problem, the patent says

23     that one way of solving that problem, just one

24     of the ways of solving it is to select an

1    appropriate metal for the top layer and an

2    appropriate etchant, such that you don't get

3    this insolubility of the top layer in that

4    etchant?

5         A.   That would be one way you'd try to

6    make this work, yes.

7         Q.   Right.  And the solution to that

8    problem is the subject matter addressed in

9    dependent Claims 7 and 16; right?

10        Let's look at Claim 7 and 16 on

11    the screen to save you the trouble.  And what

12    they both say is that the upper layer of the

13    wiring material must be selected such that the

14    upper layer does not become insoluble in the

15    chosen acid or alkaline etchant; right?

16        A.   Well, you may remember that I said

17    a few minutes ago that the application to dual

18    layer metal etchants is described in this patent

19    in the specification as a motivation for

20    thinking about, I guess, what the very broad

21    claim should be.  There is nothing in these

22    claims which specifies whether the solubility in

23    acid or alkaline is done in the configuration of

24    the dual layer.

1        It's --

2        Q.   This is dependent from claims

3   above it, and we all looked at it.  You told us

4   earlier that the claim above it requires a dual

5   layer; right?

6            And, of course, this claim itself

7   says upper layer, which means there's a bottom

8   layer; right?

9        A.   I don't read it that way.

10       Q.   You think the upper layer means

11  the upper layer of a single layer wire?

12       A.   I think that the material for the

13  upper layer is said here to be chosen, so that

14  it will not become insoluble in an acid or an

15  alkaline.

16            So that -- so that --

17       Q.   I'm sorry.

18       A.   So that means --

19       Q.   Go ahead.

20       A.   I take a vessel with the acid or

21  the alkaline in it.  I take a piece of that

22  metal and I see if it etches or instead doesn't

23  etch.

24       Q.   Does the upper layer in this claim

 1    refer to the upper layer of a two-layer wire

 2    where a wire consists of metal on the top and

 3    metal on the bottom?

 4            A.   The words upper layer wiring

 5    material here refer to the material that will be

 6    used for the upper layer.

 7            Q.   Right.

 8            A.   But the spec -- the description of

 9    the result, whether it would be etched fast,

10    slow, whatever or relatively slowly to be

11    called, let's say, insoluble, is only a property

12    of the material.

13            Q.   Okay.  So is it true, sir, that in

14    Claim 7 and 16, these both require that the

15    upper layer of wiring material must be selected

16    such that the upper layer material does not

17    become insoluble in the chosen etchant?

18            A.   Yes.  I think under --

19            Q.   Okay.

20            A.   -- normal conditions.  Right.

21            Q.   Now, you agreed that it is

22    certainly true that a number of factors can have

23    an effect on the solubility of a particular set

24    of materials used in a multilayer structure;

1    right?

2              A.   Yes.   There are many factors.

3              Q.   One of those factors is the

4    temperature at which the etching takes place;

5    right?

6              A.   Can be temperature.   Can be many

7    things.

8              Q.   Right.   Another factor is the

9    identity of the particular etchant or mixture of

10   etchants being used; right?

11             A.   Yes.

12             Q.   Another factor is the

13   concentration of the etchant on mixture of

14   etchants; correct?

15             A.   Yes.

16             Q.   And there are probably lots of

17   other factors that I haven't listed; right?

18             A.   I'd be glad to list some.

19             Q.   That's all right.   But there are

20   others; right?

21             A.   Yes.

22             Q.   Now, in your expert report on

23   validity, the first prior art reference you

24   discuss appears at Page 20 of your report, which

1       is on the screen now.

2                     If we could blow up the Section A

3       there.  And that's the European '695 patent that

4       you spoke about on direct; right?

5               A.   That's right.

6               Q.   Now, let's look at pages 28 and 29

7       of your expert report.  And in this paragraph

8       that bridges pages 28 and 29, this contains your

9       entire discussion of the validity of Claims 7

10      and 16 in light of the European patent; correct?

11              A.   I don't remember if I had more

12      paragraphs than that.

13              Q.   I would be happy to show you your

14      report if you would like to confirm it.

15                    Turn to page 28 down at the

16      bottom, there is a paragraph that is under the

17      heading six, and it's a single paragraph that

18      spans 28 and 29.

19              A.   So, I'm sorry.

20              Q.   So is it correct that your entire

21      discussion of the validity of Claim 7 and 16 in

22      light of the European '695 patent is contained

23      in this paragraph that bridges pages 28 and 29

24      of your validity report?

```
 1              A.   You're asking me if that one

 2    paragraph is everything that I had about

 3    validity for?

 4              Q.   Claims 7 and 16 in light of the

 5    '695 patent?

 6              A.   Well, it appears that that's all

 7    that I put into the discussion.

 8              Q.   And is it correct in this

 9    paragraph you never state that the '695 patent

10    mentions the passivity problem?

11              A.   Well, the passivity problem is not

12    mentioned in the claims of the '629.

13              Q.   I didn't ask that.  Would you

14    please confine yourself to my question.

15              A.   I'm sorry.  So your question is?

16              Q.   You never mentioned the passivity

17    problem in this paragraph that bridges pages 28

18    and 29; correct?

19              A.   But my understanding of --

20              Q.   Sir, can you answer my question,

21    yes or no?

22              MR. GOODWYN:  Objection, Your

23    Honor.  Again, counsel is interrupting the

24    witness from trying to answer the question.
```

```
 1                    THE COURT:  I believe he's asking

 2      for a yes or no and then you can explain.  Can

 3      you answer the question yes or no and then

 4      explain.

 5                    Q.  Do you ever state in this

 6      paragraph that bridges pages 28 and 29 that the

 7      '695 patent mentions the passivity problem?

 8                    A.  It doesn't mention the passivity

 9      problem, I explicitly -- and the reason for

10      that --

11                    Q.  I didn't ask for the reason.  We

12      have limited time here.  If your counsel wants

13      to ask you about that on redirect?

14                    A.  I need to explain what my answer

15      means.

16                    MR. SHULMAN:  Your Honor.

17                    THE COURT:  A short explanation.

18                    THE WITNESS:  My answer is that I

19      was addressing invalidity here.  That is a

20      comparison as I said earlier between what's in

21      the '629 claims and the elements in those

22      claims, and what's in the prior art.  And in the

23      claims, it does not talk about the etchant

24      problem.
```

1          Q.   Now, in this paragraph you also

2     never state that the '695 patent mentions a

3     solution to the passivity problem; correct?

4          A.   Yes, it's the same situation I

5     just told you.

6          Q.   So the answer is no, you never

7     mention it; right?

8          A.   It was not necessary to mention

9     it.

10         Q.   I didn't ask that, sir.  Do you

11    mention it, yes or no?

12         A.   No, because it was not necessary.

13         Q.   Now, and you also never state that

14    the '695 patent ever mentions selecting an

15    appropriate metal and etchant to avoid the

16    passivity problem; correct?

17         A.   As I read the title --

18         Q.   Can you answer my question and

19    then provide the explanation?

20         A.   The answer to your question is no.

21    And the title of this paragraph is what I was

22    trying to address, which is the invalidity of

23    these claims.  These claims do not mention the

24    things that you're raising.

1          Q.   Now, depending upon the numerous

2     factors that we have gone over that, etchant

3     that we went over a few minutes ago, if you use

4     the metal etchants disclosed in the '695 patent,

5     you may or may not encounter the passivity

6     problem; correct?

7          A.   Well, that covers it if you say

8     may or may not.

9          Q.   Right.  Very good.

10          Now, the next prior art reference

11     you discuss in your report is the '275 patent

12     which appears at page 29 of your report, which

13     is on the screen.  Do you see that down at the

14     bottom?

15          A.   Yes.

16          Q.   And is it true that the '275

17     patent no where teaches that the upper layer of

18     a two-layer wiring structure does not become

19     insoluble in an acid or alkaline etchant?

20          A.   Yes, I think I explained that the

21     shortcoming of the '275 for anticipation is it's

22     a single-layer structure.

23          Q.   Is it true that quote, the '275

24     patent no where teaches that the upper layer of

```
1      a two-layer wiring structure does not become

2      insoluble in an acid or alkaline etchant, yes or

3      no?

4             A.   I'm sorry, where are you reading?

5             Q.   From the question that I just

6      wrote on the piece of paper before we got to

7      court.

8             A.   Please say it again.

9             Q.   Is it true that you, sir, have

10     written that the '275 patent no where teaches

11     that the upper layer of a two-layer wiring

12     structure does not become insoluble in an acid

13     or alkaline etchant?

14            A.   The question is -- I'm sorry,

15     you're speaking very fast.  I'm trying to digest

16     the words correctly.

17            Q.   Let's look at your report, page

18     40, sections six, lines five through seven.  Can

19     we have that on the screen.

20                 Did you write that quote, the '275

21     patent does not teach that a multilayer wiring

22     structure of that, the upper layer does not

23     become insoluble in acid or alkaline etchant,

24     did you write that?
```

1           A.   I certainly wrote that.

2           Q.   The third reference that you

3      discuss in your expert report is the '069 patent

4      which you did not refer to today; correct?

5           A.   That's correct.

6           Q.   So let's not talk about that one.

7                The next patent that you referred

8      to in your expert report was the Japanese patent

9      publication ending in '415, and we didn't hear

10     about that today, either, did we?

11          A.   That's correct.

12          Q.   So let's skip that one.

13               And the fifth prior art reference

14     that you discussed in your report was another

15     Japanese publication that ended in '811, and you

16     said nothing about that today; right?

17          A.   That's correct.

18          Q.   Okay.  Now, if you would look,

19     please, at your expert report at page 76.  If we

20     could have that on the screen, Bill, his expert

21     report at page 76.

22               And down at the bottom of the

23     bottom half of that page there is a Section F

24     that continues for six lines on the next page or

1    five lines on to the next page where you set

2    forth your entire discussion of these two LG

3    products that you testified about on your

4    direct, namely the LT06OV1 and the LT071V1;

5    correct?

6          A.   Yes.

7          Q.   Okay.  And that's the entirety of

8    your discussion on these two products in your

9    expert report; correct?

10         A.   Yes.

11         Q.   Okay.  And what you said here if I

12   understood you correctly is that if AUO's

13   infringement analysis at least with respect to

14   these two products is correct, then in my

15   opinion, the '629 patent would be invalid

16   because of the on sale bar; right?

17         A.   That's right.

18         Q.   Okay.  Now, let me hand you AUO

19   Exhibit 1539, which is a list of all of the

20   products accused of infringement by AUO in this

21   case with respect to the '629 patent.

22              And is it correct, if you could

23   just briefly look through it and look for the

24   designation LT that identifies the product

```
 1     names, and will you confirm for me that LT,

 2     whatever number, doesn't appear in this

 3     document?

 4               A.   That's in the model number column?

 5               MR. SHULMAN:   May I approach, Your

 6     Honor?

 7               THE COURT:   Yes, you may.

 8               THE WITNESS:   Is that what you

 9     mean, right here?

10               Q.   Correct.   In fact, I can help you

11     out and move this along a little bit.   Where is

12     the other one?   On the first page of this

13     document, they're all LP numbers; right?

14               A.   No, I'm going fast here.

15               Q.   Okay.   Take your time.

16               A.   (Witness reviewing document.) So

17     your question is whether I --

18               Q.   Did you find any LT?

19               A.   And the answer is no.

20               Q.   So the LT products that form the

21     basis for your on sale defense were never

22     accused of infringement according to this

23     exhibit; right?

24               A.   Well --
```

1          Q.   Is that correct?

2          A.   This is a chart that I have not

3     prepared.

4          Q.   Can you answer my question rather

5     than the one you choose to answer.  I said

6     according to this exhibit, LT products were not

7     charged with infringement; right?

8          A.   I think that's right.

9          Q.   Okay.  Thank you.

10              Now, during your direct testimony,

11    you were shown -- can we have the Elmo, Bill.

12              You were shown LGD Trial Exhibit

13    380, which was in one of your -- towards the

14    back of your binder that you had on direct.  Do

15    you recall that?  It's the second to last tab in

16    your book.

17         A.   Yes.

18         Q.   I'm not going to ask you details

19    about this, but just to refresh your

20    recollection, you were asked about this

21    document.  Do you recall that?

22         A.   Yes.

23         Q.   Okay.  And then the next tab in

24    your book is another excerpt from LGD 380 and

1    you were asked some questions about that, too;

2    right?

3              A.   Yes.

4              Q.   Okay.  And is it correct, sir, and

5    these relate to the so-called LT060V1 and the

6    LT071V1 products; correct?

7              A.   Yes.

8

9

10

11              In this paragraph, or two

12   paragraphs that bridges pages 76 and 77 of your

13   expert report; correct.

14              A.   You said page --

15              Q.   Turn to page 76 of your validity

16   report where you discuss these two on sale

17   products.

18              A.   (Witness complying.)  Yes, I'm

19   there.

20              Q.   And in the section that bridges

21   pages 76 and 77, Section F, you never refer to

22   either of these two documents in your discussion

23   of those products; correct?

24              A.   Yes, that's correct.

1          Q.   And you offered no opinions about

2     those two drawings in your expert report?

3          A.   Well, I think in my expert report

4     I said that I looked at all kinds of --

5          Q.   Can you answer my question and I

6     didn't finish it, so give me the courtesy of

7     letting me finish my question.

8          A.   Excuse me.

9          Q.   Is it correct that you offered no

10    opinion about either of these two drawings on

11    pages 76 or 77 of your report, yes or no?

12         A.   I don't know whether it was yes or

13    no.  I did not explicitly mention these, that's

14    what you're after.

15         Q.   During your direct testimony in

16    reference to these two documents, you said

17    something to the effect that the metal wires

18    there were two-layer wires; right?

19         A.   Yes.

20         Q.   Okay.  And you were asked that

21    question at your deposition, and you said I

22    don't know; right?

23         A.   I don't remember it.

24         Q.   Let's look.  Can I have the Elmo,

```
 1    please.

 2                    This is from page 422 of your

 3    deposition transcript taken in April; right?

 4         A.   I think so.

 5         Q.   Okay.

 6              "QUESTION:  Do you know how many

 7    layers the wiring of either of these two

 8    products -- that's a poor question.  How many

 9    layers are in the wiring of either of these two

10    products; do you know?"

11                    I represent to you, sir, they were

12    talking about the two products we are talking

13    about here.

14              "ANSWER:  I don't.  I would have

15    to look.  For that, I would have to look at the

16    masked files and probably look at the QC charts

17    and the QE charts."

18                    That was your testimony; right?

19         A.   That was my testimony.

20         Q.   And the QC charts and the QE

21    charts are not referred to in this passage that

22    bridges pages 76 and 77; right?

23         A.   Correct.

24         Q.   And neither are the mask files;
```

1    right?

2            A.    Correct.

3            Q.    You also testified on your direct

4    that you made an area calculation with respect

5    to these two so-called on sale products; right?

6            A.    I don't remember that.

7            Q.    You said it anticipates, so you

8    must have made that 30 percent calculation;

9    right?

10           A.    Well, I looked at ways that I

11   understood at that time AUO to be defining area

12   and percent area, which is certainly now been

13   made much more clear by what we've heard

14   yesterday.

15           Q.    So the answer is you did make a

16   calculation; right?

17           A.    I looked at a number of

18   calculations that might be the way to look at

19   this, that's right.

20           Q.    So in your opinion in order to

21   tell the Judge that it anticipated, you had to

22   conclude based upon some calculation that you

23   made that 30 percent was occupied by these dummy

24   patterns; right?

1          A.   That's correct.

2          Q.   Now, your deposition was taken as

3     we see here on May 2nd, 2009; right?

4          A.   Yes.

5          Q.   Roughly a month ago; right?

6          A.   Yes.

7          Q.   And at that point, a month before

8     the trial began, you were asked, "So, have you

9     contemplated a percent coverage?"

10             And I represent to you once again,

11    this is about the same two products.

12             "ANSWER:  No, I couldn't.  I

13    probably thought about it, but the '629 doesn't

14    give a prescription for calculating the percent

15    coverage that is in the claims.  So as I said,

16    the patent is indefinite."

17             That was your testimony; right?

18         A.   That was my testimony.

19         Q.   And today you're giving us a

20    percentage?

21         A.   I'm giving you a percentage today

22    because it's become increasingly clear what the

23    interpretation of area and percent area is by

24    AUO and Dr. Silzars --

1      Q.   And you provided us no prior

2   knowledge of that opinion before today; right?

3           MR. GOODWYN:   Objection, Your

4   Honor.  Again, counsel was interrupting the

5   witness and not letting him finish his answer.

6           Q.   I apologize.  Go ahead.

7           A.   I was attempting to explain how

8   clear it became first from Dr. Silzars'

9   deposition testimony, and then his testimony

10   yesterday, what the various things that AUO's

11   documents had been converging to as a position

12   with regard to area and percent area.

13               Now it is absolutely crystal

14   clear, and so my statement in the direct today

15   came from all of those recent factors that have

16   emerged, his deposition testimony, the way he

17   drew the different patterns on the '629 figures,

18   and the discussion that we all heard yesterday.

