```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE


LG DISPLAY CO., LTD,        ) Volume 4
                            )
        Plaintiff,          )
                            )
v.                          )
                            )
AU OPTRONICS CORPORATION,   )
AU OPTRONICS CORPORATION    )
AMERICA, CHI MEI            )
OPTOELECTRONICS             )
CORPORATION, and CHI MEI    )
OPTOELECTRONICS, USA,       )
INC.,                       )
                            )
        Defendants.         )


                  Friday, June 5, 2009
                  9:30 a.m.
                  Courtroom 4B


                  844 King Street
                  Wilmington, Delaware


BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
         United States District Court Judge

APPEARANCES:

         BAYARD
         BY:  RICHARD D. KIRK, ESQ.
         BY:  STEPHEN B. BRAUERMAN, ESQ.

            -and-

         McKENNA, LONG & ALDRIDGE, LLP
         BY:  GASPARE J. BONO, ESQ.
         BY:  CASS W. CHRISTENSON, ESQ.
         BY:  LORA BRZEZYNSKI, ESQ.
         BY:  TYLER GOODWYN, ESQ.

            Counsel for the Plaintiff
```

```
1    APPEARANCES CONTINUED:

2

3            YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
             BY:  KAREN L. PASCALE, ESQ.
4            BY:  JOHN SHAW, ESQ.

5                     -and-

6            WILSON, SONSINI, GOODRICH & ROSATI
             BY:  RON E. SHULMAN, ESQ. ESQ.
7            BY:  JULIE HOLLOWAY, ESQ.
             BY:  CRAIG TYLER, ESQ.
8            BY:  GREGORY WALLACE, ESQ.

9                Counsel for the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    THE CLERK:  All rise.

 2                    THE COURT:  All right.  Be seated,

 3          please.

 4                    THE COURT:  Good morning

 5                    MR. SHULMAN:  Good morning, Your

 6          Honor.

 7                    THE COURT:  Ready to proceed?

 8                    MR. SHULMAN:  Yes, Your Honor.  We

 9          had one housekeeping matter from yesterday.

10                    As you may recall, at the end of

11          the day, LG raised an issue of the completeness

12          of one of the deposition impeachment passages

13          that I read into the record.  And so I'd like to

14          correct that.  We've agreed on this.

15                    In the transcript from yesterday's

16          proceedings at Page 1023, I'll just read it and

17          then explain what we're going to be adding.

18          This begins at Line 9.

19                    "Question:  And do you recall

20          being asked at your deposition whether Kido

21          teaches compensation such that the time

22          integration quantity of brightness change is

23          effectively equal to the ideal quantity of

24          light.  Do you recall being asked that question?
```

1        Answer:  I don't recall the

2   question.  I recall the topic and about that.  I

3   don't recall exactly that question.

4        "Question:  Let's look at your

5   deposition at Page 102, Line 16 to 19.

6        'Question:  It's your opinion that

7   Kido teaches compensation such that the time

8   integration quantity of a brightness change is

9   effectively equal to the ideal quantity of

10  light.'

11       "So you were asked that question;

12  right.

13       "Answer:  Yes.

14       "Question:  Let's look at the

15  answer.  Your response was, 'No, I don't believe

16  that's what I said.'  And then you continued to

17  explain what you meant; right?

18       "Answer:  Yes."

19       Now, I will read from Page 102 of

20  Mr. Eccles deposition the continued response to

21  which I alluded to yesterday in the transcript.

22       And this appears at Page 102 of

23  Eccles deposition beginning at Line 16.  And now

24  I'll read it into the record.

1    "Sure.  It's your opinion that

2    Kido teaches compensation such that the time

3    integration quantity of a brightness change is

4    effectively equal to the ideal quantity of

5    light.

6        "Answer:  No.  I don't believe

7    that's what I said.  Kido teaches a method that,

8    first of all, attempts to approach the ideal

9    quantity of light is if -- you can

10   overcompensate for the rise and fall times, that

11   it can approach that.  There may be instances

12   where it may achieve the ideal quantity in -- in

13   a single instance.

14       There's certainly a lot more

15   instances where it does not achieve that.

16       "Question:  Okay.  So what Kido

17   teaches is improving response time and it's

18   possible but not certain that you may approach

19   the ideal quantity of light if you do that, is

20   that fair.

21       "ANSWER:  That -- that's a fair

22   statement."

23       And that's the full answer.

24       THE COURT:  All right.  Thank you.

1       MR. BONO:  Your Honor, our first

2    witness today will be a translated testimony, so

3    could we have the translator sworn in.

4       THE COURT:  Do you have a

5    different interpreter?

6       MR. BONO:  Yes, I believe this

7    will be in Korean, so it is not the translators

8    from the other case.

9       THE COURT:  It looks like the

10   interpreter has the need for a writing surface

11   as most do, so you have to move the table back.

12   I apologize to you.

13       (Discussion off the record.)

14       THE COURT:  Before we administer

15   the oath, I have reviewed the papers on the

16   motion in liminae filed by the plaintiff, LG

17   Display.  First, this is a bench trial.  Second,

18   there is the contention which I'll resolve post

19   trial about newly admitted evidence by LG and so

20   AUO argues that this is fair response, and in

21   that context, I'm going to deny the motion in

22   liminae and allow the witness to testify.

23       MR. SHULMAN:  Thank you, Your

24   Honor.

```
 1                    THE CLERK:  Please raise your

 2      right hand.

 3

 4                    JAMIE WRIGHT,

 5                    ALBERT KIM

 6           the interpreters herein, having first

 7           been duly sworn on oath, interpreted

 8           the examination as follows:

 9                    THE COURT:  Good morning.

10                    THE INTERPRETER:  Good morning,

11      Your Honor.  Jamie Wright, W-R-I-G-H-T.

12                    THE INTERPRETER:  Albert Kim, last

13      name K-I-M.  Good morning, Your Honor.

14                    THE COURT:  Good morning.

15                    MS. BRZEZYNSKI:  Good morning,

16      Your Honor.  May I approach with the exhibits?

17                    THE COURT:  Yes, you may.

18                    MS. BRZEZYNSKI:  Good morning,

19      Your Honor.  Our first witness today will be

20      Won-Jun Choi.

21                    THE CLERK:  Please state and spell

22      your full name for the record.

23                    THE WITNESS:  My name is Won-Jun

24      Choi.  W-O-N, J-U-N, C-H-O-I.
```

```
 1
 2                    WON-JUN CHOI
 3              the deponent herein, having first
 4              been duly sworn on oath, was
 5              examined and testified as follows:
 6                  DIRECT EXAMINATION
 7  BY MS. BRZEZYNSKI:
 8              Q.   Good morning, Mr. Choi.
 9              A.   Good morning.
10              Q.   Would you please state your full
11  name?
12              A.   My name is Won-Jun Choi.  The
13  spelling is W-O-N, J-U-N, C-H-O-I.
14              Q.   Are you employed with LG Display
15  Company?
16              A.   Yes, correct.
17              Q.   And how long have you worked for
18  LG Display?
19              A.   I have been working there for
20  fourteen years since 1995.
21              Q.   What is your title, sir?
22              A.   Current title is senior manager.
23              THE INTERPRETER:  The check
24  interpreter said deputy senior manager.
```

1       Q.   In what department, sir?

2       A.   I'm working at the patent

3    licensing team.

4       Q.   And what are your responsibilities

5    with LG Display?

6       A.   I'm involved in patent licensing

7    and patent litigation.

8       Q.   And have you also been responsible

9    for overseeing part of this litigation?

10       A.   Yes, I'm responsible for this

11    case.

12       Q.   As part of your job

13    responsibilities related to this case, were you

14    also responsible for compiling answers to

15    certain of AUO's interrogatories?

16       A.   Yes, correct.

17       Q.   I'd like to refer you to LG

18    Display's supplemental answer to AUO's

19    Interrogatory Number 16.  And it's Trial Exhibit

20    406.

21            MR. TYLER:  Your Honor, we object

22    to the document as hearsay.

23            THE COURT:  All right.  The

24    objection will be noted.

1    BY MS. BRZEZYNSKI:

2              Q.   I'd like to turn your attention to

3        Page 7, please.

4              A.   Yes.  I'm looking at it.

5              Q.   Now, in the course of your

6        responsibilities at LG Display in connection

7        with this litigation, did you compile the answer

8        to this interrogatory that's identified in the

9        chart?

10             A.   Yes.  Correct.

11             Q.   Does LG Display use Renesas

12       Technology timing controllers in its products?

13             A.   Yes.  We -- we are using Renesas

14       timing control.

15             Q.   What information is contained in

16       the chart that begins on Page 7 of this

17       interrogatory response?

18             A.   From the left, that is LG's part

19       number.  In the second -- second one is Renesas'

20       part number.

21                  And then the third is timing

22       controller supply, which has Renesas Technology

23       name.  And then the last one is model number.

24             Q.   Does this answer identify the LG

1   Display products that use timing controllers

2   manufactured by Renesas Technology?

3            A.   Yes.   Correct.

4            Q.   Are you familiar with Renesas

5   Technology?

6            A.   Yes.   I'm aware of it.   Renesas

7   Technology is Hitachi subsidiary, and Hitachi

8   Limited has 55-percent share of the company.

9   And currently they're providing timing

10  controller to our company.

11           Q.   Does LG Display track the sales of

12  its products that are listed in this response

13  that use Renesas timing controllers?

14           A.   Yes.

15           Q.   And are you familiar with the

16  sales of LG Display?

17           A.   Yes.

18           Q.   I'd like to introduce Trial

19  Exhibit 419, please. Do you recognize these as

20  LG Display sales summaries?

21           A.   Yes.

22           Q.   And can you tell us:  For what

23  time frame is this first sales summary

24  spreadsheet?

1          A.   I can tell that there's sales data

2     from 1997, 1998 and 1999.

3          Q.   Why don't we go to the next

4     spreadsheet in this exhibit.  And can you tell

5     us the years that are covered by this sales

6     spreadsheet?

7          A.   I can see 2000, 2001, 2002, 2003

8     and 2004.  And if you move right more, than

9     there will be some other years there, too.

10         Q.   Can you see 2005, 2006?

11         A.   Yes.  I can see 2005 and 2006.

12         Q.   And what kind of data is provided

13    in these spreadsheets, Mr. Choi?

14         A.   From the left, I can see customer

15    name, sales date, ship to information, bill to

16    information and item, which is model name.  And

17    there's quantity, currency, total amount biz

18    maker, maker and final destination, which is

19    the -- which means products are shipped to those

20    destinations.

21         Q.   Now, I'd like to turn to the next

22    spreadsheet, please.  Is this LG Display's sales

23    spreadsheet for 2007 and part of 2008?

24         A.   Yes.  It's 2007, the whole year,

1    and then part of 2008.

2         Q.   And can we see the next

3    spreadsheet, please?  And what is this

4    spreadsheet, please, what years?

5         A.   It shows the sales data for the

6    entire year 2008.

7         Q.   And you mentioned the field final

8    destination earlier.  Where are products shipped

9    that have America as the final destination?

10             THE INTERPRETER:  Could we have it

11   reinterpreted?

12             THE INTERPRETER:  He asked me to

13   repeat your question again.

14             THE INTERPRETER:  If we could have

15   the question one more time so my colleague could

16   appreciate the nuance.

17        Q.   Where are products shipped that

18   have America as the final destination?

19        A.   That is United States of America.

20        Q.   Can you calculate the sales of the

21   products with Renesas timing controllers with

22   this information?

23        A.   Yes, we can.

24        Q.   And did you prepare a summary of

1    the sales of products with Renesas timing

2    controllers?

3              A.   Yes.

4              Q.   I would like to show Exhibit 1078,

5    please.

6              Is this the document that you

7    helped prepare?

8              A.   Yes.

9              Q.   And what is the volume of sales of

10   LG Display's TVs with ODC that have Renesas

11   timing controllers since March 8, 2007?

12

13

14

15

16

17

18

19

20

21

22

23

24



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1      Q.   Are you familiar with Avionics

2  Display Corporation?

3      A.   Yes.  ADC, Avionics Display

4  Corporation, manufacturers display products for

5  industry used in military equipment such as

6  aircraft, helicopters and tanks.

7      Q.   Is Avionics Display Corporation

8  also known by another name or now known by

9  another name?

10     A.   In 1999, their display department

11  was spun up as American Panel Corporation.  To

12  be more exact it was towards the end of 1998.

13     Q.   I would like to introduce the next

14  exhibit, please, 1064.

15          Do you recognize these documents,

16  Mr. Choi?

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7          MS. BRZEZYNSKI:  Thank you, Your

8  Honor.  I'll pass the witness now.  But before

9  doing so, I would like to offer into evidence

10  the following exhibits:  Trial Exhibit 406, LG

11  Display Trial Exhibit 1076, 1078, 1077, and

12  1064.

13          THE COURT:  All right, they'll be

14  admitted.

15          MR. TYLER:  Subject to our

16  objection, Your Honor.

17          THE COURT:  Yes.

18          CROSS-EXAMINATION

19  BY MR. TYLER:

20          Q.  Good morning, sir.  My name is

21  Craig Tyler.  I have a few questions for you.

22          A.  Good morning.

23          Q.  Do you speak or read English?

24          A.  A little.

1          Q.   Earlier you talked about timing

2     controllers that LG buys from Renesas; correct?

3          A.   Yes.

4          Q.   And a timing controller chip is

5     not an LCD module, is it?

6          A.   It is a part that is asserted into

7     the LCD module.

8          Q.   But it is not an LCD module;

9     correct?

10         A.   As I said, it's a part for LCD

11    module and LCD module is consisting of those

12    parts.  And LCD module is operated by the

13    operation of timing controller.

14         Q.   Okay.  Please answer my question,

15    sir.

16              A timing controller chip is not a

17    complete LCD module; correct?

18         A.   The part such as timing controller

19    consist of LCD module, so I cannot say that the

20    timing controller is not a LCD module.

21         Q.   A timing controller chip --

22              CHECK INTERPRETER:  Mr. Tyler,

23    please.

24              MR. TYLER:  Yes.

1           THE WITNESS:  So timing

2      controllers and other parts comprises LCD

3      modules, but itself is not a LCD module.

4    BY MR. TYLER:

5           Q.   A timing controller chip is not an

6      LCD panel; correct?

7           A.   Yes, it's not.  You're correct.

8           Q.   And timing controller chips are

9      components of LCD panels; correct?

10          A.   When you say "LCD panel", in the

11     industry-wise meaning, there's two panels of

12     glasses.  So I would say LCD module rather than

13     LCD panel.

14          Q.   Would you agree with me that a

15     timing controller chip is a component of an LCD

16     module?

17          A.   Yes.

18          Q.   And LGD receives the timing

19     controller chips from Renesas and then LGD

20     assembles the modules to include the timing

21     controller chips; correct?

22          A.   Yes.

23          Q.   Now, you testified that you're

24     familiar with Renesas, and I think testified

1   that it was 55 percent owned by Hitachi Limited.

2   My question is:  How do you know that?

3          A.   Those who are working in this area

4   pretty much knows the fact.  And if you go to

5   Renesas' home page, it says 55 percent.

6          Q.   So you rely on publicly available

7   documents to know that?

8          A.   Yes.

9          Q.   Can we turn to 1582, please?  AUO

10  1582.

11          And I'm not sure if you read

12  enough English, so I'll ask you the question

13  first.  But this is just confirming your

14  testimony from Capital IQ confirming that, and I

15  indicated the highlighted text, "Renesas

16  Technology operates as a subsidiary of Hitachi

17  Limited."

18          And that's consistent with your

19  understanding?

20          A.   Yes.  Correct.

21          MS. BRZEZYNSKI:  Could I see a

22  copy of that?

23          MR. TYLER:  Yeah, I believe so.  I

24  don't believe I have it here.

```
 1                    MS. BRZEZYNSKI:  I just want to

 2      see what else it says.

 3                    MR. TYLER:  You can blow it up, if

 4      you like.  Blow it up full-size.

 5                    One second, Your Honor.

 6                    MS. BRZEZYNSKI:  Can you show the

 7      second page on the screen?

 8                    MR. TYLER:  May I proceed, Your Honor?

 9                    THE COURT:  Yes.

10      BY MR. TYLER:

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1

2

3

4

5

6

7

8

9

10

11

12

13

14           MR. TYLER:  Your Honor, at this

15    time we move for admission of 1582 and 1583.  I

16    think AUO 97 we're looking at is already in

17    evidence.

18           THE COURT:  All right.  It will be

19    admitted.

20  BY MR. TYLER:

21           Q.   Let's go to the definition of

22    component.  Looking at this definition and based

23    on your experience with patent licensing, would

24    you believe that the timing controllers you have

1   been testifying about qualify as a component

2   under this agreement?

3           A.   Yes.

4           Q.   Now, you testified about LG's

5   sales into the United States on direct, do you

6   recall that?

7           A.   Yes.

8           Q.   And in your deposition, I think

9   you told us that you were responsible for

10  providing sales revenues and profits information

11  for LG Display's filings with the SEC; correct?

12          A.   Yes, I was responsible for

13  compiling part of that report.

14          Q.   Now, LG Display knows and intends

15  to make sales to the United States companies;

16  correct?

17          A.   Yes.

18

19

20

21

22

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20          Q.   Okay.   My question was that you

21     are aware of the claims that AUO believed LGD

22     was infringing its patents when it made these

23     sales; correct?

24          A.   Yes.

1        Q.   But LGD did not change its

2    products in any way to avoid infringing AUO's

3    patents when it made these sales; correct?

4              MS. BRZEZYNSKI:   Objection, Your

5    Honor.

6              THE COURT:   The objection is

7    noted.

8              A.   No, we didn't.

9              Q.   And to your knowledge, LG Korea

10   obtained no opinion of counsel in which to rely

11   that it was not infringing AUO's patent when it

12   made these United States sales; correct?

13             MS. BRZEZYNSKI:   Objection.

14             A.   Since they filed a lawsuit against

15   us, we've been involved with our counsel to talk

16   about this case.  So I wouldn't say that we

17   didn't consult with our counsels to deal with

18   that issue while making sales.

19             CHECK INTERPRETER:   Your Honor,

20   belatedly and apologies to my colleague and the

21   parties.  Could we just have the former question

22   done again?

23             Can we just have the last question

24   read back, please?

 1           (Whereupon the record was read

 2      back.)

 3   BY MR. TYLER:

 4           Q.   And let me offer one

 5      clarification.  Excluding the counsel you've

 6      retained for this litigation.

 7           A.   Excluding those litigators

 8      assigned for this specific litigation, I didn't

 9      have any other counsels to talk about it.

10           Q.   So, in excluding your

11      conversations with your counsel retained for

12      litigation in this case, you, in making these

13      sales to the United States, have disregarded

14      AUO's claims of patent infringement; correct?

15           MS. BRZEZYNSKI:  Objection to the

16      question, Your Honor.

17           THE COURT:  Objection is noted.

18           THE WITNESS:  I wouldn't

19      completely agree with the expression disregard,

20      but we were selling our products while this

21      litigation was going on.

22   BY MR. TYLER:

23           Q.   Outside of working with your

24      counsel that you've retained in this litigation,

1    what have you done to establish that you have

2    not disregarded AUO's patent right in making the

3    sales?

4             A.   We only talked to our counsels

5    which was assigned for this specific litigation.

6    So outside of those attorneys, we didn't really

7    talk or do anything regarding this case.

8             Q.   Thank you.

9             Okay.  Final questions on your

10   sales activities in the United States.

11            Are you familiar with LGD's

12   website regarding its sales network?

13            A.   Yes.

14            Q.   Let's look at AUO 819, please.

15   And I have to blow up the top.

16            This is a printout of your LG

17   Philips LCD sales network in America.  Are you

18   familiar with this web page?

19            A.   Yes.

20            Q.   And throughout this web page, LG

21   Display identifies several of its sales network

22   agents, representatives in the United States;

23   correct?

24            A.   Yes.

```
 1              MR. TYLER:  Your Honor, at this

 2     time we'd offer AUO 1581 and AUO 819 in

 3     evidence.

 4              THE COURT:  It will be admitted.

 5              MR. TYLER:  Thank you for your

 6     time today, sir.

 7              MS. BRZEZYNSKI:  Your Honor, I'd

 8     also like to also offer 419, the sales database,

 9     the sales spreadsheets.

10              THE COURT:  It will be admitted.

11              MS. BRZEZYNSKI:  Thank you.

12              THE COURT:  Any redirect?

13              MS. BRZEZYNSKI:  No.

14              THE COURT:  Thank you, sir.  You

15     may step down.

16              MR. BONO:  Your Honor, LG Display

17     calls as its next witness Robert

18     Smith-Gillespie.

19              THE CLERK:  Sir, do you want to

20     swear or affirm?

21              THE WITNESS:  Swear.

22              THE CLERK:  Okay.  Please state

23     and spell your full name for the record.

