```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE


LG DISPLAY CO., LTD,        ) Volume 5
                            )
          Plaintiff,        )
                            )
v.                          )
                            )
AU OPTRONICS CORPORATION,   )
AU OPTRONICS CORPORATION    )
AMERICA, CHI MEI            )
OPTOELECTRONICS             )
CORPORATION, and CHI MEI    )
OPTOELECTRONICS, USA,       )
INC.,                       )
                            )
          Defendants.       )
```

                    Monday, June 8, 2009
                    2:00 a.m.
                    Courtroom 4B


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
         United States District Court Judge

APPEARANCES:

         BAYARD
         BY:  RICHARD D. KIRK, ESQ.
         BY:  STEPHEN B. BRAUERMAN, ESQ.

            -and-

         McKENNA, LONG & ALDRIDGE, LLP
         BY:  GASPARE J. BONO, ESQ.
         BY:  CASS W. CHRISTENSON, ESQ.
         BY:  LORA BRZEZYNSKI, ESQ.
         BY:  TYLER GOODWYN, ESQ.

            Counsel for the Plaintiff

1    APPEARANCES CONTINUED:

2

3            YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
             BY:  KAREN L. PASCALE, ESQ.
4            BY:  JOHN SHAW, ESQ.

5                     -and-

6            WILSON, SONSINI, GOODRICH & ROSATI
             BY:  RON E. SHULMAN, ESQ. ESQ.
7            BY:  JULIE HOLLOWAY, ESQ.
             BY:  CRAIG TYLER, ESQ.
8            BY:  GREGORY WALLACE, ESQ.

9               Counsel for the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                   THE CLERK:  All rise.

 2                   THE COURT:  All right.  Be seated,

 3      please.  Good afternoon.

 4                   THE COURT:  Good afternoon.

 5                   MR. SHULMAN:  Pardon me.  Your

 6      Honor, we have three witnesses today.  The first

 7      witness is Mr. Samuel Fu, who will -- it's about

 8      a five-minute deposition read-in.  Then we'll

 9      have Dr. Silzars and then we will have a third

10      witness at the tail end today.

11                   THE COURT:  Okay.

12                   MR. BONO:  Your Honor, just a

13      couple of brief matters.

14                   THE COURT:  Sure.

15                   MR. BONO:  One is a housekeeping

16      matter.  When we corrected the deposition

17      read-in from last week on the one sentence at

18      the tail end, I incorrectly identified the

19      deponent as In Duk Song.

20                   And it should have been C.G. Kim.

21      And I'd just like to make that clear on the

22      record.

23                   THE COURT:  All right.  The record

24      will reflect that change.
```

1           MR. BONO:  Your Honor, I would

2     like to interpose an objection at this point to

3     what appears to be the planned testimony for

4     Dr. Silzars.  From the exhibits we have been

5     provided and the slide we have been provided and

6     we think he's planned to testify for a couple of

7     hours.  It makes it evident to us that they're

8     only putting Dr. Silzars on on the issue of

9     infringement and not just simply as rebuttal to

10    our invalidity case.

11          We believe this is improper.  They

12    had put Dr. Silzars on last week for two hours

13    and 50 minutes of direct, and 25 minutes of

14    redirect.  He was crossed for three and a half

15    hours on the issues of infringement.

16          They then rested their

17    infringement case.  We raised no new issues in

18    our opposition to their infringement case with

19    our expert.

20          All of those issues were raised

21    during the cross-examination of Dr. Silzars and

22    they had a complete opportunity to put in

23    redirect any issues they wanted to raise.

24          It was our understanding that this

1    part of the case was to be rebuttal to the our

2    invalidity case.  And it appears to us they now

3    are attempting to retry affirmatively their

4    infringement case.

5              We believe this is improper

6    rebuttal.  The glaring example of this is on

7    Friday, June 5, we were given 63 proposed

8    exhibits.  On the next day, on Saturday, we had

9    a proposed "rebuttal exhibit list" of 533

10   exhibits now from them.  469 out of those 400

11   '70 increased exhibits were originally on their

12   designated exhibit list for infringement for

13   purposes of Dr. Silzars' direct testimony.

14             We think it's fundamentally unfair

15   and inappropriate for AUO now to basically

16   sandbag us and basically retry in total their

17   infringement case.

18             THE COURT:  Well, why don't you

19   let -- since there's no jury here and it's

20   unlikely if what you're saying is correct that

21   I've be influenced by it, and let them use their

22   time.  You can file a motion to strike after you

23   have full presentation of the testimony if it's

24   along the lines you talk about.

```
 1            All you've got to do is file a
 2     motion to strike if you're correct.
 3            MR. BONO:  Thank you, Your Honor.
 4            THE COURT:  Ready to proceed?
 5            MR. SHULMAN:  Yes.  Mr. Dietzel
 6     and Mr. Long will read in the testimony.
 7            THE COURT:  Okay.
 8            MR. DIETZEL:  Your Honor, may we
 9     approach with the binder?
10            THE COURT:  Yes, you may.
11            MR. DIETZEL:  Your Honor, my name
12     is Brian Dietzel, counsel for AUO.  My
13     co-counsel, Xiang Long and I are going to be
14     reading in a few lines from the deposition of
15     Samuel Shih-Che Fu taken on January 19th, 2009.
16            I have given the court reporter a
17     hard copy of the transcript we're going to read
18     in and they're included in the binder we just
19     distributed.
20            I'll be reading the questions and
21     my colleague will be reading the witness's
22     responses.
23            Q.  Could you please state your full
24     name for the record and spell it phonetically?
```

1           A.    My name is Fu Shih-Che.

2           Q.    When did you start working for

3     AUO?

4           A.    In '02.

5           Q.    And what was your position at that

6     time?

7           A.    Engineer.

8           Q.    With what department?

9           A.    R & D department for new products.

10          Q.    Mr. Fu, you are one of the

11    inventors of the '157 patent; is that correct?

12          A.    Yes.

13          Q.    You said earlier that you prepared

14    an invention disclosure document; is that

15    correct?

16          A.    Yes.

17          Q.    I'm marking what is plaintiff's

18    Exhibit 1227.  It's Bates Nos. AUO-LGD0021090

19    through AUO-LGD0021094.  Is this the document

20    that you have been -- we have been discussing?

21          A.    Yes.

22          Q.    Did you prepare this document?

23          A.    I filled out much of this form.

24    However, the upper right-hand corner was not

1    filled out by me.  That particular box was done

2    by folks from the legal department.

3              Q.   Other than the box that you just

4    identified, did you fill out the remainder of

5    the invention disclosure?

6              A.   Well, I did fill out this form.

7    However, these signatures were not mine.

8                   Yes, I did fill out this form.

9    However, these signatures were done by

10   respective people.

11             Q.   And what signatures are you

12   referring to?

13             A.   At the bottom of the form, there

14   are several signatures.

15             Q.   And whose signatures are those?

16             A.   Well, there is my signature and

17   there are signatures by the second and third

18   inventors.  And also there are signatures by the

19   first witness, second witness, as well as the

20   person in charge at the department level.

21             MR. DIETZEL:  Your Honor, at this

22   time I would like to offer into evidence exhibit

23   AUO 0231 which corresponds to Fu deposition

24   Exhibit 1227 in the transcript we just read as

```
1       well as AUO Exhibit 0833 which is an English

2       translation of that exhibit.

3                       THE COURT:  It will be admitted.

4                       MR. DIETZEL:  Thank you, Your

5       Honor.

6                       MS. HOLLOWAY:  Good afternoon,

7       Your Honor.  AUO calls its next witness,

8       Dr. Aris Silzars.

9

10                      ARIS SILZARS, PH.D.,

11              the witness herein, having previously

12              been duly sworn on oath, was

13              examined and testified as follows:

14                      DIRECT EXAMINATION

15      BY MS. HOLLOWAY:

16              Q.   Good afternoon, Dr. Silzars.

17              A.   Good afternoon.

18              Q.   Were you in the courtroom last

19      week when Mr. Eccles was testifying?

20              A.   Yes, I was.

21              Q.   Mr. Eccles had a number of

22      critiques about your light measurement results

23      and calculations.  Do you recall that?