19           Q.   Okay.  Now --

20           A.   And excuse me, that's the basis

21   for my statement now.

22           Q.   Okay.  Now, one of the slides you

23   were shown earlier on your direct examination

24   was this one, Trial Exhibit 1074; right?

1          A.   Yes.

2          Q.   And this has to do with

3    constructions concerning this area limitation;

4    right?

5          A.   Yes.

6          Q.   Okay.  And up at the top or in the

7    middle, rather, is LG's proposed construction,

8    which says what it says.  On the right is AUO's

9    proposed construction which is plain meaning.

10   And then down at the bottom, the indefinite,

11   that's your personal opinion; right?

12         A.   It certainly was my personal

13   opinion.

14         Q.   And the one above is LG's

15   position, not your personal opinion, your

16   personal opinion is it's indefinite; right?

17         A.   No, that's not what it says.

18         Q.   Your personal opinion is that it's

19   indefinite?

20         A.   My personal opinion is that the

21   use of the term area is indefinite, and that

22   means that there is a great deal of ambiguity in

23   a layer of insulating substrate having an area

24   which I believe is resolved by my own opinion

1    and by LG Display's construction as you see it

2    there.

3              Q.   Let's look at the next slide,

4    which was shown, it's LGD629015.  And you used

5    this to explain how LG's products don't

6    infringe.  Do you recall that?

7

8

9

10

11             Area and said that's where the

12   dummy pattern should be located; right.

13             A.   Yes, that's taught in the '629.

14             Q.   And you -- if I understood you

15   correctly, you said LG's products don't infringe

16   because the --

17             A.   Would you like a laser pointer?

18             Q.   No, I'm even worse with those.

19             But the area where the -- the

20   metal that occupies the area where the dummy

21   pattern should be has to be at least 30 percent

22   of all of the metal on the substrate; right?

23             A.   Yes, the dummy pattern area, if

24   there is some, within what's essentially the

```
 1      yellow region would have to be 30 percent of all

 2      the metal that's seen.

 3              Q.   And so -- and you concluded that

 4      based upon that understanding of the claim, LG's

 5      products don't satisfy that 30 percent

 6      limitation; right?

 7              A.   That's correct.

 8              Q.   Okay.  And you used the same claim

 9      construction undoubtedly when you analyzed the

10      prior art; right?

11              A.   Let me go through this.  No, I

12      think it's different in the following sense --

13              Q.   It is different; right?

14              A.   Please let me explain.

15              Q.   Well, let's first establish it was

16      a different claim construction you used when

17      analyzing the prior art; right?

18              A.   The prior --

19              Q.   Yes or no first.

20              A.   I have to think about the odds of

21      how that's supposed to be, because it's not the

22      right question.

23              Q.   Let me see if I can help you.

24      Okay.
```

1          Take it a little bit quicker.

2     Let's turn to your prior art slide.  Here's one

3     of them.

4               This is slide LGD 629-019.  And

5     down towards the bottom there, you show in

6     yellow in something labeled Figure 1 the dummy

7     pattern area; right?

8          A.   Yes.

9          Q.   Okay.  And what you don't show is

10    how much metal occupies the rest of the

11    substrate; right?

12         A.   Well, I can estimate what it is.

13         Q.   You didn't.  And you have no way

14    of knowing that what's shown in yellow is 30

15    percent or more of all of the other metal that

16    exists on the substrate; right?

17         A.   Well, I think the back of the

18    envelope calculation, that would show that quite

19    clearly.

20         Q.   Which you did not offer; right?

21         A.   No. I didn't have time to offer.

22              Back of the envelope calculation

23    would say the pixel array is transparent, for

24    the most part.  Therefore, the amount of metal

1    will not be that much or you wouldn't be able to

2    see light through it.

3          Q.   But you never made that

4    measurement, because there's not enough

5    information in that prior art to make the

6    measurement; right?

7          A.   I -- I accept that.

8          Q.   Very good.

9          Now, let's see what you did here.

10   This is Slide 23, LGD 629-023.  And this

11   concerns the other prior art reference, the

12   '275; right?

13          Yes?

14          A.   Yes.

15          Q.   And Figure 2 of the patent is what

16   you used to illustrate the so-called dummy

17   patterns; right?

18          A.   Yes.

19          Q.   Now, what you colored in yellow

20   are the dummy patterns; right?  Or what you call

21   the dummy patterns; right?

22          A.   No, what I colored in yellow was

23   the structure.  The light -- it's the light

24   shielding structure that was added there.  And a

1     fraction that the triangle at the top would be

2     the dummy pattern according to '629.

3          Q.   Okay so the dummy pattern is just

4     this triangular top of the yellow piece of

5     object that's on the screen?

6          A.   Yes.

7          Q.   Okay.  And once again, you don't

8     show the total metal occupied on the substrate;

9     right?

10         A.   No.

11         Q.   So you didn't make that 30 percent

12    calculation; right?

13         A.   No.  I can make that 30 percent

14    calculation if I assume Dr. Silzars' definition

15    of area, because that's a blanket area.

16         Q.   No.  I want you to use the claim

17    construction that you used for purposes of

18    infringement.

19              MR. GOODWYN:  Objection.  Your

20    Honor, counsel is repeatedly interrupting this

21    witness and not letting him finish his answer.

22    He's not getting the answer he perhaps wants.

23              I'd just ask that the witness be

24    permitted to give a full response to the

1        questions that he's asked.

2  BY MR. SHULMAN:

3            Q.   Let me repeat the question.  Using

4  LG's construction, which you use for purposes of

5  infringement, denying infringement, is it

6  correct that you cannot make the 30-percent

7  calculation based upon the information contained

8  in Figure 2 of Slide LGD 629-023?

9            A.   It would be difficult to make a

10  calculation based on LG's construction in this

11  case, but not difficult on AUO's construction.

12            Q.   But you've got to use the same

13  construction, whether it's infringement or

14  invalidity, and you didn't; right?

15            A.   Well, wait a minute.  This is a

16  situation, as I understand, the -- I think you

17  know I'm not an attorney.

18                 This is a situation where there

19  are multiple constructions before the Court, and

20  they have not been resolved.  And I thought the

21  issue was that my responsibility is to interpret

22  each prior art reference, each accused product

23  reference, and so on on the basis of the various

24  constructions that are on the table.

```
 1                   Q.   Okay.  Finally, let's look at LGD

 2      1080, which was also shown to you on your direct

 3      examination.  Correct?

 4                   A.   Yes.

 5                   Q.   Okay.  I don't expect you to read

 6      your whole report.

 7                        But I've looked through your whole

 8      report and I found no -- on invalidity, and I

 9      found -- strike that.

10                   MR. SHULMAN:  Excuse me for one

11      second, Your Honor.  Sorry for the interruption.

12      BY MR. SHULMAN:

13                   Q.   This document LGD Trial Exhibit

14      1080, you discussed when explaining your reasons

15      that LGD doesn't infringe; correct?

16                   A.   Yes.

17                   Q.   Okay.  And I don't expect you to

18      read through your infringement report right now,

19      because it's lengthy.

20                        But I'll represent to you that I

21      looked through your infringement report and I

22      couldn't find any reference to this exhibit in

23      there.

24                   A.   Well, excuse me.  I don't think I
```

1       said that quite right.

2                    In terms of infringement, what

3       this shows is one simple fact that the product

4       didn't have an etchant problem.  This doesn't

5       relate to dummy patterns.  There are no dummy

6       patterns in this one.

7               Q.    So this is --

8               A.    In the gate metal.

9               Q.    Sorry for interrupting.  I keep

10      doing that.

11                   Are you finished?

12              A.    So I don't recall that this was

13      directly addressing the infringement in my

14      report.

15              Q.    So Exhibit 1080 is not relevant to

16      your infringement opinion?

17              A.    No, that's not true.  The

18      discussion of the patent, the merits of the

19      patent, et cetera, has to take into account, I

20      believe, the specification, which is the

21      technical description of the -- of this etchant

22      phenomenon and also the specification of the

23      claim.

24                   And as I said earlier, these are

1    very different in this patent.  The claims are

2    extremely broad.

3              What this information in this

4    slide shows is that there was no problem with

5    undercutting with etching with any mouse holes,

6    whatever you want to call it, because this

7    product didn't have that problem.

8              So it relates in the specification

9    of the patent.  I'd have to think harder to

10   think whether that has any implication to the

11   infringement.

12             MR. SHULMAN:  Thank you very much.

13   I have no further questions.

14             MR. GOODWYN:  Your Honor, I just have

15   one quick question for Dr. Rubloff.

16             REDIRECT EXAMINATION

17   BY MR. GOODWYN:

18        Q.  Dr. Rubloff, you included as an

19   Exhibit 3 to your invalidity report a list of

20   all the materials you considered.  Do you

21   remember right?

22        A.  Yes.

23        Q.  And it was an extensive list?

24        A.  I think I remember it.  Yes.

1          Q.   And in that list, you also

2     included a list of the mask files that you

3     reviewed?

4          A.   I think I must have.  That's in

5     the binder?

6          Q.   I don't believe it's in your

7     binder.

8          A.   Okay.  Go ahead.

9               I'm sorry.  Go ahead.

10              MR. GOODWYN:  Excuse me one

11     second.  I apologize.

12     BY MR. GOODWYN:

13          Q.   And this was one of the pages in

14     Exhibit 3 to your expert report that identifies

15     the mask files that you reviewed?

16          A.   Oh, yes.

17          Q.   Do you see that?  Do you see

18     Number 76 on this spreadsheet?

19          A.   Yes.

20          Q.   Is that the mask file related to

21     the two --

22          A.   On-sale bar products.

23          Q.   -- on-sale bar products?

24          A.   Absolutely.  I remember the 7160

```
 1     especially now.  But, yes, that's the mask file.

 2                    MR. GOODWYN:  Okay.  Thank you.

 3     No more questions.

 4                    THE COURT:  Doctor, you may step

 5     down.

 6                    THE WITNESS:  Thank you.

 7                    MR. BONO:  We call Mr. David

 8     Eccles to the stand.

 9                    THE CLERK:  Please state and spell

10     your name for the record.

11                    THE WITNESS: David Albert Eccles.

12     D-A-V-I-D A-L-B-E-R-T E-C-C-L-E-S.

13                    THE CLERK:  Okay. Do you prefer to

14     swear or affirm?

15                    THE WITNESS: Swear.

16                    THE CLERK:  Do you solemnly swear

17     that the testimony you're about to give to the

18     Court in the case now pending will be the truth,

19     the whole truth and nothing but the truth so

20     help you God?

21                    THE WITNESS:  Yes.

22                    THE CLERK:  Thank you.

23                    DIRECT EXAMINATION

24     BY MR. GOODWYN:
```

1          Q.   Good afternoon, Mr. Eccles.

2          A.   Good afternoon.

3          Q.   Are you here to testify regarding

4     your opinions about the '160 patent?

5          A.   Yes, I am.

6          Q.   Before we begin going over the

7     '160 patent and your opinions, could you briefly

8     describe your education, experience and work

9     experience?

10         A.   I received a bachelor's degree in

11    electrical engineering from the University of

12    California at Irvine, and studied signal

13    processing.

14              I did post-graduate work at Perdue

15    University.  Then I went to work at Hughes

16    Aircraft Company as a design engineer designing

17    display circuits.  And I also led projects doing

18    display designs and investigations.

19              This is where I first became

20    familiar with liquid crystal display technology.

21    In approximately 1979, I worked on my first

22    liquid crystal display and started to understand

23    the effects of this, the slow response time of

24    the liquid crystal; and therefore, the need for

1    driving it harder or what's been called later

2    overdrive.

3              So I had experience with that

4    doing -- also doing photometric measurements,

5    and human factor studies and display

6    performance.  In 1987, I joined Sony, worked

7    there for about 17 years in doing design of the

8    world's first 2000 line computer monitor used

9    for air traffic control and helped develop that.

10   Worked on the video circuit and video processing

11   as well as photo metric measurements on that.

12             And I also led a project to

13   develop the world's first microprocessor

14   controlled software controlled multi-scan

15   computer monitor for sale in the market in the

16   world.

17             And I also the engineer in charge

18   of manufacturing to build the monitors and

19   introduced some automated camera equipment that

20   would measure and adjust the monitors.  And in

21   about 1994, I was asked to take over and develop

22   a TV design group to design Sony's television

23   products for North and South America.

24             So I recruited and built up a

1    group to do that, which ended up making,

2    designing the products for sale in America by

3    Sony, and which was about three and a half

4    million TV products a year.  And we developed

5    all the different engineering expertise that was

6    needed and product design procedures.

7                In 2004, I left to start doing

8    independent consulting.  My first job was

9    working with the company that had a video

10   processing technology, so I helped them develop

11   a product, and test that out, and show how it

12   would improve the dynamic contrast of high

13   definition TVs, including, of course, liquid

14   crystal flat panels.

15               And I've worked for various

16   companies since then, all in display technology

17   developing new display products and evaluating

18   them.

19         Q.   When you mentioned for a couple of

20   different experiences, I think both with Hughes

21   and Sony, that you had experience with

22   photometric measurements.  What are photometric

23   measurements?

24         A.   Photometric measurements are the

1    way you characterize displays.  It's important

2    to characterize them in a way that the eye sees

3    them.

4              There's various ways to measure

5    energy coming from a display.  But one way, in

6    particular, is, of course, to measure it as the

7    eye sees, what colors the eye sees.  And there's

8    various tests that are run to do that.

9              But it's very important to set up

10   the procedures properly so that you can

11   duplicate and get repeatable results.  That's

12   important for -- often in the case of air

13   traffic control, we have to get procedures

14   approved and then sell off the products that --

15   because of the safety issue.

16             Also, and just for TVs or selling

17   products to other companies, you have to meet

18   certain specifications.

19        Q.   Well, in addition to your work

20   experience, do you have any other experiences

21   within the industry, for example, related to

22   displays?

23        A.   I've been a member of the Society

24   for Information Display, and I've served on

 1     committees that evaluate papers and display

 2     design, a signal processing display performance

 3     for at least 20 years.

 4                     I was also vice president of that

 5     organization.  It's the largest organization in

 6     the world in display technology.

 7                     I was a Board member of the Video

 8     Electronic Standards Association who sets the

 9     standards for inputs, for instance, digital

10     inputs to monitors and video processing, and of

11     course, a member of IEEE.

12                     I have published some papers, and

13     I've been invited internationally to teach

14     seminars on liquid crystal display product

15     design which has to do with the electronics, the

16     signal processing, back lights and the

17     performance and study of artifacts that come out

18     based on the different video processing.

19                 Q.   Do you have some specific

20     experience relevant to the technology described

21     in the '160 patent?

22                 A.   Well, I think there's three

23     particular areas of my background that in my 30

24     years as a display engineer that are

1    particularly interesting.

2              For instance, video signal

3    processing design, both as an engineer and as a

4    leader for the groups.  The -- due to the

5    processing of the video throughout the system.

6    I wouldn't say I was an expert on technology of

7    the liquid crystal, for instance, like we've

8    heard about here today.

9              But I have had extensive

10   experience on how to drive the liquid crystals

11   and what results come out.

12              And so you asked me about the

13   photometric measurements, that was a large part

14   of that process is to accurately measure and

15   characterize the results of the displays.

16              And then, finally, because of my

17   experience and my understanding of the

18   importance of the display product that's

19   actually in TV, that was the most important

20   aspect.  So I recruited and set up a group in

21   Sony to which was a visual performance group.

22              We created source material to

23   evaluate displays and TVs and evaluated those

24   displays, measured them, observed them and came

1      up with criteria so that those TVs would be

2      acceptable for sale into the market.

3                  MR. GOODWYN:  Your Honor, at this

4      point, I'd like to offer Mr. Eccles as an expert

5      in the area of driving in optics for displays,

6      including liquid crystal displays.

7                  MR. SHULMAN:  No objection.

8                  THE COURT:  He'll be admitted.

9      BY MR. GOODWYN:

10                 Q.   Mr. Eccles, you mentioned earlier

11     that you had formed an opinion with respect to

12     the '160 patent.  Did you form an opinion with

13     respect to infringement of the '160 patent?

14                 A.   Yes, I did.

15                 Q.   Could you explain to me what that

16     opinion is?  I'll put up Claim 1 on the board if

17     that helps you.

18                 A.   As far as Claim 1, looking at the

19     limitations of the claim, I determined that LG

20     does not have a storage for storing the previous

21     brightness level which we can explain later.

22     They do not have a determinator for determining

23     an output brightness level based on the previous

24     brightness level for the same reason as the

1    previous one.

2              And first of all I believe the

3    term substantially equal is indefinite, it's

4    difficult to understand just from the patent

5    language.  But even with respect to that, I

6    think there is prior art that also would meet

7    that, so I don't see how that LG could possibly

8    infringe upon that, either.

9              Q.   Well, let's take the first one.

10   If you could just briefly explain what your

11   opinion is with respect to why LG Display

12   doesn't have a storage for storing the previous

13   brightness level in its accused products?