24              THE WITNESS:  Robert Smith
```

1  Gillespie.  It's R-O-B-E-R-T Smith

2  S-M-I-T-H-G-I-L-L-E-S-P-I-E.

3                THE CLERK:  Please place your left

4  hand on the Bible and raise your right hand.

5                Do you solemnly swear that the

6  testimony you are about to give to the Court in

7  the case now pending will be the truth, the

8  whole truth and nothing but the truth so help

9  you God?

10                THE WITNESS:  I do.

11                MR. GOODWYN:  Your Honor, may we

12  retrieve some of the exhibit binders?  May I

13  approach the witness?

14                THE COURT:  Yes.

15                DIRECT EXAMINATION

16  BY MR. GOODWYN:

17        Q.  Good morning, Mr. Smith-Gillespie.

18        A.  Good morning.

19        Q.  Were you asked to provide opinions

20  with respect to AUO's '157 patent?

21        A.  Yes, I was.

22        Q.  Is this the patent?

23        A.  It is.

24        Q.  Prior to getting into your

1  opinions, could you give us a brief background

2  of your work experience and education?

3              A.   Certainly.

4              Mostly my industrial experience

5  began when I started for the Sperry Corporation

6  in Phoenix in 1985 where I was a manufacturing

7  engineer for a flight controller line.  We built

8  electromechanical products for aircraft

9  applications.

10             After a few years in the

11 manufacturing engineering organization, I moved

12 over into a product development group where I

13 was responsible for flight deck mounted

14 equipment which would be control panels, various

15 instruments and indicators.  Primarily my

16 responsibilities grew to be responsible for the

17 lighted products based on my experience, my

18 background in physics as well as mechanical

19 engineering.

20             But I was well-suited for handling

21 development of new LCDs, mostly at first for

22 small control panel applications and the

23 lighting design for those.  That grew eventually

24 into being responsible for the 777 displays,

1      that's the Boeing 777 aircraft when that was

2      being developed.

3               We were introducing transitioning

4      from cathode-ray tube displays to LCD products

5      and this is the first time it was done and there

6      was quite a bit of development on the technology

7      side.  And I was responsible for, somewhat for

8      the technical developments on the backlight,

9      mostly for the design and supplier development

10     of components that go into the backlight

11     assembly for that product.

12               And then later for qualification

13     testing, design of various materials and LCD

14     quality development work as well.

15               Following that, after the 777

16     program launched, I moved over to a company

17     called Three-Five Systems which was located in

18     Tempe, Arizona, where I spent a few years

19     working as what's called a technical specialist

20     for displays.  I was sort of a go to guy for

21     backlighting, integration of display modules

22     with backlights, so optimization of designs,

23     that sort of thing, as well as design of various

24     molded components for the backlight and support.

1        Whenever a new product launched --

2   I guess I should describe what Three-Five

3   Systems did generally.  I went from a very

4   custom oriented air transport type product line

5   to consumer products where now we're selling,

6   you know, building thousands a week of

7   individual module types that went into cell

8   phones, medical products, office equipment, that

9   sort of thing.

10        And while the LCD cells were being

11   built in a line in Arizona, all the integration

12   work was done in the Philippines and then later

13   in Beijing at the assembly plants there.  And I

14   made several trips, whenever a new product

15   launched we had to go over and make sure the

16   ramp up was fine and the integration.

17        Those products included small LCDs

18   that typically were what were called super

19   twisted pneumatic style or STN or color STN.

20   They used -- we're similar with the size of the

21   displays in cell phones, they used what we

22   called a heat seal connector which is just

23   simply a flexible circuit that's connected to

24   the cell ledge with what's called an

1    anti-ecstrophic conductive film and a hot bar

2    application.  And that usually was connected to

3    a small rigid circuit board that integrated a

4    number of components speaking to the cell phone.

5                Following that, I moved to Oregon

6    to work for Rosen Products, whose a company that

7    was developing automotive entertainment displays

8    and aircraft aviation displays.  And again I

9    worked as sort of a technical liaison to the

10   product teams and worked closely with suppliers

11   overseas defining specifications for automotive

12   LCD products in these entertainment systems.

13               After the economic downturn in

14   2002, that company split up and I began working

15   in a consulting role, various positions,

16   including DuPont Displays in Southern

17   California, a company called E-3 Innovation.

18   And then we started working with E-3 Displays

19   which is a group that's also doing ruggedized

20   displays and enhanced display products.  That's

21   pretty much the work experience.

22               My education begins with the

23   bachelor of physics in 1981.  I moved to Arizona

24   to enter a masters program, then because of life

1    changes, moved out of the area and came back

2    later on, began, or finished up a bachelors

3    degree, since I already had a bunch of

4    mechanical engineering courses.  While I was

5    working at Sperry and Honeywell I completed the

6    bachelor of mechanical engineer.  Of course

7    along the way I have taken graduate courses in

8    mechanical engineering and optics as well.

9              Q.   Mr. Smith-Gillespie, you mentioned

10   during some of your experience that you were

11   involved with the design of backlights, I think

12   you mentioned that a couple of times.  What

13   aspects of the design were you involved with?

14             A.   Everything from materials, light

15   source development, the mechanical and optical

16   design of the back light.  Yeah.

17             I spent a lot of time on

18   florescent lamp design, reflective structure

19   design.

20             I was at Honeywell at Three-Five

21   Systems.  We were doing predominantly LED back

22   lights in edge-lit products for handheld

23   devices.  So integrating LEDs into -- into small

24   back lights on ridged and flexible circuits,

1   that sort of thing.

2           Q.  Did you take into consideration

3   issues such as assembly of products in your

4   design?

5           A.  Yes.  That's a critical element

6   in -- in designing products, especially in the

7   high volume world.

8               In the low volume world, assembly

9   was concerned more -- reliability was the main

10  concern.  So you could take more time assembling

11  something to get a product that's basically

12  bullet proof.

13              In the high volume world, at

14  Three-Five Systems, we did extensive analysis

15  manufacturing methodologies and assembly methods

16  to ensure, because product margins are very,

17  very low in these kind of materials or products.

18              So you have to ensure, you know,

19  high -- high yields, fast throughputs.  So,

20  yeah, it was -- every step of the way, you

21  considered manufacturing.

22          Q.  Did you also have experience with

23  respect to design, taking into account

24  environmental conditions such as thermal

1    loading?

2           A.   Well, absolutely.  And it was --

3    in the products that we did for the avionics

4    environment, that was an absolute critical

5    consideration, because the thermal environment

6    that displays in these sort of organized

7    environments is very extreme compared to

8    consumer products with temperatures ranging from

9    like minus 40 degrees C to plus 70 degrees C for

10   operations temperatures.

11          Consumer products are usually a

12   much narrower temperature range.  But still you

13   might even see heavy self heating with the back

14   light in the back-lit products.  So thermal

15   concerns were absolutely required.

16          Q.   Well, in addition to your work in

17   education, do you have any publications?

18          A.   Yeah, there's several.  Pretty

19   much I started back -- in the Honeywell days, we

20   were encouraged to publish our technical results

21   of investigations.

22          So really my first refereed

23   article was a -- on the back light life test and

24   development of long-life lamps at Honeywell for

1    the avionics systems on -- in the 777 Program.

2                  And then other of the small LCD

3    products that we did, moving upwards, you know,

4    closer to in the 2000 time range, you know, some

5    papers on organization methodologies, design of

6    and design considerations that would be back

7    lights.

8                  And quite recently a very large

9    technical report going to the LCD back light

10   report that I did for Insight Media, which is --

11   it's like a 250 to 300 page document that was

12   intended for industry people within the supply

13   chain and investors to both teach the

14   technologies of back lighting in televisions,

15   monitors and notebook computers as well as look

16   at opportunities for growth.  And in terms of

17   components, optical films, back light designs,

18   those sort of things where -- where the industry

19   has growth and people might want to invest.

20                  Q.  Have you also received any awards

21   or patents?

22                  A.  On the patent side, there's

23   currently a pending application in -- that I did

24   while working -- well, consulting actually at

1    DuPont.  One of the few reflective materials

2    that I believe DuPont is right now

3    commercializing.

4              And at Honeywell, I was recognized

5    with a Technical Achievement Award, which is a

6    fairly prestigious award and you get a banquet

7    and everything.

8              And for the work and contribution

9    on the back light development for 777 Program.

10        Q.   Okay.  And are you involved in any

11   professional memberships?

12        A.   I am.  I continue to participate

13   in the Society for Information Display or for

14   the Organizing Committee, which its primary role

15   there is technical paper review and selection

16   for the annual symposia.

17              Unfortunately, I was somewhat

18   delayed from attending this year.

19        Q.   Is that because it's going on

20   right now?

21        A.   Yes, I believe so.  Yeah.

22              And then -- and so I'll continue

23   with that.  I've worked, you know, as session

24   chairs in that organization as well.

1           And then I've also participated in

2     the SAE, Society for Automotive Engineer.  Flat

3     Panel Displays Metrology Working Group, which is

4     responsible for developing performance metrics

5     for automotive displays.

6                MR. GOODWYN:  Your Honor, at this

7     time, I'd like to offer Mr. Smith-Gillespie as

8     an expert in the field of mechanical design and

9     assembly of displays, especially liquid crystal

10    displays and their back lighting.

11               MR. SHULMAN:  No objection, Your

12    Honor.

13               THE COURT:  He's admitted.

14    BY MR. GOODWYN:

15         Q.   Now, Mr. Smith-Gillespie, you

16    indicated that you had formed some opinions with

17    respect to the '157.  Have you formed any

18    opinions with respect to noninfringement of the

19    asserted claims of the '157 patent?

20         A.   Yes.  I've reviewed this, and it's

21    my opinion that none of the accused LG products

22    infringe the '157 patent with regard to Claim 1.

23    Really for two reasons.

24               Primarily, there's a requirement

1   that -- that the films do not contact

2   non-supporting portions, and all the LG products

3   do not meet this requirement.

4            And then, additionally, there's a

5   limitation that when the frame is disposed in

6   the second position, additionally other

7   supporting members do not contact.  And many of

8   the LG products that were accused are not

9   intended to be positioned in a second position.

10           So none of these LG products

11  infringe.

12           Q.   Okay.  Before we go into your

13  opinions in detail, I'd like to show you a list

14  of documents.

15           Is what's shown on the display now

16  and marked as LG Display Trial Exhibit 1086 a

17  list of documents that you considered in forming

18  your opinions?

19           A.   Yes.

20           Q.   Okay.  There's a second page which

21  also includes documents.

22           A.   Yes.

23           Q.   Did you rely on each of these

24  documents in forming your opinion?

1      A.   Yes, I did.

2              MR. GOODWYN:  Your Honor, I'd like

3      to offer into evidence LG Display Trial Exhibit

4      1086 and all of the documents identified.

5              MR. SHULMAN:  No objection.

6              THE COURT:  It's admitted without

7      objection.

8    BY MR. GOODWYN:

9              Q.   Okay.  Now the first claim term

10     that you had mentioned about why LG Display's

11     products don't infringe the '157 patent was does

12     not contact.

13              Can you explain to me why your

14     opinion is that LG Display's products don't

15     infringe for not meeting that limitation?

16              A.   Sure.  In my review of the patent,

17     the file history, the invention disclosure and

18     review of deposition testimony, it's clear to me

19     that LG products are designed such that the

20     non-supporting portions will contact.

21              In other words, they do touch the

22     or I should say the non-constraining portions of

23     the films will touch and they're designed to do

24     so to prevent vibration.  So vibration induced

1    film damage.

2              So it's my opinion and I did a

3    bunch of analysis to validate this, that LG

4    Displays' -- none of the accused LG Display

5    products meet the does not touch or does not

6    contact claim limitation.

7         Q.   Now, what would one of ordinary

8    skill in the art understand does not contact to

9    mean in the context of the '157 patent?

10        A.   In the context of the '157, it's

11   clear that the -- one of the distinguishing

12   features of the '157 is to prevent film stress

13   on the optical films during expansion and

14   contraction due to thermal variations.

15             So what that will mean is in

16   reading not only the patent but, you know, the

17   prosecution history and the invention

18   disclosure, the inventors sought to solve the

19   problem which was apparent at that time where

20   especially film display sizes started to grow

21   that when the displays underwent thermal

22   variations, low temperature, high temperature,

23   that the films would contact the support, see

24   stress, that stress would cause deformation of

1    the film that were nonrecoverable known as Mura

2    defects.  And they're culled out here.

3            Q.   How did the '157 patent seek to

4    solve the problem with the stress?

5            A.   Essentially what the '157 patent

6    does is it provides support along a single edge

7    so that the films would hang under gravity load

8    and then provides clearance on other supporting

9    portions so that when the display is rotated --

10   I should say there is additionally other

11   supporting portions to provide for alternate

12   positions of the display.

13           And the key element here is that

14   there are gaps formed between the secondary

15   supporting portions and the secondary

16   constraining portions when supported in the

17   first position as well as between the first

18   constraining portion and the first supporting

19   portion.

20           And the gaps are designed based on

21   thermal expansion characteristics of the

22   backlight assembly as a whole.

23           Q.   Well, the patent refers to a

24   number of issues, thermal expansion of the

1   optical film, panel temperature and room

2   temperature.  Are all of those related to

3   thermal expansion or are they related to

4   something else?

5          A.   Those are all related to the

6   thermal expansion characteristics.  There is a

7   thing called modeling tolerance which the patent

8   points out may affect film deformation due to

9   self weight.

10         Q.   I just want to look at the first

11  three.  Let's take the next two separately.  The

12  first three that are listed in the patent in

13  column five that looks like around 26 to 29, the

14  first three identify a thermal expansion of the

15  optical film, panel temperature and room

16  temperature.  What are those related to?

17         A.   Okay.  So essentially in order to

18  determine how to prevent the film from

19  contacting and being constrained by the

20  nonsupporting member, one needs to look at the

21  design condition at room temperature.  So this

22  is where room temperature comes in.  All your

23  sizes and mechanical dimensions are placed on

24  the part of room temperature where they're

1     fabricated and then what is the temperature of

2     use which is the panel temperature, because that

3     determines the amount of expansion and

4     contraction you might see based on the thermal

5     expansion coefficient of each of the individual

6     components.

7              Q.   How much can room temperature

8     vary?

9              A.   Well, for typical display products

10    that I looked at, the operating temperatures

11    from zero degrees C to 50 degrees C.

12             Q.   The next two items that are

13    mentioned in the patent, manufacturing tolerance

14    and modeling tolerance.  What are they?

15             A.   Manufacturing tolerance is really

16    a consideration of the absolute perfection, I

17    guess if you want, to which something can be

18    made.  When you're designing things, for

19    instance, a boss, it has a size that you're

20    targeting, say three millimeters.  But in

21    actuality when it's fabricated, the measured

22    size is going to be somewhat larger or less

23    than, because the cost of making it perfect is

24    unacceptable.  So that's called a tolerance.

1           The films have tolerance of both

2     the size of the hole that goes in the film and

3     the location of the hole, the peg in this case,

4     that is the same sort of tolerance.

5           So manufacturing tolerance is

6     really a general engineering tolerance that you

7     need to consider in order to decide on what the

8     clearance needs to be to insure that the parts

9     always go together.

10          Q.   What's a modeling tolerance?

11          A.   Modeling tolerance as best as I

12    can see, because when I do modeling, I model

13    with zero tolerance and then pick up the

14    tolerances by knowing what the manufacturbility

15    is when making drawings for the components.  But

16    as the patent describes it, it would include

17    such considerations as deformations as you might

18    see as I said under self weight.

19          And actually I did some

20    calculations and found out that that's really

21    absolutely a nonconsiderable -- it's many, many

22    orders of magnitude less than the expansion and

23    contraction tolerance that you need to have.

24          Q.   What would the self weight

1    expansion or deformation be as a result -- for

2    these optical films like in LG Display's films?

3         A.   It's really what you consider

4    stretch.  If you hold a rubber-band up with the

5    ends cut, what would be the difference in length

6    of the rubber-band when you're holding it up

7    versus laying it on the table.

8              With the films they're fairly

9    high-strength films.  It turns out when I did

10   the calculation of the simply supported film,

11   not counting any load that might be concentrated

12   at the supports, the film itself under self

13   weight increases by less than microns.

14        Q.   Do each of the embodiments

15   disclosed in the '157 patent explain that the

16   gaps are calculated this way or are there

17   different approaches?

18        A.   Well, actually, there are a number

19   of different embodiments in the patent.  There

20   you go.  And in each and every case, there are

21   gaps, and the gaps are defined as being

22   allowable movement range for thermal expansion

23   and contraction.

24             In fact, I decided to go through

1      one time and count how many times the patent

2      specification points to thermal expansion and

3      contraction considerations and it turns out

4      eighteen times within the specification thermal

5      expansion and contraction is mentioned relative

6      to design of the gaps around the nonsupporting

7      portions.

8              Q.   You also mentioned that you had

9      reviewed the invention disclosure.  Did that

10     give you any indication that the '157 patent was

11     directed to some particular issue?

12             A.   Yes, it did.  In fact, the

13     invention disclosure highlights three separate

14     prior art embodiments, all of which have an

15     issue relative to over constraining during

16     thermal excursions.  It clearly states that the

17     goal of the patent or the invention in this case

18     was to provide for free expansion and

19     contraction of the films and also to address

20     mounting for larger size films to avoid stress

21     caused by thermal issues.

22             Q.   Now, after reviewing the documents

23     and the patent that you did, did you also review

24     LG Displays' accused products?

1    A.   I did.  I looked at one particular

2    product, it was a 42-inch panel, I believe.  And

3    then looked at a number of -- starting really

4    with product specifications going down through

5    all the components through assembly drawing

6    levels, assembly backlight and then the

7    component drawings that make up that, a very

8    large list.

9    But before I get into that list it

10   probably would be a good idea to describe the

11   optical film design for the LG products.

12   Essentially this is an engineering

13   drawing.  You can't really see the yellow.  For

14   some reason the dimension is in yellow.  It's

15   not really meaningfully here, it's really just

16   putting positional and size dimensions on the

17   features.

18   But what you'll see in this case

19   are four tabs along the top side of the film

20   with narrow slots in the tabs.  Those slots are

21   actually holes that are formed in the tabs,

22   engage with tabs that are formed in the sheet

23   metal housing, or reflective frame.  And the

24   film sort of hangs off of those.

1          And then on the left-hand side are

2     similarly configured tabs with holes in them

3     that engage pegs that are on a subcomponent of

4     the frame that also has pegs in them.

5          And the design is such that the

6     pegs are sized so that there is a small,

7     essentially a like a fit clearance between the

8     peg and the hole to constrain the film from

9     moving in this case what we called the

10    horizontal or X direction during vibration

11    because according to LG's engineering

12    representative, the folks I talked to, even, the

13    vibration issue was a major concern because the

14    films translate and move much more rapidly in

15    vibration and can cause mirror defects by

16    rubbing.

17         The thermal considerations are

18    addressed equally well by having unconstrained

19    bottom and right edge.  So they basically

20    constrain the films from moving along the left

21    edge to allow them to expand and contract in the

22    opposite direction.

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          A.   So what I did then was look at fit

16    clearances between the supporting and

17    constraining portions and then performed the

18    differential thermal expansion process on each

19    and every one of these products that's accused

20    here.

21               And what I've done is I've

22    highlighted in this slide one particular

23    product, just to sort of walk through the

24    methodology used here.  This is just a single

1    representative product, but the same analyses

2    were done on every one of these products.

3              And I've summarized the tables.

4         Q.   But you did analyze each and every

5    one of the accused products; is that correct?

6         A.   That's correct.

7         Q.   Okay.  Let's step through one of

8    those products, and if you could explain to us

9    what you did.

10         A.   Okay.  This is just a spreadsheet

11    that summarizes my differential thermal

12    expansion analysis.

13              On the left side is a low

14    temperature evaluation, and on the right side is

15    a high temperature evaluation.  On the low

16    temperature side, we took the low operating

17    temperature, which was zero degrees as the low.

18    So the delta from room temperature or the

19    difference from room temperature that's used in

20    the calculation is minus 25 degrees.

21              On the right-hand side, we used

22    plus -- plus 60 degrees, which is really a

23    conservative value because the high operating

24    temperature for the display is typically around

1     50 degrees C.  Almost all of the specs are 50

2     degrees C.

3                   So that's only considering a

4     10-degree C internal rise, which is, in my

5     opinion, conservative.  Usually 20 to 25 degrees

6     C would be seen -- internal rise would be seen

7     in films.  So that's a Delta T of 35 degrees.

8                   And then what I did was I

9     basically established what the coefficient of

10    thermal expansion for each of the films were in

11    both the -- the Y direction, the horizontal or X

12    direction and the Y direction.  And in some

13    cases, they are not the same because of the way

14    films are manufactured, so that they have

15    different expansion coefficients among the

16    machine direction and transverse direction.

17                  Q.   Where did you get your information

18    for the dimensions?

19                  A.   For the dimensions did you say?

20                  Q.   Yes.

21                  A.   Dimensional data, such as the

22    second column, which I guess I should explain,

23    Lc-e is actually the distance from the center to

24    the edge where the mounting location is.  Those

1    dimensions came off of the engineering drawings

2    for either the films or the support components.

3         Q.   You also mentioned that the

4    coefficient of thermal expansion may vary for

5    materials.  Where did you or how did you

6    identify what the relevant coefficient of

7    thermal expansion is?

8         A.   Some of the materials are well

9    known.  There is a steel called roll steel with

10   electric coating on it, electric coating.  So

11   that you look up AISI 1020 cold -- roll steel or

12   look at all the steels and they're all in a

13   certain range.  It turns out that that's -- so

14   that's sort of an industry-known value.

15           The optical films, it's a little

16   more complicated.  First, I just went through

17   with numbers that I had from work that I had

18   done in its past.  I mean, this is probably

19   known to me from some of the display enhancement

20   issues that I dealt with over the years,

21   particularly at DuPont and the liquid displays.

22           So that was sort of my first

23   round.  I mean, in actuality, I did the

24   calculations twice, because then I refined the

1    films.  I needed to ensure that the numbers I

2    was using were the identical numbers to -- were

3    the identical values of the components used in

4    the LG products.

5              So that was when I think you'll

6    recall that I had a conference call with LG

7    engineers, and they provided data from their

8    supplier on the optical films used in these

9    products.  So I refined the numbers.

10             This -- I mean, my first cut was,

11   you know, well within, you know, a few percent,

12   10, 20 percent.

13        Q.   Well, you mentioned coefficient of

14   expansion of steel and of the optical films.

15   Did you take more than just the optical film

16   thermal expansion and contraction into account

17   in your analysis?

18        A.   Yes, since both components are

19   expanding, in the back light when they had to

20   undergo temperature excursions really to look

21   for interference due to thermal expansion, you

22   need to calculate the circumstances, the thermal

23   expansion of the film.  And you calculate the

24   thermal expansion of the frame.

1            And the difference between those

2    two expansions will allow you to derive the

3    possible interference.  So you can see that the

4    frame's expansion rate is really typically,

5    one-sixth to one-fifth roughly or more even of

6    the optical films.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13          Q.   For simplicity, is expansion just

14    the film getting bigger?

15          A.   It's the film getting bigger, but

16    it's also the frame getting bigger.  But the

17    film gets expansion -- expands at a much faster

18    rate than the frame.  But I considered them

19    both, so...

20          Q.   And is that also for contraction,

21    it gets smaller?

22          A.   That's correct.

23          Q.   And so what's the significance,

24    then, of the fact that the number in your chart

1    with respect to the distance between the peg and

2    the film is smaller than the contraction and

3    expansion numbers?

4            A.   Yeah.  So basically what that

5    tells us is that the design philosophy of the LG

6    engineers, this bears out the design philosophy

7    of the LG engineers.

8                Basically that the clearance is

9    much less than what would be required to prevent

10   the optical films from stretching from expansion

11   and contraction.

12               The fact that, say, during the

13   film expansion, we're seeing seven-tenth of the

14   millimeter of expansion of the optical film from

15   the center location means that after .15

16   millimeters of expansion, the film can't go

17   anywhere.  So it's now constrained by the peg

18   and forced to move in a planar direction

19   opposite the peg's orientation.

20           Q.   I notice that this chart that you

21   have on the screen now is labeled first position

22   landscape.  Did you also do the analysis for a

23   rotated display?

24           A.   Yes, I did.  And I did the

1    analysis actually for every single product, not

2    just ones that are listed as LG as being for

3    public displays, which we'll talk about a little

4    bit later.

5              So in the second position, now we

6    have pegs that were along the left-hand side

7    located at the top, and they're now supporting

8    the film.  And there should be, according to the

9    claim language, the film on the right-hand side,

10   the slot cannot touch the supporting member,

11   what was the supporting member on the other

12   side.

13             So now it's really the same

14   calculation that was done.  In fact, my table, I

15   think back a few slides -- no, this is just for

16   landscaping.  Yeah.

17             So it's the same calculation in

18   other tables.  But the whole thing basically

19   drops out here where -- where we have a distance

20   between the peg and the hole that's nominally,

21   you know, .3 millimeters or less.  Maybe .15

22   millimeters.

23             And the expansion is upwards of .6

24   to, you know, almost .8 millimeters in some

1    cases.

2              So, again, the film is going to

3    move a little bit, then it's going to contact

4    the pegs.  The peg also constrains it from

5    moving anymore.

6              Really this small space is to

7    prevent vibration in use -- movement of the

8    films.  Now, during expansion, the -- now that

9    it's held on the side so that it can't move

10   anymore, that dimension, it has to -- it's

11   forced to expand in the opposite direction or

12   contract, as the case may be.

13        Q.   Okay.  Well, you mentioned that

14   you considered products, public displays and

15   also nonpublic displays.  What's your opinion

16   with respect to the products that are nonpublic

17   displays, such as televisions with respect to

18   the infringement issue --

19        A.   My opinion --

20        Q.   -- of the '157?

21        A.   -- is essentially that the

22   products used in nonpublic displays do not meet

23   the does not contact requirement.  Additionally,

24   those products do not meet the when in the

```
 1        second position limitation the claim.  So for

 2        nonpublic display products for those two

 3        reasons, none of the accused products infringe.