24              A.   I do.
```

1    Q.   Were those critiques in his expert

2    report on noninfringement?

3    A.   I did not find them in his expert

4    report.

5    Q.   Did he describe them at his

6    deposition?

7    A.   He did not.

8    Q.   Now, Mr. Eccles testified that he

9    could not have provided those critiques based on

10   what was in your infringement expert report.  Do

11   you recall that testimony?

12   A.   I recall that testimony, yes.

13   Q.   Is it true that Mr. Eccles could

14   not have provided those critiques based on the

15   information in your expert report?

16   A.   I do not agree with that based on

17   the fact that I provided the raw data as well as

18   the analysis.

19   Q.   What is the significance of you

20   providing the raw data in your expert report?

21   A.   In addition to providing the

22   analysis, which showed the various percentages

23   and the various improvements that are obtained

24   by using the overdrive method that LG uses, I

1    provided the data that was taken directly from

2    the oscilloscope.  In other words, the waveforms

3    were recorded, I provided a full description of

4    the tests methodology that I used, and the

5    intent for that was to allow LG's expert to do a

6    correlation, to do an independent analysis of

7    data as it is obtained during the experiment

8    itself.

9           Q.   Thank you.

10               Let's talk a minute about what was

11   in your expert report.  Could we have AUO

12   Exhibit 1085 up on the screen.  And this is

13   quite a long document, so we'll just go through

14   a few pages.

15               Do you recall AUO 1085,

16   Dr. Silzars?

17           A.   Yes, I do.

18           Q.   About how many tests are in

19   exhibit AUO 1085?

20           A.   We performed well over 100

21   independent tests, and that consists of well

22   over 200 separate waveform photographs taken

23   from the digital oscilloscope.

24           Q.   Was everything in AUO 1085

1      provided in your expert report on infringement?

2              A.   Yes, it was.

3              Q.   Okay.  Now, this first page is a

4      table and we've looked at similar information to

5      this table in summary form; is that right?

6              A.   Yes.  This is one of, I believe,

7      13 such measurement tables.

8              Q.   Let's turn to the next page of the

9      document.  And can you tell us what we're

10     looking at here, please?

11             A.   What we're looking at here is the

12     actual waveform that -- the rectangles are

13     annotated.  Those have been added.

14                  And the horizontal lines on the

15     two left most photographs have been added.  But

16     what we're looking at here is four examples of

17     digital capture of waveforms taken from the

18     oscilloscope and produced exactly as they were

19     captured during the measurements.

20                  MS. HOLLOWAY:  Okay.  Bill, could

21     we see the next page of this document, please?

22                  No.  I'm actually looking for one

23     of the new bright blue pages I think with, yes,

24     yellow lines.

BY MS. HOLLOWAY:

Q.   Yes.   Dr. Silzars, this says
18A-3A.   What is this an example of this
particular photograph here?

A.   This is an example, as it is seen
on the test equipment on this oscilloscope.   And
what this represents is, in fact, the
calibrating waveform that shows the starting
level, which would be to the left and the higher
level of white being detected on the right side.

So this is a way to -- for
example, the left side is 50 and the right side
is 200.   That's the information that's being fed
into the display.

This would precisely tell us that
the level that's shown on the left is the level
represented by 50.   And the level on the right
is represented by 200.   In effect, it's a
self-calibrating system.

Q.   And why did you include these
oscilloscope pictures such as the one we're
looking at here, this raw data as you say in
your expert report?

A.   This was included, again, so that

1    if LG's expert chose to analyze the data, they

2    could -- he could see the accuracy of the data.

3    He could see exactly how the data was captured,

4    and he could add whatever other analytical

5    interpretation he wished to have.

6         Q.   Did Mr. Eccles show the court any

7    analysis of the raw data from your expert report

8    last week?

9         A.   He did not show any analysis of

10   the raw data.

11        Q.   If there were any errors in the

12   raw data, could Mr. Eccles have done anything to

13   prove that there were errors?

14        A.   The test set up is relatively

15   simple.  It requires a digital oscilloscope that

16   is available from multiplicity of sources.  The

17   photosensors that used a standard item that's

18   again available from any many sources.  And

19   Mr. Eccles could readily have taken one of the

20   displays and repeats my measurements to point

21   out and to see if he could agree or disagree

22   with the outcome of my tests.

23        Q.   And did we see any independent

24   test from Mr. Eccles last week?

1        A.   To my knowledge, Mr. Eccles made

2   no such attempt and he certainly did not show

3   any such results during any of his testimonies.

4        Q.   Now, let's look at what else was

5   in your report.  Could we have Dr. Silzars

6   expert report on infringement of the '781, '160,

7   '157 and '069 patents up on the screen?  This is

8   Exhibit AUO 1603.

9             Okay.  And if we could turn to

10  Page 52, please.  I'd like to focus on

11  Paragraphs 186 and 187.

12            Doctor, if you could just read

13  those paragraphs briefly and tell us what

14  they're about?

15       A.   Yes.  Paragraph 186 says, I

16  performed tests on the LC420WX8-SLA1 containing

17  the new Monde chips as follows.  I measured the

18  light emitted by an area of the screen that was

19  uniformly illuminated (that is, each pixel in

20  the area was driven with the same gray level) --

21       Q.   I'm sorry, Doctor.  I think I was

22  not clear.

23            If you could briefly summarize

24  what we're looking at here, rather than reading

1     the entire two paragraphs in.

2            A.   Okay.  I'm sorry.  You asked to

3     read, so I began to read.

4            Q.   I meant to yourself.  Sorry.

5            A.   Okay.  Yes, what is shown here in

6     Paragraph 186 and 187 is a description precisely

7     of the test methodology that I used and also the

8     test equipment that was used.

9            Q.   Okay.  In Paragraph 187, I see

10    mention of a photosensor.  What is that please?

11           A.   A photosensor is a generic term

12    for anything that detects light and converts it

13    into an electrical signal.  In this particular

14    case, it was a photodiode.

15           Q.   Would you expect a person in the

16    field reading your report to understand what

17    kind of photosensors you were describing in your

18    report?

19           A.   Yes, I would.  Photosensors for

20    this kind of application are very standard

21    products.  They're available from a number of

22    sources.  And they are typically a photodiode.

23           Q.   Would you expect a person in the

24    field reading your report to understand that the

1   photodiode is linear?

2           A.   Yes.   Photodiode is a relatively

3   simple device.

4              It is a reverse bias diode and it

5   simply collects light.  So for every photon,

6   every quantum of light coming in, it creates a

7   number of electrons, and those electrons are

8   what is generated.

9              If you double the number of

10  photons coming in, we double the number of

11  electrons coming out.  So it's inherently a

12  linear device that responds to the amount of

13  light that it sees and simply translates that

14  into electrical current.

15          MS. HOLLOWAY:  Okay.  Your Honor,

16  we offer AUO 1603 into evidence.

17          THE COURT:  Admitted.

18  BY MS. HOLLOWAY:

19          Q.   Does a photodiode require

20  calibration as Mr. Eccles suggests?

21          A.   Calibration usually means that

22  there is some sort of an adjustment possible.

23  Typically for test equipment, it's calibrated by

24  making sure that it responds with the right

1    timing with the right amplitude.

2            Photodiode or a photosensor has no

3    such calibration capability.  There is no

4    adjustment that can be made, because it is a

5    device that is simply responds linearly to light

6    coming out.

7            Q.   Would you expect an expert in your

8    field to know the photodiode does not require

9    calibration?

10           A.   Absolutely.

11           Q.   On the next page, please, of the

12   expert report, could you look at Paragraphs 188

13   through 190.  And could you, again, just briefly

14   summarize for the Court what's being described

15   in those paragraphs?

16           A.   188 to 190 is a summary of the

17   light measurements that were made and let me

18   just scan them very quickly here.

19           It describes a test methodology I

20   used and why I chose that methodology.

21           Q.   Is there sufficient information in

22   the paragraphs that we've looked at in your

23   expert report and in the test results that were

24   attached to your expert report for a person in

1    the field to analyze your results?

2            A.   With the raw data that was

3    provided and the test methodology that was

4    described completely, anyone knowledgeable in

5    the field could certainly have looked at the

6    data, analyzed it, made whatever modifications

7    they might choose to make for analysis purposes,

8    and come to conclusions that were either similar

9    or different than the ones that I made.

10           Q.   Is there sufficient information in

11   these paragraphs in your expert report and the

12   test results, Exhibit 1085, for a person in the

13   field to perform similar tests to see if he got

14   different results?

15           A.   Yes.  As I said earlier, the test

16   setup is relatively simple, it requires a

17   photosensor which could be of one's choosing, it

18   doesn't have to be the same as the one I used.

19   It would produce the same result and it requires

20   a digital oscilloscope, that's all that is

21   required and then the test can be performed and

22   the results that I obtained could be readily

23   duplicated.

24           Q.   Would you expect a person in the

1    field who questioned the result of tests to do

2    such a test to perform his own test and make a

3    comparison?

4         A.  If there was any doubt in test

5    results that are being looked at, that would be

6    absolutely the simplest thing to do.  In this

7    case its very little time to set it up.  So I

8    would definitely expect someone who had some

9    question of the validity of the results to

10   simply duplicate them and find that they were

11   erroneous or agreed.

12        Q.  Did you see last week any critique

13   of your test or analysis or measurements that

14   could not be provided in Mr. Eccles' rebuttal to

15   your infringement report?

16        A.  I did not.

17        Q.  Mr. Eccles said something to the

18   effect that he didn't realize there were

19   problems with your photodiode and these supposed

20   problems were what really alerted him to the

21   supposed deficiencies in your analysis.  Do you

22   recall that?

23        A.  I do.

24        Q.  And if I remember, he said that

1    the photodiode needed to be calibrated and

2    adjusted for eye response.  Does that sound

3    right?

4           A.   That does sound like what I recall

5    from his testimony.

6           Q.   What do you say to the criticism

7    that the photodiode should have been calibrated?

8           A.   In the case the specific comment

9    was that it should have been calibrated to the

10   eye response and that is something that the

11   photodiode itself does not do.  As I already

12   explained, it's a linear device.  It collects

13   photons and produces current.  Any further

14   adjustment or modification of its response is

15   always done by circuitry that is attached to the

16   photodiode.  Also, once the raw data is

17   available, the raw data can be used and modified

18   mathematically.  It's an easy calculation to

19   make that if you wish to modify the linear

20   result for some other kind of response curve,

21   you simply superimpose the two and you get the

22   new result.  So the data was already available

23   to do what Mr. Eccles was suggesting.

24          Q.   So is it fair to say that if the

1   data needed to be adjusted for the eye response,

2   Mr. Eccles could have performed such

3   calculations and determined whether they made

4   any difference?

5           A.   All the data was available for him

6   to do that.

7           Q.   Okay.  And with respect to

8   calibration of a photodiode, did you mention to

9   LG's counsel at your deposition that there is no

10  need to calibrate a photodiode?

11          A.   Yes, I did.

12          Q.   Could we have the Silzars

13  deposition transcript, May 1st, page 229, lines

14  9 through 21 up on the screen.

15              And I'm looking here at lines 9

16  through 21.  Was that the testimony you were

17  referring to?

18          A.   That is the testimony that I'm

19  referring to, and it's the same testimony that

20  I'm giving today.

21          Q.   Okay.  Now, Mr. Eccles argues that

22  the term -- I'm changing gears now -- the term

23  time integration quantity of a brightness change

24  is indefinite.  Do you recall that?

1    A.   I do.

2    Q.   So according to Mr. Eccles, in

3    measuring time integration of a brightness

4    change, you must always start from zero and end

5    at zero.  Is that what you understood him to be

6    testifying?

7    A.   That is what I understood his

8    testimony to be.

9    Q.   And is that correct?

10   A.   I don't believe that's correct.

11   Q.   What do you think the patent

12   teaches about the starting point and end point

13   for a brightness change?

14   A.   I think the most compelling guide

15   that the patent provides is in the claims,

16   specifically Claim 1 itself, where it talks

17   about the integration quantity of a brightness

18   change, and with the emphasis on change.  So the

19   claim itself is very, very clear on what the

20   patent is describing.  And in addition to that,

21   throughout the patent it teaches how we should

22   make these measurements with regard to the

23   brightness change.

24   Q.   I would like to focus on the white

1    board here, Claim 1.  We have the claim language

2    you just referred to, time integration quantity

3    of a brightness change.  I would also like to

4    have AUO 1085 at attachment 18H-17 up on the

5    screen.  And then we can focus on the two curves

6    on the right-hand side.

7              Dr. Silzars, focusing on the claim

8    language, time integration quantity of a

9    brightness change, when going from one gray

10   scale to another gray scale, rather than simply

11   from off to on, how would one determine time

12   integration quantity of a brightness change?

13        A.   With regard to again what the

14   patent language clearly states is that we are

15   required to look at the change in brightness,

16   not at some absolute value.  So we have a

17   change, we have a starting point and we have an

18   ending point.  In this case the starting point

19   is the lower level and the ending point is the

20   upper level.

21             And then in this case we again

22   return back to the lower level.  So the change

23   is going from the first condition to the second

24   condition back to the first condition.

1    Q.   And, Bill, could we have the whole

2    slide, please.  What do those first and second

3    and first conditions in this instance?

4         A.   In this instance, we have as I

5    said earlier, I used the oscilloscope as, in

6    fact, a self-calibrating system and what that

7    means is that the left most baseline, the

8    horizontal line on the left side in the left two

9    photographs is the level 50.  When I put a level

10   50 into the display, that is the level of

11   brightness that the photosensor is measuring.

12        When I go to level 225, the

13   brightness jumps to the straight line on the

14   top, and we let it settle to the steady state.

15   So a flat line means steady state, increasing

16   waveforms mean change and, again, a flat line

17   means steady state.

18        Q.   The two cases on the right-hand

19   side, the two curves, as you understand it you

20   calculated the time integration quantity of a

21   brightness change to be underneath those curves;

22   is that right?

23        A.   Yes, the red rectangle represents

24   the ideal quantity for one frame, so we have had

1   a perfectly responding device, it would go from

2   level 50 and instantly jump to level 225 and

3   instantly come back to 50, and that would give

4   us the two rectangles that are in the

5   photograph.

6           The actual response from the

7   liquid crystal are the curves that are

8   superimposed on those rectangles.  And in actual

9   fact the rectangles were superimposed later, the

10  curves are the raw data.

11          Q.   Let's talk for a minute about one

12  of Mr. Eccles' slides.  This is from Exhibit

13  LGD-1085 and slide 160-011.  You can see my Elmo

14  ineptitude.

15          Now, with respect to this slide of

16  Mr. Eccles, did you understand him to be

17  testifying that when you did your calculations

18  of the quantity of light, you should have

19  included the area of the hatch marked portion on

20  the right-hand side?  I'll just mark that so we

21  can be clear.

22          A.   Yes, I see that.

23          Q.   Okay.  And was that what you

24  understood to be Mr. Eccles' opinion that the

1     part I've marked there should have been included

2     in your light calculations?

3               A.   That's my understanding of his

4     opinion.

5               Q.   And again, this wasn't in his

6     expert report?

7               A.   That's correct, I did not find

8     that in his expert report.

9               Q.   Okay.  Is that area that I have

10    marked, the cross hatched area, part of the time

11    integration quantity of a brightness change as

12    recited in Claim 1?

13              A.   Absolutely it is not.  Claim 1

14    requires that you look at the time integration

15    quantity of brightness change, not what is

16    happening in the steady state.  So we have to

17    focus on the changing part of the waveform and

18    not improperly add something that is a steady

19    state level which does not change as we make our

20    measurement.

21              Q.   Looking at the figure on the right

22    here, in 160-011, what is the time integration

23    quantity of a brightness change shown in this

24    figure?

1        A.   In this figure, the time

2   integration quantity of brightness change is the

3   green shaded area shown in that oscilloscope

4   photograph on the left in the left figure.

5        Q.   Okay.  And is the brightness

6   changing over time with respect to the curve

7   that defines that area?

8        A.   The brightness is changing,

9   starting at the level 50 going to level 225 and

10  returning back to level 50 during the time that

11  that green shaded area in the left oscilloscope

12  photo is -- is indicated.

13       Q.   Would a person of ordinary skill

14  in the art understand how to determine a time

15  integration quantity of brightness change when

16  you go from one gray level to another gray level

17  and back again as opposed to going off and on

18  only?

19       A.   Certainly.  In even reading the

20  plain language of the patent, I think that would

21  be clear.

22            But it's especially clear in

23  reading the entire patent specification and what

24  the patent teaches.  It precisely describes how

1    to construct a look-up table and how to

2    calculate the compensation values to go from one

3    brightness change to another that is not

4    starting at zero and ending up at zero.

5              Q.   Okay.  And with respect to the

6    types of measurements that you made in your

7    Exhibit 1085, would a person of ordinary skill

8    in the art know how to make such measurements?

9              A.   Absolutely.  They could readily

10   look at the measurements that I made and

11   duplicate them.

12             MS. HOLLOWAY:  Your Honor, we'd

13   like to mark this as our next exhibit, the slide

14   we've just marked, the LGD 1085, as Exhibit AUO

15   1599, and offer AUO 1599 into evidence.

16             THE COURT:  It's admitted.

17             MS. HOLLOWAY:  Let's have Figure 7

18   from the '160 patent up on the screen.

19             I'm sorry.  I don't need the elmo

20   anymore, Bill.

21   BY MS. HOLLOWAY:

22             Q.   Does the '160 patent teach how to

23   go from one gray level to another gray level?

24             A.   Yes.  This is the figure that I

1   just referenced a moment ago.  And if we look at

2   this figure, we can see along the left side, the

3   left column it says previous brightness from

4   zero to 100, in this case using a scale where

5   100 is black and zero.

6                And then along the top row, we see

7   something identified as next brightness.  And it

8   shows, again, a scale from zero to 100.  So we

9   can begin at any brightness level that we

10  choose.

11               And the patent even teaches you to

12  interpolate between those numbers.  But if we

13  choose a level of, let's say, 20 and we wish the

14  next brightness level to be 80, it shows us what

15  kind of a value that we would have in order to

16  achieve that brightness level.

17               And this is just exemplary.  It's

18  not intended to encompass all situations.

19               This is an example that they, the

20  inventors provided for us.  This would not be a

21  table that would be used in all cases.

22               Q.  Could we have the '160 patent at

23  Column 9, Lines 40 through 56 up on the screen?

24               That's a little bit dense here,

1    but if you could explain what this passage is

2    explaining.

3            A.   Yes, without reading the entire

4    excerpt here, what this passage describes is

5    that the precise methodology that one should use

6    if we start at a level other than zero and go to

7    a second level that is other than zero.  So this

8    explains and teaches how to work with gray scale

9    values that are anywhere from full black to full

10   white and anywhere in between.

11           Q.   Okay.  Thank you.

12           Well, let's just assume, for the

13   sake of argument, that Mr. Eccles is right and

14   you are wrong and that you have to measure the

15   time integration quantity of brightness change

16   starting at zero and ending at zero.  Okay?

17           A.   Yes.

18           Q.   Did you make any such

19   measurements?

20           A.   I did make such measurements.

21           Q.   Could we have Exhibit 1075 up on

22   the screen?  And I know this is a big document,

23   but can you identify where those measurements

24   are on this Exhibit 1075?

1       A.   Yes.   This document represents, I

2   believe, 12 of the measurements that I made or

3   12 different products that I -- that I analyzed.

4            And if we look in each case, the

5   very first line, the top line of each group of

6   measurements shows a measurement going from

7   zero, which is black, to 200 and back to zero.

8   And that was done for every product that I

9   analyzed.

10       Q.   Did Mr. Eccles have anything to

11   say about those tests yesterday or rather last

12   week?

13       A.   I was very disappointed that it

14   appeared that Mr. Eccles was actually ignoring

15   all of those results.   In none of his analysis

16   did he acknowledge that these tests were made

17   and presented in my expert report and in my

18   previous depositions.

19       Q.   Okay.   Well, let's take a look at

20   some of Mr. Eccles' slides critiquing your

21   examples in LGD 1085.

22            Could we first have Slide 160-010

23   up on the screen?   Is Mr. Eccles correct that

24   this slide shows that you calculated the

1    quantity of light incorrectly?

2            A.   He's not correct about that.

3            Q.   What's wrong with what he's saying

4    here?

5            A.   What he is saying that he is once

6    again ignoring that Claim 1, specifically of the

7    patent, says that we are making a time

8    integration of a brightness change rather than

9    the total brightness.

10           Q.   In this Slide 160-010, does the

11   cross hatch area under the right-hand curve,

12   does that belong in the calculation of the

13   quantity of light?

14           A.   It does not, because that is the

15   steady state brightness that has nothing to do

16   with brightness change.

17           Q.   Could we have Slide 160-012?  Is

18   Mr. Eccles correct that you're testing applied

19   the wrong level after correction?

20           A.   He is not correct about that.

21           Q.   And what's he saying wrong in this

22   slide?

23           A.   He is, again, incorrectly reading

24   Claim 1 of the patent and adding steady state

1    brightness measurements when the patent clearly

2    talks about integration quantity of brightness

3    change.  And that's what it teaches throughout

4    the patent.

5              So, once again, we have areas

6    added to the patent to this figure that have

7    nothing to do with what the teachings of the

8    patent are.

9         Q.   Well, let's look at LGD 160-015 in

10   Exhibit LGD 1085.  Is Mr. Eccles correct here

11   that this slide shows that you incorrectly

12   calculated a quantity of light?

13        A.   No.  I think this slide shows the

14   strange result that one achieves, really an

15   unexplainable result when we apply Mr. Eccles'

16   approach.  We end up with a result that is

17   clearly nonsensical.

18              In this case, again, we're

19   calculating a brightness change here going from

20   the higher level to a lower level.  And if we

21   use Mr. Eccles' approach, we end up with a

22   result that is not interpretable by anyone.

23        Q.   Okay.  So when you're going from a

24   higher value to a lower value and back again,

1    you've got a change in brightness in the

2    corresponding change in light?

3            A.   Again, it's just a reciprocal of

4    what we did before.  And we have to be able to

5    do this analysis, because we're talking about

6    real images, and real images will change from

7    brighter to darker as well as from darker to

8    brighter.

9            And, again, we are looking at the

10   change.  That is what the patent is dealing with

11   is how to compensate for change, not how to

12   compensate for some steady state value.

13           Q.   Now, Mr. Eccles also testified

14   that you disabled something called dynamic

15   contrast ratio.  Do you remember that?

16           A.   I remember that testimony.

17           Q.   Did you disable any circuitry to

18   conduct your tests?

19           A.   No.  The only circuitry that was

20   disabled was the overdrive itself.

21           There is an option that's provided

22   on the remote control.  This is the remote

23   control that any user would have for any

24   customer that buys the display.  And it has

1   something on there that's called picture modes.

2                And within those picture modes,

3   some are brighter, some are dimmer.  Some have

4   higher contrast, some have lower.

5                Some of those modes create a

6   nonuniform emission from the back light, and

7   other modes do not.  I simply selected the mode

8   that had uniform emission from the back light,

9   and that's about half of the modes that's

10  available from the remote control.

11               So I did not disable anything

12  other than simply using the remote control

13  that's available to any customer that buys a

14  display.

15               Q.  Did the selectable mode that you

16  just mentioned dim the backlight, dim the

17  backlight, di that impact the results of your

18  test?

19               A.  When we pick one of the models and

20  backlight it adds some noisiness to the

21  measurement, but it does not impact the basic

22  result, it just makes it a little bit harder to

23  draw the curves.

24               Q.  Let's turn to data compression.  I

1    would like to have AUO Exhibit 1538 at page ten.

2    This is the binary front page encoding that

3    Mr. Eccles talked so much about.

4                   Take a look at the matrix values

5    in the upper right corner.  Did you hear

6    Mr. Eccles and LG's counsel going back and forth

7    about how the values in these matrix would be

8    realistic if you looked at bombs exploding in a

9    computer-generated image?

10        A.   I do remember that testimony.

11        Q.   Is there any discussion in his

12   expert report about how these values would be

13   realistic if you had computer-aided bombs

14   exploding on a screen?

15        A.   I do remember that.

16        Q.   Was it in his report?

17        A.   I don't believe it was in his

18   report, I believe that only came up in the

19   courtroom testimony.

20        Q.   Let's assume we are looking at

21   bombs exploding in a computer-generated image,

22   would those matrix values be a real reflection

23   of what one might see up on the screen?

24        A.   I don't believe they would be.  I

1    think what has to be appreciated is that this

2    matrix, the four-by-four represents a display,

3    part of a display that is about one-eighth of an

4    inch in size.

5          Q.   You mean on each side?

6          A.   On the side.  One eighth of an

7    inch on the side.  So what we're looking at is a

8    very, very, very tiny part of the display and we

9    are displaying these widely varying images here.

10   If a bomb is exploding, an entire screen lights

11   up, not little tiny pieces of it.

12         Q.   How many sharp edges would one

13   have to see in this eighth of an inch square

14   area for these values to be realistic?

15         A.   If we look at the high values, the

16   larger numbers that are the bright values, then

17   we look at the darker values, we see that we

18   would end up with a half a dozen very sharp

19   edges, so we would have bright and dark bright

20   and dark all within this one little eighth inch

21   area on the screen.  I don't know of any real

22   images that ever have such drastic variations

23   over such a small area.

24         Q.   Okay.  Turning to the supposed

1    changes in the data caused by compression and

2    decompression.  Let's look at page nine.

3              Let's focus on the block diagram.

4    Is it your understanding that Mr. Eccles is now

5    claiming that it's okay if the previous frame

6    has a whole bunch of errors in it because you're

7    not going to drive the display with the previous

8    frame brightness?

9         A.   That's my understanding.

10        Q.   Did he say that in his expert

11   report?

12        A.   I do not remember reading that in

13   his expert report.

14        Q.   Do you agree that the previous

15   frame brightness does not actually drive the

16   display?

17        A.   I do agree with that, yes.

18        Q.   Well, what does drive the display?

19        A.   The display is actually driven

20   from the lookup table.

21        Q.   If the previous frame is full of

22   errors due to compression and decompression,

23   would the output of a lookup table be reliable

24   information for driving the display?

1          A.   If we feed erroneous information

2     into the lookup table, we would get erroneous

3     information out.  I think using the traditional

4     computer terminology, garbage in, garbage out.

5          Q.   Would that unreliable information

6     in turn impact the quality of the displayed

7     image?

8          A.   Absolutely it would impact the

9     quality of what was finally displayed.

10         Q.   Mr. Eccles also had a new

11    explanation for why LGD's response time is

12    different from what you identified response time

13    in your test results.  Do you remember that?

14         A.   I do.

15         Q.   Do you recall what he had to say

16    about that?

17         A.   What he had to say about that?

18         Q.   Yes.

19         A.   As I recall his interpretation is

20    now that the measurement is made from ten to

21    ninety percent rise time, but then when the

22    response is increased, we don't really measure

23    from ten to ninety percent, we keep the old

24    measurement and simply add something to the top.

1    Q.   Is that a definition of response

2    time that you were previously familiar with it?

3    A.   It's an incorrect definition of

4    rise time, and it's not one that I'm familiar

5    with either for rise time or for response time.

6    Q.   What is the result as far as the

7    waveform of doing what Mr. Eccles described as

8    setting the rise time?

9    A.   What would be the result is that

10   if in the first case we measure what would be

11   the traditional way of measuring rise time from

12   ten to ninety percent and then we now add

13   something to the top, but still retain the

14   measurement that we had before, we have now

15   changed the shape of the waveform.  We have

16   reshaped the waveform.  We have modified it to

17   change the total quantity of light.

18   Q.   Let's talk about that in

19   connection with one of your test results.  Can

20   we have AUO 1085, Attachment 18H-17.  And can

21   you explain what you mean by shaping the

22   waveform in connection with this exhibit?

23   A.   Yes.  If you look at the lower

24   right-hand oscilloscope photo first, this is

1    with the overdrive disabled.  And we see that it

2    rises from let's say ten to ninety percent in

3    just over one major division in the horizontal

4    direction.  If we look at now the top right-hand

5    graph and that is with the overdrive enabled,

6    and see that again the rise time within the

7    rectangle occurs in just a little bit over one

8    division, so the rise time hasn't -- the

9    response time during that segment of the

10   response has not changed much at all.

11              What has happened is we have added

12   now an additional amplitude, an additional

13   response at the top of the waveform and we have

14   also changed the fall time, so the waveform has

15   been reshaped dramatically while the actual

16   response time during that period when it's

17   rising within the rectangular box has not

18   changed much.

19              Q.   What is the result of the

20   reshaping of the waveform that we see in the

21   upper right-hand corner?

22              A.   The resulting of the waveform and

23   being reshaped is changing this total integrated

24   quantity of light.

1        Q.   You mentioned that part of the

2   response that goes beyond the desired

3   brightness.  Does that have a standard name?

4        A.   That would typically be called

5   some kind of overdrive, in a generic sense it

6   would be overdrive.

7        Q.   Is the term overshoot a term that

8   applies to this picture?

9        A.   Overshoot is a term that could be

10  used.

11       Q.   What does undershoot means?

12       A.   Undershoot is sort of the

13  reciprocal of that, that it doesn't quite get

14  there.

15

16

17

18

19       Q.   Let's turn for a moment to the

20  input signal.  I would like AUO proposed

21  construction up on the screen.  This is AUO 1595

22  at 160003.

23            Now, did you hear Mr. Eccles say

24  that the input signal does not include a level

1   of intensity of light?

2          A.   I believe what I really heard him

3   say is that the input does not include intensity

4   of light.  I'm not sure that he included the

5   part about level.

6          Q.   Okay.  Does the input signal in

7   fact include a level of intensity of light?

8          A.   Yes, it does.  And it is typically

9   an analog voltage level, or it is a digital

10  level using our traditional gray scale values.

11         Q.   Mr. Eccles testified that the term

12  substantially equal is indefinite.  Do you

13  recall that?

14         A.   I do recall that.

15         Q.   Let's take a look at one of his

16  slides on indefinite, LGD 160-020, and this is

17  from LGD 1085.  This includes Figure 3 from the

18  patent.  Do you see that?

19         A.   I do.

20         Q.   What were the inventors doing when

21  they made the measurements that are in Figure 3?

22         A.   In Figure 3, they were looking at

23  various types of products and looking at how

24  they responded and comparing response time, this

1    integrated quantity of light, and evaluating the

2    effect that response time did or did not have on

3    proving this integrating quantity of light.

4            Q.   What sorts of images were the

5    inventors displaying when they did the analysis

6    discussed in Figure 3?

7            A.   My understanding is from the

8    description of the patent that they were always

9    looking at wire frame models, which simply means

10   images that go from full black to full white and

11   then back to full black.

12           Q.   Was there a phenomenon called

13   flicker that was relevant to this analysis?

14           A.   Yes.  In fact, the title to the

15   patent has the word flicker in it and what they

16   were doing was the perception of flickering of

17   the wire frame model when they were doing their

18   studies.

19           Q.   Is the wire frame model the CAD

20   model that Mr. Eccles mentioned in his testimony

21   last week?

22           A.   It would be -- a CAD model could

23   be a wire frame model.

24           Q.   How difficult it for the LCD to

1    display a moving wire frame model as compared to

2    video moving images?

3            A.   The wire frame model or any type

4    of image that has dramatic variations in

5    brightness that goes from full black to full

6    white back to full black, that is the most

7    challenging in terms of flicker and perception

8    of motion, because it stresses the performance

9    of the display and it's also something that our

10   eye is most sensitive to is dramatic changes in

11   brightness.

12           Q.   Is video any less demanding to

13   display than the wire frame models?

14           A.   Video is much less demanding

15   because it generally has a gradual variation of

16   colors and light, and it has less dramatic

17   variations typically.

18           Q.   It's pretty hard to see in this

19   copy, but you can see in the third row of Figure

20   3 there is a Model C that Mr. Eccles did not

21   highlight on his slide?

22           A.   I do see that.

23           Q.   What percent of the ideal quantity

24   of light did Model C emit?

1    A.   Model C is shown here as emitting

2    eighty-five percent.

3    Q.   What does the triangle next to

4    Model C mean?

5    A.   The triangle as we can find if we

6    have the actual document in front of us says

7    that it's an acceptable level.

8    Q.   Does it say it's acceptable, can

9    we take a look at the next slide, Bill.

10    A.   We can see in the highlighted area

11    in the lower left that this is a flicker, the

12    triangle indicates that the flicker level is

13    quite acceptable in the view of the inventors.

14    Q.   So for this most demanding case,

15    the inventors believe that eighty-five percent

16    was quite acceptable for visual perception?

17    A.   Yes, they did.

18    Q.   Would a person of ordinary skill

19    in the art understand any lower figure to be

20    acceptable for displaying -- to be quite

21    acceptable for displaying video images as

22    opposed to wire frame CAD models?

23    A.   Given that images such as we see

24    on television are less demanding and that this

1  is the most demanding situation, it would be

2  very reasonable to say that an eighty percent

3  level would be quite acceptable for a video

4  image such as shown on televisions.

5          Q.   Would a variation of plus or minus

6  twenty percent be acceptable or over twenty

7  percent?

8          A.   No, I think plus or minus twenty

9  percent would be quite acceptable.

10         Q.   Okay.  So would this inform -- a

11  person of ordinary skill in the art reading the

12  patent would understand by substantially equal

13  for the purpose of displaying video images?

14         A.   Yes.  One of ordinary skill in the

15  art could look at this teaching of this patent

16  and the experiments that were performed at IBM,

17  and they could -- they would clearly realize

18  this -- this is the most stringent condition.

19  This is the most difficult condition to display

20  and to be able to somewhat relax those

21  conditions for normal video images.

22         Q.   Okay.  Now, Mr. Eccles argued that

23  Figure 3 shows that 81 percent of the ideal

24  quantity of light is not acceptable.  Do you

1   agree? And it was not acceptable for video.

2          A.   It was I think in the context of

3   this patent and what the inventors were looking

4   at here.  They found that they could see

5   perceptible flicker for this wire frame model.

6   I believe that with a video image, we would not

7   see such -- such a phenomenon.

8          Q.   Now, Mr. Eccles also argued that

9   Model A, which emitted within two percent of the

10  ideal quantity of light is unacceptable because

11  of the slow response time.  Do you recall that?

12         A.   I do recall that.

13         Q.   Did the inventors argue that

14  Figure 5A discloses a good response?

15         A.   No.  They were simply working on

16  analyzing these responses.

17              And I think you also have to --

18  have to put this in context.  This work was done

19  at a time when 20 milliseconds response from a

20  liquid crystal display was actually considered

21  quite good.

22              So in the context of the time

23  frame of this patent and in the context of the

24  work that they were doing, that particular

1     comment, I think, is not applicable.

2            Q.   Is Mr. Eccles correct that the

3     light emitted must be within a percent of two to

4     be considered substantially equal to the ideal

5     quantity of light?

6            A.   That would only be a correct

7     statement with steady state images with very --

8     with patterns that are very close to each other

9     with very sharp edges.  So if we look at a

10    steady image with a very crisp line running

11    through it, we may see that kind of variation.

12           It does not apply to moving

13    images.

14           Q.   Is steady image the same as a

15    still image?

16           A.   In my -- as I'm using the word,

17    yes, that would be a similar image like a

18    photograph.

19           Q.   What about all those stories

20    Mr. Eccles had about how he observed a bunch of

21    slow moving video, and he said in one experience

22    he had, he and his colleagues "found we had to

23    be within ten percent" or "within five percent".

24           What do you say to that?

1        A.   What was puzzling about that

2   description was that it seemed there was an

3   implication that it applied to the '160 patent,

4   but in actual fact, Mr. Eccles did not mention

5   what those percentages represented.

6             And in none of his testimony was I

7   able to glean that he was perhaps implying that

8   this meant ten percent of the integrated

9   quantity of light.

10       Q.   And Mr. Eccles also said that he

11   found that "the range of acceptable brightness

12   in the frame could vary less than ten percent or

13   even down to two percent".

14             What does that mean?

15       A.   Well, there's a possibility that

16   it could vary.  I don't know that that results

17   in any particular kind of conclusion.

18       Q.   And what would be the range of

19   acceptable brightness in the frame?

20       A.   In one particular frame, we're

21   talking about changing from frame to frame.  So

22   I'm not sure how to interpret this change of

23   brightness within one frame.

24       Q.   Would changes of brightness within

1        one frame be relevant to the '160 patent?

2                A.    That is not what the '160 patent

3        describes.

4                Q.    Okay.   Changing gears.

5                      We have another slide for

6        Mr. Eccles on indefiniteness.  Could we have LGD

7        1085 at LGD 160-22.

8                      MS. HOLLOWAY: It's 22, Bill. Thank

9        you.

10     BY MS. HOLLOWAY:

11               Q.    What do you understand Mr. Eccles

12       to be saying in this slide with respect to

13       overdrive?

14               A.    What I understood from this slide

15       was that Mr. Eccles was saying that if we get to

16       an overdriven level, that then we don't really

17       know what the next level has to be, because we

18       now have modified what otherwise would have been

19       the result without overdrive.

20               Q.    Is he in effect arguing that feed

21       forward overdrive is not workable?

22               A.    What I see here is that with this

23       kind of argument, that it basically says that,

24       yes, that unless we have some way to deduce what

1    we've created, we don't know what to do next.

2    And that would apply to any overdrive scheme,

3    not just the one described in the '160 patent.

4              If knowing what happens next is a

5    requirement, then we don't have any overdrive

6    system that will work.

7         Q.   Does the patent describe a feed

8    forward overdrive system?

9         A.   I believe it does.  Yes.

10        Q.   How could you do feed backward

11   overdrive, to the extent that term is

12   meaningful?

13        A.   Well, to the extent that term is

14   meaningful is -- somehow we have to detect what

15   we accomplish and then adjust the next waveform

16   based on that.

17             So the only way to detect what

18   we've accomplished would be to put a photo

19   detector or photosensor in front of the display,

20   detect the output of that photosensor, and then

21   modify the next frame based on what was actually

22   happening.

23             The problem, of course, with that

24   in a practical video display is you would have

1    to analyze the entire six million pixels, which

2    is clearly not possible.  So that the only way

3    that is known today and it is actually used in

4    some medical imaging instruments for displays

5    for specialized applications where a photo

6    detector is actually used to then set a level,

7    and that then is used to adjust the display.

8              It is not done in any kind of

9    practical television system.

10             Q.   And is that, this feed backward

11   that you've just described, is that what the

12   '160 patent requires?

13             A.   No.  The '160 patent absolutely

14   does not require that.  It simply tells us what

15   to do frame to frame to frame.

16             Q.   Now, I'd like to change gears

17   again.  Mr. Eccles testified about a couple of

18   prior art references to the '160 patent:  Mori,

19   Kido and Johnson.

20             Do either Mori, Kido or Johnson

21   expressly disclose using overdrive to obtain a

22   quantity of light substantially equal to the

23   ideal quantity?

24             A.   Absolutely they do not.

1        Q.   Do Mori, Kido or Johnson talk

2   about any kind of overdrive?

3        A.   They talk about improving response

4   time.

5        Q.   Could we have the '160 patent at

6   Column 2, Lines 2 through 12?

7             Do you understand what this

8   passage is relating to?

9        A.   As I understand this passage, this

10   is relating to the Mori patent.

11        Q.   Could we have Exhibit LGD 245 up

12   on the screen?

13             Okay.  Is this the Mori

14   application, Doctor?

15        A.   Yes, I believe it is.

16        Q.   I'd like to focus on the abstract,

17   please.

18             MS. HOLLOWAY: I don't think that's

19   the abstract, Bill.  I think the abstract is on

20   the first page.  Very bottom.

21   BY MS. HOLLOWAY:

22        Q.   And looking at the abstract of the

23   Mori patent, what is the Mori patent's purpose?

24        A.   I think this is very simple and

1       elegant statement of the Mori patent.  It's to

2       improve the speed of response to gradation

3       changes.

4               Q.  Will speeding up the response time

5       results in a pixel emitting an ideal quantity of

6       light?

7               A.  It will not, as we saw from the

8       IBM work of the '160 patent.

9               Q.  Will speeding up the response time

10      result in a pixel emitting a quantity of light

11      that is substantially equal to the ideal

12      quantity of light?

13              A.  It -- it is not.  It could happen,

14      but it may not.  There's no particular

15      relationship of response time to the ideal

16      quantity of light.

17              Q.  Could we have Figures 5A and 5B of

18      the '160 patent?  What do these figures show,

19      Doctor?

20              A.  These figures though that, in this

21      case between Figure 5A and Figure 5B, that

22      speeding up response time actually reduced the

23      total quantity of light.

24              Q.  Do either Kido or Johnson disclose

1      anything more than the cited Mori reference

2      regarding achieving a quantity of light that is

3      substantially equal to the ideal?

4              A.   I don't believe they do.

5              Q.   Mr. Eccles testified about the

6      Kido patent.  Let's talk briefly about what

7      Kido's generally about.

8                   Could we have LGD 297 up?

9                   I think you already testified what

10     overdrive Kido describes.  Does Kido describe

11     how to achieve a quantity of light that is

12     substantially equal to the ideal?

13             A.   He does not.

14             Q.   Does the phrase quantity of light

15     ever appear in Kido?

16             A.   I did not find it.

17             Q.   Let's look at what Kido does

18     disclose.  Could we have Column 3, Lines 38

19     through 47?

20                  And what does this passage

21     describe, Doctor?

22             A.   This -- I think this is a good

23     summary of what the Kido patent is focused on.

24     And it is compensation to improve -- to obtain a

1      improved rise time or improved fall time.

2             Q.   Can we look at Figures 1 and 2 of

3      the Kido patent?  Do these figures disclose a

4      compensation signal?

5             A.   Yes.  What's interesting about

6      Kido is that he observed that the response time,

7      of course, has a rise time.  It's not abrupt.

8                  And his concept was that he -- if

9      he could add a waveform that was sort of the

10     opposite of that, so if he adds this -- if we

11     look at the lower left-hand corner of Figure 2B,

12     you see this overshot kind of waveform.

13                 And his thought was that by adding

14     such waveforms, he could compensate for this

15     slower response of the display.

16            Q.   Will using the Kido compensation

17     signal necessarily result in the pixel emitting

18     a quantity of light that is substantially equal

19     to the ideal?

20            A.   No, it will not.

21            Q.   Okay.  Could we have Figure 2B --

22     oh, we've got it right there.

23                 And I believe Mr. Eccles said this

24     figure discloses an ideal response time.  I

1    think he was referring to the lower right-hand

2    corner.

3                    Does it?

4            A.   I think this is a very conceptual

5    kind of a drawing.  This does not show actual

6    results.

7                    It shows a desired outcome that if

8    this waveform can be added, and it could be done

9    exactly the opposite way, then you would get the

10   ideal response in actual facts.

11                   Liquid crystals simply don't

12   behave that way.

13           Q.   Let's look at Kido at Column 5,

14   Lines 32 to 33.

15                   Okay.  And what is Kido telling us

16   here?

17           A.   Well, he's telling us that the

18   perfect compensation that was indicated in that

19   little graphic in Figure 2B cannot be achieved.

20   And his desire is to create an improvement that

21   would get us toward this faster response time.

22           Q.   Okay.  Turning to Figure 2.

23                   Is the compensation signal

24   waveform shown here an output brightness level?

1      A.   No.  It's simply a calculated

2   compensation voltage to try to compensate for

3   the response time of the liquid crystal.

4      Q.   Is the after image elimination

5   circuit, which outputs to the compensation

6   waveform, a determinator for determining an

7   output brightness level?

8      A.   No.  It's -- it outputs

9   coefficients for this compensation waveform.

10     Q.   Could we have Kido at 7, 61

11  through 68 up on the screen?  What are the K1

12  and K2 referred to in this passage?

13     A.   These are the compensation

14  coefficients that he uses to create this

15  compensating waveform.

16     Q.   Are these brightness levels K1 and

17  K2?

18     A.   They are not.

19     Q.   Could we have Kido at 9, 27 to 33

20  up on the screen?

21          Do you see that this describes a

22  table for the coefficient circuit?

23     A.   Yes, I do.

24     Q.   Is that table a table for storing