14             A.   I have looked through each of the

15   specifications of the timing controllers and

16   they all have what's called compression feed

17   forward driving so the previous brightness level

18   is the data is compressed, it's stored as ones

19   or zeros and some other average, or

20   informational data, then it's decompressed and

21   brought back to do a comparison and so,

22   therefore, the storage doesn't actually store

23   the previous brightness levels.

24             Q.   And the determinator for

1    determining an output brightness level based on

2    the previous brightness level stored in storage,

3    can you briefly explain why you believe LG

4    Display's accused products don't meet that

5    limitation?

6         A.   Well, it refers to the previous

7    one where it talks about the -- based on the

8    previous brightness level, so LG does not use

9    the previous brightness level to do the

10   comparison.  But that one also ties in with the

11   next one which talks about substantially equal.

12        LG in my reading of the LG

13   procedures and their timing controller, they

14   measure a response time, and they optimize 10 to

15   90 percent rise and fall time, and by using a

16   probe that measures some absolute energy of the

17   waveform.  And they don't actually measure any

18   quantity of light, nor do they calculate what

19   the ideal quantity of light would be to match.

20        Q.   Well, with respect to time

21   integration quantity and substantially equal, I

22   know we have seen this a number of times over

23   the last couple of days with Dr. Silzars, but

24   have you provided a quick explanation of what

1     the patent describes as the ideal quantity of

2     light and the time integration?

3          A.   Yes, I have.

4          Q.   Can you please explain it to me?

5          A.   Well, simply in '160 patent first

6     of all talks about ideal quantity of light.  So

7     if we draw a waveform during the -- you can see

8     here outlined in red, and the area S is under

9     the curve of the red signal, so this is one

10    frame here, the ideal response would be that it

11    turns on and then turns off.  And that's all the

12    light that you get.  So the patent defines the

13    ideal quantity of light as S, versus as we could

14    measure instantaneously the brightness as we go

15    along here, but when you add the whole area

16    here, then you get the ideal quantity which the

17    '160 patent refers to.

18         Q.   When you say the ideal quantity of

19    light or the brightness, is that the amount of

20    light the human eye perceives?

21         A.   That's exactly what the '160

22    patents talks about and that's the reason for

23    their proposed novelty is to -- that we'll be

24    able to match the amount of light that the eye

1      sees.

2              Q.   Can you explain to me what the

3      time integration quantity of light is?

4              A.   If we go next, if we look at this

5      lower waveform, the S, the actual response of

6      light from the liquid crystal will not go

7      instantaneously.  In this way back in the '160

8      patent it looks like the rise time was 30

9      milliseconds or so.  So the waveform will go up,

10     but at the end of the frame when the signal goes

11     back to off it will drop down.

12              So the integration quantity of the

13     actual waveform or the actual light output is

14     this area under the green.  This will also be

15     integrated by the eye and the idea is to have

16     this green area match the area under the S, but

17     in this case it's smaller.

18              Q.   And how do you have the green area

19     be the same as S?

20              A.   Well, on the next, if you

21     overdrive, meaning instead of driving to level

22     one you actually put in the input to drive to

23     level two, this is what's commonly known in the

24     industry as overdrive.  Since the I think late

1    '80s, at least early '90s, it's been commonly

2    referred to as overdrive.

3            You overdrive the pixel with a

4    slow response time.  The light here you can see

5    under S double prime still doesn't get up to the

6    level two, but it at least gets to level one in

7    this diagram and other types of drives it will

8    get higher, other types of liquid crystals.

9            Now, as you see in the frame when

10   it's turned off, the fall time here and there is

11   a little bit larger area, so in this case the

12   '160 patent, this symbol here, the S double

13   prime is about equal to S and this is the idea

14   of the patent is to make these areas equal and

15   they'll look the same to the eye.

16       Q.  Now, is the ideal quantity of

17   light measured during a single frame in

18   accordance with the '160 patent?

19       A.   Absolutely, it's measured.  It's

20   defined here as on, or from off it goes to on

21   and then off, and it's during that one frame.

22       Q.  With respect to the time

23   integration quantity of light, it includes both

24   the rising and the falling?

1          A.   That's absolutely necessary for

2     the '160 scheme is that you include the falling

3     time, because obviously the light during the

4     first frame is not going to ever be equal to the

5     light that's by the area S, so you include the

6     falling time then you can get close to that

7     ideal quantity of light.

8          Q.   Is there any relationship between

9     the time integration quantity of light and the

10    amount of light that the eye perceives?

11         A.   Well, that's the idea here is that

12    the time integration quantity is what the eye

13    sees, as long as that's not a small enough area,

14    one or two pixels, then the eye perceives that

15    time integration quantity.  And the goal of the

16    '160 is to have that matched the same as the

17    ideal quantity of light.

18         Q.   That would be the total amount of

19    light the eye sees?

20         A.   That's the total amount of light,

21    yes.

22         Q.   Now, is there any description in

23    the '160 patent itself about the time

24    integration quantity of light?

1          A.   Yes, it describes it.

2          Q.   What does it describe?

3          A.   Well, at least it attempts to

4    describe it.  Time integration quantity taken

5    from the '160 patent, which is a change in

6    brightness in the moving-state video signal

7    integrated with respect to time, it says the

8    moving-state brightness used for storing the

9    relation is the brightness when the particular

10   pixel changes back to the off state one frame

11   after it is driven from the off state to the on

12   state, that's a little backwards, confusing.

13   What they're saying is they go from off to on to

14   off, so that's what it describes here.

15          And then it mentions, this is in

16   accordance with the passage of a wire frame

17   model over the particular pixel, and then the

18   brightness in the moving state which is used

19   when the relation is stored is the quantity of

20   light equal to the brightness change integrated

21   with respect to time.

22          So this invention obviously was

23   done for CAD models which was a big problem at

24   this time with the slow response of liquid

1    crystals, when you moved an image on the CAD

2    screen, the vertical lines -- if you move it

3    horizontally the vertical lines would disappear

4    or blink and come back when you stopped.  It

5    also caused a problem when you rotated in 3D

6    which you often did with CAD, so all directions

7    did that.  So this problem is being addressed by

8    this patent.

9              So also mentioned in here, moving

10   video images, but in my opinion, that was

11   probably an afterthought.  Because there is not

12   really sufficient information and descriptions

13   in here that would address that.  In fact, it

14   creates some problems.

15             Q.   Well, moving video images, for

16   example, won't always be from off to on to off;

17   isn't that right?

18             A.   That's hardly ever the case.

19   They're usually from different gray shades to

20   gray shades.

21             Q.   What do you mean from different

22   gray shades to gray shades, or gray level to

23   gray level?

24             A.   Rather than going from zero

1    brightness to full brightness, let's use an

2    eight bit DAC, we'll talk about level zero is

3    off or black and level 255 is full white.  So

4    usually those actual levels don't occur on video

5    signals, they're say go from 50 to 100 and then

6    goes to 200, so they jump around because video

7    is so full of different information.

8             Q.  Does the '160 patent explain how

9    to determine a time integration quantity of

10   light for that type of a situation?

11            A.  Well, I think that's where it's

12   unclear.  I made a drawing to show the

13   importance of that, to see that.  Here is a case

14   where we're going from L1 to L2 back to L1 with

15   the ideal quantity.  So you can see in red if we

16   then decide to overdrive that to level three,

17   we're going to get -- the response time is going

18   to go up to level three, and then fall back

19   down.

20            So in this case, the time

21   integration quantity would be the area shown in

22   green here which is the area under this curve.

23   Then this is the case where it goes from the

24   previous level to another level back to the

1    previous because we read in the text it defined

2    going from off to on to off, it wasn't so

3    specific or specific at all about gray levels,

4    so one interpretation could be just go back to

5    the level you started at.

6         Q.   Would there be a different result

7    if you went back to zero?

8         A.   If you go, you do what the text

9    says and go back to off.  I have shown an

10   illustration here.  Then there would be a

11   different amount of area, you would need to

12   drive it higher to L4 -- if we could show the

13   next picture -- to get the fall time to go back

14   down.  This is the light that you would measure

15   under just the green here and, therefore, you

16   would have to calculate a higher overdrive level

17   to load the lookup tables for the patent.

18        So whether you pick the previous

19   state or an off state for the frame two would

20   make a difference, there is a different area and

21   you would have to have a different drive level.

22   So that's why I think the '160 was not so

23   specific about video.  It's pretty clear about

24   wire frame, off to on to off, but it's subject

1     to interpretation or experimentation to do gray

2     to gray levels.

3              Q.   Is it important to know whether

4     you go either back to the previous level or back

5     to zero in determining the appropriate overdrive

6     level?

7              A.   To determine the overdrive in

8     accordance with the '160 patent it's absolutely

9     essential because as you can see, I have shown

10    here, you might determine level three is

11    appropriate or level four.  This determination

12    has to be made first before you can make

13    measurements to load the lookup table.

14             Q.   Did you review Dr. Silzars'

15    testing methodology and measurements?

16             A.   Yes, I did.

17             Q.   Do you have any opinions about his

18    methodology?

19             A.   Well, I see a number of errors, so

20    I'm very hesitant to believe the data.  As I

21    mentioned, I have had extensive experience in

22    photometric measurements.  I think there is a

23    basic process that's usually followed.  First

24    you do a setup and design of experiments, then

1    you would identify procedures.  And if it's

2    important, an issue for like a company or to

3    sell off a product, you would write out the

4    procedures identifying the equipment and

5    actually have them approved by a quality

6    engineer.  I would do that at a company so that

7    you know the procedures are right.

8              You, of course, need to calibrate

9    the equipment so that you know both that your

10   results are accurate and what the tolerance in

11   that accuracy is.  You would take the data, you

12   would do the analysis as outlined in the

13   procedure and then finally you would calculate

14   an experimental error when you're done.  You the

15   often do measurements and get three digits.

16   Certainly photometric measurements are not

17   accurate to three digits.  You need to know what

18   the experimental error is, depending on the test

19   either plus ten percent or minus ten percent

20   might be quite good, sometimes it might be

21   worse.

22             So I guess first of all, you asked

23   me about the measurements, I had concerns.

24   First of all, I don't see the evidence of those

1    steps in the procedure done.  And one of the

2    glaring ones is the calibration of the

3    instrument.

4              I recently read in Dr. Silzars's

5    deposition that he said he used a linear

6    photodiode.

7              Q.   Is there a problem with using a

8    linear photodiode?

9              A.   A linear photodiode is not what

10   the eye sees.  And I believe the '160 patent is

11   ideal quantity of light and what the eye sees.

12   A linear photodiode measures radiometric

13   measurements.  It measures the energy and where

14   the photometric measurements are done if they

15   want to measure what the eye sees with what's

16   called a photometer or an instrument, it could

17   be the same photodiode, but it's calibrated to a

18   photooptic curve, what your eye sees.

19              So the problem is if you look at

20   these waveforms, these are collected with the

21   photodiode.  If you use a photometric

22   instrument, then your eye is less sensitive at

23   the lower light levels, so actually this is --

24   these numbers would be a little bit lower at the

1    lower light and then your eye is more sensitive

2    at the higher light levels, so the shape of this

3    curve would be changed somewhat.

4              So that's a fundamental problem in

5    that I believe the numbers that I see in the

6    results using the photodiode are not depicting

7    what the eye sees, therefore, the calculations

8    and measurements I don't see how that can be

9    related to the ideal quantity of light.

10        Q.   You also mentioned that you

11   reviewed Dr. Silzars' deposition testimony.  Did

12   you review anything in his testimony about

13   disabling an ODC function during his testing?

14        A.   Well, he made measurements with

15   and without overdrive enabled, yes, and that's

16   in his report.

17        Q.   Did he also -- was there a feature

18   in -- in the backlight that directed -- that

19   would actually change the amount of light

20   provided based on the picture and whether or not

21   he enabled or disabled that?

22        A.   What you're a talking about is the

23   DCR function, the dynamic contrast ratio, and he

24   mentioned in his deposition, I believe in his

1    testimony as well that he disabled that.  And

2    the function of the DCR is to adjust the

3    backlight brightness according to the level of

4    brightness on the screen.  And that's to make

5    dark scenes darker and bright screens brighter.

6    That's appealing for TV signals.  It wouldn't be

7    used for a CAD system, but it's appealing for

8    TV.

9              If you disable that, it's

10   difficult to get measurements because we are not

11   sure what the actual display would show when

12   it's sold into the market.  And so I think

13   that's another reason that the numbers would be

14   different if they had been left like the product

15   is when it's sold.

16        Q.   Well, with respect to the ideal

17   quantity of light, were there any problems in

18   your opinion with respect to Dr. Silzars'

19   calculations in his testing?

20        A.   Once the measurements were made,

21   which I explained I have doubts about the

22   accuracy of those, there were also some problems

23   I see with the calculation method according to

24   the definitions in the '160 patent.

1          Q.   What are those issues?

2          A.   Well, here is the actual images

3    from Dr. Silzars' report, and on the left, we

4    can see this is where the block is, what he

5    calculated as the ideal quantity of light going

6    from L1 to L2.  The actual ideal -- actual

7    quantity of light during frame one as you can

8    see on the right, I have included the hatched

9    area at the bottom.  This is because light is

10   light, the eye sees it, and when you turn it on

11   to a level two, that's the amount and then you

12   have a perfect response.  That's the amount of

13   light that will be seen during frame one, from

14   zero to L2, that's actually what you see.  So

15   this quantity on the left is I think maybe a

16   mathematical quantity, but it is not the ideal

17   quantity of light.

18         Q.   What about Dr. Silzars'

19   calculations for the time integration quantity

20   of light?

21         A.   I should point out that the levels

22   here recorded are going from 50 to 225.  That's

23   why I mention it does not start at zero.  I'm

24   not sure if this level is zero in his

1    measurements, but wherever zero is, it was not

2    included.

3              So if you -- the next slide or the

4    next button push will show when you have a

5    response time, this is actual measured response

6    time, the same kind of calculation was done by

7    doctor -- in Dr. Silzars' test results where

8    actually what the eye sees would be what is

9    outlined here that has additional areas, so once

10   again, the amount of area is different, you get

11   a different number in the calculation.

12             Q.   When you say it's a different

13   number, would it be significantly different?

14             A.   Well, as you can see here, I'm not

15   sure if this is to scale, but yes, it's going to

16   be different, both of them are different

17   numbers, so it's hard to take this data,

18   especially in light of I don't believe the

19   numbers are actually correct in the first place,

20   it's hard to say and compare those.

21             But if you took different

22   conditions like one from 150 to 200, those would

23   be vastly different.  So I think here you can

24   add more area so it's kind of going to make the

1    ratios closer together I guess if I had to

2    predict, but I couldn't come up with a number.

3         Q.   Well, in addition to the

4    calculation for the time integration quantity

5    and the ideal quantity of light for when

6    overdrive was enabled, were there any other

7    issues that you had with respect to Dr. Silzars'

8    approach to testing?

9         A.   Yes, there is one more issue.  You

10   can see here.  The input level is level one,

11   then it went up to level two, then the input

12   went back to level one again.  However, as you

13   can see, if you push the button on the right --

14   go back, I think we missed -- this is with

15   overdrive enabled.  So what happens is you go

16   from level one to level two, but as you can see,

17   barely see and you heard Dr. Silzars explain in

18   his testimony that the level during frame two

19   that was applied to the liquid crystal itself

20   was a different level than what the input was.

21            He, of course, applied the input

22   again, level one, but in this case you can see

23   that the overdrive was enabled.  Therefore, the

24   waveform would go down a little bit below the

1     original level.

2               So in summary, I mentioned that

3     the '160 patent was not clear to go back to

4     level one or back to zero, he did neither of

5     those, he went to a different level, whichever

6     the lookup table in the product supplied.

7               Q.   If you're trying to measure the

8     time integration quantity of light, what's

9     actually being omitted from a display, is the

10    level into the TCON or the level that's provided

11    to the pixel the relevant number?

12              A.   Well, the relevant level is what

13    level it's going to occur on the display, which

14    is related to the voltage that's supplied to the

15    liquid crystal.  I think the point here is I

16    heard Dr. Silzars talk about super position.

17    Super position means, for instance, you could

18    measure one frame and measure the results during

19    the fall time according to the '160, then you

20    could do another frame and do it, then you could

21    add the results together.

22              This would make it really

23    impossible to separate out and find what the

24    actual ratios should be by driving it to a

1    different level after.  So clearly in the '160

2    patent it doesn't even talk about using an

3    overdrive level for the second frame.

4              Q.   Did you create a demonstrative to

5    explain that issue?

6              A.   Yes, I did.

7              Q.   Okay.  I believe that's on the

8    screen now.  Can you explain or does this --

9              A.   So -- so, first of all, here's

10   what was actually supplied to the liquid

11   crystal, and therefore, the resulting output

12   brightness on the left and Dr. Silzars' testing.

13              So I -- as I mentioned on the

14   upper right, you could go, and if -- you could

15   push the button.  You could do -- continue an

16   overdrive of L3 and then return to L1 and

17   calculate the area underneath it.

18              Or you could -- if you returned to

19   the level zero, then you would calculate an area

20   there, and you'd need to drive to a different

21   overdrive level.  So I've overlaid results that

22   Dr. Silzars had.

23              And you can see there's a

24   difference in area either way you do it.  So, in

1    my opinion, there's three different methods

2    here.   Three different set-up conditions and

3    three different results.