 4                    MR. GOODWYN:  Your Honor, is now a

 5        convenient time to take a break?

 6                    THE COURT:  All right.  We'll take

 7        a fifteen-minute recess.

 8                    (A brief recess was taken.)

 9                    THE COURT:  All right.  Be seated,

10        please.

11   BY MR. GOODWYN:

12              Q.   Mr. Smith-Gillespie, before the

13        break, you were discussing your opinion with

14        respect to noninfringement of the '157.  Did you

15        also form an opinion with respect to invalidity

16        of the '157?

17              A.   Yes, I did.

18              Q.   And did you review any references?

19              A.   I reviewed quite a few references.

20              Q.   Is one of them Shimizu?

21              A.   Yes, it is.

22              Q.   The '972 patent?

23              A.   Yes.

24              Q.   What's your opinion with respect
```

1    to Shimizu?

2            A.   It's my opinion that Shimizu

3    anticipates the '157 patent Claim 1 as it shows

4    each and every claimed element.

5            Q.   Can you step us through that

6    analysis that you went through?

7            A.   So what I'll do here is on the

8    left side highlight various claim elements and

9    then on the right side show in figure form where

10   those claim elements are found in the

11   disclosure.

12            Also, you'll notice under

13   supportive concluded references in the Shimizu

14   patent specification.

15            So the first thing, of course, has

16   to be backlight unit for liquid crystal display,

17   the whole thing is highlighted because the whole

18   thing is a backlight unit.

19            And the support for that is found

20   in column one, lines six through nine, column

21   seven, lines 40 through 50.

22            Q.   And any figures?

23            A.   And figure -- well, Figure 7B and

24   7A are representative.  There are others.

1          Q.    What about the next limitation?

2          A.    Frame is depicted as shield 3 in

3     Figure 7B.  The support for the specification is

4     in column seven, line 53 through 56.

5          Q.    What about the next limitation?

6          A.    Shimizu discloses a first

7     supporting portion disposed on the frame,

8     they're called projections 3a-1, and there is

9     two of them shown in the upper figure.

10              And on the rotated figure they're

11     on the right side.  And support for that is in

12     column four, line 27 through 62, column seven,

13     lines 51 through 63.

14          Q.    And did you find a second

15     supporting portion disclosed in Shimizu?

16          A.    I did.  These are highlighted in

17     the bluish-green color.  They are on the

18     left-hand side of the figure.  Again, they're

19     called projections, in this case, projections

20     3a-4-1 and 3a-4-2.  And then along the top edge

21     in the rotated position in Figure 5A.  Support

22     for that is found in column seven, lines 51

23     through 63.

24          Q.    What about the limitation a film?

1          A.   A film is the optical sheet one

2     that's shown in multiple figures throughout the

3     patent.  And the cross-sections used in this

4     particular embodiment.  Support is found in

5     column seven, 51 through 67.

6          Q.   What about a first constraining

7     portion and a second constraining portion?

8          A.   Constraining portions are portions

9     of the film that engage with the supporting

10    portions.  And Shimizu discloses both first and

11    second constraining portions.  And I highlighted

12    in yellow the first constraining portions 2a-1

13    in Figure 4A, and then along the right side not

14    labeled in Figure 5A.  And the second

15    constraining portions are labeled in the

16    blue-green color, 2a-4-1 and 2a-4-2 as well.

17         Q.   And the next limitation, when the

18    frame is disposed in a first position?

19         A.   So Figure 4A depicts the frame

20    disposed in the first position.  The first

21    supporting portions, the partially contact

22    supporting the film, and support for that I have

23    actually highlighted out here.  It says the

24    positional relationships between the locking

1    projection, those are the ones that are

2    contacting for support, and the openings are

3    designed such that at least the openings 2a and

4    the locking projections at the bottom do not a

5    but each other.  So essentially the film is

6    free.

7         Q.   What about the last limitation?

8         A.   Yes.  So in the second position is

9    shown Figure 5A depicts the display rotated such

10   that the supports 3a-4-2 have moved around to

11   the upper edge and now support the film.  There

12   is space around the nonsupporting portions now

13   which would be the yellow highlights on the

14   right.

15             So support for this is found in

16   the specification column five, lines 44 through

17   63, column eight, lines 23 through 43, and

18   column seven, lines 64 through column eight,

19   line two.

20        Q.   Did you also review a reference or

21   any other references?

22        A.   I reviewed the Fukayama reference.

23        Q.   What is your opinion with respect

24   to Fukayama?

1        A.   Fukayama, that Claim 1 is obvious

2   over Fukayama.  And in view of Sakamoto, which

3   is a patent that shows a rotation of a display

4   device because Fukayama does not disclose

5   rotation.

6        Q.   Can we step through that.

7        A.   Fukayama has a backlight unit,

8   it's Figure A in Figure 4.  The specification is

9   column 15, lines 58 through 65.  Well, that's

10  for both the backlight unit and for the frame.

11  The actual support is column 15, lines 14

12  through 24.

13       Q.   And the first supporting portion?

14       A.   The first supporting portions are

15  shown in Figure 3, here are the Pin-S, Pin-S

16  that are located along the top edge of the

17  frame.  These are described in the specification

18  column 15, lines 43 through 57.

19       Q.   And the second supporting portion?

20       A.   The second supporting position the

21  patent describes a Pin-C or BT, Figure 3 or

22  Figure 13 which describes BT.  And that's a

23  second supporting portion disposed on the frame.

24  Support for that is in column 18, lines 37

1       through 43.

2               Q.   What about a film?

3               A.   Optical sheet, on IPS is shown in

4       Figure 4 and, of course, in Figure 6, and many

5       other figures.  It's discussed in column 14,

6       lines 47 through 56.

7               Q.   And a first constraining portion

8       and a second constraining portion?

9               A.   Okay.  HOL-S in the optical film

10      is a first constraining portion shown in Figure

11      10 here and HOL-C in the optical film is shown

12      in Figure 13.  Support -- that's the second

13      constraining portion.  Support for that is found

14      in the column 17, lines 13 through 16, Figure

15      10, and Figure 13.

16              Q.   What about when the frame is

17      disposed in the first position?

18              A.   When the frame is disposed in the

19      first position, the design of Fukayama is such

20      that the Pin-S will support at HOL-S in order to

21      provide support for the wide length of the film,

22      for the wide span of the film.  So in order to

23      do that, there is partial contact at Pin-S and

24      HOL-S shown in Figure 10.  There are other

1    figures that likewise depict this in the patent

2    specification.

3             Q.   What about the second supporting

4    portion does not contact?

5             A.   Okay.  Figure 13, there is

6    depicted a pin with a head on it that loosely

7    engages the optical film at HOL-C.  It's clear

8    from the design of this that the loosely engages

9    the optical films, it's designed so that the

10   films can flow around Pin-C, that the head on

11   Pin-C is to retain the films, but still loosely

12   so as to not defeat the invention, which

13   addresses film expansion.

14            Q.   What type of product does Fukayama

15   describe?

16            A.   Fukayama describes a laptop

17   display, essentially a small LCD product for a

18   notebook computer which typically is used in one

19   orientation, though nowadays it's conceivable it

20   could be used in a tablet PC which is useable in

21   multiple orientations.

22            Q.   Does Fukayama disclose the last

23   element?

24            A.   As I said, it's possible that it's

```
 1        inherent.  What Fukayama describes is really a

 2        typical clamshell type notebook computer.  As I

 3        said, you know, those type of devices have now,

 4        you know, spawned a new generation where the

 5        clamshell also allows you to rotate and place

 6        the display down and use it like a writing

 7        tablet.

 8                     So it could be inherent in that.

 9        But in the event that it's not, then Sakamoto

10        describes the use of LCDs in rotatable display

11        devices as well.  And I think it would be

12        obvious to rotate the frame, the backlight

13        structure to accommodate other viewing

14        conditions.

15             Q.   With respect to your invalidity

16        opinions, did you apply both LG Display's

17        proposed claim constructions and AUO's proposed

18        claim constructions?

19             A.   Yes, I did.

20             Q.   Okay.

21             A.   Can I add one more thing to my

22        previous answer?