```
1    a brightness level as required by Claim 2?

2              A.   No, it's not.  It is not.

3                   It is, again, a table for storing

4    these coefficient, compensating coefficients.

5              Q.   Does the table store a brightness

6    level for two or more color signals as required

7    by Claim 3?

8              A.   No.  That's not addressed in Kido.

9              Q.   Okay.  I'd like to turn to the

10   Johnson patent, LGD 318.

11                  Looking at the abstract, what sort

12   of overdriving does Johnson describe?

13             A.   This is again overdriving to

14   improve response time in effect.

15             Q.   Does Johnson describe how to

16   achieve a quantity of light that is

17   substantially equal to the ideal quantity of

18   light?

19             A.   He does not.

20             Q.   Let's look at Figure 5 of Johnson.

21   What does this figure show?

22             A.   This figure shows curve 28 as

23   being uncompensated and then Figure 29 being

24   compensated by higher voltage.  And it shows
```

1    that when you get to the desired level which in

2    this case is the 60 percent transmission, you

3    simply turn it off, you stop.

4             Q.   Is that the dotted line three?

5             A.   That's the dotted line three, and

6    it can be compared to the voltages that are

7    shown in the upper left-hand corner as one, two,

8    three.

9             Q.   Okay.  And the overdrive example

10   shown here in Figure 5, when does the response

11   reach the desired brightness?

12            A.   In this case it shows the desired

13   brightness at the end of the frame.

14            Q.   If one used the Johnson overdrive

15   on both the rise and the fall, would the pixel

16   necessarily emit a quantity of light that is

17   substantially equal to the ideal?

18            A.   No, it would not.

19            Q.   Why not?

20            A.   Because the total integrated

21   quantity is not being measured.  All he's trying

22   to do in the Johnson patent here is achieve this

23   brightness.  Once he gets to the brightness

24   level that is desired, he stops.  So it has --

1    he is doing nothing to relate that to the total

2    quantity of light.

3              Q.   I would like to move on to the

4    '629 patent.  Now, Dr. Silzars, did you hear

5    Dr. Rubloff give an opinion regarding the

6    meaning of the limitation in Claims 7 and 16

7    last week that the quote, upper layer wiring

8    material does not become insoluable in an acid

9    or alkaline etchant.  Did he give an opinion on

10   what that means?

11             A.   I think he did, yes.

12             Q.   Could we have the trial transcript

13   at 875, line 15, to 876, line 5.  I would like

14   to focus on the language there is nothing in

15   these claims which specifies whether the

16   solubility in acid or alkaline is done in the

17   configuration of the dual layer.  What do you

18   understand Dr. Rubloff to be talking about here?

19             A.   What I understand here is that

20   somehow we should be looking at the solubility

21   or insolubility separate from the structure.

22             Q.   That is the solubility of the

23   materials being separate and apart from the

24   wire?

1        A.   That's what I understood.  I was

2   very puzzled by that, but that's what I

3   understood his testimony to be.

4        Q.   Did you know that was his opinion

5   before you heard his testimony last week?

6        A.   No, I did not.

7        Q.   So let's look now at 876, 15, to

8   877, 4.  I'm looking at where it says I take a

9   vessel with the acid or the alkaline in it.  I

10   take a piece of that metal and I see if it

11   etches or instead doesn't etch.

12        What did you understand

13   Dr. Rubloff to be saying here about the

14   limitation of Claim 7?

15        A.   What I understand here is that he

16   would take a little beaker of acid or alkaline

17   solution and simply dunk the metal into it to

18   see if it etches.  And that he would do this

19   separate from any structure.

20        Q.   Okay.  Considering the context of

21   the claim and focusing particularly on Claim 7,

22   does that interpretation of the limitation of

23   Claim 7 make any sense?

24        A.   It doesn't make any sense to me

1       because the entire patent is dealing with

2       specific structures and in particularly the

3       claims that are being asserted are dealing with

4       two-layer structures and how those are created.

5               Q.   And by two-layer structures, are

6       you referring to the two-layer wires?

7               A.   Yes.  Well, I'm referring to the

8       two-layer metal that's used in the wiring, and

9       as it turns out also in the dummy patterns.

10              Q.   In your opinion, in this claim

11      limitation, upper layer wiring material does not

12      become insoluble in an acid or alkaline etchant,

13      is the upper layer wiring material part of the

14      wiring in the claims?

15              A.   It would have to be in order for

16      the claim to make any sense.

17              Q.   Why is that?

18              A.   Well, the configuration here is

19      that if the material does become insoluable,

20      then we have this condition where we have

21      undercutting, where the material underneath is

22      removed at a different rate.  If we take it

23      separate from that configuration, then we have

24      nothing to talk about.

1    Q.   In your opinion, what does this

2  limitation, upper layer wiring material does not

3  become insoluble in an acid or alkaline etchant,

4  mean in the context of the claim in the patent?

5    A.   What this means is that we have a

6  two-layer structure, we're etching it to create

7  these wiring patterns.  And if we encounter a

8  condition where the upper layer material becomes

9  insoluable, then we will not end up with the

10  correct structure.  The insolubility is caused

11  by the etchant actually having too high a

12  concentration.  It sounds counterintuitive, but

13  if the concentration get too high, a way to look

14  at is it's so concentrated it can no longer

15  absorb ions from the metal, it can't take ions.

16  It quits etching and the etching stops, it's

17  called a flade potential, F-L-A-D-E.  And it's

18  phenomenon that's understood in the

19  electrochemistry industry and that is what we

20  are trying to avoid with the structure that's

21  described in this patent.  It is structure

22  dependent.

23    Q.   So Claim 7 requires that this

24  phenomenon that you just described does not

1    happen; is that fair?

2              A.    That's fair.

3              Q.    Dr. Rubloff also testified about a

4    product that used the GDS shown in Exhibit 1080,

5    which I would like to have up on the screen.  Do

6    you remember this?

7              A.    I do remember that.

8              Q.    Was there a GDS printout in his

9    expert report?

10             A.    It was not.

11             Q.    He said that he was -- as I

12   understood, that he was showing that this

13   product which he said had no dummy patterns

14   didn't have a problem with undercut.  Do you

15   recall testimony to that effect?

16             A.    I recall that testimony.

17             Q.    Do the GDS files associated with

18   exhibit LGD 1080 include any dummy patterns?

19             A.    Yes, they do.

20             Q.    And how do you know that?

21             A.    I know that from having examined

22   the GDS files that correspond to this drawing.

23             Q.    Can you see the dummy patterns

24   here in this first page of 1080?

```
 1              A.   In this particular drawing, they

 2      are mostly covered up.  One would have to look

 3      very hard to realize that there are some dummy

 4      patterns there, because the wiring is in this

 5      orangey red, and it looks like there is no other

 6      color like that on this illustration that's

 7      before us.  And that's not correct once the GDS

 8      files are analyzed.

 9              Q.   What do you mean covered up?

10      Covered up with what?

11              A.   We see in the lower left and right

12      side, we see this bluish pattern with it looks

13      like magenta instead of an orangey red above,

14      and we see the green squares, and those in

15      actual fact have dummy patterns underneath.

16              Q.   Let's take a look at AUO 1610.

17      And could you tell us what Exhibit 1610 is,

18      please?

19              A.   This is another version of that

20      GDS file.  And this begins to show us where some

21      of the dummy patterns are, at least in this

22      segment.

23              Q.   I was going to hand up a copy to

24      mark, but I don't seem to have one.  Could you
```

1       indicate where the dummy patterns are on Exhibit

2       1610?

3               A.   If we look at only this drawing

4       here, we see that there are dummy patterns at

5       the left end where the triangle comes to a point

6       and also at the very right most part where the

7       triangle comes to a point.  All those patterns

8       that appear to have no connection, those are

9       dummy patterns.  The little reddish square

10      that's part way in, that's a dummy pattern.  And

11      as it turns out, even the LG Philips' logo, that

12      is a dummy pattern.

13              Q.   Can we look at the next page of

14      this document, please.  Is it possible to

15      identify dummy patterns on this page or is there

16      another page to look at?

17              A.   This is the one that now shows

18      that there are also dummy patterns where in the

19      previous ones we saw that it's LG Philips' logo,

20      on this one we see that there is a rather

21      substantial dummy pattern in that area as well

22      as the dummy patterns at the end.

23              Q.   For the record this is page

24      629-106.  Any other pages you would like to look

```
 1      at, Doctor?

 2              A.   I think this one is simply an

 3      enlargement showing that there are dummy

 4      patterns at the end that's below that point of

 5      the apex of that triangle.  Those are not

 6      connected to anything in this particular

 7      drawing, and so they are dummy patterns for

 8      purposes of etching.

 9              MS. HOLLOWAY:  Your Honor, we

10      offer AUO 1610 into evidence.

11              THE COURT:  It's admitted.

12      BY MS. HOLLOWAY:

13              Q.   Are the dummy patterns in this

14      product different in any way from accused dummy

15      patterns?

16              A.   Yes, they are.

17              Q.   Why is that?

18              A.   In fact the entire wiring scheme

19      is different.

20              Q.   Could we have the picture of the

21      wiring.