4            Q.   Now, with respect to Dr. Silzars'

5    testing with the overdrive disabled, did you

6    have similar issues to his testing?

7            A.   Well, not quite as bad, but the

8    same errors.   If you talk about the ideal

9    quantity of light, of course, going from 50 to

10   225, the actual light the eye sees is in frame

11   one here, which is at a level 225.

12           His measurements comes up with, I

13   guess, two or 175.

14           Q.   Okay.   And similarly with respect

15   to the time integration quantity of light?

16           A.   So if you look at the time -- time

17   integration quantity of the actual response in

18   Dr. Silzars' measurements, you can see here,

19   once again, this is without overdrive;

20   therefore, the level one is applied after to the

21   display.

22           And that's what the light outputs.

23   So -- so to -- you get this area, but again it's

24   missing the glare below that the eye sees.   So

1    the eye would actually see what I've outlined

2    here on the right with the cross-hatch area.  It

3    would be in addition to that area.

4            Q.   So that would result in a

5    different time integration, quantity of light

6    that he included?

7            A.   Absolutely.  Both numbers would be

8    different.

9            Q.   Now, the examples you have gone

10   through were going from a level of 50 to 225

11   back to a low level again.  Did you also have

12   some opinions regarding Dr. Silzars' testing

13   methodology and calculations with respect to

14   starting at a high level and going to a low

15   level?

16           A.   Yes, I did.

17           Q.   What are those opinions?

18           A.   I could show you that on the

19   next -- next picture.

20                Okay.  So, first of all, this --

21   the level is going from 200 to 75.  So level

22   three is 200 going down to level 75.

23                So the ideal quantity of light

24   Dr. Silzars calculated in the area shaded in

1    blue on the left.  However, during that --

2    remember the ideal quantity is looking at an

3    ideal response.

4              So during frame one, the

5    brightness level is at 75.  So if you calculate

6    the area here, that's 75.  So the eye actually

7    sees 75 during frame one.

8              So here, again, the very basis for

9    the measurements are incorrect that this is what

10   the ideal quantity of light should be.

11        Q.   Well, using Dr. Silzars' testing

12   methodology, would the ideal quantity of light

13   for a signal going from zero to 250 back to zero

14   be the same as the ideal quantity of light going

15   from 250 down to zero back to 250?

16        A.   Well, that shows that this is

17   purely nonsensical.  It's measuring an area up

18   here that's not light.

19              Because you would get the same

20   result if you were going -- I'm not sure the

21   numbers that you said, but if you started it at

22   100 and went to 50, you would get a 50.  If you

23   started at 50 and went to zero, you'd get a 50.

24              And, obviously, that light is

1     different to the eye.  And so this makes no

2     sense to me to use this.  It's purely what the

3     eye would see during frame one.

4              Q.   How about with respect to the time

5     integration quantity that Dr. Silzars calculated

6     when going from a high level to -- to a low

7     level?

8              A.   Well, unfortunately, that was

9     upside down as well in his test report, I am

10    afraid.  Shown here, he measured the area that

11    was above the curve whereas clearly the time

12    integration quantity, as I show on the right, is

13    the instantaneous brightness integrated over

14    time.

15             So how do you measure that

16    brightness?  You measure the instantaneous.  You

17    make a curve and then you sum that up, which is

18    shown here, the area under the curve.  This is

19    what is actually seen by the eye during that

20    time frame.

21             Q.   Okay.

22             A.   So, once again, the basis of the

23    measurements are wrong, and the ratio doesn't

24    make sense, in my opinion.

1          Q.   Well, you mentioned with respect

2     to the overdrive enabled that it didn't go back

3     to the same level?

4          A.   Right.

5          Q.   Was the same issue -- did it occur

6     with respect to the high level to low level

7     during Dr. Silzars' testing?

8          A.   The same problem occurs, if you

9     push the next button.  The level after

10    correction, the proper level was applied to the

11    input or the intended level L3.

12               But what happens, when it went to

13    the look-up table, it's onto the next frame,

14    frame two and overdrive automatically puts in a

15    different level.  I don't know what that is, but

16    you can tell on the measurement results that the

17    brightness went to a higher level for the next

18    frame.

19               So the result, as I've shown on

20    the right, if you had gone to the same level,

21    then this curve would have been a little bit

22    lower.  And you'd have a little bit -- I'm not

23    sure if it would be less or more area under the

24    curve.  Any way, it would be different.

1           So the fundamental problem here,

2      too, is that according to the definition of the

3      '160 patent, it's neither going to the previous

4      level nor to -- I don't know what is -- what

5      it's going to.  It's just going to a different

6      level.  That doesn't make any sense.

7           Q.  With respect to the overdrive

8      disabled, did you have any opinions with respect

9      to the methodology Dr. Silzars applied to his

10     calculation?

11          A.  Well, okay.  I think you see the

12     pattern now if you look at the situation when

13     it's disabled.

14          Once again, the light measured was

15     above the curve, whereas the actual light, the

16     ideal quantity of light is what -- actually seen

17     by the eye is down here, which is -- should be

18     level 75.  And the same exact problem with

19     measurements of the actual, only there was no

20     overdrive level to go to.

21          So, but once again the

22     measurements were made incorrectly, at least the

23     calculations were made incorrectly.

24          Q.  Well, let's go back to the '160

1    patent itself.  You indicated that it was your

2    opinion that substantially equal was indefinite.

3    Why is substantially equal indefinite?

4         A.   Well, the '160 patent doesn't

5    really -- for instance, it doesn't give a

6    number.  So I don't -- substantially equal,

7    let's look at the language in the claim.

8    Substantially equal level refers to a level,

9    which is not completely the same, but can be

10   accepted as a substantially equivalent level.

11             And then it goes on to say and

12   includes a level, which is closer to an ideal

13   quantity of light than no preventive measures

14   are taken.

15             The second part of that is clear

16   that it's got to make an improvement upon no

17   overdrive.  But the first part substantially

18   equivalent level can be accepted as

19   substantially equal level, can be accepted as a

20   substantially equivalent level.

21             First, can be accepted, that's

22   subjective, unless you give some criteria for

23   that.  Substantially equivalent, it's like a

24   circular argument to -- using the same words

1    or -- to define the words.  It's -- it doesn't

2    make sense.

3                And then the last part of the

4    claim of the -- is closer to -- is required, but

5    that often resulted with prior art overdrive.

6    And certainly it does today with prior art as

7    the rise tends to get faster.  The whole purpose

8    of overdrive is to over drive.

9                So you're going to get instances

10   where the brightness is higher or the time

11   integration quantity is higher during that

12   frame, and some instances where -- when it's

13   lower.

14               So, and this way reading the whole

15   description, it's certainly indefinite.

16               Q.  Well, now, do you understand that

17   AUO has proposed that the construction be only

18   part of that sentence, and they've omitted and

19   included a level which is closer to an ideal

20   quantity of light than no preventive measures

21   are taken?

22               A.  Yes, in reading claim

23   constructions, I noticed that.  And that they're

24   clearly -- that clearly ignores the text in the

1    patent.

2              So...

3         Q.   Do you have an opinion as to

4    whether that's an appropriate -- it's

5    appropriate to ignore that text?

6         A.   Well, it's certainly not

7    appropriate to ignore it when you're considering

8    the patent for invalidity or infringement.  I

9    don't know the legal process or terminology for

10   what the claim terms are.  I know I've been told

11   that, but I am afraid I just don't have a good

12   understanding of that.

13              In my understanding, that's not an

14   appropriate claim term, because it ignores part

15   of the description in the patent.

16        Q.   Well, if you add that language,

17   does it change the meaning?

18        A.   Well, yes, it does.  And that

19   would certainly have to be added to the AUO

20   claim construction, whether it's in the term or

21   whether you just include it when you do the

22   analysis.

23        Q.   Well, what does or does the '160

24   patent provide any examples of substantially

1    equal?

2             A.   Well, I'm not sure it provides

3    examples of substantially equal, but it provides

4    examples of acceptable.  You can see on Figure 3

5    in the patent, and then there's a waveform

6    corresponding, as you can see on the right.  It

7    describes, for instance, Model A.

8             It measured some liquid crystal

9    displays and showed the data for it.  You can

10   see Model A is mentioned, and then the light

11   quantity ratio, which is in Column 64 is 1.02,

12   which means there's only a two-percent variation

13   between the ideal quantity of light and the time

14   integration quantity measured as the '160

15   defines it from off to on to off.

16            And here they put a symbol zero,

17   which in the text says the symbol zero indicates

18   that almost no flicker is visually perceived.

19   Once again, this is talking about the wire frame

20   CAD model where you move an object through the

21   field, which is visually full bright color on

22   black.

23            So they're saying that although

24   you can observe flicker with two-percent match,

1    it's almost no flicker.  So I think this means

2    it's pretty good.

3              So in one sense, maybe that's what

4    they meant by ideal quantity.  I'm not sure.

5              But that -- that's an indication

6    that that's maybe what they meant.

7              Q.  All right.  Substantially equal or

8    ideal quantity?

9              A.  I'm sorry.  Substantially equal to

10   an ideal quantity.

11             You can further see here that

12   there's more data on -- for instance, Model B

13   has a light quantity ratio of 81 percent, which

14   is 19 percent lower than the ideal quantity.

15             And in here, they say it's an "X",

16   'X' indicates that intensive flicker is

17   perceived.  So, obviously, that is not

18   acceptable per the authors of the '160 patent.

19             Q.  In fact, the title of the patent

20   is directed to solving flicker; isn't that

21   right?

22             A.  That's correct.  And as I

23   mentioned, I'm sure it was written because of

24   the CAD displays.  They wanted to improve the

 1    wire frame displays.

 2         Q.   Well, we've seen different numbers

 3    about what's perceptible and what's not

 4    perceptible.  Have you created a demonstrative

 5    that would help explain to how you can determine

 6    what is visible to the human eye?

 7         A.   Well, first, if I could explain

 8    over here.  I've made kind of a summary about

 9    what's acceptable.  But notice that even though

10    5A is acceptable per the per this table, in the

11    '160 patent, it says -- it indicates almost no

12    flicker is visually perceived.

13              As a video display, this would be

14    horrendous and would not be acceptable.  It

15    would have smearing.  We call motion smearing.

16              No way would this be accepted as a

17    video display.  And, also, in the LG adjustment

18    process, they wouldn't accept this, either.

19    They would try to make the rise times go as fast

20    as they could before accepting this, if they

21    accepted it.

22         Q.   So were you explaining that the

23    reason it's not acceptable is because of rise

24    time or for some other reason?

1          A.   Yes.  The reason it's not

2     acceptable, because the rise time is too long.

3     The frame time is 16 milliseconds.  But the rise

4     time is 18 and a half milliseconds.  And the

5     fall time is 10 milliseconds.

6               It's just too slow.

7          Q.   Okay.  Back to the issue of being

8     able to perceive images.

9               Did you create a demonstrative to

10    try to show what is perceptible to a human eye?

11         A.   Yes, I did.  And, believe it or

12    not, this is what a display engineer gets a real

13    kick out of or has fun with.

14              So I came up with these diagrams.

15    The one on the left is Dr. Silzars' map with the

16    golf ball flying through the air.  And

17    interestingly enough, we actually did this at

18    Sony.

19              We took some high definition

20    footage with slow-motion footage from sports,

21    both golf balls flying in the air as well as a

22    baseball.  And we took measurements or we

23    simulated different overdrives on displays, and

24    then evaluated them visually.

1          Because that's really what it

2     comes down to.  You can do all the measurements

3     in the world, but what does a TV look like is

4     how you judge it and decide if you can sell it,

5     and how good the video performance is.

6          So now Dr. Silzars -- this is his

7     curve from also on the left.  And he put an 80

8     percent under the first area here up to frame

9     one.

10          That is not precisely what the

11     '160 patent describes.  As we've seen, the

12     patent describes the rise time and then the area

13     under curve for the fall time.

14          So the 80 percent, if it were

15     applied according to the '160, that might be a

16     total of 95 percent or something.  I'm not sure.

17          But at any rate, we did do the

18     test like was illustrated here where the first

19     frame was some percentage.  And what we found is

20     when the golf ball moved -- first of all,

21     Dr.  Silzars' mentioned it does get fuzzy.

22          And the reason it gets fuzzy is

23     because the front, for instance, would be gray.

24     But if you overdrive it too much, then the front

1    will be white.

2              And so we found actually it was

3    very sensitive to the one -- to the higher, the

4    whiter.  People would notice the front of.  It

5    was too wide when it was above 110 percent.

6              In fact, I remember a particular

7    case where we had a 113 percent, and one of the

8    executives came in and said, "That's a problem."

9    He didn't like it.  We lowered it to 110, and he

10   was okay with it.

11             Q.  Another problem that occurs on the

12   trailing edge of the golf ball, especially as it

13   goes through the sky, that's even a worst

14   problem, because it's brightness over the darker

15   sky.

16             So in this case, we found we had

17   to be within ten percent.  Another thing that we

18   did was we used a roulette wheel.  We used the

19   Wheel of Fortune from the TV show and we used a

20   car wheel with spokes and slowing down.

21             And so what we'd look for here is

22   to the numbers, do they turn gray and then they

23   get white.  Again, when it stops in particular,

24   the roulette wheel helps because we can see the

1    lines disappear and then come back as it slows

2    down.

3              So our goal was to have the

4    numbers be crisp and be able to -- to see the

5    lines and the wheels, particular spokes in a

6    car.

7              Q.   In fact, it looks like you can see

8    those spokes graying out here, can't you?

9              A.   Right.  That's a natural effect.

10   They blur and then come back.

11             And so this occurs.  There's

12   various frequencies in here.  Sometimes it's one

13   frame.  Sometimes it's two, three, or four.

14             But, in general, we found we had

15   to even improve the brightness of the first

16   frame to within five percent to make these

17   numbers look crisp and not so blurry.

18             Finally, we built both CAD

19   displays as well as often HD TVs were used for

20   CAD systems.  And so we looked at the wire frame

21   model and as you look at -- we had a car drawn

22   here.  As the car moves horizontally, the

23   horizontal lines are okay, but the vertical

24   lines get dim.

1          And as mentioned in the '160

2    patent, they found when it was within two

3    percent, it was acceptable.  We found a very

4    similar number here.

5          So we actually found, depending on

6    the application and what video you see, the

7    range of acceptable brightness in the frame

8    could vary less than ten percent or even down to

9    two percent.

10         Q.   Now, the '160 patent, does it

11   describe any of these applications specifically?

12         A.   Well, it does mention the CAD

13   models.  It's this one.

14         That's the Table 3 that shows two

15   percent was acceptable.  Table 3 is not exactly

16   what the situation would be nowadays, because

17   rise times are much faster.  But yet, the

18   results that we had was done in the early 2000s,

19   so maybe similar results.

20         Also, I might mention that we

21   found in the sky, especially that we needed to

22   use an eight bit of color, 256 levels, when it

23   was reduced, of course, to 6 bit.  The

24   difference was 1.6 percent between pixels, and

1    everybody can see the contouring lines.

2              Seven bit was getting to be

3    acceptable, but it was generally used eight

4    bits, which is like .4 percent difference

5    between levels, which is not visible.

6              I think Dr. Silzars mentioned that

7    just noticeable differences of two percent or

8    maybe less than that depending on the set-up

9    conditions.  That's about right.

10             Q.   With respect to moving video

11   images, is there a problem with trying to

12   calculate the time integration quantity of light

13   from moving images that use, for example, a

14   feed-forward technique?

15             A.   Well, yes.  With the -- there's

16   always a problem.

17             So you make an assumption as an

18   engineer what you're going to do.  The '160

19   patent doesn't really clearly tell what to do.

20             Once again, it was clearly written

21   for CAD models.  And when you apply it to video,

22   it's somewhat ambiguous or indefinite.  I did

23   make a --

24             Q.   A demonstrative?

1        A.    -- demonstrative that you can

2   show.  So in a feed-forward overdrive what it

3   does is you have a level that you're driving to,

4   a level two here.  Then instead of going back to

5   the original level or to zero on video, you're

6   going to have another step come next.  Let's

7   say, I guess, it's level four.

8            So what happens when you go from

9   this level to the level four, the actual

10  response that I've shown here is at some

11  different location.  If it's really slow, it

12  will be lower.  If it's fast, it will be higher.

13            So in this case, the rise time is

14  less than the frame time of 16 milliseconds.

15  More like current technology.

16            So as I've blown up here, if you

17  take a look just at this corner right there,

18  here's where the actual response is.  It's at

19  level three.

20            Now, you've got to calculate what

21  level of overdrive we're going to use for the

22  next frame.  So if you put in the overdrive

23  calculated based on the level two, which is what

24  the input is, which is what's fed to the look-up

1    table.

2              So that's what's actually done

3    with a feed-forward overdrive scheme.  If you

4    push the button, you can see that the ideal

5    level would go from here to there or intended

6    level.

7              However, the instantaneous

8    brightness of the liquid crystal is at level

9    three.  That's because the liquid crystal

10   capacity cannot change instantaneously.