23             Q.   Yes.  Certainly.

24                  I didn't mean to interrupt.
```

1          A.   You didn't.  I thought of it as

2     you started talking, which means that I wasn't

3     listening while you were talking.  So I'm going

4     to get you to repeat that question.

5               The other thing that needs to be

6     pointed out is that the design of the elliptical

7     hole is, in the Fukayama patent would allow the

8     film to expand and contract.  And if the film

9     were rotated such that it was hanging off of

10    hole C in a -- in like a portrait rotary

11    orientation, the clearances around between hole

12    S and pin S would allow the non-contact

13    condition to be met.

14         Q.   My previous question was whether

15    or not you applied both LG Display's and AUO's

16    proposed constructions from the '157 patent in

17    determining your invalidity opinion.

18         A.   Yes.  So in terms of the does not

19    contact limitation, yes, I did.

20         Q.   Okay.  And what is your opinion

21    with respect to Fukayama and Shimizu with

22    respect to Claim 1 of the '157 patent?

23         A.   It's my opinion that Shimizu

24    discloses all of the elements of Claim 1

1    within -- within the Shimizu reference alone.

2    So, therefore, it anticipates the '157 patent.

3              And also that it's in -- the '157,

4    Claim 1 is obvious over Fukayama in view of

5    Fukayama by itself or, if necessary, Sakamoto.

6         Q.   Now, Mr. Smith-Gillespie, in

7    addition to reviewing the '157 patent, did you

8    also form an opinion with respect to the '506

9    patent?

10        A.   Yes, I did.

11        Q.   In general, what is your opinion

12   with respect to noninfringement and invalidity

13   of the '506 patent?

14        A.   Well, my opinion is that the

15   accused LGD devices or display products do not

16   infringe either of Claim 7 or 17.  And

17   additionally, that -- that the '506 patent is

18   invalid as being seen by either prior art

19   patents or devices that were on sale.

20        Q.   What's the basis of your opinion

21   that the accused LGD products do not infringe

22   Claim 1?

23        A.   Well, Claim 1 describes the

24   joining of -- of flexible printed circuit boards

1      and in a display device via hot bar soldering.

2      And it's my understanding and opinion that none

3      of the LGD -- LG Display products accused

4      utilize hot bar soldering to join flexible

5      printed circuits.

6              Q.   Okay.  In forming your opinions,

7      with respect to noninfringement and invalidity,

8      I have on the screen a document that's marked LG

9      Display Trial Exhibit 1087.

10             Did you consider all of the

11     material shown in this exhibit in forming your

12     opinion?

13             MR. SHULMAN:  Can I see the

14     exhibit?  Does someone have a copy?

15             I mean, go ahead and ask your

16     questions and then just give me that copy.

17             THE WITNESS:  Yes, I reviewed all

18     these documents and devices.

19     BY MR. GOODWYN:

20             Q.   There's also a second page.

21             A.   And including these.

22             MR. GOODWYN:  Your Honor, I'd like

23     to offer into evidence LG Display Trial Exhibit

24     1087 and all the documents identified in it.

1     MR. SHULMAN:  No objection, Your

2     Honor.

3     THE COURT:  Admitted.

4     BY MR. GOODWYN:

5     Q.   Mr. Smith-Gillespie, you mentioned

6     hot bar soldering.  What is hot bar soldering?

7     MR. SHULMAN:  Actually, excuse me,

8     Your Honor.  I am sorry.  I apologize for

9     interrupting.

10     I have no objection to the

11     admission of the exhibit itself, 1087, but I do

12     have an objection to certain of the exhibits

13     that are listed within this exhibit.

14     THE COURT:  All right.  That will

15     be admitted.

16     MR. SHULMAN:  We reserve on that.

17     THE COURT:  That will be noted.

18     BY MR. GOODWYN:

19     Q.   I'm sorry.  The question was --

20     A.   Yes.

21     Q.   -- could you explain to us what

22     hot bar soldering is?

23     A.   Okay.  Hot bar soldering is a

24     well-known process in the circuit industry

1    wherein a device known as a hot bar soldering

2    machine is used to make multiple solder joints

3    simultaneously by applying a bar that's

4    thermally controlled to apply both heat and

5    pressure to the soldering joints in a single

6    operation, thereby making solder joints

7    simultaneously.

8         Q.   And -- well, is hot bar soldering

9    the same as manual soldering?

10        A.   No, it is not.

11        Q.   Why?

12        A.   Manual soldering typically uses a

13   handheld soldering iron or sometimes what's

14   called soldering pencil to make solder joints

15   one at a time, essentially.

16        Q.   Do you have some examples of hot

17   bar soldering devices?

18        A.   Yes, I do.  In fact, there's a

19   commercial example from the website that I

20   found.  It's typical to or quite similar or

21   typical of equipment that I've seen in the past

22   primarily at say Three-Five Systems' factory.

23             It's essentially a machine that

24   has a thermal controlled contacter or thermode,

1   as it's called.  It is designed for a particular

2   application so that it meets the geometry of the

3   solder joint that it's going to be making.

4              It has a -- when I say thermally

5   controlled, there's actually a closed loop to

6   control the temperature of the head.  And the

7   way it works is essentially the head is aligned

8   over the solder joint, or actually probably the

9   other way around, the solder joint is aligned

10  under the head.

11             And then the head comes down,

12  contacts the parts to be soldered, which have

13  been previously aligned.  And then the heater

14  brings the head up to temperature.

15             There's a small duration where the

16  temperature is below the liquidis temperature,

17  and that's actually a time that's used for the

18  flux to operate on the solder joints.

19             And then the temperature -- the

20  head is quickly ramped up in, like, a second,

21  two seconds to multi-temperatures.  The solder

22  becomes molten.  The head immediately cools.

23             And actually they have a special

24  capability of being able to dump the heat

1    rapidly from the head, so that you don't

2    overheat the solder joint.  And the solder cools

3    while the pressure from the head is still

4    applied to the solder joint, and then the head

5    is removed again under some form of control.

6         Q.  Well, you mentioned earlier that

7    hot bar soldering was not the same as manual

8    soldering.

9         Can you explain why that's the

10   case?

11        A.  Well, okay.  Yes.

12        So I'll go through the manual

13   process first.  Manual process basically

14   utilizes an operator to -- with a soldering

15   instrument that's not much different than the,

16   you know, pointer with a small tip on it that's

17   heated at a constant temperature to contact

18   individual solder joints.  Basically the

19   function is, you know, heating a single joint at

20   a time to make a connection.

21        The way they do that is basically

22   they heat up an individual soldering joint with

23   a soldering iron or solder pencil, apply often

24   times additional solder material with the other

1    hand using a wire of solder.  And then they

2    remove the soldering iron, and the area -- the

3    soldering cools.

4              It solidifies.  And the result is

5    you get an electrical connect basically one

6    joint at a time.

7              On the hot bar side, it's a little

8    different.

9         Q.   I'm sorry.  Before we get there,

10   during the manual soldering process, do you

11   actually apply pressure during manual soldering?

12        A.   Pressure may be applied through

13   the tip, but as soon as the tip is removed, that

14   pressure goes away.  And the contact lead is

15   able to rebound so it's not held in position,

16   which is one of the drawbacks of manual

17   soldering.

18        Q.   Is that actually because of the

19   soldering joint hadn't formed when you removed

20   the pressure?

21        A.   It could be because of a number of

22   things.  The solder hadn't solidified.  So,

23   yeah, it hasn't joined.

24              There may be nonplanarity in the

1    leads.  And in particular, with flexible printed

2    circuits, there's also some thermal warping that

3    may take place when the -- when the flexible

4    substrate is heated due to dissimilar materials.

5         Q.   If you could explain hot bar

6    soldering for us.

7         A.   Okay.  So hot bar soldering

8    typically is an automated process.  There may be

9    some low-budget machines where there's a lever

10   that pulls down and starts the process.

11        But typically they're either done

12   with two hand paddles, you know, basically for

13   safety reasons, so you don't get your finger

14   under the bar when it's coming down.  Or under a

15   fully automated process system looks for

16   fiducial lines and then bada boom.

17        So an automated process for

18   simultaneously reflowing all the multiple solder

19   connects at a single time using a machine.

20   That's the function.

21        The way that this happens is, as I

22   stated earlier, is that a machine applies

23   pressure to the contact area, heats the thermode

24   or solder bar to reflow the solder, and then

1    quickly cools the bar as the solder solidifies,

2    and moves the bar from the contact area before

3    solidification has taken place.

4              The result is that you create

5    multiple solder joints with a highly uniform

6    solder thickness and probably a thinner,

7    significantly thinner solder thickness.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9          Q.    Okay.   In addition to forming an

10   opinion regarding noninfringement of Claim 1,

11   did you also form an opinion with respect to

12   noninfringement with respect to Claim 17?

13          A.    Yes, I did.   And it's my opinion

14   that none of the accused LG Display's products

15   include or infringe Claim 17, because they do

16   not include the limitation of first and second

17   alignment marks being overlapped.

18          So we're -- more specifically, a

19   second alignment mark overlapped with an align

20   to the first alignment part.

21          Q.    I think you may have misspoken, --

22          A.    Okay.

23          Q.    -- but correct me if I'm wrong.   I

24   believe you said that they infringe because they

1    don't have certain elements.

2              A.   Then I misspoke.  None of the

3    accused products -- none of the accused LG

4    Display's products include or infringe Claim 17

5    because none of the accused products include

6    overlapping alignment marks.

7              Q.   And did you review all of the

8    accused products to determine that?

9              A.   I reviewed representative accused

10   products and then documents related to the other

11   accused products.

12             Q.   What is an alignment mark or

13   overlapping alignment mark in the context of the

14   '506 patent?

15             A.   Alignment mark is really a

16   distinctive identifying feature.  It provides

17   for positioning of the circuit at assembly.

18                  It's something other than the --

19   the contact pads that's formed either in photo

20   tooling or screen printing on the substrates

21   themselves to allow alignment.

22             Q.   Now, let's look at one of the

23   accused products that or that AUO' has accused

24   of infringing of the '506 patent, Claim 17.  Do

1    you see any alignment marks on what's shown on

2    the board now which was an exhibit to

3    Dr. Silzars' expert report?  It was Exhibit

4    25-026.

5              A.   Yes, I do.  In fact, there are two

6    alignment marks on the main FPC, that's the

7    large one, we'll call the first flexible printed

8    circuit.  You'll see to the left and the right

9    of the backlight FPC that the two lead FPC that

10   there are small forward facing and backward

11   facing L's.  Those actually are alignment marks

12   that are printed on to first FPC.

13             Q.   Are there any assignment marks

14   printed on the second FPC?

15             A.   No, there are no alignment marks

16   printed on the second FPC.  The way this works,

17   in fact, is the alignment marks are sort of like

18   a goal post for the second FPC's substrate.

19   Basically you got to get them between -- get the

20   substrate between the alignment marks to insure

21   at least 70 percent contact that's specified in

22   the constructions.

23             To point with the laser pointer,

24   it's not real clear with the overheads, in the

1    slides it's pretty evident, you can see the

2    substrate of the second FPC, there is a little

3    line down along the left side and the right side

4    and what I did is I measured some parts and it

5    turns out that the -- the width of the flex in

6    this area here compared to the width of the

7    alignment marks in that area, the flexible

8    printed circuit is about .35 to .4 millimeters

9    smaller, so that means when they're aligned,

10   they'll be roughly .2 millimeters side-to-side,

11   or that there is a .2 millimeter tolerance

12   allowance for long -- let's just call it

13   horizontal alignment, in the X direction.

14       Q.   Were you in the courtroom when

15   Dr. Silzars explained that those alignment marks

16   may work in one direction, but would not work in

17   both directions, horizontally and vertically?

18       A.   Yeah.   And I guess I disagree with

19   that.   He maybe didn't have in front of him a

20   good picture to jog his memory, but he pointed

21   to the fact that if you brought the contact pad

22   on the top substrate, which is the second FPC

23   over to one of those alignment marks, vertical

24   lines, that you, in fact, short.   That's true,

1    but that's not the purpose of the alignment

2    marks.

3            Basically the tolerance zone

4    defined by the alignment marks is relative to

5    the flexible printed circuit substrate, the

6    capton material that forms the base material of

7    the circuit.  So it does provide alignment in

8    both the horizontal.

9            And then the length of the tails

10   is actually an important thing.  It's another

11   subject area that I disagree with Dr. Silzars

12   on, because when you're making these in the laid

13   open condition, you have a much longer tail than

14   you would when you fold it back around the LCD

15   module.  So it's important that your FPC, second

16   FPC stay within the alignment zones defined by

17   the length of the vertical sections of the two

18   L's, otherwise you might tear the board off, the

19   LED board.

20          Q.  In Trial Exhibit 1536, Dr. Silzars

21   explained that a document, a figure in a

22   document specifically referring to -- showing

23   the lead and the land, and it says align 70

24   percent or more.  I believe Dr. Silzars has

1      indicated that that was evidence to him that the

2      structures were used for alignment.  Do you

3      agree with Dr. Silzars' testimony?

4              A.   No, I disagree.  And actually it's

5      clear from reading this that that's actually an

6      inspection requirement.  Two reasons, one item

7      number four says after soldering, solder

8      connection is checked, and there are no defects,

9      et cetera.  For instance, when you look at the

10     pictures on the right, not only does it have an

11     alignment requirement as part of the inspection,

12     but then there is also a solder quantity

13     requirement.

14              And there is no way while applying

15     heat to the solder joint that you can both align

16     and inspect for solder quantity while the solder

17     is currently flowing out, so it's very, very

18     obvious to me that this is a visual inspection

19     that's formed.

20              And the secondary function of

21     those alignment marks is to make sure the flex

22     tail is in between the goal posts.

23              Q.   Now, have you seen any products,

24     accused products that do not have alignment

1    marks at all?

2         A.   Yeah, I have looked at accused

3    products that have nothing more than terminal

4    designators printed on the first printed

5    circuit.

6         Q.   Now, Dr. Silzars said that the

7    pads and traces were used for alignment actually

8    functioned as alignment marks.  Do you agree

9    with that position?

10        A.   I disagree with the traces being

11   alignment marks.  I do agree that pads were

12   overlaid with one another to align the parts,

13   but those are not alignment marks.  You know,

14   right here, you're showing a little bit of trace

15   coming off of the end terminating at the letters

16   A and K, which is an analog cathode at the LED

17   board.

18             You'll notice that these leads are

19   outlined and that's what Dr. Silzars was

20   pointing to that that's why they are alignment

21   marks.  I have to disagree with that.  The

22   majority of the circuit is a back plane or a

23   ground plane, and in order to bring circuit

24   traces out to transfer them to the signal,

1   basically to the outside world, they have to be

2   kept apart from.

3            So what you see is electrical

4   relief around the part and then additionally the

5   little round circles at the end are vias,

6   they're called, they're plated through holes to

7   the traces on the rear side of this board.  And

8   the reason they're distant from the solder

9   joints is because you really want to limit the

10  amount of heat that can flow out on those plated

11  through holes for fear of causing an open,

12  basically an open circuit by excess heat.

13           Q.   What's the basis for your opinion

14  that the structures in LG Display's accused

15  products are not alignment marks in the context

16  of the '506 patent?

17           A.   Well, during the prosecution of

18  the '506 patent, the examiner objected to the

19  '506 patent use of alignment marks saying that

20  alignment marks were unknown and, in fact, that

21  Tokura, the '691 patent, shows alignment marks.

22  And the inventors replied that well, Tokura may

23  show alignment marks, but it doesn't show

24  overlapping alignment marks.

1          Now, if you look at Figure 5, the

2     alignment mark that Tokura shows is essentially

3     the item three -- actually it's two double prime

4     and then there is the cap between them which is

5     three double prime.  Two double prime aligns

6     with eight, so there is sort of a half moon

7     projection that lies within a semicircle,

8     semicircular cylinder, and there is a gap that's

9     established between there.

10          So they argued that to have a '506

11    patent accepted because '506 patent shows

12    overlapping alignment marks and Tokura doesn't.

13          Well, if you tried to apply

14    Dr. Silzars' construction that the traces

15    themselves were overlining alignment marks,

16    there are traces, there is, in fact, three of

17    them that show up as number nine on the one

18    flexible printed circuit board and number four

19    -- well, excuse me, number nine on the flexible

20    printed circuit board six and number four on

21    flexible printed circuit board one, and they are

22    overlapped and soldered.  Those were not

23    considered overlapping alignment marks.

24          Q.  With respect to the '506 patent,

1    did you also form an opinion with respect to

2    validity?

3              A.   Yes, I did.  It's my opinion that

4    both Claims 7 and 17 are invalid in view of the

5    prior art.

6              Q.   Did you review some product?

7              A.   I did.

8              MR. SHULMAN:  Your Honor, may I

9    have a continuing objection to all these HP

10   products?

11             THE COURT:  Yes, you may.

12             MR. SHULMAN:  Thank you.

13             A.   I looked at a number of HP iPAQ

14   h2200 Series starting with probably one unit

15   while I was writing my invalidity report, and

16   since then I have looked at a number more.

17             Q.   About how many more have you

18   reviewed?

19             A.   Probably another dozen or so.  I

20   think the number stands at twelve or thirteen

21   right now.

22             Q.   Were those HP iPAQ 2210 and 2215?

23             A.   Mostly 2210's, but a couple of

24   2215.  They're essentially identical and that

1    follows actually from this tech review article

2    that basically says that the 2210 and 2215 are

3    the same device with model numbers that

4    designate their sales channel only.  And I found

5    that to be true because inside they actually

6    have the same part number.  So there is no

7    difference.  And the construction is identical

8    as well.

9           Q.   So you reviewed both types of

10   products and based on your review did you find

11   them to be the same or different?

12          A.   They're the same.

13          Q.   Can you step through for us why

14   you believe an HP iPAQ 2200 series invalidates

15   Claim 7?

16          A.   Yes.  The devices that I looked at

17   all looked identical to this photograph.  And

18   essentially if you go through the claim

19   language, they're part -- they form a single

20   transition device.  They're part of a display

21   module which has I guess in this case a touch

22   screen and an LED backlight.  There is a first

23   flexible printed circuit board that's shown on

24   the arrow pointing to the upper left corner of

1    the figure with the whole heavily patterned

2    orange area is the first flexible printed

3    circuit board.

4              And electrically connects the

5    display system to, or the display module to the

6    system board.  There is a second flexible

7    printed circuit board, there is actually two

8    flexible printed circuit boards, the one leading

9    device that goes to the touch screen and the two

10   leading device that goes to the backlight and

11   they connect to the first flexible printed

12   circuit board, and they are joined by hot bar

13   soldering.

14             And it's very evident to me by

15   inspecting the products that they are hot bar

16   soldered.  You can see the imprint of the hot

17   bar in the circuit substrates, the capton

18   material.  There is a -- I point out just one

19   here with a box that may actually be a tad

20   bigger.  I had some other photos that did a

21   better job defining that.  Then there is a

22   horizontally oriented box that could have been

23   placed over the device, too.

24             Finally Claim 7 requires that one

1    -- the second flexible printed circuit board

2    transmits a light source signal and that's the

3    second flexible printed circuit board in this

4    case is the circuit to the LED backlight.

5         Q.   There is some handwriting shown on

6    the exhibit.  Is that your handwriting?

7         A.   No, it is not.  I believe that's

8    Dr. Silzars'.  This photo is taken from a

9    deposition exhibit.

10        Q.   Now, with respect to your analysis

11   of Claim 7, did you apply both LG Display's and

12   AUO's proposed constructions for hot bar solder?

13        A.   Would you repeat your question,

14   please.

15        Q.   Based on the opinion that you just

16   described, did you apply both LG Display's and

17   AUO's proposed constructions for hot bar

18   soldering?

19        A.   LG Display's for sure, AUO's

20   interpretation in my mind permits the use of a

21   handheld instrument as a heated bar.

22        Q.   Would you consider a handheld

23   instrument to be a bar?

24        A.   Not a hot bar solder.  So I

1    believe that this really meets it under the,

2    probably the more clear definition which is LG

3    Display's definition of hot bar soldering.

4         Q.   Would it also meet the limitation

5    of AUO's proposed construction?

6         A.   I believe it would.

7         Q.   Did you also form an opinion with

8    respect to the invalidity of Claim 17 in view of

9    these HP iPAQ products?

10        A.   Yes, I did.  And I find it to be

11   invalid if we're to accept the AUO

12   interpretation of an alignment mark.  So you

13   know, I already outlined first and second

14   flexible printed circuit board in the first

15   claim element of the display module.

16             The reason I placed the deposition

17   testimony exhibit in here is Dr. Silzars circles

18   alignment marks on the first FPC and it would be

19   evident to me then that he also believes that

20   the contact pads such as in the accused product

21   on the second FPC form the overlapping alignment

22   mark, and, therefore, this meets all the

23   requirements of Claim 17.

24        Q.   Now, did you also take photographs

1      of some of the other products that you reviewed?

2            A.   Yes.   In addition to the exhibit

3      from the deposition of Dr. Silzars, I took

4      photos -- actually we had photos taken.   I don't

5      take such good photos of products that I

6      examined.   And of both models, the 2210 and the

7      2215, and they're shown here.   These products

8      are identical and you can see from looking at

9      the photos that there is no difference with

10     regard to the flexible circuit interconnects.

11     And these also clearly -- these also clearly

12     delineate the hot bar soldering.

13           Q.   Now, did you review a sales

14     receipt that was associated with the HP iPAQ

15     2215 that you inspected?

16           A.   Yes, I did.

17                MR. SHULMAN:   I also lodge an

18     objection to that topic.

19                THE COURT:   It's noted.

20     BY MR. GOODWYN:

21           Q.   Now, this is going to be very hard

22     to see, Mr. Smith-Gillespie, and I apologize

23     because unfortunately it was a -- it looks like

24     it was a Best Buy thermal receipt, and over the

1    years, it has become very faded.  But can you

2    tell the date based on your original review of

3    the document of what's seen on the overhead?

4            A.   What's seen on the overhead is

5    difficult.  It looks like -- I can see the year

6    was '03.  It was easier to see on the real

7    receipt.

8            Q.   Mr. Smith-Gillespie --

9            MR. GOODWYN:  May I approach, Your

10   Honor?

11           THE COURT:  Yes.

12  BY MR. GOODWYN:

13           Q.   Let me show you the actual

14   original sales receipt.  Let me see if you can

15   tell from that.

16           A.   It says 11/23/03.

17           Q.   Now, when you inspected the

18   products, did you see any identifying

19   information?

20           A.   Yes, I did.  There is inside when

21   you review move the battery cover and battery,

22   there are a number of product labels that

23   include part numbers, serial numbers, product

24   numbers which are different than actual model

1    numbers.  I think model numbers are really more

2    like a marketing designator, so the product

3    number is what is tracked in all the sales

4    literature that I looked at.  And the -- there's

5    additionally serial numbers identifying -- each

6    unit that I looked at is a different unit,

7    different actual points.  And then additionally

8    there's an FCC certification I.D. number that

9    we've highlighted in the big box up there.

10                And then --

11            Q.   Okay.  What's your understanding

12    of when these products were made and sold?

13            A.   And these were sold in the U.S. --

14                MR. SHULMAN:  Objection, Your

15    Honor.  Foundation.

16                THE COURT:  Objection will be

17    noted.  You can continue.

18                THE WITNESS:  There's -- they are

19    sold starting around May 2003.

20    BY MR. GOODWYN:

21            Q.   Okay.  What's the basis of your

22    understanding?

23            A.   So there's a number of documents.

24    There's a -- a list of sales information that we

1    got from HP, and I've reviewed that.

2              Additionally there were

3    advertisements, reviews in -- in various

4    magazines, that sort of thing.

5              So what we've done here is

6    connected the model number in this chart, which

7    is very difficult to see.  So we made several

8    blow outs, which includes the order date, the

9    part number.  You can see in the yellow

10   highlighted one that this is the FA103A iPAQ

11   H2210 color, 500 pieces destined to the United

12   States.

13             And then in the center area up

14   above the scheduled ship date of 5/31 and the

15   actual ship date looks to me like June 7th.

16   6/7/2003.

17        Q.   Is this the kind of sales and

18   manufacture data, the kind of information

19   reasonably relied upon by experts in your field

20   to determine whether a product is prior art?

21        A.   Yes, absolutely.

22        Q.   Now, is there any additional

23   information that shows the products you

24   inspected were actually sold in the United

1    States?

2            A.   Yeah.   Could you go back two

3    slides, please?

4                 So I pointed out that there's --

5    oh, that's three slides.  Right here.

6                 There is a number of different

7    numbers.  The FA103 actually links us to the

8    sales data.

9                 If you look in the upper right of

10   the lower box, it says there's this SPS number,

11   which I think is sort of like a service code

12   number or something.  That 3311607- is found on

13   the HP support document, which is the Slide 2

14   down from here.

15                That's that same number.  So the

16   product that I inspected originally is a --

17   shows to be a U.S. commercial product.

18           Q.   Okay.   You also pointed to this

19   FCC number.

20                What is the significance of that

21   number?

22           A.   Well, essentially to -- to sell a

23   wireless product in the United States, you have

24   to have FCC certification.  Typically FCC

1    certification is a process that takes

2    considerable effort, and after which design

3    changes are pretty much locked.  You don't want

4    to really go through FCC recert to -- to have

5    your design changes improved.

6                This certification document shows

7    that the -- the FCC product I.D. number that we

8    found on the iPAQ that I looked at, this

9    NM8GREATWALLA certified on March 8th, 2003.

10        Q.   What is your opinion, then, with

11   respect to the HP iPAQ as to whether or not it

12   invalidates Claim 7 and 17 of the '506 patent?

13        A.   So, it's my opinion that the HP

14   iPAQ is valid prior art and that it includes

15   every claim limitation in both Claim 7 and 17.

16                MR. GOODWYN:  Thank you.  No more

17   questions.  I'll offer this witness.

18                Excuse me, Your Honor.  I'd also

19   like to offer into evidence as Exhibit 1090 LG

20   Display Trial Exhibit 1090, the demonstrative

21   demonstratives that Mr. Smith-Gillespie used in

22   his direct examination.

23                MR. SHULMAN:  Subject to the HP

24   objection, I have no problem with that.

```
 1                    THE COURT:  All right.  They're

 2      admitted.

 3                    MR. SHULMAN:  Your Honor, rather

 4      than have my cross-examination interrupted in

 5      ten minutes, can we take an early lunch?

 6                    THE COURT:  Sure.  We'll recess

 7      until 1:15.

 8                    MR. SHULMAN:  Very well.

 9                    THE COURT:  And can I see the two

10      of you for a moment at side-bar?

11                    MR. SHULMAN:  Sure.

12                    THE COURT:  All right.  We will be

13      in recess until 1:15.

14                    THE CLERK:  All rise.

15                    (Whereupon a conference was held

16      at side-bar off the stenographic record:)

17                    (A brief recess was taken.)

18                    THE CLERK:  All rise.

19                    THE COURT:  All right.  Be seated,

20      please.

21                    Ready to proceed?

22                    MR. SHULMAN:  Thank you, Your

23      Honor.

24                    CROSS-EXAMINATION
```

1    BY MR. SHULMAN:

2              Q.   My name is Ron Shulman.  You and I

3       have not met before; correct?

4              A.   Correct.

5              Q.   Okay.  I have a few questions for

6       you.  Let's begin with the '506 patent.

7              A.   Yeah.

8              Q.   Let's first consider validity.

9       You understand, sir, that the '506 patent, like

10      all issued U.S. patents, is presumed to be

11      valid; correct?

12             A.   I do.

13             Q.   And you also understand that LG

14      has the burden of proving that the '506 patent

15      is invalid and must do so by clear and

16      convincing evidence; correct?

17             A.   Yes.

18             Q.   And you're the expert for LG who

19      is offering opinions on the issue of invalidity

20      of the '506; correct?

21             A.   I am.

22             Q.   Would you agree, sir, that to

23      invalidate the '506 patent, your expert opinions

24      should be reliable?

1           A.    That's correct.

2           Q.    And would you agree, sir, that for

3      your invalidity opinions to be reliable, they

4      must be based on reliable information?

5           A.    Okay.  Yes.

6           Q.    Okay.  And would you agree that

7      the reliability of the factual information that

8      underlies your invalidity opinion is pretty

9      important?

10          A.    Okay.  Yes.

11          Q.    Okay.  So let's explore the

12     reliability of your invalidity opinions on the

13     '506 patent.

14               On the screen is Page 110 from

15     your invalidity report.  Do you generally

16     recognize that?

17          A.    Yes, I do.

18          Q.    Okay.  And in the first sentence

19     you identified two products, the HP 2210 and the

20     HP 1910.

21               Do you see that?

22          A.    I do.

23          Q.    And on the second sentence, you

24     state that you "understand" that these HP

1     devices are prior art to the '506, because they

2     were on sale in the United States prior to

3     August 19th, 2003.  Do you see that?

4              A.   Yes, I do.

5              Q.   And at the time you signed this

6     expert report, your "understanding" was based on

7     a representation made to you by LG's lawyers

8     that these HP devices were on sale before

9     August 19th, 2003; correct?

10             A.   Actually I reviewed sales data

11    from the iPAQs.

12             Q.   Let's look at your deposition,

13    Page 30, Line 11 through Page 31, Line 8.

14                  Thirty, Line 11.

15                  Sorry.  Thirty.

16                  Yeah.

17                  "Question:  That understanding

18    that the iPAQ h2210 was on sale in the United

19    States before August 19th, 2003 is based on the

20    spreadsheet, Exhibit D-5 to your expert report?

21                  "Answer:  Okay.

22                  "Question:  Is that correct?

23                  "Answer:  It was actually

24    represented to me that that was the case.

1           "Question:  So LG's counsel

2      represented it to you?

3                "Answer:  Yes.

4                "Question:  So you're sort of

5      taking it.  So I take it you don't have personal

6      knowledge that this was the case?

7                "Answer:  I did not study the

8      sales literature or sales records.

9                "Question:  The exhibit that's in

10     your report?

11               "Answer:  That's -- well, I looked

12     at it, but by that time, it was -- it had

13     already been represented to me that this was --

14     they didn't need an opinion whether or not the

15     data was correct."

16               That was your testimony; correct?

17          A.   It was part of my testimony.

18               MR. GOODWYN:  Objection, Your

19     Honor.  That's an incomplete recitation of the

20     questions that were asked to the witness on that

21     subject.

22               MR. SHULMAN:  That's all there was

23     in this portion of the transcript.  If they want

24     to go elsewhere later on, I think they can.

1    BY MR. SHULMAN:

2            Q.   What I read to you on the screen,

3    you did give that testimony; right?

4            MR. GOODWYN:   Objection, Your

5    Honor.

6            THE WITNESS:   That was part of a

7    line of questioning that I was answering.

8            THE COURT:   Yes, sir.

9            MR. GOODWYN:   I just wanted to

10   point out that that's actually -- my reading of

11   the transcript is that that's not quite correct,

12   that there were other questions that were

13   directly related to this subject.   It's actually

14   incomplete.

15           THE COURT:   Mr. Shulman is saying

16   at least he's read the complete questions, and

17   because of the time constraints, you will get a

18   time to complete on redirect.

19           MR. GOODWYN:   Yes, Your Honor.

20           Q.   What I read into the record were

21   questions that you were asked and answers that

22   you gave; correct?

23           A.   And I responded that I had

24   reviewed the data.

1        Q.   Can you answer my question.  Were

2   the words that I read into the record questions

3   that you were asked and answers that you gave,

4   yes or no?

5        A.   You need to put it back up again

6   because I need to read what I said.

7        Q.   Do you have any doubt that what I

8   read came from your transcript?

9        A.   Like I mentioned, it was part of a

10  line of questioning that began --

11       Q.   Sir, the question was were you

12  asked the questions and did you give those

13  answers, yes or no?

14       A.   As part of an overall line of

15  questioning, I studied the sales literature

16  that's in my report.

17       Q.   We'll try one more time.  Were you

18  asked those questions and did you give those

19  answers?

20       A.   I told you what my answers were,

21  that I reviewed the report.

22       Q.   Did you give those answers, yes or

23  no, or are you incapable of answering that yes

24  or no?

1           A.    Apparently so.

2           Q.    Okay.  You're incapable.

3                 MR. BONO:  Your Honor, I object to

4     the gratuitous comment from counsel.  There is

5     no reason to do that.  And I would ask him to

6     refrain from that.

7                 THE COURT:  All right.

8                 MR. SHULMAN:  Very well.  I

9     apologize.  I think one counsel should speak for

10    the witness, too.

11                THE COURT:  That's the rule.

12                MR. SHULMAN:  Right.

13                THE COURT:  We should observe that

14    rule.

15    BY MR. SHULMAN:

16          Q.    Now, you have no personal

17    knowledge that these devices were, in fact, on

18    sale prior to August 19th, 2003; right?

19          A.    Well, I do.

20          Q.    Have you ever worked at HP?

21          A.    I saw a number of documents --

22          Q.    Sir, did you ever work at HP?

23          A.    I never worked at HP.

24          Q.    And you never worked on the 2210;

1    right?

2              A.   I never worked on the 2210.

3              Q.   And you never worked on the 1910?

4              A.   I did not work on the 1910.

5              Q.   And you never worked on the 2215;

6    right?

7              A.   Well, you know, I have taken these

8    devices apart and looked at the data.

9              Q.   Sir, did you ever work on the

10   2215?

11             A.   I never worked on it other than

12   taking it apart like I said and reviewing what's

13   inside.

14             MR. GOODWIN:  Your Honor, the

15   witness is trying to provide a complete answer

16   again to counsel's questions.

17             MR. SHULMAN:  I don't think

18   they're complete answers, Your Honor.  I think

19   they're an attempt at obfuscation, that's why

20   I'm trying to press forward because we have

21   limited time.

22             THE COURT:  All right.

23   BY MR. SHULMAN:

24             Q.   You never sold the 2210 or 2215 or

1    1910 prior to August 19th, 2003; right?

2            A.   As a merchant, you mean?

3            Q.   As in any capacity?

4            A.   As a representative of HP, no, I

5    have never sold one.

6            Q.   Okay.  And you never saw anyone

7    purchase any of these products prior to August

8    19th, 2003; right?

9            A.   You know, I can't answer that

10   question because I -- you know, I have been in

11   stores where these things are on sale.

12           Q.   Okay.  Now, let's look at on the

13   Elmo, please, slide 15 from your direct

14   examination.  Do you recognize that one?  This

15   was what you called HP sales records; right?

16           A.   That's one sheet of probably an

17   eight or maybe even ten-page document that was

18   in an exhibit to my expert report.

19           Q.   You haven't seen a deposition

20   transcript from any HP employee who testified

21   about this document; correct?

22           A.   No, I have not.

23           Q.   Right.

24                And the basis for your conclusion

1    that this is an HP sales record is because the

2    lawyers told you that; right?

3              A.   I actually drew the conclusion

4    differently.  I looked at all of the part

5    numbers that lined up with actual products and

6    where they were shipped to, what the ship date

7    was, what the invoice date was, and concluded

8    that there was very, very likely that that --

9    that there was nothing else that it could be

10   other than real sales data.

11             Q.   You have no idea who prepared this

12   document; correct, no personal knowledge about

13   that?

14             A.   My understanding is that it was

15   prepared by HP.

16             Q.   Do you have any personal knowledge

17   of that?  I don't want to hear about your

18   surmise.  Do you have any personal knowledge

19   about who prepared that document?

20             A.   I have no reason to believe it

21   wasn't prepared by HP.

22             Q.   Can you answer my questions, sir?

23   Do you have any personal knowledge about who

24   prepared that document, yes or no?

1    A.   I understand it to be HP.

2    Q.   Is that based on personal

3    knowledge?

4    A.   That's my personal knowledge.

5    Q.   Okay.  Can you tell me who at HP

6    prepared this document?

7    A.   No, I can't.

8    Q.   Do you know if anyone at HP

9    prepared this document?

10    A.   Probably someone in the sales or

11    --

12    Q.   I don't want to hear about

13    probabilities.  Do you know that someone at HP

14    prepared this document?

15    A.   Yes.

16    Q.   Okay.  How do you know that?

17    A.   Someone told me.

18    Q.   Who told you?

19    A.   Counsel when they gave it to me.

20    Q.   So you're relying -- is it

21    Mr. Bono or is it Mr. Goodwyn, or perhaps

22    somebody else?

23    A.   Mr. Auito.

24    Q.   Pardon?

1        A.    Mr. Auito.

2        Q.    How does he know that it was

3    prepared by HP, do you know that?

4        A.    It was given to him by HP.

5        Q.    And that's because he told you

6    that?

7        A.    Yes.

8        Q.    Okay.  Now, let's return to the

9    first paragraph of page 110 of your report where

10   you discuss these two HP products, namely the

11   1910 and the 2210.  And in the third sentence,

12   it's up on the screen, you make the factual

13   statement that both the 2210 and the 1910

14   products include a main FPC that integrates

15   signals to the touch screen and the LED

16   backlight.  Do you see that?

17       A.    Yes, I do.

18       Q.    In the next sentence you make

19   another factual statement, namely that the touch

20   screen FPC and the LED backlight FPC are both

21   soldered to the main FPC.  Do you see that?

22       A.    Yes.

23       Q.    But as it turned out your factual

24   statement about soldering was simply wrong, at

1   least with respect to the HP 1910 product;

2   correct?

3           A.   That's correct.

4           Q.   Okay.

5           A.   And I stated that as such in my

6   deposition that I realized that I made an error.

7           Q.   So the truth is in the HP 1910

8   referred to in your report, the FPCs are

9   connected by ZIFF connections rather than by

10  soldering; correct?

11          A.   Yes, I clarified that in my

12  deposition.

13          Q.   And your soldering statement about

14  the HP 1910 set forth in your report turned out

15  to be unreliable; right?

16          A.   In the report, it was in error,

17  that is correct.

18          Q.   Let's explore why it was

19  unreliable.  You didn't know it was unreliable

20  when you prepared your invalidity report because

21  before submitting your report, you never

22  inspected the HP 1910 product; correct?

23          A.   I inspect it, but apparently not

24  thoroughly enough.