22              A.   First of all, we have to realize

23      that this example that was shown to us very

24      recently is of a much smaller display.  This
```

1    display is only ten inches in size whereas all

2    the accused products are substantially larger

3    than that, so we're dealing with a much smaller

4    display, a much smaller area that needs to be

5    etched.

6              And furthermore, when we look up

7    closer at the wiring configuration, we see that

8    the wiring patterns are much wider and the

9    spacing is entirely different.

10             So for Mr. -- for Dr. Rubloff to

11   draw the conclusion that somehow this is a

12   generic example that dummy patterns are not

13   required I think is very misleading.

14        Q.   Do the dummy patterns in this

15   particular product meet the requirement of at

16   least about thirty percent coverage?

17        A.   They do not.

18        Q.   Okay.  Let's turn to Dr. Rubloff's

19   opinions on the supposed LGD on sale bar

20   products.  Could we have AUO 1589 and AUO 1590

21   up on the screen, if they both fit.  If not

22   we'll take them one at a time.

23             Now, Dr. Rubloff gave a couple of

24   opinions on some GDS print documents.  Do you

1    recall that?

2              A.   I do.

3              Q.   Do you recognize these two

4    documents here, AUO 1589 and 1590?

5              A.   Yes.

6              Q.   What are they, roughly speaking?

7              A.   These are general examples of GDS

8    output files from those particular documents.

9              Q.   Were these printouts in

10   Dr. Rubloff's report?

11             A.   I believe they were not.

12             Q.   Have you seen a document from LGD

13   correlating their GDS files with modules

14   numbers?

15             A.   Yes.  And we used it.

16             Q.   Could we have AUO 0579 up on the

17   screen.  Is this the document?

18             A.   This is a page from that document.

19             Q.   For the record, I believe we're at

20   page 256.

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12          Q.   Did those GDS files meet the

13   limitation of the dummy patterns comprised of at

14   least about thirty percent of the area where the

15   dummy patterns are located?

16          A.   They did not.

17          Q.   Did you do anything to determine

18   when those GDS files were last modified?

19          A.   Yes, I did.

20          Q.   Could we have Exhibit AUO 1039 and

21   1040 up on the screen side-by-side.  What are

22   these documents, please?

23          A.   I made a request that we do an

24   analysis and try to trace down when was the last

1    modification or last update made to these files.

2    So we had a software engineer who is competent

3    in this area do a search and he showed --

4    produced this result that showed that the files

5    were last modified on 1/25 of '06.

6              MS. HOLLOWAY:  Your Honor, we

7    offer AUO 1039 and 1040 into evidence.

8              THE COURT:  It's admitted.

9    BY MS. HOLLOWAY:

10             Q.   Have you analyzed the -- I would

11   like to return to printouts that Dr. Rubloff

12   showed us, AUO 1589 and 90.

13             A.   Yes.

14             Q.   Have you analyzed the GDS files

15   that these opinions came from?

16             A.   Yes, I did.

17             Q.   Was that after we heard from

18   Dr. Rubloff?

19             A.   Yes, very recently.

20             Q.   Do these patterns that Dr. Rubloff

21   identified in AUO 1589 and 1590 meet the

22   requirement of the dummy patterns comprise at

23   least about thirty percent of the area?

24             A.   They do not.

1    Q.   Could we have Exhibit 1594,

2    please.  What is this exhibit, Doctor?

3    A.   This is another GDS file just

4    showing that overall configuration.  And for

5    purposes of analysis, we selected only that area

6    where the -- I think we can call the dot pattern

7    exist.

8    Q.   And this is the dot pattern for

9    1589 and 1590, those two AUO exhibits we were

10   just looking at?

11   A.   That's my understanding yes.

12   Q.   And can you explain what you did

13   here to analyze the product?

14   A.   If we can back up just one -- yes.

15   Okay.  At that slide this is an enlargement of

16   what we actually had in that dot pattern area.

17   The diagonal lines we see are the wiring, that's

18   actually what's going to the TFT array and then

19   we see these small little hexagons in this

20   patent.

21   Q.   For the record this is slide

22   629-102 that you have just been talking about;

23   correct?

24   A.   Yes.

1    Q.   Moving to the next slide, 629-103.

2    A.   In this slide it's just an

3    enlargement.  It shows exactly what these

4    patterns look like.  And then in the final slide

5    this shows that we used -- that the rulers that

6    are actually provided within the CAD document

7    within the GDS system to measure the dimensions

8    and to calculate the area.  And if we do a very

9    simple geometric calculation using the square as

10   outlined in the upper right-hand figure, we see

11   that the dummy patterns within this dot pattern

12   area cover about twenty-two percent of that

13   area.

14   Q.   Did you include product with GDS

15   that includes patterns similar to those

16   Dr. Rubloff identified as dummy is in AUO 1589

17   and AUO 1590 of infringing?

18   A.   We did not include those products

19   for infringement.

20   Q.   Okay.  Can I have Claim 1 of the

21   '629 patent up on the screen, please.  I would

22   like to focus on the term area.

23        Now, Dr. Rubloff says this term is

24   insolubly ambiguous.  Do you agree?

1        A.   I do not.

2        Q.   Why not?

3        A.   I believe that to anyone with

4   reasonable knowledge in the art, knowing that we

5   are creating dummy patterns, knowing what the

6   purpose of those dummy patterns is, that the

7   area that needs to be identified is clearly

8   obvious.

9        Q.   Now, Dr. Rubloff talked about some

10  prior art references.  Do any of those

11  references disclose the problem relating to

12  two-layer structure etchant that is described in

13  the '629 patent?

14       A.   No, they're dealing with entirely

15  different situations.

16       Q.   Do any of those references

17  described using dummy patterns with multi-layer

18  wiring so as to insure that the upper layering

19  of wiring material does not become insoluble in

20  an acid or alkaline etchant during etching?

21       A.   Not at all.

22       Q.   What about the structures that

23  Dr. Rubloff identified as dummy patterns in the

24  prior art, are they dummy patterns within the

1    meaning of the '629 patent?

2              A.   They are not.

3              Q.   Assume that one uses these prior

4    art patterns, what Dr. Rubloff calls dummy

5    patterns, with two-layer wiring, will

6    the so-called prior art dummy patterns

7    necessarily prevent the upper layer material

8    from becoming insoluble in an acid or alkaline

9    etchant?

10             A.   It will not.

11             Q.   Why not?

12             A.   Because the particular result is

13   structure dependent.  Those patents are dealing

14   with other kinds of structures and other

15   applications.  And they are not describing a

16   method or a structure that would achieve the

17   desired result.

18             Q.   Okay.  Let's turn to the Watanabe

19   '275 patent prior art.  This is AUO -- I'm

20   looking at AUO 1587?

21             This is one of Dr. Rubloff's

22   slides from last week.  You remember that?

23             A.   Yes, I do.

24             Q.   Now, Dr. Rubloff testified that

1        the pattern marked in yellow here on the

2        right-hand side of the middle is a light

3        shielding structure.

4                    Do you agree with his description

5        of this pattern in Watanabe?

6                A.   Yes.

7                Q.   Now, Dr. Rubloff also testified

8        that the '275 patent does not disclose dual

9        layer wiring.  Do you agree with that?

10               A.   I do.

11               Q.   And Dr. Rubloff also testified

12       that the '275 patent nowhere teaches that the

13       upper wire upper layer of the -- a two layer

14       wiring structure does not become insoluble in an

15       acid or alkaline etchant.

16                   Do you agree with that?

17               A.   I agree with that, also.

18               Q.   Let's have LGD Slide 269-024.

19                   Now, do you see here on the

20       right-hand side at the bottom Dr. Rubloff says

21       that "dual layer with molybdenum on top will

22       inherently not become insoluble in acid or

23       alkaline".

24                   Do you see that?

1           A.   I see that.

2           Q.   Is that a correct statement?

3           A.   It's clearly not a correct

4    statement, because that is what one of the

5    configurations of the '629 patent specifically

6    addresses.

7           Q.   And why does Watanabe not disclose

8    the fact that this will inherently happen?

9           A.   It's just not disclosed there.

10          Q.   Let me perhaps back up a bit.

11   Let's assume we take the so-called dummy

12   patterns, the light shields.  I believe they are

13   in Watanabe?

14          A.   Yes.

15          Q.   And two layer wiring structures.

16   We put a Watanabe dummy somewhere in the

17   periphery.  We perform etching.

18               Can we conclude that there will

19   not -- that there will necessarily not have a

20   passivity problem?

21          A.   No.  We cannot conclude that

22   because passivity problem is structure dependent

23   and also etching condition dependent and

24   dependent on temperature and many other

1    parameters.

2           Q.   Okay.  Can I have AUO 1586 up on

3    the screen?

4                Now, Dr. Rubloff testified that

5    given the numerous factors that affect etching,

6    if you use the metal patterns disclosed in the

7    '695 reference, you may or may not encounter the

8    passivity problem.  Do you agree?

9           A.   I agree, and that was what I was

10   just trying to explain to you in the previous

11   question.

12          Q.   My mistake.  Okay.

13               And why is that?

14          A.   Again, because the passivity is a

15   peculiar condition that's encountered under very

16   specific conditions of structure, etchant

17   concentration, temperature, and a variety of

18   other choices such as what the etching material

19   is to begin with.

20          Q.   Can I get Exhibit LGD 246 up on

21   the screen?

22               I'd like to focus on Column 16,

23   Lines 19 through 28.

24               Now, in discussing the dual layer

1    wiring structure supposedly of this reference,

2    Dr. Rubloff cited Column 16, Lines 19 through 28

3    which are on its screen.  Does this passage

4    disclose dual layer wiring as required by Claim

5    7 and 16 of the '629 patent?

6             A.   It does not.

7             Q.   What does it disclose?

8             A.   What it discloses is a four layer

9    structure with titanium on the bottom then

10   titanium nitrite then aluminum and then titanium

11   nitrite.

12             For us to have a structure such as

13   described in the '629 patent, we would need

14   aluminum and then a metallization layer on top.

15             Titanium nitrite is not a metal

16   and it's not an alloy.  It's a compound.  And

17   not only that, it's a ceramic.

18             So we do not have the required

19   structure that would satisfy what the claim

20   language requires.

21             Q.   Does this passage mention

22   molybdenum?

23             A.   It does not.

24             MS. HOLLOWAY:  Okay.  I'd like to

1      move onto the '157 patent.

2                  Excuse me one moment, Your Honor.

3    BY MS. HOLLOWAY:

4            Q.    Okay.  Dr. Silzars, were you in

5      the courtroom when the demonstration right over

6      there, the AUO 1598 that's been marked, when

7      that demonstration was shown to

8      Mr. Smith-Gillespie with the non-public display

9      in the landscape and portrait mode?

10           A.    Yes, I was.

11           Q.    Now, do you recall also AUO

12     represented that the image was rotated by a

13     computer?

14           A.    Yes.

15

16

17

18

19

20

21           Q.    Okay.  Is that model a public

22     display model?

23           A.    It is not stated as such in my

24     understanding.

1          Q.   Would the display module of a

2     public display also require some external input

3     such as from a computer to rotate an image?

4          A.   That would always be the case,

5     yes.

6          Q.   Why is that?

7          A.   That is for the larger displays.

8     I don't know of any that are currently produced

9     as products that operate like the iPhone.  All

10    the displays that are of the larger size that

11    input information determines the format.

12         Q.   Do you have to feed an image that

13    is formatted the right way?

14         A.   It's the same way as you rotate an

15    image on your computer screen, if you just ask

16    it to rotate, it will rotate the image.  But the

17    display really does not know what image it's

18    getting.  So you tell it what you like it to

19    display.

20              And that is the external input

21    rather than internal modification.

22         Q.   Were you in the courtroom when

23    Mr. Smith-Gillespie was testifying?

24         A.   Yes, I was.

1          Q.   And he mentioned a Shimizu patent;

2     do you recall that?

3          A.   I recall that, yes.

4          Q.   And he relied on Shimizu as prior

5     art based on the publication date; correct?

6          A.   I believe so, yes.

7          Q.   Let's take a look at that

8     reference.  We have Exhibit LGD 343 cover page.

9               I'd like to focus on the PCT

10    publication date. What is that date, please?

11         A.   The date that I see on the patent

12    is March 11, 2004.

13         Q.   Thank you.  Now, could we pull up

14    AUO 0833.

15              And what is this document, sir,

16    Dr. Silzars?

17         A.   My understanding is that this is

18    an AUO Optronics invention disclosure form.

19         Q.   Okay.  Let's look at first one and

20    two of the invention disclosure.

21              What do these figures show?

22         A.   As I look at the '157 patent that

23    I have in front of me, and I look at these

24    figures, I see that, for example, Figure 2 is

1      identical to Figure 1A in the '157 patent.

2           Q.   Now, let's look at the last page

3      of the document AUO 0833.  And what do these

4      figures show?

5           A.   These figures show a structure

6      that is for all -- as much as I can tell, it's

7      identical to the structure that is shown in

8      figures.

9           And 4B -- I think also 4C and 4D

10     of the '157 patent.  The '157 patent has some

11     additional annotations.

12          But the figures themselves are --

13     the graphic part of it looks to me to be

14     identical and also is consistent with the

15     description that's in the patent.

16          Q.   Okay.  Let's compare these figures

17     then with Claim 1 of the '157, which is shown

18     right here next to you on the easel.

19          Are all the elements of the '157

20     patent shown in the figures in AUO 0 833 the

21     final page?

22          A.   I believe they are.  I should also

23     note that these were the figures that I used

24     during my direct testimony as the example of the

1    '157 patent and the configuration that was being

2    used for infringement.

3              So, yes, I believe they are

4    consistent with Claim 1 to show all the elements

5    of Claim 1.

6         Q.   Now, look at the first page of

7    Exhibit AUO 0833.  If you take a look at the

8    date by the signatures near the bottom of the

9    page.

10             Okay.  And does it appear to you

11   those dates are given in the international

12   format with the year and then month and then

13   day?

14        A.   Yes.

15        Q.   And do those dates predate the

16   publication date of the Shimizu March 2004?

17        A.   They do.  The publication date

18   shown here are 2004 and it would be February

19   6th.

20        Q.   Now, Mr. Smith-Gillespie also

21   mentioned the Fukayama patent; correct?

22        A.   Yes.

23        Q.   Could we have LGD 332 up on the

24   screen?  Was Fukayama considered by the examiner

1    during the prosecution of the '157 patent?

2            A.   That's my understanding, yes.

3            Q.   Is there any mention of Fukayama

4    of rotating a display?

5            A.   I did not find any such mention.

6            Q.   Is there any reason at all to

7    combine Fukayama with the rotatable display?

8            A.   I don't believe so.  No.

9            Q.   Was the problem of distortion

10   caused by rotation, was that known in the art at

11   the time the '157 was filed?

12           A.   I think the problem was perhaps

13   known.  It's difficult to say if someone may

14   have noted it, but certainly the '157 patent

15   addresses the problem of rotation and the

16   distortion that's caused by rotating display.

17           Q.   Let's look at Figure 1 of Fukayama

18   alongside Column 4, Lines 30 to 42.

19                And I'd like to focus on the first

20   sentence.

21                What, in general, does Fukayama

22   disclose relevant to the '157 patent?

23           A.   I'm not sure I understand.

24           Q.   Do we have Column 4 here?

1           MS. HOLLOWAY:  Bill, that doesn't

2     look right.

3           Okay.  That's more like it.

4           So focusing on the first sentence

5     here.  Which column is this, Bill?

6           Four?

7     BY MS. HOLLOWAY:

8           Q.   Column 4, lines 30 to 42.

9     Focusing on the first sentence, what, in

10    general, does Fukayama disclose that is relevant

11    to the '157 patent?

12          A.   What he is talking about here, I

13    think is about the third line on down which can

14    provide reliable positioning and secure holding

15    of the optical sheet relative to the lower

16    frame.  And I think he was specifically focusing

17    on the words secure holding.

18          So Fukayama's talking about

19    securely holding the optical sheet rather than

20    the methodology that's described or the

21    scrubbing structure that's described in '157.

22          Q.   Now, do you recall

23    Mr. Smith-Gillespie talking about Fukayama and

24    describing the films in Fukayama as being

1    loosely held?

2              A.   I do recall that.

3              Q.   In your opinion, does loosely held

4    mean does not contact?

5              A.   That is not the way that I would

6    use language as we would normally use it,

7    because we can loosely hold an object and still

8    be in contact with it.  If I'm loosely holding a

9    cup, or a baseball or something that does not

10   mean that I'm not contacting.  In fact, it would

11   mean the contrary.

12             Q.   Do you recall Mr. Smith Gillespie

13   testifying that the element second supporting

14   portion does not contact is disclosed in Figure

15   13 of Fukayama?

16             A.   I believe I remember that

17   testimony.  Yes.

18             Q.   Let's look at Fukayama Column 11,

19   Lines 24 to 43.

20             If I said 11, actually I meant to

21   say Column 18, Lines 34 to 43.  Focusing

22   specifically on the last sentence of this

23   paragraph the one that says although this

24   embodiment is similar to the first embodiment

1    and so on and so forth.

2              Look at that sentence.  Do you see

3    this mention of Figure 1?

4         A.   Yes.

5         Q.   Okay.  Looking at Figure 1, does

6    Figure 1 show the side of the film that is

7    firmly fixed?

8         A.   Yes, it does.

9         Q.   Which side is that?

10        A.   That -- it's the side towards the

11   left in the drawing.  It's using that pin so

12   that that's firmly fixed and it's firmly fixed

13   using adhesive tape.

14        Q.   Is that ATP?

15        A.   Yes.

16        Q.   Okay.  Let's return to that last

17   sentence in Fukayama at Column 18, Lines 24 to

18   43.

19             How does -- this sentence say the

20   other sides of the optical film that are not

21   depicted in Figure 3.  How are they held?

22        A.   The other side can be loosely

23   engaged.

24        Q.   Now, continuing to look at that

1    last sentence, does this refer to BT as

2    replacing the column in the other loosely held

3    sides?

4            A.    That's how I would interpret that.

5            Q.    Do you recall Mr. Smith-Gillespie

6    testifying earlier about the Sakamoto reference?

7            A.    Yes, I do.

8            Q.    LGD 299?

9            A.    Yes, I do.

10           Q.    And what did Mr. Smith-Gillespie

11   rely on Sakamoto for?

12           A.    I believe it was for the rotation

13   of the display.

14           Q.    Did you discuss Sakamoto in your

15   expert report?

16           A.    I discussed it very briefly.

17           Q.    Is there an error in your report

18   with respect to Sakamoto?

19           A.    Since the '157 patent had already

20   talked about allowing or recognizing the

21   displays can be rotated as prior art, I did not

22   focus very much on Sakamoto, and I neglected to

23   observe that Sakamoto also allowed for the

24   rotation of a liquid crystal display.

1    Q.   Okay.  You mentioned that the '157

2    patent discloses describes rotatable liquid

3    crystal displays?

4    A.   Yes.

5    Q.   Could we have Column 1, Line 12 up

6    on the screen?

7    Is this the section you're

8    referring to in the background of the '157

9    patent?

10   A.   Yes, it is.

11   Q.   So the '157 patent acknowledged

12   that it was known to rotate screens?

13   A.   Yes.  And since the '157 patent

14   had already acknowledged that as background, I

15   did not do a thorough look at that patent and

16   missed the observation that it also included an

17   LCD.

18   Q.   Okay.  I'd like to switch gears.

19   Now, we heard a lot on Friday

20   about various supposed HP iPAQ devices.  Have

21   you inspected any HP devices in your work on

22   this case?

23   A.   Yes, I have.

24   Q.   Could we have AUO 1608 and AUO

1    1601 up on the screen?

2              How many -- how many HP devices

3    have you inspected in your work on this case?

4              A.    Total of three.

5              Q.    Okay.  With respect to this email

6    up on the screen, AUO 1608, did you inspect any

7    HP devices pursuant to this invitation by LG?

8              A.    This invitation was on April 20th.

9    I believe that pertained to one -- one

10   particular device.

11             I have inspected three devices

12   total.  They were all done at separate times.

13             Q.    Mm-hmm.

14             A.    And I'm not sure I can exactly

15   reconstruct which happened when.

16             Q.    Okay.

17             A.    But they were three separate

18   occasions for the inspections that were

19   permitted?

20             Q.    Okay.  And then what about the AUO

21   1601?

22             Does this relate to any inspection

23   that you performed of an HP device?

24             A.    Yes, it does.

```
 1                    Q.   And that was very recently, I take

 2        it?

 3                    A.   Yes, just in the last few days.

 4                    MS. HOLLOWAY:   AUO offers 1608 and

 5        1601 into evidence.

 6                    THE COURT:   Admitted.

 7    BY MS. HOLLOWAY:

 8                    Q.   When about all the other iPAQ

 9        devices that Mr. Smith-Gillespie says he

10        inspected, did you ever get a chance to inspect

11        any of those?

12                    A.   I have no knowledge of any other

13        devices that -- other than the three that have

14        just been mentioned.

15                    Q.   Did LG counsel depose

16        Hewlett-Packard in this case?

17                    A.   Yes, they did.

18                    Q.   Have you reviewed the transcript

19        of that deposition?  Could we have AUO 1606,

20        please?