11             And like it or not, that's the

12   brightness that's coming out at that instant.

13   So if you apply that amount of overdrive, it's

14   actually going to go lower than level four.  And

15   you can see that there's more errors here.

16             So these errors are going to add

17   up as you go.  If you went down, it would be

18   different.  It would still be an error.

19             So it's problematic applying

20   feed-forward overdrive to video displays.  And

21   so you make some -- if you do have that

22   situation, you make some decisions to minimize

23   the amount of overdrive.

24             And really the only way to do that

1    is to look at the displays, which is commonly

2    done and has been done for all displays, and

3    prior art as well.  It's always going -- going

4    to be a visual check to see that you haven't

5    caused some strange problems like this, which

6    often occur.

7              And this can cause even problems

8    with different colors if your shading, because

9    the sensitivity is different of different

10   colors.  You could get strange hues occurring.

11   What's supposed to be gray, it might get

12   greenish or reddish.

13             Q.   The color changes?

14             A.   You would get color changes due to

15   overdrive.  So you've got to look at all that

16   and sometimes just turn it down.  You can't do

17   as much as you want, because you cause other

18   problems.

19             Q.   Well, now, I'll get to that later.

20   Excuse me.

21             Let me first go on to the next

22   issue.  In addition to the problems with

23   understanding the meaning of time integration

24   quantity and substantially equal, you mentioned

1       earlier that there were some elements that were

2       missing from LG Display's accused products.

3                    And so, therefore, they don't

4       infringe.  And I believe you went through and

5       said the storage for storing and a determinator.

6       Can we go through, first, the storage for

7       storing a previous brightness level and perhaps

8       you can explain to us how you came to the

9       conclusion that LG Display's accused products

10      don't meet this limitation?

11                   A.   Well, I think, first, we need to

12      go to the claim constructions.  I don't think

13      the storage is an issue, but the brightness

14      level evidently is, where in the claim term it

15      says brightness level.  LG calls it a gray scale

16      value or luminance value, or it could be a

17      brightness value.

18                   Right.  Brightness level, I think,

19      is maybe a better word.

20                   AUO has level of intensity of

21      light.  Intensity of light is something the eye

22      perceives that's an output from a display.

23      True, the gray scale value results in a level of

24      intensity of light, but I think this is a

1    misunderstanding in what the patent is talking

2    about.

3              It's talking about a brightness

4    level from a storage.  It's a digital or it's a

5    voltage.

6              Q.   Well, it's also speaking about the

7    brightness level.  In fact, we'll look back at

8    the claim.

9              A brightness level of the video

10   input signal is the video input signal related

11   to the light emitted, or is it actually the

12   light emitted?

13             A.   It's related to the light emitted.

14   It's a hydrodynamic through all the process of

15   the display, and then the drivers to the liquid

16   crystal as well.  And then it will result in an

17   intensity level output.

18             So that's how I read the AUO

19   construction.  It's talking about the light out.

20   So I think it was a misunderstanding here.

21             Q.   Okay.  Now, with respect to a

22   storage for storing the previous brightness

23   level of a video input signal through said

24   logic.

1           A.   I think it's pretty clear what the

2     storage is for storing the previous signal.

3     Once again, the AUO language has light

4     intensity.  That would need to be changed in

5     order for their definition to be valid.

6           Q.   You don't actually store a level

7     of light in memory; is that right?

8           A.   No.  You store a voltage value or

9     what we call a gray scale value digitally.

10          Q.   Well, now how does LG Display the

11    timing controllers store compressed data?

12          A.   Well, I prepared an explanation of

13    how it works on this demonstrative.  First of

14

15

16

17

18

19

20

21

22

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1

2

3

4          Opinion with respect to that

5     assertion.

6          A.   I didn't understand him to say

7     that, but I can address that.  This, of course,

8     could occur in displays.

9          Q.   Before we go there, what did you

10    understand -- you were in the courtroom, what

11    did you understand Dr. Silzars to say?

12         A.   I believed him to say that this

13    recovered data if it was displayed it would look

14    terrible, it's nothing like the original, which

15    is true.  And the reason is it's only overdrive

16    calculation data, it's not the actual data,

17    that's what I believe he said.

18              But I can address your question.

19    Yes, this would certainly would occur, for

20    instance, you go to analog signal conversion,

21    there is going to be all kinds of noise or black

22    and white.  There is also in certain kinds of

23    animation they use on off pixels or shading to

24    create shades rather than just a plain area.

 1              There is also things that happen

 2      in the video scenes, explosions and things and

 3      when you did MPEG processing and unprocessed the

 4      MPEG --

 5              Q.   Encoding?

 6              A.   When you encode an MPEG and then

 7      decode, it's going to have some artifacts, so

 8      certainly these kind of things occur.  I think

 9      this is not unusual video.

10              Q.   Are there also types of images

11      that could perhaps be displayed that may have

12      that type of -- those numbers?

13              A.   Well, as I mentioned, like

14      computer generated video, or animations would

15      use that.  There is all kinds of things I can

16      think of.  If you take a close look at the TV,

17      that's got that kind of data or noise, it might

18      be noise like I mentioned with an analog signal.

19              Q.   What about an explosion or picture

20      of an explosion on a television?

21              A.   Yeah, those things happen and you

22      get a lot of crazy artifact, mostly because the

23      satellite and cable companies don't broadcast in

24      -- they do a lot of compression themselves with

1    MPEG and there can be some really strange

2    artifacts because they're trying to save

3    bandwidth to get more channels and save money so

4    they didn't put the perfect image up like you

5    may get with your Blue Ray player.

6         Q.   In combination with not having

7    storage, I believe you indicated that LG

8    products don't have a determinator?

9         A.   In the sense of the '160 patent

10   they don't have a determinator.  Let's look at

11   the claim construction.  LG mentions as it does

12   in the patent that the determinator, you can

13   apply the next brightness level and it has to be

14   predetermined based on the difference in

15   quantity of the light based on the actual and

16   ideal response, so that's the way you calculate

17   the next overdrive level.

18        Q.   I apologize, I interrupted.

19        A.   AUO simply says a logic such as

20   circuity for determining an output brightness

21   level, that's true as far as it goes, but the

22   patent describes how you get that and that's not

23   the full definition of determinator.  So once

24   again, legal language, I don't know if you have

1    to include the whole description in the claim

2    term, but you certainly have to look at the

3    whole description when you apply it.

4          Q.   Well, with respect to the '160

5    patent, what does it require with respect to a

6    determinator?

7          A.   Well, I can explain, the patent

8    requires logic to determine the output

9    brightness level, and you predetermine it based

10   on the difference as we've talked about before

11   in the quantity of light between the actual and

12   ideal, simply.

13          So it's the actual which is the

14   square as we saw in previous measurements versus

15   -- I mean, the actual is the waveform and the

16   ideal is the square amount, so you predetermine

17   by measuring the difference then you can

18   calculate an overdrive level that would cause

19   the actual to be closer to the ideal.

20         Q.   Do you have an understanding of

21   how LG Display performs its overdrive function?

22         A.   Yes.  After reading the TCON

23

24



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5    Maximum responses --

6             A.   I didn't hear the whole question.

7             Q.   Do you know whether or not LG

8    Display's customers define the necessary

9    response time for a display?

10            A.   Well, it's -- whether the

11   customers require it or specify it, if it's a

12   consumer in the store, no, he doesn't specify

13   it.  If you're selling it OEM equipment, then

14   yes, they would specify it.

15            Q.   Someone like Dell or HP?

16            A.   Absolutely.  But there is an art

17   to that.  It depends on the response of the

18   liquid crystal and how much overdrive you're

19   using.  But as I mentioned there is a whole

20   bunch of different measurements so they kind of

21   summarize that into a number, which is a general

22   number.

23            Q.   Well, you mentioned earlier about

24   the overdriving and the color change with

1    respect to the feed forward.  And I believe

2    Dr. Silzars mentioned something about a final

3    visual check during his testimony yesterday.

4    Did you hear that?

5              A.   Yes, I did.

6              Q.   And I believe he said that to

7    imply the LG Display was somehow adjusting the

8    brightness level.  Do you have an opinion as to

9    whether or not that is correct?

10              A.   I have no idea of the intent of

11    why he said that, but I did hear it.  As I think

12    I mentioned before, every display before you

13    make a judgment on it, you look at it.  That's

14    obviously part of the prior art, and existing

15    art and future art.  You look at the display for

16    a number of reasons.  You look to see that the

17    gamma curve is right.  You look to see that

18    there is no noise, or you look to see that you

19    haven't created artifacts due to things like

20    overdrive or MPEG encoding or decoding.  You

21    look for all those things.  You look to see if

22    the colors have changed because of your

23    overdrive.

24              And quite often there will be

1    excessive overdrive and you got to tone it down

2    in order to eliminate some of these artifacts.

3    There is a whole bunch of reasons why you would

4    look, but isn't it obvious that you would look

5    at a display before deciding it's ready for

6    sale.

7             Q.   Could some of those artifacts be,

8    for example, a color shift?

9             A.   That's what I mentioned.  If you

10   got some different colors and you're getting

11   more overdrive on one than another, you're going

12   to have to turn down the overdrive.  That could

13   be done while you look at it, say there is a

14   problem, go turn it down until the color is

15   right.

16            Q.   Now, you mentioned that LG Display

17   calculates the response time.  Did you look at

18   any documents from LG Display that helped you to

19

20

21

22

23

24

973

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          A.   That's right, which would affect

16     the light on the output.  And Dr. Silzars

17     mentioned there was some ripple which I imagine

18     was the inverter, but there was also level

19     changes that were going on, that would make it

20     very difficult to make measurements.  I can see

21     it would be difficult.  But that's not what the

22     eyes see when they look at the display.

23          Q.   Now, with respect to Dr. Silzars'

24     test results, did you have any opinions?

1      A.   Well, yes.   First of all, as I

2  think you brought out before is that six out of

3  the 13 TCONs were not even measured with

4  overdrive disabled, so we have no way of

5  comparing the numbers.

6           But as I mentioned before, because

7  of the wrong instrument measuring, the

8  photometric data was not measured so the numbers

9  I don't believe are correct.   The ideal quantity

10  in some cases were calculated, were calculated

11  incorrectly.   And in almost all cases the time

12  integration quantity was calculated incorrectly.

13           There was overdrive on frame two

14  which was incorrect in the gray to gray

15  transitions.   Backlight was disabled and I

16  didn't see any experimental errors so I have no

17  idea what the errors add up to, so I don't know

18  if I can compare two numbers, what the

19  tolerances are on those numbers.

20           So based on that, I really

21  conclude that the data is inaccurate.   If I

22  received a report like this in a company, I

23  would reject it, of course.   And you couldn't

24  draw conclusions from it.   It's not valid data.

1    It needs to be -- it should be redone with the

2    corrections in order to get any kind of valid

3    data.

4                 MR. GOODWYN:  Your Honor, I'm

5    getting ready to move on to another topic.  Is

6    it a good time for a break?

7                 THE COURT:  We'll take a

8    fifteen-minute recess.

9                 (A brief recess was taken.)

10               THE COURT:  All right.  Be seated,

11   please.

12   BY MR. GOODWYN:

13               Q.  Mr. Eccles, before the break we

14   were discussing your noninfringement opinions

15   with respect to LG Display's accused products.

16   In addition, did you form any opinions with

17   regard to invalidity of the '160 patent?

18               A.  Yes, I did.

19               Q.  What is your opinion?

20               A.  Well, I analyzed several patents

21   that were prior art and I determined that in my

22   opinion the '160 patent, at least the claims,

23   the 1 and 3 that are addressed here are invalid.

24               Q.  Did you look at one of the

1       references that was specifically identified in

2       the '160 patent, the Mori reference?

3                   A.   The Mori is -- actually the title

4       here is wrong.  Next page, it's the '532 patent.

5                   Do you want to go through each

6       one?

7                   Q.   Yes.

8                   Can you show where each of the

9       limitations in Claim 1 are disclosed in the Mori

10      preference?

11                  A.   First of all, a liquid crystal

12      display comprising is shown in Mori and here in

13      the reference here, it says a liquid crystal

14      panel drive device.

15                  Q.   That's referencing a paragraph in

16      Mori?

17                  A.   Yes, paragraph one.

18                  Q.   What about the next limitation?

19                  A.   So an input logic is referenced in

20      paragraph ten in Mori, and shown in the figure

21      on Figure 1.

22                  Q.   And a storage for storing?

23                  A.   And the storage is also mentioned

24      in paragraph ten and shown on the Figure 11 --

1    well, the block 11 on Figure 1.

2              Q.   Where it says capable of storing

3    one frame of image data, what does that mean?

4              A.   That means it's a frame buffer or

5    it stores one entire frame of video drive memory

6    for all three colors.

7              Q.   And what about a determinator?

8              A.   So the determinator in this case

9    it mentions the ROM, the blocks, the ROM, the

10   comparator and the add or subtracter which look

11   like 12, 13 and 14 in Figure 1 of Mori.

12             Q.   Now, you mentioned that it was

13   difficult to understand whether or not how the

14   determinator worked; is that right, or did I

15   misunderstand -- let me withdraw.  I think I'm

16   misthinking of another question.  Excuse me,

17   Mr. Eccles.  It shows you're paying attention.

18                   So as to make a time integration

19   quantity of a brightness change?

20             A.   Well, Mori addresses that in a

21   sense and he talks about the optimal

22   increase/decrease values that have been stored

23   in advance.  So it is addressed here.  If you go

24   to the next --

1          Q.   You mentioned that time

2     integration quantity of a brightness change

3     substantially equal to an ideal quantity of

4     light as being indefinite; is that right?

5          A.   That's right.

6          Q.   Is that shown in Mori?

7          A.   Well, it's addressed in Mori, and

8     it calls the optimal increase, so what is the

9     optimal increase.  And here he's talking about

10    rise time which results in an output, so you

11    know, to tell the truth if I'm analyzing this

12    patent, I would say that's indefinite, it is

13    it's optimal.  What is optimal?  I can't put a

14    number on it.  Clearly the intent was to improve

15    on the previous arts and these kind of words

16    would be very well used in an SID symposium when

17    you're presenting papers and I have seen many

18    papers in IEEE as well.

19               As far as patent language, I'll

20    leave that to lawyers to define the term.  I

21    don't know what optimal means.  It means as good

22    as you can get to me.

23          Q.   As good as you can get, would that

24    be substantially equal to the ideal quantity of

1     light?

2              A.   I guess if we're just -- not

3     having well defined those terms, yes, it's the

4     same thing in my mind.

5              Q.   What about the driver for driving

6     an image?

7              A.   The driver, of course, is the

8     output that drives the liquid crystal selling

9     extension.  It says end of segment driver

10    circuit, six, that drives the liquid crystal

11    panel, 208, perform the display based on the

12    output of this adder-subtracter 14.  So its's

13    described there in Figure 1.

14             Q.   Does Mori also disclose the

15    limitations of Claim 3?

16             A.   Yes.  First, you have to go look

17    at frame two.  I mean, Claim 2, because Claim 3

18    is dependent on Claim 2, which, of course, is

19    dependent on Claim 1.

20             So we can see the reference to

21    Figure 3 in the Mori patent, which describes the

22    look-up table.

23             Q.   That's the look-up table of Claim

24    2?

1          A.    That's correct.

2          Q.    And what about Claim 3?

3          A.    Well, in Claim 3p --

4          Q.    Let me go back so you can see it.

5     There you go.

6          A.    There.  Basically all it says is a

7     plurality of colors in a table.  And so this, I

8     believe, is also part of the table.  This is

9     part of the table.

10              If you go to the next one.

11     Although it seemed obvious in Mori, that he is

12     dealing with color, because he's driving

13     displays, it doesn't mention it precisely.  So I

14     selected other patents that mention -- Kido

15     does.

16              For instance, an Okumura, who is a

17     very famous inventor of some of the overdrive

18     technologies, there's certain patents that are

19     mentioned on blue colors specifically.

20          Q.    So let's look then at the Kido

21     reference you just mentioned.

22          A.    Okay.

23          Q.    Is it your opinion that the Kido

24     '860 reference invalidates the claims of the

1    '160 patent, the asserted claims?

2           A.   Yes, it teaches all the

3    limitations certainly of Claims 1 and 3.  For

4    instance, it provides for a liquid crystal

5    display.  So an afterimage elimination circuit

6    for a liquid crystal display apparatus as

7    mentioned here.

8           Kido mentioned -- I'm not sure

9    what paragraph that is of the patent.

10          Q.   How about an input logic?

11          A.   Number 1 in the figure -- of

12   Figure 4 as denoted in the text is the input

13   logic.

14          Q.   That's --

15          A.   Text is Column 6, Lines 34 to --

16   37 to 40.  Excuse me.

17          Q.   And a storage for storing?

18          A.   Storage is mentioned in Column 6,

19   Lines 37 to 40 and also Figure 4.

20          Q.   And that's identified in the

21   figure as memory?

22          A.   Number three, memory.

23          Q.   How about determinator?

24          A.   Determinator is mentioned in the

1    text Column 7, Line 6 through 16.  And it's

2    shown in Figure 4, as you can see here.