```
1              Q.   You never inspected it; isn't that

2        true?

3              A.   I actually took it apart, but I

4        didn't take it apart deeply enough.

5              Q.   Let's look at your deposition.

6        Page 203, 2 through 10.

7                   "QUESTION:  Page 110 of the

8        invalidity report?

9                   "ANSWER:  Yes.

10                  "QUESTION:  Yeah, please go ahead.

11                  "ANSWER:  So you know when we have

12       pictures of the internals of the iPAQ 2210 and I

13       understood that the 1910 was of the same

14       internal structure, and it wasn't until after,

15       actually, I submitted my report that I was able

16       to look inside that device.  And it turns out

17       that the 1910, while it does have a flexible

18       printed circuit --"

19                  MR. GOODWIN:  Your Honor, he's

20       leaving out about --

21                  MR. SHULMAN:  We're moving on here

22       when we get the rest of it.  Bill, do you have

23       the rest of it.

24              Q.   -- "while it does have a flexible
```

1    printed circuit having a touch screen signal and

2    a flexible printed circuit having an LED signal

3    and they combine into the main circuit board

4    that then passes -- or the main flexible printed

5    circuit board that passes through the system

6    they actually use what are termed ZIFF

7    connectors.  They're ultra low profile

8    connectors.  There is a ZIFF connector for each,

9    each of those signals on the main FPC."

10              You did give that testimony;

11   right?

12        A.  Yes.

13        Q.  What you said here was it wasn't

14   until after I submitted my report that I was

15   able to look inside the device; right?

16        A.  That's not actually what I said.

17   Let's see, was not able to --

18        Q.  "It wasn't until after actually I

19   submitted my report that I was able to look

20   inside that device."

21              Those words appear on the screen;

22   right?

23        A.  Yes, they do.

24        Q.  Okay.  Now, instead prior to

1    submitting your invalidity report, your factual

2    statements about the HP 1910 were based on what

3    the LG lawyers told you; right?

4            A.   In the 1910, I had taken it off --

5    taken the back cover off and looked at the

6    circuit board, validated some things.  But I

7    actually didn't peel it down far enough to

8    validate.

9            So I -- I ended up looking at

10   photographs that I misinterpreted as being the

11   1910.

12           Q.   There were no photographs of the

13   1910 in your first report; right?

14           A.   No, they were the 2210.

15           Q.   Okay.  So where are these

16   photographs of the 1910?

17           They've never been produced in

18   this case, have they?

19           A.   Maybe I was mistaken when I said I

20   thought I looked at photographs of the 1910.

21           Q.   The truth is the lawyers told you

22   that the 1910 was the same as the 2210, and that

23   turned out to be unreliable; right?

24           A.   It appears to be so.

1          Q.   Okay.  Now, in the section of your

2    invalidity report that discusses the HP 2210,

3    there were several photographs; correct?

4          A.   Yes.

5          Q.   Okay.  And at your deposition, you

6    didn't know who took those photos, did you?

7          A.   Which photographs are you

8    referring about?

9          Q.   The ones that purport to be of the

10   22 ten in your invalidity report.

11         A.   Well, I didn't take them myself.

12         Q.   And you didn't know who did;

13   right?

14         A.   I was -- it was represented to me

15   that -- well, actually, no.  I don't know.

16         Q.   Right.  And today you still don't

17   know who took them; right?

18         A.   It doesn't really matter, because

19   I've taken enough photographs now myself that

20   are identical to them, so...

21         Q.   So back in the time when you were

22   preparing your report, you were simply given the

23   photos in early February and told by LG's

24   attorneys that supposedly they were pictures of

1    a 2210; right?

2             A.   I believe that's the case.

3             Q.   Okay.  Now, you didn't actually

4    see the physical product depicted in the photos

5    in your expert report until the day before your

6    April 15th, 2009 deposition; right?

7             A.   Which unit are we talking about?

8             Q.   The one that is actually depicted

9    in the photos.

10            A.   Oh, which is a Korean version is

11   my understanding.  The one I had seen was

12   actually a U.S. version.

13            Q.   You didn't actually see the

14   physical product depicted in the photos in your

15   expert report until the day before your

16   deposition, namely April 14th, 2000, and

17   whatever year we're in, nine?

18            A.   I'm not sure that's true.

19            Q.   Let's look.  That's what you told

20   us.  Twenty-nine, 13 to 16.

21                 "When were you first provided with

22   the iPAQ device, the physical device that's

23   photographed in your expert report?

24                 "Answer:  Yesterday."

1           You did tell the truth; right?

2           A.   It was true then.

3           Q.   Okay.  And so April 14th, 2009 was

4    the date when you first determined that the

5    actual physical product was the one shown in the

6    photos; right?

7           A.   Yes.

8           Q.   Okay.  And did you make that

9    determination on that day?

10          A.   What determination?

11          Q.   That the thing that was finally

12   given to you on April 14th was actually the

13   thing that was depicted in the photos in your

14   report?

15          A.   I -- yes.

16          Q.   So you -- so you inspected the

17   actual physical product depicted in the photos

18   when you finally got the product on April 14th;

19   right?

20          A.   As I said, though, before

21   submitting my report, I had looked at a physical

22   sample of another one that was not the one that

23   was in the photographs.

24          Q.   Woah.  We are going to get to that

1    in a few minutes.

2                    Now, have you inspected the actual

3    physical product in the photos since then?

4            A.   Yes, I have.

5            Q.   And are you familiar with the

6    actual physical product depicted in the photos?

7            A.   I believe so.  I have a list of

8    serial numbers and units that I've looked at.

9    I've now observed 13 of them that I have in my

10   list.

11           Q.   Let's talk about whether there's

12   any reliable information that the actual

13   physical product depicted in the photos is of a

14   model 2210.  Okay?

15                    Isn't it true, sir, that there is

16   no marking anywhere on the actual physical

17   product that you inspected that bears the

18   supposed model number 2210?

19           A.   There -- no model 2210.  It is the

20   FA103A.

21           Q.   Maybe yes, maybe no.  Does the

22   thing that you inspected bear the designation

23   2210 on it, yes or no?

24           A.   No.

1          Q.   Okay.  And your conclusions about

2    the F103A are based upon that HP or based upon

3    that document that has information that you

4    think came from HP; right?

5          A.   Well, and then there's -- well,

6    no.  There's also the support document.

7          Q.   Well, we'll come to that.

8               Now, isn't it true that there is

9    no date anywhere on the actual physical product

10   that you inspected in April of 2009 indicating

11   when that particular device was manufactured?

12         A.   The product labels don't include a

13   date.  They may be coded into the serial number

14   somehow.

15         Q.   Okay.  Now, you mentioned just a

16   few minutes ago and earlier today that you first

17   inspected a 2210 on April 14th, and you've

18   inspected others, either before or after then;

19   right?

20         A.   That's correct.

21         Q.   How many of these others have you

22   inspected, round number?

23         A.   Twelve or 13.

24         Q.   Twelve or 13.  And when did you

1    inspect those, sir?

2            A.   I inspected some probably -- I

3    inspected a bunch yesterday.  Before that I

4    had -- I inspected probably another two devices.

5    I'm trying to recall the date.

6            Q.   Was it after your deposition?

7            A.   It was probably after my

8    deposition.

9            Q.   Okay.  So before your deposition,

10   the only one you had inspected was the one on

11   the photos; right?

12           A.   That's correct.

13           Q.   And since your deposition, you

14   inspected two sometime ago, and then a few more

15   in the last week?

16           A.   Yeah.

17           Q.   Okay.  None of these -- and the

18   grand total is, leaving out the one that was in

19   the photo, the grand total is how many?

20           A.   Twelve or 13, I've forgotten the

21   number.

22           Q.   Twelve or 13.  And are you aware,

23   sir, that these 12 or 13 have never been

24   produced to us for our inspection?

1           A.   I'm not aware of that.

2           Q.   Okay.  Now, I think on your direct

3      you mentioned that you also looked at a 2215;

4      right?

5           A.   Two of them.

6           Q.   Two of them.  When did you first

7      see the 2215?

8                Well, all of the 2215s?

9           A.   This past week.

10          Q.   This past week.  When this past

11     week?

12          A.   I became aware of the 2215, I want

13     to say it was Friday or so a week ago.

14          Q.   So last Friday?

15          A.   Yes.

16          Q.   Okay.  And are you aware that it

17     was produced to us for inspection, what purports

18     to be the 2215, Wednesday night?

19          A.   I was not aware of that.

20          Q.   Are you aware, sir, that we were

21     first informed that you were going to try and

22     rely on the 2215 at 1:00 a.m. Wednesday morning?

23          A.   I was not aware of that, either.

24          Q.   Okay.  And what's this second

1   2215?

2            Where did that come from?

3        A.   I'm not sure where the second one

4   came from.  I reviewed a number of products that

5   were all in a shipping packaging.

6        Q.   What date was the -- were either

7   of these two, what you call 2215s, made?

8        A.   I don't know.

9        Q.   What date were either of these two

10   2215s sold, if at all?

11       A.   I -- I can't say.

12       Q.   Okay.  Now, in your expert

13   report -- oh, by the way, the 2215, or what you

14   call the 2215, is nowhere mentioned in your

15   expert report; right?

16       A.   No, it's not.

17       Q.   First time we ever heard about it,

18   first time you ever heard about it was a week

19   ago; right?

20       A.   The 2200 series was essentially --

21       Q.   The first time you ever saw a 2215

22   was last Friday, or what you call a 2215; right?

23       A.   Okay.

24       Q.   Is that right?

1          A.   That's correct.

2          Q.   And by the way, these two devices

3     that you want to call a 2215, do they bear the

4     model number 2215 on them?

5          A.   No, they don't.  But we can just

6     start calling it the FA103A if you would like.

7          Q.   No, I want to find out about the

8     2215 designation, it's not on there; right?

9          A.   No.

10         Q.   Now, in your expert report and

11    today during your direct you described the

12    configuration inside of the actual physical

13    product that you call the 2210 as well as the

14    2215; correct?

15         A.   I did.

16         Q.   Okay.  Let's first talk about the

17    2210.  Isn't it true, sir, that you don't know

18    whether the actual physical product as we heard

19    about it configured today was sold or offered

20    for sale in that same configuration prior to

21    August 19th, 2003; correct?

22         A.   I'm not sure what you mean by that

23    same configuration, sir.

24         Q.   Let's look at your deposition,

1  page 32, line 19 through 3321.

2  "QUESTION: I take it you don't

3  personally know that that specific device that

4  you analyzed was on sale in the United States

5  before August 19th, 2003?"

6  Skipping over the objection.

7  "ANSWER: Well, that specific one

8  that I had in -- in -- you're talking about the

9  one that the pictures are made of --

10  "QUESTION: Correct.

11  "ANSWER: -- or the one that I

12  reviewed? No I can't say that that exact device

13  was, but I'm not -- I've seen another device and

14  it has the exact same configuration. I guess I

15  did not know that it was an opinion area for me

16  as to whether or not it was actually sold, the

17  one that I had, at that time.

18  "QUESTION: It's just a fact.

19  "THE WITNESS: Okay.

20  "QUESTION: I'm asking one way or

21  the other if you know, that's all.

22  "ANSWER: All right."

23  Continuing with the answer.

24  "ANSWER: And the answer was, I

1    don't know that that particular one was sold at

2    that time."

3                    You did give that testimony;

4    correct?

5                    A.   I'm not sure which serial number

6    we're talking about right now, so in order to

7    answer this question, I really need to know

8    which device specifically you're talking about,

9    because I did review documents that looked at

10   device sales through the sales date.

11                   Q.   You just told us a moment ago that

12   you don't know when any of these were sold?

13                   A.   No, you said that.  Actually I

14   said that I looked at sales data that had

15   product names and then there was a support

16   document that showed the actual serial number of

17   the device that I had.

18                   Q.   Isn't it also true, sir, that you

19   don't know whether the design of what you call

20   the 2210 was changed on or after August 19th,

21   2003?

22                   A.   I'm sorry, would you repeat that,

23   please?

24                   Q.   Yes.

```
 1                   You don't know whether the design

 2        of what you call the 2210 was changed on or

 3        after August 19th, 2003; correct?

 4                   A.   No, that's not true.  It's my

 5        opinion that --

 6                   Q.   I didn't ask your opinions.

 7                   A.   -- based on the FCC documents --

 8        please let me finish -- that I reviewed that was

 9        for that same HP iPAQ series, that short a new

10        certification, the devices would not be changed.

11                   Q.   Let's look at what you said in

12        your deposition.  Page 34, lines 17 to 22.

13                   "QUESTION:  And I take it you

14        don't personally know whether Hewlett-Packard

15        ever changed the design of the iPAQ h2210 any

16        time after August 19th, 2003?

17                   "ANSWER:  No, I'm not sure about

18        that."

19                   You did give that testimony;

20        right?

21                   A.   That was my testimony.

22                   Q.   Okay.

23                   A.   I believe I clarified it shortly

24        afterwards to refer to what I understand is a --
```

1    Q.   If you did, I'm sure your counsel

2    will bring that out.

3              Let's turn to the reliability on

4    the so-called Godzilla reference that you rely

5    upon in your expert report to support your

6    invalidity opinion concerning the '506.  Today

7    we heard nothing about Godzilla; right?

8         A.   Apparently not.

9         Q.   You didn't testify about it, did

10   you?

11        A.   I did not.

12        Q.   And is that because you concluded

13   that Godzilla was unreliable as prior art?

14        A.   I wouldn't have made that kind of

15   a conclusion.

16        Q.   Let's explore that.  Let's look on

17   the screen at page 100 of your invalidity report

18   where you begin your discussion of Godzilla.  Do

19   you see that down at the bottom?

20        A.   Yes, I do.

21        Q.   In the first sentence you state

22   that you understand that the Godzilla reference

23   is prior art because it was made in the US by

24   another prior to the invention of the '506, do

1    you see that?

2              A.   Yes.

3              Q.   And you cite to Exhibit D-4 to

4    your report; correct?

5              A.   I do.

6              Q.   Okay.

7                   MR. SHULMAN:   Your Honor, may I

8    hand out Exhibit D-4?

9                   THE COURT:   Yes.

10                  MR. SHULMAN:   And Exhibit D-4 is

11   marked as LGD Exhibit 282 in this trial.

12                  Here, you go, sir.   And Exhibit

13   D-4 which we offer into evidence, Your Honor.

14   We offer LGD 282 into evidence.

15                  MR. GOODWYN:   No objection.

16                  THE COURT:   It's admitted.

17   BY MR. SHULMAN:

18             Q.   And the documents in d-4 are what

19   you relied upon in your report as the Godzilla

20   prior art; correct?

21             A.   That is correct.

22             Q.   And the documents in Exhibit D-4

23   consist of a set of drawings, a product review,

24   a product announcement, and a photograph; right?

1        A.   Yes.

2        Q.   And the version of the drawings in

3   Exhibit D-4 is a revision that bears a date of

4   October 2003; right?

5        A.   I see September date as well.

6        Q.   September, October, sometime in

7   the fall of 2003; right?

8        A.   That's correct.

9        Q.   And the drawings bearing the logo

10   of a company called Three-Five Systems; right?

11        A.   That's correct.

12        Q.   You never personally worked on

13   Godzilla; right?

14        A.   I did not work on Godzilla.

15        Q.   And although you once worked for

16   the Three-Five Systems company, you left the

17   company in 1999, four years before these

18   drawings were prepared; correct?

19        A.   That's correct.

20        Q.   So you had no role in preparing

21   these drawings; correct?

22        A.   I did not.

23        Q.   And you have no personal knowledge

24   of when these drawings were prepared; correct?

1          A.   Well, I do have personal

2     knowledge.

3          Q.   No, someone told you when they

4     were prepared, but you don't know that of your

5     own?

6          A.   Well, there is actually release

7     dates on the drawings, and as a prior engineer

8     at the company, I understand what the document

9     control system is.  And looking at the release

10    dates, you know, I can ascertain that.  And to

11    claim that that's not reliable is not realistic.

12         Q.   Well, maybe so and that's why we

13    have a Judge here.

14              But the point is you don't

15    personally know who prepared these or when,

16    you're just reading the document and concluding

17    from the document that they were written in

18    2003; right?

19         A.   No.

20         Q.   Let's move on.

21              This past February, somebody named

22    Randy Glinski gave you the documents in Exhibit

23    D-4; correct?

24         A.   That's correct.

```
 1              Q.   And Mr. Glinski is a friend and

 2      colleague of yours who used to work for

 3      Three-Five; right?

 4              A.   That's correct.

 5              Q.   Now, all of the drawings in

 6      Exhibit D-4 are marked confidential and

 7      proprietary; correct?

 8              A.   That's correct.

 9              Q.   And that marking means that the

10      drawings are for internal use only at Three-Five

11      Systems; right?

12              A.   Except that Three-Five Systems no

13      longer exist.

14              Q.   Right.  But when it did, these

15      were for internal use only; right?