21                    A.   I have reviewed that transcript.

22        Yes.

23                    Q.   Did LG counsel ask any questions

24        about the internal mechanical or electrical
```

1    design of the LCD modules to be used in iPAQ

2    products?

3              A.   I did not find any such question.

4              Q.   Did LG counsel ask any questions

5    about when any iPAQ product was sold?

6              A.   No.  I did not see any such

7    questions in there in the deposition transcript.

8              MS. HOLLOWAY:  AUO offers AU 1606

9    into evidence.

10             MR. GOODWYN:  Objection, Your

11   Honor.  I think in the beginning of this case,

12   we had suggested that transcripts be offered

13   into evidence to avoid the burden of having to

14   read them.  I believe your ruling was that

15   transcripts would be read in and the parties

16   would be charged time based on the amount of

17   transcript time, and now they're offering up

18   seven hours of deposition transcript in

19   evidence.

20             MS. HOLLOWAY:  Your Honor, we're

21   offering that merely for the evidentiary

22   objection and not for the truth of the matter

23   asserted.  So we're simply saying they had the

24   opportunity to question about the HP devices and

1    they did not.  So we want this for our evidence

2    objections only.

3                    MR. GOODWYN:  If they would like

4    to read in portions of the transcript, they're

5    certainly entitled to do so.

6                    THE COURT:  You can read it in for

7    that purpose.

8                    MS. HOLLOWAY:  Sure, Your Honor.

9    Okay.

10   BY MS. HOLLOWAY:

11                   Q.   Now, Mr. Smith-Gillespie talked

12   about some FCC documents.  Do you remember that?

13                   A.   I do.

14                   Q.   And were those documents mentioned

15   in his report?

16                   A.   They were not.

17                   Q.   Were you at his deposition?

18                   A.   I was.

19                   Q.   Did he mention anything about FCC

20   documents at his deposition?

21                   A.   Yes, he did.  I'm sorry, not at

22   his deposition.

23                   Q.   Okay.  Do you know when we

24   received the FCC documents from LG counsel?

```
 1              MS. HOLLOWAY:  And could I have

 2      AUO 1600 up on the screen?

 3  BY MS. HOLLOWAY:

 4              Q.  Did you look at the documents

 5      described by the Bates numbers on this letter?

 6              A.  I see the date May 22, 2009, and

 7      those appear to be the documents.  I personally

 8      did not see them until after Mr.

 9      Smith-Gillespie's deposition.

10              MS. HOLLOWAY:  Your Honor, we

11      offer AUO --

12              THE WITNESS:  I mean the

13      testimony, excuse me, in Court here.  We offer

14      AUO 1600 into evidence.

15              THE COURT:  It's admitted.

16  BY MS. HOLLOWAY:

17              Q.  Now, Mr. Smith-Gillespie testified

18      on Friday that the FCC certification of an HP

19      iPAQ device means that the design of the HP

20      device was not changed in any way or at least he

21      suggested that it means that.

22              Do you recall testimony to that

23      effect?

24              A.  I do recall that testimony.
```

1           Q.   Is that testimony reliable?

2           A.   I don't believe it is.

3                MS. HOLLOWAY:   Could we have AUO

4      1602 up on the screen?

5      BY MS. HOLLOWAY:

6           Q.   The document you've reviewed,

7      Dr. Silzars, is this?

8           A.   Yes.

9           Q.   Do FCC regulations permit

10     mechanical changes to certified devices?

11          A.   Based on the review of this

12     document, they do.  And specifically the

13     highlighted portion here, it says variations in

14     electrical and mechanical construction.

15               Other than these indicated items

16     are permitted provided the variations either do

17     not effect the characteristics required to be

18     reported to the Commissioner, and the

19     characteristics that they're talking about are

20     characteristics that pertain to transmission

21     that would perhaps cause some interference with

22     other signals.

23          Q.   Okay.  So would changing the

24     internal mechanical to learn how flexible PCs

1     are connected together, would that be permitted

2     under this section of the FCC we're looking at?

3               A.   My understanding is that would be

4     one of the changes that would not require

5     further approval.

6               MS. HOLLOWAY:  AUO offers AUO 1602

7     into evidence.  It's admitted.

8     BY MS. HOLLOWAY:

9               Q.   Did LG produce this section of the

10    FCC regulations as far as you know?

11              A.   As far as I know, they did not.

12              Q.   Could we change gears again?  I'd

13    like to bring up Exhibit AUO 1022.

14              Is this a document you've seen

15    before, Doctor?

16              A.   In an enlarged version we have in

17    front of us now, yes I recognize it.

18              Q.   And what is it?

19              A.   This is also an invention

20    disclosure form.

21              MS. HOLLOWAY:  We offer AUO 1022

22    into evidence.

23              THE COURT:  It's admitted.

24    BY MS. HOLLOWAY:

```
 1              Q.   Have you prepared a claim chart

 2     analyzing this invention disclosure form and

 3     comparing it to the claims?

 4              A.   Yes, I have.

 5              Q.   Could we have Exhibit 1604 up on

 6     the screen.   Was this claim chart, Doctor,

 7     attached to your expert report?

 8              A.   Yes, it was.   And the specific

 9     comparison is provided in the right-hand column

10     of several more pages in addition to this one.

11              MS. HOLLOWAY:   AUO offers AUO 1604

12     into evidence.

13              THE COURT:   It's admitted.

14              MS. HOLLOWAY:   No further

15     questions for this witness barring any rebuttal,

16     Your Honor.

17              THE COURT:   All right.   Thank you.

18              MR. GOODWYN:   Your Honor, is now

19     an appropriate time to take a break?

20              THE COURT:   Well, it is.   I have

21     to do a criminal ten-minute matter at four

22     o'clock.   If you have any time you want to take

23     up now or do you want to take a break.

24              MR. GOODWYN:   Can we just take a
```

```
 1        break now?
 2                    THE COURT:  Sure.
 3                    (A brief recess was taken.)
 4                    THE COURT:  All right.  Be seated,
 5        please.
 6                    CROSS-EXAMINATION
 7    BY MR. GOODWYN:
 8              Q.   Good afternoon, Dr. Silzars.
 9              A.   Good afternoon.
10              Q.   During your direction examination,
11        you put up a slide that I believe is on the
12        projector now.  Was the purpose of this slide to
13        try to demonstrate that the wiring density of LG
14        Display's accused products is lower than another
15        product?
16              A.   No.  The purpose for showing this
17        was to show that this was a very different
18        configuration, and should not be used in an
19        example that purports to demonstrate that dummy
20        patterns are not needed.
21                    What I was illustrating with this
22        particular graphic, which one thing you don't
23        see on this graphic is that this LT model on the
24        left is only a ten-inch display, but the
```

1   objective of showing this was that the wiring

2   structure is very different in this particular

3   model than the wiring structure that was used in

4   at least one of the products that was accused.

5          Q.   You say the wiring structure is

6   different.  You mean that the wiring structure

7   is thinner in the accused products?

8          A.   Just the spacing, the width in

9   particular, what we can see here on the left

10  that the wiring is much thicker in dimension, in

11  cross-section.  If the wiring is inherently

12  thicker in cross-section, there is a greater

13  allowable error that can be permitted in the

14  edges as far as the evenness of the etchant.  So

15  if you inherently have a, let's just call it a

16  fatter wire, if it's a fatter wire, than if you

17  have a greater tolerance in the manufacturing

18  process for problems such as undercutting and

19  what, of course one of the problems that has

20  been mentioned in the '629 patent that is being

21  solved by the configurations that are described.

22          So I wanted to illustrate that

23  this is not a simple comparison to show that LGD

24  products don't need dummy patterns.  They may

1    not need them in a particular configuration

2    which even in the one that said we do not have

3    them, we he have dummy patterns.

4           Q.   Dr. Silzars, did you create this

5    slide?

6           A.   I created the slide using the GDS

7    files, yes.

8           Q.   You reviewed the GDS file in

9    creating this?

10          A.   Yes, absolutely.

11          Q.   Did you review the entire GDS

12   file?

13          A.   I reviewed the pertinent file for

14   -- given that we had about one day to do this, I

15   reviewed the metallization layer.  I did not

16   review every layer in the entire GDS file.  And

17   this was done as an exemplary product.  There is

18   no conclusion intended here other than to say

19   the wiring is significantly different in

20   dimension in the illustrated product that

21   Dr. Rubloff put up as a way to show that we

22   don't need dummy patterns.

23          Q.   Dr. Silzars, given our limited

24   time, I'm going to ask that you listen to my

1    question and just answer my question.  Okay?

2              A.   I will try to do that, yes.

3              Q.   My question is:  Did you select

4    the product for reviewing the mask file, did you

5    select that particular mask file?

6              A.   There was no particular decision

7    process occurring to select the product.  You

8    said let's select one of the products that was

9    accused.

10             Q.   Did you review any of the other

11   accused mask files?

12             A.   No, I did not.

13             Q.   How much time did you spend

14   reviewing this mask file?

15             A.   We spent on this particular part

16   of the presentation, perhaps a total of two

17   hours.

18             Q.   Do you know what portion of the

19   product that this region comes from that you

20   have got on your display?

21             A.   It's one portion of the wiring.

22   The way that we did was simply scrolling up and

23   down on the computer screen and picking a sample

24   structure.

1    Q.   Okay.  Well, do you know, in fact,

2    that the portion you chose that's shown on your

3    exhibit, if we look over at the demonstrative,

4    was actually the portion very close to the

5    middle of the fan out and very close to the edge

6    of the array?

7         In fact, this is right before the

8    beginning of the pixel arrays; isn't that right?

9    A.   I wouldn't be able to correlate

10   those two at all right now.

11   Q.   Well, you looked at the mask file

12   yourself in creating those?

13   A.   Well, as I told you, when we were

14   creating this, it was for illustrative purposes

15   of the wiring thickness.  And we simply scrolled

16   up and down the mask file and picked a spot.

17   There was nothing more intended with this

18   example.

19   Q.   Do you know whether or not the

20   wiring is uniform throughout fan out?

21   A.   As looking through it, from top to

22   bottom, it appeared to be uniformed.  And when

23   I've done other examinations under the

24   microscope, it's certainly uniform.  So I have

1    no reason to think that it's otherwise.

2            Q.   Well, do you have any

3    understanding as to the length of the wiring

4    affecting the resistance of the wiring?

5            A.   Of course.

6            Q.   Okay.  So that if you want to --

7    if you have a longer wire, you need to actually

8    decrease the resistance overall potentially by

9    making it fatter; isn't that right?

10           A.   It's certainly dependent on a

11   particular situation.  If it's very well

12   current, higher resistance may be acceptable.

13   If there's a current that needs to be carried

14   that would -- that creates a significant voltage

15   drop, then that has to be taken into account.

16   Yes.

17           Q.   Okay.  Well, let me show you

18   another wiring printout from another portion of

19   the display.

20               Now, where you had a dimension of

21   around 9.8, if we go to another part of the

22   display, it actually -- the wires actually get

23   much closer in size to the space between the

24   wires, don't they?

1          A.   I don't know what you're showing

2     me or what part of the display you're showing

3     me.  I -- I can take your representation that

4     it's part of the same display.

5

6

7

8

9          That's the same one you chose,

10    isn't it?

11         A.   I think you can appreciate that I

12    cannot memorize that long string of numbers.  If

13    we put a side-by-side comparison, I have no

14    reason to -- yes.  I have no doubt that it can

15    be the same file.

16         Q.   It's the same one, isn't it?  And

17    it shows, in fact, --

18         A.   Yes.

19         Q.   -- that the wiring is different

20    than the wiring for the example or the -- what

21    you were trying to convey to the Court that the

22    wiring is further apart in the accused product,

23    but it's not, is it?

24         A.   No.  What I'm trying to convey to

1    the Court is simply that there are differences

2    in the wiring dimensions, and those differences

3    will affect whether one needs a dummy pattern or

4    not.

5         Q.   You chose a spot furthest away

6    from the edge of the fan out edge, and last week

7    you testified that the most important area were

8    these last wires, out of the end of the fan out.

9              Yet, you chose the part as far

10   away or just about as far away as you can get

11   from that point for your example, didn't you?

12        A.   As I said before, we're comparing

13   a 10-inch display to a display that's

14   considerably larger.  The 10-inch display has a

15   different layout, has a different wiring

16   pattern.

17             And my only objective of putting

18   the slide up there was to say there are

19   differences that do not allow a simple

20   conclusion to be made, that LGD does not meet

21   the dummy patterns.

22        Q.   Well, let's actually look at a

23   product that you said it was most important, the

24   last wires or the wires furthest out at the fan

1    out.  Let's look at the two products that you

2    put in your summary chart.

1

2

3          MS. HOLLOWAY:  Your Honor, if

4    counsel could put a question instead of standing

5    here testifying, we object to this.

6          THE COURT:  The objection is

7    noted.

8          Q.  It's not as different as you tried

9    to convey earlier, is it, Dr. Silzars?

10         A.  My point then and my point now is

11   -- first of all, not with any specific dimension

12   in mind.  My point then and my point now was

13   that we cannot make a comparison of simply

14   putting up a GDS file and coming to the

15   conclusion that I believe Dr. Rubloff was

16   implying that LGD does not need to use dummy

17   patterns.

18         My point in illustrating this is

19   that dummy patterns depend on many different

20   features and they depend on the wiring with --

21   they depend on the spacing, they depend on the

22   size of the display, how far apart the driver

23   chips are, and they of course depend on the kind

24   of metals that are used.  So I did not make any

1    conclusion about specific spacings or specific

2    dimensions other than to say they're different.

3    And indeed they are different.  And as we found

4    in the examples shown by Dr. Rubloff, indeed

5    they contain dummy patterns.

6           Q.   And one of the things that you

7    accused of being a dummy pattern was the LG

8    logo; isn't that right?

9           A.   That is a legitimate dummy

10   pattern, yes.  It takes up space and it's

11   covered with metal.

12          Q.   Would you agree, Dr. Silzars, that

13   this slide you presented earlier during your

14   rebuttal testimony, that it's actually not an

15   accurate representation of the density of the

16   wires for other product in the area of the edge

17   of the wiring that you accused was the most

18   important area?

19          A.   First of all, I will say one more

20   time, my only purpose for showing this --

21          Q.   No, Dr. Silzars.  My question is,

22   would you agree that the slide you used during

23   your direct is not an accurate representation of

24   the density of the wires at the outer most wire

1     of the fan out as shown in both of these

2     products?

3              A.   This is a representation of the

4     area that is shown in those figures.

5              Q.   And it's not the outer most wire,

6     is it?

7              A.   I would have to see the entire

8     structure to see it.

9              Q.   You created these, didn't you?

10             A.   As I said, we were simply scanning

11    through the region and picking a representative

12    example.

13             Q.   Do you know whether or not this is

14    near the pixel array, the area you chose?

15             A.   I would say -- no, at the moment I

16    really don't know.  I would have to look --

17             Q.   You have no idea what these

18    structures are, and you don't know the area you

19    chose; right?

20             A.   That was not the objective.  The

21    way we could tell what area we chose was to look

22    at the entire layout and identify that area.  I

23    did not feel the need to do that for my

24    illustrative example here.

1          Q.   But your illustrative example was

2    not something that was representative of the

3    wires at the edge of the display?

4          A.   I was not making an accusation, I

5    was pointing out a difference.

6          Q.   But the difference wasn't as great

7    as you implied it, was it?

8          A.   The difference is as great because

9    the entire display is much smaller.  We were

10   talking about a ten-inch display versus large

11   displays that are used for television.  That is

12   a significant difference.

13         Q.   The 15.4 is an accused product,

14   isn't it, the one here on the right?

15         A.   Yes.

16         Q.   That's not a large TV, is it?

17         A.   That's correct.

18         Q.   Now, on your direct you discussed

19   some testimony about Watanabe; is that right?

20         A.   That's correct.

21         Q.   Would you agree that Watanabe

22   discloses dummy patterns greater than thirty

23   percent of an area in accordance with your claim

24   constructions?

1           A.   In accordance with a part of the

2      claim construction.

3           Q.   In accordance with your claim

4      construction, also?

5           A.   Watanabe.  Well, the accused

6      claims require two layers.

7           Q.   I'm not asking that.  I asked you,

8      does it disclose the dummy pattern?

9           A.   You said in accordance with claim

10     construction.

11          Q.   In accordance with your

12     understanding of dummy pattern, does your

13     construction of dummy pattern require two

14     layers?

15          A.   For the accused claims, it does.

16     In general a dummy pattern --

17          Q.   I'm asking you does the dummy

18     pattern in Claim 1 require two layers?

19          A.    In general, a dummy pattern would

20     not require two layers.

21          Q.   Does Watanabe show a dummy pattern

22     comprising thirty percent of an area in

23     accordance with Claim 1, using your claim

24     constructions?

1     A.   Well, I think to clarify that,

2   perhaps you could put what you say is my claim

3   construction because I really have not made a

4   personal claim construction.

5          Q.   What is your claim construction?

6          A.   What we have that's been presented

7   here in the courtroom is an AUO proposed claim

8   construction, and an LGD proposed claim

9   construction, not one that's assigned to

10  Dr. Silzars.

11         Q.   Do you agree with AUO's claim

12  construction?

13         A.   I think if you want me to comment

14  on it, put it up on the board.

15         Q.   Do you recall what that claim

16  construction is?

17         A.   Not from memory.

18         Q.   You don't know whether you agree

19  with AUO's construction or LG Display's

20  construction?

21         A.   If we could put it up there, I

22  could verify that for you.

23         Q.   During your analysis, do you know

24  whether you agreed with AUO's claim construction

1    for dummy patterns?

2         A.   I believe that during my analysis

3    I did agree with that.  And I would be happy to

4    verify that for you if you put it up on the

5    board.

6         Q.   Now, this is another slide that

7    you spoke about.  It was marked as AUO 629-107.

8    And I believe you testified that this showed

9    dummy patterns.  I believe you were referring to

10   these regions at the top and bottom on the

11   left-hand side; is that right?

12        A.   That's correct.

13        Q.   These are actually the pads

14   directly above it, aren't they, the contact

15   pads?

16        A.   Yes.

17        Q.   Down here the contact pads?

18        A.   Given what we have up on the

19   screen right now, it's hard to see where the

20   dividing point is, but if we enlarge it, it's

21   relatively easy to see.  I don't know if we can

22   see it on this layout with enough resolution,

23   but we can certainly identify it if we enlarge

24   it a little further.

1          Q.   These are contact pads here;

2    right?

3          A.   They are -- yes, they are the

4    contacts that go to the wiring.

5          Q.   In fact, what you said were dummy

6    patterns are actually the same size and shape

7    and distance from the edge of the display as the

8    pads themselves; isn't that right?

9          A.   What do you mean by distance from

10   the edge of the display?  I'm not quite sure how

11   to interpret that part of your --

12         Q.   They're in the same location as

13   the pads, the pads and what you called the dummy

14   patterns were all from the same sentence from

15   the edge of the display?

16         A.   They're basically a continuation

17   of the contact pads.

18         Q.   In fact, what you have identified

19   as dummy patterns are not between the pads on

20   the edge of the array, are they?

21         A.   I simply identified them as dummy

22   patterns.

23         Q.   My question, Dr. Silzars, is are

24   what you identified as dummy patterns between

1    the pads and the edge of the array?

2         A.   They are between the edge of the

3    array and the wiring.  And the TFT array and the

4    edge of the array, yes.

5         Q.   Again, my question, Dr. Silzars,

6    are what you identified as dummy patterns

7    between the contact pads and the edge of the

8    array?

9              Yes or no?

10         A.   They are between where the contact

11    pads begin and the edge of the array.

12         Q.   They're not between the pads and

13    the array.  You're defining the start of the

14    pads as part of the between, aren't you?

15         A.   I think this is consistent with

16    the '629 patent.  When we drew the patterns

17    before, we can see in the '629 patent that that

18    is an area that is considered to be between in

19    the claim.  It does not --

20         Q.   Dr. Silzars, the claim says

21    between the pads in the array, doesn't it?

22         A.   Yes, it does.

23         Q.   Okay.  Dr. Silzars, you would

24    agree that on Page 52, Paragraph 187 during your

1    direct rebuttal testimony, you pointed to two

2    paragraphs describing your test set up; isn't

3    that right?

4           A.   I don't know what you're -- what

5    you mean by --

6           Q.   Can I see Page 52 of Dr. Silzars'

7    infringement expert report, starting at

8    Paragraph 187?

9           Okay.  These are the two

10   paragraphs that you identified during direct of

11   your rebuttal examination saying that this

12   explained your testing methodology; isn't that

13   right?

14          A.   Oh, okay.

15          Q.   It's your expert report?

16          A.   You're not talking about dummy

17   patterns anymore?

18          Q.   Now, I'm talking about the '160

19   patent.

20          A.   Thank you.  Yes.

21          Q.   Okay.  These are the only two

22   paragraphs in your entire report that talk about

23   your testing methodology, aren't they, test set

24   up?

1          A.   No, that's not correct.

2          Q.   Okay.  Well, I actually had to

3    spend, what, about an hour's worth of time at

4    your deposition getting the details of your

5    testing methodology, didn't I?

6          A.   That was by your choice.

7          Q.   Okay.  But the only way to get the

8    insight as to what you actually did, it wasn't

9    included in your report, I had to ask you about

10   it, didn't I?

11         A.   No.  I believe from even my direct

12   testimony earlier today, that there are several

13   other paragraphs that specifically talk about

14   testing methodology.

15         Q.   Okay.  Well, in Paragraph 187 when

16   you said you used a photosensor, does that

17   indicate whether or not you used a

18   phototopically calibrated photosensor?

19         A.   I already described in my direct

20   testimony that I used a photodiode that is a

21   linear sensor that responds directly to light

22   input and produces a linear output based on that

23   light input.  So, no, it is not correct.

24              And the only way to get such a

1       sensor is to have electronics -- a photodiode.

2                Q.   My question was:  Dr. Silzars, did

3       you identify in your expert report whether you

4       used a phototopically calibrated photosensor?

5                A.   I identified that I did not.

6                Q.   In your expert report?

7                A.   Yes.

8                Q.   It just says a photosensor.  It

9       doesn't say whether or not it's calibrated.

10               A.   As I described earlier, a

11      photosensor has no inherent calibrations that

12      that can be made to it.

13               Q.   Okay.  Dr. Silzars, would you

14      agree that the '160 patent is directed to the

15      amount of light perceived by the human eye?

16               A.   It is directed to an integrated

17      quantity of light as measured from the display.

18               Q.   Perceived by the human eye?

19               A.   The intent is that when it is

20      equal, that the perception of the human eye will

21      be that it is substantially equal.

22               Q.   My question, Dr. Silzars, is:   Is

23      the '160 patent directed to the amount of light

24      perceived by the human eye?

1        A.   Well, since this is dealing with

2   the display, of course, that is what we are

3   eventually trying to accomplish, that the human

4   eye perceives the light quantity of light that

5   is equal to the desired quantity of light.

6        Q.   Would you agree that the human eye

7   perceives brightness?

8        A.   Yes.

9        Q.   Okay.  Would you agree that the

10  human eye has a nonlinear phototopic response?

11       A.   The human eye has a variety of

12  special features.  We don't respond uniformly to

13  different colors.  We don't respond uniformly to

14  widely varying levels of light.

15            So you are discussing phototpic

16  versus scotopic; is that right?

17       A.   Can I finish my answer?

18       Q.   I'd prefer, Dr. Silzars, if you

19  just answered my question.  And my question was

20  simply:  Would you agree that the human eye has

21  a nonlinear phototopic response?

22       A.   When we are comparing two

23  quantities that are intended to be equal, equal

24  is not dependent on linearity.  Equal is equal

1     under -- whether it's linear or nonlinear.

2                    And the objective of this patent

3     is to create an equality, a near equality within

4     that range.  The eye is quite linear.

5              Q.   Dr. Silzars, I did not ask you

6     anything about the patent.  I asked you about

7     your understanding about how the human eye

8     operates.

9                    My question is:  Would you agree

10    that the human eye has a nonlinear phototopic

11    response to color?

12             A.   Well, over a wide range of

13    brightness levels speaking -- thinking of

14    looking directly into the sun and looking at an

15    object under starlight, the eye is nonlinear

16    because it adjusts for the brightness.

17                   But that's over an extremely wide

18    range.  That is not the range that we're dealing

19    with in a display.

20             Q.   For your optical testing would you

21    agree that LG Display's products use a photo or,

22    excuse me, for your optical testing of LGD

23    products, you used a photodiode from Tektronix

24    that was calibrated for linear response?

1                    I believe that's what you

2      explained earlier; isn't that right?

3               A.   It has a linear response.

4               Q.   You would agree that the

5      photodiodes you used measures energy and not

6      brightness?

7               A.   It measures amount of light and

8      presents a result as brightness.  It measures a

9      number of photons coming in and it converts

10     those to electrons.  When the area is the same,

11     when the measurement is done under the same

12     conditions, you're measuring the brightness.

13              Q.   But you're measuring energy,

14     because you're measuring the photons that are

15     being received.  I believe you testified earlier

16     that as these photons or the electron hole

17     pairs.

18                   So it's measuring energy; isn't

19     that correct?

20              A.   Under -- if you -- to talk about

21     energy, we now have to include wave length. We

22     have to include the area that's being measured.

23                   We have to include things that

24     aren't -- do not vary in this experiment.  When

1    we have a photometer, if I take a photometer

2    that measures in either candelas per meter

3    squared or foot-lamberts, which is exactly what

4    this photodiode is doing, except we're not using

5    those units.  When I point a photometer at the

6    stream, I will measure a brightness.  It will be

7    given in candelas per meters squared or

8    foot-lamberts. It's a number.

9                    That -- that is a brightness

10   level. It is not an energy level.  Energy is

11   something else that includes the area, includes

12   wavelength, includes other things that are not

13   pertinent to what we're measuring here.

14                    We are measuring brightness.

15   Brightness is measuring candelas per meter

16   squared or foot-lamberts.

17                    Q.   It's actually converting the

18   energy to a voltage level for the oscilloscope,

19   isn't it?

20                    A.   No.  It's converting a brightness

21   level to a voltage.

22                    Q.   And how is -- it's measuring the

23   brightness by the receipt of photons; isn't that

24   right?

1          A.    That's how a photometer works.

2          Q.    And the photon -- the amount of

3     energy is based on the number of photons

4     received?

5          A.    The amount of brightness.

6          Q.    Did you have your photodiodes

7     calibrated by a recognized agency before doing

8     your testing of the LGD products?

9          A.    What would you consider a

10    "recognized agency", because I don't know of

11    such.

12         Q.    Did you have your photodiodes

13    calibrated at all prior to testing of LG

14    Display's products?

15         A.    Yes, I did.

16         Q.    How did you personally calibrate

17    them?

18         A.    Yes.  I have a number of

19    photometers that are calibrated that produce

20    actually a like measurement in candelas per

21    meters squared or foot-lamberts.  Such

22    measurement devices are available and also

23    photodiodes that are produced by other

24    commercial entities such as Thor labs.

1    Q.   All you did was compare one

2    photodiode to another patent portfolio?

3    A.   The photodiode is inherently

4    linear.  I compared it to a calibrated

5    photometer, not to another photodiode.

6    Q.   Do you determine the experimental

7    error in your measurements for calculation of

8    time integration quantity of light?

9    A.   The reason that I produced the raw

10   data, I sent the exact waveforms that I was

11   capturing so that any expert could determine the

12   experimental error.

13   Q.   Dr. Silzars, I'm asking you did

14   you determine the experimental error of your

15   measurements in calculations for the time

16   integration quantity of light?

17   A.   The experimental error, the raw

18   data shows the waveforms.  It shows the actual

19   result.  The experimental error can be

20   determined by anyone reading that report.

21   Q.   Dr. Silzars, I'm going to ask you

22   again, would you please answer my question.  Did

23   you determine the experimental error of your

24   measurements and calculations for the time

1    integration quantity of light?

2             A.   The experimental error depends on

3    which levels we are looking at.  We can look at

4    the -- any particular waveform and I can tell

5    you what the experimental error is on that

6    waveform.  If you look at my graphs, you will

7    see that there is a range shown on all of the

8    lines.  I have two lines with a center line, on

9    both the baseline and the high line and also on

10   the waveform.  That is in effect an estimate of

11   the experimental error.

12            Q.   Dr. Silzars, I'm going to ask you

13   again, I'm not asking you whether you can

14   calculate the experimental error, I'm asking you

15   if you did calculate the experimental error?

16            A.   I just told you that I did because

17   it's on those graphs.  If we just look at one of

18   the pictures I will point out to you where the

19   experimental error was shown.

20            Q.   What was the experimental error of

21   your measurements?

22            A.   We have to look at the particular

23   graph.  It's different for every measurements

24   because it depends on the light level.

1          Q.   Can I see Mr. Eccles' direct LGD

2     160-034.

3               What I have got up here,

4     Dr. Silzars, are the proposed claim

5     constructions for ideal quantity of light in a

6     stationary state and time integration quantity

7     of a brightness change.  Do you see that?

8          A.   Yes.

9          Q.   Now, AUO has proposed that the

10    ideal quantity of light in a stationary state is

11    the quantity of light emitted by a pixel during

12    one time increment when the pixel is in a

13    nonchanging state; isn't that right?

14         A.   Yes.

15         Q.   And AUO proposed for the time

16    integration of a brightness change, a quantify

17    of light equal to the actual brightness level

18    output through a liquid crystal summed over a

19    time period including the rise and fall response

20    time of the liquid crystal.  Is that what it

21    says?

22         A.   That's what it says, yes.

23         Q.   Can I see 160-010.

24              Now, Dr. Silzars, you would agree

1    that the area that is cross hatched in this

2    exhibit includes a portion of the quantity of

3    light emitted by a pixel; isn't that right?

4          A.   Repeat that question.

5          Q.   The area that's cross hatched that

6    you omitted from your calculations for ideal

7    quantity of light includes or represents a

8    portion of the total quantity of light that's

9    emitted by a pixel?

10         A.   Yes.

11         Q.   Now, could I get 01-05, please.

12              Now, you would agree in a figure

13   used in Mr. Eccles' direct, that the cross

14   hatched area shaded in blue on the right-hand

15   figure below the curve represents the quantity

16   of light emitted by a pixel during one time

17   increment when the pixel is in a nonchanging

18   state, wouldn't you?

19         A.   In a steady state, is that what

20   you're asking, in a nonchanging state?

21         Q.   Correct, in a nonchanging state.

22         A.   There is a qualification here that

23   in a nonchanging state we would be looking at

24   the value of 75, and since we don't have a zero,

1    a black level indicated here, which was not

2    pertinent to the measurement, there would be a

3    light level that corresponds to the level of 75

4    if we establish where zero is.

5              Q.   You indicated that using the area

6    under the curve would result in a strange

7    result, I believe are the words you used; is

8    that right?

9              A.   I don't know if that's exactly the

10   word that I would use, but it's not applicable

11   to this patent.

12             Q.   I wrote it down because I was

13   interested in why you would consider it a

14   strange result.  Let me show you, give you a

15   hypothetical.  And I'm going to draw up real

16   quickly here.  If you assume that you start and

17   you're trying to determine the ideal quantity of

18   light, and you go from zero to 255, the ideal

19   quantity of light would be this area, the total

20   area under the curve, this cross hatched; is

21   that right?

22             A.   Could you change the magnification

23   on the Elmo.

24             Q.   In fact I can.  You can't see that