3            Q.   And those are elements four?

4            A.   Subtractor of the coefficient

5    circuit matter to do the determination.

6            Q.   And what about making a time

7    integration quantity of a brightness change

8    substantially equal to an ideal quantity of

9    light in a stationary state?

10           A.   This is interesting, because Kido

11   shows an outward form that's a square wave.  It

12   appears to be the ideal response.  And, of

13   course, the goal of overdrive is to achieve the

14   ideal response, which is a voltage, which is

15   output response from the liquid crystal.  The

16   brightness outputs being a square-wave-type

17   response.

18           So the prior art, the current art,

19   future art, the goal is to mimic that actual

20   response time.  And there are -- some liquid

21   crystals over time got faster and faster.  They

22   start at maybe a hundred milliseconds, were up

23   around 30 at the time '160 wasn't.

24           Now, we hear numbers eight, four

```
1    even 2.5 are advertised for televisions.

2    There's a ^ fair oh, electric liquid crystal

3    that I've used in head mounted displays which is

4    much faster than that.  So essentially with a

5    tiny bit of overdrive, it achieves the ideal

6    quantity of light just because you've improved

7    the response.

8                So, here, I think any technique

9    that is trying to mimic the ideal response is

10   eventually going to get to the ideal quantity of

11   light, because the ideal response leads to the

12   ideal quantity of light.

13               So my -- in my opinion, that this

14   also teaches that same limitation of the '160.

15        Q.    Okay.  And then we see further

16   described in Column 5, Lines 41 to 44 the

17   compensation.

18               Why is it important to know what

19   the compensation is for signals going in the

20   opposite direction?

21        A.    Well, as in the context of the

22   '160, it talks about the rise and fall, and you

23   measure the time integration quantity under the

24   falling curve.
```

```
 1                  So, obviously, this -- all signals

 2      have a fall eventually.  So what goes up must

 3      come down.

 4                  So, in this case, he's talking

 5      about the falling time as well.

 6            Q.    So if you were able to achieve as

 7      close as possible to the ideal response time,

 8      would you achieve as close as possible to the

 9      ideal quantity of light?

10            A.    That would be a natural by-product

11      and that's the goal of what overdrive display

12      designers are doing.

13            Q.    How about the driver?

14            A.    Well, the driver is mentioned that

15      in Column 7, Lines 4 to 24 and in Figure 4.

16            Q.    And is it item Number 8?

17            A.    Yes, it is.

18            Q.    Well, in addition to Kido showing

19      all the elements or all the limitations of Claim

20      1, did you also compare it to claims -- to

21      asserted Claim 3?

22            A.    Yes, I did.  To 2 -- and -- well,

23      I had to look at Claim 2 as well.

24            Q.    Right.
```

1          A.    And in Figure 4 of Kido, it

2     mentions in Column 9, Lines 27 through 32.  It

3     mentions about the --

4          Q.    The read-only memory?

5          A.    The ROM is the read-only memory

6     which --

7          Q.    What about the number of plurality

8     of input columns?

9          A.    Well, obviously in Figure 9, we've

10    got red, green and blue, and it mentions in the

11    text Column 6, Lines 51 through 54.

12         Q.    Now, there's another reference,

13    Johnson.  Did you review or form an opinion with

14    respect to whether the Johnson '254 patent

15    discloses all of the elements shown in the

16    asserted claims of the '160 patent?

17         A.    Yes, I did.

18         Q.    Okay.  Can you step us through

19    that, please?

20         A.    Okay.  Johnson, the liquid crystal

21    device is described in -- liquid crystal device

22    based on plane switching in which the switching

23    speed is, and so forth.  So, obviously it's

24    talking about liquid crystal.

1                        Also mentions the --

2              Q.   I'm sorry.

3              A.   Also mentions it hydrodynamical

4    test of the liquid crystal.  It shows they're

5    driving some response time.

6                   Then the input logic is mentioned

7    in Column 3, Lines 15 and 16 and also shown in

8    Figure 7.

9              Q.   Storage for storing?

10             A.   Storage, you can see.  Obviously,

11   here's the drum figure.  It looks like Figure

12   32.  I mean, Item 32.  And Figure 7, it's

13   mentioned.

14                  In the patent, Column 4, 67

15   through 5, Line 2.  And field store is mentioned

16   in Column 4, Lines 66 and 67.

17             Q.   How do you know a field delay is a

18   storage?

19             A.   Well, it's obvious from the

20   circuit designer, that's what you're doing.

21   It's, also -- as I mentioned, there's a drum up

22   here, which is the common symbol for a memory,

23   digital memory device.

24                  And that's how -- in reading the

1      patent, that's the operation of it, obviously.

2      In fact, we've seen this picture before.  It's

3      got the input coming, video.

4                   It's got frame store or a delay.

5      It could be called a frame delay or a storage.

6      And then they both go to look-up tables to

7      create new values.

8           Q.   What about the limitation relating

9      to a determinator?

10          A.   The determinator is described in

11     Table 1, and it mentions it in Column 4, Line 65

12     through Column 5, Line 14.  And you can see in

13     the table that there's replacement values.

14          Q.   Are those replacement values or

15     are those output values?

16          A.   Well, okay.  You're right.  These

17     are output values that are -- in terms of

18     voltages, normally the digital memory has

19     digital values or bits.

20                   And so it's described here for, I

21     guess, purposes of illustration that they're

22     voltages.  They correspond to voltages that are

23     going to drive the liquid crystal.

24          Q.   What about the next element, so as

1    to make a time integration quantity of a

2    brightness change substantially equal to an

3    ideal quantity of light?

4         A.   Well, Johnson addresses this.  You

5    can see in Figure 5.

6              And he discusses it in Column 6,

7    Line 61 through 65.  Talks about a rise time.

8              And as you can see, as you improve

9    the rise time, it gets closer to the ideal

10   quantity of light.  So, certainly, we talked

11   about the claim limitation that requires that it

12   be closer to the ideal quantity than if no

13   preventive measures were taken.

14             So this, obviously, does that.

15   And because it's an overdrive, it will, of

16   course, overdrive.  In this case, he's got

17   really slow response time liquid crystal, but

18   it's -- through the years, as the response time

19   improves, then the rise time will go actually

20   above.

21             And he basically teaches once you

22   go above, slow it down and get equal, that's

23   because he was talking about such slow response

24   times.  But as you get to a faster response

1     time, you can overdrive during the frame and

2     then come down.

3              So I believe it's obvious, in some

4     instances, applying the Johnson overdrive scheme

5     to liquid crystals that have a faster response

6     time than what he's showing here, you will get

7     some instances where it does achieve the ideal

8     quantity of light or even higher.

9              He also refers to the falling time

10    which is in Column 4, Lines 29 through 32.

11         Q.   Okay.  So that the rise time and

12    the fall time would allow you to determine the

13    quantity of light?

14         A.   That's right.  He teaches that.

15         Q.   And what about the last limitation

16    driver?

17         A.   Well, then the data that goes out

18    to the drive is taught in Column 5, Lines 10

19    through 12, as well as it's shown in Figure 7.

20         Q.   Okay.  Did you also look at Claim

21    3?

22         A.   Yes, I did.  By first looking at

23    Claim 2, and so there's a -- Claim 2 mentions a

24    table for storing, and obviously, I already

1      mentioned Table 1 is representative of storing.

2      And it mentions in Column 4, Lines 46 through 54

3      of the table.

4              And it also mentions while taking

5      into, for example, the hydrodynamical properties

6      of liquid crystal material into account.

7              Q.   What does that mean?

8              A.   Well, that's adjusting for the

9      slow response time of the liquid crystal.  And

10     it's obvious that it's also different for

11     different cells, and materials, and colors and

12     things.  But any way, he's making a general

13     statement here, I believe.

14             Q.   Okay.  What about Claim 3 for

15     Johnson?

16             A.   Well, I think it's obvious, he was

17     driving color displays.  That -- I didn't see it

18     mentioned specifically.

19             MR. SHULMAN:  That says Kido.

20     That doesn't say Johnson.

21             MR. GOODWYN:  I understand.

22             THE WITNESS:  That's correct.  As I

23     was saying, I didn't find specific mention to

24     color in Johnson, although it's obvious that he

```
1    was driving.  So I think to be technically

2    correct, I'd refer to a different patent to

3    teach that portion of it.

4              And so Claim 2 -- obviously, I

5    mentioned Kido mentions the -- mentions the

6    table for storing, mentions the colors, the red,

7    green and blue.  And it mentions it in Column 6,

8    Lines 51 through 54.

9              Q.   Is there another reference that

10   you considered that shows the same limitations

11   of three colors?

12             A.   Yes.  In the Okumura patent '257,

13   it also obviously identifies in Figure 4 the

14   red, green and blue, and identifies it in text,

15   pixel signal by -- talks about the data basis of

16   conversion characteristics, which may vary with

17   the data delayed by the field memory.

18             Well, actually -- well, it shows

19   it in Figure 4.

20             Q.   But the text then refers to the

21   compensating circuit shown in Figure 4?

22             A.   That's right.  For converting the

23   transmittance data, which understood from Figure

24   4 that it's different colors.
```

1          Q.   So in summary, Mr. Eccles, what is

2     your opinion regarding infringement of LGD's --

3     LG Display's accused products with respect to

4     Claim 1 and 3 of the '160 patent?

5          A.   Well, I think I have explained my

6     analysis of the claim.  That is, LG does not

7     infringe upon the Claims 1, 2 or 3.

8          Q.   What about validity?

9          A.   Well, actually in reading the

10    prior art, I believe that the '160 certainly in

11    Claims 1, 2 and 3 should not be valid.

12         Q.   Now, in forming your opinions and

13    that you've discussed, I want to show you a list

14    of materials that were included in the binder

15    and that we have gone over today.

16              The patent, and the prosecution

17    history, and the joint claim construction

18    statement, and a number of exhibits to your

19    report, as well as to Dr. Silzars' report.  Did

20    you rely on all of these documents in forming

21    your opinions today?

22         A.   I relied on those and some others.

23    Yes.

24              MR. GOODWYN:  Okay.  Your Honor, I

1     would like to offer into evidence LG Display

2     Trial Exhibit Number 1083 and all the documents

3     cited therein.

4               MR. SHULMAN:  No objection, Your

5     Honor.

6               THE COURT:  Admitted.

7               MR. GOODWYN:  Thank you.

8               MR. SHULMAN:  Your Honor, before I

9     begin the cross, can I just deal with one

10    housekeeping matter?

11              THE COURT:  Sure.

12              MR. SHULMAN:  During my

13    cross-examination of Dr. Rubloff, I referred to

14    LGD 629-015, which was a slide that they used

15    during the direct.  And there's no way to know

16    what that is in the record.

17             So I'd like to mark for

18    identification as AUO Exhibit 1585.  I'm not

19    offering it into evidence, but just marking it

20    for identification, so we know that it's that

21    slide.

22              THE COURT:  We can -- actually I

23    think a good technique is to actually admit it

24    into the record, unless you object and just give

1      it the designation of the number plus A.

2                   MR. SHULMAN:  I have no problem

3      with admitting it into the record, but I didn't

4      follow the last part of what you just said.

5                   THE COURT:  Is that the same

6      number that was used in the reference during the

7      course of the presentation?

8                   MR. SHULMAN:  Correct.  And I've

9      just marked it with an exhibit number, because

10     it didn't have an exhibit number.

11                  THE COURT:  Oh, so you gave it a

12     separate exhibit number?

13                  MR. SHULMAN:  Correct.  That's

14     what I'm doing right now.

15                  THE COURT:  Okay.  That's fine.

16                  MR. SHULMAN:  Slide LG 629-015 is

17     AUO Exhibit 1585.

18                  Slide LGD 629-019 is exhibit AUO

19     Exhibit 1586.

20                  Slide LGD 629-023 is AUO Exhibit

21     1587.

22                  And then there were excerpts from

23     LGD Exhibit 380 that were part of the direct

24     examination of Dr. Rubloff.  There were two

1    excerpts.

2              The first pertained to the product

3    known as LT060V1.  And we've marked that as AUO

4    Exhibit 1589.

5              And lastly, the second excerpt

6    from LGD Exhibit 380, which pertained to the

7    product LT071D1, we have marked as AUO 1590.

8              THE COURT:  It's admitted.

9              MR. SHULMAN:  Thank you.

10             MR. GOODWYN:  Your Honor, if I

11   could just do one housekeeping thing as well,

12   perhaps it will clarify or simplify things.  I'd

13   like to offer into evidence the demonstratives

14   that were used with Dr. Rubloff as LG Display

15   Trial Exhibit 1084 and the demonstratives used

16   with Mr. Eccles as LG Display Trial Exhibit

17   1058, so there's a complete set of all the

18   demonstratives instead of just pieces.

19             THE COURT:  It will be admitted.

20             MR. SHULMAN:  That's fine.  Your

21   Honor, how much time do we have today, so I can

22   gauge myself?

23             THE COURT:  We're going until five

24   o'clock.

1          MR. SHULMAN:  Okay.

2               CROSS-EXAMINATION

3     BY MR. SHULMAN:

4          Q.   Mr. Eccles, we've not met before;

5     correct?

6          A.   No.  Hello.

7          Q.   Hello.  As you probably know, my

8     name is Ron Shulman, and I have a few questions

9     for you.

10              Now, in your opinion, what the

11    overdrive invention of the '160 patent seeks to

12    do is to cause the pixels and the liquid crystal

13    display to emit a quantity of light that is

14    equivalent to the ideal quantity of light;

15    correct?

16         A.   Basically, yes, under the

17    conditions that are described in the '160.

18         Q.   Now, let's focus on conventional

19    overdrive systems that predate the invention of

20    the '160.  In your opinion, seeking to improve

21    the response time of the liquid crystal material

22    is the fundamental purpose of conventional

23    overdrive; correct?

24         A.   Well, seeking to improve the

1    response time, yes, in order to get better

2    motion pictures on the display.  So the end goal

3    is to make a better picture, but yes, what they

4    do is improve the response time.

5              Q.   Okay.  And the Mori prior art

6    reference that you spoke about today is an

7    example of a conventional overdrive system;

8    correct?

9              A.   Yes.

10             Q.   And the Kido prior art patent that

11   you relied upon is another example of such an

12   overdrive system that attempts to improve

13   response time; right?

14             A.   It has some nuances in it that I

15   wouldn't say are conventional, has some

16   additions, but basically that's the same thing

17   it tries to do, yes.

18             Q.   And the Johnson prior art patent

19   that you relied upon today is, yet another

20   example of such an overdrive system that

21   attempts to improve the response time; correct?

22             A.   That's true.

23             Q.   Okay.  Now, is it true, sir, that

24   if you use the prior art overdrive system such

1    as Mori, and Kido and Johnson that seek to

2    improve the response time, you may emit, but you

3    will not necessarily emit a quantity of light

4    that approaches the ideal?

5            A.   That's true, you may also emit the

6    actual quantity of light or you may emit more.

7    You're right, it would be -- it could occur,

8    it's not a guarantee to occur.

9            Q.   In fact, merely improving response

10   time can result in an amount of light that is

11   farther away from the ideal amount of light than

12   would be the case if the response time were not

13   improved; correct?

14           A.   That's possible in the case where

15   you're improving the rise time and the fall time

16   is faster than the rise time, so there is

17   particular waveforms and liquid crystal

18   materials that if you drove it that way, you

19   could get less time integration quantity of

20   brightness than if you didn't do it.

21           Q.   Indeed there is an example of that

22   in the patent?

23           A.   That's right.

24           Q.   That's Figure 5B; right?

1        A.   I believe so.

2        Q.   Right.

3             Now, is it true, sir, that

4   although the Kido reference discusses improving

5   response time, it nowhere mentions improving the

6   quantity of light?

7        A.   That's correct.

8        Q.   And is it likewise true, sir, that

9   the other prior art references that you rely

10  upon today nowhere mentions improving the

11  quantity of light?

12       A.   They do not mention that per se.

13  As I mentioned, they attempt to match the ideal

14  response time which would be an indirect way of

15  achieving the ideal quantity of light, but

16  you're right, they do not specifically mention

17  the issue of quantity of light.

18       Q.   It may or may not be an indirect

19  way of improving the quantity of light as we

20  just went over?

21       A.   It may or may not.

22       Q.   Let's turn to the '160 patent and

23  let's again by looking at unasserted Claim 12 on

24  the screen, please.

1          This is not asserted.  But do you

2    see that Claim 12 is a method for driving a

3    liquid crystal?  I'm not going to ask you

4    detailed questions about this.

5          A.   Yes.

6          Q.   And according to unasserted Claim

7    12, that method comprises a series of steps that

8    are recited there; right?

9          A.   Right.

10         Q.   Now, let's look at asserted Claim

11   1 on the screen.  Do you see that in contrast,

12   to method Claim 12, Claim 1 covers a liquid

13   crystal display itself?

14         A.   Yes.

15         Q.   Okay.  And according to Claim 1,

16   the liquid crystal display itself comprises

17   certain structures that are set forth in the

18   claim; right?