16              A.   That's correct.

17              Q.   And it existed in 2003; right?

18              A.   Yes.

19              Q.   Okay.  And this confidentiality

20      marking also means that nothing in the drawings

21      can be disclosed to anyone outside the company

22      without the express written consent of

23      Three-Five Systems; right?  You can read that in

24      the margin.
```

1        A.   That's correct.

2        Q.   Okay.  And you haven't seen any

3   writing in which Three-Five ever expressly

4   consented to the disclosure of these drawings to

5   anyone outside the company; right?

6        A.   No, I haven't.

7        Q.   Okay.  Now, Glinski told you that

8   Godzilla was designed for use in a PDA

9   wristwatch to be sold by Fossil and/or Abacus;

10  right?

11       A.   Yes.

12       Q.   But you haven't seen any

13  documentation showing that Godzilla was included

14  in the Fossil wrist PDA; right?

15       A.   We actually -- no, that's not

16  really true.

17       Q.   Let's look at your deposition,

18  page 40, lines 4 to 10.

19            "And you don't have any Fossil

20  design documentation showing that Godzilla was

21  included in a Fossil wrist PDA; correct?

22            "ANSWER:  No, I don't have that

23  documentation."

24            You did give that testimony;

1    right?

2              A.   Yes, I did.

3              Q.   And you also haven't seen any

4    documentation showing that Godzilla was included

5    in an Abacus wrist PDA; right?

6              A.   No, I didn't.

7              Q.   Okay.  And you haven't seen any

8    testimony from a Fossil or Abacus witness

9    concerning whether they ever included Godzilla

10   in a wrist PDA product; correct?

11             A.   No, I haven't.

12             Q.   And the drawings in Exhibit D-4 do

13   not mention either Fossil or Abacus; right?

14             A.   No, it was understood that Fossil

15   was the customer.

16             Q.   Well, you don't know that, you

17   weren't there at the time; right?

18             A.   I guess that's true.

19             Q.   Okay.  Now, on the screen, let's

20   look at page LGD 2154209, which is part of

21   Exhibit D-4.  It's after the drawings.  Do you

22   see that in front of you?

23             A.   I do.

24             Q.   Down towards the bottom is a press

1    clipping about a wristwatch PDA to be launched

2    by Fossil and Abacus.  Do you see that?

3           A.   I do.

4           Q.   And this press clipping that you

5    relied on said a Singapore company called

6    Flextronics developed the PDA bringing it from

7    concept to completion in just five months.

8    Right?

9           A.   They're a contract manufacturer --

10          Q.   Is that what it says?

11          A.   It says that.

12          Q.   Okay.  And the press clipping

13   doesn't mention Three-Five Systems; right?

14          A.   No, it doesn't.

15          Q.   And it doesn't mention Godzilla,

16   either?

17          A.   Flextronics is not a LCD

18   manufacturer.

19          Q.   It doesn't mention Godzilla, does

20   it?

21          A.   I already answered.

22          Q.   And the clipping says that the

23   product will be available in the first quarter

24   of 2003, which is months before the October 2003

1    drawings; right?

2              A.   That's correct.

3              Q.   Let's look at the next page from

4    Exhibit D-4, and this appears to be a page from

5    a Fossil website concerning a Fossil wrist PDA.

6    Do you see that?

7              A.   Yes, I do.

8              Q.   And this document doesn't mention

9    Three-Five Systems, does it?

10             A.   No.

11             Q.   And it doesn't mention Godzilla,

12   does it?

13             A.   No.

14             Q.   And the document says that the

15   product will be available in the summer of 2003,

16   which is before the October 2003 drawings;

17   right?

18             A.   That's correct.

19             Q.   Let's look at the last page of

20   Exhibit D4.  This is a photograph that Glinski

21   sent to you; right?

22             A.   Yes.

23             Q.   And Glinski told you that the

24   wristwatch without a clock face in this photo

1       was the fossil wrist PDA; correct?

2               A.   This is a prototype that was being

3       used for testing at Three-Five Systems.

4               Q.   That's what he told you.  You

5       don't know that to be the case, he just told you

6       that; right?

7               A.   He's reliable.

8               Q.   Maybe so, maybe not, but we're not

9       here able to ask him any questions; right?

10              A.   Okay.

11              Q.   We just have to take your word for

12      it that that's reliable and the information he

13      gave to you and that you're parroting to us is

14      reliable as well; right?

15              A.   Nevertheless, it's a -- it's a PDA

16      wristwatch that includes the Godzilla product.

17              Q.   How do you know that?

18              A.   Mr. Glinski said so.

19              Q.   Maybe he's a compulsive liar;

20      right?

21              A.   Maybe he is.

22              Q.   Okay.

23              A.   But I've worked with him for going

24      on probably ten years now, and that's never been

1      the case.

2              Q.   And is it true that you

3      personally, at the time you signed your report,

4      didn't know whether or not Godzilla was used in

5      a fossil wrist PDA as you stated in your report;

6      right?

7              A.   No.  I understood that it was used

8      in a fossil PDA.  So I believe that to be that I

9      knew it.

10             Q.   Oh, okay.  Let's look at your

11     deposition.  Page 41, Line 21 to Page 52, Line

12     8.

13              "Do you personally know that

14     Godzilla was used in a fossil wrist PDA sold

15     before December 2003?

16              "Answer:  I can't say that it was

17     personally -- that I have personal knowledge

18     that it was sold.  You know, I have knowledge

19     based on discussions, interviews with my

20     colleague that it was built and tested, and that

21     it was offered for sale.  But whether it was

22     sold, I -- I can't say."

23              Were you telling the truth?

24             A.   I was telling the truth.

1           Q.   Good.   Now, let's move on to

2     another reference that you relied upon in your

3     expert report for invalidity regarding the '506

4     that we never heard about today, and that's the

5     Oishi reference.

6                Do you recall that?

7           A.   I do.

8           Q.   Okay.  And did you decide not to

9     talk about it today because you thought that

10    what you had said on prior occasions about the

11    reference was unreliable?

12          A.   No.

13          Q.   Well, let's explore that.

14               Let's look at Page 98 of your

15    invalidity report where you discuss Claim 17 in

16    light of Oishi.  Do you see that?

17          A.   Yes, I'm reading it.

18          Q.   I'm not going to ask you about the

19    detail on this page, but you see the discussion

20    begins here on Page 98?

21          A.   Yes.

22          Q.   Okay.  Let's turn to Page 99 where

23    you quote the final element from Claim 17

24    requiring the so-called alignment marks.

1      Do you see that?

2           A.   I do.

3           Q.   And you state that Oishi discloses

4      all of the limitations of this element as shown

5      in the annotated figure below.  Do you see that?

6           A.   Yes.  And then I dropped the wrong

7      figure.

8           Q.   But the figure below that you

9      placed in this report doesn't even come from the

10     Oishi reference, does it?

11          A.   No, it was a mistake.  And I

12     explained that before I was even questioned on

13     it at my deposition.

14          Q.   Actually at your deposition you

15     were asked to tell us what mistakes, if any,

16     there were right at the outset, and you said a

17     couple of typos.  And then 110 pages later, you

18     told us about Oishi; right?

19          A.   Okay.

20          Q.   Okay.  So the figure that you

21     placed in your report plainly is not reliable to

22     show that Oishi -- to show what Oishi discloses;

23     correct?

24          A.   That's correct.

```
1              Q.   And you made the same mistake in

2       yet another spot in this report; right?

3              A.   That picture is asserted twice in

4       the wrong spot.

5              Q.   Let's look at Page 96 of your

6       report.  And there you discuss the invalidity of

7       Claim 2 in light of Oishi; right?

8              A.   That's correct.

9              Q.   And Claim 2 also deals with these

10      alignment marks; right?

11             A.   Yes.

12             Q.   And there you stated that Oishi

13      discloses all of the limitations of Claim 2 as

14      shown in the annotated figure below.  And once

15      again, you put in the figure that God knows

16      where it came from; right?

17             A.   Well, I do know where it came

18      from, but it wasn't Oishi.

19             Q.   Pardon?

20             A.   But it was not Oishi.

21             Q.   An so that turned out to be

22      unreliable; correct?

23             A.   It was an error.  The -- if the

24      proper figure was in there, it would have been
```

```
 1        reliable.

 2                  Q.   Maybe, but the proper figure

 3        wasn't in there, was it?

 4                       Let's --

 5                       MR. SHULMAN:  Your Honor, can I

 6        have two minutes?

 7                       THE COURT:  Yes, you may.

 8   BY MR. SHULMAN:

 9                  Q.   Let's turn to the '157 patent.

10   And let's look at Claim 1 on the screen.

11                       MR. SHULMAN:  I'm going to take

12        another minute, Your Honor, to get some water.

13                       THE COURT:  No problem.

14   BY MR. SHULMAN:

15                  Q.   So let's look at Claim 1 of the

16        '157 patent.  Do you see that on the screen?

17                  A.   Yes, I do.

18                  Q.   Okay.  And do you understand that

19        Claim 1 is an independent claim?

20                  A.   I do.

21                  Q.   Now, let's look at Claim 9 on the

22        screen.  Do you see that Claim 9 says that it

23        depends from Claim 1?

24                  A.   Backlight unit is in Claim 1.
```

1          Q.   Pardon?

2          A.   Yes.

3          Q.   And do you understand, sir, that

4    the patent law principle is that by definition a

5    dependent claim contains all the limitations of

6    the independent claim from which it depends?

7          A.   I understand that.

8          Q.   Do you also understand the patent

9    law principle that by definition a dependent

10   claim adds additional limitations to the subject

11   matter defined by the independent claim from

12   which it depends?

13         A.   I understand that principle.

14         Q.   Okay.  Now, let's look again at

15   Claim 9.  It's still on the screen.

16              Do you understand that Claim 9 was

17   allowed to issue by the patent examiner?

18         A.   I do.

19         Q.   And as issued by the patent

20   examiner, Claim 9 is a dependent claim that

21   depends from Claim 1; right?

22         A.   That's correct.

23         Q.   So according to the patent law

24   principle that we just spoke about, by

1    definition dependent Claim 9 adds additional

2    limitations to the subject matter defined by

3    Claim 1; correct?

4          A.   That's correct.

5          Q.   Okay.  Based on the literal

6    language of dependent Claim 9, you know that the

7    limitations that Claim 9 says it is adding to

8    Claim 1 are recited after the word wherein;

9    correct?

10         A.   Yes.

11         Q.   And you also know that these

12   additional limitations of Claim 9 do not appear

13   in the literal language of Claim 1; right?

14         A.   Not in the literal language, but

15   in the claim itself, based on my readings of the

16   patent specification, prosecution history and

17   invention disclosure, it's my understanding

18   that -- that the -- some of the elements of this

19   claim are inherent in Claim 1.

20         Q.   Okay.  It's your opinion that

21   Claim 1 standing alone should be interpreted as

22   if those additional limitations from Claim 9

23   were actually recited in Claim 1; correct?

24         A.   That's correct.

1        Q.   Okay.  And you said that in

2   your -- one of your reports; correct?

3        A.   That's correct.

4        Q.   Let's just look at that.  Can we

5   have the invalidity report, the sentence that

6   bridges Pages 49 to 50?

7             And what you wrote was

8   Accordingly, I believe that Claim 9 is improper,

9   because it does not further limit independent

10  Claim 1 from which it depends since all of the

11  limitations of dependent Claim 9 are necessarily

12  present in independent Claim 1.

13            So everything that's in Claim 9,

14  in your opinion, is already in Claim 1; right?

15       A.   That's my opinion.

16       Q.   Okay.  So if I understand you

17  correctly, you're of the view that all this

18  additional verbiage that we see in Claim 9

19  should be read into Claim 1?

20       A.   In fact, I believe that that's the

21  case if you look at the prosecution history.

22       Q.   We're going to get to that.

23            Now, let's place on the screen the

24  demonstrative exhibit that I've created, and

1    I'll hand it out for those who want to follow

2    along in hard copy.

3              MR. SHULMAN:  May I approach, Your

4    Honor?

5              THE COURT:  Yes.

6              MR. SHULMAN:  It is AUO 1591, which I

7    will move the admission of.

8              THE COURT:  All right.  It will be

9    admitted.

10   BY MR. SHULMAN:

11        Q.   And this exhibit, if you look at

12   it, it's also on the screen, which ever one you

13   want to look at, combines the language from

14   Claim 1 and Claim 9 into a single hypothetical

15   claim.  Do you see that?

16        A.   I do.

17        Q.   And in this exhibit, the language

18   just so everyone follows the -- the -- strike

19   that.

20             The key down there explains how

21   this language is marked, namely that the

22   language from Claim 1 doesn't have any

23   underscoring, and the language from Claim 9 has

24   all of the underscoring.

1           Do you understand that?

2           A.   Yes, it's clear.

3           Q.   Okay.  Now, do you understand,

4    sir, that under the patent law, the patent

5    applicant for this patent could have written a

6    claim like we see on the scene?

7                That's perfectly permissible;

8    correct?

9           A.   Well, I don't know.  I need to

10   read the whole thing first and see if that even

11   makes sense the way it's written.

12          Q.   Well, it's a dependent claim

13   because it must be because you're adding these

14   two limitations to Claim 9 from Claim 1.  We're

15   rolling them into one claim; right?

16          A.   Okay.

17          Q.   So do you understand that under

18   the patent law, if the applicant wanted to, he

19   could have drafted a claim like we see on the

20   screen?

21          A.   Okay.

22          Q.   During the prosecution of the '157

23   application, the examiner did not require the

24   applicant to combine the elements of Claims 1

1    and 9 into a single claim; correct?

2         A.   That examiner basically said that

3    without having the does not contact language in

4    Claim 1, that Claim 1 was shown in prior art.

5    And that the does not contact language was

6    provided -- would meet the requirement to having

7    a gap allowable for thermal expansion and

8    contraction.   So it's my opinion that the patent

9    examiner read Claim 1 the same way that I'm

10   interpreting it to mean, that its does not

11   contact included a gap for thermal expansion and

12   contraction.

13        Q.   Do you remember what the question

14   was?

15        A.   That this claim could be -- this

16   is the interpretation -- this claim could have

17   been -- part of the -- the Claim 1 could have

18   been modified to read this way.

19        Q.   That is not even close.   I'll

20   reread the question.

21             Is it true that the examiner did

22   not require the applicant to combine the

23   elements of Claims 1 and 9 into a single claim,

24   yes or no?

1          A.    He did not make that requirement.

2          Q.    Instead the examiner determined

3    that Claim 1, without any of the underscored

4    language that we see on this screen was

5    patentable; right?

6          A.    That's correct.

7          Q.    And he, likewise, concluded that

8    the underscored limitations that we see on the

9    screen were properly added by way of dependent

10   Claim 9, which he also determined was separately

11   patentable; correct?

12         A.    I believe in his hand waving sort

13   of way where he basically said because they're

14   dependent, I'll allow them all.

15         Q.    Did you see him waving his hand?

16         A.    He didn't provide an analysis at

17   all of why they were allowable to the dependent

18   claims.

19         Q.    He determined that they were

20   patentable; right?

21         A.    That's correct.

22         Q.    Okay.  Now, let's focus on this

23   underscored language from Claim 9 that you

24   believe should be part of Claim 1.

1          On your direct examination, you

2    expressed the opinion that LG's accused products

3    don't infringe Claim 1, because they don't meet

4    this thermal expansion stuff that appears in

5    Claim 9; right?

6          A.   No, that's not exactly correct.  I

7    said that they don't meet the does not contact

8    because they do contact.

9          Q.   But because they contact you say

10   during thermal expansion; right?

11         A.   That's one case of thermal

12   expansion.

13         Q.   Okay.  So let's call that opinion

14   number 1?

15         A.   And, in fact, I stated because the

16   gap is nothing more than a clearance fit.

17         Q.   Well, but a clearance fit means it

18   clears; right?

19         A.   Means it will go together.

20         Q.   It clears, that's what clearance

21   fit means.  If it didn't clear, it couldn't fit;

22   right?

23         A.   Okay.

24         Q.   What you said on your direct

1   examination was there was no infringement

2   because supposedly the gap that exists in the

3   accused products wasn't big enough to

4   accommodate thermal expansion, which is what

5   Claim 9 is all about; right?

6           A.   Well, I didn't say that.

7           Q.   Forget the Claim 9 part.

8           A.   Okay.   I said that the films will

9   contact.

10          Q.   During this thermal expansion?

11          A.   During thermal expansion and

12   contraction, that's correct.

13          Q.   Let's me ask you a hypothetical.

14   Assume for a moment the Court rejects your

15   interpretation of Claim 1 and concludes that the

16   thermal contact limitations of Claim 9 simply

17   are not part of Claim 1.   Let's assume that's

18   the case.   We won't find out until he rules, but

19   let's just assume that's the case.   Okay?   If

20   that's true, then you would agree that the Court

21   would have to reject your opinion that LG does

22   not infringe because its products contact during

23   thermal expansion; right?

24          A.   No, I don't agree with that.

1       Q.   All right.  Let's move on.

2            Just a couple of more questions

3    about this language from Claim 9, the

4    underscored language that's on the screen.  You

5    see that the two gaps referred to there are

6    quote, an allowance for film expansion and

7    contraction due to temperature variation?

8       A.   Yes, I do.

9       Q.   Is it correct that Claim 9 itself

10   does not say how much temperature variation must

11   be allowed for by the gap, Claim 9 itself, the

12   underscored language?

13       A.   I'm not sure what you're asking.

14       Q.   I'll repeat it.  Is it correct

15   that Claim 9 does not say how much temperature

16   variation must be allowed for by the gap?

17       A.   Well, it has to be enough that it

18   does not contact, because Claim 9 depends from

19   Claim 1.

20       Q.   Well, if there is a one degree

21   temperature variation, it won't contact; right?

22       A.   It depends on the gap size, I

23   suppose.

24       Q.   Okay.  Well I'm saying does Claim

1    1 -- does Claim 9, rather, say anything about

2    what temperature variation must be allowed so as

3    to preserve the existence of the gap?

4         A.   Yes.

5         Q.   Can you point out the temperature?

6         A.   The temperature is due to

7    temperature variation, that's all temperature

8    variations.

9         Q.   Does it quantify the temperature

10   variation, does Claim 9 do that?

11        A.   Claim 9 says that due to

12   temperature variations, it's pointing to a

13   liquid crystal display, a backlight unit and a

14   liquid crystal display or the temperatures that

15   would be seen by a liquid crystal display.

16        Q.   Does it quantify the temperature

17   variation, yes or no?

18        A.   Does it give me an actual number

19   for the temperatures?  No.

20        Q.   Is it true that specification of

21   the '157 patent no where quantifies how much

22   temperature variation must be allowed for by the

23   gap?

24        A.   It sounds like a good reason to

1    invalidate it.

2              Q.   How about an answer to my

3    question?  Are there any temperature numbers in

4    the patent?

5              A.   They point out that when panels go

6    over or cycle over temperature, that problems

7    exist and they're trying to solve them.

8              Q.   Are there any temperature numbers

9    in the patent?

10             A.   No.

11             Q.   Okay.  And there are none in the

12   file history, either; right?

13             A.   Not specific numbers, no.

14             Q.   Okay.  Now, let's go back to the

15   actual language of Claim 1 which is on the

16   screen.  And this is a product claim that

17   defines structure; correct?  It's got a frame,

18   it's got these pegs, it's got these holes;

19   right?

20             A.   Yes.

21             Q.   And you understand that a process

22   step cannot be read into a structural claim;

23   correct?

24             A.   Not -- yeah, I'm not totally clear

1    on that.

2              Q.   Let's look at your deposition,

3    page 17, lines 5 to 10.

4              "QUESTION:  And you understand

5    that a process step cannot be read into a

6    structural claim?

7              "ANSWER:  Well, yes, I understand

8    that to be the case."

9              You were testifying truthfully;

10   right?

11             A.   Yes.

12             Q.   Okay.  Now, it's your opinion that

13   the claims of the '157 patent require that the

14   backlight must be in a product that rotates, for

15   instance, by 90 degrees between landscape and

16   portrait; correct?

17             A.   Between two positions.  Landscape

18   and portrait are the most common positions.

19             Q.   And in your expert report on

20   infringement, you stated that with respect to

21   some unspecified subset of its accused products,

22   LG does not warrant them if they are rotated 90

23   degrees from the landscape position to the

24   portrait position; correct?

1          A.   That's correct.

2          Q.   And in your view, these

3    unwarranted products cannot be rotated; right?

4          A.   They're not designed to be rotated

5    is what I was saying.

6          Q.   Okay.  But so they can be rotated?

7          A.   That their useful positions are in

8    the landscape mode.

9          Q.   Can they be rotated, yes or no?

10         A.   It depends on what the user wants

11   to do at the very end.  LG Display has no

12   control over that.  They're not designed for

13   that.

14         Q.   Can they be rotated, yes or no, or

15   you don't know?

16         A.   They could be rotated.

17         Q.   Would they work if they rotate?

18         A.   They may or may not.

19         Q.   But because you concluded that

20   these nonwarranted accused products don't rotate

21   and, therefore, they don't infringe; right?

22         A.   They would not include the

23   limitation for when the frame is disposed in a

24   second position.

1          Q.   Right.  But in your expert report

2     you said because they don't rotate they don't

3     infringe because the claim requires rotation;

4     right?

5          A.   That's correct.

6          Q.   Okay.  Now, if you would look at

7     Claim 1 on the screen and show the Court where

8     the word rotate appears?

9          A.   Actually it doesn't say rotate, it

10    says when it's disposed in a second position,

11    which means changed from the first position to

12    the second position.

13         Q.   It doesn't say change the

14    position, it says if you're disposed in position

15    one, then these structures apply.  If you're in

16    position two, these structures apply.  It

17    doesn't tell you you got to move from position

18    one to position two, does it?

19         A.   It has to be two positions that a

20    single product needs to be in in order for that

21    claim element to apply.

22         Q.   Now, let me hand you AUO Exhibit

23    80.  And I represent to you, sir, that AUO

24    Exhibit 80 was Deposition Exhibit 12 at

```
1         Mr. Moon's deposition.  Okay?

2                   A.   Okay.

3                   Q.   And you read Mr. Moon's

4    deposition; right?

5                   A.   Yes, I did.

6

7

8

9

10                  Q.   And on the fourth page?

11                  MR. GOODWYN:  Objection, Your

12   Honor.  I'm not sure that that representation of

13   this being an accused product is actually

14   correct based on the products that were

15   identified.

16                  MR. SHULMAN:  I'm pretty certain

17   it was.  If it is an error on his exhibit, we'll

18   correct it.  I'm 99 percent sure.  Someone at my

19   table will correct me if I'm wrong.

20                  Okay.  I apologize.  He's right,

21   and I'm wrong.