```
 1    very well.  Here you go.  Is that right?
 2            A.   Okay.  For one frame which I
 3    presume we're referencing, yes.
 4            Q.   For one frame?
 5            A.   Yes.
 6            Q.   Now, based on the way you
 7    calculated the ideal quantity of light for the
 8    measurement of LG Display's products, if you
 9    were to start at 255 and go down to zero, based
10    on your measurement technique, the ideal
11    quantity of light for turning a product off
12    would be the same as the ideal quantity of light
13    for turning a pixel full on, isn't that right?
14    Doesn't that seem like a strange result?
15            A.   No, because what the patent
16    describes is that time integration quantity of
17    brightness change the simple quantity of light
18    --
19            Q.   I'm not talking about --
20            MS. HOLLOWAY:  Objection, Your
21    Honor.  Let the witness finish his answer.  He
22    keeps interrupting the witness.
23            THE COURT:  Don't speak to
24    directly to counsel.
```

1          Q.   Dr. Silzars, I'm talking about

2     ideal quantity of light.  Based on your

3     measurements, if you were to have done a test

4     from zero to 255, you would have chosen or

5     calculated an ideal quantity of light equal to

6     the rectangle that's shaded.  Similarly, if you

7     did a test running from 255 to zero, you would

8     have calculated an exact same amount of ideal

9     quantity of light; isn't that right?

10         A.   Because the change is the same in

11    each case.  One case it's going from dark to

12    light, the other case it's going from light to

13    dark, our eye perceives the same effect.

14         Q.   So the ideal quantity of light of

15    turning a pixel off is the same as the ideal

16    quantity of light as turning a pixel on?

17         A.   For calculating the brightness

18    change, of course it is.

19         Q.   Now, if I could get Mr. Eccles'

20    direct, LGD 160-011.

21              Now, you would agree, wouldn't

22    you, Dr. Silzars, that the portion that's shaded

23    in the figure on the right, the cross hatched

24    area under the curve represents a portion of the

1     quantity of light output through a liquid

2     crystal; isn't that right?

3            A.   Yes.

4            Q.   May I get 016, from Mr. Eccles'

5     direct.

6                 Now, you would agree that in a

7     figure on the right, the area under the curve

8     that's shaded in green represents the quantity

9     of light equal to the actual brightness level

10    output through a liquid crystal summed over a

11    time period including the rise and fall time of

12    the liquid crystal, wouldn't you?

13           A.   That does -- it's not a comparison

14    to anything that we're dealing with in the

15    patent, but there is a light level that could be

16    assigned to that.

17           Q.   I would like to ask you a couple

18    of quick questions about the '157 patent.

19              And if I could get his expert

20    report, rebuttal report, paragraphs 14 to 18.

21    Now, if I can get the heading and paragraphs 14

22    and 15.

23             You would agree with me, wouldn't

24    you Dr. Silzars, that you did not offer an

1     opinion in your expert report that US Patent

2     7,380,972 to Shimizu does not meet all the

3     limitations of Claim 1 of the '157 patent; is

4     that correct?

5          A.   I would have to review my report

6     to be able to verify that for you.

7          Q.   What you see in front of you for

8     photograph 14 and 15, you didn't say anything,

9     did you?

10          A.   I'm not sure what you put up here.

11     Is this part of my report?

12          Q.   Yes, it is.

13          A.   Okay.  I did not hear you tell me

14     that.  And your question, please repeat your

15     question.

16          Q.   You do not offer an opinion as to

17     whether or not Shimizu discloses each and every

18     limitation of Claim 1 of the '157 patent, do

19     you?

20          A.   That is because of my

21     understanding that it was not prior art, so I

22     did not feel the need to offer an opinion.

23          Q.   Again, if he could have the Elmo

24     again, please.  I would like to show you what's

1    been marked as LG Display Trial Exhibit 1095,

2    which is the first page of the PCT publication.

3    Have you reviewed this document before?

4              A.   I can't -- it's a blur, so I am

5    not sure what we're looking at here.

6              Q.   Well, if we look up in the top

7    right, this is Shimizu; isn't that right?

8              A.   That I can read.

9              Q.   If we look at the figures, those

10   are Figures 1A and 1B from the Shimizu patent;

11   is that right?

12             A.   Since they're on this page, I'm

13   assuming that's correct, yes.

14             MR. GOODWYN:   Your Honor, at this

15   time I would like to offer into evidence LG

16   Display Trial Exhibit 1095 which is the PCT

17   patent.

18             THE COURT:   It's admitted.

19   BY MR. GOODWYN:

20             Q.   Could I get the direct slide from

21   Mr. Smith-Gillespie which is 506-013.

22             These are three -- or photographs

23   of three different devices, an HP iPAQ 2210,

24   another HP iPAQ 2210, and another HP iPAQ 2215.

1   These photographs represent the three products

2   you reviewed, don't they?

3           A.   I reviewed three products, but I

4   cannot represent to you just by looking at the

5   photographs if those are the products.  And I

6   also -- I've had questions about what products

7   are they actually identifying because on some of

8   the products there was -- I could not find a

9   product number, so if these are indeed the three

10  -- and the reason I'm bringing that up as a

11  question is because Mr. Smith-Gillespie

12  apparently reviewed many others, but if these

13  are the -- you tell me that these are the three,

14  then I would accept that as fact.

15          Q.   Well, the photograph on the

16  left-hand side, there is some annotations.  Is

17  that your handwriting?

18          A.   It appears to be, yes.

19          Q.   The structures shown in all these

20  photographs with respect to the '506 patent are

21  the same, aren't they, first flexible printed

22  circuit board, second flexible printed circuit

23  board, third flexible printed circuit board, all

24  soldered?

1    A.   I think to be precise we should go

2    through the claim terms, but in a rough sense,

3    yes, they are certainly very similar.

4    Q.   You would agree that each and

5    every one of the elements shown in the figure on

6    the left, each of the elements of Claim 1 are

7    disclosed in the HP iPAQ 2210 photograph on the

8    left; isn't that right?

9    A.   You said Claim 1.

10    Q.   Yes.

11    A.   Yes, I believe they are.

12    Q.   And you would agree that the two

13    elements on the flexible printed circuit boards

14    where you've identified the alignment marks

15    connects to the LED; isn't that right?

16    Carries light signals?

17    A.   Yes.

18    Q.   And you would agree that these

19    products are hot bar soldered?

20    A.   Yes.

21    Q.   If I could see the photograph of

22    506-011.

23    MR. GOODWYN:  I need one second.

24    (Following a discussion held off

1      the record:)

2                  MR. GOODWYN:  Can I have the elmo,

3      please?

4   BY MR. GOODWYN:

5          Q.   Okay.  Do you know whether what's

6      shown on the board now is a picture that you

7      took when you examined the -- one of the

8      products?

9          A.   It's -- I believe it is.  It's

10     certainly very similar to a picture that I took.

11         Q.   Well, if we look at this

12     photograph, and it's actually with the

13     production number AUO-LGD 0166676.  Do you see

14     that at the bottom right-hand corner?

15         A.   Yes, I do.

16         Q.   That was a photograph produced by

17     AUO in this case, which I believe was one that

18     you took or --

19         A.   Yes, looking at the background, I

20     believe it's the conference table.  And just

21     based on that, I would say it's the photograph I

22     examined just a day or two ago.

23         Q.   Okay.  You see on this product

24     where it says product number FA103A?

1          A.   I do see that.  Yes.

2          Q.   Did you review any HP sales data

3     produced by Hewlett-Packard in this case?

4          A.   I did not.  there was some --

5     there was some information that was being

6     represented as sales data shown to me during my

7     deposition.  I can't verify what that -- what

8     that document was.

9          Q.   Do you recall seeing entries that

10    referred to FA103A in that sales data?

11         A.   Not as I sit here right now.

12              MR. GOODWYN:  Could I have the --

13    one last question -- from Mr. Smith-Gillespie,

14    506-011.

15    BY MR. GOODWYN:

16         Q.   Would you agree that overlapping

17    alignment marks are shown in the photograph that

18    you took and marked as alignment marks in --

19    overlapping alignment marks within the context

20    of the asserted claims?

21         A.   I would agree that there are

22    alignment marks.  Yes.

23         Q.   Would you agree that they're

24    overlapping alignment marks?

1          A.   It's hard to tell that from

2     looking at just the photograph.

3          Q.   Can you zoom in on the portion

4     that's -- actually zoom in on just the portion

5     that he has identified as alignment marks.

6               Right here.  Right there where

7     those circles are, can you tell now whether or

8     not it has overlapping alignment marks?

9          A.   Yes.

10         Q.   It does?

11         A.   I believe so, yes.

12              MR. GOODWYN:  No more questions.

13              Oh, I'd like to offer into

14    evidence the unfortunately not very good figure

15    I threw on the elmo, but it's marked LG Display

16    Trial Exhibit 1096.

17              THE COURT:  It's admitted.

18              MS. HOLLOWAY:  I'm sorry, Your

19    Honor.  No redirect.

20              THE COURT:  Okay.  Thank you.  You

21    may step down.

22              MR. DIETZEL:  Your Honor, our next

23    witness for AUO is a gentleman named Kuang-Tao

24    Sung, and he's going to require translators.  So

1    if we can go ahead and get them set up and then

2    call him in.

3                    MR. SHULMAN:  We are near the

4    bitter end, Your Honor.

5                    MR. DIETZEL:  Do you mind if I

6    hand out binders?

7                    THE COURT:  That's fine.

8                    THE CLERK:  Please state and spell

9    your full name for the record.

10                   THE WITNESS:  Kuang-Tao Sung.

11   K-U-A-N-G T-A-O S-U-N-G.

12                   THE CLERK:  Do you prefer to swear

13   or affirm?

14                   THE WITNESS:  Affirm.

15                   THE CLERK:  Okay.  Do you affirm

16   that the testimony that you're about to give to

17   the Court in the case now pending will be the

18   truth, the whole truth and nothing but the

19   truth?

20                   THE WITNESS:  Yes.

21                   THE CLERK:  Thank you.

22                   MR. DIETZEL:  May I proceed, Your

23   Honor?

24                   THE COURT:  Yes.

1    BY MR. DIETZEL:

2              Q.   Mr. Sung, please introduce

3    yourself to the Court.

4              A.   May name is Kuang-Tao Sung.

5    Currently working for AUO in the Shingzu

6    facility.

7              Q.   How long have you worked for AUO?

8              A.   Since the year of 2000 until this

9    time, approximately eight years.

10             Q.   Okay.  And have you ever worked in

11   AUO's audio-video product group?

12             A.   Yes.  Since 2000 to 2006, I'm

13   responsible for cellular phones, and portable

14   devices and the small LCDs.

15             Q.   Okay.  Can we have Exhibit AUO

16   0011?

17             Mr. Sung, do you recognize this

18   document?

19             A.   Yes.  I do recognize it.  This is

20   the '506 patent invented by Jun-Hsian Lao and

21   myself.

22             Q.   When did you come up with the

23   ideas described in the '506 patent?

24             A.   Approximately late 2002 or early

1      2003.

2              Q.   And are you aware of any

3      documentation reporting your early work on the

4      concepts described in the '506 patent?

5              A.   Yes.  We do have some mechanical

6      drawings to prove.

7              Q.   Okay.  Can we have Exhibit AUO

8      1545, please?

9                   Mr. Sung, do you recognize this

10     document?

11             A.   Yes.  I do recognize it.  This is

12     a mechanical drawing of a transmitter card FPC.

13             Q.   Do you know when these drawings

14     were created?

15             A.   You can tell from the upper

16     right-hand corner of this.  It was created

17     before January 15th, 2003.

18             Q.   Is there a particular set of

19     images in Exhibit AUO 1545 that captures the

20     concept of the '506 patent as of January 15th,

21     2003?

22             A.   Yes.  You can tell from the front

23     view, rearview and detailed view of this

24     drawing.

1    Q.   Okay.  Can we have Slide SS-101?

2         And, Mr. Sung, are these the front

3    and rearview of the main FPC you identified in

4    AUO 1545 that we just discussed?

5    A.   Yes.

6    Q.   Can you please describe for the

7    Court what is indicated in each of A through C?

8    A.   Yes, I can.

9         B is what connects to the LCM end.

10   And C is the end that connects to the system

11   end.

12        A is the embodiment of the FPC.

13   It is used to transmit signals back and forth in

14   between B and C.

15   Q.   If we could have slide SS-102,

16   please.

17        And, Mr. Sung, is this the detail

18   of the back light and touch panel contact pads

19   you've identified in Exhibit AUO 1545 that we

20   just discussed?

21   A.   Yes.

22   Q.   Can you describe to the Court,

23   please, what is indicated in each of D through

24   G?

1           A.   Okay.   D is the soldering contact

2      pad.   It is used for touch panel FPC.

3                E is a soldering contact pad for

4      the use for the LED backlight FPC.

5                F and G are alignment marks

6      respectively for the use of the touch panel as

7      well as the LED backlight.   In this design, we

8      use holes as alignment marks.

9           Q.   If we could have Exhibit AUO 1546,

10     please.

11                Do you recognize this document,

12     Mr. Sung?

13          A.   This is a mechanical drawing of a

14     touch panel.

15          Q.   Do you know when these drawings

16     were created?

17          A.   You can tell from the upper

18     right-hand corner of this drawing.   This drawing

19     was created before January 22nd, 2003.

20          Q.   And is there a particular set of

21     images in Exhibit AUO 1546 that capture the

22     concepts in the '506 patent as of January 15,

23     2003?

24          A.   Yes.   They can be seen in the

1       front view and detail view of this picture.

2              Q.   Can we have slide SS-103, please.

3       And are these images the front view of the touch

4       panel assembly and the contact pad detail you

5       identified in AUO 1546 that we just discussed?

6              A.   Yes.

7              Q.   Can you describe for the Court,

8       please, what is indicated in each of the labels

9       H through K?

10             A.   Yes, I can.

11                  H is the embodiment of the touch

12      panel.  I is the touch panel FPC used to

13      transmit touch panel signals.  J is the

14      soldering contact pads.  They will be soldered

15      onto the corresponding areas of the transmitter

16      card FPC.  K is the alignment mark which we left

17      there.  In this design, we used a hole as the

18      assignment mark.

19             Q.   Can we please have Exhibit AUO

20      1544.

21             A.   Okay.

22             Q.   Mr. Sung, do you recognize this

23      document?

24             A.   This is a mechanical drawing of an

1    LED backlight FPC.

2            Q.   Do you know when these drawings

3    were created?

4            A.   You can tell from the upper

5    right-hand corner of this drawing it was created

6    before January 27, 2003.

7            Q.   And is there a particular set of

8    images in Exhibit AUO 1544 that capture the

9    concepts in the '506 patent as of January 15,

10   2003?

11           A.   Yes, you'll be able to see them on

12   the front view and the detailed view of this

13   drawing.

14           Q.   Can we have slide SS-104, please.

15   Are these the front view of the light source

16   assembly and the contact pad detail you

17   identified in Exhibit AUO 1544 that we just

18   discussed?

19           A.   Yes.

20           Q.   Can you describe for the Court

21   what is indicated in each of the labels L

22   through O, please?

23           A.   L is a part of the backlight

24   structure.  M is the FPC used for transmitting

1    the signals that is needed by the backlight.  N

2    is the soldering contact pad used to solder on

3    to the corresponding areas on the transmitter

4    card FPC.  O is alignment mark.  Over here we

5    used a hole as alignment mark.

6             Q.   You mentioned alignment holes.

7    How are those used?

8             A.   The operator will use a pin to

9    position the first FPC.  And then the operator

10   will use the pin to position the hole on the

11   second FPC.  Through the pin the holes on the

12   two FPCs and the soldering pads will be aligned

13   and overlapped.  And then the operator will

14   proceed with the soldering process.

15            Q.   Can I have AUO 1544, please.

16            Did you ever use alignment marks

17   other than alignment holes?

18            A.   Yes.  You can tell from this

19   drawing, you can tell from this drawing on both

20   sides of the soldering contact pads, there are

21   some T-shaped pads.  Over here we used a contact

22   pads as alignment marks.  Corresponding to the

23   first FPC there would be corresponding alignment

24   marks as well.

1          Q.   Was a product with the concepts of

2     the '506 patent ever made?

3          A.   Yes.  In July of 2003, we made

4     some products.

5          Q.   How do you know there were

6     products made by July 2003?

7          A.   You can tell from the upper

8     right-hand corner where the instructions were on

9     the transmitter card FPC drawing.

10         Q.   Can you bring up AUO 1545, please.

11    Blow up the box in the upper right.  Third line

12    from the bottom.  Is this the line you were

13    referring to, Mr. Sung?

14         A.   That is correct.

15         Q.   Did these samples include

16    alignment marks?

17         A.   Yes, there are.  The alignment

18    marks on these samples were expressed with

19    holes.

20         Q.   Did you ever make samples or

21    prototypes with contact pads as alignment marks?

22         A.   Yes.  Yes.

23              You can tell from the drawing we

24    had just viewed earlier, which were the

1    touch-panel FPC as well as the LED back light

2    FPC.  You can tell that there were drawings

3    there.

4              We had used contact pads as

5    alignment holes.

6              THE INTERPRETER:  Excuse me.

7    Interpreter correction.  We had used contact

8    pads as alignment marks.

9  BY MR. DIETZEL:

10             Q.  What types of soldering are used

11   by AUO to assemble products incorporating

12   concepts described in the '506 patent?

13             A.  At AUO, the soldering method that

14   we used there were -- there are two types.  One

15   type is manual soldering.  The other type is

16   machine soldering.

17             Q.  From the design perspective, is

18   there a reason to choose manual soldering over

19   machine soldering?

20             A.  From the perspective of a

21   designer, either machine soldering or manual

22   soldering -- either machine soldering or manual

23   soldering, they provide the two FPCs that needed

24   electrical connection and mechanical connection.

1                        To a designer, there are no

2       differences.

3                        Q.   For the prototypes in sample

4       products that were shipped in July 2003, how had

5       the FPCs bonded together?

6                        A.   They used machine soldering.

7                        Q.   And the prototypes that you built?

8                        A.   We used manual soldering on the

9       prototype.

10                       Q.   Can we have Exhibit AUO 0235?

11                       Mr. Sung, do you recognize this

12      document?

13                       A.   Yes.  I can recognize it.

14                       This is the invention disclosure

15      for the; 506 patent.  This disclosure

16      represented by us approximately around December

17      of 2003.

18                       Q.   Can you tell me what's disclosed

19      in this document?

20                       A.   This document disclosed everything

21      that we had just discussed.

22                       Q.   If we can turn to Page 5 of this

23      exhibit, please.  Can you tell me what's

24      described here?

1        A.   Over here it describes two of the

2   methods in order to -- connect the FPCs.  It

3   indicates that it uses -- the first one says

4   soldering process is used in order to connect

5   the two FPCs.

6            THE INTERPRETER:  Interpreter

7   correction.  The witness had just indicated

8   method four indicates that soldering process is

9   used in order to connect the FPCs.

10           At AUO, we use a heated head and

11  soldering material.  We solder by using either a

12  manual soldering or machine soldering.

13           The second method would be method

14  number five indicated on this document.  It

15  describes using ACF in order to connect the two

16  FPCs.

17  BY MR. DIETZEL:

18       Q.   Okay.  Can we have AUO 1545?

19           And can you tell me if there was

20  any work being done on this project between

21  January and December 2003?

22       A.   Yes.  This document gives a very

23  detailed description, which you can tell from

24  the upper right-hand corner.  From January

1       through November or December, we had made many

2       revisions.  All of those were for the testing

3       and also revision for the '506.

4               Q.   Okay.  And do you recall when the

5       first application for patent was filed for you

6       and Mr. Lao's idea?

7               A.   In December of 2003, we presented

8       the invention disclosure to AUO internally.

9       Around February of 2004 or so, we passed the

10      internal examination and evaluation process of

11      AUO.

12              It was April 2004 or so, it was

13      submitted to the Taiwanese relevant agency.

14              Q.   Do you recall when your

15      application for patent was filed in the United

16      States?

17              A.   As I recall, it was approximately

18      around August of 2004 or so.

19              MR. DIETZEL:  Your Honor, before

20      passing the witness, I'd like to offer into

21      evidence stuff that we looked at today.

22              AUO 0235, and AUO 1022, which is

23      an English translation of 235.

24              I'd also like to offer AUO 1544,

1      AUO 1545 and AUO 1546 into evidence.

2                    And in addition, Slides SS-101 as

3      AUO 1611.

4                    SS-102 as AUO 1612.

5                    SS-103 as AUO 1613.

6                    SS-104 as AUO 1614.

7                    THE COURT:  All right.  They'll

8      all be admitted.

9                    MS. BRZEZYNSKI:  Your Honor, can I

10     reserve an objection as untimely.

11                   THE COURT:  Yes.

12                         CROSS-EXAMINATION

13     BY MS. BRZEZYNSKI:

14            Q.   Good afternoon, Mr. Sung.

15            A.   Hi.  Good afternoon.

16            Q.   Do you understand that AUO served

17     an interrogatory answer in this case in

18     September of 2008 saying that the conception

19     date for the '506 was December of 2003?

20            A.   I'm not aware.

21            Q.   Do you understand that AUO also

22     served an interrogatory answer in 2008 in

23     September saying that the '506 was

24     constructively reduced to practice by April 19,

1      2004?

2                A.   I'm not aware.

3                Q.   Let me go ahead and show you Trial

4      Exhibit 1089, please.  This is AUO's

5      interrogatory response from September of 2008.

6      Let's go to page three, please.  Do you see the

7      statement the '506 was conceived at least by

8      December 16, 2003?  Do you see that, sir?

9                A.   Yes.  But I cannot really say that

10     I understand the meaning of what it's saying

11     here.

12               Q.   That's fine.  Let's go to the next

13     page, please.  Do you see the top line, the '506

14     was constructively reduced to practice by April

15     19, 2004.  Do you see that, sir?

16               A.   I do understand the date, but I do

17     not quite understand the meaning of the writings

18     before that.

19               Q.   Are you saying that AUO never

20     discussed its interrogatory answer in September

21     of 2008 with you?

22               A.   I do not quite understand.  What

23     do you mean by discussed?

24               Q.   Did anyone at AUO speak with you

1    regarding its interrogatory answer in September

2    of 2008?

3            A.   No.

4            Q.   Let's go to the next page.  Do you

5    see that is dated September of 2008?

6            A.   Yes.

7            MS. BRZEZYNSKI:  Your Honor, I

8    would like to move into evidence Trial Exhibit

9    1089, please.

10           THE COURT:  It's admitted.

11   BY MS. BRZEZYNSKI:

12           Q.   Do you understand that AUO never

13   supplemented or changed its interrogatory answer

14   until Wednesday, June 3rd, 2009?

15           A.   I'm not aware.

16           Q.   Do you understand that AUO now

17   says that the conception date for the '506 was

18   eleven months earlier in January of 2003?

19           A.   I do not know.

20           Q.   Let's show the '506 patent,

21   please.  The application for this patent was

22   filed on August 19th, 2004; correct?

23           A.   Yes.

24           Q.   The foreign application date was

1    also in 2004; correct?

2              A.   Yes.

3              Q.   In fact, it was April 19, 2004;

4    right?

5              A.   Are you talking about the foreign

6    portion, 2004 in April?

7              Q.   Yes, the portion that's

8    highlighted.

9              A.   Yes.  You mean the Taiwan portion?

10             Q.   Yes.  That was filed on April

11   2004; correct?

12             A.   Yes.

13             Q.   Let's go ahead and show you your

14   invention disclosure statement, that's AUO 1022.

15   You signed this form; right?

16             A.   Can you enlarge the lower

17   left-hand corner, please.  It doesn't look very

18   clear to me, therefore, I am not very certain.

19             Q.   Let me go ahead and give you my

20   copy, sir.

21             MS. BRZEZYNSKI:  Your Honor, may I

22   approach?

23             THE COURT:  Yes.

24   BY MS. BRZEZYNSKI:

1          Q.   Here you go.  Is that your

2     signature on the bottom?

3          A.   Yes, it is my name.

4          Q.   Is it standard practice at AUO to

5     wait eleven months after an invention to prepare

6     an invention disclosure statement?

7          A.   At AUO, we actually encourage to

8     make sure and confirm that the concept is valid

9     before we would submit an invention disclosure.

10         Q.   But the standard practice at AUO

11    is to prepare the invention disclosure very

12    close in time to the invention; isn't that

13    correct?

14         A.   I did not know the practice of

15    other people, but in my department, including

16    myself and my colleague, you have to make sure

17    of your invention, which is valid before you can

18    proceed further.

19         Q.   So are you saying that you did not

20    appreciate that you had an invention until

21    December of 2003?

22              THE INTERPRETER:  May the

23    interpreter ask that the question be read back?

24              MS. BRZEZYNSKI:  Sure.

1          (The reporter read back as

2     instructed.)

3          THE WITNESS:  No, what I said was

4     that I had this idea in or about late 2002 or

5     early 2003.  We went through some time for

6     testing and we also thought about what are the

7     other ways that can make the production and

8     manufacturing more efficient.

9          A.   Ultimately, at a later time, we

10    wrote it down on the invention disclosure form.

11         Q.   And inventors at AUO are

12    compensated for preparing and submitting

13    invention disclosure forms; correct?

14         A.   Yes, approximately anti dollars

15    500.

16         Q.   And inventors are also compensated

17    for an invention that results in the filing of a

18    patent application; correct?

19         A.   To submit; no.

20         Q.   Inventors at AUO get paid not only

21    for the invention disclosure form, they also get

22    paid for the filing of a patent application;

23    isn't that correct?

24         A.   I don't know what is being done

1   currently, because it has been a long time since

2   I wrote any.  But back in that time, no, we did

3   not have any.

4          Q.   All right.  Do you have any reason

5   to doubt the testimony of Spencer Yu?

6          A.   I do not know what his testimonies

7   are, so therefore, I'm not able to answer that

8   question.

9          Q.   Mr. Yu testified that inventors at

10  AUO get paid not only for submitting the

11  invention disclosure form, but also the patent

12  application.

13         A.   So?

14         Q.   Do you have any reason to doubt

15  hit testimony, sir?

16         MR. SHULMAN:  I don't want to

17  interrupt, but by my calculation, their time

18  expired a few minutes ago.

19         MS. BRZEZYNSKI:  Your Honor, I

20  would request the Court's indulgence.  I had

21  understood on Friday from counsel that this

22  witness would not be a translated deposition.

23         So we had allocated approximately

24  15 minutes for cross, which is what it would

1    have been.  But now that it's translated,

2    obviously it's taking much longer.

3              In addition, given that this is a

4    surprise witness, we request the Court's

5    indulgence and request an additional 15 minutes.

6              MS. HOLLOWAY:  Your Honor, I'd

7    like to respond to that.  It is not true.

8              Counsel asked me whether or not

9    the witness would testify with a translator.  I

10   said I did not know.  I wasn't sure how good his

11   English was.  We would certainly have a

12   translator brought in.

13             They deposed him with a

14   translator.

15             MS. BRZEZYNSKI:  That is certainly

16   not my understanding from our conversation on

17   Friday.

18             THE COURT:  Okay.  You have a few

19   more questions.

20             MS. BRZEZYNSKI:  I have about ten

21   minutes more, Your Honor.

22             THE COURT:  I don't want to go

23   past.  If you do have a couple questions you

24   really want to zero in on, I'll let you ask two

1          or three questions.  Then we'll wrap it up.

2                         Two or three best questions.

3                         THE INTERPRETER:  The interpreter

4          has not yet interpreted the last response.

5                         MS. BRZEZYNSKI:  Okay.  Could I

6          have the response?

7                         THE INTERPRETER:  He's in the

8          legal department.

9     BY MS. BRZEZYNSKI:

10                    Q.   You had your deposition taken in

11         this case; correct?

12                    A.   Yes.

13                    Q.   And at your deposition, you did

14         not testify that the conception date for the

15         '506 was January 15th, 2003, did you?

16                    A.   That is correct, because your

17         people did not ask me.

18                    Q.   And the documents that you were

19         shown on the screen today, you did not -- you

20         did not raise those documents with LG Display

21         counsel during your deposition; correct?

22                    A.   My job at that time was to be a

23         witness.  Therefore, I was not aware that that

24         was supposed to be my job.