19         A.   Yes.

20         Q.   And Claims 2 and 3 depend from

21   Claim 1; right?

22         A.   That's right.

23         Q.   And each of Claims 2 and 3 call

24   for additional structures that are not recited

1    in Claim 1 by itself; right?

2          A.   Yes.

3          Q.   Okay.  Now, unlike method Claim 12

4    which calls for certain steps to be performed,

5    asserted Claims 1 through 3 call for structures

6    that make up the liquid crystal display;

7    correct?

8          A.   I'm not familiar with the term

9    structure, but it sounds right.

10          Q.   Structures are things you can look

11    at and touch and feel?

12          A.   If we're talking laymen's terms,

13    yes.

14          Q.   Yeah, I don't mean to confuse you

15    with legales.

16          A.   Okay.

17          Q.   And do you understand, sir, that

18    to infringe Claim 1 or Claim 3, someone has to

19    either make, use or sell a liquid crystal

20    display that contains these various structures

21    that are defined in the claim?

22          A.   Yes.

23          Q.   Okay.  And Claims 1 and 3 do not

24    recite any steps that must be performed before

1    making, using or selling the liquid crystal

2    display; correct?

3            A.   Well, when it talks about a

4    determinator, it puts some definition to that in

5    that it's based on the previous brightness level

6    and next brightness level and comparing it, so I

7    think the process of doing that is inherent in

8    the definition of the determinator.

9            Q.   We're going to get to that.  You

10   would agree that whatever -- we'll get to the

11   definition of determinator.  This recites

12   structure, Claim 1, not method steps; right?

13           A.   I'm afraid I'm not familiar enough

14   with the terms structure and method to comment

15   on that.

16           Q.   You would agree that the word

17   "step" does not appear in Claim 1; right?

18           A.   The word "step"?

19           Q.   Yes.

20           A.   I don't see it in Claim 1.

21           Q.   And it doesn't appear in Claim 2

22   or 3 either; right?

23           A.   I'll take your word for it that it

24   doesn't.

1    Q.   Well, if you have any doubt, you

2    better confirm it for yourself.

3         A.   I better.

4         Q.   If you're willing to accept my

5    representation, just say so.

6         A.   No, I do not see the word step.

7         Q.   But in your opinion, Claim 1

8    requires what you call a predetermination step;

9    correct?

10        A.   That's correct.

11        Q.   Okay.  And you'd agree with me,

12   however, that the word predetermined or

13   predetermination or any of its variants also

14   does not appear in Claim 1, Claim 2 or Claim 3;

15   right?

16        A.   Right, I used that word.

17        Q.   Right.

18             Now, in contrast to asserted

19   Claims 1 through 3, which don't mention

20   predetermining anything, there are other

21   nonasserted claims in this patent that

22   specifically require a predetermination step;

23   correct?  For example, let's look at nonasserted

24   method Claim 9 on the screen.

1        A.   Okay.

2        Q.   And do you see there the very

3   first subparagraph of that claim specifically

4   recites a step that calls for storing certain

5   predetermined information; right?

6        A.   Well, this is referring to a

7   predetermined gray scale level which is the

8   input, and all inputs are predetermined.

9        Q.   Okay.  But it's calling for

10  something that's storing something that's

11  predetermined, that's the step; right?

12       A.   It says the word predetermined,

13  and I would say it's referring to the input.

14       Q.   Okay.  So based on what we see in

15  nonasserted Claim 9, would you agree that the

16  inventors of this patent knew how to include a

17  predetermination step when they intended to do

18  so?

19       A.   Well, I have no idea of their

20  intent or their ability in English language or

21  if somebody helped them, I couldn't comment on

22  that.  I agree that they didn't put the word in

23  Claim 1.

24       Q.   But you want to include it in

1       Claim 1?

2              A.   I don't have to include that word,

3       but we're talking about -- if we're talking

4       about the determinator, you're comparing the two

5       different levels, then that work needs to be

6       done in order to calculate the overdrive for the

7       lookup table.

8              Q.   It's your opinion that Claim 1

9       requires what you have called quote a

10      predetermination step; right?

11             A.   That's my opinion, yes.

12             Q.   Okay.  Now, you have expressed the

13      opinion that LG's accused products don't

14      infringe Claims 1 through 3 of the patent, or

15      Claims 1 and 3, rather?

16             A.   Yes.

17             Q.   Because LG does not practice the

18      predetermination step that you believe is

19      required; right?

20             A.   That's one of the reasons, yes.

21             Q.   Let's call that opinion number

22      one, just focusing on predetermination.  And let

23      me ask up a hypothetical.  If the Court were to

24      conclude that the predetermination step is not

1      required by Claim 1, then opinion number one of

2      yours should be rejected; correct?

3                  A.   Well, Claim 1, LG still would not

4      violate Claim 1.

5                  Q.   For other reasons, I'm just

6      talking about predetermination.  If the Court

7      rejects your notion that predetermination is an

8      element of Claim 1, then opinion number one

9      which hinges on the absence of predetermination

10     would have to be rejected; correct?

11                 A.   Well, if -- I think you could

12     explain it in other terms.  It clearly states

13     what needs to be done in Claim 1 in order to

14     come up with the overdrive values for the lookup

15     tables, so whether you call that

16     predetermination or not, there is something that

17     needs to be done to achieve that, because it

18     talks about achieving the ideal quantity of

19     light.

20                 Q.   But what you have referred to as

21     the predetermination step is what I'm using for

22     purposes of my question.  And if the Court

23     rejects that what you've referred to as the

24     predetermination step is an element of Claim 1,

1    then your noninfringement opinion based upon the

2    necessity of practicing that predetermination

3    step would disappear; correct?

4         A.   I don't think it's that simple.

5         Q.   Okay.  Let's move on, then.

6              Now, is it correct that in your

7    opinion, Claims 1 through 3 also require that

8    something called an offset must be applied to

9    the next brightness level?

10        A.   Yes.

11        Q.   And do you agree that the word

12   offset does not appear in Claims 1 or 3 or 2?

13        A.   (Witness reviewing document.)

14   Claim 2 talks about modifying said brightness

15   level.

16        Q.   Does the word offset appear, that

17   was the question?

18        A.   The word offset does not appear.

19        Q.   Okay.  Now, in contrast to

20   asserted Claims 1 through 3, which do not

21   mention any offset, there are other nonasserted

22   claims in this patent that specifically require

23   the use of an offset; correct?

24        A.   Yes.

1    Q.   For example, let's look at

2    independent Claim 4, which is not being

3    asserted.  And as you can see on the screen, in

4    the third and fourth subparagraphs of Claim 4,

5    they specifically call for an offset; right?

6    A.   Yes.

7    Q.   Okay.  So would you agree that

8    based on what we see in Claim 4, whoever drafted

9    this patent knew how to include the use of an

10   offset when they intended to do so?

11   A.   Certainly in Claim 4 they intended

12   to and they did.

13   Q.   But the inventors or whoever

14   drafted this patent chose not to include an

15   offset in the asserted Claims 1 through 3;

16   right?

17   A.   It does not appear there, yes.

18   Q.   But you want to include one?

19   A.   I think that's one way to state

20   it, yes.

21   Q.   Okay.  Now, let's say the judge

22   rejects your position that an offset is required

23   by Claims 1 through 3.  You've expressed the

24   opinion that LG's accused products don't

1    infringe those claims because LG doesn't use an

2    offset; right?

3         A.   That's one reason, yes.

4         Q.   And so if the judge rejects your

5    view that offset is required by Claims 1 through

6    3, then he would likewise have to reject your

7    opinion that there is no infringement because of

8    the absence of an offset?

9         A.   In the strict sense of looking at

10   the offset and the word offset, what you said is

11   true.  But you do have to read the claim and

12   understand what is described here, so I'm not

13   sure that the word is that important.  If you

14   take that word out, but as long as you apply the

15   claim, then that would be an interpretation that

16   would apply for the Judge to look at.

17        Q.   Let's talk about your third and

18   final basis for concluding that LG does not

19   infringe the asserted claims.  And again, let's

20   look at Claim 1.  And the second element of

21   Claim 1 calls for a storage structure in which

22   the previous brightness level is stored.  Do you

23   see that?

24        A.   Yes.

1      Q.   In your opinion LG's accused

2  products don't have that element; right?

3      A.   That's correct.

4      Q.   And in your opinion the storage

5  structure in the accused products stores a

6  compressed representation of the previous

7  brightness level rather than the data itself;

8  right?

9      A.   Yes.

10      Q.   Okay.  And in your opinion, the

11  compressed representation of the brightness

12  level data is different than the brightness

13  level data itself; right?

14      A.   Yes, that's obvious from looking

15  at the data tables.

16      Q.   For that reason you conclude that

17  the accused products lack the storage element of

18  Claim 1 and, therefore, do not infringe; right?

19      A.   Yes.  As you read the text in the

20  claim, it clearly says the previous brightness

21  levels, so I conclude that.

22      Q.   In forming your opinions

23  concerning how the accused products work, you

24  relied on various documents and deposition

1    transcripts among other things; right?

2              A.   Yes, I did.

3              Q.   And one of the deposition

4    transcripts you relied upon was the testimony by

5    an LG engineer, Mr. Jong Kim; right?

6              A.   Yes, I did.

7              Q.   Do you recall that Mr. Kim was

8    designated by LG to testify about the

9    implementations of overdrive in accused LG

10   products?

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3         A.   First, yes, I testified to that.

4    And I would like to explain the meaning if I

5    may.

6         Q.   Well, I tell you what, you can do

7    that on redirect.

8              MR. GOODWYN:  Your Honor, again,

9    counsel is continuing to interrupt the witness's

10   answers.  He tried repeatedly to say that he

11   wanted to explain his answer and I believe to

12   give a full response the witness should be

13   entitled to provide a full response to question.

14             THE COURT:  You can give an

15   explanation.

16             THE WITNESS:  Could I have the

17   question back please.

18        Q.   I asked you did you testify that

19   in the accused products that LG sells, the small

20   differences that may be introduced are

21   acceptable and allowable, you said yes, and now

22   you want to give an explanation?

23        A.   Yes.  The differences that occur

24   first of all, the restructured or the

1    decompressed data is used to calculate overdrive

2    values, and so what it's going to do is it is

3    going to cause some errors in the overdrive as

4    it's calculated.  There could be some small

5    errors that you would have to look closely at,

6    there could be some larger errors that would be

7    glaring.  When you look at a display as you

8    mentioned, I have had quite a bit of experience

9    at evaluating TV performance, if you're selling

10   a TV that's going to sell for $200 you would

11   gladly accept a lot of those artifacts because

12   the price is so low.  If you're selling

13   something for more than a thousand dollars or

14   two-and-a-half thousand dollars, you would need

15   to examine much more closely and eliminate those

16   artifacts.

17            So are they acceptable?  It

18   depends on the product and depends on how well

19   you can do with the technology and how much you

20   want to save money by reducing the memory size.

21            Q.   Okay.

22            A.   So that's what I mean by

23   acceptable.

24            Q.   Very good.

1          Would you agree, sir, that if the

2   compressed and decompressed data in the accused

3   LG products were substantially different than

4   the original data, LG wouldn't be able to sell

5   its modules?

6          A.   I'm not sure what you mean by

7   substantially different.  You're talking about

8   the data that goes into the lookup table, not

9   the output?

10         Q.   If the compressed and then

11  decompressed data is substantially different in

12  the accused LG products from the original data

13  that exists before it's compressed, if those

14  things were substantially different, then

15  wouldn't you agree that LG wouldn't be able to

16  sell any of its modules?

17         A.   Well, first of all, there is two

18  parts to that question.  What does substantially

19  different mean?  Different data is -- if it's

20  supposed to be 24 and it's 36, is that

21  substantially different?  That's 30 percent.  If

22  it's supposed to be a hundred and it's 110,

23  that's ten percent.  I'm not sure what

24  substantially different is.

1                  But once again we have to remember

2       this data is only used to calculate the

3       overdrive values.  This data is not displayed on

4       the screen.  So as I explained in the block

5       diagram, it goes up there, it calculates

6       overdrive values and because it's put in blocks

7       there is an average that occurs over the

8       display.  So although the numbers can be quite

9       different, maybe even substantially different,

10      there will -- there could be some averaging of

11      that over the display, so I'm not prepared --

12      first of all, since I don't know exactly what

13      substantially different means in terms of

14      numbers, I couldn't really define it, but

15      certainly differences will occur and I could

16      look at a display and tell you where that's

17      occurring, and I could go to a store and tell

18      you that because those products are sold.

19                  Q.   Okay.  Whatever the differences

20      are between the original data and the

21      decompressed data on the other end, it's good

22      enough for LG to sell the products?

23                  A.   Obviously, yes.

24                  Q.   Now, you believe that Kido

1    anticipates the '160; right?

2              A.   Yes.

3              Q.   And do you recall being asked at

4    your deposition whether Kido teaches

5    compensation such that the time integration

6    quantity of a brightness change is effectively

7    equal to the ideal quantity of light, do you

8    recall being asked that question?

9              A.   I don't recall the question.  I

10   recall the topic and about that, I don't recall

11   exactly that question.

12             Q.   Let's look at your deposition at

13   102, lines 16 to 19.

14                  "QUESTION:  It's your opinion that

15   Kido teaches compensation such that the time

16   integration quantity of a brightness change is

17   effectively equal to the ideal quantity of

18   light?"

19                  So you were asked that question;

20   right?

21             A.   Yes.

22             Q.   Let's look at the answer.  Your

23   response was, "No, I don't believe that's what I

24   said."

1          And then you continue to explain

2     what you meant; right?

3          A.   Yes.

4          Q.   Now, let's look at page one of

5     Exhibit L to your expert report on validity.

6     And this is a claim chart.  Can you blow up the

7     top there, Bill.  Thanks.

8               This a claim chart you prepared

9     comparing the '160 claims to the Kido reference;

10    right?

11         A.   Yes.

12         Q.   And if we could focus in on the

13    bottom two boxes on that page, you identified

14    something called the after image elimination

15    circuit shown in Figure 4 of Kido as

16    corresponding to the determinator; right?

17         A.   Yes.

18         Q.   And as you state here this after

19    image elimination circuit outputs a quote,

20    compensated video signal, unquote; correct?

21         A.   Yes, it does.

22         Q.   So if Kido's after image circuit

23    corresponds to the claim determinator, then am I

24    correct in understanding that Kido's output

1        compensated video signal corresponds to the

2        claimed output brightness level in your opinion?

3            A.   Well, yes, it determines an output

4        brightness level, it may -- yes, in those

5        particular words, yes.

6            Q.   And let's explore that.  Kido's

7        compensated video signal is the sum of two other

8        signals; correct?

9            A.   Yes.

10            Q.   And it's the sum of something

11        called Si, and the compensation signal Ss;

12        correct, right down there at the bottom?

13            A.   I can't see that.

14            Q.   Figure 2 B at the bottom of the

15        page.

16            A.   I can't see it.

17            Q.   It's very small.

18                Bill, go back to page two of

19        Exhibit L down at the bottom there, blow up

20        Figure 2B.  There is Si, and --

21            A.   Ss, yes, the compensation is added

22        to the Si.

23            Q.   Okay.  And Figure 3 of Kido refers

24        to the compensation signal Ss; correct?

1           And let me point you to where the

2    Kido patent says that, column seven, lines 45 to

3    60 of Kido.  See it refers to the compensation

4    signal illustrated in Figure 3?

5           A.   Yes.

6           Q.   And the compensation signal Ss of

7    Figure 3 is a voltage; correct?

8           A.   It appears to be so because it has

9    a fault to it.

10          Q.   And according to your view of the

11   world, a voltage is not a brightness level;

12   correct?

13          A.   No, that's not true.

14          Q.   Let's look at your deposition.

15   Page 108, lines 13 to 15.

16          "QUESTION:  Is it not a brightness

17   level then?

18          "ANSWER:  A voltage is not a

19   brightness level.  So it refers to a voltage."

20          You did give that testimony;

21   correct?

22          A.   I need to read before and after

23   this and I could explain fully.

24          Q.   Well, you can do that on redirect.

```
 1                    Now, asserted Claim 3 of the '160

 2      depends from Claims 1 and 2; correct?

 3             A.   I'm sorry, I didn't understand.

 4             Q.   Claim 3 depends from Claims 1 and

 5      2; right?

 6             A.   Yes.

 7             Q.   And Claim 3 includes all of the

 8      limitations of Claims 1 and 2; right?

 9             A.   Yes.

10             Q.   Now, let's look at Claim 2 and how

11      you compared it to Kido.  Okay?

12             A.   Okay.

13             Q.   Your comparison can be found at

14      page four of Exhibit L to your expert report on

15      validity which is now on the screen.  Do you see

16      page -- Claim 2 down there being compared to

17      Kido on the screen, sir.  It's from your expert

18      report.

19             A.   Okay.

20             Q.   And Claim 2 requires that the

21      determinator include a table for storing a

22      brightness level; correct?

23             A.   Yes.

24             Q.   Now, let's look at the third box
```

1    on the right of page four of Exhibit L on the

2    screen and there you state that the Kido

3    reference discloses the claimed table in the

4    form of a table of values held in a ROM that is

5    described at column 9, lines 27 through 32 of

6    Kido; right?

7              A.   I'm sorry, I didn't follow that.

8    Are you reading from the slide?

9              Q.   Yes.

10             It says that the claimed table in

11   Kido, it's disclosed in the form of a table of

12   values held in a ROM and that's disclosed at

13   column 9, lines -- it's the highlighted text,

14   sir.