22   BY MR. SHULMAN:

23                  Q.   Forget about it being an accused

24   product, but it's certainly a product of LG;
```

1    right?

2            A.   Yeah.   I had not looked at a

3    47-inch panel.   Most of the product specs that I

4    looked at were 32 and 42, but yes, this is an LG

5    panel.

6            Q.   Let's look at page four.   And do

7    you see down at the bottom of page four, there

8    is a box called General Features.   It's on the

9    screen if it makes it easier for you.

10           A.   Okay.

11           Q.   And it lists some general features

12   of the product; right?

13           A.   Yes.

14           Q.   And one of the general features

15   that's listed is that the product can be used in

16   both the landscape and the portrait positions,

17   that's the last feature; right?

18           A.   Yes.

19           Q.   That's one of these so-called

20   unwarrant -- or products that can be rotated;

21   correct?

22           A.   Yes.

23           Q.   Okay.   Now, let me ask you to look

24   at Exhibit C-14 to your noninfringement report,

1    which has been marked as LGD Exhibit 1063.  Now

2    this one I know is accused of infringement.  Do

3    you recognize this document?

4            A.   Yes, I do.

5            Q.   And this is Exhibit C-14 that was

6    attached to your infringement report; right?

7            A.   Okay.  Yes.

8

9

10

11

12           Q.   Okay.  Now, in the first page of

13   this Exhibit C-14, which is on the screen, up at

14   the top it says that this display, "Is not

15   designed for public display, or for the public

16   display."

17               Do you see that?

18           A.   This product must be used for a TV

19   application.  This is not designed for a public

20   display.

21           Q.   Is it fair to conclude from that

22   notation that the model described in this

23   exhibit, C-14 to your report, is one of the

24   so-called unwarranted displays that allegedly

1    can't be rotated?

2              A.   Yes.

3              Q.   Okay.  Now, in your expert report

4    submitted on the issue of infringement, you

5    didn't mention having performed any tests on the

6    accused LG products, the ones that are accused

7    of infringing the '157; correct?

8              A.   Could you repeat that, please?

9              Q.   Yes.  I don't mean your expansion

10   analysis.

11             A.   You mean thermal cycle test.

12             Q.   I'm not talking about that.  That

13   was done on paper; right?

14             A.   Ask your question again.

15             Q.   In your expert report submitted on

16   the issue of infringement on the '157 patent,

17   you did not mention, I don't believe having

18   performed any tests on the accused LG products;

19   correct?

20             A.   No, I did not.

21             Q.   So is it correct, sir, that before

22   submitting your reports on the issue of

23   infringement on the '157, you did not test any

24   of the so-called unwarranted LG products to

1    determine whether, in fact, they are incapable

2    of being rotated?

3              A.   Capability of being rotated, no, I

4    did not test for that.

5

6

7

8

9

10

11

12              A.   I'll accept your representation.

13              Q.   I mean, you can inspect it, but

14   we'll have to do that after --

15              A.   I might go up, yes.

16              Q.   We'll do the demonstration, and if

17   you want to inspect it, we'll take it apart

18   because the model number is inside.

19              MR. GOODWYN:   Mr. Shulman, will

20   you also identify the suffix number associated

21   with that product?

22              MR. SHULMAN:   We'll open it up and

23   find out.

24   BY MR. SHULMAN:

1       Q.   So let's display an image when the

2  display is in the landscape position.  Okay.

3            MR. SHULMAN:  Bill, could we have

4  an image.

5       Q.   And this is an image that you

6  sometimes see in airports; right?

7       A.   Yes.

8       Q.   And it has one, two, three, four,

9  something like twelve flights listed there;

10 right?

11      A.   Okay.

12      Q.   This is in the landscape position;

13 right?

14      A.   Right.

15      Q.   Now, let's rotate this display 90

16 degrees clockwise and see if it displays an

17 image.  It does display an image, doesn't it?

18      A.   Yes, it does.

19      Q.   And in the portrait position there

20 is enough room to list thirty-one flights;

21 right?

22      A.   Okay.

23      Q.   I did the counting, I don't expect

24 you to.  But a lot more flights; right?

1          A.   Yes.

2          Q.   And that's why when you go to

3     airports you usually see them listed in the

4     portrait position as opposed to landscape

5     position because it's a more efficient use of

6     the space; right?

7          A.   That's correct.

8          Q.   Now, you read and relied on the

9     deposition testimony of Mr. Moon in connection

10    with preparing your infringement report?

11               MR. SHULMAN:   You can turn that

12    off, now.

13         Q.   And Mr. Moon was designated to

14    testify on behalf of LG concerning LG's

15    backlight units that are accused of infringing

16    the '157; correct?

17         A.   Mr. Moon, you said?

18         Q.   Yes.

19         A.   Yes.

20         Q.   And is it correct that Mr. Moon

21    testified that there are no designs of LG's

22    backlight units that change between the product

23    that is only landscape enabled versus one that

24    is portrait and landscape enabled?

1          A.   I believe that to be his

2     testimony, yes.

3          Q.   Okay.  Now, let's switch topics

4     and talk about validity.  The first reference

5     you relied upon in your expert validity report

6     and today is Shimizu.  Is that how you pronounce

7     it?  Close enough?

8          A.   Yes.

9          Q.   S-H-I-M-I-Z-U.

10          And you stated that you understand

11     that Shimizu was published before the US filing

12     date for the '157 patent and, therefore, it's

13     prior art to the '157 patent; correct?

14          A.   Yes.

15          Q.   Okay.  And that is the only

16     grounds you have for asserting that Shimizu is

17     prior art to the '157; correct?

18          A.   That's correct.

19          Q.   Okay.  Now, let's look at the

20     cover page of the Shimizu patent on the screen.

21     And the publication date for the Shimizu patent

22     is March 11th, 2004; correct?

23          A.   I see that.

24          Q.   Okay.  And you understand that if

1    the invention of the '157 patent, AUO's '157

2    patent was invented before March 11th, 2004,

3    then Shimizu would not qualify as prior art;

4    correct?

5            A.   Yes, that's true.

6            Q.   Okay.  And let's just return to

7    the '506 patent for a moment.

8                 The product that you call the HP

9    2215 that you claim was sold in November of

10   2003, do you recall that one?

11           A.   Which one are you referring to?

12           Q.   You pulled out a receipt today

13   from Best Buy or someplace and said a 2215 was

14   sold in, I think it was the day Kennedy was shot

15   in 2003; right?

16           A.   Okay.

17           Q.   And that's after August 19th,

18   2003; right?

19           A.   Yes.

20           Q.   Now, do you understand, sir, that

21   if the invention of the '506 patent was invented

22   before November 2003, then the particular 2315

23   that you say was sold in November of '03 would

24   not qualify as prior art?

1    A.   Which are you talking about now?

I have lost your train of questions here.

2    Q.   Yeah, I said, you understand that

if the invention of the '506 patent, that's the

last one we spoke of?

6    A.   '506 right.

7    Q.   Was invented before November of

2003, then the particular 2215 that you say was

sold in November of '03 would not qualify as

prior art?

11   A.   That sales receipt would not allow

it to qualify.  But if it was offered for sale

earlier in order to be sold, then okay.

14   Q.   Okay.  But the particular one that

was actually sold in November wouldn't qualify

as prior art?

17   A.   I understand, yes.

18   Q.   Okay.  And is it correct, sir,

that in your expert report submitted in this

case you did not offer any opinions about

whether the inventors of the '157 patent made

their invention before March 11th, 2004?

23   A.   No, I didn't make any opinions.

24   Q.   Okay.  And similarly, you haven't

```
1    rendered any opinions on when the inventors of

2    the '506 patent made their invention; right?

3              A.   No.

4              Q.   Now, let's talk about the second

5    reference that you relied upon today, namely

6    Fukayama.  Have I got that more or less right?

7              A.   Yes.

8              Q.   Okay.  And the cover page of

9    Fukayama is on the screen.  Do you see that?

10             A.   I do.

11             Q.   And Fukayama is U.S. Patent Number

12   6, 835, 961; correct?

13             A.   That's correct.

14             Q.   Now, let's look at the cover page

15   of the '157 patent on the screen.  And I want to

16   focus on the list of references cited during

17   prosecution of the '157.  Do you see that list.

18                  Do you see the list?

19             A.   I see the list.

20             Q.   Okay.  And there were eight

21   references cited during prosecution; right?

22             A.   This is from the '157 patent?

23             Q.   Correct.  One, two, three, four,

24   six, six -- eight references were cited; right?
```

1           A.   Yes.

2           Q.   And the same Fukayama reference

3     that you rely upon for your invalidity opinion

4     was cited by the examiner during prosecution of

5     the '157; correct?

6           A.   That's correct.

7                MR. SHULMAN:   Incidentally, Your

8     Honor, I didn't do so.  It just occurred to me.

9                Can I move Exhibit C-14 into

10    evidence?

11               THE COURT:  It's admitted.

12  BY MR. SHULMAN:

13          Q.   And although the examiner cited

14    Fukayama, he never relied upon Fukayama to

15    reject any of the claims; correct?

16          A.   That's correct.

17          Q.   The examiner allowed all of the

18    claims in the '157 patent to issue over the

19    Fukayama reference; right?

20          A.   That's correct.

21          Q.   And do you recall, sir, that in

22    his notice of allowability, the examiner

23    specifically stated that the prior art of

24    record, which included Fukayama, "does not show

1    or suggest the applicant's invention as

2    claimed"?

3              Do you recall that?"

4         A.   Yes.

5         Q.   And you understand that that's

6    another way of saying that the claims of the

7    '157 patent are neither anticipated nor rendered

8    obvious by Fukayama; right?

9         A.   That's correct.

10         Q.   But you say that with respect to

11    Fukayama, the examiner got it wrong; right?

12         A.   Essentially, yes.

13         Q.   Okay.  And can you tell the Court

14    what training you've had in law?

15         A.   I have had no training in law.

16         Q.   Any training in patent law?

17         A.   Other than self study; no.

18         Q.   Okay.  Ever attended a seminar on

19    patents?

20         A.   Read a few books.

21         Q.   Now, earlier you told us that, in

22    your opinion, the claims of the '157 patent

23    require that the back light must be in a product

24    that rotates, for instance, by 90 degrees;

1        right?

2                    A.    Yes.

3                    Q.    Okay.  And your opinion is that

4        Fukayama does not disclose rotation of the

5        display; correct?

6                    A.    No, he doesn't.

7                    Q.    Okay.  So when you told the Court

8        on your direct that rotation of the display in

9        Fukayama was inherent, that was just wrong;

10       right?

11                   A.    No different than what's being

12       claimed about products that LG has stated are

13       not designed for use in a landscape mode.

14                   Q.    Your opinion is that Fukayama

15       doesn't disclose rotation; right?

16                   A.    Fukayama -- my opinion was that

17       Fukayama discloses a structure for a notebook

18       display, notebook computer display.  And that

19       there's no limitation keeping that structure

20       from being rotated similarly as you demonstrated

21       here.

22                   Q.    Is it your opinion that Fukayama

23       does not disclose rotation?

24                   A.    It's my opinion that Fukayama does

1       not disclose rotation.

2              Q.   Okay.  So when you told the Court

3       that Fukayama does disclose rotation inherently,

4       that's inconsistent, wouldn't you agree?

5              A.   I said explicitly, though.

6              Q.   No, you said inherently.

7              A.   Well, no.  I said Fukayama does

8       not explicitly disclose, though I -- I went on

9       to clarify that it is possible to use the device

10      that's -- that's taught by Fukayama in a product

11      that does rotate.

12             Q.   Okay.

13             A.   Such as a tablet PC.  And it's

14      quite common to use the same display device in a

15      notebook computer or a tablet PC computer.

16             MR. SHULMAN:  Your Honor, may I

17      have two minutes?

18             THE COURT:  Yes.

19      BY MR. SHULMAN:

20             Q.   Could I have the elmo, please?

21      I've placed on the screen Slide Number 8 on the

22      slide deck dealing with the '506 patent that

23      you've testified about on direct.  Do you

24      recognize that one?

1       A.   I do.

2          Q.   And on direct you went into -- you

3   offered some opinions about the meaning and

4   significance of these two L and reverse L marks

5   that appear there.  Do you see that?

6          A.   Yes, I do.

7          Q.   Is it correct that in your expert

8   report, either one of them dealing with the '506

9   patent submitted in this case, you never uttered

10  a peep about these L and reverse L marks?

11         A.   They were there in photos.

12  There's --

13         Q.   I didn't ask whether we could see

14  them.  I said did you utter a peep about them?

15         A.   No peeps in my report, but I did

16  not opine.

17         Q.   You didn't say word one about

18  those marks; right?

19         A.   No.

20         Q.   What you said today was the first

21  time the world ever heard anything that you had

22  to say about those marks, apart from what you

23  may have told the lawyers while preparing to

24  testify; right?

1          A.   I don't recall if I was questioned

2     about those in deposition at all.

3          Q.   Okay.  We're almost done, sir.

4          Do you recognize this slide as

5     Number 19 as one of the ones you testified about

6     on your direct examination?

7          A.   I do.

8          Q.   Okay.  And this -- the testimony

9     you gave here has to do with this Tokura

10    reference; correct?

11         A.   That's correct.

12         Q.   And its impact on your conclusion

13    about infringement; correct?

14         A.   The accusation of certain products

15    for overlapping alignment specifically.

16         Q.   Which is an independent issue?

17         A.   Yes.

18         Q.   Okay.  And is it correct that in

19    your expert reports submitted in this case, you

20    didn't utter a peep about Tokura?

21         A.   I don't know if that's true.  I

22    think in the background section, I talked about

23    Tokura, but not in the analysis.

24         Q.   Well, if I have it wrong, I'm sure

1    someone will point that out to me.

2                 MR. SHULMAN:  One moment, Your

3    Honor.

4                 Your Honor, I have no further

5    questions.  Just because I've been on my feet

6    for a little while, do you mind if we take a

7    short break?

8                 THE COURT:  No, no problem.  We'll

9    take a 15-minute recess.

10                THE CLERK:  All rise.

11                (Whereupon a brief recess was

12   taken.)

13                THE COURT:  All right.  Be seated,

14   please.

15                MR. SHULMAN:  Your Honor, there is

16   one housekeeping matter.  I placed an AUO

17   exhibit sticker number 1598 on the monitor that

18   we used for the demonstration.

19                THE COURT:  All right.  Thank you.

20                MR. SHULMAN:  And I offer that

21   into evidence.

22                THE COURT:  It's admitted.

23                    REDIRECT EXAMINATION

24   BY MR. GOODWYN:

1        Q.   Hello, Mr. Smith-Gillespie.

2    During your cross-examination, Mr. Shulman read

3    to you part of your deposition transcript.  Do

4    you recall several of those --

5        A.   Yes, I do.

6        Q.   -- instances?

7             And I'll have to move the page,

8    but we'll start with where Mr. Shulman asked you

9    a question.  And I believe it was a sequence of

10   questions that you had indicated you were trying

11   to respond to and that was just part of it.

12   What I would like to do is continue in the

13   sequence of questions of what we have

14   highlighted.

15       A.   Okay.

16       Q.   And what Mr. Shulman asked you

17   was:

18            "QUESTION:  And that understanding

19   is based on -- let me state this more clearly:

20   That understanding that the iPAQ h2210 was on

21   sale in the United States before August 19th,

22   2003 is based on the spreadsheet, Exhibit D-5 to

23   your expert report?

24            "ANSWER:  Okay.

1           "QUESTION:  Is that correct?

2           "ANSWER:  It was actually

3    represented to me that that was the case.

4           "QUESTION:  Okay.  So LG's counsel

5    represented it to you?

6           "ANSWER:  Yes."

7           Now, the line of questioning

8    continued directly from that, so the continuous

9    sequence of questions --

10          MR. SHULMAN:  Actually I read all

11   the way through 31, line eight.

12          MR. GOODWYN:  Okay.  I apologize.

13   Thank you.  I'll keep going.

14          "QUESTION:  So you're sort of

15   taking it.  So I take it you don't have personal

16   knowledge that this was the case?

17          "ANSWER:  I did -- I did not study

18   the sales literature or sales records.

19          "QUESTION:  The exhibit that's in

20   your report.

21          "ANSWER:  That's -- well, I looked

22   at it, but by that time, it was -- it had

23   already been represented to me that this was --

24   they didn't need an opinion whether or not the

1    data was correct."

2              Now we'll continue with the

3    additional questions and answers that you

4    provided.  Beginning on page 31, line nine.

5              "QUESTION:  Right.  And what I'm

6    asking is you don't personally know that this

7    device, the iPAQ h2210, was on sale before

8    August 19th, 2003; you're simply relying on

9    representation?

10             "ANSWER:  There was data provided

11   to me and it was represented as such, so, and

12   now I know it, but...

13   "BY MS. HOLLOWAY:

14             "QUESTION:  But your knowledge is

15   based solely on the representation of counsel?

16             "ANSWER:  And the -- and the

17   information that's in my report.  I said at

18   first.  You said, first, when you did you do

19   that?  And this is not first.

20             "Okay.  First it was represented

21   to me that it was on sale, okay, and then later

22   on, when we were putting together exhibits, I

23   reviewed all the exhibits that went into the

24   report."

1          Is that the line of testimony that

2     you were trying to refer to?

3          A.   That's correct.

4          Q.   Now, at another instance,

5     Mr. Shulman did not allow you to clarify your

6     testimony regarding whether there could have

7     been a design change in the iPAQ product that

8     was sold.  Would you like to complete your

9     answer now?

10         A.   I was trying to explain that it's

11    my understanding from, you know, work in the

12    industry that the certification requirements for

13    these type of devices were such that you -- if

14    you make any significant change to the product

15    design, you have to undergo recertification, and

16    the certification, FCC certification labels that

17    were on the products that I examined all had

18    that, I think it was something like

19    NM8GREATWALLA number which refers back to a

20    single FCC report, so based on my experience,

21    it's my opinion that no design changes would

22    have been possible after that certification

23    issued without recertifying.

24         Q.   Well, you also testified about

1      some photographs that you initially discussed in

2      your report.  Have you now compared those

3      photographs that were given to you with the

4      photos that you took yourself?

5                      MR. SHULMAN: Your Honor, I would

6      object.  I mean, it's been established that

7      these things were never produced to us.

8                      THE COURT:   Objection is noted.

9                      THE WITNESS:  The answer is yes, I

10     have.

11  BY MR. GOODWYN:

12             Q.   Okay.  Did you determine whether

13     or not they were the same?

14             A.   They're the same.

15             Q.   Now, the physical product you

16     inspected had an FA number; is that right?

17             A.   Yes, it was.

18                  MR. SHULMAN: Can we clarify which

19     physical product?

20                      THE COURT:   Sure.

21  BY MR. GOODWYN:

22             Q.   When you reviewed a physical

23     product in HP iPAQ 2210, did that have an FA

24     number on it?

1        MR. SHULMAN: Again, which physical

2   product?  The one that's in the photos or the

3   ones that weren't produced to us?

4        THE WITNESS:  All the HP iPAQs that

5   I looked at had -- in the 2200 series had an FA

6   number on them, the 2210s, as I recall, and the

7   2215s all had the FA103A designation.

8   BY MR. GOODWYN:

9        Q.   All of the products which you

10   reviewed?

11        A.   All.

12        Q.   And that number, the FA number you

13   just cited, is that included in the sales

14   documents that you reviewed?

15        A.   Yes, it is.

16        Q.   Now, the HP 2215 product that you

17   were questioned about, is that product or that

18   model of that -- of that product referenced in

19   an attachment to your expert report?

20        A.   I'm sorry.  Would you ask the

21   question again, please?

22        Q.   Sure.  During your

23   cross-examination, Mr. Shulman asked you some

24   questions about an HP iPAQ 2215; do you recall

1    that?

2              A.   Right.

3              Q.   Do you know whether or not there

4    was an exhibit to your expert report that

5    referenced the HP iPAQ 2215?

6              A.   There was a review, and I can't

7    remember -- remember which magazine did the

8    review, but pointed out that the HP iPAQ 2200

9    series, and then it stated something like 2210

10   and 2215 and pointed out that they were actually

11   the same -- same design, different sales

12   channels.

13              So that was included in my expert

14   report.

15              Q.   Okay.  Now, Mr. Shulman also asked

16   you about the allowance of the '157 patent and

17   referred to the difference between Claim 1 and

18   Claim 9, but he didn't show you the prosecution

19   history; is that correct?

20              A.   That's correct.

21              Q.   Now, this is from the allowable

22   subject matter with respect to the '157 patent

23   and -- and it allows Claims 1 through 23.  And

24   then there's a statement that says Claims 1

1    through 15 are necessarily allowed because of

2    their dependency on the allowed base Claim 1.

3              Is that what you were referring to

4    in your cross-examination when you said that it

5    was allowed, because the independent claim was

6    allowed?

7         A.   It didn't look to be analyzed.  It

8    was just basically allowed upon the allowance of

9    the independent claim.

10        Q.   Okay.  Now, there was also a

11   question with respect to temperature variation.

12   How would an engineer designing an optical film

13   for a liquid crystal display backlight interpret

14   temperature variation?

15        A.   Temperature variation would be the

16   temperature -- the panel temperature, if you're

17   designing the optical film that the product

18   would see over the useful range of operation,

19   and that value would come from product

20   specification typically and maybe even a

21   customer specification.

22        Q.   And you were also given a

23   demonstration of a product, the display.  Do you

24   know whether or not that display is actually a

1    public display or television?

2            A.   I do not.

3            Q.   Do you know how the image on that

4    display was controlled, whether it was -- when

5    it changed from portrait to landscape whether it

6    was internal to the display or whether it was

7    controlled by the computer that AUO' scounsel

8    was controlling?

9            A.   My guess is that it was not

10   controlled internally through sensors.  It was a

11   TV, which is what we were told this was to be.

12   I can't imagine a TV including orientation

13   sensors to automatically flip an image.

14           MR. SHULMAN: I will represent to

15   the Court that, indeed, it was controlled by the

16   computer that we chose what image to put up.

17           THE WITNESS:  Okay.  The other

18   thing I'd like to say is that I'm not sure what

19   would happen if that same display were rotated

20   the other 90-degree direction, how long it would

21   take before the significant film damage would

22   occur.

23           MR. GOODWYN: No more questions.

24           THE COURT:   All right.  Thank

1       you.  You may step down.

2                      MR. BONO: Your Honor, we have some

3       deposition designations that we'll be reading

4       in.

5                      MS. BRZEZYNSKI: Your Honor, at

6       this time I'd like to go ahead and move in the

7       exhibits that were identified during the counter

8       designations that were read in two days ago.

9       Okay.

10                     THE COURT:   All right.

11                     MS. BRZEZYNSKI: Thank you.  During

12      the Jacobson Deposition LGD Trial Exhibit 652.

13                     During the J.S. Kim deposition,

14      LGD Trial Exhibit 497, 622, 649 and 629.  And

15      during the ^ Perparno ^ deposition, LGD trial

16      Exhibit 598.

17                     And during the Woo deposition, LGD

18      Trial Exhibit 728 and 739.

19                     THE COURT:   They'll be admitted.

20                     MS. BRZEZYNSKI: Thank you.  And

21      this time, my colleagues Mindy Caplan and Claire

22      Maddox will read in the deposition designations.

23                     MR. SHULMAN: Can I interrupt for

24      one second?

```
 1              THE COURT:   Sure.

 2              MR. SHULMAN: This is going to take

 3    about an hour.  We're not going to get

 4    through -- I think they rest their case after

 5    this, I believe.

 6              MS. BRZEZYNSKI: That's correct.

 7              MR. SHULMAN: We're not going to

 8    get through our rebuttal case, and I would

 9    rather go back to the hotel, unless we're going

10    to sit until five o'clock.  But it just seems to

11    me we're going to be finishing up at about 4:30,

12    and we can certainly get our rebuttal case, even

13    with the truncated schedule that Your Honor told

14    us about on on Monday.

15              So if it's all right --

16              THE COURT:   I'm not sure.  You

17    want to go back to the hotel?

18              MR. SHULMAN: Yeah.

19              THE COURT:   Oh, go ahead.

20              MR. SHULMAN: But I don't want to

21    miss further proceeding.  I don't want to listen

22    to the deposition designations.