```
 1              Q.   You never informed LG Display's

 2      counsel that your conception date was, in fact,

 3      January of 2003; isn't that right?

 4              A.   They did not ask; therefore, I did

 5      not mention it.

 6              Q.   During your deposition, you

 7      testified that in manual soldering, no pressure

 8      should be applied by the operator; correct?

 9              MR. SHULMAN:  Your Honor, we're

10      now onto a new subject.  You said two or three.

11      This is number five.

12              MS. BRZEZYNSKI:  Your Honor, I

13      just have a few more questions I'm trying to ask

14      the witness.

15              THE COURT:  Well, just get to

16      them.  Just ask them and get his answers.

17              MS. BRZEZYNSKI:  Okay.

18              THE COURT:  Two questions.  One,

19      two.  I am trying to get down to two questions.

20              A.   At my deposition, yes, that is

21      what I said.  Because the attorney who asked me

22      the question he never indicated how much of a

23      pressure.

24              Q.   In fact, you said no pressure,
```

1    isn't that correct?  Do I have to show you your

2    deposition testimony?

3            A.   That is correct.  For instance, if

4    you press on this piece of paper like this, it's

5    not considered adding pressure.

6            Q.   You were shown slides referring to

7    Model H027QT01 and those products were sold in

8    the United States -- excuse me, were sold by AUO

9    in 2003; correct?

10           THE COURT:  That's the last

11   question.  Relax.

12           THE WITNESS:  I did not see the

13   document, therefore, I do not know.  And also I

14   do not work for the sales department, I'm an

15   inventor.  And also questions like these may be

16   better to be posed to our sales department

17   personnel.

18           Q.   So you're not --

19           THE COURT:  That's it.  We're not

20   going to have time to hear from the salespeople.

21           MR. BONO:  Your Honor, just two

22   little housekeeping matters.

23           THE COURT:  Let me make sure, are

24   there any exhibits you want to admit?

```
 1              MS. BRZEZYNSKI:  Your Honor, I

 2    would like to admit the AUO sales information

 3    that I just put up, and that LG Display 407.

 4              THE COURT:  It's admitted.

 5              MR. SHULMAN:  Your Honor, we have

 6    some housekeeping matters that we over the

 7    weekend reviewed everything that was referred to

 8    during the trial and realize that certain

 9    exhibits hadn't been offered and that's what we

10    want to do now if that's all right.

11              THE COURT:  Yes.

12              MR. SHULMAN:  Ms. Morgan will

13    handle that.

14              MS. MORGAN:  Thank you for your

15    patience, Your Honor.  So beginning --

16              THE COURT:  Did you have any other

17    -- I see you holding another exhibit?