15             The table in Claim 2, what you

16   found corresponding in Kido is a table of values

17   held in a ROM which is described at column 9,

18   lines 27 through 32?

19             A.   Okay.  The table is the ROM?

20             Q.   Right.  Are you with me?

21             A.   Yes.

22             Q.   Now, as indicated in this same box

23   we're looking at on the screen, the ROM

24   described at column 9, lines 27 through 32 of

1    Kido is an implementation of what Kido calls

2    coefficient circuits.  Do you see that?

3              A.   Yes.

4              Q.   Okay.  And the implementation of

5    the coefficient circuits discussed in column 9

6    of Kido stores values K1 and K2 in the ROM

7    table; correct?

8              I can show you your deposition if

9    you don't recall.

10             A.   That sounds right.  I believe so.

11             Q.   But K1 and K2 are not brightness

12   levels; correct?

13             A.   I need to look at the --

14             Q.   Let's look at your deposition,

15   110, lines 17 through 20.

16             "QUESTION:  Now, K1 and K2 are not

17   brightness levels; correct?

18             "ANSWER:  No.  They are

19   coefficients, they're abstract concepts or

20   mathematical concepts."

21             That was your testimony; right?

22             A.   In the context we were talking

23   about that, yes, that's what I did reply.

24             Q.   Let's turn to Johnson.  And let's

1    look at Johnson Figure 5, which is now on the

2    screen.  And you agree that the goal of

3    Johnson's invention is to have the pixel reach

4    the desired brightness before the next frame

5    time; correct?

6         A.   Well, he states that as a goal.

7    Yes, but other things occur.

8         Q.   Okay.  Right.

9              But that's one of the goals?

10        A.   That's one of the goals, yes.

11        Q.   And that goal is what's

12   illustrated by the dotted line with the

13   parenthetical three that's in the middle of

14   Johnson Figure 5; right?

15        A.   If you're referring to that's the

16   goal that he wanted to get to, yes.

17        Q.   Okay.

18        A.   In this case, 60 percent

19   transmission.

20        Q.   You would agree that what we see

21   here in curve number two in Johnson, the curvy

22   curve up at the top there, certainly would not

23   be the ideal quantity of light during the first

24   frame time namely between time zero and time T

1    sub F?

2              A.    In this particular case with these

3    examples of these very slow rise times, that's

4    true.  There's no way for that to get to the

5    ideal quantity of light.

6              Q.    Okay.

7              A.    However, with -- as the years go

8    by and technology improves, then -- and as the

9    rise time gets less, than the frame time,

10   certainly that would occur using this technique.

11             Q.    Now, during the first frame time,

12   namely between time zero and time T sub F,

13   what's shown in curve number two in Johnson

14   Figure 5 appears to be -- appears to be closer

15   to the ideal quantity of light than curve number

16   one where no overdrive is used; right?

17             A.    Yes, it is.

18             Q.    However, you would agree that

19   merely providing something that is closer to the

20   ideal quantity of light does not meet your

21   definition of the claim phrase substantially

22   equal; right?

23             A.    Absolutely.  It does not meet my

24   definition, nor do I see how it could meet

1    anybody's definition of substantially equal.

2         Q.   Okay.  In your opinion, to be

3    substantially equal to the ideal quantity of

4    light, two conditions have to be met.

5              First, the actual quantity of

6    light has to be such that it can be accepted as

7    substantially equivalent to the ideal quantity.

8              And, second, the actual quantity

9    of light should represent an improvement over

10   what you would get without using overdrive at

11   all; correct?

12        A.   I can clearly understand the

13   second part being closer.  The first part is so

14   nebulous.  I believe it's indefinite.

15             If there was a definition of what

16   that was; absolutely, yes.  It would need to

17   meet that.

18             I -- I just have trouble defining

19   that, and so I have offered some numbers in

20   different cases that I think would be acceptable

21   or hardly visible.  But in the actual definition

22   of that, I leave that to somebody else to decide

23   what it is going to be interpreted as legally.

24        Q.   Well, let's see what you said at

```
 1        your deposition.  See if -- let's just see what

 2        you said at your deposition.

 3                    Page 51, Lines 5 through 16.

 4                    "Question:  Is it your view then

 5        that you really need to meet both conditions?

 6        One, the quantity has to be such that it can be

 7        accepted as substantially equivalent; and, two,

 8        it should represent an improvement over what you

 9        would get without using overdrive?"

10                    "That's correct."  And then you

11        proceeded to explain.

12              A.    Just like I did now.

13                    MR. GOODWYN:  Objection, Your

14        Honor.  I'd like to have the record reflect the

15        full question and the full answer.

16                    MR. SHULMAN:  I'll read it.

17                    MR. GOODWYN:  And the full answer.

18        We have been getting partial answers in the

19        record.

20                    MR. SHULMAN:  I'll read it in.

21        Your answer was, "That's correct.  I still have

22        difficulty with the first statement of defining

23        what is accepted as substantially equivalent,

24        but that's the intent.  You need to be accepted
```

1    as substantially equivalent, and it needs to be

2    some improvement over a circuit that has no

3    overdrive applied."

4  BY MR. SHULMAN:

5         Q.   Both conditions; right?

6         A.   That's correct.

7         Q.   Okay.  Now, you didn't mention the

8    Hartman reference today, did you?

9         A.   No, I did not.

10         Q.   It was in your expert report, but

11   we heard nothing about it today; right?

12         A.   I didn't mention it today.  No.

13         Q.   And in your expert report, you

14   mentioned a -- I don't know how to pronounce it

15   U-E-N-O reference.

16         A.   Ueno.

17         Q.   Ueno?

18         A.   Ueno.

19         Q.   Ueno.  Thank you.

20         A.   It's Japanese.

21         Q.   You didn't mention that one today

22   either; right?

23         A.   I didn't feel that I needed to.  I

24   think there was plenty of evidence and

```
 1        descriptions in the patents that I did use.

 2              Q.   Right.  Just give me a moment.  I

 3        have a couple of other questions.

 4                   Do you have the set of slides?

 5        Can we have the elmo please?

 6                   MR. SHULMAN:  Can I confer with

 7        counsel for a moment?

 8                   THE COURT:  Sure.

 9                   (Following a discussion held off

10        the record:)

11   BY MR. SHULMAN:

12              Q.   1085 is the LG Exhibit Number for

13        the slides that were used during his direct

14        examination, and I'm going to refer you to Slide

15        44 in that deck.  Okay.

16              A.   Okay.

17              Q.   Do you recall this slide?

18              A.   What slide number is that?

19              Q.   Hang on.  Hang on.  This is Slide

20        44.

21                   If you need me to zoom in, just

22        let me know or you can look in your book.

23              A.   I can look at it here.  I can't

24        quite see it on the display.
```

1    Q.   Slide 40.  Woah.

2    A.   Okay.

3    Q.   Okay?

4    A.   Yes.  I don't see it up there, but

5    I see it here in mine.

6    Q.   This was a comparison of Mori to

7    Claim 1; right?

8    A.   Yes.

9    Q.   Okay.  Either my eyes are bad or

10   the focusing isn't working.

11   A.   The focus is not good there, but I

12   can see it on the page that I have.

13   Q.   Can you tell me what the question

14   mark, the green question mark means?

15   A.   Yes.  I believe that that

16   particular limitation is indefinite.

17   Q.   So you're not sure if Cori -- Mori

18   rather has ideal in it?

19   A.   I'm sure of the word optimal as I

20   am sure of the word ideal.  So if you're fair to

21   both sides, then yes, I believe it teaches that.

22   Q.   Okay.

23   A.   Now, I asked the reporter during

24   your direct testimony to jot down an answer that

1    you gave.  In fact, it was the last answer on

2    direct.

3              And he can't both read it and

4    write at the same time, but she's now taking it

5    down, so maybe we get around that problem;

6    right?

7              THE REPORTER:  Right.

8  BY MR. SHULMAN:

9        Q.  But at the tail end of your

10   examination --can I borrow that for a moment?

11   And I'll have the reporter read it in, because

12   you don't have to take my word for it.

13             But at the tail end of the direct

14   examination, you were giving sort of a

15   conclusory summary of what your opinions were

16   with respect to the patent.  Do you recall that?

17       A.  Yes.

18       Q.  And you spoke about infringement.

19   You spoke about validity; right?

20       A.  Yes.

21       Q.  And with respect to infringement,

22   you summarized the opinions that you had -- that

23   you expressed today rather concerning the tests

24   that our expert wrote; right?

```
 1              A.   Yes.

 2              Q.   And those tests were described in

 3    the report that he submitted, I think it was in

 4    February sometime; right?

 5              A.   I don't recall the date.  I

 6    remember the report.

 7              Q.   The first round of reports?

 8              A.   That would have been February

 9    20th.

10              Q.   7th?

11              A.   Or 4th maybe.

12              Q.   So -- and so you had the

13    opportunity to review that report from February

14    27th until certainly up through the time of your

15    deposition was taken; right?

16              A.   Yes, I did.

17              Q.   And your deposition was taken in

18    April?  April or May?

19              A.   It was late April.

20              MS. HOLLOWAY:  April 21st.

21              MR. SHULMAN:  April 21st, I'm

22    told.

23              THE WITNESS:  Yes.

24    BY MR. SHULMAN:
```

1    Q.   And at the tail end of your cross,

2    or I'm sorry, your direct, you said, and I'll

3    have the court reporter read it, "But if I

4    received a report like this in a company, I

5    would reject it, of course.  And you couldn't

6    draw a conclusion from it.  It's not valid

7    data."

8         You were referring to Dr. Silzars'

9    report; correct?

10   A.   Yes, I was.

11   Q.   Okay.  And the opinions that you

12   expressed today concerning Dr. Silzars' -- the

13   inadequacies of Dr. Silzars' report were not set

14   forth in your expert report; correct?

15   A.   In my -- no, I had no chance to --

16   the opinions that I ascribed today, I don't

17   believe were set forth in my expert report.  No.

18   Q.   Right.  And you had a month to

19   prepare your expert report after receiving

20   Dr. Silzars' report; right?

21   A.   Yes, I did.

22   Q.   And then at your deposition?

23   A.   Well, I didn't have exactly a

24   month.  I got documents from McKenna, Long &

1    Aldridge.  It wasn't exactly at the same time.

2    It took some time.

3              But approximately, you know, maybe

4    three weeks I had.

5         Q.   Well, your responsive report was

6    submitted a month after --

7         A.   Right.

8         Q.   -- his report was submitted?

9         A.   That's right.

10        Q.   Correct?

11             And then you had another month

12   before your deposition was taken; right?

13        A.   Yes.

14        Q.   And at your deposition -- is the

15   elmo still on?  Yes.

16             Pardon my ineptitude.  This is

17   Page 73.

18             You were asked:  "Okay."  This is

19   all about Silzars' report and his experiments.

20             "Okay.  But sitting here today,

21   you have no basis for saying that they are not

22   accurate, is that fair?"

23             "I have no -- I've not noticed any

24   evidence or something concrete that I would say

 1     is incorrect in his measurements.  I -- as I

 2     explained, I don't have enough information to

 3     determine if they are correct or not."

 4                    And you had his report for two

 5     months at that point; correct?

 6                    A.   Approximately, yes.

 7                    MR. SHULMAN:  I have no further

 8     questions.

 9                    THE COURT:  All right.  How long

10     do you have?

11                    MR. GOODWYN:  I actually just have

12     a couple of questions.  I have one request that

13     one of the first deposition transcripts they put

14     up and only read a portion of an answer.  I

15     request that the record reflect an entire answer

16     and then I have one quick question.

17                    THE COURT:  All right.  Ask it.

18                    MR. GOODWYN:  Then we'll get that

19     conclusion under Rule 106.

20                    REDIRECT EXAMINATION

21     BY MR. GOODWYN:

22                    Q.   Mr. Eccles, you were just asked as

23     to whether or not you had included any analysis

24     of or opinions regarding Dr. Silzars' testing in

1    your report; is that right?

2              A.   Yes, I was.

3              Q.   Okay.  And you -- I believe that

4    the deposition transcript that counsel put on

5    the screen during your cross was that you said

6    you didn't have enough information; isn't that

7    right?

8              A.   That was part of my answer.  Yes.

9              Q.   When did you first get sufficient

10   explanation of Dr. Silzars' testing methodology

11   to allow you to understand what he did?

12             A.   Approximately last week when I

13   received his deposition transcript, and I

14   noticed that he mentioned using silicon detector

15   photo diode that was linear response, and that

16   he compared it to several others that were also

17   in linear response and that he did not do

18   calibration.

19             At that point I got to thinking,

20   What's the validity of these measurements?  So

21   with my experience with making radiometric

22   versus photometric measurements, it was obvious

23   to me that the actual data would not be what the

24   eye sees, which is what the '160 calls out.

1          Therefore, at that point I

2     realized that the measurements of all this data

3     was incorrect.  As I further studied and looked

4     at the report, I admit I missed something and

5     that was the time integration quantity of light

6     and the ideal quantity of light.

7          I just -- I probably arrived at

8     that last week after I got into the

9     measurements.  I was thinking about, Well, how

10    would the curve be different if I applied a

11    photometric curve?

12         And I go, Woah, that's not even

13    the right thing to measure.  So, at that point,

14    I started -- that's when I made the list of what

15    things I would have done when I was directing

16    photometric measurements.

17         And I realized the set up, the

18    calibration, all those things, elements were

19    missing.  So, yes, I should have noticed it a

20    couple of months ago, but the trigger was the

21    deposition testimony, that incorrect sensor was

22    used.

23         MR. GOODWYN:  Thank you.  No more

24    questions.

```
 1                    THE COURT:  All right.  Thank you.

 2                    You may step down.  Thank you.

 3                    All right.  We'll be in recess

 4       until 9:30 tomorrow morning.

 5                    THE CLERK:  All rise.

 6                    MR. BONO:  Your Honor, can we just

 7       handle that right now for the ten seconds,

 8       because I just -- we need them as a professional

 9       courtesy to put that segment on.  We don't know

10       what page it's from.

11                    He didn't cite the page number.

12       If he could just put that on the screen, we'll

13       read it in and then be done with that one

14       housekeeping issue.

15                    THE COURT:  Sure.

16                    MR. BONO:  If you could do that,

17       please.

18                    MR. SHULMAN:  It was professional

19       courtesy.  I did read the pages and line

20       numbers, but I'm happy to do it again.

21                    MR. BONO:  Thank you.

22                    MR. SHULMAN:  Do you know what the

23       point was?

24                    MR. BONO:  It's where the answer
```

1    was no.

2                   MR. SHULMAN:  What was it?

3                   MR. BONO:  It was like the third

4    read in right before --

5                   MR. SHULMAN:  The very first one?

6                   MR. GOODWYN:  Yes.

7                   MR. SHULMAN:  Whoops.  I'm looking

8    at the wrong outline.  Pardon me.

9                   We're not going to be able to do

10   it now.  We'll work it out and we'll do it first

11   thing in the morning.

12                  THE WITNESS:  I could find it.

13                  MR. SHULMAN:  Pardon?

14                  THE WITNESS:  I could find it.

15                  THE COURT:  You can do it in the

16   morning.  We will make that the first order of

17   business.  You will have a chance.

18                  MR. BONO:  Just one other thing,

19   Your Honor.  It's my understanding, AUO is

20   proposing to call a rebuttal witness, Mr. Sung,

21   and we filed a motion this morning to preclude

22   this testimony.

23                  And I wanted to alert Your Honor

24   to this.  We believe the testimony should not be

1    permitted.

2                    THE COURT:  I didn't see the

3    motion.  I didn't know it was filed.  I'll take

4    a look at it.

5                    MR. SHULMAN:  We're going to be

6    submitting a responsive brief today.

7                    THE COURT:  All right.  So I'll

8    get them both and get you an answer tomorrow.

9                    All right.  We will be in recess

10   until 9:30 tomorrow morning.

11                   MR. SHULMAN:  Thank you, Your

12   Honor.

13                   (Court was recessed at 5:05 p.m.)

14

15

16

17

18

19

20

21

22

23

24

1  State of Delaware )
                    )
2  New Castle County )

3

4

5                CERTIFICATE OF REPORTER

6

7        I, Heather M. Triozzi, Registered

8  Professional Reporter, Certified Shorthand Reporter,

9  and Notary Public, do hereby certify that the

10 foregoing record, Pages 667 to 1,047 inclusive, is a

11 true and accurate transcript of my stenographic notes

12 taken on June 4, 2009, in the above-captioned matter.

13

14       IN WITNESS WHEREOF, I have hereunto set my

15 hand and seal this 4th day of June, 2009, at

16 Wilmington.

17

18

19       _____

20       Heather M. Triozzi, RPR, CSR
         Cert. No. 184-PS
21

22

23

24