23              THE COURT:  I is misunderstood.

24    No, you're free to go.
```

1           MR. SHULMAN: Thank you, Your

2    Honor.

3           MS. BRZEZYNSKI: We also request --

4    we'd like to reserve the right to look at the

5    public display.

6           THE COURT:  Mr. Shulman, did you

7    hear what they're asking?

8           MS. BRZEZYNSKI: Inspect it.

9           MR. SHULMAN: Absolutely.  They

10   have the right to do that.

11          THE COURT:  Yes, you may.

12          MR. SHULMAN: I wish we could have.

13          MS. CAPLAN:  My name is Mindy

14   Caplan.  If Your Honor will permit me, my

15   colleague, Claire Maddox and I, we are going to

16   be reading in some designations.

17          Prior to doing so, I would like to

18   cover some of the exhibits that are contained

19   within those designations.

20          And I will start with LGD Trial

21   Exhibit 924, LGD Trial Exhibit 920, 928, 931,

22   232, 202, 986, which is ^ Chang Gone Kim.

23   Deposition Exhibits 19, 39, 50 and 52.

24          LGD Trial Exhibit 9987, which is

1   J.D. Kim Deposition Exhibits 2, 3, and 24.

2                    K.H. Moon Deposition Exhibit 12,

3   which is LGD Trial Exhibit 1063.  And that is

4   it.

5                    And at this time, I'd like to

6   submit to Your Honor what we've marked as LGD

7   Trial Exhibit 1091, which is a chart that tracks

8   the deposition, the date and the deposition

9   exhibit number and the corresponding trial

10   exhibit number.

11                    And may I have permission to

12   approach the bench.

13                    THE COURT:   Sure.  Thank you.

14   And they'll be admitted.

15                    MS. CAPLAN: In addition, Your

16   Honor, the reading we are going to do this

17   afternoon, I've prepared a one-page sheet to

18   assist the clerks in going through the

19   designations.  I thought it might speed the

20   process up.

21                    I have a copy for opposing

22   counsel.  If I may, just to represent, this is

23   just a abbreviation and notations to perhaps

24   assist them.

1          MS. CAPLAN:   I would like to begin

2     with the deposition of Ms. Boru Chen who is a

3     30(b)(6) deponent on behalf of AUO dated January

4     19, 2009.   I would be reading on behalf of the

5     person taking the deposition, and Ms. Maddox

6     will be reading on behalf of the witness itself.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15             MS. CAPLAN:  We are now reading

16   from the deposition of Paul S. Carter, 30(b)(6)

17   witness for International Business Machines

18   Corporation, taken January 16, 2009.

19             MR. TYLER:  Your Honor, we ask

20   that the deposition of Ms. Chen be sealed as

21   confidential.

22             THE COURT:  It will be sealed.

23             MS. CAPLAN:  Deposition of Paul

24   Shane Carter.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16          MS. CAPLAN:  I'm now reading from

17     the deposition of Gabriele Piperno, 30(b)(6)

18     witness for Hewlett-Packard Company, taken

19     January 8, 2009.

20          MR. TYLER:  Your Honor, we would

21     ask that the deposition testimony of Mr. Carter

22     be sealed.

23          THE COURT:  It will be sealed.

24          MS. CAPLAN:  Reading from the

1    deposition of Gabrielle Piperno taken on January

2    8, 2009.

3        Q.   Good morning, Mr. Piperno.  Again,

4    my name is Mindy Caplan.  I'm here on behalf of

5    LG Display.  Is it your understanding that you

6    are here today as the corporate designee of

7    Hewlett-Packard Company?

8        A.   Yes.

9        MS. CAPLAN:  Okay.  Just for the

10   record, counsel for HP has requested that the

11   transcript be designated as "Confidential -

12   Attorneys' Eyes Only."  And counsel has agreed

13   to stipulate that HP's document production are

14   true and correct copies of HP's business

15   records.  Is that correct, counsel?

16       MS. HAMILL:  That's correct, yes.

17       MS. CAPLAN:  Thank you.

18       This is from the deposition

19   testimony of In Duk Song, witness for LG

20   Display, taken February 18, 2009.

21       Q.   Mr. Song, can please state and

22   spell your full name for the record?

23       A.   My name is In Duk Song.  And it is

24   spelled S-O-N-G, I-N, D-U-K.

1           Q.   Mr. Song, are you currently

2     employed with LG Display?

3           A.   Yes.

4           Q.   How long have you worked with LG

5     Display?

6           A.   I have been working for

7     approximately sixteen to seventeen years at LG

8     Display Company.

9           Q.   And what is your current title at

10    LG Display?

11          A.   I'm senior engineer.

12          Q.   And with what product group are

13    you a senior engineer?

14          A.   Mobile products.

15

16

17

18

19

20

21

22

23

24



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          MS. CAPLAN:  This is from the

19    deposition of Chang Gone Kim, witness for LG

20    Display, taken December 15th, 2008.

21          Q.   Could you please state your name

22    and spell it for the record?

23          A.   My name is Chang Gone Kim, spelled

24    C-H-A-N-G, G-O-N-E, K-I-M.

1    Q.   Who is your present employer?

2    A.   It is LG Display.

3    Q.   How long have you worked for LG

4    Display?

5    A.   For 11 years.

6    Q.   What is your current job title at

7    LGD?

8    A.   I am a chief engineer.

9    Q.   What are your responsibilities?

10   A.   Developing timing -- timing

11   controller.

12   Q.   How long have you been a chief

13   engineer at LGD?

14   A.   Twenty months now.

15   Q.   During that whole twenty months,

16   you were in charge of development of the -- the

17   timing controller?

18   A.   Yes.

19   Q.   And what was your job title before

20   you became a chief engineer?

21   A.   I was a senior engineer.

22   Q.   And for approximately how long

23   were you a senior engineer?

24   A.   For five years.

1        Q.   And what were your job

2    responsibilities as a senior engineer?

3        A.   Developing time -- timing

4    controller.

5        Q.   Anything else?

6        A.   Nothing else.

7        Q.   What was your position before you

8    became a senior engineer?

9        A.   Junior engineer.

10       Q.   And for approximately how long

11   were you a junior engineer?

12       A.   For three years.

13       Q.   And what were your job

14   responsibilities as a junior engineer?

15       A.   Developing timing controller.

16       MS. CAPLAN:  This is from the

17   deposition of Chang Gone Kim, witness for LG

18   Display, taken on December 16, 2008.

19       Q.   Thank you.  What is your area of

20   expertise, please?

21       A.   In circuitry design.

22       Q.   Any and all circuitry design?

23       A.   In general; correct.

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24











1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697   FAX (302) 658-8418



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



1           MS. CAPLAN:  Reading from the

2    deposition of Kyohun Moon, witness for LG

3    Display, taken on December 16th, 2008.

4           Q.   Good morning, sir.  Would you

5    provide us your name and address, please?

6           A.   Kyohun Moon and I -- currently I

7    am living in Kyoung Book Gu.  Phonetically

8    K-Y-O-U-N-G B-O-O-K G-U in Goomi, G-O-O-M-I

9    City, and Pong Gok Dong, P-O-N-G G-O-K D-O-N-G,

10    201 Dong, 402 Ho, H-O.

11           Q.   What is your current title,

12    Mr. Moon?

13           A.   I am a lead senior -- senior

14    researcher.  Senior engineer researcher.

15           Q.   How long have you worked for LG?

16           A.   It has been about 13 years.

17           Q.   What work, what group do you work

18    in?

19           A.   I am working in an mechanical

20    design group or device design, mechanical design

21    group.

22           Q.   Have you worked in that group for

23    the entire 13 years?

24           A.   Yes.

1          MS. CAPLAN:  Reading from the

2    deposition of Kyohun Moon, witness for LG

3    Display, taken on December 17th, 2008.

4          Mr. Wallace:  Let me mark this as

5    Exhibit K. Moon 12.  It's a document Bates

6    labeled LGD 2063986 to LGD 2064018.

7          Q.  Now, can you please turn to Page 4

8    of 33, which is Bates labeled LGD 2063989,

9    please?

10         Do you see now in the general

11   features where it describes possible display

12   type?

13         A.  You're talking about the last

14   line?

15         Q.  Correct.  And beside it it says

16   landscape and portrait enabled.

17         Do you see that?

18         A.  Yes.

19         Q.  So would you understand this

20   product as capable of being used in landscape or

21   portrait orientation?

22         A.  Yes, but when you say landscape or

23   portrait orientation, it is not referring to

24   this or that types of direction, but instead it

1    has a specified directions, specified

2    orientations.

3                Check Interpreter:  But when you

4    say landscape or portrait, it is not entirely

5    this or that, but instead I understand it to

6    have particular orientations.

7                Q.   What are the particular

8    orientations that you understand it to have?

9                A.   Let's say that your orientation is

10   this way.  However, this orientation would not

11   work.

12               Let's say in this case this would

13   be possible.  However, it is recommended not to

14   use in this orientation.

15               Q.   Now, looking at the heading

16   General Description on the page labeled LGD

17   2063989, in the last sentence it says it is

18   intended to support public display.  Do you see

19   that?

20               A.   Yes.

21               Q.   What does that mean?

22               A.   It refers to the capability to

23   support displays for the public sending out

24   informations such as in airports, public

1      stations, such as train stations and so on.

2             Q.   What characteristics of an LG

3      Display, LG LCD display make it not portrait and

4      landscape enabled?

5             A.   Basically, one of the biggest

6      reasons -- I'm sorry.  One of the main reasons,

7      first of all, the main design is done for

8      landscape orientation.  We do not specifically

9      test for portrait orientation.

10            However, we would tell the buyers

11     or customers that portrait orientation is

12     possible.  However, we would not guarantee the

13     quality or the lifetime of that product if it is

14     used in that orientation.

15            Q.   Are there any design, designs of

16     the back light assembly that changes between a

17     product that is only landscape enabled versus

18     one that is portrait and landscape enabled?

19            A.   No.

20            Q.   And your answer would be the same

21     for public displays?

22            A.   Yes.

23            Q.   So you're saying any LGD LCD

24     product can be orientated in landscape or

1     portrait, but it's not guaranteed to be enabled

2     for that purpose?

3              A.   These models are likely used or

4     specifically -- specifically supported to be

5     used in a portrait orientation.  However, when

6     it comes to other models, using the monitor in a

7     portrait orientation is not a permanent,

8     permanently supported understood usage of it.

9              Instead portrait orientation would

10    be temporary usage.  So, therefore, we do not

11    indicate any type of guarantee for that type of,

12    for those models.

13             Q.   What responsibilities do you have

14    relating to optical films at LGD?

15             A.   I design the outer shape or the

16    surface shape of optical sheets.  Or physical

17    shape.  I'm sorry.  The sheet shape of the

18    optical sheet.

19             Q.   So that would include any physical

20    holes in the sheet?

21             A.   Yes.

22             Q.   And how generally is the optical

23

24



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



1300

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12           MS. CAPLAN:  Next reading from the

13     deposition of Samuel Shih-Che Fu, 30(b)(6)

14     witness for AUO, taken on January 19th, 2009.

15           Q.   Could you please state your full

16     name for the record and spell it phonetically?

17           A.   My name is Fu Shih Che.  (In

18     English) F-U S-H-I-H C-H-E.

19           Q.   Mr. Fu, you are one of the

20     inventors of the '157 patent; is that correct?

21           A.   Yes.

22           Q.   How would you describe the '157

23     invention?

24           A.   Well, I really don't know about

1  the legal definitions of the terms used here.

2  However, I would like to tell you about the

3  development process.  Would that work?

4          Ms. Lain:  May the interpreter

5  clarify the rendition.  In fact, I really don't

6  know or rather, not have a lot of understanding

7  when it comes to legal definitions, but,

8  however, I would like to introduce to you my

9  design concept, if that is okay with you.

10         A.   Let me use this as a prop to

11  explain this.  Well, in the concept design, what

12  we try to achieve is to have a good image when

13  the display panel is in on state.

14         Ms. Lain:  May the interpreter

15  clarify.  Initially our design concept is that

16  there would be good images in various positions

17  for the display panel.

18         A.   I'll give you an example.  I'll

19  say when you put the display panel vertically,

20  then you should have pins and holes to hold the

21  films in position.  When you put the display

22  panel vertically, then another set of pins and

23  holes would serve to put the films in place, so

24  that with these pins and holes you achieve the

1    goal of having -- getting the same image,

2    whether you have the heat expansion, but whether

3    it's getting cold.

4              Ms. Lain:  The Interpreter would

5    like to provide a clarification of the previous

6    rendition.  Let me give you an example.  If the

7    display is placed flat as such, there is a set

8    of hooks and holes which will be hanging and

9    supporting.

10             And when the display is placed on

11   a 90-degree angle, there would be another set of

12   pins and holes which will hang the film, no

13   matter if there is thermal expansion or if there

14   is contraction due to cold temperature, and the

15   assembly would remain the same.

16             Q.   What is your understanding of the

17   term gap?

18             A.   Well, let me explain our concept

19   design.  When we design something like this,

20   there is a gap between a hole and a pin.  The

21   gap is there because we need to have that, so

22   that whether the hole is being functional or a

23   pin is being functional, the film would have

24   contact, and also the gap would allow us to have

1    the thermal expansion or contraction.

2              Ms. Lain:  May the interpreter

3    clarify the previous rendition.  When it comes

4    to our design, my holes and pins does have gap,

5    and the gap is used to have different

6    connections of pins and holes when the film is

7    in different positions.  And, also, this allows

8    the assembly tolerances and also under thermal

9    expansion or cold temperature contraction.

10             Q.   What is an assembly tolerance?

11             A.   Well, in our design work, we have

12   to take all these tolerances into consideration.

13   For the component itself, while forming the

14   component, there may be some tolerance, and also

15   tolerance would be needed when the component is

16   working with other components.

17             Ms. Davis:  I'd like to mark

18   Plaintiff's Exhibit 1226, which is Bates numbers

19   AUO-LGD 0000083 through AUO-LGD 0000099.

20             Q.   Mr. Fu, are you listed as an

21   inventor on this patent?

22             A.   Yes.

23             Q.   As a first name inventor of the

24   '157 patent, what information in Figure 4A

1    allows you to determine that it can be rotated

2    90 degrees?

3            A.   Well, I used this drawing, Figure

4    4A, as an example, because this is very similar

5    to the line of thinking in our concept design in

6    that this is composed of various sets of pins

7    and holes.

8            Q.   You said earlier that you prepared

9    an invention disclosure document; is that

10   correct?

11           A.   Yes.

12           Q.   And did the other inventors assist

13   in the preparation of that document?

14           A.   No.

15           Q.   I'm marking what is Plaintiff's

16   Exhibit 1227.  It's Bates Nos AUO-LGD 0021090

17   through AUO-LGD 0021094.

18               Is this the document that you have

19   been -- we have been discussing?

20           A.   Yes.

21           Q.   Did you prepare this document?

22           A.   I filled out much of this form.

23   However, the upper right-hand corner was not

24   filled out by me.  That particular box was done

1   by folks from the legal department.

2          Q.   If you turn to the second page of

3   the invention disclosure, it's Page 2 of 4.  It

4   says in English Background on the Invention.  Do

5   you see that?

6          A.   Yes.

7          Q.   And in that description below

8   that, it discusses that the current art has

9   simple fixing functionalities.  What is that?

10          A.   What I meant by simple fixing

11   functionality was this:  With the current art,

12   picture quality was only a short -- was short

13   only in one position, and the multimedia

14   requirements for the product to be placed in

15   various positions and angles would not be met.

16          Ms. Lain:  Interpreter would like

17   to clarify the last rendition.  What I mean by

18   simple fixing functionality is that with this

19   here, the display is only clear in one position,

20   which cannot meet the demands of multimedia

21   requirements.

22          Q.   And what do you mean by multimedia

23   requirements?

24          A.   As I explained before, our

1    customers wanted to have the product -- have the

2    imaging capabilities in different positions, for

3    instance, at 90 degrees, at 180 degrees.

4         Q.   So your design concepts

5    specifically applies -- was developed for panels

6    that were to be rotated to different positions;

7    is that correct?

8         A.   Well, one of the issues that we

9    faced with the first model, our design -- the

10   objective of our design, concept design, was to

11   resolve the issues when the product was in

12   different positions.

13        Ms. Lain:   Interpreter would like

14   to clarify the last rendition.  Based on the

15   first model in which the issues were

16   encountered, our objective was for different

17   angles and positions.

18        Q.   Is the term "general engineering

19   tolerance" mentioned in the paragraph on Page 4

20   of 4, the top of Page 4 of 4?

21        A.   Are you asking whether general

22   tolerance is referred to in this particular

23   paragraph?

24        Q.   Yes.

1       A.   Yes, it is.

2       Q.   What is the general tolerance?

3       A.   Well, here the general tolerance

4    is really referring to the tolerance that the

5    particular component would have in the process

6    of forming.  And also when a particular

7    component is working in conjunction with other

8    component, there should be tolerance as well.

9       Q.   And in what particular component

10   are you referring to in the context of the

11   paragraph?

12       A.   For instance, tolerances of the

13   pins and tolerances of the films.

14       Ms. Lain:  May the interpreter

15   clarify the last rendition.  For instance, the

16   assembly tolerance of pin and film.

17       Q.   And what is the difference between

18   a general tolerance and a gap?

19       A.   In designing our first product, we

20   calculated the gap.  And in doing that, we took

21   into consideration of tolerances.

22       Now, the general tolerance would

23   be taken into consideration when we calculated

24   the gap and also the index -- the expansion and

1   contraction indexes would be taken into

2   consideration in calculating the gap as well.

3          Q.   And how did you calculate the gap?

4          A.   As I explained just now, you have

5   to take into consideration the general tolerance

6   as well as expansion and contraction indexes.

7          Q.   Did you use a particular formula

8   to calculate the gap?

9          A.   No, there is not a set formula.

10  However, the designers, while designing panels

11  of different sizes, would have to take these

12  factors into consideration.

13         Q.   You stated that the expansion and

14  contraction indexes were taken into

15  consideration in calculating the gap.  Were

16  these indexes important to calculating the gap?

17         A.   Yes, very important relatively.

18         Q.   If you turn to the last page of

19  the invention disclosure document, next to what

20  appears to be a pin, what does it read, on the

21  top figure?

22              The Interpreter:  The main

23  interpreter remembers that the check interpreter

24  used the term 'copper bolts' and here the

1   witness is saying that this refers to the copper

2   bolts, quote and unquote.

3           Q.   And to the left of the figures, it

4   states gap and it has a number below that.  Are

5   you aware how that number was calculated?

6           A.   Now, again, this is only a value

7   for reference to explain the drawings.  When

8   you're calculating, when you're actually

9   calculating the gap, as I said before, you would

10  have to take into consideration the tolerance as

11  well as the expansion and contraction indexes.

12          Q.   Are there any other factors that

13  would be important to calculating the gap?

14          A.   There may be.  However, these are

15  all that I can think of at this point in time.

16          Q.   How would an increase in the

17  tolerance affect the calculation of the gap?

18          A.   Now, what I explained was what

19  would go into consideration when you do the

20  concept design -- when I do my concept design.

21  Now, when you are designing different size

22  products, you really have to take all these

23  variants into consideration.  So in calculating

24  the gap, you have to take into consideration all

1      these factors.

2                  MS. CAPLAN:  Reading from the

3      deposition of Jong Dae Kim, witness for LG

4      Display, taken on December 15, 2008.

5                  Q.   Good morning, Mr. Kim?

6                  A.   I'm glad to see you.

7                  Q.   Mr. Kim, what is your current

8      title?

9                  A.   Chief engineer.

10                 Q.   And how long have you worked at LG

11     Display?

12                 A.   Since it's been -- since it's

13     been -- I'm sorry -- since -- it's been 13

14     years.  I'm sorry.  I'm sorry.

15                 Since from '95, so it's been 13

16     years.

17                 Q.   The term "FPC" is used within LG

18     to refer to flexible printed circuits; is that

19     correct?

20                 A.   Yes, it is used by some.

21                 Check Interpreter:  It is used to

22     some extent.

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24





1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1

2

3

4

5

6

7

8

9

10

11

12

13

14          MS. CAPLAN:  Your Honor, that

15     concludes the readings.

16          MR. BONO:  Your Honor, one

17     clarification.  May I ask that the testimony

18     right at the end of In Duk Song's testimony, I

19     believe I heard a misquotation of this, so I

20     would like to have it read again.  The very last

21     part where it says the interpreter, very end of

22     In Duk Song.

23          MS. CAPLAN:  Line 14.

24          MR. BONO:  Starting at line 14 if

1    you could just read that again to correct it.

2                   MS. CAPLAN:  It's at the very last

3    page.  I can just read it in.

4

5

6

7

8                   MR. BONO:  Thank you, Your Honor.

9                   MR. TYLER:  I thought we were

10   going to stipulate, also.  And, Your Honor, AUO

11   would like to offer all underlying exhibits to

12   the AUO counter-designations as well.

13                   THE COURT:  They will be admitted.

14                   All right, we'll be in recess

15   until Monday.  Have a nice weekend.

16                   MR. BONO:  Your Honor, is it one

17   o'clock on Monday?

18                   THE COURT:  1:00 or 2:00, and I'll

19   either let you know later today or first thing

20   Monday.

21                   MR. BONO:  Great.

22                   THE COURT:  When I find out.

23                   MR. BONO:  Is there a way we can

24   have access to the courtroom?

1             THE COURT:  You got to talk to the

2    boss.

3             MR. BONO:  Very good.

4             THE COURT:  You got to talk to the

5    boss.

6             MR. BONO:  Thank you, Your Honor.

7             MR. TYLER:  Thank you, Your Honor.

8             (Court recessed at 4:25 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    State of Delaware )
                      )
2    New Castle County )

3

4

5                CERTIFICATE OF REPORTER

6

7         I, Heather M. Triozzi, Registered

8    Professional Reporter, Certified Shorthand Reporter,

9    and Notary Public, do hereby certify that the

10   foregoing record, Pages 1048 to 1321 inclusive, is a

11   true and accurate transcript of my stenographic notes

12   taken on February 2, 2009, in the above-captioned

13   matter.

14

15        IN WITNESS WHEREOF, I have hereunto set my

16   hand and seal this 2nd day of February, 2009, at

17   Wilmington.

18

19

20   _____

21        Heather M. Triozzi, RPR, CSR
          Cert. No. 184-PS
22

23

24