18              MR. BONO:  Before she goes into --

19    I just have two items.  I would like to offer

20    LGD Trial Exhibit 1092 which is a list of our

21    technical reports that are taken from Exhibits

22    399, 401 and 403.  And I would like to move for

23    the admission of this list as well as the

24    underlying documents.
```

```
 1              THE COURT:  That will be admitted.
 2              MR. BONO:  And then just house --
 3    and then as part of the deposition designations,
 4    Your Honor, there I would like to move LG
 5    Exhibit 1093 which is the signed errata sheet by
 6    Mr. K.H. Moon, and that's Exhibit 1093.
 7              And then I would like to move also
 8    Exhibit LGD Exhibit 1094 which is the errata
 9    sheet of Mr. C.J. Kim.  I would like to move
10    those into evidence.
11              THE COURT:  Admitted.
12              MR. GOODWYN:  Your Honor, real
13    quickly, there were a couple of slides that were
14    used during the cross-examination of
15    Dr. Silzars, they were printouts from LG
16    Display, Trial Exhibit 380, and I would like to
17    mark those printouts as LG Display Trial Exhibit
18    109 seven and there was one more slide that
19    Dr. Silzars used on his direct, which was marked
20    as 629-110, and I would like to offer that as
21    Exhibit LG Display Trial Exhibit 1098.
22              THE COURT:  It will be admitted.
23              Now you're on.
24              MS. CAPLAN:  In addition just to
```

1    clarify the record, we would like to move for

2    admission the actual mask files, the printout

3    was admitted as LGD Trial Exhibit 1079 with

4    actual mask file from LGD Trial Exhibit 380

5    which is TV_P6_LC320W01_B6_T6CWOWC06_G0005.gds.

6    I would like to move those to be admitted.

7             In addition we like to move for

8    the actual mask file NBPC_P2_10.4_SVGA_G0005.gds

9    which is taken from LGD Trial Exhibit 380.  The

10   printout was already admitted as LGD Trial

11   Exhibit 1080.  We would like to move for the

12   admission of the actual mask file.  In addition

13   --

14             THE COURT:  All right.  It's

15   admitted.

16             MS. KAPLAN:  Thank you, Your

17   Honor.  In addition there was a list in

18   Dr. Rubloff's witness binder contains 46

19   items -- those are 46 mask files that

20   Dr. Rubloff testified that he reviewed.  We

21   would like that list to be marked as LGD Trial

22   Exhibit 1099.

23             THE COURT:  Admitted.

24             MS. CAPLAN:  And all the mask

1    files on there to be admitted as well.  In

2    addition to the printouts of those mask files

3    which were also in Dr. Rubloff's binder, we can

4    just mark this as 1099-1 and so on through 46 to

5    coincide with printouts from the binder.  Does

6    that make sense?

7                    THE COURT:  They'll be admitted.

8                    MS. CAPLAN:  In addition there are

9    two printouts at the end of the binder that were

10   not numbered which we would like to move for

11   their admission as well and those are printouts

12   of the following mask files, C7160VA01.GDS which

13   is Cell: 60LAY_PNL_$49 and the mask file is from

14   Trial Exhibit 380.

15                    We'd also move for the admission

16   of the printout of C7160VA01.gds, which is

17   Cell:LAY_PNL that is also taken from the LGD

18   Trial Exhibit 380 as well.

19                    In addition, Your Honor, on June

20   3rd, we moved to admit LGD Trial Exhibit 862,

21   which is the file history for the '157 patent.

22   The transcript -- the transcript, however,

23   reflected the admission of 682, and I would just

24   like to have that corrected that we actually

1    move for the admission of 862.  Perhaps we

2    misspoke.

3                    THE COURT:  Correction noted.

4                    MS. CAPLAN:  On June 4th we moved

5    to admit LGD Trial Exhibit 1085, which were the

6    demonstratives from Mr. Eccles and LGD -- and I

7    just wanted to be clear it was 1085 to the 1058

8    as noted at least once in the transcript.

9                    THE COURT:  Okay.  It's noted.

10                   MS. MORGAN:  We reserve our

11   objections with respect to LGD's exhibits.

12                   THE COURT:  Sure.

13                   MS. MORGAN:  So for the few

14   corrections beginning with today's testimony,

15   during the Dr. Silzars' testimony, we move to

16   admit the following exhibits that were used.

17                   AUO 1538, AUO 1586, AUO 1587, AUO

18   1593, AUO 1594, AUO 1601, AUO 1608.

19                   Then --

20                   THE COURT:  They'll be admitted.

21                   MS. MORGAN:  Thank you, Your

22   Honor.  Then we seek to admit AUO 62, which was

23   read in concurrently with deposition transcript

24   testimony on the -- day one of trial.

```
 1              We also seek to admit AUO 63 for
 2     the same reason.  AUO 65 for the same reason.
 3     And AUO 67.
 4              In addition, we seek to admit AUO
 5     80.  This was used in the deposition of Qui
 6     Young Moon, which was read in the transcript and
 7     was also used in the cross-examination of
 8     Mr. Smith-Gillespie.
 9              We also seek to admit AUO 85.
10     That was read into the transcript during
11     deposition testimony as well.  Same with AUO 86,
12     AUO 87, and AUO 88.
13              And AUO 162, AUO 176, AUO 218, and
14     then we seek to admit the following exhibits.
15              THE COURT:  They will all be
16     admitted.
17              MS. MORGAN:  Thank you, Your
18     Honor.  We seek to admit the following exhibits,
19     because they are translations of admitted
20     exhibits.
21              AUO 130, AUO 132, AUO 134, AUO
22     136, AUO 138, AUO 140, AUO 142, AUO 144, AUO
23     146, AUO 148, AUO 150, AUO 152, AUO 154, AUO
24     158, AUO 161, AUO 165, AUO 168, AUO 170, AUO
```

1    172, AUO 174, AUO 177, AUO 179, and AUO 185.

2              And then we seek to admit exhibit

3    AUO 180 as the underlying original document

4    after translation that was already admitted.

5              THE COURT:  All right.  They'll be

6    admitted.

7              MS. BRZEZYNSKI:  LG Display

8    reserves its objections.

9              MS. MORGAN:  And then we seek to

10   admit AUO 251, which was used in the deposition

11   testimony of Mr. Woo.  We just need to correct

12   the transcript.  The transcript reflects AUO 51

13   and it should be 251.  This was on day two of

14   the transcript.

15             THE COURT:  That will be

16   corrected.

17             MS. MORGAN:  Thank you, Your

18   Honor. Then a similar correction, also from day

19   two, the transcript reflects that AUO 52 was

20   entered, but it should be AUO 252.

21             THE COURT:  All right.  That will

22   be corrected.

23             MS. MORGAN:  Thank you, Your

24   Honor.

1          Then we seek to admit AUO 283,

2    which was an exhibit used during the direct

3    examination of Dr. Putnam.  The record needs to

4    be corrected from day three of that testimony,

5    because the numbers were transposed.  It was a

6    typographical error.

7               THE COURT:  All right.

8               MS. MORGAN:  Then we seek to admit

9    AUO 288, which was discussed during the direct

10   examination of Dr. Putnam on day three and AUO

11   289, which also is discussed during the direct

12   examination of Dr. Putnam.

13               In addition, Your Honor --

14               MR. CHRISTENSON:  We'll reserve

15   all our objections on those exhibits.

16               MS. MORGAN:  We also seek to admit

17   AUO 305, AUO 311, AUO 327, because they are

18   translations of admitted exhibits.

19               THE COURT:  All right.

20               MS. MORGAN:  Then we ask to admit

21   AUO 451.  It was -- AUO 47 was listed on AUO

22   1532.  1532 lists the documents Dr. Silzars

23   relied upon for the '506 patent.

24               But that was a typographical

1    error.  So AUO 47 will be moved to admit those

2    underlying exhibits.  AUO 47 should be AUO 451.

3                    THE COURT:  All right.

4                    MS. MORGAN:  And for the same

5    reason, I'm going to read what was there and

6    what should be there.

7                    So what AUO 372 should be -- I'm

8    sorry.  AUO 485 should be AUO 372.  AUO 486

9    should be AUO 373.

10                   AUO 488 should be AUO 375.  AUO

11   491 should be AUO 395.  And AUO 491 should be

12   AUO 395.

13                   And then AUO 496 should be AUO

14   404.  AUO 499 should be AUO 407.

15                   AUO 500 should be AUO 408.  And

16   AUO 506 should be AUO 419.  The prints were

17   submitted as exhibits, and we're relacing those

18   with the native files is what this does.

19                   Then, Your Honor, we -- so I

20   request that all those be admitted.

21                   THE COURT:  I'm not -- when you

22   say that you're replacing them, I'm not sure I

23   understand.  Isn't that going to affect the

24   transcript and the witness' testimony?

1          MS. MORGAN:  Actually these

2    documents were submitted as exhibits.

3          Let me start over.  We moved to

4    admit an exhibit that Dr. Silzars relied upon

5    regarding the '506 patent, and it lists a number

6    of exhibits there.  And then we moved to admit

7    those underlying exhibits.

8          And so we're seeking to admit --

9    we're seeking to admit the native files.

10          THE COURT:  What are those

11    numbers?

12          MS. MORGAN:  We are seeking to

13    admit the native files that relate to those

14    exhibits.

15          THE COURT:  I guess, but...

16          It's not my transcript, and it's

17    not my record, but...

18          MS. MORGAN:  Your Honor, then I

19    would just request that they be admitted in

20    addition to.

21          THE COURT:  No, you can admit

22    them.  But how would I put this?  You may get be

23    getting a record that could be confusing.

24          MS. MORGAN:  I understand, Your

1      Honor's concern.

2                    THE COURT:  It's not my concern.

3      I'm not appealing.

4                    MS. MORGAN:  I understand.  We'll

5      ask that they just be admitted in addition to.

6                    THE COURT:  Okay.

7                    MS. BRZEZYNSKI:  Your Honor, LG

8      Display would like to note its objection for the

9      record.

10                    MS. MORGAN:  So for clarity, I'll

11      just read real quick the exhibits that are

12      narrative files.  It is AUO 419, AUO 451, AUO

13      372, AUO 373, AUO 375, AUO 395, AUO 404, AUO

14      407, AUO 408, AUO 419.

15                    And then, Your Honor, there is

16      just a couple more, a few more.  We request to

17      admit AUO 444.  It was identified -- there is a

18      typographical error in Dr. Silzars' Exhibit

19      1532.  The identified exhibit in 1532 is 357 and

20      it should be 444.

21                    THE COURT:  All right.

22                    MS. MORGAN:  And the same thing

23      for -- in that same exhibit, it identifies AUO

24      553, and that should be AUO 539.  Those are --

1    so AUO 553, that is within Exhibit AUO Exhibit

2    1534 should be AUO 539.

3              MR. BONO:  Can I ask just one

4    clarification.  Did we overrule the correction

5    of those other documents and you just move

6    the --

7              MS. MORGAN:  Just the.

8              MR. BONO:  So there will be no

9    correction for purposes of the transcript?

10              MS. MORGAN:  Correct.

11              MR. BONO:  Thank you.

12              MS. MORGAN:  Thank you.

13              AUO Exhibit 284 was admitted

14    during the direct examination of Dr. Putnam and

15    we would like to admit two exhibits underlying

16    that were listed in that exhibit, it is AUO 703

17    and AUO 704.

18              THE COURT:  All right.  Admitted.

19              MS. MORGAN:  We would also like to

20    admit AUO 858 and AUO 859, these were both

21    identified on Dr. Silzars' list considered for

22    the '629 patent as LGD interrogatory responses

23    and I'm just supplying the exhibit numbers for

24    those.  That is AUO 858 and AUO 859.

1          THE COURT:  All right.

2          MS. MORGAN:  And we would like to

3   admit AUO 963.  This exhibit was used in the

4   direct examination of Boru Chen.  The record

5   reflects that what was admitted was the Exhibit

6   629, and that's an error, it should be 963.

7          THE COURT:  All right.  That will

8   be corrected.

9          MS. MORGAN:  Then we would like to

10  admit Exhibit 964.  This exhibit was referenced

11  in the direct examination of Boru Chen.

12         THE COURT:  It will be admitted.

13         MS. MORGAN:  And we would like to

14  admit the following certifications for

15  translations that are admitted exhibits.  They

16  are AUO 983, AUO 984, AUO 985, AUO 986, AUO 988.

17         Then, during day four in the

18  cross-examination of Mr. Smith-Gillespie an

19  exhibit was entered referenced as Exhibit C-14.

20  The trial exhibit number for AUO for that is AUO

21  1082, we seek to have it admitted under that

22  number.

23         THE COURT:  All right.  It will be

24  admitted.

1        MS. MORGAN:   AUO 1529 we seek to

2   have admitted as it's Dr. Silzars' CV, which

3   provides a summary of his direct examination

4   testimony regarding his background.

5        THE COURT:   It will be admitted.

6        MS. MORGAN:   And then we seek to

7   admit AUO 1542 which was exhibit to the In Duk

8   Song deposition that was read into the record on

9   day one.

10       We also seek to admit AUO 1543

11   which is a license between CMO and Sharp which

12   was one of the licenses Dr. Putnam considered

13   and it was inadvertently left off an exhibit

14   that contained a number of licenses which we

15   moved for admission on.

16       THE COURT:   That will be admitted.

17       MS. MORGAN:   Then there are

18   slides, Your Honor, that we would like to have

19   admitted as exhibits.   AUO 1619 are the slides

20   from Dr. Lao's direct examination.

21       AUO 1620 are slides from

22   Mr. Cheng's direct examination.   AUO 1597 are

23   the slides from Dr. Putnam's direct examination.

24   AUO 1616 are the slides from Dr. Silzars' direct

1    examination regarding the '629 patent.  AUO 1615

2    are slides from Dr. Silzars' direct examination

3    regarding the '160 patent.  AUO 1618 are slides

4    from Dr. Silzars' direct examination regarding

5    the '506 patent.  AUO 1617 are slides from

6    Dr. Silzars' direct examination regarding the

7    '157 patent.

8              And then lastly, we ask that a

9    physical exhibit that was used in day one, AUOP

10   1494 be admitted.

11             THE COURT:  All right.  They'll be

12   admitted.

13             MS. MORGAN:  Thank you.  And then

14   lastly, Your Honor, we would just like to

15   request because these exhibits contain the

16   confidential information of third party --

17             MR. SHULMAN:  Why don't we do that

18   in written form.

19             MS. MORGAN:  We will.

20             MR. SHULMAN:  Your Honor, what

21   we're going to just -- we've throw a lot of

22   stuff at you in the last ten minutes or so.

23   Mr. Bono and I were conferring, and once all the

24   dust settles, we're going to go over the

1    transcript.  They have done a great job, I have

2    been reading the transcript, there are some

3    typos and we'll agree on typographical

4    corrections stipulate to that.

5              And when we come up with an agreed

6    upon official, official, official exhibit list,

7    so that you guys don't have to do all that work

8    and figure out is this in, is it not, what's

9    happened here.  So we will put that in along

10   with the briefing at the appropriate time.

11             THE COURT:  All right.

12             MR. BONO:  Your Honor, I would

13   suggest that if it's all right with AUO's

14   counsel that both sides stipulate and reserve

15   the right to move the admission of any exhibits

16   that have not already been moved in and that we

17   can all reserve our rights to do that at some

18   point rather than trying --

19             THE COURT:  You can do that.  We

20   have been reading the transcript also as the

21   case goes along, so the transcript is really the

22   guidepost of what has been put into evidence.

23   And I think we talked about before the trial

24   started that a witness had to testify about an

1    exhibit in some manner for it to be admitted.

2            Now, we're allowing a lot of

3    backup apparently to come into the record.  But

4    I'm not sure that it's something we'll be

5    looking at.

6            MR. SHULMAN:  If no one explained

7    the document, I don't know how we're going to be

8    able to make arguments unless it's some negative

9    inference, because, for example, I think they

10   just moved the admission of some of their expert

11   reports and it's hearsay as of now, it doesn't

12   come in for truth.  But we may want to rely upon

13   that in order to prove up some evidentiary

14   objection like the man never said boo about X,

15   therefore, he should have been precluded from

16   testifying about it at the trial because he

17   never offered an opinion on.  They'll be used

18   for opinions like that.

19            But I agree, unless someone

20   testifies about a document, we can't make much

21   use of it.

22            THE COURT:  That's the only

23   caution I wanted to provide you.  So when the

24   decision gets written, it's pretty much taking

1    exhibits that have meaningfully testimony, tying

2    that testimony to some possible incorporation in

3    the exhibit.  But a long, deep record may not be

4    helpful for you.

5              MR. SHULMAN:  Probably what I

6    would suggest, and I can talk it over, I don't

7    want to take up everybody else's time, it's

8    already 6:30.  Once the briefing is in, and we

9    cite to whatever we cite to in our briefs, then

10   probably the record ought to be whatever we cite

11   to in our briefs.

12             MR. BONO:  I don't agree with

13   that, Your Honor.  And I don't know if

14   Mr. Shulman was inferring something in his

15   statement, but I certainly understand fully what

16   Your Honor is explaining about the practicality

17   of the burden on the Court in making a decision

18   --

19             THE COURT:  No.  See it's not a --

20   I always get concerned that what went on in the

21   courtroom isn't clear.  So when we draft an

22   opinion, we track that transcript and exhibits

23   that came in under a witness, and like I'm not

24   even sure, because all the exhibits that -- when

1    you talk about like translated exhibits, I mean,

2    I don't know what they're translated to and

3    from.

4              But just to have a deep exhibit

5    list isn't going to help you at least here

6    because we're going to track the transcript.  So

7    I'm just trying to tell you that when you write

8    the proposed findings of fact and the

9    conclusions of law and the argument, that's the

10   the tracking you ought to do.

11             Now, I understand Mr. Shulman's

12   point that well, if there has been some

13   testimony outside of the notice of the expert

14   report and we've got the report in, apparently

15   you have admitted some expert reports, we might

16   take a look at that, comparing it to the

17   argument and then, you know, making a comment

18   about it in the transcript.

19             But then that's a very limited

20   purpose.  But when I hear all these numbers and

21   all these descriptions of exhibits, I'm sure

22   there is enough clerks in your law firms from

23   the Federal Circuit and having been there a

24   couple of times, they don't look at them.

```
1              MR. SHULMAN:  I agree, Your Honor.

2      I think everybody was trying to be safe than

3      sorry.

4              THE COURT:  And that's okay.

5              MR. SHULMAN:  They're probably

6      over safe.

7              THE COURT:  And that's okay.  I

8      just don't want you to think that I'm going to

9      look at all those exhibits.

10             MR. BONO:  Your Honor, I

11     understand exactly what you're saying.  And I

12     think the purpose of just putting in all these

13     exhibits is neither side wants to have it turn

14     up that there is some fact, isolated fact that's

15     not supported by some record evidence.

16             THE COURT:  Here is where I'm

17     going to help you.  Instead of having all that

18     valuable legal talent wasted on that effort,

19     because I would probably let you have it in

20     later anyway if it's that one critical document

21     that was missed, it's a bench trial, it's not

22     like we're going to get a verdict and everybody

23     is going home and we're left, this is still a

24     work in progress, sort of.  So if you find
```

1    something like that, I'll let it in the record,

2    absent some extraordinary undue prejudice, which

3    I imagine would be hard to establish given the

4    nature of the case and what you have put on

5    already.

6              But I would be more focused on --

7    well, what I said in the transcript and what

8    exhibits have been passed around, flashed up,

9    because that's what we have been tracking, and

10   we'll probably utilize -- sort of like in the

11   old days when somebody would say can you have

12   discovery, give them a key to the room or the

13   building, let them go wherever they wanted to go

14   in there, but I don't do that.

15             So but I think you understand what

16   I'm saying, so you'll track your papers so that

17   you'll be able to argue where I made the mistake

18   when you get to the next level.

19             MR. SHULMAN:  Your Honor, we have

20   the good fortune of being able to go home now.

21   Unfortunately he doesn't.  But it's been a

22   pleasure trying the case.  We enjoyed it.

23             THE COURT:  We enjoyed having you.

24             MR. SHULMAN:  And you guys should

1    have fun next week or the week after.

2                    THE COURT:  It's always enjoyable

3    and we like having you here.  We're going to

4    start up on the 16th.  We'll be getting a little

5    order again to set out what you have to do and

6    the times.

7                    There is going to be a little bit

8    of adjustment because I have I think on one day

9    a Markman hearing, like at four o'clock or 4:30

10   in the afternoon, so I'm going to accommodate

11   that.  I might start you earlier or go later

12   another day.  So you don't have to worry about

13   any of this, you're going to be back to sunny

14   California.

15                   MR. SHULMAN:  That's right.

16                   THE COURT:  Thank you.

17                   (Court recessed at 6:31 p.m.)

18

19

20

21

22

23

24

1    State of Delaware )
                      )
2    New Castle County )

3

4

5                    CERTIFICATE OF REPORTER

6

7         I, Heather M. Triozzi, Registered

8    Professional Reporter, Certified Shorthand Reporter,

9    and Notary Public, do hereby certify that the

10   foregoing record, Pages 1322 to 1510 inclusive, is a

11   true and accurate transcript of my stenographic notes

12   taken on June 8, 2009, in the above-captioned matter.

13

14        IN WITNESS WHEREOF, I have hereunto set my

15   hand and seal this 8th day of June, 2009, at

16   Wilmington.

17

18

19        _____

20        Heather M. Triozzi, RPR, CSR
          Cert. No. 184-PS
21

22

23

24